IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, GUTHRIE ABBOTT, CATHERINE BURNELL, STEVEN QUEYROUZE, JAIME ALEXIS ARROYO BORNSTEIN, and JUAN C. OLANO, on behalf of themselves and all others similarly situated, | § § § § § § § § | |
| *Plaintiffs,* | § § | Civil Action No. _____ |
| v. | § § | JURY TRIAL DEMANDED |
| TRUSTMARK NATIONAL BANK, HSBC BANK PLC, THE TORONTO-DOMINION BANK, SG PRIVATE BANKING (SUISSE) S.A., and BANK OF HOUSTON, | § § § § § § § | |
| *Defendants.* | § § | |

## NOTICE OF REMOVAL

Defendants Trustmark National Bank ("Trustmark"), The Toronto-Dominion Bank ("TD Bank"), and Bank of Houston ("BoH") (collectively, the "Removing Defendants") hereby jointly notify this Court that they are removing the above-captioned civil action, currently pending in the 129th Judicial District Court of Harris County, Texas, to the United States District Court for the Southern District of Texas, Houston Division. The Removing Defendants invoke four independent grounds for removal: (1) the Class Action Fairness Act of 2005 ("CAFA"), Pub L. No. 109-2, 119 Stat. 4 (2005); (2) the Edge Act, 12 U.S.C. § 611 *et seq.*; (3) the existence of an Amended Receivership Order dated March 12, 2009, in which a federal district court for the Northern District of Texas has assumed exclusive jurisdiction over certain of the claims and causes of action asserted herein; and (4) federal question jurisdiction, 28 U.S.C. §1441(a)-(b).

## PLEADINGS AND PROCEEDINGS

1.     On August 23, 2009, Plaintiffs filed a four-count putative class action petition against five banks: Trustmark, TD Bank, BoH, HSBC Bank PLC ("HSBC"), and SG Private Banking (Suisse) S.A. ("SGPB Suisse") (collectively, "Defendant Banks").  On October 9, 2009, Plaintiffs filed a First Amended Petition (hereafter, "Amended Petition").  The state court case is styled *Rotstain, et al. v. Trustmark National Bank, et al.*, Cause No. 2009-53845 ("State Court Action").

2.     In compliance with 28 U.S.C. § 1446(a) and Local Rule 81, a copy of all process, pleadings, and orders served in the State Court Action, along with the docket sheet, an index of matters being filed, and a list of counsel, including addresses, telephone numbers and parties represented, are attached hereto as Exhibit A.

3.     Defendants BoH and TD Bank were the first of the Defendant Banks to be served in this action.  BoH and TD Bank were both served with a Summons and the Amended Petition through their registered agents for service of process on November 4, 2009.  Trustmark's registered agent for service of process was served with a Summons and the Amended Petition on November 5, 2009.  This Notice of Removal is filed within thirty days of the simultaneous service of the Summons and Amended Petition as required by 28 U.S.C. § 1446(b).  However, the Removing Defendants note that defendants are not bound by the thirty day time period set forth in 28 U.S.C. § 1446(b) when removing under the Edge Act.  *See Hill v. Citicorp*, 804 F. Supp. 514, 516 (S.D.N.Y. 1992).  Rather, defendants may remove any time before trial.  *See* 12 U.S.C. § 632; *Hill*, 804 F. Supp. at 516.

4.     None of the other Defendant Banks have been served with a Summons and the Amended Petition.  Therefore, their consent to removal is not required.  *See Getty Oil Corp. v.*

*Ins. Co. of N. Am.*, 841 F.2d 1254, 1263 (5th Cir. 1988) (stating that all *served* defendants must join in the petition).  In any event, consent to removal is unnecessary under CAFA, 28 U.S.C. § 1453(b).

## NATURE OF ACTION

5.     The Amended Petition purports to state claims on behalf of persons allegedly defrauded by Antiguan-based Stanford International Bank, Ltd. ("SIBL"), part of the Stanford Financial Group controlled by R. Allen Stanford (collectively, "Stanford"), against correspondent banks that collected and transferred funds for SIBL.  According to the Amended Petition, Stanford perpetrated "a massive fraud in which Stanford misappropriated billions of dollars, falsified SIBL's financial statements, and concealed their fraudulent conduct from customers, prospective customers, and regulators in the United States and elsewhere."  Am. Pet. ¶ 31.  Plaintiffs have not named SIBL, SFG, R. Allen Stanford, or any other Stanford entity as a defendant in this action; rather, Plaintiffs filed suit against the five Defendant Banks with which SIBL may have maintained accounts.

6.     Plaintiffs define the putative class to include "all individuals who, and entities that, as of February 16, 2009, were customers of SIBL, with monies on deposit at SIBL and/or holding CDs issued by SIBL."  Am. Pet. ¶ 23.

7.     Counts One, Two, and Three purport to state claims under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), Tex. Bus. & Com. § 24.001, *et seq.*, seeking to avoid "fees and other monies" allegedly collected by the Defendant Banks for providing banking services to Stanford and SFG.  Am. Pet. ¶¶ 80-97.

8.     Count Four purports to state a claim against the Defendant Banks for allegedly conspiring and/or aiding and abetting the alleged fraud of Stanford on the theory that the Defendant Banks knew or should have known of the alleged fraud.  Am. Pet. ¶¶ 98-148.

9.     Plaintiffs seek (1) certification of the class, (2) an order avoiding the alleged fraudulent transfers, (3) an award of compensatory damages alleged to be in excess of $7 billion for the class, and (4) an award of attorneys' fees and costs.  Am. Pet. at 38 ("Request for Relief").

## VENUE

10.     The Southern District of Texas, Houston Division, embraces Harris County, the place where the State Court Action is pending.  Consequently, for purposes of this notice of removal, venue is proper in this district and division under 28 U.S.C. § 1441(a).

## JURISDICTION

11.     This case is removable for the following independent reasons:

## A.     JURISDICTION UNDER CAFA

12.     This Court has diversity jurisdiction under CAFA, 28 U.S.C. §§ 1332(d), 1441, and 1453, and all other applicable bases for removal within CAFA.  "Under CAFA, subject to certain exceptions and exclusions, a defendant may remove a class action to federal court if: (1) minimal diversity exists; (2) the aggregate amount in controversy exceeds $5,000,000; and (3) the proposed class includes more than 100 people."  28 U.S.C. §§ 1332(d) & 1453; *see also Werner v. KPMG LLP*, 415 F. Supp. 2d 688, 694 (S.D. Tex. 2006).  All of these requirements are met in the present case.

13.     This action is a "class action" because Plaintiffs bring this action under a "rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."  28 U.S.C. § 1332(d)(1)(B); *see also* Am. Pet. ¶¶ 23-30.

## 1.     <u>Minimal Diversity</u>

14.     Generally, "minimal diversity" means "the existence of at least *one* party who is diverse in citizenship from one party on the other side of the case."  *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 577 n.6 (2004) (emphasis in original).  CAFA specifies that minimal diversity exists where "(A) any member of a class of plaintiffs is a citizen of a State different from any defendant; (B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or (C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state."  28 U.S.C. § 1332(d)(2).

15.     For individuals, "the state where someone establishes his domicile serves a dual function as his state of citizenship."  *Preston v. Tenet Healthsystem Memorial Medical Ctr., Inc.*, 485 F.3d 793, 797 (5th Cir. 2007).  A "citizen or subject of a foreign state" refers "to those aliens or foreigners who are citizens or subjects of some specific foreign state."  *Blair Holdings Corp. v. Rubinstein*, 133 F. Supp. 496, 500 (S.D.N.Y. 1955).  "For purposes of diversity jurisdiction, only the American nationality of a dual national is recognized."  *Coury v. Prot*, 85 F.3d 244, 247 (5th Cir. 1996).

16.     "[A] corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."  28 U.S.C. § 1332(c)(1).  "A corporation incorporated in a foreign country is a citizen of that country for

purposes of diversity jurisdiction." *Panalpina Welttransport GmBh v. Geosource, Inc.*, 764 F.2d 352, 354 (5th Cir. 1985).

17.     As pleaded by Plaintiffs, Plaintiff Peggy Rotstain is a citizen of Peru residing in Peru; Plaintiff Catherine Burnell is a citizen of the United Kingdom residing in Antigua; Plaintiff Steven Queyrouze is a citizen of Louisiana residing in Louisiana; Plaintiff Jaime Alexis Arroyo Bornstein is a citizen of Mexico residing in Mexico; and Plaintiff Juan C. Olano is a citizen of Florida residing in Florida. *See* Am. Pet. ¶¶ 6-11.  Upon information and belief, Plaintiff Guthrie Abbott is a citizen of Mississippi residing in Mississippi.  With respect to the class generally, the Plaintiffs allege that the "fraud was based upon the collection of billions of dollars from unsuspecting victims in the United States, Canada, Mexico, Colombia, Peru, Venezuela, and elsewhere in the world."  Am. Pet. at 2 ("Preliminary Statement").  Thus, Plaintiffs allege that the named class members are citizens or subjects of various States and foreign states.

18.     As pleaded by Plaintiffs, Defendant TD Bank is a banking corporation incorporated in Canada, with its principal place of business in Canada; Defendant HSBC is an international bank with its registered office and principal place of business in London, England; Defendant SGPB Suisse is a banking corporation organized under the laws of France with its principal place of business in France[1]; Defendant Trustmark is organized under the laws of the United States with its principal place of business in the State of Mississippi; and Defendant BoH is a banking institution with its principal place of business in Houston, Texas.  *See* Am. Pet. ¶¶ 13-17.

19.     Accordingly, on the foregoing facts as alleged in Plaintiffs' Amended Petition, the requisite minimal diversity of citizenship exists between Plaintiffs and the Defendant Banks

---

[1]  Although it has no bearing on the bases for removal set forth in this motion, Plaintiffs incorrectly allege that SGPB Suisse is organized under the laws of France with its principal place of business in France, when, in fact, it is organized under the laws of Switzerland and has its principal place of business there.

under 28 U.S.C. § 1332(d)(2)(A), (B), and (C) both at the time that Plaintiffs' First Amended Petition was filed and at the time of removal.[2]

## 2.    <u>Amount In Controversy</u>

20.    Under CAFA, a minimally diverse class action is removable if the amount in controversy is greater than $5,000,000, exclusive of interest and costs.  *See* 28 U.S.C. § 1332(d)(2).  The claims of the individual class members "shall be aggregated" to determine whether the jurisdictional minimum has been met.  28 U.S.C. § 1332(d)(6); *see also Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 324 (5th Cir. 2008); *Rasberry v. Capitol County Mut. Fire. Ins. Co.*, 609 F. Supp. 2d 594, 600-01 (E.D. Tex. 2009).

21.    "Unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith."  *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938); *see also De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1408 (5th Cir. 1995).

22.    While the Removing Banks deny that Plaintiffs are entitled to any recovery, Plaintiffs allege that the aggregate damages to the class are "in excess of $7 billion," well in excess of the $5 million threshold under CAFA.  Am. Pet. ¶ 147.  It is apparent from the face of the Amended Petition that the amount-in-controversy requirement is satisfied in this case.

## 3.    <u>The Proposed Class Exceeds 100 Members</u>

23.    The proposed class includes "all individuals who, and entities that, as of February 16, 2009, were customers of SIBL, with monies on deposit at SIBL and/or holding CDs issued

---

[2]  For example, because Plaintiffs Queyrouze and Olano are citizens of States (LA and FL) different from Defendants Trustmark and BoH (MS and TX), minimal diversity is present under § 1332(d)(2)(A). Likewise, because Plaintiffs Rotstain, Burnell, and Bornstein are citizens of foreign states (Peru, U.K., Antigua, and Mexico) and Defendants Trustmark and BoH are citizens of States (MS and TX), minimal diversity is present under § 1332(d)(2)(B).  Finally, because Plaintiffs Queyrouze, Olano, and Abbot are citizens of States (LA, FL, and MS) and Defendants TD Bank, HSBC, and SGPB Suisse are citizens of foreign states (Canada, U.K., and, in the case of SGPB Suisse, allegedly France, actually Switzerland), minimal diversity is present under § 1332(d)(2)(C).

by SIBL." Am. Pet. ¶ 23. Plaintiffs allege upon information and belief that the "[c]lass members number in the tens of thousands," Am. Pet. ¶ 24, well in excess of the 100 class members needed to satisfy CAFA jurisdictional requirements. For these reasons, removal is proper under CAFA, 28 U.S.C. §§ 1332(d), 1441, and 1453.

**B.**     **JURISDICTION UNDER THE EDGE ACT**

24.     This Court also has federal question jurisdiction under the Edge Act, which states in pertinent part:

> Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking . . . or out of other international or foreign financial operations . . . shall be deemed to arise under the laws of the United States.

12 U.S.C. § 632. Thus, the jurisdictional requirements under the Edge Act are: "(1) a corporation organized under the laws of the United States must be a party to the action and (2) the action must arise out of transactions involving international or foreign banking or other international or foreign financial operations." *Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings, Inc.*, 627 F. Supp. 2d 730, 732 (N.D. Tex. 2008) (citing *Bank of America Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 213 (S.D.N.Y. 2005)).

25.     According to the Amended Petition, Trustmark "is a national bank association chartered by the Office of the Comptroller of the Currency pursuant to the applicable laws of the United States of America and the related rules promulgated by the Office of the Comptroller of the Currency." Am. Pet. ¶ 16. BoH is also a corporation organized under the laws of the United States. Therefore, this case undoubtedly includes a corporate party organized under the laws of the United States, thereby satisfying the first requirement for jurisdiction under the Edge Act.

26.    In determining whether the second jurisdictional requirement under the Edge Act is satisfied, the Court must consider "whether the lawsuit arises out of transactions that are (a) foreign and (b) either banking transactions or financial operations." *Highland Crusader*, 627 F. Supp. 2d at 732.  "A suit satisfies the jurisdictional requisites of Section 632 if any part of it arises out of transactions involving international or foreign banking." *In re Lloyd's American Trust Fund Litigation*, 928 F. Supp. 333, 338 (S.D.N.Y. 1996).  In particular, "Section 632 confers jurisdiction on the district courts over suits arising out of national banks engaging in banking activities with foreign companies." *First National Bank of Joliet v. Promatek Medical Systems*, Inc., 870 F. Supp. 234, 237 (N.D. Ill. 1994).

27.    Because Plaintiffs' claims arise out of the Defendant Banks' collection of SIBL deposits into bank accounts at the Defendant Banks and the transfers of funds out of those bank accounts, which are traditional banking activities, Plaintiffs' claims arise out of "banking" transactions.  *See, e.g.*, Am. Pet. ¶ 81 ("At all relevant times Defendants provided banking services to Stanford.").  Even if Plaintiffs' claims did not arise out of "banking" transactions, the claims unquestionably arise out of "financial operations."

28.    Moreover, as Plaintiffs' Amended Petition makes clear, the banking and financial operations at issue were foreign or international in character.  Plaintiffs have identified class representatives from various foreign countries and have named several foreign banks as Defendants.  *See* Am. Pet. ¶¶ 6-17.  In addition, Plaintiffs allege the following:

- "The Stanford fraud was based upon the collection of billions of dollars from unsuspecting victims in the United States, *Canada, Mexico, Columbia, Peru, Venezuela, and elsewhere in the world*."  *Id.* at 2 ("Preliminary Statement") (emphasis added).

- "SFG sold purported certificates of deposit ("CDs") issued by *Antigua-based* SIBL . . . ."  *Id.* (emphasis added).

- "Stanford used HSBC to collect all wire transfers intended by the victims to be deposited in [*Antiguan-based*] SIBL in *British Pound Sterling, Euros, and other European currencies*." *Id.* at 2-3 (emphasis added).

- "Similarly, Stanford used TD Bank to collect all such deposits in US dollar and *Canadian dollar* denominations." *Id.* at 3 (emphasis added).

- Stanford directed the Executive Vice President of SGPB Suisse in *Geneva, Switzerland* to make certain payments. *Id.* at 3.

- "Trustmark received daily bundles of checks that Class members intended for deposit *in Antigua.*" *Id.* at 4 (emphasis added).

- "SIBL marketed CDs and promised higher rates of return on those CDs than were generally offered at banks in the United States." *Id.* ¶ 20.

- "In its December, 2008, Monthly Report, SIBL purported to have more than 30,000 clients *from 131 countries . . . .*" *Id.* (emphasis added).

- To give the appearance of a capital infusion, Stanford falsified accounting records by recording bogus transactions involving *Antiguan* real estate. *Id.* ¶¶ 52-53.

- SIBL's senior investment officer was instructed to tell "customers and prospective customers that SIBL's entire investment portfolio was managed by a *global network* of money managers . . . ." *Id.* ¶ 58 (emphasis added).

- "Stanford also represented to Plaintiffs and members of the Class that it was subject to the laws of the *Commonwealth of Antigua and Barbuda ("Antigua")* and the regulatory oversight of *that nation's* Financial Services Regulatory Commission [] ("FSRC")." *Id.* ¶¶ 75 (emphasis added).

- "Thus, Stanford was engaged in a multi-year, *international* scheme in which literally every transaction was undertaken with the purpose and intent of defrauding the class." *Id.* ¶ 79 (emphasis added).

- Defendants failed to heed an April 1999 United States Department of Treasury Financial Crimes Enforcement Network ("FinCEN") concerning "Enhanced Scrutiny for Transactions Involving *Antigua and Barbuda.*" *Id.* ¶¶ 98-104 (emphasis added).

- "Stanford provided members of the Class with deposit instructions indicating that they could make deposits in *Antigua-based SIBL by wiring funds to HSBC in London*." *Id.* at ¶ 108 (emphasis added).

- "**HSBC was aware of these instructions . . . and expressly agreed with Stanford to receive wire deposits from members of the Class for further transfer to SIBL *in Antigua*." *Id.* ¶ 109 (emphasis added).

- **"[T]he funds that members of the class transferred to HSBC, with the intent that such funds would be transferred to SIBL *in Antigua* for deposit there, were redirected by HSBC . . . to bank accounts in Houston, Texas and elsewhere . . . ." *Id.* ¶ 111 (emphasis added).**

- "As a correspondent bank of SFG, TD Bank was required, pursuant to *Canadian money laundering regulations*, to conduct thorough due diligence on SIBL and SFG's operations." *Id.* ¶ 114 (emphasis added).

- "TD Bank . . . expressly agreed with Stanford to receive wire deposits from members of the Class for further transfer to SIBL *in Antigua.*" *Id.* ¶ 117 (emphasis added).

- "Stanford made regular monthly payments to an outside auditor . . . from a Stanford . . . account at Trustmark Bank in Houston, Texas . . . [and] made additional payments to [the auditor] from its private *Swiss accounts at [SGPB Suisse].*" *Id.* ¶¶ 126-127 (emphasis added).

- "Trustmark received large and highly suspicious wire transfers from HSBC and TD Bank of funds that were received by those institutions from members of the Class and intended for deposit with SIBL in Antigua." *Id.* ¶ 132.

- "Class members who paid by check in U.S. dollars sent their checks to SIBL in Antigua, where those checks were bundled and sent daily to Trustmark National Bank in Houston, Texas, for deposit there." *Id.* ¶ 133.

- "[Bank of Houston] received large and highly suspicious wire transfers from HSBC and TD Bank . . . ." *Id.* ¶ 138.

29.     In this case, the nexus to transactions involving international or foreign banking could hardly be stronger. Because Defendant Trustmark is a U.S. national bank, Defendant BoH is a corporation organized under the laws of the United States, and Plaintiffs' claims arise out of foreign or international banking and financial operations, removal is proper under 12 U.S.C. § 632.

## C.     **EXCLUSIVE JURISDICTION IN FEDERAL COURT**

30.     This case is also removable because a federal court has assumed exclusive jurisdiction over the matters involved in Plaintiffs' Amended Petition, including without limitation the fraudulent transfer claims Plaintiffs assert. In an amended order dated March 12,

2009, a federal court in the Northern District of Texas "assume[d] exclusive jurisdiction and [took] possession of the assets, . . . tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges . . . of [SIBL, Stanford Group Company, Stanford Capital Management, LLC, Robert Allen Stanford, James M. Davis, Laura Pendergest-Holt, SFG, and The Stanford Financial Group Bldg Inc. (collectively the "Receivership Defendants")] and all entities they own or control . . . ."  Exhibit B ¶ 1 (Am. Receivership Order).

31.     The Receiver's "complete and exclusive control, possession, and custody of the Receivership Estate" lasts until the expiration date of the order.  *Id*. ¶ 4.  All "creditors" of the Receivership Defendants and "all other persons" are "restrained and enjoined, without prior approval of the Court, from: (a) Any act to obtain possession of the Receivership Estate assets; . . . [or] (c) Any act to collect, assess, recover a claim against the Receiver or that would attach to or encumber the Receivership Estate . . . ."  *Id*. ¶ 10.

32.     In addition, the federal court expressly enjoined the Defendant Banks from taking numerous actions and affirmatively ordered the Defendant Banks to "hold and retain control" over accounts held by Stanford-related entities, to cooperate with the Receiver, and to provide the SEC and the Receiver with access to all records.  *Id*. ¶¶ 12, 14 and 15.

33.     The federal court's jurisdiction over the Receivership Estate is unqualified.  *See, e.g.*, 28 U.S.C. § 754; WRIGHT, MILLER & MARCUS, FED. PRAC. & PROC. CIVIL 2d § 2985 (1997) (collecting cases).   The Removing Banks deny that Plaintiffs' claims, including without limitation the fraudulent transfer claims, have any merit.  As pleaded, however, Plaintiffs' claims raise issues that are already pending before another court that has issued a Receivership Order

establishing exclusive jurisdiction and has issued extant injunctions against creditors of the Receivership Estate and the Defendant Banks.

34.     Indeed, on October 6, 2009, the United States Judicial Panel on Multidistrict Litigation transferred seven other Stanford-related cases to the United States District Court for the Northern District of Texas on the grounds that the cases all involved the same facts, witnesses, and documents.   *See* Exhibit C (MDL Transfer Order).   Upon removal to federal court, this case can likewise be transferred to the centralized proceedings in the Northern District of Texas, thus ensuring streamlined, just, and expeditious resolution of all Stanford-related actions.

35.     Jurisdiction of this lawsuit is proper in federal, not state, court, and it may be removed on this ground.

**D.      JURISDICTION UNDER 28 U.S.C. §1441(a) and (b)**

36.     In addition, this case is removable pursuant to 28 U.S.C. §1441(a) and (b), which permit removal of any civil action over which the district courts of the United States have original jurisdiction.   The district courts of the United States have original jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.   *See* 28 U.S.C. § 1331.

37.     Federal question jurisdiction is present in this case because Plaintiffs' action is founded on claims arising under the laws of the United States.   Plaintiffs assert in Count Four of their Amended Petition that Defendants Trustmark and BoH conspired in or aided and abetted SIBL's alleged fraud, contending that Trustmark and BoH knew or should have known of SIBL's alleged fraud by virtue of their obligations under "U.S. anti-money laundering laws and regulations, to conduct a thorough investigation of any suspicious and potentially illegal banking

activity." Am. Pet. ¶¶ 131 & 137; *see also id.* ¶ 103.  Although Defendants Trustmark and BoH deny that such laws and regulations establish a relevant standard of care or create a duty in favor of Plaintiffs, Plaintiffs' Amended Petition nonetheless necessarily raises and requires resolution of substantial and disputed issues regarding Trustmark's and BoH's duties under federal anti-money laundering statutes and regulations and their compliance with the same, and it implicates a serious federal interest warranting the exercise of federal jurisdiction.

### JURY DEMAND

38.     Plaintiffs demanded a jury trial, *see* Am. Pet. ¶ 149, and the Removing Defendants likewise demand a jury trial of the removed action.

### CONCLUSION

WHEREFORE, the Removing Defendants now pray that the above action now pending in the 129th Judicial District Court of Harris County, Texas be removed to the United States District Court for the Southern District of Texas, Houston Division, and that said district court assume jurisdiction of this action and enter such other and further orders as may be necessary to accomplish the requested removal and promote the ends of justice.

Respectfully submitted,

| | |
|---|---|
| **THE TORONTO-DOMINION BANK** | **TRUSTMARK NATIONAL BANK** |
| By: */s/ James Eloi Doyle* | By: */s/ Robin C. Gibbs* |
| James Eloi Doyle | Robin C. Gibbs |
| Attorney-in-Charge | Attorney-in-Charge |
| State Bar No. 06093500 | State Bar No. 07853000 |
| S.D. Tex. Bar No. 4848 | S.D. Tex. Bar No. 4790 |
| DOYLE, RESTREPO, HARVIN & | GIBBS & BRUNS LLP |
| ROBBINS, LLP | 1100 Louisiana, Suite 5300 |
| 600 Travis Street, Suite 4700 | Houston, Texas 77002 |
| Houston, Texas 77002 | Telephone: (713) 650-8805 |
| Telephone: (713) 228-5100 | Facsimile: (713) 750-0903 |
| Facsimile: (713) 228-6138 | E-mail: rgibbs@gibbsbruns.com |
| E-mail: jdoyle@drhrlaw.com | |
| | |
| OF COUNSEL: | OF COUNSEL: |
| | |
| Robert Plotkin | Robert J. Madden |
| Jeremy S. Byrum | Jeffrey C. Kubin |
| McGUIREWOODS LLP | Ashley McKeand |
| 1050 Connecticut Ave. N.W. Suite 1200 | GIBBS & BRUNS LLP |
| Washington D.C. 20036 | 1100 Louisiana, Suite 5300 |
| Telephone: (202) 857-1750 | Houston, Texas 77002 |
| Facsimile: (202) 857-1737 | Telephone: (713) 650-8805 |
| E-mail: rplotkin@mcguirewoods.com | Facsimile: (713) 750-0903 |
| | |
| *Counsel for Defendant The Toronto-* | *Counsel for Defendant Trustmark National Bank* |
| *Dominion Bank* | |

**BANK OF HOUSTON**

By: ___*/s/ Jim D. Hamilton*_____
       Jim D. Hamilton
       Attorney-in-Charge
       State Bar No. 98829300
       S.D. Tex. Bar No. 2089
       ROSS, BANKS, MAY, CRON & CAVIN, P.C.
       2 Riverway, Suite 700
       Houston, TX  77056-1918
       Telephone:  (713) 626-1200
       Facsimile:  (713) 623-6014

OF COUNSEL:

Anthony F. Sullivan
ROSS, BANKS, MAY, CRON & CAVIN, P.C.
2 Riverway, Suite 700
Houston, TX  77056-1918
Telephone:  (713) 626-1200
Facsimile:  (713) 623-6014

*Counsel for Defendant Bank of Houston*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of November, 2009, a true and correct copy of the

foregoing Notice of Removal was served via facsimile and first class mail, postage prepaid,

upon:

> Paul Lackey
> LACKEY HERSHMAN, LLP
> 3102 Oak Lawn Avenue, Suite 777
> Dallas, Texas 75219
> Telephone: (214) 560-2201
> Facsimile: (214) 560-2203
>
> Peter D. Morgenstern
> Gregory A. Blue
> Rachel K. Marcoccia
> MORGENSTERN & BLUE, LLC
> 885 Third Avenue
> New York, New York 10022
> Telephone: (212) 750-6776
> Facsimile: (212) 750-3128
>
> *Counsel for Plaintiffs*

<u>    /s/ Robin C. Gibbs                            </u>
Robin C. Gibbs

**EXHIBIT "A"**

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, GUTHRIE ABBOTT, CATHERINE BURNELL, STEVEN QUEYROUZE, JAIME ALEXIS ARROYO BORNSTEIN, and JUAN C. OLANO, on behalf of themselves and all others similarly situated, | § § § § § § § § | |
| *Plaintiffs,* | § § | Civil Action No. _____ |
| v. | § § | JURY TRIAL DEMANDED |
| TRUSTMARK NATIONAL BANK, HSBC BANK PLC, THE TORONTO-DOMINION BANK, SG PRIVATE BANKING (SUISSE) S.A., and BANK OF HOUSTON, | § § § § § § | |
| *Defendants.* | § § | |

**EXHIBIT "A"**
**INDEX OF MATTERS BEING FILED**

1.  Docket Sheet from Cause No. 2009-53845; *Peggy Roif Rotstain, et al. v. Trustmark National Bank, et al.*; in the 129th Judicial District Court of Harris County, TX
2.  Certified copy of Original Petition from Cause No. 2009-53845; *Peggy Roif Rotstain, et al. v. Trustmark National Bank, et al.*; in the 129th Judicial District Court of Harris County, TX
3.  Certified copy of First Amended Petition from Cause No. 2009-53845; *Peggy Roif Rotstain, et al. v. Trustmark National Bank, et al.*; in the 129th Judicial District Court of Harris County, TX
4.  List of Counsel of Record
5.  Returns of Service on file with the State Court Clerk.

*The State Court has not entered any Orders.

**HCDistrictclerk.com**                    Cause: 200953845          CDI: 7      11/13/2009
**DOCUMENTS**

| Number | Court | Pgs | Date | Document |
|--------|-------|-----|------|----------|
| 43861576 | 129 | 2 | 11/10/2009 | Citation corporate |
| 43861577 | 129 | 2 | 11/10/2009 | Citation corporate |
| 43757087 | 129 | 1 | 10/28/2009 | Filing letter |
| 43561547 | 129 | 38 | 10/9/2009 2:32:00 PM | Plaintiffs First Amended Petition |
| 43120733 | 129 | 38 | 8/23/2009 | plaintiffs' Original Petition |

| 2009-53845 / Court: 129 | |
|---|---|

Filed 09 August 23 P2:58
Loren Jackson - District Clerk
Harris County
ED101J015492642
By: Nelson Cuero

CAUSE NO. _____

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, GUTHRIE ABBOTT, CATHERINE BURNELL, STEVEN QUEYROUZE, JAIME ALEXIS ARROYO BORNSTEIN, and JUAN C. OLANO, on behalf of themselves and all others similarly situated, | § § § § § § | **IN THE DISTRICT COURT** |
| Plaintiffs, | § § | |
| v. | § § | |
| TRUSTMARK NATIONAL BANK, HSBC BANK PLC, THE TORONTO-DOMINION BANK, SG PRIVATE BANKING (SUISSE) S.A., and BANK OF HOUSTON, | § § § § § | **HARRIS COUNTY, TEXAS** |
| Defendants. | § § § § § | _____ **JUDICIAL DISTRICT** |

## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs PEGGY ROIF ROTSTAIN, GUTHRIE ABBOTT, CATHERINE

BURNELL, STEVEN QUEYROUZE, JAIME ALEXIS ARROYO BORNSTEIN, and

JUAN C. OLANO, ("Plaintiffs") on behalf of themselves and all others similarly

situated, by and through their undersigned attorneys, as and for their Original Petition

against Defendants TRUSTMARK NATIONAL BANK ("Trustmark"),

HSBC BANK PLC ("HSBC"), THE TORONTO-DOMINION BANK ("TD Bank"), SG

PRIVATE BANKING (SUISSE) S.A. ("Société Générale"), and BANK OF HOUSTON

("BoH") (collectively, "Defendants"), allege on information and belief as follows:

Certified Document Number: 43120733 - Page 1 of 38

# I.

## **PRELIMINARY STATEMENT**

This is an action on behalf of the victims of the fraud at Stanford International Bank, Ltd. ("SIBL"), part of the Stanford Financial Group[1], to recover damages and fraudulent transfers from the banks that provided essential assistance to Stanford in one of the largest financial crimes in history.

The Stanford fraud was based upon the collection of billions of dollars from unsuspecting victims in the United States, Canada, Mexico, Colombia, Peru, Venezuela, and elsewhere in the world. Through a network of sales offices located in those countries, SFG sold purported certificates of deposit ("CDs") issued by Antigua-based SIBL, offering interest rates higher than those generally available at other banks. While SFG's sales representatives convinced the victims that SIBL could offer those higher rates of return because of its unique and successful investment strategy, the operation was a fraud. The Defendants each played an essential role in that scheme, and reaped substantial fees from doing so.

In particular, Defendants HSBC and TD Bank acted as willing and essential conduits for the flow of money from Stanford's unsuspecting victims to Stanford's fraudulent criminal enterprise. Stanford used HSBC to collect all wire transfers intended by the victims to be deposited in SIBL in British Pound Sterling, Euros, and other

---

[1] Stanford Financial Group ("SFG") refers to the dozens of affiliated companies owned and/or controlled by R. Allen Stanford ("Allen Stanford"), including but not limited to SIBL, Stanford Group Company, Stanford Capital Management, LLC, Stanford Trust Company Ltd., and Stanford Financial Group Global Management, LLC. As used herein, "SFG" refers to these entities, and "Stanford" refers to these entities together with Allen Stanford.

Certified Document Number: 43120733 - Page 2 of 38

European currencies. Similarly, Stanford used TD Bank to collect all such deposits in US dollar and Canadian dollar denominations. All or substantially all of the money that Stanford's victims sent to HSBC and TD Bank was eventually diverted from SIBL, where the victims intended the funds to go, to be "invested" in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation.

Both HSBC and TD Bank handled enormous volumes of such transfers. Upon information and belief, HSBC and TD Bank either knew that Stanford's banking operation was illegitimate or, through reasonable and required diligence could have determined that it was illegitimate.

Société Générale also played a central role in the scheme, providing essential banking services to Stanford. Upon information and belief, Société Générale held SFG operating accounts that were used to make illicit monthly payments to Stanford's purported auditor. When Stanford's financial troubles increased – and the need to purchase the cooperation of its auditor grew more urgent – Stanford directed Société Générale to make larger monthly payments to that auditor. That instruction was given by Stanford to Blaise Friedli, Executive Vice President of Société Générale Private Banking in Geneva, Switzerland, who – not coincidentally – was a member of the Stanford Financial Group International Advisory Board. Moreover, in a highly unusual transfer of funds, Stanford directed Société Générale to transfer more than $100 million out of Société Générale in the last two weeks of December 2008. Upon information and belief,

all or substantially all of that money is missing, and is unavailable to satisfy victims' claims.

Through its role as Stanford's private banker, its essential assistance in the payment of bribes to Stanford's purported auditor, and Mr. Friedli's position on the Stanford Financial Group International Advisory Board, among other things, Société Générale either knew that Stanford's banking operation was illegitimate or, through reasonable and required diligence, could have determined that it was illegitimate.

Trustmark received daily bundles of checks that Class members intended for deposit in SIBL in Antigua. Those checks were deposited in SIBL accounts at Trustmark, and later distributed to other Stanford entities and put to the private use of Allen Stanford. These highly suspicious and unusual deposits, together with other information readily available to Trustmark concerning Stanford's operations, either did, or should have, alerted Trustmark to the illegal nature of the Stanford banking operation.

Finally, each of the Defendants collected substantial fees and other payoffs in exchange for its role in transferring money from the victims of the crime, to SFG and, in many instances, out to R. Allen Stanford's personal and private business ventures. Every dollar that was paid to the Defendants by SFG was paid in furtherance of Stanford's scheme to defraud the victims of the scheme, using money fraudulently stolen from the victims. As a result, all such payments are recoverable by SFG's creditors as fraudulent transfers under the Texas Uniform Fraudulent Transfer Act ("UFTA") and pursuant to common law.

Certified Document Number: 43120733 - Page 4 of 38

## II.

## DISCOVERY CONTROL PLAN

1.      Plaintiffs intend that discovery shall be conducted under Level 2, pursuant to Rule 190.3 of the TEXAS RULES OF CIVIL PROCEDURE.

## III.

## JURISDICTION AND VENUE

2.      Venue is appropriate in Harris County, Texas, because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Harris County, Texas.

3.      Jurisdiction is proper in this Court because each of the Defendants have purposefully availed themselves of the privilege of conducting business activities in Texas and each of the Defendants has had continuous and systematic business contacts with Texas. Additionally, the amount in controversy exceeds the minimum jurisdictional threshold of this Court.

4.      Pursuant to Section 15.001, *et seq.*, of the TEXAS CIVIL PRACTICE & REMEDIES CODE, venue is proper in this Court because: (a) the events or omissions giving rise to Plaintiffs' causes of action occurred in whole or part in Harris County, Texas; and/or (b) each of the Defendants has its principal office in the State of Texas located in Harris County, Texas.

Certified Document Number: 43120733 - Page 5 of 38

## IV.

### PARTIES

5.     At all relevant times, Plaintiff Peggy Roif Rotstain is and was a citizen of Peru residing in Peru.  Rotstain caused funds to be transmitted via draft to SIBL, and to TD Bank, for the intended purpose of purchasing SIBL CDs.

6.     At all relevant times, Plaintiff Guthrie Abbott is and was a citizen of the United States.

7.     At all relevant times, Plaintiff Catherine Burnell is and was a citizen of the United Kingdom residing in Antigua.  Burnell caused funds to be transmitted to HSBC for the intended purpose of purchasing SIBL CDs.

8.     At all relevant times, Plaintiff Steven Queyrouze is and was a citizen of the United States residing in Louisiana.

9.     At all relevant times, Plaintiff Jaime Alexis Arroyo Bornstein is and was a citizen of Mexico residing in Mexico.  Bornstein caused funds to be transmitted to TD Bank for the intended purpose of purchasing SIBL CDs.

10.     At all relevant times, Plaintiff Juan C. Olano was a citizen of Colombia and the United States residing in Florida.

11.     As of February 16, 2009, Plaintiffs were customers of SIBL, had money on deposit at SIBL, and held CDs issued by SIBL.  Plaintiffs are each members of the Class, as defined below.

12.     Upon information and belief, Defendant TD Bank is a banking corporation incorporated in Canada.

Certified Document Number: 43120733 - Page 6 of 38

13.     Upon information and belief, Defendant HSBC is an international bank with its registered office and principal place of business located at 8 Canada Square, London E14 5HQ, England.

14.     Upon information and belief, Defendant Société Générale is a banking corporation organized under the laws of France with its principal place of business in France.

15.     Upon information and belief, Defendant Trustmark is a national banking association chartered by the Office of the Comptroller of the Currency pursuant to the applicable laws of the United States of America and the related rules promulgated by the Office of the Comptroller of the Currency. Upon information and belief, Trustmark's corporate headquarters and principal place of business are located in Jackson, Mississippi. Upon information and belief, Trustmark is "located" in and is a citizen of the State of Mississippi, although Trustmark also maintains offices in Harris County, Texas and in other jurisdictions.

16.     Upon information and belief, Defendant BoH is a banking institution with a principal place of business at 750 Bering Drive, Suite 100, Houston, Texas 77057.

## RELEVANT NON-PARTIES

17.     At all relevant times, SFG was a group of affiliated financial services entities led by Allen Stanford. SFG maintained its headquarters in Houston, Texas, and maintained offices in several other locations including Memphis, Tennessee, and Miami, Florida. Upon information and belief, the activities of SFG and all of the Stanford Entities were directed from SFG's Houston, Texas, headquarters.

Certified Document Number: 43120733 - Page 7 of 38

18.    At all relevant times, SIBL was a private, offshore bank with offices on the island of Antigua. SIBL was organized in Montserrat, originally under the name of Guardian International Bank. In or about 1989, SIBL's principal banking location was moved to Antigua.

19.    Until the SEC instituted civil enforcement proceedings against it in February of 2009, SIBL marketed CDs and promised higher rates of return on those CDs than were generally offered at banks in the United States. In its 2007 Annual Report, SIBL stated that it had approximately $6.7 billion worth of CD deposits, and more than $7 billion in total assets. In its December, 2008, Monthly Report, SIBL purported to have more than 30,000 clients from 131 countries, representing $8.5 billion in assets.

20.    Stanford Group Company ("SGC"), a Houston-based company, was founded in or about 1995. SGC, and the financial advisers employed by SGC, promoted the sale of SIBL's CDs through SGC's 25 offices located throughout the United States. According to the Court-appointed receiver[2] for the Stanford entities, "the principal purpose and focus of most of [Stanford's] combined operations was to attract and funnel outside investor funds into the Stanford companies through the sale of [CDs] issued by Stanford's offshore entity SIBL." Report Of The Receiver Dated April 23, 2009 (the "Report"), at p. 6.

---

[2] In February 2009, the SEC filed a complaint in the United States District Court for the Northern District of Texas (the "SEC Action") against Allen Stanford and various Stanford entities and employees, alleging a "massive, on-going fraud." By order dated February 16, 2009 (as amended March 12, 2009), the court in the SEC Action appointed Ralph Janvey, Esq., to be the receiver in that action (hereinafter, the "Receiver"). On or about February 27, 2009, the SEC filed a First Amended Complaint in the SEC Action.

Certified Document Number: 43120733 - Page 8 of 38

21.    Allen Stanford founded and owned SFG and its affiliated companies, including, through a holding company, SIBL.   Allen Stanford was the chairman of SIBL's Board of Directors and a member of SIBL's Investment Committee.

## V.

## FACTS APPLICABLE TO ALL COUNTS

### CLASS ALLEGATIONS

22.    The class of persons that Plaintiffs seek to represent (the "Class") is comprised of all individuals who, and entities that, as of February 16, 2009, were customers of SIBL, with monies on deposit at SIBL and/or holding CDs issued by SIBL. All such individuals are creditors of SIBL, Allen Stanford, and other entities that are members of SFG within the meaning of the UFTA.

23.    *Numerosity.*  A class action is appropriate in this case because the Class is so numerous that joinder of all members is impracticable.   While the precise number of Class members and their addresses are unknown to the Plaintiffs, their identities can be determined from SIBL's records.   Upon information and belief, Class members number in the tens of thousands.

24.    *Commonality.*  A class action is appropriate in this case because there are questions of law and fact common to the Class, including but not limited to:

(a)    whether the Defendants received fees and other monies from Stanford within the relevant time period;

(b)    whether Stanford paid fees and other monies to the Defendants with the actual intent to hinder, delay, or defraud members of the Class;

Certified Document Number: 43120733 - Page 9 of 38

(c)     whether any such fees were paid, or other monies transferred, by Stanford to the Defendants while Stanford was engaged or was about to engage in a business or a transaction for which Stanford's remaining assets were unreasonably small in relation to the business or transaction;

(d)     whether any such fees were paid, or other monies transferred, by Stanford to the Defendants when Stanford intended to incur, or believed or reasonably should have believed that it would incur, debts beyond the its ability to pay as they became due;

(e)     whether any such fees were paid, or other monies transferred, by Stanford to the Defendants without Stanford receiving a reasonably equivalent value in exchange for the transfer

(f)     whether any such fees were paid, or other monies transferred, by Stanford to the Defendants at a time when Stanford was insolvent, or whether Stanford became insolvent as a result of the payment of such fees or other monies transferred;

(g)     whether the Defendants received any such fees, or other monies transferred, in good faith and for a reasonably equivalent value;

(h)     whether the Defendants conspired with Stanford;

(i)     whether the Defendants knew or should have known of Stanford's fraud;

(j)     whether the Defendants knew or should have known of Stanford's fraud; and

Certified Document Number: 43120733 - Page 10 of 38

(k)     whether the Class has been damaged by the alleged conspiracy by or among the Defendants and Stanford.

25.     The questions of law and fact common to the Class predominate over any questions affecting only individual members.

26.     *Typicality.*  The claims of the representative Plaintiffs are typical of the claims of the Class. '

2.      *Adequacy.*  The representative Plaintiffs will fairly and adequately protect the interests of the Class.

27.     In the absence of class certification, there is a risk that adjudications in thousands of separate cases with respect to individual Class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

28.     A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## FACTUAL ALLEGATIONS

### The Fraud[3]

29.     Stanford's business was a massive fraud in which Stanford misappropriated billions of dollars, falsified SIBL's financial statements, and concealed

---

[3] The factual allegations in this sub-section are made upon information and belief, based upon the allegations made by the SEC in its civil enforcement action *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 09-cv-0298-N (N.D. Tex), the indictment in *United States v. Stanford, et al.*, Case No. 09-cr-342 (S.D. Tex), the public materials cited therein, and other public materials and media reports.

Certified Document Number: 43120733 - Page 11 of 38

their fraudulent conduct from customers, prospective customers, and regulators in the United States and elsewhere.

30.     SIBL represented to the Plaintiffs and the Class that: (i) their assets were safe and secure because the bank invested in a "globally diversified portfolio" of "marketable securities;" (ii) SIBL had averaged double-digit returns on its investments for over 15 years; (iii) Allen Stanford had solidified SIBL's capital position in late 2008 by infusing $541 million in capital into the bank; (iv) SIBL's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee; (v) SIBL, in early 2009, was stronger than at any time in its history; and (vi) SIBL did not have exposure to losses from investments in the fraudulent "Ponzi" scheme that had been operated by Bernard L. Madoff (the "Madoff Scheme"). More fundamentally, Stanford represented that SIBL was a legitimate banking institution, which made money by investing assets and generating investment returns. These representations were false.

31.     Stanford intended that Plaintiffs and other members of the Class would rely upon these representations when making their decisions to entrust their money to Stanford, and the Plaintiffs and other members of the Class did so.

32.     Contrary to SIBL's public statements, by February 2009, Stanford had misappropriated billions of dollars from Plaintiffs and the Class, and "invested" an undetermined amount of those funds in speculative, unprofitable private businesses controlled by Allen Stanford. Contrary to SIBL's representations regarding the liquidity and safety of its portfolio, the Plaintiffs' and the Class's funds were not invested in a

Certified Document Number: 43120733 - Page 12 of 38

"well-diversified portfolio of highly marketable securities." Instead, SIBL's internal records reflect that more than half of the bank's investment portfolio was comprised of undisclosed "Private Equity Real Estate."

33.     According to the SEC, Stanford fabricated SIBL's financial statements. Using a predetermined return on investment number, Stanford reverse-engineered SIBL's financial statements to report investment income that SIBL had not actually earned.  As a result, information in SIBL's financial statements and annual reports bore little or no relationship to the actual performance of SIBL's investments.

34.     Plaintiffs and other members of the Class reasonably relied upon SIBL's fabricated financial statements when making their decisions to entrust their money to Stanford.

35.     In selling the CDs, SIBL touted, among other things, the CDs' safety, security, and liquidity.  SIBL told Plaintiffs and the Class that SIBL aggregated customer deposits, and then reinvested those funds in a "globally diversified portfolio" of assets. SIBL also represented to the Plaintiffs and the Class that Stanford employed a sizeable team of analysts to monitor SIBL's portfolio.  These representations were false.

36.     Plaintiffs and other members of the Class reasonably relied upon SIBL's representations regarding the safety, security, liquidity, composition, and monitoring of SIBL's investment portfolio.

37.     SIBL's annual reports also represented that "SIBL does not expose its clients to the risks associated with commercial loans...the Bank's only lending is on a cash secured basis."  Contrary to SIBL's representations, however, SIBL exposed

Plaintiffs and the Class to the risks associated with more than $1.6 billion in undisclosed and unsecured personal "loans" to Allen Stanford.  To conceal the theft, some of these "loans" were evidenced by promissory notes from Allen Stanford.

38.     These promissory notes were typically created after James M. Davis ("Davis"), who was the Chief Financial Officer of SFG and SIBL, and served as a member of SIBL's Investment Committee, had, at Allen Stanford's direction, fraudulently wired out billions dollars of SIBL investor funds to Allen Stanford or his designees.  Allen Stanford made few, if any, payments required by the terms of the promissory notes, and the outstanding loan balances and interest owed by him to SIBL were rolled into new, larger, promissory notes.

39.     The personal "loans" to Allen Stanford were inconsistent with representations that had been made to Plaintiffs and members of the Class:  despite the fact that SIBL's annual reports included a section entitled "Related-Party Transactions" that purported to disclose all related-party transactions entered into by SIBL, SIBL's "loans" to Allen Stanford were not disclosed in the "Related-Party Transactions" section of SIBL's annual reports from 2004 through 2008.

40.     Allen Stanford used the money that he "borrowed" from SIBL to, among other things, fund his personal ventures and private pursuits, including more than $400 million to fund personal real estate deals and more than $36 million to subsidize "Stanford 20/20," an annual cricket tournament that boasted a $20 million purse.

41.     Plaintiffs and other members of the Class reasonably relied upon SIBL's misrepresentations regarding SIBL's bogus "loans" to Allen Stanford.

Certified Document Number: 43120733 - Page 14 of 38

42.     Allen Stanford's misappropriation of the Plaintiffs' and the Class's assets (and the poor performance of SIBL's investment portfolio) created a giant hole in SIBL's balance sheet.  To conceal their fraudulent conduct and thereby ensure that Plaintiffs and the Class continued to entrust their money to SIBL, the Stanford Co-Conspirators fabricated the growth, composition, and performance of SIBL's investment portfolio to give the appearance that SIBL's investments were highly profitable.

43.     In its training materials for the SGC advisers, SIBL represented that it had earned consistent double-digit annual returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993) for almost fifteen years.  SIBL marketed the CDs using these purported returns on investment.  Likewise, SIBL's Annual Reports stated that the bank earned from its "diversified" investments approximately $642 million in 2007 (11 %), and $479 million in 2006 (12%).

44.     SIBL claimed that its high returns on investment allowed it to offer higher rates on the CD than those offered by U.S. banks.  For example, SIBL offered 7.45% as of June 1, 2005, and 7.878% as of March 20, 2006, for a fixed-rate CD based upon an investment of $100,000.  On November 28, 2008, SIBL quoted 5.375% on a 3-year flex CD, while comparable U.S. bank CDs paid less than 3.2%.

45.     None of the information that SIBL disseminated regarding the growth, composition, and performance of its investment portfolio was true.  Instead, through their actions, the Stanford Co-Conspirators caused SIBL to report investment income that the bank did not actually earn and, thereby, greatly inflate the value of its investment portfolio.  Specifically, the Stanford Co-Conspirators prepared and reviewed SIBL's

Certified Document Number: 43120733 - Page 15 of 38

financial statements, including the annual reports that were provided to customers and posted on the bank's website.

46. Plaintiffs and other members of the Class reasonably relied upon the information that SIBL disseminated regarding the growth, composition, and performance of its investment portfolio.

47. As world financial markets experienced substantial declines in 2008, it became apparent to Allen Stanford and Davis that SIBL could not credibly report investment profits in the 11% to 15% range (as it had done in previous years). Allen Stanford and Davis thus agreed that SIBL would for the first time show a "modest" loss to avoid raising too many "red flags" to customers and other nations' regulators. In other words, they opted to tell a "more believable lie" in order to conceal their many previous years of fraudulent conduct.

48. SIBL touted a purported $541 million capital infusion from Allen Stanford in a December 2008 report:

> Although our earnings will not meet expectations in 2008, Stanford International Bank Ltd. is strong, safe and fiscally sound. We have always believed that depositor safety was our number one priority. To further support the Bank's growth and provide a strong cushion for any further market volatility, the Bank's Board of Directors made a decision to increase the Bank's capital by $541 million on November 28, 2008. This contribution brings total shareholder equity to $1,020,029,802 with a capital to assets ratio of 11.87% and a capital to deposits ratio of 13.48%.

49. The purported capital infusions by Allen Stanford were backdated, fictitious, and engineered to give the appearance that SIBL had achieved "desired" levels of capital.

Certified Document Number: 43120733 - Page 16 of 38

50.     In December 2008, well after Allen Stanford had purportedly infused the $541 million in additional capital into SIBL, Stanford implemented a series of fraudulent round-trip real estate transactions utilizing undeveloped Antiguan real estate acquired by SIBL in 2008 for approximately $63.5 million (or roughly $40,000 per acre).

51.     To give the appearance that the above-referenced capital infusions actually occurred Stanford falsified accounting records by recording bogus transactions:

- SIBL sold the Antiguan real estate to several newly-created Stanford-controlled entities at the original cost of $63.5 million (although there is no evidence that Stanford paid SIBL the $63.5 million);

- the Stanford-controlled entities, at Allen Stanford's and Davis's instruction, immediately wrote-up the value of the real estate to approximately $3.2 billion dollars (or $2 million per acre), thereby exponentially increasing the value of the entities' stock;

- in an effort to satisfy a portion of Allen Stanford's personal debt to SIBL, Allen Stanford contributed to SIBL $1.7 billion of the fraudulently-inflated stock (using the inflated $2 million per acre valuation); and

- Allen Stanford then contributed to SIBL additional stock in the real estate holding companies valued at $200 million and $541 million (again using the inflated $2 million per acre valuation) to fund the backdated capital contributions.

52.     These transactions did not infuse real capital into SIBL. In fact, the entire process was fabricated after the reported capital contributions allegedly occurred. Moreover, the purported inflation in value of the real estate from $40,000 to $2 million per acre was not justifiable under applicable U.S. or international accounting principles. SIBL did not secure an appraisal and had no other reasonable support for such a drastic increase in value. The transactions among Stanford-controlled entities simply were not the kind of arm's-length transactions required to justify a 5000% increase in value.

Certified Document Number: 43120733 - Page 17 of 38

Nevertheless, on a mere promise from Allen Stanford that the land would be appraised for over $3 billion, Stanford used $63.5 million of Antiguan real estate to simultaneously plug a multi-billion dollar hole in SIBL's balance sheet and eliminate a significant portion of Allen Stanford's personal debt to SIBL.

53.    Following the fraudulent capital infusions, the largest segment of the bank's investment portfolio would have been $3.2 billion in over-valued real estate. Yet, SIBL did not disclose the transactions in its December 2008 newsletter, which touted Allen Stanford's purported capital infusion. Moreover, Stanford's real estate investments were wholly inconsistent with SIBL's representations to customers that SIBL's investment portfolio was composed of marketable securities, and not real estate.

54.    Plaintiffs and other members of the Class reasonably relied upon the information regarding Allen Stanford's purported capital infusion to SIBL.

<u>Misrepresentations Regarding Management</u>
<u>of SIBL's Investment Portfolio</u>

55.    Prior to making decisions to entrust their money to SIBL, prospective customers routinely asked how SIBL safeguarded and monitored its assets. They also frequently inquired whether Stanford could "run off with the money."

56.    In response to these questions, at least during 2006 and much of 2007, Pendergest-Holt trained SIBL's senior investment officer ("SIO") to tell customers and prospective customers that the bank's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee.    The SIO followed Pendergest-Holt's instructions, telling customers and prospective customers that SIBL's entire investment portfolio was

Certified Document Number: 43120733 - Page 18 of 38

managed by a global network of money managers and monitored by a team of more than twenty analysts.

57.     Neither Pendergest-Holt nor the SIO disclosed to customers that SIBL segregated its investment portfolio into three tiers: (i) cash and cash equivalents ("Tier 1"); (ii) investments with "outside portfolio managers (25+)" that were monitored by the SFG analysts ("Tier 2"); and (iii) undisclosed assets managed by Stanford and Davis ("Tier 3"). As of December 2008, Tier 1 represented merely approximately 9% ($800 million) of SIBL's purported portfolio. Tier 2, prior to the bank's decision to liquidate $250 million of investments in late 2008, represented approximately 10% of SIBL's portfolio. Tier 3, the undisclosed assets managed by Allen Stanford and Davis, thus represented *approximately 80%* of SIBL's investment portfolio in December, 2008.

58.     Neither Pendergest-Holt nor SIBL's SIO disclosed that the bank's Tier 3 assets were managed and/or monitored exclusively by Allen Stanford and Davis. Likewise, they did not disclose that Allen Stanford and Davis surrounded themselves with a close-knit circle of family, friends and confidants, thereby eliminating any independent oversight of SIBL's assets.

59.     Neither Pendergest-Holt nor the SIO disclosed to the Plaintiffs or the Class that the "global network" of money managers and the team of analysts did not manage any of SIBL's Tier 3 investments and, in reality, only monitored approximately 10% of SIBL's portfolio. In fact, Pendergest-Holt trained the SIO "not to divulge too much" about the oversight of SIBL's portfolio because that information "wouldn't leave

an investor with a lot of confidence." Likewise, Davis instructed the SIO to "steer" potential customers away from information about SIBL's portfolio.

60.     Plaintiffs and other members of the Class reasonably relied upon the information disseminated by SIBL's SIO when making their decisions to invest in and with the Stanford Entities.

<u>Misrepresentation That SIBL Was "Stronger" Than Ever Before</u>

61.     On January 10, 2009, Allen Stanford, Davis and Pendergest-Holt spoke to SGC's Top Performers Club (a collection of high performing Stanford financial advisers) in Miami, Florida.

62.     During that meeting, Davis stated that SIBL was "stronger" than at any time in its history.  Allen Stanford, Davis, and Pendergest-Holt represented that SIBL was secure and built upon a strong foundation, and that its financial condition was shored up by Allen Stanford's capital infusions.  Davis, however, failed to disclose that he had been informed only days earlier by the head of SIBL's treasury that, despite SIBL's best efforts to liquidate Tier 2 assets, SIBL's cash position had fallen from the June 30, 2008, reported balance of $779 million to less than $28 million.

63.     Allen Stanford and Davis also failed to disclose to the SGC sales force that: (i) Allen Stanford had misappropriated more than $1.6 billion of investor funds; (ii) SIBL's annual reports, financial statements and quarterly reports to the FSRC were false; (iii) hundreds of millions of dollars of SIBL customers' funds had been invested in a manner inconsistent with SIBL's representations to customers that SIBL's investment

Certified Document Number: 43120733 - Page 20 of 38

portfolio was composed of marketable securities, and not real estate and/or private equity; and (iv) the purported 2008 capital infusions by Allen Stanford were a fiction.

64.     During her speech, Pendergest-Holt, after being introduced as SFG's chief investment officer and a "member of the investment committee of the bank," answered questions about SIBL's investment portfolio.  In so doing, she failed to disclose to attendees that she and her team of analysts did not manage SIBL's entire investment portfolio and, instead, only monitored approximately 10% of the bank's investments. She also failed to disclose that SIBL had invested SIBL's funds in a manner inconsistent with SIBL's representations to customers that SIBL's investment portfolio was composed of marketable securities, and not real estate and/or private equity.

65.     Allen Stanford, Davis and Pendergest-Holt also failed to disclose that, on or about December 12, 2008, Pershing, LLC (SGC's clearing broker-dealer) had informed SGC that it would no longer process wire transfers from SGC to SIBL for the purchase of the CDs, citing suspicions about SIBL's investment returns and its inability to get from the bank "a reasonable level of transparency" into its investment portfolio.

66.     Allen Stanford, Davis and Pendergest-Holt knew that SGC advisers would rely upon the information provided to them during the Top Performers Club meeting to sell CDs.  Plaintiffs and other members of the Class reasonably relied upon that information.

<u>Exposure to Losses From Madoff-related Investments</u>

67.     In the December 2008 Monthly Report, SIBL told its customers that it "had no direct or indirect exposure to any of [Bernard] Madoff's investments."

Certified Document Number: 43120733 - Page 21 of 38

68.     Contrary to this statement, Allen Stanford, Davis and Pendergest-Holt knew, prior to the release of the December 2008 Monthly Report, that SIBL had exposure to losses from the Madoff Scheme.

69.     On December 12, 2008, and again on December 18, 2008, Pendergest-Holt received e-mails from Meridian Capital Partners, a hedge fund with which SIBL had invested, detailing SIBL's exposure to losses from the Madoff Scheme.

70.     On December 15, 2008, an SFG-affiliated employee notified Pendergest-Holt and Davis that SIBL had exposure to losses from the Madoff Scheme in two additional funds through which SIBL had invested.  That same day, Davis, Pendergest-Holt, and others consulted with Allen Stanford regarding the bank's exposure to losses from the Madoff Scheme.

71.     Allen Stanford, Davis and Pendergest-Holt never corrected this misrepresentation in the December 2008 monthly report.

72.     Plaintiffs and other members of the Class reasonably relied upon the information regarding SIBL's purported lack of exposure to losses from the Madoff Scheme.

Bribery of Regulatory Officials

73.     Stanford also represented to Plaintiffs and members of the Class that it was subject to the laws of the Commonwealth of Antigua and Barbuda ("Antigua") and the regulatory oversight of that nation's Financial Services Regulatory Commission of ("FSRC").

74.     The FSRC was created by and, at all relevant times, existed under the authority of, Antigua's International Business Corporations Act (the "IBC Act").

75.     Leroy King ("King") was the Administrator and Chief Executive Officer for the FSRC.  King, among other things, was ostensibly responsible for FSRC's (and, thus, Antigua's) oversight of SIBL's investment portfolio, including the review of SIBL's financial reports, and the response to requests by foreign regulators, including the SEC, for information and documents regarding SIBL's operations.

76.     King, however, "facilitated the Ponzi scheme by ensuring that the FSRC 'looked the other way' and conducted sham audits and examinations of [SIBL's] books and records.  In exchange for bribes paid to him over a period of several years, King made sure that the FSRC did not examine [SIBL's] investment portfolio.  King also provided Stanford with access to the FSRC's confidential regulatory files."[4]

77.     Thus, Stanford was engaged in a multi-year, international scheme in which literally every transaction was undertaken with the purpose and intent of defrauding the Class.

## VI.

## CLAIMS

A.     **COUNT ONE: AGAINST ALL DEFENDANTS FOR AVOIDANCE OF FRAUDULENT TRANSFERS UNDER § 24.005(a)(1) OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT AND/OR UNDER THE COMMON LAW**

78.     Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

---

[4] SEC Action, (Proposed) Second Amended Complaint, at p. 3.

Certified Document Number: 43120733 - Page 23 of 38

79.    At all relevant times Defendants provided banking services to Stanford.

80.    Upon information and belief, Defendants received substantial fees and other monies from Stanford during the preceding four (4) years.

81.    Upon information and belief, all or substantially all of those fees and other monies were paid with funds fraudulently stolen from the Plaintiffs and members of the Class.

82.    Upon information and belief, Stanford paid all such fees and other monies to the Defendants in connection with the scheme, and with the actual intent to hinder, delay, or defraud members of the Class.

83.    By reason of the foregoing, each such payment or transfer was fraudulent as to Class members whose claim(s) arose before or within a reasonable time after the transfer was made pursuant to § 24.005(a)(1) of the UFTA.

84.    By reason of the foregoing, the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford pursuant to § 24.008(a)(1) of the UFTA.

85.    By reason of the foregoing, each such payment or transfer was fraudulent as to Class members and the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford under the common law applicable to fraudulent transfers.

**B.**    **COUNT TWO: AGAINST ALL DEFENDANTS FOR AVOIDANCE OF FRAUDULENT TRANSFERS UNDER § 24.005(a)(2) OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT AND/OR UNDER THE COMMON LAW**

86.    Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

87.    Upon information and belief, Stanford paid all such fees and other monies to the Defendants in connection with the scheme without receiving a reasonably equivalent value in exchange for the transfers, and at a time when Stanford was engaged or was about to engage in a business or a transaction for which Stanford's remaining assets were unreasonably small in relation to the business or transaction; or Stanford intended to incur, or believed or reasonably should have believed that the it would incur, debts beyond its ability to pay as they became due.

88.    By reason of the foregoing, each such payment or transfer was fraudulent as to Class members whose claim(s) arose before or within a reasonable time after the transfer was made pursuant to § 24.005(a)(2) of the UFTA.

3.    By reason of the foregoing, the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford pursuant to § 24.008(a)(1) of the UFTA.

89.    By reason of the foregoing, each such payment or transfer was fraudulent as to Class members and the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford under the common law applicable to fraudulent transfers.

Certified Document Number: 43120733 - Page 25 of 38

**C.     COUNT THREE: AGAINST ALL DEFENDANTS FOR AVOIDANCE OF FRAUDULENT TRANSFERS UNDER § 24.006(a) OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT AND/OR UNDER THE COMMON LAW**

90.     Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

91.     Upon information and belief, Stanford paid all such fees and other monies to the Defendants without receiving a reasonably equivalent value in exchange for the transfers.

92.     Upon information and belief, Stanford was insolvent at the time of each transfer or became insolvent as a result of such transfers.

93.     By reason of the foregoing, each such payment or transfer to the Defendants was fraudulent as to Class members whose claim(s) arose before such transfer was made pursuant to § 24.006(a) of the UFTA.

94.     By reason of the foregoing, the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford pursuant to § 24.008(a)(1) of the UFTA.

95.     By reason of the foregoing, each such payment or transfer was fraudulent as to Class members and the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford under the common law applicable to fraudulent transfers.

**D.     COUNT FOUR: AGAINST ALL DEFENDANTS FOR CONSPIRACY TO COMMIT FRAUD AND/OR AIDING AND ABETTING FRAUD**

96.     Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

Certified Document Number: 43120733 - Page 26 of 38

<u>FinCEN Advisory</u>

97.    In April 1999, the United States Department of Treasury Financial Crimes

Enforcement Network ("FinCEN") issued a FinCEN Advisory concerning "Enhanced

Scrutiny for Transactions Involving Antigua and Barbuda.   The FinCEN Advisory

warned that:

> Banks and other financial institutions are advised to give enhanced
> scrutiny to all financial transactions routed into or out of Antigua
> and Barbuda, or involving entities organized or domiciled, or non-
> resident persons maintaining accounts, in Antigua and Barbuda....

> In November 1998, the government of Antigua and Barbuda
> amended its Money Laundering (Prevention) Act in a manner that
> significantly weakened that Act; the statute had been enacted in
> December 1996 but had not been fully implemented. In November
> 1998, the Antiguan and Barbudan government also changed the
> supervision of its offshore financial services sector, by vesting
> authority over that sector in a new International Financial Sector
> Authority.   The Authority's board of directors includes
> representatives of the very institutions the Authority is supposed to
> regulate, thus raising serious concerns that those representatives
> are in fact in control of the Authority, so that the Authority is
> neither independent nor otherwise able to conduct an effective
> regulatory program in accordance with international standards.

> The amendment of the Money Laundering (Prevention) Act,
> combined with changes in Antigua and Barbuda's treatment of its
> offshore financial services sector, are likely to erode supervision,
> stiffen bank secrecy, and decrease the possibility for effective
> international law enforcement and judicial cooperation regarding
> assets secreted in Antigua and Barbuda. These changes threaten to
> create a "haven" whose existence will undermine international
> efforts of the United States and other nations to counter money
> laundering and other criminal activity, a concern of which the
> United States has repeatedly made the government of Antigua and
> Barbuda aware.

> The actions taken by the government of Antigua and Barbuda that
> weaken that nation's anti-money laundering laws and oversight of
> its financial institutions necessarily raise questions about the

purposes of transactions routed into or out of Antigua and Barbuda or involving entities organized or domiciled, or non-resident persons maintaining accounts, in Antigua and Barbuda. Institutions subject to the suspicious activity reporting rules contained in 31 CFR 103.21 (effective April 1, 1996) should carefully examine the available facts relating to any such transaction, to determine if such transaction (of $5,000 or more, U.S. dollar equivalent) requires reporting in accordance with those rules. (Institutions subject to the Bank Secrecy Act but not yet subject to specific suspicious activity reporting rules should consider such a transaction with relation to their reporting obligations under other applicable law.) Enhanced scrutiny is especially important for transactions involving Antigua and Barbuda offshore banks, transactions involving both Antigua and Barbuda offshore banks and the nine commercial banks licensed to do business in Antigua and Barbuda, and transactions in which one or more of such nine commercial banks act for one or more Antigua and Barbuda offshore institutions.

98.     The FinCEN Advisory's reference to the International Financial Sector Authority's board of directors including "representatives of the very institutions the Authority is supposed to regulate," was a reference to representatives of Stanford.

99.     Upon information and belief, the Defendants received and were aware of the FinCEN Advisory.

100.     Upon information and belief, the Defendants knew or should have known that FinCEN Advisory was referring specifically to Stanford when it warned that the International Financial Sector Authority's board of directors included "representatives of the very institutions the Authority is supposed to regulate," and that the Authority is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards."

101.     While the FinCEN Advisory was withdrawn in August 2001, FinCEN cautioned that "[t]he withdrawal of [the] Advisory…does not relieve institutions of their

Certified Document Number: 43120733 - Page 28 of 38

pre-existing and on-going obligation to report suspicious activity, as set forth in regulations issued by FinCEN and by the federal bank supervisory agencies, as well as their obligation to comply with all other applicable provisions of law."

102.    Moreover, each of Defendants knew, or should have known, by virtue of their knowledge and experience in international banking and banking regulation, that Antigua's lax regulatory oversight of its offshore banking sector, including SIBL, posed a heightened risk that Stanford was involved in illegal activity.

<u>HSBC</u>

103.    Defendant HSBC was a "correspondent" bank of SIBL, receiving wire transfers of funds from members of the Class.

104.    As a correspondent bank of Stanford, HSBC was required, pursuant to The Money Laundering Regulations 2007, enacted by Parliament on July 25, 2007, and effective as of December 15, 2007, to conduct thorough due diligence on SIBL and SFG's operations. Specifically, The Money Laundering Regulations 2007 provide, in relevant part:

> A credit institution ("the correspondent") which has or proposes to have a correspondent banking relationship with a respondent institution ("the respondent") from a non-[European Economic Area] state must—
> (a)    gather sufficient information about the respondent to understand fully the nature of its business;
> (b)    determine from publicly-available information the reputation of the respondent and the quality of its supervision;
> (c)    assess the respondent's anti-money laundering and anti-terrorist financing controls;
> (d)    obtain approval from senior management before establishing a new correspondent banking relationship;
> (e)    document the respective responsibilities of the respondent and correspondent; and

Certified Document Number: 43120733 - Page 29 of 38

(f)    be satisfied that, in respect of those of the respondent's customers who have direct access to accounts of the correspondent, the respondent—
(i) has verified the identity of, and conducts ongoing monitoring in respect of, such customers; and
(ii) is able to provide to the correspondent, upon request, the documents, data or information obtained when applying customer due diligence measures and ongoing monitoring.

105.    Upon information and belief, prior to and during their establishment of a correspondent banking relationship with Stanford, HSBC gathered sufficient information concerning Stanford to understand Stanford's business and, as a result, knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

106.    Stanford provided members of the Class with deposit instructions indicating that they could make deposits in Antigua-based SIBL by wiring funds to HSBC in London.

107.    HSBC was aware of these instructions that were provided to members of the Class, and expressly agreed with Stanford to receive wire deposits from members of the Class for further transfer to SIBL in Antigua.

108.    After the establishment of the HSBC-Stanford correspondent bank relationship, members of the Class transferred funds to HSBC with the intent that such funds would be transferred to SIBL in Antigua for deposit there.

109.    Upon information and belief, all or substantially all of the funds that members of the class transferred to HSBC, with the intent that such funds would be transferred to SIBL in Antigua for deposit there, were redirected by HSBC, in concert with and/or at the direction of Stanford, to bank accounts in Houston, Texas, and elsewhere, after which such funds were distributed to other Stanford entities, "invested"

Certified Document Number: 43120733 - Page 30 of 38

in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation.

110.   Based upon the foregoing, and based upon its longstanding correspondent banking relationship with Stanford, HSBC knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

TD Bank

111.   Defendant TD Bank was a "correspondent" bank of SIBL, receiving wire transfers of funds from members of the Class.

112.   As a correspondent bank of SFG, TD Bank was required, pursuant to Canadian money laundering regulations, to conduct thorough due diligence on SIBL and SFG's operations.

113.   Upon information and belief, prior to and during their establishment of a correspondent banking relationship with SFG, TD Bank gathered sufficient information concerning SFG to understand Stanford's business and, as a result, knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

114.   Stanford provided members of the Class with deposit instructions indicating that they could make deposits in Antigua-based SIBL by wiring funds to TD Bank.

115.   TD Bank was aware of these instructions that were provided to members of the Class, and expressly agreed with Stanford to receive wire deposits from members of the Class for further transfer to SIBL in Antigua.

Certified Document Number: 43120733 - Page 31 of 38

116.   After the establishment of the TD Bank-Stanford correspondent bank relationship, members of the Class transferred funds to TD Bank with the intent that such funds would be transferred to SIBL in Antigua for deposit there.

117.   Upon information and belief, all or substantially all of the funds that members of the class transferred to TD Bank, with the intent that such funds would be transferred to SIBL in Antigua for deposit there, were redirected by TD Bank, in concert with and/or at the direction of Stanford, to bank accounts in Houston, Texas, and elsewhere, after which such funds were distributed to other Stanford entities, "invested" in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation.

118.   Among other things, during 2008 alone, approximately $474 million of funds were transferred from SIBL's accounts at TD Bank to SIBL's account at BoH.

119.   Based upon the foregoing, and based upon its longstanding correspondent banking relationship with Stanford, TD Bank knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

Société Générale

120.   Defendant Société Générale provided "private banking" services to Stanford.

121.   Upon information and belief, Société Générale earned substantial fees through its "private banking" relationship with Stanford.

122.   Blaise Friedli, the Executive Vice President of Private Banking at Société Générale, served on the Stanford Financial Group International Advisory Board.

Certified Document Number: 43120733 - Page 32 of 38

123.   Upon information and belief, Stanford, with the active support and assistance of Friedli and Société Générale, made illicit payments to Stanford's outside auditor in exchange for the auditor's role in conducting sham audits and falsely vouching for the financial integrity of SIBL and SIBL's investments.[5]

124.   Specifically, Stanford made regular monthly payments to an outside auditor, C.A.S. Hewlett, as payment for that firm's accounting services. Those regular payments, made from a Stanford Financial Group Limited account at Trustmark Bank in Houston, Texas, were $18,000 per month for professional services in 2007 and through April 2008, and $25,000 per month thereafter.

125.   Stanford, however, made *additional* payments to C.A.S. Hewlett from its private Swiss accounts at Société Générale. Those payments, which were in the amount of £ 15,000 (sterling) per month, were *increased* to £20,000 (sterling) per month effective June 15, 2008.   Upon information and belief, those additional payments were not for audit services, but were instead illicit payments made with the purpose and intent of paying C.A.S. Hewlett to provide fraudulent auditing services.

126.   Mr. Friedli, a member of the Stanford Financial Group International Advisory Board, and the Executive Vice President of Private Banking at Société Générale, was aware of those payments to C.A.S. Hewlett and, in fact, was essential to carrying them out.   According to documents made filed in the Receivership Action, James Davis informed Mr. Friedli in May 2008 to increase the additional payments to

---

[5] The allegations concerning the payments to C.A.S. Hewlett from the account at Société Générale are made upon information and belief, and based upon the Supplemental Declaration of Karyl Van Tassel dated July 10, 2009, submitted in *In re Stanford International Bank, Ltd.*, Case No. 3-09-CV-0721-N (S.D. Tex.), Dkt. No. 42, Exh. A.

Certified Document Number: 43120733 - Page 33 of 38

C.A.S. Hewlett from the Société Générale accounts, and Stanford's financial records reflect that Mr. Friedli did so.

127.    Based upon the foregoing, and based upon Mr. Friedli's knowledge: (a) of Stanford as a member of Stanford's International Advisory Board; (b) of Stanford's bank accounts and funds transfers as the Executive Vice President of Private Banking at Société Générale, and the Société Générale banker in charge of overseeing those accounts; and (c) that Stanford was making monthly illicit payments to C.A.S. Hewlett from accounts at Société Générale, Société Générale knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

Trustmark

128.    Trustmark held and managed numerous Stanford operating accounts, including a SIBL "sweep" account, which sent: (i) approximately $295 million to SIBL's account at TD Bank during 2008; (ii) approximately $66 million to an SIBL client account at Trustmark; (iii) $32 million to an SIBL Vendor Account at Trustmark; and (iv) approximately $2 million to the SIBL Payroll Account at Trustmark.

129.    Trustmark was required, pursuant to U.S. anti-money laundering laws and regulations, to conduct a thorough investigation of any suspicious and potentially illegal banking activity.

130.    Upon information and belief, Trustmark received large and highly suspicious wire transfers from HSBC and TD Bank of funds that were received by those institutions from members of the Class and intended for deposit with SIBL in Antigua.

131.    Upon information and belief, Class members who paid by check in U.S. dollars sent their checks to SIBL in Antigua, where those checks were bundled and sent daily to Trustmark National Bank in Houston, Texas, for deposit there.

4.    Members of the Class were not aware that their checks were diverted from Antigua to Houston, Texas, where they were deposited in a bank other than the intended recipient, SIBL.

132.    Upon information and belief, numerous large transfers of funds were made from SIBL's accounts at Trustmark to other Stanford entities, "invested" in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation.

133.    Based upon the foregoing, and based upon its longstanding banking relationship with Stanford, Trustmark knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

<u>BoH</u>

134.    BoH held and managed certain of Stanford's operating accounts, including Stanford's principal operating account.

135.    BoH was required, pursuant to U.S. anti-money laundering laws and regulations, to conduct a thorough investigation of any suspicious and potentially illegal banking activity.

136.    Upon information and belief, BoH received large and highly suspicious wire transfers from HSBC and TD Bank of funds that were received by those institutions from members of the Class and intended for deposit with SIBL in Antigua.

Certified Document Number: 43120733 - Page 35 of 38

137.    Among other things, during 2008 alone, approximately $474 million of funds were transferred from SIBL's accounts at TD Bank to SIBL's account at BoH.

138.    Members of the Class were not aware that their checks were diverted from Antigua to Houston, Texas, where they were deposited in a bank other that the intended recipient, SIBL.

139.    Upon information and belief, numerous large transfers of funds were made from SIBL's accounts at BoH to other Stanford entities, and "invested" in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation. Upon information and belief, during 2008 approximately $300 million of SIBL funds were distributed from BoH among various Stanford entities.

140.    Based upon the foregoing, and based upon its longstanding banking relationship with Stanford, BoH knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

<u>General Allegations</u>

141.    Defendants together or separately, conspired with Stanford to commit fraud.

142.    The object of the fraud was to fraudulently induce members of the Class to send funds to SIBL, which were then distributed to Defendants in the form of "fees," and diverted for: (a) "investment" in Allen Stanford's personal business ventures; (b) funding Allen Stanford's lavish lifestyle; and (c) funding and perpetuating the fraud described above.

Certified Document Number: 43120733 - Page 36 of 38

143.    Defendants together or separately, had a meeting of the minds with Stanford on the course of action for perpetrating the fraud.

144.    Specifically Defendants, by word and deed, conveyed to members of the Class that funds transmitted to SIBL, through HSBC and/or TD Bank, were being deposited in SIBL in Antigua, and being entrusted to a legitimate banking institution.

145.    By reason of the foregoing, the Class has been damaged in an amount to be determined at trial, but believed to be in excess of $7 billion.

146.    By reason of the foregoing, Defendants are liable to the Plaintiffs and the Class for Conspiracy to Commit Fraud and/or Aiding and Abetting Fraud.

### JURY DEMAND

147.    Plaintiffs demand a jury trial.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(i)     certify the Class;

(ii)    enter judgment in favor of the Class and against the Defendants:
(a) ordering the avoidance of the fraudulent transfers described herein;

(b) awarding damages in an amount to be determined at trial;

(c) awarding attorney fees, and costs as permitted by law; and

(d) granting such other and further relief as the Court may deem just and appropriate.

LACKEY HERSHMAN, L.L.P

By:     _____

Paul Lackey
State Bar Number 00791061

Certified Document Number: 43120733 - Page 37 of 38

3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

MORGENSTERN & BLUE, LLC

Peter D. Morgenstern (*pro hac vice pending*)
Gregory A. Blue (*pro hac vice pending*)
Rachel K. Marcoccia (*pro hac vice pending*)
885 Third Avenue
New York, NY 10022
Telephone: (212) 750-6776
Facsimile: (212) 750-3128

*Attorneys for Plaintiffs*



I, Loren Jackson, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date
Witness my official hand and seal of office
this September 8, 2009

Certified Document Number:   43120733 Total Pages:  38

LOREN JACKSON, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

Filed 09 October 9 P2:32
Loren Jackson - District Clerk
Harris County
ED101J015540615
By: aayesha kitchen

CAUSE NO. 2009-53845

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, GUTHRIE ABBOTT, CATHERINE BURNELL, STEVEN QUEYROUZE, JAIME ALEXIS ARROYO BORNSTEIN, and JUAN C. OLANO, on behalf of themselves and all others similarly situated, | § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| TRUSTMARK NATIONAL BANK, HSBC BANK PLC, THE TORONTO-DOMINION BANK, SG PRIVATE BANKING (SUISSE) S.A., and BANK OF HOUSTON, | § § § § § § | |
| Defendants. | § | 129th JUDICIAL DISTRICT |

## PLAINTIFFS' FIRST AMENDED PETITION

Plaintiffs PEGGY ROIF ROTSTAIN, GUTHRIE ABBOTT, CATHERINE BURNELL, STEVEN QUEYROUZE, JAIME ALEXIS ARROYO BORNSTEIN, and JUAN C. OLANO, ("Plaintiffs") on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, as and for their First Amended Petition against Defendants TRUSTMARK NATIONAL BANK ("Trustmark"), HSBC BANK PLC ("HSBC"), THE TORONTO-DOMINION BANK ("TD Bank"), SG PRIVATE BANKING (SUISSE) S.A. ("Société Générale"), and BANK OF HOUSTON ("BoH") (collectively, "Defendants"), allege on information and belief as follows:

Certified Document Number: 43561547 - Page 1 of 38

# I.

## **PRELIMINARY STATEMENT**

This is an action on behalf of the victims of the fraud at Stanford International Bank, Ltd. ("SIBL"), part of the Stanford Financial Group[1], to recover damages and fraudulent transfers from the banks that provided essential assistance to Stanford in one of the largest financial crimes in history.

The Stanford fraud was based upon the collection of billions of dollars from unsuspecting victims in the United States, Canada, Mexico, Colombia, Peru, Venezuela, and elsewhere in the world. Through a network of sales offices located in those countries, SFG sold purported certificates of deposit ("CDs") issued by Antigua-based SIBL, offering interest rates higher than those generally available at other banks. While SFG's sales representatives convinced the victims that SIBL could offer those higher rates of return because of its unique and successful investment strategy, the operation was a fraud. The Defendants each played an essential role in that scheme, and reaped substantial fees from doing so.

In particular, Defendants HSBC and TD Bank acted as willing and essential conduits for the flow of money from Stanford's unsuspecting victims to Stanford's fraudulent criminal enterprise. Stanford used HSBC to collect all wire transfers intended by the victims to be deposited in SIBL in British Pound Sterling, Euros, and other

---

[1] Stanford Financial Group ("SFG") refers to the dozens of affiliated companies owned and/or controlled by R. Allen Stanford ("Allen Stanford"), including but not limited to SIBL, Stanford Group Company, Stanford Capital Management, LLC, Stanford Trust Company Ltd., and Stanford Financial Group Global Management, LLC. As used herein, "SFG" refers to these entities, and "Stanford" refers to these entities together with Allen Stanford.

Certified Document Number: 43561547 - Page 2 of 38

European currencies.  Similarly, Stanford used TD Bank to collect all such deposits in US dollar and Canadian dollar denominations.    All or substantially all of the money that Stanford's victims sent to HSBC and TD Bank was eventually diverted from SIBL, where the victims intended the funds to go, to be "invested" in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation.

Both HSBC and TD Bank handled enormous volumes of such transfers.  Upon information and belief, HSBC and TD Bank either knew that Stanford's banking operation was illegitimate or, through reasonable and required diligence could have determined that it was illegitimate.

Société Générale also played a central role in the scheme, providing essential banking services to Stanford.  Upon information and belief, Société Générale held SFG operating accounts that were used to make illicit monthly payments to Stanford's purported auditor.    When Stanford's financial troubles increased – and the need to purchase the cooperation of its auditor grew more urgent – Stanford directed Société Générale to make larger monthly payments to that auditor.  That instruction was given by Stanford to Blaise Friedli, Executive Vice President of Société Générale Private Banking in Geneva, Switzerland, who – not coincidentally – was a member of the Stanford Financial Group International Advisory Board.  Moreover, in a highly unusual transfer of funds, Stanford directed Société Générale to transfer more than $100 million out of Société Générale in the last two weeks of December 2008.  Upon information and belief,

all or substantially all of that money is missing, and is unavailable to satisfy victims' claims.

Through its role as Stanford's private banker, its essential assistance in the payment of bribes to Stanford's purported auditor, and Mr. Friedli's position on the Stanford Financial Group International Advisory Board, among other things, Société Générale either knew that Stanford's banking operation was illegitimate or, through reasonable and required diligence, could have determined that it was illegitimate.

Trustmark received daily bundles of checks that Class members intended for deposit in SIBL in Antigua. Those checks were deposited in SIBL accounts at Trustmark, and later distributed to other Stanford entities and put to the private use of Allen Stanford. These highly suspicious and unusual deposits, together with other information readily available to Trustmark concerning Stanford's operations, either did, or should have, alerted Trustmark to the illegal nature of the Stanford banking operation.

Finally, each of the Defendants collected substantial fees and other payoffs in exchange for its role in transferring money from the victims of the crime, to SFG and, in many instances, out to R. Allen Stanford's personal and private business ventures. Every dollar that was paid to the Defendants by SFG was paid in furtherance of Stanford's scheme to defraud the victims of the scheme, using money fraudulently stolen from the victims. As a result, all such payments are recoverable by SFG's creditors as fraudulent transfers under the Texas Uniform Fraudulent Transfer Act ("UFTA") and pursuant to common law.

Certified Document Number: 43561547 - Page 4 of 38

## II.

### DISCOVERY CONTROL PLAN

1.      Plaintiffs intend that discovery shall be conducted under Level 2, pursuant to Rule 190.3 of the TEXAS RULES OF CIVIL PROCEDURE.

## III.

### JURISDICTION AND VENUE

2.      Venue is appropriate in Harris County, Texas, because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Harris County, Texas.

3.      Jurisdiction is proper in this Court because each of the Defendants have purposefully availed themselves of the privilege of conducting business activities in Texas and each of the Defendants has had continuous and systematic business contacts with Texas. Additionally, the amount in controversy exceeds the minimum jurisdictional threshold of this Court.

4.      Pursuant to Section 15.001, *et seq.*, of the TEXAS CIVIL PRACTICE & REMEDIES CODE, venue is proper in this Court because: (a) the events or omissions giving rise to Plaintiffs' causes of action occurred in whole or part in Harris County, Texas; and/or (b) one or more of the Defendants has its principal office in the State of Texas located in Harris County, Texas.

5.      Among other things, Defendants conspired with one or more Texas residents to commit torts in Texas; committed torts in and/or directed at Texas residents; caused foreseeable harm in Texas; made misrepresentations to or relied upon in Texas;

Certified Document Number: 43561547 - Page 5 of 38

converted, fraudulently transferred and/or aided and abetted in converting and fraudulently transferring Texas property and/or property of Texas residents, or did so in a manner foreseeably harming Texas residents and violating the laws and protections of the State of Texas.

### IV.

### PARTIES

6.      At all relevant times, Plaintiff Peggy Roif Rotstain is and was a citizen of Peru residing in Peru.  Rotstain caused funds to be transmitted via draft to SIBL, and to TD Bank, for the intended purpose of purchasing SIBL CDs.

7.      At all relevant times, Plaintiff Guthrie Abbott is and was a citizen of the United States.

8.      At all relevant times, Plaintiff Catherine Burnell is and was a citizen of the United Kingdom residing in Antigua.  Burnell caused funds to be transmitted to HSBC for the intended purpose of purchasing SIBL CDs.

9.      At all relevant times, Plaintiff Steven Queyrouze is and was a citizen of the United States residing in Louisiana.

10.     At all relevant times, Plaintiff Jaime Alexis Arroyo Bornstein is and was a citizen of Mexico residing in Mexico.  Bornstein caused funds to be transmitted to TD Bank for the intended purpose of purchasing SIBL CDs.

11.     At all relevant times, Plaintiff Juan C. Olano was a citizen of Colombia and the United States residing in Florida.

Certified Document Number: 43561547 - Page 6 of 38

12.     As of February 16, 2009, Plaintiffs were customers of SIBL, had money on deposit at SIBL, and held CDs issued by SIBL.  Plaintiffs are each members of the Class, as defined below.

13.     Upon information and belief, Defendant TD Bank is a banking corporation incorporated in Canada.  TD Bank may be served by serving its registered agent, CSC Corporation, 701 Brazos Street, Suite 1050, Austin, Texas 78701.

14.     Upon information and belief, Defendant HSBC is an international bank with its registered office and principal place of business located at 8 Canada Square, London E14 5HQ, England.  HSBC may be served by serving its Deputy Chairman and Chief Executive Officer, Dyfrig D.J. John, at 8 Canada Square, London E14 5HQ, England.

15.     Upon information and belief, Defendant Société Générale is a banking corporation organized under the laws of France with its principal place of business in France.  Société Générale may be served by serving its Executive Vice President, Blaise Friedli, at 701 Brickell Avenue, Suite 1740, Miami, Florida 33131.

16.     Upon information and belief, Defendant Trustmark is a national banking association chartered by the Office of the Comptroller of the Currency pursuant to the applicable laws of the United States of America and the related rules promulgated by the Office of the Comptroller of the Currency.  Upon information and belief, Trustmark's corporate headquarters and principal place of business are located in Jackson, Mississippi.  Upon information and belief, Trustmark is "located" in and is a citizen of the State of Mississippi, although Trustmark also maintains offices in Harris County,

Certified Document Number: 43561547 - Page 7 of 38

Texas and in other jurisdictions.   Trustmark may be served by serving its registered agent, James M. Outlaw, Jr., at 4200 Westheimer, Suite 102, Houston, Texas 77027.

17.    Upon information and belief, Defendant BoH is a banking institution with its principal place of business at 750 Bering Drive, Suite 100, Houston, Texas 77057. BoH may be served by serving its President and Chief Executive Officer, Jim Stein, at 750 Bering Drive, Suite 100, Houston, Texas 77057.

## RELEVANT NON-PARTIES

18.    At all relevant times, SFG was a group of affiliated financial services entities led by Allen Stanford.   SFG maintained its headquarters in Houston, Texas, and maintained offices in several other locations including Memphis, Tennessee, and Miami, Florida.   Upon information and belief, the activities of SFG and all of the Stanford Entities were directed from SFG's Houston, Texas, headquarters.

19.    At all relevant times, SIBL was a private, offshore bank with offices on the island of Antigua.  SIBL was organized in Montserrat, originally under the name of Guardian International Bank.  In or about 1989, SIBL's principal banking location was moved to Antigua.

20.    Until the SEC instituted civil enforcement proceedings against it in February of 2009, SIBL marketed CDs and promised higher rates of return on those CDs than were generally offered at banks in the United States.  In its 2007 Annual Report, SIBL stated that it had approximately $6.7 billion worth of CD deposits, and more than $7 billion in total assets.  In its December, 2008, Monthly Report, SIBL purported to have more than 30,000 clients from 131 countries, representing $8.5 billion in assets.

Certified Document Number: 43561547 - Page 8 of 38

21.     Stanford Group Company ("SGC"), a Houston-based company, was founded in or about 1995. SGC, and the financial advisers employed by SGC, promoted the sale of SIBL's CDs through SGC's 25 offices located throughout the United States. According to the Court-appointed receiver[2] for the Stanford entities, "the principal purpose and focus of most of [Stanford's] combined operations was to attract and funnel outside investor funds into the Stanford companies through the sale of [CDs] issued by Stanford's offshore entity SIBL." Report Of The Receiver Dated April 23, 2009 (the "Report"), at p. 6.

22.     Allen Stanford founded and owned SFG and its affiliated companies, including, through a holding company, SIBL. Allen Stanford was the chairman of SIBL's Board of Directors and a member of SIBL's Investment Committee.

## V.

## FACTS APPLICABLE TO ALL COUNTS

### CLASS ALLEGATIONS

23.     The class of persons that Plaintiffs seek to represent (the "Class") is comprised of all individuals who, and entities that, as of February 16, 2009, were customers of SIBL, with monies on deposit at SIBL and/or holding CDs issued by SIBL. All such individuals are creditors of SIBL, Allen Stanford, and other entities that are members of SFG within the meaning of the UFTA.

---

[2] In February 2009, the SEC filed a complaint in the United States District Court for the Northern District of Texas (the "SEC Action") against Allen Stanford and various Stanford entities and employees, alleging a "massive, on-going fraud." By order dated February 16, 2009 (as amended March 12, 2009), the court in the SEC Action appointed Ralph Janvey, Esq., to be the receiver in that action (hereinafter, the "Receiver"). On or about February 27, 2009, the SEC filed a First Amended Complaint in the SEC Action.

Certified Document Number: 43561547 - Page 9 of 38

24. *Numerosity.* A class action is appropriate in this case because the Class is so numerous that joinder of all members is impracticable. While the precise number of Class members and their addresses are unknown to the Plaintiffs, their identities can be determined from SIBL's records. Upon information and belief, Class members number in the tens of thousands.

25. *Commonality.* A class action is appropriate in this case because there are questions of law and fact common to the Class, including but not limited to:

   (a)   whether the Defendants received fees and other monies from Stanford within the relevant time period;

   (b)   whether Stanford paid fees and other monies to the Defendants with the actual intent to hinder, delay, or defraud members of the Class;

   (c)   whether any such fees were paid, or other monies transferred, by Stanford to the Defendants while Stanford was engaged or was about to engage in a business or a transaction for which Stanford's remaining assets were unreasonably small in relation to the business or transaction;

   (d)   whether any such fees were paid, or other monies transferred, by Stanford to the Defendants when Stanford intended to incur, or believed or reasonably should have believed that it would incur, debts beyond the its ability to pay as they became due;

   (e)   whether any such fees were paid, or other monies transferred, by Stanford to the Defendants without Stanford receiving a reasonably equivalent value in exchange for the transfer;

Certified Document Number: 43561547 - Page 10 of 38

(f)     whether any such fees were paid, or other monies transferred, by Stanford

to the Defendants at a time when Stanford was insolvent, or whether

Stanford became insolvent as a result of the payment of such fees or other

monies transferred;

(g)     whether the Defendants received any such fees, or other monies

transferred, in good faith and for a reasonably equivalent value;

(h)     whether the Defendants conspired with Stanford;

(i)     whether the Defendants knew or should have known of Stanford's fraud;

(j)     whether the Defendants knew or should have known of Stanford's fraud;

and

(k)     whether the Class has been damaged by the alleged conspiracy by or

among the Defendants and Stanford.

26.     The questions of law and fact common to the Class predominate over any

questions affecting only individual members.

27.     *Typicality.*   The claims of the representative Plaintiffs are typical of the

claims of the Class.

28.     *Adequacy.*   The representative Plaintiffs will fairly and adequately protect

the interests of the Class.

29.     In the absence of class certification, there is a risk that adjudications in

thousands of separate cases with respect to individual Class members would, as a

practical matter, be dispositive of the interests of the other members not parties to the

Certified Document Number: 43561547 - Page 11 of 38

individual adjudications, or would substantially impair or impede their ability to protect their interests.

30.     A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## FACTUAL ALLEGATIONS

### The Fraud[3]

31.     Stanford's business was a massive fraud in which Stanford misappropriated billions of dollars, falsified SIBL's financial statements, and concealed their fraudulent conduct from customers, prospective customers, and regulators in the United States and elsewhere.

32.     SIBL represented to the Plaintiffs and the Class that: (i) their assets were safe and secure because the bank invested in a "globally diversified portfolio" of "marketable securities;" (ii) SIBL had averaged double-digit returns on its investments for over 15 years; (iii) Allen Stanford had solidified SIBL's capital position in late 2008 by infusing $541 million in capital into the bank; (iv) SIBL's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee; (v) SIBL, in early 2009, was stronger than at any time in its history; and (vi) SIBL did not have exposure to losses from investments in the fraudulent "Ponzi" scheme that had been operated by Bernard L. Madoff (the "Madoff Scheme"). More fundamentally, Stanford represented that SIBL

---

[3] The factual allegations in this sub-section are made upon information and belief, based upon the allegations made by the SEC in its civil enforcement action *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 09-cv-0298-N (N.D. Tex), the indictment in *United States v. Stanford, et al.*, Case No. 09-cr-342 (S.D. Tex), the public materials cited therein, and other public materials and media reports.

Certified Document Number: 43561547 - Page 12 of 38

was a legitimate banking institution, which made money by investing assets and generating investment returns. These representations were false.

33.    Stanford intended that Plaintiffs and other members of the Class would rely upon these representations when making their decisions to entrust their money to Stanford, and the Plaintiffs and other members of the Class did so.

34.    Contrary to SIBL's public statements, by February 2009, Stanford had misappropriated billions of dollars from Plaintiffs and the Class, and "invested" an undetermined amount of those funds in speculative, unprofitable private businesses controlled by Allen Stanford. Contrary to SIBL's representations regarding the liquidity and safety of its portfolio, the Plaintiffs' and the Class's funds were not invested in a "well-diversified portfolio of highly marketable securities." Instead, SIBL's internal records reflect that more than half of the bank's investment portfolio was comprised of undisclosed "Private Equity Real Estate."

35.    According to the SEC, Stanford fabricated SIBL's financial statements. Using a predetermined return on investment number, Stanford reverse-engineered SIBL's financial statements to report investment income that SIBL had not actually earned. As a result, information in SIBL's financial statements and annual reports bore little or no relationship to the actual performance of SIBL's investments.

36.    Plaintiffs and other members of the Class reasonably relied upon SIBL's fabricated financial statements when making their decisions to entrust their money to Stanford.

37.     In selling the CDs, SIBL touted, among other things, the CDs' safety, security, and liquidity.  SIBL told Plaintiffs and the Class that SIBL aggregated customer deposits, and then reinvested those funds in a "globally diversified portfolio" of assets. SIBL also represented to the Plaintiffs and the Class that Stanford employed a sizeable team of analysts to monitor SIBL's portfolio.  These representations were false.

38.     Plaintiffs and other members of the Class reasonably relied upon SIBL's representations regarding the safety, security, liquidity, composition, and monitoring of SIBL's investment portfolio.

39.     SIBL's annual reports also represented that "SIBL does not expose its clients to the risks associated with commercial loans...the Bank's only lending is on a cash secured basis."   Contrary to SIBL's representations, however, SIBL exposed Plaintiffs and the Class to the risks associated with more than $1.6 billion in undisclosed and unsecured personal "loans" to Allen Stanford.  To conceal the theft, some of these "loans" were evidenced by promissory notes from Allen Stanford.

40.     These promissory notes were typically created after James M. Davis ("Davis"), who was the Chief Financial Officer of SFG and SIBL, and served as a member of SIBL's Investment Committee, had, at Allen Stanford's direction, fraudulently wired out billions dollars of SIBL investor funds to Allen Stanford or his designees.  Allen Stanford made few, if any, payments required by the terms of the promissory notes, and the outstanding loan balances and interest owed by him to SIBL were rolled into new, larger, promissory notes.

41.    The personal "loans" to Allen Stanford were inconsistent with representations that had been made to Plaintiffs and members of the Class: despite the fact that SIBL's annual reports included a section entitled "Related-Party Transactions" that purported to disclose all related-party transactions entered into by SIBL, SIBL's "loans" to Allen Stanford were not disclosed in the "Related-Party Transactions" section of SIBL's annual reports from 2004 through 2008.

42.    Allen Stanford used the money that he "borrowed" from SIBL to, among other things, fund his personal ventures and private pursuits, including more than $400 million to fund personal real estate deals and more than $36 million to subsidize "Stanford 20/20," an annual cricket tournament that boasted a $20 million purse.

43.    Plaintiffs and other members of the Class reasonably relied upon SIBL's misrepresentations regarding SIBL's bogus "loans" to Allen Stanford.

44.    Allen Stanford's misappropriation of the Plaintiffs' and the Class's assets (and the poor performance of SIBL's investment portfolio) created a giant hole in SIBL's balance sheet.  To conceal their fraudulent conduct and thereby ensure that Plaintiffs and the Class continued to entrust their money to SIBL, the Stanford Co-Conspirators fabricated the growth, composition, and performance of SIBL's investment portfolio to give the appearance that SIBL's investments were highly profitable.

45.    In its training materials for the SGC advisers, SIBL represented that it had earned consistent double-digit annual returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993) for almost fifteen years.  SIBL marketed the CDs using these purported returns on investment.  Likewise, SIBL's Annual Reports stated that the

Certified Document Number: 43561547 - Page 15 of 38

bank earned from its "diversified" investments approximately $642 million in 2007 (11 %), and $479 million in 2006 (12%).

46.     SIBL claimed that its high returns on investment allowed it to offer higher rates on the CD than those offered by U.S. banks.  For example, SIBL offered 7.45% as of June 1, 2005, and 7.878% as of March 20, 2006, for a fixed-rate CD based upon an investment of $100,000.   On November 28, 2008, SIBL quoted 5.375% on a 3-year flex CD, while comparable U.S. bank CDs paid less than 3.2%.

47.     None of the information that SIBL disseminated regarding the growth, composition, and performance of its investment portfolio was true.  Instead, through their actions, the Stanford Co-Conspirators caused SIBL to report investment income that the bank did not actually earn and, thereby, greatly inflate the value of its investment portfolio.   Specifically, the Stanford Co-Conspirators prepared and reviewed SIBL's financial statements, including the annual reports that were provided to customers and posted on the bank's website.

48.     Plaintiffs and other members of the Class reasonably relied upon the information that SIBL disseminated regarding the growth, composition, and performance of its investment portfolio.

49.     As world financial markets experienced substantial declines in 2008, it became apparent to Allen Stanford and Davis that SIBL could not credibly report investment profits in the 11 % to 15% range (as it had done in previous years).  Allen Stanford and Davis thus agreed that SIBL would for the first time show a "modest" loss to avoid raising too many "red flags" to customers and other nations' regulators.  In other

words, they opted to tell a "more believable lie" in order to conceal their many previous

years of fraudulent conduct.

50.     SIBL touted a purported $541 million capital infusion from Allen Stanford

in a December 2008 report:

> Although our earnings will not meet expectations in 2008, Stanford International
> Bank Ltd. is strong, safe and fiscally sound. We have always believed that
> depositor safety was our number one priority. To further support the Bank's
> growth and provide a strong cushion for any further market volatility, the Bank's
> Board of Directors made a decision to increase the Bank's capital by $541 million
> on November 28, 2008. This contribution brings total shareholder equity to
> $1,020,029,802 with a capital to assets ratio of 11.87% and a capital to deposits
> ratio of 13.48%.

51.     The purported capital infusions by Allen Stanford were backdated,

fictitious, and engineered to give the appearance that SIBL had achieved "desired" levels

of capital.

52.     In December 2008, well after Allen Stanford had purportedly infused the

$541 million in additional capital into SIBL, Stanford implemented a series of fraudulent

round-trip real estate transactions utilizing undeveloped Antiguan real estate acquired by

SIBL in 2008 for approximately $63.5 million (or roughly $40,000 per acre).

53.     To give the appearance that the above-referenced capital infusions actually

occurred Stanford falsified accounting records by recording bogus transactions:

- SIBL sold the Antiguan real estate to several newly-created Stanford-
  controlled entities at the original cost of $63.5 million (although there is
  no evidence that Stanford paid SIBL the $63.5 million);

- the Stanford-controlled entities, at Allen Stanford's and Davis's
  instruction, immediately wrote-up the value of the real estate to
  approximately $3.2 billion dollars (or $2 million per acre), thereby
  exponentially increasing the value of the entities' stock;

Certified Document Number: 43561547 - Page 17 of 38

- in an effort to satisfy a portion of Allen Stanford's personal debt to SIBL, Allen Stanford contributed to SIBL $1.7 billion of the fraudulently-inflated stock (using the inflated $2 million per acre valuation); and

- Allen Stanford then contributed to SIBL additional stock in the real estate holding companies valued at $200 million and $541 million (again using the inflated $2 million per acre valuation) to fund the backdated capital contributions.

54.     These transactions did not infuse real capital into SIBL. In fact, the entire process was fabricated after the reported capital contributions allegedly occurred. Moreover, the purported inflation in value of the real estate from $40,000 to $2 million per acre was not justifiable under applicable U.S. or international accounting principles. SIBL did not secure an appraisal and had no other reasonable support for such a drastic increase in value. The transactions among Stanford-controlled entities simply were not the kind of arm's-length transactions required to justify a 5000% increase in value. Nevertheless, on a mere promise from Allen Stanford that the land would be appraised for over $3 billion, Stanford used $63.5 million of Antiguan real estate to simultaneously plug a multi-billion dollar hole in SIBL's balance sheet and eliminate a significant portion of Allen Stanford's personal debt to SIBL.

55.     Following the fraudulent capital infusions, the largest segment of the bank's investment portfolio would have been $3.2 billion in over-valued real estate. Yet, SIBL did not disclose the transactions in its December 2008 newsletter, which touted Allen Stanford's purported capital infusion. Moreover, Stanford's real estate investments were wholly inconsistent with SIBL's representations to customers that SIBL's investment portfolio was composed of marketable securities, and not real estate.

56.     Plaintiffs and other members of the Class reasonably relied upon the information regarding Allen Stanford's purported capital infusion to SIBL.

Misrepresentations Regarding Management
of SIBL's Investment Portfolio

57.     Prior to making decisions to entrust their money to SIBL, prospective customers routinely asked how SIBL safeguarded and monitored its assets. They also frequently inquired whether Stanford could "run off with the money."

58.     In response to these questions, at least during 2006 and much of 2007, Pendergest-Holt trained SIBL's senior investment officer ("SIO") to tell customers and prospective customers that the bank's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee.   The SIO followed Pendergest-Holt's instructions, telling customers and prospective customers that SIBL's entire investment portfolio was managed by a global network of money managers and monitored by a team of more than twenty analysts.

59.     Neither Pendergest-Holt nor the SIO disclosed to customers that SIBL segregated its investment portfolio into three tiers: (i) cash and cash equivalents ("Tier 1"); (ii) investments with "outside portfolio managers (25+)" that were monitored by the SFG analysts ("Tier 2"); and (iii) undisclosed assets managed by Stanford and Davis ("Tier 3").  As of December 2008, Tier 1 represented merely approximately 9% ($800 million) of SIBL's purported portfolio.  Tier 2, prior to the bank's decision to liquidate $250 million of investments in late 2008, represented approximately 10% of

SIBL's portfolio. Tier 3, the undisclosed assets managed by Allen Stanford and Davis, thus represented *approximately 80%* of SIBL's investment portfolio in December, 2008.

60.     Neither Pendergest-Holt nor SIBL's SIO disclosed that the bank's Tier 3 assets were managed and/or monitored exclusively by Allen Stanford and Davis. Likewise, they did not disclose that Allen Stanford and Davis surrounded themselves with a close-knit circle of family, friends and confidants, thereby eliminating any independent oversight of SIBL's assets.

61.     Neither Pendergest-Holt nor the SIO disclosed to the Plaintiffs or the Class that the "global network" of money managers and the team of analysts did not manage any of SIBL's Tier 3 investments and, in reality, only monitored approximately 10% of SIBL's portfolio.  In fact, Pendergest-Holt trained the SIO "not to divulge too much" about the oversight of SIBL's portfolio because that information "wouldn't leave an investor with a lot of confidence."   Likewise, Davis instructed the SIO to "steer" potential customers away from information about SIBL's portfolio.

62.     Plaintiffs and other members of the Class reasonably relied upon the information disseminated by SIBL's SIO when making their decisions to invest in and with the Stanford Entities.

<u>Misrepresentation That SIBL Was "Stronger" Than Ever Before</u>

63.     On January 10, 2009, Allen Stanford, Davis and Pendergest-Holt spoke to SGC's Top Performers Club (a collection of high performing Stanford financial advisers) in Miami, Florida.

Certified Document Number: 43561547 - Page 20 of 38

64.     During that meeting, Davis stated that SIBL was "stronger" than at any time in its history. Allen Stanford, Davis, and Pendergest-Holt represented that SIBL was secure and built upon a strong foundation, and that its financial condition was shored up by Allen Stanford's capital infusions. Davis, however, failed to disclose that he had been informed only days earlier by the head of SIBL's treasury that, despite SIBL's best efforts to liquidate Tier 2 assets, SIBL's cash position had fallen from the June 30, 2008, reported balance of $779 million to less than $28 million.

65.     Allen Stanford and Davis also failed to disclose to the SGC sales force that: (i) Allen Stanford had misappropriated more than $1.6 billion of investor funds; (ii) SIBL's annual reports, financial statements and quarterly reports to the FSRC were false; (iii) hundreds of millions of dollars of SIBL customers' funds had been invested in a manner inconsistent with SIBL's representations to customers that SIBL's investment portfolio was composed of marketable securities, and not real estate and/or private equity; and (iv) the purported 2008 capital infusions by Allen Stanford were a fiction.

66.     During her speech, Pendergest-Holt, after being introduced as SFG's chief investment officer and a "member of the investment committee of the bank," answered questions about SIBL's investment portfolio. In so doing, she failed to disclose to attendees that she and her team of analysts did not manage SIBL's entire investment portfolio and, instead, only monitored approximately 10% of the bank's investments. She also failed to disclose that SIBL had invested SIBL's funds in a manner inconsistent with SIBL's representations to customers that SIBL's investment portfolio was composed of marketable securities, and not real estate and/or private equity.

Certified Document Number: 43561547 - Page 21 of 38

67.     Allen Stanford, Davis and Pendergest-Holt also failed to disclose that, on or about December 12, 2008, Pershing, LLC (SGC's clearing broker-dealer) had informed SGC that it would no longer process wire transfers from SGC to SIBL for the purchase of the CDs, citing suspicions about SIBL's investment returns and its inability to get from the bank "a reasonable level of transparency" into its investment portfolio.

68.     Allen Stanford, Davis and Pendergest-Holt knew that SGC advisers would rely upon the information provided to them during the Top Performers Club meeting to sell CDs.  Plaintiffs and other members of the Class reasonably relied upon that information.

<u>Exposure to Losses From Madoff-related Investments</u>

69.     In the December 2008 Monthly Report, SIBL told its customers that it "had no direct or indirect exposure to any of [Bernard] Madoff's investments."

70.     Contrary to this statement, Allen Stanford, Davis and Pendergest-Holt knew, prior to the release of the December 2008 Monthly Report, that SIBL had exposure to losses from the Madoff Scheme.

71.     On December 12, 2008, and again on December 18, 2008, Pendergest-Holt received e-mails from Meridian Capital Partners, a hedge fund with which SIBL had invested, detailing SIBL's exposure to losses from the Madoff Scheme.

72.     On December 15, 2008, an SFG-affiliated employee notified Pendergest-Holt and Davis that SIBL had exposure to losses from the Madoff Scheme in two additional funds through which SIBL had invested.  That same day, Davis, Pendergest-

Holt, and others consulted with Allen Stanford regarding the bank's exposure to losses from the Madoff Scheme.

73.     Allen Stanford, Davis and Pendergest-Holt never corrected this misrepresentation in the December 2008 monthly report.

74.     Plaintiffs and other members of the Class reasonably relied upon the information regarding SIBL's purported lack of exposure to losses from the Madoff Scheme.

Bribery of Regulatory Officials

75.     Stanford also represented to Plaintiffs and members of the Class that it was subject to the laws of the Commonwealth of Antigua and Barbuda ("Antigua") and the regulatory oversight of that nation's Financial Services Regulatory Commission of ("FSRC").

76.     The FSRC was created by and, at all relevant times, existed under the authority of, Antigua's International Business Corporations Act (the "IBC Act").

77.     Leroy King ("King") was the Administrator and Chief Executive Officer for the FSRC.  King, among other things, was ostensibly responsible for FSRC's (and, thus, Antigua's) oversight of SIBL's investment portfolio, including the review of SIBL's financial reports, and the response to requests by foreign regulators, including the SEC, for information and documents regarding SIBL's operations.

78.     King, however, "facilitated the Ponzi scheme by ensuring that the FSRC 'looked the other way' and conducted sham audits and examinations of [SIBL's] books and records.  In exchange for bribes paid to him over a period of several years, King

Certified Document Number: 43561547 - Page 23 of 38

made sure that the FSRC did not examine [SIBL's] investment portfolio. King also provided Stanford with access to the FSRC's confidential regulatory files."[4]

79.    Thus, Stanford was engaged in a multi-year, international scheme in which literally every transaction was undertaken with the purpose and intent of defrauding the Class.

## VI.
## CLAIMS

**A.    COUNT ONE: AGAINST ALL DEFENDANTS FOR AVOIDANCE OF FRAUDULENT TRANSFERS UNDER § 24.005(a)(1) OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT AND/OR UNDER THE COMMON LAW**

80.    Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

81.    At all relevant times Defendants provided banking services to Stanford.

82.    Upon information and belief, Defendants received substantial fees and other monies from Stanford during the preceding four (4) years.

83.    Upon information and belief, all or substantially all of those fees and other monies were paid with funds fraudulently stolen from the Plaintiffs and members of the Class.

84.    Upon information and belief, Stanford paid all such fees and other monies to the Defendants in connection with the scheme, and with the actual intent to hinder, delay, or defraud members of the Class.

---

[4] SEC Action, (Proposed) Second Amended Complaint, at p. 3.

Certified Document Number: 43561547 - Page 24 of 38

85.     By reason of the foregoing, each such payment or transfer was fraudulent as to Class members whose claim(s) arose before or within a reasonable time after the transfer was made pursuant to § 24.005(a)(1) of the UFTA.

86.     By reason of the foregoing, the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford pursuant to § 24.008(a)(1) of the UFTA.

87.     By reason of the foregoing, each such payment or transfer was fraudulent as to Class members and the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford under the common law applicable to fraudulent transfers.

**B.      COUNT TWO: AGAINST ALL DEFENDANTS FOR AVOIDANCE OF FRAUDULENT TRANSFERS UNDER § 24.005(a)(2) OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT AND/OR UNDER THE COMMON LAW**

88.     Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

89.     Upon information and belief, Stanford paid all such fees and other monies to the Defendants in connection with the scheme without receiving a reasonably equivalent value in exchange for the transfers, and at a time when Stanford was engaged or was about to engage in a business or a transaction for which Stanford's remaining assets were unreasonably small in relation to the business or transaction; or Stanford intended to incur, or believed or reasonably should have believed that the it would incur, debts beyond its ability to pay as they became due.

Certified Document Number: 43561547 - Page 25 of 38

90.     By reason of the foregoing, each such payment or transfer was fraudulent as to Class members whose claim(s) arose before or within a reasonable time after the transfer was made pursuant to § 24.005(a)(2) of the UFTA.

2.      By reason of the foregoing, the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford pursuant to § 24.008(a)(1) of the UFTA.

91.     By reason of the foregoing, each such payment or transfer was fraudulent as to Class members and the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford under the common law applicable to fraudulent transfers.

**C.      COUNT THREE: AGAINST ALL DEFENDANTS FOR AVOIDANCE OF FRAUDULENT TRANSFERS UNDER § 24.006(a) OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT AND/OR UNDER THE COMMON LAW**

92.     Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

93.     Upon information and belief, Stanford paid all such fees and other monies to the Defendants without receiving a reasonably equivalent value in exchange for the transfers.

94.     Upon information and belief, Stanford was insolvent at the time of each transfer or became insolvent as a result of such transfers.

95.     By reason of the foregoing, each such payment or transfer to the Defendants was fraudulent as to Class members whose claim(s) arose before such transfer was made pursuant to § 24.006(a) of the UFTA.

Certified Document Number: 43561547 - Page 26 of 38

96.     By reason of the foregoing, the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford pursuant to § 24.008(a)(1) of the UFTA.

97.     By reason of the foregoing, each such payment or transfer was fraudulent as to Class members and the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford under the common law applicable to fraudulent transfers.

**D.    COUNT FOUR: AGAINST ALL DEFENDANTS FOR CONSPIRACY TO COMMIT FRAUD AND/OR AIDING AND ABETTING FRAUD**

98.     Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

<u>FinCEN Advisory</u>

99.     In April 1999, the United States Department of Treasury Financial Crimes Enforcement Network ("FinCEN") issued a FinCEN Advisory concerning "Enhanced Scrutiny for Transactions Involving Antigua and Barbuda. The FinCEN Advisory warned that:

> Banks and other financial institutions are advised to give enhanced scrutiny to all financial transactions routed into or out of Antigua and Barbuda, or involving entities organized or domiciled, or non-resident persons maintaining accounts, in Antigua and Barbuda....
>
> In November 1998, the government of Antigua and Barbuda amended its Money Laundering (Prevention) Act in a manner that significantly weakened that Act; the statute had been enacted in December 1996 but had not been fully implemented. In November 1998, the Antiguan and Barbudan government also changed the supervision of its offshore financial services sector, by vesting authority over that sector in a new International Financial Sector Authority.     The     Authority's     board     of     directors     includes

representatives of the very institutions the Authority is supposed to regulate, thus raising serious concerns that those representatives are in fact in control of the Authority, so that the Authority is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards.

The amendment of the Money Laundering (Prevention) Act, combined with changes in Antigua and Barbuda's treatment of its offshore financial services sector, are likely to erode supervision, stiffen bank secrecy, and decrease the possibility for effective international law enforcement and judicial cooperation regarding assets secreted in Antigua and Barbuda. These changes threaten to create a "haven" whose existence will undermine international efforts of the United States and other nations to counter money laundering and other criminal activity, a concern of which the United States has repeatedly made the government of Antigua and Barbuda aware.

The actions taken by the government of Antigua and Barbuda that weaken that nation's anti-money laundering laws and oversight of its financial institutions necessarily raise questions about the purposes of transactions routed into or out of Antigua and Barbuda or involving entities organized or domiciled, or non-resident persons maintaining accounts, in Antigua and Barbuda. Institutions subject to the suspicious activity reporting rules contained in 31 CFR 103.21 (effective April 1, 1996) should carefully examine the available facts relating to any such transaction, to determine if such transaction (of $5,000 or more, U.S. dollar equivalent) requires reporting in accordance with those rules. (Institutions subject to the Bank Secrecy Act but not yet subject to specific suspicious activity reporting rules should consider such a transaction with relation to their reporting obligations under other applicable law.) Enhanced scrutiny is especially important for transactions involving Antigua and Barbuda offshore banks, transactions involving both Antigua and Barbuda offshore banks and the nine commercial banks licensed to do business in Antigua and Barbuda, and transactions in which one or more of such nine commercial banks act for one or more Antigua and Barbuda offshore institutions.

100.    The FinCEN Advisory's reference to the International Financial Sector Authority's board of directors including "representatives of the very institutions the Authority is supposed to regulate," was a reference to representatives of Stanford.

Certified Document Number: 43561547 - Page 28 of 38

101.    Upon information and belief, the Defendants received and were aware of the FinCEN Advisory.

102.    Upon information and belief, the Defendants knew or should have known that FinCEN Advisory was referring specifically to Stanford when it warned that the International Financial Sector Authority's board of directors included "representatives of the very institutions the Authority is supposed to regulate," and that the Authority is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards."

103.    While the FinCEN Advisory was withdrawn in August 2001, FinCEN cautioned that "[t]he withdrawal of [the] Advisory...does not relieve institutions of their pre-existing and on-going obligation to report suspicious activity, as set forth in regulations issued by FinCEN and by the federal bank supervisory agencies, as well as their obligation to comply with all other applicable provisions of law."

104.    Moreover, each of Defendants knew, or should have known, by virtue of their knowledge and experience in international banking and banking regulation, that Antigua's lax regulatory oversight of its offshore banking sector, including SIBL, posed a heightened risk that Stanford was involved in illegal activity.

HSBC

105.    Defendant HSBC was a "correspondent" bank of SIBL, receiving wire transfers of funds from members of the Class.

106.    As a correspondent bank of Stanford, HSBC was required, pursuant to The Money Laundering Regulations 2007, enacted by Parliament on July 25, 2007, and

effective as of December 15, 2007, to conduct thorough due diligence on SIBL and SFG's operations. Specifically, The Money Laundering Regulations 2007 provide, in relevant part:

> A credit institution ("the correspondent") which has or proposes to have a correspondent banking relationship with a respondent institution ("the respondent") from a non-[European Economic Area] state must—
>
> (a) gather sufficient information about the respondent to understand fully the nature of its business;
>
> (b) determine from publicly-available information the reputation of the respondent and the quality of its supervision;
>
> (c) assess the respondent's anti-money laundering and anti-terrorist financing controls;
>
> (d) obtain approval from senior management before establishing a new correspondent banking relationship;
>
> (e) document the respective responsibilities of the respondent and correspondent; and
>
> (f) be satisfied that, in respect of those of the respondent's customers who have direct access to accounts of the correspondent, the respondent—
> (i) has verified the identity of, and conducts ongoing monitoring in respect of, such customers; and
> (ii) is able to provide to the correspondent, upon request, the documents, data or information obtained when applying customer due diligence measures and ongoing monitoring.

107. Upon information and belief, prior to and during their establishment of a correspondent banking relationship with Stanford, HSBC gathered sufficient information concerning Stanford to understand Stanford's business and, as a result, knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

108. Stanford provided members of the Class with deposit instructions indicating that they could make deposits in Antigua-based SIBL by wiring funds to HSBC in London.

109.    HSBC was aware of these instructions that were provided to members of the Class, and expressly agreed with Stanford to receive wire deposits from members of the Class for further transfer to SIBL in Antigua.

110.    After the establishment of the HSBC-Stanford correspondent bank relationship, members of the Class transferred funds to HSBC with the intent that such funds would be transferred to SIBL in Antigua for deposit there.

111.    Upon information and belief, all or substantially all of the funds that members of the class transferred to HSBC, with the intent that such funds would be transferred to SIBL in Antigua for deposit there, were redirected by HSBC, in concert with and/or at the direction of Stanford, to bank accounts in Houston, Texas, and elsewhere, after which such funds were distributed to other Stanford entities, "invested" in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation.

112.    Based upon the foregoing, and based upon its longstanding correspondent banking relationship with Stanford, HSBC knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

### TD Bank

113.    Defendant TD Bank was a "correspondent" bank of SIBL, receiving wire transfers of funds from members of the Class.

114.    As a correspondent bank of SFG, TD Bank was required, pursuant to Canadian money laundering regulations, to conduct thorough due diligence on SIBL and SFG's operations.

Certified Document Number: 43561547 - Page 31 of 38

115.    Upon information and belief, prior to and during their establishment of a correspondent banking relationship with SFG, TD Bank gathered sufficient information concerning SFG to understand Stanford's business and, as a result, knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

116.    Stanford provided members of the Class with deposit instructions indicating that they could make deposits in Antigua-based SIBL by wiring funds to TD Bank.

117.    TD Bank was aware of these instructions that were provided to members of the Class, and expressly agreed with Stanford to receive wire deposits from members of the Class for further transfer to SIBL in Antigua.

118.    After the establishment of the TD Bank-Stanford correspondent bank relationship, members of the Class transferred funds to TD Bank with the intent that such funds would be transferred to SIBL in Antigua for deposit there.

119.    Upon information and belief, all or substantially all of the funds that members of the class transferred to TD Bank, with the intent that such funds would be transferred to SIBL in Antigua for deposit there, were redirected by TD Bank, in concert with and/or at the direction of Stanford, to bank accounts in Houston, Texas, and elsewhere, after which such funds were distributed to other Stanford entities, "invested" in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation.

120.    Among other things, during 2008 alone, approximately $474 million of funds were transferred from SIBL's accounts at TD Bank to SIBL's account at BoH.

Certified Document Number: 43561547 - Page 32 of 38

121.    Based upon the foregoing, and based upon its longstanding correspondent banking relationship with Stanford, TD Bank knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

<u>Société Générale</u>

122.    Defendant Société Générale provided "private banking" services to Stanford.

123.    Upon information and belief, Société Générale earned substantial fees through its "private banking" relationship with Stanford.

124.    Blaise Friedli, the Executive Vice President of Private Banking at Société Générale, served on the Stanford Financial Group International Advisory Board.

125.    Upon information and belief, Stanford, with the active support and assistance of Friedli and Société Générale, made illicit payments to Stanford's outside auditor in exchange for the auditor's role in conducting sham audits and falsely vouching for the financial integrity of SIBL and SIBL's investments.[5]

126.    Specifically, Stanford made regular monthly payments to an outside auditor, C.A.S. Hewlett, as payment for that firm's accounting services.  Those regular payments, made from a Stanford Financial Group Limited account at Trustmark Bank in Houston, Texas, were $18,000 per month for professional services in 2007 and through April 2008, and $25,000 per month thereafter.

---

[5] The allegations concerning the payments to C.A.S. Hewlett from the account at Société Générale are made upon information and belief, and based upon the Supplemental Declaration of Karyl Van Tassel dated July 10, 2009, submitted in *In re Stanford International Bank, Ltd.*, Case No. 3-09-CV-0721-N (S.D. Tex.), Dkt. No. 42, Exh. A.

Certified Document Number: 43561547 - Page 33 of 38

127.    Stanford, however, made *additional* payments to C.A.S. Hewlett from its private Swiss accounts at Société Générale. Those payments, which were in the amount of £ 15,000 (sterling) per month, were *increased* to £20,000 (sterling) per month effective June 15, 2008.    Upon information and belief, those additional payments were not for audit services, but were instead illicit payments made with the purpose and intent of paying C.A.S. Hewlett to provide fraudulent auditing services.

128.    Mr. Friedli, a member of the Stanford Financial Group International Advisory Board, and the Executive Vice President of Private Banking at Société Générale, was aware of those payments to C.A.S. Hewlett and, in fact, was essential to carrying them out.   According to documents made filed in the Receivership Action, James Davis informed Mr. Friedli in May 2008 to increase the additional payments to C.A.S. Hewlett from the Société Générale accounts, and Stanford's financial records reflect that Mr. Friedli did so.

129.    Based upon the foregoing, and based upon Mr. Friedli's knowledge: (a) of Stanford as a member of Stanford's International Advisory Board; (b) of Stanford's bank accounts and funds transfers as the Executive Vice President of Private Banking at Société Générale, and the Société Générale banker in charge of overseeing those accounts; and (c) that Stanford was making monthly illicit payments to C.A.S. Hewlett from accounts at Société Générale, Société Générale knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

<u>Trustmark</u>

130. Trustmark held and managed numerous Stanford operating accounts, including a SIBL "sweep" account, which sent: (i) approximately $295 million to SIBL's account at TD Bank during 2008; (ii) approximately $66 million to an SIBL client account at Trustmark; (iii) $32 million to an SIBL Vendor Account at Trustmark; and (iv) approximately $2 million to the SIBL Payroll Account at Trustmark.

131. Trustmark was required, pursuant to U.S. anti-money laundering laws and regulations, to conduct a thorough investigation of any suspicious and potentially illegal banking activity.

132. Upon information and belief, Trustmark received large and highly suspicious wire transfers from HSBC and TD Bank of funds that were received by those institutions from members of the Class and intended for deposit with SIBL in Antigua.

133. Upon information and belief, Class members who paid by check in U.S. dollars sent their checks to SIBL in Antigua, where those checks were bundled and sent daily to Trustmark National Bank in Houston, Texas, for deposit there.

3. Members of the Class were not aware that their checks were diverted from Antigua to Houston, Texas, where they were deposited in a bank other than the intended recipient, SIBL.

134. Upon information and belief, numerous large transfers of funds were made from SIBL's accounts at Trustmark to other Stanford entities, "invested" in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation.

Certified Document Number: 43561547 - Page 35 of 38

135.   Based upon the foregoing, and based upon its longstanding banking relationship with Stanford, Trustmark knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

BoH

136.   BoH held and managed certain of Stanford's operating accounts, including Stanford's principal operating account.

137.   BoH was required, pursuant to U.S. anti-money laundering laws and regulations, to conduct a thorough investigation of any suspicious and potentially illegal banking activity.

138.   Upon information and belief, BoH received large and highly suspicious wire transfers from HSBC and TD Bank of funds that were received by those institutions from members of the Class and intended for deposit with SIBL in Antigua.

139.   Among other things, during 2008 alone, approximately $474 million of funds were transferred from SIBL's accounts at TD Bank to SIBL's account at BoH.

140.   Members of the Class were not aware that their checks were diverted from Antigua to Houston, Texas, where they were deposited in a bank other that the intended recipient, SIBL.

141.   Upon information and belief, numerous large transfers of funds were made from SIBL's accounts at BoH to other Stanford entities, and "invested" in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation.   Upon information

and belief, during 2008 approximately $300 million of SIBL funds were distributed from BoH among various Stanford entities.

142.    Based upon the foregoing, and based upon its longstanding banking relationship with Stanford, BoH knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

<u>General Allegations</u>

143.    Defendants together or separately, conspired with Stanford to commit fraud.

144.    The object of the fraud was to fraudulently induce members of the Class to send funds to SIBL, which were then distributed to Defendants in the form of "fees," and diverted for: (a) "investment" in Allen Stanford's personal business ventures; (b) funding Allen Stanford's lavish lifestyle; and (c) funding and perpetuating the fraud described above.

145.    Defendants together or separately, had a meeting of the minds with Stanford on the course of action for perpetrating the fraud.

146.    Specifically Defendants, by word and deed, conveyed to members of the Class that funds transmitted to SIBL, through HSBC and/or TD Bank, were being deposited in SIBL in Antigua, and being entrusted to a legitimate banking institution.

147.    By reason of the foregoing, the Class has been damaged in an amount to be determined at trial, but believed to be in excess of $7 billion.

148.    By reason of the foregoing, Defendants are liable to the Plaintiffs and the Class for Conspiracy to Commit Fraud and/or Aiding and Abetting Fraud.

Certified Document Number: 43561547 - Page 37 of 38

### JURY DEMAND

149.    Plaintiffs demand a jury trial.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(i)     certify the Class;

(ii)    enter judgment in favor of the Class and against the Defendants:
(a) ordering the avoidance of the fraudulent transfers described
herein;

(b) awarding damages in an amount to be determined at trial;

(c) awarding attorney fees, and costs as permitted by law; and

(d) granting such other and further relief as the Court may deem
just and appropriate.


LACKEY HERSHMAN, L.L.P.


By:    /s/ Scott S. Hershman
       Paul Lackey
       State Bar No. 00791061
       Scott S. Hershman
       State Bar No. 00793205


3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

MORGENSTERN & BLUE, LLC

Peter D. Morgenstern (*pro hac vice pending*)
Gregory A. Blue (*pro hac vice pending*)
Rachel K. Marcoccia (*pro hac vice pending*)
885 Third Avenue
New York, NY 10022
Telephone: (212) 750-6776
Facsimile: (212) 750-3128

*Attorneys for Plaintiffs*



I, Loren Jackson, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date
Witness my official hand and seal of office
this November 11, 2009

Certified Document Number: _43561547_ Total Pages: 38

LOREN JACKSON, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, GUTHRIE ABBOTT, CATHERINE BURNELL, STEVEN QUEYROUZE, JAIME ALEXIS ARROYO BORNSTEIN, and JUAN C. OLANO, on behalf of themselves and all others similarly situated, | § § § § § § § § | |
| *Plaintiffs,* | § § | Civil Action No. _____ |
| v. | § § | JURY TRIAL DEMANDED |
| TRUSTMARK NATIONAL BANK, HSBC BANK PLC, THE TORONTO-DOMINION BANK, SG PRIVATE BANKING (SUISSE) S.A., and BANK OF HOUSTON, | § § § § § § | |
| *Defendants.* | § § | |

**LIST OF COUNSEL**

## LIST OF COUNSEL

| | |
|---|---|
| Paul Lackey<br>LACKEY HERSHMAN, LLP<br>3102 Oak Lawn Avenue, Suite 777<br>Dallas, Texas 75219<br>Telephone: (214) 560-2201<br>Facsimile: (214) 560-2203<br><br>Peter D. Morgenstern<br>Gregory A. Blue<br>Rachel K. Marcoccia<br>MORGENSTERN & BLUE, LLC<br>885 Third Avenue<br>New York, New York 10022<br>Telephone: (212) 750-6776<br>Facsimile: (212) 750-3128<br><br>*Counsel for Plaintiffs* | James Eloi Doyle<br>Attorney-in-Charge<br>State Bar No. 06093500<br>S.D. Tex. Bar No. 4848<br>DOYLE, RESTREPO, HARVIN & ROBBINS, LLP<br>600 Travis Street, Suite 4700<br>Houston, Texas 77002<br>Telephone: (713) 228-5100<br>Facsimile: (713) 228-6138<br>E-mail: jdoyle@drhrlaw.com<br><br>OF COUNSEL:<br><br>Robert Plotkin<br>Jeremy S. Byrum<br>McGUIREWOODS LLP<br>1050 Connecticut Ave. N.W. Suite 1200<br>Washington D.C. 20036<br>Telephone: (202) 857-1750<br>Facsimile: (202) 857-1737<br>E-mail: rplotkin@mcguirewoods.com<br><br>*Counsel for Defendant The Toronto-Dominion Bank* |
| Robin C. Gibbs<br>Attorney-in-Charge<br>State Bar No. 07853000<br>S.D. Tex. Bar No. 4790<br>GIBBS & BRUNS LLP<br>1100 Louisiana, Suite 5300<br>Houston, Texas 77002<br>Telephone: (713) 650-8805<br>Facsimile: (713) 750-0903<br>E-mail: rgibbs@gibbsbruns.com<br><br>OF COUNSEL:<br><br>Robert J. Madden<br>Jeffrey C. Kubin<br>Ashley McKeand<br>GIBBS & BRUNS LLP<br>1100 Louisiana, Suite 5300<br>Houston, Texas 77002<br>Telephone: (713) 650-8805<br>Facsimile: (713) 750-0903<br><br>*Counsel for Defendant Trustmark National Bank* | Jim D. Hamilton<br>Attorney-in-Charge<br>State Bar No. 98829300<br>S.D. Tex. Bar No. 2089<br>ROSS, BANKS, MAY, CRON & CAVIN, P.C.<br>2 Riverway, Suite 700<br>Houston, TX  77056-1918<br>Telephone:  (713) 626-1200<br>Facsimile:  (713) 623-6014<br><br>OF COUNSEL:<br><br>Anthony F. Sullivan<br>ROSS, BANKS, MAY, CRON & CAVIN, P.C.<br>2 Riverway, Suite 700<br>Houston, TX  77056-1918<br>Telephone:  (713) 626-1200<br>Facsimile:  (713) 623-6014<br><br>*Counsel for Defendant Bank of Houston* |

**RECORDER'S MEMORANDUM:**
This instrument is of poor quality
and not satisfactory for photographic
recordation and/or alterations were
present at the time of filming

*P.2*

RECEIPT NUMBER   393761          0.00
TRACKING NUMBER   72465116        ATY

**CAUSE NUMBER**   200953845

CONFIRMED FILE DATE: 11/10/2009

| | |
|---|---|
| **PLAINTIFF:** ROTSTAIN, PEGGY ROIF | In The 129th |
| **vs.** | **Judicial District Court of** |
| **DEFENDANT:** TRUSTMARK NATIONAL BANK | **Harris County, Texas** |

### CITATION CORPORATE

**THE STATE OF TEXAS**
County of Harris

TO: BANK OF HOUSTON (BANKING INSTITUTION)
    BY SERVING ITS PRESIDENT AND CHIEF EXECUTIVE OFFICER JIM STEIN

    750 BERING DRIVE SUITE 100   HOUSTON TX 77057

Attached is a copy of ___PLAINTIFF'S FIRST AMENDED PETITION___

This instrument was filed on the ___9th___ day of ___October___, 20_09_, in the above cited cause number and court. The instrument attached describes the claim against you.

**YOU HAVE BEEN SUED;** you may employ an attorney. If you or your attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of 20 days after you were served this citation and petition. a default judgment may be taken against you.

**TO OFFICER SERVING:**

**This Citation was issued under my hand** and seal of said Court, at Houston, Texas, this ___21st___ day of ___October___, 20_09_.

Issued at request of:
HERSHMAN, SCOTT S.
3102 OAK LAWN AVE700
DALLAS, TX 75219
Tel: (214) 560-2201
Bar Number:  793205

**LOREN JACKSON, District Clerk**
Harris County, Texas
**201 Caroline, Houston, Texas 77002**
**P.O. Box 4651, Houston, Texas 77210**

**Generated by:** KITCHEN, AAYESHA LAM   SBK/SBK/8532

---

### OFFICER/AUTHORIZED PERSON RETURN

I received this citation on the ___4th___ day of ___November___, 20_09_, at ___9:00___ o'clock ___A.M._, endorsed the date of delivery thereon, and executed it at ___750 Bering Drive, Suite 100___, ___Houston___,
(street address)                                    (city)

in ___Harris___ County, Texas on the ___4th___ day of ___November___, 20_09_, at ___11:35___ o'clock ___A. M._,

by delivering to ___Bank of Houston___, by delivering to its
(the defendant corporation named in citation)

___president & CEO___, in person, whose name is ___Jim Stein___,
(registered agent, president, or vice-president)

a true copy of this citation, with a copy of the ___Plaintiff's First Amended___ Petition attached,
(description of petition, e.g., "Plaintiffs Original")

and with accompanying copies of _____.
(additional documents, if any, delivered with the petition)

I certify that the facts stated in this return are true by my signature below on the ___9th___ day of ___November___, 20_09_.

FEE: $ _____                By: _____
                                        (signature of officer)

                             Printed Name: _____

_Elwin Stuart_          As Deputy for: _____
Affiant Other Than Officer  Elwin Stuart, SCH1192        (printed name & title of sheriff or constable)

On this day, ___Elwin Stuart___, known to me to be the person whose signature appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME this ___9th___ day of ___November___, 20_09_.

_Marti Purnell_
Notary Public

N.INT.CITC.P

CAUSE NO.   200953845

ROTSTAIN, PEGGY ROIF

VS

TRUSTMARK NATIONAL BANK

IN THE DISTRICT COURT OF

HARRIS COUNTY

129TH JUDICIAL DISTRICT

### AFFIDAVIT

Before me, the undersigned authority, personally appeared Elwin Stuart, who swore on oath that the following facts are true and correct.

"My name is Elwin Stuart. I am a private process server authorized July 1st, 2008 by the Texas Supreme Court to deliver process in matters pending in all Harris County Courts, ID # SCH1192."

I am an agent of:      Duces Tecum, Inc.
My business address is:   3801 Kirby, Suite 313, Houston. Texas  77098
My business phone is:    (713) 249-2452

The parties to this case are as follows:

PLAINTIFF:      ROTSTAIN, PEGGY ROIF

DEFENDANT:      TRUSTMARK NATIONAL BANK

I am not a party to this case, nor am I related to, employed by, or otherwise connected to  (other than having been retained to serve process in this case) any party or any party's attorney in this case and I have no interest in the outcome of this lawsuit. I am over the age of 18 years, am of sound mind and have never been convicted of a felony or misdemeanor involving moral turpitude.

_Elwin Stuart_
Elwin Stuart, SCH1192

Before me, a notary public, on this day personally appeared Elwin Stuart, known to me to be the person whose name is subscribed to the foregoing document and being by me first duly sworn, declared under oath that the statements therein contained are true and correct. Given under my hand and seal of office this 9th day of November, 2009.

_Marti Turnell_
Notary Public



I, Loren Jackson, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date
Witness my official hand and seal of office
this November 13, 2009

Certified Document Number:  43861576 Total Pages: 2

LOREN JACKSON, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

RECORDER'S MEMORANDUM:
This instrument is of poor quality
and not satisfactory for photographic
recordation and/or alterations were
present at the time of filming

*P-2*

RECEIPT NUMBER ___393761___         0.00
TRACKING NUMBER __72465113__   MTA

CAUSE NUMBER ___200953845___

| | |
|---|---|
| **PLAINTIFF:** ROTSTAIN, PEGGY ROIF | **In The** 129th |
| **vs.** | **Judicial District Court of** |
| **DEFENDANT:** TRUSTMARK NATIONAL BANK | **Harris County, Texas** |

## CITATION CORPORATE

**THE STATE OF TEXAS**
**County of Harris**

TO: TRUSTMARK NATIONAL BANK (NATIONAL BANKING CORPORATION)
BY SERVING ITS REGISTERED AGENT JAMES M OUTLAW JR

4200 WESTHEIMER SUITE 102  HOUSTON TX 77057

Attached is a copy of ___PLAINTIFF'S FIRST AMENDED PETITION___

This instrument was filed on the ___9th___ day of ___October___, 20 ___09___, in the above cited cause number and court. The instrument attached describes the claim against you.

**YOU HAVE BEEN SUED**; you may employ an attorney. If you or your attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of 20 days after you were served this citation and petition, a default judgment may be taken against you.

**TO OFFICER SERVING:**

**This Citation was issued under my hand** and seal of said Court, at Houston, Texas, this ___21st___ day of ___October___, 20 ___09___.

Issued at request of:
HERSHMAN, SCOTT S.
3102 OAK LAWN AVE700
DALLAS, TX 75219
Tel: (214) 560-2201
Bar Number:  793205

**LOREN JACKSON, District Clerk**
Harris County, Texas
**201 Caroline, Houston, Texas 77002**
**P.O. Box 4651, Houston, Texas 77210**

**Generated by:** KITCHEN, AAYESHA LAM    SBK/SBK/8532

### OFFICER/AUTHORIZED PERSON RETURN

I received this citation on the ___4th___ day of ___November___, 20 ___09___, at ___9:00___ o'clock __A__.M., endorsed the date of delivery thereon, and executed it at ___10497 Town and Country Way, Suite 860, Houston,___
(street address)                                                     (city)

in __Harris__ County, Texas on the __5th__ day of ___November___, 20 _09_, at __3:55__ o'clock __P__. M., by delivering to ___Trustmark National Bank___, by delivering to its
(the defendant corporation named in citation)

___registered agent___, in person, whose name is ___James M. Outlaw___,
(registered agent, president, or vice-president)

a true copy of this citation, with a copy of the ___Plaintiff's First Amended___ Petition attached,
(description of petition, e.g., "Plaintiffs Original")

and with accompanying copies of _____.
(additional documents, if any, delivered with the petition)

I certify that the facts stated in this return are true by my signature below on the _____ day of _____, 20_____.

FEE: $ _____          By: _____
(signature of officer)

Printed Name: _____

As Deputy for: _____
(printed name & title of sheriff or constable)

Affiant Other Than Officer  Elwin Stuart, SCH1192

On this day, ___Elwin Stuart___, known to me to be the person whose signature appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME on this __9th__ day of ___November___, 20 _09_

Notary Public

MARTI TURNELL
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
APRIL 25, 2011

CONFIRMED FILE DATE: 11/10/2009

Certified Document Number: 43861577 - Page 1 of 2

CAUSE NO.   200953845

*ROTSTAIN, PEGGY ROIF*                          *IN THE DISTRICT COURT OF*

**VS**                                          **HARRIS COUNTY**

**TRUSTMARK NATIONAL BANK**                     **129TH JUDICIAL DISTRICT**

### AFFIDAVIT

Before me, the undersigned authority, personally appeared Elwin Stuart, who swore on oath that the following facts are true and correct.

"My name is Elwin Stuart. I am a private process server authorized July 1st, 2008 by the Texas Supreme Court to deliver process in matters pending in all Harris County Courts, ID # SCH1192."

| | |
|---|---|
| I am an agent of: | Duces Tecum, Inc. |
| My business address is: | 3801 Kirby, Suite 313, Houston. Texas 77098 |
| My business phone is: | (713) 249-2452 |

The parties to this case are as follows:

PLAINTIFF:      **ROTSTAIN, PEGGY ROIF**

DEFENDANT:      **TRUSTMARK NATIONAL BANK**

I am not a party to this case, nor am I related to, employed by, or otherwise connected to (other than having been retained to serve process in this case) any party or any party's attorney in this case and I have no interest in the outcome of this lawsuit. I am over the age of 18 years, am of sound mind and have never been convicted of a felony or misdemeanor involving moral turpitude.

_____
Elwin Stuart, SCH1192

Before me, a notary public, on this day personally appeared Elwin Stuart, known to me to be the person whose name is subscribed to the foregoing document and being by me first duly sworn, declared under oath that the statements therein contained are true and correct. Given under my hand and seal of office this 9th day of November, 2009.

_____
Notary Public

Certified Document Number: 43861577 - Page 2 of 2



I, Loren Jackson, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date
Witness my official hand and seal of office
this November 13, 2009

Certified Document Number:    43861577 Total Pages: 2

LOREN JACKSON, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

**EXHIBIT "B"**



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SECURITIES AND EXCHANGE COMMISSION §
§
Plaintiff, §
§
§
v. §
§
STANFORD INTERNATIONAL BANK, LTD., §
ET AL. §
§
Defendants. §
§
§
§

Case No.: 3-09CV0298-N

## AMENDED ORDER APPOINTING RECEIVER

This matter came before me, the undersigned United States District Judge, on the motion

of Plaintiff Securities and Exchange Commission ("Commission") for the appointment of a

Receiver for Defendants Stanford International Bank, Ltd., Stanford Group Company, Stanford

Capital Management, LLC, Robert Allen Stanford, James M. Davis, Laura Pendergest-Holt,

Stanford Financial Group, and The Stanford Financial Group Bldg Inc. ("Defendants"). It

appears that this Amended Order Appointing Receiver (the "Order") is both necessary and

appropriate in order to prevent waste and dissipation of the assets of Defendants to the detriment

of the investors.

IT IS THEREFORE ORDERED that:

1.      This Court assumes exclusive jurisdiction and takes possession of the assets,

monies, securities, properties, real and personal, tangible and intangible, of whatever kind and

description, wherever located, and the legally recognized privileges (with regard to the entities),

of the Defendants and all entities they own or control ("Receivership Assets"), and the books and

records, client lists, account statements, financial and accounting documents, computers, computer hard drives, computer disks, internet exchange servers telephones, personal digital devices and other informational resources of or in possession of the Defendants, or issued by Defendants and in possession of any agent or employee of the Defendants ("Receivership Records").

2.    Ralph S. Janvey of Dallas, Texas, is hereby appointed Receiver for the Receivership Assets and Receivership Records (collectively, "Receivership Estate"), with the full power of an equity receiver under common law as well as such powers as are enumerated herein as of the date of this Order. The Receiver shall not be required to post a bond unless directed by the Court but is hereby ordered to well and faithfully perform the duties of his office: to timely account for all monies, securities, and other properties which may come into his hands; and to abide by and perform all duties set forth in this Order. Except for an act of willful malfeasance or gross negligence, the Receiver shall not be liable for any loss or damage incurred by the Receivership Estate, or any of Defendants, the Defendants' clients or associates, or their subsidiaries or affiliates, their officers, directors, agents, and employees, or by any of Defendants' creditors or equity holders because of any' act performed or not performed by him or his agents or assigns in connection with the discharge of his duties and responsibilities hereunder.

3.    The duties of the Receiver shall be specifically limited to matters relating to the Receivership Estate and unsettled claims thereof remaining in the possession of the Receiver as of the date of this Order. Nothing in this Order shall be construed to require further investigation of Receivership Estate assets heretofore liquidated and/or distributed or claims of the Receivership Estate settled prior to issuance of this Order. However, this paragraph shall not be

construed to limit the powers of the Receiver in any regard with respect to transactions that may have occurred prior to the date of this Order.

4.    Until the expiration date of this Order or further Order of this Court, Receiver is authorized to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate.

5.    As of the date of entry of this Order, the Receiver is specifically directed and authorized to perform the following acts and duties:

(a)    Maintain full control of the Receivership Estate with the power to retain or remove, as the Receiver deems necessary or advisable, any officer, director, independent contractor, employee or agent of the Receivership Estate;

(b)    Collect, marshal, and take custody, control, and possession of all the funds, accounts, mail, and other assets of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated, the income and profit therefrom and all sums of money now or hereafter due or owing to the Receivership Estate with full power to collect, receive, and take possession of without limitation, all goods, chattel, rights, credits, monies, effects, lands, leases, books and records, work papers, records of account, including computer maintained information, contracts, financial records, monies on hand in banks and other financial initiations, and other papers and documents of other individuals, partnerships, or corporations whose interests are now held by or under the direction, possession, custody, or control of the Receivership Estate;

3

(c)     Institute such actions or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate. All such actions shall be filed in this Court;

(d)     Obtain, by presentation of this Order, documents, books, records, accounts, deposits, testimony, or other information within the custody or control of any person or entity sufficient to identify accounts, properties, liabilities, causes of action, or employees of the Receivership Estate. The attendance of a person or entity for examination and/or production of documents may be compelled in a manner provided in Rule 45, Fed. R. Civ. P., or as provided under the laws of any foreign country where such documents, books, records, accounts, deposits, or testimony maybe located;

(e)     Without breaching the peace and, if necessary, with the assistance of local peace officers or United States marshals to enter and secure any premises, wherever located or situated, in order to take possession, custody, or control of, or to identify the location or existence of Receivership Estate assets or records;

(f)     Make such ordinary and necessary payments, distributions, and disbursements as the Receiver deems advisable or proper for the marshaling, maintenance, or preservation of the Receivership Estate. Receiver is further authorized to contract and negotiate with any claimants against the Receivership Estate (including, without limitation, creditors) for the purpose of compromising or settling any claim. To this purpose, in those instances in which Receivership Estate assets serve as collateral to secured creditors, the Receiver has the authority to surrender such assets to secured creditors, conditional upon the waiver of any deficiency of collateral;

4

(g)     Perform all acts necessary to conserve, hold, manage, and preserve the value of the Receivership Estate, in order to prevent any irreparable loss, damage, and injury to the Estate;

(h)     Enter into such agreements in connection with the administration of the Receivership Estate, including, but not limited to, the employment of such managers, agents, custodians, consultants, investigators, attorneys, and accountants as Receiver judges necessary to perform the duties set forth in this Order and to compensate them from the Receivership Assets;

(i)     Institute, prosecute, compromise, adjust, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve the value of the Receivership Estate, or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order and likewise to defend, compromise, or adjust or otherwise dispose of any or all actions or proceedings instituted against the Receivership Estate that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

(j)     Preserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants;

(k)     Promptly provide the Commission and other governmental agencies with all information and documentation they may seek in connection with its regulatory or investigatory activities;

(l)     Prepare and submit periodic reports to this Court and to the parties as directed by this Court;

(m)     File with this Court requests for approval of reasonable fees to be paid to the Receiver and any person or entity retained by him and interim and final accountings for any reasonable expenses incurred and paid pursuant to order of this Court;

6.     The Receiver shall have the sole and exclusive power and authority to manage and direct the business and financial affairs of the Defendants, including without limitation, the sole and exclusive power and authority to petition for relief under the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), for any or all of the Defendants. Solely with respect to the authorization to file and execution of a petition for relief under the Bankruptcy Code; without limiting any powers of the Receiver under applicable law and this Order; and irrespective of provisions in any Defendants' corporate organizing documents, by-laws, partnership agreements, or the like, the Receiver shall be deemed to succeed to the position of and possess the authority of any party with power to authorize and execute the filing of a petition for relief under the Bankruptcy Code, including without limitation corporate directors, general and limited partners, and members of limited liability companies. ~~With respect to any non-individual Defendants on whose behalf the Receiver authorizes and executes a petition for relief under chapter 11 of the Bankruptcy Code, the Receiver shall be deemed a debtor in possession for such Defendant, with all the rights and powers of a debtor in possession under the Bankruptcy Code. The turnover provisions of 11 U.S.C. § 543 shall not apply to the Receiver in his capacity as debtor in possession.~~ With respect to any Defendants on whose behalf the Receiver authorizes and executes a petition for relief under chapter 11 of the Bankruptcy Code, the Receiver shall be authorized, pursuant to 11 U.S.C. § 1505, to act in a foreign country on behalf of an estate created under section 541 of the Bankruptcy Code, ~~and may act in any way permitted by the applicable foreign law.~~



6

7.     Before taking action under paragraph 6 of this Order, the Receiver must provide the Commission and the Defendants with at least two business days' written notice (unless shortened or lengthened by court order) that the Receiver is contemplating action under the Bankruptcy Code; provided that the Receiver may apply for an order under seal or a hearing *in camera*, as circumstances require. To facilitate an efficient coordination in one district of all bankruptcies of the Defendants, the Northern District of Texas shall be the Receiver's principal place of business for making decisions in respect of operating and disposing of each of the Defendants and their respective assets.

8.     Upon the request of the Receiver, the United States Marshal's Office is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody, or control of, or identify the location of, any Receivership Estate assets or records.

9.     Creditors and all other persons are hereby restrained and enjoined from the following actions, except in this Court, unless this Court, consistent with general equitable principals and in accordance with its ancillary equitable jurisdiction in this matter, orders that such actions may be conducted in another forum or jurisdiction:

        (a)     The commencement or continuation, including the issuance or employment of process, of any judicial, administrative, or other proceeding against the Receiver, any of the defendants, the Receivership Estate, or any agent, officer, or employee related to the Receivership Estate, arising from the subject matter of this civil action; or

        (b)     The enforcement, against the Receiver, or any of the defendants, of any judgment that would attach to or encumber the Receivership Estate that was obtained before the commencement of this proceeding.

10.     Creditors and all other persons are hereby restrained and enjoined, without prior approval of the Court, from:

(a)     Any act to obtain possession of the Receivership Estate assets;

(b)     Any act to create, perfect, or enforce any lien against the property of the Receiver, or the Receivership Estate;

(c)     Any act to collect, assess, or recover a claim against the Receiver or that would attach to or encumber the Receivership Estate;

(d)     The set off of any debt owed by the Receivership Estate or secured by the Receivership Estate assets based on any claim against the Receiver or the Receivership Estate; or

(e)     The filing of any case, complaint, petition, or motion under the Bankruptcy Code (including, without limitation, the filing of an involuntary bankruptcy petition under chapter 7 or chapter 11 of the Bankruptcy Code, or a petition for recognition of foreign proceeding under chapter 15 of the Bankruptcy Code).

11.     Creditors and all other persons are hereby restrained and enjoined from seeking relief from the injunction contained in paragraph 10(e) of this Order for a period of 180 days from the date of entry of this Order.

12.     Defendants, their respective officers, agents, and employees and all persons in active concert or participation with them who receive notice of this Order by personal service or otherwise, including, but not limited to, any financial institution, broker-dealer, investment adviser, private equity fund or investment banking fun), and each of them, are hereby ordered, restrained, and enjoined from, directly or indirectly, making any payment or expenditure of any Receivership Estate assets that are owned by Defendants or in the actual or constructive

possession of any entity directly or indirectly owned or controlled or under common control with the Receivership Estate, or effecting any sale, gift, hypothecation, assignment, transfer, conveyance, encumbrance, disbursement, dissipation, or concealment of such assets. A copy of this Order may be served on any bank, savings and loan, broker-dealer, or any other financial or depository institution to restrain and enjoin any such institution from disbursing any of the Receivership Estate assets. Upon presentment of this Order, all persons, including financial institutions, shall provide account balance information, transaction histories, all account records and any other Receivership Records to the Receiver or his agents, in the same manner as they would be provided were the Receiver the signatory on the account.

13. Defendants, and their respective agents, officers, and employees and all persons in active concert or participation with them are hereby enjoined from doing any act or thing whatsoever to interfere with the Receiver's taking control, possession, or management of the Receivership Estate or to in any way interfere with the Receiver or to harass or interfere with the duties of the Receiver or to interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estate, including the filing or prosecuting any actions or proceedings which involve the Receiver or which affect the Receivership Assets or Receivership Records, specifically including any proceeding initiated pursuant to the United States Bankruptcy Code, except with the permission of this Court. Any actions so authorized to determine disputes relating to Receivership Assets and Receivership Records shall be filed in this Court.

14. Defendants, their respective officers, agents, and employees and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, including any financial institution, broker-dealer, investment adviser, private equity fund or investment banking firm, and each of them shall:

9

(a) To the extent they have possession, custody, or control of same, provide immediate access to and control and possession of the Receivership Estate assets and records, including securities, monies, and property of any kind, real and personal, including all keys, passwords, entry codes, and all monies deposited in any bank deposited to the credit of the Defendants, wherever situated, and the original of all books, records, documents, accounts, computer printouts, disks, and the like of Defendants to Receiver or his duly authorized agents;

(b) Cooperate with the Receiver and his duly authorized agents by promptly and honestly responding to all requests for information regarding Receivership Assets and Records and by promptly acknowledging to third parties the Receiver's authority to act on behalf of the Receivership Estate and by providing such authorizations, signatures, releases, attestations, and access as the Receiver or his duly authorized agents may reasonably request;

(c) Provide the Commission with a prompt, full accounting of all Receivership Estate assets and documents outside the territory of the United States which are held either: (1) by them, (2) for their benefit, or (3) under their control;

(d) Transfer to the territory of the United States all Receivership Estate assets and records in foreign countries held either: (1) by them, (2) for their benefit, or (3) under their control; and

(e) Hold and retain all such repatriated Receivership Estate assets and documents and prevent any transfer, disposition, or dissipation whatsoever of any such assets or documents, until such time as they may be transferred into the possession of the Receiver.

15.     Any financial institution, broker-dealer, investment adviser, private equity fund or investment banking firm or person that holds, controls, or maintains accounts or assets of or on behalf of any Defendant, or has held, controlled, or maintained any account or asset of or on behalf of any defendant or relief defendant since January 1, 1990, shall:

(a)     Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, hypothecation, encumbrance, disbursement, dissipation, conversion, sale, gift, or other disposal of any of the assets, funds, or other property held by or on behalf of any defendant or relief defendant in any account maintained in the name of or for the benefit of any defendant or relief defendant in whole or in part except:

(i)     as directed by further order of this Court, or

(ii)    as directed in writing by the Receiver or his agents;

(b)     Deny access to any safe deposit boxes that are subject to access by any Defendant; and

(c)     The Commission and Receiver may obtain, by presentation of this Order, documents, books, records, accounts, deposits, or other information within the custody or control of any person or entity sufficient to identify accounts, properties, liabilities, causes of action, or employees of the Receivership Estate. The attendance of a person or entity for examination and/or production of documents may be compelled in a manner provided in Rule 45, Fed. R. Civ. P, or as provided under the laws of any foreign country where such documents, books, records, accounts, deposits, or testimony may be located;

16.     The Defendants, their officers, agents, and employees and all persons in active concert or participation with them and other persons who have notice of this Order by personal service or otherwise, are hereby restrained and enjoined from destroying, mutilating, concealing,

altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, any contracts, accounting data, correspondence, advertisements, computer tapes, disks or other computerized records, books, written or printed records, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, copies of federal, state, or local business or personal income or property tax returns, and other documents or records of any kind that relate in any way to the Receivership Estate or are relevant to this action.

17.     The Receiver is hereby authorized to make appropriate notification to the United States Postal Service to forward delivery of any mail addressed to the Defendants, or any company or entity under the direction and control of the Defendants, to himself. Further, the Receiver is hereby authorized to open and inspect all such mail to determine the location or identity of assets or the existence and amount of claims.

18.     Nothing in this Order shall prohibit any federal or state law enforcement or regulatory authority from commencing or prosecuting an action against the Defendants, their agents, officers, or employees.

So Ordered and signed, this 12 day of March 2009.

UNITED STATES DISTRICT JUDGE

**EXHIBIT "C"**

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**Oct 06, 2009**

FILED
CLERK'S OFFICE

## UNITED STATES JUDICIAL PANEL
### on
### MULTIDISTRICT LITIGATION

**IN RE: STANFORD ENTITIES
SECURITIES LITIGATION**

MDL No. 2099

### TRANSFER ORDER

**Before the entire Panel[*]:** Lead plaintiff movants[1] in two of the three Northern District of Texas actions have moved, pursuant to 28 U.S.C. § 1407, for coordinated or consolidated pretrial proceedings of this litigation in the Northern District of Texas. This litigation presently consists of seven actions listed on Schedule A and pending in four districts as follows: three actions in the Northern District of Texas, two actions in the Southern District of Texas and one action each in the Southern District of Florida and Middle District of Louisiana.[2]

The following responding parties support or do not oppose the motion: plaintiffs in two of the three Northern District of Texas actions; Receiver (Ralph S. Janvey) in the Securities & Exchange Commission (SEC) action;[3] and Willis of Colorado, Inc., an insurer defendant in two actions. The following responding parties oppose the motion: the Southern District of Florida plaintiff (a "Willis" insurance letter case); plaintiffs in one Southern District of Texas action (the "Antigua" case); and insurer defendant Bowen, Miclette & Britt, Inc., and one affiliated individual. If the Panel deems centralization appropriate, the opposing Southern District of Florida plaintiff suggests centralization of the Willis insurance letter cases in the Southern District of Florida.

---

[*] Judge Furgeson took no part in the disposition of this matter.

[1] Ute Amann; Fawzi Ale Dargham; Michael Edgecomb; Italo Belon Neto; and Christain Palacios.

[2] Two additional actions included in the Section 1407 motion were dismissed and are no longer before the Panel: *John Cohron v. Stanford International Bank, Ltd., et al.*, S.D. Texas, C.A. No. 4:09-511, and *Jerry Adams, et al. v. Stanford Group Co., et al.*, S.D. Texas, C.A. No. 4:09-474.

The Panel has been notified that ten related actions have recently been filed. These actions will be treated as a potential tag-along actions. *See* Rules 7.4 and 7.5, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001).

[3] *Securities & Exchange Commission v. Stanford International Bank, Ltd., et al.*, N.D. Texas, C.A. No. 3:09-0298.

- 2 -

On the basis of the papers filed and hearing session held, we find that the actions in this litigation involve common questions of fact. Centralization under Section 1407 in the Northern District of Texas will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. All actions arise out of the alleged $8 billion fraud orchestrated by R. Allen Stanford through companies that he controlled, including Stanford International Bank, Ltd., Stanford Group Co. and Stanford Capital Management (collectively Stanford). Common factual questions involve alleged misrepresentations or omissions relating to the safety of Stanford investments.

Whether claims focus on (1) alleged misrepresentations or omissions by Stanford, (2) insurance coverage letters used by Stanford to promote its investments or (3) the alleged role of The Commonwealth of Antigua and Barbuda in the alleged Stanford fraud, all actions will likely focus on a significant number of common events, defendants, and/or witnesses. *See In re Lehman Brothers Holdings, Inc., Securities & Employee Retirement Income Security Act (ERISA) Litigation*, 598 F.Supp.2d 1362 (J.P.M.L. 2009). Centralization under Section 1407 will eliminate duplicative discovery; avoid inconsistent pretrial rulings; and conserve the resources of the parties, their counsel and the judiciary. While some unique questions of fact distinguish the Willis insurance letter cases and the Antigua case, transfer to a single district under Section 1407 will permit one court to formulate a pretrial program that allows any non-common issues to proceed concurrently with common issues, *In re Multi-Piece Rim Products Liability Litigation*, 464 F.Supp. 969, 974 (J.P.M.L. 1979); thus ensuring streamlined, just and expeditious resolution of all actions.

The MDL No. 2099 transferee court can employ pretrial techniques – such as establishing separate discovery and/or motion tracks – to efficiently manage this litigation. The parties can present any concerns regarding the manner and extent of coordination or consolidation of the pretrial proceedings to the transferee judge. The governing statute contemplates transfer for "coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a). Accordingly, we leave the extent of coordination or consolidation of these actions to the discretion of the transferee judge. *See In re The Bear Stearns Companies Inc. Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation,* 572 F.Supp.2d 1377 (J.P.M.L. 2008); *In re Mutual Funds Litigation*, 310 F.Supp.2d 1359 (J.P.M.L. 2004); *In re Equity Funding Corp. of America Securities Litigation*, 375 F.Supp. 1378 (J.P.M.L. 1974).

We are persuaded that the Northern District of Texas is an appropriate transferee district for this litigation, because (1) three of the eight actions are already pending there before Judge David C. Godbey, who is also presiding over the SEC action, and (2) Stanford is headquartered in nearby Houston, Texas, and parties, witnesses and documents are likely there.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the Northern District of Texas are transferred to the Northern District of Texas and, with the consent of that court, assigned to the Honorable David C. Godbey for coordinated or consolidated pretrial proceedings with the actions pending there and listed on Schedule A.

- 3 -

PANEL ON MULTIDISTRICT LITIGATION

John G. Heyburn II
Chairman

| | |
|---|---|
| J. Frederick Motz | Robert L. Miller, Jr. |
| Kathryn H. Vratil | David R. Hansen |
| W. Royal Furgeson, Jr.* | Frank C. Damrell, Jr. |

**IN RE: STANFORD ENTITIES**
**SECURITIES LITIGATION**                      MDL No. 2099

## SCHEDULE A

Southern District of Florida

Reinaldo Ranni v. Willis of Colorado, Inc., et al., C.A. No. 1:09-22085

Middle District of Louisiana

Sandra C. Allen v. Stanford Group Co., et al., C.A. No. 3:09-108

Northern District of Texas

Jerry Adams, et al. v. Stanford Group Co., et al., C.A. No. 3:09-334
Larry Hernandez v. Stanford Financial Group Co., et al., C.A. No. 3:09-487
Samuel Troice, et al. v. Willis of Colorado, Inc., et al., C.A. No. 3:09-1274

Southern District of Texas

James O. Kyle v. Stanford International Bank, Ltd., et al., C.A. No. 4:09-525
Joan Gale Frank, et al. v. The Commonwealth of Antiqua & Barbuda, C.A. No. 4:09-2217

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Peggy Roif Rotstain, Guthrie Abbott, Catherine Burnell, Steven Queyrouze, Jaime Alexis Arroyo Bornstein, and Juan C. Olano, on ☐

## DEFENDANTS

Trustmark National Bank, The Toronto-Dominion Bank, and Bank of Houston ☐

**(b)** County of Residence of First Listed Plaintiff    Peru
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Jackson County, MS
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

See attached List of Counsel

Attorneys (If Known)

See attached List of Counsel

## II. BASIS OF JURISDICTION    (Place an "X" in One Box Only)

☐ 1  U.S. Government
     Plaintiff

☒ 3  Federal Question
     (U.S. Government Not a Party)

☐ 2  U.S. Government
     Defendant

☐ 4  Diversity
     (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT    (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Med. Malpractice | ☐ 625 Drug Related Seizure |     28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument |     Liability   ☐ 365 Personal Injury - |     of Property 21 USC 881 |  | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &     Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
|    & Enforcement of Judgment |     Slander   ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent |     Corrupt Organizations |
| ☐ 152 Recovery of Defaulted |     Liability     Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
|     Student Loans | ☐ 340 Marine   **PERSONAL PROPERTY** |     Safety/Health |  | ☐ 490 Cable/Sat TV |
|     (Excl. Veterans) | ☐ 345 Marine Product   ☒ 370 Other Fraud | ☐ 690 Other |  | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment |     Liability   ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
|     of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) |     Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle     Property Damage |     Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract |     Product Liability   ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) |     12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |     Injury |     & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting   ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment     Sentence | ☐ 791 Empl. Ret. Inc. |     or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/   **Habeas Corpus:** |     Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land |     Accommodations   ☐ 530 General |  |     26 USC 7609 |     Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare   ☐ 535 Death Penalty | **IMMIGRATION** |  | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application |  |     Under Equal Access |
|  |     Employment   ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - |  |     to Justice |
|  | ☐ 446 Amer. w/Disabilities -   ☐ 555 Prison Condition |     Alien Detainee |  | ☐ 950 Constitutionality of |
|  |     Other | ☐ 465 Other Immigration |  |     State Statutes |
|  | ☐ 440 Other Civil Rights |     Actions |  |  |

## V. ORIGIN    (Place an "X" in One Box Only)

☐ 1 Original
     Proceeding

☒ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     another district
     (specify)

☐ 6 Multidistrict
     Litigation

☐ 7 Appeal to District
     Judge from
     Magistrate
     Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:
Plaintiffs assert claims under the Texas Uniform Fraudulent Transfer Act and for conspiracy/aiding & ☐

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
     UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE    Hon. David Godbey    DOCKET NUMBER    MDL Docket # 2099

DATE
11/13/2009

SIGNATURE OF ATTORNEY OF RECORD
/s/ Robin C. Gibbs

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.  (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.   Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.   Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.   Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.   Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.   Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.   Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.   Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, GUTHRIE ABBOTT, CATHERINE BURNELL, STEVEN QUEYROUZE, JAIME ALEXIS ARROYO BORNSTEIN, and JUAN C. OLANO, on behalf of themselves and all others similarly situated, | § § § § § § § | |
| *Plaintiffs,* | § § | Civil Action No. _____ |
| v. | § § | JURY TRIAL DEMANDED |
| TRUSTMARK NATIONAL BANK, HSBC BANK PLC, THE TORONTO-DOMINION BANK, SG PRIVATE BANKING (SUISSE) S.A., and BANK OF HOUSTON, | § § § § § § | |
| *Defendants.* | § § | |

**LIST OF COUNSEL**

**LIST OF COUNSEL**

| | |
|---|---|
| Paul Lackey<br>LACKEY HERSHMAN, LLP<br>3102 Oak Lawn Avenue, Suite 777<br>Dallas, Texas 75219<br>Telephone: (214) 560-2201<br>Facsimile: (214) 560-2203<br><br>Peter D. Morgenstern<br>Gregory A. Blue<br>Rachel K. Marcoccia<br>MORGENSTERN & BLUE, LLC<br>885 Third Avenue<br>New York, New York 10022<br>Telephone: (212) 750-6776<br>Facsimile: (212) 750-3128<br><br>*Counsel for Plaintiffs* | James Eloi Doyle<br>Attorney-in-Charge<br>State Bar No. 06093500<br>S.D. Tex. Bar No. 4848<br>DOYLE, RESTREPO, HARVIN & ROBBINS, LLP<br>600 Travis Street, Suite 4700<br>Houston, Texas 77002<br>Telephone: (713) 228-5100<br>Facsimile: (713) 228-6138<br>E-mail: jdoyle@drhrlaw.com<br><br>OF COUNSEL:<br><br>Robert Plotkin<br>Jeremy S. Byrum<br>McGUIREWOODS LLP<br>1050 Connecticut Ave. N.W. Suite 1200<br>Washington D.C. 20036<br>Telephone: (202) 857-1750<br>Facsimile: (202) 857-1737<br>E-mail: rplotkin@mcguirewoods.com<br><br>*Counsel for Defendant The Toronto-Dominion Bank* |
| Robin C. Gibbs<br>Attorney-in-Charge<br>State Bar No. 07853000<br>S.D. Tex. Bar No. 4790<br>GIBBS & BRUNS LLP<br>1100 Louisiana, Suite 5300<br>Houston, Texas 77002<br>Telephone: (713) 650-8805<br>Facsimile: (713) 750-0903<br>E-mail: rgibbs@gibbsbruns.com<br><br>OF COUNSEL:<br><br>Robert J. Madden<br>Jeffrey C. Kubin<br>Ashley McKeand<br>GIBBS & BRUNS LLP<br>1100 Louisiana, Suite 5300<br>Houston, Texas 77002<br>Telephone: (713) 650-8805<br>Facsimile: (713) 750-0903<br><br>*Counsel for Defendant Trustmark National Bank* | Jim D. Hamilton<br>Attorney-in-Charge<br>State Bar No. 98829300<br>S.D. Tex. Bar No. 2089<br>ROSS, BANKS, MAY, CRON & CAVIN, P.C.<br>2 Riverway, Suite 700<br>Houston, TX 77056-1918<br>Telephone: (713) 626-1200<br>Facsimile: (713) 623-6014<br><br>OF COUNSEL:<br><br>Anthony F. Sullivan<br>ROSS, BANKS, MAY, CRON & CAVIN, P.C.<br>2 Riverway, Suite 700<br>Houston, TX 77056-1918<br>Telephone: (713) 626-1200<br>Facsimile: (713) 623-6014<br><br>*Counsel for Defendant Bank of Houston* |