| 2009-53845 / Court: 129 |

Filed 09 August 23 P2:58
Loren Jackson - District Clerk
Harris County
ED101J015492642
By: Nelson Cuero

CAUSE NO. _____

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, GUTHRIE ABBOTT, CATHERINE BURNELL, STEVEN QUEYROUZE, JAIME ALEXIS ARROYO BORNSTEIN, and JUAN C. OLANO, on behalf of themselves and all others similarly situated, | § § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § | |
| v. | § § | |
| TRUSTMARK NATIONAL BANK, HSBC BANK PLC, THE TORONTO-DOMINION BANK, SG PRIVATE BANKING (SUISSE) S.A., and BANK OF HOUSTON, | § § § § § | HARRIS COUNTY, TEXAS |
| Defendants. | § § § § § | _____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs PEGGY ROIF ROTSTAIN, GUTHRIE ABBOTT, CATHERINE BURNELL, STEVEN QUEYROUZE, JAIME ALEXIS ARROYO BORNSTEIN, and JUAN C. OLANO, ("Plaintiffs") on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, as and for their Original Petition against Defendants TRUSTMARK NATIONAL BANK ("Trustmark"), HSBC BANK PLC ("HSBC"), THE TORONTO-DOMINION BANK ("TD Bank"), SG PRIVATE BANKING (SUISSE) S.A. ("Société Générale"), and BANK OF HOUSTON ("BoH") (collectively, "Defendants"), allege on information and belief as follows:

Certified Document Number: 43120733 - Page 1 of 38

## I.

## **PRELIMINARY STATEMENT**

This is an action on behalf of the victims of the fraud at Stanford International Bank, Ltd. ("SIBL"), part of the Stanford Financial Group[1], to recover damages and fraudulent transfers from the banks that provided essential assistance to Stanford in one of the largest financial crimes in history.

The Stanford fraud was based upon the collection of billions of dollars from unsuspecting victims in the United States, Canada, Mexico, Colombia, Peru, Venezuela, and elsewhere in the world. Through a network of sales offices located in those countries, SFG sold purported certificates of deposit ("CDs") issued by Antigua-based SIBL, offering interest rates higher than those generally available at other banks. While SFG's sales representatives convinced the victims that SIBL could offer those higher rates of return because of its unique and successful investment strategy, the operation was a fraud. The Defendants each played an essential role in that scheme, and reaped substantial fees from doing so.

In particular, Defendants HSBC and TD Bank acted as willing and essential conduits for the flow of money from Stanford's unsuspecting victims to Stanford's fraudulent criminal enterprise. Stanford used HSBC to collect all wire transfers intended by the victims to be deposited in SIBL in British Pound Sterling, Euros, and other

---

[1] Stanford Financial Group ("SFG") refers to the dozens of affiliated companies owned and/or controlled by R. Allen Stanford ("Allen Stanford"), including but not limited to SIBL, Stanford Group Company, Stanford Capital Management, LLC, Stanford Trust Company Ltd., and Stanford Financial Group Global Management, LLC. As used herein, "SFG" refers to these entities, and "Stanford" refers to these entities together with Allen Stanford.

Certified Document Number: 43120733 - Page 2 of 38

European currencies. Similarly, Stanford used TD Bank to collect all such deposits in US dollar and Canadian dollar denominations.    All or substantially all of the money that Stanford's victims sent to HSBC and TD Bank was eventually diverted from SIBL, where the victims intended the funds to go, to be "invested" in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation.

Both HSBC and TD Bank handled enormous volumes of such transfers. Upon information and belief, HSBC and TD Bank either knew that Stanford's banking operation was illegitimate or, through reasonable and required diligence could have determined that it was illegitimate.

Société Générale also played a central role in the scheme, providing essential banking services to Stanford. Upon information and belief, Société Générale held SFG operating accounts that were used to make illicit monthly payments to Stanford's purported auditor.    When Stanford's financial troubles increased – and the need to purchase the cooperation of its auditor grew more urgent – Stanford directed Société Générale to make larger monthly payments to that auditor. That instruction was given by Stanford to Blaise Friedli, Executive Vice President of Société Générale Private Banking in Geneva, Switzerland, who – not coincidentally – was a member of the Stanford Financial Group International Advisory Board. Moreover, in a highly unusual transfer of funds, Stanford directed Société Générale to transfer more than $100 million out of Société Générale in the last two weeks of December 2008. Upon information and belief,

all or substantially all of that money is missing, and is unavailable to satisfy victims' claims.

Through its role as Stanford's private banker, its essential assistance in the payment of bribes to Stanford's purported auditor, and Mr. Friedli's position on the Stanford Financial Group International Advisory Board, among other things, Société Générale either knew that Stanford's banking operation was illegitimate or, through reasonable and required diligence, could have determined that it was illegitimate.

Trustmark received daily bundles of checks that Class members intended for deposit in SIBL in Antigua. Those checks were deposited in SIBL accounts at Trustmark, and later distributed to other Stanford entities and put to the private use of Allen Stanford. These highly suspicious and unusual deposits, together with other information readily available to Trustmark concerning Stanford's operations, either did, or should have, alerted Trustmark to the illegal nature of the Stanford banking operation.

Finally, each of the Defendants collected substantial fees and other payoffs in exchange for its role in transferring money from the victims of the crime, to SFG and, in many instances, out to R. Allen Stanford's personal and private business ventures. Every dollar that was paid to the Defendants by SFG was paid in furtherance of Stanford's scheme to defraud the victims of the scheme, using money fraudulently stolen from the victims. As a result, all such payments are recoverable by SFG's creditors as fraudulent transfers under the Texas Uniform Fraudulent Transfer Act ("UFTA") and pursuant to common law.

Certified Document Number: 43120733 - Page 4 of 38

## II.

## DISCOVERY CONTROL PLAN

1.      Plaintiffs intend that discovery shall be conducted under Level 2, pursuant to Rule 190.3 of the TEXAS RULES OF CIVIL PROCEDURE.

## III.

## JURISDICTION AND VENUE

2.      Venue is appropriate in Harris County, Texas, because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Harris County, Texas.

3.      Jurisdiction is proper in this Court because each of the Defendants have purposefully availed themselves of the privilege of conducting business activities in Texas and each of the Defendants has had continuous and systematic business contacts with Texas. Additionally, the amount in controversy exceeds the minimum jurisdictional threshold of this Court.

4.      Pursuant to Section 15.001, *et seq.*, of the TEXAS CIVIL PRACTICE & REMEDIES CODE, venue is proper in this Court because: (a) the events or omissions giving rise to Plaintiffs' causes of action occurred in whole or part in Harris County, Texas; and/or (b) each of the Defendants has its principal office in the State of Texas located in Harris County, Texas.

Certified Document Number: 43120733 - Page 5 of 38

## IV.

## PARTIES

5.      At all relevant times, Plaintiff Peggy Roif Rotstain is and was a citizen of Peru residing in Peru.  Rotstain caused funds to be transmitted via draft to SIBL, and to TD Bank, for the intended purpose of purchasing SIBL CDs.

6.      At all relevant times, Plaintiff Guthrie Abbott is and was a citizen of the United States.

7.      At all relevant times, Plaintiff Catherine Burnell is and was a citizen of the United Kingdom residing in Antigua.  Burnell caused funds to be transmitted to HSBC for the intended purpose of purchasing SIBL CDs.

8.      At all relevant times, Plaintiff Steven Queyrouze is and was a citizen of the United States residing in Louisiana.

9.      At all relevant times, Plaintiff Jaime Alexis Arroyo Bornstein is and was a citizen of Mexico residing in Mexico.  Bornstein caused funds to be transmitted to TD Bank for the intended purpose of purchasing SIBL CDs.

10.     At all relevant times, Plaintiff Juan C. Olano was a citizen of Colombia and the United States residing in Florida.

11.     As of February 16, 2009, Plaintiffs were customers of SIBL, had money on deposit at SIBL, and held CDs issued by SIBL.  Plaintiffs are each members of the Class, as defined below.

12.     Upon information and belief, Defendant TD Bank is a banking corporation incorporated in Canada.

Certified Document Number: 43120733 - Page 6 of 38

13.     Upon information and belief, Defendant HSBC is an international bank with its registered office and principal place of business located at 8 Canada Square, London E14 5HQ, England.

14.     Upon information and belief, Defendant Société Générale is a banking corporation organized under the laws of France with its principal place of business in France.

15.     Upon information and belief, Defendant Trustmark is a national banking association chartered by the Office of the Comptroller of the Currency pursuant to the applicable laws of the United States of America and the related rules promulgated by the Office of the Comptroller of the Currency.   Upon information and belief, Trustmark's corporate headquarters and principal place of business are located in Jackson, Mississippi.   Upon information and belief, Trustmark is "located" in and is a citizen of the State of Mississippi, although Trustmark also maintains offices in Harris County, Texas and in other jurisdictions.

16.     Upon information and belief, Defendant BoH is a banking institution with a principal place of business at 750 Bering Drive, Suite 100, Houston, Texas 77057.

### RELEVANT NON-PARTIES

17.     At all relevant times, SFG was a group of affiliated financial services entities led by Allen Stanford.   SFG maintained its headquarters in Houston, Texas, and maintained offices in several other locations including Memphis, Tennessee, and Miami, Florida.   Upon information and belief, the activities of SFG and all of the Stanford Entities were directed from SFG's Houston, Texas, headquarters.

Certified Document Number: 43120733 - Page 7 of 38

18.     At all relevant times, SIBL was a private, offshore bank with offices on the island of Antigua. SIBL was organized in Montserrat, originally under the name of Guardian International Bank. In or about 1989, SIBL's principal banking location was moved to Antigua.

19.     Until the SEC instituted civil enforcement proceedings against it in February of 2009, SIBL marketed CDs and promised higher rates of return on those CDs than were generally offered at banks in the United States. In its 2007 Annual Report, SIBL stated that it had approximately $6.7 billion worth of CD deposits, and more than $7 billion in total assets. In its December, 2008, Monthly Report, SIBL purported to have more than 30,000 clients from 131 countries, representing $8.5 billion in assets.

20.     Stanford Group Company ("SGC"), a Houston-based company, was founded in or about 1995. SGC, and the financial advisers employed by SGC, promoted the sale of SIBL's CDs through SGC's 25 offices located throughout the United States. According to the Court-appointed receiver[2] for the Stanford entities, "the principal purpose and focus of most of [Stanford's] combined operations was to attract and funnel outside investor funds into the Stanford companies through the sale of [CDs] issued by Stanford's offshore entity SIBL." Report Of The Receiver Dated April 23, 2009 (the "Report"), at p. 6.

---

[2] In February 2009, the SEC filed a complaint in the United States District Court for the Northern District of Texas (the "SEC Action") against Allen Stanford and various Stanford entities and employees, alleging a "massive, on-going fraud." By order dated February 16, 2009 (as amended March 12, 2009), the court in the SEC Action appointed Ralph Janvey, Esq., to be the receiver in that action (hereinafter, the "Receiver"). On or about February 27, 2009, the SEC filed a First Amended Complaint in the SEC Action.

Certified Document Number: 43120733 - Page 8 of 38

21.     Allen Stanford founded and owned SFG and its affiliated companies, including, through a holding company, SIBL.   Allen Stanford was the chairman of SIBL's Board of Directors and a member of SIBL's Investment Committee.

## V.

## **FACTS APPLICABLE TO ALL COUNTS**

### CLASS ALLEGATIONS

22.     The class of persons that Plaintiffs seek to represent (the "Class") is comprised of all individuals who, and entities that, as of February 16, 2009, were customers of SIBL, with monies on deposit at SIBL and/or holding CDs issued by SIBL. All such individuals are creditors of SIBL, Allen Stanford, and other entities that are members of SFG within the meaning of the UFTA.

23.     *Numerosity.*  A class action is appropriate in this case because the Class is so numerous that joinder of all members is impracticable.   While the precise number of Class members and their addresses are unknown to the Plaintiffs, their identities can be determined from SIBL's records.   Upon information and belief, Class members number in the tens of thousands.

24.     *Commonality.*  A class action is appropriate in this case because there are questions of law and fact common to the Class, including but not limited to:

(a)     whether the Defendants received fees and other monies from Stanford within the relevant time period;

(b)     whether Stanford paid fees and other monies to the Defendants with the actual intent to hinder, delay, or defraud members of the Class;

Certified Document Number: 43120733 - Page 9 of 38

(c)    whether any such fees were paid, or other monies transferred, by Stanford to the Defendants while Stanford was engaged or was about to engage in a business or a transaction for which Stanford's remaining assets were unreasonably small in relation to the business or transaction;

(d)    whether any such fees were paid, or other monies transferred, by Stanford to the Defendants when Stanford intended to incur, or believed or reasonably should have believed that it would incur, debts beyond the its ability to pay as they became due;

(e)    whether any such fees were paid, or other monies transferred, by Stanford to the Defendants without Stanford receiving a reasonably equivalent value in exchange for the transfer

(f)    whether any such fees were paid, or other monies transferred, by Stanford to the Defendants at a time when Stanford was insolvent, or whether Stanford became insolvent as a result of the payment of such fees or other monies transferred;

(g)    whether the Defendants received any such fees, or other monies transferred, in good faith and for a reasonably equivalent value;

(h)    whether the Defendants conspired with Stanford;

(i)    whether the Defendants knew or should have known of Stanford's fraud;

(j)    whether the Defendants knew or should have known of Stanford's fraud; and

(k)    whether the Class has been damaged by the alleged conspiracy by or

among the Defendants and Stanford.

25.    The questions of law and fact common to the Class predominate over any

questions affecting only individual members.

26.    *Typicality.*  The claims of the representative Plaintiffs are typical of the

claims of the Class. '

2.    *Adequacy.*  The representative Plaintiffs will fairly and adequately protect

the interests of the Class.

27.    In the absence of class certification, there is a risk that adjudications in

thousands of separate cases with respect to individual Class members would, as a

practical matter, be dispositive of the interests of the other members not parties to the

individual adjudications, or would substantially impair or impede their ability to protect

their interests.

28.    A class action is superior to other available methods for fairly and

efficiently adjudicating this controversy.

## FACTUAL ALLEGATIONS

### The Fraud[3]

29.    Stanford's business was a massive fraud in which Stanford

misappropriated billions of dollars, falsified SIBL's financial statements, and concealed

---

[3] The factual allegations in this sub-section are made upon information and belief, based upon the allegations made by the SEC in its civil enforcement action *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 09-cv-0298-N (N.D. Tex), the indictment in *United States v. Stanford, et al.*, Case No. 09-cr-342 (S.D. Tex), the public materials cited therein, and other public materials and media reports.

Certified Document Number: 43120733 - Page 11 of 38

their fraudulent conduct from customers, prospective customers, and regulators in the United States and elsewhere.

30.    SIBL represented to the Plaintiffs and the Class that: (i) their assets were safe and secure because the bank invested in a "globally diversified portfolio" of "marketable securities;" (ii) SIBL had averaged double-digit returns on its investments for over 15 years; (iii) Allen Stanford had solidified SIBL's capital position in late 2008 by infusing $541 million in capital into the bank; (iv) SIBL's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee; (v) SIBL, in early 2009, was stronger than at any time in its history; and (vi) SIBL did not have exposure to losses from investments in the fraudulent "Ponzi" scheme that had been operated by Bernard L. Madoff (the "Madoff Scheme").  More fundamentally, Stanford represented that SIBL was a legitimate banking institution, which made money by investing assets and generating investment returns. These representations were false.

31.    Stanford intended that Plaintiffs and other members of the Class would rely upon these representations when making their decisions to entrust their money to Stanford, and the Plaintiffs and other members of the Class did so.

32.    Contrary to SIBL's public statements, by February 2009, Stanford had misappropriated billions of dollars from Plaintiffs and the Class, and "invested" an undetermined amount of those funds in speculative, unprofitable private businesses controlled by Allen Stanford. Contrary to SIBL's representations regarding the liquidity and safety of its portfolio, the Plaintiffs' and the Class's funds were not invested in a

"well-diversified portfolio of highly marketable securities." Instead, SIBL's internal records reflect that more than half of the bank's investment portfolio was comprised of undisclosed "Private Equity Real Estate."

33.     According to the SEC, Stanford fabricated SIBL's financial statements. Using a predetermined return on investment number, Stanford reverse-engineered SIBL's financial statements to report investment income that SIBL had not actually earned. As a result, information in SIBL's financial statements and annual reports bore little or no relationship to the actual performance of SIBL's investments.

34.     Plaintiffs and other members of the Class reasonably relied upon SIBL's fabricated financial statements when making their decisions to entrust their money to Stanford.

35.     In selling the CDs, SIBL touted, among other things, the CDs' safety, security, and liquidity. SIBL told Plaintiffs and the Class that SIBL aggregated customer deposits, and then reinvested those funds in a "globally diversified portfolio" of assets. SIBL also represented to the Plaintiffs and the Class that Stanford employed a sizeable team of analysts to monitor SIBL's portfolio. These representations were false.

36.     Plaintiffs and other members of the Class reasonably relied upon SIBL's representations regarding the safety, security, liquidity, composition, and monitoring of SIBL's investment portfolio.

37.     SIBL's annual reports also represented that "SIBL does not expose its clients to the risks associated with commercial loans...the Bank's only lending is on a cash secured basis." Contrary to SIBL's representations, however, SIBL exposed

Plaintiffs and the Class to the risks associated with more than $1.6 billion in undisclosed and unsecured personal "loans" to Allen Stanford. To conceal the theft, some of these "loans" were evidenced by promissory notes from Allen Stanford.

38.     These promissory notes were typically created after James M. Davis ("Davis"), who was the Chief Financial Officer of SFG and SIBL, and served as a member of SIBL's Investment Committee, had, at Allen Stanford's direction, fraudulently wired out billions dollars of SIBL investor funds to Allen Stanford or his designees. Allen Stanford made few, if any, payments required by the terms of the promissory notes, and the outstanding loan balances and interest owed by him to SIBL were rolled into new, larger, promissory notes.

39.     The personal "loans" to Allen Stanford were inconsistent with representations that had been made to Plaintiffs and members of the Class: despite the fact that SIBL's annual reports included a section entitled "Related-Party Transactions" that purported to disclose all related-party transactions entered into by SIBL, SIBL's "loans" to Allen Stanford were not disclosed in the "Related-Party Transactions" section of SIBL's annual reports from 2004 through 2008.

40.     Allen Stanford used the money that he "borrowed" from SIBL to, among other things, fund his personal ventures and private pursuits, including more than $400 million to fund personal real estate deals and more than $36 million to subsidize "Stanford 20/20," an annual cricket tournament that boasted a $20 million purse.

41.     Plaintiffs and other members of the Class reasonably relied upon SIBL's misrepresentations regarding SIBL's bogus "loans" to Allen Stanford.

42.     Allen Stanford's misappropriation of the Plaintiffs' and the Class's assets (and the poor performance of SIBL's investment portfolio) created a giant hole in SIBL's balance sheet.  To conceal their fraudulent conduct and thereby ensure that Plaintiffs and the Class continued to entrust their money to SIBL, the Stanford Co-Conspirators fabricated the growth, composition, and performance of SIBL's investment portfolio to give the appearance that SIBL's investments were highly profitable.

43.     In its training materials for the SGC advisers, SIBL represented that it had earned consistent double-digit annual returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993) for almost fifteen years.  SIBL marketed the CDs using these purported returns on investment.  Likewise, SIBL's Annual Reports stated that the bank earned from its "diversified" investments approximately $642 million in 2007 (11 %), and $479 million in 2006 (12%).

44.     SIBL claimed that its high returns on investment allowed it to offer higher rates on the CD than those offered by U.S. banks.  For example, SIBL offered 7.45% as of June 1, 2005, and 7.878% as of March 20, 2006, for a fixed-rate CD based upon an investment of $100,000.  On November 28, 2008, SIBL quoted 5.375% on a 3-year flex CD, while comparable U.S. bank CDs paid less than 3.2%.

45.     None of the information that SIBL disseminated regarding the growth, composition, and performance of its investment portfolio was true.  Instead, through their actions, the Stanford Co-Conspirators caused SIBL to report investment income that the bank did not actually earn and, thereby, greatly inflate the value of its investment portfolio.  Specifically, the Stanford Co-Conspirators prepared and reviewed SIBL's

financial statements, including the annual reports that were provided to customers and posted on the bank's website.

46.     Plaintiffs and other members of the Class reasonably relied upon the information that SIBL disseminated regarding the growth, composition, and performance of its investment portfolio.

47.     As world financial markets experienced substantial declines in 2008, it became apparent to Allen Stanford and Davis that SIBL could not credibly report investment profits in the 11 % to 15% range (as it had done in previous years). Allen Stanford and Davis thus agreed that SIBL would for the first time show a "modest" loss to avoid raising too many "red flags" to customers and other nations' regulators. In other words, they opted to tell a "more believable lie" in order to conceal their many previous years of fraudulent conduct.

48.     SIBL touted a purported $541 million capital infusion from Allen Stanford in a December 2008 report:

> Although our earnings will not meet expectations in 2008, Stanford International Bank Ltd. is strong, safe and fiscally sound. We have always believed that depositor safety was our number one priority. To further support the Bank's growth and provide a strong cushion for any further market volatility, the Bank's Board of Directors made a decision to increase the Bank's capital by $541 million on November 28, 2008. This contribution brings total shareholder equity to $1,020,029,802 with a capital to assets ratio of 11.87% and a capital to deposits ratio of 13.48%.

49.     The purported capital infusions by Allen Stanford were backdated, fictitious, and engineered to give the appearance that SIBL had achieved "desired" levels of capital.

50.     In December 2008, well after Allen Stanford had purportedly infused the

$541 million in additional capital into SIBL, Stanford implemented a series of fraudulent

round-trip real estate transactions utilizing undeveloped Antiguan real estate acquired by

SIBL in 2008 for approximately $63.5 million (or roughly $40,000 per acre).

51.     To give the appearance that the above-referenced capital infusions actually

occurred Stanford falsified accounting records by recording bogus transactions:

- SIBL sold the Antiguan real estate to several newly-created Stanford-controlled entities at the original cost of $63.5 million (although there is no evidence that Stanford paid SIBL the $63.5 million);

- the Stanford-controlled entities, at Allen Stanford's and Davis's instruction, immediately wrote-up the value of the real estate to approximately $3.2 billion dollars (or $2 million per acre), thereby exponentially increasing the value of the entities' stock;

- in an effort to satisfy a portion of Allen Stanford's personal debt to SIBL, Allen Stanford contributed to SIBL $1.7 billion of the fraudulently-inflated stock (using the inflated $2 million per acre valuation); and

- Allen Stanford then contributed to SIBL additional stock in the real estate holding companies valued at $200 million and $541 million (again using the inflated $2 million per acre valuation) to fund the backdated capital contributions.

52.     These transactions did not infuse real capital into SIBL. In fact, the entire

process was fabricated after the reported capital contributions allegedly occurred.

Moreover, the purported inflation in value of the real estate from $40,000 to $2 million

per acre was not justifiable under applicable U.S. or international accounting principles.

SIBL did not secure an appraisal and had no other reasonable support for such a drastic

increase in value.  The transactions among Stanford-controlled entities simply were not

the kind of arm's-length transactions required to justify a 5000% increase in value.

Certified Document Number: 43120733 - Page 17 of 38

Nevertheless, on a mere promise from Allen Stanford that the land would be appraised for over $3 billion, Stanford used $63.5 million of Antiguan real estate to simultaneously plug a multi-billion dollar hole in SIBL's balance sheet and eliminate a significant portion of Allen Stanford's personal debt to SIBL.

53.     Following the fraudulent capital infusions, the largest segment of the bank's investment portfolio would have been $3.2 billion in over-valued real estate. Yet, SIBL did not disclose the transactions in its December 2008 newsletter, which touted Allen Stanford's purported capital infusion. Moreover, Stanford's real estate investments were wholly inconsistent with SIBL's representations to customers that SIBL's investment portfolio was composed of marketable securities, and not real estate.

54.     Plaintiffs and other members of the Class reasonably relied upon the information regarding Allen Stanford's purported capital infusion to SIBL.

Misrepresentations Regarding Management<br>of SIBL's Investment Portfolio

55.     Prior to making decisions to entrust their money to SIBL, prospective customers routinely asked how SIBL safeguarded and monitored its assets. They also frequently inquired whether Stanford could "run off with the money."

56.     In response to these questions, at least during 2006 and much of 2007, Pendergest-Holt trained SIBL's senior investment officer ("SIO") to tell customers and prospective customers that the bank's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee.     The SIO followed Pendergest-Holt's instructions, telling customers and prospective customers that SIBL's entire investment portfolio was

managed by a global network of money managers and monitored by a team of more than twenty analysts.

57.     Neither Pendergest-Holt nor the SIO disclosed to customers that SIBL segregated its investment portfolio into three tiers: (i) cash and cash equivalents ("Tier 1"); (ii) investments with "outside portfolio managers (25+)" that were monitored by the SFG analysts ("Tier 2"); and (iii) undisclosed assets managed by Stanford and Davis ("Tier 3"). As of December 2008, Tier 1 represented merely approximately 9% ($800 million) of SIBL's purported portfolio. Tier 2, prior to the bank's decision to liquidate $250 million of investments in late 2008, represented approximately 10% of SIBL's portfolio. Tier 3, the undisclosed assets managed by Allen Stanford and Davis, thus represented *approximately 80%* of SIBL's investment portfolio in December, 2008.

58.     Neither Pendergest-Holt nor SIBL's SIO disclosed that the bank's Tier 3 assets were managed and/or monitored exclusively by Allen Stanford and Davis. Likewise, they did not disclose that Allen Stanford and Davis surrounded themselves with a close-knit circle of family, friends and confidants, thereby eliminating any independent oversight of SIBL's assets.

59.     Neither Pendergest-Holt nor the SIO disclosed to the Plaintiffs or the Class that the "global network" of money managers and the team of analysts did not manage any of SIBL's Tier 3 investments and, in reality, only monitored approximately 10% of SIBL's portfolio. In fact, Pendergest-Holt trained the SIO "not to divulge too much" about the oversight of SIBL's portfolio because that information "wouldn't leave

Certified Document Number: 43120733 - Page 19 of 38

an investor with a lot of confidence." Likewise, Davis instructed the SIO to "steer" potential customers away from information about SIBL's portfolio.

60.    Plaintiffs and other members of the Class reasonably relied upon the information disseminated by SIBL's SIO when making their decisions to invest in and with the Stanford Entities.

<u>Misrepresentation That SIBL Was "Stronger" Than Ever Before</u>

61.    On January 10, 2009, Allen Stanford, Davis and Pendergest-Holt spoke to SGC's Top Performers Club (a collection of high performing Stanford financial advisers) in Miami, Florida.

62.    During that meeting, Davis stated that SIBL was "stronger" than at any time in its history.  Allen Stanford, Davis, and Pendergest-Holt represented that SIBL was secure and built upon a strong foundation, and that its financial condition was shored up by Allen Stanford's capital infusions.  Davis, however, failed to disclose that he had been informed only days earlier by the head of SIBL's treasury that, despite SIBL's best efforts to liquidate Tier 2 assets, SIBL's cash position had fallen from the June 30, 2008, reported balance of $779 million to less than $28 million.

63.    Allen Stanford and Davis also failed to disclose to the SGC sales force that: (i) Allen Stanford had misappropriated more than $1.6 billion of investor funds; (ii) SIBL's annual reports, financial statements and quarterly reports to the FSRC were false; (iii) hundreds of millions of dollars of SIBL customers' funds had been invested in a manner inconsistent with SIBL's representations to customers that SIBL's investment

portfolio was composed of marketable securities, and not real estate and/or private equity; and (iv) the purported 2008 capital infusions by Allen Stanford were a fiction.

64.    During her speech, Pendergest-Holt, after being introduced as SFG's chief investment officer and a "member of the investment committee of the bank," answered questions about SIBL's investment portfolio.   In so doing, she failed to disclose to attendees that she and her team of analysts did not manage SIBL's entire investment portfolio and, instead, only monitored approximately 10% of the bank's investments. She also failed to disclose that SIBL had invested SIBL's funds in a manner inconsistent with SIBL's representations to customers that SIBL's investment portfolio was composed of marketable securities, and not real estate and/or private equity.

65.    Allen Stanford, Davis and Pendergest-Holt also failed to disclose that, on or about December 12, 2008, Pershing, LLC (SGC's clearing broker-dealer) had informed SGC that it would no longer process wire transfers from SGC to SIBL for the purchase of the CDs, citing suspicions about SIBL's investment returns and its inability to get from the bank "a reasonable level of transparency" into its investment portfolio.

66.    Allen Stanford, Davis and Pendergest-Holt knew that SGC advisers would rely upon the information provided to them during the Top Performers Club meeting to sell CDs.   Plaintiffs and other members of the Class reasonably relied upon that information.

Exposure to Losses From Madoff-related Investments

67.    In the December 2008 Monthly Report, SIBL told its customers that it "had no direct or indirect exposure to any of [Bernard] Madoff's investments."

Certified Document Number: 43120733 - Page 21 of 38

68.     Contrary to this statement, Allen Stanford, Davis and Pendergest-Holt knew, prior to the release of the December 2008 Monthly Report, that SIBL had exposure to losses from the Madoff Scheme.

69.     On December 12, 2008, and again on December 18, 2008, Pendergest-Holt received e-mails from Meridian Capital Partners, a hedge fund with which SIBL had invested, detailing SIBL's exposure to losses from the Madoff Scheme.

70.     On December 15, 2008, an SFG-affiliated employee notified Pendergest-Holt and Davis that SIBL had exposure to losses from the Madoff Scheme in two additional funds through which SIBL had invested. That same day, Davis, Pendergest-Holt, and others consulted with Allen Stanford regarding the bank's exposure to losses from the Madoff Scheme.

71.     Allen Stanford, Davis and Pendergest-Holt never corrected this misrepresentation in the December 2008 monthly report.

72.     Plaintiffs and other members of the Class reasonably relied upon the information regarding SIBL's purported lack of exposure to losses from the Madoff Scheme.

<u>Bribery of Regulatory Officials</u>

73.     Stanford also represented to Plaintiffs and members of the Class that it was subject to the laws of the Commonwealth of Antigua and Barbuda ("Antigua") and the regulatory oversight of that nation's Financial Services Regulatory Commission of ("FSRC").

Certified Document Number: 43120733 - Page 22 of 38

74.    The FSRC was created by and, at all relevant times, existed under the authority of, Antigua's International Business Corporations Act (the "IBC Act").

75.    Leroy King ("King") was the Administrator and Chief Executive Officer for the FSRC.  King, among other things, was ostensibly responsible for FSRC's (and, thus, Antigua's) oversight of SIBL's investment portfolio, including the review of SIBL's financial reports, and the response to requests by foreign regulators, including the SEC, for information and documents regarding SIBL's operations.

76.    King, however, "facilitated the Ponzi scheme by ensuring that the FSRC 'looked the other way' and conducted sham audits and examinations of [SIBL's] books and records.  In exchange for bribes paid to him over a period of several years, King made sure that the FSRC did not examine [SIBL's] investment portfolio.  King also provided Stanford with access to the FSRC's confidential regulatory files."[4]

77.    Thus, Stanford was engaged in a multi-year, international scheme in which literally every transaction was undertaken with the purpose and intent of defrauding the Class.

## VI.

## CLAIMS

A.    **COUNT ONE: AGAINST ALL DEFENDANTS FOR AVOIDANCE OF FRAUDULENT TRANSFERS UNDER § 24.005(a)(1) OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT AND/OR UNDER THE COMMON LAW**

78.    Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

---

[4] SEC Action, (Proposed) Second Amended Complaint, at p. 3.

Certified Document Number: 43120733 - Page 23 of 38

79.    At all relevant times Defendants provided banking services to Stanford.

80.    Upon information and belief, Defendants received substantial fees and other monies from Stanford during the preceding four (4) years.

81.    Upon information and belief, all or substantially all of those fees and other monies were paid with funds fraudulently stolen from the Plaintiffs and members of the Class.

82.    Upon information and belief, Stanford paid all such fees and other monies to the Defendants in connection with the scheme, and with the actual intent to hinder, delay, or defraud members of the Class.

83.    By reason of the foregoing, each such payment or transfer was fraudulent as to Class members whose claim(s) arose before or within a reasonable time after the transfer was made pursuant to § 24.005(a)(1) of the UFTA.

84.    By reason of the foregoing, the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford pursuant to § 24.008(a)(1) of the UFTA.

85.    By reason of the foregoing, each such payment or transfer was fraudulent as to Class members and the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford under the common law applicable to fraudulent transfers.

**B.    COUNT TWO: AGAINST ALL DEFENDANTS FOR AVOIDANCE OF FRAUDULENT TRANSFERS UNDER § 24.005(a)(2) OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT AND/OR UNDER THE COMMON LAW**

86.    Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

87.    Upon information and belief, Stanford paid all such fees and other monies to the Defendants in connection with the scheme without receiving a reasonably equivalent value in exchange for the transfers, and at a time when Stanford was engaged or was about to engage in a business or a transaction for which Stanford's remaining assets were unreasonably small in relation to the business or transaction; or Stanford intended to incur, or believed or reasonably should have believed that the it would incur, debts beyond its ability to pay as they became due.

88.    By reason of the foregoing, each such payment or transfer was fraudulent as to Class members whose claim(s) arose before or within a reasonable time after the transfer was made pursuant to § 24.005(a)(2) of the UFTA.

3.    By reason of the foregoing, the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford pursuant to § 24.008(a)(1) of the UFTA.

89.    By reason of the foregoing, each such payment or transfer was fraudulent as to Class members and the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford under the common law applicable to fraudulent transfers.

**C.    COUNT THREE: AGAINST ALL DEFENDANTS FOR AVOIDANCE OF FRAUDULENT TRANSFERS UNDER § 24.006(a) OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT AND/OR UNDER THE COMMON LAW**

90.    Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

91.    Upon information and belief, Stanford paid all such fees and other monies to the Defendants without receiving a reasonably equivalent value in exchange for the transfers.

92.    Upon information and belief, Stanford was insolvent at the time of each transfer or became insolvent as a result of such transfers.

93.    By reason of the foregoing, each such payment or transfer to the Defendants was fraudulent as to Class members whose claim(s) arose before such transfer was made pursuant to § 24.006(a) of the UFTA.

94.    By reason of the foregoing, the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford pursuant to § 24.008(a)(1) of the UFTA.

95.    By reason of the foregoing, each such payment or transfer was fraudulent as to Class members and the Class is entitled to avoidance of the transfers to the extent necessary to satisfy the Class's claims against Stanford under the common law applicable to fraudulent transfers.

**D.    COUNT FOUR: AGAINST ALL DEFENDANTS FOR CONSPIRACY TO COMMIT FRAUD AND/OR AIDING AND ABETTING FRAUD**

96.    Plaintiffs repeat, reiterate, and reallege each of the allegations in the foregoing paragraphs.

Certified Document Number: 43120733 - Page 26 of 38

FinCEN Advisory

97.      In April 1999, the United States Department of Treasury Financial Crimes

Enforcement Network ("FinCEN") issued a FinCEN Advisory concerning "Enhanced

Scrutiny for Transactions Involving Antigua and Barbuda.   The FinCEN Advisory

warned that:

> Banks and other financial institutions are advised to give enhanced
> scrutiny to all financial transactions routed into or out of Antigua
> and Barbuda, or involving entities organized or domiciled, or non-
> resident persons maintaining accounts, in Antigua and Barbuda....
>
> In November 1998, the government of Antigua and Barbuda
> amended its Money Laundering (Prevention) Act in a manner that
> significantly weakened that Act; the statute had been enacted in
> December 1996 but had not been fully implemented. In November
> 1998, the Antiguan and Barbudan government also changed the
> supervision of its offshore financial services sector, by vesting
> authority over that sector in a new International Financial Sector
> Authority.   The Authority's board of directors includes
> representatives of the very institutions the Authority is supposed to
> regulate, thus raising serious concerns that those representatives
> are in fact in control of the Authority, so that the Authority is
> neither independent nor otherwise able to conduct an effective
> regulatory program in accordance with international standards.
>
> The amendment of the Money Laundering (Prevention) Act,
> combined with changes in Antigua and Barbuda's treatment of its
> offshore financial services sector, are likely to erode supervision,
> stiffen bank secrecy, and decrease the possibility for effective
> international law enforcement and judicial cooperation regarding
> assets secreted in Antigua and Barbuda. These changes threaten to
> create a "haven" whose existence will undermine international
> efforts of the United States and other nations to counter money
> laundering and other criminal activity, a concern of which the
> United States has repeatedly made the government of Antigua and
> Barbuda aware.
>
> The actions taken by the government of Antigua and Barbuda that
> weaken that nation's anti-money laundering laws and oversight of
> its financial institutions necessarily raise questions about the

Certified Document Number: 43120733 - Page 27 of 38

purposes of transactions routed into or out of Antigua and Barbuda or involving entities organized or domiciled, or non-resident persons maintaining accounts, in Antigua and Barbuda. Institutions subject to the suspicious activity reporting rules contained in 31 CFR 103.21 (effective April 1, 1996) should carefully examine the available facts relating to any such transaction, to determine if such transaction (of $5,000 or more, U.S. dollar equivalent) requires reporting in accordance with those rules. (Institutions subject to the Bank Secrecy Act but not yet subject to specific suspicious activity reporting rules should consider such a transaction with relation to their reporting obligations under other applicable law.) Enhanced scrutiny is especially important for transactions involving Antigua and Barbuda offshore banks, transactions involving both Antigua and Barbuda offshore banks and the nine commercial banks licensed to do business in Antigua and Barbuda, and transactions in which one or more of such nine commercial banks act for one or more Antigua and Barbuda offshore institutions.

98.    The FinCEN Advisory's reference to the International Financial Sector Authority's board of directors including "representatives of the very institutions the Authority is supposed to regulate," was a reference to representatives of Stanford.

99.    Upon information and belief, the Defendants received and were aware of the FinCEN Advisory.

100.    Upon information and belief, the Defendants knew or should have known that FinCEN Advisory was referring specifically to Stanford when it warned that the International Financial Sector Authority's board of directors included "representatives of the very institutions the Authority is supposed to regulate," and that the Authority is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards."

101.    While the FinCEN Advisory was withdrawn in August 2001, FinCEN cautioned that "[t]he withdrawal of [the] Advisory...does not relieve institutions of their

Certified Document Number: 43120733 - Page 28 of 38

pre-existing and on-going obligation to report suspicious activity, as set forth in regulations issued by FinCEN and by the federal bank supervisory agencies, as well as their obligation to comply with all other applicable provisions of law."

102.   Moreover, each of Defendants knew, or should have known, by virtue of their knowledge and experience in international banking and banking regulation, that Antigua's lax regulatory oversight of its offshore banking sector, including SIBL, posed a heightened risk that Stanford was involved in illegal activity.

HSBC

103.   Defendant HSBC was a "correspondent" bank of SIBL, receiving wire transfers of funds from members of the Class.

104.   As a correspondent bank of Stanford, HSBC was required, pursuant to The Money Laundering Regulations 2007, enacted by Parliament on July 25, 2007, and effective as of December 15, 2007, to conduct thorough due diligence on SIBL and SFG's operations.   Specifically, The Money Laundering Regulations 2007 provide, in relevant part:

> A credit institution ("the correspondent") which has or proposes to have a correspondent banking relationship with a respondent institution ("the respondent") from a non-[European Economic Area] state must—
> (a)   gather sufficient information about the respondent to understand fully the nature of its business;
> (b)   determine from publicly-available information the reputation of the respondent and the quality of its supervision;
> (c)   assess the respondent's anti-money laundering and anti-terrorist financing controls;
> (d)   obtain approval from senior management before establishing a new correspondent banking relationship;
> (e)   document the respective responsibilities of the respondent and correspondent; and

Certified Document Number: 43120733 - Page 29 of 38

(f) be satisfied that, in respect of those of the respondent's customers who have direct access to accounts of the correspondent, the respondent—
(i) has verified the identity of, and conducts ongoing monitoring in respect of, such customers; and
(ii) is able to provide to the correspondent, upon request, the documents, data or information obtained when applying customer due diligence measures and ongoing monitoring.

105. Upon information and belief, prior to and during their establishment of a correspondent banking relationship with Stanford, HSBC gathered sufficient information concerning Stanford to understand Stanford's business and, as a result, knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

106. Stanford provided members of the Class with deposit instructions indicating that they could make deposits in Antigua-based SIBL by wiring funds to HSBC in London.

107. HSBC was aware of these instructions that were provided to members of the Class, and expressly agreed with Stanford to receive wire deposits from members of the Class for further transfer to SIBL in Antigua.

108. After the establishment of the HSBC-Stanford correspondent bank relationship, members of the Class transferred funds to HSBC with the intent that such funds would be transferred to SIBL in Antigua for deposit there.

109. Upon information and belief, all or substantially all of the funds that members of the class transferred to HSBC, with the intent that such funds would be transferred to SIBL in Antigua for deposit there, were redirected by HSBC, in concert with and/or at the direction of Stanford, to bank accounts in Houston, Texas, and elsewhere, after which such funds were distributed to other Stanford entities, "invested"

Certified Document Number: 43120733 - Page 30 of 38

in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation.

110. Based upon the foregoing, and based upon its longstanding correspondent banking relationship with Stanford, HSBC knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

TD Bank

111. Defendant TD Bank was a "correspondent" bank of SIBL, receiving wire transfers of funds from members of the Class.

112. As a correspondent bank of SFG, TD Bank was required, pursuant to Canadian money laundering regulations, to conduct thorough due diligence on SIBL and SFG's operations.

113. Upon information and belief, prior to and during their establishment of a correspondent banking relationship with SFG, TD Bank gathered sufficient information concerning SFG to understand Stanford's business and, as a result, knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

114. Stanford provided members of the Class with deposit instructions indicating that they could make deposits in Antigua-based SIBL by wiring funds to TD Bank.

115. TD Bank was aware of these instructions that were provided to members of the Class, and expressly agreed with Stanford to receive wire deposits from members of the Class for further transfer to SIBL in Antigua.

Certified Document Number: 43120733 - Page 31 of 38

116.   After the establishment of the TD Bank-Stanford correspondent bank relationship, members of the Class transferred funds to TD Bank with the intent that such funds would be transferred to SIBL in Antigua for deposit there.

117.   Upon information and belief, all or substantially all of the funds that members of the class transferred to TD Bank, with the intent that such funds would be transferred to SIBL in Antigua for deposit there, were redirected by TD Bank, in concert with and/or at the direction of Stanford, to bank accounts in Houston, Texas, and elsewhere, after which such funds were distributed to other Stanford entities, "invested" in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation.

118.   Among other things, during 2008 alone, approximately $474 million of funds were transferred from SIBL's accounts at TD Bank to SIBL's account at BoH.

119.   Based upon the foregoing, and based upon its longstanding correspondent banking relationship with Stanford, TD Bank knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

<u>Société Générale</u>

120.   Defendant Société Générale provided "private banking" services to Stanford.

121.   Upon information and belief, Société Générale earned substantial fees through its "private banking" relationship with Stanford.

122.   Blaise Friedli, the Executive Vice President of Private Banking at Société Générale, served on the Stanford Financial Group International Advisory Board.

Certified Document Number: 43120733 - Page 32 of 38

123.    Upon information and belief, Stanford, with the active support and assistance of Friedli and Société Générale, made illicit payments to Stanford's outside auditor in exchange for the auditor's role in conducting sham audits and falsely vouching for the financial integrity of SIBL and SIBL's investments.[5]

124.    Specifically, Stanford made regular monthly payments to an outside auditor, C.A.S. Hewlett, as payment for that firm's accounting services. Those regular payments, made from a Stanford Financial Group Limited account at Trustmark Bank in Houston, Texas, were $18,000 per month for professional services in 2007 and through April 2008, and $25,000 per month thereafter.

125.    Stanford, however, made *additional* payments to C.A.S. Hewlett from its private Swiss accounts at Société Générale. Those payments, which were in the amount of £ 15,000 (sterling) per month, were *increased* to £20,000 (sterling) per month effective June 15, 2008.    Upon information and belief, those additional payments were not for audit services, but were instead illicit payments made with the purpose and intent of paying C.A.S. Hewlett to provide fraudulent auditing services.

126.    Mr. Friedli, a member of the Stanford Financial Group International Advisory Board, and the Executive Vice President of Private Banking at Société Générale, was aware of those payments to C.A.S. Hewlett and, in fact, was essential to carrying them out.    According to documents made filed in the Receivership Action, James Davis informed Mr. Friedli in May 2008 to increase the additional payments to

---

[5] The allegations concerning the payments to C.A.S. Hewlett from the account at Société Générale are made upon information and belief, and based upon the Supplemental Declaration of Karyl Van Tassel dated July 10, 2009, submitted in *In re Stanford International Bank, Ltd.*, Case No. 3-09-CV-0721-N (S.D. Tex.), Dkt. No. 42, Exh. A.

Certified Document Number: 43120733 - Page 33 of 38

C.A.S. Hewlett from the Société Générale accounts, and Stanford's financial records reflect that Mr. Friedli did so.

127.   Based upon the foregoing, and based upon Mr. Friedli's knowledge: (a) of Stanford as a member of Stanford's International Advisory Board; (b) of Stanford's bank accounts and funds transfers as the Executive Vice President of Private Banking at Société Générale, and the Société Générale banker in charge of overseeing those accounts; and (c) that Stanford was making monthly illicit payments to C.A.S. Hewlett from accounts at Société Générale, Société Générale knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

Trustmark

128.   Trustmark held and managed numerous Stanford operating accounts, including a SIBL "sweep" account, which sent: (i) approximately $295 million to SIBL's account at TD Bank during 2008; (ii) approximately $66 million to an SIBL client account at Trustmark; (iii) $32 million to an SIBL Vendor Account at Trustmark; and (iv) approximately $2 million to the SIBL Payroll Account at Trustmark.

129.   Trustmark was required, pursuant to U.S. anti-money laundering laws and regulations, to conduct a thorough investigation of any suspicious and potentially illegal banking activity.

130.   Upon information and belief, Trustmark received large and highly suspicious wire transfers from HSBC and TD Bank of funds that were received by those institutions from members of the Class and intended for deposit with SIBL in Antigua.

131.    Upon information and belief, Class members who paid by check in U.S. dollars sent their checks to SIBL in Antigua, where those checks were bundled and sent daily to Trustmark National Bank in Houston, Texas, for deposit there.

4.    Members of the Class were not aware that their checks were diverted from Antigua to Houston, Texas, where they were deposited in a bank other than the intended recipient, SIBL.

132.    Upon information and belief, numerous large transfers of funds were made from SIBL's accounts at Trustmark to other Stanford entities, "invested" in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation.

133.    Based upon the foregoing, and based upon its longstanding banking relationship with Stanford, Trustmark knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

<u>BoH</u>

134.    BoH held and managed certain of Stanford's operating accounts, including Stanford's principal operating account.

135.    BoH was required, pursuant to U.S. anti-money laundering laws and regulations, to conduct a thorough investigation of any suspicious and potentially illegal banking activity.

136.    Upon information and belief, BoH received large and highly suspicious wire transfers from HSBC and TD Bank of funds that were received by those institutions from members of the Class and intended for deposit with SIBL in Antigua.

Certified Document Number: 43120733 - Page 35 of 38

137.   Among other things, during 2008 alone, approximately $474 million of funds were transferred from SIBL's accounts at TD Bank to SIBL's account at BoH.

138.   Members of the Class were not aware that their checks were diverted from Antigua to Houston, Texas, where they were deposited in a bank other that the intended recipient, SIBL.

139.   Upon information and belief, numerous large transfers of funds were made from SIBL's accounts at BoH to other Stanford entities, and "invested" in Allen Stanford's private ventures, used to fund Allen Stanford's lavish lifestyle, and reinvested in the criminal venture to keep the fraudulent scheme in operation. Upon information and belief, during 2008 approximately $300 million of SIBL funds were distributed from BoH among various Stanford entities.

140.   Based upon the foregoing, and based upon its longstanding banking relationship with Stanford, BoH knew, or should have known, that Stanford was conducting an illegal and fraudulent scheme.

<u>General Allegations</u>

141.   Defendants together or separately, conspired with Stanford to commit fraud.

142.   The object of the fraud was to fraudulently induce members of the Class to send funds to SIBL, which were then distributed to Defendants in the form of "fees," and diverted for: (a) "investment" in Allen Stanford's personal business ventures; (b) funding Allen Stanford's lavish lifestyle; and (c) funding and perpetuating the fraud described above.

Certified Document Number: 43120733 - Page 36 of 38

143. Defendants together or separately, had a meeting of the minds with Stanford on the course of action for perpetrating the fraud.

144. Specifically Defendants, by word and deed, conveyed to members of the Class that funds transmitted to SIBL, through HSBC and/or TD Bank, were being deposited in SIBL in Antigua, and being entrusted to a legitimate banking institution.

145. By reason of the foregoing, the Class has been damaged in an amount to be determined at trial, but believed to be in excess of $7 billion.

146. By reason of the foregoing, Defendants are liable to the Plaintiffs and the Class for Conspiracy to Commit Fraud and/or Aiding and Abetting Fraud.

### **JURY DEMAND**

147. Plaintiffs demand a jury trial.

### **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court:

    (i)    certify the Class;

    (ii)    enter judgment in favor of the Class and against the Defendants:
(a) ordering the avoidance of the fraudulent transfers described herein;

    (b) awarding damages in an amount to be determined at trial;

    (c) awarding attorney fees, and costs as permitted by law; and

    (d) granting such other and further relief as the Court may deem just and appropriate.

LACKEY HERSHMAN, L.L.P

By: _____

Paul Lackey
State Bar Number 00791061

Certified Document Number: 43120733 - Page 37 of 38

3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

MORGENSTERN & BLUE, LLC

Peter D. Morgenstern (*pro hac vice pending*)
Gregory A. Blue (*pro hac vice pending*)
Rachel K. Marcoccia (*pro hac vice pending*)
885 Third Avenue
New York, NY 10022
Telephone: (212) 750-6776
Facsimile: (212) 750-3128

*Attorneys for Plaintiffs*



I, Loren Jackson, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date
Witness my official hand and seal of office
this September 8, 2009

Certified Document Number:   43120733 Total Pages:  38

LOREN JACKSON, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**