IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, *et al.* | § | |
| | § | |
| *Plaintiffs,* | § | Civil Action No. 3:09-CV-2384 |
| | § | |
| v. | § | |
| | § | |
| TRUSTMARK NATIONAL BANK, *et al.* | § | |
| | § | |
| *Defendants.* | § | |

## Plaintiffs' Reply to HSBC Bank plc's Responses to Plaintiffs' Motion for Extension of Briefing Schedule on Motions to Dismiss and Plaintiffs' Motion for a Limited Stay

**MORGENSTERN & BLUE, LLC**
885 Third Avenue
New York, NY 10022
Telephone: (212) 750-6776
Facsimile: (212) 750-3128

**LACKEY HERSHMAN, L.L.P.**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Attorneys for Plaintiffs*

**FRIEDMAN KAPLAN SEILER & ADELMAN LLP**
1633 Broadway, 46th Floor
New York, NY 10019-6708
Telephone: (212) 833-1100
Facsimile: (212) 833-1250

*Of Counsel*

Plaintiffs respectfully submit this reply to the Responses of HSBC Bank plc ("HSBC") (the "HSBC Response") [1] to Plaintiffs' Motion for Extension of Briefing Schedule on Motions to Dismiss and Plaintiffs' Motion for a Limited Stay.

The HSBC response cites not a single case, statute, or rule.  In opposition to plaintiffs' compelling showing that a stay would be in the victims' interests, the public interest, and the interest of judicial efficiency – and that a stay is required to protect the victims from being placed at a disadvantage by the stay and injunction previously granted by this Court in the receivership action – HSBC simply asserts, without any support, that a stay is not warranted. HSBC's three-sentence argument should be rejected for at least the following reasons:

*First,* HSBC argues that it is not subject to the personal jurisdiction of this Court.  That, however, is an argument that HSBC already made in its motion to dismiss, and which can be addressed by the Court upon the expiration of the requested stay.  During the requested stay, HSBC will not be subjected to any additional costs or burdens, and HSBC is not at all prejudiced by a delay in that determination.  Indeed, HSBC does not even suggest that it will suffer any prejudice from such a delay.

*Second,* HSBC argues that it "already has expended significant resources briefing these issues and responding to plaintiffs' jurisdictional discovery requests."  (HSBC Response at p. 1) HSBC, though, already expended those resources and this Court's grant (or denial) of a stay will not have any effect on those past expenditures.  The only relevant issue is whether the requested stay will prejudice HSBC in the future.  Once again, HSBC has not identified a single way in which it will be prejudiced by the stay. The reason is simple: it will not be prejudiced.

Finally, HSBC argues that Mr. Stanford's criminal trial "has nothing to do with the issues raised" in the motions to dismiss.  (HSBC Response at pp. 1-2)  It is, however, beyond serious dispute that Mr. Stanford's criminal trial will feature a plethora of evidence that has not yet been

---

[1]  The HSBC Response is Dkt. No. 64.

made publicly available. (HSBC itself does not dispute that fact.) Among that evidence will be information concerning the movement of money in Stanford's bank accounts, and Mr. Stanford's actions in connection with those accounts. Notably, the Indictment alleges, among other things that the criminal defendants moved massive amounts of money through overseas bank accounts:

> It was a part of the conspiracy that [the criminal defendants] would cause the movement of millions of dollars of fraudulently obtained investors' funds from and among bank accounts located in the Southern District of Texas and elsewhere in the United States to various bank accounts located outside of the United States, including as follows:
>
> a. [the criminal defendants] would cause investors and potential investors in SIBL's products to transfer the investors' funds into bank accounts located in the Southern District of Texas which were maintained by STANFORD;
>
> b. [the criminal defendants] would subsequently cause the transfer of the investors' funds in amounts exceeding $10,000 from bank accounts located in the Southern District of Texas into intermediary bank accounts located outside of the United States; and
>
> c. [the criminal defendants] would cause the transfer of investors' funds from intermediary bank accounts into other bank accounts located outside of the United States in order for [the criminal defendants] to exercise exclusive control over the investors' funds.
>
> 4. It was further a part of the conspiracy [the criminal defendants] would cause the movement of millions of dollars of fraudulently obtained investors' funds from and among bank accounts outside the United States to various bank account in the United States, in the Southern District of Texas and elsewhere, as follows:
>
> a. [the criminal defendants] would cause the transfer of funds from bank accounts outside the United States to bank accounts in the United States in order to repay investors who had requested redemption of their SIBL CDs and to perpetuate the false appearance that SIBL was financially sound and was operating in accordance with the representations it had made to investors….

(Indictment, at pp. 47-48; 2nd Supplemental Appendix at pp. 47-48)

Moreover, the Indictment specifically alleges that proceeds of the fraud, traceable to the conspiracy, were deposited by the criminal defendants in no less than four separate accounts *held at HSBC in London*. (*Id.* at p. 49) It therefore is beyond credulity for HSBC to suggest that Mr.

Stanford's criminal trial will not feature evidence relevant to HSBC's role in the Stanford fraud, as well as HSBC's contacts with the defendants in the state of Texas, which are the subject of the personal jurisdiction arguments in HSBC's motion to dismiss.[2]

## CONCLUSION

HSBC has utterly failed to offer any factual or legal arguments in opposition to plaintiffs' request for a temporary stay.  For all of the reasons set forth in plaintiffs' opening briefs, plaintiffs respectfully request that this Court: (a) stay this action pending the completion of Mr. Stanford's criminal trial, or until further order of this Court; and (b) extend the briefing schedule on the pending motions to dismiss.

Dated: October 28, 2010

<div style="margin-left:40%">

Respectfully submitted,

**MORGENSTERN & BLUE, LLC**

By:     /s/ Peter D. Morgenstern

       Peter D. Morgenstern (*pro hac vice*)
       Gregory A. Blue (*pro hac vice*)

885 Third Avenue
New York, NY 10022
Telephone: (212) 750-6776
Facsimile: (212) 750-3128

**LACKEY HERSHMAN, L.L.P.**

3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Attorneys for Plaintiffs*

**FRIEDMAN KAPLAN SEILER & ADELMAN LLP**

Scott M. Berman
1633 Broadway, 46th Floor
New York, NY 10019-6708
Telephone: (212) 833-1100
Facsimile: (212) 833-1250

*Of Counsel*

</div>

---

[2]  HSBC also argues that a stay of *discovery* is appropriate.  Plaintiffs, however, have not suggested that they are seeking discovery from HSBC (or any of the other defendants) during the requested temporary stay.

## **Certificate of Service**

I hereby certify that on October 28, 2010, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: October 28, 2010

/s/ Peter D. Morgenstern
Peter D. Morgenstern

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, *et al.* | § | |
| on behalf of themselves and all others | § | |
| similarly situated, | § | |
| | § | |
| *Plaintiffs,* | § | Civil Action No. 3:09-CV-2384 |
| | § | |
| v. | § | |
| | § | |
| TRUSTMARK NATIONAL BANK, *et al.* | § | |
| | § | |
| *Defendants.* | § | |

**SECOND SUPPLEMENTAL APPENDIX
IN SUPPORT OF PLAINTIFFS' MOTION FOR LIMITED STAY**

**MORGENSTERN & BLUE, LLC**
885 Third Avenue
New York, NY 10022
Telephone: (212) 750-6776
Facsimile: (212) 750-3128

**LACKEY HERSHMAN, L.L.P.**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Attorneys  for Plaintiffs*

**FRIEDMAN KAPLAN SEILER & ADELMAN LLP**
1633 Broadway, 46th Floor
New York, NY 10019-6708
Telephone: (212) 833-1100
Facsimile: (212) 833-1250

*Of Counsel*

UNSEALED
PER ORDER
6/19/09

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

United States District Court
Southern District of Texas
FILED

JUN 1 8 2009

Michael N. Milby, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | Cr. No. **H-09- 342** |
| § | |
| ROBERT ALLEN STANFORD § | **UNDER SEAL** |
| a/k/a Sir Allen Stanford § | |
| a/k/a Allen Stanford, § | |
| LAURA PENDERGEST-HOLT § | |
| a/k/a Laura Pendergest § | |
| a/k/a Laura Holt, § | |
| GILBERTO LOPEZ, § | |
| MARK KUHRT § | |
| and § | |
| LEROY KING, § | |
| § | |
| Defendants. § | |

## INDICTMENT

The Grand Jury Charges:

At all times material to this Indictment, unless otherwise specified:

### COUNT ONE
### Conspiracy to Commit Mail, Wire and Securities Fraud
### (Violation of 18 U.S.C. § 371)

## RELEVANT PERSONS AND ENTITIES

1. Stanford Financial Group (SFG) was the parent company of Stanford

International Bank, Ltd. and a web of other affiliated financial services entities,

including Stanford Group Company. SFG maintained offices in several locations, including Houston, Texas, Memphis, Tennessee, and Miami, Florida.

2.    Stanford International Bank, Ltd. (SIBL) was a private, offshore bank with offices on the island of Antigua and elsewhere. SIBL was organized in or about 1985 in Montserrat, originally under the name of Guardian International Bank. In or about 1989, SIBL's principal banking location was moved to Antigua.

3.    SIBL's primary investment product was marketed as a "Certificate of Deposit" (CD). SIBL marketed CDs to investors promising substantially higher rates of return than were generally offered at banks in the United States from 2001 to 2008. In its 2007 Annual Report to investors, SIBL purported to have approximately $6.7 billion worth of the CD deposits and over $7 billion in total assets. In its December 2008 Monthly Report, SIBL purported to have over 30,000 clients from 131 countries representing $8.5 billion in assets.

4.    Stanford Group Company (SGC), a Houston-based company, was founded in or about 1995. SGC was registered with the Securities and Exchange Commission (SEC) as a broker-dealer and investment advisor. SGC was also a member of the Financial Industry Regulatory Agency, formerly the National Association of Securities Dealers, and the U.S. Securities Investor Protection Insurance Corporation (SIPIC). Although SGC and the financial advisers employed

2

by SGC promoted the sale of SIBL's CDs through SGC's 25 offices located throughout the United States, SIBL's CDs were not insured by SIPIC or the Federal Deposit Insurance Corporation (FDIC).

5.     In Antigua, SIBL was purportedly regulated by the Financial Services Regulatory Commission (FSRC), an agency of the Antiguan government, and was subject to annual on-site inspection by the FSRC. The FSRC claimed on its website that it conducted these inspections to determine the solvency of the banks, review the quality of the investments, and review the accuracy of the banks' returns. Annually, SIBL provided to the FSRC an "Analysis of Investments" report which listed purported values for SIBL's investments. FSRC did not, however, audit SIBL's financial statements or verify the value SIBL ascribed to its investments in the Analysis of Investments.

6.     Defendant **ROBERT ALLEN STANFORD** controlled SFG and its affiliated companies, including, through a holding company, SIBL.   **STANFORD** was the chairman of the SIBL Board of Directors and a member of SIBL's Investment Committee.   **STANFORD**, among other things, received regular updates and financial reports on the investment activities of SIBL; made hiring decisions for SIBL; made decisions about what revenue and asset numbers to report to investors and others; made investment decisions for SIBL; updated investors and others about

3

the activities and financial status of SIBL; and approved reports to investors and others about the financial condition of SIBL. **STANFORD** also authorized SIBL to make loans to himself and authorized SIBL to purchase property from **STANFORD**-controlled entities and to sell property to **STANFORD**-controlled entities.

7.      JAMES M. DAVIS, a co-conspirator not named as a defendant herein, was the Chief Financial Officer (CFO) for SFG and SIBL, and served as a member of SIBL's Investment Committee. DAVIS, among other things, regularly consulted with **STANFORD** about the financial status of SIBL, including investment decisions; received regular updates on SIBL's revenue and loss records; made decisions, based on the direction of **STANFORD**, about what revenue and asset numbers to report to investors and others; updated investors and others about the financial status and operations of SIBL; and approved reports to investors and others about the financial condition of SIBL.

8.      Defendant **LAURA PENDERGEST-HOLT** was the Chief Investment Officer (CIO) of SFG. In or about December 2005, **HOLT** was appointed by the SIBL Board of Directors as a member of SIBL's Investment Committee. **PENDERGEST-HOLT**, among other things, held herself out to investors, employees of SIBL and SFG, and others as managing the entire investment portfolio of SIBL; updated investors and employees of SIBL and SFG regarding the financial

4

status of SIBL; provided information about SIBL's investment portfolio to SFG and SGC financial brokers; and supervised SFG research analysts.

9.     Defendant **GILBERTO LOPEZ** was the Chief Accounting Officer of SFG. **LOPEZ**, among other things, was responsible for tracking SIBL revenues, assets and liabilities, and was responsible for the preparation of the revenue and asset numbers used in SIBL's financial reports.

10.     Defendant **MARK KUHRT** was the Global Controller for Stanford Financial Group Global Management, an affiliate of SFG and SIBL. **KUHRT**, among other things, maintained calculations of investment revenue of SIBL and, along with **LOPEZ**, was responsible for the preparation of the revenue and asset numbers used in SIBL's financial reports.

11.     Defendant **LEROY KING** was the Administrator and Chief Executive Officer for the FSRC. **KING**, among other things, was responsible for Antigua's regulatory oversight of SIBL's investment portfolio, including the review of SIBL financial reports for the Antiguan Government, and the response to requests by foreign regulators, including the SEC, for information and documents about SIBL's operations.

5

## BACKGROUND

### SIBL's Investment "Program"

12.     **STANFORD, HOLT, LOPEZ, KUHRT**, DAVIS and others managed, marketed and monitored SIBL's CD investment program.  The defendants and their conspirators caused investors and potential investors in SIBL CDs to receive a Disclosure Statement, amended several times over the years, and other documents providing information regarding SIBL, including data purportedly depicting SIBL's historical investment portfolio performance by specific categories of investment and updating SIBL investors on the financial condition of SIBL.

13.     In promoting the SIBL CDs to investors, **STANFORD, HOLT** and DAVIS represented and caused others to represent: (a) the safety and security of SIBL's investments and CDs; (b) consistent double-digit returns on the bank's investment portfolio; and (c) high return rates on the SIBL CDs that greatly exceeded those offered by commercial banks in the United States.

14.     **STANFORD, HOLT, LOPEZ, KUHRT**, DAVIS, and others caused to be sent to investors Annual Reports purportedly representing SIBL's earnings from its "diversified investments."  For example, the Annual Reports listed investment earnings of approximately $479 million in 2006, and approximately $642 million in 2007.

6

15.     Commencing in or about 2000, **STANFORD** sought to increase sales of SIBL CDs in the United States.  To do so, SGC recruited investment advisors, along with their clients, from other brokerage firms.  Financial advisors at SGC would receive a 1% commission based upon the value of CDs they sold, and were eligible to receive additional commissions for CD sales.  **STANFORD**, **HOLT** and DAVIS provided and caused to be provided information to these financial advisors about the financial condition of SIBL and the SIBL CDs.

16.     SIBL investors and potential investors were *not* advised of the actual investments made by SIBL and could not determine the nature and risk of investments.  Unknown to investors, the defendants and their conspirators internally segregated SIBL's investment portfolio into three investment tiers: (a) cash and cash equivalents ("Tier I"); (b) investments with "outside portfolio managers" ("Tier II"); and (c) other assets ("Tier III").

17.     According to internal SIBL documents, as of June 30, 2008: Tier I investments represented only about 9% of the purported total value of SIBL's investments; Tier II investments represented only about 10% of the purported total value of SIBL's investments; and Tier III investments represented more than 80% of the purported total value of SIBL's investments.

7

18.     SIBL's Treasurer ("the SIBL Treasurer") had primary responsibility for the Tier I cash and cash equivalent investments.

19.     Unknown to investors, SGC financial advisors and others, **HOLT** "monitored" only Tier II investments, which were actually managed by well-known investment entities outside of SIBL that had complete discretion over the Tier II investments. SIBL would provide funds for investments to these "outside portfolio managers," also referred to as "money managers," and the money managers would select how funds would be invested for Tier II, that is, what investments would be made, limited by the funds available to them.

20.     **STANFORD** and DAVIS directed, managed, and monitored the remaining investments – the Tier III investments.   According to internal SIBL documents, as of June 30, 2008, these Tier III investments comprised the majority of the purported value of SIBL's investment portfolio.   Approximately 50% of the purported value of Tier III (approximately $3.2 billion) included investments in artificially valued real estate and approximately 30% of the purported value of Tier III (approximately $1.6 billion) included notes on personal loans to **STANFORD**. **STANFORD**, DAVIS and others did not disclose to, and actively concealed from, investors, SGC and SIBL employees, and others the fact that approximately $4.8

8

billion in purported Tier III investments consisted of such artificially valued real estate and notes on personal loans to **STANFORD**.

21.    In its Monthly Report to investors for December 2008, SIBL reported total assets of over $8 billion, and an approximate 1.3% decline in earnings for the year, which the Monthly Report contrasted with the performance of other financial indices reporting approximately 30% to 40% declines.  As set forth above, it was not disclosed in the Report that approximately $4.8 billion of the purported $8 billion "value" of these "total assets" was in notes on additional loans to **STANFORD** and in interests in certain "island properties," the values of which had been grossly overstated.

### Marketing of SIBL CDs

22.    **STANFORD, HOLT,** DAVIS, and others routinely made presentations to financial advisors employed by SGC regarding the financial condition of SIBL and its investment portfolio.  The SGC financial advisors, in turn, provided information to prospective investors regarding the CD investment program.

23.    **STANFORD, HOLT,** and DAVIS, at times, made presentations directly to individuals or groups of prospective investors regarding SIBL's CD program and to existing investors who were considering additional CD purchases or redemptions of their CDs.

9

24. **STANFORD** regularly sponsored "Top Producers Club" (TPC) meetings, which were held at various locations, including January 2009 meetings in Phoenix and Miami, and were attended by financial advisors and others. At these TPC meetings, **STANFORD, HOLT,** DAVIS and others touted the purported economic condition and viability of SIBL to instill confidence in the CD investment program and encourage the financial advisors to aggressively market and sell SIBL's CDs.

25. **STANFORD, HOLT**, DAVIS and others, on behalf of SIBL, reviewed and caused the issuance of SIBL's periodic Annual, Quarterly and Monthly Reports, which were provided to investors and used by SGC's financial advisors in marketing SIBL's CDs. In marketing the CDs as safe and secure investments, the financial advisors and SIBL's brochures, reports and other documents variously emphasized that SIBL was "strong, safe and fiscally sound" and that its investment strategy was a "conservative approach" and "long term, hands on and globally diversified with strong liquidity and minimal leverage."

### SEC Investigation

26. In or about 2005, the Securities and Exchange Commission (SEC) initiated an investigation of SFG and began making official inquiries with the FSRC regarding the value and content of SIBL's purported investments.

10

27.     In June 2005, the SEC confidentially requested the assistance of **KING** at the FSRC in determining whether SIBL and SFG had "perpetrated a fraud upon investors."

28.     In September 2006, the SEC confidentially requested from **KING** at the FSRC, among other things, copies of "the FSRC's exam reports" regarding SIBL.

29.     In or about January 2009, the SEC issued subpoenas to **STANFORD, HOLT** and DAVIS seeking both testimony and documents regarding SIBL's investment portfolio.

30.     In late January 2009, the SEC notified SIBL's attorney that the SEC had scheduled sworn testimony of the SIBL President and **HOLT** to provide "credible and verifiable testimony regarding all of the assets" of SIBL.

31.     On or about February 10, 2009, **HOLT** attended an SEC proceeding in Fort Worth, Texas, and provided sworn testimony to the SEC regarding SIBL's investment portfolio.

32.     On or about February 16, 2009, the SEC filed a Complaint seeking emergency relief against SFG and related individuals and entities in the United States District Court for the Northern District of Texas ("the District Court"), alleging a "massive, on-going fraud." In its Amended Complaint, filed February 27, 2009, the

11

SEC further alleged "misappropriation of billions of dollars of investor funds" and other fraudulent conduct.

33.     On or about February 17, 2009, the District Court appointed an individual – known as a Receiver – to take over SFG and its related entities to protect and preserve their investments and assets.

## THE CONSPIRACY

34.     From in or about at least September 1999, through on or about February 17, 2009, in the Southern District of Texas and elsewhere, the defendants,

**ROBERT ALLEN STANFORD**
**a/k/a Sir Allen Stanford**
**a/k/a Allen Stanford,**
**LAURA PENDERGEST-HOLT**
**a/k/a Laura Pendergest**
**a/k/a Laura Holt,**
**GILBERTO LOPEZ,**
**MARK KUHRT**
**and**
**LEROY KING,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other, with JAMES M. DAVIS, and with others, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

12

(a) to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and causing to be delivered certain mail matter by the United States Postal Service and any private or commercial interstate carrier, according to the directions thereon, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1341;

(b) to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and transmitting and causing to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1343; and

(c) to, by use of the means and instrumentalities of interstate commerce, the mails, and wire communications, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, that is, certificates of deposit of the Stanford International Bank, Ltd. and in connection with such transactions, (i) employ devices, schemes, and artifices to defraud holders of the securities; (ii) make untrue statements of

13

material facts and omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engage in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon holders of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5.

## PURPOSE OF THE CONSPIRACY

35. It was a purpose of the conspiracy that the defendants and their conspirators would solicit and obtain billions of dollars of investors' funds through false pretenses, representations and promises, all in order to obtain substantial economic benefits for themselves and others through the payment of fees, wages, bonuses, and other monies, and unauthorized diversions, misuse, and misappropriation of funds.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

36. It was a part of the conspiracy that the defendants and their conspirators would make and cause to be made false and misleading representations in

14

promotional materials, periodic reports, newsletters, emails sent by mail and wire

transmissions in interstate commerce to investors and others, and in conversations,

presentations and meetings with investors and others, including the following:

**False Statements Regarding the Value of SIBL's Finances:**

      a.    The defendants and their conspirators would make and cause to

be made false and misleading representations concerning SIBL's financial condition

touting year-by-year percentage and dollar amount increases in the purported value

of its earnings, revenue, and assets, including an increase in the purported value of

SIBL's assets from approximately $1.2 billion in 2001 to approximately $8.5 billion

in December 2008, when, in truth and in fact, those values were false and designed

to deceive investors into believing that SIBL's "investments" were performing as

falsely touted.

**False Statements Regarding SIBL's Investment Strategy and Use of Investors' Funds:**

      b.    The defendants and their conspirators would make and cause to

be made false and misleading representations concerning SIBL's investment strategy

as seeking to "minimize risk and achieve liquidity," when, in truth and in fact,

approximately 80% of SIBL's investment portfolio consisted of illiquid investments,

such as (i) grossly overvalued real and personal property that SIBL had acquired from

**STANFORD**-controlled entities through fraudulent "round trip" transactions and (ii)

unsecured notes on more than a billion dollars in personal loans to **STANFORD**.

**False Statements Regarding the Management of Investors' Funds**:

c.   **STANFORD, HOLT,** DAVIS and others would make false and

misleading misrepresentations that SIBL's entire investment portfolio was closely

and well-managed, including identifying **HOLT** as SFG's "Chief Investment Officer"

and as a member of SIBL's "Investment Committee," responsible for management of

SIBL's entire portfolio of assets through a "global network" of "outside portfolio

managers" and "money managers," when, in truth and in fact, **HOLT** ultimately

"managed" less than approximately 10% of SIBL's investment portfolio.

**False Statements Regarding Oversight by Antiguan Regulators**:

d.   **STANFORD, KING,** DAVIS and others would make false and

misleading representations regarding the nature and extent of regulatory oversight

of SIBL, including that SIBL's operations and financial condition were being

scrutinized by the FSRC in Antigua and that SIBL's financial statements were subject

to annual audits and regulatory inspections by Antiguan regulators, when, in truth and

in fact, **STANFORD** had made corrupt payments to **KING** in order to ensure that the

FSRC did not accurately audit SIBL's financial statements or verify the existence or

value of SIBL's assets as reflected in the SIBL financial statements.

16

37.     It was further a part of the conspiracy that the defendants and their conspirators would create and cause to be created false and misleading accounting books and records and other documents concerning the financial condition and investment portfolio of SIBL, through, among other things, the following means:

a.     The defendants and their conspirators would create false books and records containing artificial values for SIBL's investment portfolio and its return on investment by causing already inflated values that had been reported to investors for prior periods to be adjusted (multiplied) by a percentage increase "as deemed necessary" to produce the new false investment and revenue values.

b.     The defendants and their conspirators would conceal and disguise as "investments" in SIBL's books and records, and fail to disclose in such books and records, that **STANFORD** had received and not repaid more than a billion dollars of personal loans from SIBL.

c.     The defendants and their conspirators would conceal and disguise in SIBL's books and records fraudulent "roundtrip" transactions in which SIBL would transfer interests in real and personal property to **STANFORD**-controlled entities and then back to SIBL at grossly inflated values, in order to mask the artificially inflated values of those "assets" on SIBL's books and records, to falsely disguise and purportedly "settle" a substantial portion of the loans **STANFORD** had

17

taken from SIBL, and to falsely inflate the value and disguise the nature of **STANFORD**'s purported capital contributions to SIBL.

38.     It was further a part of the conspiracy that **STANFORD** would make regular secret corrupt payments of thousands of dollars in cash to **KING**, the Administrator and CEO of the FSRC, to ensure that, among other things:

        a.     The FSRC would not exercise its true regulatory functions in verifying the existence and value of SIBL's investments;

        b.     **KING** corruptly would provide to **STANFORD**, DAVIS and others information about official inquiries that the FSRC had received from United States regulators who had requested information from the FSRC regarding "possible fraud perpetrated upon investors" by SIBL; and

        c.     **KING** would make false representations in response to official inquiries of regulators, including U.S. regulators, and would seek and receive the assistance of **STANFORD**, DAVIS and others, in preparing false responses to such inquiries.

39.     It was further a part of the conspiracy that **STANFORD, HOLT,** DAVIS and others, would conceal from the SEC the true operations and financial condition of SIBL, and the true nature and value of its holdings, and would forestall the SEC's investigation through various means, including, among others, the following:

18

a.    **STANFORD**, **HOLT**, DAVIS and others would make and cause to be made false and misleading statements to SEC attorneys in order to persuade them to delay the sworn testimony of **STANFORD** and DAVIS by falsely representing that **HOLT** and SIBL's President could better explain specific details about SIBL's entire investment portfolio and assets rather than **STANFORD** and DAVIS; and

b.    **HOLT** would attend the SEC proceeding in Fort Worth, Texas, on February 10, 2009, at which **HOLT** would provide false sworn testimony regarding SIBL's investment portfolio, her knowledge of the portfolio, and her preparation for her testimony.

## OVERT ACTS

In furtherance of the conspiracy and to achieve the objects and purpose thereof, at least one of the conspirators committed and caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

40.    In or about April 2000, **STANFORD** and DAVIS caused to be sent to investors SIBL's Annual Report for 1999, which included representations that SIBL's total assets at year end 1999 were up 28.75% to $675.89 million, with a $3.81 million profit.

19

41.    In or about April 2001, **STANFORD** and DAVIS caused to be sent to investors SIBL's Annual Report for 2000, which included representations that SIBL's total assets at year end 2000 were up 22.84% to $830.70 million, with profit up 31.61% to $5.01 million.

42.    In or about April 2002, **STANFORD** and DAVIS caused to be sent to investors SIBL's Annual Report for 2001, which included representations that SIBL's total assets at year end 2001 were up 44.19% to $1.198 billion, with a "record" profit up 142.59% to $12.16 million.

43.    In or about April 2003, **STANFORD** and DAVIS caused to be sent to investors SIBL's Annual Report for 2002, which included representations that SIBL's total assets at year end 2002 were up 43.1% to $1.7 billion, with a "record operating profit" up 97.9% to $23.7 million, and which included a "Report of Management" signed by **STANFORD** and DAVIS representing that the financial statements presented "fairly and consistently the Bank's financial position and results of operations."

44.    In or about March 2004, **STANFORD** and DAVIS caused to be sent to investors SIBL's Annual Report for 2003, which included representations that SIBL's total assets at year end 2003 were up 29.9% to $2.2 billion, with a "record operating

20

profit" up 39.7% to $33.1 million, and which included a "Report of Management" signed by **STANFORD** and DAVIS.

45.     On or about February 7, 2005, **KING** caused a deposit to be made in the amount of approximately $15,000 in U.S. currency into a bank account he controlled in Tucker, Georgia.

46.     On or about February 25, 2005, **KING** caused a deposit to be made in the amount of approximately $9,000 in U.S. currency into a bank account he controlled in Tucker, Georgia.

47.     In or about March 2005, **STANFORD** and DAVIS caused to be sent to investors and placed on SIBL's website SIBL's Annual Report for 2004, which included representations that SIBL's total assets at year end 2004 were up 38.7% to $3.1 billion, with a "fifth consecutive year of record operating profit, reaching $36.2 million," and which also included a "Report of Management" signed by **STANFORD** and DAVIS.

48.     On or about March 24, 2005, **KING** caused a deposit to be made in the amount of approximately $9,700 in U.S. currency into a bank account he controlled in Tucker, Georgia.

49.     On or about June 21, 2005, **KING** represented in a letter to the SEC that if **STANFORD** were running a Ponzi scheme then the FSRC's examination of SIBL

21

would have detected it, even though **KING** knew that, at his direction, the FSRC was not scrutinizing SIBL's operations and finances.

50.     On or about December 30, 2005, **KING** caused a deposit to be made in the amount of approximately $6,000 in U.S. currency into a bank account he controlled in Tucker, Georgia.

51.     In or about March 2006, **STANFORD** and DAVIS caused to be sent to investors and placed on SIBL's website SIBL's Annual Report for 2005, which included representations that SIBL's total assets at year end 2005 were up 31.5 % to $4.1 billion, with "operating profit" of $35.9 million, "slightly down" from the 2004 "record profit" of $36.2 million, and which also included a "Report of Management" signed by **STANFORD** and DAVIS.

52.     On or about March 10, 2006, **KING** caused deposits to be made in the total amount of approximately $9,800 in U.S. currency into bank accounts he controlled in Tucker, Georgia.

53.     On or about March 14, 2006, **KING** caused a deposit to be made in the amount of approximately $7,000 in U.S. currency into a bank account he controlled in Acworth, Georgia.

54.    On or about March 20, 2006, **KING** caused a deposit to be made in the amount of approximately $8,000 in U.S. currency into a bank account he controlled in Decatur, Georgia.

55.    On or about March 27, 2006, **KING** caused a deposit to be made in the amount of approximately $5,000 in U.S. currency into a bank account he controlled in Acworth, Georgia.

56.    On or about August 31, 2006, **KING** caused deposits to be made in the total amount of approximately $2,000 in U.S. currency into a bank account he controlled in Chamblee, Georgia.

57.    On or about September 18, 2006, **KING** caused a deposit to be made in the amount of approximately $5,000 in U.S. currency into a bank account he controlled in Tucker, Georgia.

58.    On or about September 21, 2006, **KING** caused a deposit to be made in the amount of approximately $6,000 in U.S. currency into a bank account he controlled in Chamblee, Georgia.

59.    On or about September 25, 2006, **KING** delivered to **STANFORD** and DAVIS official correspondence which the FSRC had received from the SEC.

23

60.     On or about September 25, 2006, **STANFORD, KING** and DAVIS had a conversation in which they discussed how to respond to an SEC request for information about SIBL.

61.     On or about September 28, 2006, **KING** caused a deposit to be made in the amount of approximately $6,000 in U.S. currency into a bank account he controlled in Tucker, Georgia.

62.     On or about October 10, 2006, **KING** provided to the SEC an official response of the FSRC regarding SIBL, which response contained text actually prepared by **STANFORD** and others.

63.     On or about October 23, 2006, **KING** caused a deposit to be made in the amount of approximately $8,000 in U.S. currency into a bank account he controlled in Tucker, Georgia.

64.     On or about January 11, 2007, **KUHRT** sent an email from Houston, Texas, to DAVIS in Tupelo, Mississippi, with a copy to **LOPEZ** in Houston, Texas, attaching an artificial SIBL revenue entry for December 2006 and noting that the SIBL President was looking for financials that he could present at an upcoming Top Producers Club event.

24

65.   On or about January 31, 2007, **KING** caused a deposit to be made in the amount of approximately $4,000 in U.S. currency into a bank account he controlled in Tucker, Georgia.

66.   On or about March 19, 2007, **KING** caused a deposit to be made in the amount of approximately $6,000 in U.S. currency into a bank account he controlled in Hallandale, Florida.

67.   In or about April 2007, **STANFORD** and DAVIS caused to be sent to investors and placed on SIBL's website SIBL's Annual Report for 2006, which included representations that SIBL's total assets at year end 2006 were up 31.5% to $5.3 billion, with an "operating profit of $28.8 million," and which also included a Report of Management signed by **STANFORD** and DAVIS.

68.   On or about April 16, 2007, **KUHRT** sent an email from Houston, Texas, to DAVIS in Tupelo, Mississippi, with a copy to **LOPEZ**, in Houston, Texas, which attached a falsely inflated March 2007 revenue entry for SIBL.

69.   On or about April 16, 2007, **KING** caused a deposit to be made in the amount of approximately $9,000 in U.S. currency into a bank account he controlled in Chamblee, Georgia.

70.   In or about June 2007, **STANFORD, HOLT,** and DAVIS caused a newsletter, called the Stanford Eagle, to be sent to investors in which representations

25

were made that SFG had "worldwide assets under management or advisement" exceeding $43 billion and which touted the "Stanford Investment Model" as one in which they would "carefully consider asset classes, investment strategies, sectors and regions of the world that most investors either don't have easy access to or rarely get information about."

71.    On or about September 14, 2007, **KING** caused a deposit to be made in the amount of approximately $5,500 in U.S. currency into a bank account he controlled in Tucker, Georgia.

72.    On or about December 24, 2007, **KING** caused a deposit to be made in the amount of approximately $4,470 in U.S. currency into a bank account he controlled in Tucker, Georgia.

73.    On or about January 23, 2008, **KING** caused a withdrawal to be made in the amount of approximately $15,000 from a bank account he controlled in New York,  New York and deposited the money into an investment account in New York.

74.    On or about January 30, 2008, **KING** caused a deposit to be made in the amount of approximately $9,500 in U.S. currency into a bank account he controlled in Tucker, Georgia.

75.    On or about March 10, 2008, Davis sent a fax to **KUHRT** concerning creation of false revenue entries for SIBL and instructing **KUHRT** to reduce equities and increase fixed income.

76.    In or about April 2008, **STANFORD** and DAVIS caused to be sent to investors SIBL's Annual Report for 2007, which included representations that SIBL's total assets grew by 32.3% to $7.1 billion and that SIBL earned a "record operating profit of $43.6 million," and which also included a Report of Management signed by **STANFORD** and DAVIS.

77.    On or about April 8, 2008, **KUHRT** caused an SFG employee to send a fax from Houston, Texas, to DAVIS in Tupelo, Mississippi, which sought DAVIS' review and approval of false amounts to insert in the monthly report for SIBL's "Return on Investment" for March 2008, and asked what figures to reduce with the understanding that year-to-date income "should be about $1.8 million loss."

78.    On or about April 8, 2008, DAVIS caused a reply fax to be sent from Tupelo, Mississippi, back to an SFG employee in Houston, Texas, titled: "SIBL Accrual for Approval MAR 2008," in which DAVIS provided handwritten instructions regarding the need to "reduce equity" to "come in line with" a $1.8M loss.

27

79.    On or about April 23, 2008, **KING** caused a deposit to be made in the amount of approximately $9,600 in U.S. currency into a bank account he controlled in Chamblee, Georgia.

80.    On or about June 30, 2008, **KING** caused a deposit to be made in the amount of approximately $7,000 in U.S. currency into a bank account he controlled in Chamblee, Georgia.

81.    In or about July 2008, **STANFORD** caused SIBL to sell interests in "island properties" to an entity controlled by **STANFORD**, which interests SIBL had acquired in 2008 for approximately $63.5 million.

82.    In or about September and November 2008, **STANFORD** transferred interests in these "island properties" back to SIBL at a purported value of approximately $3.2 billion, a portion of which was than purportedly used to settle loans made by SIBL to **STANFORD** and as "capital contributions" of **STANFORD** to SIBL.

83.    In or about fall 2008, **STANFORD, KUHRT, LOPEZ, KING** and DAVIS caused bogus reports to be provided to the FSRC and investors falsely representing the value of SIBL's total investments and including specific entries establishing grossly inflated values for real estate purportedly held by SIBL.

28

84.     On or about October 8, 2008, **KUHRT** caused an SFG employee to send a fax from St. Croix, U.S. Virgin Islands, to DAVIS, concerning "SIBL Accrual for Approval/SEPTEMBER 2008 ADDENDUM," and containing false revenue entries.

85.     On or about October 28, 2008, **HOLT** sent an email to an SFG employee in which **HOLT** represented that there had been "no loss on the portfolio," that "a $235 million capital infusion was just made, "and that the liquidity stood at 1.5 billion."

86.     On or about November 10, 2008, **KUHRT** sent an email from St. Croix, U.S. Virgin Islands, to DAVIS in Tupelo, Mississippi, with a copy to **LOPEZ** in Houston, Texas, which attached various fabricated Return on Investment scenarios for SIBL.

87.     In or about December 2008, **STANFORD, HOLT**, DAVIS and others caused to be sent to investors in Houston, Texas, and elsewhere SIBL's Monthly Report for December 2008, which falsely represented that SIBL had received a "capital infusion" of approximately $541 million from **STANFORD**.

88.     On or about December 8, 2008, **KING** caused a deposit to be made in the amount of approximately $6,800 in U.S. currency into a bank account he controlled in Miami, Florida.

<div align="center">29</div>

89.     On or about December 11, 2008, **KUHRT** caused an SFG employee to send a fax from St. Croix, U.S. Virgin Islands, to DAVIS in Tupelo, Mississippi, regarding the "SIBL Accrual for Approval NOVEMBER 2008," which provided a false adjustment to show a small loss to deflect scrutiny of SIBL's records.

90.     On or about December 23, 2008, **LOPEZ, KUHRT** and others caused a spreadsheet to be created outlining the "sale" and grossly inflated "valuation" of the island properties.

91.     On or about December 24, 2008, **KING** caused a deposit to be made in the amount of approximately $4,200 in U.S. currency into a bank account he controlled in Tucker, Georgia.

92.     On or about January 5, 2009, **KUHRT** caused an email to be sent from St. Croix, U.S. Virgin Islands, to **LOPEZ** in Houston, Texas, which attached a spreadsheet concerning an artificial "roundtrip" real estate transaction to transfer interests in real estate back to SIBL.

93.     On or about January 10, 2009, **STANFORD, HOLT**, DAVIS and others made presentations at a Top Producer's Club meeting in Miami, Florida, at which they falsely touted the state of SIBL's investments and financial condition.

30

94.     On or about January 16, 2009, **STANFORD, HOLT**, DAVIS and others made presentations at a Top Producer's Club meeting in Phoenix, Arizona, at which they falsely touted the state of SIBL's investments and financial condition.

95.     On or about January 21, 2009, at a meeting at **STANFORD**'s aircraft hangar in Miami, Florida, **STANFORD, HOLT,** DAVIS and others discussed how to respond to subpoenas that had been issued by the SEC in connection with an on-going investigation.

96.     In or about January 2009, DAVIS instructed SIBL's Treasurer to destroy SIBL records which had been moved to Antigua.

97.     On or about January 22, 2009, at a meeting with SEC attorneys at a restaurant in Houston, Texas, SIBL's attorney represented to the SEC attorneys that SIBL was "not a criminal enterprise" and that "all assets are there."

98.     On or about January 23, 2009, at a meeting between SIBL's attorney and an SEC attorney at SFG's offices in Houston, Texas, SIBL's attorney requested that the SEC attorney defer the SEC subpoenas to **STANFORD** and DAVIS, and represented that **HOLT** and the SIBL President would be better witnesses than **STANFORD** and DAVIS, whom SIBL's attorney claimed were executive level officers of the company not involved in the "nuts and bolts," and who could not tell the SEC attorneys about details of the bank's assets.

31

99.    On or about January 24, 2009, SIBL's attorney sent an email to an SFG employee, forwarded on or about January 25, 2009, from the SFG employee to **HOLT**, DAVIS and others, with a copy to **STANFORD**, in which SIBL's attorney stated that he had persuaded the SEC that **HOLT** and the SIBL President would be better witnesses to testify about SIBL's entire portfolio of assets and stated that **HOLT** would "have to get up to speed on Tier 3."

100.    On or about January 27, 2009, SIBL's attorney sent an email to **HOLT** and SIBL's President, with a copy to DAVIS and an SFG employee, regarding the need to address all three tiers of the SIBL asset portfolio, stating that they needed to "rise to the occasion" and that "our livelihood depends on it."

101.    On or about February 4, 2009, **HOLT,** DAVIS and others met in Miami, Florida, and discussed the SEC testimony of **HOLT** and the SIBL President, **STANFORD's** recent capital contribution to SIBL, SIBL's purported substantial investment in real estate, and SIBL's unsecured loans to **STANFORD**.

102.    On or about February 4, 2009, at the Miami meeting, **HOLT** suggested that she only disclose in her testimony to the SEC the June 30, 2008 SFG financials as those numbers "looked better."

32

103.   On or about February 10, 2009, prior to **HOLT**'s testimony before the SEC, DAVIS spoke by telephone with **HOLT** regarding her planned testimony at the SEC proceeding.

104.   On or about February 10, 2009, **HOLT** and SIBL's attorney attended an SEC proceeding in Fort Worth, Texas, at which **HOLT** provided sworn testimony to the SEC in which she (1) did not disclose the Miami meetings to prepare her testimony; and (2) represented that she did not know specifically the nature and allocation of assets in Tier III.

105.   On or about February 11, 2009, **HOLT** caused funds in the amount of approximately $4.3 million to be sent by wire transfer from the Bank of New York to SIBL's operating account at the Bank of Houston in Houston, Texas.

106.   On or about February 11, 2009, **STANFORD** caused a letter, addressed "Dear Client," to be sent to investors, in which **STANFORD** made representations that SIBL "remains a strong institution" and that he had "already added two capital infusions into the bank."

107.   On or about February 12, 2009, **STANFORD** sent an email to SFG global employees, including employees in Houston, Texas, in which **STANFORD** made representations that SIBL "remained a strong institution" and that he had made "two recent capital infusions" into SIBL.

108.   On or about February 13, 2009, **HOLT** caused funds in the amount of approximately $170,177 to be sent by wire transfer from the Bank of New York to SIBL's operating account at the Bank of Houston in Houston, Texas.

109.   On or about February 17, 2009, at a meeting with SEC attorneys in Memphis, Tennessee, **HOLT** represented to the SEC attorneys that if she "knew anything about Tier III" she would tell them.

110.   The acts alleged in Counts 2 through 18 of the Indictment are realleged and incorporated herein as additional overt acts in furtherance of the conspiracy and to achieve the objects and purpose thereof.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH  EIGHT
### Wire Fraud
### (Violation of 18 U.S.C. §§ 1343 and 2)

1.   Paragraphs 1 through 33 of Count One of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.   Among the persons and entities purchasing SIBL's CDs were persons known to the Grand Jury and referred to herein as "Investor JD" and "Investor WJ."

3.   From in or about at least September 1999, the exact date being unknown to the Grand Jury, through on or about February 17, 2009, in the Southern District of Texas and elsewhere, the defendants,

<div align="center">34</div>

**ROBERT ALLEN STANFORD**
**a/k/a Sir Allen Stanford**
**a/k/a Allen Stanford,**
**LAURA PENDERGEST-HOLT**
**a/k/a Laura Pendergest**
**a/k/a Laura Holt,**
**GILBERTO LOPEZ,**
**MARK KUHRT**
**and**
**LEROY KING,**

aided and abetted by each other and others, known and unknown to the Grand Jury,

did knowingly and with intent to defraud devise and intend to devise a scheme and

artifice to defraud, and to obtain money and property by means of materially false and

fraudulent pretenses, representations, and promises, knowing that the pretenses,

representations, and promises were false and fraudulent when made.

## PURPOSE OF THE SCHEME AND ARTIFICE

4.     It was a purpose of the scheme and artifice that the defendants and their

co-schemers would solicit and obtain billions of dollars of investors' funds through

false pretenses, representations and promises, all in order to obtain substantial

economic benefits for themselves and others through the payment of fees, wages,

bonuses, and other monies, and unauthorized diversions, misuse, and

misappropriation of funds.

35

## SCHEME AND ARTIFICE

5.     Paragraphs 36 through 39 of Count 1 of this Indictment are re-alleged and incorporated by reference herein as a description of the scheme and artifice.

## USE OF THE WIRES

6.     On or about the dates specified as to each count below, the defendants, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, as more particularly described below:

| COUNT | APPROX. DATE | DESCRIPTION OF WIRE COMMUNICATIONS |
|---|---|---|
| 2 | June 14, 2005 | Wire transmission of approximately $39,965 from an account at Wells Fargo Bank in Houston, Texas, to a bank account in New York, New York, regarding Investor JD's purchase of an SIBL Certificate of Deposit |
| 3 | January 11, 2007 | Email from **KUHRT** in Houston, Texas, to DAVIS in Tupelo, Mississippi, with a copy to **LOPEZ** in Houston, Texas, attaching false revenue entry for SIBL for December 2006 |
| 4 | April 16, 2007 | Email from **KUHRT** in Houston, Texas, to DAVIS in Tupelo, Mississippi, with a copy to **LOPEZ** in Houston, Texas, attaching false revenue entry for SIBL for March 2007 |

36

| 5 | November 10, 2008 | Email from **KUHRT** in St. Croix, U.S. Virgin Islands, to Davis in Tupelo, Mississippi, with a copy to **LOPEZ** in Houston, Texas, attaching bogus scenarios for Return on Investment for SIBL |
| 6 | December 24, 2008 | Wire transmission of approximately $700,000 from an account at Frost Bank in Houston, Texas, to a bank account for SIBL in New York, New York, regarding Investor WJ's purchase of SIBL Certificates of Deposit |
| 7 | January 5, 2009 | Email from **KUHRT** in St. Croix, U.S. Virgin Islands, to **LOPEZ** in Houston, Texas, attaching spreadsheet concerning artificial "roundtrip" real estate transaction to transfer interests in island properties back to SIBL |
| 8 | February 12, 2009 | Email from **STANFORD** to SFG Global Employees transmitted to employees in Houston, Texas, Memphis, Tennessee, and elsewhere representing that SIBL "remained a strong institution" and that he had made "two recent capital infusions" into SIBL |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS NINE THROUGH EIGHTEEN
### Mail Fraud
### (Violation of 18 U.S.C. §§ 1341 and 2)

1.      Paragraphs 1 through 33 of Count One of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      Among the persons and entities purchasing SIBL's CDs was a person known to the Grand Jury and referred to herein as "Investor TA."

3.      From in or about at least September 1999, the exact date being unknown to the Grand Jury, through on or about February 17, 2009, in the Southern District of Texas and elsewhere, the defendants,

**ROBERT ALLEN STANFORD**
**a/k/a Sir Allen Stanford**
**a/k/a Allen Stanford,**
**LAURA PENDERGEST-HOLT**
**a/k/a Laura Pendergest**
**a/k/a Laura Holt,**
**GILBERTO LOPEZ,**
**MARK KUHRT**
**and**
**LEROY KING,**

aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and

38

fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made.

## PURPOSE OF THE SCHEME AND ARTIFICE

4.     It was a purpose of the scheme and artifice that the defendants and their co-schemers would solicit and obtain billions of dollars of investors' funds through false pretenses, representations and promises, all in order to obtain substantial economic benefits for themselves and others through the payment of fees, wages, bonuses, and other monies, and unauthorized diversions, misuse, and misappropriation of funds.

## SCHEME AND ARTIFICE

5.     Paragraphs 36 through 39 of Count 1 of this Indictment are re-alleged and incorporated by reference herein as a description of the scheme and artifice.

## USE OF THE MAILS

6.     On or about the dates specified as to each count below, the defendants, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, knowingly deposited and caused to be deposited the matters and things listed below, and caused the matters and things to be sent and delivered, by private and commercial interstate carrier and by the United States Postal Service:

39

| COUNT | APPROX. DATE | DESCRIPTION |
|---|---|---|
| 9 | July 31, 2006 | Package of documents, including investor subscription information, sent and delivered via Federal Express (FedEx) from SGC in Houston, Texas, and delivered to SIBL in Antigua |
| 10 | December 31, 2007 | Package of documents, including investor subscription information, sent and delivered via Federal Express (FedEx) from SGC in Houston, Texas, and delivered to SIBL in Antigua |
| 11 | January 29, 2008 | Package of documents, including investor subscription information, sent and delivered via Federal Express (FedEx) from SGC in Houston, Texas, and delivered to SIBL in Antigua |
| 12 | February 22, 2008 | Package of documents, including investor subscription information, sent and delivered via Federal Express (FedEx) from SGC in Houston, Texas, and delivered to SIBL in Antigua |
| 13 | August 13, 2008 | Package of documents, including investor subscription information, sent and delivered via Federal Express (FedEx) from SGC in Houston, Texas, and delivered to SIBL in Antigua |
| 14 | September 18, 2008 | Package of documents, including investor subscription information, sent and delivered via Federal Express (FedEx) from SGC in Houston, Texas, and delivered to SIBL in Antigua |

| 15 | October 22, 2008 | Mail matter containing an SIBL Certificate of Deposit purchased by Investor TA sent and delivered via United States Postal Service to Investor TA's address in Spring, Texas. |
| 16 | November 30, 2008 | Mail matter containing a purported SIBL account statement for Investor TA sent and delivered via United States Postal Service to Investor TA's address in Spring, Texas. |
| 17 | December 31, 2008 | Mail matter containing a purported SIBL account statement for Investor TA sent and delivered via United States Postal Service to Investor TA's address in Spring, Texas. |
| 18 | January 31, 2009 | Mail matter containing a purported SIBL account statement for Investor TA sent and delivered via United States Postal Service to Investor TA's address in Spring, Texas. |

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT NINETEEN
### Conspiracy to Obstruct SEC Investigation
### (Violation of 18 U.S.C. § 371)

1.     Paragraphs 1 through 33 of Count One of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

### THE CONSPIRACY

2.     From in or around 2005, the exact date being unknown to the Grand Jury, through in or around March 3, 2009, in the Southern District of Texas and elsewhere, the defendants,

41

**ROBERT ALLEN STANFORD**
**a/k/a Sir Allen Stanford**
**a/k/a Allen Stanford,**
**LAURA PENDERGEST-HOLT**
**a/k/a Laura Pendergest**
**a/k/a Laura Holt**
**and**
**LEROY KING,**

did willfully, that is, with the intent to further the objects of the conspiracy, and

knowingly combine, conspire, confederate and agree with each other, with JAMES

M. DAVIS, and with others, known and unknown to the Grand Jury, to commit a

certain offense against the United States, that is: to corruptly influence, obstruct and

impede, and endeavor to influence, obstruct and impede, in whole or in part, a

pending proceeding  before any department and agency of the United States of

America, that is, the Securities and Exchange Commission (SEC), in violation of 18

U.S.C. § 1505.

## PURPOSE OF THE CONSPIRACY

3.    It was a purpose of the conspiracy that the defendants and their

conspirators would corruptly influence, obstruct and impede the SEC's investigation

of SFG and SIBL, including the SEC's efforts to ascertain SIBL's true financial

condition and the content and value of SIBL's investment portfolio, all in an effort

to, among other things, perpetuate and prevent detection of an ongoing fraud and

42

continue receiving economic benefits from the fraud.

## MANNER AND MEANS OF THE CONSPIRACY

4.      Paragraphs 38 through 39 of Count One of this Indictment are re-alleged and incorporated by reference as though fully set forth herein as a description of the manner and means by which the defendants and their conspirators sought to accomplish the objects and purpose of the conspiracy.

## OVERT ACTS

In furtherance of the conspiracy and to achieve the objects and purpose thereof, at least one of the conspirators committed and caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

5.      Paragraphs 45, 46, 48, 49, 50, 52 through 63, 65, 66, 69, 71 through 74, 79, 80, 88, 91, 95 through 105, 108 and 109 of Count One of the Indictment are re-alleged and incorporated by reference as though fully set forth herein as overt acts.

6.      On or about February 23, 2009, **KING** caused approximately $150,000 to be transferred from his investment account in New York, New York, to a bank account he controlled in Antigua.

7.      On or about February 26, 2009, an attorney at the SEC sent a letter to **KING** seeking assistance of the FSRC ("SEC Request for Assistance Letter") to

43

determine, among other things, the amount of investor funds which were in SIBL accounts and to identify persons who had been involved in the fraudulent scheme or had been victims of the scheme.

8. On or about March 2, 2009, **KING** caused approximately $410,000 to be transferred from his investment account in New York, New York, to a bank account he controlled in Antigua.

9. On or about March 3, 2009, in response to the SEC Request for Assistance Letter, **KING** sent a letter to the SEC denying the request and stating that the FSRC had "no authority to act in the manner requested and would itself be in breach of law if it were to accede to your request."

All in violation of Title 18, United States Code, Section 371.

## COUNT TWENTY
### Obstruction of SEC Investigation
### (Violation of 18 U.S.C. §§ 1505 and 2)

1. Paragraphs 1 through 33 and 38 through 39 of Count One and paragraphs 5 through 9 of Count Nineteen of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

44

2.     From in or around 2005, the exact date being unknown to the Grand Jury, through in or around March 3, 2009, in the Southern District of Texas and elsewhere, the defendants,

**ROBERT ALLEN STANFORD**
**a/k/a Sir Allen Stanford**
**a/k/a Allen Stanford,**
**LAURA PENDERGEST-HOLT**
**a/k/a Laura Pendergest**
**a/k/a Laura Holt**
**and**
**LEROY KING,**

aided and abetted by JAMES M. DAVIS and others, known and unknown to the Grand Jury, did corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede, in whole or in part, a pending proceeding before any department and agency of the United States of America, that is, the Securities and Exchange Commission.

In violation of Title 18, United States Code, Sections 1505 and 2.

### COUNT TWENTY-ONE
**Conspiracy to Commit Money Laundering**
**(Violation of 18 U.S.C. § 1956(h))**

1.     Paragraphs 1 through 33 and 36 through 39 of Count One of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

45

## THE CONSPIRACY TO COMMIT MONEY LAUNDERING

2.      Beginning in or around at least September 1999, the exact date being unknown to the Grand Jury, through on or about February 17, 2009, in the Southern District of Texas and elsewhere, the defendants,

**ROBERT ALLEN STANFORD**
**a/k/a Sir Allen Stanford**
**a/k/a Allen Stanford,**
**LAURA PENDERGEST-HOLT**
**a/k/a Laura Pendergest**
**a/k/a Laura Holt,**
**GILBERTO LOPEZ,**
**MARK KUHRT**
**and**
**LEROY KING,**

did knowingly and intentionally conspire, combine, confederate, and agree with each other, with JAMES DAVIS, and with others, known and unknown to the Grand Jury, to transport, transmit, or transfer a monetary instrument and funds from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, wire fraud, mail fraud, and securities fraud, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

46

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

3.     It was a part of the conspiracy that **STANFORD, HOLT, KUHRT, LOPEZ**, DAVIS and others would cause the movement of millions of dollars of fraudulently obtained investors' funds from and among bank accounts located in the Southern District of Texas and elsewhere in the United States to various bank accounts located outside of the United States, including as follows:

a.     **STANFORD, HOLT, KUHRT, LOPEZ**, DAVIS and others would cause investors and potential investors in SIBL's products to transfer the investors' funds into bank accounts located in the Southern District of Texas which were maintained by **STANFORD**;

b.     **STANFORD, HOLT, KUHRT, LOPEZ**, DAVIS and others would subsequently cause the transfer of the investors' funds in amounts exceeding $10,000 from bank accounts located in the Southern District of Texas into intermediary bank accounts located outside of the United States; and

c.     **STANFORD, HOLT, KUHRT, LOPEZ**, DAVIS and others, would cause the transfer of investors' funds from intermediary bank accounts into

47

other bank accounts located outside of the United States in order for **STANFORD, HOLT** and DAVIS to exercise exclusive control over the investors' funds.

4. It was further a part of the conspiracy that **STANFORD, HOLT, KUHRT, LOPEZ**, DAVIS and others would cause the movement of millions of dollars of fraudulently obtained investors' funds from and among bank accounts outside the United States to various bank account in the United States, in the Southern District of Texas and elsewhere, as follows:

a. **STANFORD, HOLT, KUHRT, LOPEZ**, DAVIS and others would cause the transfer of funds from bank accounts outside the United States to bank accounts in the United States in order to repay investors who had requested redemption of their SIBL CDs and to perpetuate the false appearance that SIBL was financially sound and was operating in accordance with the representations it had made to investors; and

b. **STANFORD** would make thousands of dollars of corrupt payments to **KING** outside the United States and **KING**, in turn, would transport the funds into the United States and deposit them into bank accounts at financial institutions in the United States.

All in violation of Title 18, United States Code, Section 1956(h).

48

## NOTICE OF FORFEITURE
## 28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(c);
## 18 U.S.C. § 982(a)(1)

**A.**   <u>**As To Counts One through Eighteen**</u>

Pursuant to Title 28, United States Code, Section 2461(c), and Title 18,

United States Code, Section 981(a)(1)(c), the United States gives notice to the

defendants, **ROBERT ALLEN STANFORD, LAURA PENDERGEST-HOLT,**

**GILBERTO LOPEZ, MARK KUHRT** and **LEROY KING**, that in the event of

their conviction of any of the offenses charged in Counts One through Eighteen of

this Indictment, the United States intends to forfeit the following property:

a.   All property, real or personal, which constitutes or is derived from

proceeds traceable to each such offense, including the conspiracy to commit such

offenses, including but not limited to all monies on deposit in the following bank

accounts:

### <u>HSBC Bank, PLC, London, United Kingdom</u>

| Beneficiary | Account Number |
| --- | --- |
| Stanford International Bank Ltd. | XXXX0160 |
|  | XXXX3136 |
|  | XXXX8105 |
|  | XXXX0538 |

49

## Credit Suisse, United Kingdom

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank, Ltd. | LDXXX051 |
| | LDXXX465 |
| | LDXXX830 |
| | 2LFXXX651 |
| | LDXXX909 |

## SG Private Banking, Geneva, Switzerland

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XXX 800 |
| Stanford International Bank (Antigua) | XXX 801 |
| Stanford Financial Group LTD, Lausanne | XXX 731 |
| Robert Allen Stanford | X XXX 600 |

## SG Private Banking, Lausanne, Switzerland

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank, Ltd. | XXX 782 |

## Banque Franck Galland & Cie S.A., Geneva, Switzerland

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank, Ltd. | XXX-XXXX-934 |

50

## Banque Franck, Galland, Geneva, Switzerland

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XXX 058 |

## Bank Julius Baer and Co. Ltd., Zurich

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank, Ltd. | XXXXXX9574 |

## Julius Baer, Zurich, Switzerland

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XX.XXX.6744 |

## RBS Coutts, Zurich, Switzerland

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XX XXX 375 |

## Coutts Bank Von Ernst, Geneva, Switzerland

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank, Ltd. | XXXXXXXXXXXXXXXXX5110AF |

## Toronto Dominion Bank, Canada

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank, Ltd. | XXXXX-XXX1573 |
| | XXXXX-XXX1670 |
| | XXXXX-XXX4235 |

| XXXXXX-XXX0513 |
| XXXXXX-XXX0380 |
| XXXXXX-XXX5558 |
| XXXXXX-XXX5569 |
| XXXXXX-XXX5624 |

b.     Defendants are further notified that the United States will seek a money judgment in an amount equal to the total amount of proceeds derived from each such offense for which defendants **ROBERT ALLEN STANFORD, LAURA PENDERGEST-HOLT, GILBERTO LOPEZ, MARK KUHRT** and **LEROY KING** are convicted, for which the defendants may be jointly and severally liable.

**B.     As To Count Twenty-One**

Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to the defendants, **ROBERT ALLEN STANFORD, LAURA PENDERGEST-HOLT, GILBERTO LOPEZ, MARK KUHRT** and **LEROY KING**, that in the event of their conviction of the offense charged in Count Twenty-One, the United States intends to forfeit the following property:

a.     All property, real or personal, involved in a violation of the offense listed in Count Twenty-One, and any property, real or personal, traceable

52

to such property, including, but not limited to all monies on deposit in the

following bank accounts:

## HSBC Bank, PLC, London, United Kingdom

| Beneficiary | Account Number |
| --- | --- |
| Stanford International Bank Ltd. | XXXX0160 |
| | XXXX3136 |
| | XXXX8105 |
| | XXXX0538 |

## Credit Suisse, United Kingdom

| Beneficiary | Account Number |
| --- | --- |
| Stanford International Bank, Ltd. | LDXXX051 |
| | LDXXX465 |
| | LDXXX830 |
| | 2LFXXX651 |
| | LDXXX909 |

## SG Private Banking, Geneva, Switzerland

| Beneficiary | Account Number |
| --- | --- |
| Stanford International Bank (Antigua) | XXX 800 |
| Stanford International Bank (Antigua) | XXX 801 |
| Stanford Financial Group LTD, Lausanne | XXX 731 |
| Robert Allen Stanford | X XXX 600 |

53

## SG Private Banking, Lausanne, Switzerland

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank, Ltd. | XXX 782 |

## Banque Franck Galland & Cie S.A., Geneva, Switzerland

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank, Ltd. | XXX-XXXX-934 |

## Banque Franck, Galland, Geneva, Switzerland

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XXX 058 |

## Bank Julius Baer and Co. Ltd., Zurich

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank, Ltd. | XXXXXX9574 |

## Julius Baer, Zurich, Switzerland

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XX.XXX.6744 |

## RBS Coutts, Zurich, Switzerland

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XX XXX 375 |

### Coutts Bank Von Ernst, Geneva, Switzerland

| Beneficiary | Account Number |
| --- | --- |
| Stanford International Bank, Ltd. | XXXXXXXXXXXXXXX5110AF |

### Toronto Dominion Bank, Canada

| Beneficiary | Account Number |
| --- | --- |
| Stanford International Bank, Ltd. | XXXXX-XXX1573 |
| | XXXXX-XXX1670 |
| | XXXXX-XXX4235 |
| | XXXXX-XXX0513 |
| | XXXXX-XXX0380 |
| | XXXXX-XXX5558 |
| | XXXXX-XXX5569 |
| | XXXXX-XXX5624 |

b.      A money judgment in an amount equal to the total amount of property involved in such offense of which defendants **ROBERT ALLEN STANFORD, LAURA PENDERGEST-HOLT, GILBERTO LOPEZ, MARK KUHRT** and **LEROY KING** are convicted, for which the defendants may be jointly and severally liable.

55

## SUBSTITUTE ASSETS

In the event that property subject to forfeiture, as a result of any act or

omission of the defendants, **ROBERT ALLEN STANFORD, LAURA**

**PENDERGEST-HOLT, GILBERTO LOPEZ, MARK KUHRT** and **LEROY**

**KING,**

> (A) cannot be located upon the exercise of due diligence;

> (B) has been transferred or sold to, or deposited with, a third party;

> (C) has been placed beyond the jurisdiction of the court;

> (D) has been substantially diminished in value; or

> (E) has been commingled with other property that cannot be divided
> without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the

defendants up to the total value of the property subject to forfeiture, pursuant to

Title 21, United States Code, Section 853(p), incorporated by reference in Title 28,

United States Code, Section 2461(c), and Title 18, United States Code, Section

982(b)(1).

A TRUE BILL:

ORIGINAL SIGNATURE ON FILE

FOREPERSON

TIM JOHNSON
United States Attorney

GREGG COSTA
Assistant United States Attorney

STEVEN A. TYRRELL
Chief
Fraud Section, Criminal Division
U.S. Department of Justice

PAUL E. PELLETIER
Principal Deputy Chief
JACK B. PATRICK
Senior Litigation Counsel
MATTHEW KLECKA
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice