# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, et al.<br>on behalf of themselves and all others<br>similarly situated, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No.: 3:09-CV-02384-N |
| TRUSTMARK NATIONAL BANK, et al., | § § § | |
| Defendants. | § § | |
| | § § | |
| THE OFFICIAL STANFORD INVESTORS<br>COMMITTEE, on its own behalf and as assignee of<br>RALPH S. JANVEY, IN HIS CAPACITY AS COURT-<br>APPOINTED RECEIVER, | § § § § § | |
| Intervenor-Plaintiff, | § § | |
| v. | § § | |
| SG PRIVATE BANKING (SUISSE) S.A.<br>and BLAISE FRIEDLI, | § § § | |
| Defendants. | § § § § | |

---

## INTERVENOR COMPLAINT

---

THE OFFICIAL STANFORD INVESTORS COMMITTEE (the "Committee"), on its own behalf and as assignee of certain claims and causes of action of RALPH S. JANVEY, AS COURT-APPOINTED RECEIVER (the "Receiver") for the various entities that were owned and controlled by R. Allen Stanford ("Stanford", and collectively, the "Stanford Entities"), as and for its Intervenor Complaint against Defendants SG PRIVATE BANKING (SUISSE) S.A. and BLAISE FRIEDLI, alleges as follows:

## INTRODUCTION

1.      This action arises out of one of the largest financial frauds in U.S. history and seeks from Defendants, a secretive Swiss bank and one of its most senior executives, (i) billions in damages for their knowing and direct participation in this massive Ponzi scheme, and (ii) return of well over one hundred million dollars of funds illegally transferred by the Stanford Entities to the Defendants.

2.      The Defendants for decades served in numerous and inherently conflicting roles in and in support of the fraudulent Stanford empire, including acting as Stanford's secret personal bankers, business advisors, lenders, and money managers – all solely for Stanford's personal benefit and without regard to the interests of the Stanford Entities, and their investors who were their other customers.  Simply stated, without the knowing and substantial assistance of Defendants there would have been no Stanford Ponzi scheme.

3.      On February 17, 2009, the Securities and Exchange Commission ("SEC") charged Stanford and certain of his colleagues with fraud and multiple violations of the U.S. securities laws.  Soon after, this Court ordered the Receiver to take control of all assets of Stanford and the Stanford Entities in order to maximize recoveries and to enable the Receiver to make an equitable distribution to claimants, creditors and investor-victims of the fraud.  On August 10,

2010, the Court also established and recognized the Committee (also referred to herein as "Plaintiff") and empowered it to work cooperatively with the Receiver to investigate and prosecute certain claims and causes of action against third-parties who were complicit in the Stanford fraud or who illegally obtained or hold proceeds of the fraud.

4. Through its own investigation, evidence obtained from the main Receivership case, and testimony and exhibits from Stanford's criminal trial, the Committee has determined that the Receivership Estates, the Committee on its own behalf, and Stanford investors, have significant legal claims against SG Private Banking (Suisse) S.A. ("SG Suisse") and Blaise Friedli ("Friedli" and together with SG Suisse, "Defendants"). Consistent with his authority under Orders of this Court, the Receiver unconditionally assigned his claims against the Defendants to the Committee, and further granted the Committee a power of attorney to pursue claims against the Defendants on his behalf, including, without limitation, claims for Defendants' participation in and assistance to Stanford's fraudulent scheme, and seeking the return of fraudulent transfers made directly to or otherwise facilitated by the Defendants.

5. As is now well known, Stanford's massive Ponzi scheme was funded by the sale of purported certificates of deposit ("CDs") of Stanford International Bank, Ltd. ("SIBL") and marketed by Stanford Financial Group ("SFG") – the trade name for a network of entities organized and operated principally for promoting the sale of SIBL CDs to investors in the United States and throughout the world. Stanford used the proceeds from the CD sales to fund a lavish and extravagant personal lifestyle and to "invest" in wasteful and speculative ventures outside the purview of SIBL's investment mandate. In other instances he simply looted certain of the Stanford Entities for his own personal benefit or for the benefit of other Stanford Entities through direct transfers to himself or to such entities as to which the SIBL CD holders had no recourse

and no interests.  Stanford and his co-conspirators regularly reported false and fraudulent results to his investors during the entire decades-long period of the fraud.

6.      SG Suisse, a Swiss bank with offices located in the United States and throughout the world, and Friedli, an Executive Vice President at SG Suisse with decades-long responsibility for Stanford's accounts and relationship at SG Suisse and its predecessors, were willing participants and facilitators of the fraud.  Defendants provided numerous private services to Stanford personally and to many of the Stanford Entities, many of which promoted and facilitated the massive, multi-billion dollar scheme which devastated thousands of victims in the U.S. and around the world and caused multi-billion dollar losses to Stanford's unsuspecting victims.   Among its many and often conflicted roles, SG Suisse provided (i) discretionary brokerage, investment management, and merchant banking services to Stanford, SIBL, and other Stanford Entities, managing hundreds of millions of dollars of SIBL's CD customer funds in various accounts; and (ii) maintained and facilitated use of what U.S. authorities have termed a "secret" slush fund account in the name of Stanford Financial Group Ltd. ("SFGL") from which SFGL dispensed bribes, the "grease" for the Ponzi scheme, to regulators and auditors who, like the Defendants, kept the fraud hidden from SIBL CD investors.

7.      Most illustrative of SG Suisse's significant role in Stanford's fraud is Friedli's wholesale facilitation of Stanford's theft from his investors.   SG Suisse, through Friedli, knowingly and actively assisted Stanford in using his "secret" account to transfer over $80 million in CD customer funds to himself, to funnel "hush money" to SIBL's outside auditor C.A.S. Hewlett & Co., which knew of the Ponzi scheme.  Additionally, upon information and belief, Defendants also knowingly and actively assisted Stanford with one payment of bribes to Antiguan banking authorities.  In exchange for these services, SG Suisse collected significant

banking and investment advisory fees, and Friedli personally received illicit payments for advising, consulting with, and facilitating Stanford's sprawling criminal enterprise as a senior member of the SG Suisse management team and as Stanford's personal banker and confidant.

8.      Defendants also received substantial fraudulent transfers from SIBL and other Stanford Entities.  Significantly, and as but one example described in greater detail below, SG Suisse provided Stanford with a $95 million *personal* loan, which Stanford used in part to purchase (in his personal capacity) a Venezuelan bank.  Neither SIBL (nor its CD customers) or SFGL had any interest in the bank or any other assets purchased with those loan proceeds. However, Stanford directed that this personal loan be repaid by his personal bankers at SG Suisse with SIBL CD customer funds from the secret SFGL account, only weeks before his Ponzi scheme was shut down by U.S. authorities and the SEC's investigation became public.  SG Suisse took repayment of Stanford's personal loan from SFGL with knowledge of Stanford's fraudulent activity, in bad faith, and most importantly having provided no value whatsoever to SFGL in return.

9.      The Committee expects, through discovery, to uncover additional significant fraudulent transfers from Stanford and the Stanford Entities to SG Suisse, and from SG Suisse to other third parties which may be recovered as fraudulent transfers, or as to which SG Suisse has responsibility as the facilitator of such payments.  Significantly, SG Suisse has to date resisted the exercise of jurisdiction by this Court and has hidden behind Swiss bank secrecy laws to evade the full production of documents relating to its role in facilitating Stanford's operations and Stanford's fraud.  Plaintiff understands that SG Suisse has to date provided only a limited number of documents to the Receiver pursuant to an order of this Court.  These documents have

not yet been made available to Plaintiff or their counsel, pursuant to restrictions insisted on by SG Suisse.

10.     The Committee also seeks the return of millions of dollars in banking and management fees which SIBL, SFGL and other SFG entities transferred fraudulently to Defendants and which Defendants took with knowledge of Stanford's improper conduct, in bad faith, and/or for no consideration or for less than reasonably equivalent value.

11.     Accordingly, by this action, the Committee, on its own behalf and on behalf of the Receiver, the Receivership Estates and defrauded Stanford investors, seeks the return of all funds transferred fraudulently from the Stanford Entities to Defendants, and damages for aiding and abetting fraudulent transfers made from the Stanford Entities' accounts at SG Suisse to Stanford and other entities and individuals; breach of fiduciary duty; aiding and abetting breaches of fiduciary duty; aiding and abetting fraud; aiding and abetting conversion; conspiracy; and for violation of the Texas Securities Act.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

13.     Further, as the Court that appointed the Receiver and the Committee, this Court has jurisdiction over any claim brought by them to execute their duties.

14.     Further, this Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(C) and 28 U.S.C. §§ 754 and 1692.   Upon information and belief, within 10 days of the entry of the Order and Amended Orders Appointing Receiver, the Receiver filed the original SEC Complaint and the Order Appointing Receiver in all United States District Courts,

giving this Court *in rem* and *in personam* jurisdiction in every other district where the Complaint and Order were filed.

15.     The Court also has personal jurisdiction over Defendants under the Texas Long-Arm Statute because Defendants regularly conducted business in Texas and/or engaged in continuous and systematic activities within Texas; committed tortious acts directed towards Texas; and fraudulently transferred and/or aided and abetted in fraudulently transferring property of Texas residents, or did so in a manner foreseeably harming Texas residents.

16.     Finally, Texas was the center of main interest of the Stanford Entities with whom Defendants regularly conducted business.  *See* Order in Civil Action No. 3:09-CV-0721-N [Doc. 176] (granting conditional and limited recognition to the Antiguan Joint Liquidators). Defendants transacted and communicated on an ongoing basis with Stanford and the Stanford Entities, which Defendants knew, and which were found by this Court, to be controlled and operated from Houston, Texas, the Stanford Entities' headquarters.

## PARTIES

17.     On February 16, 2009, the SEC commenced a lawsuit in this Court (*SEC v. Stanford Int'l Bank, Ltd., et al.*, Civil Action No. 3-09-CV-0298-N, the "SEC Action") against Stanford, two associates, James M. Davis ("Davis") and Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd., Stanford Group Company, and Stanford Capital Management, LLC. The SEC alleges, in its Second Amended Complaint filed on January 8, 2010, that Stanford and various Stanford-related entities perpetrated a multi-billion-dollar fraudulent scheme by (1) promising high rates of return on CDs that exceeded those available through true certificates of deposit offered by traditional banks; and (2) selling a

proprietary mutual fund wrap program known as Stanford Allocation Strategy using materially false and misleading historical performance data.  SEC Action Am. Comp. ¶¶ 4, 7 [Doc. 952].

18.     The Court found good cause to believe that Stanford and the Stanford Entities violated the federal securities laws.  Accordingly, on February 17, 2009, the Court entered an order appointing Ralph S. Janvey receiver over all the assets of Stanford, associated companies, and all the entities they owned or controlled.  SEC Action, Order Appointing Receiver (the "Receivership Order") [Doc. 10].  The Receivership Order also empowered the Receiver to marshal and preserve the assets of the Receivership Estates and address outstanding claims and liabilities.  The provisions of the original Receivership Order are now embodied in the Second Amended Order Appointing Receiver dated July 19, 2010 [Doc. 1130].  The Receiver is empowered by the Receivership Order and by applicable law to bring actions for the benefit of the Receivership Estates and on behalf of investors in SIBL CDs.

19.     By Order dated August 10, 2010, this Court authorized and approved the formation of the Committee, and designated the Committee to represent the interests of SIBL investors in these and related proceedings and, under certain circumstances, to bring and take legal actions for the benefit of SIBL investors and on behalf of the Receiver and the Receivership Estates.  *See* SEC Action, Order Appointing Committee (the "Committee Order") [Doc. 1149].  The Committee and Receiver subsequently entered into an agreement regarding the prosecution of claims against third-parties (the "Agreement"), which was approved by Order of the Court dated February 15, 2011.  *See* SEC Action [Doc. No. 1267].  As required by the terms of the Committee Order and the Agreement, the Committee is, and has been, cooperating with the Receiver concerning the identification and prosecution of actions under fraudulent transfer and

8

other legal theories for the benefit of the Receivership Estates and SIBL investors. *See* Committee Order at ¶¶ 7, 8.

20. The Committee now brings this action as an intervening plaintiff pursuant to this Court's Order dated December 6, 2012, granting the Committee's motion to intervene in *Rotstain, et al., v. Trustmark National Bank, et al.* SG Suisse and other defendants have filed motions to dismiss in this case which are *sub judice*.

21. Upon information and belief, Defendant SG Suisse is a banking corporation organized under Swiss law. SG Suisse maintains offices in the United States and may be served at 701 Brickell Avenue, Suite 1740, Miami, Florida 33131, one of its principal places of business.

22. Upon information and belief, Defendant Blaise Friedli is a Swiss national who works principally out of SG Suisse's offices in Lausanne, Switzerland. During the period relevant to this Complaint, Friedli acted as Stanford's personal banker, served as a consultant to Stanford and various Stanford Entities, and served on Stanford's International Advisory Board. Numerous of Friedli's activities took place in and were directed to the United States and to the Stanford Entities' headquarters in Houston, Texas.

## RELEVANT NON-PARTIES

23. SIBL was organized in Montserrat, originally under the name of Guardian International Bank. In or about 1989, SIBL changed its domicile to Antigua.

24. At all relevant times, SFG was a group of separately organized but affiliated financial services entities led by Stanford. SFG maintained its headquarters in Houston, Texas, and operated offices in several other locations, including Memphis, Tennessee, and Miami,

9

Florida. The activities of SFG and all Stanford Entities were directed from SFG's Houston, Texas headquarters.

25.     Stanford Group Company ("SGC"), a Houston-based company, was founded in or about 1995. SGC, and the financial advisers employed by SGC, promoted the sale of SIBL's CDs through SGC's 25 offices located throughout the United States.

26.     SFGL was organized under the laws of Antigua and Barbuda. It was domiciled in St. John's, Antigua and operated by its board of directors out of Texas.

27.     Until the SEC instituted civil enforcement proceedings against them in February of 2009, the main business of the Stanford Entities was to market purported CDs issued by SIBL. In its 2007 Annual Report, SIBL stated that it had approximately $6.7 billion worth of CD deposits and more than $7 billion in total assets. In its December, 2008, Monthly Report, SIBL purported to have more than 30,000 clients from 131 countries and $8.5 billion in assets. "[T]he principal purpose and focus of most of [Stanford's] combined operations was to attract and funnel outside investor funds into the Stanford companies through the sale of [CDs] issued by Stanford's offshore entity SIBL." *See* SEC Action, Report Of The Receiver Dated April 23, 2009 [Doc. 339].

## THE STANFORD PONZI SCHEME

28.     The Stanford Entities orchestrated and operated a wide-ranging Ponzi scheme.

29.     While Stanford and his co-conspirators masked the Stanford Entities as a legitimate investment behemoth, the unfortunate reality is that it was a massive, worldwide Ponzi scheme run from Houston, Texas.

30.     Stanford and his co-conspirators used the SIBL CDs to lure investor money into SIBL and then steal billions of dollars in assets from SIBL and the Stanford Entities for their

own personal benefit. Substantial sums of these stolen funds were used to: (i) support the lavish lifestyles of Stanford and his Ponzi insiders; (ii) issue bogus, unsecured personal "loans" to Stanford; (iii) capitalize other entities wholly owned by Stanford; and (iv) fund investments in speculative, illiquid, and high-risk assets, including private equity holdings and speculative investments in Antiguan real estate. By February 2009, Stanford and his cronies had stolen at least $1.8 billion through the bogus loans alone. The Stanford Entities also spent hundreds of millions of dollars of CD investor funds to create and perpetuate the charade of Stanford's image, with lavish offices, excessive bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and employees, and the other accouterments necessary to create the illusion of wealth, power, and prestige.

31.     In addition to stealing billions of dollars from Stanford Entity companies, Stanford and his co-conspirators violated U.S. securities laws by functioning as an unregistered investment company in violation of the Investment Company Act.

32.     These facts were never disclosed to CD investors. Instead, investors were consistently and uniformly told – both verbally and via promotional materials – that the Stanford Entities were compliant, authorized, and regulated by the SEC and the Financial Industry Regulatory Authority ("FINRA"), were duly audited, and were backed by insurance coverage from the Securities Investor Protection Corporation ("SIPC") and Lloyd's of London.

33.     Davis, SIBL's former chief financial officer, admitted that the Stanford fraud was a Ponzi scheme from the beginning. SEC Action, Davis Plea Agreement at ¶ 17(n) [Doc. 771] (Stanford, Davis, and other conspirators created a "massive Ponzi scheme"); SEC Action, Davis Tr. of Rearraignment [Doc. 807] at 16:16-17, 21:6-8, 21:15-17 (admitting the Stanford Ponzi fraud was a "massive Ponzi scheme *ab initio*"). Moreover, as proven in the criminal trial of

Stanford, Stanford and Davis fabricated the nature, size, and performance of SIBL's purported investment portfolio.  Gilbert Lopez and Mark Kuhrt, accountants for the Stanford Financial companies, fabricated the financial statements using pre-determined returns on investments that were typically provided by Stanford or Davis.  Lopez and Kuhrt used these fictitious returns to reverse-engineer the bank's financial statements and report investment income that SIBL did not actually earn.  The information in SIBL's financial statements, ''blessed'' by SIBL's Antiguan auditor CAS Hewlett & Co. ("CAS Hewlett"), bore no relationship to the actual performance or existence of SIBL's purported investments.  SIBL's financial statements were prepared, drafted, and approved by Stanford in conjunction with Davis, Lopez and Kuhrt.  Stanford and Davis also fraudulently inflated real estate and private equity holdings in SIBL's purported portfolio so the bank could appear to maintain its minimum capital requirements.

34.     This Court has found that the Stanford fraud was a Ponzi scheme as a matter of law.  *See* Case No. 3:09-CV-0724-N, Doc. 456 at 2 ("The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."), at 11 ("[T]he Receiver presents ample evidence that the Stanford scheme . . . was a Ponzi scheme."), and at 13 ("The Court finds that the Stanford enterprise operated as a Ponzi scheme . . . ."); SEC Action, Doc. 1315 at 10-11 ("The Court previously determined that the Stanford Defendants operated a massive Ponzi scheme that stole approximately $8 billion from an estimated 50,000 investors scattered over more than 100 countries.") and at 14 ("The Stanford Defendants' Ponzi scheme dissipated billions of dollars over its long existence.").

35.     In an opinion filed on December 15, 2010, the Fifth Circuit upheld this Court's findings that the Stanford Entities' fraud was a Ponzi scheme.  *See Janvey v. Alguire*, 628 F.3d 164, 168-69, 185 (5th Cir. 2010) (motion for reh'g *en banc* pending) (upholding this Court's

Order).  In particular, the Fifth Circuit made several rulings on the nature of the Stanford fraud,

as follows:

> We find that the district court did not err in finding that the
> Stanford enterprise operated as a Ponzi scheme.
>
> *       *       *
>
> The Davis Plea and the Van Tassel Declarations provide sufficient
> evidence to support a conclusion that there is a substantial
> likelihood of success on the merits that the Stanford enterprise
> operated as a Ponzi scheme. . . . The Davis Plea, when read as a
> whole, provides sufficient evidence for the district court to assume
> that the Stanford enterprise constituted a Ponzi scheme *ab initio*.
>
> *       *       *
>
> The Receiver carried his burden of proving that he is likely to
> succeed in his prima facie case by providing sufficient evidence
> that a Ponzi scheme existed . . . .
>
> *       *       *
>
> Here, the Receiver provided evidence of a massive Ponzi
> scheme. . . The record supports the fact that Stanford, when it
> entered receivership, was grossly undercapitalized.

*Id.* at 176-78, 180.

36.     In marketing, selling, and issuing CDs to investors, the Stanford Entities

repeatedly touted the CDs' safety and security and SIBL's consistent, double-digit returns.  SEC

Action, SEC's Second Amended Complaint, ¶¶ 32-33 [Doc. 952].  In its brochure, SIBL told

investors, under the heading "Depositor Security," that its investment philosophy is "anchored in

time-proven conservative criteria, promoting stability in [the Bank's] certificate of deposit."

SIBL also emphasized that its "prudent approach and methodology translate into deposit security

for our customers."  *Id*. ¶ 34.  But contrary to these representations, significant portions of

SIBL's portfolio were misappropriated by Stanford and were either placed in speculative

investments (many of them illiquid, such as private equity deals), diverted to other Stanford Entities "on behalf of shareholder" – *i.e.*, for the benefit of Stanford, or to finance Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure crafts, luxury cars, homes, travel, company credit cards, etc.).   In fact, at year-end 2008, the largest segments of the Bank's portfolio were private equity; over-valued real estate; and at least \$1.6 billion in undocumented "loans" to Stanford.  *See id.* ¶¶ 39-40.

37.     In an effort to conceal their fraud and ensure that investors continued to purchase the CDs, Stanford and his associates fabricated the performance of SIBL's investment portfolio. *Id.* ¶ 4. SIBL's financial statements, including its investment income, were fictional.  *Id.* ¶¶ 4, 53. In calculating SIBL's investment income, Stanford and Davis provided to SIBL's internal accountants a pre-determined return on investment for the Bank's portfolio.  *Id.*  Using this pre-determined number, SIBL's accountants reverse-engineered the Bank's financial statements to reflect investment income that SIBL did not actually earn.  *Id.*

38.     For a time, the Stanford Entities were able to perpetuate the fraud by using funds from current sales of SIBL CDs to make interest and redemption payments on pre-existing CDs. *See id.* ¶ 1.  However, in late 2008 and early 2009, CD redemptions increased to the point that new CD sales were inadequate to cover redemptions and normal operating expenses.  As the depletion of liquid assets accelerated, the fraudulent Ponzi scheme collapsed.

39.     The Stanford Entities represented to regulators that SIBL's holdings and operations were duly audited by the independent firm of CAS Hewlett.  In fact, the audits never happened, and Stanford paid over \$3 million in bribes to CAS Hewlett to ensure its cooperation in the scheme.

40.     The Stanford Entities also represented to investors that they were subject to the laws of the Commonwealth of Antigua and Barbuda ("Antigua") and the regulatory oversight of that nation's Financial Services Regulatory Commission of ("FSRC").  The FSRC was created by and, at all relevant times, existed under the authority of, Antigua's International Business Corporations Act.

41.     Leroy King ("King") was the Administrator and Chief Executive Officer for the FSRC.  King, among other things, was ostensibly responsible for FSRC's (and thus Antigua's) oversight of SIBL's investment portfolio, including the review of SIBL's financial reports, and the response to requests by foreign regulators, including the SEC, for information and documents regarding SIBL's operations.

42.     King, however, "facilitated the Ponzi scheme by ensuring that the FSRC 'looked the other way' and conducted sham audits and examinations of [SIBL's] books and records.  In exchange for bribes paid to him over a period of several years, King made sure that the FSRC did not examine [SIBL's] investment portfolio.  King also provided Stanford with access to the FSRC's confidential regulatory files."  SEC Action, SEC's Second Amended Complaint, ¶ 27 [Doc. 952].

43.     On February 17, 2009, the SEC filed a Complaint against SGC and SIBL, as well as Stanford and Davis, in the U.S. District Court for the Northern District of Texas, alleging a "massive Ponzi scheme of staggering proportions."  The SEC obtained an injunction to freeze the assets of Stanford Financial, and Ralph S. Janvey was appointed to serve as Receiver to liquidate the Stanford Financial group of companies.

44.     On June 18, 2009, a federal grand jury in Houston, Texas indicted Stanford, Pendergest-Holt, Lopez, Kuhrt and King on 21 counts, including wire and mail fraud,

obstruction of an SEC investigation, and money laundering. Former Stanford Financial CFO Davis subsequently pled guilty to several crimes, including conspiracy to commit securities fraud and conspiracy to obstruct an SEC proceeding. Davis awaits sentencing in early 2013. On March 6, 2012, Stanford was convicted after a six-week jury trial, of thirteen counts of wire fraud, conspiracy to commit wire fraud, mail fraud, obstruction of an SEC proceeding, conspiracy to obstruct an SEC proceeding, and conspiracy to commit money laundering. On June 14, 2012, Stanford was sentenced to 110 years in prison. King is awaiting extradition from Antigua. Former Chief Investment Officer, Laura Pendergest-Holt, who pleaded guilty in June 2012 to obstructing an SEC investigation in the Stanford Ponzi scheme, was sentenced in September 2012 to 36 months in prison, followed by three years supervised release. Former Chief Accounting Officer Gilberto T. Lopez and Mark J. Kuhrt, former Global Controller of Stanford Financial Group Global Management, were convicted in November 2012 on 9 counts of wire fraud and one count of conspiracy to commit wire fraud. Lopez and Kuhrt are scheduled to be sentenced on February 14, 2013.

45.     Thus, it cannot be disputed that Stanford was engaged in a multi-year, international Ponzi scheme in which Stanford's transactions were undertaken with the purpose and intent of defrauding the CD investors.

## DEFENDANTS' ROLE IN THE FRAUD

### SG Suisse's Management of Receivership Assets

46.     SG Suisse and Friedli played major and essential roles in the management of the Stanford Entities' businesses and assets, and in facilitating Stanford's fraudulent scheme. As part of its multiple and conflicting roles, SG Suisse acted as an investment manager with respect

to funds belonging to various Stanford Entities and Stanford personally. SG Suisse managed at least the following accounts on behalf of Stanford and the Stanford Entities:

### SG Private Banking, Geneva, Switzerland

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank (Antigua) | 800 800 |
| Stanford International Bank (Antigua) | 800 801 |
| Stanford Financial Group LTD, Lausanne | 108 731 |
| Robert Allen Stanford | 2 148 600 |
| Bank of Antigua | 108 732 |
| Stanford Bank (Panama) | 2 706 100 |

### SG Private Banking, Lausanne, Switzerland

| Beneficiary | Account Number |
|---|---|
| Stanford International Bank. Ltd. | XXX 782 |

47. Upon information and belief, all the money deposited or transferred into these accounts and from these accounts, were investor funds derived from the sale of SIBL CDs. Defendants were granted discretionary investing and fiduciary authority over many of these accounts, and were compensated generously with banking and brokerage fees. Due to their multiple and conflicted roles, Defendants had a clear picture of Stanford's management, diversion and looting of CD-customer funds for his own benefit and for the benefit of the Stanford Entities in which he alone had an interest.

**Stanford's Personal Banker and Confidante − Blaise Friedli**

48.    All of the Stanford Entities' depository accounts and investments at, or made through, SG Suisse were supervised in all respects by its Executive Vice-President Blaise Friedli and others under his supervision.

49.    Upon information and belief, Stanford's relationship with Friedli dated back to at least 1994.  While working at a predecessor bank, Friedli strongly recommended Stanford and the Stanford business entities to prospective investors and third parties, vouching for Stanford personally, and for his business.  Friedli distributed letters addressed "To Whom it May Concern" signed by him and apparently provided to Stanford with the understanding that these unqualified recommendation letters would be forwarded to potential business counter-parties and prospective investors at Stanford's discretion.  These recommendation letters attest to Friedli's deep association with SIBL's management for "almost 10 years," and "strongly recommend" SIBL for any "business dealings."  The letters further invite the recipient to contact Friedli for "any further information you may wish to get."

50.    In addition to serving as Stanford's long-standing banker, confidante and fiduciary to Stanford, and the Stanford Entities at SG Suisse, Friedli also served on Stanford's International Advisory Board, which was a group of influential business and political figures hired by Stanford as trusted advisors on the operation and direction of SIBL and the other Stanford Entities.  Moreover, upon information and belief, Friedli was separately compensated as a consultant to Stanford Financial Group Global LLC, for which he was paid at least $50,000 annually.  Shockingly, Friedli's consulting agreement called on him to provide the following broad-based services to Stanford and the Stanford Entities while serving as a senior executive at SG Suisse:

Advice and guidance to any officer or member of the Board of Directors of Stanford Financial Group Global Management, LLC, and in particular to the Regional Managing Director for Europe, primarily pertaining to issues relating to European operations.

Participate in Advisory Board Meetings as may be requested by Company, including service as a member of the Advisory Board if so requested.

Analysis and recommendations concerning company's and/or its affiliates' strategic growth plans in Europe.

Advise and support to Company and/or its affiliates in respect to their relations with local governments and regulators in those countries in Europe where they do business or may desire to conduct operations.

Support on Company's and/or its affiliates' activities or operations in those jurisdictions in Europe where company and/or its affiliates maintain or desire to conduct operations.

Research and analysis regarding the growth of Company and/or any of its affiliates in those jurisdictions in Europe where Company and/or its affiliates maintain or desire to conduct operations.

Upon request, participate at quarterly or selected Company meetings as a speaker or as otherwise requested.

Any other related services that from time to time the company may require.

51. As evidenced by Friedli's glowing recommendation letters, and by his course of conduct through years of consulting to and advising Stanford and the Stanford Entities, Friedli presented himself to the outside world – including actual and prospective SIBL investors – as an international banker uniquely familiar and intimate with SIBL's management and inner-workings. Based on the foregoing, Friedli understood SIBL's banking operations, CD issuance activities, investment strategies, and regulatory disclosure obligations. Of course, Friedli's dual role, as a Stanford consultant and employee, placed him and SG Suisse in a compromised and

utterly conflicted position, with respect to SG Suisse, Stanford personally, and Stanford's investors. At all times, Friedli had irreconcilable conflicts and a personal financial stake in the perpetration of Stanford's illicit businesses.

**Stanford's "Slush Fund"**

52. SG Suisse also maintained what U.S. authorities have termed a "secret" account in the name of Stanford Financial Group, Ltd ("SFGL"): SG Suisse Account No. 108.731 ("Account 731").

53. During Stanford's criminal trial, Davis described Account 731 as Stanford's personal "slush fund." Davis and FBI Agent Robert Martin testified that Stanford used this account to bribe Antiguan regulators and SIBL's outside auditor, CAS Hewlett. Stanford also used this account to transfer at least $80 million to his personal bank accounts at JPMorgan Chase, Bank of New York Mellon, Sterling Bank, Bank of Antigua and elsewhere through his personal banker, Friedli.

54. Davis and Stanford never disclosed the existence of this secret slush fund, Account 731, to bank regulators, investors, or even to their own senior executives, and because of Swiss bank privacy laws, and Friedli's conflicted roles, they knew that Friedli would similarly never reveal its existence. Most of the funds routed through Account 731 vanished into Stanford's criminal enterprise, to Stanford personally, to Stanford Entities in which his investors had no interest, or into Defendants' pockets.

55. The secret Account 731 differed from a typical corporate or personal bank account. Only two individuals were listed as signatories on the account – Stanford and Davis. The instructions on the account required that no funds could be transferred or debited from the

secret account without a written directive signed by either Stanford or Davis, <u>with</u> a follow-up phone call from Davis or Stanford to confirm the transaction.

56.     Davis testified at Stanford's criminal trial that "Blaise Friedli was the banking officer in charge of this particular account [*i.e.*, Account 731]."  It was Friedli whom Davis or Stanford would contact to transfer funds out of Account 731.  Accordingly, Friedli had actual knowledge of each transfer request and manually facilitated each transfer of investors' funds to the intended recipient, including to Stanford himself.

57.     SG Suisse was not a blind "conduit" for transactions initiated remotely by Stanford and Davis through Account 731.  Rather, SG Suisse had actual knowledge of the amount and purpose of each transaction and the diversion of massive amounts of investor funds for improper purposes through the 731 Account.  As noted above, given his long-standing relationship with Stanford, his status as fiduciary to the Stanford Entities, his intimate knowledge of Stanford's business operations through service on the International Advisory Board, and as a paid consultant and Stanford confidant, his role as the "banking officer in charge" of Account 731, and international banking and business practices, Friedli was aware of Stanford's improper activities at all relevant times and Friedli and SG Suisse acted as Stanford's secret partners in facilitating his fraud and the diversion of investor funds.

**SG Suisse Effects Improper Transfers of CD Customer Funds to Stanford**

58.     As established at the numerous criminal trials and through expert testimony of the Receiver's forensic accountants, virtually all of the funds deposited into <u>any</u> of the Stanford Entity's bank accounts were derived from the sale of phony certificates of deposit to SIBL investors.  As Friedli and SG Suisse were aware, SIBL's only business was selling CDs to investors, and Friedli therefore knew that all funds deposited into Account 731 and other

21

accounts at SG Suisse in the name of other Stanford Entities were derived from CD sales SIBL investors. All transfers made to Account 731 were from accounts held in SIBL's name at TD Bank and Union Credit. From June 23, 2000, through September 12, 2008, SIBL transferred $262.1 million in CD customer funds to Account 731.

59. Notwithstanding the nature of the funds at SG Suisse as belonging to SIBL investors, Friedli presided over and actively facilitated at least $80 million in transfers from Account 731 directly to Stanford's personal bank accounts, as follows:

| Date | Amount (USD) | Recipient Bank | Account Holder |
|---|---|---|---|
| 6/26/2000 | $ 1,200,000.00 | Chase Bank, Texas | Allen Stanford |
| 7/27/2000 | 775,000.00 | Chase Bank, Texas | Allen Stanford |
| 8/31/2000 | 600,000.00 | Chase Bank, Texas | Allen Stanford |
| 9/5/2000 | 600,000.00 | Chase Bank, Texas | Allen Stanford |
| 11/3/2000 | 200.000.00 | Chase Bank, Texas | Allen Stanford |
| 12/12/2000 | 1,500,000.00 | Chase Bank, Texas | Allen Stanford |
| 12/15/2000 | 2,000,000.00 | Chase Bank. Texas | Allen Stanford |
| 12/22/2000 | 4,000,000.00 | Chase Bank, Texas | Allen Stanford |
| 2/16/2001 | 500,000.00 | Chase Bank, Texas | Allen Stanford |
| 6/7/2002 | 5,000,000.00 | Chase Bank, Texas | Allen Stanford |
| 4/10/2003 | 7,500,000.00 | Chase Bank, Texas | Allen Stanford |
| 8/5/2003 | 10,000,000.00 | Chase Bank, Texas | Allen Stanford |
| 10/1/2003 | 8,000,000.00 | Chase Bank, Texas | Allen Stanford |
| 10/3/2003 | 8,000,000.00 | Chase Bank, Texas | Allen Stanford |
| 10/8/2003 | 6,000,000.00 | Chase Bank, Texas | Allen Stanford |
| 1/30/2004 | 4,971,543.00 | Mellon United National Bank | Allen Stanford |
| 4/8/2004 | 4,654,300.00 | Mellon United National Bank | Allen Stanford |
| 4/9/2004 | 3,345,650.00 | Sterling Bank. Houston | Allen Stanford |
| 8/20/2004 | 2,576,301.00 | Sterling Bank, Houston | Allen Stanford |
| 8/20/2004 | 2,499,254.00 | Mellon United National Bank | Allen Stanford |
| 4/24/2006 | 2,989,574.00 | Sterling Bank, Houston | Allen Stanford |
| 4/24/2006 | 3,501,188.00 | Mellon United National Bank | Allen Stanford |
| **TOTAL** | **$ 80,412,810.00** | | |

60. Significantly, many of these transfers to Stanford's personal accounts were made on the same day or in close proximity to each other, further highlighting the suspicious nature of the transfers.

61.     In addition to the aforementioned fraudulent transfers to Stanford, upon information and belief, SG Suisse and Friedli facilitated other significant fraudulent transfers from Account 731 and other accounts which are recoverable, and as to which Plaintiff is not aware at this time.

**SG Suisse Transfers Funds from Account 731 to Bribe Stanford's Auditors**

62.     Further, at the direction of Stanford, Friedli regularly transferred large sums of money from Account 731 to three separate accounts in the name of SIBL's purported auditor, CAS Hewlett – one at Barclays Bank PLC, London ("Barclays"), another at First Bank Puerto Rico, and to another account at First Bank Virgin Islands.

63.     In total, from January 14, 2000 to January 15, 2009, SG Suisse transferred approximately £1,975,692 from Account 731 to CAS Hewlett.

64.     For example, on March 14, 2002, Davis sent a letter to Friedli instructing him to transfer £80,000 from "our 108.731 account" to CAS Hewlett's Barclays account.

65.     From January 2000 to February 2003, SG Suisse, at SFG's direction, transferred £10,000 each month from the 731 Account to the CAS Hewlett account at Barclays.

66.     On February 26, 2003, Davis directed SG Suisse to "increase the monthly wire transfer to CAS Hewlett from 10,000 pounds sterling to 15,000 pounds sterling per month by debiting our 108.731 account.  This change is effective on March 1, 2003."

67.     From March 2003 to May 2008, SG Suisse transferred £15,000 each month to CAS Hewlett's Barclays account from the 731 Account.

68.     In May 2008, Stanford once again increased the amount of the monthly payments to CAS Hewlett.  In an email dated May 19, 2008, Davis instructed Carol Meylan of SG Suisse to "change the monthly debit amount that is disbursed to <u>Mr. C.A.S. Hewlett</u> [*emphasis added*]

from our 108.731 a/c.  Please change this standing order by increasing the amount from 15,000 sterling, to 20,000 sterling.  Effective date for this change should be the payment of 15 June 2008, and should continue monthly until further notice."

69.     From June 13, 2008, until January 15, 2009, one month before the SEC commenced its lawsuit, SG Suisse transferred £20,000 from Account 731 to CAS Hewlett.

70.     In addition to these payments, Stanford instructed SG Suisse to make payments from the 731 Account to CAS Hewlett, and SG Suisse complied with these instructions.  Davis instructed SG Suisse to transfer the following amounts on or about the following dates:

       a.      £6,000 in September 2005;

       b.      US$125,000 on November 1, 2005;

       c.      US$125,000 on November 3, 2005;

       d.      US$125,000 on December 1, 2005;

       e.      US$100,000 on February 13, 2006;

       f.      £16,000 on May 1, 2007;

       g.      £60,000 on September 1, 2008; and

       h.      £60,000 on September 8, 2008.

71.     Notably, the payments described in the foregoing paragraph were in addition to the regular audit fees paid to CAS Hewlett by other Stanford Entities from their regular bank accounts.

72.     Based on the irregularity and varying amounts of the substantial payments to CAS Hewlett, the multiple accounts receiving the transfers, their source from a "secret account" and the fact that at least one payment was, upon information and belief, made to Hewlett individually, and not to the auditing firm, Friedli had to know something improper was taking

place and that he was facilitating such improper conduct. Yet Friedli continued to ignore the highly suspicious nature of these transfers, so that he and SG Suisse could continue to earn substantial fees for their services.

**SG Suisse and Friedli Ignore Other Significant Red Flags**

73.     In April, 1999, the U.S. Treasury issued an extraordinary advisory (FinCEN Advisory No. 11) warning recipient banks and financial institutions – including SG Suisse – to scrutinize all transactions routed in or out of Antigua for evidence of money laundering. FinCEN Advisory No. 11 flagged a number of disturbing developments within the Antiguan banking industry, including possible collusion between Antiguan bank regulators and members of the Antiguan banking community. This was an obvious reference to Stanford and SIBL, which dominated and was synonymous with Antiguan banking during the relevant period. Defendants received FinCEN Advisory No. 11, and knew that the advisory referred to Stanford and SIBL. Despite this, SG Suisse and Friedli facilitated numerous transfers from Account 731 to Stanford's personal bank account at Bank of Antigua.

74.     Further, the purported interest rates on CDs issued by SIBL and marketed by SFG were unusually high and far beyond competitive industry standard rates, exceeding comparable CDs issued by other banks. In materials available to SG Suisse, SIBL represented that it had earned consistent double-digit annual returns on its investment of customer CD deposits for fifteen years (ranging from 16.5% in 1993 to 11.5% in 2005). From 2000 to 2005, SIBL claimed to have outperformed the S&P 500 by approximately 13%. Yet, at the same time, SIBL represented that its investment portfolio was diversified, conservative and stable. Based on their experience in the financial industry and their knowledge of SIBL's business – gained from

actively managing SIBL's funds – Defendants knew that such consistent returns for such a long period of time were mathematically implausible.

75.     Moreover, articles published in the *Wall Street Journal* (on April 27, 1999), the *Chicago Tribune* (on July 25, 1999), the *Houston Chronicle* (on July 16, 2000), and the *Miami Herald* (on September 2, 2002), reported that Stanford was appointed to sit on an Antiguan government board that supervised the offshore banking sector – a clear red flag available to Defendants.    Articles published worldwide in 2008 (including in the *Daily Telegraph* and *Bloomberg* in July 2008) reported that the SEC was actively investigating the activities of Stanford.

76.     Significantly, many of these red flags were brought to the direct attention of Friedli and SC Suisse's predecessor bank, Compagnie Bancaire Genève ("CBG").    Upon information and belief, as far back as May 2000, and possibly earlier, CBG commissioned a report as part of their due diligence of Stanford and his operations.    Upon information and belief, the report alerted Defendants to FinCen Advisory No. 11 concerning Antigua, and detailed Antigua's history of money laundering and lax banking regulations.    The report, upon information and belief, also revealed Stanford's history of laundering money for a Mexican drug cartel.    Upon information and belief, the report based upon a number of concerns surrounding the Bank of Antigua and Stanford, suggested that CBG consider refraining from conducting business with Stanford in order to minimize the bank's future legal exposure and reputational harm.

77.     In sum, through their role as Stanford's portfolio manager; their essential assistance in the payment of bribes to Stanford's purported auditor and, upon information and belief, Antiguan regulators; Friedli's position on the Stanford International Advisory Board; Friedli's role as a consultant to Stanford; and publicly and privately available information raising

questions about Stanford's operations, among other things, Defendants knew Stanford's banking operations were illegitimate.

## DEFENDANTS' RECEIPT OF FRAUDULENT TRANSFERS

78. Funds from the Ponzi scheme described above were transferred by or at the direction of SIBL, SFGL, Stanford and Davis to Defendants and are recoverable for the benefit of creditors/investors pursuant to applicable law.

### The $95 million transfer from SFGL to SG Suisse

79. The Committee has identified a $95 million fraudulent transfer made in December 2008 from SFGL to SG Suisse. The transfer was made from Account 731 – which was in SFGL's name – directly to SG Suisse in repayment of a loan made by SG Suisse to Stanford personally.

80. Specifically, in September 10, 2004, Stanford sent a letter to Rene de Ricciotto, Chairman of SG Suisse, requesting to "personally borrow $95 million from SG Private Banking Suisse SA." In the letter, Stanford proposed that the loan be guaranteed by $110 million on deposit in Account 731. Friedli was copied on the letter. As Friedli knew, the funds on deposit in Account 731 were CD customer funds transferred from other SIBL bank accounts. On November 15, 2004, Stanford sent another letter to Friedli enclosing an executed promissory note relating to the $95 million personal loan request. Stanford wrote, "Please credit my personal account for the full $95,000,000 on November 22, 2004." The letter was signed "Allen."

81. Soon thereafter, SG Suisse transferred the borrowed funds to Stanford's loan facility account – account no. 2148600 – for Stanford's personal benefit. Stanford used some of these funds to purchase in his personal capacity 100% of the assets of Bank Galicia – a

27

Venezuelan bank – and the balance was transferred to Stanford's private bank accounts in Houston and Miami.

82. None of the funds lent directly by SG Suisse to Stanford – including those used to purchase the Venezuelan bank – benefitted SFGL in any way. None of these funds were invested on behalf of SFGL or SIBL's CD customers. Significantly, Account 731 statements from the relevant period list an entry stating "PLEDGE FAV. 3RD PAR W/O M" in the amount of $96 million – *i.e.*, $96 million in the account had been pledged for a no-maturity loan made to a <u>third-party</u>. This third-party was Stanford.

83. Stanford's personal loan from SG Suisse matured in October 2007. SG Suisse waited over a year to call the loan and did so only weeks before Stanford's fraud was finally exposed in early 2009. Thus, on or about October 8, 2008, SG Suisse deducted $200,000 from Account 731. Also, on or about December 15, 2008, Stanford instructed Friedli by letter to "debt [sic] account 108.731 for US$95,350,000 to liquidate the balance due on my loan." Friedli proceeded to debit $95,350,000 from Account 731 – which Friedli knew was funded entirely by CD customer funds – in satisfaction of Stanford's personal loan.

84. SFGL made these transfers to SG Suisse at a time when it was insolvent. SFGL made these transfers to SG Suisse and received no value whatsoever in return.

**<u>Banking and Management Fees</u>**

85. Defendants also received banking and investment management fees from various Stanford Entities, including SIBL and SFGL. These fees were derived from CD customer funds transferred to various banking and investment accounts managed by SG Suisse. The precise amount of such fees and charges cannot be pleaded at this time, as records evidencing such

payments are uniquely in Defendants' possession.  Defendants took these fees in bad faith and with knowledge of Stanford's improper activity.

86.     Plaintiff's investigation is ongoing, and Plaintiff reserves the right to amend this complaint to identify additional fraudulent transfers from the Stanford Entities to Defendants. Defendants are hereby put on notice that all transfers from the Stanford Entities to Defendants, and all transfers from the Stanford Entities to Stanford personally which were facilitated by Defendants, are implicated in this action.  Records relating to these transfers are either readily ascertainable by, or are uniquely in the possession of Defendants and are expected to be produced in the course of discovery.

## RELIEF REQUESTED

87.     For each of the following causes of action, Plaintiff incorporates by reference and reassert the allegations above as if fully set forth below.

## STATUTE OF LIMITATIONS DEFENSES

88.     Plaintiff also asserts the discovery rule and the doctrine of equitable tolling as applicable to the statute of limitations for each claim herein.  The SEC filed an action against Stanford, SIBL, and other Stanford-related entities on February 17, 2009.  The Committee was formed on August 10, 2010.  During the government's criminal investigation of Stanford a discovery stay was in effect.  SG Suisse objected to the Receiver's discovery requests during the relevant period and continues to resist full disclosure of all of is documents relating to Stanford and the Stanford Entities.  Moreover, many of the facts stated herein were first learned during the course of Stanford's criminal trial, which concluded on March 6, 2012.  Plaintiff did not discover until more recently – and could not have discovered with the exercise of reasonable diligence –

29

the details of Defendants' participation in Stanford's fraud and the nature of these fraudulent transfers. Indeed, Defendants' wrongful acts were, until recently, inherently undiscoverable.

89.     Further, this Court has recognized the necessarily complex nature of Plaintiff's investigation and the inherent limitations attendant to this process. *See, e.g.*, SEC Action, Doc. 1315 at 11, 14 ("This Court has charged the Receiver with the responsibility of tracking down and collecting ill-gotten funds that properly belong to the Receivership Estate and, ultimately, defrauded investors. That task has been complicated by the Ponzi scheme's complexity. . . . The Stanford Defendants' Ponzi scheme collected and dissipated billions of dollars over its long existence. Coupled with the scheme's Byzantine structure, the process of recouping any fraudulently obtained funds necessarily includes weeding through a massive number of individual transactions and any documents and information related to those transactions.").

90.     Thus, the discovery rule and equitable tolling principles apply to any applicable limitations period. *See*, *e.g.*, *Wing v. Kendrick*, No. 08-CV-01002, 2009 WL 1362383, at *3 (D. Utah May 14, 2009); *Quilling v. Cristell*, No. 304CV252, 2006 WL 316981, at *6 (W.D.N.C. Feb. 29, 2006); *see also* TEX. BUS. & COMM. CODE ANN. § 24.010(a)(1) (claims may be brought either within four years of the transfer or "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant").

## RESPONDEAT SUPERIOR

91.     Finally, the doctrine of *respondeat superior* is also applicable to each cause of action. SG Suisse is liable for the tortious acts of its employees, including Friedli. Friedli and others were acting within the course and scope of their employment with SG Suisse and in furtherance of SG Suisse's business when they engaged in the wrongful conduct described herein.

## CAUSES OF ACTION

### COUNT I: AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS UNDER §§ 24.005(a)(1), 24.005(a)(2), AND 24.006(a) OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT AND/OR UNDER THE COMMON LAW
(Against All Defendants)

92.     The Receivership Estates are entitled to disgorgement of the funds transferred from SIBL, SFGL, and other Stanford Entities subject to the Receivership to Defendants because such payments constitute fraudulent transfers under applicable law.  These transfers include, but are not limited to, $95 million transferred to SG Suisse in December 2008 and all banking and investment management fees paid to Defendants by the Stanford Entities.

93.     The transfers were made to Defendants with actual intent to hinder, delay, or defraud Stanford's creditors; as a result, Plaintiff is entitled to the disgorgement of those transfers.  Additionally, the Stanford Entities transferred the funds to SG Suisse at a time when the Stanford Entities were insolvent, and the Stanford Entities did not receive reasonably equivalent value in exchange for the transfers.

94.     Plaintiff may avoid transfers made with the actual intent to hinder, delay, or defraud creditors.  "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception."  *Quilling v. Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007); *see also Janvey*, 628 F.3d at 176 "[A] Ponzi scheme 'is, as a matter of law, insolvent from its inception.'"); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (". . . [the debtor] was a Ponzi scheme, which is, as a matter of law, insolvent from its inception. . . .  The Receiver's proof that [the debtor] operated as a Ponzi scheme established the fraudulent intent behind transfers made by [the debtor].").

31

95.     The Stanford Entities were running a Ponzi scheme and paid Defendants with funds stolen from unwitting SIBL CD investors.  Plaintiff, therefore, is entitled to disgorgement of the funds the Stanford Entities fraudulently transferred to Defendants.

96.     Consequently, the burden is on Defendants to establish an affirmative defense, if any, of good faith and provision of reasonably equivalent value.  *See* Case No. 3:09-CV-0724-N, Doc. 456 at 13 ("A defendant invoking this defense has the burden to show *both* objective good faith and reasonable equivalence of consideration.") (emphasis in original); *see also Scholes v. Lehmann*, 56 F.3d 750, 756-57 (7th Cir. 1995) ("If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly.").  Plaintiff, therefore, is entitled to recover the full amount of the transfers Defendants received — either directly or indirectly — unless Defendants prove both objective good faith and reasonably equivalent value by competent evidence.

97.     The good-faith element of this affirmative defense requires that Defendants prove objective, rather than subjective, good faith.  *See Warfield*, 436 F.3d at 559-560 (good faith is determined under an "objectively knew or should have known" standard); *In re IFS Fin. Corp.*, Bankr. No. 02-39553, 2009 WL 2986928, at *15 (Bankr. S.D. Tex. Sept. 9, 2009) (objective standard is applied to determine good faith); *Quilling v. Stark*, No. 3-05-CV-1976-BD, 2007 WL 415351, at *3 (N.D. Tex. Feb. 7, 2007) (good faith "must be analyzed under an objective, rather than a subjective, standard.  The relevant inquiry is what the transferee objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint.") (internal citations and quotation marks omitted).

98.     Defendants may only raise good faith in their answer or in an evidentiary motion for summary judgment.  *Hahn v. Love*, 321 S.W.3d 517, 526 (Tex. App—Houston (1st Dist.)

2009) (explaining that defendants bear the burden of proof under § 24.009(a) to establish affirmative defense of good faith); *Flores v. Robinson Roofing & Const. Co.*, 161 S.W.3d 750, 756 (Tex. App.—Fort Worth 2005) (stating that "good faith" is an "affirmative defense" that cannot be raised in non-evidentiary motion for summary judgment).

99.     Moreover, both this Court and the Fifth Circuit have held that providing services in furtherance of a Ponzi scheme does not confer reasonably equivalent value. *Warfield*, 436 F.3d at 555, 560; Case No. 3:09-CV-0724-N, Doc. 456 at 13-14 ("[A]s a matter of law, services provided in the context of a Ponzi scheme do not constitute 'reasonably equivalent value.'"). Furthermore, consideration which has no utility from the creditor's perspective does not satisfy the statutory definition of "value." *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000). Defendants cannot now claim that, in return for furthering the Ponzi scheme and helping it endure, and for taking repayment from SIBL of a personal loan made to Stanford, that they should be entitled to keep the transfers they received.

100.     Accordingly, Defendants cannot meet their burden to establish that they provided reasonably equivalent value for the funds they directly or indirectly received from the Stanford Entities and that they received such payments in good faith.

101.     Finally, under applicable fraudulent-transfer law, Plaintiff is entitled to attorneys' fees and costs for its claims against Defendants. *See, e.g.*, TEX. BUS. & COM. CODE ANN. § 24.013 ("[T]he court may award costs and reasonable attorney's fees as are equitable and just."). As a result, Plaintiff requests reasonable attorneys' fees and costs for prosecuting their fraudulent-transfer claims against Defendants.

**COUNT II: AIDING, ABETTING, OR PARTICIPATION IN
FRAUDULENT TRANSFERS
(Against All Defendants)**

102.     Plaintiff is entitled to disgorgement of funds transferred from SFGL to Stanford personally.  These transfers were made to Stanford while Stanford and his associates were operating a Ponzi scheme.  The transfers were made to Stanford with actual intent to hinder, delay, or defraud SFGL's creditors, and were made when SFGL was insolvent.  SFGL received no value in return for these transfers.

103.     Plaintiff has identified at least $80 million transferred fraudulently from SFGL to Stanford from accounts maintained by Defendants.  Plaintiff expects to discover additional fraudulent transfers from the Stanford Entities' accounts at SG Suisse to third parties as this action progresses, and reserved the right to amend this Complaint to seek recovery thereof.

104.     By its conduct described herein, Defendants knowingly aided, abetted and participated in these fraudulent transfers.  Defendants were aware that SFGL was fraudulently transferring assets to Stanford, and Defendants were also aware that they were aiding, abetting and participating in these fraudulent transfers.  The fraudulent transfers and Defendants' participation in these fraudulent transfers were a proximate cause of actual damages to the Stanford Entities, and therefore to the Receiver and the Committee.  Therefore, Plaintiff is entitled to recover from Defendants at least $80 million and the full amount of any other fraudulent transfers that Stanford received from accounts maintained by Defendants.  Plaintiff is also entitled to recover attorneys' fees and costs for its claims against Defendants.  As a result, Plaintiff requests reasonable attorneys' fees and costs for prosecuting its fraudulent-transfer claims against Defendants.

## COUNT III: BREACHES OF FIDUCIARY DUTY
(Against All Defendants)

105.    By virtue of their status as a discretionary broker and money manager, and Friedli's multiple roles as a trusted business and financial advisor to Stanford and the Stanford Entities, Defendants were fiduciaries of SFGL, SIBL and the other Stanford Entities.  Defendants were thus required to use reasonable care in operating and managing the Stanford Entity accounts.  Defendants breached their fiduciary duty by actively facilitating or failing to take steps to prevent Stanford's theft of at least $80 million from Account 731 and possibly other Stanford Entity accounts.  Defendants also breached their fiduciary duty by continuously ignoring the numerous red flags discussed in this Complaint and continuing to provide services that furthered the Stanford Ponzi scheme, such as knowingly facilitating the payment of bribes to SIBL's purported auditor.  As a result of this conduct, Defendants are liable for breaches of fiduciary duty, and Defendants' actions, on their own and in combination with the actions of Stanford and Davis generally, are a proximate cause of actual damages to the Stanford Entities and therefore to the Receiver and the Committee.

## COUNT IV: AIDING, ABETTING, OR PARTICIPATION IN BREACHES OF FIDUCIARY DUTY
(Against All Defendants)

106.    Stanford and Davis were fiduciaries of SIBL and SFGL during the relevant period.  Stanford and Davis breached their fiduciary duties to SIBL and SFGL in that they (i) misappropriated and converted funds from certain SIBL and SFGL accounts maintained by Defendants; and (ii) paid bribes to SIBL's auditor and bank regulator to hide SIBL true financial condition and fraudulent operations.  By their conduct described herein, Defendants knowingly aided, abetted, or participated in Stanford and Davis' breach of fiduciary duty to SIBL and SFGL, and therefore to the Receiver and the Committee.  Defendants' actions, on their own and

35

in combination with the actions of Stanford and Davis generally, are a proximate cause of actual damages to the Stanford Entities and therefore to the Receiver and the Committee.

### COUNT V: AIDING, ABETTING, OR PARTICIPATION IN A FRAUDULENT SCHEME
### (Against All Defendants)

107.    By their conduct described herein, Defendants aided, abetted, and/or participated with Stanford and his co-conspirators in a fraudulent scheme against SIBL and therefore against the Receiver and the Committee.   In particular, Defendants' services assisted a fraudulent scheme that allowed Stanford and his co-conspirators to misappropriate billions of dollars from SIBL, and therefore from the Receiver and the Committee.   Based on their knowledge of the financial industry and of SIBL's operations, it is reasonable to infer that Defendants had subjective knowledge of, and provided necessary assistance to, Stanford and his co-conspirators' payment of bribes to SIBL's auditor.   As a result of this conduct, Defendants are directly liable for aiding and abetting a fraudulent scheme.   Defendants' actions, in combination with the actions of Stanford and Davis, are a proximate cause of actual damages to the Stanford Entities and therefore to the Receiver and the Committee.

### COUNT VI: AIDING, ABETTING, OR PARTICIPATION IN CONVERSION
### (Against All Defendants)

108.    SFGL, SIBL, and the Stanford Entities generally, and therefore the Receiver and the Committee, owned, possessed, or had the right to immediate possession of personal property. Stanford and his co-conspirators wrongfully exercised dominion or control over such property. Stanford and his co-conspirators misappropriated billions of dollars in assets from the Stanford Entities, including at least $80 million in funds from an SFGL account operated and maintained by Defendants.

36

109.     By their conduct described herein, Defendants knowingly or recklessly aided, abetted, or participated in this misappropriation and conversion of property from SFGL and therefore from the Receiver and the Committee.  Defendants were aware that Stanford and his co-conspirators were wrongfully exercising dominion or control over the personal property of SFGL.  Defendants were also aware that they were aiding, abetting, or participating in this wrongful conversion of personal property.  The conversion of property by Stanford, his co-conspirators was a proximate cause of actual damages to SFGL and therefore to the Receiver and the Committee.

### COUNT VII: FOR AIDING AND ABETTING VIOLATIONS OF THE TEXAS SECURITIES ACT (Against All Defendants)

110.     As argued by the SEC in the SEC Action, the CDs offered by the Stanford Entities constitute "securities" under the relevant securities law jurisprudence.  Stanford, Davis, and the other Stanford Entities sold these securities to residents of Texas and other states.

111.     Stanford, Davis, and the other Stanford Entities sold these securities through the use of untrue representations and materially misleading omissions.  In particular, Stanford, Davis, and the other Stanford Entities uniformly led investors, verbally and through written marketing materials prepared and disseminated via the Stanford Entities' Houston offices, to believe that their money was being invested in safe, liquid investments that were completely insured.  They also led investors to believe that the issuer – SIBL – was properly and regularly audited.  Investors relied on these representations when purchasing SIBL CDs.

112.     These were material misstatements because SIBL was never truly audited.  Instead, Stanford bribed SIBL's outside auditor to turn a blind eye to fraudulent activity.  Moreover, CD funds were not invested in safe, liquid and fully insured investments, but rather

were pooled together with other investors' money and transferred to Stanford to finance his profligate lifestyle, among other things.

113. Defendants are liable as an "aider" under TEX. REV. CIV. STAT. ANN. art. 581-33F(2) (Vernon Supp. 2004-2005). Defendants were subjectively aware at all relevant times of Stanford's misrepresentations, omissions, and improper activity. While presiding over and facilitating the transfer of bribes to CAS Hewlett and transfers of CD customer funds to Stanford's personal bank accounts, Defendants were subjectively aware that their role was part of an overall activity that was fraudulent. Defendants thus rendered necessary assistance to Stanford in the face of a perceived risk that their assistance would facilitate untruthful or illegal activity. As a result, investors in SIBL CDs were harmed, and therefore, the Receiver and Committee were harmed.

## COUNT VIII: CIVIL CONSPIRACY
### (Against All Defendants)

114. There was a meeting of the minds between Stanford, Davis and Defendants to commit the wrongful conduct described herein, including breaches of fiduciary duty, fraudulent transfers, fraud, and conversion.

115. Through their years of faithful service to Stanford and the Stanford Entities, including acting as fiduciary to Stanford and Stanford-Entity assets, and as long-standing advisors and consultants to Stanford's operations, Defendants acquired extensive knowledge of Stanford's fraudulent scheme and illicit business activities. Despite their knowledge of the fraud, Defendants continued to serve Stanford without question, playing a pivotal role in furthering the Ponzi scheme.

116. Defendants are responsible for the wrongdoing committed by Stanford, Davis, CAS Hewlett and others who conspired with Stanford. In particular, Defendants conspired with

and are responsible for Stanford's theft of over $80 million in CD customer funds and for bribing SIBL's auditor CAS Hewlett. Defendants' actions in furthering this conspiracy were taken during the conspiracy's operation. Indeed, Defendants' actions were taken to protect the Stanford Ponzi scheme and to avoid regulatory intervention so that the Sanford Ponzi scheme could continue and persist. Therefore, Defendants' actions were part of a continuing activity that was illegal in nature and essential to furthering the survival of an ongoing Ponzi scheme conspiracy.

117. But for the overt acts taken by Defendants and other members of the conspiracy to further the objectives of the Ponzi scheme conspiracy described herein, Stanford and his co-conspirators would not have been able to carry out the Ponzi scheme. The conspiracy harmed Stanford investors and the Stanford Entities and therefore, caused damages to the Receiver and the Committee.

## PUNITIVE DAMAGES

118. The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of §41.003, TEX. CIV. PRAC. & REM. CODE. Plaintiff is entitled to recover punitive damages in an amount necessary to punish Defendants and to deter similar conduct of others in the future.

## CONDITIONS PRECEDENT

119. All conditions precedent to filing this Complaint have been met.

## JURY DEMAND

120. Plaintiff demands a jury trial.

## PRAYER

WHEREFORE, the Committee requests that SG PRIVATE BANKING (SUISSE) S.A. and BLAISE FRIEDLI be summoned to answer this Complaint, that the case be tried before a jury, and that upon final judgment the Committee recover its damages as alleged herein, including its actual damages, punitive damages, and its costs and expenses of suit, including reasonable attorneys' fees. The Committee prays for such other relief to which it may be justly entitled.

Dated:  December 14, 2012                    Respectfully submitted,


                                             BUTZEL LONG, a professional corporation

                                                 By: /s/ Peter D. Morgenstern
                                                 Peter D. Morgenstern (pro hac vice)
                                                 380 Madison Avenue, 22nd Floor
                                                 New York, NY 10017
                                                 Telephone: (212) 818-1110
                                                 Facsimile: (212) 818-0494
                                                 morgenstern@butzel.com


                                             ONE OF THE ATTORNEYS FOR
                                             THE OFFICIAL STANFORD INVESTORS COMMITTEE


                                             FRIEDMAN KAPLAN SEILER & ADELMAN LLP
                                             Scott M. Berman
                                             7 Times Square
                                             New York, NY 10036-6516
                                             Telephone: (212) 833-1100
                                             Facsimile: (212) 833-1250

                                             Of Counsel

## <u>REQUEST PURSUANT TO LOCAL RULE 83.10</u>

       The undersigned hereby requests leave to appear in this case without local counsel.  The undersigned has been admitted pro hac vice as counsel to the class plaintiffs in the underlying *Rotstain* case; is a member of and counsel to the Official Stanford Investors Committee in numerous actions; appears regularly with other duly admitted attorney-members of the Committee before this Court in connection with such matters; and is prepared to appear personally for all conferences and hearings in this action.

/s/ *Peter D. Morgenstern*    <br>
Peter D. Morgenstern
