IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, *et al.*, § | | |
| § | | |
| Plaintiffs, § | | |
| § | | |
| v. § | | Civil Action No. 3:09-CV-2384-N |
| § | | |
| TRUSTMARK NATIONAL BANK, *et al.*, § | | |
| § | | |
| Defendants. § | | |

# **ORDER**

This Order addresses the Rule 12(b)(2) motions to dismiss for lack of personal jurisdiction of defendants HSBC Bank PLC ("HSBC"), Societe Generale Private Banking (Suisse) S.A. ("SG"), and Blaise Friedli (collectively, the "Foreign Defendants").[1] [docs. 28, 32, 155, 157, 160]  The Foreign Defendants claim that notwithstanding their solicitation of Stanford's business in Texas, their regular communications with Stanford personnel in Texas, the flow of millions of dollars to and from Stanford, their travel to Texas in connection with those banking relationships, the substantial revenue they received from Stanford in Texas, and in the case of HSBC, its Texas branches that supported that relationship, they cannot be held accountable in Texas.  Because the Court finds that the Foreign Defendants have sufficient minimum contacts with Texas, the Court denies the motions to dismiss.

---

[1]The Court will address the related Rule 12(b)(6) motions to dismiss by separate order.

ORDER – PAGE 1

## I. BACKGROUND

### *A. Procedural Background*

This case arises out of the Stanford Ponzi scheme. On February 16, 2009, the Securities and Exchange Commission filed a lawsuit against R. Allen Stanford and others alleging that Stanford, through a variety of entities, operated a massive Ponzi scheme. This Court appointed Ralph S. Janvey to serve as Receiver for the Stanford entities, and take control of the Receivership Assets and the Receivership Records. *See* Second Am. Order Appointing Receiver, July 19, 2010 [1130] (the "Receivership Order"), *in SEC v. Stanford Int'l Bank*, Civil Action No. 3:09-CV-0298-N (N.D. Tex. filed Feb. 17, 2009). The Receivership Order vested the Receiver with "the full power of an equity receiver under common law as well as such powers as are enumerated" in the Receivership Order. *Id.* at 3. Among these enumerated powers, the Court "authorized [the Receiver] to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." *Id.* at 4. Additionally, the Court "specifically directed and authorized [the Receiver] to . . . [c]ollect, marshal, and take custody, control, and possession of all the funds, accounts, mail, and other assets of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated," *id.*, and to file in this Court "such actions or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." *Id.* at 5.

The Court also, by substantial agreement of the interested parties, appointed the Official Stanford Investors Committee, to act much like a creditors' committee in a bankruptcy proceeding. *See* Order, Aug. 10, 2010 [1149] (the "OSIC Order"), *in SEC v. Stanford Int'l Bank*, *supra*.

By Order dated October 6, 2009, the Judicial Panel on Multidistrict Litigation centralized various litigation arising out of the Stanford Ponzi scheme. *In re: Stanford Entities Sec. Lit.*, 655 F. Supp. 2d 1360 (J.P.M.L. 2009). This case was originally filed in state court in Harris County, Texas by Plaintiff Rotstain as a putative class action against various financial institutions accused of aiding Stanford with his Ponzi scheme. Defendants removed to federal court [1], and by Order dated November 24, 2009, the JPML transferred the case to this Court. [6]  By Order dated December 6, 2012, the Court granted OSIC's motion to intervene as plaintiff. [129] The Foreign Defendants have moved to dismiss both the original plaintiffs' complaint and OSIC's amended complaint against them for lack of personal jurisdiction.

### B. The Operation of the Stanford Ponzi Scheme

Stanford operated, directly or indirectly, a network of over 100 interrelated companies in over 13 countries to perpetrate his Ponzi scheme.[2]  *See generally* Order, July 30, 2012 [176] (the "COMI Order"), *in In re Stanford Int'l Bank, Ltd.*, Civil Action No. 3:09-CV-0721-N (N.D. Tex.). Stanford International Bank, Ltd., operating out of Antigua and

---

[2]Unless otherwise required for clarity, the Court will refer to Stanford individually and his enterprise collectively as "Stanford."

Barbuda, issued CDs that purported to be backed by Stanford's investment in high quality securities and thus offered too-good-to-be-true above market returns at low risk. Stanford marketed the CDs through an international network of financial advisors. In fact, the proceeds of CD sales went to: pay back earlier investors, pay above-market commissions to financial advisors, subsidize Stanford's extravagant lifestyle, a variety of risky and speculative private capital investments, and the overhead to keep up the sham appearance of Stanford's financial empire. In total, the Stanford Ponzi scheme took in approximately $7 billion, of which relatively little has been recovered, devastating the lives of investors in the United States (including Texas), in Latin America, and around the world. This Court and the Fifth Circuit have repeatedly held that Stanford operated a Ponzi scheme. *See, e.g.*, *Janvey v, Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) ("We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme."). This Court has also held that, notwithstanding the appearance of multiple legal entities, Stanford's financial empire was a single business enterprise centered in Houston, Texas. *See* COMI Order 36, 41-42.

## II. BASICS OF PERSONAL JURISDICTION

A nonresident defendant is subject to the jurisdiction of a federal court sitting in diversity if (1) the forum state's long-arm statute confers personal jurisdiction over that defendant, and (2) exercise of personal jurisdiction by the forum state is consistent with due process under the United States Constitution. *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 418 (5th Cir. 1993). The Texas long-arm statute confers jurisdiction to the limits of the Constitution. *See id.*; *Hall v. Helicopteros Nacionales de Colombia, S.A.*, 638 S.W.2d

870, 872 (Tex. 1982), *rev'd on other grounds*, 466 U.S. 408 (1984). The Court, therefore, need concern itself only with the federal due process inquiry. *See Aviles v. Kunkle*, 978 F.2d 201, 204 (5th Cir. 1992).

The Due Process Clause of the Fourteenth Amendment limits the reach of a state court's – and thus a federal court's – jurisdiction over a nonresident defendant. *See Shaffer v. Heitner*, 433 U.S. 186, 207 (1977). Specifically, due process requires that two elements be satisfied. First, the nonresident must have purposefully established "minimum contacts" in the forum state such that he should reasonably anticipate being haled into court in the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). Second, the exercise of personal jurisdiction must "comport with 'fair play and substantial justice.'" *Id.* at 476 (quoting *Int'l Shoe*, 326 U.S. at 320). The minimum contacts analysis required by due process ensures that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Id.* at 472 (quoting *Shaffer*, 433 U.S. at 218 (Stevens, J., concurring), alteration in original).

"There are two types of 'minimum contacts': those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction." *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001). Specific jurisdiction exists if (1) the cause of action is related to, or arises from, the defendant's contacts with the forum, and (2) those contacts meet the due process standard. *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 777 (5th Cir. 1986).

ORDER – PAGE 5

General jurisdiction, on the other hand, exists where the claim is unrelated to the nonresident's contacts with the forum, but where those contacts are "continuous and systematic." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984) (citation omitted). A court may assert general jurisdiction over a foreign corporation "to hear any and all claims against" it only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive "as to render [it] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011); *accord Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014). Under either a general or specific jurisdiction analysis, however, "[t]he constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Stuart v. Spademan*, 772 F.2d 1185, 1191 (5th Cir. 1985) (quoting *Burger King*, 471 U.S. at 474).

When considering specific jurisdiction in connection with a claim for tortious conduct, "a single act by [a defendant] directed toward Texas that gives rise to a cause of action by [plaintiff] can support a finding of minimum contacts." *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 211 (5th Cir. 1999); *see also Ruston*, 9 F.3d at 419 ("A single act by the defendant directed at the forum state, therefore, can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted."). In that circumstance, it is not a "fortuity" that the injured party is in Texas. "If this argument were valid in the tort context, the defendant could mail a bomb to a person in Texas but claim Texas had no jurisdiction because it was fortuitous that the victim's zip code was in Texas. It may have been fortuitous, but the tortious nature of the directed activity constitutes purposeful availment." *Wien Air*, 195 F.3d

at 213. It also does not matter if the tortious conduct took place out of state if the intended harm results in Texas. *See, e.g.*, *Aerotech Holdings, Inc. v. Alliance Aero. Eng'g, LLC*, 650 F. Supp. 2d 594, 599 (N.D. Tex. 2009); *Pension Advisory Grp. Ltd. v. Country Life Ins. Co.*, 771 F. Supp. 2d 680, 694 (S.D. Tex. 2011). The Supreme Court has recently clarified, however, "that mere injury to a forum resident is not a sufficient connection to the forum" for specific jurisdiction. *Walden v. Fiore*, 134 S. Ct. 1115, 1125 (2014). "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.*

A court must consider the totality of the circumstances of a case when making the purposeful availment inquiry, as "no single factor, particularly the number of contacts, is determinative." *Stuart*, 772 F.2d at 1192. "[W]hether the minimum contacts are sufficient to justify subjection of the non-resident to suit in the forum is determined not on a mechanical and quantitative test, but rather under the particular facts upon the quality and nature of the activity with relation to the forum state." *Miss. Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1006 (5th Cir. 1982). *See also Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 115 (1987) (court should exercise great care when asserting personal jurisdiction over foreign defendant).

Plaintiffs, as the parties seeking to invoke the Court's power, bear the burden of establishing the Court's jurisdiction over the Foreign Defendants. *See Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 219 (5th Cir. 2012) (citing cases). If a district court, as here, decides a motion to dismiss without holding an evidentiary hearing,

ORDER – PAGE 7

a prima facie case suffices to establish jurisdiction. *See Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994) (citing *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985)). A court must take uncontroverted allegations in the complaint as true, and it must resolve all factual conflicts favor of the plaintiff. *Pervasive Software*, 688 F.3d at 219-20 (citing *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004)). In deciding the motion, a court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 344 (5th Cir. 2002) (quoting *Thompson*, 755 F.2d at 1165). "But even if the court receives discovery materials, unless there is a full and fair hearing, it should not act as a fact finder and must construe all disputed facts in the plaintiff's favor and consider them along with the undisputed facts." *Walk Haydel & Assocs. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008).

### III. THE FOREIGN DEFENDANTS HAVE MINIMUM CONTACTS WITH TEXAS

#### *A. SG and Friedli Have Minimum Contacts with Texas*

SG is a Swiss bank and longtime banker to Stanford. Friedli is an SG employee who was point person for SG's banking relationship with Stanford.[3] Plaintiffs allege that SG played an important role in the operation of Stanford's Ponzi scheme. SG: (1) provided discretionary brokerage, investment management, and merchant banking services to multiple Stanford entities, managing hundreds of millions of dollars of CD proceeds; (2) maintained and facilitated a secret slush fund account holding hundreds of millions of dollars for

---

[3]Friedli was acting as SG's agent and his contacts are therefore attributable to SG.

Stanford, which was not on Stanford's books, that was used in dispensing substantial bribes to Stanford regulators and auditors so they would conceal the existence of the Ponzi scheme from the public; (3) made numerous communications with Stanford employees and agents in Texas; (4) made numerous multi-million dollar wire transfers for Stanford in and out of Texas; (5) through Friedli, traveled twice to Houston to meet with Stanford regarding Stanford business; (6) through Friedli, served on Stanford's International Advisory Board; and (7) as discussed below, fraudulently conveyed $95 million of investor proceeds to itself as the Ponzi scheme was about to collapse, causing injury to Stanford in Texas.[4] The result of these activities were a variety of fraudulent transfers causing injury to both Stanford in Texas, *see Janvey v. Democratic Senatorial Campaign Comm., Inc*, 712 F.3d 185 (5th Cir. 2013) (holding Receiver could assert fraudulent transfer claims on behalf of Stanford entities), and to Stanford's Texas investors.[5]

In particular, in 2004, Stanford obtained a $95 million personal loan from SG, secured by investor funds in the secret slush account. Stanford used the loan proceeds for his personal benefit. In late 2008, when the Ponzi scheme was about to unravel, SG repaid itself by deducting $95 million in funds from the slush account, which SG knew was funded by CD proceeds. Plaintiffs allege this fraudulent transfer injured Stanford in Texas.

---

[4]Plaintiffs also refer to an unsigned contract found in Stanford's records under which Friedli would personally provide consulting services to Stanford. Because the document is unsigned and there is no context for it, the Court does not give it any weight.

[5]SG and Friedli of course deny these accusations, but the Court must resolve all factual disputes in this context in favor of Plaintiffs.

ORDER – PAGE 9

Considering these contacts as a whole, they are amply more than enough minimum contacts to support specific personal jurisdiction.

### B. HSBC Has Minimum Contacts with Texas

HSBC is a London-based bank with substantial international operations, including various offices in Texas.[6] When Stanford first explored a banking relationship with HSBC, HSBC touted its "local relationship team" as adding value. Stanford explored the possibility of storing rare coins at HSBC's Houston branch. During the relationship, HSBC regularly communicated with Stanford personnel in Houston. Finally, multiple HSBC employees made multiple trips to Texas to visit Stanford personnel. Plaintiffs' claims against HSBC arise out of those contacts. Additionally, as with SG, these contacts resulted in fraudulent transfers (taking Plaintiffs' contentions at face value) causing injury to Stanford in Texas and to Stanford's Texas investors. The Court holds that these are sufficient minimum contacts to support specific personal jurisdiction.

### IV. THE EXERCISE OF JURISDICTION OVER THE FOREIGN DEFENDANTS WOULD COMPORT WITH FAIR PLAY AND SUBSTANTIAL JUSTICE

Finally, the Court finds that the exercise of jurisdiction comports with due process. Once minimum contacts are found, as here, "it is rare to say the assertion [of jurisdiction] is unfair." *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009) (quoting *Wien Air*, 195 F. 3d at 215, alteration in original). "In this inquiry we examine five factors: '(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in

---

[6]In addition to branches, HSBC also had approximately ten credit centers in Texas in late 2006.

securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies.' " *Id.* at 760 (quoting *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 473 (5th Cir. 2006)).

There would certainly be some burden for the Foreign Defendants to defend this case in Texas. However, they are substantial commercial entities (or the employee of one) and can certainly afford that burden. Moreover, travel to Texas was not a significant burden when they were seeking business from Stanford. Additionally, HSBC has extensive operations in the United States and Texas, and has initiated litigation in the United States when it was to its advantage to do so.[7] The forum state, Texas, certainly has an interest in this dispute, as Stanford's empire was centered here and run from here and Texas investors suffered losses from the Ponzi scheme. The Plaintiffs are substantially interested in this forum as they might as a practical matter be unable to seek relief in Switzerland and England. The interest of efficient administration of justice favors resolving this dispute here under the auspices of the MDL, as evidenced by the JPML's orders centralizing Stanford litigation and transferring this case to this Court for pretrial proceedings. Finally, the shared interest of the several states in providing a remedy for the victims of Ponzi schemes favors maintaining this action here rather than requiring investors to commence separate actions in Switzerland and England.

---

[7]*See HSBC Bank PLC v. Goldstein*, 155 F. App'x 923 (7th Cir. 2005); *In re HSBC Bank PLC*, 2007 WL 2936648 (D. Colo. 2007).

The Court thus finds that maintaining this action against the Foreign Defendants does not offend traditional notions of fair play and substantial justice.

## CONCLUSION

The Foreign Defendants availed themselves of the privilege of doing business with Stanford in Texas in order to obtain significant revenue from Stanford. Plaintiffs contend that the Foreign Defendants' relationship with Stanford enabled the Ponzi scheme to continue on, undetected, to the financial ruin of Stanford and Stanford's investors, many of whom are also from Texas. The Foreign Defendants cannot complain of being haled into a Texas court to defend their actions. The Court denies the Foreign Defendants' motions to dismiss for lack of personal jurisdiction.

Signed June 5, 2014.

_____
David C. Godbey
United States District Judge