TO BE FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEGGY ROIF ROTSTAIN, et al. on behalf of §
themselves and all others similarly situated, §
                                          §   Civil Action No 3:09-CV-02384-N-BG
          Plaintiffs,                     §
                                          §   Judge: Hon. David C. Godbey
v.                                        §
                                          §   Mag.: Hon. Nancy M. Koenig
TRUSTMARK NATIONAL BANK, ET AL.,          §
                                          §
          Defendants.                     §
                                          §

## PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

**Fishman Haygood, L.L.P.**
James R. Swanson
Lance C. McCardle
Benjamin D. Reichard
201 St. Charles Ave. Ste. 4600
New Orleans, LA 70170

**Butzel Long, P.C.**
Peter D. Morgenstern
Joshua E. Abraham
230 Park Ave. Ste. 850
New York, NY 10169

*Attorneys for the Plaintiffs*

Eric Seiler
Scott M. Berman
**Friedman Kaplan Seiler &
Adelman, L.L.P.**
7 Times Square
New York, NY 10036-6516

*Of Counsel*

# TABLE OF CONTENTS

*Page*

ABBREVIATIONS .................................................................................................................. iv

I. INTRODUCTION. ................................................................................................................. 1

II. PARTIES. ............................................................................................................................. 7

A.  Plaintiffs. ........................................................................................................................... 7

B.  Defendants. ........................................................................................................................ 8

C. Relevant Non-Parties. ........................................................................................................ 9

III. JURISDICTION AND VENUE. ...................................................................................... 11

IV. FACTUAL ALLEGATIONS. ........................................................................................... 12

A.  Allegations Common to the Class. .................................................................................. 12

1.  The Applicable Banking Standards. ................................................................................. 13

a.  Worldwide Banking Industry Standards. ......................................................................... 13

b.  U.S. Standards. ................................................................................................................. 15

c.  Canadian Standards. ......................................................................................................... 21

d.  U.K. Standards. ................................................................................................................ 23

e.  Swiss Standards. ............................................................................................................... 27

2.  The Stanford Scheme. ...................................................................................................... 28

a.  Origins and History of SIBL. ........................................................................................... 28

b.  SIBL's Uniform Marketing Omitted Key Facts. .............................................................. 31

c.  SIBL CD Sales. ................................................................................................................ 39

d.  The Inner Operations of the Fraud. .................................................................................. 40

e.  The Houston Headquarters of the Fraud. .......................................................................... 42

f.  The Inevitable Collapse. ................................................................................................... 44

3.  Defendants' Integral Role in Assisting the Fraud. ........................................................... 49

4.  The Information Defendants were Charged with Knowing. .............................................. 52

a.  Industry Information Available to Defendants. ................................................................. 52

b.  Others Concluded that Stanford Should be Avoided. ....................................................... 60

     i.   The SEC. ................................................................................................................ 60

     ii.  Pershing, L.L.C. .................................................................................................... 61

     iii. Chase Manhattan Bank. ......................................................................................... 62

iv. Bank of America. ............................................................................... 62

v. NASD. ............................................................................................... 63

vi. U.S. Customs. ................................................................................... 64

5. Defendants' Banking Relationships with R.A. Stanford and Stanford Entities. .................. 65

6. Defendants' Respective Roles in the Fraud. ........................................................ 68

a. Trustmark's Role. ................................................................................ 68

    i. The Trustmark Relationship. ..................................................... 68

    ii. Account Activity at Trustmark Demonstrating its Knowledge of the Fraud. ........... 72

b. SG Suisse's Role. ................................................................................ 79

    i. SG Suisse's Management of Assets. ............................................. 79

    ii. R.A. Stanford's Personal Banker and Confidante − Blaise Friedli. ......................... 80

    iii. R.A. Stanford's "Slush Fund." ................................................... 82

    iv. SG Suisse Effects Improper Transfers of CD Funds to R.A. Stanford. ..................... 84

    v. SG Suisse Transfers Funds from Account ▓ to Bribe Stanford's Auditors. ........... 86

    vi. SG Suisse and Friedli Ignore Other Significant Red Flags. ...................... 88

    vii. The $95 million transfer from SFGL to SG Suisse. ................................ 91

    viii. Banking and Management Fees. ............................................. 92

c. TD Bank's Role. ................................................................................ 93

    i. History of TD Bank's Relationship with the Stanford Entities. ................................ 93

    ii. TD Bank's Close Relationship with Stanford Personnel. ........................... 96

    iii. Account Activity at TD Bank Demonstrating its Knowledge of the Fraud. .............. 99

d. BoH's Role. ................................................................................ 103

    i. The BoH Relationship. ............................................................. 104

    ii. Account Activity at BoH Demonstrating its Knowledge of the Fraud. .................... 105

e. HSBC's Role. ................................................................................ 110

    i. The HSBC Relationship. ............................................................. 110

    ii. Account Activity at HSBC Demonstrating Its Knowledge of the Fraud. ............... 112

B. Class Action Allegations. ................................................................. 117

V. CAUSES OF ACTION. ................................................................. 119

A. (Count 1) Common Law Aiding, Abetting, or Participation in a Fraudulent Scheme (Against All Defendants). ................................................................. 120

B.   (Count 2) Aiding, Abetting or Participation in Violations of the Texas Securities Act (Against All Defendants). ......................................................................................................... 121

C.   (Count 3) Aiding, Abetting, or Participation in Breach of Fiduciary Duty (Against All Defendants). .................................................................................................................................. 123

D.   (Count 4) Aiding, Abetting, or Participation in Conversion (Against All Defendants)...... 124

E.   (Count 5) Civil Conspiracy (Against All Defendants). ...................................................... 125

JURY DEMAND ......................................................................................................................... 126

PRAYER FOR RELIEF .............................................................................................................. 126

## **ABBREVIATIONS**

<u>AML</u> – Anti-money Laundering

<u>BOA</u> – Bank of Antigua

<u>BoH</u> – Independent Bank, formerly known as Bank of Houston

<u>BSA</u> – Bank Secrecy Act

<u>CDs</u> – Certificates of Deposit

<u>FACML</u> - Federal Action Combating Money Laundering and Terrorist Financing in the

Financial Sector

<u>FATF</u> – Financial Action Task Force

<u>FFIEC</u> – Federal Financial Institutions Examination Council

<u>FSRC</u> – Financial Services Regulatory Commission

<u>HSBC</u> – HSBC Bank, plc

<u>JMLSG</u> – Joint Money Laundering Steering Group

<u>KYC</u> – Know Your Customer

<u>OCC</u> – United States Office of the Comptroller of Currency

<u>OSFI</u> – Office of the Superintendent of Financial Institutions

<u>PCMLFTA</u> – Proceeds of Crime (Money Laundering) and Terrorist Financing Act

<u>POCA</u> – Proceeds of Crime Act 2002

<u>SEC</u> – United States Securities and Exchange Commission

<u>SG Suisse</u> – Société Générale Private Banking (Suisse) S.A.

<u>SFG</u> – Stanford Financial Group

<u>SFIS</u> – Stanford Fiduciary Investor Services

<u>SGC</u> – Stanford Group Company

<u>SIBL</u> – Stanford International Bank, Ltd.

<u>R.A. Stanford</u> – Robert Allen Stanford

<u>Stanford Entities</u> – the affiliated companies that R.A. Stanford owned and controlled

<u>TD Bank</u> – Toronto-Dominion Bank

<u>Trustmark</u> –Trustmark National Bank

Plaintiffs Steven Queyrouze, Guthrie Abbott, Salim Estefenn Uribe, Sarah Elson-Rogers, Diana Suarez, and Ruth Alfille de Penhos (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, as and for their Second Amended Class Action Complaint against Defendants Trustmark National Bank ("Trustmark"), HSBC Bank, Plc ("HSBC"), The Toronto-Dominion Bank ("TD Bank"), Société Générale Private Banking (Suisse), S.A. ("SG Suisse"), Blaise Friedli ("Friedli"), and Independent Bank f/k/a Bank of Houston ("BoH") (collectively, "Defendants"), allege as follows:

## I. INTRODUCTION.

1.

On February 17, 2009, the news broke that the mighty financial empire of Robert Allen Stanford ("R.A. Stanford") was nothing more than a façade of wealth and prestige, as insubstantial as the morning mist; and as that mist evaporated in a matter of hours, so too did the value of Plaintiffs' investments in the certificates of deposit ("CDs") issued by R.A. Stanford's Stanford International Bank, Ltd. ("SIBL"). The SIBL CDs were the engine of an operation that this Court has determined was a Ponzi scheme.

2.

If Plaintiffs had known that SIBL CDs were part of a giant Ponzi scheme, they would not have invested their money in those CDs. Plaintiffs did not and could not have known that there was a gaping hole in SIBL's balance sheet—a hole that emerged from the outset and only widened because for years R.A. Stanford and his confidants secretly used SIBL CD investor funds for vice, vanity, and speculative personal business ventures cooked up by R.A. Stanford.

For example, Plaintiffs did not know that: hundreds of millions of dollars[1] of SIBL CD deposits were funneled to two money-losing Caribbean airlines; hundreds of millions of dollars more of SIBL CD deposits funded at least six private planes, four yachts, and a separate Venezuelan bank owned by R.A. Stanford; tens of millions of dollars of SIBL CD deposits funded R.A. Stanford's personal purchase of two islands to construct a resort that he envisioned catering to the super wealthy elite, with the cheapest homes starting at $50 million; and huge sums of investor deposits simply sat idle, like cash stuffed in a mattress, uninvested in anything at all. Plaintiffs did not know that at least $2 billion of SIBL deposits were frittered away. Nor did Plaintiffs know that, as a result of such criminal profligacy, the assets that SIBL claimed would repay their principal and interest were largely a fiction.

3.

This case is directed against the five banks that did know. Over the course of many years, Defendants could see what Plaintiffs could not—that SIBL was operated as R.A. Stanford's personal piggy bank, that as quickly as SIBL CD money flowed into SIBL, it flowed back out to the other Stanford Entities (*e.g.*, Stanford Financial Group ["SFG"], Bank of Antigua ["BOA"], Stanford Group Company ["SGC"], Stanford Fiduciary Investor Services ["SFIS"], Stanford Group Capital Management, Caribbean Sun Airlines, and dozens of others) in large, round sums, and that there was no way for SIBL's business model to succeed with the way it treated (and mis-treated) SIBL CD funds.

4.

A common set of banking standards applicable to all Defendants required that they know and understand the history and operations of R.A. Stanford, SIBL, and the other Stanford

---

[1] All references herein to "dollars" are to U.S. dollars, unless otherwise specified.

Entities. Knowing what they did about the misuse of SIBL CD investor funds, Defendants should have frozen the accounts of the Stanford Entities and severed the banking relationship, as others before them had done. But their close relationship with such a wealthy, high-profile customer who provided substantial revenue led them to paper over R.A. Stanford's fraud. R.A. Stanford and SIBL, in turn, used each Defendants' good names and reputations to lend an air of credibility and legitimacy to the SIBL CD program. Each Defendant, however, betrayed its public standing by helping R.A. Stanford misappropriate SIBL investors' funds.

5.

Trustmark's relationship with R.A. Stanford and his employees was deep and incestuous, extending back to the late 1990s under Trustmark's predecessor, Republic National Bank. Trustmark presided over hundreds of millions of dollars' worth of unusual check "pouching" activity, wherein investors' checks to purchase SIBL CDs were bundled by the dozen on a daily basis and mailed in pouches from Houston to Antigua and back to Houston. Trustmark knew the purported nature of SIBL's business and, through the dozens of accounts it held for various Stanford Entities, it could see that SIBL CD investor funds were routinely transferred in large, round sums to other Stanford Entities in order to fund those entities. Trustmark bent over backwards to accommodate and appease its client, both from an account management perspective and from a regulatory compliance perspective. R.A. Stanford's empire was a hugely important client relationship to Trustmark; Trustmark did as it was told.

6.

TD Bank's relationship with R.A. Stanford dated back to the early 1990s and involved the largest sums of money handled by any Defendant. Billions of dollars in SIBL CD investor funds flowed into TD Bank via wire transfer, but were never invested in sufficient volume or in a

proper fashion to come close to earning the returns that TD Bank knew SIBL had promised its investors. For many years, TD Bank held deep and abiding suspicions about the legitimacy of R.A. Stanford and the SIBL CD program. The frequent withdrawals and deposits of huge round sums in the tens of millions of dollars should have been enough to prompt serious action, and the transfer of investor funds to other Stanford Entities that SIBL never disclosed to its investors was a clear theft of investor funds. But TD Bank would not extricate itself; SIBL had become its largest correspondent banking client, and TD Bank did not want to lose that important and lucrative relationship.

7.

HSBC handled the purchases of SIBL CD investors in Euros and Pounds Sterling. SIBL's relationship with HSBC was peculiar and inexplicable. For most of SIBL's relationship with HSBC, investor funds were simply deposited into SIBL's accounts and then those funds mostly sat there uninvested and unable to earn the returns that HSBC knew had been promised to investors. SIBL CD investors could have done nearly as well for themselves simply by placing their money in a standard savings account at their local bank. SIBL CD investors could not have known this, but it was plain as day to HSBC, and it ran directly contrary to what SIBL said to HSBC it would do with investor funds. HSBC frequently chatted and visited with high-ranking employees of the Stanford Entities and even sought on more than one occasion to expand its banking relationship with the Stanford Entities. Obviously, HSBC knew that it had no ordinary customer on its hands, and it knew that SIBL CD funds were being misused; but it could not bear to lose the business that SIBL and the other Stanford Entities provided.

8.

When BoH received business from the Stanford Entities, its deposits suddenly doubled overnight. The relationship at BoH was a carry-over from Trustmark—one of SIBL's close confidantes at Trustmark, Dennis Watson, moved to BoH and attracted a large volume of Stanford Entity business with him. He also transferred to BoH an attitude that put the Stanford Entities' aims first, ahead of BoH's own regulatory obligations. BoH regularly received enormous transfers of money from SIBL accounts at other banks. BoH knew that these were transfers of SIBL CD investor funds, but BoH, like Trustmark, readily facilitated the transfer of investor funds to other Stanford Entities that provided no value whatsoever to investors. The banking relationship proved such a bonanza for the relatively tiny BoH that it was unwilling to stand up to the Stanford Entities.

9.

SG Suisse maintained the longest-standing relationship with the Stanford Entities and with R.A. Stanford personally, dating to the late 1980s through its predecessor Compagnie Bancaire Genève. SG Suisse hosted R.A. Stanford's secret "slush fund," which was held off the books of any of the Stanford Entities. That slush fund provided tens of millions of dollars of personal payments to R.A. Stanford. It also provided bribe payments to SIBL's auditor and to regulators. None of these payments were reflected in SIBL's annual reports, nor were the personal loans that SG Suisse made to R.A. Stanford that were secured by SIBL CD investor assets. Thus, it was clear to SG Suisse that R.A. Stanford was using investor funds in a way that was not revealed to investors, and in a way that was obviously improper and incongruent with SIBL's purported business. But R.A. Stanford's longstanding close personal relationship with SG Suisse Vice President Blaise Friedli held sway and prevented SG Suisse from applying what

it knew to prevent the theft of investor funds. Indeed, as SG Suisse became aware that the Stanford empire was beginning to crumble, it called a $95 million personal loan to R.A. Stanford, which was repaid to SG Suisse with what it knew were SIBL CD investor assets.

10.

In short, Defendants smelled the smoke and saw the fire that was the Stanford Fraud, but, reaping financial gain, they allowed the fire to grow and rage, and ultimately consume all the innocent investors in its path. Plaintiffs and the Class seek damages from Defendants for their knowing and substantial assistance to R.A. Stanford's theft and diversion of billions of dollars of investor funds.

11.

Plaintiffs submit this Second Amended Complaint to substitute and add Class Plaintiffs, in accordance with their Motion to Substitute Plaintiffs filed on April 15, 2015. In addition, Plaintiffs submit this Second Amended Complaint to supply additional detail to the facts already presented or incorporated by reference into the First Amended Class Action Complaint, and to bring Plaintiffs' allegations into conformity with the allegations in the complaints filed by Intervenor OSIC, which allegations were incorporated by reference into the First Amended Complaint pursuant to this Court's Order Granting Plaintiffs' Motions for Leave to Amend dated August 25, 2014 [Doc. No. 212]. Those allegations were the subject of the Court's recent Order on Defendants' Motions to Dismiss [Doc. No. 234], which granted in part and denied in part Defendants' motions. Accordingly, Plaintiffs' Second Amended Complaint is pleaded in conformity with the Court's Order dismissing Plaintiffs' claims alleged under the Texas Uniform Fraudulent Transfer Act. In addition, Plaintiffs reassert and specify their legal claims against all

Defendants arising from the factual situation described in Plaintiffs' Original and First Amended Class Action Complaints and amplified herein.

## II. PARTIES.

### A. Plaintiffs.

12.

Plaintiff Steven Queyrouze is a citizen of the United States residing in Louisiana. He purchased at least two SIBL CDs. He has submitted a claim relating to those SIBL CDs to the U.S. Receiver that has been recognized.

13.

Plaintiff Guthrie Abbott is a citizen of the United States residing in Mississippi. He purchased at least five SIBL CDs. He has submitted a claim relating to those SIBL CDs to the U.S. Receiver that has been recognized.

14.

Plaintiff Sarah Elson-Rogers is a citizen of the United Kingdom residing in North Carolina. She purchased at least three SIBL CDs. She has submitted a claim relating to those SIBL CDs to the U.S. Receiver that has been recognized.

15.

Plaintiff Diana Suarez is a citizen of Venezuela residing in Florida. She purchased at least two SIBL CDs. She has submitted a claim relating to those SIBL CDs to the U.S. Receiver that has been recognized.

16.

Plaintiff Salim Estefenn Uribe is a citizen of Colombia residing in Colombia. He purchased at least four SIBL CDs. He has submitted a claim relating to those SIBL CDs to the U.S. Receiver that has been recognized.

17.

Plaintiff Ruth Alfille de Penhos is a citizen of Mexico residing in Mexico. She purchased at least five SIBL CDs. She has submitted a claim relating to those SIBL CDs to the U.S. Receiver that has been recognized.

18.

Plaintiffs are each members of the Class, as defined below.

**B. Defendants.**

19.

Defendant TD Bank is a banking corporation incorporated in Canada.

20.

Defendant HSBC is an international bank with its registered office and principal place of business located at 8 Canada Square, London E14 5HQ, England.

21.

Defendant Trustmark is a national banking association chartered by the Office of the Comptroller of the Currency pursuant to the applicable laws of the United States of America and the related rules promulgated by the Office of the Comptroller of the Currency. Trustmark's corporate headquarters and principal place of business are located in Jackson, Mississippi. Trustmark is "located" in and is a citizen of the State of Mississippi, although Trustmark also

maintains offices in Harris County, Texas, and in other jurisdictions.

22.

Defendant BoH was a state, non-member bank, chartered and regulated by the Texas Department of Banking, and subject to regulation by its primary federal regulator, the Federal Deposit Insurance Corporation ("FDIC"). BoH was also subject to the regulations of the Federal Reserve System by virtue of its deposit and lending activities. BoH was acquired by Independent Bank on April 16, 2014, which has its principal place of business at 750 Bering Drive, Suite 100, Houston, Texas 77057.

23.

Defendant SG Suisse is a banking corporation organized under Swiss law. SG Suisse maintains offices in the United States.

24.

Defendant Blaise Friedli is a citizen and resident of Switzerland.

**C. Relevant Non-Parties.**

25.

R.A. Stanford is a citizen of the United States and Antigua. He was the sole owner, directly or indirectly, of more than 130 separate Stanford Entities.

26.

SFG was a company incorporated in Florida and the Caribbean island nation of Antigua, with its headquarters and principal place of business located in Houston, Texas. From its Houston headquarters, SFG provided its affiliated companies in the financial services industry with a variety of services, including accounting and investment services. R.A. Stanford was the

founder and sole shareholder of SFG and affiliates, including SIBL and SGC.

27.

SIBL was an offshore bank that ostensibly operated on the island of Antigua and primarily sold certificates of deposit ("CDs") that promised higher rates of return than CDs sold in the United States. R.A. Stanford was the sole owner and shareholder of SIBL.

28.

The members of SIBL's Board of Directors were R.A. Stanford, James A. Stanford (R.A. Stanford's father), James Davis, Sir Courtney N. Blackman, O.Y. Goswick, Kenneth C. Allen, and Robert S. Winter. R.A. Stanford was the Chairman of the Board of Directors and Sir Courtney N. Blackman, an independent director and former Governor to the Central Bank for Barbados, served as the Vice Chairman.

29.

SIBL and its affiliates also had an advisory board—the Stanford International Advisory Board—comprised primarily of politicians and former businesspeople. Blaise Friedli, SG Suisse's Executive Vice President, served on this board, which met as recently as September 25, 2008 in New York City with Friedli in attendance.

30.

Stanford Group Company ("SGC") was a Houston-based entity, founded in or around 1995, which operated as a broker-dealer and investment advisor. Financial advisors who worked for SGC sold SIB CDs to potential investors in the United States.

31.

James M. Davis ("Jim Davis"), a citizen of the United States, was the Chief Financial Officer for SFG and SIBL.

32.

Laura Pendergest-Holt ("Holt"), a citizen of the United States, was the Chief Investment Officer for SFG.

## III. JURISDICTION AND VENUE.

33.

This Court has jurisdiction over this action, and venue is proper, under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

34.

This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. §1332(d)(2)(A) because this action is a class action in which the amount in controversy exceeds $5,000,000.00 and is a class in which some members of the Plaintiff class are citizens and residents of states and countries different from Defendants.

35.

Further, this Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(C) and 28 U.S.C. §§ 754 and 1692.

36.

The Court also has personal jurisdiction over Defendants because Defendants regularly conducted business in Texas and/or engaged in continuous and systematic activities within Texas; committed tortious acts directed towards Texas; and/or aided and abetted violations of the Texas Securities Act.

37.

Texas was the epicenter of the Stanford Entities with whom Defendants regularly

conducted business. *See* Order Denying Defendants' Motion to Dismiss [Doc. No. 234] ("[A]lthough SIBL was located in Antigua, it was but a cog in the vast Stanford machinery, which was organized and operated in Houston."); Order Denying Defendants' Motions to Dismiss for Lack of Jurisdiction [Doc. No. 194]. Defendants transacted and communicated on an ongoing basis with the Stanford Entities, which Defendants knew, and which this Court has found, to have been controlled and operated from Houston, Texas.

## IV. FACTUAL ALLEGATIONS.

### A. Allegations Common to the Class.

38.

Plaintiffs allege below in six parts the facts that underlie their legal claims.

- First, Plaintiffs detail the basic tenets of the regulatory regimes that govern the conduct of banks, such as Defendants, with respect to clients such as R.A. Stanford and the Stanford Entities (¶¶ 39-87);

- Second, Plaintiffs outline the facts of the investment fraud carried out by R.A. Stanford and his co-conspirators, including the history of SIBL, the uniform omissions upon which the investment fraud was based, the manner in which the SIBL CDs were sold to investors, the management and disposition of SIBL CD investor funds, the Houston base of operations for the Stanford empire, and the ultimate collapse of the Stanford empire (¶¶ 88-161);

- Third, Plaintiffs explain why Defendants' banking services were integral in assisting the fraud (¶¶ 162-172);

- Fourth, Plaintiffs set forth the facts that were available to Defendants, and which they were obligated to know, about R.A. Stanford and the Stanford Entities (¶¶ 173-221);

- Fifth, Plaintiffs describe the general features of Defendants' banking relationships with R.A. Stanford and the Stanford Entities (¶¶ 222-237); and

- Sixth, Plaintiffs identify each Defendant's role in the investment fraud (¶¶ 238-419).

## 1.  The Applicable Banking Standards.

### 39.

A synopsis of regulations that are applicable worldwide in the banking industry, and also those particular regulations that speak to the conduct of each Defendant, follows. Boiled down, those regulations all require that Defendants adopt appropriate procedures and undertake steps to know the customer and to look for any indicia of money-laundering and fraud. Observing those tenets here should have led Defendants to avoid a banking relationship with R.A. Stanford and the Stanford Entities.

### 40.

For the sake of clarity, Plaintiffs do not allege that these standards create a private cause of action. Rather, these standards are alleged herein only to illustrate customary practices and procedures in the banking industry, which, in combination with the facts on hand to Defendants as further alleged herein, demonstrate Defendants' knowledge of the Stanford fraud—an issue common to all class members.

### a.  Worldwide Banking Industry Standards.

### 41.

In addition to country-specific laws and regulations described herein, there are industry organizations that develop and provide guidance on anti-money laundering laws that are applicable throughout the world, including the Basel Committee on Banking Supervision ("Basel Committee"), and the Financial Action Task Force on Money Laundering ("FATF").

42.

The Basel Committee is a committee of central banks and bank supervisors and regulators from major industrialized countries that meets at the Bank for International Settlements (BIS) in Basel, Switzerland, to discuss issues related to prudent banking supervision. The Basel Committee formulates broad standards and guidelines and makes recommendations regarding sound practices, including those on customer due diligence.

43.

The FATF is an intergovernmental body established for the development and promotion of policies to combat money laundering and terrorist financing. The FATF has developed recommendations on various money laundering issues.

44.

While those standards are extensive, some of the requirements that are relevant here demand that banks:

- undertake due diligence on all clients;
- implement enhanced due diligence procedures to be utilized in higher risk situations;
- develop Know Your Customer ("KYC") risk management programs that include proper management oversight, systems and controls, segregation of duties, training and other related policies;
- understand the products and services offered by the client and understand the normal and reasonable account activity of the client;
- understand the ownership and management of the correspondent banking client;
- obtain financial statements and descriptions of clients' principal lines of business with respect to large corporate accounts;
- understand the client's regulatory status and history;
- determine from publicly available information the reputation of the client and whether it had been the subject of past money laundering or terrorist financing investigations or regulatory actions;

- develop anti-money laundering ("AML") policies, procedures and controls;
- designate compliance officers at the senior management level to ensure compliance with their AML programs;
- incorporate anti-money laundering policies that address the risks associated with non-face-to-face business relationships and transactions;
- pay particular attention to complex or unusual transactions with no apparent economic purpose or visibly lawful purpose and examine the background of such transactions; and
- report all suspicious transactions to the appropriate authorities.

### b.  U.S. Standards.

45.

In addition to the industry standards outlined above, a number of U.S. statutes and regulations govern the conduct of U.S. banks, such as Defendants Trustmark and BoH.

46.

Those statutes include 12 U.S.C. § 1829(b) and 31 U.S.C. § 5311, *et seq.* — "The Bank Secrecy Act" ("BSA").

47.

Relevant regulations promulgated by the U.S. Treasury/FinCEN are contained in 31 C.F.R. § 103. Those regulations address such topics as:

- Suspicious transaction reporting;
- Customer Identification Programs ("CIP"), which must be a written part of a bank's BSA/AML program; and
- Due diligence programs, and particular due diligence requirements for correspondent banking accounts.

48.

Regulations promulgated by the Office of the Comptroller of Currency ("OCC") are contained in 12 C.F.R. § 326 Subpart B and 12 C.F.R. § 353 and address such topics as the requirements for filing suspicious activity reports and procedures for monitoring BSA compliance. Related regulations promulgated by the Federal Deposit Insurance Corporation ("FDIC") are contained at 12 C.F.R. § 21.11 and 12 C.F.R. § 21.21, and also those of the Board of Governors of the Federal Reserve System at 12 C.F.R. § 208.

49.

In addition, the OCC issues periodic BSA/AML directives. These OCC Alerts are published with special urgency to notify bankers and examiners of matters of pressing concern, often suspicious or illegal banking practices. OCC Bulletins and Advisory Letters contain information of continuing importance to banks.

50.

Finally, the U.S. Department of State publishes an annual report entitled "International Narcotics Control Strategy Report by the Bureau of International Narcotics and Law Enforcement Affairs" and ranks countries according to three categories:

- Jurisdictions of Primary Concern – those identified as major money laundering countries;

- Jurisdiction of Concern; and

- Other Jurisdictions Monitored.

Antigua was on the list of Countries/Jurisdictions of Primary Concern for a number of years.

51.

Drawing on these sources, the Federal Financial Institutions Examination Counsel's ("FFIEC's") Bank Secrecy Act/Anti-Money Laundering Manual, which was in place during the time that Republic/Trustmark and BoH served the Stanford Entities, provides a guidebook for financial institutions on the application of legal requirements and best practices for U.S. banks.

52.

The 2006 version of the FFIEC Manual specifically identifies certain banking products and services that pose a higher risk of money laundering and other illegal activity, including:

- Electronic funds transfers (domestic and international);
- Foreign correspondent accounts;
- Pouch activities; and
- Politically Exposed Persons.

53.

The FFIEC Manual also identifies certain geographic-specific risk variables, including:

- Jurisdictions determined to be "of primary money laundering concern" by the Secretary of the Treasury, and jurisdictions subject to special measures imposed by the Secretary of the Treasury, through FinCEN, pursuant to section 311 of the Patriot Act;

- Jurisdictions or countries identified as non-cooperative by [the FATF];

- Major money laundering countries and jurisdictions identified in the U.S. Department of State's annual International Narcotics Control Strategy Report (INCSR); in particular, countries which are identified as jurisdictions of primary concern;

- Offshore financial centers (OFCs) as identified by the U.S. Department of State; and

- Other countries identified by the bank as high-risk because of its prior experiences or other factors.

54.

Banks are also obligated to gather information on their customers under the Customer Identification Program ("CIP"), Customer Due Diligence ("CDD"), and Enhanced Due Diligence ("EDD") policies.

55.

The FFIEC Manual provides guidelines for enhanced due diligence of high-risk customers, warning:

> Enhanced due diligence for high-risk customers is especially critical in understanding their anticipated transactions and implementing a suspicious activity monitoring system that reduces the bank's reputation, compliance, and transaction risks. High-risk customers and their transactions should be reviewed more closely at account opening and more frequently throughout the term of their relationship with the bank.

56.

Electronic funds transfers (domestic and international) are a topic of particular attention in the FFIEC Manual because "these systems can present an attractive method to disguise the source of funds derived from illegal activity."

57.

Foreign correspondent banking relationships are a topic of particular attention in the FFIEC Manual:

> One of the central goals of the Patriot Act was to protect access to the U.S. financial system by requiring certain records and due diligence programs for foreign correspondent accounts. In addition, the Patriot Act prohibits accounts with foreign shell banks. Foreign correspondent accounts, as noted in past U.S. Senate investigative reports, are a gateway into the U.S. financial system.

58.

Under 31 C.F.R. § 1010.605, a "correspondent account" is an account established by a bank for a foreign bank to receive deposits from, or to make payments or other disbursements on behalf of the foreign bank, or to handle other financial transactions related to the foreign bank.

59.

Special due diligence procedures apply to foreign correspondent accounts and the FFIEC Manual advises that "U.S. bank[s] should generally understand the AML controls at the foreign correspondent financial institution, including customer due diligence practices and recordkeeping documentation."

60.

Pouch activities are another area of particular concern in the FFIEC Manual that is relevant here.

61.

As the FFIEC Manual explains it, pouch activity:

[E]ntails the use of a carrier, courier (either independent or common), or a referral agent employed by the courier, to transport currency, monetary instruments, and other documents from outside the United States to a bank in the United States. Pouches can be sent by another bank or individuals. Pouch services are commonly offered in conjunction with foreign correspondent banking services. Pouches can contain loan payments, transactions for demand deposit accounts, or other types of transactions.

62.

To avoid the risks that accompany pouch activity, the FFIEC Manual instructs banks to implement policies and procedures that "detail procedures for reviewing for unusual or suspicious activity, including elevating concerns to management. (Contents of pouches may be

subject to Currency Transaction Report (CTR), Report of International Transportation of Currency or Monetary Instruments (CMIR), and Suspicious Activity Report (SAR) reporting requirements)."

63.

Finally, the FFIEC Manual lists a number of common indicators of unlawful conduct, including:

- Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts;

- Funds transfer activity occurs to or from a financial secrecy haven, or to or from a high-risk geographic location without an apparent business reason or when the activity is inconsistent with the customer's business or history;

- Funds transfer activity is unexplained, repetitive, or shows unusual patterns;

- Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals;

- Suspicious movements of funds occur from one bank to another, and then funds are moved back to the first bank;

- Frequent involvement of multiple jurisdictions or beneficiaries located in high-risk offshore financial centers;

- Use of nested correspondent banking relationships;

- A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves high-risk locations; and

- Funds are sent or received via international transfers from or to high-risk locations.

64.

These indicators match the conduct of the Stanford Entities as described herein.

### c.  Canadian Standards.

65.

In Canada, TD Bank and other banks are regulated by the Office of the Superintendent of

Financial Institutions ("OSFI"). OSFI has developed a manual of best practices for banks with

regard to deterring and detecting money laundering. In addition to that guide, banks in Canada

are governed by the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act*, S.C.

2000, c. 17 (the "PCMLTFA").

66.

Among other things, OSFI Standards required banks to:

- conduct higher levels of due diligence when dealing with clients from countries with anti-money laundering requirements that were considered inadequate;

- have customer identification and verification processes which were fully compliant with the PCMLTFA, including with respect to correspondent banking;

- take reasonable measures to obtain the names and occupations of all directors and beneficial owners of 25 percent or more of their corporate clients; and

- report all transactions or attempted transactions that were suspicious.

67.

The PCMLTFA, which was originally titled the *Proceeds of Crime (Money Laundering)*

*Act*, came into force in 2000. Section 7 of the Act came into force in 2001 and required Canadian

banks to:

> report . . . in the prescribed form and manner, every financial transaction that occurs in the course of their activities and in respect of which there are reasonable grounds to suspect that the transaction is related to the commission of a money laundering offence or a terrorist activity financing offence.

68.

In 2002, the General Regulation to the PCMLTFA, SOR/2002-184 came into force. As

amended, these regulations require that:

Every financial entity shall, when it enters into a correspondent banking relationship, keep a record in respect of the foreign financial institution containing the following information and documents:

(a) the name and address of the foreign financial institution;
(b) the names of the directors of the foreign financial institution;
(c) the primary business line of the foreign financial institution;
(d) a copy of the most recent annual report or audited financial statement of the foreign financial institution;
(e) a copy of the foreign financial institution's banking licence, banking charter, authorization or certification to operate from the relevant regulatory agency or certificate of corporate status or a copy of another similar document;
(f) a copy of the correspondent banking agreement or arrangement, or product agreements, defining the respective responsibilities of each entity;
(g) the anticipated correspondent banking account activity of the foreign financial institution, including the products or services to be used;
(h) a statement from the foreign financial institution that it does not have, directly or indirectly, correspondent banking relationships with shell banks;
(i) a statement from the foreign financial institution that it is in compliance with anti-money laundering and anti-terrorist financing legislation in its own jurisdiction; and
(j) the measures taken to ascertain whether there are any civil or criminal penalties that have been imposed on the foreign financial institution in respect of anti-money laundering or anti- terrorist financing requirements and the results of those measures.

69.

In addition, section 71.1 of the regulations requires that financial institutions take special

measures with a higher risk client:

The prescribed special measures that are required to be taken by a person or entity referred to in subsection 9.6(1) of the Act for the purpose of subsection 9.6(3) of the Act are the development and application of written policies and procedures for

(a) taking reasonable measures to keep client identification information and the information referred to in section 11.1 up to date;
(b) taking reasonable measures to conduct ongoing monitoring for the purpose of detecting transactions that are required to be reported . . . ; and
(c) mitigating the risks identified in accordance with subsection 9.6(3) of the Act.

70.

These rules and regulations governed the conduct of TD Bank and applied to its relationship with SIBL, R.A. Stanford, and the Stanford Entities.

**d.  U.K. Standards.**

71.

In the U.K., a number of laws and regulations govern conduct in the financial sector, including: The U.K. Money Laundering Regulations in place since 1993, and The Proceeds of Crime Act 2002 ("POCA").

72.

Under these laws and regulations, among the primary responsibilities of U.K. banks is customer due diligence, which Money Laundering Regulations of 2007, Regulation 5 describes to mean:

(a) identifying the customer and verifying the customer's identity on the basis of documents, data or information obtained from a reliable and independent source;

(b) identifying, where there is a beneficial owner who is not the customer, the beneficial owner and taking adequate measures, on a risk-sensitive basis, to verify his identity so that the relevant person is satisfied that he knows who the beneficial owner is, including, in the case of a legal person, trust or similar legal arrangement, measures to understand the ownership and control structure of the person, trust or arrangement; and

(c) obtaining information on the purpose and intended nature of the business relationship.

73.

Thus, U.K. banks are required to establish a baseline understanding of their customers.

74.

The Joint Money Laundering Steering Group ("JMLSG") is a group that comprises over a dozen U.K. trade associations that promulgate guidance for best practices in accordance with the laws and regulations of the U.K., and in accordance with international banking standards.

75.

The 2007 JMLSG Guide offers a detailed section on proper practices in the realm of correspondent banking. HSBC provided correspondent banking services to SIBL. That guidance is summarized below.

76.

First, the JMLSG Guide defines correspondent banking as "the provision of banking-related services by one bank (Correspondent) to an overseas bank (Respondent) to enable the Respondent to provide its own customers with cross-border products and services that it cannot provide them with itself, typically due to a lack of an international network." The JMLSG Guide goes on to explain that a correspondent acts as an agent for the respondent bank that "executes/processes payments or other transactions for customers of the Respondent."

77.

The JMLSG Guide identifies correspondent banking as a high-risk business line, thus requiring enhanced customer due-diligence measures under the Money Laundering Regulations. The JMLSG Guide states that:

For any Correspondent, the highest risk Respondents are those that:

- are offshore banks that are limited to conducting business with non residents or in nonlocal currency, and are not subject to robust supervision of their AML/CTF controls; or

- are domiciled in jurisdictions with weak regulatory/AML/CTF controls or other significant reputational risk factors e.g., corruption.

78.

Both of these risk factors applied to SIBL's relationship with HSBC.

79.

The JMLSG Guide lists a number of risk indicators to be considered, including the customer's domicile, its ownership and management structure, and its business and customer base.

80.

More specifically, the Money Laundering Regulations 2007, Regulation 14(3) addresses the enhanced due diligence that was demanded of HSBC:

A credit institution ("the correspondent") which has or proposes to have a correspondent banking relationship with a respondent institution ("the respondent") from a non-EEA [European Economic Area] state must—

(a) gather sufficient information about the respondent to understand fully the nature of its business;

(b) determine from publicly-available information the reputation of the respondent and the quality of its supervision;

(c) assess the respondent's anti-money laundering and anti-terrorist financing controls;

(d) obtain approval from senior management before establishing a new correspondent banking relationship;

(e) document the respective responsibilities of the respondent and correspondent; and

(f) be satisfied that, in respect of those of the respondent's customers who have direct access to accounts of the correspondent, the respondent—

(i) has verified the identity of, and conducts ongoing monitoring in respect of, such customers; and

(ii) is able to provide to the correspondent, upon request, the documents, data or information obtained when applying customer due diligence measures and ongoing monitoring.

81.

Finally, the JMLSG Guide lists a number of monitoring techniques that constitute "good practice in the area of correspondent banking relationships":

Anomalies in behavior
• Monitoring for sudden and/or significant changes in transaction activity value or volume.

Hidden relationships
• Monitor for activity between accounts, customers (including Respondents and their underlying customers). Identify common beneficiaries and remitters or both amongst apparently unconnected accounts/Respondents. This is commonly known as link analysis.

High risk geographies and entities
• Monitoring for significant increases of activity or consistently high levels of activity with (to or from) higher risk geographies and/or entities.

Other money laundering behaviours
• Monitoring for activity that may, in the absence of other explanation, indicate possible money laundering, such as the structuring of transactions under reporting thresholds, or transactions in round amounts

Other considerations
• In addition to the monitoring techniques above, the monitoring system employed to monitor correspondent banking for AML/CTF purposes should facilitate the ability to apply different thresholds against customers that are appropriate to their particular risk category.

82.

These factors and the other discussed herein applied squarely to SIBL's accounts at HSBC.

**e. Swiss Standards.**

83.

Banks in Switzerland are regulated by the Swiss Financial Market Supervisory Authority and are governed, at least in part, by a set of standards under the "Federal Action Combating Money Laundering and Terrorist Financing in the Financial Sector" ("FACML").

84.

Among the duties of Swiss banks under the FACML is the duty of due diligence, which requires verification of the customer's identity.

85.

In addition, Swiss banks have a duty to clarify, which requires that a bank "identify the nature and purpose of the business relationship wanted by the customer."

86.

Further, for transactions that appear unusual, a bank must "clarify the economic background and the purpose of a transaction or of a business relationship."

87.

As in other countries, Swiss banks are under a general obligation to adopt "organizational measures" to combat money laundering. In particular, they must "ensure that their staff receive adequate training and that checks are carried out."

## 2. The Stanford Scheme.

### a. Origins and History of SIBL.

88.

Each of the Defendants was required by applicable regulations and good commercial practices to know the history of SIBL, its products and services, the factors giving rise to its collapse, and information about R.A. Stanford personally. That history, as detailed below, should have proved preclusive to any banking relationship.

89.

R.A.  Stanford's investment fraud began in or around 1985 when, without any prior banking experience, he founded Guardian International Bank, Ltd. ("Guardian") on the island of Montserrat in the Caribbean after suffering personal and business bankruptcies in Texas. The bank's primary business revolved around CDs. Although Guardian was located offshore, its marketing and sales-force operated from Houston, Texas, as would later be the case with SFG and SIBL.

90.

R.A. Stanford established his bank offshore because he did not want to be overseen by U.S. banking regulatory agencies.

91.

Despite his desire to escape regulatory scrutiny, by 1990, the OCC issued a Banking Circular regarding Stanford's unauthorized banking activities in the U.S.

92.

Around that same time, the Texas Department of Banking warned R.A. Stanford about operating unlicensed and unauthorized feeder offices in Texas for a foreign bank.

93.

Shortly thereafter, the Texas Department of Banking ordered Guardian to immediately cease its Texas operations or "the Texas Attorney General will be requested to promptly file charges against the bank, its board of directors and its management for apparent willful and continuing violations of the Texas Banking Code."

94.

In the late 1980s and early 1990s, the banking sector in Montserrat came under scrutiny as a haven for drug money laundering, prompting investigations by the Federal Bureau of Investigation and the United Kingdom's Scotland Yard.

95.

In or around November 1990, Montserrat revoked Guardian's banking license because Guardian: (1) used an unapproved Antiguan auditor (CAS Hewlett); (2) operated in a manner detrimental to depositors; (3) failed to supply satisfactory details about bank liquidity; (4) had a formerly bankrupt director (R.A. Stanford had operated a failed fitness business); and (5) failed to maintain good standing by neglecting to submit annual reports.

96.

As a result, in 1991, Guardian relocated from Montserrat to Antigua and re-incorporated under Antigua's International Business Corporations Act ("IBC Act"). In exchange for the banking license, the Antiguan government requested that R.A. Stanford buy the insolvent Bank of Antigua ("BOA"), which he did for $20 million in depositor funds. BOA was originally incorporated on February 10, 1981. As a domestic Antiguan bank, BOA offered banking services primarily to Antiguan citizens in Eastern Caribbean dollars, the local currency.

97.

On December 20, 1994, Guardian changed its name to Stanford International Bank, Ltd. ("SIBL") and continued to perpetuate the same core fraud, but on an ever-increasing scale over the subsequent 15 years.

98.

Under the IBC Act, SIBL, as an offshore international banking corporation, was prohibited from knowingly accepting deposits in the legal tender of Antigua, effectively barring it from doing business with residents of Antigua. Instead, SIBL, like Guardian before it, would derive its deposits from customers in foreign jurisdictions.

99.

Because SIBL was an offshore Antiguan bank, which was unable to receive wire transfers or other payments on its own, it needed to gain access to onshore banking facilities as a means to collect investor funds. SIBL did so by procuring accounts with Defendants.

100.

Defendants TD Bank, HSBC, and Trustmark provided, among other services, "correspondent banking" services for SIBL. In general, a correspondent bank can conduct business transactions, accept deposits, and gather documents on behalf of another financial institution. A foreign correspondent bank essentially acts as the agent of a bank in another country. Thus, in order to access financial systems outside of Antigua to gather "customer deposits," SIBL needed to establish foreign correspondent banking relationships. Without those relationships, it could not have taken in any significant amount of money.

101.

Likewise, Defendants SG Suisse and BoH provided important depository and investment

services for the Stanford Entities, facilitating the movement of funds and the siphoning and diversion of investor money into R.A. Stanford's pockets for years and years. TD Bank also provided important investment services to the Stanford Entities.

102.

By December 2008, SIBL owed investors $7 billion in SIBL CD deposits but failed to disclose to investors that it in fact had only a fraction of that amount on hand. Thus, investors could not have known that SIBL's insufficient assets would be unable to sustain the increasing rate of redemptions prompted by the economic downturn. Essentially, SIBL had never earned profits and the returns on its investment portfolio were nominal, meaning that there was an ever-increasing gap between what it owed CD investors and the funds it had on hand to satisfy those debts.

103.

In 2009, the U.S. Securities and Exchnage Commission ("SEC") finally closed in on the Stanford Fraud.

104.

On February 16, 2009, this Court appointed a Receiver for the Stanford Entities at the SEC's request. The following day, the Receiver took over the Stanford Entities.

**b. SIBL's Uniform Marketing Omitted Key Facts.**

105.

Financial advisors employed by the Stanford Entities persuaded their clients to purchase SIBL CDs using information given to the financial advisors in training materials, training sessions, and corporate "pep talks." The information, which omitted key facts about the

disposition of SIBL CD depositor funds, came directly or indirectly from R.A. Stanford, Jim Davis, and/or Holt.

106.

The information regarded such topics as the value of SIBL's investments, SIBL's investment allocation, SIBL's investment strategy, the persons who managed SIBL's investments, SIBL's history of consistently high earnings, R.A. Stanford's purported capital infusion into SIBL to strengthen it, and the security of customers' deposits with SIBL. None of these materials revealed the actual disposition of SIBL CD investors' funds.

107.

For instance, the SIBL manual that was used to create a uniform marketing message for the CDs states that "SIBL is extremely liquid—up to 50% of the portfolio can be liquidated in T plus 2 and 25% can be liquidated in T plus 3 and the remaining within 90 days (locked up alternative investments)." It claims, "The SIBL portfolio is a globally diverse strategy that is invested with over 20 international advisory firms in over 12 worldwide markets." SIBL training and marketing manuals further state: "[SIBL] invests most of its assets in securities such as bonds and equities that are marketable instruments, negotiable in financial markets and easy to liquidate." And as to payments to R.A. Stanford, they state: "[SIBL] has never paid dividends to shareholders [*i.e.*, R.A. Stanford] on earnings, but instead has retained them as a means to enhance income-producing assets and therefore total returns." This same point was made in various other materials as well: SIBL did not pay a dividend to its owner R.A. Stanford.

108.

SIBL CD investors received a subscription document that made statements similar to those in the training materials: "the funds deposited with us are primarily invested in foreign and

U.S. investment grade bonds and securities and Eurodollar and foreign currency deposits." It described SIBL's conservative investment philosophy and its desire to include "companies with demonstrated consistency in earnings, reasonable P/Es, above average dividend yields, above average growth rates and low price-to-sales ratios." It describes its 3 percent marketing and service arrangement with SGC and  its lease of the bank's building from Stanford Development Company, but does not mention any loans to or investments in affiliates.

109.

SIBL's annual reports, which were made available to Defendants in the course of the banking relationships, delivered the same message as all the other SIBL materials. For instance, SIBL's 2004 Annual Report stated: "The Certificates of Deposit accounts guarantee payment of the stated interest rate until maturity. Funds from these accounts are generally invested in investment-grade bonds, securities and euro and foreign currency deposits." And further stated that: "The investment portfolio consists of bonds, notes and equities. . . . These investments are generally listed on major international exchanges and are deemed highly liquid." Likewise, the 2007 Annual Report stated that "the bank's assets are invested in a well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements."

110.

SIBL's 2007 Annual Report claimed that SIBL's investment portfolio consisted of 58.6 percent equity, 18.6 percent fixed income, 15.6 percent alternative investments (i.e., hedge funds) and 7.2 percent precious metals:



111.

The 2007 Annual Report described SIBL's portfolio as a "well-diversified portfolio of highly marketable securities issued by stable governments, strong multi-national corporations and major international banks." Other than fixed income, the performance of every component of this investment allocation was volatile and subject to significant risk. The purported composition of SIBL's portfolio was therefore at odds with the consistently high rates of return that SIBL claimed to generate, as follows:



112.

SIBL claimed that its high returns on investment allowed it to offer higher rates on CDs than those offered by U.S. banks. For example, a Stanford prospectus presented the following chart contrasting SIBL's interest rates with those offered by U.S. banks:



113.

SIBL's 2007 Annual Report further stated that "SIBL does not expose its clients to the risks associated with commercial loans. [SIBL's] only lending is on a cash secured basis." SIBL often stated that "By making only cash-secured loans to its existing customers, the bank eliminates credit risks and the negative impact on earnings due to loan losses." In reality, SIBL made more than $1.8 billion in undisclosed and unsecured personal "loans" to its sole shareholder, R.A. Stanford.

114.

That such loans are *verboten* is common knowledge in the banking industry. Dr. Paul Ashe, who joined the FSRC in February 2008, testified that a shareholder such as R.A. Stanford "cannot [borrow] because, unlike other companies, when a bank holds funds, the bank holds

funds on behalf of its customers. So, the assets of the bank do not belong to the shareholder." Stanford Trial Testimony at 4184-4185. He went on to say that if he had known of the loans, R.A. Stanford would have been required to post cash to secure the loans and a cease and desist order as to such activity would have issued.

115.

These "loans" consisted of Jim Davis, at R.A.  Stanford's direction, fraudulently wiring billions of dollars of SIBL investor funds to R.A.  Stanford or his designees. Few, if any, "loan" payments were made.

116.

This was clearly a "related-party" transaction; yet, between 2004 and 2008, SIBL's annual reports did not disclose this and other such loans under the section entitled "Related Party Transactions," which purported to disclose any such transaction.

117.

Nothing in SIBL's uniform marketing message hinted at the truth: that billions of dollars of SIBL CD proceeds were used to meet the cash needs of various unprofitable entities that R.A. Stanford owned and to fund R.A. Stanford's extravagant lifestyle. For instance, as of the end of 2008, $2 billion of SIBL CD proceeds had been used to fund his personal projects. Some notable examples include:

- $333,464,547 had been provided to Allen Stanford's two commercial airlines, Caribbean Sun and Caribbean Star, and his private airplane fleet. The commercial airlines consistently lost money;

- $471,576,592 had been spent on investments in the Caribbean, mostly real estate projects, but also on a fleet of yachts ($20 million), a local newspaper ($11 million) and R.A. Stanford's cricket tournaments ($36 million); and

- $750 million had been spent in the U.S., largely on his broker dealer company and his venture capital company.

Of course, SIBL CD depositors did not know that this was how their money was being "invested."

### 118.

Nor did investors know that SIBL was bribing its auditor and regulator.

### 119.

Beginning on Montserrat, R.A. Stanford hired only one auditor, CAS Hewlett, a one-man "independent auditor."

### 120.

According to Jim Davis's testimony, CAS Hewlett rubber-stamped the bank's misleading financial statements without performing a proper audit. CAS Hewlett never received the proper documentation to verify the accuracy of the bank's assets, nor did he ever require it in order to certify the bank's financial position. Yet every single year, in exchange for large bribe payments, described in greater detail *infra*, he issued an opinion contained in the annual report verifying the accuracy of the assets.

### 121.

As alleged herein, Leroy King, the head of the very entity meant to regulate SIBL, assisted R.A. Stanford in escaping regulatory scrutiny.

### 122.

King, as Administrator and Chief Executive Officer of the FSRC was ostensibly responsible for the FSRC's (and, thus, Antigua's) oversight of SIBL, including review of its

investment portfolio and financial reports, and responses to requests by foreign regulators, such as the SEC, for information and documents regarding SIBL's operations.

123.

King, however, accepted large cash bribes, paid from accounts at SG Suisse, to conduct sham audits of SIBL's books and records and to run interference for SIBL regarding outside regulatory scrutiny. R.A. Stanford and King sealed their deal by cutting themselves in a blood-oath ceremony.

124.

Investors were never informed of the nature of SIBL's relationship with its auditor and purported regulator.

### c. SIBL CD Sales.

125.

Through a worldwide network of affiliates controlled from and directed by its Houston, Texas headquarters, the Stanford Entities sold CDs issued by SIBL, offering interest rates higher than those generally available at other banks. These entities included SGC and SFIS in the United States, Stanford Bolsa Y Banca S.A. in Mexico, Comisionista De Bolsa in Columbia, and others.

126.

The financial advisors that the Stanford Entities provided to investors were the face of SIBL and the other Stanford Entities, and they helped SIBL customers complete their SIBL CD applications and manage their CD investments.

127.

Depositors generally purchased SIBL CDs in two ways, either by a wire transfer or by a personal check.

128.

Depositors received wiring instructions that indicated that transfers denominated in British Pounds or Euros were to be sent to an account at HSBC, and transfers denominated in U.S. or Canadian Dollars were to be sent to an account in the name of SIBL at TD Bank.

129.

Depositors who paid by check generally gave the check to their financial advisor for deposit in SIBL, which checks were then bundled and sent in pouches to be deposited in SIBL's account at Trustmark.

130.

In general, SIBL CD investors' funds either remained on deposit at Trustmark, HSBC, and TD Bank, were transferred between and among all Defendants, were transferred to one of the other Stanford Entities, or were frittered away by R.A. Stanford.

### d.  The Inner Operations of the Fraud.

131.

Holt, SFG's Chief Investment Officer, supervised the analysts who supposedly managed the investment portfolio of SIBL.

132.

In reality, Holt's analysts managed only about 15% of the portfolio, internally referred to as "Tier 2."

133.

Cash and cash instruments comprised about 10% of SIBL's portfolio, internally referred to as "Tier 1." Thus, only about 25% of the bank's reported assets, Tier 1 and Tier 2, were invested in a manner consistent with its annual reports and marketing materials.

134.

Tier 1 was managed from Houston, Texas, by a team led by SFG Treasurer Patricia Maldonado, who worked at the direction of Jim Davis.

135.

The Tier 2 funds were invested with outside money managers at banks, including TD Bank and SG Suisse. The investments were overseen by Holt, who reported to Jim Davis and R.A. Stanford. Holt's analysts in Memphis were each assigned to monitor specific investment accounts and outside money managers. For instance, Zack Davis, the son of Jim Davis, oversaw the SIBL Tier 2 investments that were invested through TD Bank.

136.

Jim Davis, Holt, and their team were in charge of managing Tier 2 funds and SIBL's employees in Antigua were not involved in any real way. All records regarding Tier 2 sent to SIBL in Antigua were held under lock and key. Only Jim Davis and approved members of his team were allowed to review such documents.

137.

R.A. Stanford siphoned the remaining 75% of SIBL's assets, "Tier 3," to his personal companies, real estate purchases, and extravagant lifestyle, including more than $36 million to subsidize "Stanford 20/20," an annual cricket tournament that boasted a $20 million purse, and over $400 million in real estate ventures. The pet companies were non-liquid and non-marketable

investments that did not have securities traded on worldwide exchanges.

138.

SIBL investment "earnings" were provided monthly by Jim Davis and persons working at his direction and under his supervision in the U.S. Earnings were pegged at whatever amount was needed to give SIBL acceptable financial performance and capital ratios for regulatory purposes. In other words, earnings—at least for 10 years—were fictitious, reverse-engineered, "plug" numbers.

139.

It was never disclosed to investors that 75% of the bank's assets were the personal piggy bank of R.A. Stanford or that the totality of the bank's assets were severely overvalued.

### e. The Houston Headquarters of the Fraud.

140.

The day-to-day management of SIBL and the majority of SIBL's business operations were conducted in the U.S. by other Stanford Entities and employees, primarily in Houston, Texas.

141.

In a bankruptcy case filing made by Courtney Blackman, a member of SIBL's board of directors from 1999 forward, Blackman stated that "the marketing of CD[s] [and] the investment of receipts from the sale of CD's . . . were carried out by Stanford Financial Group in the United States." Blackman confirmed that the Stanford Entities "in the United States sold—designed and sold CDs. Stanford International Bank did not sell CDs." According to Blackman, "Antigua had nothing at all to do with the marketing or investment of — marketing of CDs or the investment

of proceeds from CDs." Instead, he explained: "The marketing originated in Houston. I know training and so on went on in Miami. And the investment took place in Memphis." Blackman further stated that "the nerve center of the bank, of [SIBL], was in the United States" and that SIBL's headquarters were "by definition" in the United States.

142.

In the transcript of a 2006 marketing video entitled "SFG Corporate Video," R.A. Stanford highlighted the Houston headquarters of his empire: "Stanford Financial Group is a family of financial services companies with global reach. We serve over 40,000 clients who reside in 79 countries on six continents. Our world headquarters are located in Houston, Texas, and we have a continual growing number of offices around the world to serve our clients. ... Although independent, all of our affiliate companies work together to form a powerful cohesive network."

143.

Davis and Houston-based employees, including, Former Chief Accounting Officer Gilberto T. Lopez, SFG's Chief Accounting Officer, and Mark J. Kuhrt, SFG's Global Controller, prepared the purported financial statements for SIBL as well as similar reports concerning SIBL's assets that were submitted to the FSRC in Antigua. Harry Failing, Stanford's long-time accountant in Houston, also had significant input into SIBL's financial statements.

144.

Even the basic administrative functions for the Antiguan Stanford Entities were performed in Houston. For instance, according to the U.S. Receiver's forensic expert, Karyl Van Tassel, between August 2006 and February 2009, approximately $9 million in Antiguan Stanford Entity payroll funds were administered from and paid by Stanford Entity employees in Houston.

In particular, according to Van Tassel, SIBL's president, Juan Rodriguez-Tolentino, was not on SIBL's payroll. His salary was paid by SFG from the U.S. And he did not even reside in Antigua; his home was in Orlando, Florida. Additionally, SIBL's payroll for its non-management employees was paid from an account located at Trustmark in Houston.

145.

Thus, as this Court has previously found, the Stanford fraud was operated and directed from Houston, Texas.

### f. The Inevitable Collapse.

146.

During the financial crisis of 2008, SIBL CD redemptions dramatically increased and new sales dried up, a confluence of events that proved lethal to the perpetuation of the Ponzi scheme. The unprofitable Stanford-related businesses, which hemorrhaged tens of millions of dollars in depositors' funds, were illiquid and could not readily be sold. Yet, the ruse was maintained for a time.

147.

In November 2008, Jason Green, President of SGC, met with R.A. Stanford to discuss the rapid rate of SIBL CD redemptions. Stanford provided Green with a list of "talking points" for financial advisors to give to investors, which stressed the bank's emphasis on strong, liquid, diverse investments. R.A. Stanford also promised a personal capital cash infusion to offset the effects of the withdrawals.

148.

In December 2008, R.A. Stanford drafted a newsletter sent to SIBL CD holders assuring them that the bank remained strong, despite the dire financial climate and the panic surrounding the collapse of Bernard Madoff's hedge fund. The letter advised depositors that the Board of Directors made a capital injection in November 2008, which supposedly increased shareholder equity.

149.

Specifically, the newsletter advised:

Although our earnings will not meet expectations in 2008, Stanford International Bank Ltd. is strong, safe and fiscally sound. We have always believed that depositor safety was our number one priority. To further support the Bank's growth and provide a strong cushion for any further market volatility, the Bank's Board of Directors made a decision to increase the Bank's capital by $541 million on November 28, 2008. This contribution brings total shareholder equity to $1,020,029,802 with a capital to assets ratio of 11.87% and a capital to deposits ratio of 13.48%.

150.

In other words, R.A. Stanford reported SIBL's very first "down" year but advised that he was filling the hole and that SIBL had strong capital.

151.

It was concealed from SIBL CD investors that the $541 million cash injection was merely a bookkeeping entry to support the announcement and that no actual transfer of cash or assets to the bank had occurred.

152.

At nearly the same time, on December 12, 2008, Pershing, L.L.C., SGC's clearing broker, informed SGC that it would no longer process wire transfers to SIBL accounts at TD Bank for the purchase of SIBL CDs.

153.

On January 10, 2009, R.A. Stanford, Jim Davis, and Holt spoke to SGC's Top Performers Club (a collection of high-performing Stanford financial advisors) in Miami, Florida.

154.

During that meeting, Jim Davis represented that SIBL was stronger than ever. He, however, failed to disclose that just a few days earlier he had learned that despite efforts to liquidate Tier 2 assets, SIBL's cash position had fallen to less than $28 million.

155.

SIBL and SGC executives, including Jim Davis, Jason Green, Holt, and others, met in early February 2009 to prepare for a presentation to the SEC in Fort Worth, Texas. At this meeting, Jim Davis revealed to the executives that a $5 billion gap existed between the bank's reported and actual assets, exposing the true nature of Tier 3 for the first time. He explained that the bulk of SIBL CD deposits went to R.A. Stanford's real estate, companies that SIBL never owned, and to personal "loans" to R.A. Stanford.

156.

Persistent in the lie, on February 12, 2009, R.A. Stanford drafted a letter that was sent to investors claiming the Stanford Entities were as strong as ever.

157.

Shortly thereafter, the U.S. District Court for the Northern District of Texas appointed a

Receiver for the Stanford companies on February 16, 2009, and the Receiver took over the companies the following day.

158.

Jim Davis, SIBL's former chief financial officer, has testified that the Stanford fraud was a Ponzi scheme from the beginning. The criminal trial of R.A. Stanford proved that he and Jim Davis concealed from investors the true nature, size, and performance of SIBL's purported investment portfolio. Moreover, this Court has previously found that the Stanford fraud was a Ponzi scheme as a matter of law.

159.

In an opinion filed on December 15, 2010, the U.S. Court of Appeals for the Fifth Circuit upheld this Court's findings that the Stanford Entities' fraud was a Ponzi scheme. *See Janvey v. Alguire*, 628 F.3d 164, 168-69, 185 (5th Cir. 2010) (motion for reh'g *en banc* pending) (upholding this Court's Order). In particular, the Fifth Circuit made several rulings on the nature of the Stanford fraud, as follows:

> We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme.
>
> ***
>
> The Davis Plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as a Ponzi scheme. . . . The Davis Plea, when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme *ab initio*.
>
> ***
>
> The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed . . .
>
> ***

Here, the Receiver provided evidence of a massive Ponzi scheme
. . . The record supports the fact that Stanford, when it entered receivership, was
grossly undercapitalized.

*Id.* at 176-78, 180.

160.

Jim Davis pled guilty to several crimes, including conspiracy to commit securities fraud

and conspiracy to obstruct an SEC proceeding. On March 6, 2012, R.A. Stanford was convicted

after a six-week jury trial, of thirteen counts of wire fraud, conspiracy to commit wire fraud, mail

fraud, obstruction of an SEC proceeding, conspiracy to obstruct an SEC proceeding, and

conspiracy to commit money laundering. On June 14, 2012, R.A. Stanford was sentenced to 110

years in prison. He has appealed the verdict. Holt, who pleaded guilty in June 2012 to

obstructing an SEC investigation in the Stanford Ponzi scheme, was sentenced in September

2012 to 36 months in prison, followed by three years of supervised release. Lopez and Kuhrt

were convicted in November 2012 on 9 counts of wire fraud and one count of conspiracy to

commit wire fraud. Lopez and Kuhrt were each sentenced on February 14, 2013 to 20 years in

prison, followed by three years of supervised release.

161.

It cannot seriously be disputed that R.A. Stanford and the Stanford Entities were engaged

in a multi-year, international Ponzi scheme, working with Defendants to effect banking

transactions that were undertaken with the purpose and intent of defrauding the SIBL CD

investors.

### 3.  Defendants' Integral Role in Assisting the Fraud.

162.

Defendants assisted the fraud by moving SIBL investor money to other Stanford Entities through a warren of accounts.

163.

Jim Davis testified that the Stanford Entities used the structure of bank accounts maintained by Defendants, and made transfers between and among those accounts, in order specifically to further the fraud.

164.

SIBL funded all the other Stanford Entities, primarily using investor funds. The other Stanford Entities were not independently profitable—they existed solely for the purpose of perpetuating the fraud.

165.

R.A. Stanford was the sole owner and shareholder, whether directly or via holding companies, of every Stanford Entity and he treated those entities without any real recognition of corporate separateness. Defendants recognized this and Defendants also recognized that the only real infusion of capital into the Stanford empire came from SIBL CD investors.

166.

Once the investor money came into R.A. Stanford's control, he needed the Defendants' services to convert the money to his desired use. SIBL, an Antiguan entity, could not clear transactions in U.S. Dollars, Pounds Sterling, Euros, or Swiss francs. Funds sent in those currencies for the purchase of SIBL CDs would have been useless unless SIBL and R.A.

Stanford could establish bank accounts with financial institutions that could accept and transact in those currencies.

167.

Without Defendants' services, the fraud's supply lines would have been choked off and it would have quickly died. Despite what they knew, what they saw, and what information was available to them, Defendants provided those services, effectively facilitating the transfer of investor money into R.A. Stanford's pocket. Those transfers into R.A. Stanford's pocket are the reason that investors could not be repaid their investments (CDs) with SIBL.

168.

To achieve the funding of R.A. Stanford's entities, SIBL would typically move funds to SFG, from which it would be distributed to the other Stanford Entities. The records demonstrate that wires from SIBL to SFG were effectively simultaneous with wires from SFG to one of the money-losing Stanford Entities. According to Patricia Maldonado, who ran Stanford's Treasury department, SIBL CD investor deposits were routinely routed from the accounts at TD Bank and Trustmark that received investor deposits—TD Bank Account [REDACTED] and Trustmark Account [REDACTED] (discussed *infra*)—to whatever entity needed cash in the Stanford empire

169.

Jim Davis testified that this structure was implemented with the express purpose of hiding from Stanford Entity employees the fact that those entities were being funded by SIBL—*i.e.*, from investor funds. In particular, trial testimony states:

Q: Why use Stanford Financial Group as an intermediary?

A: It was a way to disguise the origin of the monies, the recipients feeling it came from Stanford Financial Group Company rather than the CD money, and it

certainly would have killed the company in terms of not being ever reported to respective CD holders or internal FAs [financial advisors] or present customers.

Davis testimony at 2884.

170.

Davis's explanation was confirmed by Henry Amadio, an accountant at SFG, who was tasked with tracking the flow of SIBL CD funds from SIBL to R.A. Stanford, the sole shareholder, and to the different Stanford Entities. Amadio created secret monthly "Shareholder Funding Reports" and sent them to his supervisors, Gil Lopez and Mark Kuhrt, who shared them with Jim Davis. R.A. Stanford received the Shareholder Funding Reports from Jim Davis. The Shareholder Funding Reports gave a detailed analysis of the Stanford Entities, grouped by region and the total amount of SIBL CD depositor funds used to support them. These Shareholder Funding Reports tracked R.A. Stanford's misuse of depositor funds, and by the end of 2008, over $2 billion in depositor funds had gone to prop up the operations of over 50 different Stanford Entities. This Shareholder Funding Report summarized the critical fact that was hidden from investors: that their deposits were never put to work for their benefit but instead supported absurd and speculative ventures.

171.

Jim Davis and Amadio describe a quintessential money laundering transaction, hundreds of examples of which plainly came before Defendants on a routine basis over the course of many years.

172.

Despite what they knew and what they saw, Defendants continued to facilitate these transactions, received substantial fees for doing so—and made significant profits on the funds

deposited with them—all the while allowing the fraud to grow and flourish at the expense of investors.

### 4. The Information Defendants were Charged with Knowing.

173.

In accordance with the know-your-customer and due diligence standards applicable to them, Defendants would have become aware of R.A. Stanford's personal history, SIBL's history, the risk level posed by doing business with an Antiguan bank, how other banks had dealt with SIBL and R.A. Stanford, and how regulators had dealt with SIBL and R.A. Stanford.

174.

When combined with what they learned about R.A. Stanford and the Stanford Entities in the course of doing business with them, the facts outlined below should have caused Defendants to put an end to their respective relationships with R.A. Stanford and the Stanford Entities.

### a. Industry Information Available to Defendants.

175.

With reasonable investigative efforts, Defendants would know, and at least in part did know, the following.

176.

R.A. Stanford petitioned himself into personal bankruptcy on February 17, 1984 before the U.S. Bankruptcy Court (for the Western District of Texas, Waco Division) under Case No. 6-84-00263-T on the basis of personal debts of $13,648,618.75. A bankrupt individual is generally deemed unfit to control and operate a bank.

177.

From 1985 until 1990, SIBL predecessor, Guardian, operated in Montserrat, a jurisdiction that was reputed in the financial services industries to have inadequate anti-money laundering regulations.

178.

By 1989, the banking system in Montserrat came under investigation by U.S. and U.K. authorities. Consequently, Guardian itself came under scrutiny for possible drug money laundering.

179.

By late 1990, after the OCC had issued banking circulars concerning Guardian's violation of banking laws and Texas regulators had threatened legal action against Guardian, Montserrat revoked Guardian banking license.

180.

R.A. Stanford moved Guardian from Montserrat to Antigua at the very time that Montserrat was scrutinizing its banks. Antigua subjected its offshore banking industry to limited regulation and had the reputation of being among the most corrupt islands in the Caribbean.

181.

Having moved to Antigua, Guardian/SIBL reported that it was audited by CAS Hewlett, a small, Antigua-based firm that clearly did not possess sufficient manpower or competence to adequately audit a financial institution the size and scale of SIBL. Notably, it was the same audit firm that Montserrat had deemed to be an unapproved auditor of Guardian.

182.

In 1994, then-Antiguan Prime Minister Lester Bird allowed R.A. Stanford to organize and arrange financing for a public hospital project in Antigua. R.A. Stanford purportedly funded an interim loan to the Antiguan Government to finance 100 percent of the project's architectural and engineering costs. Eventually, R.A. Stanford lent the Antiguan Government over $40 million through BOA, thereby heavily indebting the Antiguan Government—BOA and SIBL's only regulator—to R.A. Stanford. R.A. Stanford's involvement in the hospital project prompted a 1996 U.S. congressional investigation into corruption in Antigua.

183.

At least as early as 1996, the U.S. State Department's International Narcotics Control Strategy Report ("INCSR") highlighted weaknesses in Antigua's banking system related to money laundering. The report noted that "Antigua's offshore banking sector—established in the mid-1980's with only limited regulation—expanded rapidly in recent years. Some newer banks lack ties to established banking centers, and are suspect. The growing potential for money laundering has been an increasing concern of both the US and the Antiguan Government."

184.

These findings were reiterated in subsequent INCSRs. For instance, in 2003, the INCSR indicated that "[m]oney laundering in [Antigua and Barbuda] is related both to narcotics and fraud schemes, as well as to other crimes, but money laundering appears to occur more often in the offshore sector than in the domestic financial sector."

185.

In response to criticisms such as those contained in the 1996 INCSR, the Antiguan government passed the *Money Laundering (Prevention) Act of 1996* and later, after criticisms of

Antigua's banking sector persisted, formed the Antiguan Offshore Financial Sector Planning Committee to advise the government and recommend changes to its banking laws. Despite being one of the most prominent individuals in the very industry that the Committee was created to evaluate, R.A. Stanford was appointed Chairman of the Committee in 1997 by then-Prime Minister Bird, to whose election campaign Stanford had been a major contributor.

186.

As Chairman of the Committee, R.A. Stanford created a "task force" that was charged with considering improvements to Antigua's banking laws. R.A. Stanford paid the expenses of establishing the task force out of his own pocket, creating a clear conflict of interest.

187.

Ultimately, the task force recommended removing various offenses from Antigua's banking laws, including "false accounting" and "fraud," two of SIBL's and R.A. Stanford's cardinal sins. Adopting the task force's recommendations, in November 1998, the government of Antigua amended the *Money Laundering (Prevention) Act of 1996*, substantially watering it down.

188.

The Antiguan government also changed the supervision of its offshore financial sector by vesting authority over that sector in a new International Financial Sector Authority ("IFSA"). Stanford was appointed Chair of the IFSA.

189.

Shortly thereafter, in April 1999, the United States Department of Treasury Financial Crimes Enforcement Network ("FinCEN") issued FinCEN Advisory No. 11 concerning

Enhanced Scrutiny for Transactions Involving Antigua and Barbuda. FinCEN Advisory No. 11 essentially described agency capture in Antigua by a criminal element (emphasis added):

> *Banks and other financial institutions are advised to give enhanced scrutiny to all financial transactions routed into or out of Antigua or Barbuda*, or involving entities organized or domiciled, or non-resident persons maintaining accounts, in Antigua and Barbuda . . . .

In November 1998, the government of Antigua and Barbuda amended its Money Laundering (Prevention) Act in a manner that significantly weakened that Act; the statute had been enacted in December 1996 but had not been fully implemented. In November 1998, the Antiguan and Barbudan government also changed the supervision of its offshore financial services sector, by vesting authority over that sector in a new International Financial Sector Authority. *The Authority's board of directors includes representatives of the very institutions the Authority is supposed to regulate, thus raising serious concerns that those representatives are in fact in control of the Authority, so that the Authority is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards.*

The amendment of the Money Laundering (Prevention) Act, combined with changes in Antigua and Barbuda's treatment of its offshore financial services sector, are likely to erode supervision, stiffen bank secrecy, and decrease the possibility for effective international law enforcement and judicial cooperation regarding assets secreted in Antigua and Barbuda. *These changes threaten to create a "haven" whose existence will undermine international efforts of the United States and other nations to counter money laundering and other criminal activity, a concern of which the United States has repeatedly made the government of Antigua and Barbuda aware.*

The actions taken by the government of Antigua and Barbuda that weaken that nation's anti-money laundering laws and oversight of its financial institutions *necessarily raise questions about the purposes of transactions routed into or out of Antigua and Barbuda* or involving entities organized or domiciled, or non-resident persons maintaining accounts, in Antigua and Barbuda. Institutions subject to the suspicious activity reporting rules contained in 31 CFR 103.21 (effective April 1, 1996) should carefully examine the available facts relating to any such transaction, to determine if such transaction (of $5,000 or more, U.S. Dollar equivalent) requires reporting in accordance with those rules. … *Enhanced scrutiny is especially important for transactions involving Antigua and Barbuda offshore banks*, transactions involving both Antigua and Barbuda offshore banks and the nine commercial banks licensed to do business in Antigua and Barbuda, and transactions in which one or more of such nine commercial banks act for one of more Antigua and Barbuda offshore institutions.

190.

Significantly, FinCEN Advisory No. 11 marked only the second time in its history that the U.S. Treasury Department had released an advisory targeting a specific country. The U.K issued a similar advisory around that same time.

191.

Giving credence to the concerns articulated in FinCEN Advisory no. 11, R.A. Stanford removed Althea Crick, the chief banking regulator for the FSRC, after she criticized his interference with regulators.

192.

Leroy King then became the head of the FSRC and regularly accepted cash bribes from R.A. Stanford to overlook the false financial reports submitted by SIBL to the FSRC. The FinCEN Advisory foretold of these very dangers.

193.

Defendants received and/or were aware of the FinCEN Advisory.

194.

Defendants knew or should have known that the FinCEN Advisory was referring specifically to R.A. Stanford and the Stanford Entities when it warned that the International Financial Sector Authority's board of directors included "representatives of the very institutions that Authority is supposed to regulate," and that the Authority was "neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards."

195.

In February 2001, the U.S. Senate's Minority Staff of the Permanent Subcommittee on Investigations issued a "Report on Correspondent Banking: A Gateway for Money Laundering." That report specifically targeted an Antiguan bank, called American International Bank ("AIB"), which had been engaged in fraud.

196.

The U.S. Senate Report identified that AIB had fallen into liquidation after it laundered millions of dollars and collapsed from insider abuse, insufficient capital and the sudden withdrawal of deposits. TD Bank's involvement in this fraudulent scheme appeared as a case study in the U.S. Senate Report, which identified that correspondent accounts are particularly vulnerable to money laundering and provide corrupt foreign banks access to the U.S. financial system and the freedom to move money around the world. With respect to TD Bank's relationship with the Antiguan AIB, it concluded, among other things, that:

- TD Bank was used to receive wire transfers from fraud victims and/or to disburse the illicit funds to accounts controlled by the criminals; and

- TD Bank in Canada was a major conduit for AIB funds in to the U.S. banking system and that between June 1996 and January 1997, $20.9 million was wired to the AIB correspondent account from the account at TD Bank in Canada.

197.

In 2003, and continuing at least until 2007, the U.S. State Department's INCSRs listed Antigua as a "jurisdiction of major concern" on its list of Major Money Laundering Countries.

198.

In or around 2004, World-Check, an  organization that gathers information globally on heightened risk individuals and entities, added R.A. Stanford to its database of high risk

individuals and classified him as a Politically Exposed Person ("PEP") on account of, among other things, his association with then Antiguan Prime Minister Bird. By virtue of their positions or influence they may hold, PEPs present a high risk for potential involvement in bribery and corruption.

199.

In or around 2006, a former employee of a Stanford-owned entity filed a private whistle-blower lawsuit against Stanford and SGC. The suit, filed in Miami-Dade County Circuit Court in Florida, charged that SGC was attracting clients by selling CDs with artificially high yields and was operating a Ponzi scheme. In addition, it was alleged that R.A. Stanford was bribing Antiguan regulators to keep them from passing money laundering legislation. After the presiding judge gave the plaintiff permission to depose R.A. Stanford, SGC settled.

200.

In or around June 2007, World-Check added SGC to its database as a financial institution that posed a heightened risk. At the time that World-Check added SGC to its database, World-Check indicated that one or more public sources had reported that SGC distributed sales literature that failed to present a fair and balanced treatment of investment risks and benefits, and contained misleading, unfair and unbalanced information.

201.

In or around January 2008, the Financial Industry Regulatory Authority ("FINRA") censured SGC and fined it $10,000 for distributing misleading, unfair and unbalanced information about the CDs, as well the fact that the relationship between SIBL and SGC could create a conflict of interest.

202.

As a result of this extensive information, the facts surrounding the Stanford fraud were widely known in the law enforcement, anti-money laundering, and banking communities from at least 1997. Defendants are part of these communities.

203.

Notwithstanding the information available to them about R.A. Stanford and the Stanford Entities through reasonable and mandatory investigative efforts and monitoring, Defendants did not limit the banking activities of R.A. Stanford or the Stanford Entities.

### b.  Others Concluded that Stanford Should be Avoided.

204.

Notably, other entities and regulators that were part of the banking and regulatory communities concluded that business should not be conducted with SIBL or, in some cases, that a fraud was taking place.

### i.  The SEC.

205.

According to a March 2010 Report issued by the SEC's Office of Inspector General ("OIG Report"), the SEC's office in Fort Worth, Texas, reviewed the operations of SGC and its sale of SIBL CDs in 1997. At that time, after only six days of fieldwork in examination of R.A. Stanford and his companies, the SEC came to the conclusion that he was likely operating a Ponzi scheme. SEC examiners concluded that SIBL's statements promoting SIBL CDs appeared to be misrepresentations. Those examiners noted that the interest rates purportedly paid on SIBL CDs, combined with large "referral" payments being made to SGC and SFG, were too high to be

achieved through SIBL's purported low-risk investments. Taking into account these and other facts, the SEC's Fort Worth branch chief concluded that the returns on SIBL CDs were "absolutely ludicrous."

206.

According to the OIG Report, the SEC's Forth Worth office conducted additional investigations into SGC and SIBL in 1998, 2002 and 2004. Each examination resulted in the conclusion that the SIBL CDs could not have been "legitimate" and that it was "highly unlikely" that the claimed returns could have been achieved with the purported conservative investment approach.

207.

The OIG Report concluded that the SEC's failure to end the SIBL fraud and bring R.A. Stanford to justice did not result from a lack of evidence that the SIBL fraud was taking place. Rather, the OIG Report found that senior officials at the SEC's Fort Worth office felt that prosecuting large, novel, or complex cases was disfavored in comparison to prosecuting numerous "quick-hit" cases.

### ii.    Pershing, L.L.C.

208.

SGC entered into a "clearing agreement" with international clearinghouse Pershing in December 2005. Initially, Pershing processed wire transfers to TD Bank from investor accounts for the purpose of purchasing SIBL CDs. By approximately mid-2006, however, Pershing became concerned about the relationship between SGC and SIBL; SGC was not turning a profit and its main stream of revenue consisted of referral payments from SIBL for CD sales.

209.

As a result, in the summer of 2006, Pershing began to ask for verification of SIBL's assets and the returns that SIBL's investment portfolio purportedly generated.

210.

Pershing also became concerned that SIBL was not properly reporting its SIBL CD sales to the Internal Revenue Service.

211.

Pershing never received a satisfactory response to its concerns from SGC or SIBL. As a result, Pershing notified SGC in December 2008, shortly after the Madoff fraud became public, that it would no longer process wire transfers with TD Bank for the purchase of SIBL CDs.

### iii.   Chase Manhattan Bank.

212.

Upon information and belief, Guardian had a correspondent banking relationship with Chase that was closed by Chase due to concerns regarding double endorsed checks.

### iv.   Bank of America.

213.

Bank of America provided SIBL with correspondent banking services over the course of approximately one year in the mid-to-late 1990s. During that period, Bank of America's Compliance Department determined that providing services to SIBL constituted an intolerable risk from an anti-money laundering perspective. After about one year, Bank of America closed the correspondent account of SIBL due to those compliance concerns.

214.

Thomas Wulff, former head of correspondent banking at Bank of America, testified that Bank of America stopped performing correspondent services for the Stanford Entities in or around 1998 but that R.A. Stanford, for the sake of appearances, wished to terminate the relationship from his side.

215.

Wulff further testified that Bank of America stopped doing correspondent services with all Caribbean offshore banks because "at some point, we all became aware that it was too good to be true."

216.

According to Wulff, the "whole [Stanford] operation was suspicious from the perspective of how can they do that, how can he live that way, how can he maintain, how many jets?"

**v.    NASD.**

217.

The National Association of Securities Dealers ("NASD") concluded as early as 2006 that SGC violated NASD rules through "unwarranted and misleading" assertions that SIBL's portfolio investments were "prudent" at a time when SGC admitted that it did not know what was in SIBL's portfolio.

218.

Jim Davis later testified that among the NASD's chief complaints was that the broker-dealer arm of the Stanford Entities was set up merely for the sale of SIBL CDs.

### vi.   U.S. Customs.

219.

As far back as the early 1990's, U.S. Customs officials noted that SIBL (then known as Guardian) had "constant cash flow" from foreign depositors but "no regulation of its activities" and U.S. Customs took an interest in the "possible smuggling activities of principals in the Stanford organization."

220.

These above-listed entities concluded that R.A. Stanford and SIBL should be avoided, and did so without the window into the Stanford Entities' activities that Defendants possessed.

221.

In sum, Defendants possessed facts that carried special weight to members of the banking and financial services industry, or possessed access to such facts, that would have tipped off a member of that industry that R.A. Stanford was involved in illicit activities, based on:

- their experience in the financial industry;

- their knowledge of SIBL's business activities;

- SIBL being organized in Antigua, a noted high-risk jurisdiction in the banking community;

- their knowledge of FinCEN Advisory No. 11;

- their knowledge of INCSRs; and

- their knowledge of regulatory authority scrutiny of Antigua in general and R.A. Stanford and SIBL in particular.

5.  **Defendants' Banking Relationships with R.A. Stanford and Stanford Entities.**

222.

Defendants provided banking services across four countries in a global arrangement that, upon scrutiny, made little sense.

223.

Wires for purchases of SIBL CDs in dollars went to TD Bank, a Canadian bank, even though the Stanford empire was headquartered in Houston and had accounts with U.S. banks.

224.

The checks for SIBL CD purchases drawn on checking accounts were bundled up and sent to Antigua and then sent to the U.S. in pouches on a daily basis in enormous amounts, even though many of the checks originated in the U.S.

225.

Wires for purchases of SIBL CDs in Pounds Sterling and Euros went to HSBC and sat uninvested and untouched until they were transferred out en masse, even though SIBL's business model depended on its investment of depositor funds.

226.

R.A. Stanford was paying himself and taking personal loans from SG Suisse, and securing the loans with SIBL CD investor assets, even though SIBL never showed such borrowings on its financial statements.

227.

Wires in huge, round sums went back and forth between and among the banks, even though there was no clear purpose for such transfers.

228.

Perhaps most curiously, all of the operations of a supposedly offshore bank were run from the United States, primarily Houston, even though the picture painted to the outside world was that of an Antiguan entity at the heart of the Stanford empire.

229.

None of it added up, except as a way to dodge regulation—the very thing that the Texas Department of Banking had zeroed in on in the late 1980s when it investigated Guardian.

230.

Defendants knew that SIBL's sole product line was CDs, were fully aware that the source of the deposits into the accounts they maintained were the proceeds of the sale of SIBL CDs, and assisted R.A. Stanford and the Stanford Entities in transferring SIBL CD customer funds from SIBL accounts to dozens of other Stanford Entity accounts, where the funds were ultimately dissipated.

231.

Critically, Defendants understood the economics of SIBL's supposed business model: borrow money by way of CD issuances and use that money to earn a return greater than what was paid to borrow it. Because the CD rates were high and SIBL paid a high commission to its sales force, SIBL generally would have needed to earn over 10 percent on its investment of depositor funds simply to break even.

232.

Defendants, however, knew the market and also observed what SIBL did with CD funds; thus, they were aware that it was economically infeasible for SIBL to break even, much less turn a profit. SIBL consistently reported profits over many years.

233.

Defendants also knew that SIBL represented itself as an Antiguan bank, and that the bank's Antiguan citizenship was largely a fiction. None of the Antiguan employees possessed any real authority or control, nor were the account statements maintained by Antiguan employees.

234.

Defendants were aware that the Stanford Entities were run from Houston and that the use of non-U.S. accounts and addresses was done to evade scrutiny.

235.

The SIBL CDs were supposedly sold under a Regulation D exemption from registration under the Securities Act of 1933; however, given the number of investors, and the extensive marketing efforts of the Stanford Entities, Defendants knew that the SIBL CDs were illegal, unregistered securities.

236.

Defendants nevertheless provided critical correspondent banking, private banking, investment banking and other financial services across dozens of accounts, assisting the Stanford Fraud in flourishing worldwide.

237.

Each Defendant's role is discussed in detail below.

6. **Defendants' Respective Roles in the Fraud.**

   a. **Trustmark's Role.**

238.

Trustmark was the primary conduit for the introduction of U.S. dollars to the Stanford fraud via check, receiving pouched bundles of checks from investors and providing banking and investment services for the Stanford Entities, beginning at least as early as 1999 through its predecessor Republic National Bank and beginning in 2006 as Trustmark.

239.

The Stanford Entities maintained at least 75 different accounts with Trustmark over time, and they were among Trustmark's largest depositors and most important customers.

240.

Not only were the Stanford Entities a profit source for Trustmark, but high-level Trustmark personnel and high-level Stanford personnel developed close, personal relationships with one another, communicating and socializing frequently.

   i. **The Trustmark Relationship.**

241.

Trustmark maintained very close contact with its client, particularly with Jim Davis. A number of senior Republic National Bank/Trustmark officers serviced the Stanford Entities' accounts, including James Outlaw and Dennis Watson, both of whom had served as Trustmark's Chief Operating Office, and Gene Henson, President of Trustmark's Memphis Regional Office.

242.

Watson subsequently was employed by BoH, continuing his relationship with the Stanford Entities there.

243.

Before Watson left Trustmark for BoH, Trustmark bought Republic National Bank and James Outlaw took over the due diligence for the Stanford Entities. In one of his first acts in that role, Outlaw sent a series of questions to the Stanford Entities in August 2006. This so rankled the Stanford insiders that it prompted Patricia Maldonado and Jim Davis to make contingency plans to move the Stanford Entities' wire business to another bank.

244.

In October 2006, Richard Hickson (Trustmark's Chairman), Outlaw, and Jim Lenoir (Trustmark's Risk Officer) met with Jim Davis in Memphis, Tennessee. A series of communications following that visit demonstrate that Trustmark was in the palm of the Stanford Entities.

245.

On October 13, 2006, Lenoir, Anthony Grantham (Trustmark's Compliance Officer), and George Shirley (Trustmark's Audit Officer) held a telephone conference with Maldonado, discussing wire activity. After the call, Maldonado wrote to Jim Davis that Trustmark had "a barrage [sic] of questions. They're 'seeing alot of wire activity' and want to know 'what the wires are for,' especially international wires."

246.

This prompted Jim Davis to write an email on October 16, 2006 to Outlaw, Lenoir, and Hickson complaining about "Questions. Questions." Davis asked Outlaw to "help in introducing

our company and its operations to your various operatives . . . ." Incredibly, Davis ended his email by stating, "Quite honestly, I'm somewhat surprised that there are 'Questions' about 'what these wires are for?'"

247.

Outlaw replied, "Unfortunately, the OCC will dive much deeper in our relationship than they did with [Republic National Bank]. . . . Our previous dealings with the OCC have found international wires a topic that receives a great deal of scrutiny. Jim, I want our relationship to grow."

248.

Jim Davis scuttled that scrutiny of wire activity, apparently by causing Trustmark to fear that such scrutiny would prompt the Stanford Entities to take their business elsewhere. An October 16, 2006 email from Stanford employee Jane Bates to Maldonado states that "James Lenoir called me today and he was concerned about our impression of their 'tone' the other day. He was very apologetic and wanted to be sure that we understood how much they wanted us for clients. Hmmmm! Seems he had a conversation with you and you had expressed concerns." In reply, Maldonado commented "I fyi'd [Davis] on the conversation with [Trustmark] and he forwarded that e-mail to Jim Outlaw with his request to look into the scrutinous attitude. Jim must have mentioned it to these guys."

249.

That Jim Davis held such sway with senior Trustmark personnel was no surprise. Davis did his personal banking with Trustmark and had a close relationship with Henson, the President of Trustmark's Memphis regional offices. Davis and Henson socialized on a monthly basis, attending plays, dining, and playing golf together. They also did personal business together.

250.

Illustrative of the wide berth afforded to Jim Davis, Trustmark had permitted him to overdraw his personal account and allowed him to pay interest-only on his personal loan with Trustmark.

251.

Likewise, Outlaw made special exceptions for the Stanford Entities' payment of overdrafts, especially as the Stanford fraud entered its death throes. Thus, it was manifest to Trustmark that SIBL had lost its ability to pay its depositors as SIBL was drawing money into Trustmark from all the various Stanford Entity accounts in order to fund redemptions.

252.

On the eve of the collapse, Trustmark questioned wire activity to affiliates, demonstrating that Trustmark knew exactly what its customer was doing with SIBL CD funds. In January 2009, Outlaw questioned "the ability to transfer from one affiliate to the other" and Maldonado was "providing him explanations." Outlaw asked if "the Madoff situation was affecting our deposits." He also questioned the transfers going to and from BoH and wanted to "come up with a single solution." This prompted Maldonado to suggest that Davis have a chat with Trustmark's Chairman, Hickson, to smooth things over.

253.

Some of the specific account activity that demonstrates Trustmark's knowledge of the fraud is set forth below.

ii.    **Account Activity at Trustmark Demonstrating its Knowledge of the Fraud.**

254.

Trustmark maintained at least 75 accounts in the names of various Stanford Entities. This very volume of accounts without any legitimate reason, combined with routine inter-account transfers, as occurred here and detailed below, was a clear indicator of fraud. These accounts, some of which are discussed below, included:

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Stanford International Bank;

- Account no. **REDACTED** ("Trustmark Account REDACTED")  in the name of Stanford Financial Group;

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Stanford Development Corp.;

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Stanford Financial Group Company;

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Stanford Venture Capital Holdings;

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Stanford Eagle;

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Stanford Financial Group, Ltd.;

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Caribbean Sun Airlines Holdings;

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Caribbean Star Airlines;

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Stanford Group Holdings;

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Stanford Aviation 5555;

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Stanford Aircraft;

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Stanford Aviation II;

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Stanford Corporate Ventures BVI;

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the Stanford Group Companies Payroll;

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Stanford Group Company; and

- Account no. **REDACTED** ("Trustmark Account REDACTED") in the name of Stanford International Holdings (Panama), among many others.

255.

All account statements were routinely held at Trustmark's River Oaks branch. This was true also for the SIBL accounts; they were not sent to Antigua. In fact, SIBL's President, Tolentino, did not even possess signatory authority on the SIBL account.

256.

Indeed, Trustmark dealt with U.S.-based personnel on all substantive matters, relying on SIBL's Antiguan employees only to assist with administrative tasks. Thus, Trustmark knew that SIBL's Antiguan "residence" was a fiction designed merely to avoid regulatory scrutiny.

257.

The checks of investors who paid for their SIBL CDs in U.S. Dollars arrived at Trustmark in Houston, Texas in bundled packages from Antigua on a near-daily basis, often numbering 20 or more per day and averaging at least $1 million, primarily for deposit to

Trustmark Account ▮▮▮. Some checks deposited were as old as 6 months.  Many of the checks were returned for insufficient funds.

258.

The volume of pouching that occurred was extraordinary:

- In 2007, 259 deposits (representing thousands of checks) totaling $362,295,806 arrived from Antigua; and

- In 2008, 252 deposits (representing thousands of checks) totaling $358,094,525 arrived from Antigua.

259.

According to the testimony of Jim Davis, checks received in the U.S. were "pouched" to Antigua and then immediately "pouched" back to the U.S. for deposit at Trustmark. Other checks were written in the name of foreign investors and then endorsed to SIBL.

260.

By its very nature, this pouching activity should have raised alarms at Trustmark. The only reason for such a convoluted procedure was to evade regulatory scrutiny in the U.S. by creating the illusion that the SIBL CD program was an Antiguan operation.

261.

In sum, hundreds of millions of dollars of investor money, if not more, were received via the daily pouch deliveries. Many hundreds of millions of dollars more of investor funds were wired into Trustmark.

262.

Trustmark Account ▮▮▮ in the name of SIBL was the account to which were deposited the bundled checks and the wires from TD Bank Account ▮▮▮. Trustmark Account ▮▮▮ often reflected activity in excess of $100 million on its monthly statements, but maintained a balance

of less than $10 million, and often less than $3 million, due to the rapid flow of money into and out of the account.

263.

Large sums were routinely transferred from Trustmark Account <span style="background:black;color:white;">REDACTED</span> account to Trustmark Account <span style="background:black;color:white;">REDACTED</span>, which was the SFG account. These transfers were generally in large, round dollars and there were many hundreds of such transactions per year.

264.

For instance, the account activity shows that from January 2007 – July 2007, there were 130 transfers from Trustmark Account <span style="background:black;color:white;">REDACTED</span> to Trustmark Account <span style="background:black;color:white;">REDACTED</span> totaling $267,792,098, over two-thirds of which were $1 million or more.

265.

From account <span style="background:black;color:white;">REDACTED</span>, sums were transferred to companies such as Stanford Development Corp. (Trustmark Account <span style="background:black;color:white;">REDACTED</span>), Stanford Financial Group Company (Trustmark Account <span style="background:black;color:white;">REDACTED</span>), Stanford Venture Capital Holdings (Trustmark Account <span style="background:black;color:white;">REDACTED</span>), Stanford Eagle (Trustmark Account <span style="background:black;color:white;">REDACTED</span>), Caribbean Sun Airlines Holdings (Trustmark Account <span style="background:black;color:white;">REDACTED</span>), Caribbean Star Airlines (Trustmark Account <span style="background:black;color:white;">REDACTED</span>), Stanford Financial Group Ltd. (Trustmark Account <span style="background:black;color:white;">REDACTED</span>), Stanford Group Holdings (Trustmark Account <span style="background:black;color:white;">REDACTED</span>), Stanford Aviation 5555 (Trustmark Account <span style="background:black;color:white;">REDACTED</span>), Stanford Aircraft (Trustmark Account <span style="background:black;color:white;">REDACTED</span>), Stanford Aviation II (Trustmark Account <span style="background:black;color:white;">REDACTED</span>), and others.

266.

Likewise, Trustmark Account <span style="background:black;color:white;">REDACTED</span> was the Stanford Financial Group Payroll account. It paid out approximately $3 million to $5 million on a monthly basis. The money in Trustmark

Account ▉ came from Trustmark Account ▉, which ultimately flowed from the SIBL Trustmark Account ▉.

267.

The same held for Trustmark Account ▉, which was the Stanford Group Holdings Account. Money was occasionally wired into this account from outside Trustmark, or transferred from Trustmark Accounts ▉ or ▉. Money often went out to Trustmark Account ▉ or later to Trustmark Account ▉. The wires and transfers were generally between $5 and $10 million in round amounts.

268.

In one particularly odd scenario, Trustmark Account ▉, in the name of Stanford International Holdings, was completely inactive except that on April 5 2006, $2 million was wired in and wired out; on July 16, 2007, $10 million was wired in and wired out; on September 29, 2008,  $3.6 million and $2.32 million were wired in and out; and on October 31, 2008, $15 million was wired in and out. This account never had an end-of-day balance.

269.

Thus, significant amounts of investor funds were wired into accounts of Stanford Entities that were losing money or that clearly had no business purpose. It was plain to Trustmark that SIBL CD money was being transferred to entities that did not appear in the SIBL annual report.

270.

These examples are illustrative of the wider pattern that extended over the course of many years and that demonstrated to Trustmark that SIBL was deceiving its investors.

271.

In any event, Trustmark plainly knew that the investor funds that Trustmark received generally were not invested, in any real sense, to generate the promised returns on the SIBL CDs. Rather, the funds were transferred to other accounts to fund the various operations of the Stanford Entities or earned nominal interest in Trustmark accounts in amounts that were small potatoes compared to what SIBL promised to CD investors. Indeed, Trustmark issued CDs to Stanford Financial Group in 2008 that earned only 2.96% interest. Thus, Trustmark knew it was commercially infeasible for SIBL to issue CDs at a higher rate and without any real investment activity to back its promised returns. Because SIBL's cost of funds was around 10 percent just to break even on its obligations, it was obvious to Trustmark that the SIBL CD rates were not just "too good to be true," they were mathematically impossible to be true.

272.

Trustmark could see, given SIBL's dissipation of investor funds and the lack of any significant investment activity, that it was impossible for SIBL to pay the interest rates that it offered to investors.

273.

Trustmark was required to consider all of the information it acquired in the course of providing services to Stanford Entities and to determine whether it was appropriate to provide correspondent and other banking services to SIBL.

274.

At the time that Trustmark began providing correspondent banking services to SIBL, Trustmark knew, or came to know, that SIBL performed its U.S. dollar wire transfer business

through TD Bank, which would have aroused suspicion because SIBL had relatively few connections to Canadian customers or other business interests in Canada.

275.

In addition, having chosen to establish a correspondent bank account for SIBL, Trustmark would have been on particularly high alert in light of the fact that:

- SIBL was located in Antigua, one of the highest risk jurisdictions in the world;

- R.A. Stanford was a Politically Exposed Person;

- R.A. Stanford had declared bankruptcy;

- Guardian bank had been run out of Montserrat;

- Trustmark was providing correspondent banking services, the highest risk type of banking services; and

- investor funds sent to SIBL's Trustmark account were done by check pouching from Antigua, a method which itself carries a higher risk of fraudulent activity.

276.

Despite what Trustmark knew concerning the background of SIBL, the types of transactions in which it engaged, and the blatant misapplication of SIBL CD investors' funds, it continued to provide essential banking services to SIBL that perpetuated the transfer of funds to R.A. Stanford and the entities that he owned, which was the essence of the fraud.

### b.    SG Suisse's Role.[2]

### i.    SG Suisse's Management of Assets.

### 277.

SG Suisse and Friedli played major and essential roles in the management of the Stanford Entities' businesses and assets, and in facilitating R.A. Stanford's fraudulent scheme. As part of its multiple and conflicting roles, SG Suisse acted as an investment manager with respect to funds belonging to various Stanford Entities and R.A. Stanford personally. SG Suisse managed at least the following accounts on behalf of R.A. Stanford and the Stanford Entities:

**SG Private Banking, Geneva, Switzerland**

| Beneficiary | Account Number |
| --- | --- |
| Stanford International Bank (Antigua) | REDACTED |
| Stanford International Bank (Antigua) | REDACTED |
| Stanford Financial Group LTD, Lausanne | REDACTED |
| Robert Allen Stanford | REDACTED |
| Bank of Antigua | REDACTED |
| Stanford Bank (Panama) | REDACTED |

**SG Private Banking, Lausanne, Switzerland**

| Beneficiary | Account Number |
| --- | --- |
| Stanford International Bank. Ltd. | REDACTED |

---

[2] The allegations that follow in section IV.A.6.b do not differ from those contained in Intervenor OSIC's complaint against SG Suisse, except that this Second Amended Class Action Complaint has deleted references to fraudulent transfer claims because the Court has ruled that the Class does not possess the right to bring such claims.

278.

Upon information and belief, all the money deposited or transferred into these accounts and from these accounts, were investor funds derived from the sale of SIBL CDs. Defendants were granted discretionary investing and fiduciary authority over many of these accounts, and were compensated generously with banking and brokerage fees. Due to their multiple and conflicted roles, Defendants had a clear picture of R.A. Stanford's management, diversion and looting of CD-customer funds for his own benefit and for the benefit of the Stanford Entities in which he alone had an interest.

## ii.    R.A. Stanford's Personal Banker and Confidante ‒ Blaise Friedli.

279.

All of the Stanford Entities' depository accounts and investments at, or made through, SG Suisse were supervised in all respects by its Executive Vice-President Blaise Friedli and others under his supervision.

280.

Upon information and belief, R.A. Stanford's relationship with Friedli dated back to at least 1994. While working at a predecessor bank, Friedli strongly recommended Stanford and the Stanford Entities to prospective investors and third parties, vouching for R.A. Stanford personally, and for his business. Friedli distributed letters addressed "To Whom it May Concern" signed by him and apparently provided to R.A. Stanford with the understanding that these unqualified recommendation letters would be forwarded to potential business counter-parties and prospective investors at Stanford's discretion. These recommendation letters attest to Friedli's deep association with SIBL's management for "almost 10 years," and "strongly

recommend" SIBL for any "business dealings." The letters further invite the recipient to contact Friedli for "any further information you may wish to get."

281.

In addition to serving as R.A. Stanford's long-standing banker, *confidante*, and fiduciary to R.A. Stanford and the Stanford Entities at SG Suisse, Friedli also served on Stanford's International Advisory Board, which was a group of influential business and political figures hired by R.A. Stanford as trusted advisors on the operation and direction of SIBL and the other Stanford Entities. Moreover, upon information and belief, Friedli was separately compensated as a consultant to Stanford Financial Group Global LLC, for which he was paid at least $50,000 annually. Shockingly, Friedli's consulting agreement called on him to provide the following broad-based services to R.A. Stanford and the Stanford Entities while serving as a senior executive at SG Suisse:

> Advice and guidance to any officer or member of the Board of Directors of Stanford Financial Group Global Management, LLC, and in particular to the Regional Managing Director for Europe, primarily pertaining to issues relating to European operations.

> Participate in Advisory Board Meetings as may be requested by Company, including service as a member of the Advisory Board if so requested.

> Analysis and recommendations concerning company's and/or its affiliates' strategic growth plans in Europe.

> Advise and support to Company and/or its affiliates in respect to their relations with local governments and regulators in those countries in Europe where they do business or may desire to conduct operations.

> Support on Company's and/or its affiliates' activities or operations in those jurisdictions in Europe where company and/or its affiliates maintain or desire to conduct operations.

> Research and analysis regarding the growth of Company and/or any of its affiliates in those jurisdictions in Europe where Company and/or its affiliates maintain or desire to conduct operations.
>
> Upon request, participate at quarterly or selected Company meetings as a speaker or as otherwise requested.
>
> Any other related services that from time to time the company may require.

282.

As evidenced by Friedli's glowing recommendation letters, and by his course of conduct through years of consulting to and advising R.A. Stanford and the Stanford Entities, Friedli presented himself to the outside world—including actual and prospective SIBL investors—as an international banker uniquely familiar and intimate with SIBL's management and inner-workings. Based on the foregoing, Friedli understood SIBL's banking operations, CD issuance activities, investment strategies, and regulatory disclosure obligations. Of course, Friedli's dual role, as a R.A. Stanford consultant and employee, placed him and SG Suisse in a compromised and utterly conflicted position, with respect to SG Suisse, R.A. Stanford personally, and Stanford's investors. At all times, Friedli had irreconcilable conflicts and a personal financial stake in the perpetration of R.A. Stanford's illicit businesses.

### iii.    R.A. Stanford's "Slush Fund."

283.

SG Suisse also maintained what U.S. authorities have termed a "secret" account in the name of Stanford Financial Group, Ltd ("SFGL"): SG Suisse Account No. ███████ ("Account ███").

284.

During R.A. Stanford's criminal trial, Davis described Account ▮ as R.A. Stanford's personal "slush fund." Jim Davis and FBI Agent Robert Martin testified that R.A. Stanford used this account to bribe Antiguan regulators and SIBL's outside auditor, CAS Hewlett. R.A. Stanford also used this account to transfer at least $80 million to his personal bank accounts at JPMorgan Chase, Bank of New York Mellon, Sterling Bank, Bank of Antigua and elsewhere through his personal banker, Friedli.

285.

Jim Davis and R.A. Stanford never disclosed the existence of this secret slush fund, Account ▮, to bank regulators, investors, or even to their own senior executives, and because of Swiss bank privacy laws, and Friedli's conflicted roles, they knew that Friedli would similarly never reveal its existence. Most of the funds routed through Account ▮ vanished into R.A. Stanford's criminal enterprise, to R.A. Stanford personally, to Stanford Entities in which his investors had no interest, or into Defendants' pockets.

286.

The secret Account ▮ differed from a typical corporate or personal bank account. Only two individuals were listed as signatories on the account—R.A. Stanford and Jim Davis. The instructions on the account required that no funds could be transferred or debited from the secret account without a written directive signed by either R.A. Stanford or Jim Davis, with a follow-up phone call from Davis or Stanford to confirm the transaction.

287.

Jim Davis testified at R.A. Stanford's criminal trial that "Blaise Friedli was the banking officer in charge of this particular account [*i.e.*, Account ▮]." It was Friedli whom Davis or

Stanford would contact to transfer funds out of Account ▮▮▮.  Accordingly, Friedli had actual knowledge of each transfer request and manually facilitated each transfer of investors' funds to the intended recipient, including to R.A. Stanford himself.

288.

SG Suisse was not a blind "conduit" for transactions initiated remotely by R.A. Stanford and Jim Davis through Account ▮▮▮.  Rather, SG Suisse had actual knowledge of the amount and purpose of each transaction and the diversion of massive amounts of investor funds for improper purposes through the ▮▮▮ Account.  As noted above, given his long-standing relationship with Stanford, his status as fiduciary to the Stanford Entities, his intimate knowledge of R.A. Stanford's business operations through service on the International Advisory Board, and as a paid consultant and Stanford *confidante*, his role as the "banking officer in charge" of Account ▮▮▮, and international banking and business practices, Friedli was aware of R.A. Stanford's improper activities at all relevant times and Friedli and SG Suisse acted as R.A. Stanford's secret partners in facilitating his fraud and the diversion of investor funds.

iv.    **SG Suisse Effects Improper Transfers of CD Funds to R.A. Stanford.**

289.

As established at the numerous criminal trials and through expert testimony of the Receiver's forensic accountants, virtually all of the funds deposited into <u>any</u> of the Stanford Entity's bank accounts were derived from the sale of phony certificates of deposit to SIBL investors.  As Friedli and SG Suisse were aware, SIBL's only business was selling CDs to investors, and Friedli therefore knew that all funds deposited into Account ▮▮▮ and other accounts at SG Suisse in the name of other Stanford Entities were derived from CD sales to

SIBL investors. All transfers made to Account ▓ were from accounts held in SIBL's name at TD Bank and Union Credit Bank, which held Stanford accounts for a brief time. From June 23, 2000, through September 12, 2008, SIBL transferred $262.1 million in CD customer funds to Account ▓.

290.

Notwithstanding the nature of the funds at SG Suisse as belonging to SIBL investors, Friedli presided over and actively facilitated at least $80 million in transfers from Account ▓ directly to R.A. Stanford's personal bank accounts, as follows:

| Date | Amount (USD) | Recipient Bank | Account Holder |
|---|---|---|---|
| 6/26/2000 | $ 1,200,000.00 | Chase Bank, Texas | Allen Stanford |
| 7/27/2000 | 775,000.00 | Chase Bank, Texas | Allen Stanford |
| 8/31/2000 | 600,000.00 | Chase Bank, Texas | Allen Stanford |
| 9/5/2000 | 600,000.00 | Chase Bank, Texas | Allen Stanford |
| 11/3/2000 | 200,000.00 | Chase Bank, Texas | Allen Stanford |
| 12/12/2000 | 1,500,000.00 | Chase Bank, Texas | Allen Stanford |
| 12/15/2000 | 2,000,000.00 | Chase Bank. Texas | Allen Stanford |
| 12/22/2000 | 4,000,000.00 | Chase Bank, Texas | Allen Stanford |
| 2/16/2001 | 500,000.00 | Chase Bank, Texas | Allen Stanford |
| 6/7/2002 | 5,000,000.00 | Chase Bank, Texas | Allen Stanford |
| 4/10/2003 | 7,500,000.00 | Chase Bank, Texas | Allen Stanford |
| 8/5/2003 | 10,000,000.00 | Chase Bank, Texas | Allen Stanford |
| 10/1/2003 | 8,000,000.00 | Chase Bank, Texas | Allen Stanford |
| 10/3/2003 | 8,000,000.00 | Chase Bank, Texas | Allen Stanford |
| 10/8/2003 | 6,000,000.00 | Chase Bank, Texas | Allen Stanford |
| 1/30/2004 | 4,971,543.00 | Mellon United National Bank | Allen Stanford |
| 4/8/2004 | 4,654,300.00 | Mellon United National Bank | Allen Stanford |
| 4/9/2004 | 3,345.650.00 | Sterling Bank. Houston | Allen Stanford |
| 8/20/2004 | 2,576,301.00 | Sterling Bank, Houston | Allen Stanford |
| 8/20/2004 | 2,499,254.00 | Mellon United National Bank | Allen Stanford |
| 4/24/2006 | 2,989,574.00 | Sterling Bank, Houston | Allen Stanford |
| 4/24/2006 | 3,501,188.00 | Mellon United National Bank | Allen Stanford |
| **TOTAL** | **$ 80,412,810.00** | | |

291.

Significantly, many of these transfers to R.A. Stanford's personal accounts were made on the same day or in close proximity to each other, further highlighting the suspicious nature of the transfers.

**v.   SG Suisse Transfers Funds from Account ▆ to Bribe Stanford's Auditors.**

292.

Further, at the direction of R.A. Stanford and Jim Davis, Friedli regularly transferred large sums of money from Account ▆ to three separate accounts in the name of SIBL's purported auditor, CAS Hewlett – one at Barclays Bank PLC, London ("Barclays"), another at First Bank Puerto Rico, and to another account at First Bank Virgin Islands.

293.

In total, from January 14, 2000 to January 15, 2009, SG Suisse transferred approximately £1,975,692 from Account ▆ to CAS Hewlett.

294.

For example, on March 14, 2002, Jim Davis sent a letter to Friedli instructing him to transfer £80,000 from "our ▆REDACTED▆ account" to CAS Hewlett's Barclays account.

295.

From January 2000 to February 2003, SG Suisse, at SFG's direction, transferred £10,000 each month from the ▆ Account to the CAS Hewlett account at Barclays.

296.

On February 26, 2003, Jim Davis directed SG Suisse to "increase the monthly wire transfer to CAS Hewlett from 10,000 pounds sterling to 15,000 pounds sterling per month by debiting our ▮REDACTED▮ account.  This change is effective on March 1, 2003."

297.

From March 2003 to May 2008, SG Suisse transferred £15,000 each month to CAS Hewlett's Barclays account from the ▮REDACTED▮ Account.

298.

In May 2008, Stanford once again increased the amount of the monthly payments to CAS Hewlett.  In an email dated May 19, 2008, Jim Davis instructed Carol Meylan of SG Suisse to "change the monthly debit amount that is disbursed to Mr. C.A.S. Hewlett [*emphasis added*] from our ▮REDACTED▮ a/c.  Please change this standing order by increasing the amount from 15,000 sterling, to 20,000 sterling.  Effective date for this change should be the payment of 15 June 2008, and should continue monthly until further notice."

299.

From June 13, 2008, until January 15, 2009, one month before the SEC commenced its lawsuit, SG Suisse transferred £20,000 from Account ▮REDACTED▮ to CAS Hewlett.

300.

In addition to these payments, Stanford instructed SG Suisse to make payments from the ▮REDACTED▮ Account to CAS Hewlett, and SG Suisse complied with these instructions.  Jim Davis instructed SG Suisse to transfer the following amounts on or about the following dates:

- £6,000 in September 2005;

- $125,000 on November 1, 2005;

- $125,000 on November 3, 2005;

- $125,000 on December 1, 2005;

- $100,000 on February 13, 2006;

- £16,000 on May 1, 2007;

- £60,000 on September 1, 2008; and

- £60,000 on September 8, 2008.

301.

Notably, the payments described in the foregoing paragraph were in addition to the regular audit fees paid to CAS Hewlett by other Stanford Entities from their regular bank accounts.

302.

Based on the irregularity and varying amounts of the substantial payments to CAS Hewlett, the multiple accounts receiving the transfers, their source from a "secret account" and the fact that at least one payment was, upon information and belief, made to Hewlett individually, and not to the auditing firm, Friedli had to know something improper was taking place and that he was facilitating such improper conduct. Yet Friedli continued to ignore the highly suspicious nature of these transfers, so that he and SG Suisse could continue to earn substantial fees for their services.

### vi.   SG Suisse and Friedli Ignore Other Significant Red Flags.

303.

In April, 1999, the U.S. Treasury issued an extraordinary advisory (FinCEN Advisory No. 11) warning recipient banks and financial institutions – including SG Suisse – to scrutinize

all transactions routed in or out of Antigua for evidence of money laundering.  FinCEN Advisory No. 11 flagged a number of disturbing developments within the Antiguan banking industry, including possible collusion between Antiguan bank regulators and members of the Antiguan banking community.   This was an obvious reference to R.A. Stanford and SIBL, which dominated and was synonymous with Antiguan banking during the relevant period.   Defendants received FinCEN Advisory No. 11, and knew that the advisory referred to R.A. Stanford and SIBL.  Despite this, SG Suisse and Friedli facilitated numerous transfers from Account ██ to Stanford's personal bank account at Bank of Antigua.

304.

Further, the purported interest rates on CDs issued by SIBL and marketed by SFG were unusually high and far beyond competitive industry standard rates, exceeding comparable CDs issued by other banks.  In materials available to SG Suisse, SIBL represented that it had earned consistent double-digit annual returns on its investment of customer CD deposits for fifteen years (ranging from 16.5% in 1993 to 11.5% in 2005).  From 2000 to 2005, SIBL claimed to have outperformed the S&P 500 by approximately 13%.  Yet, at the same time, SIBL represented that its investment portfolio was diversified, conservative and stable.  Based on their experience in the financial industry and their knowledge of SIBL's business—gained from actively managing SIBL's funds—Defendants knew that such consistent returns for such a long period of time were mathematically implausible.

305.

Moreover, articles published in the *Wall Street Journal* (on April 27, 1999), the *Chicago Tribune* (on July 25, 1999), the *Houston Chronicle* (on July 16, 2000), and the *Miami Herald* (on September 2, 2002), reported that R.A. Stanford was appointed to sit on an Antiguan government

board that supervised the offshore banking sector—a clear red flag available to Defendants. Articles published worldwide in 2008 (including in the *Daily Telegraph* and *Bloomberg* in July 2008) reported that the SEC was actively investigating the activities of Stanford.

306.

Significantly, many of these red flags were brought to the direct attention of Friedli and SC Suisse's predecessor bank, Compagnie Bancaire Genève ("CBG"). Upon information and belief, as far back as May 2000, and possibly earlier, CBG commissioned a report as part of their due diligence of R.A. Stanford and his operations. Upon information and belief, the report alerted Defendants to FinCen Advisory No. 11 concerning Antigua, and detailed Antigua's history of money laundering and lax banking regulations. The report, upon information and belief, also revealed R.A. Stanford's history of laundering money for a Mexican drug cartel. Upon information and belief, the report based upon a number of concerns surrounding the Bank of Antigua and R.A. Stanford, suggested that CBG consider refraining from conducting business with R.A. Stanford to minimize the bank's future legal exposure and reputational harm.

307.

In sum, through their role as R.A. Stanford's portfolio manager; their essential assistance in the payment of bribes to R.A. Stanford's purported auditor and, upon information and belief, Antiguan regulators; Friedli's position on the Stanford International Advisory Board; Friedli's role as a consultant to R.A. Stanford; and publicly and privately available information raising questions about R.A. Stanford's operations, among other things, Defendants knew R.A. Stanford's banking operations were illegitimate.

### vii. The $95 million transfer from SFGL to SG Suisse.

308.

A transfer was made from Account [REDACTED] – which was in SFGL's name – directly to SG Suisse in repayment of a loan made by SG Suisse to R.A. Stanford personally.

309.

Specifically, in September 10, 2004, R.A. Stanford sent a letter to Rene de Ricciotto, Chairman of SG Suisse, requesting to "personally borrow $95 million from SG Private Banking Suisse SA." In the letter, R.A. Stanford proposed that the loan be guaranteed by $110 million on deposit in Account [REDACTED]. Friedli was copied on the letter. As Friedli knew, the funds on deposit in Account [REDACTED] were CD customer funds transferred from other SIBL bank accounts. On November 15, 2004, R.A. Stanford sent another letter to Friedli enclosing an executed promissory note relating to the $95 million personal loan request. Stanford wrote, "Please credit my personal account for the full $95,000,000 on November 22, 2004." The letter was signed "Allen."

310.

Soon thereafter, SG Suisse transferred the borrowed funds to R.A. Stanford's loan facility account – account no. [REDACTED] – for R.A. Stanford's personal benefit. He used some of these funds to purchase in his personal capacity 100% of the assets of Bank Galicia—a Venezuelan bank—and the balance was transferred to R.A. Stanford's private bank accounts in Houston and Miami.

311.

None of the funds lent directly by SG Suisse to R.A. Stanford—including those used to purchase the Venezuelan bank—benefitted SFGL in any way. None of these funds were

invested on behalf of SFGL or SIBL's CD customers. Significantly, Account ▮ statements from the relevant period list an entry stating "PLEDGE FAV. 3RD PAR W/O M" in the amount of $96 million – *i.e.*, $96 million in the account had been pledged for a no-maturity loan made to a <u>third-party</u>. This third-party was R.A. Stanford.

312.

R.A. Stanford's personal loan from SG Suisse matured in October 2007. SG Suisse waited over a year to call the loan and did so only weeks before R.A. Stanford's fraud was finally exposed in early 2009. Thus, on or about October 8, 2008, SG Suisse deducted $200,000 from Account ▮. Also, on or about December 15, 2008, R.A. Stanford instructed Friedli by letter to "debt [sic] account REDACTED for US$95,350,000 to liquidate the balance due on my loan." Friedli proceeded to debit $95,350,000 from Account ▮—which Friedli knew was funded entirely by CD customer funds—in satisfaction of R.A. Stanford's personal loan.

### viii. Banking and Management Fees.

313.

Defendants also received banking and investment management fees from various Stanford Entities, including SIBL and SFGL. These fees were derived from SIBL CD customer funds transferred to various banking and investment accounts managed by SG Suisse. The precise amount of such fees and charges cannot be pleaded at this time, as records evidencing such payments are uniquely in Defendants' possession. Defendants took these fees in bad faith and with knowledge of R.A. Stanford's improper activity.

###### c.   TD Bank's Role.

314.

TD Bank was the primary conduit for the introduction of U.S. and Canadian dollars to the Stanford Fraud via wire, receiving wire transfers of funds from members of the Class and providing correspondent banking, investment, and other financial services for the Stanford Entities, beginning in the mid-1990s.

315.

SIBL was no run-of-the-mill, anonymous customer for TD Bank. Over time, SIBL grew to become TD Bank's largest correspondent banking customer, providing significant revenue for TD Bank and affording numerous opportunities for both business and social interactions between top-level executives associated with both banks.

###### i.   History of TD Bank's Relationship with the Stanford Entities.

316.

In or around 1992, TD Bank acquired some of the Bank of New York's ("BoNY") interests in Canada. These interests included BoNY's then-existing correspondent banking relationships with a number of banks throughout the Caribbean, including Bank of Antigua.

317.

TD Bank came to open accounts for SIBL as an affiliated company of R.A. Stanford's BOA, whose account TD Bank had inherited from BoNY.

318.

During the 1990s and early 2000s TD Bank's largest correspondent banking customers were generally from the U.S., not Antigua or other offshore entities.

319.

But SIBL's exponential growth from the late 1990s onward (during which time several billion dollars of SIBL CDs were sold to investors) vaulted SIBL into position as a major correspondent bank customer and a significant source of revenue for TD Bank.

320.

For instance, between December 31, 2005 and December 31, 2007, TD Bank reported annual increases of corporate banking revenue rising from CAD$266 million in 2005 to CAD$287 million and CAD$337 million in 2006 and 2007, respectively. In both years, TD Bank attributed these increases "largely due to higher net interest income from correspondent banking deposits and higher lending volumes."

321.

During that same period, SIBL's reported assets grew from $4.1 billion to $7.1 billion.

322.

By 2008, SIBL had become TD Bank's largest correspondent banking customer worldwide, no small feat in a major entity such as TD Bank.

323.

In addition to correspondent services, TD Bank also provided a credit facility to R.A. Stanford's Caribbean Star Airlines, and SIBL secured that line of credit through one of its U.S. Dollar accounts at TD Bank.

324.

Further, TD Waterhouse, TD Bank's investment arm, managed discretionary investment portfolios for both SIBL and BOA throughout the period that TD Bank provided correspondent banking services to SIB.

325.

John Pepperell, who was the Vice Chairman of TD Waterhouse, and Perry Mercer, who was a senior portfolio manager at TD Asset Management, initially managed the SIBL and BOA portfolios.

326.

From 2002 until February 2009, Zack Davis, the son of Jim Davis, was the research analyst at SFG with responsibility for handling the SIBL and BOA investment portfolios. Zack Davis dealt directly with Mercer and others at TD Bank and TD Waterhouse, generating substantial written correspondence. Towards the end of the Stanford Fraud, Zack Davis sought to have his email correspondence with Mercer kept secret from a FINRA inquiry.

327.

TD Bank also provided trade financing and treasury services to SIBL. In connection with loans, advances, and other obligations that SIBL had with TD Bank, SIBL pledged to TD Bank its security holdings with TD Waterhouse.

328.

When customers began to demand SIBL CD redemptions in increasing numbers in 2008, SIBL began to liquidate certain of its accounts with TD Bank in order to make payments to its investors.

329.

TD Bank, primarily through Mercer, facilitated this liquidation at the direction of Holt and Zack Davis. TD Bank did not mount any serious inquiry into why the liquidations were occurring or alter the services it provided to SIBL or BOA until it was too late.

### ii.    TD Bank's Close Relationship with Stanford Personnel.

330.

As Jim Davis put it in a 2003 email regarding the Caribbean Star Airlines letter of credit that TD Bank maintained, he had "initiated and nurtured our T/D banking relationship for the past 15 years."

331.

Maldonado later expressed internally "we maintain a very important relationship with Toronto Dominion Bank."

332.

Indeed, executives such as Maldonado, Holt, and Jim Davis often visited Toronto to meet with TD Bank personnel.

333.

TD Bank executives regularly attended the Stanford-sponsored St. Jude golf tournament. In addition, Mercer was reputedly a member of the International Advisory Board with Friedli, and on at least one occasion, Sebenski attended an Advisory Board meeting, as did Sharon Caro, TD Bank's Vice President and Director of Financial Institutions, USA Region.

334.

Given the length of time that it served SIBL, its close relationships with Stanford personnel, and its obligations under the applicable standards, TD Bank understood what SIBL was supposed to be selling and the manner in which the deposits from the CD sales were supposed to be invested.

335.

Indeed, as early as 2000, TD Bank questioned how its understanding matched up with SIBL's banking practices because SIBL CD deposits were not being used in a manner that was consistent with SIBL's business plan. Investors could not see this because they did not have TD Bank's vantage into the disposition of SIBL CD funds.

336.

Upon information and belief, in or around 2000, a meeting occurred between Stephen Cullen, Bill Sebenski, and John Leckie. At that time, Sebenski had recently taken over Cullen's role as TD Bank's Managing Director of Correspondent Banking for the Caribbean and Latin America, and both Cullen and Sebenski reported to Leckie, TD Bank's General Manager of Trade Finance and Correspondent Banking. At the meeting, Leckie questioned whether TD Bank understood SIBL's business, even though SIBL had already become a significant correspondent banking client of TD Bank and Leckie was responsible for overseeing the relationship. Ultimately, Cullen and Sebenski visited Houston, Texas to meet with SIBL and SFG personnel.

337.

Upon information and belief, after the due diligence trip to Houston, Cullen informed Sebenski that he was uncomfortable with TD Bank's continued correspondent banking relationship with SIBL and that TD Bank needed to conduct an additional due diligence investigation of SIBL and apply a strict know-your-customer ("KYC") standard because something was amiss.

338.

Even though TD Bank recognized that something was amiss, it continued its relationship with SIBL and the other Stanford Entities.

339.

Over the subsequent years, TD Bank personnel took over a dozen trips to meet with SIBL and/or SFG personnel in Antigua or Houston, and also met on various other occasions in numerous locations around the world.

340.

For instance, Sebenski and Tarik Muzaffar, TD Bank's relationship manager for Latin America and the Caribbean, visited Houston in January 2004. The invitation to them stated that TD Bank was of "the utmost importance to the Stanford group of companies."

341.

Prior to another visit in November 2006, Muzaffar sought to have a due diligence questionnaire completed "based on additional scrutiny in the KYC and due diligence process at TD." Among other things, that questionnaire sought to determine the Stanford Entities' correspondent banking partners, its client base, and its regulatory responsibilities. But TD Bank already knew that there were no satisfactory answers to those questions.

342.

In or around August 2008, Muzaffar queried Stanford personnel about a Bloomberg article describing an SEC investigation into the SIBL CDs. Following some oblique correspondence, Jim Davis said that there was no such investigation of which he was aware. Muzaffar replied, "That's perfect" and indicated he had merely asked for "your official comment on this issue for our files."

343.

According to SFG's records, Sebenski and Mercer were scheduled to attend a meeting in Houston on February 3-4, 2009. The meeting note indicates that TD Bank regularly visited Antigua, Memphis, Miami, and Houston, and that their trips were "compliance driven."

344.

These final meetings likely centered on the fact that throughout the latter half of 2008 and into 2009, the investments at TD Bank were being liquidated.

345.

In sum, there were close ties between TD Bank and the Stanford Entities over the course of many years, affording TD Bank ample opportunity to observe the operations of the Stanford Entities and providing TD Bank with knowledge and awareness of the Stanford Fraud.

iii.     **Account Activity at TD Bank Demonstrating its Knowledge of the Fraud.**

346.

TD Bank and its affiliate, TD Waterhouse, maintained at least 11 accounts in the name of the Stanford Entities. These accounts included, among others:

- Account no. **REDACTED** ("TD Bank Account REDACTED") in the name of Stanford International Bank, Ltd., in U.S. dollars;

- Account no. **REDACTED** ("TD Bank Account REDACTED") in the name of SIBL Collateral, in U.S. dollars;

- Account no. **REDACTED** ("TD Bank Account REDACTED") in the name of SIBL Collateral, in U.S. dollars;

- Account no. **REDACTED** ("TD Bank Account REDACTED") in the name of SIBL Vendor, in Canadian dollars;

- Account no. ███████ REDACTED ("TD Bank Account ███") in the name of Bank of Antigua, in Canadian dollars;

- Account no. ███████ REDACTED ("TD Bank Account ███") in the name of Bank of Antigua, in U.S. dollars;

- Account no. ███████ REDACTED ("TD Bank Account ███") in the name of Stanford International Bank, Ltd., in Canadian dollars; and

- Account no. ███ REDACTED ("TD Bank Account ███") in the name of Caribbean Star Airlines, Ltd., in U.S. dollars.

347.

In particular, TD Bank Account ███ received the SIBL CD deposits sent via wire transfer in U.S. dollars. When SIBL eventually obtained a handful of Canadian investors, TD Bank also provided such services for Canadian dollar wire transfers. But the volume of U.S. dollar transactions was orders of magnitude greater than those carried out in Canadian dollars.

348.

By their very nature, the types of account activity that occurred in the TD Bank accounts were clear indicators of fraud, especially in combination with TD Bank's knowledge of the supposed nature of SIBL's business and the representations to investors.

349.

From TD Bank Account ███, large round dollar sums were regularly wired to Trustmark Account ███. TD Bank also wired significant sums to other Stanford Entities. For example, in 2008, there were over 30 wires of over $1 million to non-bank Stanford Entities out of TD Bank Account ███, including three wires of over $15 million in mid-2008 to Stanford Group Global.

350.

Billions of dollars were wired into TD Bank Account ███ in many tens of thousands of

wires. A great deal of the outgoing wire activity in the TD ▉ account was in round numbers in the millions and tens of millions per transaction. Taking a small sample of especially high dollar value transfers shows that from January 2007 – February 2009, there were 76 round sum withdrawals of $10,000,000 or greater totaling $1,399,000,000.

351.

Round dollar transactions suggest that the transactions are not likely to be payments for goods or services provided in the ordinary course of business.

352.

In addition, TD Bank knew that:

- the returns on the portion of the portfolio that TD Bank's investment arm, TD Waterhouse, managed could not support the CD returns SIBL was offering. And the transfers out of TD Bank, even if invested elsewhere, were not sufficient to generate the annual profits on $7 billion that SIBL claimed to be making;

- TD Bank was consistently wiring money to accounts maintained by entities other than SIBL. These entities did not appear in SIBL's annual reports and the transfers were of sufficient size and volume that TD Bank had to know that SIBL CD deposits were being used to fund businesses that did not appear in SIBL's annual reports or on SIBL's balance sheet; and

- Investors were daily wiring millions of dollars into TD Bank Account ▉ through Pershing from 2006 forward. Thus, TD Bank could see how many U.S. investors were wiring money to buy SIBL CDs and could tell that this number of investors was inconsistent with offering the SIBL CDs under a Regulation D exemption.

353.

As a result of such information, TD Bank observed the breaches of duty owed to SIBL committed by R.A. Stanford and other employees of the Stanford Entities.

354.

TD Bank was required to consider all of the information it acquired in the course of providing services to Stanford Entities and to determine whether it was appropriate to provide correspondent and other banking services to SIBL.

355.

TD Bank knew that SIBL had few Canadian customers. TD Bank also knew or should have known that other financial institutions had denied or ceased to provide correspondent banking services to the Stanford Entities.

356.

Moreover, TD Bank knew that by agreeing to provide SIBL with correspondent banking services, it was agreeing to facilitate the transfer of funds into the U.S. and other jurisdictions in a manner that shielded the true nature of those transfers from the recipient banks in those jurisdictions and their regulatory authorities.

357.

TD Bank also knew that SIBL established correspondent banking services with Trustmark, rendering suspicious SIBL's need for correspondent banking services in Canada. Although Trustmark processed checks, it did not provide wire transfer services to SIBL. This further made TD Bank aware that it should have declined to provide correspondent banking services to SIBL.

358.

In addition, TD Bank would have been on particularly high alert in light of the following:

- SIBL was located in Antigua, one of the highest risk jurisdictions in the world;

- TD Bank was providing correspondent banking services, the highest risk type of banking services;

- R.A. Stanford was a Politically Exposed Person;

- R.A. Stanford had declared bankruptcy;

- Guardian bank had been run out of Montserrat;

- all funds transferred to and from SIBL's TD Bank accounts were done by wire transfer, a method which itself carries a higher risk of fraudulent activity; and

- those wire transfers were SIBL CD investor funds, which were not to be used to fund other entities within the Stanford empire.

359.

Despite what TD Bank knew, it continued to provide essential banking services to SIBL in perpetuation of the fraud.

### d. BoH's Role.

360.

Starting in early 2007, Stanford Entities began opening accounts at BoH, which was a relatively minor player in the Houston banking market and thus an odd choice for a banking relationship with the gargantuan Stanford empire.

361.

Within a short time, the Stanford Entities had opened numerous accounts with BoH and nearly overnight became BoH's largest depositor, doubling BoH's deposits. This was an enormous *coup* for BoH.

362.

BoH's relationship with the Stanford Entities was no coincidence. Instead, it resulted from the relationship manager at Trustmark, Dennis Watson, picking up stakes and moving to

BoH as its new CEO and relationship officer. Until the fraud came to light, BoH hosted one of the primary operating accounts and transferred enormous sums of SIBL investor money to other Stanford Entities.

### i.   The BoH Relationship.

363.

As noted above, Dennis Watson brought the Stanford business to BoH from Trustmark shortly after Trustmark began to adopt a more "scrutinous" attitude towards the Stanford operations.

364.

Watson saw to it that no such scrutiny would occur at BoH.

365.

Indeed, when Watson drafted a compliance and due diligence memorandum on the Stanford Entities, he forwarded it to Maldonado to ask for "critique and suggestions" and suggested that "you may have ideas that would be helpful." It noted the various regulators involved in the Stanford Entities' affairs and that the Stanford Entities committed to use BoH. The memorandum further noted that the Stanford Entities were BoH's largest depositor.

366.

It was entirely improper for Watson, the relationship manager, to draft the compliance memorandum concerning his longtime client. Moreover, to hand the memorandum to the Stanford Entities for them to complete it betrayed any semblance of objectivity.

367.

The memorandum also makes clear that Watson's relationship with R.A. Stanford preceded his time at Trustmark, extending all the way back to the early 1990s at Chase. Watson states in the memo that "Chase Bank performed numerous due diligent [sic] exercises with satisfactory results." That, of course, was false, as Chase had terminated its banking relationship with Stanford Entities in the 1990s.

368.

The Watson memorandum also noted he had almost daily contact with SIBL employees, that he had visited SIBL, as had Clay Hoster, the Vice Chairman of BoH, and that the Stanford Entities had also been the largest depositor at Republic National Bank (merged into Trustmark). Finally, Watson noted that SIBL was audited by CAS Hewitt and that its business was different than a typical bank because it did not make loans.

369.

As SG Suisse and TD Bank also did, Watson had sent a letter personally vouching for R.A. Stanford.

370.

In sum, Watson was highly familiar with R.A. Stanford and his organization.

### ii.    Account Activity at BoH Demonstrating its Knowledge of the Fraud.

371.

Stanford Capital Management was the first of the Stanford Entities to open an account at BoH. This was a minor account with a million or so U.S. dollars in activity each month.

Subsequently, the number of accounts and amount on deposit expanded greatly. These accounts included:

- Account no. REDACTED ("BoH Account REDACTED") in the name of SIBL;

- Account no. REDACTED ("BoH Account REDACTED") a money market account in the name of SIBL;

- Account no. REDACTED ("BoH Account REDACTED") in the name of Stanford Financial Group Company;

- Account no. REDACTED ("BoH Account REDACTED") in the name of Stanford Financial Group Global Management, LLC;

- Account no. REDACTED ("BoH Account REDACTED") in the name of Stanford Venture Capital;

- Account no. REDACTED ("BoH Account REDACTED") in the name of Stanford Capital Management, LLC; and

- Account no. REDACTED ("BoH Account REDACTED") in the name of Stanford Real Estate Acquisition.

372.

Similar to the accounts that the SIBL held at Trustmark, the BoH account statements were held at the Houston branch and were not sent to Antigua.

373.

BoH Account REDACTED, the SIBL Operating Account, was opened on June 25, 2006. Although the address on the account opening document was in Antigua, statements were initially sent to Punam Singh in Houston and later were held at the bank. Starting in August 2007, large sums were wired into this account. TD Bank began to wire tens of millions of dollars usually in large round figures to BoH Account REDACTED from TD Bank Account REDACTED. BoH was aware that these funds were generated by the sale of CDs issued by SIBL.

374.

From BoH Account ███, the CD deposits were then regularly transferred to BoH Account ███ (Stanford Financial Group Global Management), BoH Account ███ (Stanford Venture Capital), BoH Account ███ (Stanford Financial Group Company), BoH Account ███ (Stanford Real Estate Acquisition), and others.

375.

The CD money was then transferred or wired from these accounts to various Stanford Entities where they were used to buy real estate, make venture capital investments, purchase and operate private aircraft and yachts, and pay for the acquisition and operation of myriad financially unproductive initiatives like health clubs, restaurants, and cricket tournaments.

376.

For instance, from August 2007 – January 2009, 29 transfers were made from BoH Account ███ to international accounts, mostly Stanford Group (Suisse), totaling $17,167,678.

377.

Even as the fraud was winding down, in the month of December 2008 alone, outgoing wires to other banks from BoH Account ███ totaled $52,439,783.

378.

A number of the transactions in BoH Account ███ and others were for large, round sums. For example:

- There were 307 round dollar transactions in BoH Account ███ of $100,000 or greater from August 2007 – February 2009, totaling $477,521,000, and averaging over $1.5 million per transaction; and

- There were 119 round dollar transactions in BoH Account [REDACTED] of $100,000 or greater from August 2007 – February 2009, totaling $118,446,000, and averaging nearly $1 million per transaction.

379.

As alleged elsewhere herein, these round sum transactions would have made BoH aware that the Stanford Entities were not on the up-and-up.

380.

Much of the SIBL money at BoH was invested at low, short-term rates. Thus BoH could see, given SIBL's dissipation of investor funds and the lack of any significant investment activity, that it was impossible for SIBL to pay the interest rates that it offered to investors.

381.

BoH was required by law to conduct thorough due diligence on the Stanford Entities and to conduct investigation of any suspicious and/or potentially illegal banking activity. Indeed, BoH entered into a written correspondent banking relationship with SIBL, pursuant to which SIBL acknowledged BoH's duty to look for suspicious transactions.

382.

Indeed, within a year after establishing its banking relationship with SIBL, BoH expressed concern over "intercompany activities" within the Stanford Entities empire.

383.

BoH was required to consider all of the information it acquired in the course of providing services to Stanford Entities and to determine whether it was appropriate to provide correspondent and other banking services to SIBL.

384.

BoH and Watson knew SIBL and understood its business operations from the outset of the relationship. As a result, at the time that BoH began providing banking services to SIBL, BoH was knew that SIBL performed its U.S. dollar wire transfer business through TD Bank, which should have aroused suspicion because SIBL had relatively few connections to Canadian customers or other business interests in Canada.

385.

In addition, BoH would have been on particularly high alert in light of the fact that:

- SIBL was located in Antigua, one of the highest risk jurisdictions in the world;

- R.A. Stanford was a Politically Exposed Person;

- R.A. Stanford had declared bankruptcy;

- Guardian bank had been run out of Montserrat; and

- BoH entered into a correspondent banking services agreement with SIBL, a high risk type of banking service.

386.

As would have been familiar to Watson from his days at Trustmark, BoH plainly could see that SIBL deposits were not being used in the way that SIBL claimed in the internal due diligence memorandum or in its annual reports. Rather than being invested in marketable securities, SIBL CD deposits were used to fund other Stanford Entities' operations.

387.

Despite what BoH knew, it continued to provide essential banking services to SIBL in perpetuation of the fraud.

### e. HSBC's Role.

388.

HSBC was the primary conduit for the introduction of Euros and Pounds Sterling to the Stanford Fraud, receiving wire transfers of funds from members of the Class and providing banking and investment services for the Stanford Entities, beginning at least as early as 2005.

### i. The HSBC Relationship.

389.

HSBC was aware from the account opening documents that the Stanford Entities were marketing SIBL CDs and that the CDs provided an above-market return.

390.

HSBC could also plainly see that the decisions were not made in Antigua and that no meaningful decision-making activity occurred in Antigua. All meaningful meetings and communications were with U.S.-based employees.

391.

For instance, Jim Davis and Danny Bogar, who were based in the United States, visited HSBC in 2003. Similarly, a meeting occurred between Jim Davis, Holt and three HSBC representatives—Ian Brooks, Quentin Alyward and Richard Moseley—on February 10, 2003. The name and address of the client on the initial memo about the possible new business was SFG in Memphis, Tennessee.

392.

In November 2005, HSBC sent three representatives—Nigel Wier (Director of Financial Institutions), Simon Balmford (Regional Relationship Manager for Institutional Banking), and

Georgina Anderson (Client Services Manager for Institutional Banking)—to meet with SIBL's president in Antigua to solicit additional business. It should have been obvious during that meeting that none of the decision-making, nor the real work conducted for the Stanford Entities, occurred in Antigua.

393.

HSBC conducted numerous other meetings with U.S.-based employees of the Stanford Entities. For instance, in January 2008, Bradley Johnson of HSBC met with Jim Davis and L. Jack Staley, President of Stanford Group (Suisse) in Zurich. The notes to that meeting demonstrate that HSBC was earning approximately $2 million in fees alone on its relationship with SIBL.

394.

Later, in May 2008, Patricia Maldonado and Yolanda Suarez met with HSBC representatives Bradley Johnson, Martin Holcombe and Graham Kenison in London, providing HSBC with annual reports. Holcombe sought to understand the organizational chart for the Stanford Entities and their product needs, and sought to do "desktop due diligence."

395.

In July 2008, HSBC sent a pitch book to the Stanford Entities in an attempt to expand its business with them. In September 2008, the Stanford Entities approached HSBC about replacing Pershing for clearing and custody, but HSBC did not offer that business line to its customer.

396.

Maldonado met with HSBC's Richard Whitehouse in November of 2008 to discuss an expansion of their Latin American relationship. Whitehouse also discussed with Maldonado expanding their banking relationship to Colombia.

397.

Also in November 2008, Maldonado met with Paresh Patel, who assumed Martin Holcombe's role.

398.

A final meeting shortly before the fraud was exposed was scheduled and held in Houston on January 26, 2009, attended by Kevin Martin and Margarita Molina for HSBC, in order to pitch additional services to the Stanford Entities.

399.

Recognizing the need for a partner of worldwide renown, Maldonado noted to her colleagues prior to that meeting that "[t]he HSBC relationship is an important one to Stanford as a whole."

> ii. **Account Activity at HSBC Demonstrating Its Knowledge of the Fraud.**

400.

HSBC maintained at least 3 accounts in the name of the Stanford Entities. These accounts included:

- Account no. REDACTED, denominated in Euros ("HSBC Account REDACTED");

- Account no. REDACTED, denominated in Pounds Sterling ("HSBC Account REDACTED"); and

- Account no. REDACTED, denominated in U.S. Dollars ("HSBC Account REDACTED")

401.

HSBC developed knowledge and awareness from the outset that dealing with SIBL carried significant risks.

402.

For instance, HSBC's initial due diligence returned an alert on one of SIBL's directors, Courtney Blackmon. Thus, HSBC should have been on heightened alert regarding SIBL's activities from the very beginning of its relationship.

403.

HSBC was aware that the business model of the Stanford Entities depended on SIBL's investing the funds it received from CD investors.

404.

Thus, HSBC was aware that in order for the Stanford Entities to prosper and for the CDs to generate their promised return, the Stanford Entities would have to "put to work" the money that they received from investors.

405.

Indeed, SIBL's account opening documents with HSBC demonstrate that SIBL's business was supposed to be $1 million per month of deposits and "outgoing payments of around 75 percent of the incoming values payable to Investment Companies or Money Managers in Europe or the Americas."

406.

Despite this knowledge, HSBC could clearly observe that the actual business of SIBL was different than SIBL had initially described and entirely inconsistent with the description in the account opening documents. Once investor funds were wired into SIBL's accounts, enormous sums of the money simply remained in those accounts, untouched and essentially uninvested, generating only a nominal amount of interest that was entirely insufficient to provide the returns promised to investors.

407.

For instance, the HSBC Euro Account started out in 2004 at just a few million euros, and grew to €50 million by the end of the year. There was a major deposit of over €30 million at the end of the year. In 2005, the account contained between €50 million and €66 million. In 2006, it reached a balance of €78 million. In order to be able to pay its investors the promised interest rate on SIBL CDs, SIBL needed to quickly invest this money rather than letting it sit in an account drawing nominal interest for years at a time.

408.

In April 2006, €58 million were transferred out of the HSBC Euro Account and another approximately €15 million were transferred out in May 2006.  The account held less than €1 million by June of 2006. From there, the account began to grow again. By the end of 2006, it held €19 million. At the end of 2007, it held €45 million and on June 30, 2008, it held €70 million. In the last half of 2008, it peaked at €80 million and then depleted to €7 million. Again, in order to be able to pay its investors the promised interest rate on SIBL CDs, SIBL needed to quickly invest this money rather than letting it accumulate in this account in this fashion.

409.

Even more starkly, the HSBC GBP Account simply grew in a linear fashion, beginning at £1,000 in 2004, then growing to £12 million at year-end 2005, to £34 million by year-end 2006, to £41 million by year-end 2007, and to £61 million in 2008 before depleting to £36 million by year-end 2008. Investor money simply sat in the HSBC GBP Account untouched and uninvested for nearly the entire life of the account.

410.

In sum, SIBL took in deposits that purportedly paid approximately 6%-10% interest (and paid 3% of the deposits in fees on top of that), yet it did not bother investing tens of millions of Euros and Pounds Sterling for years. There was no commercially feasible explanation for this account activity (or lack thereof), given HSBC's knowledge of SIBL's supposed business model.

411.

In addition to this  bizarre banking relationship, from which HSBC earned upwards of $2 million, the HSBC accounts reflected a number of badges of fraud in the last year of the Stanford Fraud, including "round-trip" transactions—a transaction that involves a debit and a credit of the same amount within a short period—such as:

- HSBC Account [REDACTED]: $10 million withdrawal on November 1, 2008 and $10 million deposit on November 18, 2008;

- HSBC Account [REDACTED]: $12 million withdrawal on November 28, 2008 and $2 million and $10 million deposit on the same day; and

- HSBC Account [REDACTED]: $14 million withdrawal on December 19, 2008 and $9 million and $5 million deposit on the same day.

412.

The HSBC accounts also showed a number of large, round sum transfers—another typical badge of fraudulent activity—for example:

- HSBC Account [REDACTED] showed 14 such transactions >$100,000 from June 2007 through January 2009;

- HSBC Account [REDACTED] showed 49 such transactions >€100,000 from January 2007 through January 2009; and

- HSBC Account [REDACTED] showed 181 such transactions >£100,000 from January 2007 through January 2009.

413.

HSBC was required to consider all of the information it acquired in the course of providing services to Stanford Entities and to determine whether it was appropriate to provide correspondent and other banking services to SIBL.

414.

It is apparent from the account opening documents that HSBC knew what SIBL's business operations supposedly entailed prior to agreeing to act as correspondent bank. In addition, HSBC would have known that SIBL had relatively few customers in the U.K. and few business connections to the U.K. Yet, Stanford executives insisted upon maintaining their account with the HSBC affiliate in London, and not any other branch.

415.

Moreover, HSBC knew that by agreeing to provide SIBL with correspondent banking services, it was agreeing to facilitate the transfer of funds from and to various countries in a manner that shielded the true nature of those transfers from the recipient banks in those jurisdictions and their regulatory authorities.

416.

Thus, based on the information arising from the necessary due diligence required of HSBC with respect to SIBL, HSBC knew that there was no legitimate business or economic purpose for SIBL's need for correspondent banking services in the U.K.

417.

HSBC also would have been on high alert because SIBL hit all the high notes of enhanced due diligence:

- SIBL was located in Antigua, one of the highest risk jurisdictions in the world;

- HSBC was providing correspondent banking service, a high-risk type of banking service;

- R.A. Stanford was a Politically Exposed Person;

- R.A. Stanford had declared bankruptcy;

- Guardian bank had been run out of Montserrat; and

- all, or virtually all, funds transferred to and from SIBL's HSBC accounts were done by wire transfer, a method which itself carries a higher risk of fraudulent activity.

418.

The ongoing monitoring of SIBL that HSBC was required to undertake should have continuously ensured that SIBL was utilizing its correspondent bank accounts in a manner consistent with how HSBC understood those accounts would be utilized when it agreed to open them.

419.

Despite what HSBC knew, it continued to provide essential banking services to SIBL in perpetuation of the fraud.

**B. Class Action Allegations.**

420.

The class of persons whom the Plaintiffs seek to represent (the "Class") comprises all persons who invested in SIBL CD(s) from August 23, 2004 – February 16, 2009, inclusive, and

whose claims for losses related to SIBL CDs are recognized, authorized, and calculated by the United States Receiver for the Stanford Entities, Ralph S. Janvey.[3]

421.

**Numerosity:** Class action is the appropriate procedure in this case because the Class is so numerous that joinder of all members of the Class is impracticable. Although the precise number of Class member is unknown to Plaintiffs, the most recent report submitted by the Receiver to this Court avers that over 17,000 unique SIBL CD-related claims have been submitted and recognized by the Receiver.

422.

**Commonality:** Class action is the appropriate procedure in this case because questions of law and fact are common to the Class, including but not limited to:

   a.  Whether the SIBL CD program was a fraudulent investment scheme;

   b.  Whether the respective Defendants knew about or possessed a general awareness of wrongdoing by the Stanford Entities;

   c.  Whether the Defendants' respective banking services substantially assisted the wrongdoing of the Stanford Entities;

   d.  Whether the Defendants received fees and other monies from the Stanford Entities within the relevant time period;

   e.  Whether the Defendants conspired with Stanford;

   f.  Whether the Class has been damaged by the alleged wrongful conduct of Defendants.

---

[3] In addition, or in the alternative, the Court may also wish to certify a class comprised of all persons who invested in SIBL CD(s) on or before February 16, 2009 and whose claims for losses related to SIBL CDs are recognized and authorized by the United States Receiver for the Stanford Entities, Ralph S. Janvey, or any other classes or sub-classes that the Court deems appropriate.

423.

The questions of law and fact common to the Class predominate over questions affecting only individual members.

424.

**Typicality:** The claims of the representative Plaintiffs are typical of the claims of the Class.

425.

**Adequacy:** The representative Plaintiffs will fairly and adequately protect the interests of the Class.

426.

In the absence of class certification, there is a risk that adjudications in thousands of separate cases with respect to individual Class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

427.

The class action procedure is a superior mechanism for fairly and efficiently adjudicating this controversy in comparison to other methods of adjudication.

**V. CAUSES OF ACTION.**

428.

Plaintiffs assert and specify the following causes of action, which arise from the factual situation that is described in Plaintiffs' Original Class Action Complaint, filed August 23, 2004,

and that is further amplified in Plaintiffs First Amended Class Action Complaint [Doc. 1-5], the OSIC Intervenor Complaints [Docs. 130, 133], and herein.

429.

For each cause of action, to the extent not specifically pleaded below, Plaintiffs reassert and reallege the facts set forth in ¶¶ 38 – 427 as to each Defendant.

430.

Plaintiffs assert the discovery rule as applicable to the statute of limitations for each claim herein. Until the SEC filed an action against R.A. Stanford, SIBL, and other Stanford-Entities on February 17, 2009, Plaintiffs could not have discovered with the exercise of reasonable diligence the details of Defendants' participation in the Stanford Fraud.

431.

The doctrine of *respondeat superior* is also applicable to each cause of action. Defendants are liable for the wrongful and tortious acts of their employees as a matter of law.

## A.  (Count 1) Common Law Aiding, Abetting, or Participation in a Fraudulent Scheme (Against All Defendants).

432.

By their conduct described herein, Defendants aided, abetted, and/or participated with Stanford and his co-conspirators in a fraudulent scheme against Plaintiffs and the Class involving the issuance of SIBL's investment product, the CDs. In particular, Defendants provided banking services, as alleged herein, that assisted a fraudulent scheme that allowed Stanford and his co-conspirators to misappropriate billions of dollars of investor funds. Based on their knowledge of the financial industry and of SIBL's operations, it is reasonable to infer that Defendants had subjective knowledge of, and provided necessary assistance to, R.A. Stanford's fraud. Each

Defendant's conduct is described in particularity herein, but illustrative here are: (1) Defendants SG Suisse and Friedli's knowledge and facilitation of the payment of bribes to SIBL's auditor and to Leroy King; (2) Defendants Trustmark, BoH, and TD Bank's respective knowledge that they were facilitating the transfer of SIBL CD deposits to various Stanford Entities in a fashion that ran counter SIBL's stated business model and in a fashion that constituted a fraud upon SIBL CD investors; and (3) Defendant HSBC's knowledge of SIBL's inexplicable accumulation of SIBL CD investor funds in a fashion that was at variance with its understanding of SIBL's business model and that HSBC knew was a fraud upon SIBL CD investors. As a result of this conduct, Defendants are directly liable for aiding and abetting a fraudulent scheme. Defendants' actions, in combination with the actions of R.A. Stanford and Jim Davis, are a proximate cause of actual damages to Plaintiffs and the Class.

**B. (Count 2) Aiding, Abetting or Participation in Violations of the Texas Securities Act (Against All Defendants).**

433.

As alleged in Plaintiffs' Original Class Action Complaint and further amplified herein, the SIBL CD scheme was centered on the sale of an investment product, marketed and directed from the Houston, Texas headquarters of the Stanford empire.

434.

As shown by the SEC in the SEC Action, the CDs offered by the Stanford Entities constituted "securities" under the relevant securities law jurisprudence. R.A. Stanford, Jim Davis, and the Stanford Entities sold these securities to Plaintiffs and the Class.

435.

R.A. Stanford, Jim Davis, and the Stanford Entities sold these securities by omitting

information material to the purchase of the SIBL CDs. In particular, it was never disclosed to SIBL CD investors that the SIBL CD deposits were not invested in the manner described, nor was it disclosed that R.A. Stanford took out personal loans backed by SIBL CD investor funds, nor was it disclosed that SIBL CD deposits funded the operations of the other Stanford Entities that were mainly unprofitable, and paid for his personal pleasures and enthusiasms.

436.

These were material omissions because the CD funds contributed by Plaintiffs and the Class were not invested in safe, liquid, and insured investments, but rather were pooled together with other investors' money and transferred to Stanford to finance his profligate lifestyle, among other things.

437.

Defendants are liable as an "aider" under TEX. REV. CIV. STAT. ANN. art. 581- 33F(2) (Vernon Supp. 2004-2005). Defendants were subjectively aware at all relevant times of R.A. Stanford's omissions and improper activity.

438.

While presiding over and facilitating the transfer of bribes to CAS Hewlett and transfers of CD customer funds to R.A. Stanford's personal bank accounts, Defendants SG Suisse and Friedli were subjectively aware that their role was part of an overall activity that was fraudulent. Likewise, while presiding over and facilitating the transfer of SIBL CD deposits to various Stanford Entities in a fashion that ran counter to SIBL's business model, Defendants Trustmark, BoH, and TD Bank were subjectively aware that their role was part of an overall activity that was fraudulent. Likewise, while providing correspondent banking services to SIBL and presiding over SIBL's inexplicable accumulation of SIBL CD investor funds in a fashion that was at

variance with its understanding of SIBL's stated business model, HSBC was subjectively aware that its role was part of an overall activity that was fraudulent. Defendants thus rendered necessary assistance to Stanford in the face of a perceived risk that their assistance would facilitate untruthful or illegal activity. As a result, Plaintiffs and the Class were harmed.

### C. (Count 3) Aiding, Abetting, or Participation in Breach of Fiduciary Duty (Against All Defendants).

439.

The Stanford Entities and their officers and directors were fiduciaries to Plaintiffs and the Class during the relevant period. The Stanford Entities, through the conduct of R.A. Stanford, Davis and others, breached their fiduciary duties to Plaintiffs in that they: (i) misappropriated and converted funds from certain SIBL and SFG accounts maintained by Defendants; and (ii) paid bribes to SIBL's auditor and bank regulator to hide SIBL's true financial condition and fraudulent operations.

440.

Defendants knew that R.A. Stanford and other officers and directors of the Stanford Entities owed fiduciary duties to Plaintiffs and the Class. Defendants also knew that Plaintiffs and the Class purchased SIBL CDs with the expectation of receiving a return on that investment and that SIBL was to use the money that was invested in its CDs consistent with SIBL's mandate as an international bank.

441.

Defendants possessed sufficient information to know and/or become aware of the actions described herein that constituted breaches of fiduciary duty by SIBL. Despite such knowledge

and/or awareness, Defendants continued to facilitate the theft of SIBL CD investor funds by R.A. Stanford, thereby facilitating and substantially assisting the breaches of fiduciary duty.

442.

By their conduct described herein, Defendants knowingly aided, abetted, or participated in the Stanford Entities' breach of fiduciary duty to Plaintiffs. Defendants' actions, on their own and in combination with the actions of the Stanford Entities, and R.A. Stanford and Jim Davis generally, are a proximate cause of actual damages to Plaintiffs and the Class.

**D. (Count 4) Aiding, Abetting, or Participation in Conversion (Against All Defendants).**

443.

The funds of Plaintiffs and the Class supposedly "on deposit" at SIBL were personal property of Plaintiffs. R.A. Stanford and his co-conspirators wrongfully exercised dominion or control over such property. R.A. Stanford and his co-conspirators misappropriated billions of dollars that Plaintiffs and the Class collectively entrusted to SIBL.

444.

By their conduct described herein, Defendants knowingly or recklessly aided, abetted, or participated in misappropriation and conversion of property from Plaintiffs and the Class. Defendants were aware that R.A. Stanford and his co-conspirators were wrongfully exercising dominion or control over the personal property of Plaintiffs and the Class. Defendants were also aware that they were aiding, abetting, or participating in this wrongful conversion of personal property. The conversion of property by R.A. Stanford, his co-conspirators was a proximate cause of actual damages to Plaintiffs and the Class.

**E. (Count 5) Civil Conspiracy (Against All Defendants).**

445.

There was a meeting of the minds between R.A. Stanford, Jim Davis and Defendants (acting through banking officers friendly to R.A. Stanford and Jim Davis and who stood to gain by having the Stanford accounts) to commit the wrongful conduct described herein, including breaches of fiduciary duty, fraudulent transfers, fraud, and conversion.

446.

Through their years of faithful service to R.A. Stanford and the Stanford Entities, including acting as fiduciary to Stanford and Stanford-Entity assets, and as long-standing advisors and consultants to R.A. Stanford's operations, Defendants acquired extensive knowledge of Stanford's fraudulent scheme and illicit business activities. Despite their knowledge of the fraud, Defendants continued to serve Stanford without question, playing a pivotal role in furthering the Stanford fraud.

447.

Defendants are responsible for the wrongdoing committed by R.A. Stanford, Jim Davis, CAS Hewlett, King, and others who conspired with R.A. Stanford. In particular, Defendants are responsible for R.A. Stanford's theft of CD customer funds and for bribing SIBL's auditor CAS Hewlett and regulator Leroy King. Defendants' actions in furthering this conspiracy were taken during the conspiracy's operation. Indeed, Defendants' actions were taken to protect the Stanford fraud and to avoid regulatory intervention so that the Stanford fraud could continue and persist. Therefore, Defendants' actions were part of a continuing activity that was illegal in nature and essential to furthering the survival of an ongoing Ponzi scheme conspiracy.

448.

But for the overt acts taken by Defendants and other members of the conspiracy to further the objectives of the Stanford fraud described herein, R.A. Stanford and his co-conspirators would not have been able to carry out the Stanford fraud. The conspiracy caused damages to the Plaintiffs and the Class.

449.

## JURY DEMAND

450.

Plaintiffs demand a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

- Certify the Class as defined herein, or any alternative subclasses, as the Court deems fit;

- Enter judgment in favor of the Class and against the Defendants:

  a. Awarding damages in an amount to be determined at trial and in accordance with the claim determinations of the U.S. Receiver;

  b. Awarding attorneys' fees, and costs, as permitted by law; and

  c. Granting such other and further relief as the Court may deem just and appropriate.

Dated: May 1, 2015                                     Respectfully submitted,

/s/     *Benjamin D. Reichard*
James R. Swanson (*pro hac vice*)
jswanson@fishmanhaygood.com
Lance C. McCardle (*pro hac vice*)
Benjamin D. Reichard (*pro hac vice*)
**Fishman Haygood, L.L.P.**
201 St. Charles Avenue, 46th Floor

New Orleans, Louisiana 70170-4600
Tel.: (504) 586-5252
Fax: (504) 586-5250

Peter D. Morgenstern (*pro hac vice*)
Joshua E. Abraham (*pro hac vice*)
**Butzel Long, P.C.**
230 Park Avenue, Suite 850
New York, New York 10169
Tel.: (212) 818-1110
Fax: (212) 818-0494

***Attorneys for the Plaintiffs***

Eric Seiler
Scott M. Berman
**Friedman Kaplan Seiler &
Adelman, L.L.P.**
7 Times Square
New York, NY 10036-6516
Tel.: (212) 833-1100
Fax: (212) 833-1250

***Of Counsel***