# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

-------------------------------------------------------------------- ✕

PEGGY ROIF ROTSTAIN, *et al.*, *on behalf of*
*themselves and all others similarly situated*,

                  Plaintiffs,

and

THE OFFICIAL STANFORD INVESTORS
COMMITTEE,

                  Plaintiff-Intervenor,

                -against-

TRUSTMARK NATIONAL BANK, HSBC BANK
PLC, THE TORONTO-DOMINION BANK,
INDEPENDENT BANK F/K/A BANK OF
HOUSTON, SG PRIVATE BANKING (SUISSE)
S.A., and BLAISE FRIEDLI,

                  Defendants.

-------------------------------------------------------------------- ✕

Case No. 3:09-CV-02384-N

(Oral Argument Requested)

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, FOR DESIGNATION OF CLASS REPRESENTATIVES AND CLASS COUNSEL

CONTAINS CONFIDENTIAL MATERIAL PROTECTED
BY AGREED CONFIDENTIALITY ORDER

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT............................................................................................1

FACTUAL BACKGROUND ............................................................................................4

    A.    Plaintiff's and OSIC's Claims in This Action ................................................4

    B.    Defendants' Alleged Roles in Stanford's Business Were Varied and Limited ..........5

    C.    Plaintiffs Ask to Certify A Global Class of Over 17,000 Investors in SIBL CDs ..................................................................................................................6

    D.    Putative Class Members Received and Relied on Varying and Individualized Information From Disparately-Situated Financial Advisors ..............7

ARGUMENT ....................................................................................................................14

I.    PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE 23(b)(3) .................................................................................................................15

    A.    Plaintiffs Have Not Shown Superiority ......................................................15

        1.    Plaintiffs Have Argued That a Class Action Is Inferior ...............................15

        2.    Plaintiffs Have Not Proven That The Foreign Jurisdictions Involved Would Recognize and Give Preclusive Effect to a Class Action Judgment in This Case ....................................................................17

            a.    European and Caribbean Civil Law Countries Would Not Give Preclusive Effect to a Judgment in This Action ......................18

                (i)    France and Spain ......................................................19

                (ii)    Germany and Switzerland ........................................20

                (iii)    The Former Netherlands Antilles (Including Aruba) ...........21

            b.    Latin American Countries Would Not Give Preclusive Effect to a Judgment in This Action ....................................................21

                (i)    Venezuela, Colombia and Mexico........................22

                (ii)    Perú and Ecuador ....................................................24

                (iii)    Panama and El Salvador ..........................................26

            c.    Common Law Countries Would Not Give Preclusive Effect to a Judgment in This Action ....................................................27

                (i)    England ....................................................................27

                (ii)    Canada........................................................................28

        3.    Plaintiffs Have Not Shown that Putative Class Members Are Unable or Unwilling to Bring Individual Actions ................................30

    B.    Plaintiffs Have Not Shown Predominance ......................................................32

        1.    Choice-of-Law Considerations Preclude Certification of a Global or a Nationwide Class ....................................................................33

|  |  | a. | Different Jurisdictions' Laws Apply to The Putative Class Members' Claims | 33 |
|  |  | b. | Significant Differences in Applicable Laws Defeat Predominance | 37 |
|  | 2. |  | Individual Issues of Misrepresentations and Omissions to Putative Class Members Predominate | 42 |
|  | 3. |  | Individual Issues of Reliance Predominate | 44 |
|  |  | a. | Courts Refuse to Certify Classes Based On Reliance Grounds | 45 |
|  |  | b. | There Is No Presumption of Reliance | 46 |
|  | 4. |  | Individual Issues of Causation Predominate | 47 |
|  | 5. |  | Plaintiffs Did Not Provide a Methodology for Calculating Damages on a Class-Wide Basis | 49 |

C.     Adjudicating Plaintiffs' Claims Against Five Banks and One Individual Under the Banking Laws of Four Countries and the Substantive Laws of 106 Countries and 47 States Would Be Wholly Unmanageable ........................... 55

II.     PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE 23(a) .......... 57

A.     Plaintiffs Have Not Established Commonality ........................................ 58

B.     Plaintiffs Have Not Established Typicality ............................................ 59

C.     Plaintiffs Have Not Established Adequacy ............................................ 61

|  | 1. |  | There Are Serious Questions About the Integrity, Honesty, Credibility, and Conscientiousness of the Class Representatives | 61 |
|  |  | a. | Diana Suarez | 62 |
|  |  | b. | Salim Estefenn | 64 |
|  |  | c. | Sarah Elson-Rogers | 66 |
|  |  | d. | Ruth Alfille de Penhos | 67 |
|  |  | e. | Steven Queyrouze | 69 |
|  |  | f. | Guthrie Abbott | 71 |
|  | 2. |  | Conflicts of Interest Between the Class Representatives and Other Class Members Negate Adequacy | 72 |

III.     THE PROPOSED CLASS IS NOT CLEARLY ASCERTAINABLE ................................ 74

CONCLUSION ........................................................................................................ 75

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972).....................................................................................46, 47

*Albright v. Attorney's Title Ins. Fund*,
    No. 2:03-cv-517, 2008 WL 2952260 (D. Utah July 28, 2008) ..........................38

*Alliance Grp. Servs., Inc. v. Grassi & Co.*,
    406 F. Supp. 2d 157 (D. Conn. 2005).............................................................39

*Allison v. Citgo Petroleum Corp.*,
    151 F.3d 402 (5th Cir. 1998)...........................................................................52

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997)...................................................................................30, 72

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013)....................................................................................45

*Ansari v. New York Univ.*,
    179 F.R.D. 112 (S.D.N.Y. 1998)..............................................................17, 20

*Anwar v. Fairfield Greenwich, Ltd.*,
    289 F.R.D. 105 (S.D.N.Y. 2013)...............................................................passim

*Armour v. City of Anniston*,
    89 F.R.D. 331 (N.D. Ala. 1997) .....................................................................61

*ASARCO LLC v. Americas Min. Corp.*,
    382 B.R. 49 (S.D. Tex. 2007)..........................................................................36

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003)....................................................................49, 54

*Bell v. Ascendant Solutions, Inc.*,
    No. 301-CV-0166-N, 2004 WL 1490009 (N.D. Tex. July 1, 2004) (Godbey,
    J.), *aff'd*, 422 F.3d 307 (5th Cir. 2005) .....................................................18, 46

*Bennett v. McKibben*,
    915 P.2d 400 (Okla. Civ. App. 1996) .............................................................39

*Berger v. Compaq Computer Corp.*,
    257 F.3d 475 (5th Cir. 2001)..........................................................................61

*Berry v. Indianapolis Life Ins. Co.*,
    No. 3:08-CV-0248-B, 2009 WL 424545
    (N.D. Tex. Feb. 19, 2009) ..............................................................................35

*Bersch v. Drexel Firestone, Inc.*,
   519 F.2d 974 (2d Cir. 1975) .......................................................................... 21

*Broyles v. Cantor Fitzgerald & Co.*,
   No. CIV.A. 10-854-JJB, 2014 WL 6886158
   (M.D. La. Dec. 8, 2014) ................................................................................ 38

*Buettgen v. Harless, et al.*, 263 F.R.D. 378 (N.D. Tex. 2009) .................................... 20

*Calpetco 1981 v. Marshall Exploration, Inc.*,
   989 F.2d 1408 (5th Cir. 1993) ................................................................ 45, 49

*Carrera v. Bayer Corp.*,
   727 F.3d at 308 ............................................................................................ 75

*Casa Orlando Apartments, Ltd. v. Fed. Nat. Mortgage Ass'n*,
   624 F.3d 185 (5th Cir. 2010) ................................................. 34, 35, 36, 41

*Castano v. Am. Tobacco Co.*,
   84 F.3d 734 (5th Cir. 1996) .................................................. 30, 46, 55, 56

*Citizens Ins. Co. of Am. v. Daccach*,
   217 S.W.3d 430 (Tex. 2007) ...................................................................... 37

*CL-Alexanders Laing & Cruickshank v. Goldfeld*,
   127 F.R.D. 454 (S.D.N.Y. 1989) ................................................................ 17

*Cole v. Gen. Motors Corp.*,
   484 F.3d 717 (5th Cir. 2007) ................................................................ 3, 33

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ........................................................... 4, 53, 54

*Community Title Co. v. U.S. Title Guar. Co.*,
   965 S.W.2d 245 (Mo. Ct. App. 1998) ....................................................... 40

*Consor v. Occidental Life Ins. Co. of Cal.*,
   469 F. Supp. 1110 (N.D. Tex. 1979) ........................................................ 61

*Corley v. Entergy Corp.*,
   220 F.R.D. 478 (E.D. Tex. 2004) .............................................................. 41

*Corley v. Orangefield Indep. Sch. Dist.*,
   152 F. App'x 350 (5th Cir. 2005) .............................................................. 41

*Crescendo Invs., Inc. v. Brice*,
   61 S.W.3d 465 (Tex. App.—San Antonio 2001, pet. denied) ...................... 45, 49

*Curley v. AMR Corp.*,
   153 F.3d 5 (2d Cir. 1998) .......................................................................... 40

*Darvin v. Int'l Harvester Co.*,
　　610 F. Supp. 255 (S.D.N.Y. 1985) ................................................................69

*DeBremaecker v. Short*,
　　433 F.2d 733 (5th Cir. 1970) ......................................................................74

*Dvorin v. Chesapeake Exploration, LLC*,
　　No. 3:12-CV-3728-G, 2013 WL 6003433
　　(N.D. Tex. Nov. 13, 2013) ...........................................................31, 32, 59

*Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*,
　　51 S.W.3d 573 (Tex. 2001) .........................................................................45

*Fed. Ins. Co. I.C. v. Banco de Ponce*,
　　751 F.2d 38 (1st Cir. 1984) ........................................................................40

*Fed. Mgt. Co. v. Coopers & Lybrand*,
　　137 Ohio App. 3d 366, 738 N.E.2d 842 (2000) ..........................................38

*Fleming v. Travenol Labs., Inc.*,
　　707 F.2d 829 (5th Cir. 1983) ......................................................................57

*Gardner v. Best Western Int'l, Inc.*,
　　929 S.W.2d 474 (Tex. App.—Texarkana 1996, writ denied) ..........................41

*Gibson v. City Yellow Cab Co.*,
　　No. 20167, 2001 WL 123467 (Ohio Ct. App. Feb. 14, 2001) ..........................39

*Grant Thornton LLP v. Prospect High Income Fund, ML CBO IV (Cayman), Ltd.*,
　　314 S.W.3d 913 (Tex. 2010) .......................................................................38

*Gyarmathy & Assoc., Inc. v. TIG Ins. Co.*,
　　No. 3:02-CV-1245, 2003 WL 21339279
　　(N.D. Tex. June 3, 2003)........................................................................passim

*Halliburton Co. v. Erica P. John Fund, Inc.*,
　　134 S. Ct. 2398 (2014)...............................................................................44

*Ibarra v. Izaguirre*,
　　985 So.2d 1117 (Fla. Dist. Ct. App. 2008) ...................................................39

*In re Alstom SA Secs. Litig.*,
　　253 F.R.D. 266 (S.D.N.Y. 2008)........................................................17, 19, 20

*In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*,
　　228 F. Supp. 2d 348 (S.D.N.Y. 2002).............................................................30

*In re BP P.L.C. Sec. Litig.*,
　　No. 4:12-CV-1256, 2013 WL 6383968 (S.D. Tex. Dec. 5, 2013) ..........40, 51, 53

*In re Bridgestone/Firestone, Inc.*,
    288 F.3d 1012 (7th Cir. 2002) ........................................................................56

*In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014) ..........................................................................53

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    511 F. Supp. 2d 742 (S.D. Tex. 2005) ............................................................34

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    761 F. Supp. 2d 504 (S.D. Tex. 2011) ............................................................37

*In re Enron Corp.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) ................................................. 45, 59, 62

*In re Estate of Dugger*,
    No. 224629, 2000 WL 1528710 (Del. Ch. Sept. 29, 2000) .............................39

*In re Estate of Kindsfather*,
    108 P.3d 487 (Mont. 2005) ..............................................................................39

*In re Felt Mfg. Co., Inc.*,
    371 B.R. 589 (Bankr. D.N.H. 2007) ................................................................38

*In re Ford Motor Co. Vehicle Paint Litig.*,
    182 F.R.D. 214 (E.D. La. 1998) ......................................................................47

*In re Kosmos Energy Ltd. Sec. Litig.*,
    299 F.R.D. 133, 152 (N.D. Tex. 2014) .......................................................51, 52

*In re Park Cent. Global Litig.*,
    No. 3:09-cv-765-M, 2014 WL 4261950 (N.D. Tex. Aug. 25, 2014) ...............43

*In re Parmalat Sec. Litig.*,
    No. 04 MD 1653 (LAK), 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)..........20

*In re Vioxx Prods. Liab. Litig.*,
    239 F.R.D. 450 (E.D. La. 2006) ......................................................................60

*In re Vivendi Universal, S.A. Sec. Lit.*,
    242 F.R.D. 76 (S.D.N.Y. 2007).................................................................17, 20

*Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667 (Tex. 1998)...........................................42

*Jackson, et al. v. Cox, et al.*,
    No. 3:10-cv-00328-N-BG (M.D. La. Jan. 11, 2010) .......................................31

*Janvey v. Alguire*,
    No. 3:09-CV-0724-N, 2013 WL 2451738 (N.D. Tex. Jan. 22, 2013)...............34

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) .........................................................................58

*Jo Ann Howard & Assocs.*,
  *P.C. v. Cassity*, No. 4:09-cv-01252, 2012 WL 3984486 (E.D. Mo. Sept. 11,
  2012) ................................................................................................................38

*John v. Nat'l Sec. Fire & Cas. Co.*,
  501 F.3d 443 (5th Cir. 2007) ...........................................................................74

*Karnes v. Fleming*,
  No. H-07-0620, 2008 WL 4528223 (S.D. Tex. July 31, 2008)..........................62

*Kelley v. Galveston Autoplex*,
  196 F.R.D. 471 (S.D. Tex. 2000) ......................................................................41

*King County, Wash. v. IKB Deutsche Industriebank AG*,
  916 F. Supp. 2d 442 (S.D.N.Y. 2013)................................................................47

*Langbecker v. Electronic Data Sys., Corp.*,
  476 F.3d 299 (5th Cir. 2007)............................................................................72

*Lee v. American Airlines, Inc.*,
  No. CIV.A.3:01-CV-1179-P, 2002 WL 31230803
  (N.D. Tex. Sept. 20, 2002) ................................................................. 33, 34, 56

*Ludlow v. BP, P.L.C.*,
  No. 14-20420, 2015 WL 5235010 (5th Cir. Sept. 8, 2015) .........................53, 54

*M.D. ex rel. Stukenberg v. Perry*,
  675 F.3d 832 (5th Cir. 2012)............................................................................58

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012) .............................................................................75

*Martin v. Pac. Parking Sys. Inc.*,
  583 F. App'x 803 (9th Cir. 2014)......................................................................75

*McClure v. Owens Corning Fiberglas Corp.*,
  720 N.E.2d 242 (Ill. 1999) ...............................................................................39

*Melo v. Gardere Wynne Sewell*,
  No. 04-cv-2238-BD, 2007 WL 92388 (N.D. Tex. Jan. 12, 2007)......................59

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010)...................................................................................19, 37

*Ned-Sthran v. Methodist Hosps. of Dallas (d/b/a Methodist Health Sys.), et al.*,
  No. 3:08-CV-0072, 2008 WL 5420601 (N.D. Tex. Nov. 25, 2008) ..................32

*Newman v. RVN Telecom Servs., Inc.*,
    238 F.R.D. 57 (S.D.N.Y. 2006) ...................................................................................60

*Nola v. Exxon Mobil Corp.*,
    No. 13-439-JJB, 2015 WL 2338336 (M.D. La. May 13, 2015) .......................................48

*Norwood v. Raytheon Co.*,
    237 F.R.D. 581 (W.D. Tex. 2006) ................................................................... 33, 40, 41

*O'Sullivan v. Countrywide Home Loans, Inc.*,
    319 F.3d 732 (5th Cir. 2003) .............................................................................. 14, 52

*O'Neill v. The Home Depot U.S.A., Inc.*,
    243 F.R.D. 469 (S.D. Fla. 2006) .................................................................................59

*Ogden v. AmeriCredit Corp.*,
    225 F.R.D. 529 (N.D. Tex. 2005) ......................................................................... 61, 62

*Orem v. Ivy Tech State Coll.*,
    711 N.E.2d 864 (Ind. Ct. App. 1999) ...........................................................................40

*OSIC v. BDO USA, LLP, et al.*,
    No. 3:12-cv-91447-N-BG (N.D. Tex. May 15, 2015) .......................................................1

*Ostalkiewicz v. Guardian Alarm, Div. of Colbert's Sec. Servs., Inc.*,
    520 A.2d 563 (R.I. 1987) ...........................................................................................39

*Owner Operator Indep. Drives Ass'n, Inc. v. FFE Transp. Servs., Inc.*,
    245 F.R.D. 253 (N.D. Tex. 2007) ................................................................................14

*PCR Contractors, Inc. v. Danial*,
    354 S.W.3d 610 (Ky. Ct. App. 2011) ..........................................................................39

*Pemex Exploracion y Produccion v. BASF Corp.*,
    No. H-10-1997, 2011 WL 9523407 (S.D. Tex. Oct. 20, 2011) .........................................36

*Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek & Co. LLC*,
    277 S.W.3d 255 (Ky. Ct. App. 2008) ..........................................................................38

*Proppant Solutions, LLC v. Delgado*,
    2015 WL 4299503, No. 01-14-00800–CV (Tex. App.—Houston [1st Dist.]
    2015, no pet.) ...........................................................................................................45

*Ramsay v. Boeing Co.*,
    432 F.2d 592 (5th Cir. 1970) .....................................................................................41

*Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*,
    482 F.3d 372 (5th Cir. 2007) .............................................................................. 15, 44, 45

*Robertson v. Monsanto Co.*,
    287 F. App'x 354 (5th Cir. 2008) ...............................................................................48

*Sandwich Chef, Inc. v. Nat'l Ins. Co.*,
   319 F.3d 205 (5th Cir. 2003) ...................................................................45

*Savino v. Computer Credit, Inc.*,
   164 F.3d 81 (2d Cir. 1998) ......................................................................61

*SEC v. Stanford Int'l Bank, Ltd.*,
   No. 3:09-cv-00298 (N.D. Tex. May 12, 2015) ...................................... 1, 27, 54

*Serrano v. Serrano*,
   No. 1 CA-CV 10-0649, 2012 WL 75639 (Ariz. Ct. App. Jan. 10, 2012) ..........40

*Simms v. Jones*,
   296 F.R.D. 485 (N.D. Tex. 2013) .............................................................47

*Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   482 F.2d 880 (5th Cir. 1973) ....................................................... 15, 42, 43, 45

*Smith v. Ayres*,
   845 F.2d 1360 (5th Cir. 1988) .......................................................... 44, 47

*Spence v. Glock, Ges.m.b.H.*,
   227 F.3d 308 (5th Cir. 2000) ...................................................................33

*Springs Indus., Inc. v. Am. Motorists Ins. Co.*,
   137 F.R.D. 238 (N.D.Tex.1991) ...............................................................18

*Steering Comm. v. Exxon Mobil Corp.*,
   461 F.3d 598 (5th Cir. 2006) ........................................................... 47, 48

*Stirman v. Exxon Corp.*,
   280 F.3d 554 (5th Cir. 2002) ...................................................................37

*Stott v. Capital Fin. Servs., Inc.*,
   277 F.R.D. 316 (N.D. Tex. 2011) .............................................................59

*Stuart v. Freiberg*,
   116 A.3d 1195 (Conn. 2015) ...................................................................39

*Suchanek v. Sturm Foods, Inc.*,
   764 F.3d 750 (7th Cir. 2014) ...................................................................59

*Ticknor v. Rouses Enterprises, LLC*,
   592 F. App'x 276 (5th Cir. 2014) ...................................................... 31, 56

*Tremco, Inc. v. Holman*,
   No. C8-96-2139, 1997 WL 423575 (Minn. Ct. App. July 29, 1997) ................39

*Troice v. Proskauer Rose LLP*,
   No. 3:09-CV-1600-N, 2015 WL 1219522 (N.D. Tex. Mar. 4, 2015)
   (Godbey, J.) ........................................................................................47

*Tyson Foods v. Davis,*
  66 S.W.3d 568 (Ark. 2002) .........................................................................39

*Unger v. Amedisys Inc.,*
  401 F.3d 316 (5th Cir. 2005) ...............................................................45, 62

*United States v. Green,*
  46 F.3d 461, 465 n.3 (5th Cir. 1995) ........................................................18

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011) ........................................................................14, 58

*Warren v. Reserve Fund, Inc.,*
  728 F.2d 741 (5th Cir. 1984) .....................................................................60

*Winn Fuel Serv., Inc. v. Booth,*
  34 So.3d 515 (La. Ct. App. 2010) ..............................................................39

*Zorrilla v. Aypco Constr. II, LLC,*
  No. 14-0067, 2015 WL 3641299 (Tex. June 12, 2015) ............................42

## Rules

17 C.F.R. 240.10b-5 .........................................................................................46

Fed. R. Civ. P. 23 ....................................................................................... passim

FED. R. CIV. P. 23 Advisory Committee Notes (1966 Amendment, Subdivision
  (b)(3) ..........................................................................................................42

Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(1) (2015) ......................................75

Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2) (2015) .......................... 42, 44, 49

Tex. Rev. Civ. Stat. Ann. art. 581-33(F)(2) (2015) .......................................60

Tex. State Sec. Bd., Rule 139.7(a) (2015) .............................................36, 73

## Other Authorities

7 Tex. Admin. Code. § 139.19 (2015) ............................................................60

Miss. Code Ann. § 75-71-719 (1981) .............................................................38

Moore's Federal Practice – Civil § 23.24 .......................................................59

Restatement (Second) of Conflict of Laws § 145 ..............................34, 35, 36

Restatement (Second) of Conflict of Laws § 148 ....................................34, 36

Restatement (Second) of Conflict of Laws § 6 ...............................................35

Texas Securities Act ................................................................................................. 36, 38, 44, 48

Defendants The Toronto-Dominion Bank ("TD Bank"), Trustmark National Bank ("Trustmark"), HSBC Bank plc ("HSBC"), Independent Bank, successor by merger to Bank of Houston ("IB"), Société Générale Private Banking (Suisse) S.A. ("SG Suisse") (collectively, the "Banks"), and Blaise Friedli (together with the Banks, the "Defendants") respectfully submit this opposition to Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel (the "Motion").[1]

## PRELIMINARY STATEMENT

This Motion presents the Court with an unusual situation: the investor-Plaintiffs ask the Court to certify this case as a class action, yet the same Plaintiffs previously argued that a suit by the Receiver is *better than* a class action and that a class action is plagued by various drawbacks, uncertainties and costs.  In *Adams & Reese* and *BDO*, Plaintiffs argued that class certification would be "duplicative" of the Receiver action; certification would cause "uncertainty and delay"; and it would be "*far more efficient and save substantial costs*" not to pursue class claims.[2]  This Court has also questioned whether "the individual class actions [are] duplicative of efforts by the Receiver or the Investors Committee to seek recovery."[3]  While Defendants have significant issues with the Receiver-assigned claims asserted by The Official Stanford Investors Committee ("OSIC") in this case,[4] Defendants agree that the Court should not certify a class.

On top of Plaintiffs' statements regarding the inferiority of a class action, Plaintiffs cannot meet their required showings under Rule 23.  Plaintiffs indisputably bear the burden of proving

---

[1]      HSBC, SG Suisse and Blaise Friedli submit this opposition subject to, and without waiving, the defense that they are not subject to personal jurisdiction in Texas.

[2]      Motion For Order Approving Proposed Settlement with Adams & Reese LLP, BSW, Cordell Haymon and Lynette Frazer ("*Adams & Reese* Settlement Mot.") ¶ 21 (emphasis added), *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-00298 (N.D. Tex.), Dkt. No. 2134; Expedited Request for Entry of Scheduling Order and Motion To Approve Proposed Settlement with BDO USA, LLP, To Approve the Proposed Notice of Settlement with BDO USA, LLP ("*BDO* Settlement Mot.") ¶¶ 38-39 (emphasis added), *OSIC v. BDO USA, LLP, et al.*, No. 3:12-cv-01447-N-BG (N.D. Tex.), Dkt. No. 52.

[3]      Appendix in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, For Designation of Class Representatives and Class Counsel ("App.") at 1272 [Excerpt of Aug. 21, 2014 Status Hr'g Tr. at 4:6-8].

[4]      Defendants do not waive, and expressly preserve, their arguments that OSIC lacks standing to assert tort claims on behalf of individual investors in this Action.  *See* Dkt. Nos. 154, 157, 159, 162, 172, 174, 176, 177.

that certification of a global class of investors from more than 100 different countries spanning every continent (including Antarctica) is appropriate.  Plaintiffs come nowhere close to carrying that burden.  Defendants submit expert reports from thirteen renowned scholars, practitioners, arbitrators, and foreign judges affirming that key Latin American, European and common law countries would not recognize, enforce or give preclusive effect to a judgment in this Action against absent class members.  Plaintiffs do not even contest Defendants' proof with respect to five of these countries.  For others, Plaintiffs have designated experts who address the wrong question—namely, whether these foreign jurisdictions would enforce a judgment against Defendants, *not* the absent class members.  Plaintiffs' experts fail to examine whether, if Defendants win in this Action, class members unhappy with that outcome could simply bring new claims in their home jurisdictions.  Conversely, Plaintiffs' experts do not address whether, if the class prevails or settles, dissatisfied class members could sue elsewhere for more.  The Court should not certify a global class because this Court's adjudication of claims will not preclude class members from relitigating the same issues in another forum and Defendants would face the potential for duplicative litigation around the world.[5]

The Court should also refuse to certify a nationwide class given the material differences among the applicable state laws.  Tellingly, only Defendants present a fifty-state comparative analysis, which demonstrates that substantial differences among the state laws applicable to various members of the class hopelessly compound the disparities among class members' claims.  Even for a class limited to U.S. investors, this Court would potentially have to instruct a jury on four different countries' banking laws as applied to common law claims under the unique

---

[5]     For example, TD Bank is already the subject of duplicative litigation brought by the Antiguan Joint Liquidators in Canada seeking even greater damages for losses related to the same conduct alleged by Plaintiffs here. *See* Fresh as Amended Statement of Claim, *Joint Liquidators of SIBL. v. TD Bank*, No. CV-12-9780-00CL, May 16, 2014 (Can. Ont. Sup. Ct. J.), attached as Exhibit 5 to the Appendix in Support of TD Bank's Supplemental Opposition Brief To Plaintiffs' Motion.

substantive laws of fifty states.[6]  The jury instructions could involve hundreds of issues and sub-issues.  The Fifth Circuit presumes that the impact of material variances in state law will create "insuperable obstacles" weighing against class certification.  *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007).  It was Plaintiffs' burden to address this conflict of laws issue, but they made no attempt to do so.

A host of individualized fact issues further defeats predominance, making certification of *any* class improper.  Plaintiffs fail to make their required showing that common evidence can support the putative class' claims and that individualized questions of reliance, causation, and damages will not overwhelm common questions.  Unlike traditional 10b-5 class actions, this case does not involve public statements that affected an efficient market.  Instead, each class member's purchase of and loss from Stanford certificates of deposit ("CDs") is unique.  Differences among the proposed class representatives illustrate the infinite variety of broker relationships, personal relationships, oral sales pitches, printed sales materials, outside research (or lack thereof), and other information provided to or relied on by each individual purchaser of the CDs issued by Stanford International Bank Limited ("SIBL").  Each class member's decision to purchase a CD from a CD seller—some of whom were Stanford employees and others of whom were not—was as varied as the two people involved.  In addition, Plaintiffs' damages theory has shifted twice already and is presented now merely as a prospective plan without any discernible methodology for how to quantify the injury supposedly caused by Defendants' conduct on a class-wide basis.  The predominance of so many individualized inquiries into each of the idiosyncratic claims alleged by the disparate class of worldwide plaintiffs renders certification wholly inappropriate.

Finally, this matter is unsuitable for class certification because Plaintiffs have failed to prove that each of the basic Rule 23(a) requirements has been met.  Specifically, the different and

---

[6]     For a global class, the Court would have to identify and provide legal instructions on the laws of over a hundred foreign jurisdictions.

unique circumstances underlying each individual class member's claims, as well as the lack of common allegations regarding Defendants' banking activities, demonstrate that there is no common contention that will drive the resolution of the case, nor does any class representative's claim qualify as typical of the claims held by the thousands of absent putative class members. Moreover, there are serious questions about the credibility and adequacy of each of the six proposed class representatives, who have submitted erroneous declarations, given inaccurate testimony, and exhibited conflicts with the class. Plaintiffs' over-reaching attempt to throw a world-wide net over 17,000 global investors and call them an undifferentiated "class" recalls the Supreme Court's admonishment that class actions are an "exception to the usual rule" that litigation involves an individual assertion of unique claims. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). For the reasons set forth below and in the accompanying papers, the Court should deny Plaintiffs' Motion.

## FACTUAL BACKGROUND

### A.    Plaintiff's and OSIC's Claims in This Action

In this case, six named investor-Plaintiffs attempt to assert common law and statutory claims against five Banks and one retired bank executive.[7]  OSIC moved to intervene—*with Plaintiffs' support*—to prosecute various claims against Defendants.[8]  In support of OSIC's request, Plaintiffs stated:

> Plaintiffs and [OSIC] share identical fraudulent transfer claims against Defendants; and any recovery of fraudulent transfers from Defendants will be distributed to Plaintiffs from the Receivership Estate pursuant to the Receiver's distribution protocol regardless of which party is first to prevail.[9]

Plaintiffs emphasized that the "identity of interest between the investor-Plaintiffs and [OSIC]

---

[7]      *See* Pls.' Second Am. Class Action Compl. ("SAC"), Dkt. No. 279, ¶¶ 12-24, 432-48.

[8]      *See* Mot. of OSIC to Intervene, Dkt. No. 96; Plaintiffs' Mot. Under Rule 20(A) to Join OSIC as a Plaintiff, Dkt. No. 112; Order, Dkt. No 129.

[9]      Reply in Further Support of Pls.' Mot. to Join OSIC as a Pl. Under Rule 20(A), Dkt. No. 118, at 1-2.

could not be more complete."[10]

In its intervenor complaints, which were filed in late 2012 and early 2013, OSIC asserts claims against Defendants for fraudulent transfers under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), aiding and abetting fraudulent transfers, aiding and abetting fraud, aiding and abetting conversion, and civil conspiracy.[11] After OSIC's intervention, Plaintiffs amended their petition to incorporate by reference OSIC's allegations.[12] On June 23, 2015, Plaintiffs filed their operative Second Amended Class Action Complaint (the "SAC"), asserting claims against Defendants for aiding and abetting common law fraud; aiding and abetting violations of the Texas Securities Act ("TSA"); aiding and abetting breach of fiduciary duty; aiding and abetting conversion; and civil conspiracy.[13] Plaintiffs' filing of the SAC, over five years after this case was commenced, marked the first time that Plaintiffs asserted claims for aiding and abetting breach of fiduciary duty and aiding and abetting TSA violations against Defendants TD Bank, Trustmark, HSBC, and IB.[14] Defendants have moved to dismiss the SAC.[15]

The overlapping claims asserted by Plaintiffs and OSIC in this Action rest upon the theory that at some undefined point Defendants should have heeded various warnings and severed their relationships with Stanford.[16]

## B.   Defendants' Alleged Roles in Stanford's Business Were Varied and Limited

According to Plaintiffs' allegations, the Banks in this case provided different banking services in different countries to different entities in the Stanford organization.[17] Plaintiffs allege

---

[10]   *Id.* at 5.

[11]   Intervenor Compl., Dkt. No. 130, ¶¶ 92-117; Intervenor Compl., Dkt. No. 133, ¶¶ 75-99.

[12]   *See* Pls.' Mot. for Leave to Amend the Compl., Dkt. No. 131; Class Pls.' Mot. for Leave to Amend, Dkt. No. 182.

[13]   *See* SAC ¶¶ 432-48.

[14]   *See* Pls.' First Am. Pet., Dkt. No. 1-5, ¶¶ 80-148; Intervenor Compl., Dkt. No. 130, ¶¶ 92-117.

[15]   *See* Dkt. Nos. 293, 295, 296, 297, 298, 299.

[16]   *See* SAC ¶¶ 4, 10; Intervenor Compl., Dkt. No. 133, ¶¶ 4, 8, 46-47, 53-54, 65-69; App. 2595 [Pls.' Interrog. Resp. at Pls.' Answers to Interrog. No. 3].

[17]   *See* SAC ¶ 222.

that some Banks performed banking services that allowed SIBL to take in foreign currency; some provided depository services that moved funds among various entities owned or controlled by Stanford (the "Stanford Entities"); some provided investment services to Stanford Entities; and some provided a combination of the above.[18]  TD Bank allegedly processed wires in U.S. and Canadian dollars related to investor deposits and interest payments and also managed certain investment portfolios.[19]  HSBC allegedly processed wires in Euros and Pounds Sterling related to investors' transactions.[20]  Trustmark allegedly processed checks that SIBL received from investors and otherwise facilitated the transfer of funds among the Stanford Entities.[21]  IB allegedly provided investment and depository services regarding the CD sales and made transfers to various Stanford Entities.[22]  Finally, SG Suisse allegedly oversaw investment accounts for Stanford Entities and Stanford personally, and Mr. Friedli allegedly acted as a senior banker on the Stanford accounts for SG Suisse.[23]

**C.      Plaintiffs Ask to Certify A Global Class of Over 17,000 Investors in SIBL CDs**

In this Motion, Plaintiffs ask the Court to certify a class consisting of:

> All persons who invested in SIBL CD(s) from August 23, 2004–February 16, 2009, inclusive, and whose claims for losses related to SIBL CDs are recognized, authorized, and calculated by the United States Receiver for the Stanford Entities, Ralph S. Janvey.[24]

Plaintiffs have not identified the citizenship or the residency of the proposed class members (other than the six named Plaintiffs[25]) and simply state that the proposed class is comprised of "more

---

[18]     *See id.* ¶¶ 100-01, 238, 314, 388.

[19]     *See id.* ¶¶ 314, 323, 349.

[20]     *See id.* ¶¶ 388, 225.

[21]     *See id.* ¶¶ 168, 238, 261-67, 349.

[22]     *See id.* ¶¶ 101, 360, 373-75.

[23]     *See id.* ¶¶ 277, 279.  SG Suisse is not alleged to have had any contact with CD investors.

[24]     Memorandum Supporting Plaintiffs' Motion ("Pls.' Br.") at 17; *see also* SAC ¶ 420.  References in this opposition to "Pls.' App." are to the Appendix to Plaintiffs' Motion.

[25]     *See* SAC ¶¶ 12-17.  By Order dated May 4, 2015, the Court permitted Plaintiffs Sarah Elson-Rogers, Salim Estefenn Uribe, Ruth Alfille de Penhos, and Gabriel Suarez to replace four previously-named Plaintiffs.  *See* Dkt. No. 237.  The Court further permitted Plaintiffs to substitute Diana Suarez as a class representative in place of her son,

than 17,000 SIBL investors from around the world."[26]  Through discovery, Defendants have

learned that the putative class includes investors from 106 countries spread across all seven

continents (including a claimant from Bouvet Island, which is a reportedly uninhabited island in

Antarctica) and 47 states in the U.S.[27]  Appendices A through D to this brief contain charts

demonstrating the geographic dispersion of the SIBL investors and the relative size of their claims.

Plaintiffs have not even tried to demonstrate that these individuals fall within the Court's

jurisdiction or what their local laws state with respect to their claims.

**D.    Putative Class Members Received and Relied on Varying and Individualized Information From Disparately-Situated Financial Advisors**

There is incredible diversity among the Stanford financial advisors, the information that

they provided to putative class members, and the circumstances in which putative class members

received such information and decided to make their investments.  Some financial advisors were

based in the United States, but many were based in Latin America, Europe and elsewhere.[28]  Some

had been with Stanford for years, had high-level executive positions and were experienced with

Stanford's business practices,[29] while others had just started at Stanford when they recommended

the SIBL CDs.[30]  Others were not Stanford employees at all, but independent financial advisors.[31]

---

Gabriel Suarez, in June 2015.  *See* Dkt. Nos. 238, 278, 279.  Plaintiffs' withdrawal of class representatives after five years of litigation and insertion of newly-located individuals raises questions about the legitimacy of the original representatives and the motivations of the new designees.

[26]      Pls.' Br. at 7.  *See also id.* at 10.

[27]      *See* App. 649 [ABBOTT_000006].  Defendants' country data comes from information provided by the Joint Liquidators and produced by investor-Plaintiffs in another *Stanford MDL* proceeding, *Troice v. Proskauer Rose LLP, et al.*  App. 651 ["Stanford International Bank Limited – in Liquidation: Summary of Claims by Country and Status"].  The data provides information about the investors' *citizenship* for the *total* population of claimants, but the Receiver's representative testified the country breakdown is a good proxy for *allowed* claimants.  *See* App. 2928-32 [Russell Dep. Tr. at 125:17-129:21].  The Receiver apparently has gathered information about the *residence* of *allowed* claimants, but contends that it is incomplete and has not produced it.  App. 2921-25, 2933-34, 2935, 2939-40 [Russell Dep. Tr. at 115:19-119:14, 130:16-131:19,136:13-17, 140:22-141:5.  Defendants' analysis thus focuses on the available data from the Joint Liquidators.

[28]      *See, e.g.*, Pls.' Br. at 9.

[29]      *See* App. 1528-29, 1530, 1534, 1538-39 [Penhos Dep. Tr. at 27:17-28:13, 36:4-19, 54:14-20, 60:17-61:4] (testifying that she was provided oral, written, and video representations regarding Stanford from senior, president-level executives).

[30]      *See* App. 1672-75 [Estefenn July 2, 2015 Dep. Tr. at 37:22-40:6] (testifying that he purchased Stanford CDs primarily on the oral recommendation of a financial advisor who had just started working at Stanford).

Putative class members' relationships with their financial advisors and with Stanford employees were unique and varied widely.[32]

Plaintiffs have offered no evidence that financial advisors followed the same model or script in selling SIBL CDs.  Nor can they, as the circumstances under which putative class members received information concerning SIBL CDs were wide-ranging.  The class representatives dramatically illustrate these differences:

- Mr. Abbott is a Mississippi-based attorney and former law professor who started purchasing SIBL CDs in 2006 when his financial advisor, John Mark Holliday, who had advised Mr. Abbott since 1999, joined the Stanford Group.[33]  Mr. Abbott purchased ████ SIBL CDs worth ████REDACTED████ between ████████REDACTED████████, and stated that he relied "blindly" on the oral representations of his financial advisor, conveyed during in-person meetings in Oxford, Mississippi, when he initially decided to invest ████REDACTED████ in his first CD with Stanford.[34]

- Ms. Suarez is a former chocolatier from Venezuela who made all ████REDACTED████ of her SIBL CD purchases with her financial advisor between ████████REDACTED████████, initially investing ████REDACTED████.[35]  She met with her financial advisor at a Stanford office in Miami, Florida.[36]  Ms. Suarez purchased these CDs in Miami out of a fear that, because of Hugo Chavez's election, it was unstable to keep her money in Venezuela.[37]  She never received any written Stanford materials prior to purchasing SIBL CDs and only considered her financial advisor's oral representations when deciding to invest.[38]

- Ms. Elson-Rogers is a global consultant who purchased ████REDACTED████ SIBL CDs between ████REDACTED████ ████████REDACTED████████ while living in Greece and North Carolina.[39]  Among other reasons for making her initial investments, Ms. Elson-Rogers believed she was holding

---

[31]     *See* App. 1467 [Elson-Rogers Dep. Tr. at 38:16-24] (testifying that she was given information and materials about Stanford CD purchases by an independent, non-Stanford financial advisor).

[32]     *See, e.g.*, App. 1548 [Penhos Dep. Tr. at 88:22-23] (testifying she loved her financial advisor, David Nanes, "like a son"); App. 1620-22, 1623 [Suarez July 1, 2015 Dep. Tr. at 78:22-80:18, 82:3-20] (testifying that she invested in a SIBL CD in reliance on Maria Villanueva, her financial advisor, whom she "trusted completely" and "relied on exclusively").

[33]     *See* App. 1404-05, 1413 [Abbott Dep. Tr. at 25:24-26:11, 42:9-20].

[34]     *See* App. 1406-11, 1414-16, 1449 [Abbott Dep. Tr. 30:14-31:24, 32:8-33:14, 34:14-35:20, 44:2-46:18; 241:11-13].

[35]     *See* App. 1620-21, 1625, 1628, 1630-31 [Suarez July 1, 2015 Dep. Tr. at 78:22:-79.21, 89:10-15, 114:12-18, 119:25-120:13, 236:12-19].

[36]     *See* App. 1621 [Suarez July 1, 2015 Dep. Tr. 79:6-21].

[37]     *See* App. 1625-26 [Suarez July 1, 2015 Dep. Tr. 89:16-90:11].

[38]     *See* App. 1623 [Suarez July 1, 2015 Dep. Tr. 82:3-20].

[39]     *See* App. 1479-80 [Elson-Rogers Dep. Tr. at 68:8-23, 69:20-23]; App. 1016 [Dep. Ex. 67]; App. 2603 [Pls.' Interrog. Resp. at Elson-Rogers' Answers to Interrog. No. 1].

too much money in Greece and wanted to invest somewhere safer.[40]  She was mailed a brochure by her independent financial advisor, but based her investment decision on the oral representations of two financial advisors, conveyed initially during a meeting at her home in Greece in April 2005, and subsequent assurances made by her financial advisors over email, as well as the written materials.[41]  She initially invested in a CD worth REDACTED and in total invested about REDACTED with Stanford.[42]

- Ms. Penhos is a former clothing factory employee from Mexico who first learned about Stanford in 1993 or 1994[43] and ultimately invested REDACTED in SIBL CDs.[44]  Ms. Penhos and her family received a video and insurance papers at an initial meeting with her financial advisor, David Nanes, at her home in Mexico.[45]  She relied on a combination of these materials and the oral representations of Mr. Nanes, a high-ranking Stanford executive who had been with the company since the 1990s.[46]

- Mr. Queyrouze is a former owner of Ruth's Chris Steak House franchises who purchased REDACTED CDs worth REDACTED from his Louisiana-based financial advisor.[47]  Mr. Queyrouze made these purchases in REDACTED, based exclusively on the oral representations of his financial advisor during in-person meetings—either over lunch or at his financial advisor's office—in New Orleans.[48]

- Mr. Estefenn is a former employee at a publishing company started by his father in Colombia.  Mr. Estefenn testified that he purchased SIBL CDs on behalf of two separate trusts and, accordingly, did not submit personal claims to the Receiver.[49]  Mr. Estefenn purchased SIBL CDs for the trusts starting in 2002 solely as a result of his father's recommendations and the oral advice of his father's long-time financial advisor, who had started working at Stanford in 1999.[50]  Mr. Estefenn visited this advisor numerous times in Miami with his father, as well as in connection with his trusts' SIBL CD purchases, which totaled over REDACTED.[51]

The variation among the six named Plaintiffs is further demonstrated by the differences in their Stanford-related claims.  For example, the chart attached as Appendix G to this brief shows

---

40    *See* App. 1477-78 [Elson-Rogers Dep. Tr. at 62:5-63:1].

41    *See* App. 1467- [Elson-Rogers Dep. Tr. 38:16-20, 39:6-40:21, 45:6-48:1, 122:11-123:4]; App. 654 [Dep. Ex. 64]; App. 713 [Dep. Ex. 66].

42    *See* App. 1512-13, 1515 [Elson-Rogers Dep. Tr. at 199:12-16, 224:5-9, 240:11-20].

43    *See* App. 1530-31 [Penhos Dep. Tr. at 36:20-37:12].

44    *See* App. 1578-87 [Penhos Dep. Tr. at 201:2-210:19]; App. 976 [Dep. Ex. 91]; App. 669 [PENHOS_000282].

45    *See* App. 1530-31, 1538, 1540 [Penhos Dep. Tr. at 36:4-37:8; 60:17-21, 62:1-3].

46    *See* App. 1530-31, 1534, 1536-379, 1544-45, 1549 [Penhos Dep. Tr. at 36:4-37:3, 54:14-20, 56:16-57:1, 60:17-61:1, 79:12-80:5, 99:10-17].

47    *See* App. 1339-42, 1354-54, 1357-58 [Queyrouze Dep. Tr. at 12:4-13:22, 17:20-18:21, 54:1-15, 55:7-24, 62:12-18, 64:5-11].

48    *See* App. 1341, 1355, 1367 [Queyrouze Dep. Tr. at 17:20-21:1, 56:19-24, 157:1-158:6].

49    *See* App. 1673, 1745-46 [Estefenn July 2, 2015 Dep. Tr. at 38:20-24, 286:3-287:22].

50    *See* App. 1692-95 [Estefenn July 2, 2015 Dep. Tr. at 117:2-6, 118:9-119:25, 120:10-15].

51    *See* App. 1688-91, 1725 [Estefenn July 2, 2015 Dep. Tr. at 112:5-115:13, 224:7-15].

the amounts claimed and "allowed" by both the Receiver and the Joint Liquidators.  As the Court will see, the amounts recognized across the two different claims processes differ significantly, sometimes higher in the U.S., sometimes higher in Antigua.  In all cases, the allowed amount was less than the amounts claimed by the named representatives, raising questions about the validity of their applications.  And at least ▮▮ of the six named representatives have been asked to repay funds to the Joint Liquidators because of preferential payments, but have refused to do so.[52]  Since the Joint Liquidators are seeking the return of approximately $600 million paid to investors in the last six months that SIBL operated,[53] this creates a clear conflict between those who have received such demands and those who have not.  As an example, Mr. Abbott redeemed a ▮REDACTED▮ CD in ▮▮▮▮▮▮▮▮▮▮REDACTED▮▮▮▮▮▮▮▮▮▮ and testified that, unless ordered by a court, he would not repay that amount despite the Joint Liquidators' demand that he do so.[54]  Mr. Estefenn similarly withdrew over ▮REDACTED▮ from his Stanford account in ▮▮▮▮▮REDACTED▮▮▮▮▮ ▮▮▮, and his mother received a letter regarding preference payments for one of his trusts; however, Mr. Estefenn testified that he has not repaid any funds to the Joint Liquidators, nor does he intend to do so.[55]  Ms. Penhos received over ▮REDACTED▮ in preference payments during the final months of Stanford's operations, which she has refused to repay despite the Joint Liquidators' demand.[56]  Ms. Suarez received a demand to repay over ▮REDACTED▮ in preference payments received

---

[52]      See App. 1643-44 [Suarez July 1, 2015  Dep. Tr. at 165:17-166:20]; App. 1156 [Dep. Ex. 20]; App. 1422-25, 1428 [Abbott Dep. Tr. at 79:18-82:7, 104:1-13]; App. 1164 [Dep. Ex. 52]; App. 1701-04 [Estefenn July 2, 2015 Dep. Tr. 158:20-161:5]; App. 780 [Dep. Ex. 123]; App. 1161 [PENHOS_000270]; App. 1575-76 [Penhos Dep. Tr. at 198:9-199:8].

[53]      See App. 3047 [*Stanford International Bank – In Liquidation (the Bank) Preference Payments to Creditors in the run up to insolvency*, available at http://www.sibliquidation.com/faq/preference-payments/ (last visited Oct. 1, 2015)].

[54]      See App. 1422-25, 1428, 1442-44, 1453-55 [Abbott Dep. Tr. at 79:18-82:7, 104:1-13, 200:18-202:13, 318:25-320:15]; App. 1164 [Dep. Ex. 52].

[55]      See App. 1701-04, 1685-87 [Estefenn July 2, 2015 Dep. Tr. at 158:20-161:5, 88:15-90:10]; App. 816 [Dep. Ex. 123 at URIBE_000151].

[56]      See App. 1575-76 [Penhos Dep. Tr. at 198:9-199:8].

10

███████████ REDACTED ███████████, but has refused.[57]  Separately, Ms. Elson-Rogers

withdrew over ██REDACTED██ from her Stanford account in ███ REDACTED ███, but testified that she has not

received a repayment demand from the Joint Liquidators.[58]

The substance of the representations made to individual putative class members also varied

significantly.  For instance, Ms. Elson-Rogers and Ms. Penhos were both allegedly assured by

their financial advisors that the SIBL CDs were insured by Lloyd's of London,[59] whereas other

putative class members were told nothing about insurance for the investments.[60]  Putative class

members also received different representations concerning how Stanford secured its interest

rates—information used by financial advisors to convince investors of the strength of the CDs.

Ms. Penhos, for example, was told by her financial advisor that interest rates were high because

SIBL did not have any local branches, resulting in low expenses,[61] whereas Mr. Abbott was told

that the high rates were due to "really strong international investments."[62]  Mr. Queyrouze was

told that Stanford was able to provide higher returns because it was subject to less regulation than

domestic banks.[63]  Ms. Elson-Rogers, on the other hand, did not have any understanding

concerning the higher rates offered by SIBL CDs as compared to other CDs on the market; rather,

she was assured by her financial advisor that the SIBL CDs were safe and that the risk exposure

was low because Stanford was a private bank, with no retail outlets and overhead costs.[64]

With respect to Defendants, the named representatives have either no connections or

---

[57]     *See* App. 1643-44 [Suarez July 1, 2015 Dep. Tr. at 165:17-166:20]; App. 1156 [Dep. Ex. 20]; App. 740 [Dep. Ex. 12].

[58]     *See* App. 1481-82, 1503-04 [Elson-Rogers Dep. Tr. at 84:14-85:4, 145:13-146:18]; App. 1016 [Dep. Ex. 67].

[59]     *See* App. 1474, 1510, 1511 [Elson-Rogers Dep. Tr. at 47:6-11, 190:10-22, 191:3-7]; App. 1521-22, 1542, 1543 [Penhos Dep. Tr. at 38:25-39:5, 74:11-17, 75:11-18].

[60]     *See, e.g.*, App. 1627 [Suarez July 1, 2015 Dep. Tr. at 101:4-10]; App. 1695-96 [Estefenn July 2, 2015 Dep. Tr. at 120:20-121:11].

[61]     *See* App. 1535-36 [Penhos Dep. Tr. at 55:20-56:9].

[62]     App. 1415 [Abbott Dep. Tr. at 45:19-25].

[63]     *See* App. 1315016, 1367 [Queyrouze Dep. Tr. at 56:25-57:11, 157:12-23].

[64]     *See* App. 1469, 1476, 1507-08 [Elson-Rogers Dep. Tr. at 40:17-41:4, 52:9-21, 169:15-170:12].

tangential ones.  Most of the named representatives testified that they had no knowledge of or communications with the Banks until their lawyers told them post-facto about the lawyers' desire to sue the Banks.[65]  One named Plaintiff testified that she wired money to HSBC in connection with her investment in SIBL CDs, but she admitted that she did not know or inquire whether HSBC was providing services to Stanford when she did so, and she acknowledged that HSBC did not make any representations to her, at any time, concerning Stanford or the SIBL CDs.[66]  In sum, the named Plaintiffs' decisions to invest in SIBL CDs were not based on Defendants.

Finally, *all* of the named Plaintiffs have acted in ways that call into question their truthfulness and reliability.  Specifically:



- REDACTED[67] REDACTED[68] REDACTED REDACTED[69]

- REDACTED  Mr. Queyrouze has already recovered REDACTED approximately REDACTED from the Joint Liquidators, REDACTED

---

[65]     *See* App. 1429-30, 1450, 1452 [Abbott Dep. Tr. at 120:19-121:4 (admitting "I've never dealt with any of these five banks"), 275:14-25 ("I've had no dealings with any of these—of the five banks that are defendants in this lawsuit"), 312:2-6]; App. 1612, 1651-52, 1657-68 [Suarez July 1, 2015 Dep. Tr. at 36:5-13, 200:6-12, 208:5-19, 282:6-283:20] (testifying that any knowledge she has concerning the Banks was told to her by her attorneys); App. 1359-61 [Queyrouze Dep. Tr. at 92:15-94:16 (admitting that he cannot name a specific wrongful act of the Banks)]; App. 1705-06, 1713, 1726-27, 1728, 1731 [Estefenn July 2, 2015 Dep. Tr. at 166:3-167:22, 198:8-13 ("Q.  None of these banks made any representations to you, did they? A. No."), 245:24-246:17, 247:17-22, 270:15-17] (testifying that he did not know about or have communications with the Banks).

[66]     *See* App. 1514 [Elson-Rogers Dep. Tr. at 239:12-25]; *see also* App. 1507-09 [Elson-Rogers Dep. Tr. at 169:6-12, 170:13-17, 171:11-15].

[67]     *See* App. 1680-81 [Estefenn July 2, 2015 Dep. Tr. at 62:17-63:19]; App. 1639-40 [Suarez July 1, 2015 Dep. Tr. at 160:10-161:22]; App. 1572073, 1587-88 [Penhos Dep. Tr. at 186:12-187:18, 210:20-211:6].

[68]     *See* App. 1680-82 [Estefenn July 2, 2015 Dep. Tr. at 62:17-64:11]; App. 1639-40 [Suarez July 1, 2015 Dep. Tr. at 227:23-229:22]; App. 740 [Dep. Ex. 12]; App. 828[Dep. Ex. 142]; App. 2853-54, 2855-57, 2864-68 [Suarez Aug. 28, 2015 Dep. Tr. at 65:3-66:14, 67:13-69:4, 116:19-118:13, 119:11-120:18]; App. 1170 [Dep. Ex. 151].

[69]     *See* App. 1572-73, 1587-88 [Penhos Dep. Tr. at 186:12-187:18, 210:20-211:6]; App. 870 [Dep. Ex. 90 at PENHOS_000011].

REDACTED[70]   And Mr. Abbott, REDACTED filed an administrative claim against the U.S. Securities and Exchange Commission (the "SEC") under the Federal Tort Claims Act ("FTCA").[71]

- Ms. Elson-Rogers also filed an FTCA administrative claim against the SEC REDACTED REDACTED.[72]

- Mr. Queyrouze, Mr. Abbott and Ms. Elson-Rogers made loss claims on their tax returns in connection with their SIBL CDs, with Mr. Abbott estimating that, by claiming a loss, he avoided approximately REDACTED in taxes that he otherwise would have had to pay.[73] REDACTED[74]

- Mr. Abbott[75] and Ms. Suarez[76] testified that, in some or all years, they did not report interest income earned on their SIBL CDs on their tax returns filed in the United States, and they have not amended their tax returns to do so.

- Mr. Estefenn, Ms. Elson-Rogers and Ms. Penhos all signed and submitted declarations in this Action concerning their SIBL CD purchases that they later admitted were inaccurate.[77]

- Mr. Estefenn used his Stanford account for purposes that raise issues as to his credibility and integrity, namely round-trip and currency exchange transactions.[78]  Mr. Estefenn also testified that he solicited and received confidential investment information from other Stanford investors in connection with purportedly helping them manage their Stanford-related claims on the condition that he would not provide such information to third parties.[79] REDACTED

---

[70]    *See* App. 2617-18 [Pls.' Interrog. Resp. at Pl. Queyrouze's Answer to Interrog. Nos. 7, 8]; App. 1376-80, 1385-92 [Queyrouze Dep. Tr. at 222:3-226:6, 233:8-235:25, 267:5-269:22, 270:10-271:12]; App. 677 [Dep. Ex. 44].

[71]    *See* App. 1425-27 [Abbott Dep. Tr. at 82:18-84:23]; App. 2599 [Pls.' Interrog. Resp. at Pl. Abbott's Answer to Interrog. No. 7]; App. 673 [Dep. Ex. 53].

[72]    *See* App. 2599 [Pls.' Interrog. Resp. at Pl. Elson-Rogers' Answer to Interrog. No. 7]; App. 1441, 1447-48 [STAN_TDBANK_000649-51].

[73]    *See* App. 1369-70 [Queyrouze Dep. Tr. at 186:21-187:16]; App. 1441, 1147-48 [Abbott Dep. Tr. at 194:7-22, 237:24-238:14]; App. 1505-06 [Elson-Rogers Dep. Tr. at 149:23-150:5].

[74]    *See* App. 677 [Dep. Ex. 44]; App. 673 [Dep. Ex. 53]; App. 1125-27 [STAN_TDBANK_000649-51].

[75]    *See* App. 1439-70 [Abbott Dep. Tr. at 192:8-194:1].

[76]    App. 2848-52, 2871 [Suarez Aug. 28, 2015 Dep. Tr. at 60:11-25, 61:13-62:21, 63:22-64:17, 151:6-15].

[77]    *See* App. 1322 [Dep. Ex. 127]; App. 1733-49 [Estefenn July 2, 2015 Dep. Tr. at 274:10-290:15]; App. 1318 [Dep. Ex. 70]; App. 1483-88, 1518-20 [Elson-Rogers Dep. Tr. at 86:11-91:25, 293:4-295:23]; App. 1325 [Dep. Ex. 88]; App.1559-61 [Penhos Dep. Tr. 169:7-171:4].

[78]    *See* App. 1714-24 [Estefenn July 2, 2015 Dep. Tr. at 203:6-213:10].

[79]    *See* App. 2964, 2968-71 [Estefenn Sept. 10, 2015 Dep. Tr. at 329:11-330:2, 336:5-339:17]; App. 895-96 [Dep. Ex. 159 at URIBE_009022-23]; App. 891 [Dep. Ex. 160 at URIBE_009025].

REDACTED [80]

- Ms. Penhos falsely testified that she was not a party to any other litigation and only admitted that she was involved in other cases when confronted with details of three other lawsuits in Mexico.[81]  In addition, she falsely denied having filed Stanford-related claims other than with the Receiver and the Joint Liquidators.[82]  Two months after her deposition, Defendants learned that Ms. Penhos has filed a Stanford-related arbitration against the United States under the North American Free Trade Agreement ("NAFTA").[83]



These named representatives should not be deputized as the leaders of a global class.  The chart attached as Appendix E to this brief provides an overview of their issues.

## ARGUMENT

"The party seeking certification bears the burden of demonstrating that the requirements of Rule 23 have been met."  *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737-38 (5th Cir. 2003).  In determining whether a movant has satisfied its burden, a court "must undertake a rigorous analysis of Rule 23's prerequisites by probing beyond the pleadings to understand the claims, defenses, and relevant facts."  *Owner Operator Indep. Drives Ass'n, Inc. v. FFE Transp. Servs., Inc.*, 245 F.R.D. 253, 254 (N.D. Tex. 2007) (Godbey, J.); *see Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ("Rule 23 does not set forth a mere pleading standard.").[87]

---

[80]      *See* App. 2972-75, 2976-79 [Estefenn Sept. 10, 2015 Dep. Tr. at 350:23-353:16, 358:15-360:11]; App. 970 [Dep. Ex. 162 at URIBE_011178].

[81]      *See* App. 1590-93 [Penhos Dep. Tr. at 231:23-234:5].

[82]      *See* App. 1567-68 [Penhos Dep. Tr. at 181:16-182:17].

[83]      *See* App. 2611 [Pls.' Interrog. Resp. at Pl. Penhos's Answer to Interrog. No. 7]; App. 685 [PENHOS_000285-308].

[84]      *See* App. 684 [Dep. Ex. 95].

[85]      *See id.*; App. 1647-48 [Suarez July 1, 2015 Dep. Tr. at 169:18-170:4].

[86]      *See* App. 1645-46 [Suarez July 1, 2015 Dep. Tr. 167:16-168:12].

[87]      Defendants adopt and incorporate by reference the relevant arguments made by the defendants in *Troice v. Proskauer Rose LLP, et al.*, *Troice v. Willis of Colorado Inc., et al.* and *Turk v. Pershing, LLC* in their oppositions to

**I.      PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE 23(b)(3)**

Plaintiffs seek class certification pursuant to Rule 23(b)(3), which requires proof "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. P. 23(b)(3).  But this is, at core, a fraud case, and courts in this and other circuits have consistently held that where multiple individualized inquiries are required, fraud cases are generally inappropriate for class certification.  *See Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1973) ("If there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action."); *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 383 (5th Cir. 2007) (same).  The same is true here.  Because Plaintiffs fail to adequately carry their burden on the necessary elements under Rule 23(b)(3), class certification should be denied.

**A.      Plaintiffs Have Not Shown Superiority**

Plaintiffs have not met their burden of proving that class resolution is a superior alternative to adjudicate this controversy.  *See* FED. R. CIV. P. 23(b)(3).  Plaintiffs have failed to establish that (a) their proposed class action is the superior method for resolving their claims; (b) the hundred-odd foreign jurisdictions from which putative class members hail will each recognize, enforce, and grant preclusive or *res judicata* effect to a judgment in this Action; and (c) putative class members are either unable or unwilling to bring individual suits.

**1.      Plaintiffs Have Argued That a Class Action Is Inferior**

Plaintiffs have repeatedly denounced a class action as an inferior mechanism for resolving their claims in connection with other *Stanford MDL* actions in this Court.  Specifically, in

---

class certification.  Dkt. No. 197, *Troice v. Proskauer Rose LLP, et al.*, Civil Action No. 3:09-cv-01600 (N.D. Tex.); Dkt. Nos. 243, 253, 255, 256, *Troice v. Willis of Colorado Inc., et al.*, Civil Action No. 3:09-cv-01274-N-BG (N.D. Tex.); Dkt. No. 159, *Turk v. Pershing, LLC*, Civil Action No. 3:09-cv-02199 (N.D. Tex.).

requesting this Court's approval of settlements in *Adams & Reese* and *BDO*, investor-Plaintiffs

argued that a proceeding brought by the Receiver and/or OSIC is *superior* to putative investor

class actions:

> There would be uncertainty and delay in certifying a settlement class involving all
> Stanford Investors who reside in multiple countries throughout the world, and such
> a class would, at any rate, be duplicative with respect to the Stanford Investors
> who are already participating in the Receivership claims and distribution process.
> It is far more efficient and saves substantial costs to distribute the settlement funds
> through the court-approved Receivership distribution process rather than create an
> entirely separate and parallel class action claims and settlement distribution
> process. *Moreover, a class action settlement process would result in substantial
> delay and less money flowing to investors.* The Receivership settlement and bar
> order, together with a dismissal of the Investor Lawsuit, protects all interested
> parties, both the Defendants and the Stanford Investors.[88]

Here, the proposed class definition is limited to include only those Stanford investors

"whose claims for losses . . . are recognized, authorized, and calculated by the United States

Receiver."[89]  Plaintiffs have stated that distributions of any potential recoveries will not be done

through a class process, but through the Receiver process,[90] and they take the position in their

Motion that the Receiver can calculate damages in this case.[91]  Indeed, Plaintiffs contend that the

claims asserted by the class in the SAC are virtually identical to those pursued by OSIC.[92]  The

Court has also questioned the extent to which "the individual class actions [are] duplicative of

efforts by the Receiver or the Investors Committee to seek recovery."[93]

Plaintiffs nevertheless ask the Court to certify a class.  It is telling that Plaintiffs (a) ask

this Court to engage in the enhanced oversight required by a class action and to "look after the

---

[88]    *Adams & Reese* Settlement Mot. ¶ 21 (emphasis added); *see BDO* Settlement Mot. ¶¶ 38-39 (emphasis added).

[89]    Pls.' Br. at 17; *see also id.* at 19, 54.

[90]    *See* Reply In Further Support of Plaintiffs' Mot. To Join OSIC As A Plaintiff Under Rule 20(A), Dkt. No. 118, at 1 ("[A]ny recovery of fraudulent transfers from Defendants will be distributed to Plaintiffs from the Receivership Estate pursuant to the Receiver's distribution protocol *regardless of which party is first to prevail*.") (emphasis added).

[91]    *See* Pls.' Br. at 6, 55.

[92]    *See* Memorandum in Support of Plaintiffs' Sealed Motion for Leave to Amend Complaint, Dkt. No. 238, at 6-8.

[93]    App. 1272 [Excerpt of Aug. 21, 2014 Status Hr'g Tr. at 4:6-8].

welfare of class members"[94] yet (b) simultaneously disavow this judicial oversight in other *Stanford MDL* actions because it would be too time-consuming and expensive.

> **2.      Plaintiffs Have Not Proven That The Foreign Jurisdictions Involved Would Recognize and Give Preclusive Effect to a Class Action Judgment in This Case**

Plaintiffs are "required to demonstrate" under Rule 23 that foreign jurisdictions will "probably," *i.e.*, "more likely than not," recognize and give preclusive effect to a class action judgment in the action at issue. *See, e.g.*, *Anwar v. Fairfield Greenwich, Ltd.*, 289 F.R.D. 105, 114-15 (S.D.N.Y. 2013) (plaintiffs must show that foreign courts would "probably recognize as preclusive" a U.S. judgment); *In re Alstom SA Secs. Litig.*, 253 F.R.D. 266, 282 (S.D.N.Y. 2008) (requiring plaintiffs to demonstrate a reasonable "probability"); *In re Vivendi Universal, S.A. Sec. Lit.*, 242 F.R.D. 76, 95 (S.D.N.Y. 2007) (plaintiffs must show that foreign courts would "more likely than not" recognize and give preclusive effect to any judgment rendered); *see also Ansari v. New York Univ.*, 179 F.R.D. 112, 116-17 (S.D.N.Y. 1998); *CL-Alexanders Laing & Cruickshank v. Goldfeld*, 127 F.R.D. 454, 459-60 (S.D.N.Y. 1989).  Plaintiffs have not carried their burden. Nor can they.  Defendants' evidence establishes that, if Defendants prevail on the merits, class members who did not affirmatively participate in this lawsuit will be able to bring individual claims against Defendants in a host of foreign jurisdictions and seek damages for the same losses and based on the same alleged conduct at issue in this Action.  And class members dissatisfied with a settlement could sue for more elsewhere.  As a result, whether Defendants win or lose in this Court, they will be forced to face the expense and uncertainty of relitigating Plaintiffs' claims in untold foreign jurisdictions.

In their Motion, Plaintiffs provided no expert evidence on this topic (or on any topic, for that matter).  In this Opposition, Defendants submit thirteen expert reports from highly respected

---

[94]      App. 2671 [Oquendo Decl. at 34].

legal authorities opining on the laws in seven Latin American jurisdictions (Colombia, Ecuador, El Salvador, Mexico, Panama, Perú, and Venezuela), as well as expert reports opining on the laws in seven additional jurisdictions in North America, Europe and the Caribbean (Canada, France, Germany, Spain, Switzerland, England, and the former Netherlands Antilles, which includes Aruba).[95]  Defendants' experts include distinguished scholars in the field of international enforcement of judgments, highly experienced practitioners, international arbitrators, and the former Chief Judge of the Supreme Court of Panama.  Appendix F to this brief is a chart showing Defendants' experts and their credentials.

In their reply brief, Plaintiffs may attempt to rely on testimony from three individuals dealing with eight countries, partially.[96]  Because U.S. opt-out class actions under Rule 23(b)(3) conflict with an important premise of many foreign legal systems, Plaintiffs cannot meet their burden by offering only scant and admittedly "speculative" rebuttal reports and citing non-binding U.S. cases that Plaintiffs' expert agreed would not be looked at by foreign courts.[97]

a.      **European and Caribbean Civil Law Countries Would Not Give Preclusive Effect to a Judgment in This Action**

It is uncontroverted that European and Caribbean civil law jurisdictions would not recognize and grant preclusive or *res judicata* effect to an opt-out class action judgment. Defendants submitted five expert reports on (i) France; (ii) Spain; (iii) Germany; (iv) Switzerland; and (v) the Netherlands Antilles (including Aruba), demonstrating that these countries would not recognize a judgment in this Action.  Plaintiffs have not designated any experts to rebut this

---

[95]      *See* App. 1751 to 2587 [Expert Declarations attached in full].

[96]      The Court should not accept Plaintiffs' expert reports submitted *in reply* to Defendants' opposition submission.  Plaintiffs waived their right to submit expert testimony by not including it in their case-in-chief.  *See United States v. Green*, 46 F.3d 461, 465 n.3 (5th Cir. 1995) (evidence raised for the first time on reply is waived); *Bell v. Ascendant Solutions, Inc.*, No. 301-CV-0166-N, 2004 WL 1490009, at *1 n.1 (N.D. Tex. July 1, 2004) (Godbey, J.) (denying plaintiffs' motion for class certification, and stating that the Court "discourages" plaintiffs from offering expert testimony "for the first time" on reply), *aff'd*, 422 F.3d 307 (5th Cir. 2005); *Springs Indus., Inc. v. Am. Motorists Ins. Co.*, 137 F.R.D. 238, 240 (N.D. Tex. 1991) ("'[A] movant should not be permitted to cure by way of reply what is in fact a defective motion.'").

[97]      *See* App. 2890 [Harris Dep. Tr. at 299:15-23].

18

conclusion.  Plaintiffs also fail to address a host of other European countries with purported class members, including Austria, Belgium, Bosnia and Herzegovina, Bulgaria, Croatia, Cyprus, Denmark, Greece, Hungary, Iceland, Ireland, Isle of Man, Italy, Latvia, Macedonia, the Netherlands, Norway, Poland, Portugal, Romania, Serbia, Sweden, Turkey, and Ukraine. Individuals from these countries cannot be part of a class.

### (i)      France and Spain

George Bermann is a distinguished professor at both Columbia Law School and the Parisian *Institut des Sciences Politiques*, who explains that the French government itself has made clear that "French courts would *almost certainly* refuse to enforce a court judgment in a U.S. 'opt out' class action because it violates . . . French constitutional principles and public policy."[98] Even the case law on which Plaintiffs rely in their Motion excluded putative French class members.  *See, e.g.*, *Anwar*, 289 F.R.D. at 117-18; *Alstom*, 253 F.R.D. at 282-87.

David Arias, a professor of procedural law and arbitration in Madrid, international practitioner and law firm founder, explains that Spanish public policy—as evidenced in the Spanish Constitution, the Spanish Civil Code, and the limited collective actions permitted by law—would not permit recognition or enforcement of a judgment in this Action.[99]  Plaintiffs offer nothing to show that Spanish courts would enforce a judgment in this Action.[100]

---

[98]      App. 1854 [Bermann Decl. ¶ 32] (quoting Brief for the Republic of France as *Amicus Curiae* Supporting Respondents, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010)) (emphasis added).  France would find it "deeply offensive" for class members to be bound without their consent.  App. 1862 [Bermann Decl. ¶ 47].  The French Constitutional Council has made it "abundantly clear" that opt-out class actions do not pass muster in French courts, and the former Chief Justice of the French Supreme Court has stated that opt-out actions are "too far removed from [France's] own legal reflexes."  App. 1844, 1850-51-53 [Bermann Decl. ¶¶ 3, 25-26, 28, 31].  Any judgment in this Action purporting to bind absent French class members would violate French constitutional and public policy principles of *consentement*, requiring affirmative consent to an action, and *autonomie des parties*, giving claimholders the right to make essential litigation decisions.  *See* App. 1848, 1850-51[Bermann Decl.  ¶¶ 16-17, 23-24, 27].

[99]       *See* App. 1821-23 [Arias Decl. ¶¶ 22-35].  Spanish courts would not recognize this Court's jurisdiction over absent class members who have not manifested their consent to the court's jurisdiction through any "concrete procedural actions" as required by the Spanish Constitution, App. 1821 [Arias Decl. ¶¶ 22-24], and whose "right to intervene and actively participate" have not been met in an opt-out setting, App. 1822, 1823 [Arias Decl. ¶¶ 28, 35].

[100]      Plaintiffs may argue that this Court should include Spanish class members on the basis of *Anwar*, but that would be a mistake.  In *Anwar*, the defendants "fail[ed] to identify an explicit conflict with Spanish public policy that would bar recognition of the judgment."  289 F.R.D. at 118.  Here, Professor Arias explicitly describes the conflicts of

(ii)    **Germany and Switzerland**

Dr. Stephan Wilske, a reputed German law firm partner and international practitioner, explains that enforcement of a judgment in this Action would violate German laws on personal jurisdiction, national rules of civil procedure and the German Code of Civil Procedure based on the failure of service of process, infringement on German *ordre public* (public policy), and inadequate notice under binding provisions of the Hague Service Convention.[101]  German investors would not be barred from relitigating their claims in Germany, as numerous courts have recognized, including *Anwar*, *Alstom* and *Vivendi*, as well as *Ansari v. New York Univ.*, 179 F.R.D. 112 (S.D.N.Y. 1998), and *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008).

Isabelle Romy, a former Swiss federal Supreme Court judge and current law professor and Zurich law firm partner, explains that Swiss courts would not enforce or give preclusive effect to a judgment in this Action against their own citizens and residents because it would violate Swiss constitutional law and public policy.[102]  Many courts, including those cited by Plaintiffs, have refused to certify a global class with Swiss members.  *E.g.*, *Anwar*, 289 F.R.D. at 117; *Buettgen v. Harless, et al.*, 263 F.R.D. 378, 382-83 (N.D. Tex. 2009; *Bersch v. Drexel Firestone, Inc.*, 519

---

a judgment in this Action with the "procedural guarantees" in the Spanish Constitution.  App.1818-19 [Arias Decl. ¶ 15].

[101]    *See* App. 2202 [Wilske Decl. ¶ 50].  Under German law, this Court lacks jurisdiction over absent German class members because German law requires an affirmative submission to a court's jurisdiction, and "[a]n unnamed class member's failure to opt out . . . does not and cannot establish personal jurisdiction."  App. 2196 [Wilske Decl. ¶¶ 23-24].  A judgment against German investors who did not "wilfully, knowingly, and actively" participate would *per se* infringe the German *ordre public* because Germany recognizes a "constitutional right to be heard, the principle of 'correct representation,' and the principle that the parties determine and delimit the scope of proceedings."  App.2197-99 [Wilske Decl. ¶¶ 28-36].  Moreover, service not in compliance with the Hague Service Convention would infringe German sovereignty and preclude recognition.  *See* App. 2200 [Wilske Decl. ¶¶ 41, 43].

[102]    *See* App. 2569, 2581 [Romy Decl. ¶¶ 2, 45].  Opt-out class actions violate Swiss public policy because they dispose of class members' procedural autonomy and substantive rights without active participation in the proceeding.  *See* App. 2573 [Romy Decl. ¶ 17].  Swiss absent class members would not be barred from instituting duplicative suits because class members who do not opt out are not "parties" to the proceeding.  *See* App. 2575 [Romy Decl. ¶¶ 22-26].  A judgment in this Action would be unrecognizable for want of jurisdiction because Swiss law does not consider an absent class member's silence as a submission to the jurisdiction of the foreign court.  *See* App. 2576-77 [Romy Decl. ¶¶ 27-31].  Moreover, service of notice not in accordance with the Hague Service Convention is grounds for non-recognition.  *See* App. 2579-80 [Romy Decl. ¶¶ 36-41].

20

F.2d 974, 996-97 (2d Cir. 1975).

### (iii)  The Former Netherlands Antilles (Including Aruba)

Rogier F. van den Heuvel, a renowned Dutch attorney and lecturer on private international law at the University of Curaçao, explains that the former Netherlands Antilles—which includes Aruba, Bonaire, Curaçao, Saba, Sint Eustatius, and Sint Maarten—would not recognize or enforce a judgment in this Action because opt-out class actions violate several facets of established public policy.[103]  Plaintiffs submit no evidence of record, nor any case law, to suggest otherwise.

### b.  Latin American Countries Would Not Give Preclusive Effect to a Judgment in This Action

Plaintiffs' putative class includes thousands of investors scattered across numerous Latin American countries, yet Plaintiffs fail to address whether most of these countries would recognize and give preclusive effect to a judgment in this Action.[104]  To date, no Latin American country has recognized and enforced an opt-out class action judgment.[105]  Nor would they be expected to, because opt-out class actions violate established public policy, constitutional principles requiring internationally-acceptable service of process, and international law standards of jurisdiction over absent class members, as assessed on a country-by-country basis.[106]

---

[103]     *See* App. 1962, 1969 [van den Heuvel Decl. ¶¶ 2-4, 41].  As Professor van den Heuvel explains, the former Netherlands Antilles holds the right to self-determination with respect to individuals' legal interests, the right to access to court, and the right to be heard as "fundamental principles" of public policy.  App.1967 [van den Heuvel Decl. ¶ 34].  The notion that a party is bound simply for failing to opt out of a class he did not affirmatively consent to contravenes public policy.  *See* App. 1969 [van den Heuvel Decl. ¶ 41].  U.S. class actions also violate the former Netherlands Antilles' public policy on allowable damages, as the limited collective actions permitted (which do not bind non-parties) "expressly exclude the possibility of a pecuniary damage award."  App. 1965 [van den Heuvel Decl. ¶¶ 24-25].

[104]     Plaintiffs' Latin American designee, Professor Oquendo, addresses only Panama, Venezuela, Mexico, Colombia, Ecuador, and Perú, but does not address the rest of the Latin American countries with CD investors—including Argentina, Bolivia, Brazil, Chile, Costa Rica, Cuba, the Dominican Republic, El Salvador, Guadeloupe, Guatemala, Haiti, Honduras, Martinique, Nicaragua, Paraguay, and Uruguay.  Nor does Professor Oquendo address a swath of Caribbean and Central American countries falling within Plaintiffs' class, such as Anguilla, Antigua and Barbuda, Bahamas, Barbados, Belize, Bermuda, Cayman Islands, Grenada, Jamaica, Montserrat, St. Lucia, St. Kitts and Nevis, Suriname, St. Vincent and Grenadines, and Trinidad and Tobago.  Without any proof as to enforcement in these countries, individuals from there cannot be part of a class here.

[105]     *See* App. 1929 [Gidi Decl. ¶ 17].

[106]     *See* App. 1931, 1934, 1937 [Gidi Decl. ¶¶ 26, 42, 57].

### (i)        Venezuela, Colombia and Mexico

Plaintiffs have not shown that Venezuelan, Colombian and Mexican courts would give preclusive effect to a judgment in this case.  With respect to Venezuela, Defendants submit two expert reports: one from James Otis Rodner, a Venezuelan law firm founder with a Harvard Law J.D., and another from Antonio Gidi, a law professor and drafter of Latin American class action legislation, showing that U.S. opt-out class actions are "at complete odds with Venezuelan conceptions of civil procedure, fundamental fairness, and public policy."[107]  In an attempt to rebut the testimony of Defendants' experts, Plaintiffs proffer a University of Connecticut law professor, Ángel Oquendo, who opines that Venezuelan courts would recognize a judgment because Venezuelan law permits a limited subset of collective group actions, and Venezuelan due process draws from U.S. notions of due process.[108]  Yet Professor Oquendo acknowledges, as he must, that collective group actions differ from U.S. class actions (opt-out or opt-in).[109]  As Professors Rodner and Gidi explain, comparing the two is like comparing apples to oranges.  Binding absent group members without consent on a claim belonging to the public in Venezuela is fundamentally different than binding an absent member on his or her individual claim without his or her consent in the U.S.[110]  Professor Oquendo's testimony falls short of meeting Plaintiffs' burden to show that

---

[107]    App. 1762 [Rodner Decl. ¶ 30].  Venezuelan public policy protects the constitutional right of defense and due process, both of which require that a party be served and afforded all procedural guarantees under Venezuelan law, including the right to be heard and present individual claims and defenses.  *See* App. 1760 [Rodner Decl. ¶ 25.  Venezuelan courts would not consider absent class members to have participated before this Court, and any binding judgment entered against such class members would violate Venezuelan public policy by limiting the class members' constitutional right of defense.  *See* App. 1760 [Rodner Decl. ¶ 26].  American class actions are also contrary to Venezuelan civil procedure, since falling within a defined class "does not make [an individual] a recognized plaintiff in Venezuela, much less a party to the litigation."  App. 1756 [Rodner Decl. ¶ 15].  Venezuelan law does not permit an individual to be bound by a judgment in an action to which they were not a party, *see* App.1757 [Rodner Decl.¶ 17], and while third parties can participate in proceedings under Venezuela law, they must "incorporate themselves" by expressly consenting to the action, App. 1756 [Rodner Decl.¶ 16]; *see also* App. 1939 [Gidi Decl. ¶ 65].

[108]    *See* App. 2706 [Oquendo Decl. at 69].

[109]    Venezuelan group actions are limited to injunctive relief on "matters of collective or social interest," not monetary relief for class members' private injuries, and—more importantly—are brought to protect "collective rights."  App. 1757-58 [Rodner Decl. ¶¶ 18-20].  Professor Oquendo agrees that such actions are different from U.S. class actions but, with little explanation or analysis, suggests that the difference is only in "minimal respect[s]."  App. 2696-97, 2703-04 [Oquendo Decl. at 59-60, 66-67].  He is wrong for the reasons described above.

[110]    *See* App. 1757-58 [Rodner Decl. ¶¶ 18-20] App. 1932- 1938 [Gidi Decl. ¶¶ 28-30, 62].

it is "more likely than not" that Venezuela would recognize a foreign, class-action judgment.[111]

Plaintiffs have likewise failed to meet their burden to show that Colombian courts would give preclusive effect to a judgment in this Action.  As noted by Eduardo Zuleta, an esteemed practitioner and former law professor, the Colombian Supreme Court would deny recognition of a judgment here because opt-out class actions violate Colombian due process and public policy by depriving absent Colombian class members of the opportunity to affirmatively and expressly join the proceeding, and the ability to opt out of a judgment in which they did not participate.[112]  In rebuttal, Professor Oquendo asserts that Latin American due process has the same "essential components" as U.S. due process, and that Colombian opt-in collective actions are "comparable" to opt-out actions.[113]  This, however, does not show that Colombian courts are likely to recognize a judgment in this Action.  Plaintiffs fail to take on Professor Zuleta's reasoning as to why collective actions satisfy Colombian due process in ways that U.S. opt-out actions do not—*e.g.*, by affording both an opportunity for absent members to join the proceeding with acceptable means of service of process (*e.g.*, letters rogatory), as well as a discretionary due process right to be excluded from a decision after having been given a right of access to justice under Colombian procedural law.[114]  Plaintiffs fail to meet their burden to show that binding Colombian residents to a judgment in this Action would not, therefore, constitute a "flagrant and grave violation" of Colombian due process, as Professor Zuleta testifies.[115]

Plaintiffs also fail to show that Mexican courts would give preclusive effect to a judgment

---

[111]   Moreover, Professor Oquendo does not have the necessary qualifications to be accepted as an expert on the laws of Venezuela, Columbia, Mexico, and the other three countries on which he opines.  He is not admitted to practice in any of these jurisdictions, has never litigated in any of them, has only a shallow understanding of their legal systems from his academic readings in Connecticut, opined erroneously on many basic aspects of their legal practice, and has never been accepted as an expert on these topics.  If Plaintiffs continue to proffer him with their Reply, Defendants will file an appropriate *Daubert* motion.

[112]   *See* App. 2553 [Zuleta Decl. ¶ 74].

[113]   *See* App. 2689, 2706 [Oquendo Decl. at 52, 69].

[114]   *See* App. 2573-46, 2550-51 [Zuleta Decl. ¶¶ 36-46, ¶¶ 62-67].

[115]   App. 2551 [Zuleta Decl.  ¶ 66].

in this Action.  Eduardo Siquieros, a highly-reputed Mexican law professor and practitioner with over 35 years of experience, has explained that opt-out class actions are "fundamentally at odds with Mexican public policy," and enforcement against absent class members of a judgment in this Action would violate specific Mexican constitutional law, Supreme Court precedent, and "unwaivable" legislation.[116]  In response, Professor Oquendo points to Mexico's opt-in collective actions and claims that the "differences in the details should not affect the analysis."[117]  But in Mexican courtrooms, they make all the difference because Mexico's opt-in statute is a mandatory public order provision and under Mexican law, failure to opt out is not deemed to be implied consent to class treatment.[118]  The importance of consent is underscored by the fact that the original Mexican class action bill provided for an opt-out model, but was rejected by the Mexican Congress in favor of an opt-in mechanism.[119]  Plaintiffs do not rebut this record evidence, which weighs heavily against a finding that a Mexican court would give preclusive effect to a judgment in this Action.

### (ii)   Perú and Ecuador

Plaintiffs fail to demonstrate that Peruvian and Ecuadorian courts would likely give preclusive effect to a judgment in this Action.  Defendants submit two expert reports, including one by J. Domingo Rivarola Reisz, a Peruvian law professor and practitioner, explaining that Peruvian courts would not recognize such a judgment because it would contravene Peruvian

---

[116]    App. 1773, 1781, 1788, 1789 [Siqueiros Decl. ¶¶ 3-4, 27, 50, 57-60].  The Mexican Constitution, Mexican case law, and the Mexican class action statute all treat autonomy, self-determination and consent as matters of public policy.  *See* App. 1783-87 [Siqueiros Decl. ¶¶ 35-47].  Article 594 of the Federal Code of Civil Procedure, which sets forth Mexico's opt-in procedure, is a public order statute that sets a "mandatory rule of procedure," meaning consent is an "unwaiveable" requirement for class treatment.  App. 1787 [Siqueiros Decl. ¶¶ 45-46].  Any judgment against class members who did not affirmatively consent to class treatment would violate Mexican public policy.  *See* App. 1782, 1787, 1788-89 [Siqueiros Decl. ¶¶ 32, 47, 51-55].  Mexican courts also would not enforce a judgment against a party that was not served with process.  *See* App. 1782 [Siqueiros Decl. ¶ 33].

[117]    App. 2690 [Oquendo Decl. at 53].

[118]    *See* App. 1787, 1775-76 [Siqueiros Decl. ¶¶ 48, 13-14].

[119]    *See* App. 1786 [Siqueiros Decl. ¶¶ 42-43].

public order and constitutional principles of due process.[120]  Peruvian due process mandates that "no person shall be deemed a default or absent member of a non-consumer protection collective action."[121]  A judgment in this Action would additionally fail the reciprocity requirement under Peruvian law.[122]  Again, Professor Oquendo does not address a majority of the barriers to recognition and enforcement in the record, but rather concludes that Peruvian group actions are "comparable enough" that Peruvian courts would find U.S. class actions "compatible with the public order."[123]  This conclusion is unsupportable because Peruvian group actions are "fundamentally different" mechanisms that are brought by public agencies and intended to offer a means to address public harms (*e.g.*, environmental issues).[124]

Plaintiffs also have not shown that Ecuadorian courts would more likely than not recognize a judgment in this Action.  Professor Gidi demonstrated that enforcement of an opt-out class action judgment in Ecuador would result in a violation of Ecuadorian policies of international notice and personal jurisdiction.[125]  Plaintiffs' assertion that jurisdiction and service by rogatory letters are only required for defendants[126] ignores that absent class members' rights are affected by opt-out class actions in the same way as traditional defendants' rights.  As Professor Gidi explains, in the case of class actions, where absent Ecuadorian class members do not take any affirmative steps to bring an action and consent to the Court's jurisdiction, Ecuadorian courts would not consider them to have submitted to the Court's jurisdiction.[127]  Because Plaintiffs fail to analyze

---

[120]     App. 2144 [Reisz Decl. ¶ 35]; App. 1940 [Gidi Decl. ¶ 73].

[121]     App. 2144 [Reisz Decl.¶ 36].

[122]     App. 2142-43, 2144 [Reisz Decl. ¶¶ 26-28, 36-37]; *see also* App. 1940[Gidi Decl. ¶¶ 71-73] (noting in addition that Peruvian courts would deem this Court to lack jurisdiction over absent class members without service through letters rogatory).

[123]     App. 2690 [Oquendo Decl. at 53].

[124]     App. 2139 [Reisz Decl. ¶¶ 17-19].

[125]     *See* App. 1944 [Gidi Decl. ¶ 90].

[126]     *See* App. 2660, 2678-79 [Oquendo Decl. at 23, 41-42].

[127]     *See* App. 1936, 1944 [Gidi Decl. ¶¶ 46, 89].  Moreover, Ecuadorian due process demands that Ecuadorian class members "receive notice of the class action proceeding through rogatory letters."  1944 [Gidi Decl. ¶ 88].

the relevant issue in this case—how Ecuadorian courts would treat absent class members in opt-out class action judgments—they have not met their burden as to the preclusive effect of a judgment in this Action.

### (iii)    Panama and El Salvador

Plaintiffs fail to meet their burden of showing that Panamanian and El Salvadorian courts will give preclusive effect to a judgment in this case.  As noted by the former Chief Justice of the Supreme Court of Panama—one of Defendants' two experts on Panamanian law—any judgment in this Action would "fundamentally contradict Panamanian laws and public policy (*orden publico*)."[128]  Plaintiffs' reliance on historical due process similarities and distinguishable Panamanian group actions[129] does not demonstrate that Panamanian courts will more likely than not enforce this Court's judgments.

Plaintiffs' Professor Oquendo does not address, and was explicitly instructed by Plaintiffs' counsel not to opine on, El Salvador.[130]  It is thus undisputed that courts in El Salvador would find that opt-out class actions violate public policy, that this Court lacked jurisdiction over El Salvadoreans, and that there was improper notice to El Salvadorian class members.[131]

---

Because U.S. opt-out class actions provide no such notice, Ecuadorian courts would deny recognition.  *See* App. 1933-34, 1944 [Gidi Decl. ¶¶ 35-42, 88, 90].

[128]    *See* App. 1990 [Hoyos Decl. ¶ 43].  This Court would lack jurisdiction over Panamanian class members who do not opt in because, under Panamanian law, failure to opt out does not confer jurisdiction over absent Panamanians.  *See* App. 1987 [Hoyos Decl. ¶ 40].  And Panamanian courts would not deem the submission of a Proof of Claim in the SEC Receivership action to constitute consent to participate in Plaintiffs' opt-out class action.  *See* App. 1990 [Hoyos Decl. ¶ 42].  Moreover, Panamanian class members would not be properly served by letter rogatory and would not have sufficient notice of the action to permit them to "opt in" (a required element of due process), thus depriving them of their right to present evidence and assert allegations.  *See* App. 1987 [Hoyos Decl. ¶ 40]; *see also* App. 1942 [Gidi Decl. ¶ 79].

[129]    *See* App. 2706 [Oquendo Decl. at 69].

[130]    *See* App. 2997-98 [Oquendo Dep. Tr. at 65:17-66:10].

[131]    *See* App. 1942-43 [Gidi Decl. ¶¶ 80-85].  El Salvador does not recognize opt-out class actions, nor does it recognize that a non-party may be bound by a judgment in a proceeding to which it did not participate or have knowledge of.  *See id.* ¶ 82.  Moreover, this Court would lack jurisdiction over El Salvadorian absent class members because mere silence or the failure to opt out is not considered a submission to this Court's jurisdiction.  *See* App. 1935-46, 1943 [Gidi Decl. ¶¶ 44-46, 84].  Additionally, El Salvadorian law would require service to be effected through rogatory letters.  *See* App. 1943 [Gidi Decl. ¶ 83].

### c.  Common Law Countries Would Not Give Preclusive Effect to a Judgment in This Action

Plaintiffs have not shown that it is more likely than not that England, Canada, and other common law countries would recognize and give preclusive effect to a judgment in this Action.

### (i)  England

Adrian Briggs, a renowned Barrister, professor of private international law at Oxford University and author of the leading English treatise on the enforcement of foreign judgments, opines that the recognition and enforcement of an opt-out class action judgment would violate English private international law and English common law.  The law of England would find that U.K. absent class members were not subject to this Court's jurisdiction without their consent or territorial presence.[132] [133]

Plaintiffs present Jonathan Harris, one of Professor Briggs' former students, who notes an "absence of any binding authority" and believes that "one can only speculate" as to how an English court would rule in this "new [and] uncertain terrain."[134]  This half-hearted opinion does not satisfy Plaintiffs' burden of proving by a preponderance of the evidence that English courts

---

[132]  *See* App. 1917 [Briggs Decl. ¶ 105].  As a matter of English private international law, this Court does not have jurisdiction over U.K. absent class members.  *See* App. 1897 [Briggs Decl. ¶ 17]..  English case law demonstrates that jurisdictional competence is assessed "by reference to the person said to be bound by the foreign decision (whether plaintiff or defendant)."  App. 1899 [Briggs Decl. ¶¶ 27-29].  And English private international law requires "either that the person was present within the territorial jurisdiction of the foreign court when the proceedings were commenced, or that person submitted, by prior agreement or by actual appearance, to the jurisdiction of the foreign court."  App. 1898 [Briggs Decl. ¶ 22].  Here, absent U.K. class members are not deemed to have submitted to this Court's jurisdiction simply by doing nothing because, under English law, failure to respond to notice of the action does not signify submission to jurisdiction.  *See* App. 1900, 1903, 1905 [Briggs Decl. ¶¶ 30, 43-45, 54-55].

[133]  Plaintiffs' argument in their moving brief that the Proof of Claim submissions to the Receiver constitute an implied submission to the Court's jurisdiction for *this* Action, Pls.' Br. at 54, is both misplaced and belied by the evidence.  This Court's prior ruling specifically ordered that the "consent to jurisdiction" language in the Proof of Claim form be expressly limited to claims in the Receivership Action.  *See* Order at 1, *SEC v. Stanford Int'l Bank, Ltd., et al.*, No. 3:09-CV-298-N (N.D. Tex. May 4, 2012), Dkt. No. 1584.  Plaintiffs have effectively conceded this point, as their experts uniformly agreed with Defendants' experts that the "consent" to the Receivership proceeding was inapplicable to this Action.  *See* App. 2881[Harris Dep. Tr. at 142:5-18]; App. 3001 [Oquendo Dep. Tr. at 183:18-24]; App. 2992 [Black Dep. Tr. at 87:9-19]; App. 1848-49 [Bermann Decl. ¶¶ 19-22]; App. 2199-2200 [Wilske Decl. ¶¶ 37-40]; App. 2578 [Romy Decl. ¶¶ 33-35]; App. 1821-22 [Arias Decl. ¶¶ 25-27]; App. 1788-89 [Siqueiros Decl. ¶¶ 51-55]; App. 1990 [Hoyos Decl. ¶ 42]; App. 1936-49 [Gidi Decl. ¶¶ 47-53]; App. 1909 [Briggs Decl. ¶¶ 67-69]; App. 2171-73 [Walker Decl. ¶¶ 64-70].

[134]  App. 2716-17 [Harris Decl. ¶¶ 20, 21]; App. 2882 [Harris Dep. Tr. at 154:14-25, 239:11, 52:4-8].

*would* recognize and *would* give preclusive effect to a judgment here.  Mr. Harris admits that "there are reasonable and respectable arguments that can be made for and against [] recognition," and this is if one assumes that adequate notice was provided to *each English class member*.  He stated that his opinion would change if such notice was not provided.[135]  Mr. Harris was not prepared to say anything more than "the law is completely uncertain"; he stated he was not capable of saying that England would "more likely than not" recognize a judgment in this Action.[136]  On this record, Plaintiffs lose.

### (ii)   Canada

Plaintiffs have not met their burden to show that Canadian courts will give preclusive effect to a judgment in this Action.  Janet Walker, a prominent law professor in Toronto and author of the foremost book on Canadian conflicts law (*Castel & Walker: Canadian Conflict of Laws* (6th Ed.)), demonstrates that any judgment in this Action would not be given preclusive effect by Canadian courts because (a) the Canadian courts have already deputized the Joint Liquidators to pursue claims regarding assets for the Stanford estate, including a case against TD Bank; (b) class notice in this Action would have to advise class members of the differences between the Canadian and U.S. actions and that they were forfeiting all potential entitlements in Canada, and a Canadian court would not find it reasonable to bind class members who were silent in response; and (c) significant issues exist regarding the adequacy of representation in this Action, including the lack of a named Canadian Plaintiff.[137]  Moreover, Professor Walker explains

---

[135]   App. 2716, 2751 [Harris Decl. ¶¶ 19, 106]; App. 2878-80 [Harris Dep. Tr. at 50:22-52:8].  Mr. Harris also admitted that the Supreme Court of the United Kingdom has reasoned that a U.S. class action judgment would *not* be recognized if English class members had not received adequate notice, in the only English case that explicitly considered this issue.  *See* App. 2885-87 [Harris Dep. Tr. at 157:10-159:25].

[136]   App. 2884-85, 2888 [Harris Dep. Tr. at 156:20-157:3, 160:2].

[137]   *See* App. 2164, 2169 [Walker Decl. ¶¶ 38, 55-56]; App. 3042-44 [Walker Dep. Tr. at 144:16-146:4].  The Superior Court of Québec ruled in August 2011 that the Joint Liquidators have exclusive authority to initiate and pursue litigation in Canada against TD Bank and related parties regarding the Stanford matter.  *See* App. 2154, 2164-65 [Walker Decl. ¶¶ 3, 38-42].  The Québec court's order "is independently determinative" in Canada "unless and until it is varied," meaning a Canadian court would have to depart from the Québec court's order to permit other proceedings.  App. 2165 [Walker Decl. ¶¶ 43-44].  Such variation is unlikely because Canadian jurisprudence strongly

why Plaintiffs' assertion that no other jurisdiction has a significant interest in the Action, Pls.' Br. at 45, is "patently contrary" to the ongoing action in Canada and the Canadian courts' numerous rulings regarding the Stanford estate and the pending case against TD Bank.[138]  Significantly, Plaintiffs' professor on Canadian law, Vaughan Black, *concedes* that Canada would likely *not* enforce a plaintiffs-favoring judgment in this Action if it is rendered *after* the Joint Liquidators' case reaches a conclusion.[139]  This proves Defendants' point; this Court cannot expect its judgment to be enforced in Canada.

To the extent that Plaintiffs try to piggy-back on earlier, non-binding decisions of other district courts like *Anwar* to meet their burden with respect to common law countries such as Canada, these efforts fail.  *Anwar* and other New York cases were decided under different circumstances and in reliance on different records and without the significant expert proof submitted by Defendants here.  For example, several of the foreign jurisdictions have a reciprocity test that must be met prior to recognizing and according preclusive effect to a U.S. opt-out class action judgment.[140]  The reciprocity test analyzes whether the law of the state where the judgment is issued—here, Texas—would provide for a similar judgment in the foreign jurisdiction to be equally recognized and enforced.[141]  The New York cases Plaintiffs cite do not consider this analysis under Texas law, which is the required inquiry before this Court (and which Defendants' experts do assess).[142]  In short, the Court should not certify a global class.  Plaintiffs have not carried their burden under Rule 23, and Defendants would unfairly face the risk of relitigation in

---

favors cross-border adjudication "in the jurisdiction in which the investors would reasonably expect [the case] to be decided," and Canadian courts are "unlikely to endorse the abandonment of the JL's Canadian Action in favour of the proposed U.S. Class Action because the SIB investors would reasonably expect the claims at issue to be decided in accordance with Canadian law."  App. 2168-69 [Walker Decl. ¶ 53-54].  Indeed, Plaintiffs allege in their SAC that TD Bank is governed by Canadian banking laws.  *See* SAC ¶¶ 65-70.

[138]       *E.g.*, App. 2170 [Walker Decl. ¶ 58].

[139]       *See* App. 2825-26 [Black Decl. ¶¶ 26-29]; *see also* App. 2993 [Black Dep. Tr. at 152:10-153:2].

[140]       *See, e.g.*, App. 2143-44 [Reisz Decl. § VIII] (Perú); App. 2546-51 [Zuleta Decl. § 5C] (Colombia); App. 1816 [Arias Decl. ¶8] (Spain); App. 2195 [Wilske Decl. ¶ 20] (Germany); App. 1778 [Siqueiros Decl. ¶ 22] (Mexico).

[141]       *See* App. 2552 [Zuleta Decl. at ¶ 71].

[142]       *See, e.g.*, App. 2552-53 [Zuleta Decl. ¶¶ 71-73].

each of the relevant foreign jurisdictions. *See In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*, 228 F. Supp. 2d 348, 364 (S.D.N.Y. 2002) (relying on two prior cases which found it "unfair" to certify a class with significant foreign membership where class could "litigate abroad in their home countries should they lose in this forum").

### 3.   Plaintiffs Have Not Shown that Putative Class Members Are Unable or Unwilling to Bring Individual Actions

Plaintiffs fail to establish that a class action is the superior vehicle for adjudicating CD investor claims because the evidence does not show that the putative class members are either unable or unwilling to sue Defendants individually. Indeed, the record demonstrates the opposite: individual Stanford investors are both sufficiently incentivized and capable of directly prosecuting their claims. Hundreds—including *named putative class representatives in this Action*—have already done so. Class certification under these circumstances is inappropriate. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996) (decertifying a class and noting a lack of superiority where "there is reason to believe that individual suits are feasible").

Plaintiffs allege that putative class members' losses are too small to justify bringing stand-alone suits. *See* Pls.' Br. at 6, 42. But Plaintiffs' only purported proof is an October 2014 declaration from the Examiner, John J. Little, stating that a 2010 investigation "revealed that almost 85% of Stanford Investors had total investments (and losses) of less than $500,000." Pls.' App., Ex. 12 at ¶¶ 6-7, 12. Neither that declaration nor Plaintiffs' Motion provides any further details or backup documentation concerning this investigation.

Tellingly, elsewhere Plaintiffs highlight that the putative class "exceeds 17,000 investors with over $4.4 billion in approved claims." Pls.' Br. at 19. ████ REDACTED ████

████████████████████████████████████████

███████████████████████████████

REDACTED[143]   Furthermore, data regarding the named class representatives contradicts

Plaintiffs' assertions that class members' claims are "too small" to sufficiently motivate them.  REDAC

REDACTED

Courts routinely find that claims

for far smaller amounts provide individuals with sufficient interest in prosecuting separate actions.

*See, e.g.*, *Ticknor v. Rouses Enters., LLC*, 592 F. App'x 276, 277 (5th Cir. 2014) (affirming denial

of class certification where plaintiffs stood to recover damages between $100 and $1,000,

attorney's fees, and potentially punitive damages); *Dvorin v. Chesapeake Exploration, LLC*, No.

3:12-CV-3728-G, 2013 WL 6003433, at *9 (N.D. Tex. Nov. 13, 2013) (plaintiffs' claims for

"several thousand dollars" each were "not so small as to render a class action a superior method of

adjudication, as the size of individual claims is generally only sufficient to persuade courts that

class actions are superior when those individual claims are very small").

The record demonstrates that hundreds of Stanford investors have commenced individual

lawsuits against various individual and corporate third-party defendants—including against one of

the Defendants named in this Action—to recover losses allegedly suffered in connection with

Stanford's Ponzi scheme.[144]  For example, in a case filed in Louisiana, six plaintiffs individually

sued Trustmark and others for their Stanford losses.[145]

In addition, *five of the six named putative class representatives in this Action* have asserted

claims outside of the Receivership process.  Mr. Abbott sued his third-party financial advisor in

Mississippi state court to recover $750,000 that he and others allegedly lost on purchases of SIBL

---

[143]      *See* App. 253 [Spreadsheet from Receiver].

[144]      *See, e.g.,* Opp. of Defs.' Proskauer Rose LLP et al. to Pls.' Opposed Mot. for Class Certification at 13, n.7, *Troice v. Proskauer Rose LLP, et al.,* No. 3:09-cv-01600 (N.D. Tex.), Dkt. No. 197; Willis & Amy Baranoucky's Opp. To Pls.' Mot. for Class Certification at 55 n.45, *Troice v. Willis of Colorado Inc., et al.,* No. 3:09-cv-01274-N-BG (N.D. Tex. Apr. 20, 2015), Dkt. No. 243.

[145]      *See* Notice of Removal, Dkt. No. 1, *Jackson, et al. v. Cox, et al.,* No. 3:10-cv-00029-EEF-DEK (M.D. La. Jan. 11, 2010); *see also* Opp. of Defs.' Proskauer Rose LLP *et al.* to Pls.' Opposed Mot. for Class Certification at 13, *Troice v. Proskauer Rose LLP,* No. 3:09-cv-01600-N-BG (N.D. Tex), Dkt. No. 197 (April 20, 2015).

CDs.[146] ██████████████████████████ REDACTED ██████████████████████████

████████████████████████████[147] Mr. Abbott and Ms. Elson-Rogers

have brought FTCA administrative claims against the SEC, and Ms. Alfille de Penhos has

submitted a NAFTA Arbitration claim against the United States.[148] Mr. Estefenn testified that

there is a group action pending against a Stanford entity in Colombia, from which he could

potentially recover money damages.[149]

That hundreds of putative class members have filed individual lawsuits against a wide

range of third-party defendants—from individual financial planners to securities brokers and law

firms—is proof that individual investors are sufficiently motivated and equipped to pursue

recoveries outside of a class action.

### B.    Plaintiffs Have Not Shown Predominance

Plaintiffs fail to show that common questions of law or fact will predominate over

questions affecting only individual class members. *See* FED. R. CIV. P. 23(b)(3). Adjudication of

putative class members' claims will require individualized inquiries, including with respect to (1)

the law applicable to a putative class member's claims; (2) whether a putative class member has

shown reliance; (3) what misrepresentations or omissions were made to a putative class member;

(4) whether a putative class member's losses were caused by Defendants' alleged conduct; (5) a

putative class member's damages; and (6) application of defenses. When a trial on the proposed

class members' claims will require such separate analyses, predominance does not exist. *See*

*Dvorin*, 2013 WL 6003433 at *8; *Ned-Sthran v. Methodist Hosps. of Dallas (d/b/a Methodist*

*Health Sys.), et al.*, No. 3:08-CV-0072, 2008 WL 5420601, at *4-5 (N.D. Tex. Nov. 25, 2008).

---

[146]    *See* App. 883 [Dep. Ex. 61 ¶ 21]; App. 2599 [Pls.' Interrog. Resp. at Pl. Abbott's Answer to Interrog. No. 7].

[147]    *See* App. 1376, 1391-92 [Queyrouze Dep. Tr. at 222:3-225:9, 270:10-271:12]; App. 2617-18 [Pls.' Interrog. Resp. at Pl. Queyrouze's Answer to Interrog. Nos. 7, 8].

[148]    *See* App. 2600, 2605, 2611 [Pls.' Interrog. Resp. at Pls.' Answers to Interrog. No. 7].

[149]    *See* App. 2979-84 [Estefenn Sept. 10, 2015 Dep. Tr. at 394:24-399:7].

**1.      Choice-of-Law Considerations Preclude Certification of a Global or a Nationwide Class**

The laws of numerous jurisdictions apply to the putative class members' claims.

Plaintiffs' failure to undertake a choice-of-law analysis is, as a matter of law, fatal to

predominance.  *See Cole*, 484 F.3d at 724 ("Failure to engage in an analysis of state law variations

is grounds for decertification."); *Norwood v. Raytheon Co.*, 237 F.R.D. 581, 594 (W.D. Tex.

2006); *Gyarmathy & Assoc., Inc. v. TIG Ins. Co.*, No. 3:02-CV-1245, 2003 WL 21339279, at *1

n.1 (N.D. Tex. June 3, 2003) (Godbey, J.).[150]  Although they have no burden, Defendants present

an analysis of Texas choice-of-law rules (which Plaintiffs fail to perform) and a comparison of

foreign laws (which Plaintiffs fail to undertake) to demonstrate that significant differences

between the laws of the numerous jurisdictions that are applicable to claims by putative class

members preclude certification.  Unlike in federal securities cases, certification of a nationwide

class is improper here because, *inter alia*, (a) there is no overriding federal law to apply, (b) the

securities at issue were sold in one-on-one transactions instead of on a regulated exchange, and (c)

reliance cannot be presumed for the class.  Plaintiffs here assert distinctly state law claims

regarding individualized purchases that occurred in widely varying circumstances.

**a.      Different Jurisdictions' Laws Apply to The Putative Class Members' Claims**

Plaintiffs globally argue that Texas law applies to every cause of action, but they are

wrong.  Texas federal courts sitting in diversity follow Texas choice-of-law rules, which apply the

"most significant relationship" test from the Restatement (Second) of Conflict of Laws

("Restatement") to tort claims.  *Spence*, 227 F.3d at 311.  Under this test, "the Court must apply an

---

[150]      *See also Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 316 (5th Cir. 2000) ("By not providing the district court with a sufficient basis for a proper choice of law analysis or a workable sub-class plan, the plaintiffs failed to meet their burden of demonstrating that common questions of law predominate."); *Lee v. Am. Airlines, Inc.*, No. 3:01-CV-1179-P, 2002 WL 31230803, at *12 (N.D. Tex. Sept. 20, 2002) ("Because Plaintiff has not provided the Court with the factual information necessary to conduct a proper choice-of-law analysis, . . . the Court finds that Plaintiff has not sustained its burden of establishing the element of predominance and that certification is proper.").

individualized choice-of-law analysis to each plaintiff's claims" and with respect to each cause of

action. *Lee,* 2002 WL 31230803, at *11; *see also Janvey v. Alguire*, No. 3:09-CV-0724-N, 2013

WL 2451738, at *3 (N.D. Tex. Jan. 22, 2013) (Godbey, J.) (finding an individual choice of law is

necessary "for each plaintiff"); *Casa Orlando Apartments, Ltd. v. Fed. Nat. Mortgage Ass'n*, 624

F.3d 185, 191 (5th Cir. 2010) ("The choice of law is evaluated issue by issue."). Application of

this test shows that the laws of a panoply of jurisdictions apply to the claims of putative class

members residing in the U.S. and internationally.

For aiding and abetting fraud claims, Restatement § 148 applies. *See In re Enron Corp.

Sec., Derivative & "ERISA" Litig.,* 511 F. Supp. 2d 742, 793 (S.D. Tex. 2005). Section 148

provides for application of the law where the investor received false representations and acted on

them: "[w]hen the plaintiff has suffered pecuniary harm on account of his reliance on the

defendant's false representations and when the plaintiff's action in reliance took place in the state

where the false representations were made and received, the local law of this state [or country]

determines the rights and liabilities of the parties."[151] The testimony of the six proposed

representatives confirms that they received sales information and made purchases all over the

map.[152] Accordingly, each of Plaintiffs' fraud-related claims is governed by a different state's or

---

[151]     Restatement § 148(1). If "the plaintiff's action in reliance took place in whole or in part in a state other than
that where the false representations were made," the above-referenced presumption is inapplicable and the court
should consider: "(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
(b) the place where the plaintiff received the representations, (c) the place where the defendant made the
representations, (d) the domicile, residence, nationality, place of incorporation and place of business of the parties, (e)
the place where a tangible thing which is the subject of the transaction between the parties was situated at the time,
and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by
the false representations of the defendant." *Id.* at § 148(2).

[152]     For example, Mr. Abbott met his financial advisor and purchased his SIBL CDs in Mississippi. *See* App.
1445-46 [Abbott Dep. Tr. at 215:18-216:21]. Ms. Suarez met with her financial advisor in Florida and made deposits
from Florida or Venezuela. *See* App. 1620-21, 1624-25, 1656 [Suarez July 1, 2015 Dep. Tr. at 78:22-79:21, 88:20-23,
89:10-15, 236:12-19]. Ms. Elson-Rogers purchased SIBL CDs when living in Greece, after meeting with her financial
advisors in her home there, and in North Carolina based on repeated email assurances from her advisor. *See* App.
1471, 1489-94, 1495-96, 1499 [Elson-Rogers Dep. Tr. at 44:18-25, 92:1-97:10, 98:11-99:6, 106:18-21]. Mr.
Queyrouze met with his financial advisor and decided to purchase SIBL CDs in Louisiana. *See* App. 1341-45, 1355,
1367-68 [Queyrouze Dep. Tr. at 17:20-21:1, 56:19-24, 157:1-158:6]. Mr. Estefenn met with his financial advisor in
Miami and made purchases while living in Colombia. *See* App. 1688-91 [Estefenn July 2, 2015 Dep. Tr. at 112:5-
115:13]; App. 2627 [Pls.' Interrog. Resp. at Pl. Estefenn's Answer to Interrog. No. 1]. Ms. Penhos invested from

country's laws.

Separate choice-of-law analyses are required for Plaintiffs' other causes of actions as well. Turning to the claim for aiding and abetting breach of fiduciary duty, the Court must consider the factors applicable to tort claims generally, which are set forth in Restatement § 145: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *See Casa Orlando*, 624 F.3d at 191 (applying Restatement § 145 to breach of fiduciary duty claim); *Berry v. Indianapolis Life Ins. Co.*, No. 3:08-CV-0248-B, 2009 WL 424545, at *3 (N.D. Tex. Feb. 19, 2009) (Boyle, J.) ("In tort cases, 'the applicable law will usually be the local law of the state where the injury occurred.'"). Plaintiffs' SAC alleges the breach of a fiduciary duty owed by the Stanford entities and their directors and officers to investors.[153] While Defendants have demonstrated in their motions to dismiss that no such fiduciary relationship exists, the law that would govern such a claim is the law of the investors' domicile or the domicile of SIBL and its directors and officers.[154] Again, because the investors were domiciled all over the world, the laws of multiple jurisdictions are implicated. First, putative class members were injured in their place of domicile. Second, the conduct causing the injury occurred in investors' domicile or that of SIBL, which was domiciled

---

Mexico. *See* App. 1530-31, 1538, 1540 [Penhos Dep. Tr. at 36:4-37:8, 60:17-21, 62:1-3]; App. 2609 [Pls.' Interrog. Resp. at Pl. Penhos's Answer to Interrog. No. 1]. None of their meetings or purchases took place in Texas.

[153]     *See* SAC ¶¶ 439, 442. Plaintiffs also claim that SIBL's officers and directors breached a fiduciary duty to SIBL, Dkt. No. 304 at 26, and that Stanford financial advisors breached a fiduciary duty to investors. *See* Dkt. No. 309 at 8-9. Defendants continue to contest that any of Plaintiffs' alleged fiduciary duties exist and incorporate by reference their motion to dismiss arguments. *See* Dkt. Nos. 293, 297, 298, 299, 307, 309, 311, 314. To the extent that a fiduciary relationship exists between SIBL and its directors, Plaintiffs lack standing to bring this claim as CD investors. *See* Dkt. No. 297 at 22 n.29.

[154]     Because Restatement § 145 provides for specific factors to be weighed when evaluating tort claims, the Court need not rely on the general principles set forth in Restatement § 6. However, the § 6 principles further support the application of multiple jurisdictions' laws. The first, and "most important," interest enumerated in § 6 is "the needs of the interstate and international systems." *See* Restatement (Second) Conflict of Laws § 6 and Cmt. d. This requires the Court to respect the laws of all jurisdictions interested in this dispute. *See Casa Orlando*, 624 F.3d at 193 ("[T]he needs of the interstate system direct us not to ignore relevant states' interests . . . by applying [law of the jurisdiction of Defendant's headquarters] to all matters of this case.").

in St. Johns, Antigua.  *See* Compl. ¶ 19, *Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd., et al.*, No. 3:09-cv-0298-N (N.D. Tex. Feb. 16, 2009), Dkt. No. 1.  The alleged aiding and abetting by the Banks supposedly occurred in Defendants' places of business, which are also geographically dispersed.  *See* SAC ¶¶ 19–24.  Third, the domicile of the parties favors the application of the law of the investor's domicile or Defendants' four different places of incorporation.  Finally, the alleged fiduciary relationships between SIBL and the Stanford directors and officers, on the one hand, and the investors, on the other hand, were also centered in investors' domiciles or in Antigua.  Given Stanford's geographically-dispersed sales activities, Fifth Circuit precedent indicates the Court should apply the law where the investors were located.  *See Casa Orlando*, 624 F.3d at 193 (holding that "no single jurisdictional law [] can be applied to the class as a whole" for breach of fiduciary duty claim against Washington, D.C.-headquartered defendant that contacted putative class members through regional offices nationwide).

Plaintiffs' claims for aiding and abetting conversion and conspiracy are also tort claims that require application of the Restatement § 145 factors.  *See Pemex Exploración y Producción v. BASF Corp.*, No. H-10-1997, 2011 WL 9523407, at *7 (S.D. Tex. Oct. 20, 2011) (applying § 145 to conversion claim); *ASARCO LLC v. Ams. Min. Corp.*, 382 B.R. 49, 73-74 (S.D. Tex. 2007) (applying § 145 to conspiracy claim).  As discussed above, these factors favor application of the laws of numerous jurisdictions around the country and world where investors lived and formed and maintained relationships with SIBL and their Stanford financial advisors.

As for Plaintiffs' Texas Securities Act ("TSA") claim, the applicable choice-of-law inquiry depends on the nature of the TSA violation Plaintiffs allege, which cannot be determined from Plaintiffs' vague pleading.  *See* Dkt. No. 307.  To the extent Plaintiffs claim the primary violation was the sale of unregistered securities, SAC ¶ 235, the claim cannot be brought by putative class members who are non-Texans or who were not present in Texas when the offer of sale was made.

*See* Tex. State Sec. Bd., Rule 139.7(a) (2015).  Given that fewer than 1,300 Receivership

claimants are from Texas (less than 7.4% of the class), the vast majority of the putative class

members likely made their purchases outside of Texas, which would bar them from bringing this

claim.[155]  To the extent Plaintiffs claim the primary TSA violation was the sale of securities

through untruths and omissions, Restatement § 148 may apply.[156]  *See In re Enron Corp. Sec.,*

*Derivative & "ERISA" Litig.*, 761 F. Supp. 2d 504, 534 (S.D. Tex. 2011) (applying Restatement §

148 to TSA claim for untruths and omissions).  However, an "extensive analysis" is still required,

because the TSA does not automatically apply "in every securities case involving facts touching

Texas or its residents."  *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 442 (Tex. 2007).

Indeed, to apply Texas law to the entire class would be "contrary to the policies of other state

'blue sky' laws."  *Id.* (Jefferson, J., concurring).  While the TSA may apply to Texas investors

who purchased CDs and sustained losses in Texas, under Restatement § 148, the law applicable to

claims by other class members can only be determined by an extensive analysis of the local fraud

laws of the 106 countries and 47 states where the putative class members live.

### b.    Significant Differences in Applicable Laws Defeat Predominance

Plaintiffs must demonstrate that a choice-of-law analysis does not reveal variances in

applicable laws that defeat predominance.  *See Stirman v. Exxon Corp.*, 280 F.3d 554, 564-65 &

n.9 (5th Cir. 2002)  (in order for common issues to predominate, "[t]he relevant state laws must be

uniform in [] necessary aspects").  Plaintiffs fail to undertake any such analysis, blithely ignoring

major differences in numerous jurisdictions' laws.  Defendants, however, have undertaken a

---

[155]    *See* App. 649 [ABBOTT_00006].

[156]    Defendants also contest the extraterritorial application of the TSA to foreign purchases of Stanford CDs by foreign individuals in light of the Supreme Court's decision in *Morrison v. Nat'l Austl. Bank, Ltd.*, 561 U.S. 247 (2010).  Although this Court has previously held that the TSA's untruth or omission provision may be applied extraterritorially, the Court has also acknowledged that Texas courts have not addressed the issue.  *See Janvey v. Willis of Colorado*, No. 13-cv-03980-N-BG (N.D. Tex.), Dkt. No. 64, at 19-21.  Defendants believe that extraterritorial application of the TSA is an improper and unconstitutional extension of this state statute to foreign transactions brought by foreign individuals involving foreign securities.

comprehensive analysis of state law variances across all fifty states with respect to the four common law claims in this Action.  Defendants attach an executive summary of the results as Appendix H to this brief and include the complete results as Exhibits 9 to 12 in the Appendix.  As demonstrated by this survey, and as highlighted below, there is considerable variation in the laws applicable to Plaintiffs' claims of aiding and abetting fraud, aiding and abetting breach of fiduciary duty, aiding and abetting conversion, and civil conspiracy.  Many states do not recognize certain of these claims, while others differ significantly as to their required elements.

For example, some states, such as Louisiana and Ohio, do not recognize aiding and abetting tort claims at all.  *See Broyles v. Cantor Fitzgerald & Co.*, No. 10-854-JJB, 2014 WL 6886158, at *5 (M.D. La. Dec. 8, 2014); *Fed. Mgt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 853 (Ohio Ct. App. 2000).  Other states, including Texas, Kentucky, Utah, and Missouri, question the scope, if not the existence, of such claims.  *Grant Thornton LLP v. Prospect High Income Fund, ML CBO IV (Cayman), Ltd.*, 314 S.W.3d 913, 930 n.28 (Tex. 2010); *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 260 (Ky. Ct. App. 2008); *Albright v. Attorney's Title Ins. Fund*, No. 2:03-cv-517, 2008 WL 2952260, at *12 (D. Utah July 28, 2008); *Jo Ann Howard & Assocs., P.C. v. Cassity*, No. 4:09-cv-01252, 2012 WL 3984486, at *6 (E.D. Mo. Sept. 11, 2012).  Still others only speculate as to the existence of such claims.  *In re Felt Mfg. Co., Inc.*, 371 B.R. 589, 615 (Bankr. D.N.H. 2007).

Likewise, domestic blue sky laws can vary significantly from state to state.  For instance, when Mr. Abbott sued his financial advisor in Mississippi, he brought claims under the Mississippi Securities Act (the "MSA").[157]  The TSA and the MSA conflict on key issues. Significantly, the MSA permits aiding and abetting claims only against employees of the seller, broker-dealers, or agents.  Miss. Code Ann. § 75-71-719 (1981).  Plaintiffs thus cannot bring

---

[157]      *See* App. 885 [Dep. Ex. 61 ¶¶ 29-30]; App. 2599 [Pls.' Interrog. Resp. at Pl. Abbott's Answer to Interrog. No. 7]; Miss. Stat. Ann. § 75-71-101 *et seq.* (1981).

claims against Defendants under the MSA.

Material variations permeate state fraud claims. For example, the standards of proof for the elements of fraud vary by state. *Compare Stuart v. Freiberg*, 116 A.3d 1195, 1203-04 (Conn. 2015) (noting that elements of fraud must be "show[n] by clear and convincing evidence"); *In re Estate of Dugger*, No. 224629, 2000 WL 1528710, at *4 (Del. Ch. Sept. 29, 2000) (same); *Ibarra v. Izaguirre*, 985 So.2d 1117, 1119 (Fla. Dist. Ct. App. 2008) (same), *with In re Estate of Kindsfather*, 108 P.3d 487, 490 (Mont. 2005) (fraud must be proven by a "preponderance of the evidence"); *Tyson Foods v. Davis*, 66 S.W.3d 568, 577 (Ark. 2002) (same); *Ostalkiewicz v. Guardian Alarm, Div. of Colbert's Sec. Servs., Inc.*, 520 A.2d 563, 569 (R.I. 1987) (same). There are also marked differences in the required elements: some states permit fraud claims where the statement is made "recklessly without any knowledge of its truth," *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 615 (Ky. Ct. App. 2011), while other states require actual knowledge that the statement is false, *see Alliance Grp. Servs., Inc. v. Grassi & Co.*, 406 F. Supp. 2d 157, 167 (D. Conn. 2005).

The standards for a conspiracy claim also vary significantly. Some states require clear and convincing evidence, *see McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999); while others require specific intent, *Tremco, Inc. v. Holman*, No. C8-96-2139, 1997 WL 423575, at *4 (Minn. Ct. App. July 29, 1997); and others still require malice, *see Gibson v. City Yellow Cab Co.*, No. 20167, 2001 WL 123467, at *3 (Ohio Ct. App. Feb. 14, 2001). Differences for the conversion and breach of fiduciary duty claims are addressed in the executive summary at Appendix H to this brief and the detailed 50-state surveys.

States also vary widely as to the applicable statutes of limitations. *See, e.g., Winn Fuel Serv., Inc. v. Booth*, 34 So.3d 515, 519 (La. Ct. App. 2010) (one year for fraud); *Bennett v. McKibben*, 915 P.2d 400, 405 (Okla. Civ. App. 1996) (two years for fraud); *Orem v. Ivy Tech*

*State Coll.*, 711 N.E.2d 864, 870 n.7 (Ind. Ct. App. 1999) (six years for fraud); *Serrano v.*

*Serrano*, No. 1 CA-CV 10-0649, 2012 WL 75639, at *6 (Ariz. Ct. App. Jan. 10, 2012) (two years

for breach of fiduciary duty); *Cmty. Title Co. v. U.S. Title Guar. Co.*, 965 S.W.2d 245, 253 (Mo.

Ct. App. 1998) (five years for breach of fiduciary duty).  Accordingly, this Court would be

required to analyze the relevant statute of limitations for each claim under each jurisdiction's law

and then apply a dizzying patchwork of different time bars.

What is more, because Plaintiffs seek certification of a worldwide class, the Court must

also consider foreign countries' laws.  *See Norwood*, 237 F.R.D. at 596.  England, for instance,

where many putative class members are domiciled, "does not recognize claims for aiding and

abetting common law fraud."  *In re BP P.L.C. Sec. Litig.*, No. 4:12-CV-1256, 2013 WL 6383968,

at *36 (S.D. Tex. Dec. 5, 2013) (dismissing claims after determining English law applies).

Plaintiffs' Professor Oquendo admitted that civil conspiracy is not a recognized claim in Latin

America and did not know whether conversion was a recognized claim in the six countries on

which he opined.[158]  In other instances, the foreign jurisdiction defines the claim with substantially

different elements, standards, or degrees of fault.  *See In re BP P.L.C. Sec. Litig.*, 2013 WL

6383968, at *36 (discussing differences between common law claims and English law).  Civil law

jurisdictions comprise a significant portion of Plaintiffs' putative class, yet "[t]he civil law simply

contains no relevant concept comparable to that of conversion."  *Fed. Ins. Co. I.C. v. Banco de*

*Ponce*, 751 F.2d 38, 41-42 (1st Cir. 1984) (noting the significant differences in the degrees of fault

required under civil law and acknowledging that "the history of conversion reveals that it is a

quintessential common law claim").[159]

---

[158]    *See* App. 2999-3000 [Oquendo Dep. Tr. at 154:3-155:11].

[159]    As another example, in Mexico, "specific common law torts are not recognized."  *Curley v. AMR Corp.*, 153 F.3d 5, 14 (2d Cir. 1998).  Courts therefore attempt to map U.S. common law claims onto Mexico's Civil Code provision prohibiting acts "against good customs and habits."  *Id.*  Moreover, Mexico follows a federal system, in which individual Mexican states have their own civil codes, which may require distinct analyses for claims brought by

The Court must also consider foreign statutes of limitations. A Texas court applying the law of a different jurisdiction must apply the foreign jurisdiction's statute of limitations if "the foreign jurisdiction's statute creates a right and also incorporates a limitation upon the time within which the suit is to be brought." *Ellis v. Great Sw. Corp.*, 646 F.2d 1099, 1111 (5th Cir. 1981). The Court would thus be faced with the daunting prospect of determining the statutes of limitations for four different claims under the laws of more than 150 jurisdictions. *See, e.g.*, *Ramsay v. Boeing Co.*, 432 F.2d 592, 595 (5th Cir. 1970) (applying Belgian statute of limitations that was incorporated into the substantive law of the cause of action). This alone makes the putative class too unwieldy to warrant certification.

Numerous courts have already held that application of materially different foreign and state laws and their respective statutes of limitations overwhelms common issues and precludes certification. *See Casa Orlando*, 624 F.3d at 185, 196 (5th Cir. 2010) (affirming denial of certification where multiple jurisdictions' laws applied to putative class members' claims); *Kelley v. Galveston Autoplex*, 196 F.R.D. 471, 478 (S.D. Tex. 2000) (finding "class action is an inappropriate vehicle" because of individualized determinations necessary with respect to statute of limitations and tolling); *Gyarmathy*, 2003 WL 21339279, at *1 (finding that because "a Texas court would apply the law of each insureds' states of residence . . . [plaintiff] has . . . failed to show that common issues of law predominate"); *Norwood*, 237 F.R.D. at 602 ("Defendants have demonstrated numerous variations in state and foreign laws that could swamp the proffered common issues and defeat predominance for each cause of action."); *Corley v. Entergy Corp.*, 220 F.R.D. 478, 488 (E.D. Tex. 2004) ("[V]arying statutes of limitations, as well as their differing effects on Plaintiffs' claims, slay predominance."), *aff'd sub nom. Corley v. Orangefield Indep. Sch. Dist.*, 152 F. App'x 350 (5th Cir. 2005). This Court should reach the same conclusion.

residents of different states. *See, e.g.*, *Gardner v. Best Western Int'l, Inc.*, 929 S.W.2d 474, 479-80 (Tex. App.—Texarkana 1996, writ denied).

### 2.      Individual Issues of Misrepresentations and Omissions to Putative Class Members Predominate

To establish fraud-based claims under Texas law, Plaintiffs generally must show that "a material representation was made" and that such representation "was false."  *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 524 (Tex. 1998); *see also Zorrilla v. Aypco Constr. II, LLC*, No. 14-0067, 2015 WL 3641299, at *7 (Tex. June 12, 2015).[160]  Similarly, to establish a fraud-by-omission claim under Texas law, Plaintiffs must show that a party failed to disclose a material fact that it had a duty to disclose.  *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998); *see also* Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2) (2015) (stating that omission must concern "a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading").  Unique, individualized issues with respect to representations and omissions received by putative class members are grounds for not certifying a class.  *See* FED. R. CIV. P. 23 Advisory Committee Notes (1966 Amendment, Subdivision (b)(3); *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1973) (class certification is inappropriate where "writings contain material variations, emanate from several sources, or do not actually reach the subject investors").

Here, class certification is inappropriate because this Action involves a multitude of widely varying representations that were allegedly communicated to individual putative class members in different ways under a wide range of circumstances.  Indeed, sworn testimony by the proposed class representatives demonstrates dramatic variations in the substance and circumstances of the representations upon which individual putative class members purportedly relied.  Moreover, given that four of the class plaintiffs testified that they relied exclusively on oral representations when initially purchasing SIBL CDs and that the CDs were sold through individual financial

---

[160]      While Defendants cite to Texas law for illustrative purposes, Defendants reiterate that the elements of fraud will vary based on the applicable law of the foreign country or state that applies to each investor.

advisors,[161] the Court may conclude that a vast portion of the class purchased CDs based on oral statements. Courts deny class certification in such scenarios. *See, e.g.*, *Simon*, 482 F.2d at 882 ("[C]ourts usually hold that an action based substantially, as here, on oral rather than written misrepresentations cannot be maintained as a class action").

Plaintiffs themselves have acknowledged that: (1) Stanford could have provided different materials and information to different investors; (2) the 17,000 class members could thus be relying on a "different mix of materials"; and (3) to determine what the 17,000 class members relied on, one would need to go talk to each one.[162]  This Court has denied class certification in substantially similar circumstances. *See Gyarmathy*, 2003 WL 21339279.

In *Gyarmathy*, the plaintiff purchased a worker's compensation policy from an insurance company. *Id*. at *1. Seeking to certify a class action based on alleged misrepresentations and omissions in the insurance company's printed materials, the *Gyarmathy* plaintiff alleged—like Plaintiffs here—that those written materials "omitted the same material information," and therefore the actionable misrepresentations were identical. *Id*. at *2. This Court rejected that argument, explaining that

> While the text of the [written materials] may have been identical, the record before the Court shows that those documents were not delivered to the putative class members in identical contexts. Many of the potential class members placed their coverage through brokers. The record reflects that at least some potential class members received varying representations from their brokers above and beyond what is contained in the [written materials]. . . . Accordingly, the Court finds that common issues of fact do not predominate.

*Id*. at *3. Other courts have reached similar conclusions. *See, e.g.*, *In re Park Cent. Global Litig.*, No. 3:09-cv-765-M, 2014 WL 4261950, at *13 (N.D. Tex. Aug. 25, 2014).

Plaintiffs argue that Stanford made a single, purportedly common "omission," *i.e.*, that he

---

[161]     *See, e.g.*, App. 1367-68 [Queyrouze Dep. Tr. at 157:1-158:6]; App. 1415-16 [Abbott Dep. Tr. at 45:14-46:18]; App. 1623 [Suarez July 1, 2015 Dep. Tr. at 82:3-23]; App. 1693, 1695 [Estefenn July 2, 2015 Dep. Tr. at 118:17-19, 120:10-15].

[162]     *See* App. 1497-98 [Elson-Rogers Dep. Tr. at 103:18-104:7]; App. 1368 [Queyrouze Dep. Tr. at 158:7-20]; App. 1698-99 [Estefenn July 2, 2015 Dep. Tr. at 132:21-133:6].

"misappropriated investors' deposits to bankroll other Stanford Entities and for his personal use," Pls.' Br. at 33, and that this satisfies the predominance requirement. But that allegedly common omission was made in the context of over 17,000 widely varying sales pitches that were laced with different combinations of words, assurances, and explanations for high yields and manageable risks.[163] For example, Mr. Abbott bought because his advisor, John Mark Holliday, assured him that Stanford was safe.[164] Ms. Suarez bought because her advisor, Maria Villanueva, said the CDs were secure and offered high interest rates.[165] Mr. Estefenn bought because his father and his financial advisor said the CDs were a good investment.[166] In a trial in this Action, individualized inquiries into the nature of the representations and omissions on which Plaintiffs allegedly relied, and the circumstances in which they occurred, will clearly predominate over any common issues.

### 3.   Individual Issues of Reliance Predominate

In addition to individualized inquiries regarding misrepresentations, unique reliance issues will prevent common adjudication. Because Stanford CDs were not traded in an efficient market, Plaintiffs cannot satisfy this obligation by presuming that every alleged misstatement was reflected in the CDs' prices. *See generally Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014). Moreover, Plaintiffs admit that they must also show that their reliance on any omission was justifiable. *See* Pls.' Br. at 31. Whether any reliance was justifiable is an inherently individualized question. To prove fraud, a plaintiff must generally show that "the party acted in reliance upon" an alleged representation or omission. *E.g.*, *Johnson & Higgins*, 962 S.W.2d at 524. Plaintiffs' civil conspiracy claim also requires a showing of reliance because it requires proof

---

[163]    Cases, such as this one, that are grounded in misrepresentations cannot be automatically transformed into omissions cases through artful re-characterization. *See, e.g., Regents of Univ. of Cal.*, 482 F.3d at 384 (5th Cir. 2007) (finding that "[m]erely pleading that defendants failed to fulfill . . . [a] duty [to disclose material information] by means of a scheme or an act, rather than by a misleading statement, does not entitle plaintiffs to employ" *Affiliated Ute* presumption); *Smith v. Ayres*, 845 F.2d 1360, 1363 (5th Cir. 1988) (stating that *Affiliated Ute* presumption does not apply where "[n]on-disclosure is relevant only as it makes the statements either false or misleading").

[164]    *See* App. 1416-17 [Abbott Dep. Tr. at 46:13-47:7].

[165]    *See* App. 1622, 1629-30 [Suarez July 1, 2015 Dep. Tr. at 80:2-11, 118:23-119:21].

[166]    *See* App. 1678 [Estefenn July 2, 2015 Dep. Tr. at 47:5-20].

of an underlying tort (here, fraud).  *See,e.g.*, *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577, 582-83 (Tex. 2001) (if underlying fraud claim fails, the fraud-based conspiracy claim fails as well).  Thus, Plaintiffs will need to demonstrate that each of the roughly 17,000 Stanford investors who make up the proposed class relied upon common misrepresentations or omissions in making their purchases of SIBL CDs.[167]  The evidence, however, demonstrates that the putative class members bought CDs following tens of thousands of widely varying conversations that took place in innumerable conference rooms, offices, and investors' kitchens and living rooms, as well as over the phone, in emails, faxes, and other writings.

### a.      Courts Refuse to Certify Classes Based On Reliance Grounds

"The element of reliance cannot be proved on a class-wide basis through evidence common to the class."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013); *Sandwich Chef, Inc. v. Nat'l Ins. Co.*, 319 F.3d 205, 219-20 (5th Cir. 2003).  Courts in the Fifth Circuit—including this Court—have consistently held that "a fraud class action cannot be certified when individual reliance will be an issue."  *Regents of Univ. of Cal.*, 482 F.3d at 383; *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 321-22 (5th Cir. 2005) (same); *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1973) ("If there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action."); *In re Enron Corp.*, 2006 WL 1662596, at *17 (S.D. Tex. June 7, 2006).

---

[167]      Although Plaintiffs argue that the TSA "does not require an investor to show that she relied on a defendant's omissions when purchasing the fraudulent security," Pls.' Br. at 31, the TSA explicitly provides for liability only when a person buys a security that was sold "by means of" an untruth or omission.  Art. 581-33(A)(2).  Courts have interpreted that language to mean that the alleged untruth or omission must have "induced" the purchase.  *See Crescendo Invs., Inc. v. Brice*, 61 S.W.3d 465, 475 (Tex. App.—San Antonio 2001, pet. denied); *Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1419 n.24 (5th Cir. 1993).  As a consequence, at a minimum, it will be an individualized issue for each class member whether he or she indeed was not told about or did not know or suspect the alleged omission.  That is, an omission as to each individual class member cannot simply be assumed under the law; it must be proven individually.  *See, e.g.*, *Proppant Solutions, LLC v. Delgado*, 2015 WL 4299503, No. 01–14–00800–CV, at *14 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (stating that plaintiff must prove in omissions case both that it was ignorant of alleged omission and did not have equal opportunity to discover truth).

Indeed, in *Gyarmathy*, this Court rejected a plaintiff's request for the Court "to infer class-wide reliance and avoid the problems in individualized proof." The Court concluded that "[i]ndividual issues of reliance or cause in fact preclude class certification of fraud [claims]." 2003 WL 21339279 at *2. This Court reached a similar ruling in *Bell v. Ascendant Solutions*, commenting that, "[l]acking the presumption of reliance, the question of individual reliance must be proved for each Plaintiff, and the Rule 23 requirement of predominance is not established." 2004 WL 1490009, at *5.

Here, as in *Gyarmathy* and *Bell*, determining whether and to what extent each putative class member relied on alleged misrepresentations and/or omissions will require individualized inquiries into, *inter alia*: (i) the specific representations and/or omissions made to each investor (which varied greatly); (ii) when each investor invested and what information was available to such investor at that time; (iii) what diligence each investor performed in connection with his or her investment; (iv) each investor's risk tolerance; and (v) each investor's sophistication. These individualized inquiries defeat predominance. *See, e.g.*, *Castano*, 84 F.3d at 743 n.15 (describing how numerous "factual differences"—*e.g.*, differences in class members' knowledge, risk exposure, and relevant time periods—predominate over common problems).

### b.     There Is No Presumption of Reliance

Plaintiffs argue that the Court "may" apply a "presumption of reliance" because they have alleged a purportedly "uniform" and "consistent" omission. Pls.' Br. at 31-32. But that is not the law. Numerous courts in this Circuit, again including this Court, have made it clear that presumptions of reliance apply only in discrete and unique situations, none of which is present here. For instance, the *Affiliated Ute* presumption applies only to federal securities cases brought under 17 C.F.R. 240.10b-5 ("Rule 10b-5"), not to common law fraud claims, such as those asserted in this Action. *See Gyarmathy*, 2003 WL 21339279, at *3 n.6 ("The Fifth Circuit has rejected extending an *Affiliated Ute* presumption beyond fraud on the market securities theories to

46

this sort of class action context.  This Court declines to rush in where the Fifth Circuit fears to tread."); *Simms v. Jones*, 296 F.R.D. 485, 509-10 (N.D. Tex. 2013).[168]  Nor does the *Affiliated Ute* presumption apply to claims for affirmative false and misleading statements or "mixed claims" that Plaintiffs allege here, which consist of both affirmative misrepresentations and omissions.  *See Smith v. Ayres*, 845 F.2d 1360, 1363 (5th Cir. 1988).[169]  In fact, "the vast majority of states have never adopted a rule allowing reliance to be presumed in common law fraud cases, and some states have expressly rejected such a proposition."  *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 221-22 (E.D. La. 1998) (collecting cases).  Because Plaintiffs are not entitled to a presumption of reliance, individualized inquiries into each putative class member's reliance will defeat predominance.

### 4.    Individual Issues of Causation Predominate

Predominance is also lacking when questions of causation require individualized inquiry.  *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602-04 (5th Cir. 2006).  For each of their claims, Plaintiffs must show a nexus between Defendants' alleged wrongful conduct and their purported injury.  *See, e.g.*, *Troice v. Proskauer Rose LLP*, No. 3:09-CV-1600-N, 2015 WL 1219522, at *9, *11-12 (N.D. Tex. Mar. 4, 2015) (Godbey, J.) (noting that causation is question of fact for claims for aiding and abetting fraud, aiding and abetting violations of the TSA, and civil conspiracy).  Plaintiffs try to plead causation by asserting that "Defendants' actions, in combination with the actions of R.A. Stanford and Jim Davis, are a *proximate cause* of actual damages to Plaintiffs and the Class."[170]  Plaintiffs' Motion argues that "*but for* the Banks having

---

[168]    Plaintiffs' reliance on various Southern District of New York cases, *see* Pls.' Br. at 32, is likewise misplaced. These cases speak only to individual plaintiffs with an evidentiary record of reasonable reliance.  *See, e.g.*, *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 452 (S.D.N.Y. 2013).  These cases cannot be applied here given that approximately 17,000 global investors bought SIBL CDs in differing circumstances.

[169]    *Affiliated Ute* does not apply where the omission is relevant only to the extent it renders the affirmative statements false or misleading, as is the case here where Stanford allegedly failed to state or omitted his role in a Ponzi scheme.  *See Smith*, 845 F.3d at 1363.

[170]    SAC ¶¶ 432 (emphasis added); *see also id.* ¶ 442.

47

provided the critical infrastructure and services by which investors' funds flowed to and through SIBL and into R.A. Stanford's pockets, R.A. Stanford's scheme could not have begun, much less persisted as long as it did." Pls.' Br. at 20 (emphasis added).

The requisite causation inquiry, however, requires evaluation of the allegations behind Plaintiffs' claims. Here, Defendants are alleged to have performed different services for SIBL, had different interactions with different investors (or none at all), and were supposedly aware of Stanford's fraud in different ways.[171] Putative class members' claims also vary in terms of how putative class members interacted with Defendants, where they lived, when they purchased SIBL CDs, how they paid for the SIBL CDs, and how SIBL treated the funds.[172] These differences make it impossible for the Court to resolve causation on a class-wide basis. *See Steering*, 461 F.3d at 602-04; *Robertson v. Monsanto Co.*, 287 F. App'x 354, 362-63 (5th Cir. 2008); *Nola v. Exxon Mobil Corp.*, No. 13-439-JJB, 2015 WL 2338336, at *7 (M.D. La. May 13, 2015).

Plaintiffs' theory is that Defendants should have realized that Stanford was operating a Ponzi scheme and severed all ties with him, at which point, they contend, the scheme would have stopped and their injury would have been prevented. *See* Pls.' Br. at 4, 20-21. In order to prevail on this theory, Plaintiffs must demonstrate for each putative class member that each Bank's separation from Stanford would have prevented that investor's losses. This is a highly individualized inquiry. And the record indicates that Plaintiffs could not carry their burden. For example, Ms. Penhos was warned in 2007 that Stanford was involved in money laundering, but kept on investing.[173] Mr. Abbott was warned in 2008 that his Stanford investments were uninsured and his money was at risk, but he also continued to invest new money.[174] Indeed, Plaintiffs allege that both Bank of America and Chase severed their relationships with Stanford in

---

[171]     *See, e.g., id.* ¶¶ 100-01, 168, 238, 261-67, 277, 279, 314, 323, 325, 348-49, 360, 373-75, 388-89, 401-04.
[172]     *See, e.g., id.* ¶¶ 12-17, 127-30, 420.
[173]     *See* App. 1546-48 [Penhos Dep. Tr. at 86:11-88:5].
[174]     *See* App. 1418-21 [Abbott Dep. Tr. at 72:23-75:14]; App. 834 [Dep. Ex. 51].

the 1990s, but putative class members kept on investing.[175]  Given how Plaintiffs frame their

claims, they cannot prove causation on a class-wide basis.

In addition, Plaintiffs are wrong that the TSA operates as a type of strict liability statute

that immunizes them from the need to prove a link between Defendants' conduct and their

purported injuries.  The language of the TSA provides for liability only when a person buys a

security that was sold "by means of" an untruth or omission.  Tex. Rev. Civ. Stat. Ann. art. 581-

33(A)(2).  Courts have consistently interpreted this language to mean that the alleged untruth or

omission must have "induced" the purchase.[176]  Moreover, to establish "aider" liability, Plaintiffs

must prove that Defendants materially aided Stanford in committing the underlying securities

violation.  That requires proof of an additional causal link between the Defendants' conduct and

the purchases at issue.  Plaintiffs thus err in suggesting that the possibility of "joint and several"

liability relieves them of the need to prove causation.[177]

## 5.  Plaintiffs Did Not Provide a Methodology for Calculating Damages on a Class-Wide Basis

Class certification is also inappropriate because Plaintiffs have not provided a damages

methodology that can be applied on a class-wide basis and thus have not established that common

issues of damages will predominate.  *See Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 308 (5th

Cir. 2003) ("class certification is not appropriate" where plaintiffs have "clearly failed to

demonstrate that the calculation of individualized actual economic damages, if any, suffered by

the class members can be performed in accordance with the predominance requirement").

In their moving papers, Plaintiffs did not submit a damages expert declaration and dealt

with damages only in passing, saying that the "Receiver's team" would figure them out.  Pls.' Br.

---

[175]  SAC ¶¶ 212-15, 367.

[176]  *Crescendo Invs., Inc. v. Brice*, 61 S.W.3d 465, 475 (Tex. App.—San Antonio 2001, pet. denied); *Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1419 n.24 (5th Cir. 1993).

[177]  As Plaintiffs' damages expert was forced to concede, "joint and several" liability is a "method of recovery" that potentially applies after liability attaches; it does not eliminate a plaintiff's need to prove causation.  *See* App. 3036, 3037-38 [Alexander Dep. Tr. at 135:3-12, 136:16-137:2]; App. 2807 [Alexander Decl. ¶ 15].

at 55.  Plaintiffs indicated that they would follow the Receiver's net loss calculations, by which the Receiver adds up the investors' deposits of principal, subtracts all interest, and subtracts all payouts or withdrawals of any kind, to reach a net number of "deposited cash lost."[178]  But the Receiver's calculations take into account investments that could go back to the 1990s.[179]  Thus, the Receiver does not limit himself to purchases during the August 24, 2004 – February 16, 2009 class period in this case.

Defendants responded with the declaration of highly-reputed Professor Kenneth Lehn, a professor at the business school at the University of Pittsburgh and the former chief economist of the SEC.[180]  Professor Lehn opines that (1) "Plaintiffs fail to present a damages methodology that can be applied on a class-wide basis"; (2) the Receiver's net loss methodology "is not an appropriate methodology for calculating damages resulting from … [Defendants'] alleged misconduct on a class-wide basis"; and (3) "Plaintiffs fail to address potential conflicts among members of the purported class that make a class-wide damages methodology inappropriate."[181]

Plaintiffs then tried to repair their case by serving a seven-page rebuttal declaration from Mr. Lester Alexander, who generally opines that there is "sufficient data and information" to calculate damages on a class-wide basis.[182]  This declaration is untimely given Plaintiffs' burden and can be set aside on that basis alone.  *See, e.g.*, *Green*, 46 F.3d at 465.  Moreover, it contradicts Plaintiffs' prior assertions that they would rely on the claims calculations in the Receivership

---

[178]   *See, e.g.*, App. 2913 [Russell Dep. Tr. at 92:3-23].

[179]   *See, e.g.*, App. 2914-15 [Russell Dep. Tr. 93:15-94:18].

[180]   *See* Appendix F for Professor Lehn's credentials.  *See also* App. 2080 [Lehn Decl. ¶¶ 1-2, Ex. A].

[181]   App. 2081 [Lehn Decl. ¶ 9].

[182]   App. 2804 [Alexander Decl. ¶ 8].  Plaintiffs' selection of Mr. Alexander, an accountant, as their damages rebuttal spokesperson is interesting given his background.  Mr. Alexander previously testified for banks in another Ponzi case that sophisticated fraudulent schemes, during the time period of the Stanford Ponzi scheme, are difficult for banks to detect and that internal controls, internal and external audits, bank monitoring, and other traditional risk management activities do not generally detect such frauds.  *See* App. 3013-15, 2017-18 [Alexander Dep. Tr. at 28:4-30:18, 32:18-33:15]; App. 913, 915, 917-18 [Alexander Dep. Ex. 3 ¶¶ 6-7, 11, 14].  Mr. Alexander stated in this Action that he continues to agree with these statements.  *See* App. 2013-15, 2017-18 [Alexander Dep. Tr. at 28:4-30:18, 32:18-33:15].

process. *See* Pls.' Br. at 6, 55.

Plaintiffs now argue that Mr. Alexander's team "will use data, records and information available to the Receiver" to calculate damages at some future date.[183] This belatedly-asserted position is still defective.

First, any damages calculation based on the Receiver's records will necessarily turn on unreliable information submitted by each purported class member with respect to issues such as their accounts, deposits, withdrawals, and collateral sources of recovery.[184] REDACTED

REDACTED

REDACTED

REDACTED [185] Moreover, the discrepancies between the Receiver's calculations and the Joint Liquidators' calculations should set off alarm bells. REDACT

REDACTED [186]

REDACTED

REDACTED [187] In short, Plaintiffs intend to build a damages model using fatally tainted records.

Second, Plaintiffs cannot satisfy their burden on class certification through conclusory predictions that "common proof [of damages] *will be* offered at a later stage in the proceedings." *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 152 (N.D. Tex. 2014); *see also In re BP P.L.C. Sec. Litig.*, No. 4:10-md-2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) (plaintiffs "failed to meet their burden of showing that damages can be measured on a class-wide basis consistent with their theories of liability" with proposed damages calculations via an event

---

[183]   App. 2807 [Alexander Decl. ¶ 16].

[184]   *See, e.g.*, App. 2092-95 [Lehn Decl. ¶¶ 32-39].

[185]   *See, e.g.*, App. 1388-93 [Queyrouze Dep. Tr. at 267:5-272:14].

[186]   *See* App. 35.

[187]   *See id.*

51

study that had yet to be created).  Plaintiffs now concede that the Receiver's claim calculations do not measure their supposed damages, but Mr. Alexander does not provide any alternative methodology for conducting such computations for each class member.  Moreover, he acknowledges that there are gaps in the Receiver's records, but weakly suggests they can be "remediated."[188]  As in *Kosmos*, Plaintiffs' "submissions are akin to no evidence at all" and "ought to end the Court's predominance inquiry."  299 F.R.D. at 151.

Third, Fifth Circuit precedent mandates the denial of certification where "plaintiffs' damage claims 'focus almost entirely on facts and issues specific to individuals rather than the class as a whole,'" making "individualized calculations of damages predominate."  *O'Sullivan*, 319 F.3d at 744-45; *accord Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998).  Here, the Receiver's net loss approach requires precisely these verboten "calculations that are performed and adjusted based on the investment history and supporting documents provided by each investor."[189]  Mr. Alexander's yet-to-be-created damages model relies on this same investor-specific information.[190]  Mr. Alexander's calculations also will need to "include adjustments for the amount claimants received through other forums," and he concedes that this information needs to be obtained, at least in part, from each claimant.[191]  Discovery from the proposed class representatives has already demonstrated that this information is unreliable and inaccurate.[192]

These individualized facts and issues also create potential conflicts among the members of the proposed class.[193]  For instance, Mr. Alexander baldly asserts that "[t]he Plaintiffs' individual

---

[188]     App. 3020 [Alexander Dep. Tr. at  69:11-23]; App. 2806-07 [Alexander Decl. ¶ 13]; *see also* App. 2941-43 [Russell Dep. Tr. at 150:21-152:10].  Mr. Alexander  admitted that he had "not tested the reliability of what … [he had] been told by the [R]eceiver's experts" about the available data, nor had he independently verified whether any additional gaps in the Receiver's records exist. App. 3033-34 [Alexander Dep. Tr. at  131:17-132:9].

[189]     App. 2092 [Lehn Decl. ¶ 31].

[190]     *See* App. 2805-07 [Alexander Decl. ¶¶ 11-12, 16].

[191]     *See* App. 2805 [Alexander Decl. ¶10]; *see also* App. 3031-32 [Alexander Dep. Tr. at 116:18-117:25].

[192]     *See* App. 2092-05 [Lehn Decl. ¶¶ 32-39].

[193]     *See* App. 2095-96, 2103-06 [Lehn Decl. ¶¶ 39-41, 57-63].

tax status is irrelevant to the determination of class-wide damages,"[194] but the testimony of the Receiver's representative makes clear that investors' tax benefits directly impact who gets paid.[195] Mr. Alexander concedes that there is potential variability in putative class members' ability to claim theft loss deductions based on the jurisdictions in which they pay taxes, and also variability in their ability to use such losses to offset income.[196]  Additionally, putative class members who return so-called "preference payments" pursued by the Joint Liquidators will be situated differently from those who retain such payments, yet Mr. Alexander makes no mention of how his approach will address such differences.[197]

Fourth, to survive class certification, Plaintiffs' theory of damages "must be consistent with its liability case." *Comcast*, 133 S. Ct. at 1433.[198]  The Supreme Court has rejected the argument that "at the class-certification stage any method of measurement is acceptable so long as it can be applied class-wide, no matter how arbitrary the measurements may be." *Id.* "Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.*  Under *Comcast* and its progeny, a reliable class-wide damages methodology must consider losses incurred by investors "but for" "Defendants' alleged wrongful conduct." *In re BP P.L.C. Sec. Litig.,* No. 4:10-md-2185, 2014 WL 2112823, at *1 (S.D. Tex. May 20, 2015) (noting *Comcast* provides this mandate).  Mr. Alexander opines that the "but for" world is "irrelevant" to any damages methodology here because he assumes that "Defendants' liability is joint and several

---

[194]    *See* App. 2807-08 [Alexander Decl. ¶ 17].

[195]    *See* App. 2916-20[Russell Dep. Tr. at 107:11-108:3, 112:16-114:5].

[196]    *See* App. 3026-28 [Alexander Dep. Tr. at 85:1-86:21, 88:1-14].

[197]    *See* App. 2095-96 [Lehn Decl. ¶¶ 40-41].

[198]    *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) (Pls.' Br. at 20), does not provide for a different analysis.  In that case, the Fifth Circuit declined to apply *Comcast*, as the district court had previously determined that liability and damages determinations would be bifurcated, class counsel was moving for final class certification for settlement purposes, and "the district court's inquiry into predominance was never premised on … a [damages] formula." *Id.* at 817.  None of these circumstances applies here, as Plaintiffs have not requested bifurcation, class certification is not premised on settlement proceedings, and Plaintiffs claim that damages can be calculated on a class-wide basis. *See* Pls.' Br. at 55.  Indeed, the Fifth Circuit recently stated that "by its terms *Deepwater Horizon* applies only to classes where predominance was based on the commonality of liability, not, as here, liability and damages, where we ask whether in operation the commonality is undone by the damages theory." *Ludlow v. BP, P.L.C.*, No. 14-20420, 2015 WL 5235010, at *5 n.36 (5th Cir. Sept. 8, 2015).

with Stanford when liability attaches."[199]   However, the cases cited in Mr. Alexander's declaration

and in Plaintiffs' brief do not support this proposition,[200] and they do not remove Plaintiffs'

burden at the class certification stage to provide a damages model "consistent with . . . [their]

liability case."  *Comcast*, 133 S. Ct. at 1433.  An appropriate damages methodology must assess

the effect of Defendants' alleged misconduct on investor losses, which here would require inquiry

into each investor's background, knowledge and experience, and individual investing decisions.[201]

Plaintiffs also make no effort to calculate damages based on the proposed class period or to

tie damages to Defendants' alleged acts during the class period.  For example, Plaintiffs claim that

"the proposed class is limited to include only those investors whose claims have been allowed by

the Receiver," but the Receiver's determination of allowed claim amounts includes investments

that took place prior to the start of the class period.[202]  As a result, Plaintiffs' proposed class

includes individuals and losses that need to be excluded from any damages determination.  *See*

*Ludlow*, 2015 WL 5235010, at *10-11 (affirming denial of class certification where damages

model could not be applied on class-wide basis because it failed to separate plaintiffs who did not

fall within theory of liability).  Plaintiffs' Motion further does not explain how putative class

members with barred "holder" claims as of August 23, 2004 would be identified and excluded

from the proposed class.[203]  Similarly, Plaintiffs' proposed class would need to exclude any "net

---

[199]   App. 2807 [Alexander Decl. ¶ 15].  Mr. Alexander testified that Plaintiffs' counsel instructed him that "the TSA applies and liability judgments can be enforced joint [and] severally," and he proceeded from those instructions in rendering his opinion in this action.  App. 3030 [Alexander Dep. Tr. at 98:5-25, 132:24-133:15].

[200]   App. 2807 [Alexander Decl. ¶ 15]; Pls.' Br. at 21 n.7, 29-30.

[201]   *See* App. 2097-2103 [Lehn Decl. ¶¶ 42-56.]; *see also Bell Atl. Corp.*, 339 F.3d at 306 ("[a]ny reasonable approximation of the damages actually suffered by the various class members would instead require a much tighter inquiry" into circumstances of individual class members, resulting in "individual issues concerning damages predominat[ing] over questions common to the proposed class").

[202]   *See* Pls.' Br. at 19; *see also* App. 2087 [Lehn Decl. ¶ 21]; Order, *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-00298-N (N.D. Tex. May 4, 2012), Dkt. No. 1584, at 46-47.

[203]   Here, Plaintiffs define the class as *purchasers* of SIBL CDs during the class period, *not* holders.  *See* Pls.' Br. at 17; *see also* SAC ¶ 420.  This definition differs from the way plaintiffs have defined the proposed class in the *Proskauer*, *Willis*, and *Pershing* cases.  *See, e.g.*, Br. in Supp. of Pls.' Opposed Mot. for Class Certification, For Designation of Class Representatives and Class Counsel at 29-30, *Troice v. Proskauer Rose LLP*, No. 3:09-cv-01600 (N.D. Tex. Apr. 20, 2015), Dkt. No. 193; Br. in Supp. Of Pls.' Opposed Mot. for Class Certification And For

54

winners," as such investors have not suffered any damages and thus cannot recover funds as part of a proposed class. *See Janvey v. Brown*, 767 F.3d 430, 441 (5th Cir. 2014). Plaintiffs fail to explain how any of these categories of investors could be identified and excluded from the proposed class, other than Mr. Alexander's vague claim that he believes there is "sufficient" information available from a "warehouse" and "backup tapes" to calculate damages.[204] Empty "assurances" do not meet Plaintiffs' burden to demonstrate that damages can be determined on a class-wide basis. *See Castano*, 84 F.3d at 742 ("Given the plaintiffs' burden, a court cannot rely on assurances of counsel that any problems with predominance … can be overcome.").

C. **Adjudicating Plaintiffs' Claims Against Five Banks and One Individual Under the Banking Laws of Four Countries and the Substantive Laws of 106 Countries and 47 States Would Be Wholly Unmanageable**

Under Plaintiffs' vision of this case, the Court and the jury will be required to adjudicate the liability of six Defendants under four countries' banking regulatory regimes and the substantive laws of over 150 jurisdictions, taking into account the different timelines and fact patterns asserted against each Defendant. No jury in the world could handle such a task. Nor should one have to.

Courts have broad discretion within the Rule 23 framework to determine whether to certify a class action, including determining whether a class action is manageable under the factors set forth in Rule 23(b)(3)(A) – (D). *See Castano*, 84 F.3d at 740. When conducting the manageability inquiry, "[p]ertinent difficulties encompass [] the whole range of practical problems that may render a class action format inappropriate in a particular suit." *Ticknor*, 592 F. App'x at

---

Designation of Class Representatives and Class Counsel, at 20-21, *Troice v. Willis of Colorado Inc.*, No. 3:09-cv-01274-N-BG (N.D. Tex. Apr. 20, 2015), Dkt. No. 227; Pls.' Mot. for Class Certification, For Designation of Class Representatives and Class Counsel at 2-3, *Turk v. Pershing, LLC*, No. 3:09-cv-02199 (N.D. Tex. Aug. 10, 2015), Dkt. No. 156.

[204]      App. 2804-05 [Alexander Decl. ¶ 8]; App. 3029, 3025 [Alexander Dep. Tr. at 64:6-20, 76:5-16]. Mr. Alexander has never accessed the warehouse records maintained by the Receiver, nor the backup tapes from the Joint Liquidators (tapes that the Receiver's forensic accountants also have never accessed or even requested). *See* App. 2944-47 [Alexander Dep. Tr. at 64:6-20, 72:15-73:14, 74:3-76:16]; App. 3019, 3021-25 [Russell Dep. Tr. at 174:16-175:3, 242:5-243:10].

278.  In particular, Rule 23(b)(3)(D)'s manageability factor requires courts to ascertain whether variations in state law make the action unsuitable for class treatment.  *See Castano*, 84 F.3d  at 743-44 (finding that the lower court "failed to perform its duty to determine whether the class action would be manageable in light of state law variations"); *Lee*, 2002 WL 31230803, at *6 n.3 (citing *Castano* and noting that "manageability problems arise when the Court must engage in [] difficult choice-of-law determinations").

Plaintiffs highlight that the putative class here is "geographically dispersed" and comprised of Stanford investors from countries "around the world"—not to mention nearly all of the U.S. states.[205]  Moreover, according to Plaintiffs' allegations, the applicable banking and regulatory standards that govern each Defendant's conduct are the laws of the foreign jurisdictions in which each Defendant is based—*i.e.*, Canadian standards for TD Bank; U.K. standards for HSBC; Swiss standards for SG Suisse; and U.S. standards for Trustmark and IB.[206]  This means that numerous different countries' and states' substantive laws will apply to the claims asserted by different putative class members, as well as the defenses asserted by each Defendant.

If the proposed class is certified, the difficulties that this Court and, importantly, a jury will face in wading through the variations of applicable, and potentially conflicting, substantive laws and determining each of the asserted claims and defenses under the correct standards will be extraordinary.  Indeed, Defendants' arguments regarding variations in governing law related to "predominance" likewise demonstrate that this class action is unmanageable.  *See, e.g.*, *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) ("Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable.").

Plaintiffs recognize that the ultimate focus is how a class action could be tried on the

---

[205]     *See* Pls.' Br. at 7, 42, 50, 55.

[206]     *See* SAC ¶¶ 39, 45, 65, 70-71, 82-83.

56

merits.[207]  Instead of grappling with these issues, however, Plaintiffs address manageability in cursory fashion, stating that "there are no unusual difficulties to managing this class action" because (i) the proposed class is comprised of individuals who have submitted claims to the Receiver for determination and (ii) distributions will be made pursuant to the Receiver's existing process.[208]  This blithe response was never tenable given the individualized legal and factual issues in this Action, but now collapses given Plaintiffs' concession that the Receiver's claims process cannot be used as a proxy for their damages.  Forced to confront this problem, Plaintiffs lean on Mr. Alexander's seven-page declaration to say "they'll figure it out in the future."[209]  But this does not provide the Court with a workable plan for either adjudicating the liability of five Banks or determining damages for 17,000 individuals.  By flat-out ignoring the insurmountable difficulties that this Court and a jury would face in adjudicating their claims, Plaintiffs fail to meet their burden of establishing that a class action is both manageable and superior.

## II.      PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE 23(a)

Under Rule 23(a), a class may only be certified if Plaintiffs show "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a).  Plaintiffs fail to satisfy these elements.[210]

---

[207]      *See* Pls.' Br. at 27.

[208]      *Id.* at 54-55.

[209]      *See* App. 2807 [Alexander Decl. ¶ 16].

[210]      Defendants disagree with Plaintiffs' contention that numerosity is satisfied because the Receiver has allowed over 17,000 claims in an alternate, non-class proceeding.  *See* Pls.' Br. at 19.  The group of Receiver "allowed" claimants is not co-extensive with Plaintiffs' proposed class because it is not limited by the class period or by the purchaser requirement or the necessity of having damages tied to Defendants' alleged misconduct.  It is sheer speculation how many investors fit within the class definition.  Add to this the large volume of investors that would have to be excluded from the class (foreign citizens, accredited investors, net winners, etc.), and Plaintiffs have failed to carry their burden on numerosity.  *See Fleming v. Travenol Labs., Inc.*, 707 F.2d 829, 833 (5th Cir. 1983) (finding certification inappropriate where there is "no factual basis for determining whether the numerosity requirement has been met").

### A.      Plaintiffs Have Not Established Commonality

Plaintiffs have failed to show that "there are questions of law or fact common to the class."

FED. R. CIV. P. 23(a)(2.  To satisfy commonality, there must be a "common contention" such that

"determination of its truth or falsity will resolve an issue that is central to the validity of each one

of the [class members'] claims in one stroke." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832,

838 (5th Cir. 2012); *see also Wal-Mart Stores*, 131 S. Ct. at 2551 ("What matters to class

certification . . . is not the raising of common 'questions'—even in droves—but, rather the

capacity of a classwide proceeding to generate common answers apt to drive the resolution of the

litigation.").  "Whether a question will drive the resolution of the litigation necessarily depends on

the nature of the underlying legal claims that the class members have raised." *Jimenez v. Allstate

Ins. Co*., 765 F.3d 1161, 1165 (9th Cir. 2014).

Plaintiffs claim commonality is satisfied because the putative class members "suffered the

same injury" based on the Banks "knowingly provid[ing] substantial assistance in furtherance of

Stanford's scheme."  Pls.' Br. at 20-21.  This is just a recitation of elements from Plaintiffs' aiding

and abetting fraud claim.  If commonality required only that class members satisfy the same claim

elements—which is not the case here given the differences in applicable laws—every putative

class action would satisfy commonality.  The Supreme Court rejected this tautological approach.

*See Wal-Mart*, 131 S. Ct. at 2551 ("[T]he mere claim by employees of the same company that they

have suffered . . . a disparate-impact Title VII injury, gives no cause to believe that all their claims

can productively be litigated at once.  Their claims must depend upon a common contention—for

example, the assertion of discriminatory bias on the part of the same supervisor.").

While Plaintiffs assert that the common driving question is whether "the Bank Defendants

knowingly provided substantial assistance in furtherance of Stanford's scheme," Pls.' Br. at 21,

Plaintiffs' allegations show this is not the case.  This Action involves a hodge-podge of facts

concerning five different Banks and one individual each having a unique set of reasons why it is

not responsible for Stanford's secret scheme.[211]  These separate narratives cannot be globally combined into one forced trial.  *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) ("Where the defendant's allegedly injurious conduct differs from plaintiff to plaintiff … no common answers are likely to be found."); *Dvorin*, 2013 WL 6003433, at *6 (no commonality where plaintiffs' allegations do not address individualized circumstances regarding defendant's alleged duties to potential class members and non-uniform injuries); *O'Neill v. The Home Depot U.S.A., Inc.*, 243 F.R.D. 469, 478 (S.D. Fla. 2006) (finding a lack of commonality where there were "differences identified in the proposed class members' individual experiences").[212]

### B.   Plaintiffs Have Not Established Typicality

Plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  FED. R. CIV. P. 23(a)(3).  "[T]ypicality focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent."  *Dvorin*, 2013 WL 6003433, at *9.  Important to this inquiry is "whether the class representative's claims have the same essential characteristics as those of the putative class."  5 Jerold S. Solovy *et al.*, Moore's Federal Practice § 23.24 (3d Ed. 2015).

Here, Plaintiffs assert that the named class representatives' claims "arise from the same set of omissions that defrauded all investors."  Pls.' Br. at 23.  This assertion is belied by Plaintiffs' deposition testimony, which shows that Plaintiffs received different information concerning the SIBL CDs in varying formats and from disparately-situated financial advisors.  These variations

---

[211]    *See* SAC ¶¶ 100-01, 168, 238, 261-67, 277, 279, 314, 323, 325, 348-49, 360, 373-75, 388-89, 401-04.

[212]    The cases cited by Plaintiffs do not support a finding of commonality where, as here, the putative class members are dissimilar vis-à-vis Defendants.  Plaintiffs rely on cases predating *Wal-Mart* and cases where all class members were similarly affected by the same conduct of the defendant(s).  *See Anwar*, 289 F.R.D. at 109,111 (defendants engaged in a "common course of conduct" involving "similar material misrepresentations and omissions" in four feeder funds operated by the same partnership in which the plaintiffs invested); *Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 324 (N.D. Tex. 2011) ("[A]ll of the class members invested in Provident through Capital Financial, creating at least one major issue of fact in common with all class members."); *Melo v. Gardere Wynne Sewell LLP*, No. 3-04-cv-2238-BD, 2007 WL 92388, at *1 (N.D. Tex. Jan. 12, 2007) (pre-*Wal-Mart* case brought by investors against single lawyer and his law firm that served as legal counsel to investment company); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 672 (S.D. Tex. 2006) (pre-*Wal-Mart* case applying an "undemanding test" for commonality).

defeat typicality.  *See In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 459-60 (E.D. La. 2006);

*Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 64 (S.D.N.Y. 2006).

All of the named Plaintiffs testified that they relied on oral assurances provided by their

financial advisors in choosing to purchase SIBL CDs.[213]  Since these oral assurances, coupled with

the financial advice and information provided to investors, were unique and as idiosyncratic as the

written materials received, typicality cannot be established.  *See, e.g.*,  *Spencer v. Cent. States, Se.*

*and Sw. Areas Pension Fund*, 778 F. Supp. 985, 989-91 (N.D. Ill. 1991) (finding that class did not

meet typicality requirement when there were varied oral representations made to 2,000 employees

at 27 different meetings).

The proposed class representatives also fail to satisfy the typicality requirement of Rule

23(a)(3) as they meaningfully differ from the absent class members with respect to the legal

claims and defenses available to them.  For example, certain putative class members are accredited

investors who received different materials and are treated legally as sophisticated investors.  *See*

*Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984) (finding certification was

properly denied where representative was sophisticated investor, which "might make him a weak

representative since the Fund could argue that [he] did not exercise due diligence in relying on any

reckless omissions or misrepresentations").  Mr. Queyrouze, for example, produced different sales

materials in this case and testified that he is a "sophisticated investor" with the ability to "analyze

risk somewhat better than a nonaccredited investor."[214]  Accredited investors may not bring claims

for aiding and abetting the sale of an unregistered security under the TSA as a matter of law.  *See*

7 Tex. Admin. Code. § 139.19 (2015); Tex. Rev. Civ. Stat. Ann. art. 581-33(F)(2) (2015).  While

Plaintiffs allege that all U.S. investors had to be accredited, the same was not required of investors

---

[213]        *See, e.g.*, App. 1623 [Suarez July 1, 2015 Dep. Tr. at 82:9-20]; App. 1412 [Abbott Dep. Tr. at 37:11-23];
App. 1683-84 [Estefenn July 2, 2015 Dep. Tr. at 84:19-85:2]; App. 1549 [Penhos Dep. Tr. at 99:10-15] App. 1355
[Queyrouze Dep. Tr. at 56:4-8].

[214]        *See* App. 1365-66 [Queyrouze Dep. Tr. at 137:25-138:22]; App. 715-38 [Dep. Ex. 41].

residing outside of the United States.[215]  As a result, Mr. Queyrouze would be barred from

bringing this claim and is not typical of the broad class.  *See Consor v. Occidental Life Ins. Co. of*

*Cal.*, 469 F. Supp. 1110, 1115 (N.D. Tex. 1979) (finding named representative plaintiff who did

not have claim under relevant statute "does not possess the same interest and suffer the same

injury as other potential class members").  Any other accredited investors would similarly be

precluded from asserting this claim, placing them in conflict with other members of the class.

### C.      Plaintiffs Have Not Established Adequacy

Class certification should further be denied because Plaintiffs have not shown that "the

representative parties will fairly and adequately protect the interests of the class."  FED. R. CIV. P.

23(a)(4).  The adequacy requirement mandates an inquiry into the willingness and ability of the

putative class representatives to "take an active role in and control the litigation to protect the

interests of the absentees."  *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir.

2001); *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 532 (N.D. Tex. 2005).  In addition, "[t]he

adequacy inquiry . . . serves to uncover conflicts of interest between the named plaintiffs and the

class they seek to represent."  *Ogden*, 225 F.R.D. at 532.

### 1.      There Are Serious Questions About the Integrity, Honesty, Credibility, and Conscientiousness of the Class Representatives

Courts examine integrity, honesty, conscientiousness, and other affirmative personal

qualities to determine whether a named individual is an adequate class representative.  *See Ogden*,

225 F.R.D. at 536; *Armour v. City of Anniston*, 89 F.R.D. 331, 332 (N.D. Ala. 1997) (same);

*Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (same).  In addition, "[c]lass

representatives must satisfy the court that they, and not counsel, are directing the litigation.  To do

---

[215]      Plaintiffs allege that SIBL CDs were sold in the U.S. to accredited investors only.  *See* SAC ¶ 235; *see also* App. 1294 [Aff. of Beverly M. Jacobs, sworn Nov. 13, 2014, at ¶ 56, *Marcus Wide and Hugh Dickson v. The Toronto-Dominion Bank*, Court File No. CV-12-9780-00CL (Can. Ont. Sup. Ct.)] ("[T]here were special rules in place for U.S. residents who wished to purchase SIB products.  In particular, U.S. residents had to qualify as 'accredited investors' pursuant to Regulation D of the *Securities Act of 1933*.").

this, class representatives must show themselves sufficiently informed about the litigation to manage the litigation effort."  *Unger,* 401 F.3d at 321; *see Ogden,* 225 F.R.D. at 535 (class representatives "should understand the action in which [they are] involved, and [that] understanding should not be limited to derivative knowledge acquired solely from counsel"); *In re Enron Corp. Secs.*, 529 F. Supp. 2d at 726; *Karnes v. Fleming*, No. H-07-0620, 2008 WL 4528223, at *3 (S.D. Tex. July 31, 2008).  In this case, there are troubling issues regarding the integrity, honesty, credibility, and conscientiousness of each of the class representatives.

### a.      Diana Suarez

Diana Suarez chose to become involved in this Action as a named Plaintiff only in June of this year.  During discovery, serious questions emerged regarding her trustworthiness and reliability.  For example, ████████████ REDACTED ████████████

████████████████████████████████████████████

████████████████████████████.[216] ████ REDACTED ████

████████████████████████████████████████████

████████████████████[217] ████ REDACTED ████

████████████████████[218]  With respect to her claim form submitted to the Joint Liquidators, Ms. Suarez initially said that the signature was hers, then said it was not hers, then said it might be hers; ████████ REDACTED ████████

████████[219] ████ REDACTED ████

████████████████[220] ████ REDACTED ████

---

[216]      *See* App. 684 [Dep. Ex. 95]; App. 1637-38, 1647-48  [Suarez July 1, 2015 Dep. Tr. at 158:9-21, 159:6-14, 169:18-170:4].

[217]      *See* App. 1645-46, 1649-50 [Suarez July 1, 2015 Dep. Tr. at 167:16-168:12, 172:18-173:2].

[218]      *See id.*

[219]      *See* App. 1074 [Dep. Ex. 19 at SUAREZ_000160]; App. 1645, 1650 [Suarez July 1, 2015 Dep. Tr. at 170:12-17, 173:3-11]; App. 1101-03 [Dep. Ex. 150]; App. 2858-622 [Suarez Aug. 28, 2015 Dep. Tr. at 108:15-109:7, 109:22-110:25, 111:20-112:9].

[220]      *See* App. 1637. 1639-40, 1642 [Suarez July 1, 2015 Dep. Tr. at 158:9-16, 160:10-161:22, 163:4-16].

████████████████████ REDACTED ████████████████████

Ms. Suarez also testified that she did not report interest received on her SIBL CDs on her

U.S. tax returns for at least 2007 and was uncertain whether she reported interest income in other

years.[221] ██████████████ REDACTED ██████████████

██████████████ REDACTED ██████████████

██████[222]  Ms. Suarez testified at the start of her deposition that she did not make any

withdrawals, other than of earned interest, from her Stanford accounts before Stanford entered into

receivership.[223]  Later, ████████████ REDACTED ████████████

████████████████████████████████████████████ she

admitted that her earlier testimony was incorrect.[224]  These actions establish that Ms. Suarez is

willing to misrepresent her circumstances—whether intentionally or inadvertently due to a lack of

diligence—in order to cement her own recovery, even if doing so comes at the expense of the

other SIBL CD investors whose interests she now seeks to represent.

In connection with her role as a putative class representative, Ms. Suarez has demonstrated

a similar lack of diligence and interest in adequately representing the interests of absent class

members.  For example, Ms. Suarez failed to diligently search for and produce documents in

advance of her deposition.  She ultimately produced documents, many of which were in Spanish,

*on the night before her deposition*,[225] and also produced certain critical documents *after* her initial

deposition took place, requiring the parties to incur the time and expense to continue her

deposition in Houston two months later.  Even then, Ms. Suarez testified at her second deposition

---

[221]     *See* App. 2848, 2849-52, 2871 [Suarez Aug. 28, 2015 Dep. Tr. at 60:11-25, 63:22-64:17, 61:13-62:21, 151:6-15].

[222]     *See* App. 1641-42 [Suarez July 1, 2015 Dep. Tr. at 162:11-22, 163:17-21]; App. 710-11 [Dep. Ex. 154]; App. 2869-70 [Suarez Aug. 28, 2015 Dep. Tr. at 131:1-132:20].

[223]     *See* App. 1632-33 [Suarez July 1, 2015 Dep. Tr. at 139:23-140:2].

[224]     App. 1653-55 [Suarez July 1, 2015 Dep. Tr. at 227:23-229:22]; App. 766-68 [Dep. Ex. 12 at 28-30]; App. 828-32 [Dep. Ex. 142]; App. 2853-57, 2864-68 [Suarez Aug. 28, 2015 Dep. Tr. at 65:3-66:14, 67:13-69:4, 116:19-118:13, 119:11-120:18]; App. 1105-08 [Dep. Ex. 151].

[225]     *See* App. 1607-11 [Suarez July 1, 2015 Dep. Tr. at 11:15-15:21].

that she still had not searched for requested responsive documents.[226]  Ms. Suarez repeatedly

indicated during her deposition that she would defer to her lawyers instead of actively directing

this litigation[227] and she could not articulate the substantive allegations that Plaintiffs have

asserted against Defendants.[228]  Ms. Suarez admitted that she has not spent much time on the

case[229] and is not aware of the basic procedural history in the case—for example, that some of the

original named class representatives have withdrawn[230] or that OSIC intervened and is a party to

this Action.[231]  Ms. Suarez's lack of knowledge regarding this case, as well as her own claims,[232]

is not surprising in light of her admission that she at one point "gave up" on the Stanford matter

and assigned a power of attorney for all of her Stanford claims to her son, Gabriel.[233] ▮REDACTED▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮REDACTED▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[234]

### b.   Salim Estefenn

Mr. Estefenn's credibility and trustworthiness are also in doubt.  Like Ms. Suarez, Mr.

Estefenn submitted a proof of claim form that included misrepresentations concerning his Stanford

accounts.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮REDACTED▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[226]    App. 2846-47 [Suarez Aug. 28, 2015 Dep. Tr. at 23:1-14, 25:19-25]; *see* App. 2589-91  [July 16, 2015 Letter from L. Neuner to Plaintiffs' Counsel at 1-3]; App. 3004 [Sept. 16, 2015 Letter from L. Neuner and P. Kazanoff to Plaintiffs' Counsel at 2].

[227]    *See, e.g.*, App. 1615-16 [Suarez July 1, 2015 Dep. Tr. at 65:6-15 ("But, really, we have the lawyers, because they are the ones that know more about all this stuff, and I let them to—to do what they should do."), 66:12-23 (testifying that she merely skimmed the operative Complaint, explaining that "it was too much to read and I wouldn't understand everything, and that's why I hired [counsel]")].

[228]    *See* App. 1617 [Suarez July 1, 2015 Dep. Tr. at 67:4-68:10].

[229]    *See* App. 1613 [Suarez July 1, 2015 Dep. Tr. at 53:14-17].

[230]    *See* App. 1614 [Suarez July 1, 2015 Dep. Tr. at 55:13-19].

[231]    *See* App. 1618-19 [Suarez July 1, 2015 Dep. Tr. at 68:19-69:3].

[232]    *See* App. 1634-35 [Suarez July 1, 2015 Dep. Tr. at 152:15-23 (testifying that she was not aware that her son, Gabriel Suarez, had filed an objection to the Receiver's notice of determination of her claim), 154:13-155:24 (testifying incorrectly that she had only received one check from the Receiver)]; App. 1094-99 [Dep. Ex. 15].

[233]    *See* App. 2862-63, 2872[Suarez Aug. 28, 2015 Dep. Tr. at 112:18-113:19, 159:13-24].  Plaintiffs initially substituted Gabriel Suarez as a class representative in this Action in May 2015, but subsequently sought the Court's permission to withdraw him and substitute Ms. Suarez as a class representative.  *See* Dkt. Nos. 237, 238, 278, 279. During his deposition, Mr. Suarez testified that he was only eighteen years old when his mother first bought SIBL CDs in 2006.  *See* App. 1332-33 [Gabriel Suarez Dep. Tr. at 40:5-11, 102:24-25].

[234]    *See* App. 946 [SUAREZ_001522 – SUAREZ_001530 at SUAREZ_00525].



[235] In addition, Mr. Estefenn testified that he used his Stanford account for purposes that raise questions concerning his credibility, **REDACTED** [236] After Stanford went into receivership, Mr. Estefenn solicited and received money and confidential investment information from other investors, purportedly to help them manage their Stanford-related claims.[237] **REDACTED** [238] **REDACTED** [239] His receipt of money for assisting other claimants is also antithetical to Rule 23.

In connection with this Action, Mr. Estefenn signed a declaration that included numerous false statements regarding his CD purchases; he later admitted that it was inaccurate.[240] Although Mr. Estefenn signed a revised declaration *the night before his deposition* that purported to correct some of the errors in the original declaration, he testified that even the revised declaration was still inaccurate.[241] Mr. Estefenn, like Ms. Suarez, failed to diligently search for and produce

---

[235]    *See* App. 999-1014 [Dep. Ex. 117]; App. 1676-82 [Estefenn July 2, 2015 Dep. Tr. at 45:21-47:4, 59:4-13, 62:17-64:14].

[236]    *See* App. 1714-24 [Estefenn July 2, 2015 Dep. Tr. at 203:6-213:10] (discussing suspicious round-trip and currency exchange transactions).

[237]    *See* App. 2964-65, 2968-71 [Estefenn Sept. 10, 2015 Dep. Tr. at 329:11-330:2, 336:5-339:17 (claiming that money was used for expenses he incurred, but stating that he did not keep track of the funds or segregate them from his personal savings)].

[238]    *See id.*; App. 895 [Dep. Ex. 159 at URIBE_009022]; App. 891-93 [Dep. Ex. 160].

[239]    *See* App. 2972-78 [Estefenn Sept. 10, 2015 Dep. Tr. at 350:23-353:16, 358:15-360:11]; App. 970 [Dep. Ex. 162 at URIBE_011178].

[240]    *See* App. 1322-23 [Dep. Ex. 127]; App. 1733-49 [Estefenn July 2, 2015 Dep. Tr. at 274:10-290:15].

[241]    *See* App. 1661-62 [Dep. Ex. 128]; App. 1747-49 [Estefenn July 2, 2015 Dep. Tr. at 288:11-290:15].

documents prior to his first deposition,[242] requiring Defendants to depose him a second time two months later after forcing a more complete production.

There are other serious questions concerning Mr. Estefenn's ability to represent absent class members. Although Mr. Estefenn testified that he seeks to recover the interest earned on his SIBL CDs, he stated that he does not know if other putative class members should recover their interest and, moreover, believes that it is their own responsibility to pursue.[243] When asked about the amount of time he has spent working on this case, Mr. Estefenn testified that it is class counsel's work, not his.[244] Indeed, while Mr. Estefenn quickly tabbed through one of the two complaints filed by OSIC,[245] he admitted that he has reviewed neither the operative SAC nor Plaintiffs' Motion.[246] Mr. Estefenn joined this case only in May of this year and could not articulate even a basic understanding about the various Banks' involvement with Stanford, again deferring to counsel.[247] Mr. Estefenn's demonstrated lack of regard for the legal process and the interests of the absent class members renders him an inadequate class representative.

### c.      Sarah Elson-Rogers

Sarah Elson-Rogers also submitted a false declaration regarding her CD purchases.[248] Although her declaration consists of less than two pages, Ms. Elson-Rogers testified that she simply did not review a number of factual statements in the declaration concerning her CD purchases before she signed it.[249] Furthermore, like other named Plaintiffs, Ms. Elson-Rogers is

---

[242]      *See* App. 167-71 [Estefenn July 2, 2015 Dep. Tr. at 9:21-10:13].

[243]      *See* App. 1729-30 [Estefenn July 2, 2015 Dep. Tr. at 259:16-260:3].

[244]      *See* App. 1707 [Estefenn July 2, 2015 Dep. Tr. at 171:19-25] ("Not too much. It's [class counsel's] work, it's not mine.").

[245]      *See* App. 1708-11 [Estefenn July 2, 2015 Dep. Tr. at 172:9-12, 173:6-10, 174:21-175:6].

[246]      *See* App. 1711 [Estefenn July 2, 2015 Dep. Tr. at 175:2-6].

[247]      *See* App. 1726-28, 1730-31 [Estefenn July 2, 2015 Dep. Tr. at 245:24-246:13, 247:17-22 ("As I said, it's their investigation, not my responsibility."), 270:11-17 ("The whole investigation about the bank – has been done by lawyers."), 272:8-17].

[248]      *See* App. 1319-20 [Dep. Ex. 70]; App. 1483-88, 1518-20 [Elson-Rogers Dep. Tr. at 86:11-91:25, 293:4-295:23].

[249]      *See id.*

unsure whether she reviewed key documents, including Plaintiffs' Motion, and admitted that she

has not reviewed any of the complaints filed by OSIC or any of the exhibits to the Motion.[250]  Ms.

Elson-Rogers has not reviewed her own U.S. tax returns and is unsure whether she reported

interest earned on her SIBL CDs when she filed her taxes in the United States.[251]  She confirmed,

however, that she made a loss claim on her tax returns in connection with her SIBL CDs.[252]  Ms.

Elson-Rogers ███████████████████████ REDACTED ████████████████████████

██████████████████████████████████,[253] nor has she complied with

Defendants' requests that she produce her tax returns in this Action.  ████████ REDACTED ████████

████████████████████████████████████████████████████████

████[254]  Ms. Elson-Rogers said she does not have *any* understanding of how the Receiver

calculated her allowed claim amount, even though Plaintiffs' Motion states that they will rely on

the Receiver's calculations to make distributions.[255]  Unsurprisingly, Ms. Elson-Rogers admitted

that she still has reservations about serving as a class representative.[256]

### d.      Ruth Alfille de Penhos

Ms. Penhos submitted an inaccurate declaration in this Action, which she admitted she did

not read completely before signing under oath, reasoning that the declaration was sent to her by

her lawyers and she would not distrust their direction.[257]  Similarly, Ms. Penhos submitted an

inaccurate proof of claim form to the Joint Liquidators.  ████████████ REDACTED ████████████

████████████████████████████████████████████████████████

---

[250]       *See* App. 1463-65 [Elson-Rogers Dep. Tr. at 28:14-30:3].

[251]       *See* App. 1505 [Elson-Rogers Dep. Tr. at 149:1-16].

[252]       *See* App. 1505-06 [Elson-Rogers Dep. Tr. at 149:23-150:5].

[253]       *See* App. 1126 [STAN_TDBANK_000649-51 at STAN_TDBANK_000650].

[254]       App. 2605 [Pls.' Interrog. Resp. at Pl. Elson-Rogers' Answer to Interrog. No. 7]; App. 1125-27 [STAN_TDBANK_000649-51].

[255]       *See* App. 1502 [Elson-Rogers Dep. Tr. at 142:20-23].

[256]       *See* App. 1516-17 [Elson-Rogers Dep. Tr. at 290:19-291:10].

[257]       *See* App. 1325 [Dep. Ex. 88]; App. 1559-60, 1562-64 [Penhos Dep. Tr. at 169:14-170:8, 172:23-174:22] ("It's just that I cannot see well.  With my glasses and everything, I cannot see well.  And I will not distrust whatever the lawyers, Blue and Morgenstern [sic], are sending me.").

██████████ REDACTED ██████████[258] Ms. Penhos's omission would increase her recovery at the expense of other class members.  Given Ms. Penhos's lack of concern over misrepresentations and her acknowledgement that she was not the decision-maker in her family with respect to her Stanford investment,[259] it is not surprising that she is willing to defer completely to her counsel, even if it meant that she provided false information.  Indeed, during her deposition, Ms. Penhos erroneously testified that she was not a party to any other litigation.[260] Only when confronted with details of three other lawsuits in Mexico did she admit her involvement.[261]  Moreover, Ms. Penhos never testified about her filing of a Stanford-related arbitration against the United States under NAFTA.  When asked directly whether she has filed Stanford-related claims anywhere other than with the Receiver and the Joint Liquidators, Ms. Penhos testified that she had not.[262]  Two months after her deposition, the pending NAFTA claim was revealed in her written discovery responses.[263]

Ms. Penhos also displayed a remarkable lack of knowledge about this case.  For instance, she testified that she believed that this Action, which has been pending for nearly six years, was filed approximately two months before her July deposition.[264]  She admitted that she had not received or reviewed any documents about this case and had not met with class counsel before executing her declaration and agreeing to serve as a class representative.[265]  In fact, Ms. Penhos testified that she has *never* reviewed any of the filings made by class counsel.[266] When handed

---

[258]     *See* App. 1566, 1570, 1572-73 [Penhos Dep. Tr. at 180:2-24, 184:1-8, 186:12-187:18]; App. 836 [Dep. Ex. 90].

[259]     *See* App. 1533, 1541 [Penhos Dep. Tr. at 39:10-12, 64:5-25] (testifying that her husband and children made the decision to invest in Stanford).

[260]     *See* App. 1590 [Penhos Dep. Tr. at 231:23-234:5].

[261]     *See id.*

[262]     *See* App. 1567-68 [Penhos Dep. Tr. at. 181:16-182:17].

[263]     *See* App. 2611 [Pls.' Interrog. Resp. at Pl. Penhos's Answer to Interrog. No. 7] (identifying the NAFTA Arbitration Claim).

[264]     *See* App. 1550, 1553 [Penhos Dep. Tr. at 127:1-10, 153:17-19].

[265]     *See* App. 1551-52 [Penhos Dep. Tr. at 143:9-144:24].

[266]     *See* App. 1555 [Penhos Dep. Tr. at 156:11-16].

copies of the operative SAC and the Motion, Ms. Penhos was not familiar with either document.[267]

Ms. Penhos was unaware that class counsel had designated other class representatives[268] and could

not articulate, even at a basic level, how the class was defined.[269]  Significantly, Ms. Penhos

repeatedly threatened to walk out of her deposition when asked basic questions.[270]  Her

uncooperative demeanor during her deposition and her other failings demonstrate that she is ill-

equipped to serve as a class representative.  *See, e.g.*, *Darvin v. Int'l Harvester Co.*, 610 F. Supp.

255, 257-58 (S.D.N.Y. 1985) (holding that plaintiff's refusal to answer relevant questions at his

deposition indicated that he was not suitable to fulfill fiduciary obligations of class representative).

   **e.**  **Steven Queyrouze**

   There are also questions concerning Mr. Queyrouze's truthfulness and adequacy to serve

as a class representative.  Mr. Queyrouze failed to make required disclosures in connection with

the claim he submitted to the Receiver.  REDACTED

REDACTED [271]

REDACTED

REDACTED [272]  In addition, Mr. Queyrouze testified that he filed a claim

with and received an initial distribution of REDACTED from the Joint Liquidators.  REDACTED

REDACTED

REDACTED [273]  To date, Mr. Queyrouze still has not produced his claims

correspondence with the Joint Liquidators showing the amounts of his submitted and allowed

claim.  Moreover, Mr. Queyrouze could not say whether he has reported interest earned on his

---

[267]  *See* App. 1557-58, 1565 [Penhos Dep. Tr. at 159:16-160:5, 177:10-17].

[268]  *See* App. 1553-54 [Penhos Dep. Tr. at 153:20-154:1].

[269]  *See* App. 1556-57 [Penhos Dep. Tr. at 158:10-159:13].

[270]  *See* App. 1594-95 [Penhos Dep. Tr. at 239:15-240:3] ("Whenever I want to, I will stop answering.").

[271]  *See* App. 678 [Dep. Ex. 44 at QUEYROUZE_003073].

[272]  *See* App. 1377-79, 1391-92 [Queyrouze Dep. Tr. at 222:3-10, 223:13-225:9, 270:5-271:12]; App. 2617-18 [Pls.' Interrog. Resp. at Pl. Queyrouze's Answer to Interrog. Nos. 7, 8].

[273]  *See* App. 1385-90 [Queyrouze Dep. Tr. at 233:8-20, 234:11-235:25, 267:5-21, 268:22-269:22].

SIBL CDs on his U.S. tax returns,[274] but did confirm that he made a loss claim on his tax returns in connection with his SIBL CDs.[275]         REDACTED

[276]

Although Mr. Queyrouze has been involved in this litigation as a named Plaintiff since the start of this Action in 2009, he lacks knowledge about the basic facts of the case. For example, he was unable to articulate what any of the Banks allegedly did wrong in connection with Stanford.[277] He also incorrectly asserted that Credit Suisse is a Defendant, mistakenly asserted that Karyl Van Tassel is one of the named Plaintiffs, could not name any of the other named Plaintiffs in this case, and could not estimate the number of members in the proposed class—other than to venture a guess that it was in the thousands.[278] Mr. Queyrouze also has had insufficient contact with class counsel to adequately direct this litigation. He testified, for example, that from March 2014 to March 2015, he spoke to counsel only "a couple of times" and did not remember reviewing any documents.[279] During this period, Plaintiffs fully briefed their request for leave to amend their Complaint, opposed certain Defendants' requests for reconsideration of the Court's dismissal and jurisdictional orders, and participated in a status hearing on the *Stanford MDL* cases.[280] This level of detachment is inappropriate for a class leader.

---

[274]     *See* App. 1374-75[Queyrouze Dep. Tr. at 213:6-214:4].

[275]     *See* App. 1369-70 [Queyrouze Dep. Tr. at 186:21-187:11].

[276]     *See* App. 678 [Dep. Ex. 44 at QUEYROUZE_003073].

[277]     *See* App. 1359-60 [Queyrouze Dep. Tr. at 92:17-93:21] (answering, when asked about the Banks, that, "I'm leaving that to my attorneys to pursue"); *see also* App. 1349-52 [Queyrouze Dep. Tr. at 46:25-49:4].

[278]     *See* App. 1362-63, 1364, 1381 [Queyrouze Dep. Tr. at 134:10-135:2, 136:13-21, 229:2-10].

[279]     *See* App. 1347-48 [Queyrouze Dep. Tr. at 44:23-45:19]. Mr. Queyrouze's lack of diligence as a class representative in a related case further calls into question his ability to represent any class in this case. Specifically, he testified that he is a named class representative in a lawsuit against the Bank of Antigua related to Stanford, yet he could not explain what the Bank of Antigua lawsuit was about (*see* App. 1346-47 [Queyrouze Dep. Tr. at 43:25-44:17]), could not articulate what he had done as a class representative in that case (*see* App. 1371-72 [Queyrouze Dep. Tr. at 195:20-196:1]), did not know the status of the case, including whether a class had been certified (*see* App. 1372 [Queyrouze Dep. Tr. at 196:5-25]), and has not discussed that case with counsel for the last two years (*see* App. 1373 [Queyrouze Dep. Tr. at 197:1-11]).

[280]     *See* Dkt. Nos. 182, 192, 210, 219; App. 1273-74 [Excerpt of Aug. 21, 2014 Status Hr'g Tr. at 37:17-38:8].

### f.      Guthrie Abbott

Mr. Abbott failed to provide material information in connection with the claim he submitted to the Receiver.[281]  [282] To date, Mr. Abbott has not produced claims correspondence showing the amount of his submitted claim to the Joint Liquidators.  Mr. Abbott also never reported the interest earned on his SIBL CDs on his U.S. tax returns, nor has he corrected his filings to disclose this source of income.[283]  Mr. Abbott did report a loss on his tax returns in connection with his SIBL CDs and estimated that, by claiming this loss, he did not have to pay approximately REDACTED REDACTED in taxes that he otherwise would have had to pay.[284] REDACTED REDACTED [285] nor has he produced copies of his requested tax returns. Significantly, the Receiver's representative testified that claimants who received a tax benefit related to their Stanford losses are currently being put on a suspense list and are not receiving distributions from the Estate.[286] REDACTED

While Mr. Abbott is a lawyer who was named in the original Petition, he testified that he did not meet with counsel about the case until May 27, 2015—*the day before his deposition*.[287] Moreover, Mr. Abbott has never read OSIC's complaints and did not know whether the Court

---

281  *See* App. 673 [Dep. Ex. 53]; App. 1425-27 [Abbott Dep. Tr. at 82:18-84:23].
282  *See id.*
283  *See* App. 1439-41 [Abbott Dep. Tr. 192:8-194:1].
284  *See* App. 1441, 1447-48 [Abbott Dep. Tr. at 194:7-22, 237:24-238:14].
285  *See* App. 673 [Dep. Ex. 53].
286  *See* App. 2916-27, 2918-2920 [Russell Dep. Tr. at 107:11-108:3, 112:16-114:4].
287  *See* App. 1431 [Abbot Dep. Tr. at 131:9-14].

allowed Plaintiffs to adopt the allegations therein.[288]  Mr. Abbott could not recall whether he reviewed a draft of the Motion before it was filed.[289]  He also did not review any of the exhibits to the Motion and stated that he does not view it as part of his role as a class representative "unless some controversy arose that I needed to be looking at it."[290]  His lack of oversight raises serious questions about his capacity to direct this case.

In short, there are serious concerns about the reliability, truthfulness and credibility of the putative class representatives.  Each has demonstrated a lack of diligence with respect to this Action and an improper willingness to defer to counsel on matters of importance instead of personally directing the litigation.  None qualifies as an adequate representative for the class.

### 2.   Conflicts of Interest Between the Class Representatives and Other Class Members Negate Adequacy

"Numerous courts have held that intraclass conflicts may negate adequacy under Rule 23(a)(4)."  *Langbecker v. Elec. Data Sys., Corp.*, 476 F.3d 299, 315-16 (5th Cir. 2007) (finding "[t]he trial court too readily succumbed to [plaintiffs'] minimization of the intraclass problems").  Indeed, class representatives must "possess the same interest and suffer the same injury as the class members."  *Amchem Prods.*, 521 U.S. at 625-26 (finding that serious intraclass conflicts precluded class from meeting adequacy of representation requirement).

The named Plaintiffs' claims differ in substantial and material ways from the claims of other class members, creating numerous conflicts of interest among class members:

- 

  [291]  REDACTED  In total, the

---

288   *See* App. 1432-33 [Abbott Dep. Tr. at 161:15-162:13].

289   *See* App. 1434 [Abbott Dep. Tr. 173:13-24].

290   App. 1435-38 [Abbott Dep. Tr. at 181:24-184:5].

291   *See* App. 1422-25, 1428, 1442-44, 1453-55 [Abbott Dep. Tr. at 79:18-82:7, 104:1-13, 200:18-202:13, 318:25-320:15]; App. 1164 [Dep. Ex. 52]; App. 1643-44 [Suarez July 1, 2015  Dep. Tr. at 165:17-166:20]; App. 1156 [Dep. Ex. 20]; App. 740 [Dep. Ex. 12]; App. 1685-87, 1701-04 [Estefenn  July 2, 2015 Dep. Tr. at 88:15-90:4, 158:20-161:5]; App. 1161 [PENHOS_000270]; App. 1575-76 [Penhos Dep. Tr. at 198:9-199:8].

Joint Liquidators are seeking approximately $600 million in preferential transfers.[292] The class members who did not receive such payments have a huge vested interest in seeing repayment to the estate, creating a significant rift within the class.

- Certain class members, including Mr. Queyrouze,[293] were accredited investors who had a more sophisticated understanding of their investments and received materials concerning SIBL that were not provided to class members in foreign jurisdictions who were not required to be accredited investors.

- Plaintiffs' claims hinge on an argument that Defendants should have detected Stanford's fraud and ceased doing business with Stanford. But to prove damages, Plaintiffs will have to select a date certain on which each Defendant should have severed ties with Stanford. Determination of this severance date will have disparate implications for the calculation of each class member's damages—meaning that some class members will favor an earlier severance date and others a later severance date to maximize their respective damages.[294]

- The assurances, advice and information the putative class members used in deciding whether to initially invest in SIBL CDs were unique and as varied as the putative class members themselves. For example, Mr. Abbott and Ms. Suarez both decided to invest based exclusively on the oral representations of their financial advisors,[295] putting them in conflict with members of the putative class who may have relied on Stanford's written materials.

- Some members of the putative class are able to assert certain claims under the TSA, while others are not. For example, putative class members who were not Texas residents or were not present in Texas when the offer of sale was made—which includes all of the named class representatives—cannot bring claims for violations of the TSA based on the sale of unregistered securities. *See* Tex. State Sec. Bd., Rule 139.7(a) (2015); SAC ¶ 235. As a result, the named class representatives have neither the ability nor the incentive to assert such claims on behalf of absent class members who may be able to.

- Many putative class members purchased SIBL CDs in foreign jurisdictions that will not enforce a U.S. judgment in this Action. These class members have different incentives in litigating this case. If they are dissatisfied with the Court's judgment, they could relitigate their claims against Defendants in another jurisdiction, hoping for better results.

In sum, these conflicts divide the members of the putative class and reflect tensions and

---

[292]     *See* App. 3047 [*Stanford International Bank – In Liquidation (the Bank) Preference Payments to Creditors in the run up to insolvency*, available at http://www.sibliquidation.com/faq/preference-payments/ (last visited Oct. 1, 2015)].

[293]     *See* App. 1365-66 [Queyrouze Dep. Tr. at 137:21-138:2]; *see supra,* Section II.B.

[294]     *See* App. 2103-05 [Lehn Decl. ¶¶ 57-63].

[295]     *See* App. 1408-11, 1414-16, 1449 [Abbott Dep. Tr. at 32:8-33:14, 34:14-35:12, 44:2-46:18, 241:11-13]; App. 1623 [Suarez July 1, 2015 Dep. Tr. at 82:3-23].

divided ambitions among competing class members.  Plaintiffs' failure to address these conflicts of interest is fatal to the adequacy requirement.

## III.   THE PROPOSED CLASS IS NOT CLEARLY ASCERTAINABLE

"It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."  *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970).  Indeed, "[t]he existence of an ascertainable class of persons to be represented by the proposed class representative[s] is an implied prerequisite of Federal Rule of Civil Procedure 23."  *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007).

Plaintiffs have not put forth any reliable way of identifying the putative class members during the proposed class period, instead punting that responsibility to the Receiver who, in turn, has indicated it would be very difficult to decide who fits inside the class.[296]  Moreover, because Plaintiffs have now disavowed using the Receiver's claim methodology to determine damages, there is a fatal conflict between the proposed class and their legal theories.



[299]  The Receiver's representative testified that he does not have the information required to identify class members and would have to go through a series of queries and decision-points in order to try to generate a potential list.[300]

---

[296]   *See* App. 2948-56 [Russell Dep. Tr. at 248:9-256:12].
[297]   *See* App. 7253 [Spreadsheet from Receiver].
[298]   *See id.*
[299]   *See id.*
[300]   *See* App. 2948-56 [Russell Dep. Tr. at 248:9-256:12].

Even then, the Receiver's representative stated that class members could not be identified as individuals, but only as the "groups" that the Receiver has constructed for calculating claims.[301]

Plaintiffs' failure to address this issue, which makes it wholly impossible for Defendants and the Court to determine which claimants are arguably members of the class, should doom their proposed class. *See Carrera v. Bayer Corp.*, 727 F.3d at 308; *Martin v. Pac. Parking Sys. Inc.*, 583 F. App'x 803, 804 (9th Cir. 2014) ("Given these difficulties identifying the members of the proposed class, and the fact that [plaintiff] proposed no plan to the district court for manageably determining which individuals are members, we conclude that the court did not abuse its discretion in denying class certification.").

Moreover, excluding the claimants from foreign countries that would not enforce this Court's judgment would likely be impossible. The Receiver testified that the geographic data he has about most investors is meaningless because his claim "groups" may aggregate the claims of multiple, geographically-dispersed individuals; people's addresses have changed; and many claimants used mailing addresses outside their countries of residence.[302] Likewise, parsing out class members who are "accredited investors" and therefore unable to pursue a TSA claim under Article 581-33(A)(1) would involve highly individualized inquiries—as would elimination of class members based on the statute of limitations, lack of reliance, and lack of causally-connected damages. "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012).

## CONCLUSION

For all of the reasons stated above, Defendants respectfully request that the Court deny the Motion.

---

[301]   *See* App. 2948-50 [Russell Dep. Tr. at 248:9-250:17].

[302]   *See* App. 2911-12, 2921-25, 2933-34 [Russell Dep. Tr. at 38:10-39:24, 115:19-119:14, 130:1-131:19].

Dated: October 1, 2015                    Respectfully submitted,


                                          By: /s/ Rodney Acker
                                              Rodney Acker
                                                  State Bar No. 00830700
                                              Ellen Sessions
                                                  State Bar No. 00796282
                                              James V. Leito IV
                                                  State Bar No. 24054950
                                              NORTON ROSE FULBRIGHT US LLP
                                              2200 Ross Avenue, Suite 3600
                                              Dallas, Texas 75201-7932
                                              T: (214) 855-8000
                                              F: (214) 855-8200
                                              rodney.acker@nortonrosefulbright.com
                                              ellen.sessions@nortonrosefulbright.com
                                              james.leito@nortonrosefulbright.com

                                              Of Counsel:

                                              Lynn K. Neuner (*pro hac vice*)
                                              Peter E. Kazanoff (*pro hac vice*)
                                              Katherine A. Helm (*pro hac vice*)
                                              SIMPSON THACHER & BARTLETT LLP
                                              425 Lexington Avenue
                                              New York, New York 10017
                                              T: (212) 455-2000
                                              F: (212) 455-2502
                                              lneuner@stblaw.com
                                              pkazanoff@stblaw.com
                                              khelm@stblaw.com

                                              *Attorneys for Defendant*
                                              *The Toronto-Dominion Bank*

By: /s/ Jeffrey C. Kubin
    Robin C. Gibbs
      State Bar No. 07853000
    Jeffrey C. Kubin
      State Bar No. 24002431
    Robert J. Madden
      State Bar No. 07853000
    Ashley McKeand Kleber
      State Bar No. 24060263
    GIBBS & BRUNS LLP
    1100 Louisiana, Suite 5300
    Houston, Texas 77002
    T:  (713) 650-8805
    F:  (713) 750-0903
    rgibbs@gibbsbruns.com
    jkubin@gibbsbruns.com
    rmadden@gibbsbruns.com
    akleber@gibbsbruns.com

    *Attorneys for Defendant Trustmark*
*National Bank*

By: /s/ Roger B. Cowie
    Edwin R. DeYoung
      State Bar No. 05673000
    Roger B. Cowie
      State Bar No. 00783886
    Taylor F. Brinkman
      State Bar No. 24069420
    LOCKE LORD LLP
    2200 Ross Avenue, Suite 2200
    Dallas, Texas 75201
    T:  (214) 740-8000
    F:  (214) 740-8800
    edeyoung@lockelord.com
    rcowie@lockelord.com
    tbrinkman@lockelord.com

    *Attorneys for Defendant*
*HSBC Bank PLC*

By: /s/ Noelle M. Reed
    Noelle M. Reed
      State Bar No. 24044211
    SKADDEN, ARPS, SLATE,
      MEAGHER & FLOM LLP
    1000 Louisiana Street, Suite 6800
    Houston, Texas 77002
    T:  (713) 655-5122
    F:  (713) 483-9122
    noelle.reed@skadden.com

    George A. Zimmerman (*pro hac vice*)
    SKADDEN, ARPS, SLATE,
      MEAGHER & FLOM LLP
    4 Times Square
    New York, New York 10036
    T:  (212) 735-3000
    george.zimmerman@skadden.com

    *Attorneys for Defendant Société*
*Générale Private Banking (Suisse) S.A.*

By: /s/ Brad Repass
    Brad Repass
      State Bar No. 16786700
    HAYNIE RAKE REPASS & KLIMKO P.C.
    Wellington Centre
    14643 Dallas Parkway, Suite 550
    Dallas, Texas 75254
    T:  (972) 716-1855
    F:  (972) 716-1850
    brad@hrrpc.com

    Paul C. Watler
      State Bar No. 20931600
    Jeffrey G. Hamilton
      State Bar No. 00793886
    JACKSON WALKER LLP
    901 Main Street, Suite 6000
    Dallas, Texas 75202
    T: (214) 953-6000
    F: (214) 953-5822
    pwatler@jw.com
    jhamilton@jw.com

    *Attorneys for Defendant Independent Bank,*
*successor by merger to Bank of Houston*

By: /s/ Brian A. Herman

Brian A. Herman (*pro hac vice*)
Stephanie Gamiz (*pro hac vice*)
MORGAN LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
T:  (212) 309-6000
F:  (212) 309-6001
bherman@morganlewis.com
sgamiz@morganlewis.com

Aaron C. Christian
   State Bar No. 24076089
MORGAN LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
T:  (214) 446-4000
F:  (214) 466-4001
achristian@morganlewis.com

Ryan C. Wooten
   State Bar No. 24075308
MORGAN LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5006
T:  (713) 890-5000
rwooten@morganlewis.com

*Attorneys for Defendant Blaise Friedli*



APPENDIX A

CLAIMANTS BY CONTINENT

Europe
$285 M
679 claimants

Asia
$44 M
81 claimants

Australia
$25 M
15 claimants

Africa
$76 M
70 claimants

Antarctica
$56
1 claimant

North America
$4.8 B
11,209 claimants

South America
$2 B
9,683 claimants

Source: Data taken from information provided by the Joint Liquidators and produced by investor-Plaintiffs in *Troice v. Proskauer* regarding the country of citizenship for claimants who submitted claims to the Joint Liquidators.  *See* App. 2926-27, 2928-32 [Russell Dep. Tr. at 122:17-123:22, 125:17-129:21]; App. 651-52 ["Stanford International Bank – In Liquidation: Summary of Claims by Country and Status"]; *Troice v. Proskauer Rose LLP, et al.*, No. 09-cv-01600-N-BG, Dkt. No. 198-8 at 105-06, Dkt. No. 197 at 55, Dkt. No. 193 at 45-46.

**APPENDIX B**

**CLAIMANTS IN TOP 6 COUNTRIES**



**United States**
$1.6 B
3,438 claimants

**Haiti**
$234 M
294 claimants

**Antigua & Barbuda**
$1.5 B
3,176 claimants

**Mexico**
$976 M
3,077 claimants

**Venezuela**
$1.6 B
8,313 claimants

**Peru**
$122 M
378 claimants

Source: Data taken from information provided by the Joint Liquidators and produced by investor-Plaintiffs in *Troice v. Proskauer* regarding the country of citizenship for claimants who submitted claims to the Joint Liquidators.  *See* App. 2926-27, 2928-32 [Russell Dep. Tr. at 122:17-123:22, 125:17-129:21]; App. 651-52 ["Stanford International Bank – In Liquidation: Summary of Claims by Country and Status"]; *Troice v. Proskauer Rose LLP, et al.*, No. 09-cv-01600-N-BG, Dkt. No. 198-8 at 105-06, Dkt. No. 197 at 55, Dkt. No. 193 at 45-46.

**APPENDIX C**

**CLASS COMPOSITION—106 COUNTRIES**

| Country | Total Value of Claimants in US Dollars | Percentage of Total Dollars | No. of Claimants | Percentage of Total Claimants |
|---|---|---|---|---|
| Venezuela | 1.6B | 22% | 8313 | 38% |
| United States | 1.6B | 22% | 3438 | 16% |
| Antigua and Barbuda | 1.5B | 20% | 3176 | 15% |
| Mexico | 976M | 13% | 3071 | 14% |
| Haiti | 234M | 3% | 294 | 1% |
| Peru | 122M | 2% | 378 | 2% |
| Colombia | 105M | 1% | 384 | 2% |
| Virgin Islands (British) | 91M | 1% | 102 | .4% |
| Panama | 90M | 1% | 99 | .4% |
| Aruba | 76M | 1% | 268 | .1% |
| The Netherlands | 75M | 1% | 116 | .5% |
| Ecuador | 65M | 1% | 378 | .2% |
| El Salvador | 63M | .9% | 77 | .4% |
| Netherlands Antilles | 63M | .8% | 235 | 1% |
| Libyan Arab Jamahiriya | 58M | .8% | 2 | .009% |
| United Kingdom | 56M | .7% | 158 | .7% |
| Canada | 45M | .6% | 159 | .7% |
| France | 34M | .4% | 37 | .2% |
| Argentina | 29M | .4% | 122 | .5% |
| Spain | 29M | .5% | 106 | .5% |
| Guatemala | 27M | .4% | 87 | .4% |
| Germany | 21M | .3% | 29 | .1% |
| Singapore | 17M | .2% | 11 | .5% |
| Israel | 16M | .2% | 40 | .1% |
| Bahamas | 15M | .2% | 4 | .2% |
| Italy | 15M | .2% | 49 | .2% |

| Country | Total Value of Claimants in US Dollars | Percentage of Total Dollars | No. of Claimants | Percentage of Total Claimants |
|---|---|---|---|---|
| Nicaragua | 15M | .2% | 30 | .1% |
| New Zealand | 14M | .2% | 11 | .5% |
| Jamaica | 12M | .2% | 14 | .06% |
| Guyana | 11M | .1% | 22 | .1% |
| Russian Federation | 11M | .1% | 21 | .09% |
| Brazil | 10M | .1% | 32 | .1% |
| Bolivia | 9M | .1% | 24 | .1% |
| Cayman Islands | 9M | .1% | 6 | .03% |
| Costa Rica | 9M | .1% | 16 | .07% |
| Egypt | 9M | .1% | 42 | .1% |
| Latvia | 9M | .1% | 6 | .03% |
| Portugal | 8M | .1% | 17 | .08% |
| Belgium | 7M | .1% | 24 | .1% |
| Switzerland | 7M | .1% | 28 | .1% |
| Dominican Republic | 6M | .08% | 36 | .2% |
| United Arab Emirates | 6M | .09% | 6 | .02% |
| Barbados | 5M | .08% | 14 | .06% |
| Trinidad and Tobago | 5M | .07% | 30 | .1% |
| Ireland | 3M | .05% | 6 | .03% |
| Isle of Man | 3M | .05% | 3 | .01% |
| Saint Kitts and Nevis | 3M | .05% | 7 | .03% |
| Virgin Islands (U.S.) | 3M | .04% | 4 | .02% |
| Chile | 2M | .03% | 12 | .05% |
| Guadeloupe | 2M | .03% | 2 | .01% |
| Kenya | 2M | .04% | 8 | .04% |
| Liberia | 2M | .03% | 2 | .01% |

Source:  Data taken from information provided by the Joint Liquidators and produced by investor-Plaintiffs in *Troice v. Proskauer* regarding the country of citizenship for claimants who submitted claims to the Joint Liquidators.  *See* App. 2926-27, 2928-32 [Russell Dep. Tr. at 122:17-123:22, 125:17-129:21]; App. 651-52 ["Stanford International Bank – In Liquidation: Summary of Claims by Country and Status"]; *Troice v. Proskauer Rose LLP, et al.*, No. 09-cv-01600-N-BG, Dkt. No. 198-8 at 105-06, Dkt. No. 197 at 55, Dkt. No. 193 at 45-46.

| Country | Total Value of Claimants in US Dollars | Percentage of Total Dollars | No. of Claimants | Percentage of Total Claimants |
|---|---|---|---|---|
| Senegal | 2M | .03% | 1 | .001% |
| Australia | 1M | .02% | 4 | .02% |
| Bahrain | 1M | .02% | 2 | .01% |
| Bermuda | 1M | .03% | 4 | .02% |
| Greece | 1M | .01% | 8 | .03% |
| Honduras | 1M | .02% | 4 | .02% |
| Lebanon | 1M | .03% | 5 | .02% |
| Montserrat | 1M | .01% | 2 | .01% |
| Namibia | 1M | .02% | 4 | .02% |
| People's Republic of China | 1M | .01% | 3 | .01% |
| Puerto Rico | 1M | .03% | 8 | .03% |
| Sweden | 1M | .02% | 18 | .08% |
| Suriname | 1M | .02% | 5 | .02% |
| Ukraine | 1M | .03% | 6 | .03% |
| Uruguay | 1M | .02% | 6 | .03% |
| Paraguay | 917K | .01% | 7 | .03% |
| Austria | 873K | .01% | 14 | .06% |
| Tanzania | 828K | .01% | 1 | .01% |
| Denmark | 767K | .01% | 7 | .03% |
| India | 752K | .01% | 6 | .03% |
| Belize | 721K | .01% | 4 | .02% |
| Martinique | 572K | .008% | 2 | .01% |
| South Africa | 572K | .008% | 3 | .01% |
| Bulgaria | 507K | .007% | 3 | .01% |
| Cyprus | 448K | .006% | 6 | .03% |
| Saint Lucia | 447K | .006% | 5 | .02% |
| Cuba | 354K | .005% | 3 | .01% |
| Romania | 345K | .005% | 2 | .01% |

| Country | Total Value of Claimants in US Dollars | Percentage of Total Dollars | No. of Claimants | Percentage of Total Claimants |
|---|---|---|---|---|
| Taiwan | 331K | .005% | 1 | .01% |
| Bosnia and Herzegovina | 305K | .004% | 1 | .01% |
| Grenada | 257K | .004% | 3 | .01% |
| Ghana | 238K | .003% | 2 | .01% |
| Poland | 239K | .003% | 2 | .01% |
| Saudi Arabia | 266K | .004% | 1 | .01% |
| Syrian Arab Republic | 233K | .003% | 4 | .02% |
| Macedonia | 212K | .003% | 3 | .01% |
| Kuwait | 197K | .003% | 1 | .01% |
| Anguilla | 158K | .002% | 4 | .02% |
| Turkey | 116K | .002% | 2 | .01% |
| Iceland | 101K | .001% | 1 | .01% |
| Angola | 96K | .001% | 1 | .01% |
| Croatia (Hrvatska) | 56K | .001% | 1 | .01% |
| Norway | 53K | .001% | 1 | .01% |
| Nigeria | 49K | .001% | 1 | .01% |
| Serbia | 43K | .001% | 1 | .005% |
| Saint Vincent and The Grenadines | 34K | .000% | 1 | .005% |
| Hungary | 26K | .000% | 1 | .005% |
| Congo (Democratic Republic) | 25K | .000% | 1 | .005% |
| Uganda | 20K | .000% | 1 | .005% |
| Chad | 19K | .000% | 1 | .005% |
| Malta | 18K | .000% | 1 | .001% |
| Azerbaijan | 13K | .000% | 1 | .005% |
| Bouvet Island | 55.78 | .000% | 1 | .005% |
| Yemen | 52.11 | .000% | 1 | .005% |
| TOTAL | 7.2B | | 21,738 | |

# APPENDIX D

## CLASS COMPOSITION—47 STATES

| State | Dollars | % of Dollars | # of Claimants | % of Claimants |
|---|---|---|---|---|
| FL | 857M | 33.26% | 2,409 | 34.02% |
| TX | 582M | 22.59% | 1,290 | 18.22% |
| LA | 561M | 21.77% | 1,810 | 25.56% |
| TN | 83M | 3.22% | 196 | 2.77% |
| MS | 64M | 2.48% | 125 | 1.77% |
| GA | 62M | 2.41% | 160 | 2.26% |
| CA | 60M | 2.33% | 177 | 2.50% |
| NC | 59M | 2.29% | 125 | 1.77% |
| CO | 44M | 1.71% | 72 | 1.02% |
| AR | 35M | 1.36% | 88 | 1.24% |
| AZ | 35M | 1.36% | 28 | 0.40% |
| SC | 25M | 0.97% | 20 | 0.28% |
| NY | 16M | 0.62% | 71 | 1.00% |
| MD | 13M | 0.50% | 26 | 0.37% |
| NJ | 8M | 0.31% | 45 | 0.64% |
| PR | 8M | 0.31% | 39 | 0.55% |
| MI | 8M | 0.31% | 24 | 0.34% |
| CT | 8M | 0.31% | 11 | 0.16% |
| MA | 7M | 0.27% | 30 | 0.42% |
| VA | 6M | 0.23% | 31 | 0.44% |
| OK | 5M | 0.19% | 26 | 0.37% |
| OH | 4M | 0.16% | 14 | 0.20% |
| NV | 4M | 0.16% | 9 | 0.13% |
| MO | 3M | 0.12% | 14 | 0.20% |
| NM | 2M | 0.08% | 14 | 0.20% |
| AL | 2M | 0.08% | 12 | 0.17% |
| DC | 2M | 0.08% | 9 | 0.13% |
| UT | 2M | 0.08% | 5 | 0.07% |
| OR | 2M | 0.08% | 4 | 0.06% |
| KY | 2M | 0.08% | 2 | 0.03% |
| WA | 1M | 0.04% | 22 | 0.31% |
| WI | 1M | 0.04% | 6 | 0.08% |
| IN | 1M | 0.04% | 5 | 0.07% |
| HI | 1M | 0.04% | 3 | 0.04% |
| KS | 1M | 0.04% | 3 | 0.04% |
| AK | 546K | 0.02% | 2 | 0.03% |
| NH | 501K | 0.02% | 4 | 0.06% |
| WV | 352K | 0.01% | 1 | 0.01% |
| VT | 323K | 0.01% | 2 | 0.03% |
| VI | 286K | 0.01% | 3 | 0.04% |
| SD | 254K | 0.01% | 1 | 0.01% |
| D.C. | 128K | 0.00% | 1 | 0.01% |
| DE | 66K | 0.00% | 2 | 0.03% |
| IA | 56K | 0.00% | 1 | 0.01% |
| WY | 50K | 0.00% | 1 | 0.01% |
| Unkown | 37K | 0.00% | 71 | 1.00% |
| MN | 25K | 0.00% | 1 | 0.01% |
| IL | 23K | 0.00% | 33 | 0.47% |
| PA | 7K | 0.00% | 31 | 0.44% |
| MT | 0 | 0.00% | 2 | 0.03% |
| ID | 0 | 0.00% | 1 | 0.01% |
| **47 States** | **$2.6B** | | **7,082** | |

Source: Data taken from chart produced by the U.S. Receiver providing the allowed claimants' state of residence for the allowed claims in the United States. See App. 2936-39 [Russell Dep. Tr. at 137:18-140:2]; App. 649 [ABBOTT_000006].

# APPENDIX E

## OVERVIEW OF PROPOSED CLASS REPRESENTATIVES

### GUTHRIE ABBOTT



U.S. citizen; Mississippi resident

REDACTED

REDACTED

- Filed lawsuit against financial advisor in Mississippi
- Did not report interest from Stanford CDs on tax returns

### RUTH ALFILLE DE PENHOS



Mexican citizen and resident

REDACTED

- Admitted her class representative declaration is wrong
- Wrongly testified she is not party to any other lawsuit, but is part of three suits in Mexico and a NAFTA arbitration
- Repeatedly threatened to walk out of deposition

### SARAH ELSON-ROGERS



U.K. citizen; North Carolina resident

REDACTED     REDACTED

- Submitted inaccurate information in declaration to be class representative

### STEVEN QUEYROUZE

 

U.S. citizen; Louisiana resident

REDACTED     REDACTED

REDACTED     REDACTED

### DIANA SUAREZ

 

Venezuela citizen; Florida resident

REDACTED     REDACTED

REDACTED

- Gave Power of Attorney for all Stanford-related matters to her son
- Put money in U.S. to avoid Hugo Chavez Administration
- Did not declare interest on Stanford CDs on U.S. tax returns

### SALIM ESTEFENN URIBE



Colombian citizen and resident

REDACTED

- Submitted erroneous class representative declaration regarding Trusts that purchased CDs
- Used his Stanford accounts for suspicious round-trip and currency exchange transfers




## APPENDIX F

## DEFENDANTS' CLASS CERTIFICATION EXPERTS

| Subject Matter of Legal Opinion | Expert | Notable Qualifications/Affiliations |
|---|---|---|
| **Canadian Law** | Janet Walker  | • Professor of Law and past Associate Dean of *Osgoode Hall Law School* in Toronto and former visiting professor at universities across the globe focused on private international and comparative law<br>• Author of leading authoritative treatise, *Castel & Walker: Canadian Conflict of Laws*, 6th Edition |
| **Colombian Law** | Eduardo Zuleta  | • Named Senior Partner at a Bogotá law firm with 25+ years of practice<br>• Vice President of the International Court of Arbitration of the International Chamber of Commerce, active arbitrator across numerous foreign jurisdictions<br>• Former Professor of International Law at two Colombian law schools |
| **English Law** | Adrian Briggs  | • Barrister at the bar of England and Wales<br>• Professor of Private International Law at the *University of Oxford*<br>• Author of authoritative texts on *Civil Jurisdiction and Judgments*; *Private International Law in English Courts*; *Agreements on Jurisdiction and Choice of Law*; and section editor for Dicey, Morris & Collins, *The Conflict of Law* |
| **French Law** | George A. Bermann  | • Professor of Law and of European Union law at *Columbia Law School*, focus includes comparative and international law<br>• Distinguished Chair holder and Affiliated Professor of Law at the *Institut des Sciences Politiques* (Paris, France)<br>• Council Member of the European Law Institute |

| | | |
|---|---|---|
| **German Law** | Stephan Wilske<br> | • Partner at German law firm with specialized practice in international disputes and cross-border litigation, including the recognition and enforcement of foreign judgments<br>• Dual U.S. and German licensed, multi-lingual practitioner of private international law |
| **Latin American Law, with focus on: Ecuador, El Salvador, Mexico, Panama, Peru, and Venezuela** | Antonio Gidi<br> | • Drafter of model class action code for Latin America / Civil Law countries and of comprehensive class action legislation for Mexico and Brazil<br>• Visiting Professor of International Law at universities throughout the U.S., Brazil, Italy, Belgium, France<br>• Reputed scholar on the recognition and enforcement of U.S. class actions abroad |
| **Mexican Law** | Eduardo Siqueiros<br> | • Partner at Hogan Lovells LLP in Mexico City and former founding partner of prominent Mexican law firm with 30+ years of practice<br>• Professor of Law at two Mexican law schools on matters of private international commercial law<br>• Chairman of the Board of Arbitration before the International Court of Arbitration of the International Chamber of Commerce |
| **Former Netherlands Antillean Law (including Aruba)** | Rogier F. van den Heuvel<br> | • Attorney at a Curaçao law firm, specializing in corporate litigation, international disputes and the recognition and enforcement of foreign awards<br>• Visiting lecturer in Private International Law at the *University of Curaçao* School of Law |
| **Panamanian Law** | Arturo Hoyos<br> | • Former Chief Justice of the Supreme Court of Justice of Panama, with longest tenure in Panamanian history (16 years)<br>• Eight years sitting on Fourth Chamber of Supreme Court that governs recognition of foreign judgments<br>• 40 years' experience in Panamanian courts and abroad<br>• Current law firm founder and practitioner at *Hoyos & Associates* |

| | | |
|---|---|---|
| **Peruvian Law** | J. Domingo Rivarola Reisz  | • Drafter of Peruvian legislation concerning class action litigation for consumer protection issues<br>• Partner at a Lima law firm, Fulbright Scholar with extensive experience in international commercial litigation<br>• Professor at Law at *Pontificia Universidad Católica del Perú* |
| **Spanish Law** | David Arias  | • Founding partner of Madrid law firm *Arias SLP*, head of international dispute resolution practice<br>• Professor of Law at *Universidad Francisco de Vitoria*<br>• Drafter of model rules for international dispute resolution, arbitrator and counsel in international conflicts |
| **Swiss Law** | Isabelle Romy  | • Former Deputy Judge at Swiss Federal Supreme Court<br>• Partner at Zurich law firm<br>• Associate Professor of Law at the *University of Fribourg* and the *Federal Institute of Technology* in Lausanne, focus includes Swiss and European Private International Law |
| **Venezuelan Law** | James Otis Rodner  | • Founding partner of highly-ranked Venezuelan law firm *Rodner Martínez & Asociados*<br>• Harvard J.D. and M.B.A., former professor of law at numerous universities in Caracas<br>• Former principal member of International Court of Arbitration of the International Chamber of Commerce |

3

| Damages | Kenneth M. Lehn  | <ul><li>Former Chief Economist of the U.S. Securities and Exchange Commission</li><li>Samuel A. McCullough Professor of Finance at the University of Pittsburgh, Joseph M. Katz Graduate School of Business</li><li>Former Director of the Center for Research on Contracts and the Structure of Enterprise, University of Pittsburgh</li></ul> |
|---|---|---|

REDACTED

**APPENDIX G**

**PROPOSED CLASS REPRESENTATIVES' ALLOWED CLAIM AMOUNTS**

Source: Data taken from documents produced by the six plaintiffs and the U.S. Receiver, and plaintiffs' deposition testimony. *See* App. 675 [ABBOTT_000433]; App. 1059 [STAN_TDBANK_000383]; App. 1051 [STAN_TDBANK_000553]; App. 1055 [STAN_TDBANK_000654]; App. 1165 [ABBOTT_000095]; App. 1111 [PENHOS_000095]; App. 1574-75 [June 10, 2015 Penhos Dep. Tr. at 195:18-25, 198:9-11]; App. 671 [ELSON-ROGERS_000790]; App. 903-04 [ELSON-ROGERS_000639-40]; App. 1087, 1090 [URIBE_000016]; App. 1113 [URIBE_000083]; App. 1121 [URIBE_000090]; [STAN_TDBANK_000089]; App. 1137 [STAN_TDBANK_000210]; App. 1063 [STAN_TDBANK_000657]; App. 1381-84 [May 27, 2015 Queyrouze Dep. Tr. at 229:18-232:18]; App. 1071 [SUAREZ_000158]; App. 1156 [SUAREZ_000167]; App. 1083 [SUAREZ_000204].

## APPENDIX H

### EXECUTIVE SUMMARY OF STATE LAW DIFFERENCES

This Executive Summary provides examples of state law variations regarding the common law claims in this Action, which involve aiding and abetting tort liability; aiding and abetting a fraud; aiding and abetting conversion; aiding and abetting a breach of fiduciary duty; and civil conspiracy. The complete analysis of the state laws on these claims is set forth in Exhibits 9 to 12 in the Appendix.

| I.   STATE VARIATIONS IN THE LAW OF AIDING AND ABETTING TORTS |
|---|
| **A.     Examples of States that Do Not Recognize Aiding and Abetting Tort Liability** |
| **Alabama** – *Continental Casualty Co. v. Compass Bank*, No. CIV.A. 04-0766-KD-C, 2006 WL 566900, at *11 (S.D. Ala. Mar. 6, 2006) (noting "it does not appear that Alabama recognizes the claim of aiding and abetting common law torts" and commenting that "[w]hen aiding and abetting is discussed in Alabama cases it is almost exclusively in the context of a criminal case or in reference to a specific civil statutory provision"). |
| **Louisiana** – *Guidry v. Bank of LaPlace*, 661 So. 2d 1052, 1057 (La. Ct. App. 1995) ("In the absence of a conspiracy, there is no distinct cause of action for aiding and abetting under Louisiana law."). |
| **Ohio** – *Wells Fargo v. Smith*, No. 2012-04-006, 2013 WL 938069, at *7 (Ohio Ct. App. Mar. 11, 2013) ("Ohio does not recognize a cause of action for aiding and abetting a tortious act."); *DeVries Dairy, L.L.C. v. White Eagle Coop. Assn., Inc.*, 974 N.E.2d 1194 (Ohio 2012) (holding that Ohio has never recognized an action for tortious acts in concert under the Restatement (Second) of Torts § 876). |
| **B.     Examples of States that Recognize Aiding and Abetting Tort Liability** |
| **Alaska** – *Beal v. McGuire*, 216 P.3d 1154, 1174 (Alaska 2009) ("aiding and abetting liability occurs when the actor knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other"). |
| **California** – *Casey v. U.S. Bank Nat'l Ass'n*, 26 Cal. Rptr. 3d 401, 405 (Ct. App. 2005) ("California has adopted the common law rule for subjecting a defendant to liability for aiding and abetting a tort."). |
| **Maine** – *Barnes v. McGough*, 623 A.2d 144, 145 (Me. 1993) (the claim of aiding and abetting a tort is recognized in Maine). |
| **New Mexico** – *GCM, Inc. v. Kentucky Cent. Life Ins. Co.*, 947 P.2d 143, 147 (N.M. 1997) ("New Mexico recognizes tort liability for aiding and abetting another's tortious conduct."). |

**C.      Examples of States That Have Not Explicitly Addressed Aiding and Abetting Tort Liability**

**Missouri** – *Jo Ann Howard & Assocs., P.C. v. Cassity*, No. 09 CV 1252, 2012 WL 3984486, at *6 (E.D. Mo. Sept. 11, 2012) ("[T]he Missouri Supreme Court has not squarely decided whether to recognize the tort of aiding and abetting.").

**II.      STATE VARIATIONS IN THE LAW OF AIDING AND ABETTING FRAUD**

**A.      Examples of State Law Variations With Respect to States' Recognition of a Cause of Action for Aiding and Abetting Fraud**

**Ohio** – *Fed. Mgt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 853 (Ohio Ct. App. 2000) ("Ohio does not recognize a claim for aiding and abetting common-law fraud.").

**New Jersey** – *State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 904 A.2d 775, 782 (N.J. Super Ct. App. Div. 2006) ("[A]iding and abetting fraud is a cognizable civil cause of action under New Jersey law." )

**Hawaii** – *Television Events & Mktg., Inc. v. Amcon Distrib*. Co., 488 F. Supp. 2d 1071, 1077 (D. Haw. 2006) ("the courts recognized that Hawaii had not indicated whether a cause of action for aiding and abetting fraud existed, but neither court reached the issue because the respective plaintiffs failed to make any allegations to support such a claim").

**B.      Examples of State Law Variations With Respect to the Injured Party's Reliance on  the Fraudulent Statement**

**Texas** – *Miller Global Props., LLC v. Marriott Int'l, Inc.*, 418 S.W.3d 342, 347-48 (Tex. App.—Dallas 2013, pet. denied) (plaintiffs "must have both actually and *justifiably* relied on the alleged misrepresentation to suffer a compensable injury").

**Kansas** –  *Slaymaker v. Westgate State Bank*, 241 Kan. 525, 532 (1987) ("The injured party's reliance on a fraudulent misrepresentation must be reasonable, justifiable and detrimental.").

**Massachusetts** – *Mass. v. Mylan Labs.*, 608 F. Supp. 2d 127, 156-57 (D. Mass 2008) (a plaintiff "must also prove that it relied upon the representation as true" and that reliance was reasonable).

**Iowa** – *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 736 (Iowa 2009) (noting that "justifiable reliance is an essential element of a claim for fraud").

**New Mexico** – *Papatheofanis v. Allen*, 242 P.3d 358, 361 (N.M. Ct. App. 2010) (noting there must be detrimental reliance).

**Oregon** – *Or. Pub. Emples. Ret. Bd. v. Simat, Helliesen & Eichner*, 83 P.3d 350, 361 (Or. Ct. App. 2009) (to prevail on a fraud claim, "reliance in fact must be reasonable, but such reasonableness is measured in the totality of the parties' circumstances and conduct").

**North Dakota** – *Phoenix Assurance Co. v. Runck*, 366 N.W.2d 788, 792 (N.D. 1985) ("In actions for fraud it is not required that a defendant's representations be the sole cause of the damage.  If they are a substantial factor in inducing the plaintiff to act, even though he also relies in part upon the advice of others, reliance is sufficiently shown.").

### C.    Examples of State Law Variations Regarding Required Level of Knowledge and Intent of Party Making the Fraudulent Statement

#### 1.    Example of States Requiring Actual Knowledge of Falsity

**Alaska** – *Lightle v. State, Real Estate Comm'n*, 146 P.3d 980, 983-84 (Alaska 2006) ("To be 'fraudulent,' then, a representation need only be made with 'scienter,' in other words, the necessary 'knowledge of the untrue character.'").

**Connecticut** – *Alliance Grp. Servs., Inc. v. Grassi & Co.*, 406 F. Supp. 2d 157, 167 (D. Conn. 2005) ("[A] defendant must know what he or she represents as true is not true.  A reckless allegation will not suffice.").

#### 2.    Example of States Requiring Only Recklessness

**Minnesota** – *Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn. 1986) ("even if a misrepresentation is made without purpose to deceive or without knowledge of its falseness, 'the fraud is as great as if the party knew his statement to be untrue'").

**Tennessee** – *Davis v. McGuigan*, 325 S.W.3d 149, 154 (Tenn. 2010) (statement needs to have been made with knowledge of falsity or recklessness or without belief that it was true).

**West Virginia** – *State v. Berkeley*, 23 S.E. 608, 609 (W. Va. 1985) ("[A] false representation may be made [with] scienter, in contemplation of law, in any of the following ways: (1) With actual knowledge of its falsity; (2) without knowledge either of its truth or falsity; or (3) under circumstances in which the person making it ought to have known, if he did not know, of its falsity.")

#### 3.    Example of States Requiring Actual Knowledge Plus Intent to Deceive

**New Jersey** – *Desi, poLink Court Reporting & Litig. Support Servs. v. Rochman*, 64 A.3d 579, 586 (App. Div. 2013) (plaintiff must demonstrate "defendant's knowledge of the falsity and intent to obtain an undue advantage").

**North Carolina** – *Latta v. Rainey*, 689 S.E.2d 898, 909 (N.C. Ct. App. 2010) ("required scienter is not present without both knowledge and an intent to deceive, manipulate, or defraud").

#### 4.    Example of States Requiring Actual Knowledge or Recklessness, Plus Intent to Deceive

**Kentucky** – *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) (knowledge or recklessness, coupled with intent to induce reliance is required for fraud claims).

| **Louisiana** – *Sys. Eng'g and Sec., Inc. v. Sci. & Eng's Ass'ns, Inc.*, 962 So. 2d 1089, 1091 (La. Ct. App. 2007) (knowing misrepresentation and intent to deceive required). |
|---|
| **New Mexico** – *Papatheofanis v. Allen*, 242 P.3d 358, 361 (N.M. Ct. App. 2010) (there must be knowledge of the falsity of the representation or recklessness in making the representation and intent to deceive and to induce reliance). |

### D. Examples of State Law Variations With Respect to the Required Standard of Proof for Fraud

#### 1. Examples of States That Require Clear and Convincing Evidence

| **Connecticut** – *Stuart v. Freiberg*, 116 A.3d 1195, 1203-04 (Conn. 2015) (noting that the elements of fraud must be "show[n] by clear and convincing evidence"). |
|---|
| **Delaware** – *In re Estate of Dugger*, No. 224629, 2000 WL 1528710, at *4 (Del. Ch. Sep. 29, 2000 (same) |
| **Florida** – *Ibarra v. Izaguirre*, 985 So.2d 1117, 1119 (Fla. Dist. Ct. App. 2008) (same). |
| **Mississippi** – *Moore v. Bailey*, 46 So. 3d 375, 383-384 (Miss. Ct. App. 2010) ("To demonstrate a prima facie case of fraud, otherwise known as intentional misrepresentation, a plaintiff must demonstrate by clear and convincing evidence the following nine elements [of fraud]."). |

#### 2. Examples of States That Require Proof by a Preponderance of the Evidence

| **Arkansas** – *Tyson Foods v. Davis*, 66 S.W.3d 568, 577 (Ark. 2002) ("The tort of fraud or deceit consists of five elements that the plaintiff must prove by a preponderance of the evidence."). |
|---|
| **Montana** – *In re Estate of Kindsfather*, 108 P.3d 487, 490 (Mont. 2005) ("A mere suspicion of fraud is not sufficient, fraud must be proven by a preponderance of the evidence."). |
| **Rhode Island** – *Ostalkiewicz v. Guardian Alarm, Div. of Colbert's Sec. Servs., Inc.*, 520 A.2d 563, 569 (R.I. 1987) ("[F]raud in a civil suit need only be proven by a fair preponderance of the evidence."). |

#### 3. Examples of States That Apply Other Standards of Proof

| **Alabama** – *Hunt Petroleum Corp. v. State*, 901 So. 2d 1, 17 (Ala. 2004) ("[A] party can prove fraud by 'substantial evidence' without having the "clear and convincing evidence" described in the statute as necessary to justify punitive damages in a fraud action."). |
|---|
| **Iowa** – *Hoelscher v. Sandage*, 462 N.W.2d 289, 291 (Iowa Ct. App. 1990) (each element of fraud must be proved "by a preponderance of clear, satisfactory, and convincing evidence"). |

**South Carolina** – *Moseley v. All Things Possible, Inc.*, 694 S.E.2d 43, 45 (S.C. Ct. App. 2010) ("To prevail on a cause of action for fraud, a Plaintiff must prove [the elements] by clear, cogent and convincing evidence.").

| | E. | Examples of State Law Variations With Respect to the Applicable Statute of Limitations for Fraud |

**Louisiana** – *Winn Fuel Serv., Inc. v. Booth*, 34 So.3d 515, 519 (La. Ct. App. 2010) (one-year statute of limitations for fraud).

**Ohio** – *Bennett v. McKibben*, 915 P.2d 400, 405 (Okla. Civ. App. 1996 (two-year statute of limitations for fraud).

**Georgia** – *Hamburger v. PFM Capital Mgmt., Inc.*, 286 Ga. App. 382, 387 (2007) (four-year statute of limitations for fraud claims).

**Indiana** – *Orem v. Ivy Tech State Coll.*, 711 N.E.2d 864, 870 n.7 (Ind. Ct. App. 1999) (six years for fraud).

**III.   STATE VARIATIONS IN THE LAW OF AIDING AND ABETTING CONVERSION**

**A.   Examples of State Law Variations With Respect to Recognition of a Cause of Action for Aiding and Abetting Conversion**

**Kentucky** – *Budsgunshop.com, LLC v. Security Safe Outlet, Inc.*, No. 10-cv-00390-KSF, 2012 WL 1899851, at *18-19 (E.D. Ky. May 23, 2012) (noting that the court was unable to find a Kentucky state court case recognizing a civil action for aiding and abetting conversion).

**New York** – *Dickinson v. Igoni*, 76 A.D.3d 943, 945 (N.Y. App. Div. 2010) (New York law "permits a claim for aiding and abetting conversion").

**Utah** – *Albright v. Attorney's Title Ins. Fund*, No. 2:03-cv-517, 2008 WL 2952260, at *12 (D. Utah July 28, 2008) ("Although Utah appears to recognize aiding and abetting liability for intentional torts . . . Utah courts have not specifically recognized a cause of action for aiding and abetting conversion.").

**B.   Examples of State Law Variations With Respect to Required Intent for Conversion**

**Hawaii** – *Brooks v. Dana Nance & Co.*, 153 P.3d 1091, 1100 (Haw. 2007) (plaintiff must prove that defendant had "a constructive or actual intent to injure"); *accord. Newcomb v. Cambridge Home Loans, Inc.*, 861 F. Supp. 2d 1153, 1164 (D. Haw. 2012).

**Colorado** – *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1199 (Colo. App. 2009) (for conversion claim, a plaintiff must show a defendant "intentionally exercised dominion or control over a chattel"); *but see Holmes v. Young*, 885 P.2d 305, 310 (Colo. App. 1994) ("There is a

divergence of authority [in Colorado] as to whether actual knowledge is required or whether constructive knowledge of the breach will suffice.").

**Delaware** – *Segovia v. Equities First Holdings*, LLC, No. CIV.A.06C09-149-JRS, 2008 WL 2251218, at *19 (Del. Super. May 30, 2008) ("Conversion need not be accompanied by a subjectively wrongful intent to be actionable . . . . A person who mistakenly believes that his or her conduct is legal may nonetheless commit conversion.").

| | C. | Examples of State Law Variations in Rules Governing Claims for Conversion of Money |
|---|---|---|

**Delaware** – *AM Gen. Holdings LLC ex rel. Ilshar Capital LLC v. Renco Grp., Inc.*, No. CV 7639-VCN, 2013 WL 5863010, at *16 (Del. Ch. Oct. 31, 2013) ("Under Delaware law, an action in conversion will not lie to enforce a claim for the payment of money.").

**California** – *Sanowicz v. Bacal*, 184 Cal. Rptr. 3d 517, 529 (Ct. App. 2015) (money cannot be the subject of a conversion action "*unless there is a specific, identifiable sum involved*").

**Wyoming** – *Ferguson v. Coronado Oil Co.*, 884 P.2d 971, 978 (Wyo. 1994) (money may be the subject of a conversion action, but the money needs to be "identifiable" and "there must also be an obligation to deliver that money in a specific manner").

**Alaska** – *Burseth v. Weyerhaeuser Mortgage Co.*, No. S-5075, 1993 WL 13563649, at *5 (Alaska Oct. 13, 1993) (the Supreme Court of Alaska has recognized "an action for conversion where the allegedly converted property is money").

| | D. | Examples of State Law Variations With Respect to the Required Interest in the Allegedly Converted Property |
|---|---|---|

**Vermont** – *Miller v. Merchants Bank*, 415 A.2d 196, 199 (Vt. 1980) ("To make out a claim for conversion . . . plaintiff must show an immediate right to possession.").

**Connecticut** – *Devitt v. Manulik*, 410 A.2d 465, 467 (Conn. 1979) (in an action for conversion, plaintiff must prove "an immediate right to possession at the time of conversion").

**Alaska** – *McKibben v. Mohawk Oil Co.*, 667 P.2d 1223, 1229 (Alaska 1983) ("A future possessory interest is sufficient for a plaintiff to maintain an action for conversion.").

| | E. | Examples of State Law Variations With Respect to the Applicable Statute of Limitations for Conversion |
|---|---|---|

**Louisiana** – La. Rev. Stat. Ann. 10:3-420 (one-year statute of limitations for conversion of an instrument).

**Mississippi, Texas, Tennessee, Washington** – Tex. Bus. & Com. Code Ann. § 3.118(g) (West) (three-year statute of limitations); Tenn. Code Ann. § 47-3-118(g) (West) (same); Wash. Rev. Code Ann. § 62A.3-118 (g) (West) (same); Miss. Code. Ann. § 75-3-118 (g)(West) (same).

**New York** – *Doukas v. Ballard*, 972 N.Y.S.2d 143 (N.Y. Sup. Ct. 2013) (three-year statute of limitations for conversion under N.Y. C.P.L.R. § 214(3)).

**Florida** – *Feingold v. Am. Rack & Stack, Inc.*, 734 So.2d 479, 480 (Fla. Dist. Ct. App. 1999) (applying Fla. Stat. Ann. § 95.11(3)(h)'s four-year statute of limitations for conversion).

**Iowa, Virginia** – *Husker News Co. v. Mahaska State Bank*, 460 N.W.2d 476, 477 (Iowa 1990) (applying five-year statute of limitations to claim for conversion of an instrument); *Willard v. Moneta Bldg. Supply, Inc.*, 551 S.E.2d 596, 599 (Va. 2001) (noting that it is "well-established" that conversion actions constitute claims of injury to property and applying the five-year statute of limitations under Va. Code. Ann. § 8.01-243(B)).

**Oregon** – Or. Rev. Stat. Ann. § 73.0118(7)(a) (West) (six-year statute of limitations for conversion of an instrument).

## IV.   STATE VARIATIONS IN THE LAW OF AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### A.   Examples of State Law Variations With Respect to States' Recognition of a Claim for Aiding and Abetting Breach of Fiduciary Duty

#### 1.   Examples of States That Do Not Recognize This Cause of Action

**Louisiana** – *Broyles v. Cantor Fitzgerald & Co.*, No. 10-854-JJB, 2014 WL 6886158, at *5 (M.D. La. Dec. 8, 2014) ("This Court has ruled before that aiding and abetting the breach of a fiduciary duty is not a cause of action recognized in Louisiana.").

**Indiana** – *Crystal Valley Sales, Inc. v. Anderson*, 22 N.E.3d 646, 656 (Ind. Ct. App. 2014) (noting that "Indiana does not recognize . . . a cause of action" for aiding and abetting a breach of fiduciary duty).

**Kentucky** – *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 260 (Ky. Ct. App. 2008) ("Kentucky law has never recognized a civil cause of action for aiding and abetting a breach of fiduciary duty.").

#### 2.   Examples of States That Recognize This Cause of Action

**Oregon** – *Granewich v. Harding*, 985 P.2d 788, 793 n.3 (Or. 1999) (recognizing claim for aiding and abetting a breach of a fiduciary duty as a "subcategory of a broader theory of vicarious tort liability").

**South Carolina** – *Vortex Sports & Entm't, Inc. v. Ware*, 662 S.E.2d 444, 448 (S.C. Ct. App. 2008) (setting out elements for aiding and abetting a breach of fiduciary duty).

**Washington** – *Vanguard Int'l, Inc. v. Guangdong Fully, Ltd.*, No. 57396-9-I, 2008 WL 116268, at *4 (Wash. Ct. App. 2008) (describing "well settled" rule that a person who "knowingly assists another in violating his fiduciary" obligation is "liable as an aider and abettor").

| **3.      Examples of States Where This Is an Open Question** |
|---|
| **Connecticut** – *Flannery v. Signer Asset Fin. Co.*, 94 A.3d 553, 560 n.12 (Conn. 2014) (noting that this issue is an open question in Connecticut and commenting that "[t]he Appellate Court assumed, without deciding, 'that Connecticut recognizes an action for aiding and abetting in the breach of a fiduciary duty'"). |
| **New Hampshire** – *In re Felt Mfg. Co., Inc.*, 371 B.R. 589, 615 (Bankr. D.N.H. 2007) (noting that New Hampshire has not addressed whether a claim for aiding and abetting a breach of fiduciary duty exists under New Hampshire law). |
| **B.      Examples of State Law Variations With Respect to the Required Level of Knowledge and Intent by an Alleged Aider and Abettor** |
| **Georgia** – *Wright v. Apartment Inv. & Mgmt. Co.*, 726 S.E.2d 779, 788 (Ga. Ct. App. 2012) (plaintiff must establish that defendant had knowledge of fiduciary duty owed between primary wrongdoer and plaintiff and that "the defendant acted purposely and with malice and the intent to injure"). |
| **New Jersey** – *Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 307 (D.N.J. 2012) (New Jersey law requires that a defendant had "actual knowledge" of the breach of fiduciary duty). |
| **Minnesota** – *Park Midway Bank, N.A. v. R.O.A., Inc.*, No. A11-2092, 2012 WL 3263866, at *4 (Minn. Ct. App. Aug. 13, 2012) (requiring plaintiff demonstrate that defendant had "actual knowledge that the [primary tortfeasor was] engaging in tortious conduct"). |
| **Connecticut** – *Katcher v. 3V Capital Partners LP*, No. 05CV085008383S, 2011 WL 1105724, at *13 (Conn. Super. Ct. Feb. 1, 2011) (in a claim for aiding and abetting breach of fiduciary duty, "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance"). |
| **South Dakota** – *Chem-Age Indus., Inc. v. Glover*, 652 N.W.2d 756, 775 (S.D. 2007) ("Although in some instances actual knowledge may be required, constructive knowledge will often suffice. Constructive knowledge is adequate when the aider and abettor has maintained a long-term or in-depth relationship with the fiduciary.") |
| **C.      Examples of State Law Variations With Respect to the Applicable Statute of Limitations for Breach of Fiduciary Duty** |
| **Tennessee** – Tenn. Code Ann. § 48-18-601 (one-year statute of limitations applies to breach of fiduciary duty claims). |
| **Arizona, Pennsylvania** – *Serrano v. Serrano*, No. 1 CA-CV 10-0649, 2012 WL 75639, at *3, 6 (Ariz. Ct. App. Jan. 10, 2012) (two-year statute of limitations for breach of fiduciary duty claims); *Pierce v. Rossetta Corp.*, No. 88-5873, 1992 WL 165817, at *10 (E.D. Pa. June 12, 1992) (same). |

| |
|---|
| **California, Massachusetts** – Cal Code Civ Proc § 338; *William L. Lyon & Associates, Inc. v. Superior Court*, 204 Cal. App. 4th 1294, 1313 (Cal. App. 3d Dist. 2012) (three-year statute of limitations for aiding and abetting breach of fiduciary duty); M.G.L.A. 260 § 2A; *O'Connor v. Redstone*, 452 Mass. 537, 551 (Mass. 2008) (same). |
| **Georgia, Utah** – O.C.G.A. § 9-3-25; *Hendry v. Wells*, 650 S.E.2d 338, 343-44 (four-year statute of limitations applicable to breach of fiduciary duty claims); *United Park City Mines Co. v. Greater Park City Co.*, 870 P.2d 880, 890 (Utah 1993) (citing Utah Code Ann. § 78B-2-307) (same). |
| **Colorado, Missouri** – *Johnston v. CIGNA Corp.*, 916 P.2d 643, 652 (Colo. App. 1996) (five years for breach of fiduciary duty); *Cmty. Title Co. v. U.S. Title Guar. Co.*, 965 S.W.2d 245, 253 (Mo. Ct. App. 1998) (same). |
| **Minnesota, New Jersey** – *O'Leary ex rel. Lakeland Printing Co., Inc. v. Carefree Living of Am. (Minnetoka)*, No. C5-00-2072, 2001 WL 1083757, at *3 (Minn. Ct. App. Sep. 18, 2001) (Minnesota imposes a six-year statute of limitations for "allegations of breach of fiduciary duty based on" fraud claims); *Balliet v. Fennell*, 845 A.2d 168, 170, 172 (N.J. Super. Ct. App. Div. 2004) (six-year statute of limitations for breach of fiduciary duty causing purely economic loss). |

## V.   STATE VARIATIONS IN THE LAW OF CIVIL CONSPIRACY

### A.   Examples of State Law Variations With Respect to Civil Conspiracy as an Independent Cause of Action

#### 1.   Examples of States that Do Not View Civil Conspiracy as a Stand-Alone Cause of Action

| |
|---|
| **Michigan** – *Early Detection Ctr., P.C., v. New York Life Ins. Co.*, 403 N.W.2d 830, 836 (Mich. Ct. App. 1986) ("[A] claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable, tort."). |
| **Mississippi** – *Bradley v. Kelley Bros. Contractors*, 117 So.3d 331, 339 (Miss. Ct. App. 2013) ("A conspiracy standing alone, without the commission of acts causing damage is not actionable."). |
| **North Carolina** – *New Bar P'ship v. Martin*, 729 S.E.2d 675, 682 (N.C. Ct. App. 2012) ("[I]t is well established that there is not a separate civil action for civil conspiracy in North Carolina. Instead, civil conspiracy is premised on the underlying act.  Thus, where a plaintiff's underlying claims fail, its claim for civil conspiracy must also fail."). |
| **Pennsylvania** – *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. Ct. 2000) ("[A]bsent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act."). |

| | |
|---|---|
| **2.** | **Examples of States That May View Civil Conspiracy as an Independent Cause of Action** |

**Delaware** – *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 805 n. 149 (Del. Ch. 2009) (stating that "civil conspiracy is an independent wrong," and noting that that while "[s]ome jurisdictions have abandoned the independent tort of conspiracy," "Delaware has never done so").

**Florida** – *Churruca v. Miami Jai-Alai, Inc.*, 353 So.2d 547, 550 (Fla. 1977) (in specific circumstances, Florida law does not require an independent, underlying tort for a claim for civil conspiracy to be maintained: "[I]f the plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which power an individual would not possess, then conspiracy itself becomes an independent tort.").

| | |
|---|---|
| **B.** | **Examples of State Law Variations With Respect to the Required Level of Knowledge and Intent** |

| | |
|---|---|
| **1.** | **Examples of States That Require Specific Intent** |

**Alabama** – *First Bank of Childersburg v. Florey*, 676 So.2d 324, 327 (Ala. Civ. App. 1996) (to establish an agreement, "[t]he plaintiff must allege and prove that the claimed conspirators had actual knowledge of, and the intent to bring about, the object of the claimed conspiracy");

**Arkansas** – *Faulkner v. Arkansas Children's Hosp.*, 69 S.W.3d 393, 406 (Ark. 2002) (civil conspiracy in Arkansas is an "intentional tort which requires specific intent to accomplish the contemplated wrong").

**Minnesota** – *Tremco, Inc. v. Holman*, No. C8-96-2139, 1997 WL 423575, at *4 (Minn. Ct. App. July 29, 1997 (plaintiff must demonstrate that defendants had a "specific intent to achieve an unlawful purpose").

**Mississippi** – *S. Health Corp. of Houston v. Crausby*, No. 2014-CA-00603-COA, 2015 WL 3541907, at *3 (Miss. Ct. App. May 26, 2015) (a meeting of the minds requires not just an agreement, but an agreement "to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully").

| | |
|---|---|
| **2.** | **Example of States That Require Malice** |

**Florida** – *Churruca v. Miami Jai-Alai, Inc.*, 353 So.2d 547, 550 (Fla. 1977) (for species of conspiracy claim not requiring an underlying tort, conspiracy requires "malicious motive").

**Ohio** – *Cook v. Kudlacz*, 974 N.E.2d 706, 725 (Ohio Ct. App. 2012) (civil conspiracy requires a "malicious combination"); *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996) ("The 'malice' in 'malicious combination' is legal or implied malice . . . and is defined as 'that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.'").

| |
|---|
| **Pennsylvania** – *Rutherford v. Presbyterian-Univ. Hosp.*, 612 A.2d 500, 508 (Pa. Super. Ct. 1992) ("Proof of malice, i.e., an intent to injure, is an essential part of a conspiracy cause of action; this unlawful intent must also be without justification."). |

| |
|---|
| **C.   Examples of State Law Variations With Respect to the Standard of Proof** |

| |
|---|
| **1.   Examples of States That Require Proof by Clear and Convincing Evidence** |

| |
|---|
| **Arizona** – *Law Corp. of Brian Finander, P.C. v. Alexander*, No. 1 CA-CV 08-0290, 2009 WL 449233, at *4 (Ariz. Ct. App. Feb. 24, 2009) ("The agreement to commit a tort must be proven by clear and convincing evidence." ). |

| |
|---|
| **Illinois** – *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) ("If a conspiracy is shown by circumstantial evidence, however, that evidence must be clear and convincing."). |

| |
|---|
| **Missouri** – *Chmieleski v. City Prods. Corp.*, 660 S.W.2d 275, 289-90 (Mo. Ct. App. 1983) (proof of a civil conspiracy must be "supported by clear and convincing evidence") |

| |
|---|
| **Oklahoma** – *Shadid v. Monsour*, 746 P.2d 685, 688 (Okla. Civ. App. 1987) (proof of a conspiracy must be with clear and convincing evidence). |

| |
|---|
| **Utah** – *Crane Co. v. Dahle*, 576 P.2d 870, 872 (Utah 1978) (the burden of proof for conspiracy "is higher than mere preponderance," as a plaintiff must establish civil conspiracy "by clear and convincing evidence"). |

| |
|---|
| **Virginia** – *Waytec Elec. Corp. v. Rohm & Haas Elec. Materials, LLC*, 459 F. Supp. 2d 480, 492 (W.D. Va. 2006) ("[A] civil conspiracy must be shown by clear and convincing evidence."). |

| |
|---|
| **2.   Example of States That Require Proof by a Preponderance of the Evidence** |

| |
|---|
| **Rhode Island** – *Stubbs v. Taft*, 149 A.2d 706, 708-09 (R.I. 1959) ("[T]he doctrine of reasonable doubt has no place in a civil suit for damages where it is sufficient if the evidence is full, clear and satisfactory, and the conspiracy established by a preponderance of the evidence. This degree of proof, however, is necessary. The evidence must do more than raise a suspicion. It must lead to belief."). |

| |
|---|
| **Washington** – *Sterling Bus. Forms, Inc. v. Thorpe*, 918 P.2d 531, 533 (Wash. Ct. App. 1996) ("A plaintiff in a civil conspiracy action has the burden of proving the case by a preponderance of the evidence, and must establish the existence of the conspiracy by clear, cogent and convincing evidence."). |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 1, 2015, the foregoing document was delivered electronically to all counsel of record who have consented to electronic service.

<u>/s/ James V. Leito IV</u>
James V. Leito IV