# EXHIBIT 60

AMENDED THIS / MODIFIÉE CE May 16-14 PURSUANT TO / CONFORMÉMENT À
☑ RULE/LA RÈGLE 26.02 ( C )
☑ THE ORDER OF / L'ORDONNANCE DU Justice Penny
DATED/FAIT LE May 15th 2014
Krown
LOCAL REGISTRAR / SUPERIOR COURT OF JUSTICE — GREFFIER LOCAL / COUR SUPÉRIEURE DE JUSTICE

Court File No: CV-12-9780-00CL

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

BETWEEN:

MARCUS WIDE of Grant Thornton (British Virgin Islands) Limited, and HUGH DICKSON, of Grant Thornton Specialist Services (Cayman) Ltd, acting together herein in their capacities as joint liquidators of Stanford International Bank Limited

Plaintiffs

- and -

THE TORONTO-DOMINION BANK

Defendant

FRESH AS AMENDED STATEMENT OF CLAIM

Notice of Action issued on August 22, 2011

1. The plaintiffs claim from the defendant, The Toronto-Dominion Bank ("TD Bank"):

(a) damages in the Canadian dollar amount equivalent to US$5.5 billion and further amounts to be determined prior to trial;

(b) an accounting and disgorgement of profits in amounts to be determined prior to trial;

(c) prejudgment and post-judgment interest on the foregoing amounts pursuant to the *Court of Justice Act*;

(d) costs of this action on a substantial indemnity basis plus H.S.T.; and

(e) such further and other relief as this Honourable Court may deem just.

## I. OVERVIEW

2. The plaintiffs seek to recover damages arising from the defendant's negligence, knowing assistance, recklessness and failure to act as a reasonable bank in response to a multi-billion dollar fraud perpetrated against its customer, Stanford International Bank Limited ("SIB"), an Antiguan bank now in liquidation, and SIB's customers.

3. SIB, an international banking company based in Antigua, offered opportunities to customers around the world to purchase certificates of deposit (**"CDs"**).

4. Approximately US$10 billion in CDs were sold by SIB to more than 21,000 customers in approximately 113 different countries. Taking into account amounts paid or repaid to SIB depositors in interest or CD redemption payments, SIB had a core capital loss of approximately US$5.5 billion by the time SIB collapsed in February 2009. Purchasers of SIB CDs and SIB employees were led to believe that sums deposited with SIB would be and were invested using a low-risk investment strategy concentrating on maximum liquidity in a well-balanced, widely diversified global portfolio that would provide generous returns.

5. Instead of investing funds received by SIB customers as represented, Robert Allen Stanford (**"Stanford"**) and a small cabal of other insiders (the **"Other Insiders"**) orchestrated a scheme to loot SIB of several billion dollars of its assets (the **"SIB Looting"**). The Other Insiders consisted of, most notably, James Milton Davis (**"Davis"**), SIB's Chief Financial Officer.

6. To perform the SIB Looting, Stanford and the Other Insiders misappropriated and misapplied the vast majority of SIB's assets. They placed SIB's assets into speculative, largely illiquid investments, diverted them to other companies owned by Stanford, made approximately US$2 billion in concealed and unsecured SIB shareholder loans to Stanford and used them to

fund their own lavish lifestyles. As a result, Stanford and the Other Insiders breached their fiduciary duties owed to SIB and acted to the detriment of SIB and its customers for their own financial gain. On June 12, 2012, Stanford was sentenced to 110 years in prison for orchestrating the SIB Looting. The Other Insiders have also been convicted in connection with the SIB Looting.

7. Beginning in the early 1990s, TD Bank acted as correspondent bank for SIB. In particular, TD Bank opened and maintained multiple correspondent bank accounts for SIB through which flowed the vast majority of all investor funds for the purchase of SIB CDs and payments from SIB to investors and others in multiple jurisdictions around the world. For instance, in the January 1, 2008 to February 2009 period which preceded the date when regulators discovered and terminated the SIB Looting, approximately US$2,539,762,421.22 was credited to SIB's TD Bank account number 360012161670. As a result, SIB was a significant source of revenue for TD Bank. In fact, as the SIB Looting grew, so too did TD Bank's revenue, so much so that SIB became TD Bank's largest correspondent banking customer in the world. In addition, TD Bank provided trade financing and treasury services to SIB.

8. TD Bank also acted as correspondent bank for Bank of Antigua Limited ("**BOA**"), a Stanford-owned onshore bank based in Antigua, and provided other banking services to Caribbean Star Airlines Ltd. and Caribbean Sun Airlines Inc., both entities owned by Stanford (together, "**Caribbean Star Airlines**"). Further, TD Asset Management Inc. and TD Waterhouse Private Investment Counsel Inc., both of which were wholly-owned subsidiaries of TD Bank (together, "**TD Waterhouse**"), managed discretionary investment portfolios for both SIB and BOA.

9. TD Bank opened SIB's correspondent bank accounts without conducting any "know your client" ("KYC") or anti-money laundering ("AML") due diligence. It did so notwithstanding that correspondent banking is the highest risk service provided by banks. In addition, there was clearly no legitimate business purpose for SIB to require correspondent banking services in Canada. For among other reasons, this was because SIB initially did not have any Canadian customers and all of the funds wired to SIB's accounts at TD Bank were in U.S. dollars. Accordingly, TD Bank never should have accepted SIB as a client in the first place.

10. In legitimate circumstances, SIB would have sought and received correspondent banking services from a U.S. bank. However, due to the clear risk occasioned by SIB, U.S. banks had refused to provide correspondent banking services to SIB, a fact that TD Bank was required to be aware of. In fact, throughout the period that TD Bank provided correspondent banking services to SIB, U.S. banks generally refused to provide correspondent banking services to any offshore or Antiguan-based banks or required such banks to be part of a reputable banking group, a quality SIB clearly did not have.

11. TD Bank negligently opened SIB's correspondent bank accounts and compounded its negligence by operating those accounts for nearly 20 years. It was also required under the laws of Canada and mandatory banking industry standards to perform due diligence reviews of SIB's affairs, SIB's use of TD Bank's correspondent banking services, Stanford and the Other Insiders, and other relevant information. These obligations gave rise to the requirement that TD Bank ask for and obtain information from SIB, Stanford and the Other Insiders that would have enhanced TD Bank's exclusive window into SIB's affairs. In the circumstances, such inquiries and the resulting information should have indicated to TD Bank that it was required to terminate SIB's

access to TD Bank's facilities, report the conduct of Stanford and the Other Insiders to the appropriate authorities and freeze SIB's accounts.

12. For instance, if TD Bank undertook even the basic required due diligence reviews, it would have determined that, during the period of time that TD Bank provided banking services to SIB, Antigua's banking regulations and AML practices were subject to extensive, sustained and public condemnation, all of which related to Antigua's known facilitation of fraud and money laundering. It also would have discovered that Stanford himself undertook various well-publicized manipulations of Antigua's regulatory regime.

13. TD Bank had direct experience with the risks occasioned by providing correspondent banking services to an Antiguan-based offshore bank. For instance, in 1996, it closed the correspondent bank accounts of another Antiguan-based offshore bank, American International Bank Limited ("AIB"). It did so after a senior TD Bank executive responsible for TD Bank's relationship with AIB determined that the amounts moving through the AIB account at TD Bank were too large for a legitimate bank in Antigua.

14. Notwithstanding that the volume of funds moving through SIB's correspondent accounts was significantly larger than that moving through AIB's account, TD Bank maintained its relationship with SIB. In fact, by at least 2008, SIB had become TD Bank's single largest correspondent banking customer, not just in the Caribbean, but worldwide. Notably, as virtually all investments with SIB flowed through TD Bank, the exponential growth of SIB's balance sheet created a significant source of revenue for TD Bank.

15. TD Bank was also required to diligently conduct ongoing monitoring of publicly-available information pertaining to SIB and SIB's business operations. During the almost twenty

years that TD Bank provided correspondent banking services to SIB, such publicly-available information repeatedly disclosed clear warning signs with respect to SIB and Stanford. For example, in 1984, just prior to entering the offshore banking industry, Stanford was declared a bankrupt by a Texas court with personal debts in excess of US$13 million. This fact alone should have precluded TD Bank from providing banking services to SIB, as banking industry standards clearly provide that a previously-bankrupt individual should be ineligible to run a bank. Among other issues, World-Check, a reputable organization that gathers information globally on heightened risk individuals and entities, officially deemed Stanford a politically exposed person (a "PEP") in 2004 and designated one of Stanford's companies a financial institution that posed a high risk in 2007.

16. As a result of publicly-available information, even without the benefit of the window into SIB's affairs such as the one enjoyed by TD Bank, other banks and regulators discovered seriously adverse information regarding SIB and Stanford. This information revealed that business should not have been conducted with SIB and/or that the SIB Looting was taking place.

17. For instance, in September 2000, a U.K. consulting firm issued a due diligence report in respect of BOA to the predecessor of Société Générale Private Banking (Suisse) S.A. ("SocGen"), which provided SIB with banking services in Switzerland. That report, which was completed in the course of only a few hours and at a cost of only £500, commented on both SIB and Stanford. In particular, it identified various "red flags" in respect of Stanford and SIB and concluded that "SIB has had a somewhat dubious reputation for many years", that "it is an accepted fact that Stanford International Bank has been used by Mexican drug cartels to launder considerable volumes of criminally obtained funds" and that SocGen should be concerned about

entering into business relationships with SIB or Stanford as "it would be very difficult for [SocGen] to defend itself or its reputation should any problems arise in the future."

18. Even earlier, in 1997, after just six days of field research, the U.S. Securities and Exchange Commission (the "SEC") was even more definitive: red flags about Stanford's operations indicated a likely "Ponzi" scheme. The SEC's failure to act on such conclusions has now been the subject of a comprehensive report that in no way disavowed the conclusion that publicly accessible information revealed Stanford's fraud more than ten years prior to SIB's collapse.

19. Similarly, when international clearing house Pershing LLC ("Pershing") sought to verify SIB's assets in connection with its provision of services to another Stanford-owned entity, it was refused access to any documentation regarding SIB's balance sheet and the supporting paperwork that reflected SIB's assets. Due to the lack of transparency into SIB's portfolio, Pershing withdrew its services and by December 2008 announced publicly that it could not verify that Stanford was not involved in fraud of some nature. Several others also came to the same conclusion, including various U.S. banks, an international clearing house, a private due diligence firm, a prominent U.S. law firm and the National Association of Securities Dealers.

20. TD Bank not only had access to the publicly-available information relied on by other entities that identified the SIB Looting and/or refused to provide services to SIB, but also had extensive additional information as a result of its unique vantage point as SIB's correspondent bank, as well as its other business relationships with SIB, BOA and Caribbean Star Airlines. For instance, in addition to the fact that there was no legitimate business purpose for SIB to have

accounts in Toronto, TD Bank knew that the rates of return purported to be generated by SIB were completely at odds with the rates of return actually generated for SIB by TD Waterhouse.

21. TD Bank not only ignored the information available to it, but did so in the face of a 2001 U.S. Senate report in respect of correspondent banking that specifically named TD Bank. That report indicated that TD Bank had provided correspondent banking services to AIB and confirmed that, as a result, TD Bank had directly acted as a major conduit for improper access to the U.S. financial system. At the very time of the U.S. Senate report and for several years afterward, TD Bank continued unabated in its provision of banking services to SIB and access to the U.S. financial system.

22. In the face of its knowledge about SIB's affairs and the publicly-available information in respect of SIB and Stanford, by at least 2000, the TD Bank executive responsible for the SIB correspondent banking relationship admitted internally that TD Bank did not understand SIB's business and concluded that he was uncomfortable with TD Bank's relationship with SIB and that due diligence under strict KYC and AML standards was required as "something did not seem right". In addition, by at least July 2008, different executives at TD Bank were "nervous" about TD Bank's relationship with SIB. However, TD Bank continued unabated in its provision of banking services to SIB until being ordered by a court to cease doing so nearly a month after SIB's collapse.

23. TD Bank, as a member of the international banking community, should have acted long before regulatory agencies intervened and effectively ended the SIB Looting in early 2009. In opening and maintaining its relationship with SIB, TD Bank was negligent. By its acts and omissions described herein, TD Bank failed to act as a reasonable bank would have acted when

confronted with the same suspicious circumstances. At all times, it had sufficient information such that it knew or ought to have known of, or was recklessly or willfully blind to, the SIB Looting. Despite this knowledge, TD Bank continued to provide correspondent banking services to SIB (as well as the other aforementioned services) until after SIB's collapse.

24. In addition, TD Bank also assisted Stanford and the Other Insiders in breaches of fiduciary duties owed to SIB and breaches of trust owed to SIB's customers.

25. TD Bank was required to take reasonable measures to avoid causing loss to SIB and its customers. By failing to do so, TD Bank caused significant injuries and losses to SIB and SIB's customers, all of whom are now creditors of SIB's estate.

## II. THE PARTIES

### A. The Plaintiffs

26. Nigel Hamilton-Smith and Peter Wastell (the "**Former Liquidators**") were appointed as joint liquidators of SIB by order of an Antiguan Court on April 15, 2009 (entered on April 17, 2009), which determined that it was just and convenient that SIB be liquidated and dissolved under its supervision pursuant to the *International Business Corporations Act*, Cap. 222 of the laws of Antigua and Barbuda (as amended) (the "***IBC Act***").

27. The Former Liquidators were removed further to a removal order of the High Court of Justice Antigua and Barbuda dated June 8, 2010.

28. Marcus A. Wide and Hugh Dickson of Grant Thornton LLP were appointed as joint liquidators of SIB (in liquidation) ("**Joint Liquidators**") by order of the Eastern Caribbean Supreme Court dated May 12, 2011 (entered on May 13, 2011) (the "**Appointment Order**").

29. The Appointment Order, among other things, vested all the assets of SIB in the Joint Liquidators and empowered them to sue entities in relation to SIB in any jurisdiction where they believe assets or property of SIB may be located.

30. Pursuant to an Order of the Superior Court of Québec (Commercial Division) dated September 11, 2009, Ernst & Young Inc. ("**E&Y**") was appointed pursuant to the *Bankruptcy and Insolvency Act* (Canada) as interim receiver of the Canadian assets SIB and authorized to initiate and pursue proceedings in respect of SIB (the "**E&Y Order**").

31. The E&Y Order expressly precluded the Former Liquidators and subsequently the Joint Liquidators from acting in Canada. However, on August 19, 2011, in light of E&Y's failure to commence claims against TD Bank (or any other third parties), the Joint Liquidators moved before the Superior Court of Québec (Commercial Division) for an Order permitting them to act in the place of E&Y in respect of claims against TD Bank.

32. As a result, on August 19, 2011, the Superior Court of Québec authorized and empowered the Joint Liquidators to institute and litigate, in the place and stead of E&Y, proceedings against TD Bank in any appropriate jurisdiction (the "**Authorization Order**"). In addition, the Authorization Order specifically recognized the Joint Liquidators as having "the equivalent or substantially similar powers and capacities than those of a trustee in bankruptcy or other insolvency holder within Canada" and authorized the Joint Liquidators to exercise those powers and capacities for the purposes of the institution and litigation of the within action against TD Bank.

33. Accordingly, since obtaining the Authorization Order, the Joint Liquidators are acting with the express authority of a Canadian Court in the same capacity as a trustee in bankruptcy under Canada's federal *Bankruptcy and Insolvency Act* for the benefit of SIB and its creditors.

34. Upon obtaining the Authorization Order, the Joint Liquidators were granted the capacity to pursue claims against TD Bank in Canada for the first time.

35. The Joint Liquidators have commenced these proceedings both in their capacity as representatives of SIB and in their capacity as representatives of the 21,000 SIB creditors. In these capacities, the Joint Liquidators seek damages on behalf of SIB and its creditors. Any damages awarded to SIB will form part of SIB's estate and be disbursed to SIB's creditors.

**B. Robert Allen Stanford and SIB**

36. Stanford was born in the United States on March 24, 1950. He is a citizen of the U.S. and Antigua.

37. Stanford wholly owned Stanford International Bank Holdings Ltd., an Antiguan corporation which itself directly and wholly owned SIB. There were no other equity owners of SIB. Stanford was the Chairman of the Board of SIB.

38. SIB was at relevant times the largest private international or "offshore" bank in Antigua. By the time of its collapse in 2009, SIB employed approximately 100 individuals at its headquarters in Antigua and thousands of others were employed at other Stanford-owned entities around the world.

39. Stanford was on SIB's Board of Directors, as were his father, James A. Stanford, Davis, Sir Courtney N. Blackman, O.Y. Goswick, Kenneth C. Allen and Robert S. Winter. At relevant

times, Stanford was Chairman of the Board of Directors and Sir Courtney N. Blackman, an independent director and former Governor to the Central Bank for Barbados, served as the Vice Chairman.

40. SIB's Board of Directors met regularly and was comprised of various sub-committees. For instance, Sir Courtney N. Blackman served as Chairman of the Audit Committee and presented audit committee reports to SIB's Board of Directors on behalf of the other audit committee members.

41. SIB and its affiliates also had an advisory board that was comprised primarily of former politicians and international business persons, most of whom were independent from SIB. It has been reported that a TD Bank executive, Perry Mercer, served on this advisory board, as did Blaise Friedli of SocGen.

C. The Defendant

42. TD Bank is a Schedule I bank, duly constituted by letters patent under the authority of the *Bank Act*, R.S.C. 1991, c. 46, with a head office located in Toronto, in the Province of Ontario.

43. As detailed herein, TD Bank provided correspondent banking, lending, trade financing and treasury services to SIB, BOA, another Antiguan bank owned by Stanford, and at least one other Stanford-owned entity.

III. HISTORY OF SIB'S OPERATIONS AND AFFAIRS

44. TD Bank was required to know the history of SIB, SIB's products and services, the factors giving rise to SIB's collapse and information in respect of Stanford personally. Such history and information is detailed below. It is full of "red flags".

**A. Stanford Purchases BOA and Establishes SIB**

45. In 1985, with no previous involvement in the banking industry, Stanford incorporated Guardian International Bank Limited ("Guardian") in the British Overseas Territory of Montserrat. At that time, Stanford and his father owned all of the share capital of Guardian.

46. In order to support sales of Guardian CDs, Stanford established representative offices for Guardian in Miami, Florida and Houston, Texas under the name "Guardian International Investment Services".

47. From 1985 until 1990, Stanford operated Guardian in Montserrat with his former college roommate, Davis. They operated Guardian as an "offshore" bank and, as such, it catered almost exclusively to customers outside of Montserrat.

48. Guardian primarily targeted Latin American customers and offered CDs with interest rates of double the then-current standard rate of return. Using this strategy, by the end of 1989, Guardian claimed US$55.5 million in accounts, a number which grew to over US$100 million by the following year.

49. Notwithstanding its apparent success, Guardian came under the scrutiny of bank regulators. By 1989, the Texas Department of Banking had warned Stanford about operating a foreign bank representative office in Texas "without authority under either state or federal law."

50. Thereafter, following investigations by bank regulators in Texas, Florida and California, the U.S. Office of the Comptroller of Currency issued a Banking Circular regarding Stanford's unauthorized banking activities in the U.S. The Texas Department of Banking went further, ordering Guardian to immediately cease its Texas operations or "the Texas Attorney General will

be requested to promptly file charges against the bank, its board of directors and its management for apparent willful and continuing violations of the Texas Banking Code."

51. Around the same time, the banking system in Montserrat at large came under investigation by the Federal Bureau of Investigation and the U.K.'s Scotland Yard. Consequently, Guardian itself came under scrutiny for possible drug money laundering.

52. As a result of reports from those law enforcement agencies, the government of Montserrat determined that Stanford no longer met bank ownership requirements on the island and informed Stanford that Guardian's banking license was going to be revoked. Among other reasons provided, Montserrat informed Stanford this decision was due to the fact that (i) Guardian was operating in a manner "detrimental to its depositors", (ii) Guardian failed to supply adequate details as to its liquidity, and (iii) Stanford was formerly a bankrupt.

53. In response, and before Montserrat could formally revoke Guardian's license, on December 7, 1990, Stanford caused Guardian to migrate its domicile to Antigua and re-incorporate under Antigua's *IBC Act*. Following Guardian's arrival in Antigua, it shared headquarters with BOA.

54. On December 8, 1990, the day after Stanford reincorporated Guardian in Antigua, Stanford completed his acquisition of all of the share capital of BOA in exchange for Eastern Caribbean ("EC") $469,700.80 through his holding company, Guardian Bank Group Holdings Limited (as it was then called). The sellers of BOA's share capital were a group of Antiguan citizens and the Government of Antigua.

55. BOA was originally incorporated on February 10, 1981. As a domestic Antiguan bank, BOA offered banking services primarily to citizens of Antigua, in EC dollars, the local currency.

56. On December 20, 1994, Guardian changed its name to SIB.

57. As an offshore international banking company, and pursuant to s. 240 of the *IBC Act*, SIB was prohibited from knowingly accepting deposits in the legal tender of Antigua or of other countries of the CARICOM region. As the legal tender in Antigua is the EC dollar, SIB was effectively barred from doing business with residents of Antigua. Instead, its deposits derived from customers located in foreign jurisdictions.

58. Since SIB was an offshore Antiguan bank which had no way to receive wire transfers or other payments on its own, it needed to gain access to an onshore bank's facilities as a means for SIB customers to transfer funds to SIB. This was accomplished by way of SIB's procurement of correspondent bank accounts.

59. The term "correspondent account" is defined broadly for banking organizations and includes any account or formal relationship established by a financial institution to receive deposits from, make payments to or other disbursements on behalf of a foreign financial institution, or to handle other financial transactions related to the foreign financial institution. By analogy, SIB needed to "rent" the services of one or more onshore banks in order for it to operate and access the U.S. financial system. Absent such correspondent arrangements, it would have been paralysed operationally.

60. By relying on correspondent banks such as TD Bank, SIB eventually operated in approximately 113 countries and by late 2008 reported that it held approximately US$8.5 billion

in assets under management. SIB's 2007 Annual Report stated that SIB had in excess of 50,000 clients. When any customer of SIB wished to make a U.S. or Canadian dollar deposit with SIB by electronic funds transfer, they were directed to remit their value electronically to SIB's correspondent accounts at TD Bank.

61. In addition to TD Bank, SIB was also provided the following banking services:

(a) correspondent banking services by HSBC Bank PLC ("HSBC") in the United Kingdom. HSBC received all EURO and British Pound Sterling wire transfer payments from SIB's depositors;

(b) Republic Banchsares of Texas, Inc., which was later acquired by Trustmark National Bank (together, "Trustmark"), received U.S. dollar cheque deposits as correspondent bank to SIB, but refused to accept any wire transfers on behalf of SIB. Such cheques were sent by SIB customers to SIB in Antigua, which in turn bundled and delivered them for deposit into SIB's accounts held at Trustmark in Houston; and

(c) SocGen provided what have been referred to as secret "slush fund" accounts for SIB. It has been alleged that bribes to SIB's auditor, to Leroy King of the Financial Services Regulatory Commission of Antigua (the "FSRC"), and to others were funded from accounts at SocGen.

B. SIB's Products and Services

62. SIB offered six different deposit products to customers: fixed CDs, flex CDs, index linked CDs, premium accounts, performance accounts and express accounts. SIB customers

almost exclusively purchased CDs. SIB also offered other products to customers, but the availability of such products was tied to the need for customers to hold accounts with SIB, almost always in the form of CDs. Such products included Visa, Mastercard and American Express credit card services, as well as loan facilities, letters of credit, letters of guarantee and private banking services. Thus, for example, SIB required customers to maintain a CD with SIB as security in order to acquire a credit card and SIB placed holds on customers' CDs in an amount twice that of their credit card limits.

63. In addition, SIB engaged in various investment banking services. Such services included multi-million dollar public equity dealings, private placements, mergers and acquisitions and debt financings, all of which were undertaken for an array of clients in various locations around the world. SIB assembled a team of professionals from various industry-leading financial firms to provide its investment banking services.

64. SIB primarily sold its CDs through SIB-affiliated companies. Most notably, these companies included:

(a) the Stanford Financial Group ("SFG"), which was based in Houston, Texas and reported to have more than US$50 billion "under advisement";

(b) the Stanford Group Company ("SGC"), which was an investment dealer and broker dealer based in Houston, Texas. It registered with the SEC in 1996;

(c) the Stanford Trust Company, Ltd. ("STC"), a trust company organized under the laws of Antigua that as of 1998 operated a foreign trust representative office in

Miami, Florida and carried on business as "Stanford Fiduciary Investory Services";

(d) SIB itself through its Montreal, Québec office; and

(e) Numerous affiliated company offices in Latin and Central America, as well as in Zürich, Switzerland.

65. SIB's annual reports consistently disclosed that SIB had a portfolio that produced returns of over 10 percent.

66. SIB's Annual Reports disclosed that SIB's auditors were C.A.S. Hewlett & Co. Ltd., a small accounting firm based in Antigua.

67. Financial advisors and SIB employees sold SIB CDs using information such as investment return figures and promotional materials that had been provided or were based on information prepared by Stanford and the Other Insiders. Thus, on the basis of the representations that Stanford and the Other Insiders caused to be made, SIB sold billions of dollars of CDs.

68. As illustrated by the graph below, between approximately 1990 and 2009, SIB grew its business exponentially from approximately US$14 million in CD investments while operating as Guardian in Montserrat to approximately US$8 billion in CD investments by 2009.

C. TD Bank Provided Services to Stanford-Owned Entities

1. TD Bank Improperly Opened the SIB Accounts

69. In approximately 1992, TD Bank acquired some of the Bank of New York's interests in Canada. These interests included the Bank of New York's then existing correspondent banking relationships with approximately 20 banks located throughout the Caribbean. Three of these banks were based in Antigua, namely (i) the Stanford-owned domestic Antiguan bank, BOA, (ii) the domestic Antiguan bank, Antigua Overseas Bank, the share capital of which was owned by William Cooper ("Cooper") and (iii) another Antiguan domestic bank, Antigua Barbuda Investment Bank ("ABIB"). TD Bank thus acquired its way into becoming the correspondent bank for BOA.

70. As domestic Antiguan banks, BOA, Antigua Overseas Bank and ABIB primarily used TD Bank's correspondent banking services to provide limited services to Antiguans who required services in Canada to conduct transfers or effect foreign currency exchanges involving minimal amounts of money. Because TD Bank was not the originator of these correspondent accounts (in that Bank of New York had established them), TD Bank never conducted any KYC or AML due

diligence inquiries in respect of the counter-party banks in the Caribbean. TD Bank thus "grandfathered" the noted three Antiguan banks' correspondent banking relationships. The BOA, Antigua Overseas Bank and ABIB correspondent accounts showed relatively minor activity.

71. Following TD Bank's acquisition of some of the Canadian interests of the Bank of New York, Cooper asked TD Bank to establish a correspondent bank account for AIB, the Antiguan domiciled international banking company also owned by Cooper. The "grandfathering" of Antigua Overseas Bank by TD Bank's acquisition of some of the Bank of New York's Canadian interests thus allowed Cooper to present AIB as an affiliate of a pre-existing correspondent customer of TD Bank. Since TD Bank was already doing business with a Cooper-owned bank, TD Bank agreed to allow AIB to establish its own correspondent account. No KYC or AML due diligence inquiries were completed by TD Bank in respect of AIB or Cooper. AIB and Cooper thus entered into TD Bank's Caribbean correspondent banking division through a "side door" and not the "front door".

72. If it adhered to the KYC and AML compliance standards of a reasonable bank, TD Bank would have insisted that AIB come through the "front door" and, in turn, TD Bank would have properly vetted AIB and Cooper and refused to accept AIB as a customer. TD Bank did not do so. The activities of AIB and Cooper subsequently gave rise to a number of successful criminal prosecutions in the late 1990s by U.S. law enforcement authorities for laundering the proceeds of certain advance fee and other frauds. Cooper remains a fugitive of U.S. Justice.

73. The same explanation for how AIB got to enjoy correspondent banking privileges at TD Bank applies to SIB.

74. Around the same time that TD Bank acquired its correspondent relationship with BOA, SIB (the successor of Guardian, which just previously had its license revoked in Montserrat) attempted to use various U.S.-based banks for its correspondent banking purposes. This made sense, as the vast majority of purchases of SIB CDs were made with U.S. dollars. However, after conducting due diligence, each of these banks ultimately declined to provide correspondent banking accounts to SIB or quickly closed such accounts due to concerns over money laundering or other impropriety. As a result of its inability to acquire correspondent banking services from a U.S.-based bank, SIB applied for such services from TD Bank in Canada.

75. TD Bank did not conduct KYC or AML due diligence inquiries when SIB applied for correspondent bank accounts. Instead, because TD Bank already had a correspondent banking relationship with the Stanford-owned BOA, TD Bank allowed SIB to "piggyback" onto BOA's antecedent relationship for KYC and AML compliance purposes. In other words, like with AIB, TD Bank allowed SIB to access its services through the "side door" and not the "front door".

76. Consistent with this sloppy approach (and according to TD Bank itself), TD Bank has no record of account opening applications being completed by SIB or there being any written contracts in respect of SIB's correspondent bank accounts. In fact, it appears the only written contracts that at any time purported to govern the TD Bank's provision of correspondent banking services to SIB were TD Bank's standard form unilateral contracts in respect of correspondent banking that did not address SIB in any specific manner. Such unilateral contracts arose for the first time only in 1998 but did not contain any substantive legal terms until less than two years prior to SIB's collapse.

77. If TD Bank adhered to the KYC and AML compliance standards of a reasonable bank, it would have insisted that SIB come through the "front door" and would have also properly vetted SIB and Stanford and refused to accept SIB as a customer. TD Bank did not do so.

78. The reasons that TD Bank was required to refuse to accept SIB as a customer are extensive and are detailed further below. Most simple and straightforward, however, was that Stanford was formally declared bankrupt in 1984 with personal debts in excess of US$13 million. It is widely accepted in the banking community that an individual who has been personally bankrupted is not a fit and proper person to own or manage a bank.

79. Stanford's personal bankruptcy was a matter of public record. Therefore, a basic public records database search would have revealed Stanford's lack of fitness to own or manage SIB. In fact, this was one of the very reasons that led Montserrat to revoke Guardian's banking license. Similarly, when Guardian sought a license from the Eastern Caribbean Central Bank (the "ECCB") to own a trust company, the ECCB determined that Guardian was not permitted to hold such a license due to Stanford's bankruptcy.

80. Another significant factor indicating that TD Bank should never have provided services to SIB was that there was clearly no legitimate purpose for SIB to hold correspondent bank accounts in Toronto. Among other reasons, this was because, at the time the TD Bank-SIB relationship commenced, SIB had no Canadian customers and thus transacted no business in Canadian dollars. Instead, at that time and throughout the period that TD Bank provided banking services to SIB, the vast majority of investor funds transacted were in U.S. dollars.

81. Wire transfers were critical to the operation of SIB and, in turn, the SIB Looting. Without them, SIB would have had no means to quickly or efficiently complete any transaction, a clearly

necessary feature of modern commerce. Without access to wire transfers, SIB, as an offshore Antiguan bank, would have been dependent on delivery of physical cash or cheques to complete any transaction, a commercially untenable situation particularly since SIB's customers were located around the world.

82. Normal practice is that U.S. dollar correspondent bank accounts are provided by U.S. banks. Although, as a Canadian bank based in Toronto, TD Bank was permitted to undertake U.S. dollar transactions, it was not permitted to clear U.S. dollar wire transfers in Canada. This was significant because the vast majority (if not all) U.S. dollar deposits into SIB's correspondent bank accounts were received by wire transfer. Instead, TD Bank was required to rely on U.S. banks to serve as intermediaries to clear U.S. dollar wire transfers.

83. Accordingly, TD Bank at all relevant times required and relied upon the clearing services of a U.S. bank to complete most basic transactions for SIB. For instance, for at least part of the period that TD Bank provided correspondent banking services to SIB, U.S. wire transfers were routed through and cleared by Bank of America in New York City. This is rather ironic given that Bank of America had previously refused to continue providing correspondent banking services to SIB. Such arrangements were maintained by SIB and TD Bank notwithstanding that reliance on U.S. intermediary banks resulted in fees being incurred by SIB and/or SIB customers that would not have been incurred had SIB simply relied on a U.S. bank for its U.S. dollar correspondent banking services. Using such arrangements, TD Bank provided access to the U.S. financial system that otherwise was unavailable to SIB.

2. The Provision of Banking Services by TD Bank

84. From the time the SIB TD Bank accounts were opened, TD Bank and TD Waterhouse together opened and maintained approximately 11 separate accounts for SIB and other Stanford-owned entities. Among other things, those accounts facilitated all of SIB's U.S. dollar wire transfers. When SIB eventually obtained Canadian customers, TD Bank also provided such services for Canadian dollar transfers. However, in total, SIB only had 159 Canadian customers who together invested less than CAD$50 million with SIB. In contrast, SIB at large had in excess of 21,000 customers that invested approximately US$10 billion, primarily in U.S. dollars.

85. The provision of correspondent banking services is both a competitive and lucrative business for banks. Banks seek out valuable correspondent banking relationships because they can generate substantial "fee from free balances" revenue overnight for the bank that is the provider of the relevant services. Transaction fee revenue is also a source of income from correspondent banking relationships.

86. During the 1990s and early 2000s, TD Bank's largest correspondent bank customers were generally properly capitalised and regulated banks from the United States. In 1999, the total revenue generated by TD Bank from the provision of correspondent banking services to banks in the Caribbean did not exceed CAD$1 million. At that time, SIB's reported assets were also limited. For instance, at the end of 1999, SIB reported having US$676,236,000 in assets and US$623,560,000 in liabilities to depositors.

87. However, the exponential growth of SIB's balance sheet from approximately 2002 until late 2008 (during which time approximately US$9 billion of SIB CDs were sold to depositors)

altered the profile of SIB from that of a relatively minor source of business into that of a major correspondent bank customer and a significant source of revenue for TD Bank.

88. For instance, between December 31, 2005 and December 31, 2007, TD Bank reported annual increases of corporate banking revenue of 8% (for 2006) and 17% (for 2007), which reflected annual corporate banking revenue rising from CAD$266 million in 2005 to CAD$287 million and CAD$337 million in 2006 and 2007, respectively. In both years, these increases in corporate banking revenue were reported by TD Bank as being "largely due to higher net interest income from correspondent banking deposits and higher lending volumes." At the same time, between December 31, 2005 and December 31, 2007, SIB's reported assets grew from US$4.1 billion to US$7.1 billion. By the last year of SIB's operations – between January 2008 and February 2009 – approximately US$2,539,762,421.22 was credited to SIB's TD Bank account number 360012161670.

89. As a result, by 2008, SIB had become TD Bank's single largest correspondent banking customer not just in the Caribbean, but worldwide. This was the case notwithstanding that TD Bank had hundreds if not thousands of correspondent banking relationships, including with major U.S. banks and other globally-recognized banks from around the world. Until the growth of SIB, such banks constituted TD Bank's largest correspondent banking customers.

90. Notably, in 1996, TD Bank closed AIB's correspondent account. This decision was based on, among other things, the fact that the amounts moving through the AIB account at TD Bank were too large to be associated with a legitimate bank in Antigua. TD Bank determined that an offshore bank in Antigua that generated a large sum of money was a "red flag".

91. At that same time, the amounts running through SIB's correspondent bank accounts at TD Bank were comparable to the amounts running through AIB's account and soon after escalated dramatically. This escalation occurred during the period that the risk of doing business with Antiguan financial institutions also greatly increased in notoriety, which is detailed below. However, unlike with AIB, TD Bank continued to provide correspondent banking services to SIB.

92. In addition, TD Bank provided banking services including credit to the Stanford-owned Caribbean Star Airlines. SIB secured the credit provided to these entities through a U.S. dollar account held by SIB at TD Bank.

93. Further, TD Waterhouse managed discretionary investment portfolios for both SIB and BOA throughout the period that TD Bank provided correspondent banking services to SIB. The investment strategy employed by TD Waterhouse was the same for both the SIB and BOA portfolios.

94. TD Bank also provided trade financing and treasury services to SIB. In addition, in connection with loans, advances and other obligations that SIB had with TD Bank, SIB pledged to TD Bank its security holdings with TD Waterhouse.

95. During the years that SIB and BOA maintained investment portfolios with TD Waterhouse, those portfolios were managed by John Pepperell, who was the Vice Chairman of TD Waterhouse, and Perry Mercer.

96. From 2002 until SIB's collapse in 2009, James Zachariah Davis ("Zack Davis"), who is the son of Davis, was a research analyst at SFG. Zack Davis' job as a research analyst at SFG

entailed monitoring and providing instructions with respect to the SIB and BOA portfolios that were managed by TD Waterhouse. He dealt directly with Perry Mercer (who according to Zack Davis was a long-time friend of Davis) and others at TD Bank and TD Waterhouse.

D. Stanford and the Other Insiders Looted SIB

97. As CEO, director and Chairman of the Board of Directors of SIB, Stanford owed fiduciary duties to SIB, as did the Other Insiders, including Davis.

98. Section 95 of the *IBC Act* provides that Stanford and the Other Insiders had a duty to "act honestly and in good faith with a view to the best interests of the corporation" and to "exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances."

99. In addition, Stanford and the Other Insiders owed common law fiduciary duties to SIB. Such duties paralleled those owed by Canadian corporate executives and included, among other things, the duty to:

(a) act with loyalty, good faith, and honesty;

(b) avoid conflicts of interest and duty;

(c) use all of their energy, ability, and imagination in the best interests of SIB;

(d) develop business opportunities for the sole benefit of SIB; and

(e) not conceal any information from SIB.

100. However, in breach of their fiduciary duties, Stanford and the Other Insiders converted customer funds used to purchase CDs from SIB for improper purposes, including for their own use, and implemented and orchestrated the SIB Looting to defraud SIB and its customers.

101. In particular, the investment strategy and rates of return promised to SIB customers by Stanford and the Other Insiders were not as claimed. Under the direction and at the instigation of Stanford and the Other Insiders, several billion dollars of funds provided to SIB were diverted for the personal benefit of Stanford and the Other Insiders. As a result, SIB was the victim of acts of larceny and breaches of the fiduciary duties owed to it by Stanford and the Other Insiders.

102. Stanford and the Other Insiders separated the funds received by SIB from its customers into three tiers. Tier I contained cash or cash equivalents, while Tier II consisted of various portfolios of investments that were managed at arm's length by third party financial institutions, including TD Waterhouse, together with a small amount of cash or cash equivalents.

103. By maintaining Tiers I and II and allowing SIB employees and executives to undertake discrete tasks with respect to them, Stanford and the Other Insiders were able to deceive honest SIB employees and others. This deception allowed Stanford and the Other Insiders to use Tier III to effect the SIB Looting.

104. Tier III was the most financially-significant tier at SIB, consisting of the vast majority of SIB's funds. It was managed by Stanford and the Other Insiders and they kept its true contents secret.

105. SIB employees, executives and directors either did not know of the existence of Tier III or, if they did know, had no knowledge whatsoever of its contents and were under the impression

it was being legitimately managed. In fact, information relevant to the true contents of Tier III was not even kept on SIB's computer systems and Stanford and the Other Insiders used forged documents to deceive SIB employees, executives and directors as to the true nature of SIB's underlying assets. The real information in respect of Tier III was stored on an external drive that Stanford and the Other Insiders commonly called "the football" and kept with them at all times.

106. Once Stanford and the Other Insiders had directed SIB's funds into Tier III, instead of investing them as represented to SIB customers, employees, officers, executives and others (the "**SIB Stakeholders**"), they misappropriated and misapplied the funds by placing them into speculative, largely illiquid investments (namely real estate and private equity), diverting them to other companies owned by Stanford, using them to fund their own lavish lifestyles, and making large concealed and unsecured SIB shareholder loans to Stanford, none of which were repaid. Accordingly, Stanford and the Other Insiders acted to the detriment of SIB and the SIB Stakeholders for their own financial gain.

107. In addition, Tier III funds were used to hide the SIB Looting. In particular, Stanford and the Other Insiders diverted Tier III funds generated by SIB from the sale of CDs to pay purported interest on and redemptions of the CDs as required, thereby deceiving SIB customers, employees, executives and others, and allowing the continuation of the SIB Looting. Concealing the fraud in this manner resulted in the SIB Looting taking on the characteristics of a "Ponzi" scheme.

108. During his orchestration of the SIB Looting, Stanford in particular led a lavish lifestyle financed exclusively with SIB's funds that he had converted to his own use. Among other things, he enjoyed the use of a US$10 million Florida mansion and a fleet of private jets (valued at

approximately US$100 million). He also took extravagant and expensive vacations costing up to US$100,000 and would often rent US$100,000/week yachts.

109. In order to conceal the SIB Looting from the SIB Stakeholders, Stanford and the Other Insiders routinely caused false entries to be made in SIB's accounts. Specifically, Stanford and the Other Insiders caused, among other things:

(a) false entries to be made into SIB's ledgers for the purpose of reporting false or unjustifiably inflated revenues and/or false or unjustifiably inflated investment portfolio balances and asset values, and:

(i) such false entries to be submitted to SIB's regulator in Antigua, the FSRC, and/or

(ii) such false entries to be represented to potential investors in SIB's CDs in order to encourage investments in CDs;

(b) copies of SIB bank statements to be forged; and

(c) false and/or unjustifiably inflated increases in assets to be recorded in SIB's annual reports and promotional materials.

110. As a result of Stanford and the Other Insiders' directions, SIB's annual reports falsely claimed increases in the value of SIB's assets from approximately US$760 million in 2000 to US$8.5 billion in December 2008. In reality, SIB only had approximately US$500 million in identifiable or traceable assets at the time of SIB's collapse only two months later in February 2009.

## IV. THE COLLAPSE OF SIB

111. By the Fall of 2008, owners of SIB CDs began demanding redemptions of those CDs in increasing numbers. At the same time, SIB was increasingly experiencing difficulties generating new sales of SIB CDs. This scenario was prompted by the financial crisis in 2008.

112. As a result, by October 2008, SIB was left with no choice but to liquidate its accounts held at TD Bank and TD Waterhouse, among others, in order to pay interest and redemption rates owed to customers. TD Bank facilitated this liquidation primarily at the instruction of the Chief Investment Officer of SFG, Laura Pendergest-Holt ("Pendergest-Holt") and Zack Davis. The liquidation included both SIB and BOA assets. TD Bank did not take any steps to investigate why the liquidations were occurring or alter the services it provided to SIB or BOA except to monitor the situation from the perspective of its own credit risk.

113. By at least January 2009, the SEC began subjecting SIB to intense scrutiny. It demanded that SIB provide an itemized list of all assets in SIB's portfolios and all of SIB's financial and accounting documents. The SEC also informed various SIB executives and officers that it sought their testimony.

114. Soon thereafter, in early February 2009, Davis called a meeting with all of SIB's top executives in Miami, Florida, At that meeting, at which Stanford was not present, Davis informed the executives of the SIB Looting. The executives had no idea about the SIB Looting or the contents of Tier III prior to the meeting. According to Davis, upon hearing of the SIB Looting, the SIB executives' reaction was one of "shock".

115. On February 16, 2009, the SEC filed civil charges against SIB and its related entities, and against Stanford, Davis and Pendergest-Holt. In doing so, the SEC alleged "massive ongoing

fraud" involving SIB CDs. That same day, the SEC obtained an injunction preventing SIB and its related entities from carrying on business and the appointment of an equity receiver from the U.S. District Court in Dallas, Texas.

116. Similarly, on February 19, 2009, the FSRC appointed receiver-managers of SIB. This appointment was continued by the High Court of Justice of Antigua on February 26, 2009, which thereafter determined that SIB should be liquidated and dissolved under the supervision of the Antiguan court pursuant to the *IBC Act*. The Former Liquidators were thereby appointed.

117. Despite the unique window into SIB provided by the extensive banking services it provided and the duty that TD Bank had to understand the true nature of SIB's affairs, until the SEC issued a freezing order on March 12, 2009, TD Bank took absolutely no steps whatsoever to limit SIB's banking activities, to report SIB's numerous irregularities to any regulatory authority or to take any other action that would have prevented the losses suffered by SIB and its customers in connection with the SIB Looting.

118. By Order of the Ontario Superior Court of Justice (Commercial List) dated April 24, 2009 (and subsequently extended) in Court File No. CV-09-8154-00CL (*Attorney General of Ontario v. The Contents of Various Accounts Held with TD Bank and TD Waterhouse* in rem), TD Bank was ordered to pay into court all of the monies it held on behalf of SIB.

119. On June 18, 2009, a federal grand jury returned a 21-count indictment against, among others, Stanford and Pendergest-Holt. The grand jury indictment charged Stanford and Pendergest-Holt with various offences including conspiracy to commit mail, wire and securities fraud, wire fraud, mail fraud, conspiracy to commit money laundering and conspiracy to obstruct an SEC investigation.

120. On March 6, 2012, Stanford was convicted of 13 of the 14 counts remaining against him, including those in relation to his fraud and conspiracy. On June 14, 2012, he was sentenced by U.S. District Judge David Hittner who commented that Stanford had orchestrated "one of the most egregious frauds ever presented to a trial jury in federal court." Stanford was sentenced to 110 years in prison and ordered to forfeit US$5.9 billion.

121. On June 21, 2012, Pendergest-Holt pled guilty to obstructing the SEC's investigation into the misconduct of Stanford and the Other Insiders. However, the other counts against Pendergest-Holt were withdrawn after the SEC's investigation revealed that she did not know of Tier III or the fraud on SIB until Davis disclosed them at the February 2009 meeting in Miami, Florida referred to at paragraph 113. This was the case notwithstanding Pendergest-Holt's role as the Chief Investment Officer of SGF and her close personal relationships with Stanford and Davis. On September 13, 2012, Pendergest-Holt was sentenced to three years in prison and three years of supervised release.

122. On August 27, 2009, Davis entered into a plea arrangement whereby, in exchange for his co-operation, he was convicted of conspiracy to commit mail, wire and securities fraud, and conspiracy to obstruct an SEC investigation. Davis was sentenced to five years of prison, three years of supervised release and had a judgment of US$1 billion ordered against him.

123. SIB has at no point been indicted or charged with any offense in connection with the SIB Looting. Similarly, other than Stanford, members of SIB's Board of Directors have at no point been indicted or charged with any offence in connection with the SIB Looting, nor have any other senior executives of SIB such as its Presidents. SIB and the SIB Stakeholders were deceived by Stanford and the Other Insiders.

## V. FURTHER RED FLAGS

### A. Banking Services Should Not Have Been Provided to an Offshore Antiguan Bank

124. During the period that TD Bank provided correspondent banking services to SIB, international regulators and government authorities publicly identified that Antigua needed to improve its banking regulations to prevent money laundering and criminal activity.

125. At least as early as 1996, the U.S. State Department's International Narcotics Control Strategy Report ("INCSR") highlighted weaknesses in Antigua's banking system related to money laundering. The report noted inadequate regulation and a surge in questionable banking operations in Antigua. These findings were reiterated in the INCSRs of the subsequent years. The 2003 Report indicated that money laundering in Antigua was related to fraud schemes and that money laundering occurs more often in the offshore sector than in the domestic finance sector.

126. Although the Antiguan government subsequently passed the *Money Laundering (Prevention) Act* of 1996, the U.S. criticism of Antiguan banking laws persisted.

127. Consequently, the Antiguan government formed the Antiguan Offshore Financial Sector Planning Committee to advise the government and recommend additional changes to its banking laws. Despite being likely the most prominent individual in the very industry the Committee was designed to evaluate, and the owner of the largest offshore bank in Antigua, SIB, Stanford was appointed Chairman of the Committee in 1997. Stanford was appointed by then Antiguan Prime Minister Bird, whose election campaign Stanford had been a major contributor to.

128. As Chairman of the Committee, Stanford created a "task force" that was charged with considering improvements to Antigua's banking laws. Stanford paid the expenses of establishing

the task force out of his own pocket, creating a clear conflict of interest. In addition, members of the task force were based in the U.S. and were historically connected with and had received funds from Stanford.

129. Ultimately, the task force recommended removing various offenses from Antigua's banking laws, including "false accounting" and "fraud", all activities that Stanford himself was actively involved in through his operation of the SIB Looting. As a result of the recommendations of the task force, in November 1998, the government of Antigua amended the *Money Laundering (Prevention) Act*. The changes substantially weakened the Act's ability to address money laundering.

130. In addition, the government changed the supervision of its offshore financial sector by vesting authority over that sector in a new International Financial Sector Authority (the "IFSA"). Incredibly, Stanford was appointed Chair of the IFSA and one of Stanford's U.S. lawyers also served on the IFSA along with Stanford's Antiguan lawyer, Errol Cort, who was also the Attorney General of Antigua at that time. In essence, Stanford had been appointed to run the regulator that was tasked with overseeing the very industry that Stanford did business in.

131. The aforementioned process of banking reforms was intensely and publicly criticized, with Stanford's involvement in the process playing a central role in the criticisms. Notably, it also prompted the U.S. Treasury Department, through its Financial Crimes Enforcement Network ("FinCEN"), to issue an extraordinary advisory in April 1999 (the "FinCEN Advisory"), as appears from the FinCEN Advisory No. 11 dated April 1999. The FinCEN Advisory stated, among other things, that:

(a) "In November 1998, the government of Antigua and Barbuda amended its Money Laundering (Prevention) Act in a manner that significantly weakened that Act";

(b) "The [new International Financial Sector Authority's] Board of Directors includes representatives of the very institutions the Authority is supposed to regulate, thus raising serious concerns that those representatives are in fact in control of the Authority, so that the Authority is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards";

(c) "The amendment of the Money Laundering (Prevention) Act, combined with changes in Antigua and Barbuda's treatment of its offshore financial services sector, are likely to erode supervision, stiffen bank secrecy, and decrease the possibility for effective international law enforcement and judicial cooperation";

(d) the combination of these actions "raise questions about the purposes of transactions routed into or out of Antigua and Barbuda or involving entities organized or domiciled, or non-resident persons maintaining accounts in Antigua and Barbuda"; and

(e) "Enhanced scrutiny is especially important for transactions involving Antigua and Barbuda offshore banks, transactions involving both Antigua and Barbuda offshore banks and the nine commercial banks licensed to do business in Antigua and Barbuda, and transactions in which one or more of such nine commercial banks act for one or more Antigua and Barbuda offshore institutions."

132. The FinCEN Advisory was significant. It constituted only the second time in history the U.S. Treasury Department had released an advisory targeting a specific country. The United Kingdom also issued a similar advisory in April 1999.

133. Further, it was apparent that the FinCEN Advisory was specifically referring to Stanford when it warned that the Antiguan International Financial Sector Authority's Board of Directors included "representatives of the very institutions the Authority is supposed to regulate" and that the "Authority is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards."

134. In May 1999, U.S.-based attorney Carlos E. Loumiet, who was one of Stanford's lawyers and an architect of Antigua's AML laws, publicly responded to the FinCEN Advisory. While ultimately refuting the FinCEN Advisory, Loumiet conceded that there was "considerable, indisputable merit" to the U.S. concerns about the "inherent potential conflicts of interest" with respect to having private banking representatives such as Stanford on Antigua's International Financial Sector Authority.

135. Around the same time, Jonathan Winer, then the head of the U.S. State Department's Bureau for International Narcotics and Law Enforcement Affairs publicly stated that Antigua was "one of the most attractive financial centres in the Caribbean for money launderers."

136. In or around 2000, James Johnson, the U.S. Treasury Department's Undersecretary of Enforcement, complained in a letter to then Antiguan Prime Minister Bird, that Antigua had compromised its laws against money laundering and created a conflict of interest by allowing Stanford and other banking officials to sit on the regulatory board. He noted in the letter that the Financial Sector Authorities' seizure of bank documents from a civil servant "raises substantial

questions as to Antigua and Barbuda's commitment to provide effective supervision of its offshore sector."

137. In 2000, the Organization for Economic Cooperation and Development published a report containing a list of countries whose regulations were deemed designed to help people avoid paying taxes in their home countries and Antigua was on that list.

138. In 2001, the U.S. Senate's Minority Staff of the Permanent Subcommittee on Investigations' issued a report entitled "Report on Correspondent Banking: A Gateway for Money Laundering" dated February 5, 2001 ("**U.S. Senate Report**"). The U.S. Senate Report specifically named TD Bank as having provided correspondent banking services to AIB, an Antiguan financial institution that had been found to be engaged in fraud.

139. The U.S. Senate Report identified that AIB had fallen into liquidation after it laundered millions of dollars and collapsed from insider abuse, insufficient capital and the sudden withdrawal of deposits. TD Bank's involvement in this fraudulent scheme appeared as a case study in the U.S. Senate Report which identified that correspondent accounts are particularly vulnerable to money laundering and provide corrupt foreign banks access to the U.S. financial system and the freedom to move money around the world. With respect to TD Bank's relationship with the Antiguan AIB, it concluded, among other things, that:

(a) TD Bank was used to receive wire transfers from fraud victims and/or to disburse the illicit funds to accounts controlled by the criminals; and

(b) TD Bank in Canada was a major conduit for AIB funds in to the U.S. banking system and that between June 1996 and January 1997, US$20.9 million was wired to the AIB correspondent account from the account at TD Bank in Canada.

140. It was apparent from the U.S. Senate Report that TD Bank representatives were interviewed and asked to produce documents regarding TD Bank's relationship with AIB. These requests occurred while Stanford orchestrated the SIB Looting and while TD Bank provided correspondent banking services to SIB. Despite this, TD Bank apparently failed to adequately review, investigate or monitor its other Antiguan based correspondent bank accounts, including those of SIB and BOA. In addition, at the same time, TD Waterhouse continued to manage investment portfolios for SIB and BOA.

141. In 2003, and continuing at least until 2007, the U.S. State Department's INCSRs listed Antigua as a "jurisdiction of major concern" on its list of Major Money Laundering Countries.

142. In or around February 2007, Antiguan Prime Minister Baldwin Spencer accused Stanford of "political interference" after Stanford stated he would be touring the 17 constituencies in Antigua outlining his proposals for future development. Stanford also met with a committee of the Antiguan Cabinet and leaders of the opposition party to outline his investment program.

143. Further, at relevant times, the FSRC employed only three individuals to examine the affairs of all Antiguan banks. This was the case despite the fact that Antigua's Gross Domestic Product amounted to only a fraction of the assets claimed to be deposited at SIB alone during the same period.

144. TD Bank was aware of the extensive and public condemnation of Antigua's banking regulations and AML practices, as well as Stanford's well-publicized involvement with and manipulation of Antigua's regulatory regime.

145. The FinCEN Advisory was particularly relevant to TD Bank's relationships with SIB and BOA. This was because, at the time of the FinCEN Advisory, TD Bank had only two correspondent banking relationships with Antigua-based banks: SIB and BOA. The FinCEN Advisory therefore served as an express warning to TD Bank that banking services should not have been provided to SIB or BOA.

146. On September 29, 1999, Davis wrote to John Pepperell of TD Waterhouse to address "reports in the media [of] questionable banking practices, which involve transactions with financial institutions located in offshore jurisdictions"; a clear reference to the FinCEN Advisory and associated media reports. At the same time, Davis offered to have SIB's legal department "present [SIB's] comprehensive program to [TD Bank's] compliance department or others within your organization."

147. A TD Waterhouse employee responded to Davis' letter, noting simply that SIB's "cognizance of this problem and commitment to ensure your offshore bank officers know how to deal with this issue is assuring to us" and that it would "not be necessary" to have "[SIB's] legal department present your comprehensive program to our compliance department." Neither TD Bank nor TD Waterhouse took any steps to limit or review the banking services provided to SIB as a result of the FinCEN Advisory.

148. TD Bank was required to know the foregoing information in respect of Antigua and Stanford's influence there. Had TD Bank undertaken reasonable due diligence in respect of SIB

and Stanford, it would have discovered such information. That information alone indicated that banking services should not have been provided to SIB. However, even if banking services continued to be provided, the information revealed by a reasonable amount of due diligence in respect of Antigua at the very least indicated that TD Bank was required to undertake enhanced due diligence with respect to SIB, its business, Stanford and SIB's TD Bank accounts. To the extent that TD Bank did not undertake such enhanced due diligence, TD Bank failed to act as a reasonable bank would have in the same suspicious circumstances.

149. TD Bank was aware of sufficient information such that it knew or ought to have known that, or was recklessly or willfully blind to the fact that, Stanford and SIB were high risk customers that should not have been provided with the privileges and access that a correspondent banking relationship with TD Bank provides.

B. TD Bank Had an Exclusive Window Into SIB's Affairs

150. TD Bank's unique position provided it with sufficient information amounting to knowledge of the SIB Looting. This unique positioning was a result of the fact that:

(a) TD Bank provided correspondent banking services to SIB;

(b) TD Bank provided correspondent banking services to BOA;

(c) TD Bank provided banking services to Caribbean Star Airlines;

(d) TD Bank provided trade financing and treasury services to SIB;

(e) TD Waterhouse managed an investment portfolio for SIB; and

(f) TD Waterhouse managed an investment portfolio for BOA.

151. Each of these relationships required TD Bank and TD Waterhouse to obtain substantial information from a Stanford-owned entity in order to commence and continue the relationship. TD Bank was in the unique position of being able and duty bound to ask questions and require satisfactory answers from SIB, Stanford and the Other Insiders. Each relationship also uniquely positioned TD Bank to understand the transactions that were being undertaken by those Stanford-owned entities, as well as the relationship between those entities.

152. TD Bank has admitted that it had access to SIB's financial statements. It has further admitted that it did not conduct in depth reviews of those statements. This is an example of TD Bank not availing itself of its exclusive window into SIB's affairs as it was required to do.

153. In addition to having complete access to and control of all of SIB's accounts held at TD Bank and TD Waterhouse, TD Bank personnel had the opportunity to and in fact did visit, among other places, SIB's headquarters in Antigua and SFG's headquarters in Houston, Texas. The stated purpose of such visits was to conduct due diligence, including meeting senior SIB personnel and examining first hand SIB's operations.

154. For instance, in 1999 or 2000, a meeting took place between Stephen Cullen ("Cullen"), Bill Sebenski ("Sebenski") and John Leckie ("Leckie"). At that time, Sebenski had recently taken over Cullen's role as TD Bank's Managing Director of Correspondent Banking for the Caribbean and Latin America and both Cullen and Sebenski reported directly to Leckie, TD Bank's General Manager of Trade Finance and Correspondent Banking. At the meeting, Leckie inquired whether TD Bank really understood SIB's business. This inquiry was made notwithstanding that SIB had become a significant correspondent banking client of TD Bank and Leckie was responsible for overseeing the TD Bank-SIB relationship. Since both Cullen and

Sebenski answered that they in fact did not understand SIB's business, both were sent by Leckie to Houston, Texas to meet with SIB and SFG personnel.

155. After the due diligence trip to Houston, Texas, Cullen informed Sebenski that he was uncomfortable with TD Bank's continued correspondent banking relationship with SIB. Cullen further informed Sebenski that TD Bank needed to conduct a due diligence investigation of SIB and apply a strict KYC standard because "something did not seem right". However, TD Bank either did not conduct such an investigation or did so and nonetheless continued to provide correspondent banking services to SIB.

156. In fact, over the period that TD Bank provided correspondent banking services to SIB, TD Bank personnel took at least 15 trips to meet with SIB and/or SFG personnel in Antigua or Houston. TD Bank was able to and did set the agenda for such visits, including by indicating to SIB what information TD Bank would require during such visits. In addition, SIB personnel met with TD Bank personnel responsible for the SIB correspondent banking relationship in Toronto and at SIB's Montreal office on various occasions, as well as in other locations around the world including Miami, Memphis, New York, Vienna and London, England.

157. However, although TD Bank was required to take trips to meet with SIB personnel and thoroughly examine SIB's operations, the visits between TD Bank and SIB personnel consisted primarily of expensive meals, high-priced accommodations and social events such as participating in or attending at PGA golf Pro-Am tournaments and cricket tournaments hosted by Stanford. Further, to the extent that TD Bank did undertake due diligence during such visits, that due diligence was inadequate. For instance, TD Bank focused on questions concerning SIB's customers. Although TD Bank was required to ask such questions, it was also required to ask

questions and demand satisfactory answers in respect of SIB's own operations and affairs, including in respect of Stanford personally, but failed to do so.

158. The Applicable Standards (which are discussed below at paragraphs 241 to 309) required TD Bank to aggregate all of the information acquired by TD Bank and TD Waterhouse in the course of providing the aforementioned services to Stanford-owned entities and to consider that information holistically when determining whether it was appropriate to provide correspondent banking services to SIB.

159. For example, in accordance with the Applicable Standards, TD Bank was required to "know" SIB and understand its business operations prior to agreeing to act as correspondent bank. As a result, at the time that TD Bank began providing correspondent banking services to SIB, TD Bank was required to know that SIB had neither Canadian customers nor business connections to Canada. TD Bank was also required to know that, while it had agreed to accept wire transfers in both Canadian and U.S. dollars, because SIB did not have Canadian customers, the wires processed by TD Bank would be exclusively in U.S. dollars. Similarly, TD Bank should have determined if other financial institutions had denied or ceased to provide correspondent banking services to SIB.

160. Moreover, TD Bank knew that by agreeing to provide SIB with correspondent banking services, it was agreeing to facilitate the transfer of funds into the U.S. and other jurisdictions in a manner which shielded the true nature of those transfers from the recipient banks in those jurisdictions and their regulatory authorities. This very same issue was confronted in the U.S. Senate Report regarding TD Bank's participation in the AIB fraud.

161. Thus, based on the information arising from the necessary due diligence required of TD Bank with respect to SIB, which was required to be conducted in addition to and in place of any due diligence previously undertaken with respect to BOA, TD Bank knew that there was no legitimate business or economic purpose for SIB to require correspondent banking services in Canada.

162. This was even more apparent due to the fact that SIB had an existing banking relationship with Trustmark in Houston, Texas (which a reasonable bank would have determined), making the business case for any correspondent banking services even more dubious. While Trustmark processed cheques for SIB, it declined to provide wire transfer services to SIB. As a practical matter, if SIB could not utilize wire transfers, it would have been virtually impossible for Stanford and the Other Insiders to perpetrate the SIB Looting because they would been forced to rely on mailing cheques in every instance where they caused SIB and its affiliates to conduct transactions. Stanford and the Other Insiders solved this issue by relying on TD Bank. They were able to do so notwithstanding that TD Bank was required by the Applicable Standards to decline to provide correspondent banking services to SIB.

163. In addition, having chosen to establish correspondent bank accounts for SIB, TD Bank was required, in accordance with the Applicable Standards, to undertake enhanced ongoing monitoring of SIB and the appropriateness of its relationship with SIB. Among other reasons, this was particularly true in light of the fact that:

(a) SIB was located in Antigua, one of the highest risk jurisdictions in the world;

(b) TD Bank was providing correspondent banking services, the highest risk type of banking services ; and

(c) all funds transferred to and from SIB's TD Bank accounts were done by wire transfer, a method which itself constitutes a high risk.

164. However, TD Bank has admitted that it did not undertake enhanced monitoring of SIB's accounts until late 2008 and only did so then because of concerns over SIB's liquidity.

165. The ongoing monitoring of SIB that TD Bank was required to undertake should have continuously ensured that SIB was utilizing its correspondent bank accounts in a manner consistent with how TD Bank understood those accounts would be utilized when it agreed to open them, or in accordance with its updated understanding of what normal usage of SIB's accounts entailed.

166. As such, when TD Bank compared its understanding of how SIB's accounts operated to the actual use of those accounts, TD Bank should have realized either (i) that it did not have an understanding of the normal use of SIB's correspondent bank accounts, or (ii) that its understanding of how SIB should have been using its correspondent bank accounts indicated that there was no legitimate business or economic purpose for SIB to require correspondent bank accounts in Canada. Either way, TD Bank's review of SIB should have led to the conclusion that TD Bank should not continue to provide correspondent banking services to SIB.

167. Alternatively, to the extent that TD Bank failed to conduct the necessary ongoing monitoring of SIB's correspondent bank accounts, it acted in direct contravention of the Applicable Standards, acted recklessly and fell clearly below the standard of a reasonable bank.

168. As a result, every day that TD Bank provided services to SIB, it did so in reckless disregard of the fact that there was no legitimate business or economic purpose to SIB's banking

relationship with TD Bank. This recklessness only got worse as the relationship continued and TD Bank obtained further information that amounted to actual knowledge of the SIB Looting.

169. In addition to the fact that there was no legitimate economic or business purpose to SIB's banking relationship with TD Bank, as a result of the aforementioned relationships, TD Bank was also uniquely positioned to have knowledge of SIB's general history (discussed at paragraphs 44 to 109) and also knowledge of the fact that:

(a) Prior to engaging TD Bank to provide correspondent banking services, Guardian or SIB used financial institutions in the U.S. for its correspondent banking purposes, including Chase Manhattan Bank ("Chase"), First Interstate Bank and Bank of America, all of which chose to end their relationships with Guardian or SIB. For instance, Bank of America's Compliance Department repeatedly insisted to Bank of America's management that providing services to SIB constituted an intolerable risk. After one year of providing such services, Bank of America's management came to agree with the warning of the Compliance Department and ended Bank of America's relationship with SIB;

(b) TD Bank previously provided correspondent banking services to AIB, another Antiguan financial institution. TD Bank was aware that its relationship with AIB caused TD Bank to become a conduit for the transfer of significant volumes of fraudulent transfers. In fact, the very same TD Bank executive who administered AIB's TD Bank account also was responsible for the SIB and BOA correspondent bank accounts with TD Bank. As such, TD Bank was aware of the clear and

present need to subject its other Antiguan correspondent bank customers, including SIB, to particular scrutiny;

(c) TD Bank contributed to the U.S. Senate investigation into correspondent banking. That investigation resulted in the U.S. Senate Report, which not only concluded that correspondent banking was a gateway for money laundering, but specifically noted the use of TD Bank's accounts to facilitate the fraud committed by AIB and Guardian Bank and Trust (Cayman) Ltd. Since TD Bank was aware of the U.S. Senate Report, TD Bank's awareness of the risks associated with providing correspondent banking was high, including with respect to providing such services to an Antiguan financial institution;

(d) SIB represented that Mercer, who was also a long-time friend of Davis, sat on an advisory board for SIB. If indeed Mercer sat on the advisory board, this relationship also provided TD Bank with access to information concerning the SIB Looting. If he did not, and SIB represented that he did, TD Bank ought to have been aware of this. Such a misrepresentation would have been a red flag, to say the least, to TD Bank that required TD Bank to investigate and take action;

(e) The rates of return generated by TD Waterhouse were at odds with the rates of return that SIB purportedly generated; and

(f) SIB directed TD Bank to send funds held in its correspondent bank accounts to locations and to entities in a manner that clearly indicated such funds were not being used as represented to SIB's customers, a clear "red flag" within the exclusive knowledge of TD Bank.

170. TD Bank, by virtue of its banking relationship with SIB, was also uniquely positioned to demand further particulars about the publicly available information concerning SIB and Stanford, all of which TD Bank was required to be aware of. If TD Bank demanded such further particulars, those particulars were denied by Stanford and the Other Insiders or, if provided, revealed further cause for concern. Any such result should have led TD Bank to determine that banking services should not have been provided to SIB. Alternatively, Stanford and the Other Insiders provided TD Bank with further particulars that were inconsistent with the publicly available information. Such inconsistencies were themselves a "red flag" that should have been properly investigated, with the result being that TD Bank determined banking services should not be provided to SIB.

171. As a result of such information, TD Bank was uniquely situated to identify the breaches of duty owed to SIB committed by Stanford and the Other Insiders through the orchestration of the SIB Looting.

**C. TD Bank Knew or Ought to Have Known of Relevant Open Source Information**

172. Over the period of time that TD Bank provided correspondent banking services to SIB, it knew or ought to have known, or was recklessly or willfully blind to, information that was discoverable with even limited investigative efforts. In accordance with the Applicable Standards, TD Bank was required to diligently conduct ongoing monitoring of such publicly-available or "open source" information pertaining to SIB and its business operations. A summary of such information follows.

173. Stanford petitioned himself into personal bankruptcy on February 17, 1984 before the U.S. Bankruptcy Court (for the Western District of Texas, Waco Division) under Case No. 6-84-00263-T on the basis of personal debts of US$13,648,618.75.

174. From 1985 until 1990, Guardian operated in Montserrat, a jurisdiction which was historically known to have inadequate AML regulations.

175. By 1988, Stanford had been accused of violating banking laws in Texas by running unlicensed "feeder" sales offices in Houston for Guardian. The U.S. Office of the Comptroller of the Currency in 1988 and again in 1989 issued advisories concerning Stanford's similar violations of banking laws in Florida and California.

176. By 1989, the banking system in Montserrat came under investigation by U.S. and British authorities. Consequently, Guardian itself came under scrutiny for possible drug money laundering. When Guardian was forced to report to the Montserrat banking authorities, Stanford and Davis fabricated account statements and ledgers.

177. On November 28, 1990, the Financial Secretary of Montserrat notified Stanford that it was going to revoke Stanford's banking licenses because:

(a) Guardian's auditor, C.A.S. Hewlett & Co. Ltd., was not an approved auditor;

(b) Guardian was operating in a manner "detrimental to its depositors";

(c) Guardian failed to supply satisfactory details as to its liquidity;

(d) Stanford was formerly a bankrupt; and

(e) Guardian had failed to submit annual financial statements.

178. However, before the threatened revocation could be imposed, Stanford caused Guardian to change its domicile to Antigua.

179. Stanford moved Guardian from Montserrat to Antigua at the very time that Montserrat was scrutinizing its banks. At the same time, Antigua subjected its offshore banking industry to limited regulation and had the reputation of being the most corrupt island in the Caribbean.

180. There were extensive deficiencies in Antigua's offshore banking industry and Stanford played a major role in Antigua's actions with respect to its offshore banking industry.

181. Having moved to Antigua, Guardian/SIB reported that it was audited by C.A.S. Hewlett & Co. Ltd., which is a small firm based in Antigua that clearly did not possess sufficient competence to adequately audit a financial institution the size and scale of SIB. This was evidenced by the fact that it did not have a website and basic internet-based searches would not reveal any information on the firm. Further, on account of being based in Antigua, C.A.S. Hewlett & Co. Ltd was not subject to significant regulatory oversight. Notably, it was also the same audit firm that Montserrat had deemed to be an unapproved auditor of Guardian.

182. In 1991, the U.S. Federal Bureau of Investigation, U.S. Customs and Texas law enforcement authorities investigated Stanford's possible involvement in drug money laundering. This investigation resulted in U.S. Customs officials searching Stanford's private jet when he returned from the Caribbean.

183. In 1994, then Antiguan Prime Minister Lester Bird allowed Stanford to organize and arrange financing for a public hospital project in Antigua. Stanford purportedly funded an interim loan to the Antiguan Government to finance 100 percent of the project's architectural and

engineering costs. Eventually, Stanford lent the Antiguan Government over US$40 million through BOA, thereby heavily indebting the Antiguan Government – BOA and SIB's only regulator – to Stanford. Stanford's involvement in the hospital project prompted a 1996 U.S. congressional investigation into corruption in Antigua.

184. In both 1995 and 1996, SIB disclosed *identical* rates of return of exactly 15.71 percent, a result that was highly unusual and unlikely.

185. In addition, SIB's Annual Reports disclosed rates of return far higher than those offered by traditional banks, including TD Bank. From 1997 until 2006, SIB disclosed returns on its CDs that were, at their worst, 140 percent greater than the average return generated by U.S. banks' CDs. At their best, the returns disclosed by SIB on its CDs were 388 percent greater than the average return generated by U.S. banks' CDs.

186. The SIB promotional materials, which induced prospective customers to purchase CDs, advertised rates of return in excess of those offered by TD Bank or other major financial institutions. The promotional materials did not explain how those rates of return were earned or could be paid.

187. On April 29, 1997, a verdict was rendered against Stanford by a U.S. Tax Court in his case against the Internal Revenue Service. The Court ruled that Stanford failed to file a 1990 tax return and owed in excess of US$500,000 in taxes and penalties related to his ownership of Guardian in Montserrat.

188. In July 1998, U.S. authorities obtained a warrant to freeze funds controlled by suspected money launderers. The seizure warrant was executed by U.S. authorities and sought to freeze a

total of US$3.3 million. While the seizure warrant sought to freeze funds in U.S. financial institutions, including SGC, most of the funds – nearly US$3.2 million – were found to be in an SIB account.

189. In November 1998, Stanford caused SIB to file a Regulation D ("Reg. D") exemption with the SEC. The exemption allowed SFG, via SGC, to sell SIB CDs to U.S. "accredited investors" in the U.S. without registering them as securities. SIB's initial Reg. D filing listed SIB CD offerings totalling only US$50 million. SIB's filed an amended Reg. D in November 2001 to increase the Reg. D offering to US$150 million. SIB filed additional amendments in March and November of 2004, increasing the size of SIB's CD offerings to US$200 million and then US$1 billion, clearly evidencing the massive sales of SIB CDs taking place in the U.S. In November 2007, SIB filed yet another Reg. D amendment to increase the size of the offering to US$2 billion.

190. From 1999 to 2008, SFG spent approximately US$4.8 million on government lobbying activities — spending US$2.2 million of that in 2008 alone — and its employees and its political action committee gave US$2.4 million to federal Democratic and Republican candidates since 2000. At the same time, SFG lobbied against aspects of proposed U.S. legislation aimed at cracking down on offshore banks and money laundering.

191. Beginning in or around 2001 and continuing until at least 2008, various employees of Stanford-owned entities filed individual cases with the American Financial Industry Regulatory Authority ("FINRA"), or its predecessor, claiming that they had been wrongfully dismissed and alleging fraudulent business practices in violation of U.S. securities laws.

192. In or around 2002, media reports indicated that Stanford and employees of SFG donated US$90,350 to the legal defense fund of Robert Torricelli ("Torricelli"), then a U.S. Senator from New Jersey. This represented the largest block of contributions to Torricelli's legal defense fund in the preceding reporting period. The legal defense fund existed to pay Torricelli's legal bills stemming from a criminal investigation into his involvement with Korean-American businessman David Chang. Torricelli notably sat on the Senate Subcommittee on Investigations and the Senate Finance Committee, both of which deal with money laundering issues. Torricelli was also a member of the Senate Finance Committee's Subcommittee on the Internal Revenue Service. At that time, the Internal Revenue Service was moving to obtain records of offshore bank credit cards that U.S. officials had said may be used to avoid taxes. Those same media reports noted the accusations that had been leveled against Stanford with respect to his influence in Antigua.

193. In or around November 2003, Stanford gave two Antiguan government officials – Antiguan Tourism Minister, Molwyn Joseph, and Antiguan Planning Minister, Gaston Browne – each US$37,000. At the time, both officials were part of a team negotiating with Stanford for a proposed exchange of two properties in St John's, Antigua. Civic groups publicly urged their removal, calling the payments "apparent inducements" and saying that the two had "serious conflicts of interest".

194. In or around 2004, World-Check, a reputable organization that gathers information globally on heightened risk individuals and entities, added Stanford to its database of high risk individuals and classified him as a PEP on account of, among other things, his association with then Antiguan Prime Minister Bird. By virtue of their positions or influence they may hold, PEPs present a high risk for potential involvement in bribery and corruption.

195. In or around 2005, a civil complaint against SIB and SGC was filed in the U.S. District Court for the Southern District of Florida by two investors. The investors claimed they were the victims of a "Ponzi" scheme which targeted South Florida residents of Venezuelan origin and that SIB and SGC knowingly aided and abetted the other individual defendants in their perpetration of the scheme.

196. In or around 2006, a former employee of a Stanford-owned entity filed a private whistle-blower lawsuit against Stanford and SGC. The suit, filed in Miami-Dade County Circuit Court in Florida, charged that SGC was attracting clients by selling CDs with artificially high yields and was operating a "Ponzi" scheme. The plaintiff also alleged that he was fired for raising concerns that the firm's practices violated federal and state laws. In addition, it was alleged that Stanford was bribing Antiguan regulators to keep them from passing money laundering legislation. After the presiding judge gave the plaintiff permission to depose Stanford, SGC became interested in settling and did so in December 2007.

197. In or around June 2007, the National Association of Securities Dealers (the "NASD") censured SGC and fined it US$20,000 for failing to establish and maintain a supervisory system reasonably designed to achieve compliance with applicable securities laws, regulations and NASD rules, and failing to maintain its required minimum capital.

198. In or around June 2007, World-Check added SGC to its database as a financial institution that posed a heightened risk. The resulting World-Check report reported that SGC was connected to, among others, Stanford, Davis and Pendergest-Holt. At the time that World-Check added SGC to its database, World-Check indicated that one or more public sources had reported that SGC distributed sales literature that failed to present a fair and balanced treatment of investment

risks and benefits, and contained misleading, unfair and unbalanced information. In addition, it appears on the face of the World-Check report that, prior to SIB being shut down in February 2009, World-Check updated its database to note that FINRA had censured and fined SGC on various occasions, that SGC had failed to adopt necessary supervisory procedures with respect to public disclosure and that SGC was alleged to be involved in a US$8 billion pyramid scheme.

199. SIB's 2007 Annual Report claimed that SIB's investment portfolio consisted of 58.6 percent equity, 18.6 percent fixed income, 15.6 percent alternative investments (i.e. hedge funds) and 7.2 percent precious metals. The 2007 Annual Report thus described SIB's portfolio as a "well-diversified portfolio of highly marketable securities issued by stable governments, strong multi-national corporations and major international banks". Other than the fixed income, the typical performance of every component of this investment allocation was volatile and subject to significant risk. SIB's 2007 Annual Report was therefore internally inconsistent because the purported composition of SIB's portfolio was at odds with the consistently high rates of return that SIB claimed to generate.

200. In or around January 2008, FINRA censured SGC and fined it US$10,000 for distributing misleading, unfair and unbalanced information about the CDs, as well the fact that the relationship between SIB and SGC could create a conflict of interest.

201. In 2008, SIB also disclosed that it had incurred a loss of 1.3 percent amidst one of the worst financial crises in history. In that same year, the S&P 500 lost 39 percent and the Dow Jones STOXX Europe 500 Fund lost 41 percent of their respective values.

202. In September 2008, the U.S. Federal Reserve Board served a subpoena on the Miami office of STC. The subpoena requested documents relating to, among other things, the

relationship between STC and Stanford Trust Company Ltd. (Antigua), as well as documents related to SIB CDs between STC and other SFG entities.

203. In or around September 2008, FINRA censured SGC and fined it US$10,000. Among other things, FINRA's findings stated that SGC's supervisory system did not provide for supervision reasonably designed to achieve compliance with applicable securities laws, as appears from the September 2008 FINRA report.

204. As detailed further below, in or around 2008, a major international clearing house, Pershing, announced that it could not verify Stanford was not involved in fraud of some nature.

205. In or around January 2008, two former top executives of SGC, Mark Tidwell ("Tidwell") and Charles Rawl ("Rawl") filed a wrongful dismissal claim against SGC. The claim alleged that SGC failed to file necessary forms with the U.S. Treasury disclosing its clients' offshore holdings and did not advise clients to file those forms. It also alleged that SGC purged files and destroyed documents as early as 2007 related to what Tidwell and Rawl claimed was an ongoing SEC investigation regarding practices relating to the sale of CDs. The suit also alleged that SGC gave clients false historical performance data for its securities.

206. In or around 2008, media reports indicated that the SEC was investigating SIB's CD sales and that it had issued subpoenas to two former SGC employees, Tidwell and Rawl, who, as previously noted, had sued SGC.

207. In or around January 2009, media reports described SIB as being a fraud. These reports noted that it was a "red flag" that the interest rates on CDs were as high as they were and that SIB's business model required depositors giving funds to the bank to invest in the market. They

also noted that it was suspicious that SIB had consistently achieved above-average results in all of its investment categories.

208. In or around January 2009, FINRA censured SGC and fined it US$30,000 for failing to adequately disclose the research methods used to report certain securities valuations and that it was making a market in the company's securities.

209. On or around February 11, 2009, *Bloomberg Businessweek* reported that the SEC, the Florida Office of Financial Regulation and FINRA were all investigating SFG. The report stated that the probe's focus was on the high-yield CDs and the investment strategy behind them, as well as how SFG could afford to provide employees with large bonuses, luxury cars and expensive vacations, especially in light of the fact that selling CDs is usually a low-margin business. The report also noted that SIB was audited by a small accounting firm, the principal of which had died on January 1, 2009.

210. TD Bank was actually aware of certain of the publicly-available information in respect of SIB. For instance, in response to a July 2008 *Bloomberg* article entitled "SEC Investigating Stanford Group Offshore-Back CDs", TD Bank contacted personnel from SIB and/or SFG and indicated that its "main question and concern about the Bloomberg article is about the alleged SEC investigation into SIB's sale of CDs into the US. This is the central and more significant issue in the media reports." Soon thereafter, Davis advised another SIB employee that TD Bank "was beginning to get nervous because of all the rumors circulating about SFG."

211. Notwithstanding TD Bank's concerns and the extensive publicly-available information in respect of Antigua, SIB and Stanford, all of which TD Bank was required to be aware of and consider, TD Bank took absolutely no steps whatsoever to limit SIB's banking activities or report

to any regulatory authority at all until receiving the freeze order dated March 12, 2009 from the SEC, nearly a month after SIB's collapse.

**D. Similarly Situated Entities Knew of the SIB Looting or Refused to Provide Services**

212. As a result of the extensive publicly-available information, even without the benefit of the window into SIB's affairs such as the one enjoyed by TD Bank, the SIB Looting was widely known in the law enforcement, AML and banking communities from at least 1997. TD Bank is part of these communities.

213. Notably, and as described below, other entities and regulators that were part of these communities concluded that business should not have been conducted with SIB or, in some cases, that the SIB Looting was taking place.

*SocGen*

214. For instance, on July 5, 2000, a report in respect of BOA was provided by a U.K. consulting firm, "Proximal Consulting", to a Swiss-based bank, Compagnie Bancaire Genève, which was subsequently acquired by SocGen in 2003 (the "Proximal Report"). The Proximal Report is a due diligence report that was completed in only a few hours and at a cost of only £500. It summarizes a compliance review of the affairs of BOA. In doing so, it also commented on both Stanford and SIB. For instance, paragraphs 4.3 – 4.4 of the Proximal Report state:

> In a controversial move in 1997, Lester Bird asked Stanford to undertake the task of tightening anti money laundering regulation in Antigua as a response to international pressure. Stanford created a board with himself as President to implement the changes and over 18 months, new laws to control money laundering were implemented. Five offshore "banks" were closed and 20 more were reviewed; "know your customer" laws were strengthened. However, the US authorities viewed Stanford's financing and participation of the board and his ownership of banks on the island as a conflict of interests. Moreover, the new law is reviewed as having substantial loopholes and making it more difficult to obtain

bank records. This led to the issue of the FinCEN advisory notice that is attached to this report.

The attached FinCEN advisory appears to have been conceived by the US State Department's Bureau of International Narcotics and Law Enforcement Affairs who are particularly concerned with the role and influence of R. Allen Stanford. One senior official from another US Government agency has been quoted on Stanford as saying, "Try as we might, we have never been able to come up with anything on him."

215. At paragraph 4.5, the Proximal Report states that "in relation to SIB, court documents we have seen show that":

Juan Zepeda Mendes, an influential member of the Carlillo Fuentes organization [Mexico's largest drug cartel at the time], opened an account in his name at SIB on 6 June 1997 with a transfer of $104,000 from Bear Stearns that we [sic] followed by subsequent transfers from Bear Stearns of $400,000 (19 June 1997) and $200,000 (2 July 1997).

Jorge Bastida, another influential member of the Carlillo Fuentes organization, deposited $1,191,332 in his account at SIB that consisted of five cheques all dated 18 April 1997 with consecutive numbers all drawn on an account of a Mexican Casa de Cambio.

216. Paragraph 4.6 of the Proximal Report addresses Stanford's involvement in and departure from banking in Montserrat. It states:

It is alleged that RAS previously owned a bank in Montserrat but he relinquished the licence in 1989/90. Further claims are that his voluntary relinquishment was due to the fact that the British Police were just about to engineer the formal revoking of the licence. Based on this information, there is a widely held view that SIB has had a somewhat dubious reputation for many years, but this has never been the subject of official action.

217. Paragraphs 5.1 and 5.2 of the Proximal Report discuss Antigua. They state:

Antigua has obtained a reputation as being a jurisdiction that has done very little about money laundering and has thus been the target of (in particular) South American and Russian criminals who have used the financial infrastructure of the island to successfully launder funds. This was highlighted by the collapse of the European Union Bank.

> Following the issue of the US Government Advisory Notice (which is attached to this report in full) many financial institutions based in Antigua have found it difficult to establish or continue correspondent banking relationships particularly with US based or owned banks. Unconfirmed reports suggest that one large US bank has closed all of its correspondent relationships with banks in Antigua.

218. In light of the foregoing, the Proximal Report concludes:

> The Bank of Antigua itself as a prospective partner and/or client of [SocGen] poses no problem in itself, as the bank is a domestic one operating solely in Antigua with no direct links to money laundering or other criminal activity. However, if the Bank of Antigua is being used as a channel to introduce clients from Stanford International Bank (or other customers not resident in Antigua) to [SocGen] we have concerns as to the consequences of this. Firstly it is an accepted fact that Stanford International Bank has been used by Mexican drug cartels to launder considerable volumes of criminally obtained funds. Secondly, because of the very high level of attention given to Antigua as a money laundering centre, it would be very difficult for [SocGen] to defend itself or its reputation should any problems occur in the future.

219. Notwithstanding its actual knowledge of the fact of "widely accepted" criminal money laundering activity at SIB and in Antigua generally, SocGen continued to provide banking services to SIB and Stanford until the collapse of SIB in February 2009. However, it has been alleged by Davis that Blaise Friedli, the principal officer at SocGen, was a friend of Stanford. He also alleged that both Friedli and other unnamed officials at SocGen received bribes from Stanford to ensure that SIB and SFG would continue to receive SocGen's services.

*The SEC*

220. The SEC office in Forth Worth, Texas reviewed the operations of SGC and its sale of SIB CDs in 1997. At that time, after only six days of field work in examination of Stanford and his companies, the SEC came to the conclusion that Stanford was likely operating a "Ponzi" scheme. SEC examiners concluded that SIB's statements promoting SIB CDs appeared to be misrepresentations. Those examiners noted that the interest rates purportedly paid on SIB CDs, combined with the large referral payments being made to SGC and SFG, were simply too high to

be achieved through the purported low-risk investments. Taking into account these and other facts, the SEC's Fort Worth branch chief concluded that the returns on SIB CDs were "absolutely ludicrous".

221. The SEC's office in Forth Worth conducted additional investigations into SGC and SIB in 1998, 2002 and 2004. Each examination resulted in the conclusion that the SIB CDs could not have been "legitimate" and that it was "highly unlikely" that the returns Stanford claimed to generate could have been achieved with the purported conservative investment approach. The only significant difference in the SEC's findings over the years was that the fraud grew exponentially from US$250 million to US$1.5 billion.

222. The SEC brought an end to the SIB Looting in February 2009, but its failure to do so earlier was the subject of a March 2010 report by the SEC's Office of the Inspector General. That report concluded that the SEC's failure to end the fraud on SIB and bring Stanford to justice did not result from a lack of evidence that the fraud on SIB was taking place. Rather, the report found that senior officials at the SEC's Fort Worth office felt that prosecuting large novel or complex cases was disfavoured in comparison to prosecuting numerous "quick-hit" cases.

223. In addition, the report found that the former head of the enforcement branch at the SEC's Fort Worth office, Spencer Barasch, who played a significant role in the multiple decisions to quash investigations of Stanford, sought to represent Stanford as legal counsel on three separate occasions after he left the SEC and, in fact, did represent Stanford briefly in 2006 before the SEC informed him he could not do so. As a result, he received the maximum allowable fine for a violation of U.S. conflict-of-interest rules and was barred from practicing before the SEC for one year due to his actions in connection with Stanford.

*Pershing LLC*

224. SGC entered into a "clearing agreement" with international clearing house Pershing in December 2005. Initially, Pershing processed wire transfers from client accounts it held for the purchase of SIB CDs. However, by approximately mid-2006, Pershing became concerned about the financial reliance of SGC on SIB because SGC was losing money and a significant portion of its revenue consisted of referral payments from SIB.

225. As a result, in the summer of 2006, Pershing began to ask for verification of SIB's assets and the returns generated by the SIB portfolio. When SGC responded with only generalities about SIB's investment policy, Pershing increased its due diligence efforts in respect of SIB. These efforts included, among other things, attempting to acquire a complete SIB CD prospectus and travelling to Antigua to meet with SIB personnel and SIB's regulator, the FSRC, to see documentation regarding SIB's balance sheet and the supporting paperwork that reflected the assets. However, in each instance, Pershing was met with stonewalling and excuses by SIB personnel, as well as by Leroy King, the senior-most official at the FSRC, who Stanford had bribed.

226. Ultimately, due to its continued concerns over its inability to gain transparency into SIB's portfolio, Pershing notified SGC that it would no longer process wire transfers from SIB. In connection with doing so, in December 2008, Pershing announced that it could not verify Stanford was not involved in fraud of some nature.

*Ferrier Lullin & Cie*

227. At least as of 2000, Swiss-bank Ferrier Lullin & Cie (now Julius Bär Group Ltd.) ("Ferrier Lullin") acted as the custodian for SIB's investments with Axia Investments in Switzerland.

228. Ferrier Lullin commissioned and received a due diligence report in respect of SIB dated May 10, 2002. Among other things, that report noted that:

(a) in the 1990s, "Antigua's offshore sector became more worrisome as individuals believe to have ties to Russian organized crime moved in";

(b) Stanford was appointed to spearhead the effort to reform Antigua's banking laws and later appointed to the board of authority to oversee Antigua's offshore banks. This was the case notwithstanding that Stanford owned the largest bank to be supervised;

(c) the U.S. State Department issued a report calling Antigua "one of the most attractive financial centers in the Caribbean for money launderers" and later stated that "[i]ndividuals suspected of involvement in money laundering and other illicit economic activities used their considerable influence to weaken Antigua's AML legislation", a clear reference to Stanford; and

(d) the U.S. had issued the FinCEN Advisory and that U.K. and French officials soon after voiced similar concerns.

229. In July 2003, an internal Ferrier Lullin memorandum confirmed concerns about Stanford and SIB. It noted that Ferrier Lullin employees from various departments had made inquiries

about SIB and had asked, among other things, whether SIB was truly a bank and if SIB was a shell bank being used to avoid rules in the U.S.

*JP Morgan Chase*

230. Between 1994 and 2003, the Middle Market division of JP Morgan Chase opened 22 bank accounts for SFG. During the same period, the Private Banking division of JP Morgan Chase held bank accounts for Stanford in his personal capacity. However, as a result of monitoring Stanford's accounts, the Private Banking division of JP Morgan Chase found "significant unfitting activities occurring in the accounts of R. Allen Stanford" and therefore closed those accounts.

231. Upon being notified that the Private Banking division of JP Morgan Chase had ended its relationship with Stanford, the Middle Market division began reviewing and more closely monitoring SFG's accounts. As a result of doing so, the Middle Market divison determined that it was "unable to obtain a reasonable explanation of the customer's account activities" and subsequently filed a Suspicious Activties Report in respect of SFG transactions totaling more than $170 million between January 1, 2003 and August 29, 2003. The Suspicious Activities Report identified various transactions giving rise to concerns about violations of the U.S. *Bank Secrecy Act* and money laundering. Such transactions included those with entities in Antigua, entities related to SFG (including SIB) and with TD Bank.

*Synder Kearney LLC*

232. In 2008, SGC engaged Snyder Kearney LLC ("Snyder Kearney"), a prominent U.S. law firm, to perform due diligence in respect of two private fund offers that were sponsored by SGC and managed by another Stanford-owned entity, Stanford Capital Management. Synder Kearney

initially accepted the engagement and thereafter requested verification of SIB's portfolio. However, SGC refused to provide the relevant information and Snyder Kearney promptly withdrew from the engagement.

*First Advantage Investigative Services*

233. Due diligence in respect of SIB CDs was also undertaken by or on behalf of certain prospective investors. For instance, Randy Shain ("Shain") of the New York-based First Advantage Investigative Services was retained to conduct due diligence in respect of SIB and SIB CDs on behalf of a client.

234. In completing such due diligence, Shain identified and reviewed certain of the "open source" information in respect of SIB and Stanford outlined above. Such information pertained to, among other things, various lawsuits filed against Stanford or his companies, all of which alleged money laundering and other impropriety, Antigua's AML deficiencies and Stanford's involvement therewith, and certain of Stanford's bribes and conflicts of interest.

*Fidelity Investments*

235. Fidelity Investments commenced providing services to SIB and SGC. However, following its attempt to conduct certain due diligence activities, it soon thereafter terminated the relationship.

*Chase Manhattan Bank*

236. In its earlier years, SIB (then known as Guardian) had a correspondent banking relationship with Chase. However, Chase ended its relationship with SIB over concerns about double endorsed cheques.

*First Interstate Bank*

237. First Interstate Bank began providing correspondent banking services to SIB (then known as Guardian) to SIB in the late 1980s. It ended its relationship with SIB in the early 1990s. It has been reported that First Interstate Bank provided money laundering services to alleged narcotics traffickers and was placed under investigation by U.S. Federal authorities. Stanford reportedly personally knew the directors of First Interstate Bank at the time, who were themselves suspected of being involved in the alleged money laundering activities.

*Citizens & Southern Bank*

238. In December 1990, when BOA was purchased by Stanford, Citizens & Southern Bank ("C&S") of Atlanta, Georgia was BOA's correspondent bank. Stanford attempted to "piggyback" SIB into a correspondent banking relationship with C&S based upon BOA's pre-existing relationship. C&S, however, promptly closed the SIB U.S. dollar account of BOA and informed Stanford that he could not indirectly use BOA's correspondent banking relationship for SIB. As a result, Stanford and some of the Other Insiders flew to C&S Headquarters in Atlanta to try to convince C&S to independently approve a correspondent banking relationship with SIB. C&S did not approve SIB for a correspondent banking relationship, so the entire group travelled to Thibodaux, Louisiana in an attempt to rectify problems that SIB was also then having with its correspondent banking relationship with First Interstate Bank.

*Bank of America*

239. Bank of America provided SIB with correspondent banking services over the course of approximately one year, which occurred in or around 1993 and 1994. During that period, Bank of America's Compliance Department repeatedly insisted to Bank of America's management that providing services to SIB constituted an intolerable risk as a result of AML concerns. After one

  
year of providing such services, Bank of America's management came to agree with the warning of the Compliance Department and ended its relationship with SIB.

*The NASD*

240. The NASD concluded as early as 2006 that SGC violated NASD rules through "unwarranted and misleading" assertions that SIB's portfolio investments were "prudent" at a time when SGC admitted that it did not know what was in SIB's portfolio.

*U.S. Customs*

241. Even as far back as the early 1990s, U.S. Customs officials noted that SIB (then known as Guardian) had "constant cash flow" from foreign depositors but "no regulation of its activities" and U.S. Customs took an interest in the "possible smuggling activities of principals in the Stanford organization."

242. The aforementioned conclusions were reached by the above-listed entities, all of which did not have TD Bank's extensive access to SIB and its operations. TD Bank's approach differed from other entities that were similarly required to and did undertake due diligence on SIB. For instance, when Pershing was met with stonewalling and excuses by SIB personnel, Pershing stopped providing services to SIB. By comparison, TD Bank:

(a) did not ask questions or demand answers as it was required to do and that would have revealed the secret kept by Stanford and the Other Insiders in respect of Tier III and the SIB Looting, in which case it fell below the standard of care;

(b) asked the required questions but was denied answers and nonetheless continued to provide banking services to SIB, in which case it fell the standard of care; or

(c) asked the required questions and was provided the answers and thereby became expressly aware of the true nature of Tier III and the SIB Looting, but nonetheless continued to provide banking services to SIB, in which case it fell below the standard of care.

243. In all of the circumstances, TD Bank should not have provided banking services to SIB.

## VI. APPLICABLE BANKING STANDARDS AND LAWS

244. The standard practices and procedures undertaken by Canadian financial institutions that enter into correspondent banking relationships derive from a combination of standards developed by financial regulators and relevant financial industry organizations, as well as legislative and statutory duties. The banking standards and laws that were applicable to TD Bank during the period that it provided correspondent banking services to SIB are set out below.

### A. Financial Regulators and International Organizations Set the Standards

#### 1. The Applicable Standards

245. Financial regulators and international organizations focused on the global financial system have for decades developed, monitored and implemented standards aimed at detecting, deterring and preventing money laundering. In addition to establishing standards for financial institutions concerning client identification and account monitoring, these regulators and organizations have long warned that correspondent banking relationships with foreign financial institutions often facilitate money laundering and that, as a result, correspondent accounts merit particular care, as well as enhanced due diligence and monitoring. This is especially the case with respect to accounts involving the provision of services in jurisdictions known to have relaxed regulatory standards for banks, since failure to exercise such care may result in the

correspondent bank holding and/or transmitting money linked to corruption, fraud or other illegal activity.

246. In Canada, federally regulated financial institutions ("Financial Institutions") such as TD Bank are regulated by the Office of the Superintendent of Financial Institutions ("OSFI"). Since 1990, OSFI has developed standards for Financial Institutions concerning AML compliance. These standards are contained in the following relevant documents:

(a) OSFI Best Practices: Deterring and Detecting Money Laundering, 1990 (the "1990 OSFI Standards");

(b) OSFI Guideline B-8, Deterring and Detecting Money Laundering, September 1996 (the "1996 OSFI Standards");

(c) OSFI Guideline B-8, Deterring and Detecting Money Laundering, April 2003 (the "2003 OSFI Standards");

(d) OSFI Guideline B-8, Deterring and Detecting Money Laundering, November 2004 (the "2004 OSFI Standards");

(e) OSFI Guideline B-8, Deterring and Detecting Money Laundering, November 2008 (the "2008 OSFI Standards")

(collectively, the "OSFI Standards").

247. TD Bank was consulted by OSFI when the OSFI Standards were drafted.

248. Since 2000, the Financial Transactions and Reports Analysis Centre of Canada ("FINTRAC") has been responsible for ensuring Financial Institutions' compliance with

Canadian AML standards pursuant to the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act*, S.C. 2000, c. 17 (the "PCMLTFA"). However, OSFI has continued to include AML compliance in its examinations of Financial Institutions for its own purposes, and as part of its memorandum of understanding with FINTRAC to perform AML compliance on its behalf.

249. Financial Institutions are also subject to the standards developed by the Basel Committee on Banking Supervision, which are contained in the following relevant documents:

(a) Customer Due Diligence for Banks, October 2001 (the "**2001 Basel Standards**");

(b) (i) General Guide to Account Opening and Customer Identification, February 2003, and (ii) Initiatives by the Basel Committee on Banking Supervision et al to combat money laundering and the financing of terrorism, June 2003 (together, the "**2003 Basel Standards**"); and

(c) Consolidated KYC Risk Management, October 2004 (the "**2004 Basel Standards**")

(collectively, the "**Basel Standards**").

250. Canada endorsed the Basel Standards.

251. The Financial Action Task Force (the "**FATF**") is an intergovernmental body that develops, monitors and evaluates countries' AML standards. The FATF has established standards applicable to Financial Institutions, which are contained in the following relevant documents:

(a) FATF 40 recommendations, 1990 (the "**1990 FATF Standards**");

(b) FATF 40 recommendations, 1996 (the "**1996 FATF Standards**");

(c) FATF 40 recommendations, 2003 (the "**2003 FATF Standards**"); and

(d) FATF Guidance on the Risk-Based Approach to Combating Money Laundering and Terrorist Financing, 2007 (the "**2007 FATF Standards**")

(collectively, the "**FATF Standards**").

252. Similarly, Financial Institutions are required to meet the standards developed by the Wolfsberg Group ("Wolfsberg"). Wolfsberg is an international association of banks which aims to develop financial service industry standards for, among other things, AML policies pertaining to correspondent banking. Such standards were established in AML Principles for Correspondent Banking, 2002 (the "**2002 Wolfsberg Standards**" or the "**Wolfsberg Standards**").

253. During the time period that TD Bank provided correspondent banking services to SIB, the OSFI Standards, the Basel Standards, the FATF Standards and the Wolfsberg Standards (together, the "**Applicable Standards**") were binding on TD Bank and informed the standard of reasonable banking that it was obliged to meet. By providing banking services to SIB, TD Bank failed to meet the Applicable Standards.

254. Notably, throughout the period that TD Bank provided correspondent banking services to SIB, it completed and submitted questionnaires to Wolfsberg. In each instance, TD Bank's completed questionnaires indicated that it had in place and adhered to strong KYC and AML policies, all of which were in compliance with the Wolfsberg Standards. However, it is clear that TD Bank was in fact not in such compliance.

**2. Timeline of the Standards' Implementation**

255. The Applicable Standards informed the standard of reasonable banking that TD Bank was obliged to meet during the time that it provided correspondent banking services to SIB. The Applicable Standards evolved as each of the individual standards was revised. The result of each revision to one of the OSFI Standards, the Basel Standards, the FATF Standards or the Wolfsberg Standards was that the Applicable Standards were continuously updated, strengthened and made more onerous over the time period that TD Bank provided correspondent banking services to SIB.

*The 1990 Applicable Standards*

256. Beginning in 1990, approximately two years prior to TD Bank beginning to act as correspondent bank for SIB, TD Bank was required to implement and follow policies and procedures that were compliant with the 1990 FATF Standards. Among other things, the 1990 FATF Standards required Financial Institutions to:

(a) undertake due diligence on all clients;

(b) develop AML policies, procedures and controls;

(c) develop screening procedures for prospective employees and provide those employees with ongoing training with respect to AML compliance;

(d) pay special attention to business relationships and transactions with clients and other financial institutions that did not sufficiently apply the FATF Standards; and

(e) report all suspicious transactions to the appropriate authorities, with particular emphasis placed on funds Financial Institutions suspected were derived from criminal activity.

257. As a result of the 1990 FATF Standards, Financial Institutions were required to take care when entering into relationships with new clients, but also to review and monitor the accounts of existing clients.

258. The 1990 FATF Standards also required Financial Institutions to gather sufficient client identification information about respondent institutions and assess respondent institutions' AML controls when acting as a correspondent bank. This was true with respect to both new and existing correspondent bank clients.

*The 1996 Applicable Standards*

259. By 1996, in addition to complying with the previously implemented Applicable Standards, Financial Institutions were required to comply with the 1996 OSFI Standards and the 1996 FATF Standards.

260. The 1996 OSFI Standards explicitly recognized that Financial Institutions' most important weapon against money laundering was knowledge of their clients. In keeping with this recognition, among other things, the 1996 OSFI Standards required Financial Institutions to:

(a) take special care when opening accounts for foreign deposit-taking institutions;

(b) subject the activities of all clients, regardless of their risk profile, to some form of ongoing monitoring to detect transactions or attempted transactions that may be suspicious;

(c) establish an annual self-assessment program to assess the effectiveness of their AML programs and procedures, the purpose of which was to enable management to identify areas of risk or assess the need for additional controls;

(d) have, as part of their deterrence and detection procedures, a process to promptly identify and report suspicious transactions, particularly transactions relating to pass-through accounts, such as correspondent banking accounts, both internally to senior management and to the appropriate authorities; and

(e) undertake enhanced monitoring of pass-through accounts, such as correspondent banking accounts, using high risk indicators, such as, for example, the accumulation of balances inconsistent with known revenue or turnover and subsequent transfers to accounts held overseas.

261. In addition, among other things, the 1996 FATF Standards required Financial Institutions to:

(a) identify and verify through official or other reliable documents the identity of their clients;

(b) designate compliance officers at the senior management level to ensure compliance with their AML programs;

(c) implement enhanced due diligence procedures to be utilized in higher risk situations; and

(d) pay particular attention to complex or unusual transactions with no apparent economic purpose or visibly lawful purpose and examine the background of such transactions, with the findings being documented in writing and made available to supervisors, auditors and law enforcement agencies.

*The 2001 Applicable Standards*

262. By 2001, in addition to complying with the previously implemented Applicable Standards, Financial Institutions were required to comply with the 2001 Basel Standards.

263. Among other things, the 2001 Basel Standards required Financial Institutions to:

(a) obtain financial statements and descriptions of clients' principal lines of business with respect to large corporate accounts;

(b) understand the normal and reasonable account activity of all clients in order to reduce risk;

(c) perform enhanced due diligence if the Financial Institution had any reason to believe that an applicant was being refused banking facilities by another bank;

(d) conduct regular reviews of existing client identification records in order to ensure that those records remained up-to-date;

(e) conduct regular reviews of a client's account whenever a significant transaction took place, client documentation standards changed or the way the account operated changed;

(f) develop KYC risk management programs that included proper management oversight, systems and controls, segregation of duties, training and other related policies;

(g) determine whether they were engaged in business relationships with any PEPs and identify any individuals or entities associated with a PEP;

(h) ensure that senior managers knew the circumstances of high risk private banking clients and, with respect to those clients, were aware of relevant third party information; and

(i) ensure that internal audit teams were adequately staffed with individuals who were well-versed in risk management policies and controls.

264. The 2001 Basel Standards also required Financial Institutions to have in place clear client acceptance policies and procedures that described the types of customers that posed a higher risk and ensured enhanced due diligence took place with respect to such higher risk clients. Where high risk clients posed problems in the banking relationship that could not be resolved, Financial Institutions were required to close the account and return money to its source.

265. The 2001 Basel Standards also recognized that certain types of transactions should alert Financial Institutions to the possibility that a client is conducting unusual or suspicious activities. Such transactions were specifically recognized to include those that did not readily appear to

make economic or commercial sense, or those that involved large amounts of cash deposits that were inconsistent with the normal and expected transactions of a particular variety of client.

266. Notably, the 2001 Basel Standards noted that very high account turnover, inconsistent with the size of the balance, may indicate that funds were being moved through the account for an improper purpose.

267. In addition, the 2001 Basel Standards specifically addressed correspondent banking. In particular, the Basel Standards required that Financial Institutions conduct appropriate levels of client identification in order to fully understand the nature of a respondent bank's business and that Financial Institutions employ enhanced due diligence procedures with respect to any transactions carried out through correspondent banking accounts.

268. Finally, pursuant to the 2001 Basel Standards, Financial Institutions were required to pay particular attention when undertaking or continuing correspondent banking relationships with a respondent bank located in a jurisdiction with poor KYC standards.

*The 2002 Applicable Standards*

269. By 2002, in addition to complying with the previously implemented Applicable Standards, Financial Institutions were required to comply with the 2002 Wolfsberg Standards.

270. The 2002 Wolfsberg Standards required Financial Institutions to utilize a risk-based approach to decide whether to initiate a relationship with a correspondent banking client and the level of due diligence required to continue such relationships. When conducting due diligence with respect to a correspondent banking client, among other things, Financial Institutions were required to consider:

(a) the client's domicile and organization;

(b) the client's ownership and executive management;

(c) the nature of the client's business;

(d) the products and services offered by the client;

(e) the client's regulatory status and history;

(f) the client's AML controls;

(g) whether the client had any business arrangements with shell banks; and

(h) the client's adherence to the Wolfsberg Standards.

271. The 2002 Wolfsberg Standards also required required Financial Institutions to conduct independent, risk-based reviews of all existing correspondent banking accounts to ensure compliance with the policies and procedures of the Financial Institution, and determine whether additional due diligence was required. When conducting such reviews, Financial Institutions were required to consider the same type of information as was required for new correspondent banking clients.

272. The 2002 Wolfsberg Standards required that at least one person senior to and other than the banker responsible for a particular correspondent account approve all correspondent banking relationships, including previously existing relationships. The 2002 Wolfsberg Standards also required a representative of the Financial Institution to visit the premises of correspondent banking clients in order to conduct due diligence.

273. The 2002 Wolfsberg Standards also noted that enhanced due diligence may be required for correspondent banking clients whose risk profile was higher than that of a typical correspondent banking client. This enhanced due diligence was required to focus on:

(a) ownership and management of the correspondent banking client;

(b) involvement of any PEP with the correspondent banking client;

(c) the correspondent banking client's AML controls; and

(d) any downstream correspondent clearing.

274. Finally, the 2002 Wolfsberg Standards required Financial Institutions to establish organization-wide policies and programs to address unusual or suspicious transactions. These policies and programs were required to provide examples and guidance as to what was to be considered unusual or suspicious and establish reporting protocols in accordance with applicable laws.

*The 2003 Applicable Standards*

275. By 2003, in addition to complying with the previously implemented Applicable Standards, Financial Institutions were required to comply with the 2003 OSFI Standards, the 2003 FATF Standards and the 2003 Basel Standards.

276. Among other things, the 2003 OSFI Standards required Financial Institutions to:

(a) ensure that senior management was responsible for the development of AML and risk management programs;

(b) keep their boards of directors adequately informed about their AML and risk management programs and those programs' effectiveness;

(c) obtain their boards of directors' approval of their AML and risk management programs at both the initial implementation stage and whenever those programs were reviewed; and

(d) report all suspicious transactions in accordance with applicable legislation.

277. Among other things, the 2003 FATF Standards required Financial Institutions to:

(a) have a risk management system in place to determine the existence of any clients or potential clients who were PEPs; and

(b) incorporate AML policies that addressed the risks associated with non-face-to-face business relationships and transactions.

278. With respect to PEPs, in addition to normal due diligence measures, according to the 2003 FATF Standards, Financial Institutions were required to ensure that senior management approval was granted before establishing the business relationship. They were also required to establish the source of any PEP's wealth and funds and to conduct enhanced, ongoing monitoring of their business relationship with any PEP.

279. With respect to correspondent banking clients, the 2003 FATF Standards also required Financial Institutions to determine from publicly available information the reputation of the respondent institution and whether it had been the subject of past money laundering or terrorist financing investigations or regulatory action.

280. Among other things, the 2003 Basel Standards required Financial Institutions to take decisions to enter into business relationships with higher risk clients, including correspondent banking clients, at the senior management level.

281. The 2003 Basel Standards also required Financial Institutions to develop risk management programs that ensured consistent client identification and account monitoring across the Financial Institutions' business lines and geographic locations.

282. Finally, the 2003 Basel Standards explicitly required that Financial Institutions implement rigorous standards for due diligence in high risk areas and develop policies and standards for handling relationships in such areas. One type of high risk relationship identified by the 2003 Basel Standards were those between a Financial Institution and a PEP.

*The 2004 Applicable Standards*

283. By 2004, in addition to complying with the previously implemented Applicable Standards, Financial Institutions were required to comply with the 2004 OSFI Standards and the 2004 Basel Standards.

284. Among other things, the 2004 OSFI Standards required Financial Institutions to:

(a) conduct higher levels of due diligence when dealing with clients from countries with AML requirements that were considered inadequate; and

(b) have customer identification and verification processes which were fully compliant with the PCMLTFA.

285. In addition, the 2004 Basel Standards required Financial Institutions to implement risk management policies and procedures to be applied across their various business lines and geographic locations. In particular, among other things, the 2004 Basel Standards required Financial Institutions to:

(a) develop standards on what records are to be obtained and retained for customer identification across their banking groups as a whole;

(b) maintain client identification information in a readily retrievable format that was accessible globally by their banking groups as a whole;

(c) have in place systems and processes to monitor and share information on the identity of clients and client account activity throughout their banking groups as a whole;

(d) be alert to clients that use their various business lines across different banking groups (for example, banking, securities and insurance) and undertake transaction monitoring on both a local and centralized basis;

(e) have their internal and external audits evaluate adherence to compliance with relevant standards across their banking groups as a whole; and

(f) implement policies and procedures to identify unusual account activity throughout their banking groups as a whole, regardless of how those accounts were utilized.

*The 2007 Applicable Standards*

286. By 2007, in addition to complying with the previously implemented Applicable Standards, Financial Institutions were required to comply with the 2007 FATF Standards.

287. Among other things, the 2007 FATF Standards required Financial Institutions to:

(a) utilize information generated by competent third parties to identify suspicious activity;

(b) exercise increased awareness of higher risk clients and any transactions such clients undertook across their various business lines; and

(c) develop policies and procedures so that senior management could independently validate the development and operation of their risk assessment and risk management processes.

*The 2008 Applicable Standards*

288. By 2008, in addition to complying with the previously implemented Applicable Standards, Financial Institutions were required to comply with the 2008 OSFI Standards.

289. Among other things, the 2008 OSFI Standards required Financial Institutions to:

(a) comply with all PCMLTFA requirements, including with respect to correspondent banking;

(b) take reasonable measures to obtain the names and occupations of all directors and beneficial owners of 25 percent or more of their corporate clients;

(c) report all transactions or attempted transactions that were suspicious to FINTRAC;

(d) conduct self-assessment of AML controls at least annually; and

(e) have independent auditors conduct effectiveness testing of their AML controls at least every two years, with the results thereof being reviewed by a senior officer.

290. In addition, the 2008 OSFI Standards explicitly recognized that the identity and beneficial ownership of a client can be determined using a credible public or other database and that enhanced account monitoring should include the gathering of information from open public sources.

291. The 2008 OSFI Standards also required that, where a Financial Institution determined that a foreign financial institution for which it provided correspondent banking services did not have in place AML policies consistent with the PCMLTFA, ongoing monitoring of all transactions should occur to mitigate the higher risk.

292. Further, the 2008 OSFI Standards required Financial Institutions to determine whether a client is a politically exposed foreign person ("PEFP"). When making that determination, Financial Institutions were required to consult public databases. According to the 2008 OSFI Standards, if a Financial Institution had a client who was a PEFP, the Financial Institution was required to:

(a) take measures to determine the source of the PEFP's funds;

(b) obtain senior management approval to open or maintain the PEFP's account; and

(c) conduct enhanced ongoing monitoring of the PEFP's account.

293. Similarly, where a Financial Institution was aware that a PEFP owned or control 25 percent or more of a corporate client, or if a PEFP was a director or officer of a corporate client, the 2008 OSFI Standards required the Financial Institution to assess the risk of providing banking services and apply enhanced due diligence as appropriate.

### 3. Financial Institutions Adopt the Standards

294. At all times, Financial Institutions were required to adhere to the Applicable Standards. As a result, it was customary for Financial Institutions to adopt the Applicable Standards into their banking practices.

295. For example, as a result of the Applicable Standards, since at least 1990, it was customary for Financial Institutions to continuously review existing correspondent accounts to ensure they met required standards and to close accounts and decline to provide service to correspondent banking customers that were not in compliance with such standards.

296. For instance, in 2001, several major American banks testified before the U.S. Permanent Subcommittee on Investigations that their practices in respect of correspondent banking included heightened due diligence, heightened monitoring and strict KYC procedures. More specifically, these practices included:

(a) evaluating the overall adequacy of banking supervision in the jurisdiction of the respondent bank;

(b) reviewing media reports for information on the respondent bank;

(c) establishing a detailed understanding of correspondent banking customers' ownership structure;

(d) establishing an understanding of correspondent banking customers' cash flows; and

(e) regularly preparing memoranda summarizing contacts with the bank and information about its staff and operations, all of which appears from the U.S. Senate Report.

297. Notably, one bank testified that it reviewed individual accounts, particularly Antiguan accounts, and would close the account if the review was unsatisfactory.

298. Further, in February 2000, the Ranking Minority Member of the Permanent Subcommittee on Investigations distributed a survey on correspondent banking to 20 banks providing correspondent banking services from locations in the U.S., at least two of which were Canadian banks. All 20 banks responded to the survey. The survey responses revealed the following:

(a) of the 12 banks that detailed their specified account opening procedures in response to the survey, all but three banks said that they evaluate the overall adequacy of banking supervision in the jurisdiction of the respondent bank and review media reports for information on the applicant; and

(b) a majority of the surveyed banks said they inquire about the applicant with the jurisdiction's bank regulator, check with local bank branches (if applicable), check

with bank rating agencies, obtain bank references and complete a customer profile.

299. The survey also specifically addressed the provision of correspondent banking services to offshore banks, such as SIB. In response, nine banks said they would not in any circumstance open a correspondent account for an offshore bank, while eight of the banks said there are times when they would open such an account, but that they would do so only when the offshore bank is part of a well-known financial group or a subsidiary or affiliate of an internationally reputable bank.

300. Responses to the survey also addressed the provision of correspondent banking services to an Antiguan respondent bank. The report in respect of the survey results states that "most banks have no relationships" with banks in Antigua. It further noted that one bank responded that it monitors every transaction involving Antigua, while another bank said that it does not accept any transfers from or to Antigua at all.

**B. Canadian AML Legislation**

301. In addition to complying with the Applicable Standards, Financial Institutions such as TD Bank are also required to comply with the laws of Canada which address AML and banking practices and directly incorporate the Applicable Standards. In Canada, such practices are primarily addressed by way of the PCMLTFA and its regulations.

302. The PCMLTFA, which was originally titled the *Proceeds of Crime (Money Laundering) Act*, came into force in 2000. Section 7 of the Act came into force in 2001 and required Financial Institutions to:

report to [FINTRAC], in the prescribed form and manner, every financial transaction that occurs in the course of their activities and in respect of which there are reasonable grounds to suspect that the transaction is related to the commission of a money laundering offence or a terrorist activity financing offence.

303. In 2007, the PCMLTFA was amended to include codification of many of the aforementioned Applicable Standards. For instance, subsection 9.4(1) required Financial Institutions to

> take the following measures before entering into a correspondent banking relationship with a prescribed foreign entity:
>
> (a) obtain prescribed information about the foreign entity and its activities;
>
> (b) ensure that the foreign entity is not a shell bank as defined in the regulations;
>
> (c) obtain the approval of senior management;
>
> (d) set out in writing their obligations and those of the foreign entity in respect of the correspondent banking services; and
>
> (e) any prescribed measures.

304. In 2002, the General Regulation to the PCMLTFA, SOR/2002-184 (the "**Regulations**") came into force. The Regulations were amended in 2007 to include further codification of the aforementioned Applicable Standards. For instance, subsections 15.1(2) and 15.1(3) of the Regulations state:

> (2) Every financial entity shall, when it enters into a correspondent banking relationship, keep a record in respect of the foreign financial institution containing the following information and documents:
>
> (*a*) the name and address of the foreign financial institution;
>
> (*b*) the names of the directors of the foreign financial institution;
>
> (*c*) the primary business line of the foreign financial institution;

(*d*) a copy of the most recent annual report or audited financial statement of the foreign financial institution;

(*e*) a copy of the foreign financial institution's banking licence, banking charter, authorization or certification to operate from the relevant regulatory agency or certificate of corporate status or a copy of another similar document;

(*f*) a copy of the correspondent banking agreement or arrangement, or product agreements, defining the respective responsibilities of each entity;

(*g*) the anticipated correspondent banking account activity of the foreign financial institution, including the products or services to be used;

(*h*) a statement from the foreign financial institution that it does not have, directly or indirectly, correspondent banking relationships with shell banks;

(*i*) a statement from the foreign financial institution that it is in compliance with AML and anti-terrorist financing legislation in its own jurisdiction; and

(*j*) the measures taken to ascertain whether there are any civil or criminal penalties that have been imposed on the foreign financial institution in respect of AML or anti-terrorist financing requirements and the results of those measures.

(3) The financial entity shall take reasonable measures to ascertain whether the foreign financial institution has in place AML and anti-terrorist financing policies and procedures, including procedures for approval for the opening of new accounts and, if not, shall, for the purpose of detecting any transactions that are required to be reported to [FINTRAC] under section 7 of the Act, take reasonable measures to conduct ongoing monitoring of all transactions conducted in the context of the correspondent banking relationship.

305. Further, since 2007, Section 55.1 of the Regulations states the following with respect to correspondent banking relationships:

55.1 Every financial entity that enters into a correspondent banking relationship shall

(*a*) ascertain the name and address of the foreign financial institution by examining a copy of the foreign financial institution's banking licence, banking charter, authorization or certification to operate from the relevant regulatory agency or certificate of corporate status or a copy of another similar document; and

(*b*) take reasonable measures to ascertain, based on publicly available information, whether there are any civil or criminal penalties that have been imposed on the foreign financial institution in respect of AML or anti-terrorist

> financing requirements and, if so, to conduct, for the purpose of detecting any transactions that are required to be reported under section 7 of the Act, ongoing monitoring of all transactions in the context of the correspondent banking relationship.

306. Section 9.6 of the PCMLTFA came into force in 2008 and required Financial Institutions to establish and implement compliance programs for correspondent banking relationships, and required enhanced due diligence in higher risk circumstances. Pursuant to section 9.6:

> (1) Every person or entity referred to in section 5 shall establish and implement, in accordance with the regulations, a program intended to ensure their compliance with this Part.
>
> (2) The program shall include the development and application of policies and procedures for the person or entity to assess, in the course of their activities, the risk of a money laundering offence or a terrorist activity financing offence.
>
> (3) If the person or entity considers that the risk referred to in subsection (2) is high, the person or entity shall take prescribed special measures for identifying clients, keeping records and monitoring financial transactions in respect of the activities that pose the high risk.

307. The requirements of section 9.6(3) of the PCMLTFA are further articulated in the 2008 amendments to Regulations. In particular, section 71 lays out the requirements that Financial Institutions must follow when implementing a compliance program:

> (1) For the purpose of subsection 9.6(1) of the Act, a person or entity referred to in that subsection shall, as applicable, implement the compliance program referred to in that subsection by
>
> (*a*) appointing a person — who, where the compliance program is being implemented by a person, may be that person — who is to be responsible for the implementation of the program;
>
> (*b*) developing and applying written compliance policies and procedures that are kept up to date and, in the case of an entity, are approved by a senior officer;
>
> (*c*) assessing and documenting, in a manner that is appropriate for the person or entity, the risk referred to in subsection 9.6(2) of the Act, taking into consideration
>
> > (i) the clients and business relationships of the person or entity,

(ii) the products and delivery channels of the person or entity,

(iii) the geographic location of the activities of the person or entity, and

(iv) any other relevant factor;

(*d*) if the person or entity has employees, agents or other persons authorized to act on their behalf, developing and maintaining a written ongoing compliance training program for those employees, agents or persons; and

(*e*) instituting and documenting a review of the policies and procedures, the risk assessment and the training program for the purpose of testing their effectiveness, which review is required to be carried out every two years by an internal or external auditor of the person or entity, or by the person or entity if they do not have such an auditor.

(2) For the purposes of the compliance program referred to in subsection 9.6(1) of the Act, every entity referred to in that subsection shall report the following in written form to a senior officer within 30 days after the assessment:

(*a*) the findings of the review referred to in paragraph (1)(*e*);

(*b*) any updates made to the policies and procedures within the reporting period; and

(*c*) the status of the implementation of the updates to those policies and procedures.

308. In addition, section 71.1 of the Regulations require Financial Institutions to take the following steps when faced with a higher risk client:

The prescribed special measures that are required to be taken by a person or entity referred to in subsection 9.6(1) of the Act for the purpose of subsection 9.6(3) of the Act are the development and application of written policies and procedures for

(*a*) taking reasonable measures to keep client identification information and the information referred to in section 11.1 up to date;

(*b*) taking reasonable measures to conduct ongoing monitoring for the purpose of detecting transactions that are required to be reported to [FINTRAC] under section 7 of the Act; and

(*c*) mitigating the risks identified in accordance with subsection 9.6(3) of the Act.

309. The 2008 amendments to the Regulations also incorporated subsection 11.1(1). That subsection requires Financial Institutions to, having confirmed the existence of a corporate client, take reasonable measures to obtain the name and occupation of all directors of the corporation and the name, address and occupation of all persons who own or control, directly or indirectly, 25 percent or more of the shares of the client corporation.

310. Since 2008, pursuant to section 9.3 of the PCMLTFA, Financial Institutions are required to determine whether they were dealing with a PEFP. In instances where a Financial Institution determines that it is dealing with a PEFP, senior management approval is required for the banking relationship to proceed. Moreover, since 2008, subsection 14(n) of the Regulations require Financial Institutions to undertake enhanced, ongoing monitoring of their relationships with any PEFP.

311. Pursuant to section 462.31(1) of the *Criminal Code*, R.S.C. 1985, c. C-46, anyone commits a "money laundering offense" for the purposes of the PCMLTFA who

> uses, transfers possession of, sends, delivers, transports, transmits, alters, disposes or otherwise deals with, in any manner and by any means, any property or any proceeds or any property with intent to conceal or convert that property or those proceeds, knowing or believing that all or a part of that property or of those proceeds was obtained as a result of fraud.

312. Any transaction in respect of which there were reasonable grounds for a Financial Institution to suspect any of these activities automatically required that Financial Institution to report to FINTRAC.

### C. TD Bank's Internal Policies

313. During the time that it provided correspondent banking services to SIB, TD Bank was required to have in place and execute internal polices ("Internal Policies") that reflected the

rules and requirements laid out in the Applicable Standards, the PCMLTFA, the Regulations and the *Criminal Code*. TD Bank's Internal Policies were required and sought to address such areas as identification, client relationship reviews, enhanced due diligence, open source intelligence monitoring, transaction monitoring and reporting, risk assessment and risk mitigation practices.

314. In April 2000, Frank Craddock, TD Bank's Chief Security Officer and the person responsible for TD Bank's deterrence programs, gave evidence before the Canadian Parliament's Standing Committee on Finance on Bill C-22. Commenting on money laundering, he stated:

> In order to protect against this criminal activity, we have established sound policies and programs that detect and prevent money laundering.
>
> Just a few of the preventative measures taken by Canadian banks include: the right to refuse financial transactions suspected of being proceeds of crime as defined by the Criminal Code; a requirement that a declaration of source of funds be signed by customers for financial transactions involving $10,000 or more; a requirement for bank employees to report any financial transactions that are judged to be suspicious, regardless of the amount; the placement of a senior bank officer in every branch, known as the designated officer, to whom suspicious transactions are reported; a strong emphasis on the know-your-customer rule, whereby employees must obtain appropriate identification and documentation from clients, as well as understand the client's usual pattern of financial transactions; an audit of branch compliance with AML policies; and various staff awareness and education programs, including the distribution of related videos produced by the CBA corporate security committees.
>
> We all work within the scope of the existing legislation, together with the guidelines issued by the Office of the Superintendent of Financial Institutions, known as OSFI, and we believe we have developed a very effective measure to identify money-laundering activities while avoiding high volumes of irrelevant reports.

315. Similarly, by at least April 2006, TD Bank publicly stated on its website that it had in place a Global AML Program. In particular, the TD Bank Financial Group of Companies' AML Statement provided:

Although a Canadian based financial institution, TDBFG is subject to the AML statutes and regulations in various countries around the globe. TDBGF's AML program (described below) contemplates and accommodates these statutes and establishes minimum standards and requirements across all our businesses throughout the world.

In order to comply with applicable Canadian and AML laws in the countries in which we operate, TDBGF has implemented a Global AML Program. The Global AML Progam includes appointing a Chief AML Officer who is responsible to senior management and the board of directors for establishing and maintaining the TD Bank Financial Group's AML Compliance Program; a risk-based Global AML Policy including Know Your Customer and Enhanced Due Diligence, record keeping & retention (the Global AML Policy establishes minimum standards across all our business units and often adopts standards higher than local requirements); currency transaction and suspicious transaction monitoring and reporting; a hierarchy of designated AML officer functions; periodic training of appropriate employees; and independent internal audits.

This program is routinely evaluated, updated and enhanced in order to reflect changes to TDBFG's business activities and applicable supervisory standards and legal requirements.

All employees are required to read and acknowledge the TDBGF Code of Conduct & Ethics annually. The guidelines require that and employee not knowingly initiate or be a party to a money laundering scheme. TDBGF is committed to complying with the *United Nations Suppression of Terrorist Regulations*. No employee shall deal, directly or indirectly, with any person or group known or reasonably known to be involved in or supporting terrorism activities. Employees are require to report illegal, suspicious or unusual activity.

Annually all employees are required to complete an enterprise wide AML training program which includes a test indicating they have mastered the concepts.

316. To the extent that TD Bank's Internal Policies did not comply with the requirements of the Applicable Standards, the PCMLTFA, the Regulations and the *Criminal Code*, TD Bank violated of the laws of Canada and breached the standard of care required by a reasonable bank.

317. Alternatively, TD Bank also violated the laws of Canada and breached the standard of care required by a reasonable bank if its Internal Polices adhered to the Applicable Standards, the PCMLTFA, the Regulations and the *Criminal Code* but failed to implement its Internal Policies.

## VII. TD BANK'S FAILURE TO ACT

318. For the reasons described above, TD Bank should never have opened correspondent bank accounts for SIB (then Guardian) and, having done so, should have determined that those accounts needed to be closed. Instead, TD Bank at all relevant times continued unabated in its provision of banking services to SIB. It did so notwithstanding that it was uniquely situated to uncover the secret in respect of Tier III and the SIB Looting. As a result, TD Bank is liable to SIB and SIB's customers in negligence and knowing assistance.

### A. TD Bank's Negligence

#### 1. Duty of Care

##### (a) TD Bank Owed a Duty of Care to SIB

319. The plaintiffs plead that TD Bank owed SIB duties by virtue of its position as SIB's correspondent bank. Such duties were an implied term of the contract that governs the relationship between a banker and its customer (even if no written contract existed) and were otherwise the result of the relationship between TD Bank and SIB.

320. It was at all times reasonably foreseeable that SIB would suffer the damages described herein as a result of the failure of TD Bank to adhere to the applicable standard of care, namely by way of its acts and omissions described herein.

##### (b) TD Bank Owed a Duty of Care to SIB's Customers

321. In the alternative to the claims made on behalf of SIB, the plaintiffs plead that as Joint Liquidators with the powers and capacities of a trustee in bankruptcy and charged to recover funds for SIB's customers, the ultimate victims of Stanford's CD Scheme, they may appropriately advance the claims SIB's creditors may have against TD Bank. If required, the plaintiffs plead

that they are entitled to a representative order pursuant to Rule 10 of the *Rules of Civil Procedure*.

322. The plaintiffs plead that TD Bank owed SIB's customers a duty of care to prevent the use of its facilities for fraudulent purposes since, in all of the circumstances described herein, it:

(a) had actual knowledge of, or was reckless and/or willfully blind to, the SIB Looting; or,

(b) ought to have known of the SIB Looting (that is, had constructive knowledge).

323. The plaintiffs plead that, as a result of TD Bank's actual knowledge (willful blindness or recklessness) or constructive knowledge of the SIB Looting, it was reasonably foreseeable that TD Bank's acts or omissions described herein would cause harm to SIB's customers. Those acts and omissions are the proximate cause of the harm suffered by SIB's customers. In all the circumstances, there was sufficient proximity between TD Bank and SIB's customers to give rise to a duty of care owed by TD Bank to SIB's customers and there is no basis on which to negate that duty of care.

**2. Standard of Care**

324. At the very least, a reasonable banker was required to act at all times in accordance with the Applicable Standards, the PCMLTFA, the Regulations and the *Criminal Code.*

325. Had TD Bank acted as a reasonable banker, it would have, through the exercise of reasonable care and skill, never provided banking services to SIB, discovered the SIB Looting, terminated SIB's access to TD Bank's facilities, reported the conduct of Stanford and the Other Insiders to the appropriate authorities and/or frozen SIB's accounts. Due to the acts and

omissions described herein (including breach of contract), TD Bank failed to act as a reasonable banker in the circumstances. As a result, TD Bank breached the duties it owed to SIB and SIB's customers.

B. TD Bank's Knowing Assistance

1. TD Bank's Liability to SIB for Knowing Assistance

326. The plaintiffs plead that TD Bank is liable for knowing assistance in the breaches of fiduciary duty and breaches of trust by Stanford and the Other Insiders.

327. TD Bank knew that Stanford and the Other Insiders were directors and/or corporate officers of SIB and thus owed fiduciary duties to SIB and SIB's customers. TD Bank also knew that SIB's customers purchased the CDs from SIB expecting to receive a return on their purchase and that SIB held the monies used to purchase the CDs in trust for SIB's customers.

328. TD Bank had sufficient information such that it also knew of, or was reckless or willfully blind to, the SIB Looting and of Stanford's and the Other Insiders' breaches of their fiduciary duties and breaches of trust through their orchestration of the SIB Looting. Despite such knowledge, TD Bank continued to provide correspondent banking services to SIB, which enabled Stanford and the Other Insiders to maintain the SIB Looting and thereby continue their misappropriation. Accordingly, TD Bank participated in the breaches of fiduciary duty and breaches of trust of Stanford and the Other Insiders.

329. SIB ultimately became insolvent and was put into liquidation. Having knowingly assisted Stanford and the Other Insiders, TD Bank is liable for the damages caused by those breaches. Such damages include the full amounts improperly diverted from SIB and SIB's customers by Stanford and the Other Insiders through the SIB Looting after TD Bank had sufficient

information that it knew of, or was recklessly or willfully blind to, the SIB Looting. The Joint Liquidators estimate that the amounts for which TD Bank is liable are approximately US$5.5 billion and potentially higher.

C. Damages Caused by TD Bank and Other Relief

330. TD Bank's acts and omissions described herein are the proximate cause of the harm suffered by SIB and SIB's customers. As a result of TD Bank's breaches of duty, it repeatedly missed opportunities to reveal and stop the SIB Looting being orchestrated and undertaken by Stanford and the Other Insiders and/or turned a blind eye to the SIB Looting. Instead, TD Bank allowed the SIB Looting to continue and Stanford and the Other Insiders were allowed to continue misappropriating SIB's funds. In addition, customers continued to make investments in SIB CDs, most or all of which were subsequently misappropriated from SIB by Stanford and the Other Insiders. The plaintiffs plead that if TD Bank had performed even its basic duties to SIB and SIB's customers as required, the discovery of the SIB Looting at an earlier date would have avoided the increased liabilities of SIB and otherwise reduced or eliminated the losses and damages incurred by SIB and SIB's customers after that date.

331. It was reasonably foreseeable that SIB and its customers would suffer the damages described herein as a result of the acts and omissions of TD Bank described herein.

332. By failing to act as a reasonable banker, TD Bank facilitated and allowed the SIB Looting to continue when it ought to have been reported and prevented. But for TD Bank's conduct, the fraudulent transactions at issue would not have been completed and damages would not have been suffered by SIB and its customers, who now comprise more than 21,000 creditors of SIB's estate.

333. SIB and its customers suffered substantial damages and losses, in an amount that is presently not fully known, but that will be quantified prior to trial, and that is at least in the amount of US$5.5 billion.

334. Given its misconduct as pleaded herein, TD Bank is also liable to provide a full accounting of all revenues and profits from its dealings with SIB and to disgorge and make full restitution of all such revenues and profits.

## VIII. LOCATION OF THE TRIAL

335. The plaintiffs propose that this action be tried in Toronto.

Date: May 12, 2014

BENNETT JONES LLP
One First Canadian Place
Suite 3400, P.O. Box 130
Toronto, ON M5X 1A4

Lincoln Caylor (LSUC # 37030L)
Maureen M. Ward (LSUC #44065Q)
Nathan J. Shaheen (LSUC #60280U)

Tel: 416.777.6121/4630/7306
Fax: 416.863.1716

Lawyers for the plaintiffs

MARCUS A. WIDE, et al.
Plaintiffs

v.

TORONTO-DOMINION BANK
Defendant

Court File No. CV-12-9780-00CL

ONTARIO
SUPERIOR COURT OF JUSTICE

Proceeding commenced at Toronto

# AMENDED STATEMENT OF CLAIM

**BENNETT JONES LLP**
Barristers and Solicitors
One First Canadian Place
Suite 3400, P.O. Box 130
Toronto, Ontario
M5X 1A4

Lincoln Caylor (LSUC # 37030L)
Maureen M. Ward (LSUC #44065Q)
Nathan J. Shaheen (LSUC #60280U)

Tel: 416.777.6121/4630/7306
Fax: 416.863.1716

Lawyers for the plaintiffs

133

# EXHIBIT 61

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: STANFORD ENTITIES SECURITIES LITIGATION | ) | CIVIL ACTION NO. 3:09-CV-0298-N |
| | ) | DALLAS, TEXAS |
| | ) | AUGUST 21, 2014 |

TRANSCRIPT OF STATUS HEARING PROCEEDINGS
BEFORE THE HONORABLE DAVID C. GODBEY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the SEC: U.S. SECURITIES AND EXCHANGE COMMISSION
BY: MR. DAVID B. REECE
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, Texas 76102
(817) 978-6476

For the Receiver, Ralph S. Janvey: MR. KEVIN SADLER
Baker Botts, LLP
1600 San Jacinto Center
98 San Jacinto Boulevard
Austin, Texas 78701-4039
(512) 322-2589

For the Examiner, John J. Little: MR. JOHN J. LITTLE
Little Pedersen Fankhauser, LLP
901 Main Street, Suite 4110
Dallas, Texas 75202
(214) 573-2300

b9386c65-0bf7-4284-93f7-817a0d2184f7

ALSO APPEARING (in order of appearance):

MR. JESSE CASTILLO
MR. RANDY PULMAN
MR. PHILLIP PREIS
MR. JAMES ROUHANDEH
MR. EDWARD VALDESPINO
MR. DOUGLAS BUNCHER
MR. ROBERT TORIAN
MR. SETH SCHMEECKLE
MR. JOSHUA FORCE
MR. GORDON COONEY
MR. JONATHAN POLKES
MR. STEVE MALOUF
MR. ROBERT PLOTKIN
MR. SCOTT BERMAN
MR. JEFFREY ZAIGER
MR. RANDLE HENDERSON
MR. CURTIS MINER
MS. ASHLEY KLEBER
MR. BRIAN TAGTMEIER
MR. MICHAEL KUCKELMAN
MR. NEEL LANE

Court Reporter: Linda J. Langford, CSR, RDR, CRR
U.S. District Court Reporter
Chambers of Judge David C. Godbey
1100 Commerce Street, Rm. 1504
Dallas, Texas 75242
(214) 748-8068

Proceedings reported by mechanical stenography, transcript produced by computer.

b9386c65-0bf7-4284-93f7-817a0d2184f7

cases are going to go forward. The Receiver doesn't play a direct role in those. But to the extent discovery is sought from the Receiver, we're looking forward to working with counsel in a coordinated way to make the burden the least burdensome on the Receivership.

THE COURT: To what extent are the individual class actions duplicative of efforts by the Receiver or the Investors Committee to seek recovery?

MR. SADLER: For the Receiver, none. For the Investor Committee, some of the class actions are being prosecuted by lawyers who also serve on the Investor Committee.

The relief sought, though, is not duplicative of the relief being sought by the -- the Receiver either in the cases the Receiver is primarily responsible for or the relief sought by the Committee in cases that the Committee is primarily responsible for.

So there is no -- there is no overlap in -- in that -- in that particular respect.

THE COURT: Okay. Thank you.

MR. SADLER: Looking down the line, and I just wanted to alert the Court to this issue, if there comes a time that any of these class action cases do resolve in a manner that there is going to be some kind of payment, settlement, we have all the class actions here.

ferent motions to dismiss against two different entities. And some of the issues may be complicated and may get lost in the welter of all the pleadings that the Court has considered. And we would like to suggest that, at least in several of the class action cases where there may be more complicated issues, that it might be useful for the Court to hold oral argument in those cases and be able to hear the arguments and to ask questions and to have -- have a better chance to fully understand and -- and appreciate what the issues are prior to the ruling.

So that is just a suggestion that the banks would like to put forth, at least in terms of their own case. There may be reasons why several other cases might get -- might warrant that same treatment.

Thank you.

THE COURT: I'll keep that in mind.

MR. BERMAN: Scott Berman, Your Honor. Friedman Kaplan Siler & Adelman, co-counsel for the plaintiffs in the Rotstain along with Butzel Long and Fishman Haygood.

We're happy to proceed in any manner that the judge wants to as long as the case gets moved along efficiently, however you want to do it. The case has been pending for a while. It's fully briefed. You've decided the jurisdictional motions. There has been motions for reconsideration which will shortly be fully briefed.

We think that the -- the time has come for discovery to proceed. We think it's -- there are certain issues, like good faith on the fraudulent transfer claims, which are certain to survive and that there's no reason we shouldn't proceed with discovery. It's really time to move these cases forward. But we will -- in terms of oral argument or anything else, we'll do whatever the Court desires.

THE COURT: Thank you.

MR. ZAIGER: Good morning, Your Honor. Jeff Zaiger from Joseph Hage Aaronson. I represent Adams & Reese and its partner, Jim Austin, in a 2011 action brought by the Investor Committee and two investors who are seeking to represent a putative class. That case number is 11-CV-329.

Your Honor, like many defendants here, Adams & Reese has fully briefed dismissal motions. Those have been sub judice since September of 2012. Several of the arguments that were presented have been addressed earlier today. I don't want to belabor those points and I don't want to turn this into an argument on the merits of those dismissal motions. I know that's not why we are here.

But there is one unique issue in our case that I just wanted to highlight for Your Honor, and that is the argument by my clients and some others in the 2011 action that

b9386c65-0bf7-4284-93f7-817a0d2184f7

# EXHIBIT 62

Court File No: CV-12-9780-00CL

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

BETWEEN:

**MARCUS WIDE of Grant Thornton (British Virgin Islands) Limited, and HUGH DICKSON, of Grant Thornton Specialist Services (Cayman) Ltd, acting together herein in their capacities as joint liquidators of Stanford International Bank Limited**

Plaintiffs

- and -

**THE TORONTO-DOMINION BANK**

Defendant

**AFFIDAVIT OF BEVERLY M. JACOBS**

**(Sworn November 13, 2014)**

I, **BEVERLY M. JACOBS**, of the City of St. Johns, in the Country of Antigua and Barbuda, MAKE OATH AND SAY:

1. At the time of the collapse of Stanford International Bank Limited ("**SIB**") in February 2009, I was employed as SIB's Vice President of Client Support. Following SIB's collapse, I have remained in this position and have reported first to the former joint liquidators of SIB, Peter Wastell and Nigel Hamilton-Smith (the "**Former Officeholders**"), and now the current joint liquidators, Marcus Wide and Hugh Dickson (the "**Joint Liquidators**"). As such, I have knowledge of the information to which I hereinafter depose, except where my statements are of my information or belief, in which cases I have identified the source of that information or belief and I believe the statements to be true.

2. As detailed below, I have worked the majority of my adult life for SIB, including in a senior management role. As a result, prior to SIB's collapse in February 2009, I had developed extensive and detailed knowledge of SIB's many operations and affairs.

3. My knowledge of SIB's operations and affairs formed a primary source of information that was available to the Former Officeholders upon SIB's collapse and their resulting appointment as receiver-managers and later as joint liquidators. In addition, while working for the Former Officeholders, I acquired additional information from other SIB personnel and provided that information to the Former Officeholders as required. I have outlined the information that I provided to the Former Officeholders in a general way in this affidavit. This is done in order to explain the extent and nature of the information available to the Former Officeholders in the initial months following SIB's collapse.

## I. BACKGROUND

### A. Personal Background

4. I was born in Antigua on November 30, 1965 and completed my education through until grade 11 in Antigua. I then attended City & East London College in the United Kingdom where I completed A-Level courses in English and mathematics. Subsequently, I obtained diplomas from the Cambridge Tutorial College in the United Kingdom in Personnel Management and Industrial Relations, Communications in Business and Management, and Private and Professional Secretarial Duties.

5. In addition, I have completed numerous courses towards a bachelors degree in business administration at Everest University Online, which was formerly Florida Metropolitan University. I have also completed a banking certification course offered by the Institute of

Canadian Bankers and, as a result, obtained a diploma in Bank Operations. Finally, I have attended a series of courses in respect of the banking industry, including a course held in New York on SWIFT wire transfer system and payments.

**B. Employment History**

6. In 1993, I was hired as an administrative assistant at Guardian International Bank Limited ("**Guardian**"), which approximately one year later became "Stanford International Bank Limited" or "SIB". I held that position until I was promoted to the position of Manager's Assistant in 1995. This position entailed working directly with the then-manager of SIB, Edward Smith. I held the position of Manager's Assistant until 1998.

7. In 1998, I was again promoted and became SIB's Client Accounts Manager, a position which entailed overseeing SIB's Client Accounts Department. This was a senior management position and I at all times thereafter remained a senior manager of SIB until its collapse in February 2009. While acting as Client Accounts Manager, I ensured the completion of: (i) adequate follow-up on outstanding documentation for approved accounts; (ii) accurate maintenance of customer information files; (iii) timely and proper handling of customer instructions; (iv) timely and accurate updating of standing orders; (v) timely processing of credit facilities such as loans, letters of credit, letters of guarantee and credit cards; and (vi) proper assignment of departmental functions.

8. In addition, while acting as SIB's Client Accounts Manager, I reviewed documentation for new account applications and output control, completed quarterly performance and other periodic evaluations, provided information to the Human Resources Manager so that job descriptions could be updated, made recommendations regarding staffing, planned and

implemented a vacation schedule for the Client Accounts Department, and, along with others, acted as a signing authority for SIB on such items as cheques, certificate of deposit confirmations, renewal certificates, bank confirmations and general correspondence.

9.      In 2000, I was promoted to the position of Operations Manager for SIB. I remained in that position until 2008. While acting as SIB's Operations Manager, I had oversight of SIB's Operations Department, which, as detailed below, was comprised of three sub-departments: Client Accounts, Client Transactions, and Bill Payments Departments. I also (i) processed letter of credit and letter of guarantee applications; (ii) received and processed claims from beneficiaries of letters of credit and letters of guarantee; (iii) monitored letters of credit and letters of guarantee for maturity dates and other relevant information; (iv) ensured that the loan/deposit ratio was within SIB's accepted guidelines; (v); served as the contact person for SIB's credit card programs; (vi) reviewed SIB's credit card portfolio to ensure adequate balances were maintained as security in deposit accounts; (vii) provided presentations and training on the products and services of SIB to SIB staff and new financial advisors of related entities owned by Robert Allen Stanford ("**Stanford**") (as discussed below); and (viii) continued to act as a signing authority for SIB.

10.     In addition, while acting as SIB's Operations Manager, I also completed quarterly performance and other periodic evaluations and served on the implementation team for SIB's conversion to a new banking system called "Temenos T24 system" (discussed below). Among other things, while implementing the Temenos T24 system, I acted as a resource person for information on SIB's products and services, created and ran tests in the new system, and set up the necessary product menus and rate tables.

11.    In 2008, I was again promoted and became SIB's Vice President of Client Support. I remained in this position until February 2009, at which point SIB's normal operations collapsed. While acting as SIB's Vice President of Customer Support, I had oversight of the Client Services and General Affairs Departments. Within this role, I: (i) ensured that human resources were deployed effectively and positions were adequately staffed, making necessary recommendations in respect of changes and/or reassignments of SIB personnel's responsibilities; (ii) ensured that personnel under my supervision were aware of SIB's policies and adhered to the applicable rules and procedures; (iii) reviewed work processes with department heads and implemented appropriate recommendations; (iv) handled any exceptions to SIB's policies and client complaints; (v) provided SIB's senior management with feedback on matters relating to the departments' operations; (vi) provided presentations and training on SIB's products and services, and continued to act as a signing authority for SIB; (vii) completed quarterly performance and other periodic evaluations of SIB personnel; (viii) provided input and updates to job descriptions in consultation with SIB's senior management and the Human Resources Manager; and (ix) handled disciplinary matters in consultation with SIB's senior management and the Human Resources Manager.

12.    As a result of the various positions and responsibilities I held while employed at SIB, I gained extensive and diverse knowledge of SIB's operations, products and services. Although certain SIB personnel were specialists in distinct parts of SIB's operations (including myself), I was among those at SIB with comprehensive generalized knowledge of SIB's affairs and was therefore a leader of many of the actions that were undertaken at SIB on a day-to-day basis in Antigua.

13. In February 2009, SIB's ongoing operations collapsed. At that time, the Former Officeholders were appointed as joint receiver-managers of SIB. In April 2009, the Former Officeholders were appointed as joint liquidators of SIB but were replaced by the Joint Liquidators in May 2011. Since SIB's collapse, I have at all times remained at SIB and provided assistance to the Former Officeholders and the Joint Liquidators as required.

## II. SIB'S OPERATIONS

### A. SIB's Offices and Employees

14. Throughout my employment at SIB (formerly Guardian), it was at all times headquartered in St. John's, Antigua. Over the years, various buildings served as SIB's headquarters, including the buildings of other Stanford-owned entities Bank of Antigua Limited ("**Bank of Antigua**") and Stanford Trust Company Ltd. ("**STC**"). However, in approximately 2001, a building exclusively for use as SIB's headquarters was constructed at No. 11 Pavilion Drive, St. John's, Antigua. That building was then used as SIB's headquarters until SIB collapsed in February 2009. SIB's affairs continue to be liquidated from its former headquarters, which is now controlled by the Joint Liquidators.

15. Throughout its operations, SIB had one office outside of Antigua. That office was located in Montreal, Quebec, Canada. It was a sales office offering SIB products and also housed SIB's disaster electronic back-up facilities. In the event that SIB could not operate from Antigua, it would have operated from its office in Montreal. In addition, as detailed below, certain of SIB's operations were undertaken by third parties pursuant to contractual agreements. No such third party was located in Antigua and, as such, large portions of SIB's operations were actually conducted from various other locations, primarily in the U.S.

16.     At the time of its collapse in February 2009, SIB had approximately 90 personnel at its headquarters in Antigua and approximately five additional personnel at its Montreal office. In addition, at all times SIB had various officers. For instance, in 2008 and 2009, SIB had 21 officers from various jurisdictions around the world.

**B.     SIB's Departments in Antigua**

17.     At the time that its operations collapsed, SIB had 10 distinct departments at its headquarters in Antigua. Together, SIB's departments received, processed and handled client deposits from tens of thousands of clients totaling billions of dollars. However, those departments did not comprise all of SIB's operations because critical portions of SIB's operations were undertaken by separate entities located outside of Antigua.

**1.     The Operations Department**

18.     SIB's Operations Department consisted of three sub-departments: the Client Accounts Department, the Client Transactions Department, and the Bill Payments Department. Generally speaking, the Operations Department was responsible for receiving new account applications for approval and processing, entering customer information into SIB's banking system and creating customer information files, processing applications for credit facilities, establishing customer accounts, reviewing new account confirmations and renewal certificates, posting customer transactions, preparing cash letters and collection letters, scanning customer transactions for electronic storage, processing standing orders, and processing bill payments.

### 2.    The Client Services Department

19.    SIB's Client Services Department was responsible for, among other things, handling inquires from clients, department managers and financial advisors, processing bank confirmations and other client requests, researching, investigating and resolving queries related to incoming, outgoing and returned wires, liaising with financial advisors regarding transaction discrepancies, following up on queries related to delinquent credit card accounts and credit card disputes, following up on collection items, and translating documents from Spanish or French into English.

### 3.    The General Affairs Department

20.    SIB's General Affairs Department was responsible for, among other things, client filings and general filings, handling all incoming mail and courier packages, processing the daily incoming and outgoing mail pouches, preparing mail items for dispatch, managing SIB's stationary and office supplies, receiving incoming SWIFT messages and releasing outgoing SWIFT messages, maintaining SIB's storage facility, retrieving filed items upon request, managing incoming and outgoing faxes, scanning client signature cards, ensuring proper organization of the file room, and maintaining all mail holds.

### 4.    The Systems Operations Department

21.    SIB's Systems Operations Department was responsible for, among other things, operating and maintaining SIB's systems and network, providing management information as required, executing end-of-day and start-of-day jobs, archiving reports, running backups, running

scheduled and *ad hoc* reports, completing the end-of-month standing orders process, printing account statements, and printing credit card statements.

**5. The Accounting Department**

22. SIB's Accounting Department was responsible for, among other things, maintaining certain of SIB's financial records and providing certain financial information as required, managing the accounts payable portfolio, managing the accounts receivable portfolio, posting journal entries, reconciling accounts, preparing settlement cheques for suppliers, compiling, analyzing and summarizing account information, preparing daily, monthly and yearly reports, preparing budgets, analyzing variances and initiating corrective action, and ensuring compliance with all reporting requirements and regulations of Antigua.

**6. The Compliance Department**

23. SIB's Compliance Department was responsible for, among other things, ensuring that SIB complied with the Antiguan *Money Laundering (Prevention) Act*, the *International Business Corporations Act* and many other legal and regulatory compliance requirements of Antigua. In addition, the Compliance Department reviewed forms, operational procedures and record-keeping files, ensured the quality of documentation was adequate and in compliance with standard operating procedures and regulations, provided training to employees in compliance-related matters, and periodically preformed tests to ensure accounts were functioning in accordance with SIB's terms and conditions.

### 7.      The Quality Control Department

24.     SIB's Quality Control Department was responsible for, among other things, auditing the accuracy of all transactions posted daily, ensuring proper interpretation of clients' instructions, checking postings against reconciliation lists, ensuring postings were reflected on the system, ensuring no duplication of transactions existed, ensuring that appropriate transaction penalties were applied, and assisting Client Services personnel with resolutions to inquiries.

### 8.      The Human Resources Department

25.     SIB's Human Resources Department was responsible for, among other things, providing the day-to-day management of human resources needs, orienting new financial advisors, ensuring that positions at SIB were adequately staffed, and ensuring that a high level of staff morale was maintained, that incumbents were fully trained and that the human resources policies and procedures were adhered to.

### 9.      The Protocol Department

26.     SIB's Protocol Department was responsible for, among other things, assisting with promoting and maintaining SIB's image in the areas of client and visitor support, assisting with SIB event planning, and providing, as necessary, concierge services to "very important" clients and other visitors.

### 10.    The Internal Audit Department

27.     SIB's Internal Audit Department was responsible for, among other things, developing SIB's annual audit plan in conjunction with the Audit Committee Chairman, examining and

evaluating for adequacy and effectiveness of SIB's internal control systems and risk management procedures, performing special investigations at the request of senior management or the Board of Directors, following up with corrective actions or implementation of audit recommendations, liaising with external auditors and regulatory authorities on matters of internal controls and regulatory concerns, and providing audit reports to SIB's Audit Committee.

**C.      Services Provided to SIB from Outside of Antigua**

28.      In addition to its operations in Antigua, it also relied on the services of certain other Stanford-owned entities that were located outside of Antigua. Most notably, SIB relied on the services of the Stanford Financial Group ("**SFG**").

29.      SFG was a distinct entity from SIB and was based in the U.S. It also had affiliates in several other countries. SFG performed most or all of SIB's marketing and treasury functions. My understanding was that SFG performed these services pursuant to contracts with SIB and that SIB paid SFG on a regular basis for the services.

30.      While SIB personnel had primary responsibility for SIB's liabilities (mostly client deposits), SFG was responsible for, among other things, managing all or virtually all of SIB's investment portfolio. SFG was also responsible for managing all or virtually all of SIB's relationships with third party financial institutions, including investment firms and correspondent banks.

31.      Certain senior SFG personnel had particular responsibility for the treasury services provided to SIB. In particular, Patricia Maldonado ("**Maldonado**") was SFG's treasury manager and was responsible for SIB's relationships with correspondent banks, while Laura Pendergest-

Holt ("**Pendergest-Holt**") had primary responsibility for SIB's investment portfolio. Both Maldonado and Pendergest-Holt ultimately reported to James Milton Davis ("**Davis**"), who was the Chief Financial Officer of SFG. Each of Davis, Maldonado and Pendergest-Holt were at all times based in the U.S. and only rarely attended at SIB's headquarters in Antigua. To the best of my knowledge, at no point were any of Davis, Maldonado or Pendergest-Holt based out of SIB's headquarters in Antigua or employed by SIB.

32.     SIB also relied on the services of third party financial advisors in order to engage and manage clients. Most such third party financial advisors were employed by Stanford-owned entities. For instance, clients in the U.S. worked with financial advisors were employed by the U.S.-based Stanford Group Company, clients from Mexico worked with Stanford Group Mexico, and so on (the "**Stanford Group Companies**").

33.     The Stanford Group Companies were at all times separate entities from SIB and provided services to SIB pursuant to contractual agreements. Nonetheless, the financial advisors employed by the Stanford Group Companies were the primary source of sales of SIB deposit products and played a role in managing client relationships for SIB. For instance, the dramatic increase in the number of SIB products sold that took place in approximately 2001 was primarily due to the increase in the number of financial advisors at third party entities – mostly the Stanford Group Companies – that referred clients to SIB products.

## D. SIB's Products and Services

### 1. Deposit Products

34. SIB offered six deposit products. In particular, SIB offered three types of "certificates of deposit" ("**CDs**") and three types of accounts: Fixed CDs, Flex CDs, Index-Linked CDs, Premium Accounts, Performance Accounts, and Express Accounts.

#### (a) Fixed CDs

35. SIB Fixed CDs required a minimum deposit of $10,000. The interest of Fixed CDs compounded daily and was payable upon maturity. No additional deposits or withdrawals prior to maturity were permitted without incurring penalties, except where the client maintained an overall balance of at least $250,000, in which case the withdrawal of interest was allowed.

#### (b) Flex CDs

36. SIB Flex CDs required a minimum deposit of $10,000. The interest of Flex CDs compounded daily and was payable at any time pursuant to the client's instructions. Additional deposits in increments of a minimum of $2,500 were allowed into Flex CDs. Withdrawals of up to 25% of the amount deposited were allowed, provided that adequate notice was given to SIB and that the balance would not drop below $10,000 as a result of the withdrawal. Accrued interest could be withdrawn at any time.

#### (c) Index-Linked CDs

37. SIB Index-Linked CDs required a minimum deposit of $25,000 and were available only in U.S. dollars. At maturity, Index-Linked CDs would pay the principal invested plus, at a minimum, a return calculated on the monthly average of the index of choice designated by the client multiplied by the participation rate, as agreed at the inception of the CD purchase, or fixed-

interest earned, whichever was higher. The available indices included the S&P500, Nasdaq 100 and DJ Euro Stoxx 50. No interim interest payments or deposits were permitted.

**(d) Premium Accounts**

38. SIB Premium Accounts were deposit accounts requiring a minimum deposit and balance of $50,000. Interest compounded daily at an adjustable and equivalent rate to the performance average of selected U.S. Treasury bills and notes. Additional deposits could be made at any time and withdrawals were allowed with prior written notice to SIB. Deposits in Premium Accounts were only allowed in U.S. dollars.

**(e) Performance Accounts**

39. SIB Performance Accounts were deposit accounts requiring a minimum deposit and balance of $10,000. Interest accrued daily. Additional deposits could be made at any time and withdrawals were allowed with prior written notice to SIB. Deposits in Performance Accounts were allowed in most international currencies.

**(f) Express Accounts**

40. SIB Express Accounts were issued to all new clients of SIB. Additional deposits could be made at any time and withdrawals were allowed with prior written notice to SIB. The interest payable could be changed by SIB without prior notice, was compounded daily, and was set based on the then-current rates established by SIB on balances of USD $1,000 or more. No interest was earned on deposits less than this amount. Deposits in Express Accounts were allowed in most international currencies. These accounts allowed clients to place standing orders for payments, automatically pay bills, served as a source of funds to acquire other types of SIB products, and allowed for the temporary placement of maturing funds.

**2. Credit Cards**

41. SIB also offered Visa, MasterCard, and American Express credit card services. The availability of SIB credit card services was tied to the need for clients to hold deposit products with SIB, almost always in the form of CDs. The amount of the SIB credit cards was limited to between $5,000 and $50,000. The bank placed a hold on the client's CD in an amount of twice the credit card limit.

42. Once a credit card was issued, statements were issued monthly to the client from SIB in Antigua. The client then had the option of paying the credit card's balance in full or the minimum stated on the statement, or having such amount debited from a deposit account held at SIB. Clients were also required to sign an authorization allowing SIB to make payments to the client's credit card from a SIB account if payments were not received directly on a monthly basis.

**3. Loan Facility Services**

43. SIB also offered loan facility services. Only existing clients of SIB who held sufficient funds at SIB were eligible for such services. The loans offered by SIB were limited to 80% of the CD or account principal balance held by the client.

44. Once a client had successfully completed the application process to obtain a loan, the loan amount was disbursed to the client and the loan would accrue daily compounded interest in favour of SIB. Minimum payments on accrued interest were required at least quarterly. These payments were normally made either by debiting a client's other accounts at SIB or by wire transfers or cheques sent to SIB in Antigua. The client could also set up a standing order for

another SIB deposit product whereby interest from that product was used for payment of the interest owed on the loan.

**4. Letters of Credit and Letters of Guarantee Services**

45. SIB also offered letter of credit services. In particular, letters of credit were issued by SIB on behalf of clients to third parties and which allowed the third party beneficiary to claim payment from SIB if the letter of credit was drawn upon. The amount of any letter of credit was limited to 80% of the principal balance held by the client at SIB. Once a client's letter of credit application was approved, a letter of credit instrument with a designated expiry date was issued and signed by two SIB officers in favour of the designated third party beneficiary.

46. The letters of credited issued by SIB were what are commonly called "standby letters of credit". To draw on such letters, the beneficiary would need to submit two documents, as determined by the specific transaction, and SIB would not conduct any further investigation. Thus, prior to the letter of credit being approved, the client would need to agree to such terms and execute a corresponding confirmation. The letters of credit instruments were sealed, stamped and couriered to the beneficiary by SIB from Antigua. A hold in the amount of the letter of credit was then placed on the client's CD or deposit account as security.

47. SIB also offered letters of guarantee. Such letters operated in the same manner as did the letters of credit, except that a guarantee of payment, instead of a letter of credit, was issued to the designated beneficiary from Antigua directly to such party.

**5. Private Banking Services**

48. SIB maintained a limited number of financial advisors at its headquarters in Antigua. Those financial advisors obtained clients directly (as opposed to from third party financial

advisors) and provided financial advice to clients or other similar services, as requested by the client. Such private banking services were available only to clients who held deposit products with SIB.

E. The Purchasing Of and Making Withdrawals From SIB CDs

1. Purchasing SIB CDs

49. While SIB offered various products and services, its primary source of business was the sale of CDs and, as noted above, certain of its other business was tied to the need for clients to hold CDs. In most circumstances, CDs were sold by third party financial advisors or agents who were employed by their own respective offices, mostly other Stanford-owned entities such as the Stanford Group Companies. In turn, SIB paid these third party companies referral fees pursuant to contractual agreements in place between SIB and such companies.

50. In order to purchase SIB CDs, clients could attend at SIB's headquarters in Antigua but were not required to do so. More often, financial advisors would gather all of the necessary account opening documentation and then send it by courier to SIB's headquarters. The account opening documentation consisted of a signature card and an account opening application, as well as a copy of photo identification and banking or professional reference letters. A due diligence form for the referral would also be required from the financial advisor.

51. The General Affairs Department was responsible for ensuring that all documents listed on the log provided by financial advisors were in fact received by SIB. The General Affairs Department would then provide the documents to SIB's Client Accounts Department, which would review the documents for completeness and ensure the adequacy of the copies of photo identification and necessary references provided. Any feature of the documentation that was out

of the ordinary or did not make sense was also identified, in which case further inquires or information would be required from the financial advisor.

52. Once the documents were reviewed and all was in order, the referral would be approved and an account number assigned to the new client. The Client Accounts Department would then send a fax to the financial advisor informing that advisor of the approval and providing the account number. All documentation was then placed in a Customer Information File created by the Client Accounts Department and subsequently forwarded to SIB's Compliance Department for further review.

53. Upon receipt of the confirmation fax and the account number, the new client could then make a deposit. Clients could make deposits either by wire transfer or by cheque. Once a new client's funds were received by SIB, the funds were deposited directly into a CD or into a SIB Express Account for further purchase of a CD. Upon the opening of a CD by SIB, a confirmation was generated by SIB's banking system that included the value of the CD and the date of deposit, the customer's name, the currency, the maturity date of the CD, and the terms of the CD and the interest rate.

54. Subsequently, the actual CD would be reviewed by personnel in SIB's Operations Department and compared to the confirmation to make sure the information contained in both was accurate. Once that information was confirmed to be accurate and approved by personnel with signing authority, the confirmation would then be sent to the General Affairs Department, which would in turn send a portion of the confirmation to the financial advisor and retain the remaining portion of the confirmation. The client was then provided the original CD or SIB would hold the original CD, depending on the preference of the client.

55. In normal course, once a CD was issued, the client was provided account statements at intervals chosen by the client: either a monthly, quarterly, yearly or bi-yearly basis. All statements were printed in and mailed from Antigua. Those statements showed all activity in each client's account, the principal balance, total interest for the period, the ending balance, and the interest earned to date for the year.

56. Notably, there were special rules in place for U.S. residents who wished to purchase SIB products. In particular, U.S. residents had to qualify as "accredited investors" pursuant to Regulation D of the *Securities Act of 1933* and had to be referred to SIB through the U.S. based Stanford Group Company brokerage, with the financial advisor being a registered broker. In addition to various other requirements applicable to U.S. accredited investors, such investors were required to make a minimum deposit into SIB CDs of $50,000.

**2. Making Withdrawals from SIB CDs**

57. As detailed above, depending on the type of CDs held, SIB clients could be entitled to make withdrawals from the amounts deposited in SIB CDs. If a SIB client was entitled to make a withdrawal, the client was required pursuant to the agreement with SIB to provide a certain number of business days' notice. To provide that notice, the client was required to send, either directly or through their financial advisor, a written instrument executed by the client that provided the instructions for the withdrawal. Instructions for withdrawal would not be accepted from financial advisors without written, executed instructions from the client.

58. Once the client's withdrawal instructions were received at SIB's headquarters in Antigua, the signature on the instructions would be verified against the client's signature card held by SIB. If everything was in order, the withdrawal transaction would be assigned a value date, with

different value dates being assigned to different transactions. Once the withdrawal request was approved and cleared at SIB, the withdrawal would be input into SIB's banking system and, on the appropriate date, the system would generate either a cheque or a wire transfer payable to the destination specified by the client.

**3. Closing an Account at SIB**

59. The process of closing a CD account was similar to the process used to withdraw funds. The client would be required to send written and executed instructions to SIB's headquarters in Antigua. Once those instructions were received, SIB personnel would confirm that the signature matched the client's signature card held by SIB and, if everything was in order, the transaction was input into SIB's banking system for transfer on a specific date in the manner and to the destination specified by the client.

**F. SIB's Correspondent Bank Accounts**

60. SIB did not have banking facilities in any jurisdiction outside of Antigua and was incapable of independently completing transactions with individuals or entities outside of Antigua. In order to undertake such transactions, SIB therefore relied on the provision of "correspondent" bank accounts from third party financial institutions. In particular, over the course of the years leading up to SIB's collapse, I understood that SIB held correspondent accounts at:

(a) The Toronto-Dominion Bank ("**TD Bank**") in Toronto, Canada, which facilitated all U.S. dollar and Canadian dollar wire transfers for SIB;

(b) HSBC Bank PLC ("**HSBC**") in London, U.K., which facilitated all EURO and British Pound Sterling wire transfers for SIB, and also facilitated payments to SIB of cheques drawn on banks in the U.K.; and

(c) Trustmark National Bank ("**Trustmark**") in Texas, U.S., which facilitated all payments made to or from SIB by way of U.S. dollar cheques.

61. I also recall that Societe Generale in Switzerland, Union Credit Bank in Miami, Florida and Argent Bank in Louisiana provided what I believe may have been correspondent banking services to SIB during the earlier years of SIB's operations, although I do not have any further information on these financial institutions.

62. My personal involvement with SIB's correspondent accounts was limited and this was also the case for most other SIB personnel. The reason for this limited involvement was that virtually all necessary interactions with the correspondent banks was undertaken by SFG personnel as part of the treasury services provided pursuant to contract by SFG to SIB.

63. In particular, Maldonado of SFG's offices in Houston, Texas was the primary point of contact between SIB and the correspondent banks, including TD Bank. With the exception of the occasions noted below, SIB policy was to contact Maldonado if interaction with one of SIB's correspondent banks was required. For instance, if a SIB client requested a standby letter of credit from SIB but indicated that the beneficiary of the letter of credit required confirmation of the validity of the letter of credit from a more well-known bank, I would email Maldonado and relay this request. In turn, Maldonado would contact TD Bank and request that it provide confirmation of the letter of credit. To my recollection, TD Bank agreed to provide such confirmation on the condition that SIB posted collateral in a TD Bank account.

64. SIB personnel in the Client Services Department did handle wire transaction disputes or investigations in respect of the funds transacted through the correspondent accounts. This occurred via the "SWIFT" system, which is a secure messaging service used by financial institutions around the world. The messages sent using the SWIFT system were at most a few sentences long. Those messages normally provided simple instructions in respect of wire transfers or, if an issue with a particular wire transfer had been encountered, provided additional information as required.

65. I also understand that SIB personnel from the Protocol Department would have had some limited contact with correspondent bank personnel. In particular, certain personnel from the Protocol Department arranged travel, accommodation and other similar items upon the travel of correspondent bank personnel to Antigua. My understanding is that the Protocol Department did so upon receiving a request from SFG personnel.

66. There were a few occasions when all SIB personnel were notified that personnel from TD Bank were visiting SIB's headquarters in Antigua. However, notwithstanding that I was a senior manager at SIB, while I may have been introduced, I did not participate in any meetings with any TD Bank personnel when they visited. Instead, I recall that Maldonado (from SFG) attended at SIB's headquarters and met with the visiting TD Bank personnel. In fact, I do not know of any SIB personnel that typically participated in such visits, except for perhaps SIB's President. From November 2003 onwards, SIB's President was Juan Rodriguez-Tolentino ("**Rodriguez-Tolentino**").

67.    I do not recall which TD Bank personnel attended at SIB and, more generally, do not recall the names of any TD Bank personnel. The same is also true of the other correspondent banks.

**G.     SIB's Record Keeping**

68.    As detailed above, throughout the course of its operations, SIB offered diverse products and services to its clients. Ultimately, SIB came to be very successful at attracting clients and their funds. At the time that SIB's operations collapsed in February 2009, it had approximately 25,000 clients located in approximately 113 different countries. Those clients collectively held SIB CDs valued at approximately USD $8 billion.

69.    As a result of the diversity of products and services offered to clients and the number of clients and volume of funds that came to be invested with SIB, its operations became complex. Therefore, SIB personnel were required to have defined roles and work hard to maintain the effective operations of SIB. Together SIB's personnel handled hundreds or thousands of discrete transactions every day, many of which had unique features reflecting the diversity of SIB's clients and their needs. Further, along with the third party financial advisors, certain SIB personnel diligently sought to both attract new clients and all SIB personnel sought to be responsive to the multitude of requests from and demands placed with SIB by existing clients. As a result of the size and diversity of SIB's operations, millions of records were created and maintained at SIB's headquarters.

**1.     The Nature of the Records at SIB's Headquarters**

70.    The records that were held at SIB's headquarters in Antigua primarily related to SIB's liabilities. In particular, those records detailed client deposits and client transactions. They were

what could be called "front of the house" records, meaning those that were required to understand SIB's external relationships with its clients.

71.    To the best of my knowledge, there were limited records held at SIB's headquarters in Antigua that pertained to the inner workings or behind-the-scenes nature of SIB's affairs. Such "back of the house" records were those that would reveal how and where the funds received from SIB's clients were being allocated and utilized. In other words, the records maintained outside of Antigua were those in respect of SIB's investment portfolio.

72.    In particular, SFG was responsible for handling SIB's investment portfolio. SFG was also responsible for handling SIB's relationships with third party financial institutions, including the correspondent banks such as TD Bank. As a result, virtually all records in respect of SIB's investment portfolio and most records in respect of its correspondent bank accounts were held by SFG in the U.S.

73.    There were a few exceptions to the foregoing. First, some SIB personnel had online access to account statements from at least some of the correspondent banks, including TD Bank. It is my understanding that the correspondent bank account statements were reviewed by the Accounting Department to ensure that those reports matched SIB's own records about client transactions. The daily and monthly transaction reports were therefore a further instance of "front of the house" records. On a few occasions, I personally looked at a TD Bank online statement in order to confirm that a particular client payment that I had been dealing with had arrived. However, I did not have regular reason to look at those statements.

74.    Second, notwithstanding that SFG was solely responsible for managing SIB's investment portfolio and its relationships with the correspondent banks, certain records from third party

financial institutions were occasionally mailed to SIB in Antigua. Although this mail was addressed to "Stanford International Bank", it was made to the attention of Davis.

75. Any mail that was received by SIB that was made to the attention of Davis was set aside and not opened by SIB personnel. In particular, my understanding was that those SIB personnel who were responsible for handling SIB's incoming mail kept any such mail in boxes secured in SIB's main filing room beside cabinets that were accessed only by Davis. Those boxes then stayed in that secure location or were transferred to an inner vault area until someone from SFG attended at SIB and retrieved the mail.

76. SIB personnel also did not have access to any electronic records or correspondence held by other Stanford-owned entities, including SFG or the Stanford Group Companies. In fact, SIB had a wholly different computer and email system from both SFG and the Stanford Group Companies. Therefore, any records that were created as a result of interactions with third parties by SFG and the Stanford Group Companies on behalf of SIB were not available to SIB personnel. For example, email correspondence exclusively between Davis, Pendergest-Holt or Maldonado and TD Bank personnel was not available to SIB personnel.

77. In sum, while SIB personnel had access to extensive "front of the house" records in respect of SIB's liabilities, to the best of my knowledge, they had only very limited, if any, access to any records in respect of SIB's investments.

### 2. The Storage of Records at SIB's Headquarters

78. There were both hard copy documents that required physical storage and electronic records held at SIB's headquarters in Antigua.

79.   SIB had expansive rooms within its headquarters dedicated to storing physical records, namely client files and all transactional data. Those records were generally stored in boxes and cabinets and could be retrieved on an as-needed basis.

80.   SIB also maintained millions of electronic records on its computer systems. There were various sources of such records. For instance, like most modern businesses, SIB had a main computer system which hosted all of SIB's computer software, digital documents and email servers. In addition, all such software, documents and email servers were separately stored on a back-up system and could be accessed if there was an emergency or the need arose to retrieve old files that were no longer stored on the main system due to the passage of time.

81.   SIB's main computer system also hosted the banking software that was used by SIB to record, organize, manipulate and produce outputs for SIB and its customers in respect of all banking transactions undertaken by SIB. In July 2006, SIB entered into a deal to acquire and implement new banking software called the "Temenos T24 system". That system was deployed at SIB by personnel from the Temenos company over the next 15 months and ultimately went into live operation in February 2008. The Temenos T24 system thereafter worked in conjunction with SIB's custom in-house computer systems.

82.   I was personally involved with the implementation of the Temenos T24 system and the necessary training of various SIB personnel on that system. The implementation of the new system resulted in the replacement of the legacy banking systems that had previously been used by SIB. Although then-active client and transaction information was moved into the Temenos T24 system, some historical transactional information was not moved into the new system. As a

result, it remained necessary to access and utilize SIB's legacy banking systems in respect of such historical information.

## III. THE RUN ON SIB AND SIB'S COLLAPSE

83. In late 2008, there were an increasing number of requests by clients to withdraw their funds from SIB CDs or other deposit accounts. Given my role as SIB's Vice President of Client Support, I was aware of and helped to manage such requests. In doing so, it soon became clear to me that SIB was having some difficulty dealing with those requests. In other words, there was a "run" on SIB.

84. As a result of the run, SIB personnel responsible for dealing with client requests (including myself), began to request information on when funds would be made available so that client withdrawal requests could be met. These requests were made to Rodriguez-Tolentino who, as SIB's President, dealt with senior SFG personnel such as Stanford, Davis, Pendergest-Holt and Maldonado. Typically, Rodriguez-Tolentino would advise that he had spoken with those SFG personnel and that SFG was in the process of making the necessary funds available, including in the TD Bank correspondent accounts. I do recall one occasion in which I was present when Rodriguez-Tolentino appeared to be speaking to Stanford and told Stanford in an agitated manner that funds needed to be made available to SIB to meet client withdrawal requests.

85. However, while some funds did appear from time-to-time in the TD Bank correspondent accounts, those funds were generally not arriving fast enough to satisfy the client requests. As a result of this shortfall, I understood that, at one time, there was approximately USD $100 million in backlogged client withdrawal requests.

86.     While I could not be certain, I assumed at all times that clients were attempting to make withdrawals due to the serious international monetary crisis that began in late 2008. I did not know why SIB was having difficulty dealing with client withdrawal requests. However, given that Rodriguez-Tolentino advised me that funds were forthcoming, I understood that SIB was simply having some liquidity issues and that once SIB's investments were liquidated or funds were otherwise accessed, there would again be sufficient funds to meet the withdrawal requests.

87.     Notwithstanding the foregoing, on or about February 18, 2009, I learned for the first time that SIB was facing certain legal or financial troubles in the U.S. In particular, on that date, all SIB personnel received an email from Ralph Janvey explaining that he had been appointed as a U.S. Securities and Exchange Commission receiver by a U.S. court over SIB and all other Stanford-owned entities (the "**U.S. Receiver**"). To my recollection, that email also indicated, among other things, that SIB's business was being halted and that nothing at SIB's headquarters was to be removed or destroyed.

88.     The news that the U.S. Receiver had been appointed came as a complete surprise to me. I also had numerous discussions with various other SIB personnel, all of whom agreed that the appointment of the U.S. Receiver was a complete shock. However, at that time, no SIB personnel were discussing with me the possibility that SIB was in any way involved with a fraud or any other wrongdoing. Rather, my understanding was only that SIB was having certain financial issues. Given that I generally understood SIB's business to be strong, I assumed at that time that any such financial issues would be quickly resolved and that SIB's business would soon return to normal operations.

89.     Following the appointment of the U.S. Receiver, SIB's headquarters in Antigua quickly became an absolute madhouse. Almost immediately, SIB clients from around the world began travelling to and arriving at SIB's headquarters. Most of those clients were highly agitated and confrontational, and the situation was made even more difficult by the fact that many of the clients were speaking Spanish or other languages that various SIB personnel did not understand. In any event, it became readily apparent that virtually all of those clients were demanding information about their investments with SIB and that their investments be repaid immediately.

90.     Along with other senior SIB personnel, I attempted to meet with the clients that had travelled to SIB's headquarters to address and calm their concerns. However, this proved to be a largely impossible task. In particular, repayments of clients' investments could not occur because SIB's funds were frozen. Further, I did not have any information on the legal troubles facing SIB in the U.S. and did not have any information on any of the allegations of fraud that were being made concerning SIB and Stanford. It also remained entirely unclear to me why SIB's funds had been frozen, why there were allegations of fraud, and when SIB's operations would return to normal. In these circumstances, there was virtually nothing that could be said to address client's concerns or questions in a satisfactory way.

91.     In the days following the freeze of SIB's funds and the appointment of the U.S. Receiver, the chaos at SIB's headquarters in Antigua escalated. Hundreds of clients arrived at SIB's headquarters from around the world. On at least one occasion, out of concern for their personal safety, SIB personnel were required to have the police attend at SIB's headquarters and escort clients off the premises because those clients otherwise refused to leave without being repaid the funds from their investments.

92. On or about February 19, 2009, just after I had learned of the appointment of the U.S. Receiver, SIB personnel learned that the Antiguan Financial Services Regulatory Commission (the "**FSRC**") had separately appointed the Former Officeholders as joint receiver-managers of SIB and it Antiguan affiliate, STC.

## IV. THE CIRCUMSTANCES FACED AND STEPS TAKEN BY THE FORMER OFFICEHOLDERS

### A. The Arrival of the Former Officeholders at SIB

93. On February 20, 2009, the Former Officeholders and others from their firm Vantis Business Recovery Services ("**Vantis**") arrived at SIB's headquarters in Antigua. The Former Officeholders were also accompanied by their legal counsel, who I recall included a man named Peter Wiltshire, and representatives of the FSRC.

94. Soon after their arrival at SIB's headquarters, the Former Officeholders, their legal counsel, the Vantis team and representatives of the FSRC met with SIB's then-President, Rodriguez-Tolentino, and other senior SIB personnel, including myself. At that meeting, the Former Officeholders explained that they had been appointed by the FSRC due to the U.S. court's decision appoint the U.S. Receiver and freeze SIB's funds. They further explained that they did not have any information concerning SIB's financial affairs. Rather, the Former Officeholders advised that their information was limited to what was available publicly through media reports.

95. Having done so, the Former Officeholders advised that their mandate was to stabilize SIB's operations but that, for the time being, those operations would not continue. Further to this mandate, the Former Officeholders then explained that the focus of their efforts would be on:

(a)     protecting the position of clients who were located around the world;

(b)     confirming the sums owed to clients;

(c)     dealing with the concerns of SIB personnel;

(d)     seeking funding for payment of the salaries of SIB personnel while they remained employed by SIB;

(e)     establishing the position of the investment assets held by SIB;

(f)     establishing the position of the non-investment assets held by SIB;

(g)     engaging with the U.S. Receiver and the U.S. court in respect of SIB's affairs; and

(h)     ensuring the preservation of the operating infrastructure and computer systems used by SIB.

96.     The Former Officeholders were also very clear that nothing was to be removed or destroyed from SIB's headquarters, a message that was later conveyed to all SIB personnel. We were advised that this was necessary in order for the Former Officeholders to ensure they had access to all possible information that could help them to stabilize SIB's operations.

97.     At the initial meeting, having outlined their mandate and priorities, the Former Officeholders began making inquiries of Rodriguez-Tolentino and the gathered senior SIB personnel. Those inquiries included requests for information concerning, among other things, SIB's assets, including its investment portfolio. In response, Rodriguez-Tolentino explained to the Former Officeholders that neither I nor the other senior SIB personnel had any knowledge of

or involvement with SIB's assets or investment portfolio. Me and other senior SIB personnel were then excused from the meeting.

98.    Soon after their arrival at SIB's headquarters, the Former Officeholders also held meetings with the rest of SIB's personnel, many of which I attended. At those meetings, the Former Officeholders informed SIB personnel of their mandate and priorities, which were the same as those that had been outlined in the earlier meeting described above.

**B.    Initial Impediments Faced by the Former Officeholders**

99.    Having heard the Former Officeholders discuss their mandate and priorities, my view was that they intended to stabilize SIB's operations. I was optimistic that they would readily do so and that SIB's operations would therefore return to normal. However, it soon became apparent that the mandate and priorities of the Former Officeholders would be severely impeded by the circumstances in which they found themselves. A description of certain features of those circumstances is detailed below.

100.    In the period following their appointment as receiver-managers, the Former Officeholders were faced with the complete chaos that continued to surround SIB's headquarters. As a starting point, at the time of the Former Officeholders' arrival at SIB's headquarters, there were approximately 100 SIB clients in the lobby. Like the clients who had attended at the headquarters in the previous days, those clients had travelled to SIB from around the world to demand repayment of their investments. Those customers continued to be extremely agitated and demanding, and many continued to speak only in Spanish, a language the Former Officeholders advised they did not speak.

101. The Former Officeholders were soon required to completely close SIB's headquarters to all persons except SIB and Vantis personnel, and the Former Officeholders' legal counsel. As a result, the Former Officeholders were required to design and implement alternative means of communicating with clients. For instance, the Former Officeholders prepared a "Frequently Asked Questions" document in both English and Spanish. That document provided responses to the types of inquiries that were repeatedly being asked by clients and was regularly updated to ensure that it contained up-to-date information. That document was thereafter distributed to each of the many clients that attended at SIB's headquarters.

102. In addition to those who attended at SIB's headquarters, many clients chose to write or place phone calls to SIB. The volume of such correspondence was generally overwhelming. While many personnel from both SIB and Vantis (including myself) were assigned by the Former Officeholders to answer phone calls of SIB clients, there was often simply no way to answer the volume of client calls being received. In particular, within the initial months following the appointment of the Former Officeholders as receiver-managers alone, SIB received a large volume of emails from SIB clients demanding information on the status of SIB and their investments. Such emails continued to be received by the Former Officeholders at all times throughout the period that they acted as receiver-managers and, later, as liquidators. Similarly, over the same initial months following SIB's collapse in February 2009, it received a large volume of phone calls from SIB clients, again demanding information on the status of SIB and their investments.

103. It was in these chaotic circumstances that the Former Officeholders embarked on their efforts to stabilize SIB's operations. To begin, the Former Officeholders conducted interviews with senior SIB personnel. However, many of those personnel were overwhelmed and confused

by the scenario unfolding around them. Whereas many such personnel had been comfortably employed by SIB for years, suddenly they were inundated with the shocking prospect that SIB may not have the funds necessary to repay its clients. Understandably, many such personnel were most interested in gaining information concerning SIB's funds and their own employment status, which had clearly been placed in jeopardy.

104.   More problematic, however, was that most SIB personnel simply had limited or no information to share with the Former Officeholders that could assist in their efforts to stabilize SIB's operations. In particular, while most SIB personnel had a good understanding of how to do their specific jobs and certain SIB personnel had detailed information on discrete issues such as client correspondence or the Temenos T24 system, no SIB personnel had any information on SIB's investment portfolio or the fraud allegations surrounding SIB.

105.   The Former Officeholders also largely did not have the benefit of any useful information that may have been provided by SIB's then-President, Rodriguez-Tolentino. In particular, although Rodriguez-Tolentino was in attendance at SIB in the initial days following the appointment of the Former Officeholders, although I do not know why, he soon thereafter stopped attending at SIB. It is my guess that Rodriguez-Tolentino may have been concerned for his safety given his prominent role at SIB, the anger of SIB's clients following its collapse, and the difficulty maintaining privacy or security on a small island like Antigua.

106.   In these circumstances, I was one of the most long-serving and senior employees at SIB who was available to the Former Officeholders. Within days of their appointment as receiver-managers, the Former Officeholders conducted an interview of me at which various topics were discussed.

107.   However, that interview barely scratched the surface of the information the Former Officeholders required to meaningfully engage with SIB's affairs. Therefore, over the course of the months following their appointment, I continued to provide regular assistance and information to the Former Officeholders. For instance, the Former Officeholders regularly asked me questions about and required my assistance in order to gain even a basic understanding of products and services or of SIB's operations and affairs. The information I provided to them therefore included that which is set out in this affidavit, although it was required to be substantially more detailed in order to assist the Former Officeholders.

108.   In the course of these interactions with the Former Officeholders, the magnitude of the task that they faced and how that task was complicated by the circumstances the Former Officeholders found themselves in became clear to me. Among other things, it was clear that the Former Officeholders knew virtually nothing about the operations, products or services of SIB and required the assistance of SIB personnel, including myself, to acquire such information. This made sense to me given that the Former Officeholders had never previously attended at or had any involvement with SIB.

109.   I also assisted the Former Officeholders with various practical tasks. For instance, soon after their appointment, the Former Officeholders determined that it was necessary to issue statements to clients providing the Former Officeholders' then-current information about the amounts each client had invested with SIB. My understanding was that issuing such statements to clients would assist the Former Officeholders with their mandate of identifying the assets and liabilities of SIB.

110. However, the Former Officeholders naturally had no idea how client statements were generated or the precise nature of the information contained on those statements. In addition, given the collapse of SIB's normal operations, the Former Officeholders required the statements to include unique information and instructions to clients in respect of their accounts, a situation not previously faced by SIB personnel. Accordingly, the Former Officeholders and certain SIB personnel (including myself) were required to work in concert to issue statements to each of SIB's approximately 25,000 clients. This process was also complicated by the fact that many of those clients had "hold mail" accounts and thus were not meant to be sent any correspondence by mail.

111. The Former Officeholders were also required to deal with the employment status of SIB's personnel. In particular, SIB's personnel were naturally concerned about whether their employment would be terminated and several inquiries were made of the Former Officeholders about that status. In response, the Former Officeholders explained that, while acting as receiver-managers, they did not have the legal authority to terminate the employment of SIB personnel. Further, the Former Officeholders explained that they had not yet determined whether the funds necessary to pay SIB personnel were available. Considering that the cost of paying SIB personnel was very minor relative to what was understood to be the multi-billion dollar operations of SIB, this strongly suggested to me that SIB and, in turn, that the Former Officeholders may be seriously lacking funds.

**C. Further Steps Taken by the Former Officeholders**

112. Within approximately one month of their appointment as receiver-managers, the Former Officeholders informed SIB personnel that, based on the limited information available to them, it appeared that SIB was insolvent and that they would be seeking permission from the Antigua

court to wind-up SIB's affairs and liquidate its assets. At that time, it became clear to me for the first time that SIB would definitely not be returning to normal operations. However, I remained employed by SIB and to assist with their winding-up and liquidation efforts. Soon thereafter, on April 15, 2009, the Former Officeholders were appointed as liquidators of SIB by the Antiguan court.

113.    Following their appointment as liquidators, the Former Officeholders, their counsel and the Vantis team continued to be present and very active at SIB's headquarters in Antigua. One of the first tasks they undertook upon being appointed as liquidators was to explain that they had acquired the legal capacity to terminate the employment of SIB personnel as necessary and soon after terminated the employment of virtually all SIB personnel. However, while the Former Officeholders confirmed that all terminated personnel were legally entitled to severance pay, they advised that SIB's estate did not have the funds required to make severance payments, but would attempt to make such payments in the future. This again confirmed my understanding that the Former Officeholders in fact lacked even the basic funds required to undertake the receivership or liquidation of SIB.

114.    Following the termination of the employment of most SIB personnel, I continued in my efforts to assist the Former Officeholders as they required. However, although I continued my employment at SIB, the Former Officeholders explained to me that they did not have the funds available to pay my normal salary. Instead, the most the Former Officeholders were in a position to pay me was an amount that was approximately half of my existing salary. Given that I had no other job opportunity at that time and that my assistance was needed by the Former Officeholders, I agreed to this arrangement. My full salary was eventually restored, but only

approximately one and a half years later, by which time the Former Officeholders had been replaced by the Joint Liquidators.

115. While reporting to the Former Officeholders, my tasks differed in nature, but generally included helping the Former Officeholders to understand SIB's products, services and operations, or dealing with SIB's clients. My interactions with clients were often in response to client inquiries. At other times, the Former Officeholders required information from clients or needed to resolve discrepancies between SIB's records and clients' understandings of their holdings at SIB.

116. I was not always actively involved with all of the steps being undertaken by the Former Officeholders. However, I was generally aware of the steps that they were taking. In particular, I was aware that the Former Officeholders were, among various other things, seeking recognition of their appointment by the Antigua court in various jurisdictions around the world and seeking to recover SIB's assets in those jurisdictions, seeking cooperation from the U.S. Receiver, and setting up and operating a comprehensive online claims database in order to process clients' claims and, if all went well, ultimately repay their investments. It at all times appeared to me that the Former Officeholders were diligently and reasonably proceeding with their efforts to wind-up SIB and liquidate its affairs.

**D. Information Concerning the Fraud Allegations**

117. In the months following the appointment of the U.S. Receiver and the Former Officeholders, I heard various news reports indicating that allegations of fraud were being made against Stanford, Davis and Pendergest-Holt. However, even upon hearing those reports, it was far from clear to me that any fraud had been committed in connection with SIB or, if that was the

case, how the fraud may have been committed. Prior to its collapse in February 2009, I had no prior reason to suspect that SIB may be in any way connected to fraudulent conduct. Accordingly, my view in the months following SIB's collapse was simply that SIB had encountered significant financial issues and not that SIB had collapsed due to fraud.

118. The first time that it became apparent to me that there may be validity to the reports of fraud when I heard or read news reports in respect of the criminal conviction of Davis. In particular, in August 2009, it was reported in the media that Davis had pleaded guilty to criminal charges in the U.S. and that Davis had agreed to statements detailing how Stanford, Davis and a small group of associated individuals had undertaken a highly complex and well-concealed fraud on SIB. Even months after SIB's collapse, those statements were shocking and completely inconsistent with my own experience at SIB.

119. Further, to the best of my knowledge, even upon the publication of Davis' explanation of the fraud, there was still no way that the explanation could be verified using the information in Antigua. Having been generally familiar with SIB's records and operations during the course of SIB's operations and, since the time of SIB's collapse, having had various discussions with the Former Officeholders, it is my view that there was simply nothing at SIB's headquarters in Antigua that could have readily revealed the fraudulent conduct detailed in the media reports about Davis' plea agreement.

120. In light of the Davis plea agreement, and later the much-publicized criminal prosecution of Stanford and various other information that has been subsequently reported publicly in connection with the U.S. Receiver's work, I have now accepted that Stanford, Davis and a small group of associated individuals committed a massive fraud on SIB. I have no reason to believe

that any SIB personnel knew of the fraud or that the records or information available to SIB personnel could have revealed that fraud at any time prior to or even in the months following SIB's collapse.

**SWORN** before me at the City of St. John's, in the Country of Antigua and Barbuda, this 13th day of November, 2014. )

A Commissioner, notary, etc.

BEVERLY M. JACOBS

NICOLETTE M. DOHERTY BA, LL.M
ATTORNEY AT LAW
NOTARY PUBLIC

Island House, Newgate Street, P.O. Box W1661, Woods Centre, St. John's, Antigua, West - Indies

MARCUS A. WIDE, et al.
Plaintiffs

v.

THE TORONTO-DOMINION BANK
Defendant

Court File No. CV-12-9780-00CL

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at Toronto

**AFFIDAVIT OF BEVERLY M. JACOBS**
**(Sworn November 13, 2014)**

**BENNETT JONES LLP**
Barristers and Solicitors
One First Canadian Place
Suite 3400, P.O. Box 130
Toronto, Ontario
M5X 1A4

Lincoln Caylor (LSUC # 37030L)
Maureen M. Ward (LSUC #44065Q)
Nathan J. Shaheen (LSUC #60280U)

Tel: 416.777.6121/4630/7306
Fax: 416.863.1716

Lawyers for the plaintiffs

# EXHIBIT 63

# Ex. 18A
# Declaration of
# Sarah Elson-Rogers
# Apr. 2015



815075v.1

# DECLARATION OF SARAH ELSON-ROGERS

I, Sarah Elson-Rogers, state as follows:

1. I am at least twenty-one years of age and am competent to make this declaration.

2. I am a citizen of the United Kingdom currently residing in Wilson, North Carolina.

3. I am a beneficial owner of certificates of deposit ("CDs") issued by the Stanford International Bank, Ltd. ("SIBL"), including those issued on or around the following dates:

   a. REDACTED

   b. REDACTED

   c. REDACTED

   d. REDACTED and

   e. REDACTED

4. In relation to the aforementioned SIBL CDs, I have submitted claims to the United States Receiver, Ralph S. Janvey.

5. The U.S. Receiver has recognized and allowed my claims, as detailed in claim numbers:

   a. REDACTED

   b. REDACTED

   c. REDACTED

   d. REDACTED

6. I am willing and able to take on the responsibilities demanded of me as a class representative in this matter, as I understand those responsibilities to include attending deposition and trial and protecting the rights of absent class members.

I state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 28th day of April, 2015.

S. Elson-Rogers

Sarah Elson-Rogers

# EXHIBIT 64

# DECLARATION OF SALIM ESTEFENN URIBE

I, Salim Estefenn Uribe, state as follows:

1. I am at least twenty-one years of age and am competent to make this declaration.

2. I am a citizen of Colmbia currently residing in Bogota.

3. I am the trustee for the Esturicol Trust, which is the beneficial owner of certificates of deposit ("CDs") issued by the Stanford International Bank, Ltd. ("SIBL") on or around the following dates:

   a. REDACTED
   b. REDACTED
   c. REDACTED
   d. REDACTED
   e. REDACTED
   f. REDACTED

4. In relation to the aforementioned SIBL CDs, I have submitted claims to the United States Receiver, Ralph S. Janvey.

5. The U.S. Receiver has recognized and allowed my claims, as detailed in claim numbers:

   a. REDACTED
   b. REDACTED
   c. REDACTED
   d. REDACTED
   e. REDACTED and
   f. REDACTED

EXHIBIT 127
Deponent Estefenn
Date 7-2-15 Rptr. KM
WWW.DEPOBOOK.COM

Scanned by CamScanner

6. I am willing and able to take on the responsibilities demanded of me as a class representative in this matter, as I understand those responsibilities to include attending deposition and trial and protecting the rights of absent class members.

I state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this, 29th day of April. 2015

Salim Estefenn Uribe

Scanned by CamScanner

# EXHIBIT 65



# Ex. 18E
# Declaration of
# Ruth Alfille de Penhos
# Apr. 2015

815075v.1



Declaración de Ruth Alfille de Penhos

Yo, Ruth Alfille de Penhos, afirmo como sigue:

1. Yo tengo por lo menos veinte-uno años de edad y soy competente para hacer esta declaración.

2. Soy una ciudadana actualmente de México viviendo en Mexico City.

3. Soy la usufructuaria de los certificados de depositos ("CDs") expedido por el Banco Internacional de Stanford, Ltd. ("SIBL") en o cerca de las fechas seguidas:

   a. REDACTED*
   b. REDACTED
   c. REDACTED
   d. REDACTED
   e. REDACTED

4. En relación a los SIBL CDS susodichos, yo he sometido reclamaciones al Síndico de Estados Unidos, Ralph S. Janvey.

5. El Síndico de E.E.U.U. ha reconocido y ha permitido mis reclamaciones, como se detalla en los números del reclamación:

   a. REDACTED
   b. REDACTED
   c. REDACTED
   d. REDACTED
   e. REDACTED
   f. REDACTED

* Demandante invertió antes del [illegible] de diciembre de 200[illegible] [illegible] actualmente [illegible] registro relacionado con los anteriores inversiones [illegible]

Scanned by CamScanner

6. Yo estoy dispuesta y capaz de tomar las responsabilidades que me demandan como una representante en esta cuestión, por lo que entiendo aquellas responsabilidades incluyen asistiendo a la deposición y el juicio y salvaguardando los derechos de los miembros ausentes de la clase.

Yo afirmo según la pena de perjurio que el precedente es verdad y correcto según mi leal saber y entender.

Formalizado este 29 día de Abril, 2015.

Ruth Alfille de Penhos

Scanned by CamScanner