# EXHIBIT 66

Page 1

1           IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
2                   DALLAS DIVISION
3  PEGGY ROIF ROTSTAIN,        §
   et al.,                     §
4                              §
                               §
           Plaintiffs,         §
5                              §        Case No.
   v.                          §    3:09-CV-2384-N-BG
6                              §
   TRUSTMARK NATIONAL          §
7  BANK, et al.,               §
                               §
8          Defendants.         §
   _____ §
9
10
11
12
13       VIDEOTAPED DEPOSITION OF GABRIEL SUAREZ
14                  Houston, Texas
15              Tuesday, May 19, 2015
16
17
18
19
20
21
22
23    Reported by:
24    SUSAN PERRY MILLER, CSR, CCR, RDR, CRR, CBC
25    JOB NO. 93134

Page 3

```
 1              A P P E A R A N C E S
 2
 3    FOR THE CLASS PLAINTIFFS:
 4       James Swanson, Esq.
         Benjamin Reichard, Esq.
 5       FISHMAN HAYGOOD PHELPS WALMSLEY
         WILLIS & SWANSON
 6       201 St. Charles Avenue
         New Orleans, Louisiana  70170
 7
 8
 9    FOR DEFENDANT SOCIÉTÉ GÉNÉRALE PRIVATE BANKING
      (SUISSE) S.A.:
10
         Julie Cohen, Esq.
11       Noelle Reed, Esq. (Houston Office)
         SKADDEN, ARPS, SLATE, MEAGHER & FLOM
12       4 Times Square
         New York, New York  10036
13
14
15
      FOR DEFENDANT HSBC BANK PLC:
16
         Taylor Brinkman, Esq.
17       LOCKE LORD
         2200 Ross Avenue
18       Dallas, Texas  75201
19
20    FOR DEFENDANT TRUSTMARK NATIONAL BANK:
21       Ashley Kleber, Esq.
         GIBBS & BRUNS
22       1100 Louisiana
         Houston, Texas  77002
23
24
25
```

Page 4

1    A P P E A R A N C E S, Continued:

2

3    FOR DEFENDANT TORONTO-DOMINION BANK:

4        Robert Plotkin, Esq.
         McGUIREWOODS
5        2001 K Street N.W.
         Washington, D.C.  20006

6

7

8    FOR DEFENDANT INDEPENDENT BANK,
     Successor-in-Interest to BANK OF HOUSTON:

9

         Brad Repass, Esq.
10       HAYNIE RAKE REPASS & KLIMKO
         14643 Dallas Parkway
11       Dallas, Texas  75254

12

13

     FOR DEFENDANT BLAISE FRIEDLI:

14

         Stephanie Gamiz, Esq.
15       MORGAN, LEWIS & BOCKIUS
         101 Park Avenue
16       New York, New York  10178

18

     VIDEO TECHNICIAN:

19

         Robert Birdsall, TSG REPORTING

20

     ALSO PRESENT:

21

         Emily von Qualen, Summer Intern, Skadden

22

                     --oOo--

23

24

25

Page 40

1   much the front line customer to Stanford.

2        Q.   Okay.  By "front line customer,"

3   what do you mean?

4        A.   She walked in the office first.

5        Q.   So when you say "walked in the

6   office first," she's the one that made the

7   decision to purchase a certificate of deposit?

8        A.   The first one, yes.

9        Q.   The first one, okay.

10            Do you know when that was?

11       A.   2006.

12       Q.   Okay.  In 2006, when your mother

13  purchased the first certificate of deposit,

14  did you discuss that with her?

15       A.   At that time, no.

16       Q.   Were you aware that she was

17  considering purchasing --

18       A.   Yes.

19       Q.   What conversations did you have

20  with her?

21       A.   She mentioned that she was going to

22  move some of her savings into another bank.

23       Q.   How much savings did she have?

24       A.   At that time?

25       Q.   Yeah.

Page 102

1    had in those accounts in 2006?

2         A.   Specific amounts, no.

3         Q.   You don't know how much she had

4    saved at all?

5         A.   No.

6         Q.   Do you know generally how much she

7    had?

8         A.   I'd say  REDACTED .

9         Q.   And you said that she thought it

10   was a good investment.  Did she communicate

11   that to you at the time?

12        A.   Yes.

13        Q.   Did she communicate why she thought

14   it was a good investment?

15        A.   Because there were already family

16   members that were customers.

17        Q.   Which family members were already

18   customers?

19        A.   I don't know.  Specifically, I

20   don't know at that time.

21        Q.   But some other family member --

22        A.   From the ones I mentioned

23   previously.

24        Q.   How old were you in 2006?

25        A.   18.

Page 280

```
 1              J U R A T

 2

 3    I,            , do hereby certify under

 4    penalty of perjury that I have read the foregoing

 5    transcript of my deposition taken on            ;

 6    that I have made such corrections as appear noted

 7    herein in ink, initialed by me; that my testimony as

 8    contained herein, as corrected, is true and correct.

 9

10    DATED this _____ day of _____, 20   ,

11    at _____,         .

12

13

14

15

16

17    _____

18    SIGNATURE OF WITNESS

19

20

21

22

23

24

25
```

# EXHIBIT 67

Page 1

1          IN THE UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF TEXAS

2                  DALLAS DIVISION

3  PEGGY ROIF ROTSTAIN,        §

   et al.,                     §

4                              §

          Plaintiffs,          §

5                              §          Case No.

   v.                          §    3:09-CV-2384-N-BG

6                              §

   TRUSTMARK NATIONAL          §

7  BANK, et al.,               §

                               §

8          Defendants.         §

   _____ §

9

10

11

12     VIDEOTAPED DEPOSITION OF STEVEN QUEYROUZE

13                 Houston, Texas

14            Wednesday, May 27, 2015

15

16

17

18

19

20

21

22

23     Reported by:

24     SUSAN PERRY MILLER, CSR, CCR, RDR, CRR, CBC

25     JOB NO. 93135

Page 3

1               A P P E A R A N C E S

2

3   FOR THE CLASS PLAINTIFFS:

4       James Swanson, Esq.
        Benjamin Reichard, Esq.
5       FISHMAN HAYGOOD PHELPS
        WALMSLEY WILLIS & SWANSON
6       201 St. Charles Avenue
        New Orleans, Louisiana   70170

7

8

9   FOR PLAINTIFFS and THE OFFICIAL STANFORD
    INVESTORS COMMITTEE:
10
        Peter Morgenstern, Esq.
11      BUTZEL LONG
        230 Park Avenue
12      New York, New York   10169

13

14
    FOR DEFENDANT SOCIÉTÉ GÉNÉRALE PRIVATE BANKING
15  (SUISSE) S.A.:
16      Noelle Reed, Esq.
        SKADDEN, ARPS, SLATE, MEAGHER & FLOM
17      1000 Louisiana
        Houston, Texas   77002

18

19

20  FOR DEFENDANT HSBC BANK PLC:

21      Taylor Brinkman, Esq.
        LOCKE LORD
22      2200 Ross Avenue
        Dallas, Texas   75201

23

24

25

Page 4

1    A P P E A R A N C E S, Continued:

2

     FOR DEFENDANT TRUSTMARK NATIONAL BANK:

3

         Jeffrey Kubin, Esq.
4        GIBBS & BRUNS
         1100 Louisiana
5        Houston, Texas   77002

6

7

     FOR DEFENDANT TORONTO-DOMINION BANK:

8

         Robert Plotkin, Esq.
9        McGUIREWOODS
         2001 K Street N.W.
10       Washington, D.C.   20006

11

12

     FOR DEFENDANT INDEPENDENT BANK,
13   Successor-in-Interest to BANK OF HOUSTON:
14       Brad Repass, Esq.
         HAYNIE RAKE REPASS & KLIMKO
15       14643 Dallas Parkway
         Dallas, Texas   75254

16

17

18   FOR DEFENDANT BLAISE FRIEDLI:
19       Ryan Wooten, Esq.
         MORGAN, LEWIS & BOCKIUS
20       1000 Louisiana Street
         Houston, Texas   77002

21

22

23   VIDEO TECHNICIAN:
24       Robert Birdsall, TSG REPORTING
25                    --oOo--

App. 1338

Page 12

1        Q.    More of a supervisory role?

2        A.    No, I was only there about a year

3   and just didn't have a case come up for trial.

4        Q.    All right.  So after a year at

5   Geico, where did you go?

6        A.    I moved to Seattle and worked in

7   the restaurant business in 1993.

8        Q.    Why Seattle?

9        A.    Because that's where the restaurant

10   was.

11        Q.    And what type of restaurant was it?

12        A.    It was a Ruth's Chris Steakhouse.

13        Q.    And those originated -- are you a

14   native of Louisiana?

15        A.    Yes.

16        Q.    Where were you born?

17        A.    In New Orleans.

18        Q.    And Ruth's Chris, that's a --

19        A.    It started in New Orleans.

20        Q.    Okay.  And so you moved up to

21   Seattle to what, manage a restaurant?

22        A.    Well, my family was a franchisee

23   for that restaurant.

24        Q.    And when you say your family was a

25   franchisee, who are you speaking about

Page 13

1   specifically?

2          A.   My mother and father.

3          Q.   And what was your role?

4          A.   Initially I was the general

5   manager.

6          Q.   And eventually, what were you?

7          A.   The owner.

8          Q.   100%?

9          A.   With my wife, yeah.

10         Q.   And I understand you eventually

11  acquired two other of those same franchises up

12  in the Pacific northwest?  Is that true?

13         A.   That's correct.

14         Q.   And where were those?

15         A.   One was in Portland, Oregon, which

16  I opened in 1997; and the other was in

17  Bellevue, Washington, which I opened in 2002.

18         Q.   And did there come a point when you

19  sold these restaurants?

20         A.   Yes.  I sold them back to the

21  franchisor in the fall of 2007, the

22  transaction was completed.

23         Q.   What was the sales price?

24         A.   REDACTED.  And I need to clarify,

25  I was the franchisor -- or franchisee, general

Page 17

1      A.    Salary was probably about REDACTED

2   REDACTED

3      Q.    Total for all three?

4      A.    Uh-huh.

5      Q.    That's a yes?

6      A.    Yes, I'm sorry.

7      Q.    Okay.  Now, all of a sudden you've

8   REDACTED , in what year?

9      A.    2007.

10      Q.    Prior to that time, did you have

11   any investments other than those three

12   restaurants?

13      A.    I might have had some 401(k) money

14   from my previous jobs, or IRAs.

15      Q.    Anything else?

16      A.    I don't believe so.

17      Q.    At the time of that sale, did you

18   have a financial advisor?

19      A.    No.

20      Q.    How did you first become associated

21   with what I'll just call the Stanford Group?

22   And by that, I mean all of the Stanford

23   companies.  Okay?

24      A.    Another Ruth's Chris franchisee who

25   had sold, prior to me selling, to the

Page 18

1    franchisor, introduced me to the Stanford

2    Group in Baton Rouge, Grady Layfield.

3           Q.    So you were introduced to Grady

4    Layfield?

5           A.    Yes, sir.

6           Q.    By whom?

7           A.    By Stan Harris.

8           Q.    And where had Stan Harris owned his

9    Ruth's Chris?

10          A.    They had seven or eight of them.

11          Q.    Whereabouts?

12          A.    One in Baton Rouge, one in Memphis,

13   one in Nashville, two in Chicago, one in

14   Jacksonville, one in Ponte Vedra.

15          Q.    How long had you known Mr. Harris

16   at the time he steered you toward the Stanford

17   folks?

18          A.    Probably since 1993.

19          Q.    By virtue of the fact you and he

20   were in the same business, franchisees?

21          A.    Yes.  Yes.

22          Q.    And what is it that he told you

23   about the Stanford Group that made you

24   interested in going that direction?

25          A.    He said they handled his finances

Page 19

1  and investments.  We were moving back from

2  Seattle to Louisiana in 2008, and he handled

3  his boss's financial stuff also.

4      Q.   Did you do any independent looking

5  into them?

6      A.   No.  I met with Grady and put the

7  accounts with him.

8      Q.   Okay.  So prior to meeting with

9  Grady, Mr. Harris had told you that he and his

10 dad had invested with them, and you had not

11 done any independent investigation or review

12 of the Stanford companies; is that a fair

13 statement?

14     A.   It was his boss, not his father.

15     Q.   I'm sorry, his boss.

16     A.   Yes.

17     Q.   But other than that, is that a fair

18 statement?

19     A.   Yes.

20     Q.   Okay.  Now, when you went to meet

21 with Grady, who all was in on that meeting?

22     A.   I might have went to lunch with

23 Stan Harris and Grady once and then met with

24 Grady Layfield afterwards one-on-one to

25 discuss move -- investing or putting the money

App. 1343

Page 20

1   in that --

2        Q.   Do you remember anything about that

3   lunch?

4        A.   Not specifically, no.

5        Q.   Can you put an approximate date on

6   it?  Like spring of this year, summer of that

7   year?

8        A.   No, I don't -- I mean, it would

9   have been in 2007 or 2008.

10        Q.   And after the lunch, about how long

11   was it before you met with Grady?

12        A.   Not -- the next trip to

13   New Orleans, probably a month.

14        Q.   When did you actually physically

15   move back to New Orleans?

16        A.   We moved in August of 2008.

17        Q.   All right.  So sometime --

18        A.   I would have met with Grady before

19   that.

20        Q.   Okay.  That's what I was getting

21   at, thank you.

22        And where did you meet him?

23        A.   Either at his office or we went to

24   lunch with him.

25        Q.   Don't remember which?

1        A.   No.

2        Q.   And can you tell us about the

3   meeting?  What sort of investments were you

4   interested in?

5        A.   We just discussed the managed

6   accounts, investment accounts that they

7   offered.

8        Q.   And what sort of investment

9   accounts did he tell you they offered?

10       A.   They offered a management brokerage

11   account where you give them the money and they

12   invest it in securities and you give them the

13   authority to buy and sell your securities.

14       Q.   Did you discuss any other accounts

15   at that time?

16       A.   No.

17            (Queyrouze Exhibit 21 marked.)

18            MR. REPASS:  Susan informed me that

19       we were just going to keep going with

20       the exhibits from last time so we're

21       going to start with Exhibit 21 if that's

22       all right with everyone.

23            MR. SWANSON:  That's fine.

24   BY MR. REPASS:

25       Q.   Okay.  Sir, let me slide over what

Page 43

1          Q.    And what's your understanding of

2     what a certificate of deposit or a CD is?  How

3     does that work?

4          A.    You put the money in a financial

5     institution and it's locked in for a period,

6     and you get a certain rate of return.

7          Q.    Now, do you recall where you would

8     have invested in CDs prior to November 2007?

9          A.    No.  It would have been in

10    New Orleans.

11         Q.    Pardon me?

12         A.    It would have been in New Orleans,

13    but I don't recall where.

14         Q.    Okay.  Have no idea which bank?

15         A.    I don't remember which bank I would

16    have done business with at that time.

17         Q.    All right.  Okay.

18         A.    They probably don't exist.

19         Q.    You are an American citizen, right?

20         A.    Yes.

21         Q.    You know you're one of the named

22    class representatives in this case; you

23    understand that?

24         A.    Yes.

25         Q.    Are you a named class

Page 44

1    representative in any other lawsuits?

2          A.    I don't believe so.   It's possible.

3    Well, the Bank of Antigua lawsuit.

4          Q.    Yeah, that's what I was thinking.

5    You're a named rep in that one too.   True?

6          A.    True.   Yes.

7          Q.    And that's some other lawsuit going

8    on where a bunch of Stanford investors just

9    basically are complaining that the Bank of

10   Antigua and some other folks down there won't

11   release or wouldn't release money that they

12   had seized to Stanford investors.   Is that a

13   fair summary of your understanding of that

14   case?

15         A.    It's been a long time since I've

16   looked at it.   I'd have to go back and review

17   it.

18         Q.    Okay.   Well, I mean, being a class

19   representative in that case, are you involved

20   in it?

21         A.    I have been in the past.   There

22   hasn't been any activity recently.

23         Q.    Right.   Well, as far as this case

24   goes, this case right here, how active have

25   you been in this?

Page 45

1        A.   I've been involved in it.

2        Q.   Say prior to March 2nd of this

3   year, how active were you in it in the

4   previous year?

5        A.   I talked to Peter Morgenstern a

6   couple of times about the case over that time

7   period.  I can't recall how many times.

8        Q.   Okay.  From, say, March of 2014 to

9   March 2015, you can't recall in particular but

10  you think you talked to Peter Morgenstern a

11  couple of times about this case.  True?

12       A.   Yes.

13       Q.   You don't remember any other

14  conversations with any other lawyers about

15  this case, do you?

16       A.   No.

17       Q.   Did you review -- do you remember

18  reviewing any documents over that year?

19       A.   I can't recall.

20       Q.   And what did you do to prepare for

21  your deposition here today?

22       A.   I met with the attorneys and

23  reviewed some of the things.

24       Q.   I don't want to hear what they

25  talked with you about, okay?  But what I am

1    interested in knowing is what documents did

2    you review?

3         A.   I reviewed the original pleadings,

4    the amended Complaints, the judge's ruling,

5    and maybe some pleadings the defendants filed.

6         Q.   All right.

7         A.   It's a lot of paper.

8         Q.   Yeah, it is a lot of paper.  I got

9    a lot of it from y'all Friday.

10             But let me ask you this:  You said

11   the defendants' pleadings.  Do you remember

12   which -- I mean, did you review any pleading I

13   had filed?

14        A.   I'd have to go back and look at the

15   pleadings to see who had filed them.

16        Q.   Do you remember Ms. Reed, do you

17   remember reading anything from them?

18        A.   I'd have to look at them.

19        Q.   Okay.  So you reviewed some

20   defendants' pleadings, you just don't know

21   what.

22        A.   Yes.

23        Q.   Right?

24        A.   Yes, sir.

25        Q.   Well, just tell me, in your own

1    words, what are you suing us for?

2         A.   For participating in the Ponzi

3    scheme that Allen Stanford committed.

4         Q.   For participating in it?

5         A.   Well, for being part of it, yes.

6         Q.   Yes, for being part of it.   True?

7         A.   Yes.

8         Q.   And it's your understanding our

9    banks actively participated in the Ponzi

10   scheme, true?

11        A.   Y'all enabled them to continue

12   these transactions, yes.

13        Q.   You said a second ago that we

14   participated in it.   Did we participate --

15   it's a simple question, yes or no:   Did these

16   banks participate in the Ponzi scheme, yes?

17        A.   They did business with Allen

18   Stanford.

19        Q.   That's not what I asked you, sir.

20   Did we participate in the Ponzi scheme?

21        A.   What do you mean by participating?

22        Q.   Well, you used the term first.

23   What did you mean by it?

24        A.   I mean you did business with Allen

25   Stanford and his enterprises.

Page 48

1      Q.   Okay.  So you've sued our banks

2   because we did business with Allen Stanford

3   and his enterprises.  Fair?

4      A.   I think y'all aided and abetted in

5   the Ponzi scheme.

6      Q.   Uh-huh.  Anything else you can come

7   up with at this point?

8      A.   I'm good right now.

9      Q.   All right.  That's all you can

10   recall about these -- why you're suing us?

11      A.   I don't think I understand your

12   question.

13      Q.   Well, my question was, that's all

14   you recall about why we're being sued.  True?

15         MR. SWANSON:  Object to the form of

16      the question.

17   BY MR. REPASS:

18      Q.   All right.  You've -- I'm just

19   trying to -- have you told me your best

20   understanding of why you and similarly

21   situated plaintiffs representatives and the

22   class are suing my banks?

23      A.   I believe the banks knew that

24   Stanford Group, enterprise, whatever you want

25   to call it, was doing suspicious activities,

Page 49

1   and they were in the best position to know,

2   and didn't take appropriate action.

3       Q.   Anything else?

4       A.   At this time, no.

5       Q.   Okay.  Now, let me show you what's

6   been marked as Exhibit 24.

7           (Queyrouze Exhibit 24 marked.)

8           MR. REPASS:  Sorry, it's light.

9           THE WITNESS:  It's all right.

10          MR. SWANSON:  Thank you.

11   BY MR. REPASS:

12      Q.   Sir, do you recognize Exhibit 24?

13      A.   No.

14      Q.   Do you know who prepared it?

15      A.   No.

16      Q.   It was produced by your lawyers,

17   and I presume they got it from you.

18      A.   I don't know who prepared it.

19      Q.   Did your wife?  Did you have your

20   wife prepare it?

21      A.   No, I don't think my wife prepared

22   it.

23      Q.   Okay.  Well, look at -- I'm just

24   trying to get to the bottom of this.

25          April 8th, for instance, 2008, that

Page 54

1      Q.   Sir, let me show you what's been
2   marked as Exhibit 25 to your deposition.  Sir,
3   I'll represent to you that to my recollection,
4   this is page 2 of 2, and I just want to zero
5   in on these transactions here on page 2.
6          Have you had a chance to look at it?
7      A.   Yes.
8      Q.   What does Exhibit 25 reflect?  The
9   purchase of a CD from SIBL?
10     A.   Yes.
11     Q.   For REDACTED.   True?
12     A.   Yes.
13     Q.   On or about April 1st of 2008.
14   True?
15     A.   Yes.
16         Q.   I'm just curious.  Why at that
17   time?  I mean, you'd been with them for at
18   least since 2007.  Why at that time did you
19   decide to buy a CD?
20         A.   I recall discussing it with Grady
21   prior to the April -- talking about
22   diversifying with some of the money from
23   securities to --
24         Q.   Do you recall what the stock market
25   was doing in March of 2008?

Page 55

1          A.    No, I don't recall independently,

2    no.

3          Q.    Do you recall the reasons for

4    wanting to diversify into a little more cash

5    in April or so of 2008?

6          A.    No.

7          Q.    All righty.  Let's move on to

8    Exhibit 26.

9                (Queyrouze Exhibit 26 marked.)

10               MR. REPASS:   Thank you.

11   BY MR. REPASS:

12         Q.    Sir, if you'll take a look at

13   Exhibit 26 for just a second, let me know when

14   you've had a chance to look at it.

15         A.    Okay.

16         Q.    Do you recognize Exhibit 26 as

17   being a true and correct copy of the original

18   certificate of deposit for REDACTED issued by

19   SIBL to you or your wife on or about April 1st

20   of 2008?

21         A.    Yes.

22         Q.    And this was a fixed CD with a

23   five-year maturity date.  True?

24         A.    Yes.

25         Q.    And it speaks in terms down below

Page 56

1   of the annual yield will be 9.69%.  Do you see

2   where I'm reading that?

3          A.   Yes, I see that.

4          Q.   Why did you go with a CD from

5   Stanford as opposed to a CD from a domestic

6   bank?

7          A.   I decided to buy it after a

8   conversation with Grady.  I don't really

9   recall specifically why.

10          Q.   And I could be wrong, but I went

11   through all of these documents and at least I

12   didn't identify any specific written

13   documentation related to CDs as opposed to,

14   say, the SIM or something like that.

15          Do you recall him having any

16   documentation that he went over with you about

17   the SIBL CDs?

18          A.   Not that I -- I don't know.

19          Q.   Do you know whether he went over

20   any documentation with you?

21          A.   He might have, it's possible.

22          Q.   But sitting here today, you don't

23   remember one way or the other?

24          A.   No.

25          Q.   Sitting here today, do you remember

Page 57

1    anything that he said in support of the notion
2    of you and your wife purchasing an SIBL CD for
3    REDACTED?
4         A.   At the time, he told me that the
5    bank was a safe investment, that it invested
6    in securities and different transactions and
7    got a higher return than domestic banks
8    because of less regulation, that they didn't
9    invest in any of their entities.  It was a
10   totally separate bank that invested in
11   securities and different things.
12        Q.   All right.  Let me see if I can
13   pick that apart, in a good way.
14             He told you that they could get a
15   better rate of return because they invested in
16   what?  You lost me on that one.
17        A.   Securities.
18        Q.   And where would they get the money
19   to invest in the securities?
20        A.   From the bank.
21        Q.   And by "from the bank," did you
22   take that to mean from CD accounts?
23        A.   From depositors, yes.
24        Q.   And a CD is a deposit, right?
25        A.   Yes.

Page 62

1    A.    Good slide.   Thank you.

2    Q.    You're welcome.

3          THE WITNESS:  Is this the same --

4          MR. SWANSON:  Yeah, you gave me

5    one.

6          MR. REPASS:  Huh?

7          MR. SWANSON:  You sent one over

8    here for me.  I thought you were looking

9    for another one.

10         MR. REPASS:  No, huh-uh.

11   BY MR. REPASS:

12   Q.    Sir, have you had a chance to look

13   at Exhibit 27?

14   A.    Yes.

15   Q.    And does this reflect your purchase

16   of an additional CD for REDACTED from SIBL in

17   early April 2008?

18   A.    Yes.

19   Q.    I'll represent to you that -- and

20   maybe I just missed it -- but I couldn't find

21   the actual certificate of CD in your

22   production for the REDACTED.  I found it for

23   the REDACTED, obviously; it's Exhibit 26.

24         And I would just ask that when y'all

25   get a chance and get back to New Orleans that

Page 64

1   of the proposed latest Complaint, filed under

2   seal, it says that you have purchased at least

3   two CDs from SIBL, and I'm just going to try

4   and save some time here.

5           To the best of your memory, you have

6   purchased only two CDs from SIBL.  Is that

7   correct?

8       A.   That's correct.

9       Q.   And one for REDACTED, one for

10  REDACTED.  True?

11      A.   That's correct.

12      Q.   All right.  Now, with respect to

13  those CDs, to the extent they earned interest

14  from, say, April 2008 until, we'll say

15  February of 2009, what happened to that

16  interest?  Was it -- was it rolled back into

17  the CD?

18      A.   It stayed in those accounts, yeah.

19      Q.   Okay.  Let me see if I can find

20  something here.

21          (Queyrouze Exhibit 28 marked.)

22  BY MR. REPASS:

23      Q.   I'd like to show you what's been

24  marked as Exhibit 28 to your deposition.  Do

25  you recognize this document, sir?

Page 92

1    you think he was a pawn or what?

2         A.   I don't really think about Grady.

3         Q.   I understand that, I really do.

4    But do you think he was a participant in the

5    Ponzi scheme?

6         A.   I couldn't tell you.

7         Q.   Okay.  Now, do you think the

8    Antiguan government was a participant in the

9    Ponzi scheme?

10        A.   I, you know, couldn't tell you.

11             MR. PLOTKIN:  Please speak up.

12             THE WITNESS:  I couldn't tell you.

13        I'm sorry.

14   BY MR. REPASS:

15        Q.   But you think these banks were?

16        A.   I do.

17        Q.   Specifically, Bank of Houston, what

18   did we do?  What did we do wrong?

19        A.   Specifically?

20        Q.   Yeah, I want to know --

21        A.   I think you aided and abetted --

22        Q.   No, no -- I'm sorry, go ahead and

23   finish.

24        A.   -- in the Ponzi scheme.

25        Q.   Okay.  And we've got your

Page 93

1    general -- hey, it's on the record that you

2    generally have these beliefs about all of the

3    defendants, all right?

4              Now I'm asking specifically about

5    Bank of Houston; can you point to anything

6    specifically that the Bank of Houston did?

7         A.   I'm leaving that to my attorneys to

8    pursue.

9         Q.   All right.  How about for any other

10   of the banks?  Can you point --

11        A.   Same thing.

12        Q.   Same thing.  Sitting here today,

13   can you tell me of anything specifically that

14   the Bank of Houston did?  Specifically.

15        A.   I'm leaving that to my attorneys to

16   pursue.

17        Q.   So the answer is no?

18        A.   No.

19        Q.   And would the same be true of the

20   other banks here today?

21        A.   Yes.

22        Q.   Did you ever have an account with

23   the Bank of Houston?

24        A.   No.

25        Q.   Have you ever had an account with

Page 94

1   any of these other banks?  HSBC,

2   Toronto-Dominion, Trustmark --

3           MS. REED:  Société Générale Private

4       Banking (Suisse).

5           MR. REPASS:  I did take two years

6       of French in college, but it wasn't --

7           THE WITNESS:  Let me hear it.

8           MR. REPASS:  Because the ratio was

9       like 12 to 1, female to male.

10          MS. REED:  I took Russian.

11          THE WITNESS:  It's possible.  I

12      don't recall having accounts there.

13  BY MR. REPASS:

14      Q.   All right.  Sitting here today, you

15  don't recall having accounts with anyone?

16      A.   No.

17      Q.   Okay.  Fair enough.

18          MR. REPASS:  What time is it?

19          MR. SWANSON:  I have 11:17.

20          MR. REPASS:  All right.  Let's take

21      a break.

22          MR. SWANSON:  Thanks.

23          THE VIDEOGRAPHER:  We are off the

24      record at 11:17.

25          (Recess, 11:17 a.m. to 11:31 a.m.)

Page 134

1   questions, if that's okay.

2       A.   Okay.

3       Q.   You understand that Trustmark

4   National Bank is one of the defendants in this

5   lawsuit?

6       A.   Yes, I do.

7       Q.   And you understand that you're a

8   proposed class representative in this lawsuit?

9       A.   Yes, I do.

10      Q.   And who do you understand are the

11  other defendants in this lawsuit?

12      A.   Bank of Houston, Toronto-Dominion.

13  Now I'm drawing a blank, sorry.  Credit Suisse

14  or Société Générale; Trustmark, yourself; Bank

15  of Houston; Toronto-Dominion, HBSC [sic].

16      Q.   Okay.  And who do you understand

17  are the other named plaintiffs or your fellow

18  class -- your fellow proposed class

19  representatives?

20      A.   What do you mean, who?

21      Q.   Do you know who they are?

22      A.   I'd have to look at the -- Peggy

23  Rotstain, different class reps that were

24  Stanford victims.

25      Q.   Can you name any others sitting

Page 135

1    here today, besides Peggy Rotstain?

2         A.    Not without looking at the thing.

3         Q.    Okay.  Could you tell me, what is

4    your understanding of what is the proposed

5    class in this lawsuit that you're being

6    proposed to represent?

7         A.    What is my understanding?

8         Q.    Yes.

9         A.    That it's the people that had

10   certificates of deposit in Stanford

11   International Bank.

12        Q.    Okay.  And are there any other

13   limits on what that proposed class is going to

14   be, as far as your understanding?

15        A.    I'm leaving most of it to the

16   attorneys to pursue.

17        Q.    Okay.  So what you just told me is

18   your understanding as the class representative

19   of what the class is going to be?

20        A.    Uh-huh.  Yes, sir.

21        Q.    Do you know what countries the

22   proposed class members reside in?

23        A.    I can tell you the countries where

24   people were affected, yes.

25        Q.    Okay.  I don't want to know where

Page 136

1    they're affected.  I want to know the
2    countries where proposed class members reside.
3    What's your understanding of that?
4         A.   Going off memory, I believe one is
5    from Mexico, Colombia, United States,
6    Venezuela, maybe a couple more.
7         Q.   Okay.  Do you know what those
8    couple others are?
9         A.   Central American countries,
10   possibly.  Panama.
11        Q.   Any others?
12        A.   Not off the top of my head.
13        Q.   Okay.  Do you know how many members
14   there are approximately of the class you're
15   proposed to represent?
16        A.   It's thousands.  I don't know the
17   exact number of certificate depositors.
18        Q.   Do you have an estimate at all as
19   the proposed class representative?
20        A.   I don't remember it off the top of
21   my head.
22        Q.   Okay.  Let me represent to you that
23   your petition says the number exceeds 17,000,
24   just so you know, as we go through some
25   questions today, if that's okay.

App. 1364

1        A.    Okay.

2        Q.    I believe you testified earlier

3   that you read some of the Complaints in this

4   lawsuit; that is, what your attorneys have

5   written, making allegations against the

6   defendants, in preparation for the deposition

7   today.  Is that correct?

8        A.    That's correct.

9        Q.    And do you remember what Complaints

10  you read?

11       A.    I would have read the original

12  petition, the amended -- and the amended

13  petitions or Complaints.

14       Q.    Okay.  And when did you actually

15  read those?  In the last week or the last day?

16       A.    No, I would have read the earlier

17  ones back before they were filed.

18       Q.    So you read each of those petitions

19  before they were filed?

20       A.    Yes.

21       Q.    Now, I believe with Mr. Repass you

22  discussed earlier that you bought two SIBL CDs

23  in April of 2008.  Do you remember that?

24       A.    Yes.

25       Q.    And at the time you bought those

Page 138

1   CDs, you were an accredited investor, correct?

2       A.   Yes.

3       Q.   And what does it mean to be an

4   accredited investor?

5       A.   By the SEC, you mean?

6       Q.   Yes.

7       A.   I believe at the time it was

8   probably a net worth of a million dollars or

9   assets of a million dollars.

10      Q.   Okay.  And does it also generally

11  mean that you're somewhat more of a

12  sophisticated investor than a nonaccredited

13  investor?

14      A.   Yes.

15      Q.   And so you, as a sophisticated

16  investor, might have a different perspective

17  or a different take, can analyze risk somewhat

18  better than a nonaccredited investor, correct?

19      A.   In theory, that's right, yes.

20      Q.   Right.  That's why they have the

21  accredited investor program, right?

22      A.   That's correct.

23      Q.   Okay.  And let me show you, if I

24  could, sir, what I think is your résumé, which

25  I'm going to mark as Exhibit 40.

Page 157

1    Q.   Okay.  And I believe you also

2  testified that as far as purchasing those CDs,

3  you don't recall reviewing or relying on any

4  written documents in making that decision; it

5  was just a conversation with Mr. Layfield.  Is

6  that correct?

7    A.   Yes.  We had one or two

8  conversations and then they were purchased.

9    Q.   Okay.  But no written documents

10  that you recall?

11    A.   Not that I recall.

12    Q.   Okay.  And I believe you also

13  testified that -- and tell me if I'm wrong --

14  but that conversation with Grady, the three

15  points that I remember were that it was a safe

16  investment, it had a higher rate of return

17  because the bank invested in securities out of

18  its Memphis office that were not related to

19  Stanford entities, and it had a higher rate of

20  return because there was less regulation.  Is

21  that correct?

22    A.   That's what I remember him telling

23  me.

24    Q.   Okay.  And those are the only three

25  things that you can remember him telling you

Page 158

1   prior to making that investment?

2        A.   Yes.

3        Q.   In other words, those were the

4   statements that you relied on in agreeing to

5   do that.  Is that correct?

6        A.   Yes.

7        Q.   Now, as far as the other class

8   members that you're proposed to represent, the

9   17,000-plus other people, I take it you don't

10  know what they -- written documents they may

11  have reviewed or what oral statements

12  financial advisors may have made to them

13  before they invested.  Is that correct?

14       A.   No, I don't.

15       Q.   Okay.  So if we wanted to know what

16  they relied on, we'd need to go talk to them.

17  Is that correct?

18       A.   I would --

19       Q.   Pardon?

20       A.   I guess.  I would assume so.

21       Q.   Yes.  You don't know the answer to

22  that question?

23       A.   I do not, no, sir.

24       Q.   Okay.  And I take it you also don't

25  know what financial advisors they -- I mean --

Page 186

1       A.   Could have been more, could have
2   been less.

3       Q.      REDACTED        ?

4       A.   No.

5       Q.   You think it was under REDACTED?

6       A.   I do.

7       Q.   But it could have been more than
8   REDACTED?

9       A.   Could have been?

10      Q.   Could have been more than REDACTED?

11      A.   I don't think so.

12      Q.   What about Wachovia?

13      A.   Same thing.

14      Q.   Under REDACTED?

15      A.   Yes.

16      Q.   But could have been more than
17  REDACTED?

18      A.   It's possible.

19      Q.   Could have been more than REDACTED?

20      A.   Probably not.

21      Q.   Since 2009, have you filed any
22  amended tax returns?

23      A.   No.

24      Q.   Have you claimed any losses in
25  connection -- in your taxes in connection with

Page 187

1    your investments in Stanford CDs?

2         A.   Yes, I have.

3         Q.   You have on your taxes?

4         A.   Yes.

5         Q.   Okay.  How much have you claimed in

6    losses on your tax returns?

7         A.   The certificates of deposit.

8         Q.   Right.  How much have you claimed?

9              MR. PLOTKIN:  Could you speak up?

10             THE WITNESS:  I'm sorry.  The

11   certificates of deposit, REDACTED.

12   BY MS. REED:

13        Q.   Okay.  And what is the tax value

14   that you've accrued for claiming those losses?

15        A.   I've been carrying it forward.  I

16   don't know what the balance is.

17        Q.   Who did you transfer your brokerage

18   account securities from Stanford?  When that

19   account was unfrozen, what institution now

20   holds those securities?

21        A.   It was Andy Galy, G-A-L-Y, and I

22   believe at that time he was with ING.

23        Q.   Did you have an account already

24   with ING before you transferred the Stanford

25   account to ING?

1          Q.    Five years ago?

2          A.    2009 or '10, yeah.

3          Q.    So at least five years ago?

4          A.    Yeah.

5          Q.    How did you come to be named as an

6     individual representative?

7          A.    Just working with my attorney,

8     Peter Morgenstern.

9          Q.    Is Peter Morgenstern your attorney?

10         A.    Yes.

11         Q.    Do you have a retainer agreement

12    with Mr. Morgenstern?

13         A.    Yes.

14         Q.    Do you know if you produced it in

15    your document productions?

16         A.    I didn't have a copy of it.  He

17    does.

18         Q.    Oh, you don't have a copy of it?

19         A.    That's correct.

20         Q.    And when did you -- and over the

21    course of the five years as a named class

22    representative, what, if anything, have you

23    done in that case?

24         A.    Well, the case was stayed for a

25    long time and there hasn't been much activity

Page 196

1    that I'm aware of at this point.

2         Q.   Have you been officially named as a

3    class representative?

4         A.   What do you mean by --

5         Q.   Has the class been certified?

6         A.   I don't believe so.  I don't know.

7         Q.   You don't know if the class has

8    been certified?

9         A.   I don't -- I don't know the current

10   disposition.

11        Q.   And -- but you're the class

12   representative?

13        A.   Yes.

14        Q.   Do you have an obligation to know

15   the current status?

16        A.   I just -- I don't know where -- if

17   there's been an official ruling on the class

18   certification.  I don't remember.

19        Q.   Do you know if there's been a

20   motion made to certify the class?

21        A.   I do not know at this time.

22        Q.   I can't --

23        A.   I do not know at this time.

24        Q.   So you don't know?

25        A.   Right.

Page 197

1        Q.    How long has it been since you and

2   Mr. Morgenstern discussed the Antiguan class

3   action?

4        A.    It's been a while.  Until last

5   night.

6        Q.    A year, two years?

7        A.    Until last night.

8        Q.    Until last night?

9        A.    Yeah.

10        Q.    And when was the time before that?

11        A.    It's been a year or two.

12        Q.    Okay.  And what is it that the

13   class in the Antiguan case is accusing the

14   Antiguan government of doing?

15        A.    I don't -- the Antiguan government?

16        Q.    Well, isn't that who you're suing?

17        A.    Seizing -- yes, seizing the assets

18   of the Bank of Antigua.

19        Q.    I'm sorry, you're suing them for

20   seizing the assets of the bank?

21        A.    That's my recollection.

22        Q.    Okay.  And what do you hope to --

23   what relief do you hope to obtain in that

24   case?

25        A.    We would like to get some value for

App. 1373

Page 213

1          A.    That's what it says, yes.

2          Q.    Right?  And you continued to

3    accumulate REDACTED until February

4    of 2009.  Is that right?

5          A.    That's -- in that account, yes.

6          Q.    Okay.  And then look at 27.  Did

7    you earn any interest in that month?

8          A.    REDACTED.

9          Q.    So if we add the two monthly

10   interest payments together, comes out to about

11   REDACTED.

12         A.    That's what it says, yes.

13         Q.    Over the course of a year, it would

14   be more than REDACTED.  Did you report that on

15   either your '07 or '08 income taxes?

16         A.    I wouldn't have reported it in '07.

17         Q.    Why not?  You had it in April of

18   '07.

19         A.    April of '08.

20         Q.    I'm sorry, April of '08, okay.  Did

21   you report it in '08?

22         A.    I would imagine I did.

23         Q.    What do you mean, imagine?

24         A.    Well, by the time I filed the 2008

25   return, Stanford was already known so I don't

Page 214

1    know how the CPA treated it.

2         Q.   Well, you signed the return, right?

3         A.   Yeah, but I would have to go back

4    and look at what he did and --

5         Q.   Okay.  You keep saying we have to

6    go back and look.  Is there any reason why you

7    didn't produce that information?

8         A.   The tax return?

9         Q.   Yeah.

10        A.   I believe I did produce the tax

11   return.

12        Q.   For '08?

13        A.   Yes.

14        Q.   Okay.  Why do you believe that?

15        A.   Because I believe I did.

16        Q.   Was that in the storage room?

17        A.   Or in my office.

18        Q.   Oh, you also kept stuff in your

19   office?

20        A.   Yes.

21        Q.   Where is your office located?

22        A.   In Metairie, Louisiana.

23        Q.   So you have an office in the

24   storage room?

25        A.   I have a storage room personally

Page 222

1    Q.   And some of them did?

2    A.   I would assume, yeah.



Page 223



App. 1377

Page 224



Page 225



7       Q.   Now, are you aware that your

8    counsel has filed, within the last 30 days or

9    so, a motion to certify the class in this

10   litigation?

11      A.   Yes.

12      Q.   You said that you had met with them

13   prior to this deposition and reviewed some

14   documents.  Is that correct?

15      A.   We just discussed the deposition.

16      Q.   Just discussed the deposition?

17   When was it that you reviewed documents in

18   relation to the case, to this motion for class

19   certification?

20      A.   Prior to them filing it, they would

21   have e-mailed it to me to review.

22      Q.   Okay.  So you have read the motion

23   for class certification?

24      A.   I read it a while ago, yeah.

25      Q.   How long ago?

Page 229

1        A.    I do not remember reading that.

2        Q.    Do you know who Karyl Van Tassel

3    is?

4        A.    I know the name, yeah.

5        Q.    Who is it?

6        A.    She's one of the class plaintiffs.

7        Q.    And do you know whether or not any

8    materials from her were attached to the -- to

9    your motion to certify a class?

10       A.    No, I do not.

11       Q.    Sorry?

12       A.    I do not know if anything was

13   attached to the motion.

14       Q.    Okay.  And the best of your

15   recollection is Karyl Van Tassel is one of the

16   plaintiffs?

17       A.    I don't know.

18       Q.    Did you ever file a claim with the

19   joint liquidators?

20       A.    I believe so.

21       Q.    Why did you do that?

22       A.    To protect the potential claim

23   recovery.

24       Q.    And did you do that at or about the

25   same time you filed a claim with the receiver?

1          A.    I don't remember.

2          Q.    Did you file a claim with the

3    receiver?

4          A.    Yes.

5          Q.    So you have a claim with each of

6    them?

7          A.    Yes.

8                MR. PLOTKIN:    I guess we ought to

9          mark this.

10   BY MR. PLOTKIN:

11         Q.    Approximately when did you file a

12   claim with the joint liquidators or the

13   U.K. receivers?

14         A.    I don't -- I don't remember the

15   exact date.

16         Q.    I'm not asking for -- I said

17   approximately when?

18         A.    I don't remember when it was.    It

19   could have been --

20         Q.    '09, '10?

21         A.    It could have been '10, I don't

22   know.

23         Q.    Okay.    And at that time, were the

24   receivers Grant Thornton?

25         A.    I'm not sure.

Page 231

1        Q.   And did you ever file an actual
2   claim with them?
3        A.   I filed whatever papers they had
4   sent me.
5        Q.   Okay.  And did they ever adjudicate
6   your claim?
7        A.   What do you mean by --
8        Q.   Did they ever respond to you with
9   regard to your claim?
10        A.   They -- they sent me receipts of
11   the information I sent them, yes.
12        Q.   Okay.  And you were asking -- you
13   were claiming money from them, right?
14        A.   Correct.
15        Q.   Did they ever say, "We turn down
16   your claim"?
17        A.   No.
18        Q.   Did they ever say "We accept your
19   claim"?
20        A.   Yes.  I believe so, yes.
21        Q.   And did they accept your claim at
22   full value?
23        A.   I think the face value of the CDs,
24   but I'd have to look at it.
25        Q.   And when they advised you of that,

Page 232

1    what, if anything, did you do?

2         A.   I think --

3         Q.   Did you say, send the check?

4         A.   No.  I mean, they said they'd be in

5    touch.  I don't remember.  They --

6         Q.   Have they sent you any money?

7         A.   I believe they made one

8    distribution.

9         Q.   So how much was that?

10        A.   I don't remember.     REDACTED

19            MR. PLOTKIN:  What number are we up

20       to on exhibits?

21            THE REPORTER:  We're up to No. 44

22       and the stickers are over there.

23            (Sotto voce discussion.)

24            (Queyrouze Exhibit 44 marked.)

25    BY MR. PLOTKIN:

Page 233

1          Q.   I'm going to hand you -- I better

2     not do that.  I'm going to throw across the

3     table to you, and here's one for your

4     counsel --

5               MR. PLOTKIN:  Whoo.

6               MR. REICHARD:  Good shot.

7     BY MR. PLOTKIN:

8          Q.   Okay.  What I've handed you is

9     marked as Exhibit 44, and you see down in the

10    bottom right-hand corner it has your name and

11    then some numbers?

12         A.   Yes.

13         Q.   Okay.  So this would suggest that

14    this was produced to your counsel by you.

15         A.   Yes.

16         Q.   Is that correct?

17         A.   That's correct.

18         Q.   And did you produce this to your

19    counsel?

20         A.   Yes.  Yes.

21         Q.   Okay.  I'm going to ask you to turn

22    to the page marked 073, the very next page.

23         A.   Yes.

24         Q.   Take a look at number 1 (a).

25         A.   Yes.

Page  234

1          Q.   Is that true?

2          A.   At the time, yes.

3          Q.   How do you know?

4          A.   Because I believe at the time --

5    that's what I recall.

6          Q.   What's what you recall?

7          A.   That I hadn't filed a claim with

8    anybody else at that point.

9          Q.   Well, when did you file this claim?

10         A.   I don't know.  It's not dated.

11         Q.   Subsequent to filing a claim with

12   the joint liquidators, did you ever update

13   this form to correct that statement?

14         A.   I don't know.  I don't recall doing

15   that.

16         Q.   REDACTED

REDACTED

24         Q.   Why?

25         A.   I just didn't.

Page 235

1        Q.    Why?

2        A.    I don't have a reason.

3        Q.    But you were seeking the same money

4    from Mr. Janvey that you were seeking from the

5    U.K.

6        A.    Well, my understanding is they were

7    working together at that point.

8        Q.    At which point?

9        A.    Since the joint agreement.

10        Q.    Well, when -- I thought you didn't

11    know any of the dates.

12        A.    I don't know the dates.

13        Q.    So then how do you know they were

14    working together?

15        A.    I guess I don't know.



Page 267

1        Q.    Okay.   You don't have any different

2   understanding as a lawyer of the nature of the

3   claims.   Is that right?

4        A.    That's right.

5        Q.    I think we've established now that

6   in your original claim to the U.S. receiver,

7   you stated and you signed, I believe under

8   penalty of perjury, that you had not applied

9   for, asserted a claim for or received any

10  compensation for any part of your total

11  claimed amount from any source other than the

12  receivership.   Correct?

13       A.    That's correct.

20       Q.    You're not confident?

21       A.    No.

22            MR. PLOTKIN:   Could you not move

23  around?

24            THE WITNESS:   No, I'm not.   I'm

25  sorry.

Page 268

1    BY MS. REED:

2        Q.   So it's possible that in fact this

3    is a false statement.  Is that correct?

4        A.   No.  When I read that I read it to

5    mean with any receivers.

6        Q.   Okay.  So you don't know whether

7    it's true?

8        A.   Right.

9        Q.   It's possible that it's a false --

10       A.   That's how I read -- that's how I

11   interpreted it.

12       Q.   Okay.  But it's possible it's a

13   false statement?

14       A.   I guess it's possible.

15       Q.   What steps have you taken to ensure

16   that the receiver has the correct information

17   about amounts you've already claimed or

18   received from other sources than the

19   U.S. receivership?

20       A.   I haven't done anything that I

21   didn't produce for you.

22       Q.   One of -- one of the things this

23   form asks you to do is to provide to the

24   receivership the identity of any other sources

25   from which you have received compensation and

Page  269



1    the amount of compensation you've received.

23        Q.   What steps do you plan to take

24   after today to advise the receiver of those

25   amounts?

Page 270

1      A.   I will notify them.

2      Q.   Do you understand that the amounts

3  you've received from other -- let me strike

4  that and ask a different question.

5                    REDACTED





Page 272



 7        Q.   And you commit today that you're

 8   going to advise the U.S. receiver of all of

 9   the amounts you've received from other sources

10   and all claims you have pending --

11        A.   Yes.

12        Q.   -- for other amounts.  Is that

13   correct?

14        A.   Yes, that's correct.

15             MS. REED:  No further questions.

16             THE WITNESS:  Are we done?

17             THE VIDEOGRAPHER:  We're done?

18        Anyone else?  Anyone else?

19             MS. REED:  Yeah, let's do a little

20        bit more on the record.

21             THE VIDEOGRAPHER:  Okay.  I haven't

22        gone off.

23             MS. REED:  Not questions for you,

24        Mr. Queyrouze, but we just want to note

25        a couple of things.

Page 274

1                   J U R A T

2

3     I,            , do hereby certify under

4     penalty of perjury that I have read the foregoing

5     transcript of my deposition taken on              ;

6     that I have made such corrections as appear noted

7     herein in ink, initialed by me; that my testimony as

8     contained herein, as corrected, is true and correct.

9

10    DATED this _____ day of _____, 20  ,

11    at _____,          .

12

13

14

15

16

17    _____

18    SIGNATURE OF WITNESS

19

20

21

22

23

24

25

Page 277

1          ------------- INDEX --------------

2                                              Page

3     APPEARANCES                                3

4       EXAMINATION OF STEVEN A. QUEYROUZE:

5     BY MR. REPASS.................................. 7

6     BY MR. KUBIN.................................. 133

7     BY MS. REED.................................. 172

8     BY MR. BRINKMAN............................. 243

9     BY MR. REPASS............................... 247

10    BY MR. KUBIN................................ 252

11    BY MR. SWANSON............................. 252

12    BY MS. REED................................ 265

13

14    REPORTER'S CERTIFICATE                     274

15

16                                         Page  Line

17    Item(s)/Document(s) Requested           63    1

18    Item(s)/Document(s) Requested          273   11

19

20

21      ---------------- EXHIBITS -----------------

22      Queyrouze                          Page  Line

23    Exhibit 21    Stanford Investment      21   17

              Model (SIM) Proposal

24            Prepared for Steve and

              Anne Queyrouze,

25            QUEYROUZE_006852 to 6866

Page 278

```
 1      ---------------- EXHIBITS -----------------
 2      Queyrouze                          Page  Line
 3   Exhibit 22      Bond Central Proposal    27    21
                     Prepared for Steve and
 4                   Anne Queyrouze,
                     QUEYROUZE_006867 to
 5                   6874
 6   Exhibit 23      Stanford Consolidated    37    25
                     Account Summary,
 7                   Period Ending
                     11/30/2007; SQ_000197
 8                   to 198
 9   Exhibit 24      Narrative Typed          49     7
                     Outline,
10                   QUEYROUZE_006309
11   Exhibit 25      Accounts Details for     53    24
                     Express Account and
12                   Fixed CD USAI,
                     QUEYROUZE_006108
13
     Exhibit 26      Stanford $600,000 CD     55     9
14                   dated 01 Apr 2008
                     (QUEYROUZE Bates
15                   number cut off)
16   Exhibit 27      Accounts Details for     61    22
                     Express Account and
17                   Flex CD USAI,
                     QUEYROUZE_006110
18
     Exhibit 28      Flowchart of Accounts,   64    21
19                   QUEYROUZE_006307
20   Exhibit 29      Steve and Anne           66    15
                     Queyrouze Chart of
21                   Accounts with
                     Handwritten Note,
22                   QUEYROUZE_006308
23   Exhibit 30      Pershing Disclosure      76    23
                     Statement,
24                   QUEYROUZE_006112 to 6118
25
```

Page 279

```
 1      ---------------  EXHIBITS  -----------------
 2      Queyrouze                            Page Line
 3   Exhibit 31      Stanford Consolidated      77   16
                     Account Summary with
 4                   Pershing as Custodian
                     for Period Ending
 5                   04/30/2008; SQ_000473
                     to 474
 6
        Exhibit 32      Handwritten Note,        80    7
 7                      "Tyron Picard," etc.;
                        (QUEYROUZE Bates
 8                      number cut off)
 9   Exhibit 33      Printout of Civil           85    3
                     Docket for Case
10                   #3:09-cv-02199-N-BG in
                     the USDC, Northern
11                   Dist. of TX and
                     Complaint-Class Action
12                   (Turk v. Pershing)
13   Exhibit 34      Defendant Grady            86   21
                     Layfield, Hank Mills
14                   and John Schwab's
                     Notice of Removal
15                   (Roland, et al. v.
                     Green, et al.)
16
        Exhibit 35      Stanford Customer        95   21
17                      Account Information,
                        Statement Period:
18                      03/25/2008 -
                        03/31/2008;
19                      QUEYROUZE_006327
20   Exhibit 36      Letter to Steven          101   10
                     Queyrouze from Jason
21                   Green at Stanford
                     Private Client Group
22                   dated May 1, 2007, and
                     Enclosures;
23                   QUEYROUZE_001427 to 1548
24
25
```

App. 1397

Page 280

```
1      ---------------- EXHIBITS -----------------
2      Queyrouze                           Page Line
3    Exhibit 37    Letter to Steven        111    12
              Queyrouze from Jason
4             Green at Stanford
              Private Client Group
5             dated October 9, 2007,
              and Enclosures;
6             QUEYROUZE_001549 to 1628
7    Exhibit 38    Letter to Steven        119     1
              Queyrouze from Jason
8             Green at Stanford
              Private Client Group
9             dated October 9, 2007,
              and Enclosures;
10            QUEYROUZE_001629 to 1707
11   Exhibit 39    Letter from Grady       121    12
              Layfield to Mr. and
12            Mrs. Steve Queyrouze
              dated April 8, 2008,
13            and Enclosures;
              QUEYROUZE_006521 to 6560
14
     Exhibit 40    Résumé of Steven        139     1
15            A. Queyrouze,
              QUEYROUZE_003304
16
     Exhibit 41    SIBL Disclosure         139    17
17            Statement for
              U.S. Accredited
18            Investor Certificate
              of Deposit Program,
19            QUEYROUZE_005373 to 5396
20   Exhibit 42    Letter to Steven        152    10
              Queyrouze from Jason
21            Green at Stanford
              Private Client Group
22            dated May 13, 2008;
              QUEYROUZE_006123 and 6122
23
     Exhibit 43    Stanford Monthly        154    14
24            Report, December 2008;
              QUEYROUZE_001126 to 1127
25
```

Page 281

```
 1      ---------------  EXHIBITS  -----------------
 2      Queyrouze                              Page Line
 3   Exhibit 44     Stanford Receivership      232   24
                    Certification Notice,
 4                  QUEYROUZE_003072 to
                    3077
 5
     Exhibit 45     E-mail Chain, Subj:        246   25
 6                  FW: For Steve, dated
                    1/29/2008, from
 7                  gmseattle@ruthschris.com
                    to SQueyrouze@aol.com;
 8                  QUEYROUZE_006607 to
                    6608
 9
10
                         --oOo--
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# EXHIBIT 68

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2                   DALLAS DIVISION
3    PEGGY ROIF ROTSTAIN,        §
     et al.,                     §
4                                §
              Plaintiffs,        §
5                                §          Case No.
     v.                          §     3:09-CV-2384-N-BG
6                                §
     TRUSTMARK NATIONAL          §
7    BANK, et al.,               §
                                 §
8              Defendants.       §
     _____ §
9
10
11
12        VIDEOTAPED DEPOSITION OF GUTHRIE ABBOTT
13                  Houston, Texas
14              Thursday, May 28, 2015
15
16
17
18
19
20
21
22
23     Reported by:
24     SUSAN PERRY MILLER, CSR, CCR, RDR, CRR, CBC
25     JOB NO. 93136

Page 3

1                    A P P E A R A N C E S

2

3    FOR THE CLASS PLAINTIFFS:

4        James Swanson, Esq.
         Benjamin Reichard, Esq.

5        FISHMAN HAYGOOD PHELPS WALMSLEY
         WILLIS & SWANSON

6        201 St. Charles Avenue
         New Orleans, Louisiana   70170

7

8

9    FOR PLAINTIFFS and THE OFFICIAL STANFORD
     INVESTORS COMMITTEE:

10

         Peter Morgenstern, Esq.

11       BUTZEL LONG
         230 Park Avenue

12       New York, New York   10169

13

14

     FOR DEFENDANT SOCIÉTÉ GÉNÉRALE PRIVATE BANKING

15   (SUISSE) S.A.:

16       Noelle Reed, Esq.
         SKADDEN ARPS SLATE MEAGHER & FLOM

17       1000 Louisiana
         Houston, Texas   77002

18

19

20   FOR DEFENDANT HSBC BANK PLC:

21       Taylor Brinkman, Esq.
         LOCKE LORD

22       2200 Ross Avenue
         Dallas, Texas   75201

23

24

25    ///

Page 4

1  A P P E A R A N C E S, Continued:
2  FOR DEFENDANT TRUSTMARK NATIONAL BANK:
3      Ashley Kleber, Esq.
        GIBBS & BRUNS
4      1100 Louisiana
        Houston, Texas   77002
5

6

7  FOR DEFENDANT TORONTO-DOMINION BANK:
8      Robert Plotkin, Esq.
        McGUIREWOODS
9      2001 K Street, N.W.
        Washington, D.C.   20006
10

11

12

    FOR DEFENDANT INDEPENDENT BANK,
13  Successor-in-Interest to BANK OF HOUSTON:
        Brad Repass, Esq.
14      HAYNIE RAKE REPASS & KLIMKO
        14643 Dallas Parkway
15      Dallas, Texas   75254
16

17

18  FOR DEFENDANT BLAISE FRIEDLI:
        Ryan Wooten, Esq.
19      MORGAN LEWIS & BOCKIUS
        1000 Louisiana
20      Houston, Texas   77002
21

22

    VIDEO TECHNICIAN:
23  Robert Birdsall, TSG REPORTING
24                  --oOo--
25

Page 25

1    was an expert.

2         Q.   Okay.

3         A.   But I learned, when you're

4    cross-examined sometimes, you question

5    yourself as to whether you're competent or

6    really know what you're talking about.  I said

7    I was an expert.

8         Q.   Okay.  So other than working at

9    Eaton Cottrell, teaching at Ole Miss Law

10   School, and then consulting and doing the CLE

11   program, have you worked in any other capacity

12   since you graduated law school?

13        A.   I was involved in -- with a friend

14   of mine from Jackson, Mississippi who had the

15   BARBRI Bar Review Course, and I worked with

16   him and actually administered it at the

17   Ole Miss Law School and lectured in it for 30

18   years.

19        Q.   Okay.  Any other employment or

20   work?

21        A.   That's it.  That kept me pretty

22   busy.  That was four jobs at the same time

23   frequently, so...

24        Q.   Okay.  Well, how did you first

25   become associated with Stanford?

Page 26

1     A.    In I think 1999, we hired a

2  financial advisor, John Mark Holliday, who was

3  with Executive Financial Planners in Tupelo,

4  Mississippi, and he became our full-time --

5  handled all of our financial matters.

6          And in 2006, Mr. Holliday came to

7  visit us and said that he was changing firms

8  and that he was joining the Stanford Group,

9  asked if we would eventually sign all the

10  documents and stuff to transfer all our

11  authority and such to him and Stanford.

12     Q.    Just before we go any further, you

13  understand that when I say Stanford, I'm

14  referring to R. Allen Stanford, the

15  Stanford Group companies, Stanford

16  International Bank and anything related to

17  those entities.  Is that fair?

18     A.    That's fair.

19     Q.    Okay.  And when you say Stanford,

20  I'm going to assume that's what you mean too,

21  okay?

22     A.    That's fair.  That is what I mean.

23  I've never understood quite what all those

24  things...

25     Q.    And so you met John Mark Holliday

Page 30

1   remember?

2       A.   He just asked if he could come meet

3   with us and discuss being our financial

4   advisor.

5       Q.   And did you meet with Mr. Holliday?

6       A.   Yes.

7       Q.   And what happened next?

8       A.   I was very impressed with him and

9   we hired him to be our financial advisor.  He

10  was a petroleum engineering major, Carrier

11  scholar from Ole Miss, which is the highest

12  scholarship the school gave at that time, and

13  a very impressive person.

14      Q.   And over the year -- starting in

15  1999, how often were you talking to

16  Mr. Holliday about your financial affairs?

17      A.   Once he took over our financial

18  affairs, we met fairly regularly and talked to

19  him by telephone a lot.

20      Q.   How regularly would you meet with

21  him?

22      A.   Oh, every several months, probably,

23  or something along that line.  Not a

24  regular -- regularly scheduled meeting, just

25  when he had something for me to sign or do or

Page 31

1    occasionally he would just come to Oxford and
2    have lunch.
3         Q.   Because he worked out of Tupelo,
4    correct?
5         A.   He worked out of Tupelo.
6         Q.   And how often would you and
7    Mr. Holliday speak over the phone?
8         A.   Whenever something came up
9    concerning any investment or something he
10   wanted to do, we needed to sign or move or
11   potentially -- just following whatever
12   Mr. Holliday wanted us to do.
13        Q.   And your attorneys produced some
14   e-mails between you and Mr. Holliday.   You
15   know that, right?
16        A.   Correct.
17        Q.   And I've gathered from looking at
18   those e-mails that over the years you-all
19   became friends, is that --
20        A.   We became very good friends.
21        Q.   And you trusted his advice, didn't
22   you?
23        A.   Totally.   And in hindsight,
24   blindly, but...
25        Q.   And in fact, oftentimes you simply

Page 32

1  deferred to him on decisions about where to

2  put money and things of that nature?

3      A.   Almost always.  I might have a

4  question or just ask what my options were, but

5  I can't remember a time that I didn't go with

6  what his advice was with regard to

7  investments.

8      Q.   And when did Mr. Holliday first

9  approach you about investing with Stanford or

10  moving your money to Stanford?

11     A.   In 2006.

12     Q.   And what was -- did you meet with

13  him and talk about Stanford?

14     A.   He came -- he frequently came to

15  Oxford.  He had a lot of clients, some of whom

16  I had recommended --

17     Q.   So --

18     A.   -- to him, actually, and he came to

19  see us and announced that he was going to be

20  changing companies and he went into explaining

21  the Stanford Group, which I had never heard

22  of.

23     Q.   And what else did Mr. Holliday tell

24  you in that first meeting where he told you

25  that he had moved to Stanford?

Page 33

1        A.   Just that he was changing

2   companies.

3        Q.   Did he tell you anything about

4   Stanford?

5        A.   Oh, yes.  I asked.

6        Q.   What did you ask?

7        A.   I just asked who Stanford was and

8   what type of company they were.  And he and

9   his partner, Neal Clement, both were going

10  with Stanford, and he explained in some detail

11  that Stanford was an old line investment

12  family from Texas that were extremely well

13  financed and he was very, very pleased with

14  the opportunity to be with them and such.

15       Q.   Did he tell you anything else about

16  Allen Stanford or the Stanford Group at that

17  meeting?

18       A.   Just that they were, in his

19  opinion -- he said he had investigated them

20  and that they were very strong and would offer

21  him very -- you know, offer him a great

22  opportunity.

23       Q.   And at that first meeting where

24  John Holliday told you he was moving to

25  Stanford, did he show you any written

Page 34

1    materials about Stanford?

2         A.   He may have given me a little

3    brochure, that was it.   And he almost never

4    provided anything in writing regarding

5    Stanford.

6         Q.   And this brochure, do you remember

7    what it said?

8         A.   I really don't.   I'm just assuming

9    I got one.

10        Q.   So you don't really know if he gave

11   you anything in writing in that first meeting;

12   you're just assuming?

13        A.   That's correct.

14        Q.   Okay.   And you said that

15   Mr. Holliday almost never gave you anything in

16   writing regarding Stanford.   What do you mean

17   by "almost never"?   Did he ever give you

18   anything in writing about Stanford?

19        A.   Well, I had -- he brought all the

20   documents necessary to sign and for my wife

21   and me and to transfer all of the authorities

22   and such so that Stanford would take over from

23   what Executive Financial Planners had been

24   doing.   And he would bring whatever documents

25   were necessary involving transfers to Stanford

Page 35

1   from 2006 on.

2          But he didn't provide -- when he

3   was touting the certificates of deposit, for

4   instance, he gave me no materials involving

5   those.

6          Q.   And we'll talk about the CDs later.

7   Would it be fair to say that the only written

8   materials that you ever received from John

9   Holliday about Stanford were forms that you

10  had to fill out in order to make certain

11  things happen with your money?

12         A.   Correct.

13         Q.   And you had this meeting with John

14  Holliday in 2006 when he said he's moving to

15  Stanford.  Did you meet with him again or

16  speak with him again before you moved your

17  money to Stanford?

18         A.   I'm sure that I did, but I don't

19  recall.  It was fairly shortly after that

20  that -- this is all in 2006.

21         Q.   Which I realize is a long time ago.

22         A.   But he got all the documents

23  together and such -- there's several months

24  before he was prepared to make the actual

25  transfers.

Page 37

1    A.    Actually, I think I produced all of
2    those.  You should have them.
3    Q.    Thank you.  And I'll just remind
4    you that because the court reporter is taking
5    this down, we have to sort of avoid talking
6    over each other.  I think we were doing a good
7    job at the beginning, but now -- you know, I
8    need to wait for you to finish your answer,
9    but likewise, please wait for me to finish the
10   question.
11   Where was I?  So you meet with
12   Mr. Holliday at first, he says he's moving to
13   Stanford.  And did you ever think twice about
14   whether you ought to move your money over to
15   Stanford?
16   A.    Not really, because he gave us, I
17   mean, every assurance that it was a wonderful
18   move for him and for his clients.
19   Q.    So you trusted him, correct?
20   A.    My wife and I both trusted him.  As
21   I said, I recommended people to him.
22   Q.    And you valued his advice, correct?
23   A.    Totally.
24   Q.    So you pretty much just moved your
25   money wholesale over to Stanford without

Page 42

1        Q.    Any others?

2        A.    I think that's it.

3        Q.    What about your wife, did she have

4    any accounts with Stanford?

5        A.    We had joint accounts.

6        Q.    But did she have any in her own

7    name?

8        A.    No.

9        Q.    At the time that you signed forms

10    to move money over to Stanford, did you have

11    all of those accounts at that time?  You said

12    they were -- let me rephrase the question.

13            You said your money was with EFP,

14    correct, until John Mark Holliday moved to

15    Stanford?

16        A.    Correct.

17        Q.    And did you move everything you had

18    at EFP over to Stanford at that time?

19        A.    Yes, he did.  He changed companies

20    and took everything with him to Stanford.

21        Q.    Okay.  And we covered this a little

22    bit, but did you do any independent research

23    on Stanford before you moved all of your money

24    to Stanford?

25        A.    No, none at all.

Page 44

1    house.

2        Q.   When did Mr. Holliday come to your

3    house?

4        A.   Late 2006.  We always met either --

5    almost always in my office at the law school

6    or he would come to our house.  Sometimes we'd

7    go out to lunch.

8        Q.   And when Mr. Holliday came to --

9    you said he came to your house?

10       A.   Came to our house.  My wife and I

11   were there.

12       Q.   In late 2006?

13       A.   Late 2006.

14       Q.   And what did he talk to you about?

15       A.   He was talking about investments

16   and he -- as I recall, this is when he first

17   pretty much finalized his joining Stanford and

18   our move to Stanford, and he said that one of

19   the really reasons he was -- the reasons that

20   he was excited about going with Stanford was

21   it offered a much bigger spectrum of

22   investments.

23            At that time, you may recall the

24   stock market was going -- had gone down

25   dramatically and it was jumping up and down

App. 1414

Page 45

1  like a yo-yo, and he knew that we were

2  interested in just conservative long-term

3  growth investments.

4          And he said that Stanford had a

5  certificate of deposit which met all of those

6  needs, and then he talked about the -- went

7  into some detail, the safety of the

8  investment.  Because I asked him if it was

9  FDIC insured, he said it was not.  And I said,

10 you know, what -- you know, what would make me

11 want to do this, and he went into great detail

12 about the strength of the Stanford company and

13 the strength of the investment and such.

14     Q.    Let's pick that apart a little bit.

15 You said he went into great detail about the

16 strength of the Stanford company.  What

17 exactly did he tell you about the Stanford

18 company?

19     A.    He said that the Stanford company

20 not only had strong U.S. holdings but that

21 they had really strong international

22 investments, which is what he said allowed the

23 certificate of deposit, as I recall, paid

24 about 1 and a half percent more than local

25 banks were paying.

Page 46

1        And I asked him about that and he
2   said that not only was it backed by Allen
3   Stanford but that they had -- the Stanford
4   companies had really strong international
5   investments that allowed them to pay a little
6   more than other CDs.
7        Q.   And did he ever show you any
8   written material showing where Stanford
9   invested its money?
10       A.   He did not.  He gave me -- gave us
11   no written materials about the certificate of
12   deposits.
13       Q.   And what else did Mr. Holliday tell
14   you about Stanford CDs at that meeting in late
15   2006?
16       A.   That's all I recall is that it was
17   a wonderful opportunity to have a stable
18   investment in a volatile stock market.
19       Q.   And did it bother you at all that
20   the Stanford CDs were not FDIC insured?
21       A.   I inquired about that, and then he
22   responded that they were backed by the
23   Stanford company, which was solid as could be,
24   and he personally vouched that they were the
25   best investment we could make at the time.

Page 47

1      Q.   And what do you mean, he personally
2   vouched?
3      A.   He personally looked us right in
4   the eye and said, "In my opinion, this is the
5   strongest investment you could -- and safest
6   investment you could make with your money at
7   this time."
8      Q.   Did you discuss at the time whether
9   the Stanford CDs were regulated by the SEC?
10      A.   No.
11      Q.   And so if I understand you
12   correctly, you wanted to invest in a CD at the
13   time because the stock market was volatile and
14   you wanted a safe investment, correct?
15      A.   That's correct.
16      Q.   So why did you decide to invest in
17   a Stanford CD instead of a CD from some other
18   bank?
19      A.   Solely because Mr. Holliday
20   broached the subject, was handling all of our
21   investments.
22      Q.   So you never even considered
23   whether you might invest in a CD issued by an
24   American bank?
25      A.   No, I hadn't been thinking about

Page 72

1       A.    He told me that he thought this was

2    not that serious, that it was just some rogue

3    employees or something of that -- that nature,

4    that he was looking into it.

5       Q.    Did he tell you anything else?

6       A.    Not at that time that I recall.

7       Q.    Do you remember if you e-mailed

8    Mr. Holliday around this time?

9       A.    No, I don't, and if I did, you'd

10   have it.  If I had it you -- and you would,

11   because from that moment on I kept all e-mails

12   concerning all of the Stanford stuff and I've

13   produced all of them to you.

14      Q.    Okay.  At any point prior to

15   February 16th, 2009, had you seen any

16   indication that Stanford was a Ponzi scheme?

17      A.    No.  Lord, no.  I purchased a CD in

18   January of 2009.

19      Q.    All right.  But prior to February

20   of 2009, had you ever heard Stanford was under

21   investigation or scrutiny of any kind?

22      A.    No, not at all.

23      Q.    So prior to February 2009, you had

24   absolutely no concerns whatsoever about

25   Stanford, correct?

Page 73

1      A.   That's correct.  Any that I had

2  were -- the only concern I had was the e-mail

3  to Mr. Holliday about my brother-in-law's

4  statement, and he gave us so much assurances

5  that I purchased an additional CD after that

6  time.

7           (Abbott Exhibit 51 marked.)

8  BY MR. BRINKMAN:

9      Q.   Guff, do you recognize Exhibit 51?

10     A.   Yes.  That's the e-mail that I've

11 been referring to.

12     Q.   So you sent this e-mail to

13 Mr. Holliday, correct?

14     A.   I did.

15     Q.   And apparently on September 22nd,

16 2008.  Is that correct?

17     A.   That's the date on there, yes.

18     Q.   So this was before Stanford

19 collapsed, correct?

20     A.   That's correct.

21     Q.   And the subject line of the e-mail

22 is "Safety of investments."

23          Were you concerned at the time you

24 wrote this e-mail?

25     A.   I was concerned to the extent that

Page 74

1    my brother-in-law did not want his wife to

2    invest in a CD.

3          Q.   Why did that concern you?

4          A.   Well, he's a knowledgeable person

5    and a lot better businessman than I am and was

6    on a bank board, so it caused me to want to

7    contact Mr. Holliday and see what's going on

8    and what his feelings were about that.

9          Q.   So the reason you called

10   Mr. Holliday was simply because somebody else

11   had expressed an opinion that it wasn't safe?

12         A.   Uh-huh.  I e-mailed him.

13         Q.   And it sounds like from this e-mail

14   that Linda was concerned that the CD was not

15   FDIC insured.  Is that accurate?

16         A.   No.

17         Q.   That --

18         A.   No, that's not accurate.

19         Q.   That's not why she was concerned?

20         A.   I don't understand your question.

21         Q.   Can you tell me again who told

22   Linda that he wouldn't invest his money in

23   Stanford CDs?

24         A.   Linda is my single sister-in-law.

25         Q.   Correct.

Page 75

1       A.   And another sister of her sisters

2  had the money from the farm sale, which she'd

3  put in the stock market, and it was going down

4  dramatically, and she had inquired about

5  investing it in a CD such as Linda had.  And

6  her husband had advised against that and she

7  told Linda that, and Linda passed that on to

8  me.  And I said, "Well, let me contact John

9  Mark Holliday and see what he says about the

10  safety of our investments."

11       And we did, and he contacted her

12  immediately, directly, and us, and gave us

13  every assurance under the sun that the

14  investments were totally safe.

15            MR. BRINKMAN:  Y'all mind if we

16       take a break?  I have to go to the

17       bathroom.  Sorry, I know it's early.

18            THE VIDEOGRAPHER:  We are off the

19       record at 10:48.

20            (Recess, 10:48 a.m. to 10:51 a.m.)

21            THE VIDEOGRAPHER:  We're on the

22       record at 10:51.  We're on the record.

23       We're on the record, gentlemen.

24  BY MR. BRINKMAN:

25       Q.   Guff, did you make a claim to the

Page 79

1        Q.    Administering what?

2        A.    The liquidation or the receivership

3   or...

4        Q.    And are you talking about the

5   U.S. receiver, about Mr. Janvey?

6        A.    No.  I received an e-mail from --

7   I guess they call themselves the joint

8   liquidators, and they are working with

9   Mr. Janvey, as I understand it, because the

10  claim was made using the same claim number as

11  that in Mr. Janvey's receivership.

12          I should have produced those

13  documents, I'm fairly certain I did, for you.

14       Q.    Yeah, let's see if we can clear it

15  up.

16          (Abbott Exhibit 52 marked.)

17  BY MR. BRINKMAN:

18       Q.    Do you recognize Exhibit 52?

19          (Document review.)

20       A.    Yes.

21  BY MR. BRINKMAN:

22       Q.    What is Exhibit 52?

23       A.    I had to think back.  This is -- I

24  never did quite understand what this

25  receivership was, but it was a letter from

Page 80

1   this gentleman inviting me to send him REDACTED

2   plus for them to proceed to process my claim.

3        Q.   So your understanding of this

4   document is that the sender was asking you to

5   pay REDACTED to process your claim?

6        A.   That's my understanding as I recall

7   it.  Let me read the...

8             (Document review.)

9        A.   We're -- I'm reading from this

10  document.  "We are initiating a clawback

11  process through the Courts against creditors

12  who have received Preference Payments... You

13  have received Preference Payments of

14  REDACTED which we require to be repaid to

15  the Estate."

16             And I interpreted that to mean that

17  they wanted me to send them REDACTED.

18  BY MR. BRINKMAN:

19       Q.   Okay.  Will you look at page 11,

20  please?  I guess that's where you are.

21       A.   Uh-huh.

22       Q.   The first paragraph under the

23  heading, "Important:  Your allowed amount has

24  been amended," it says, "I write further to my

25  previous notification to you regarding your

Page 81

1   claim, which was allowed in the amount of

2   **REDACTED** "

3           Do you know what that refers to?

4       A.   I do not.

5       Q.   So you never made a claim with

6   Grant Thornton or the joint liquidators for

7   the amount that you lost with Allen Stanford?

8       A.   I don't remember who they are, but

9   I must have -- there was -- early on, after

10  the loss and such, there was some e-mails from

11  some receiver, and I obviously was in contact

12  with them or I would not have received this.

13  But if I had any documents about it, I

14  produced them for you.

15      Q.   So I'll just ask you directly:

16  Have you made a claim with Grant Thornton or

17  the joint liquidators for the amount that you

18  lost on your Stanford CDs?

19      A.   I'm not sure.  I assume I have

20  because of this -- of this letter.

21      Q.   And so I take it you've received no

22  other correspondence from Grant Thornton or

23  the joint liquidators, have you?

24      A.   I don't think, since this -- since

25  this one, which I think I wrote myself a note

Page 82

1   saying they wanted me to send them REDACTED on

2   the off chance I might get back 1%, like I

3   have from Mr. Janvey, and that didn't seem

4   like a good exchange.

5       Q.   And did you respond to this letter

6   that's Exhibit 52?

7       A.   No.

8       Q.   Well, if you did receive any money

9   back from the Antiguan joint liquidators, that

10  money would have to be deducted from whatever

11  you recover in this lawsuit, right?

12      A.   It would.  But I assure you, I have

13  not received anything from them except

14  e-mails.

15      Q.   Okay.

16          (Abbott Exhibit 53 marked.)

17  BY MR. BRINKMAN:

18      Q.   Do you recognize Exhibit 53?

19      A.   I do.

20      Q.   What is it?

21      A.   It's a certification form from the

22  Janvey receivership.

23      Q.   So you sent this to Ralph Janvey,

24  correct?

25      A.   Correct.

Page 83

1      Q.   And in number 3 on page 431, it

2  instructs you to identify all sources other

3  than the receivership from which you have

4  applied for compensation.

5      A.   That's correct.

6      Q.   And it looks like you certify in

7  this form that you had sought compensation

8  from Mr. Holliday in a Mississippi court

9  lawsuit, correct?

10     A.   That's correct.  I signed that

11 under penalty of perjury, as I read the form.

12     Q.   So that's your signature on

13 page 432?

14     A.   That is my signature.

15     Q.   And you signed under penalty of

16 perjury that there weren't any other sources

17 of recovery that you had applied for, correct?

18     A.   That I've received.

19     Q.   Well, number 3 on page 431 says,

20 "Identify all sources other than the

21 receivership from which you have applied for

22 compensation," right?

23     A.   Correct.

24     Q.   And I suppose you didn't indicate

25 to the receiver here that you had made a claim

Page 84

1   with the Antiguan joint liquidators because

2   you weren't sure if you had?

3       A.   At first I wasn't sure -- actually,

4   I don't recall even thinking about that when I

5   completed this form.  But I was done with

6   the -- this Grant Thornton group whenever I

7   received this notification.

8            Now it's coming back to me.  I

9   wasn't aware that I had completed a claim with

10  those people.  There were -- this was years

11  ago, not long -- a year or so after the

12  losses, and we were supposed to deal with them

13  by e-mail.  And they sent a form and I do

14  recall filling out the e-mail.

15           Then I tried to contact them

16  because they had not included all of our CDs.

17  And it was -- and of course, I never received

18  anything from them by way of explanation or

19  anything else.  And at that time, I assumed I

20  had not completed a claim.  And I think the

21  next thing I finally received was your --

22       Q.   Exhibit 52?

23       A.   -- exhibit, wherever it is.

24           MR. SWANSON:  I think it's the next

25       page on that one.

Page 104

1    Q.   One of your CDs matured before

2   Stanford collapsed, correct?

3        A.   That's correct.  That's the one

4   that I described to you earlier, the REDACTED

5   CD which I purchased to pay income tax from

6   the farm sale, and it matured and it was paid

7   in January of 2009, immediately before the

8   Stanford collapse, or I'd be in trouble with

9   the IRS because I wouldn't have had the money

10  to pay the taxes.

11       Q.   So Stanford paid you roughly

12  REDACTED  in January of 2009.

13       A.   That's correct.

14       Q.   Why have you filed a claim for that

15  amount with the receiver if you've already

16  been paid it?

17       A.   I did not file --

18       Q.   I thought you said that your --

19       A.   -- a claim for that amount with the

20  receiver.

21       Q.   I thought you said you had filed

22  claims totaling REDACTED, correct?

23       A.   That's correct.

24       Q.   Which was the principal amount of

25  your investment in all of your CDs, correct?

Page 120

1    deals with that -- that's the London bank,

2    correct?

3        Q.    Yes.

4        A.    That's the London bank, correct,

5    that I'm referencing here?

6        Q.    Well, do you know where HSBC is

7    based?

8        A.    In London, or in England.

9        Q.    Okay.

10       A.    Just making sure I was referring to

11   the correct bank.

12       Q.    So why is it that you believe HSBC

13   should have known -- knew or should have known

14   that Stanford was perpetrating a fraud?  And I

15   know what's written in the Complaint.  I want

16   to know why you believe that's the case.

17           MR. SWANSON:  Object to the form of

18       the question.

19       A.    I have no personal -- I've never

20   dealt with any of these five banks, okay?  And

21   I have met with our attorneys, who I respect.

22   And I have looked carefully through the class

23   action Complaint, and so I'm basing what I'm

24   saying upon what I think are well pleaded

25   allegations, and these gentlemen are familiar

Page 121

1   with Rule 11 in the Federal Rules of Civil

2   Procedure, that there's reasonable grounds for

3   the allegations that are made; and that's what

4   I'm basing my statements on.

5   BY MR. BRINKMAN:

6       Q.   Okay.  So why is it that HSBC knew

7   or should have known that Stanford was a

8   fraudster?

9       A.   Because they were regulated, all of

10  the banks were, in some regard, with

11  regulations to protect the public.  They're

12  supposed to know their -- know their

13  customers, they're supposed to know, with the

14  millions and millions of dollars involved

15  here, exercise due diligence in investigating

16  where funds come from with regard to all sorts

17  of transfers.

18          There are anti-money laundering

19  laws that would direct them to look carefully

20  at what Stanford's up to.  I think Stanford

21  was on a -- personally on the list of those to

22  be watched.  They knew the funds were coming

23  from Antigua, which was on another list of

24  highly suspect countries for money laundering

25  and frauds.

Page 131

1    plaintiff was last night?

2         A.   That's correct, in person.

3         Q.   Okay.  And do you know when you

4    retained Mr. Morgenstern to be your attorney

5    in this case?

6         A.   Prior to -- I think the suit was

7    filed in what, August 23rd of 2009, so it had

8    been some period of time before that.

9         Q.   So you retained Mr. Morgenstern

10   sometime before August of 2009?

11        A.   If that's the correct date.

12        Q.   And yesterday was the first time

13   you met with him about the case?

14        A.   That's correct.

15        Q.   Do you remember when you retained

16   Fishman Haygood to represent you in this case?

17        A.   Not precisely.

18        Q.   Can you give me a ballpark?

19        A.   I'm not good on time spans.  At my

20   age, if you say a couple of years, it's 20.  I

21   don't know, six months ago.

22        Q.   Did you review the Complaint in

23   this lawsuit before it was filed?  And I'm

24   speaking about the original Complaint.

25        A.   Way back?  Yeah, I think I -- yeah,

Page 161

1    own Complaint, which at some point I think was

2    incorporated into the Complaint, the Class

3    Action Complaint.

4         Q.   Okay.  So let's take -- the OSIC

5    Complaint, did you review that?

6         A.   I don't recall reviewing that.

7         Q.   Now, do you know that the class

8    moved to include the OSIC Complaint in the

9    class Complaint?

10        A.   Yes.

11        Q.   And how did you know that?

12        A.   I received some information about

13   that and it was listed in the Second Amended

14   Complaint in the procedural history.

15        Q.   Okay.  Did you read that Complaint

16   before it was filed?

17        A.   Which Complaint?

18        Q.   The OSIC -- the class Complaint

19   moving to intervene -- moving to adopt the

20   Complaint filed by OSIC.

21        A.   I don't recall having read that.

22        Q.   Do you know how many of those

23   Complaints there were?

24        A.   No.

25        Q.   And have you ever read the OSIC

Page 162

1    Complaint which the class adopted?

2         A.   Not that I recall.

3         Q.   And how was the decision made by

4    the named plaintiffs to decide to go ahead and

5    file the amended Complaint?

6         A.   Which amended Complaint are you

7    referring to?

8         Q.   The first one that adopted the OSIC

9    Complaint.

10        A.   I don't recall.

11        Q.   Was there a meeting?  Were you

12   polled?

13        A.   I just do not recall.

14        Q.   Okay.  You said your role as a

15   class representative is to monitor the

16   activities of the lawyers, but you didn't

17   review the amended Complaint before it was

18   filed?

19             MR. SWANSON:  Object to the form of

20        the question.

21        A.   Not that I recall.

22   BY MR. PLOTKIN:

23        Q.   Okay.

24        A.   You're referring back into 2009,

25   correct?

Page 173

the documents that you had requested from me,

and they came up for me to give them what I

had produced, what I had, and to see what I

had.

Q.   And approximately how long did that

meeting last?

A.   That meeting, three to four hours.

I had done a week's worth of work in getting

everything organized where I could just show

them what I had, and they then took it with

them.  And then we corresponded back and forth

getting it to you.

Q.   Okay.  And you said earlier that

you reviewed drafts of the motion to certify

the class as well as the motion to certif- --

to amend -- to file the Second Amended

Complaint.  Is that correct?  Do I have that

right?

A.   I know that I reviewed a draft of

the Second Amended Complaint.

Q.   Okay.

A.   And I really don't recall one way

or the other whether I reviewed a draft of the

motion to certify the class.

Q.   Okay.  When you reviewed the

Page 181

1        filing of the Complaint.

2            Is that -- did I state it

3        correctly?

4            MR. SWANSON:  No.  No, no, no.

5            MR. PLOTKIN:  Please put it on the

6        record.

7            MR. SWANSON:  What I did say is

8        that I'd give you the dates that the

9        things were sent.  I'm not going to give

10       you any attorney-client information, no.

11           MR. PLOTKIN:  Okay.  I

12       misunderstood.  But that's satisfactory.

13           MR. SWANSON:  Yeah, I will give you

14       that, though.

15           MR. PLOTKIN:  Give us the dates.

16       That's fine.  I apologize for misstating

17       it.

18           MR. SWANSON:  No, that's okay.

19  BY MR. PLOTKIN:

20       Q.   Okay.  So let's go back, then.  We

21  were talking about the motion for class

22  certification, which you have seen?

23       A.   Yes, I have.

24       Q.   But I think right before the break

25  you testified that you had not seen any of the

Page 182

1   18 exhibits that were attached to it.  Is that

2   correct?

3        A.   That's correct.

4        Q.   And within each of those different

5   exhibits, there were multiple other documents,

6   a 2(a), a 2(b), a 2(c), for example.  You

7   haven't seen any of those documents either.

8   Is that correct?

9        A.   Not as exhibits.

10        Q.   Okay.  Do you know what they are?

11        A.   No.

12        Q.   In your role as monitoring counsel

13   to handle the class action, did you feel any

14   responsibility to review those exhibits before

15   they were filed?

16        A.   No, unless some controversy arose

17   that I needed to be looking at.

18        Q.   And since they were filed, did you

19   feel any responsibility to look at them?

20        A.   I will probably spend some more

21   time looking at a number of these documents

22   when there's more time available.

23        Q.   Well, your deposition is today.

24   It's been scheduled for several weeks.  Did

25   you have the opportunity to review those

Page 183

1    exhibits prior to the deposition?

2        A.   I don't understand your question.

3        Q.   Has your deposition been scheduled

4    for several weeks?

5        A.   Yes.

6        Q.   And is there any reason why you

7    couldn't have reviewed the exhibits prior to

8    today?

9        A.   They weren't available.  I didn't

10   get a copy of them, as I recall.

11       Q.   Have you ever gotten a copy of

12   them?

13       A.   I don't believe so at this time.

14       Q.   Do you understand what the

15   significance or the purpose of the exhibits

16   is?

17       A.   Yes.

18       Q.   What?

19       A.   To support various allegations that

20   are made in the motion or the Complaint.

21       Q.   Okay.  And you didn't believe that

22   that was something you needed to review to

23   make sure that they actually supported the

24   allegations?

25       A.   Not unless there was something that

Page 184

1    was brought to my attention as being of real

2    moment, and even though I did have a week or

3    so, I spent the time that I had reading 126

4    pages of the Second Amended Complaint and then

5    the motion itself.

6         Q.   Okay.  So let me ask you, what's

7    your understanding of what -- what is a

8    banker's blanket bond?  Do you know that?

9         A.   I do not know that.

10        Q.   Do you know what role Lloyd's of

11   London played in the Ponzi scheme committed by

12   Allen Stanford?

13        A.   All I know is from reading some

14   articles quite a while ago.  But as I recall,

15   Lloyd's of London had a policy -- 10 million

16   comes into play, or maybe more -- that was to

17   cover something, and it was a lot of

18   litigation.  I think Allen Stanford wanted the

19   policy to cover his defense in the case and

20   that went round and round.  That's all I know.

21        Q.   Okay.  And you learned that from

22   reading newspaper articles after the collapse

23   of Stanford?

24        A.   Magazine and newspaper articles.

25        Q.   Okay.  So it would be fair to say

Page 192

1        Q.    The fact that you had this account

2    at Stanford in Antigua, to get his advice?

3        A.    No.

4        Q.    Who is your tax preparer?

5        A.    A gentleman named Billy Rhodes.

6        Q.    Okay.  And where is he located?

7        A.    Oxford, Mississippi.

8        Q.    Now, you first invested in a CD in

9    2007?

10        A.    2006.

11        Q.    '6, okay.  And you were receiving

12    interest on that CD every month, right?

13        A.    I was receiving a statement that

14    said interest was accruing.  I never withdrew

15    any interest.

16        Q.    Well, the interest was accruing in

17    your account, correct?

18        A.    Allegedly.

19        Q.    At the time you believed it was

20    real interest --

21        A.    At the time I believed, oh,

22    absolutely.

23        Q.    Okay.  Did you think that you had

24    any obligation to report interest income on

25    your tax returns?

Page 193

1      A.   It never occurred to me.

2      Q.   Did it ever -- did you ever discuss

3  it with your tax advisor?

4      A.   No.   I gave him all of the 1099's

5  that I received, and I guess since I never got

6  a 1099, it never -- I keep them all and give

7  them all to my accountant at the appropriate

8  time.

9      Q.   Okay.   So you would have started

10  receiving interest in '06.   Is that correct?

11          MR. SWANSON:   Object to the form of

12      the question.

13  BY MR. PLOTKIN:

14      Q.   Is that correct?

15      A.   Correct.

16      Q.   And you would have received

17  interest in '07.

18      A.   Correct.

19      Q.   And in '08.

20      A.   Correct.

21      Q.   Okay.   Did you file tax returns for

22  each of those years?

23      A.   Yes.

24      Q.   Have you filed any amendments to

25  those tax returns?

Page 194

1        A.   No.

2        Q.   Why?

3        A.   Never crossed my mind.   My

4   accountant, who is totally aware of all of

5   this now, never mentioned that that was

6   something we should do.

7        Q.   Okay.   On any of your tax returns

8   since 2010, have you taken any losses for the

9   Stanford investments on CDs?

10        A.   Yes.

11        Q.   And why did you do that?

12        A.   There was some special legislation

13   passed, which my accountant was aware of, that

14   allowed you to take a loss -- I think it

15   happened in the Madoff matter also -- for

16   losses through the Stanford CDs.   Of course,

17   that only applied to those that were not tax

18   sheltered.

19        Q.   Right.   So you took advantage of

20   that.

21        A.   I did.

22        Q.   Okay.

23             MR. PLOTKIN:   What's our next?

24             THE REPORTER:   58.

25             (Abbott Exhibit 58 marked.)

App. 1441

Page 200

1         In the Complaint that you filed in

2    Mississippi State court, I notice that you

3    only listed five out of the six CDs that you

4    purchased.  Is there any reason why you didn't

5    mention the sixth one?

6         A.   It had been cashed in.  It matured

7    and I received the money.

8         Q.   And you didn't think that was

9    important or relevant to include in your

10   statement in the case?

11        A.   No.

12        Q.   Might it have given the impression

13   that this was a legitimate enterprise because

14   you got paid?

15        A.   Never thought about it one way or

16   another.  I viewed it, I think, from

17   establishing our losses.

18        Q.   When did you receive payment on the

19   CD that you were reimbursed on?

20        A.   In January of 2009.

21        Q.   And did you -- did you know that

22   the CD was maturing?

23        A.   Yes.

24        Q.   And did you have conversations with

25   your financial advisor about that?

Page 201

1    A.   Yes.  As I testified earlier, when

2  we purchased the REDACTED CD from the proceeds

3  of the sale of the farm, which is all the rest

4  of the CDs were to mature in three years,

5  okay -- I purchased a REDACTED CD to mature in

6  one year so that it would mature in January so

7  I could use the funds to pay the income taxes

8  that were going to be due, which were about

9  that amount, because of the sale of the farm.

10    Q.   Okay.  So let me see if I can --

11  did you call Mr. Holliday and tell him you

12  wanted to redeem the certificate of deposit?

13    A.   Yes.  I called his office.

14    Q.   And did you speak with him?

15    A.   I think I spoke with a lady named

16  Tina Moore, who was his secretary or

17  assistant, and just told her that we wanted

18  to -- didn't want to re-up, we wanted to cash

19  it in.

20    Q.   And to the best of your

21  recollection, what did she tell you?

22    A.   That she would put the steps in

23  progress and it would take a couple of weeks,

24  I think she said.

25    Q.   Okay.  And did you talk to

Page 202

1    Mr. Holliday with regard to redeeming this
2    certificate of deposit after you had that
3    phone call?
4         A.   I don't recall specifically,
5    although he knew -- he was there when he sold
6    it to me and knew what the purpose of it was
7    and that it would be redeemed when it matured,
8    because I needed to pay the taxes.  And he was
9    privy to all of our financial everything.
10        Q.   Okay.  And so there -- your CD was
11   redeemed about a month before the freeze hit
12   the Stanford accounts?  Is that correct?
13        A.   Thank you, Lord, that is correct.
14        Q.   And with regard to your brokerage
15   accounts that Mr. Holliday handled for you,
16   have you been able to recover the funds that
17   were in those accounts?
18        A.   Yes.  They were frozen --
19        Q.   Yes.
20        A.   -- initially.  And -- anyway, they
21   were frozen initially and then they were
22   released, and yes.
23        Q.   So -- and approximately how much
24   was that that was released to you?
25        A.   ██████ REDACTED ██████

Page 215

1      Q.   And this time --

2      A.   I started high school in 1957.

3      Q.   Let me make the question easier.   I

4  didn't mean to step on your answer.

5          For your current residency in

6  Mississippi, how long have you been there?

7      A.   In Oxford, Mississippi?

8      Q.   Doesn't matter whether it's Oxford,

9  but going back from 2015, sitting here today,

10  when was the last time you lived outside of

11  Mississippi?  Let's ask it that way.

12      A.   I've been domiciled in Mississippi

13  since 1957.

14      Q.   Okay.  And you certainly were

15  living there in 2005, 2006, up to today.   Is

16  that right?

17      A.   Correct.

18      Q.   Okay.  And when you first invested

19  with Mr. Holliday, you were living in

20  Mississippi.  Is that right?

21      A.   That is correct.

22      Q.   Mr. Holliday was living in

23  Mississippi?

24      A.   That is correct.

25      Q.   And when you first invested with

Page 216

1   Mr. Holliday at Stanford, you were living in

2   Mississippi.  Is that right?

3        A.   That is correct.

4        Q.   And Mr. Holliday was living in

5   Mississippi.  Is that right?

6        A.   Yes.

7        Q.   And when you did business with

8   Mr. Holliday in connection with your

9   investments with Stanford, various Stanford

10  entities, you were always in Mississippi when

11  you did that business, weren't you?

12       A.   That's correct.

13       Q.   So when you purchased these CDs,

14  you purchased them in Mississippi, correct?

15       A.   That is correct.

16       Q.   And he sold them to you in

17  Mississippi?

18       A.   He did.

19       Q.   And that's true for all of the six

20  CDs that you purchased?

21       A.   Yes.

22       Q.   Okay.  And you knew -- let's look

23  at Exhibit 48, and specifically I'm going to

24  direct you to the Bates-labeled page

25  ABBOTT_000462.

Page 237

1    misrepresentations in Count II, where you list

2    the specific misrepresentations you're suing

3    on in this Complaint?

4         A.    You'd have to ask Mr. Hodge that.

5         Q.    But you agree with me they're not

6    listed there?

7         A.    They're not in those words.

8         Q.    Paragraph 10, which follows the

9    paragraph that you just read, begins, "Based

10   upon Defendant Holliday's recommendation and

11   his description of the safety of the

12   certificates of deposit and the good return on

13   those investments," you purchased the first CD

14   and then purchased subsequent CDs.  Is that

15   correct?

16        A.    That is absolutely correct.

17        Q.    And in fact, that is what your

18   purchase depended on, the statements of

19   Mr. Holliday?

20        A.    Totally.  I've never heard of

21   Stanford or the CDs or anything else, from

22   anybody, till he appeared with this

23   presentation.

24        Q.    You mentioned earlier that you took

25   a loss on your tax return as a result of your

Page 238

1    losses in the CDs.

2         A.   That's correct.

3         Q.   Do you know what the -- to date,

4    the dollar value to you was of taking that

5    loss?

6         A.   No.

7         Q.   Are you carrying forward the loss

8    for future returns as well?

9         A.   I don't think so.

10        Q.   And you have no estimate of what

11   amount of taxes you didn't have to pay as a

12   result of your losses in the CDs?

13        A.   General estimate, it's in the REDACTED
     ████ ██████████████████, would be my best guess.

15        Q.   If you will look with me at

16   Exhibit 46, which is your account application

17   and agreement?

18        A.   Oh.  I'm going to keep these in

19   order for us.

20        Q.   If you'll let me know when you're

21   there.

22        A.   I'm there.

23        Q.   I'm going to look specifically

24   at -- it's page 3 of 7 or Bates label 597,

25   whichever is easier for you to find.

Page 241

1        Q.    Going back to this form,

2    Exhibit 46, at the time you filled it out you

3    said your net worth was somewhere between

4    REDACTED.   Is that right?

5        A.    We can stay around the REDACTED.

6        Q.    You think it was close to

7    a million?

8        A.    Yes.

9        Q.    This is in 2006.

10        A.    Yes.

11        Q.    And the first CD you bought from a

12    Stanford entity was for what dollar value?

13        A.    REDACTED.

14        Q.    Where was the rest of your

15    approximately -- we'll call it REDACTED that

16    you were including in your net worth at the

17    time you filled this out, in what kind of

18    holdings did you have it?

19        A.    It was all -- all of that would

20    have been, except for some small bank

21    accounts, with Mr. Holliday with Stanford.

22        Q.    Okay.  Well, first with EFP,

23    correct?  At the time you filled this out you

24    didn't have an account with Stanford.  This is

25    your account opening document.

1    they're the successor to Bank of Houston.

2           You testified a few minutes ago that

3    you had absolute faith in John Mark Holliday;

4    true?

5           A.   That is true.

6           Q.   And then you testified a little

7    earlier, and I wrote it down, you said you

8    absolutely and totally relied on the

9    statements of Mr. Holliday.  Is that true?

10          A.   That's correct, with regard to --

11   as our financial advisor.

12          Q.   Absolutely.

13          A.   Yeah.

14          Q.   Now, what I want to know is we've

15   got five banks sued here today.  Can you tell

16   me of any statements that any of these banks

17   made that you've relied upon?

18          A.   I've had no dealings with any of

19   these -- of the five banks that are defendants

20   in this lawsuit.

21          Q.   And because of that, none of these

22   banks made any statements to you that you

23   relied upon, did they?

24          A.   That's correct.  I've had no

25   dealings with any of them.

Page 311

1   some of that CD money allegedly?

2        A.   I don't know in details, any

3   details concerning that.

4        Q.   Is that the sort of thing you as a

5   lawyer -- and you practiced law for a few

6   years; true?

7        A.   I did.

8        Q.   You would want to know what the

9   specific allegations are about a party before

10  suing them; true?

11       A.   Say that again?

12       Q.   Yeah.  Before you sue someone, you

13  want to know what the specific allegations are

14  against them; true?

15       A.   That's correct.  At least as far as

16  the persons involved in the lawsuit, such as

17  our attorneys, it needs to be under Rule 11 a

18  sufficient investigation to think that you've

19  got a material basis for the allegations that

20  are made.

21       Q.   Understood.

22            Have you told me everything you can

23  think of that you're currently, at this

24  moment, aware of which you believe the Bank of

25  Houston did which was inappropriate or

Page 312

1    unlawful?

2         A.    I've had no personal dealings, as I

3    stated, with the Bank of Houston or any of

4    these banks.   And I was basing my statements

5    upon, and will, the allegations that were made

6    in the amended Complaint.

7              MR. REPASS:  Pass the witness.

8                FURTHER EXAMINATION

9    BY MS. REED:

10        Q.    Just very briefly, Professor.

11             THE VIDEOGRAPHER:  You want a

12    tripod?

13             MS. REED:  Oh, that would be even

14    better.

15             (Discussion off the stenographic

16    record.)

17    BY MS. REED:

18        Q.    Professor Abbott, if you'll go back

19    to Exhibit 61, which is the Complaint.

20        A.    Yes, ma'am, I'm there.  I think.

21    Yeah.

22        Q.    So if you look at paragraph 20, you

23    allege there that Defendant Holli- --

24        A.    Wait just one second.  I'm not to

25    paragraph 20.  Yes.

1   fiduciary duty to the general public in your

2   view?

3          A.   If they're dealing with the -- if

4   they're dealing with the general public or

5   with assets of the general public, I would

6   think in most relationships they would.

7          Q.   You think that banks who deal with

8   the public would have a general duty to the

9   public as opposed to a fiduciary duty to their

10  particular customers?

11         A.   I think what you just stated is

12  what I just answered.  I think that there's a

13  bodies of laws that create -- that banks must

14  act in a certain way to protect the general

15  public but that they would have a fiduciary

16  duty to those who actually are affected by or

17  deal with the banks themselves.

18         Q.   You aren't alleging that you have

19  any kind of relationship with or did any

20  business with any of the banks that you're

21  suing in this litigation, are you?

22         A.   No.  I'm not alleging any direct

23  contact, personal contact, with any of those

24  banks.

25         Q.   Judge Godbey, do you know whether

Page 319

1    Judge Godbey governs or in any way manages the

2    Antiguan liquidation process?

3         A.   I do not know.

4         Q.   Do you have any reason to believe

5    that he does?

6         A.   No.

7         Q.   Do you have any idea what the

8    Antiguan law is on preference payments?

9         A.   Absolutely not.

10        Q.   Do you have any knowledge of how

11   many class members of the class that you

12   propose to represent have made claims in the

13   Antiguan liquidation process?

14        A.   I do not know.

15        Q.   Do you know how --

16        A.   I know there's 17,000, as I

17   understand it, in the Janvey claims process.

18   I'm not privy to what's going on with the

19   Antiguan.

20        Q.   You don't know how many of those

21   proposed class members might have made claims

22   only in the Antiguan procedure?

23        A.   No.

24        Q.   Or only in the U.S. procedure?

25        A.   No.

App. 1454

Page 320

1      Q.   Or in both, like you did?

2      A.   No.

3      Q.   And do you plan to take any steps
4  to find out what obligations you might have,
5  if any, under Antiguan law in connection with
6  that preference payment claim letter you
7  received?

8      A.   No.

9      Q.   So if it turns out under Antiguan
10 law that in fact you owe that REDACTED back to
11 the receivership or to the joint liquidators,
12 you have no intention of complying with that
13 obligation?

14     A.   Only if I were ordered by a court
15 to do so.

16          MS. REED:  I'll pass the witness.

17             FURTHER EXAMINATION

18 BY MR. REPASS:

19     Q.   I'm sorry, I've got to clear up one
20 thing.  I'm just going to roll like this.

21          Sir, I want to make sure I understood
22 what you just testified to.  I believe you
23 testified that under various statutes and
24 regulations and so forth, it's your opinion
25 that the bank defendants owe a duty to the

Page 325

1        ------------ INDEX --------------

2                                            Page

3   APPEARANCES                                 3

4     EXAMINATION OF GUTHRIE ABBOTT:

5   BY MR. BRINKMAN............................... 7

6   BY MR. PLOTKIN............................. 138

7   BY MS. KLEBER.............................. 203

8   BY MS. REED................................ 213

9   BY MR. REPASS.............................. 274

10  BY MR. SWANSON............................. 302

11  BY MR. REPASS.............................. 309

12  BY MS. REED................................ 312

13  BY MR. REPASS.............................. 320

14

15  REPORTER'S CERTIFICATE                     324

16

17

18    PREVIOUSLY MARKED EXHIBITS         Ref. Page

19  Exhibit 41   SIBL Disclosure Statement      112
                 for U.S. Accredited
20               Investor Certificate of
                 Deposit Program,
21               QUEYROUZE_005373 to 5396

22

23

24

25

Page 326

```
1      ---------------  EXHIBITS  -----------------
2      Abbott                                    Page Line
3    Exhibit 46    Stanford Account              38   11
               Application and
4              Agreement,
               ABBOTT_000595 to 601
5
     Exhibit 47    Stanford SEP Account          40    3
6              Statement,
               ABBOTT_000025 to 29
7
     Exhibit 48    Proof of Claim Form,          48    9
8              ABBOTT_000458 to 468
9    Exhibit 49    Ex. 2K, SIBL Annual           63    5
               Report, 2007; STAN P
10             DOJ_0011028 to 11065
11   Exhibit 50    Stanford Monthly              64   14
               Report, December 2008
12
     Exhibit 51    E-mail to John Mark           73    7
13             Holliday from Guff
               Abbott, 9/22/2008;
14             ABBOTT_000700
15   Exhibit 52    E-mail to                     79   16
               gtabbott@ms.metrocast.
16             net from Marcus Wide &
               Hugh Dickson dated 27
17             Jan 2014, and
               Attachment;
18             ABBOTT_000010 to 12
19   Exhibit 53    Certification Form,           82   16
               ABBOTT_000431 to 433
20
     Exhibit 54    E-mail to Angie Kogutt        98    9
21             from Guthrie Abbott
               dated Mon, 13 Feb
22             2012; ABBOTT_000556
23   Exhibit 55    Stanford Victims             107   16
               Coalition
24             Questionnaire;
               ABBOTT_000586 to 590
25
```

App. 1457

Page 327

```
 1       ----------------  EXHIBITS  ----------------
 2       Abbott                                  Page  Line
 3    Exhibit 56    Stanford Report              109    2
                    Package 2, 01/01/2008
 4                  - 11/12/2008;
                    ABBOTT_000052 to 65
 5
      Exhibit 57    Stanford Letter to           142    1
 6                  Mr. & Mrs. Steven
                    Queyrouze dated May
 7                  13, 2008, from Jason
                    Green, President,
 8                  Private Client Group;
                    QUEYROUZE_006123 to
 9                  6124
10    Exhibit 58    Stanford Letter to           194   25
                    Steve and Anne
11                  Queyrouze dated
                    October 29, 2008, from
12                  Grady J. Layfield;
                    QUEYROUZE_001228 to
13                  1229
14    Exhibit 59    Stanford Letter to           198   23
                    Mr. and Mrs. Steve
15                  Queyrouze dated August
                    4, 2009;
16                  QUEYROUZE_001728 to
                    1729
17
      Exhibit 60    E-mail Chain ending          253   23
18                  with E-mail to
                    Holliday from Abbott
19                  dated 7/12/2008;
                    ABBOTT_000698 to 699
20
      Exhibit 61    Complaint in Abbott &        220   16
21                  Munn v. John Mark
                    Holliday in Chancery
22                  Court of Lafayette
                    County, MS
23
24
                        --oOo--
25
```

# EXHIBIT 69

Page 1

1            IN THE UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF TEXAS

2                  DALLAS DIVISION

3  PEGGY ROIF ROTSTAIN,        §

   et al.,                     §

4                              §

                Plaintiffs,    §

5                              §          Case No.

   v.                         §     3:09-CV-2384-N-BG

6                              §

   TRUSTMARK NATIONAL          §

7  BANK, et al.,               §

                              §

8            Defendants.       §

   _____  §

9

10

11

12     VIDEOTAPED DEPOSITION OF SARAH ELSON-ROGERS

13                 Houston, Texas

14              Tuesday, June 9, 2015

15

16

17

18

19

20

21

22

23     Reported by:

24     SUSAN PERRY MILLER, CSR, CCR, RDR, CRR, CBC

25     JOB NO. 94154

Page 3

```
 1                    A P P E A R A N C E S
 2
 3    FOR THE CLASS PLAINTIFFS:
 4        James Swanson, Esq.
          Benjamin Reichard, Esq.
 5        FISHMAN HAYGOOD
          201 St. Charles Avenue
 6        New Orleans, Louisiana   70170
 7
 8
 9    FOR DEFENDANT SOCIÉTÉ GÉNÉRALE PRIVATE BANKING
      (SUISSE) S.A.:
10
          Noelle Reed, Esq.
11        SKADDEN ARPS SLATE MEAGHER & FLOM
          1000 Louisiana
12        Houston, Texas   77002
13
14
      FOR DEFENDANT HSBC BANK PLC:
15
          Kurt Wolber, Esq.
16        LOCKE LORD
          2200 Ross Avenue
17        Dallas, Texas   75201
18
19
      FOR DEFENDANT TRUSTMARK NATIONAL BANK:
20
          Ashley McKeand Kleber, Esq.
21        GIBBS & BRUNS
          1100 Louisiana
22        Houston, Texas   77002
23
24
25
```

App. 1461

Page 4

1    A P P E A R A N C E S, Continued:

2

3    FOR DEFENDANT TORONTO-DOMINION BANK:

4        Robert Plotkin, Esq.
         McGUIREWOODS

5        2001 K Street N.W.
         Washington, D.C.  20006

6

7

8    FOR DEFENDANT INDEPENDENT BANK,
     Successor-in-Interest to BANK OF HOUSTON:

9

         Brad Repass, Esq.

10       HAYNIE RAKE REPASS & KLIMKO
         14643 Dallas Parkway

11       Dallas, Texas  75254

12

13

     FOR DEFENDANT BLAISE FRIEDLI:

14

         Stephanie Gamiz, Esq.

15       MORGAN LEWIS & BOCKIUS
         101 Park Avenue

16       New York, New York  10178

17

18

     VIDEO TECHNICIAN:

19

         Robert Birdsall, TSG REPORTING

20

21                    --oOo--

22

23

24

25

App. 1462

Page 28

1    been filed --

2         A.   Uh-huh.

3         Q.   -- in this case.  Is that right?

4         A.   Yes.

5         Q.   Have you ever reviewed the First

6    Amended Complaint that was filed in the

7    action?

8         A.   In 2009?

9         Q.   Right.

10        A.   Yes.

11        Q.   And when did you review that?

12        A.   I would have reviewed it when it

13   was filed back in 2009.

14        Q.   Have you ever reviewed the

15   Complaint filed by the official Stanford

16   Investors Committee in this case?

17        A.   I haven't reviewed the specific

18   Complaint, but I understand they initially had

19   a separate Complaint.

20        Q.   Do you know how many Complaints the

21   committee has filed?

22        A.   I don't know.

23        Q.   Have you reviewed the motion to

24   substitute class representatives that was

25   filed in 2015?

1        A.   Yes.

2        Q.   When did you first review that

3   document?

4        A.   I first reviewed that document, I

5   think, soon after I signed up to become a

6   class representative.

7        Q.   Do you know if you reviewed that

8   document before it was filed?

9        A.   I'm not absolutely sure, no.

10       Q.   Have you reviewed the motion to

11   certify a class that was filed in this case?

12       A.   Yes.

13       Q.   And when did you first review that

14   document?

15       A.   Again, within the past few weeks or

16   few months, but I'm not able to identify an

17   exact time.

18       Q.   Do you know if you reviewed a draft

19   of that document or if you reviewed it in its

20   final format?

21       A.   I believe in its final format.

22       Q.   And do you know if you reviewed it

23   before it was filed?

24       A.   I don't know.

25       Q.   Have you reviewed any of the

1    materials that were in the appendix to the

2    motion for class certification?

3         A.   No.

4         Q.   How did you first hear of Stanford?

5         A.   We had a financial advisor who

6    operated with us in Thessaloniki and she

7    introduced us to a broker from Stanford

8    Financial Group.

9         Q.   What was the name of your

10   investment advisor?

11        A.   Her name was Jacqui Jagger -- when

12   we first worked with her, Jacqui Ruane -- she

13   married in the time that we were using her as

14   an advisor -- and the Stanford Financial

15   Group's advisor was James Cross.

16        MR. PLOTKIN:  I'm sorry, could you

17        repeat the name?

18        THE WITNESS:  James Cross.

19        MR. PLOTKIN:  And if you could

20        speak -- continue to speak up a little.

21        THE WITNESS:  I'm sorry.

22        MR. PLOTKIN:  Thank you.

23   BY MS. KLEBER:

24        Q.   How did you meet Mrs. or Ms. Ruane?

25        A.   I met her in Thessaloniki, and we

Page 37

1       A.   It was about the same at that time.

2       Q.   And we just walked through a number

3   of investments.  Was Ms. Ruane managing all of

4   those investments for you back in 2004?

5       A.   Yes.

6       Q.   And did she recommend that you

7   invest in a Stanford CD?

8       A.   Yes.

9       Q.   When was that, do you recall?

10      A.   Around -- it would be early

11  two-thousand- -- no, I'm sorry.  It would be

12  around mid 2005 that she introduced us to

13  James Cross.

14      Q.   Had she given any information to

15  you before -- about Stanford before she

16  introduced you to Mr. Cross in mid 2005?

17      A.   She gave -- if I recall correctly,

18  she gave us the brochure.

19           (Elson-Rogers Exhibit 63 marked.)

20  BY MS. KLEBER:

21      Q.   At this time, I am passing you what

22  I've just marked as Exhibit 63.

23           MR. SWANSON:  Thank you.

24  BY MS. KLEBER:

25      Q.   And if you'll look at the second

Page 38

1    e-mail in that chain, the earliest in time,

2    it's an e-mail from Jacqui Jagger, who I guess

3    became Ruane later --

4          A.   Uh-huh, yep.

5          Q.   -- to your husband --

6          A.   Yep.

7          Q.   -- dated November 24th, 2004.  Do

8    you see that?

9          A.   I do.

10         Q.   And she says, "My apologies for not

11   supplying you with the relevant information on

12   Stanford Bank.  The literature is on the way

13   to you today by courier."

14              Do you see that?

15         A.   Yes.

16         Q.   And do you recall what materials

17   she provided to you by courier?

18         A.   I believe it was the -- it was like

19   a folder, which we still have today, with a

20   picture of the bank on the front.

21         Q.   And this discussion in

22   November 2004, is that around the first time

23   you had ever heard of Stanford?

24         A.   Yes.

25              (Elson-Rogers Exhibit 64 marked.)

Page 39

BY MS. KLEBER:

Q.   Now I'm going to hand you what I have just marked as Exhibit 64.   Do you recognize this document?

A.   Yes.

Q.   A moment ago, you mentioned a brochure that had a picture of the bank on the front.   Is this the brochure you're referring to?

A.   Yes.

Q.   And did you review these materials when you received them in November of 2004?

A.   I don't recall exactly when we would have reviewed them.

Q.   At some point, you reviewed them before making your investment decision?

A.   Right.

Q.   And did these materials influence your decision to invest in the Stanford CDs?

A.   It's a difficult question to answer because we were -- we would have been influenced by a host of factors, of which this would have been one.

Q.   Did you also have some just verbal discussions with Ms. Ruane about Stanford?

Page 40

1          A.   Yes.

2          Q.   And what did she tell you about

3   Stanford?

4          A.   As I recall, we had -- I'm trying

5   to remember if there was -- whether there was

6   anything specific that's not included here.

7               We were -- at that point in our --

8   we had just got married.  At that point, I was

9   pregnant with our first child.  We were

10  obviously, as you can see, in Greece, and we

11  were both earning well, and we had a very

12  small cost of living in Greece, so we were

13  looking for somewhere to safely put our cash

14  that we had sitting in a bank account in

15  Greece.

16               Does that answer the question?

17          Q.   Well, I'll rephrase.  Did you ask

18  Ms. Ruane if she had options for you to safely

19  invest your money along those lines?

20          A.   We would have had quite regular

21  contact, I think, about different options.

22          Q.   And when Ms. Ruane presented you

23  with the Stanford CD option --

24          A.   Uh-huh.

25          Q.   -- do you remember any specifics

Page 41

1   about what she told you?

2        A.   Only insofar as that it was safe,

3   secure and liquid.  Beyond that, nothing more

4   specific than that.

5        Q.   You recall that you did have an

6   actual conversation about it with Ms. Ruane?

7        A.   Yes, with her, and also with James

8   Cross.

9        Q.   Now, who is James Cross?

10       A.   James Cross worked for Stanford

11  Financial -- Financial Group, the broker house

12  in Houston.

13       Q.   And did Ms. Ruane introduce you to

14  Mr. Cross?

15       A.   Yes.

16       Q.   Do you recall when you or your

17  husband first spoke with Mr. Cross?

18       A.   I thought it was later than this.

19  I actually thought it was 2005, but clearly

20  I'm not remembering correctly.  But we met

21  with him physically.

22            (Elson-Rogers Exhibit 65 marked.)

23  BY MS. KLEBER:

24       Q.   Let me hand you Exhibit 65.  And

25  this is an e-mail from Mr. Cross to your

Page 44

1          Q.    And it shows an Antigua address.

2    Do you see that?

3          A.    Yes.

4          Q.    Did you understand that Mr. Cross'

5    office was out of Antigua?

6          A.    Well, there's a -- we have a

7    Belgian telephone number there.  I'm not sure

8    that we questioned the address block,

9    particularly.

10         Q.    Did you later form a view as to

11   whether Mr. Cross was operating out of Belgium

12   or Antigua?

13         A.    No.

14         Q.    So throughout all of your

15   communications with Mr. Cross, you never had

16   any view as to where his office was located?

17         A.    No.

18         Q.    Did you and your husband -- or your

19   husband ever meet with Mr. Cross in person?

20         A.    Yes.

21         Q.    When was that?

22         A.    I think it was around April 2005,

23   but I'm not absolutely sure.  As I said, my

24   first child had recently been born, and he

25   came with Jacqui to our house.

Page 45

1          Q.    Let me hand you something that may

2     help.

3          A.    Thank you.

4                (Elson-Rogers Exhibit 66 marked.)

5     BY MS. KLEBER:

6          Q.    Marked Exhibit 66.

7          A.    Oh.  So April.

8          Q.    And this is an e-mail from

9     Mr. Cross to your husband dated April 25th,

10    2005, correct?

11         A.    Uh-huh.  Yes.

12         Q.    And he says, Mr. Cross says, "It

13    was a pleasure meeting with you and Sarah last

14    Thursday."

15                Do you see that?

16         A.    Uh-huh.

17         Q.    So does that refresh your memory

18    that in fact the meeting did occur in --

19    sometime in April 2005?

20                THE REPORTER:  I didn't hear an

21    answer.  I'm sorry.

22                THE WITNESS:  I'm sorry.  Yes, it

23    does.  Thank you.

24    BY MS. KLEBER:

25         Q.    And do you recall that meeting he's

1   referring to?

2          A.   I do recall it.

3          Q.   Where did --

4          A.   I recall mostly my daughter being a

5   few weeks old in her baby bouncer, but go

6   ahead.

7          Q.   And so did the meeting take place

8   at your home?

9          A.   Yes.

10          Q.   Okay.  And did Ms. Ruane attend as

11   well?

12          A.   Yes.

13          Q.   Anyone else?

14          A.   No.

15          Q.   Your husband was there, obviously.

16          A.   Yes.

17          Q.   What did you discuss at this

18   meeting?

19          A.   We would have, from this e-mail,

20   discussed depositing with Stanford.  I see

21   that the e-mail subject is "Wire

22   Instructions."

23          Q.   What did Mr. Cross tell you about

24   the Stanford CDs during that meeting?

25          A.   He reiterated what we'd heard

Page 47

1    already from Jacqui, that these were

2    certificates of deposit with Stanford

3    International Bank, that it was a time deposit

4    with a certain interest rate attached to that

5    time deposit.

6         Q.   Did Mr. Cross tell you anything

7    about the security of the Stanford CDs?

8         A.   Yes.

9         Q.   What did he say?

10        A.   He said that they were insured by

11   Lloyd's, and...

12        Q.   Did he say anything else?

13        A.   No.

14        Q.   Did you go over any written

15   materials about Stanford at this meeting?

16        A.   I don't recall that -- I don't

17   recall.

18        Q.   Earlier we marked Exhibit 64, which

19   was this Stanford brochure.

20        A.   Uh-huh.

21        Q.   Do you recall if you went over that

22   document at the meeting?

23        A.   I don't recall.

24        Q.   And you mentioned there was a

25   discussion about insurance.

Page 48

1          A.    Uh-huh.

2          Q.    If you turn to -- in this

3    Exhibit 64, if you turn to the page ending in

4    625, it's page 5 of the brochure -- are you

5    there?

6          A.    Yes.

7          Q.    -- there's a section entitled

8    "Insurance."

9               It says, "SIBL maintains a

10   comprehensive insurance program with the

11   following coverages."

12              Do you see that?

13         A.    Yes.

14         Q.    Was this specific representation

15   important to you?

16         A.    It was one factor.

17         Q.    Was it an important factor?

18         A.    Yes.  But there were other

19   important factors.

20         Q.    What were the other important

21   factors?

22         A.    As the other points listed here,

23   that it was safe and secure.

24         Q.    And you mentioned that Mr. Cross

25   told you that the Stanford CDs were insured by

Page 52

1   as you understood them?

2        A.   Only that he worked for Stanford

3   Financial Group.

4        Q.   And so you were basing -- you were

5   working with Mr. Cross based on Ms. Ruane's

6   recommendation?

7        A.   That he was also an accredited

8   financial advisor.

9        Q.   Back in 2005, did you have an

10  understanding about whether the Stanford CDs

11  provided a higher rate of return than other

12  CDs available in the market?

13       A.   No.

14       Q.   Did you have no understanding one

15  way or the other?  Is that what you're saying?

16       A.   Sorry.  Can you repeat the

17  question?

18       Q.   Did you understand that the

19  Stanford CDs offered a higher rate of return

20  than other CDs available in the market?

21       A.   We didn't investigate other CDs.

22       Q.   Well, were you told by either

23  Ms. Ruane or Mr. Cross that the CDs offered a

24  higher rate of return than other CDs available

25  in the market?

Page 62

1      A.    Yes.

2      Q.    And did that influence your

3   investment decision?

4      A.    No.

5      Q.    What were your investment

6   objectives at the time you began investing

7   with Stanford?

8      A.    Well, as I said, we had -- our

9   investment objective mainly was to find

10  something safe, secure, and liquid, which of

11  course in 2015, looking at this document and

12  knowing what we know now makes -- sounds --

13  well, it sounds as it sounds.

14      Our objectives were -- we were

15  holding too much money in Greece, and so our

16  objective was to find something safer.

17      Q.    And did you have particular

18  concerns about holding money in Greece

19  specifically?

20      A.    Yes.

21      Q.    And what were those concerns?

22      A.    Those concerns mainly was that the

23  Greek banking system was looking fragile, but

24  also, we had quite a substantial amount of

25  cash and we didn't want to hold it in one

1      place.

2           Q.   Do you know whether your investment

3      objectives were the same as the other

4      17,000-plus proposed class members in this

5      case?

6           A.   I don't know that, no.

7           Q.   At least some of your objectives

8      were based on the fact that you were in Greece

9      at that time, right?

10          A.   Yes.  And these -- and we didn't

11     want to invest any more funds in the stock

12     market.

13          Q.   And certainly investors investing

14     from countries other than Greece might have a

15     whole different set of concerns than what you

16     had.  Is that right?

17          A.   That's what you've just said.

18          Q.   Do you agree with that statement?

19          A.   I think there were a standard range

20     of factors that would have made Stanford

21     International Bank sound attractive.

22          Q.   That wasn't exactly my statement.

23     I'm trying to get at whether you believe your

24     particular situation, your location in Greece

25     that we've talked about --

Page 68

1        Q.   Do you ever -- do you recall ever

2   seeing a Stanford annual report?

3        A.   No.

4        Q.   Do you know if any of the other

5   17,000-plus class members received annual

6   reports?

7        A.   I don't know.

8        Q.   I'd like to talk to you now about

9   the various CDs you purchased and redeemed

10   from 2005 to 2009.   And for ease of reference,

11   I'm going to hand you an exhibit that I

12   believe contains your account statements.

13           (Elson-Rogers Exhibit 67 marked.)

14   BY MS. KLEBER:

15        Q.   I'm passing you what I've just

16   marked as Exhibit 67.

17           MR. SWANSON:   Thank you.

18   BY MS. KLEBER:

19        Q.   Do you recognize this document?

20        A.   Yes.

21        Q.   Is this the claim that you filed

22   with the United States receiver?

23        A.   Yes.

24        Q.   And did you attach all of the

25   account statements that you had in your

1  possession to this claim form?

2       A.   Yes.  And if I recall correctly,

3  there's one missing.

4            MR. PLOTKIN:  I'm sorry, could

5       you --

6            THE WITNESS:  If I recall

7       correctly, there's one statement

8       missing.

9  BY MS. KLEBER:

10      Q.   Do you recall which statement is

11 missing?

12      A.   I believe it was one in 2008.

13      Q.   Okay.  We'll come to that.  Let's

14 turn to the document with the Bates label

15 ending in 88, please.  And this appears to be

16 the first account statement in the packet

17 dated June 30th, 2005.

18           Do you see that?

19      A.   Yes.

20      Q.   And this statement reflects that

21 your first Stanford CD purchase was in

22 May 2005.  Do you see that?

23      A.   Yes.

24      Q.   And that CD was a 12-month fixed CD

25 that you purchased in euros, correct?

Page 84

1    statement, there are five fixed CDs that are

2    listed, right?

3         A.   Five -- sorry, which page are you

4    looking at now?

5         Q.   I am now -- from pages 106 to 107.

6         A.   Okay.  I can see one, two, three --

7    yes.

8         Q.   Now, the fixed CD REDACTED is listed

9    but there's no balance in CD -- in that CD.

10   Is that because you've already redeemed it?

11        A.   We received a transfer when we

12   arrived in the States.  I'm putting two and

13   two together and assuming that it's that one.

14        Q.   And then the next CD, REDACTED --

15        A.   Uh-huh.

16        Q.   -- this CD shows that in

17   November 2008, you withdrew REDACTED

18   REDACTED

19        A.   Right.

20        Q.   -- from that account?

21        A.   Uh-huh.

22        Q.   Do you recall making that

23   withdrawal?

24        A.   As well as I recall anything from

25   November 2008.

Page 85

1          Q.   Do you recall why you made the

2     withdrawal?

3          A.   We purchased a house in

4     November 2008.

5          Q.   And then the statement shows that

6     there is approximately REDACTED still in that

7     account, right?

8          A.   Right.

9          Q.   The next statement is -- the next

10    CD on the statement is REDACTED.  Do you see

11    that?

12         A.   Yes.

13         Q.   And that one is also empty,

14    correct?

15         A.   Yes.

16         Q.   Did you also redeem that CD?

17         A.   I don't recall.

18         Q.   And the next is account number

19    REDACTED.  Do you see that?

20         A.   Yes.

21         Q.   That CD appears to have a balance

22    of approximately REDACTED.

23         A.   Yes.

24         Q.   Right?  And next is REDACTED.

25         A.   Uh-huh.

Page 86

1        Q.    That CD has a balance of

2   approximately REDACTED.  Is that right?

3        A.    Yes.

4        Q.    Now, are these five CDs and then

5   the account for the REDACTED, are those the

6   assets that you had with Stanford at the time

7   Stanford went into receivership?

8        A.    I believe so.

9              (Elson-Rogers Exhibit 70 marked.)

10  BY MS. KLEBER:

11       Q.    I'm handing you now what I've just

12  marked as Exhibit 70.  Sorry.

13             Do you recognize this document?

14       A.    Yes.

15       Q.    What is this?

16       A.    This is the declaration that --

17  that was prepared regarding my position as a

18  class representative.

19       Q.    And do you understand that this

20  declaration was filed with the plaintiffs'

21  motion for class certification with the court?

22       A.    Yeah.

23       Q.    Did you write this declaration

24  personally or did counsel prepare it for you?

25       A.    Counsel prepared it.

1    Q.   Paragraph 3 says you are the

2    beneficial owner of CDs, "including those

3    issued in or around the following dates."

4         Do you see that?

5    A.   Yep.

6    Q.   And it lists five CDs, right?

7    A.   Yes.

8    Q.   Did you select which CDs to include

9    here?

10   A.   No.

11   Q.   Did you review this document

12   carefully before you signed it?

13   A.   I reviewed it.  I reviewed it

14   carefully from the perspective of was this

15   something that I felt I could do.

16   Q.   Do you mean you considered

17   carefully whether you felt that you would be

18   prepared to serve as a class representative in

19   the case?

20   A.   Yes.

21   Q.   Okay.  Separately, there are some

22   factual statements in this declaration,

23   correct?  And did you review -- correct?  Will

24   you answer verbally?

25   A.   Sorry, did I review -- did I review

Page 88

1    a, b, c, d and e listed under point 3?

2          Q.   I'm asking about all of the facts

3    that are listed in the declaration now.

4               Did you review those factual

5    statements carefully?

6          A.   I didn't review every individual

7    subpoint to the numbers.

8          Q.   Okay.  So the answer is no?

9          A.   I didn't -- I didn't review 3a, b,

10   c, d and e.  And I didn't review 5a, b, c, d

11   either.

12         Q.   Okay.  Let me ask you about

13   paragraph 3a through e.  You've redeemed

14   certain of these CDs, correct?

15         A.   Insofar as they're on the

16   statement, do I not remain the owner?

17         Q.   I'm just asking -- I think I asked

18   you a separate question.

19         A.   Okay.

20         Q.   And that is whether you have

21   redeemed any of the CDs that are listed in a,

22   b, c, d and e.

23         A.   I didn't tally what it says under

24   a, b and c, d and e with the account numbers

25   on the statement.

Page 89

1    Q.   Okay.  And so do you know whether

2    you have redeemed any of the CDs that are

3    listed here, or would you have to look at the

4    account statement to determine that?

5    A.   I would have to look at which of

6    those a, b, c, d and e had a zero balance.

7    Q.   Let me ask you to look at part c,

8    which lists a CD issued on or around May 23rd,

9    2008.  Do you see that?

10   A.   Yes.

11   Q.   Now, we're missing the June 2008

12   account statement, right?

13   A.   Right.

14   Q.   Do you know if you purchased a CD

15   dated May 23rd, 2008?

16   A.   Not off the top of my head, no.

17   Q.   If you had, would you have included

18   a reference to that in the claim you filed

19   with the U.S. receiver, which was Exhibit 67?

20   A.   There is another document which

21   went to the receiver which showed an Excel

22   breakdown of what we had and hadn't purchased.

23   Q.   If you take a look at Exhibit 67,

24   at page ending 087 --

25   A.   Okay.

Page 90

1          Q.    -- is that the Excel spreadsheet
2    you were referring to?
3          A.    Right.
4          Q.    Okay.  And on page 087 of
5    Exhibit 67, did you list out all of the CD
6    purchases that you made that you were aware
7    of?
8          A.    On -- I'm sorry, I'm not keeping up
9    with you.
10          Q.    Sure.  Okay.
11          A.    Which document are you referring to
12    now?
13          Q.    We are now on Exhibit 67.
14          A.    Okay.  So on the --
15          Q.    On the Excel spreadsheet.
16          A.    Right.  Okay.  Yes, everything is
17    listed here.
18          Q.    So all of the CDs you purchased are
19    listed on this Excel spreadsheet?
20          A.    I believe so, yes.
21          Q.    And does this spreadsheet reflect
22    any CD purchased on or around May 23rd, 2008?
23          A.    No, it doesn't.
24          Q.    And if you'd turn back with your
25    claim to the receiver on the pages ending on

1  Exhibit 67 in 83 and 84, it appears that you

2  filled out a couple of boxes on page 83 and

3  then 84 that list all of the CD purchase

4  transactions.

5      A.  Yeah.

6      Q.  Do you see that?

7          And is a CD purchased on or around

8  May 23rd, 2008, listed on this form?

9      A.  No, it is not.

10     Q.  Do you think that this is a mistake

11 in your declaration?

12     A.  Yes.

13     Q.  Okay.

14     A.  It looks as though it's a typo.

15     Q.  What CD do you believe that it

16 should refer to?

17     A.  The third one listed here on the --

18 I guess this is the 15th of August, 2007?  I'm

19 sorry.  I would need to go over the

20 statements.

21     Q.  But you did not go over the

22 statements before you signed this declaration?

23 Is that correct?

24     A.  I didn't check a, b, c, d and e

25 under point 3.

Page 92

1      Q.   Do you recall that in March

2   of 2008, you and your husband heard reports of

3   turbulence in the financial markets?

4      A.   Yes.

5      Q.   And did your husband reach out to

6   Mrs. Ruane to ask about the market and the

7   risk exposure across the investments that

8   you-all had?

9      A.   Certainly possible.

10      (Elson-Rogers Exhibit 71 marked.)

11   BY MS. KLEBER:

12      Q.   I'm going to hand you what I've

13   just marked as Exhibit 71.  The first e-mail

14   in this chain is an e-mail from Ms. Ruane to

15   your husband on March 25th, 2008 -- oh,

16   March -- I'm sorry, strike that.

17          The first e-mail in this chain is

18   an e-mail that your husband sent to Ms. Ruane

19   on March 17th, 2008.  Do you see that?

20      A.   Yes.

21      Q.   And he says, "Considering the

22   turbulence in the markets at the moment can

23   you give us some idea of our risk exposure

24   across the investments we have."

25          Do you see that?

Page 93

1        A.   Yes.

2        Q.   And does this refresh your

3    recollection that your husband reached out to

4    Ms. Ruane in this time period to talk about

5    the risk exposure that you-all had in light of

6    what was happening in the markets?

7        A.   Yes.

8        Q.   And then the next e-mail in the

9    chain is dated March 25th, 2008, Ms. Ruane

10   responds.  Right?

11       A.   Yes.

12       Q.   And Ms. Ruane advises you Stanford

13   is a private bank, right?

14       A.   Uh-huh.  Yes.

15       Q.   And that it has no retail outlets

16   and no overhead costs, right?

17       A.   Yes.

18       Q.   She says, "More importantly, they

19   do not own a loan book."  Right?

20       A.   Right.

21       Q.   And "They have taken some measures

22   over the last few weeks in adjusting U.S.

23   dollar rates, well in advance of the last

24   fall."

25            Do you see that?

App. 1490

1          A.   Yes.

2          Q.   Did this explanation from Ms. Ruane

3   influence your decision to remain invested in

4   the Stanford CDs?

5          A.   Yes.

6          Q.   In fact, you and your husband

7   purchased additional CDs after the date of

8   this e-mail.  Isn't that right?

9          A.   Yes.

10          Q.   And did Ms. Ruane's statements in

11   this e-mail influence your decision to

12   purchase those additional CDs?

13          A.   Yes.

14               (Elson-Rogers Exhibit 72 marked.)

15   BY MS. KLEBER:

16          Q.   I'm going to hand you now what I've

17   just marked as Exhibit 72.  Oops, that was a

18   bad one.  This is an e-mail exchange between

19   your husband and Mr. Cross in September

20   of 2008, correct?

21          A.   Yes.

22          Q.   And the first e-mail in the chain,

23   your husband asks what impact the

24   Lehman/Merrill Lynch news will have on

25   Stanford.

Page 95

1              Do you see that?

2         A.   Yes.

3         Q.   Do you recall during the time that

4    there were reports that Lehman Brothers was

5    going into bankruptcy?

6         A.   Yes.

7         Q.   And that Merrill Lynch had agreed

8    to be purchased by Bank of America?

9         A.   Yes.

10        Q.   And did those reports cause you and

11   your husband to question the soundness of

12   Stanford?

13        A.   It caused us to question.

14        Q.   And Mr. Cross writes back in the

15   e-mail above, do you see that?

16        A.   Yes.

17        Q.   Mr. Cross says it won't have much

18   effect except a change in the competitive

19   landscape.

20              Do you see that?

21        A.   Yep.

22        Q.   He says more investors would look

23   for a safe haven for their money and

24   Stanford's business is based on being that

25   safe haven.

Page 96

1          Do you see that?

2      A.   Yes.

3      Q.   Then in the next paragraph he says,

4  "We have absolutely no write-downs.  We never

5  invested in mortgages."

6          Do you see that?

7      A.   Yes.

8      Q.   Did these statements in Mr. Cross'

9  e-mail influence your decision to remain

10  invested in the Stanford CDs?

11     A.   Yes.

12     Q.   He goes on to say, "Our business

13  model is old-fashioned," nothing like Lehman

14  or Merrill.

15          Do you see that?

16     A.   Yes.

17     Q.   In fact, he says he worked at

18  Merrill many years ago and he says Stanford is

19  different, right?

20     A.   Yep.

21     Q.   Do you think that Mr. Cross' past

22  work experience at Merrill gave him some

23  unique insight into whether Merrill and

24  Stanford were different?

25     A.   I don't know.

Page 97

1          Q.   Did that statement influence your

2     decision to remain invested in the Stanford

3     CDs?

4          A.   Yes.

5          Q.   And in fact, in late

6     September 2008, you and your husband wired

7     more funds to Stanford.

8          A.   Uh-huh.

9          Q.   Is that right?

10         A.   Yes.

11              MR. SWANSON:  Ashley, we're closing

12         in on another hour here, so when you get

13         to a good breaking point, we'd love to

14         take a break.

15              MS. KLEBER:  Let's do one more

16         document and we'll break.

17              THE VIDEOGRAPHER:  We've gone 50

18         minutes.

19              MR. SWANSON:  What's that?

20              THE VIDEOGRAPHER:  50 minutes,

21         we've gone.

22     BY MS. KLEBER:

23         Q.   Okay.  We can -- one more doc.  Is

24     that okay with you, Ms. Elson-Rogers?

25         A.   Uh-huh.

Page 98

1          Q.    Okay.

2                (Elson-Rogers Exhibit 73 marked.)

3    BY MS. KLEBER:

4          Q.    I'm handing you now what I have

5    marked as Exhibit 73.  This is a large packet

6    of e-mails, but I want to direct your

7    attention to page ending in 595, just a few

8    pages in.

9                Are you there?

10         A.    Yes.

11         Q.    And this is an e-mail that you sent

12   to Ms. Ruane -- at the bottom of the page,

13   there is an e-mail that you sent to Ms. Ruane

14   on September 30th, 2008.  Do you see that?

15         A.    Yeah.

16         Q.    You thank her for some information

17   she's provided and you ask, "Is Stanford still

18   OK?"

19                Do you see that?

20         A.    Yes.

21         Q.    And then in the e-mail above,

22   Ms. Ruane responds to you on September 30th,

23   2008.  Do you see that?

24         A.    Yes.

25         Q.    And she says, "Stanford is sound -

Page 99

1   no loan book."  Correct?

2        A.   Uh-huh, yeah.

3        Q.   Did this assurance from Ms. Ruane

4   influence your decision to remain invested in

5   the Stanford CDs?

6        A.   Yes.

7             MS. KLEBER:  Okay.  I think we're

8        at a good breaking point.  Let's go off

9        the record.

10            THE VIDEOGRAPHER:  We're off the

11       record at 11:11.

12            (Recess, 11:11 a.m. to 11:23 a.m.)

13            THE VIDEOGRAPHER:  We are on the

14       record at 11:23.

15   BY MS. KLEBER:

16       Q.   Welcome back, Ms. Elson-Rogers.

17       A.   Thank you.

18       Q.   Stanford offered different types of

19   CDs.  Some were fixed CDs, some were flex CDs.

20   Are you aware of that?

21       A.   Aware?

22       Q.   Generally.

23       A.   Generally.

24       Q.   And all of the CDs you purchased

25   were fixed CDs.  Is that right?

1   different currencies, right?

2       A.   Yes.  As did we.

3       Q.   Did you have any investments with

4   Stanford other than in the CDs and in your

5   express account?

6       A.   No.

7       Q.   So you didn't have any brokerage

8   accounts that had equities or mutual funds or

9   anything like that through Stanford, right?

10      A.   No.

11      Q.   Do you know how many of the other

12  proposed class members had brokerage

13  accounts --

14      A.   No.

15      Q.   -- through Stanford in addition to

16  holding CDs?

17      A.   No.

18      Q.   Do you know if Stanford provided

19  any different disclosures or information to

20  people who had brokerage accounts with

21  Stanford as opposed to people who just had

22  CDs?

23      A.   I don't know.

24      Q.   Do you know what documents other

25  SIBL CD purchasers received and reviewed

Page 104

1    related to the CDs?

2         A.   No.

3         Q.   Do you know if these materials

4    could have been different from what you were

5    given?

6         A.   I don't know if they were

7    different.

8         Q.   Have any of your friends or family

9    members invested in Stanford CDs?

10        A.   No.

11        Q.   Have you ever encouraged any

12   friends or family members to consider

13   investing in Stanford CDs?

14        A.   Thankfully not.

15        Q.   Have you ever attended any events

16   hosted by Stanford?

17        A.   No.

18        Q.   Charity events or golf tournaments

19   or the like?

20        A.   No.

21        Q.   So you never had the opportunity to

22   meet other Stanford financial advisors or

23   investors at those types of events?

24        A.   No.

25        Q.   Before Stanford entered

Page 106

1          MS. KLEBER:   Objection,

2      nonresponsive.

3  BY MS. KLEBER:

4      Q.   Do you know if Ms. -- if Mr. Cross

5  ever worked from any locations for Stanford

6  other than out of Antigua or Belgium?

7      A.   I don't know what locations James

8  Cross operated from.   There may have been more

9  than Antigua and Belgium.

10     Q.   But you don't know what those would

11 be if there are more, correct?

12     A.   No.

13     Q.   Now, your financial advisor,

14 Ms. Ruane, she operated out of Greece and

15 Kosovo during the time she was advising you.

16 Is that correct?

17     A.   Yes.

18     Q.   And when you purchased your

19 Stanford CDs, you either resided in Greece or

20 in North Carolina.   Is that right?

21     A.   Yes.

22     Q.   Did you ever travel to Texas in the

23 course of purchasing any Stanford CDs?

24     A.   No.

25          (Elson-Rogers Exhibit 74 marked.)

1   sure if I'm going to answer this in the

2   correct way, but I will do my best.

3           So we were dealing with Mrs. Ruane,

4   who was in Greece; and at the date of this

5   letter, April 2009, things were looking pretty

6   dire in Greece.  So writing a letter to the

7   Belgian authorities -- again, I'm not sure if

8   I'm answering -- I was writing a letter to the

9   Belgian authorities about an investment that

10  started with us in Greece.

11          So to me, this was another -- we

12  didn't just rely on one financial advisor in

13  Greece and operating under Greek regulations;

14  we also were dealing with somebody from

15  Belgium.  It was a layer, an additional layer.

16      Q.   If you look at the last paragraph

17  on Exhibit 77, you say, "Because of the

18  additional brokerage layer in our original

19  deposits with SIB, we are aware if fraud were

20  to be proven that there would have to be two

21  layers of fraudulent conveyance."

22          Do you see that?

23      A.   Yes.

24      Q.   What do you mean by this

25  "additional brokerage layer in our original

Page 123

1   deposits with SIB"?

2       A.   We had tried to be careful.   We

3   hadn't just relied on one advisor.   So we had

4   tried to be careful.

5       Q.   Because you were relying both on

6   Ms. Ruane and Mr. Cross, right?

7       A.   We were relying on -- I suppose --

8   like a chain.

9       Q.   And in fact, Ms. Ruane didn't work

10  directly for Stanford, right?   She was an

11  independent financial advisor, correct?

12      A.   Right.

13      Q.   And so your point here, is it that

14  your particular situation is different from

15  someone who, say, just dealt with one

16  Stanford-affiliated broker in buying the CDs?

17      A.   We all bought the CDs.   I don't

18  understand why this would make a difference.

19      Q.   Well, it was significant enough for

20  you to include in your complaint to the CBFA,

21  correct?

22      A.   Right.   Well, the context is, of

23  course, I'm writing to the CBFA in Belgium.

24      Q.   And you say -- and you stress that

25  if fraud were to be proven that there have

1          Q.    -- it's the Excel spreadsheet, is

2     the net claim you're making there for the

3     REDACTED?

4          A.    Yes.

5          Q.    And did you receive a Notice of

6     Determination from the receiver about how much

7     of that claim the receiver determined would be

8     allowed?

9          A.    Yes, we did.

10              (Elson-Rogers Exhibit 80 marked.)

11    BY MS. KLEBER:

12         Q.    I'm handing you now what I've just

13    marked as Exhibit 80.  Is this the Notice of

14    Determination that you received from the

15    receiver?

16         A.    Yes.

17         Q.    And what is the allowed claim

18    amount, according to the receiver?

19         A.    Just under    REDACTED    .

20         Q.    What is your understanding of how

21    the receiver calculated the allowed claim

22    versus the amount that you claimed?

23         A.    We don't have an understanding.

24         Q.    Have you challenged the Notice of

25    Determination that you received from the

Page 145

1    from the U.S. receiver related to these

2    distributions?

3         A.   I don't suppose we've kept the

4    check.  I'm not sure if we've kept the

5    letters.  We've kept a record of it because we

6    have to declare it to the IRS, so...

7         Q.   Now, you've also filed a claim with

8    the joint liquidator in Antigua.  Is that

9    right?

10        A.   Yes.

11             (Elson-Rogers Exhibit 81 marked.)

12   BY MS. KLEBER:

13        Q.   I'm going to hand you now what I've

14   marked as Exhibit 81.  This appears to be a

15   claim approval notice dated August 27, 2009,

16   from the Antiguan joint liquidator.  Is that

17   right?

18        A.   Sorry, say -- could you give the

19   date again, please?

20        Q.   August 27, 2009.

21        A.   Oh, I'm sorry, yes.

22        Q.   And according to this e-mail, the

23   joint liquidator approved a claim in the

24   amount of REDACTED?

25        A.   Yes.

Page 146

1    Q.   On page ending in 640 --

2    A.   Uh-huh.  Yes, sorry.

3    Q.    -- the joint liquidator in that

4  letter, right after he tells you the amount

5  that's been allowed, says, "Please note that

6  the Joint Liquidators reserve the right to

7  withhold distributions and/or modify this

8  claim subject to any preference claims that

9  may be pursued against creditors or victims."

10     Do you see that?

11    A.   Yes.

12    Q.   After you received this letter, did

13  you receive any further correspondence from

14  the joint liquidator in Antigua asserting that

15  you had received a preference payment from

16  Stanford in the last six months before

17  Stanford collapsed?

18    A.   No.

19    Q.   Have you ever received any request

20  from the Antiguan joint liquidator that you

21  pay any amount of money back to the estate in

22  Antigua?

23    A.   No.

24    Q.   Do you know how many of the other

25  proposed class members received so-called

Page 149

1      Q.   Have you ever reported income for

2   the interest you earned on your Stanford CDs

3   on any of your tax returns?

4      A.   In 2009, when we first had to

5   report in the U.S., we had to report the

6   interest we had received in 2008.

7      Q.   And you in fact included that

8   interest in your tax return?

9      A.   I believe so.

10      Q.   Is there some doubt in your mind?

11      A.   I'm responsible for doing the

12   British tax return; my husband is responsible

13   for doing the American tax return.

14      Q.   Okay.

15      A.   We try not to overlap the two of

16   them too much.

17      Q.   Have you maintained copies of the

18   tax returns that you've filed?

19      A.   Yes.

20      Q.   And have you provided those to

21   counsel?

22      A.   I don't think so.

23      Q.   Have you ever claimed losses on

24   your United States tax returns for the losses

25   you sustained on Stanford CDs?

Page 150

1      A.    We made a theft loss claim.   If I
2  am correct about this, we made it in 2010 for
3  the year 2009.   But it's possible that we did
4  it in 2011 for 2010.   We did one year, we did
5  have a theft loss claim, yes.
6      Q.    And how much did you claim on the
7  theft loss claim?
8      A.    I think when everything had been
9  calculated, we received a tax rebate for the
10  tax that we paid that year.   But for the
11  following year, we met -- we had to -- I think
12  because the loss was so high compared to our
13  salary -- at that point only my husband was
14  earning -- we had two years' worth of losses,
15  but in the second year, we fell subject to the
16  alternative minimum tax?   Is that right?
17      Q.    It sounds right.
18      A.    Okay.
19      Q.    So in the second -- so just to back
20  up, do you know in the line item where you
21  have to list the amount of the loss you
22  sustained, do you know what figure you-all
23  included there?
24      A.    I don't know.
25      Q.    Do you know what the amount of

Page 169

1   works is you don't get to object to relevance.

2         A.   Okay.  Well, I'm not -- I don't

3   understand what you're trying to ask me.

4         Q.   Well, let me see if I can work on

5   it a little bit, okay?

6              You've sued five banks here; true?

7         A.   Yes.

8         Q.   Did the banks ever give you any

9   promotional material to encourage you to

10  invest in the Stanford CDs?

11        A.   A simple answer is no, the banks

12  did not give me any promotional material.

13        Q.   Well, thank you.  I will accept

14  that.

15             Now, with respect to Exhibit 71, if

16  you could turn to that one, ma'am, you'll see

17  that this -- you will recall Exhibit 71 starts

18  out as an e-mail from your husband to

19  Ms. Ruane --

20        A.   Yep.

21        Q.   -- basically saying "there's

22  turbulence in the markets at the moment, can

23  you give us some idea of our risk of

24  exposure," and that e-mail from your husband

25  was dated March 17th of 2008.

Page 170

1              You see that, ma'am?

2       A.   Uh-huh.  Yes.

3       Q.   And then in part, Ms. Ruane goes

4    over the various investments, and with respect

5    to Stanford says, "Private bank, no retail

6    outlets, therefore no overhead costs.  More

7    importantly, they do not own a loan book," and

8    it goes on to mention some other things.

9              This e-mail from Ms. Ruane

10   contributed to you and your husband staying in

11   the Stanford CDs in the spring of 2008; true?

12       A.   Yes.

13       Q.   Did any of these five banks ever

14   make any representations to you to reassure

15   you and your husband to stay within the

16   Stanford CDs?

17       A.   No.

18       Q.   Exhibit 72, ma'am.  You will recall

19   that this is an e-mail chain and it starts out

20   once again with an e-mail from your husband to

21   Mr. Cross, dated September 15th of 2008,

22   wanting to know what impact the Lehman/Merrill

23   Lynch news will have on Stanford.

24              You remember this e-mail, ma'am?

25       A.   Yes.

Page 171

1        Q.   And in short, I won't read the

2   whole thing, but Mr. Cross essentially replied

3   that it shouldn't impact the Stanford

4   investment at all.

5            Would you agree with that?

6        A.   Yes.

7        Q.   And because of this e-mail,

8   Exhibit 72, in part, from Mr. Cross, you and

9   your husband stayed in the Stanford CDs; true?

10       A.   Yes.

11       Q.   And once again, you never received

12   anything in writing from any of these banks

13   which caused you to stay invested in the

14   Stanford CDs, did you?

15       A.   No.

16       Q.   Now, I believe the phrase you used

17   earlier when asked about what it was that

18   these banks did wrong is you used the phrase

19   "compelling evidence."

20            Now, I represent -- and if I

21   misquoted you, I apologize, but I don't think

22   I did.

23            What evidence are you aware of that

24   my client, formerly the Bank of Houston, did

25   anything wrong?

Page 190

1    should always correct me if I'm misstating

2    what you said previously -- but I think you

3    testified that when you met in person with

4    Mr. Cross for the first time, you discussed

5    some of the information in the pamphlet.  Is

6    that correct?

7         A.   Yes.

8         Q.   Exhibit 64?

9         A.   Yes.

10        Q.   And among other things, you said

11   that you had a specific conversation about

12   Stanford International Bank being insured by

13   Lloyd's of London.  Is that right?

14        A.   Right.

15        Q.   Was it only Mr. Cross who told you

16   that or did Ms. Ruane also tell you that?

17        A.   I don't recall exactly.  I'm pretty

18   sure it was him.

19        Q.   And you're certain that that

20   happened at the first meeting that you had

21   with Mr. Cross?

22        A.   Quite certain.

23        Q.   You would agree with me, though,

24   that this pamphlet, Exhibit 64, does not

25   include any reference to Lloyd's of London,

1    correct?

2         A.   It doesn't, no.

3         Q.   So to the extent that was an

4    important representation to you, it was one

5    that was made only orally to you by Mr. Cross

6    and/or Ms. Ruane?

7         A.   Yes.

8         Q.   What other information in the

9    pamphlet, in Exhibit 64, did you discuss with

10   Mr. Cross and Ms. Ruane in that first meeting?

11        A.   It's hard to recall something that

12   happened so long ago, but certainly in our

13   case -- I'm trying to think what was

14   discussed -- the currencies would have been

15   discussed and the different CDs.  I don't -- I

16   don't recall exactly how the conversation

17   went.

18        Q.   So when you say -- let me follow up

19   on both of those things.  When you say "the

20   different CDs," you recall there was some

21   discussion of the various types of CDs that

22   were available --

23        A.   Right.

24        Q.   -- through Stanford International

25   Bank.  Is that right?

Page 199

1   and do anything more complicated than take

2   money out of the ATM, so we used Internet

3   banking, and there was a limit on how much you

4   could transfer.

5        Q.   So there was a daily limit on how

6   much you could transfer out of the bank using

7   its online service?

8        A.   Right.

9        Q.   And that's why each time you

10  invested you did it in REDACTED increments?

11       A.   Right.

12       Q.   The first CD you bought from

13  Stanford International Bank was May 23rd,

14  2005.  Is that right?

15       A.   Yeah, according to the records,

16  that's the date.

17       Q.   Where were you living at that time?

18       A.   In Greece.

19       Q.   And this was through Mr. Cross,

20  correct?

21       A.   Yes.

22       Q.   Who was operating at least --

23  operating, at least, through Belgium.

24       A.   Right.

25       Q.   And you don't know physically where

Page 224

```
 1        A.    In dollars, yes.

 2        Q.    In dollars.  So is the REDACTED --

 3        A.    It's in dollars.

 4        Q.    It's been converted, got it.

 5              So let me ask the question again.

 6        Between 2005 and 2008, you made total

 7        investments with Stanford International Bank

 8        of just over REDACTED.

 9        A.    Correct.

10        Q.    And you took out just over

11        REDACTED, correct?

12        A.    Correct.

13        Q.    And the REDACTED went to purchase

14        your home in North Carolina, correct?

15        A.    Yes.

16        Q.    And to other investments, correct?

17        A.    Yes.

18        Q.    And you still have those other

19        investments, correct?

20        A.    No.

21        Q.    You do not have those other

22        investments?

23        A.    No.

24        Q.    What happened to them?

25        A.    There was -- REDACTED, I believe
```

Page 239

1    money for your first CD?

2         A.    Yes.

3         Q.    What did you know about them?

4         A.    That HSBC is the biggest

5    U.K. retail bank.  I mean, I know general

6    knowledge about HSBC.

7         Q.    Okay.

8         A.    I grew up in the U.K.

9         Q.    Do you know what HSBC stands for?

10        A.    Hongkong Shanghai Banking

11   Corporation.

12        Q.    All right, well done.  Did you know

13   anything about HSBC as it related to Stanford

14   before you first wired money to HSBC?

15        A.    No.

16        Q.    In other words, did you know that

17   they were somehow providing correspondent

18   banking services to Stanford?

19        A.    No.

20        Q.    So kind of walk me through, then,

21   the point in time when you first learned.  Did

22   you ask Jacqui or did you ask Mr. Cross,

23   "What's going on here?  Why am I wiring money

24   to HSBC?"

25        A.    No, I don't think we did, no.

Page 240

1        Q.    So it didn't strike you as odd that

2    you were purchasing a Stanford CD but you were

3    being asked to wire money to HSBC?

4        A.    No, it didn't strike us as odd, no.

5        Q.    Why would you say that didn't

6    strike you as odd?

7        A.    I didn't know all of the roles and

8    responsibility of a correspondent bank at that

9    time, but I was aware that banks use

10   intermediary banks.

11       Q.    So is it fair to say when you were

12   given the wiring instructions on how to wire

13   the first REDACTED for the CD you purchased in

14   2005, when you saw the wiring instructions

15   saying to send it to HSBC, you thought that

16   that was just normal banking practices to make

17   the deposit?

18       A.    Not only normal.  As I said, I grew

19   up in the U.K.  I hesitate to use the word

20   "reassuring."

21       Q.    Okay.  At any point in time, did

22   you personally have any communications with

23   anyone at HSBC?

24       A.    No.  My husband has a bank account

25   with HSBC.

1    perspective, it had been sitting for quite a

2    while.

3        Q.   And did she tell you why there was

4    a new firm being involved?

5        A.   I believe only inso- -- I don't

6    think it was -- I mean, only insofar as

7    Morgenstern was being joined.

8        Q.   Did she say why Morgenstern was

9    being joined?

10       A.   No.

11       Q.   Did she say how the joining firm

12   had been selected?

13       A.   No.

14       Q.   Did she say by whom they had been

15   selected?

16       A.   No.  And the conversation was far

17   more about me, actually, and how I felt about

18   participating.

19       Q.   And how did you feel about

20   participating?

21       A.   It was a very difficult decision.

22       Q.   Why?

23       A.   On the one hand, I believe myself

24   and the people that I represent have been --

25   if the correct phrase is badly served, I don't

Page 291

1    know.  I was involved early on, as I said,

2    with e-mails with Peter Morgenstern and

3    concerning the correspondent bank issue.

4              But as was pointed out by one of

5    the other lawyers, this is quite a commitment

6    to take on, and we are however many years now

7    down the line.

8         Q.   Do you still share -- do you still

9    have those reservations?

10        A.   Of course.

11        Q.   And following that call with

12   Ms. Kogutt, I think she -- did she give you

13   the lawyers' number and you contacted them?

14        A.   I'm not sure if it went like that.

15   It may have been that she copied them on an

16   e-mail and then I responded with my telephone

17   number, and I don't remember exactly but

18   that's what I think happened.

19        Q.   Okay.  And then they contacted you?

20        A.   Yes.

21        Q.   Okay.  And did you have to fill out

22   any questionnaires or paperwork in connection

23   with being considered for class

24   representative?

25        A.   Initially, no.  We had a long

App. 1517

1    let's see.

2              (Sotto voce discussion.)

3    BY MR. PLOTKIN:

4         Q.    If you'd take a look at the
affidavit that you did, here it is,
Exhibit 70.  Do you have that?

7         A.    Yes.

8         Q.    Okay.  You see it's dated
April 28th of 2015?

10        A.    Yes.

11        Q.    And how did this come to you so
that you could sign it?

13        A.    This document?

14        Q.    Yes.

15        A.    By e-mail, I think.

16        Q.    It was e-mailed to you?

17        A.    I believe so.

18        Q.    And then you signed it and dated it
and scanned it back?  Is that --

20        A.    Right.

21        Q.    Okay.  And you signed it under
penalty of perjury, "The foregoing is true and
correct to the best of my knowledge."

24        A.    Yes.

25        Q.    Okay.  And if we go through it,

Page 294

1   paragraph 1, you are 21 and competent to make

2   this declaration.  Is that correct?

3        A.   Yes.

4        Q.   And you are a citizen of the U.K.,

5   currently residing in North Carolina?

6        A.   Yes.

7        Q.   Okay.  And you're the beneficial

8   owner of certain certificates of deposit,

9   including those issued on these dates?  Is

10  that correct?

11       A.   On or around the following dates.

12       Q.   Yes.  And I think you testified

13  earlier that you didn't check those

14  certificates of deposit?

15       A.   I didn't check these dates.

16       Q.   Okay.  And why didn't you?

17       A.   I suppose I thought that the most

18  important aspect of this document was what I

19  was agreeing to do.

20       Q.   But you could only agree to do it

21  if you had submitted certain -- if you had

22  purchased certain certificates of deposit.

23       A.   Right.

24       Q.   So you didn't think it was

25  important to verify that the dates on the CDs

Page 295

1    were accurate?

2        A.   I didn't think it was the most

3    important that was pressing on my mind of what

4    this was going to involve.

5        Q.   Were you in a hurry?

6        A.   Two days later, I went to Ghana.

7    But was I in a hurry, no.   It was -- as I

8    said, the most pressing thing was what I was

9    agreeing to do.

10       Q.   On -- by April 28th, had you

11   already provided documentation --

12       A.   Yes.

13       Q.   -- to your lawyers?

14       A.   Yes.

15       Q.   And then paragraph number 4 says

16   that you've submitted claims to Ralph Janvey.

17       A.   Yes.

18       Q.   Okay.   Did you also submit claims

19   to the joint liquidators in Antigua?

20       A.   Yes.

21       Q.   Any reason why you didn't mention

22   that?

23       A.   No.

24       Q.   And then in number 5 you say, "The

25   Receiver has recognized and allowed my claims,

Page 302

```
 1          ------------  INDEX  --------------

 2                                            Page

 3    APPEARANCES                               3

 4      EXAMINATION OF SARAH ELSON-ROGERS:

 5    BY MS. KLEBER................................ 6

 6    BY MR. REPASS...............................160

 7    BY MS. REED.................................188

 8    BY MR. WOLBER...............................232

 9    BY MR. PLOTKIN..............................275

10    BY MS. REED.................................299

11

12    REPORTER'S CERTIFICATE                    301

13

14                                   Page  Line

15    Item(s)/Document(s) Requested      211    4

16

17      ---------------  EXHIBITS  -----------------

18      Elson-Rogers                    Page  Line

19    Exhibit 62     Representation         24   13
                     Agreement,
20                   ELSON-ROGERS_000810 to 809

21    Exhibit 63     E-mail from Byrne to    37   19
                     Elson-Rogers, November
22                   24, 2004;
                     ELSON-ROGERS_000059
23

      Exhibit 64     Stanford International  38   25
24                   Bank Brochure,
                     ELSON-ROGERS_000619 to 632

25
```

Page 303

| | | | | |
|---|---|---|---|---|
| Exhibit 65 | E-mail from Cross to Byrne, February 2, 2005; ELSON-ROGERS_000273 | 41 | 22 |
| Exhibit 66 | E-mail from Cross to Byrne, April 25, 2005; ELSON-ROGERS_000292 | 45 | 4 |
| Exhibit 67 | E-mail to Stanford Financial Claims from Elson-Rogers, 18th July 2012, with Attachment(s); ELSON-ROGERS_000077 to 108 | 68 | 13 |
| Exhibit 68 | E-mail from Ruane to Byrne, December 1, 2006; ELSON-ROGERS_000062 to 63 | 74 | 16 |
| Exhibit 69 | E-mail from Cross to Byrne, June 20, 2008; ELSON-ROGERS_000228 to 229 | 79 | 15 |
| Exhibit 70 | Declaration of Sarah Elson-Rogers, Apr. 2015 | 86 | 9 |
| Exhibit 71 | E-mail from Byrne to Elson-Rogers, March 26, 2008; ELSON-ROGERS_000060 to 61 | 92 | 10 |
| Exhibit 72 | E-mail from Cross to Byrne, September 15, 2008; ELSON-ROGERS_000305 to 306 | 94 | 14 |
| Exhibit 73 | Packet of E-mails beginning with "Seasons Greetings," ELSON-ROGERS_000592 to 613 | 98 | 2 |
| Exhibit 74 | E-mail from Ruane to Byrne, February 17, 2009; ELSON-ROGERS_000025 | 106 | 25 |
| Exhibit 75 | Letter to James Cross and Sharon Winter from Matthew Byrne, Feb 17th, 2009; ELSON-ROGERS_000646 to 649 | 109 | 19 |

Page 304

| | | | |
|---|---|---|---|
| Exhibit 76 | E-mail from Ruane to Byrne, April 13, 2009; ELSON-ROGERS_000049 | 113 | 4 |
| Exhibit 77 | E-mail from Elson-Rogers to CBFA, Belgium; ELSON-ROGERS_000645 | 116 | 23 |
| Exhibit 78 | Fax to the Foreign Affairs Parliamentary Select Committee from Elson-Rogers, 18th May 2009; ELSON-ROGERS_000650 to 651 | 134 | 25 |
| Exhibit 79 | Large Group of E-mails, beginning with E-mail from Ruane to Byrne, September 16, 2009; ELSON-ROGERS_000392 to 613 | 137 | 7 |
| Exhibit 80 | Notice of Determination Exhibit, ELSON-ROGERS_000790 | 142 | 10 |
| Exhibit 81 | E-mail from Vantis to Byrne, August 27, 2009, and Attachment(s); ELSON-ROGERS_000639 to 643 | 145 | 11 |
| Exhibit 82 | Terms of Deposit, ELSON-ROGERS_000634 to 638 | 299 | 21 |
| Exhibit 83 | General Terms and Conditions, ELSON-ROGERS_000615 to 618 | 299 | 22 |

--oOo--

# EXHIBIT 70

Page 1

1          IN THE UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF TEXAS

2                   DALLAS DIVISION

3   PEGGY ROIF ROTSTAIN,        §

    et al.,                     §

4                               §

                Plaintiffs,     §

5                               §          Case No.

    v.                          §    3:09-CV-2384-N-BG

6                               §

    TRUSTMARK NATIONAL          §

7   BANK, et al.,               §

                                §

8              Defendants.      §

    _____       §

9

10

11

12      VIDEOTAPED INTERPRETED DEPOSITION OF

13           RUTH ALFILLE DE PENHOS

14              Houston, Texas

15         Wednesday, June 10, 2015

16

17

18

19

20

21

22

23      Reported by:

24      SUSAN PERRY MILLER, CSR, CCR, RDR, CRR, CBC

25      JOB NO. 94155

Page 3

```
 1            A P P E A R A N C E S
 2
 3   FOR THE CLASS PLAINTIFFS:
 4       James Swanson, Esq.
         Benjamin Reichard, Esq.
 5       FISHMAN HAYGOOD PHELPS WALMSLEY WILLIS &
         SWANSON
 6       201 St. Charles Avenue
         New Orleans, Louisiana   70170
 7
 8
 9   FOR THE WITNESS, RUTH ALFILLE DE PENHOS:
10       David Druckman, Of Counsel
         BUTZEL LONG, a professional corporation
11       230 Park Avenue
         New York, New York   10169
12
13
     FOR DEFENDANT SOCIÉTÉ GÉNÉRALE PRIVATE BANKING
14   (SUISSE) S.A.:
15       Noelle Reed, Esq.
         SKADDEN ARPS SLATE MEAGHER & FLOM
16       1000 Louisiana
         Houston, Texas   77002
17
18
19   FOR DEFENDANT HSBC BANK PLC:
20       Kurt Wolber, Esq.
         LOCKE LORD
21       2200 Ross Avenue
         Dallas, Texas   75201
22
23
24
25
```

App. 1526

Page 4

1   A P P E A R A N C E S, Continued:
2   FOR DEFENDANT TRUSTMARK NATIONAL BANK:
3       Ashley Kleber, Esq.
        GIBBS & BRUNS
4       1100 Louisiana
        Houston, Texas   77002
5
6
7   FOR DEFENDANT TORONTO-DOMINION BANK:
8       Robert Plotkin, Esq.
        McGUIREWOODS
9       2001 K Street N.W.
        Washington, D.C.   20006
10
11
12  FOR DEFENDANT INDEPENDENT BANK,
    Successor-in-Interest to BANK OF HOUSTON:
13
        Brad Repass, Esq.
14      HAYNIE RAKE REPASS & KLIMKO
        14643 Dallas Parkway
15      Dallas, Texas   75254
16
17
    FOR DEFENDANT BLAISE FRIEDLI:
18
        Stephanie Gamiz, Esq.
19      MORGAN LEWIS & BOCKIUS
        101 Park Avenue
20      New York, New York   10178
21
22
    SWORN INTERPRETER:
23      Gerardo Barchielli
24  VIDEO TECHNICIAN:
        Robert Birdsall, TSG REPORTING
25

Page 27

1   business?

2          A.   I know that his name was Alejandro,

3   but I do not know.

4          Q.   Was he an employee of the business?

5          A.   Yes.

6          Q.   And was he the person who filed tax

7   returns?

8          A.   As far as I know, yes.

9          Q.   Did the owners of the business have

10  to sign the returns?

11         A.   Of course.

12         Q.   Did you sign any of those returns?

13         A.   No, I did not.

14         Q.   Were you an owner of the business?

15         A.   I did not have -- it was my son who

16  was the legal representative.

17         Q.   Do you know who David Nanes is?

18         A.   Yes.

19         Q.   Who is he?

20         A.   To my -- unfortunately for me.

21         Q.   Who is he?

22         A.   The president of Stanford.

23         Q.   In Mexico or everywhere?

24         A.   In all places.

25         Q.   You believed he was the president

Page 28

1    of Stanford in -- everywhere?

2         A.   He was always taking planes from

3    one place to another.

4         Q.   And is that why you thought he was

5    the president?

6         A.   He was surrounded by a lot of

7    luxury.  He drove a Mercedes, a bulletproof

8    Mercedes pickup.

9         Q.   Did he tell you that he was the

10   president of Stanford?

11        A.   I have the cards where he says --

12   where they say that he is the president of

13   Stanford.

14             THE WITNESS:  Ben, do you have the

15        cards for David Nanes?

16             MR. REICHARD:  The cards were

17        produced to the defendants.

18             (Sotto voce discussion between the

19        witness and Mr. Druckman.)

20             THE WITNESS:  So how are you asking

21        me whether -- how do I know if he's the

22        president?  It says it there.

23   BY MR. PLOTKIN:

24        Q.   Is David Nanes a Mexican Jew?

25             MR. SWANSON:  Objection.

App. 1529

Page 36

1      A.   Yes, if it was all sponsored by

2   Stanford.

3      Q.   Yes.

4           How did you first learn about the

5   Stanford companies?

6      A.   Because David would talk to me and

7   talk to me and talk to me all the time.

8      Q.   Where?

9      A.   At my -- in my house.

10     Q.   David came to your house to talk to

11   you?

12     A.   He would call me on the telephone,

13   and he came to the house to meet my children

14   and my husband.

15     Q.   Okay.

16     A.   When he saw that he had the

17   investment, he got away, and that was it.  And

18   from then on, he only spoke on the telephone

19   or he would send things.

20     Q.   When did he first start contacting

21   you with regard to Stanford?

22     A.   I am not very sure, but I think it

23   was in '93 or '94.  But before that -- but

24   before that he would call on the telephone

25   insisting.

Page 37

1      Q.   Insisting on what?

2      A.   For me -- for us to give him a

3   chance to invest.

4      Q.   And when was the first time you

5   gave him a chance to invest?

6      A.   I do not remember.

7      Q.   Was it in the year 2000?

8      A.   No, it was like in 1993 or '94.

9      Q.   And what did you purchase?

10     A.   What did we purchase?  CDs.

11     Q.   In '93 or '94?

12     A.   Yes.

13     Q.   How much?

14     A.   I don't know.

15     Q.   And did you -- were you able -- did

16   you purchase a certificate of deposit from

17   Stanford International Bank?

18     A.   Yes.  The lawyer then has the

19   copies of the certificates.

20     Q.   Nothing from '93 or '94.

21     A.   No.  No.

22     Q.   What happened to them?

23     A.   I was throwing them away because I

24   was getting full of paperwork.  If we had the

25   statements, they would be checked and then

Page 38

1    thrown away.

2         Q.   Were you able to redeem any of the

3    certificates of deposit?

4         A.   What does that mean?

5         Q.   Did you get any money back from the

6    certificates of deposit?

7         A.   Nothing.

8         Q.   From '93 and '94, they never paid

9    you back?

10        A.   We did not withdraw the money.

11   When my husband quit his work, they would send

12   us REDACTED per month for living expenses.

13   REDACTED a month, yes.

14        Q.   When did your husband quit his

15   work?

16        A.   In 2007, more or less.

17        Q.   So as far as you knew, the money

18   was being held for you in an account at

19   Stanford?

20        A.   That's what we believed, that our

21   money was in Stanford accounts.  In the

22   statements it said, such a CD has so much, so

23   much in interest, and so much total, and the

24   maturity.

25        Q.   Okay.  Now, when Mr. Nanes came to

App. 1532

Page 39

1   your house and met with your family, what did

2   he tell you?

3         A.   That it was a very good investment,

4   for us not to let the chance go by, that

5   everything was insured through Lloyd's.

6         Q.   This is in 1994?

7         A.   Approximately, yes.  Because my --

8   because my son married in '96, and we were

9   already with David.

10        Q.   And who made the decision in your

11  family to purchase a CD?

12        A.   My husband and my children.

13        Q.   Okay.  And in whose name was the CD

14  purchased?

15        A.   Theirs.

16        Q.   Was your name on the CD?

17        A.   Yes.

18        Q.   How do you know?

19        A.   Because I would see them.

20        Q.   Do you still have them?

21        A.   Yes.

22        Q.   From --

23        A.   Not all of them, but yes.

24        Q.   Do you have any from the 1990s at

25  all?

Page 54

1      A.    Then I don't know what they call

2 it.

3      Q.    Okay.  Do you know the name of the

4 Stanford entity that you purchased your CDs

5 from?

6      A.    The entity, from Stanford.

7      Q.    Do you know the --

8      A.    The entity is here in Houston,

9 because that's what David told me, that it was

10 here in Houston.  And then it turned out that

11 it went to Antigua.

12      Q.    And you didn't know that?

13      A.    No.

14      Q.    What were the things that David

15 told you about the benefits of a CD?

16      A.    That it paid a higher rate of

17 interest for a one-year period, or two-year,

18 or three-year, or five, ten.  According to the

19 term that one chose, they would pay a

20 different rate.

21      Q.    Did he tell you anything about

22 whether the money was tax free at the source?

23      A.    No.  What do you mean, at its

24 source?

25      Q.    Did he ever tell you that?

Page 55

1          A.    No.

2          Q.    Who told you that Stanford could

3    give you higher interest rates?

4          A.    David.

5          Q.    Did he tell you how much higher?

6          A.    Yes.

7          Q.    What did he tell you?

8          A.    I think it was 2½ points more.

9          Q.    And did he explain to you how it

10   was that Stanford could offer those higher

11   interest rates?

12         A.    At that time, yes.  He said that

13   they did not have a street address bank, they

14   had no cash registers --

15              THE WITNESS:  (In English)

16         Cashiers.

17              THE INTERPRETER:  -- "no cashiers,

18         that they were not in the street, that

19         they didn't have branches.

20              So that is how they were able to

21         pay a higher rate of return, because

22         they did not have many branches."

23   BY MR. PLOTKIN:

24         Q.    And how do you think that allowed

25   them to pay a higher rate of return because

Page 56

1    they didn't have branches?

2         A.   Why do I think that they were

3    paying me a higher rate of return for not

4    having branches?

5         Q.   Yes.

6         A.   Because he convinced us.   He told

7    us if there are no branches, there are no

8    expenses, so instead of having expenses, we

9    can offer a higher rate of interest.

10        Q.   And did he tell you this at your

11   home?

12        A.   Yes.

13        Q.   And who else was present?

14        A.   My husband, my two sons.   That's

15   all.

16        Q.   Do you recall if they asked him any

17   questions?

18        A.   To David?

19        Q.   Yes.

20        A.   Yes, many questions.   They asked

21   him many questions.   And he -- to everything,

22   he said that everything was fine, everything

23   was insured.

24             I gave him an insurance pamphlet,

25   to the lawyer, Ben, for him to see how David

1   tricked me.  And even my co-in-law told me,

2   "Look, Ruth, that about it being insured is a

3   lie.  I am an older person.  If they don't pay

4   the policy, you'll be left without any money."

5           MR. PLOTKIN:  Okay.  I'll move to

6       strike the last part of that as

7       nonresponsive.

8   BY MR. PLOTKIN:

9       Q.   Did any of your cousins come to

10  your house to speak to David?

11      A.   No.  They dealt with Hane Tanur.

12           THE WITNESS:  (In English)  Ana.

13           THE INTERPRETER:  It means Ana.

14  BY MR. PLOTKIN:

15      Q.   And who was she?

16      A.   She worked for Stanford.  She was

17  like a broker.

18      Q.   She was a broker at Stanford?

19      A.   I don't know how they call them.

20  But they are the people that work at the

21  office to get clients.

22      Q.   Did David refer your cousins to

23  Ana?

24      A.   No.

25      Q.   How did --

Page 60

1        Q.    So what did you mean when you told

2   your cousin that every time you asked Stanford

3   to send you money, they send it?

4        A.    What did I try to tell her with

5   that?

6        Q.    You testified a few minutes ago

7   that you told your cousin that whenever you

8   asked them to send her money -- send you

9   money, they would send it.

10       A.    Yes, but that was the REDACTED that

11  they sent me monthly, or if we requested for a

12  trip, they would send it.  But a complete

13  promissory note, a complete CD --

14       Q.    I didn't ask about a CD.  I asked

15  about any money that was advanced to you.

16       A.    No.  No, nothing.

17       Q.    When David Nanes came to your

18  house, did he bring any documents?

19       A.    Yes.

20       Q.    What did he bring?

21       A.    He brought a video.

22       Q.    I'm sorry?

23       A.    He brought a video.

24       Q.    And could you tell me what was on

25  the -- did you watch the video?

1        A.   Parts of it.  Almost not.

2        Q.   Where did you watch it?

3        A.   They were in my house's living

4   room.

5        Q.   On your television, in your living

6   room?

7        A.   Yes.  No, he left it for them to

8   watch.

9        Q.   And did you watch it?

10       A.   I did not, no.

11       Q.   Okay.

12       A.   But now that I've moved to a

13   different house, some videos popped up.  I'll

14   see if it's there.

15       Q.   Did you give that to your lawyers,

16   the videos?

17       A.   No.

18       Q.   Why?

19       A.   Because I don't have it.  I don't

20   know where they are.

21       Q.   I thought you said they just popped

22   up.

23            MR. DRUCKMAN:  Objection.

24       A.   No.  Let's see if they appear.

25   BY MR. PLOTKIN:

Page 62

1      Q.   Okay.  What else did he bring you

2   besides a video?

3      A.   The insurance papers.

4      Q.   What insurance papers?

5      A.   The gentleman has them.

6      Q.   What's your understanding of what

7   those insurance papers were?

8      A.   He told us that everything that was

9   deposited was insured here in the United

10   States --

11          THE INTERPRETER:  No.

12      A.   That here in the United States they

13   only recognized $100,000, but that they would

14   recognize the entire amount.

15   BY MR. PLOTKIN:

16      Q.   Who would only recognize $100,000?

17      A.   Here in the United States.

18      Q.   Who in the United States?

19      A.   The banks.

20      Q.   $100,000 of what?

21      A.   Insurance.

22      Q.   But at Stanford, they did what?

23      A.   I don't understand your question.

24      Q.   Did they insure it for more than

25   $100,000 at Stanford?

Page 64

1          A.   No, I don't know.  But it came out

2    in the news that the people in the United

3    States, they did recognize it to them and that

4    they were paid the full amount.

5          Q.   Did he give you anything else

6    besides the video and the insurance papers?

7          A.   No.  Like what?

8          Q.   An application to fill out for a

9    CD?

10         A.   Yes.

11         Q.   Did you read it?

12         A.   They must have read it, my children

13   and my husband.

14         Q.   Okay.  My question was:  Did you

15   read it.

16         A.   No.

17         Q.   Okay.  Did you ever sign it?

18         A.   Yes.

19         Q.   You signed the application?

20         A.   Yes, because a signature has to be

21   there.

22         Q.   Why did you sign it if you hadn't

23   read it?

24         A.   Because I trust my husband and my

25   children.  And if they sign, well, I signed.

Page 74

1          Q.    Okay.   Look at the third page.   It

2     says "Investor Protection" on it?

3          A.    Yes, this is the insurance.

4          Q.    Okay.   When did David Nanes give

5     this document to you?

6          A.    When we opened the account.

7          Q.    In the 1990s?

8          A.    Yes.

9          Q.    And you're certain of that?

10         A.    Yes.

11         Q.    Were you ever told that there was

12    insurance by Aetna?

13         A.    Of what?

14         Q.    Insurance provided by the insurance

15    company known as Aetna.

16         A.    No.   He told us that it was

17    Lloyd's, from England.

18         Q.    Were you ever told that there was

19    insurance provided by an insurance company

20    named Willis?

21         A.    No.

22          (Sotto voce discussion between the

23    witness and Mr. Druckman.)

24          MR. DRUCKMAN:   I'm telling her to

25    wait for the question to be finished.

Page 75

1    I'm sorry.

2    BY MR. PLOTKIN:

3         Q.    Were you ever told that there was

4    insurance provided by the British insurance

5    company Limited?

6              THE INTERPRETER:  What's the name

7         of the company?

8              MR. PLOTKIN:  Limited.

9         A.    No.

10   BY MR. PLOTKIN:

11        Q.    And what were you told about

12   Lloyd's of London by David Nanes?

13        A.    That it was a very big insurance

14   company from London, from England; and that in

15   case of anything, they would respond.

16        Q.    Had you ever heard of Lloyd's of

17   London before?

18        A.    Yes.

19        Q.    Have you ever heard of the Federal

20   Deposit Insurance Corporation?

21        A.    Is it that little paper that the

22   banks give you here in the United States, the

23   FDIC?

24        Q.    Have you ever heard of the FDIC?

25        A.    Is it that?  Yes.

Page 79

1          A.    No, I have not read it, because I
2     handed everything in.
3              MR. PLOTKIN:  Okay.  You said you
4          wanted to take a break, so why don't we
5          break here.
6              THE VIDEOGRAPHER:  We're off the
7          record at 11:24.
8              (Recess, 11:24 a.m. to 11:37 a.m.)
9              THE VIDEOGRAPHER:  We are on the
10         record at 11:37.
11    BY MR. PLOTKIN:
12         Q.    Okay.  I'm going to ask you to
13    continue to look at Exhibit 85.  I believe you
14    said that this is the insurance document that
15    David Nanes brought to your house?
16         A.    Yes.
17         Q.    Did you personally read this?
18         A.    Yes.
19         Q.    Now, this document is in English.
20         A.    Yes.
21         Q.    And you were able to read this and
22    understand it in English?
23         A.    Not completely, but my sons speak
24    English.
25         Q.    So did they read it to you?

Page 80

1        A.   No, they read it.

2        Q.   Did you also read it?

3        A.   Yes.

4        Q.   The entire document?

5        A.   Yes.

6        Q.   Okay.  Where in here does it

7   mention Lloyd's of London?

8             (Document review.)

9             MR. PLOTKIN:  Let the record

10        reflect the witness is reviewing the

11        document, Exhibit 85.

12        A.   I just looked at it, and now I

13   don't know where it is.

14   BY MR. PLOTKIN:

15        Q.   True to say it's not in there, is

16   it?

17        A.   In Exhibit 85?

18             MR. DRUCKMAN:  That's Exhibit 84.

19             THE WITNESS:  No, but I did see it

20        here.

21   BY MR. PLOTKIN:

22        Q.   I've asked you to look at

23   Exhibit 85.

24        A.   No.  I already looked at

25   Exhibit 85.

1    asking you about at the times before Stanford

2    collapsed and you were buying CDs.

3              So just so the record is clear, he

4    did not tell you at the time you were

5    purchasing CDs that --

6         A.   No.

7         Q.   Did you ever review any financial

8    statements prepared by any auditors on behalf

9    of Stanford Bank?

10        A.   No.

11        Q.   Did you read any press reports

12   about Stanford between 1997 and 2008 about

13   any --

14        A.   From the press?

15        Q.   -- press, news, about problems with

16   Stanford?

17        A.   It came out in the El Universal.

18        Q.   This is before --

19        A.   That's the name of the newspaper in

20   Mexico.

21        Q.   This is before the Stanford problem

22   arose?

23        A.   Yes.   They said that they were

24   laundering money.

25        Q.   When was that?

1    A.   I called David, and I told him --

2    Q.   When was that?

3    A.   -- "What is this that's going on?"

4         "That's envy that they have towards

5    us.  Don't believe anything."

6         It must have been in around 2007.

7    Q.   Thank you.

8         And when you saw that report, did

9    it concern you about the legality of the

10   Stanford operation?

11   A.   Of course.

12   Q.   And what, if anything, did you do?

13   A.   I called David to talk.  He said,

14   "They're envious of us.  It's not true."

15   Q.   Did you do anything else?

16   A.   No.  I told my sons, and they said,

17   "Well, if you spoke to David, he's not going

18   to trick you."

19   Q.   So he told you that in a telephone

20   conversation?

21   A.   No.  I called him for him -- for

22   him to come over to my house for me to talk to

23   him.

24   Q.   So he came to your house, and you

25   asked him this question, and that's what he

Page 88

1    told you?

2        A.   Yes.

3        Q.   And did you -- and you did nothing

4    further after he told you that?

5        A.   No.

6        Q.   When you -- during any of the time

7    from 2000 to 2008 --

8            THE INTERPRETER:  What years?

9            MR. PLOTKIN:  2000 to 2008.

10   BY MR. PLOTKIN:

11       Q.   -- did you do any independent

12   research or due diligence about Stanford?

13       A.   What happened is that he was very

14   good friends or is very good friends with my

15   nephew, and I went to school with his mother.

16   We went to the same school.

17       Q.   You're talking about David?

18       A.   Yes.

19       Q.   So the answer to the question would

20   be you didn't do any other research because of

21   the family familiarity.

22       A.   Yes, I trusted very much in him.  I

23   loved him like a son.  But he defrauded me.

24       Q.   Okay.  Did you read any websites

25   that talked about Stanford International Bank?

Page 99

1    anymore, because now that I moved to another

2    house, I tore up a lot of things.  Because I

3    had a very large house, and I moved to a very

4    small apartment.

5        Q.   Okay.  What factors did you

6    consider the most important in purchasing

7    Stanford CDs?

8        A.   I did not understand your question.

9    Who did I give more importance, or what?

10       Q.   What were the most important

11   reasons that you chose to buy Stanford CDs?

12       A.   Number one, because I trusted

13   David.  He told me, "I will never trick you,

14   ma'am."  Two, for being ambitious and wanting

15   to make a little more interest rate.

16       Q.   Anything else?

17       A.   No.  It's the truth.

18           MR. PLOTKIN:  Do we need --

19           MS. REED:  We're about ready for

20       lunch, if you want.

21           MR. PLOTKIN:  Let's go off the

22       record.

23           THE VIDEOGRAPHER:  We're off the

24       record at 12:11.

25           (Recess, 12:11 p.m. to 12:45 p.m.)

Page 127

1     Q.   Okay.  And do you know when this
2  case was initially filed, first filed?
3     A.   Approximately about two months ago.
4     Q.   Do you know if the lawsuit was
5  filed -- was there a lawsuit filed by
6  Mr. Morgenstern on behalf of his clients in
7  2009?
8     A.   No, I don't know.  But that he is
9  putting in papers and papers and papers, yes,
10  because I'm getting the information.
11     Q.   Do you get copies of all the
12  papers?
13     A.   No.
14     Q.   When you receive reports from
15  Mr. Morgenstern, are they in English or
16  Spanish?
17     A.   He writes them in both languages.
18     Q.   Okay.  When is the first time you
19  heard about the case called Rotstain?
20     A.   Rothstein?
21     Q.   Rotstain, this case.
22         THE INTERPRETER:  It's two names?
23         MR. PLOTKIN:  One word.
24     A.   Is this case called Rothstein?
25  BY MR. PLOTKIN:

Page 143

1       Q.    Okay.

2             MR. DRUCKMAN:  What date did you

3       say, I'm sorry?

4             MR. PLOTKIN:  After April 29th.

5             MR. DRUCKMAN:  You said "February."

6             THE INTERPRETER:  I said

7       "February," yes.

8    BY MR. PLOTKIN:

9             Q.    Just so the record is clear, you

10   met with them in Mexico City after you signed

11   the declaration on April 29th?

12            A.    Yes, when I agreed to testify on

13   behalf of the 17,000 persons.

14            Q.    So from the time that you spoke on

15   the phone until the time that you signed the

16   declaration, you did not meet with your

17   lawyer?

18            A.    From when we spoke?  From when we

19   spoke on the telephone until when?

20            Q.    When you signed Exhibit 88, the

21   declaration.

22            A.    In April of 2015?  No, I did not

23   see the lawyers.

24            Q.    Okay.  Did you have any other

25   telephone conversations with them from the

Page 144

1    first time until you signed the document?

2          A.   Yes, but things that were

3    unimportant.

4          Q.   How many?

5          A.   Maybe two times.

6          Q.   How long was each call?

7          A.   Especially it was concerning the

8    hotel where I would be staying and something

9    else, but it's unimportant.  Oh, he let me

10   know when they were going to have that

11   meeting.

12         Q.   Okay.  Did you stay in the hotel

13   too in Mexico City?

14         A.   No.  No.

15         Q.   And between -- before you signed

16   the declaration that's Exhibit 88 --

17         A.   Yes.

18         Q.   -- did you receive any documents to

19   review in the mail?

20         A.   This same thing.

21         Q.   Just that?

22         A.   Yes.

23         Q.   Nothing else?

24         A.   Nothing else.

25         Q.   Okay.  And at some point, did

1      A.    I did not know what I was going to

2  be asked.  How am I going to tell -- how can I

3  tell him if I don't know what it is they're

4  going to ask me?

5      Q.    Okay.  Do you know that the Peggy

6  case is a class action?

7      A.    Yes, all together.

8      Q.    What's your understanding of what a

9  class action is?

10      A.    I understand that they're going to

11  try to defend us, all of us together.

12      Q.    Okay.  And do you understand that

13  you are -- have been named here as a class

14  representative?

15      A.    Yes, but there are other

16  representatives also.

17      Q.    Do you know that this case started

18  more than two months ago?

19      A.    No.

20      Q.    Were you aware that there were

21  already people who had been identified as

22  class representatives?

23      A.    That there were already identified

24  individuals?

25      Q.    Yes.

Page 154

1    A.   No, I did not know.  They only told
2  me that they were going -- that we were going
3  to be five representatives, one per country.
4       Q.   Okay.  And who told you that?
5       A.   David.
6       Q.   Okay.  And what is your
7  understanding of what your job is as a class
8  representative?
9       A.   Speak honestly, try to do the best
10 as -- the best possible.
11      Q.   Anything else?
12      A.   Well, right now that is what comes
13 to my mind.
14      Q.   Okay.  So do you believe that the
15 only thing you have to do as a class
16 representative is to give this deposition?
17      A.   No.
18      Q.   What else do you think you have to
19 do?
20      A.   Well, I think they're going to call
21 me again to let me know about other things
22 they'll need.
23      Q.   But you have no idea of anything
24 else you might need to do?
25      A.   No.  I guess Ben or David would let

Page 156

1              MR. PLOTKIN:  It's my fault.

2    BY MR. PLOTKIN:

3        Q.   We're talking about other people

4    like yourself who are named as class

5    representatives.

6        A.   Yes, class action.

7        Q.   Do you know any of their names?

8        A.   No, I don't know them.

9        Q.   Did you review any filings that

10   were made by your lawyers in court?

11       A.   Yes.  They would send them to me by

12   e-mail, about how the case was progressing.

13       Q.   No, I mean any actual documents,

14   pleadings in the case that were filed with the

15   Court.

16       A.   No.  No, I don't know.

17       Q.   Do you know how the class is

18   defined?

19       A.   How it is defined?

20       Q.   Who's in the class?

21       A.   One person from Venezuela, one

22   person from Colombia, from Mexico, from

23   Argentina; and some other person, I don't know

24   who.

25       Q.   Okay.

Page 158

1          You can deal with the translation later,

2          but we only have one translator under

3          oath here.

4              MR. DRUCKMAN:  My objection, just

5          for the record, is that the court

6          reporter is not taking down any words in

7          Spanish.  There's no other way to make

8          that record.

9     BY MR. PLOTKIN:

10         Q.    Okay.  What I was asking you is:

11     Who -- how do you define the whole group?

12         A.    I do not understand the question.

13     What do you mean how is the group defined?

14     There are people that don't even have enough

15     to eat.  There are other people that have

16     their jobs.

17         Q.    Who are the 17,000 people?

18         A.    I don't know them.

19         Q.    No, but you represent them.

20         A.    Yes.

21         Q.    And how are they classified?  How

22     are they defined within this group?

23         A.    I don't understand.  How are they

24     defined?

25         Q.    How is the class defined?

Page 159

1       A.   Class action.

2       Q.   How is the class within the class

3   action defined?

4       A.   It's one single lawsuit for

5   everyone.

6       Q.   Well, who is included in

7   "everyone"?  Everyone in the world?

8       A.   No, the 17,000 persons and the

9   persons that might be in Venezuela, Colombia

10  and other places.  Yes.

11      Q.   Okay.

12      A.   They would all be under one

13  lawsuit.

14            (Penhos Exhibit 89 marked.)

15  BY MR. PLOTKIN:

16      Q.   I'm going to hand you what's been

17  marked as Exhibit 89.  Do you have Exhibit 89

18  in front of you?

19      A.   Yes.

20      Q.   Have you ever seen Exhibit 89

21  before?

22      A.   No.

23      Q.   Was this sent to you in the mail by

24  your lawyers?

25      A.   No.

1    Q.   Was this e-mailed to you by your
2    lawyers?
3    A.   No.
4    Q.   Do you have any idea what it is?
5    A.   No.
6    Q.   Now, if you'll turn to page 2, do
7    you see it says, "Table of Exhibits," and it
8    lists about two and a half pages of exhibits,
9    1A through 18F.
10   A.   Yes.
11   Q.   Have you ever seen any of those
12   exhibits?
13   A.   No.
14   Q.   If you'll look at page 4, do you
15   see item 18E?
16   A.   Yes.
17   Q.   Do you know what that is?
18   A.   The signed declaration that is
19   here?
20   Q.   Yes.
21   Are you surprised to see it here?
22   A.   No.  No, because I accepted it.
23   Q.   Did you know that it was going to
24   be given to the judge?
25   A.   More or less, yes.

Page 169

1    Because I can't see.

2         Q.   So I'm going to ask you a question

3    now.

4         A.   This one belongs to Moises, but I

5    cannot see the amount.

6         Q.   Okay.  There's no question pending.

7              If you'll take Exhibit 88 --

8         A.   Yes.

9         Q.   -- and put it next to Exhibit 86 --

10        A.   Yes.

11        Q.   -- on the certificates, can you see

12   the dates on the right-hand -- under the

13   right-hand corner?

14        A.   Yes, but look.  Here, the date on

15   which this certificate was issued is the 13th

16   of August of 2007.  The interest rate was 9.04

17   for three years.

18        Q.   All I asked you was:  Can you see

19   the date?

20        A.   The date, yes.

21        Q.   Okay.

22        A.   It says here, 13th of August of

23   2007.

24        Q.   Right.  Now, if you'll look at the

25   list on your declaration, paragraph 3(a)

Page 170

1    through (e), and show me where the certificate

2    for 13 August 2007 is.

3          A.   It is not there.  I told David that

4    it was not there.  Yes.

5          Q.   And you signed the declaration

6    anyway?

7          A.   What happens is that I did not have

8    all of the certificate -- certificates.

9          Q.   Before, you told me you had the

10   certificates.

11         A.   Yes, some.  I mean, these that are

12   here, yes.

13         Q.   Okay.  Show me --

14         A.   But look, this certificate could

15   not have been done on August 13 of 2007.

16   Because my brother-in-law died in December

17   of 2008, and this name of Tanya Audi Mizrahi,

18   Isaac or Jaime Penhos, this money is --

19   belongs to my husband, this one.  And this

20   document is a three-year document.

21         Q.   Where is it listed in Exhibit 88?

22         A.   This one is not there.

23         Q.   Why?

24         A.   I don't know why.

25         Q.   Okay.  And you remember when --

Page 171

1          A.   What happens is that I did not have

2     all of the certificates.   I looked for them

3     and I looked for them, and whatever I found, I

4     gave to Ben.

5          Q.   And you remember that you signed

6     this subject to the penalty of perjury?

7          A.   I'm sorry?

8          Q.   Do you remember your signature said

9     you signed it subject to the penalty of

10    perjury?

11         A.   Which one, this one?

12         Q.   Yes.

13         A.   But it's just that it's not false

14    testimony.   The certificates do exist.

15         Q.   Where are they?

16         A.   At home.

17         Q.   Now, in 2009, you were asked by

18    Peter Morgenstern to preserve all your

19    documents and to give them to Mr. Blue, and

20    you testified earlier that you did so.

21              Where are the certificates?

22         A.   I should have them in my folder at

23    home.   But it's just that you're not

24    understanding me.   This one here is in the

25    name of Tanya Audi Mizrahi, Isaac or Ruth, and

Page 172

1   for this amount -- this money belongs to my

2   husband, and it was put in Tanya's name

3   because it offered 9% interest.

4           And this one, the one below, is of

5   11 February of 2009, and this was the one that

6   was about to mature, which they did not pay

7   me.  And it's in the name of my husband.

8       Q.   Okay.  Let me direct your attention

9   to page numbered 84 of Exhibit 86.  The

10  certificate of deposit at the top of that page

11  is dated 15 December 2006.

12      A.   Uh-huh.

13      Q.   Do you see that date on here?

14      A.   Here (indicating)?

15      Q.   Yes.

16      A.   16th of December of 2006, right?

17  Here they made a mistake.

18      Q.   Who made a mistake?

19      A.   I think that when -- I think that

20  when Susan prepared this list, I did not have

21  all of the certificates.  But here's the

22  July 27th one.

23      Q.   Do you see next to the date,

24  December 16th, 2006, there's a little star,

25  asterisk?

Page 173

1          A.   Yes, little one.

2          Q.   Little one.

3               And then down below, at the bottom

4    of the page --

5          A.   Yes.

6          Q.   -- it says -- I'll wait for you --

7    "Plaintiff invested prior to December 16th,

8    2006, but she does not currently have any

9    related record of the prior investments."

10              Do you see that?

11         A.   Here?  No, I can't see it.

12              MR. PLOTKIN:  She can't see it?

13   BY MR. PLOTKIN:

14         Q.   You can't see it?

15         A.   It's just that this one from

16   16 December is this one that says 15 December.

17         Q.   That wasn't my question.  My

18   question was about the last line at the bottom

19   of the page.

20         A.   What does it say?  I cannot

21   understand it.  I can't see it.

22         Q.   So you didn't -- were you able to

23   see it when you signed the affidavit?

24         A.   When I signed the declaration?

25         Q.   Yes.

Page 174

1        A.   No.  No.

2        Q.   You couldn't see it then either?

3        A.   It's just that it says here that

4   the plaintiff had invested prior to

5   December 16 of 2006.  And what is it?

6   15 December 2006.

7        Q.   And has no records of anything

8   prior to that time.  Isn't that what it says?

9        A.   Yes, it should be.

10        Q.   Yes, it should be what?

11        A.   To be the promissory note.  How can

12   there be no record of it, if it's in my

13   husband's name?

14        Q.   Well, you're the one that signed

15   the declaration that says you do not currently

16   have any related record of prior investments.

17   Isn't that right?

18        A.   What happens is this, look.  It's

19   just that I cannot see well.  With my glasses

20   and everything, I cannot see well.  And I will

21   not distrust whatever the lawyers, Blue and

22   Morgenstern, are sending me.

23        Q.   So what they're sending you is that

24   you have no records prior to December of 2006

25   of any purchases that you made from Stanford.

Page 177

1          MR. PLOTKIN:  I'm told we need to

2      take a break, so...

3          THE WITNESS:  That's fine.

4          THE VIDEOGRAPHER:  We're off the

5      record at 15:09.

6          (Recess, 3:09 p.m. to 3:30 p.m.)

7          THE VIDEOGRAPHER:  We're on the

8      record at 15:30.

9   BY MR. PLOTKIN:

10      Q.   I'm going to hand you what has

11   previously been marked as Exhibit 8 in this

12   case.

13      A.   Uh-huh.

14      Q.   It is the Plaintiffs' Second

15   Amended Class Complaint.  Have you seen that

16   document before?

17      A.   No.

18      Q.   If you can pass it back, I think

19   we're done with it.

20          Did the investors in Stanford CDs

21   in Mexico form any kind of group?

22      A.   No.  The only thing that happens is

23   that whenever someone finds out something,

24   they'll let the rest know.

25      Q.   Is there a website that everyone

Page 180

1                    (Penhos Exhibit 90 marked.)

2     BY MR. PLOTKIN:

3          Q.    I'm going to hand you what's been

4     marked as Exhibit 90.

5                    MR. PLOTKIN:   Sorry.   Let's see if

6          we have an extra one for the translator.

7     BY MR. PLOTKIN:

8          Q.    I've handed you a package of

9     materials that are clipped together as

10    Exhibit 90, and do you see, in the bottom

11    right-hand corner, it has your name and some

12    numbers?

13         A.    Yes.

14         Q.    Okay.   You understand that these

15    are documents that we received from your

16    lawyers?

17         A.    From my lawyer.

18         Q.    You understand that?   Okay.

19                And the page numbers are not

20    consecutive because they were not organized

21    together, so I have tried to organize it so

22    that it moves from one page to the next.

23         A.    You work hard, huh?

24         Q.    Yes.

25                Have you seen -- look at the first

Page 181

1   page.  It's dated 4 March 2009.

2          A.   Yes.

3          Q.   Okay.  So this is about six weeks

4   or so after the collapse of Stanford.  And it

5   says in the first line that, "We write to

6   advise of the appointment of Joint

7   Receiver-Managers."

8               And the appointment was made by the

9   Financial Services Regulatory Commission of

10  Antigua and Barbuda.  Do you see that?  Do you

11  see that?

12              Does that refresh your recollection

13  as to whether there were court-appointed

14  people in Antigua?

15         A.   Not that I know of.

16         Q.   Do you know whether your family

17  submitted claims to these joint receivers in

18  Antigua?

19         A.   They have presented claims, but...

20         Q.   As you sit here today, do you have

21  an independent recollection that your family

22  submitted claims to the joint receivers in

23  Antigua?

24         A.   Of course.

25         Q.   You do know that?

Page 182

1        THE INTERPRETER:  I did not get to
2    translate the entire question.
3        MR. PLOTKIN:  I'm sorry.
4        MS. REED:  She understood the
5    question.
6        MR. DRUCKMAN:  I'll object to that
7    comment.
8        MS. REED:  She obviously did.
9        MR. DRUCKMAN:  Well, you don't have
10   the right to make comments either.
11   BY MR. PLOTKIN:
12       Q.  I'll add -- let me -- you recall
13   that your family made claims in Antigua?
14       A.  They were done in the United
15   States, and they were done in Antigua.
16       Q.  Anywhere else?
17       A.  No.
18       Q.  Now, if you look at the second page
19   of Exhibit 90, these --
20       A.  This is proof of a debt?
21       Q.  This is notes to proof of debt.  It
22   provides the instructions for filing a proof
23   of debt.  Have you ever seen these notes to
24   proof of debt before?
25       A.  Yes.  Yes.

Page 183

1      Q.    How did you understand these joint

2  receivers as being different from Mr. Janvey,

3  the U.S. receiver?

4            THE INTERPRETER:  What's the name?

5            MR. PLOTKIN:  Janvey.

6      A.    Let's see.  I don't understand.

7  Like how do I think that Janvey is different?

8  BY MR. PLOTKIN:

9      Q.    Yes.

10     A.    Well, I think they are regulated by

11 the same thing, right?

12     Q.    Who are they regulated by?

13     A.    The bank commission.

14     Q.    What bank commission?

15     A.    The SPIC.

16     Q.    The SPIC?  SIPC?

17     A.    SIPC.

18     Q.    So you believe that Mr. Janvey is

19 regulated by SIPC?

20     A.    I think that, yes.

21     Q.    And you think the Antiguan joint

22 liquidators are regulated by SIPC?

23     A.    No, because SIPC is for the United

24 States; and Antigua is of the United Kingdom,

25 isn't it?

Page 184

1        Q.   So take a look at the second page
2   of Exhibit 90, the notes to proof of debt.
3        A.   Where?
4        Q.   Page 2.  The notes are on page 2, 3
5   and 4.  Have you seen the notes before?
6        A.   Yes.
7        Q.   Have you read them?
8        A.   Yes.
9        Q.   Number 3, it says there that, "The
10  balance shown on the final statement of
11  account" -- actually, it's translated in
12  Spanish right below it.
13            MR. PLOTKIN:  So number 3, there's
14        a Spanish translation right below the
15        English, I think she can read that.
16            THE INTERPRETER:  Thank you.
17        Sorry.
18  BY MR. PLOTKIN:
19        Q.   Can you read that in Spanish,
20  number 3?
21        A.   Yes.  "The balance is the
22  identified account, and it's the final
23  statement --
24        Q.   Okay.  My question was:  Can you
25  read it?

Page 185

1       A.   -- dated February 2 -- 22nd of

2    February of 2009."

3       Q.   You can read and understand that,

4    correct?

5       A.   Yes.

6       Q.   What is your understanding of what

7    that means?

8       A.   What do I understand of this?

9       Q.   Yes.

10      A.   That our final balance is the -- is

11   the account that identifies us.  It's the

12   final statement dated 22nd of February of

13   2009.  It is requested for the purposes of

14   reconciliation, and it is requested for the

15   purposes of reconciliation only, and it does

16   not constitute the amount of your claim that

17   will be considered in the liquidation.

18      Q.   My question wasn't what does it

19   say.

20           My question is:  What do you

21   understand it to mean?

22      A.   That we must provide the final

23   statement for them to liquidate.

24      Q.   So they didn't provide you with any

25   statements?

Page 186

1       A.   Yes.

2       Q.   They did?  And they said it was for

3  reconciliation only?

4       A.   No.  They sent us some letters

5  where we could write down the account numbers,

6  the promissory notes, and the amount, and the

7  name of the person.

8       Q.   Okay.  So what is your

9  understanding of number 3?

10      A.   That they are requesting the final

11  balance from us for reconciliation.

12      Q.   Okay.  Look at number 7.  Please

13  read that in Spanish, not out loud, to

14  yourself.

15       (Document review.)

16  BY MR. PLOTKIN:

17      Q.   Have you had a chance to read it?

18      A.   Yes.  But I don't understand why it

19  says that any claim might be refused.

20      Q.   Do you understand -- what is your

21  understanding of deducting all amounts

22  received from SIB of any kind in relation to

23  your accounts?

24      A.   Whatever Stanford gave us?

25      Q.   Is that what you understand?

App. 1572

Page 187

1      A.   Any failure to deduct all amounts
2   received from SIBL of any kind in relation to
3   your account to get to the claim may result in
4   a denial of your claim --
5      Q.   Okay.  I didn't ask you to read it.
6   I asked you what you understood it to mean.
7      A.   That for us to tell them what they
8   gave us in money.
9      Q.   Okay.  And when you filled out your
10  claim form, did you do that?
11     A.   No.
12     Q.   Why not?
13     A.   What are we going to return if we
14  don't even have enough to eat?
15     Q.   So when you filled out the claim
16  form, you didn't put that information in
17  there, right?
18     A.   No.
19     Q.   On the next page, number 8, if
20  you'll just read that in Spanish to yourself.
21          (Document review.)
22  BY MR. PLOTKIN:
23     Q.   Have you had a chance to read that?
24     A.   I'm about to finish.
25          No, we have none of this.

Page 195

1    it is that we requested or what is it that

2    they sent us.

3         Q.   Well, you had the statements.  You

4    could have looked at those, right?

5         A.   If you want to, you can see.  There

6    are many that have nothing.  And this had to

7    be sent before a certain date.

8         Q.   Are there any that had some?

9              THE INTERPRETER:  Some amount,

10   right?

11             MR. PLOTKIN:  Yes, some record.

12        A.   What do you mean if there's any?

13   Any one of ours?

14   BY MR. PLOTKIN:

15        Q.   You saved some statements.  None of

16   them fit any of these claims?

17        A.   I don't think so.

18        Q.   You submitted those claims to the

19   joint liquidators?

20        A.   Yes, of course, they were sent.

21        Q.   And what -- have you had any

22   response from the joint liquidators with

23   regard to your claims?

24        A.   They checked everything, and they

25   saw that everything was fine.

Page 198

1        Q.    Thank you.

2        A.    Can you tell me what a preferential

3  account means?

4        Q.    No.

5        A.    No?

6        Q.    That's why you have lawyers.

7              THE WITNESS:  Then you'll tell me?

8  BY MR. PLOTKIN:

9        Q.    What was the total amount that the

10  joint liquidators allowed for your claim?

11        A.    REDACTED

12        Q.    And you received 1% of the

13  5 million?

14        A.    No.

15        Q.    How much did you receive?

16        A.    Last year, yes, we did receive 1%

17  of what they said that we had, without

18  interest.  But they have to pay for the five

19  years in which we have not received anything

20  at all.  And this year, they gave us a little

21  more than REDACTED, but because they

22  separated -- they set aside the preferential

23  accounts, and they gave us REDACTED

  REDACTED.

25        Q.    And how much was the first payment

Page 199

1    that you received?

2         A.    REDACTED

3         Q.    Okay.  Did they take away any of

4    the claim based on money that you had already

5    received?

6         A.    Whether they discounted any amount

7    from the claim?  Yes, in the second payment,

8    they did deduct.

9         Q.    You testified earlier that you were

10   receiving, for some period of time, REDACTED a

11   month?

12        A.    No.  No, of the 1%, no.  Stanford

13   would send us REDACTED for living expenses, yes.

14        Q.    Out of your interest?

15        A.    Yes.

16        Q.    Were those payments deducted from

17   the amounts that you claimed?

18        A.    Yes.

19        Q.    Was anything else deducted from the

20   amounts that you claimed?

21        A.    No, only what they had given us.

22        Q.    And I think it was your testimony

23   earlier that you never redeemed any CDs?

24        A.    Not one.

25        Q.    Okay.  Did there come a time when

Page 200

1    you also submitted claims to Mr. Janvey, the

2    U.S. receiver?

3            A.   Yes.  Yes.

4                 (Penhos Exhibit 91 marked.)

5                 MR. PLOTKIN:  Here's one more.

6    BY MR. PLOTKIN:

7            Q.   Okay.  I've handed you what's been

8    marked as Exhibit 91.  And, again --

9            A.   91?

10           Q.   Exhibit 91, yes.  And again, down

11   in the bottom right-hand corner, you see your

12   name?  It's on every page.

13           A.   The last name, Penhos.

14           Q.   Yes.  You see your name and the

15   number?

16           A.   Yes.

17           Q.   Okay.  That suggests that your

18   lawyers gave these documents to us.

19           A.   It was the lawyers?  Yes.

20           Q.   Did you give them to us?

21           A.   We sent them to the receiver.

22           Q.   Did you give the -- did you give

23   your lawyers a copy of them?

24           A.   I do not remember.

25           Q.   Did you keep a copy of them?

Page 201

1        A.   Yes.

2            Q.   Okay.  If you'll turn to the --

3   well, on the first page, this is a claim that

4   was submitted by Jaime?

5            A.   A claim?  Proof of claim.  It's

6   proof of claim.  It is not a claim, it is

7   proof.

8            Q.   Proof of claim.  And this proof of

9   claim is submitted by Jaime?

10            A.   Yes.  Yes.

11            Q.   And Jaime was born in 1963?  That

12   is correct?

13            A.   REDACTED

14            Q.   Right.  If you go to the third

15   page, which is number 68 --

16            A.   Here it is, yes.  Here it is.

17            Q.   -- in the section marked

18   "Investments/Transactions" -- it's at the top

19   of the page.

20            A.   Yes, here it is.

21            Q.   Okay.  The information asks for the

22   month, day and year of the transaction.

23            A.   Yes.  Yes, here they are.

24            Q.   And listed chronologically.  Do you

25   understand what "chronologically" means?

Page 202

1    A.   Yes.  Yes, in a sequence.

2    Q.   Yes.  Now, did you -- what are the

3 dates that are listed in the first four -- for

4 the first four transactions?

5    A.   It was on the 2nd -- no,

6 February 22nd of 2009.

7    Q.   And that same date is listed for

8 all four transactions, right?

9    A.   Yes.

10    Q.   Did you ever buy any CDs on

11 February 22nd, 2009?

12    A.   I do not remember.

13    Q.   Hadn't Stanford collapsed by

14 February 22nd, 2009?

15    A.   Yes.

16    Q.   Why did Jaime list those dates?

17    A.   I don't know.

18    Q.   Okay.  And on the next page, is

19 that Jaime's signature?

20    A.   Yes.

21    Q.   And the date is 5/31/2012.  Is that

22 right?

23    A.   May 31 of 2012.

24    Q.   Okay.

25    A.   What happens is that they had

App. 1579

Page 203

1  requested from us the proof so that they could

2  pay us the 1%.

3              (Mr. Druckman left the deposition

4        room.)

5  BY MR. PLOTKIN:

6        Q.   At the top of the page that has

7  Jaime's signature on it --

8        A.   Yes.

9        Q.   -- it says, "Supporting

10  Documentation," first paragraph.

11        A.   Yes.

12        Q.   Can you read that?

13        A.   No.  Maybe you read it so I can

14  understand it well.

15        Q.   So you can't read it?  It's a yes

16  or no.  Can you read it?

17        A.   Yes.

18        Q.   Okay.  Do you understand that it's

19  asking for documents that support your proof

20  of claim forms?

21        A.   Yes.

22        Q.   And it asks for checks or wire

23  transfer advices.  It asks for Stanford

24  International Bank account statements.

25              To your knowledge, did Jaime submit

Page 204

1   any of that information with this form?

2       A.   He presented everything.  If not,

3   they wouldn't have paid him.

4       Q.   Really?  Where is the documentation

5   that goes with this?  Let me withdraw that

6   question.

7           When we looked at the exhibit for

8   the joint liquidators, you said you didn't

9   have the records.  Now you're saying you had

10  the records and you submitted them?

11      A.   It's just that I don't know to --

12  about which records are you referring to?

13      Q.   The records that support the

14  millions of dollars of claims you're filing.

15      A.   I do not have all of the

16  certificates.  I don't have them.  I provided

17  all of the statements.

18      Q.   To the receiver?

19      A.   Whatever was there was sent to him.

20      Q.   Okay.  What was there were the four

21  statements that we showed you earlier,

22  Exhibit 86.  There's more claims here than

23  these four.

24      A.   No, there are more.

25      Q.   Where?  Are they in your folder?

Page 205

1    A.    Yes, and you should have them.

2    Q.    I should, that's right.

3    A.    Yes.

4    Q.    Okay.  Take a look at the page

5    numbered 75 down in the bottom.

6    A.    Here it is, yes.

7    Q.    This is another claim that was

8    submitted by Jaime.

9    A.    Yes.

10   Q.    Okay.  And if you take a look at

11   the second page, this is the same CD -- the

12   small one, you said, when we talked about

13   it -- REDACTED.  And you see the date there is

14   also February 22nd, 2009?

15   A.    Because this was when they asked us

16   to indicate what it is that they owed us.  It

17   was recently after the bankruptcy of the bank.

18   Q.    Bankruptcy of what bank?

19   A.    Stanford.

20   Q.    Stanford filed for bankruptcy?

21   A.    Yes.

22   Q.    Is that your understanding?

23   A.    Yes.

24   Q.    Okay.  So that's the same date that

25   he used on all the other claims in the prior

1   form that we looked at, right?

2        A.   In which other form?

3        Q.   The one we just looked at.

4   Page 68, there are four items.  They're all

5   dated February 22nd, 2009.

6        A.   Yes.  Because --

7        Q.   But you didn't buy any CDs on that

8   date, did you?

9        A.   I do not remember that.

10       Q.   If you'll go to page 45 --

11       A.   There is no page 45 here.

12       Q.   At the bottom.  Keep turning.

13       A.   45?

14            MR. REPASS:  It's about nine pages

15   back.

16       A.   5, 7, 29, 37, 48.

17            MR. PLOTKIN:  She's passed it.

18       A.   26, 48, 46, 47, 45.

19   BY MR. PLOTKIN:

20       Q.   Okay.  This is a claim that was

21   filed by Moises.

22       A.   Yes.  It's a claim filled out by my

23   son in my father's name.

24            THE INTERPRETER:  "My husband," not

25   "my father."

Page 207

1    BY MR. PLOTKIN:

2         Q.   His father.

3         A.   Yes.

4         Q.   Moises is your husband, yes?  And

5    whose handwriting is that?

6         A.   Jaime's.

7         Q.   Okay.  And if you'll skip to

8    page 47 --

9         A.   Yes.

10        Q.   -- what are the dates of the

11   transactions for these CDs that are listed?

12        A.   I don't know.

13        Q.   Can you read it?

14        A.   Yes.  It says here that it's from

15   February 22nd of 2009.  But at this date, the

16   problem with Stanford already existed, so they

17   asked us to send --

18        Q.   They asked you for the date of the

19   transaction listed chronologically.

20        A.   Yes.

21        Q.   Did you look at any of the CDs to

22   see what the actual date was?

23        A.   No.  It should appear in the

24   statements, or maybe in the -- I don't know.

25        Q.   Okay.  If you'll take a look at

1    page 26.

2         A.   From here?

3         Q.   Yes, just turn back a few pages.

4         A.   (In English)  This is a declaration

5    of my --

6         Q.   There's no question.

7              Is this proof of claim submitted by

8    your son Isaac?

9         A.   Yes.

10        Q.   And who filled it out?

11        A.   Jaime.

12        Q.   Why did Jaime fill it out for

13   Isaac?

14        A.   Because Jaime's -- Isaac's

15   handwriting is a little slanted.

16        Q.   Okay.  And if you'll turn two pages

17   back to 28, this a CD for  REDACTED

18   ███████████████████████

19        A.   That's Isaac's.

20        Q.   That's Isaac's?

21             And what's the date of that

22   transaction?

23        A.   There are a number of transactions.

24        Q.   What's the date that's listed for

25   this one?  Can you read it?

1          A.   Yes.

2          Q.   What does it say?

3          A.   It's just that that was when they

4    requested what it is that Stanford requested,

5    so we put February 22nd, 2009.

6          Q.   Stanford requested it?   Stanford

7    didn't exist then.

8          A.   No, not Stanford, did not request

9    it.   It was requested by Janvey.

10         Q.   Okay.   Go to the last claim that

11   you submitted to Janvey.

12              Oh, actually, before you do that --

13         A.   Tanya's?

14         Q.   Yes.   Go back two pages to page 29.

15   Whose signature is that?

16         A.   Isaac's.

17         Q.   And that's dated May 31st, 2012.

18   Is that right?

19         A.   Yes, because many times my children

20   don't come frequently to the house, so

21   surely -- surely on a Friday that he came

22   home.

23         Q.   And if you'll go to the last claim

24   that you submitted, proof of claim --

25         A.   That is Tanya's.

Page 210

1    Q.    Right.   And Tanya was born in 1985?

2    A.    Yes.

3    Q.    And if you'll look at the third

4  page she has a CD for REDACTED?

5    A.    No.   This is the account number.

6    Q.    What is the account number?

7    A.    REDACTED.

8    Q.    On page 7?

9    A.    5, 6, 7.

10    Q.    The CD is for REDACTED?

11    A.    REDACTED.

12    Q.    What's the date of the transaction

13  listed there?

14    A.    Same thing, same one,

15  February 22nd, 2009.

16    Q.    And on the next page, is that

17  Tanya's signature?

18    A.    Yes.   Yes, of course, here it is,

19  Tanya Audi.

20    Q.    In any of the claims that you've

21  filed, did you deduct interest from the CD?

22    A.    How am I going to deduct it?   You

23  asked for money, or you would ask money from

24  Stanford.   They would send it to you, and then

25  in the statement, the check that they had sent

Page 211

1   to you would appear.

2       Q.   Right.  But every month, whether

3   you received -- whether you got it sent to you

4   or not, interest was credited to your account,

5   wasn't it?

6       A.   Yes, of course.

7       Q.   And didn't the instructions to the

8   proof of claims tell you to deduct the

9   interest?

10      A.   No, because they subtracted them.

11  Instead of paying **REDACTED**,

12  they wanted to pay **REDACTED**.

13      Q.   Okay.  Did you ever receive a

14  determination from the U.S. receiver?

15      A.   No.

16      Q.   You never did?  So what happened to

17  your claims?

18      A.   They gave me the claim number.  I

19  don't think I brought it.  They gave me the

20  claim number, and they gave me a -- how do you

21  call that, a password?  Yes.  It's a password

22  so you can like --

23      Q.   Right.

24      A.   -- enter it.

25      Q.   Approximately what was the total

Page 226

1           witness.  I'm finished asking you

2           questions.

3                   THE WITNESS:  Okay.

4                       EXAMINATION

5    BY MS. REED:

6           Q.   Ms. Penhos, if you would please

7    look at Exhibit 86.

8           A.   Yes.

9           Q.   Exhibit 86 has copies of four

10   certificates of deposit with Stanford

11   International Bank.

12          A.   Yes.

13          Q.   Do you have any other certificates

14   of deposit from Stanford International Bank?

15          A.   Yes.

16          Q.   You have the actual certificates?

17          A.   Yes.

18          Q.   And you did not give them to your

19   lawyers?

20          A.   No.

21          Q.   Do they look just like these in

22   Exhibit 86?

23          A.   Yes.  Yes.

24          Q.   And you said you read these

25   certificates, Exhibit 86?

App. 1589

Page 231

1    questions.

2        Q.   As a matter of fact, you are,

3    Ms. Penhos.

4        A.   That's fine.

5        Q.   Are you going to refuse to answer

6    my questions?

7        A.   No, no.

8        Q.   Okay.  How old are these two

9    granddaughters that you named?

10       A.   Ruthi is about to turn 12, or she's

11   already 12 on REDACTED; and Ruth will turn 15

12   on REDACTED.

13       Q.   How old is Israel?

14       A.   26, 27.  I don't know.

15       Q.   Have you ever gone by the name Ruth

16   Alfille Chataj de Penhos?

17       A.   Yes.  That is my identification,

18   Ruth Alfille Chataj.  In Mexico we have an ID

19   called IFE.

20       Q.   Are you in any business

21   relationship with Israel?

22       A.   No.

23       Q.   You were asked by Mr. Plotkin

24   earlier if you had ever been involved in a

25   lawsuit, and you said no.

Page 232

1        A.   No.

2        Q.   You've never been sued in Mexico?

3        A.   No.

4        Q.   You've never been sued with Israel

5   Audi Mizrahi in Mexico?

6        A.   My grandson asked me to initiate an

7   action from his business in my name, but I

8   have -- I have nothing to do with his

9   business.  I have nothing to do with him.

10  Nothing.  Nothing.

11       Q.   But you allowed your name to be

12  used in the lawsuit?

13       A.   No.  No.  It was in the -- it was

14  in the active constitution that the notary

15  requested that my name be included.

16       Q.   So if I have court records from

17  Mexico that show that you were a named party

18  with Israel Audi Mizrahi --

19       A.   No.

20       Q.   -- you're denying that that's true?

21       A.   Yes.

22       Q.   Okay.  And you've never been

23  involved in a lawsuit with Banca Mifel?

24       A.   Yes.

25       Q.   You were involved in a lawsuit with

Page 233

1   Banca Mifel?

2       A.   Yes.

3       Q.   And why did you deny being involved

4   in any lawsuits?

5       A.   Because they're not -- they are not

6   suing me.

7       Q.   Would it surprise you to know they

8   are suing you?

9       A.   Yes, it does surprise me.  Because

10  Jaime had problems with them, because he had

11  no money to pay them for a lien -- for a loan.

12  As soon as he's got the money, he will pay

13  them.

14      Q.   Are you also a defendant in a

15  lawsuit brought by Alejandro Hernandez

16  Morales?

17      A.   Alejandro Hernandez?

18      Q.   Hernandez Morales.

19      A.   That gentleman was a manager of my

20  son's business, and he stole even what they

21  didn't have.

22      Q.   And he filed a lawsuit, and he

23  named you as a defendant.

24      A.   To me?  Why?

25      Q.   Yes, ma'am.

Page 234

1          A.   No.
2          Q.   So if the court records show that
3     you are a named defendant, you just have no
4     idea that you're involved in that?
5          A.   No.
6          Q.   Ms. Penhos, what year were you
7     married?
8          A.   In '63.
9          Q.   How old were --
10         A.   It is my second marriage.
11         Q.   Not the question I asked you.
12              In what year were you married?
13         A.   I already answered, 1963.
14         Q.   And that was the second time you
15    were married.  Is that what you're telling me?
16         A.   Yes.
17         Q.   But that was to Moises?
18         A.   Yes.
19         Q.   You were 20 years old?
20         A.   Yes.
21         Q.   What year were you married the
22    first time?
23         A.   In 1960.
24         Q.   Who did you marry the first time?
25         A.   With Israel Mizrahi.

Page 239

1    needlepoint business?

2        A.    From 1960 like until '70, more or

3    less.

4        Q.    And what happened to it in 1970?

5        A.    My father purchased it from us.  He

6    paid for the transfer.

7              But explain to me, what does all

8    that have to do with the problem with

9    Stanford?

10       Q.    Your father bought the business,

11   the needlepoint business, from you and your

12   husband in 1970.  How much money did he pay

13   you?

14       A.    250,000 pesos.

15             THE WITNESS:  She changes

16       everything.  She won't answer anything.

17       Whenever I want to, I will stop

18       answering.

19             MS. REED:  If you stop answering,

20       there will be a problem.

21   BY MS. REED:

22       Q.    Your obligation is to sit here and

23   answer questions.  Do you have a problem doing

24   that?

25       A.    No.

Page 240

1   Q.   Okay.  My obligation is to ask
2   them, not to answer them.
3   A.   You don't have to get mad.
4   Q.   So in 1970, your father purchased
5   your needlepoint business from you and your
6   husband for approximately 250,000 pesos.
7   A.   Yes.  He paid the transfer of the
8   place of business.
9   Q.   And did he keep the needlepoint
10  business?
11  A.   No.  Later on, it was transferred
12  to my sister.
13  Q.   Did you still, in 1970 --
14  A.   My father --
15  Q.   Excuse me.  Ma'am --
16  A.   -- left it to my sister --
17  Q.   Ma'am, I need you to wait until you
18  have a question on the table.
19       In 1970, you had the building.  How
20  much money were you making each year from
21  running the building?
22  A.   I don't know exactly how much was
23  earned.
24  Q.   Give me an approximation.
25  A.   It's just that depended on the

Page 292

1              ------------- INDEX --------------

2                                              Page

3    APPEARANCES                                  3

4      EXAMINATION OF RUTH ALFILLE DE PENHOS:

5    BY MR. PLOTKIN................................. 7

6    BY MS. REED................................. 226

7    BY MR. WOLBER.............................. 256

8    BY MS. KLEBER.............................. 266

9    BY MR. REPASS............................. 268

10

11   REPORTER'S CERTIFICATE                      291

12

13     PREVIOUSLY MARKED EXHIBITS        Ref. Page

14   Exhibit 8    Plaintiffs' Second          177
                  Amended Class Action
15                Complaint

16

17     ---------------- EXHIBITS -----------------

18     Penhos                          Page Line

19   Exhibit 84   Stanford International    65    4
                  Bank Ltd. Application
20                Form Terms & Conditions,
                  PENHOS_000091 to 94
21
     Exhibit 85   Copy of Envelope,        72   10
22                Business Card of David
                  Nanes, and "Investor
23                Protection" Flyer;
                  PENHOS_000081 to 82
24                and 86 to 90

25

Page 293

```
 1      ---------------- EXHIBITS -----------------
 2      Penhos                                    Page Line
 3   Exhibit 86    Copies of Penhos CDs,     137    4
                   PENHOS_000083 to 84
 4
     Exhibit 87    Morgenstern & Blue        117    1
 5                 Representation
                   Contract (in Spanish),
 6                 PENHOS_000109 to 116
 7   Exhibit 88    Declaration of Ruth       130   22
                   Alfille de Penhos,
 8                 Apr. 2015
 9   Exhibit 89    Plaintiffs' Motion for    159   14
                   Class Certification,
10                 for Designation of
                   Class Representatives
11                 and Class Counsel
12   Exhibit 90    Letter from Stanford      180    1
                   International Bank
13                 Ltd. dated 4th March
                   2009, PENHOS_000108
14                 to 000085 (Bates not
                   consecutive nor inclusive)
15
     Exhibit 91    Proof of Claim Forms      200    4
16                 for Jaime Penhos
                   Alfille, PENHOS_000066
17                 to 69 and 75 to 76;
                   Moises Penhos Alfie,
18                 000045 to 48; Isaac
                   Penhos Alfille, 000026
19                 to 29; Tanya Audi
                   Mizrahi, 000005 to 08
20
     Exhibit 92    Notice of Determination   214   11
21                 dated April 16, 2013;
                   PENHOS_000096 and 95
22
23
                        --oOo--
24
25
```

App. 1597

# EXHIBIT 71

Page 1

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                      DALLAS DIVISION
3    PEGGY ROIF ROTSTAIN, et    §
     al.,                        §
4                                §
                                 §
          Plaintiffs,            §
5                                §              Case No.
     VS.                         §       3:09-CV-2384-N-BG
6                                §
     TRUSTMARK NATIONAL BANK,    §
7    et al.,                     §
                                 §
8         Defendants.            §
9
10
11
12

            ORAL DEPOSITION OF DIANA SUAREZ
13                  Houston, Texas
               Wednesday, July 1, 2015
14
15
16
17
18
19
20
21
22
23        Reported by:
24        RENE WHITE MOAREFI, CSR, CRR, CLR, CCR
25        JOB NO. 94836

Page 3

1                          DIANA SUAREZ
2                    A P P E A R A N C E S
3

4      FISHMAN HAYGOOD PHELPS WALMSLEY WILLIS & SWANSON
       Attorney for Plaintiffs
5        201 St. Charles Avenue
        New Orleans, Louisiana   70170
6

       BY:  JAMES SWANSON, ESQ.
7            BENJAMIN REICHARD, ESQ.
8      BUTZEL LONG
       Attorney for Official Stanford Investors Committee
9      and the Class Plaintiffs
        230 Park Avenue
10      New York, New York   10169
11     BY:  PETER MORGENSTERN, ESQ.
12

       SKADDEN, ARPS, SLATE, MEAGHER & FLOM
13     Attorney for Defendant Société Générale Private
       Banking (Suisse) S.A.:
14       1000 Louisiana
        Houston, Texas   77002
15

       BY:  DANIEL BOLIA, ESQ.
16          NOELLE REED, ESQ.
17

       GIBBS & BRUNS
18     Attorney for Defendant Trustmark National Bank
          1100 Louisiana
19         Houston, Texas   77002
20     BY:  ASHLEY KLEBER, ESQ.
21

       SIMPSON THACHER & BARLETT
22     Attorney for Defendant Toronto-Dominion Bank
         425 Lexinton Avenue
23      New York, New York   10017
24     BY:  LYNN NEUNER, ESQ.
25

App. 1600

Page 4

1                    DIANA SUAREZ
2     LOCKE LORD
      Attorney for Defendant HSBC Bank, PLC
3      2200 Ross Avenue
       Dallas, Texas   75201
4
      BY:  TAYLOR BRINKMAN, ESQ.
5
6     HAYNIE RAKE REPASS & KLIMKO
      Attorney for Defendant Independent Bank,
7     Successor-in-Interest to Bank of Houston
       14643 Dallas Parkway
8      Dallas, Texas   75254
9     BY:  BRAD REPASS, ESQ.
10    MORGAN LEWIS
      Attorney for Defendant Blaise Friedli
11     1001 Louisiana Street
       Houston, Texas   77002
12
      BY:  RYAN WOOTEN, ESQ.
13
14    Also Present:
       MS. EMILY VONQUALEN
15     MR. GERARDO E. BARCHIELLI
       MR. ROBERT BIRDSALL - VIDEOGRAPHER
16
17
18
19
20
21
22
23
24
25

Page 5

```
 1                          DIANA SUAREZ
 2                          I N D E X
 3
                                              PAGE
 4
      DIANA SUAREZ
 5
      EXAMINATION
 6         By Mr. Bolia.............................  18
           By Mr. Repass...........................  173
 7         By Mr. Brinkman.........................  197
           By Ms. Kleber...........................  207
 8         By Ms. Neuner...........................  210
           By Mr. Swanson..........................  284
 9
      REPORTER'S CERTIFICATION.....................  294
10
11                       E X H I B I T S
12                                         PAGE LINE
      Exhibit 93 ............................ 101    17
13         E-mail string ending 10/19/2010
      from Diana Suarez to Gabriel Suarez,
14    Subject: Fw: RE: Confirmacion de la
      Apertura de la Cuenta
15    (SUAREZ_000030 - SUAREZ000032)
      Exhibit 94 ............................ 108    10
16         E-mail string ending 3/8/2006 from
      Maria Villanueva to Diana Suarez,
17    Subject: RE: Confirmacion de la
      Apertura de la Cuenta
18    (SUAREZ_000142 - SUAREZ_000145)
      Exhibit 95 ............................ 167    15
19         Correspondence from Diana Suarez
      to Judge David Hittner Re: Stanford
20    Sentencing
      (SUAREZ_000190)
21    Exhibit 96 ............................ 173    14
           Handwritten signature
22    (no Bates - 1 page)
      Exhibit 97 ............................ 174    22
23         Witness' signature
      (no Bates - 1 page)
24    Exhibit 98 ............................ 174    24
           Witness' signature
25    (no Bates - 1 page)
```

App. 1602

Page 6

```
DIANA SUAREZ
```

1

2   Exhibit 99 ............................. 175    9
        Witness' signature
3   (no Bates - 1 page)
    Exhibit 100 ............................ 175   15
4        Witness' signature
    (no Bates - 1 page)
5   Exhibit 101 ............................ 175   17
        Witness' signature
6   (no Bates - 1 page)
    Exhibit 102 ............................ 175   20
7        Witness' signature
    (no Bates - 1 page)
8   Exhibit 103 ............................ 175   23
        Witness' signature
9   (no Bates - 1 page)
    Exhibit 104 ............................ 175   23
10       Witness' signature
    (no Bates - 1 page)
11  Exhibit 105 ............................ 175   23
        Witness' signature
12  (no Bates - 1 page)
    Exhibit 106 ............................ 222   24
13       Correspondence to Maria Villaneuva
    from Diana Suarez dated 8/27/2008
14  (SUAREZ_000272 - SUAREZ_000273)
    Exhibit 107 ............................ 231   25
15       Correspondence from Diana Suarez
    to Maria Villaneuva
16  (SUAREZ_000271)
    Exhibit 108 ............................ 233   12
17       Handwritten notes
    (SUAREZ_000197)
18  Exhibit 109 ............................ 258   23
        Correspondence dated 8/14/2012
19  from Margaret Marrero to Diana Suarez
    RE: HO::-00235380-::HO
20  (SUAREZ_000187)
    Exhibit 110 ............................ 260   25
21       Article entitled "Florida victims
    seek compensation for Allen Stanford
22  Ponzi scheme dated 3/9/2012
    (SUAREZ_000265 - SUAREZ_000267)
23  Exhibit 111 ............................ 265    6
        International Private Banking
24  Interest Rates Certificate of Deposit
    Program
25  (SUAREZ_000086)
```

App. 1603

Page 7

DIANA SUAREZ

Exhibit 112 ............................ 268    8
     Correspondence from Carlos
Villaneuva dated 3/6/2009, Fw: FAs
suing Stanford and SEC read this it's
important
(SUAREZ_000028)
Exhibit 113 ............................ 271   25
     Representation Agreement
(SUAREZ_000278 - SUAREZ_000280)
Exhibit 114 ............................ 278    7
     Plaintiff Diana Suarez's Responses
and Objections to Defendants' Requests
for Production of Documents
(no Bates - 12 pages)


                  PREVIOUSLY MARKED EXHIBITS


                                        PAGE LINE
Exhibit 2 .............................. 38    14
     Representation Agreement
(SUAREZ_000278 - SUAREZ_000280)
Exhibit 5 .............................. 51    17
     Plaintiffs' First Amended Petition
(no Bates - 38 pages)
Exhibit 3 .............................. 56    13
     E-mail string ending 4/15/2015
from Angela Shaw to Gabriel Suarez,
Subject: URGENT Request Regarding
Lawsuit
(no Bates - 3 pages)
Exhibit 4 .............................. 62     2
     Plaintiffs' Motion to Substitute
Named Plaintiffs and Putative Class
Representatives
(no Bates - 15 pages)
Exhibit 10 ............................. 111   15
     Declaration of Diana Suarez dated
4/2015
(no Bates - 2 pages)
Exhibit 11 ............................. 114   13
     Copies of Certificate of Deposit
(SUAREZ_000134 - SUAREZ_000135)
Exhibit 12 ............................. 123   19
     Statement of Account dated
3/31/2006
(various Bates numbers - 39 pages)

App. 1604

Page 8

DIANA SUAREZ

1

2      Exhibit 13 ............................  126    5
           Bank of America Wire Transfer
3      Advice dated 4/3/2006
       (various Bates numbers - 7 pages)
4      Exhibit 14 ............................  149    13
           Notice of Determination
5      (SUAREZ_000203 - SUAREZ_204)
       Exhibit 15 ............................  153    9
6          Correspondence dated 3/5/2013 from
       Gabriel Suarez to Stanford Financial
7      Claims
       (SUAREZ_000191 - SUAREZ_000196)
8      Exhibit 17 ............................  154    19
           Correspondence dated 9/26/2013
9      from U.S. Receive Stanford Financial
       Claims to Diana Suarez, Eduardo
10     Suarez, Daniel Suarez, & Gabriel
       Suarez
11     SUAREZ_000045 - SUAREZ_000046)
       Exhibit 18 ............................  155    9
12         Correspondence dated 11/19/2014
       from U.S. Receiver Stanford Financial
13     Claims to Diana Suarez, Eduardo
       Suarez, Gabriel Suarez, Daniel Suarez
14     (SUAREZ_000047)
       Exhibit 19 ............................  158    14
15         Stanford International Bank
       Limited Overview of the Claims Process
16     (SUAREZ_000151 - SUAREZ_000166)
       Exhibit 20 ............................  165    18
17         Correspondence dated 1/26/2014
       from GrantThornton
18     (SUAREZ_000167 - SUAREZ_000170)

19

20

21

22

23

24

25

App. 1605

Page 10

1              DIANA SUAREZ

2              MR. REPASS:  Brad Repass on behalf

3    of Independent Bank Successors Bank of Houston.

4              MS. KLEBER:  Ashley Kleber with

5    Gibbs & Bruns on behalf of Trustmark National

6    Bank.

7              MR. BRINKMAN:  Caleb Brinkman with

8    Locke Lord on behalf of HSBC Bank PLC.

9              MR. WOOTEN:  Brian Wooten with

10   Morgan, Lewis & Bockius on behalf of Blaise

11   Friedli.

12             MR. MORGENSTERN:  Peter

13   Morgenstern on behalf of the Official Stanford

14   Investors Committee and the class plaintiffs.

15             MR. SWANSON:  And Jim Swanson on

16   behalf of the class.

17             THE VIDEOGRAPHER:  Court reporter,

18   would you please swear in the interpreter and the

19   witness.

20             GERARDO E. BARCHIELLI was duly

21   sworn by the Certified Shorthand Reporter to

22   completely and accurately translate between

23   English and Spanish.

24             (Witness sworn.)

25             MR. SWANSON:  There are a couple

Page 11

DIANA SUAREZ

1   of matters I wanted to -- that I think we need to

2   address on the record.  The first is -- has to do

3   with the translation.  The -- Mrs. Suarez is a --

4   is a pretty good English speaker, so the way I

5   think would be the best to do this today would be

6   to do it in English.

7           There may be times where there is

8   some question that she's going to want to have

9   translated into Spanish so -- so that she can

10  understand it potentially.  But I think that

11  makes the deposition go faster.  And if -- if I

12  can get everybody's indulgence to that procedure,

13  I think that's probably the best way to do it.

14          The second is that I think Noel

15  and Lynn both have raised the fact that we are

16  still producing documents kind of late -- late in

17  the game here which -- for which, you know, we --

18  we certainly apologize.

19          One of the issues was that

20  Mrs. Suarez had an account at Yahoo that she had

21  lost access to and that -- and she can explain

22  and will -- will explain this on the record.  But

23  she -- what -- they were unable to give her

24  access to the account for some reason that I'm --

Page 12

1        DIANA SUAREZ

2   I'm not sure about.  And her son has been trying

3   to get access to it for a period of time.  He --

4   he got access to it very recently, and it wasn't

5   until last night that we got the e-mails from

6   that account.

7              And I recognize that that is not

8   ideal, not through any lack of effort on our

9   part, but -- but not ideal, and that Noelle and

10  anybody else who wants to raise that has a

11  legitimate gripe about that.  I mean, it's not --

12  certainly not to be expected that you're going to

13  get e-mails the night before a deposition,

14  especially when they're in Spanish.  So we

15  recognize that that's a problem.

16              You know, a number of possible

17  solutions to that, one of which would be you get

18  the -- you know, we -- we gave you those e-mails.

19  There's a -- probably a few more e-mails that

20  you'll be receiving.

21              Two, that we could reconvene at a

22  later time to have you go over those depositions

23  should you -- you see fit.  Bring -- bring

24  Ms. Suarez back for that.

25              One -- another possibility would

Page 13

DIANA SUAREZ

2   be to reconvene the dep -- the whole deposition

3   maybe a day next week and -- and you'd have the

4   opportunity to -- to look at the e-mails in -- in

5   that regard.

6           The one thing that we would like

7   to be able to do is -- this is expensive for her

8   to come over here.  We're -- we're -- we have not

9   funded that.  If we do want -- if we do have to

10  bring her back to Houston, we would like to be

11  able to pay the cost of that.  We -- "we" meaning

12  me and -- and Peter.  So I -- I would hope

13  you-all would -- would agree to that.

14           But we recognize that, you know,

15  it would have been much preferable to get this

16  stuff quicker.  We certainly aspired to get it to

17  you quicker, but things are what -- what they

18  are.  So with that, you know -- and I'm happy to

19  address any other issues that you have regarding

20  the document production.  But -- but we're --

21  we're -- we understand that -- that -- that this

22  isn't the way it -- it should be done and -- and

23  we're apologetic and we'll -- we'll -- we'll do

24  what -- what is necessary to make sure you guys

25  have the -- the appropriate opportunity to

Page 14

1                    DIANA SUAREZ

2      examine her on these -- these documents.

3                MR. BOLIA:  Well, and we

4      appreciate that.

5                MR. SWANSON:  The -- the other

6      thing was privilege.  We don't -- we haven't

7      withheld any documents on a privileged basis

8      except the documents that are between us and --

9      and Ms. Suarez, and that's been the same, I

10     think, for -- for every plaintiff in this case,

11     that there is no privilege log because there are

12     no documents withheld and that we don't log

13     documents that are prepared during the -- the

14     course of -- of the litigation, typically.

15                With -- with respect to the

16     e-mails that are recovered from the Yahoo

17     account, I think Ms. Suarez had a lawyer at -- at

18     the time that some of the e-mails are addressed

19     to.  So those e-mails -- and I don't know how

20     many of them there are.  I don't think there's a

21     lot.  Those ones we'll have to look at.  I don't

22     think they have anything to do with this case.

23     So it may well be that with your permission,

24     we'll just give them to you, and if -- as long as

25     you don't argue that that's waiving the privilege

Page 15

1                           DIANA SUAREZ

2       that -- that we have now.  We'll give it to

3       you -- to you and you can look at them.  But we

4       need to review them, and we haven't reviewed them

5       yet.  So I think that probably covers the

6       privilege issue.

7                    If there is anything that we have

8       withheld on a privilege basis -- Ben -- Ben's not

9       here, but he'll be here in a little bit, and we

10      can -- we can all ask him about that at that

11      point.  But we're -- we're happy to prepare a --

12      a log.  But I think you'll find that there really

13      isn't much, if -- if anything, that falls in that

14      category.  So . . .

15                    MR. BOLIA:  Okay.  We're prepared

16      to go forward today, but we obviously have not

17      reviewed the documents.  You produced them after

18      10:00 o'clock last night.  And like you said,

19      they're almost all in Spanish.  So we reserve the

20      right to review those documents and recall the

21      witness if we need to.

22                    MR. SWANSON:  Yeah.

23                    MS. REED:  Anyone else have a

24      different position?

25                    MS. NEUNER:  No, not different.

Page 36

DIANA SUAREZ

1

2      A.  No.

3      Q.  No, you don't know or no, there aren't?

4      A.  There aren't.

5      Q.  Okay.  Before the Stanford collapse, which

6   happened in February of 2009, had you ever heard of

7   Société Générale Private Banking --

8      A.  No.

9      Q.  -- (Suisse)?

10      A.  No, I didn't.

11      Q.  When was the first time you heard of

12   Société Générale Private Banking?

13      A.  When this class -- class lawsuit was made.

14      Q.  And what did you hear about it?

15      A.  When?

16      Q.  No, what.

17      A.  What I -- it's -- let me see -- think how

18   I'm going to say this.  The bank -- can I talk to him

19   in Spanish so he can say the answer for me?

20      Q.  Sure.

21          (Witness speaking to the

22          interpreter in Spanish.)

23      A.  (Through the interpreter)  That the bank

24   was not doing what it should have been doing for its

25   investors.

App. 1612

Page 53

DIANA SUAREZ

1

2  CDs.

3      Q.  Regarding my client, Société Générale

4  Private Banking, what is your understanding of its

5  role with Stanford?

6              (Witness speaking to the

7              interpreter in Spanish.)

8      A.  (Through the interpreter)  At this moment,

9  no, I would have to read everything again.

10     Q.  (BY MR. BOLIA)  You don't currently have

11 any understanding what Société Générale is alleged to

12 have done wrong?

13     A.  (Through the interpreter)  Exactly, no.

14     Q.  How much time -- since you've been

15 involved in the case, how much time have you spent

16 working on the case?

17     A.  (In English)  Not much.

18     Q.  Can you give me an estimate?

19     A.  I -- I -- I started getting -- getting

20 involved in it since May in 2015.  I thought my son

21 Gabriel could be the one that had the deposition and

22 everything for me.

23     Q.  But since May of this year, what have you

24 done?

25     A.  Oh, every time I receive a document or

App. 1613

Page 55

DIANA SUAREZ

1

2   are seeking or have previously sought to be

3   named as --

4         A.  Yes.

5         Q.  -- class representatives?

6             And what do you know about any of them?

7         A.  Nothing, really.

8         Q.  Have you talked to any of them?

9         A.  No.

10        Q.  Have you exchanged e-mails with any of

11   them?

12        A.  No.

13        Q.  Do you know that some people on this

14   have -- that the lawyers have sought to withdraw them

15   as class representatives?

16        A.  No, I haven't -- I haven't -- I mean, I

17   don't know.

18        Q.  You were not aware of that?

19        A.  No.

20            MR. SWANSON:  I think we're at

21   about an hour so when --

22            MR. BOLIA:  We can take --

23            MR. SWANSON:  -- when we get to a

24   good breaking point.

25            MR. BOLIA:  No, we can take a

Page 65

DIANA SUAREZ

Q.  If you look at the top of Exhibit 4,
you'll see that it says, "Filed 4-16-15," which is
April 16th of 2015.

A.  Uh-huh.

Q.  Had -- did anything change between you and
Gabriel between April 16th, 2015, and May 1st of 2015
in terms of your ability to be a named class
representative in this case?

A.  Like I said before, I -- I got, like, more
involved in the case, and I read more things.  And I
met the lawyers and we talk about it.  But, really,
we have the lawyers, because they are the ones that
know more about all this stuff, and I let them to --
to do what they should do.

Q.  Ms. Suarez, I've handed you what has
previously been marked as Exhibit 8, which is titled
Plaintiffs' Second Amended Class Action Complaint.

Have you seen this document before?

A.  Yes.

Q.  When did you first see this document?

A.  When it was sent to me by mail.

Q.  And when was the second amended class
action complaint sent to you by mail?

A.  Exactly to date, I don't remember, but it

App. 1615

Page 66

1                     DIANA SUAREZ

2    should be around May.

3          Q.   Who sent you the second amended class

4    action complaint?

5          A.   My lawyer.

6          Q.   Which lawyer?

7          A.   Ben.

8          Q.   Ben Ricard?

9          A.   Yes.

10         Q.   Okay.

11         A.   Sorry I cannot pronounce that last name.

12         Q.   Did you read the -- the second amended

13   class action complaint?

14         A.   I just -- read it, I don't know how you

15   say that, when --

16              (Witness speaking to the

17              interpreter in Spanish.)

18         A.   (Through the interpreter)  I just read

19   over it, more or less, the pages.

20         Q.   (BY MR. BOLIA)  You just skimmed it?

21         A.   (In English)  Yes.  I thought it was too

22   much to read and I wouldn't understand everything,

23   and that's why I hired Ben and Jim.

24         Q.   I think some of the defendants might think

25   it's too much to read, too.

Page 67

1               DIANA SUAREZ

2          MR. SWANSON:  It's too much to

3   write, that's for sure.

4          Q.  (BY MR. BOLIA)  Do you have an

5   understanding of what is different about the second

6   amended class action complaint than plaintiffs' first

7   amended petition?

8          A.  No, I don't.

9          Q.  Do you know what the allegations are in

10   the second amended class action complaint?

11          A.  Allegations?

12              (Witness and interpreter

13              conferring in Spanish.)

14          Q.  (BY MR. BOLIA)  The claims against the

15   defendants.  Do you know what the claims against the

16   defendants are --

17          A.  (In English)  Yes.

18          Q.  -- in the second amended --

19          A.  Yes.

20          Q.  -- class action complaint?

21          A.  I would say yes.

22          Q.  And what are those?

23          A.  Do I have to say one by one?  My God.

24          Q.  Just your understanding of --

25          A.  Yeah --

Page 68

DIANA SUAREZ

2      Q.  -- of what the claim --

3      A.  -- it's the same thing that I said all the

4  time.  It's a -- that we were not represented by the

5  banks.  We -- the plaintiff in the case, we -- we

6  were not were represented with the banks.  I mean,

7  the banks, they didn't do their best for our

8  interests.

9      Q.  Anything else?

10     A.  No.

11     Q.  Since May 1st of 2015, how often have you

12  spoke with your counsel about this case?

13     A.  My counsel, my -- my --

14     Q.  Your lawyers.

15     A.  -- lawyer?

16         Not too many times.  I talked to Ben about

17  two or three times and with Jim, the -- when we met

18  in -- in Miami and yesterday and today.

19     Q.  Have you heard of an entity called the

20  Official Stanford Investors Committee?  I'm sorry.

21  Have you heard of an entity called the Official

22  Stanford Investors Committee?

23     A.  I would say the truth, the -- the first

24  time I -- I -- I read about it was in this documents.

25     Q.  And do you have an understanding of what

Page 69

1                    DIANA SUAREZ

2       their role is?

3            A.  No, I don't.

4            Q.  When did you first hear about Stanford?

5            A.  Okay.  For a long time in around 1999,

6       2000, my -- my family, two of my aunts, have their

7       money in Stanford in Venezuela, and they told me

8       about it.  And they -- they receive a good interest

9       in their CDs and -- that they were doing pretty good,

10      that they thought it was a good idea if I put my

11      savings on those CDs.

12           Q.  And what were your aunts' names?

13           A.  My aunt, one was Josefina Dubuc, and the

14      other one was Elsa Picon.

15           Q.  Which side of the family were they on,

16      your mom's or dad's?

17           A.  My mother's side of family.

18           Q.  Okay.  Do you know how your two aunts came

19      to be invested in Stanford?

20           A.  No.

21           Q.  Do you know how long they had been

22      invested in Stanford before they told you about it in

23      '99 or 2000?

24           A.  No.

25           Q.  When your aunts told you about Stanford

Page 78

DIANA SUAREZ

A.  I reconsider to have my money -- my money
in UBS and went to talk to her in the office in
Miami, and I decide that it was much better for me to
have the money there, because I could understand
better where I have my money.

Q.  And so this is still early 2006 you
decided to -- did you fly from Caracas to Miami?

A.  Yes, I used to come to Miami every year;
after we separate, two times a year to Miami.

Q.  Why did you travel to Miami two times a
year?

A.  Because I wanted my -- my son Gabriel to
be in touch with my husband all this time and to --
to -- to go to Miami.  I like Miami.

Q.  Where did you stay when you came to Miami
during that time?

A.  Since my husband moved to a small
apartment, at the beginning, I stay with him.  We
stay with him.  But after he moved, we couldn't stay
with him, so I stay in a hotel.

Q.  Do you remember when you flew to Miami to
speak with Maria Villanueva about investing in the
Stanford CD?  Do you remember what month in 2006 it
was?

App. 1620

Page 79

1                          DIANA SUAREZ

2          A.  Oh, it was between February and March

3      of 2003.

4          Q.  2003 or 2006?

5          A.  2006.

6          Q.  Where did you meet Maria Villanueva in

7      2006 when you flew to Miami?

8          A.  At her office.

9          Q.  Where was her office?

10         A.  In Miami.

11         Q.  Do you know where in Miami Maria's office

12     was?

13         A.  I think it was in the Intercontinental

14     building or Intercontinental hotel right there in the

15     Biscayne Bay.

16         Q.  Was Maria Villanueva's office her own

17     office or was she part of a Stanford group office?

18         A.  She was in the Stanford group office.

19         Q.  So there were more Stanford people there

20     than just Maria Villanueva?

21         A.  Yes.

22         Q.  Okay.  Can you just describe for me what

23     the meeting was like with her, the first meeting in

24     2006?

25         A.  Yes.

App. 1621

Page 80

DIANA SUAREZ

2      Q.   This is Maria Villanueva.

3      A.   Okay.  I went to that office with my aunt,

4  Elsa Pico; and my mother.  And it was very friendly.

5  She explained -- she talk -- we talk about, you know,

6  families and how long she met my husband and all

7  that, and then she explained to me what the CDs were

8  about.

9          I remember that I asked her, "This is very

10 secure?"

11         And that she said, "Of course."

12         And since I thought, you know, that invest

13 anything in the United States was the -- the -- the

14 best, because nothing would happen, anything here in

15 the United States.  I did, realizing that, you know,

16 it was a good -- good idea and I -- I start doing all

17 the -- all the procedures to -- to -- to open the

18 account.

19     Q.   What were those procedures to open the

20 account?

21     A.   She needed some documents, like, license,

22 my -- my driver's license, a check from U -- UBS

23 Bank, my sons' identifications.  I don't recall any

24 more.

25         But that paper that she gave me with

Page 82

DIANA SUAREZ

2    A.  Yes.

3         Q.  When you -- other than filling out the
4    application to open the account in 2006 when you met
5    with Maria Villanueva, did you review any documents
6    at that time?

7         A.  Let me ask you something.  What kind of
8    documents?

9         Q.  Did she provide you any materials about
10   the Stanford business, any brochures?

11        A.  No, she didn't.  I trust her completely
12   what she said to me.

13        Q.  You relied on her to --

14        A.  I relied on her.

15        Q.  -- give you advice to make the investment
16   in Stanford?

17        A.  Yes, I did.

18        Q.  Is it fair to say that you relied on her
19   exclusively?  And by "her" I mean, Maria Villanueva.

20        A.  About Stanford?  Yes.

21        Q.  Had you done any research of your own into
22   Stanford before you decided to purchase your CD?

23        A.  No, I didn't.

24        Q.  Did you --

25        A.  The only -- the only -- excuse me.

1          DIANA SUAREZ

2      Q.   Your first investment in Stanford was a

3  certificate of deposit in March of 2006, roughly --

4      A.   Roughly --

5      Q.   -- is that correct?

6      A.   -- yes.

7      Q.   How much -- how much was that; do you

8  remember?

9      A.   I think -- I think it was REDACTED

10     Q.   And the -- the money that you used to

11 purchase your first Stanford CD in March of 2006, did

12 that all come from your UBS account?

13     A.   Yes, yes.  Not all.  Part of the UBS and

14 the other part, like I said before, from my uncle's

15 inheritance.

16     Q.   And where had the money from your uncle's

17 inheritance been before you put it in the Stanford

18 account?

19     A.   In UBS.

20     Q.   Okay.  When you purchased your first CD

21 with Stanford in March of 2006, were you living in

22 Venezuela at the time?

23     A.   Yes, I was.

24     Q.   Have you ever lived in -- have you ever

25 purchased a Stanford CD when you were living in

Page 89

1                  DIANA SUAREZ

2   Texas?

3           A.  Never.

4           Q.  Did you ever mail a payment to anyone in

5   Texas related to a Stanford product?

6           A.  That I can recall, no.

7           Q.  Did you ever communicate with anyone in

8   Texas about your purchase of Stanford CDs?

9           A.  No.

10          Q.  Did you make all of your purchases of

11  Stanford CDs in Miami?

12          A.  Yes.

13          Q.  All of those purchases were through Maria

14  Villanueva?

15          A.  Yes.

16          Q.  Is there any reason why you purchased your

17  CDs through a financial adviser in the United States

18  rather than in Venezuela, the country you were living

19  at the time?

20          A.  Oh, the -- the -- the reason was that I

21  felt safer investing in the United States.

22          Q.  Why did you feel safer investing in the

23  United States?

24          A.  Because my country was very unstable.

25          Q.  What was going on in your country at the

Page 90

DIANA SUAREZ

2   time that -- your country in Venezuela at 2006.

3         A.   That Hugo Chavez won the election.   He was

4   the president.   And he start moving like a communist

5   government.   He became as a president democratically,

6   but after that, it was fraud after fraud in these --

7   in the elections.   And so I -- I -- I -- we all

8   decided that it was very unstable to have our money

9   in Venezuela.   We didn't want to -- with money be

10  like other countries in the continent, so it was very

11  safe to have our savings outside of Venezuela.

12        Q.   In the 2006 time frame, would the accounts

13  that you maintained in Venezuela, were they in US

14  dollars?

15        A.   No.

16             THE WITNESS:   Let me ask you

17  something.

18             (Witness speaking to the

19             interpreter in Spanish.)

20        A.   (Through the interpreter)   Currency

21  control.

22        A.   (In English)   We had that since 2002 in

23  Venezuela, so we didn't have -- we couldn't any

24  currency that it wasn't really worth.

25        Q.   (BY MR. BOLIA)   Since 2002, you had to

Page 101

1                      DIANA SUAREZ

2   with this -- you know, with Stanford, because it was

3   an American investment, it was secure.

4         Q.  Did Ms. Villanueva ever tell you that the

5   Stanford CDs were insured?

6         A.  She never say that they weren't or they

7   were, never.

8         Q.  You never discussed it with her either

9   way?

10        A.  Never.

11        Q.  Did you ever read any documents that said

12   that the Stanford CDs were insured?

13        A.  No.

14             MR. BOLIA:  Oh, can I get those

15   back?  I need to mark them.  Sorry about that.

16   Well, just this one.

17             (Exhibit 93 marked.)

18        Q.  (BY MR. BOLIA)  The one with the sticker

19   is yours.  Sorry.

20        A.  This is mine?

21        Q.  The one with the yellow sticker on it.

22        A.  Okay.

23        Q.  So, Ms. Suarez, I've handed you what's

24   been marked as Exhibit 93.  It's -- the top e-mail is

25   in Spanish and then underneath there's a translation

Page 114

DIANA SUAREZ

1

2      THE VIDEOGRAPHER:  We're on the
3   record at 13:12.
4      Q.  (BY MR. BOLIA)  Did I give you more than
5   two copies?
6      A.  Oh, you gave me --
7      Q.  Could you hand me back --
8      A.  Oh, a lot.  Let me take two.
9      Q.  Thank you.
10     A.  Oops.  Sorry.
11     Q.  No, that's okay.  I appreciate it.
12         Ms. Suarez, I've handed you what's been
13   previously marked as Exhibit 11, which is copies of
14   four certificates of deposit that are in your name
15   and your three children's names; is that correct?
16     A.  Yes.
17     Q.  You've seen all of these before?
18     A.  Yes, sir.
19     Q.  This one's going to be tough because it's
20   really small print.  But if you look at the -- at the
21   paragraph in the middle of the page --
22     A.  Uh-huh.
23     Q.  -- almost, let's see, one, two, three,
24   four, five lines down it says, "This certificate is
25   subject to the bank's general terms and conditions

DIANA SUAREZ

1

2        If you turn to the second page at the

3   bottom, that CD dated February 16th, 2007, you see

4   that it says it's a fixed CD?

5        A.  Wait.  Which one?

6        Q.  The -- the fourth CD on the second page of

7   SUAREZ_135.

8        A.  16?

9        Q.  Yeah, 16 February 2007 --

10       A.  Uh-huh.

11       Q.  -- do you see that?

12       A.  Yes.

13       Q.  And do you see that this says it's a fixed

14   CD?

15       A.  Yes.

16       Q.  And can you tell me again what your

17   understanding of what a fixed CD was?

18       A.  That I could not take the money out -- I

19   mean, the -- the -- I could take the interest, but

20   not the -- the -- the money.

21       Q.  The principal?

22       A.  The principal.

23       Q.  Okay.  If we go back to the first CD, the

24   one dated March 6, 2006, you see that the interest

25   rate on the -- it's in the bottom left-hand corner

Page 119

1 DIANA SUAREZ

2 was 4.775 percent?

3       A.  Uh-huh.

4       Q.  Did you have any understanding of what the

5 interest rate for comparable CDs in the United States

6 was at the time?

7       A.  Yes, this was much higher.

8       Q.  Do you know how much higher this was than

9 comparable CDs?

10      A.  I would say I think it was about two --

11 two -- two points.

12      Q.  And where did your understanding come from

13 that this had a two point higher --

14      A.  Maria --

15      Q.  -- interest rate?

16      A.  -- Villanueva told me.  I mean, you --

17          THE REPORTER:  I'm sorry?

18          THE WITNESS:  Maria Villanueva

19 told me.  And she said, "You will get more

20 from -- from your money with Stanford because of

21 the interest rates."

22      Q.  (BY MR. BOLIA)  And did she tell you why

23 he was able to generate a higher interest rate?

24      A.  No, and I never asked.

25      Q.  So if you look at this Exhibit 11, there's

Page 120

DIANA SUAREZ

1

2    a CD from March 6th, 2006.  That's the first one.

3    You see that?

4         A.  Uh-huh.

5         Q.  The second one is from September 15th,

6    2008.  Do you see that?

7         A.  Yes.

8         Q.  And then the third CD on Exhibit 11 is

9    from September 6th, 2007.  Do you see that?

10        A.  September 6th, yes.

11        Q.  And then the fourth CD on -- on Exhibit 11

12   is from February 16th, 2007.  Do you see that?

13        A.  Yes.

14        Q.  If you go back to your declaration, which

15   was Exhibit 10, and if you look at Paragraph 3 --

16   excuse me -- Paragraph 3 --

17        A.  Uh-huh.

18        Q.  -- it also says that there was a CD issued

19   on September 6th, 2006 --

20        A.  Uh-huh.

21        Q.  -- do you see that?

22        A.  Yes.

23        Q.  That's not included with this exhibit.  Do

24   you still have a copy of that CD?

25        A.  I was never -- they -- they never send me

Page 139

DIANA SUAREZ

1

2      the market started going down, I think, and I think I

3      got [REDACTED], and then it will start going down, down,

4      down to 20.

5          Q.  Do you still have that IRA?

6          A.  Yes -- no, it's not an IRA anymore because

7      it has a -- a -- a low amount that it's just like a

8      savings account.

9          Q.  And how much is in that savings account?

10         A.  [REDACTED].

11         Q.  And which bank is the savings account with

12     that we're talking about?

13         A.  UBS.

14         Q.  UBS.

15             Did you ever cash in any Stanford CDs

16     before 2009?

17         A.  No, I didn't.

18         Q.  You didn't redeem any CDs?

19         A.  No.

20         Q.  You always put your money in and you left

21     it in there for the entire time?

22         A.  Yes.

23         Q.  And other than the interest withdrawals

24     that you received on a monthly basis, that's the only

25     money that you took out of Stanford?

Page 140

1                    DIANA SUAREZ

2           A.   Yes, sir.

3           Q.   You didn't have any other investments with

4    Stanford besides CDs, did you?

5           A.   No, only the -- the two CDs.

6           Q.   Other than the visits to the Miami office,

7    have you ever visited any other Stanford offices?

8           A.   No, I never did.

9           Q.   What about in Venezuela?  Did you visit

10   any Stanford offices there?

11          A.   I never did.

12          Q.   You didn't visit your -- is it your

13   cousin?

14          A.   My cousin, no.

15          Q.   Okay.  Have you ever met Allen Stanford?

16          A.   I never did.

17          Q.   Other than Maria Villanueva, have you met

18   any other Stanford employees?

19          A.   Her assistants.

20          Q.   Have you ever had any communications with

21   any of the defendant banks about your CD purchases?

22          A.   No, I never.

23          Q.   What about for any other reason?  Have you

24   communicated with any of the defendants for any other

25   reason?

Page 152

                              DIANA SUAREZ

1

2          Q.  And then the next column over, it says the

3    allowed amount is REDACTED.

4              Do you see that?

5          A.  Yes, sir.

6          Q.  Do you know why the receiver disallowed

7    your claim amount by one hundred and -- roughly

8    REDACTED?

9          A.  I suppose it's because of the interest

10   that I was getting from all the money that it was

11   fraudulent.

12         Q.  So you think that you earned roughly

13   REDACTED in interest over the term of your CDs?

14         A.  If that -- if they say so.

15         Q.  Did they give you any explanation for why

16   they disallowed your claim amount in that amount,

17   "they" being the receiver?

18         A.  Not that I know.

19         Q.  Did you make any objection to the

20   receiver's determination of your claim?

21         A.  No.

22         Q.  Do you know if your son Gabriel did?

23         A.  I don't know.

24              THE INTERPRETER:  Counsel, can we

25   take a bathroom break?

Page 154

1                         DIANA SUAREZ

2    receiver?

3          A.   Yes.

4          Q.   How many?

5          A.   REDACTED.

6          Q.   I think that was how much.

7          A.   Huh?

8          Q.   If you received REDACTED payments, that would

9    be very impressive?

10         A.   Oh, no, no, no, no.

11              MR. SWANSON:   Right.   Great.

12         A.   Wow, yeah.

13         Q.   (BY MR. BOLIA)   How many times have you

14   received payments from the receiver?

15         A.   Only one time.

16         Q.   Are you sure about that?

17         A.   Yes, sir.

18         Q.   This is Exhibit -- previously marked

19   Exhibit 17.   And it's a check from the US receiver

20   Stanford Financial Claims dated September 26th, 2013,

21   for the amount of REDACTED.

22              Have you seen this, Ms. Suarez?

23         A.   Yes, sir.

24         Q.   And it's made out to you and your three

25   sons; is that correct?

Page 155

1        DIANA SUAREZ

2        A.   Yes, sir.

3        Q.   Did you deposit this check?

4        A.   Yeah -- my son did.

5        Q.   What account did he deposit -- did your

6   son deposit this check into?

7        A.   I think it was my Bank of America.

8        Q.   So I've just handed you what's previously

9   been marked as Exhibit 18 --

10       A.   Uh-huh.

11       Q.   -- which is a check from the US receiver,

12   Stanford Financial Claims, dated November 19th, 2014,

13   and it's made out to you and your three sons,

14   Eduardo, Daniel, and Gabriel.

15           Have you seen this?

16       A.   Never.

17       Q.   You've never seen this before?

18       A.   No, sir.

19       Q.   Have you talked to your son Gabriel about

20   any payments that he might have received from the

21   Stanford receivership?

22       A.   The only one that he told me that he

23   received was this one, the -- the first one, the

24   Exhibit 17.  I haven't seen this one.

25       Q.   Did your son produce documents to your

Page 158

DIANA SUAREZ

2      A.  Uh-huh.

3            MR. SWANSON:  You're going to have

4    to say -- you have to say "yes," because they

5    can't --

6      A.  Yes.

7            MR. SWANSON:  -- write down a --

8      A.  Uh-huh.

9      Q.  (BY MR. BOLIA)  Yes, you have filed a

10   claim with the Antiguan --

11     A.  Yes.

12     Q.  -- liquidators?

13           Ms. Suarez, I'm handing you what's

14   previously been marked as Exhibit 19.

15           Do you recognize this document?

16     A.  Yes, I -- I have read this.

17     Q.  And if you turn to the page that's marked

18   SUAREZ_160.

19     A.  160, uh-huh.

20     Q.  Is that your signature at the top?

21     A.  Yes.

22     Q.  And do you recognize the signatures of

23   your sons?

24     A.  Yes.

25     Q.  Does this appear to be the signatures of

Page 159

1                       DIANA SUAREZ

2      your three sons, Gabriel, Daniel, and --

3            A.   And Eduardo.

4            Q.   -- and Eduardo?

5            A.   Uh-huh.

6            Q.   If you turn to the page marked SUAREZ_156.

7            A.   156, uh-huh.

8            Q.   Are you there?

9            A.   Yeah.

10           Q.   And first off, did you -- you said you

11     signed it.  Did you fill out this document,

12     Exhibit 19?

13           A.   (Witness reading.)

14                Yes, I did.

15           Q.   Okay.  So let's go back to SUAREZ_156.

16     You'll see there's a box about halfway down the page

17     where it says -- above it there's some text and it

18     says that "I deposited the following amounts."

19                MR. SWANSON:   156, I think.

20           Q.   (BY MR. BOLIA)  156, yes.

21           A.   Okay.

22           Q.   Okay.  So do you see where it says that "I

23     deposited the following amounts at the dates shown to

24     my accounts"?

25           A.   Uh-huh.



Page 160

1           DIANA SUAREZ

2      Q.  And then there's a box underneath that

3   says        REDACTED

4

5            --

6      A.  Uh-huh.  Yes.

7      Q.  -- as of February 17th, 2009.

8           Do you see that?

9      A.  Yes.

10     Q.  Below that, it says that "REDACTED

11

12

13

14                    .

15   REDACTED

16

17

18

19

20

21

22

23

24

25     Q.  If you go to page -- the page marked

Page 161

1         DIANA SUAREZ

2    SUAREZ_165.

3              MR. SWANSON:  165, yeah.

4         A.  Okay.

5         Q.  (BY MR. BOLIA)  And this page is entitled

6    Notes to Proof of Debt.  If you look down at No. 7

7    where it says, "Any failure to deduct all amounts

8    received from SIB of any kind in relation to your

9    accounts to arrive at a net claim may result in a

10   denial of your claim and will delay the processing of

11   your claim and any distribution to you."

12             Do you see that?

13        A.  Yes.

14        Q.  Did you read that at the time?

15        A.  I suppose I did.

16        Q.  Did you understand that if you didn't

17   inform the joint liquidators about any payments that

18   you received from Stanford, including interest

19   payments, that it could result in a denial of your

20   claim or a delay in payment?

21        A.  I -- I don't know.  I really don't know

22   why I didn't do -- I don't remember.

23        Q.  Have you informed the United States

24   receiver that you've also submitted a claim to the

25   Antiguan joint liquidators?

App. 1640

Page 162

DIANA SUAREZ

1

2      A.  I think I did.

3      Q.  What makes you think that?

4      A.  Like I say before, everything during those

5  days, everything that was asked to be -- to do I did.

6  If I received things from Antigua or the United

7  States, I did both.  I was desperate.  I wanted my

8  money back.

9           MR. BOLIA:  Objection,

10  nonresponsive.

11      Q.  (BY MR. BOLIA)  Why do you think that you

12  told the receiver that you had also submitted a claim

13  to the Antiguan liquidators?

14      A.  Can you explain the -- the -- the

15  question?  Why?

16      Q.  Do you think that you told the receiver

17  that you had also made a claim to the Antiguan

18  liquidators?

19      A.  I think I did.

20      Q.  And why do you think that?

21      A.  Because I -- I did everything that I was

22  told to do.

23                    REDACTED

Page 163

1          DIANA SUAREZ
2          REDACTED



Page 165

1                          DIANA SUAREZ

2      file for it.

3          Q.  Were you required to report income earned

4      in the United States on Venezuelan tax returns?

5          A.  No.

6          Q.  How do you know that?

7          A.  I asked and it wasn't enough.  The -- the

8      amount wasn't -- how you call that -- I mean, enough

9      to -- to file for taxes.

10         Q.  Who did you ask?

11         A.  The government offices.

12         Q.  Have you reported your -- the loss that

13     you're claiming in relation to the Stanford fraud,

14     have you reported that loss on any tax return in the

15     United States?

16         A.  No.

17         Q.  Ms. Suarez, I have handed you what's

18     previously been marked as Exhibit 20, a January 26,

19     2014 communication from Grant Thornton.  And it

20     appears to be to your son Gabriel's e-mail account at

21     Gmail.

22              Have you seen this?

23         A.  (Witness reading.)

24              I don't recall seeing it, but I knew he

25     was doing this.

Page 166

1          DIANA SUAREZ

2          Q.   And do you know who Grant Thornton is?

3          A.   Oh, my God, I forgot.

4          Q.   If you look about -- let's see, it's the

5     third paragraph in the letter.   It says, "According

6     to company records."

7               Do you see where I'm starting?

8          A.   Yes.

9          Q.   It says, "   REDACTED



Page 167

1                    DIANA SUAREZ



Page 168

1        DIANA SUAREZ

2                REDACTED



17    Q.  And who's your brother?

18    A.  Hendrik Rijsdajk.

19    Q.  Where does he live?

20    A.  He's dead.

21    Q.  When did he die?

22    A.  In -- today, three years ago in first of

23  July nine -- 2012.

24    Q.  And where did he live?

25    A.  In Venezuela.

Page 169

1                     DIANA SUAREZ

2         Q.  What makes you think that he would have

3    done this, Hendrik?

4         A.  After what happened with Stanford, he got

5    very depressed and very sick.  He got cancer, and he

6    didn't have -- how to pay for his treatments or

7    anything, so he was really ill.  Psychiatric --

8    psychiatrically I took him to -- to -- to a

9    psychiatrist.  And he was really mixed up with his

10   illness and this.

11        Q.  Can you spell his name for the court

12   reporter?

13        A.  Hendrik, H-e-n-d-r-i-k, Hendrik.

14        Q.  And then Ri -- Rijsdajk.

15        A.  Rijsdajk.

16        Q.  Rijsdajk.

17        A.  R-e -- no -- -i- -- R-i-j-s-d-a-j-k.

18                    REDACTED

Page 170

1          DIANA SUAREZ

2                    REDACTED



12          Q.  Can you go back to Exhibit 19.

13          A.  Yes.

14          Q.  Turn to SUAREZ_160, the signature page.

15          A.  Yes.

16          Q.  Is that your signature?

17          A.  It looks like mine, yeah.

18          Q.  Look -- and then look at Exhibit 95.  Does

19     that look like yours, too?

20          A.  Excuse me.  95?

21          Q.  Yeah.

22               MR. SWANSON:  This is --

23          Q.  (BY MR. BOLIA)  No, Exhibit 95, the

24     letter --

25               MR. SWANSON:  The letter.

Page 172

DIANA SUAREZ

1

2      Q.  (BY MR. BOLIA)  95.

3           MR. SWANSON:  She's getting a

4    little confused because she doesn't have --

5           MR. BOLIA:  She --

6      A.  I --

7           MR. SWANSON:  -- the number on

8    that one.  I don't know why.

9           MR. BOLIA:  Because you took it.

10           MR. SWANSON:  Let's just trade

11    them.  Let's trade this so -- so she's got the

12    right thing.

13           THE WITNESS:  Okay.

14           MS. NEUNER:  Can you identify

15    Exhibit 95 --

16           MR. BOLIA:  So I think the --

17           MS. NEUNER:  -- for the record?

18           **REDACTED**



Page 173

1          DIANA SUAREZ

2          **REDACTED**

12              MR. BOLIA:  I'll pass the witness.

13              MR. REPASS:  Are we ready?

14          (Exhibit 96 marked.)

15              EXAMINATION

16  BY MR. REPASS:

17      Q.  Ma'am, my name is Brad Repass.  I'm a

18  lawyer.  I represent Independent Bank, used to be

19  Bank of Houston, okay?

20          I'm going to be handing you Exhibits 96,

21  97, 98, and then a few more.  And I would like you

22  just to sign your name on each of these pieces of

23  paper, please, one at a time.  That's Exhibit 96.

24  I'm sorry.

25              MR. BOLIA:  I've got it down if

App. 1650

Page 200

DIANA SUAREZ

1

2   don't -- I don't know, because when I make the

3   deposits through Maria Villanueva, I didn't know in

4   which bank they went.  I just make the deposit to the

5   Stanford International Bank.

6          Q.  Well, if you don't know how -- whether

7   your money went to HSBC, how do you know that you

8   were harmed by HSBC?

9          A.  I left that to investigate to my lawyers.

10         Q.  So you have no personal knowledge of

11   whether you were harmed by HSBC's actions, do you?

12         A.  No.

13         Q.  Do you contend that HSBC allowed Stanford

14   to perpetuate his fraud?

15         A.  Well, the banks were the only ones that --

16   that -- that they -- they saw what was going on with

17   his money.

18             MR. BRINKMAN:  I'll object to that

19   response as nonresponsive.

20         Q.  (BY MR. BRINKMAN)  Please listen to my

21   question.

22             Do you contend that HSBC helped Allen

23   Stanford perpetuate his fraud?

24             MR. SWANSON:  Asked and answered.

25   You just asked --

1          DIANA SUAREZ

2          Q.  Do you know if any of the checks you wrote

3    to Stanford were processed by Trustmark?

4          A.  I don't know.

5          Q.  At the time you bought the Stanford CDs,

6    did you know whether or not Trustmark National Bank

7    provided banking services for Stanford?

8          A.  I didn't know.

9          Q.  When did you first learn that Trustmark

10   provided banking services for Stanford?

11         A.  When we -- my lawyers did the -- the suit.

12   I mean, they sue the banks.

13         Q.  And is that within the last few months

14   that you became involved that you learned --

15         A.  Yes.

16         Q.  -- that Trustmark --

17         A.  Uh-huh.

18         Q.  -- provided banking services?

19         A.  Uh-huh.  Yes.

20         Q.  Have you ever heard of Republic National

21   Bank?

22         A.  Yes.

23         Q.  And have you ever heard of a Republic

24   National Bank that was headquartered in Houston?

25         A.  Like, if I knew they have a bank?  I mean,

Page 227

1                          DIANA SUAREZ

2           Q.  Great.

3               Let us look -- chronologically if you look

4      at the top right-hand corners, you'll see statement

5      dates.  Let us look at the statement date for

6      July 31, 2008.  And it's about two-thirds of the way

7      to the back of the --

8                    MR. SWANSON:  Is there a page --

9           Q.  (BY MS. NEUNER)  -- exhibit?

10                   MR. SWANSON:  -- is there a page

11     number on it?

12                   MS. NEUNER:  There is, but they're

13     not in order.  So it's SUAREZ_0006.

14                   MR. SWANSON:  Let me see if I can

15     locate it for you.  0006.

16          Q.  (BY MS. NEUNER)  The key is to look at the

17     top right-hand corner, which is in chronological

18     order, and it's the statement as of July 31, 2008.

19                   MR. SWANSON:  Okay.  I can find

20     that.

21                   Got it.

22                   MS. NEUNER:  Thank you.

23          Q.  (BY MS. NEUNER)  Mrs. Suarez, do you see

24     that this statement from Stanford International Bank

25     Limited, which is sent to you and your three sons,

Page 228

1              DIANA SUAREZ

2   shows a total deposit as of July 31, 2008, of the

3   following amount: REDACTED.  Do you see that in the

4   box --

5        A.  Yeah.

6        Q.  -- in the middle of the page?

7        A.  Yes, I do.

8        Q.  Do you recognize this as being the highest

9   amount that you ever had in your account for the

10  approximately three years that you were invested with

11  Stanford?

12       A.  I would say if it says there, yes.

13       Q.  Okay.  Now, let's turn two pages to the

14  statement for August 31st, 2008.

15       A.  Okay.

16       Q.  Do you see the deposits -- total deposits?

17  Now it says REDACTED?

18       A.  Yeah, right here.

19       Q.  Okay.  So you recognize that that's a

20  decrease in about REDACTED over the course of one

21  month, yes?

22       A.  Yes.

23       Q.  Now, if you turn the page once more to the

24  following page, which is Bates stamped SUAREZ_99, I

25  ask you to look at the middle block of information

Page 229

1          DIANA SUAREZ

2     that is titled Flex CD USAI.

3          A.  Yes.

4          Q.  And if you look at the line item for

5     August 7th, 2008, do you see outgoing wire in the

6     transaction amount of --

7          A.  REDACTED

12         A.  If it's here, I did it, but I don't

13    remember.  If it's here, I did it.

14         Q.  Okay.  So despite testifying earlier today

15    that you never took principal out of the Stanford

16    accounts --

17         A.  Uh-huh.

18         Q.  -- you now would say that you did, in

19    fact, take principal out of the Stanford accounts?

20         A.  I say that if it -- I don't remember --

21         Q.  Okay.

22         A.  -- okay?  And if it's here, I did it.

23         Q.  Okay.  REDACTED

Page 236

                            DIANA SUAREZ

1

2        A.   Yes, supposed.

3        Q.   Now, Mrs. Suarez, to be clear, there was a

4   second CD that you purchased in February 2007, and

5   that was in the amount of approximately REDACTED,

6   correct?

7        A.   Yes, ma'am.

8        Q.   And that money you obtained as proceeds

9   from the sale of your parents' apartment in

10  Venezuela, correct?

11       A.   Correct.

12       Q.   So the sum total of these two CD deposits,

13                          REDACTED

         REDACTED              , correct?

15       A.   Correct.

16       Q.   Do you recall making any other deposits of

17  principal besides the $REDACTED that we've just

18  reviewed together?

19       A.   No, I -- I don't recall.

20       Q.   Okay.  Now, you do recall taking out

21  approximately $REDACTED in principal as we reviewed

22  on --

23       A.   We reviewed.

24       Q.   -- on the account statements, yes?

25       A.   Yes.

Page 282

                    DIANA SUAREZ

1
2    that.
3              Do you have any documents that reflect
4    that?
5         A.  No.
6         Q.  Do you have any contact with TD Bank,
7    Toronto-Dominion Bank, my client?
8         A.  No.
9         Q.  You never had any accounts with TD Bank?
10        A.  Never.
11        Q.  And your family members never had accounts
12   with TD Bank?
13        A.  That I know of, no.
14        Q.  Are you aware of any actions by TD Bank in
15   connection with the Stanford Financial Group?
16        A.  That is not this case or some other case?
17        Q.  In this case, are you aware of any
18   involvement of Toronto-Dominion Bank with the
19   Stanford financial entities?
20        A.  Exactly, no, but that was his -- their --
21   their job, to look for it.
22        Q.  So all you know about Toronto-Dominion
23   Bank is what your lawyers told you about --
24        A.  Yes.
25        Q.  -- Toronto-Dominion Bank?

App. 1657

Page 283

1                    DIANA SUAREZ

2           A.  Yes, yes, exactly.

3           Q.  And from the time that your accounts were

4    frozen in February 2009 until April 15th, 2015, that

5    six-year period when you were first contacted about

6    being a class representative, were you thinking about

7    how the Toronto-Dominion Bank had wronged you

8    personally?

9           A.  Personally?  I would say no, but it was --

10   they were involved in the whole thing.  And like I

11   said before, I left that job to my lawyers --

12          Q.  Un --

13          A.  -- to represent me.

14          Q.  Until April 15th, 2015, when you became

15   involved in this litigation, had you ever taken any

16   legal action against the Toronto-Dominion Bank?

17          A.  Never.

18          Q.  Had you ever thought about taking any

19   legal action against the Toronto-Dominion Bank?

20          A.  No.

21          Q.  Mrs. Suarez, I know it's been a long day

22   for you.

23          A.  Huge day, yes.

24          Q.  I thank you.  I'll ask one more question

25   before we leave.

Page 293

1          DIANA SUAREZ

2      (Deposition concluded.)

3

4

5

6

7

8

9

10

11      _____

12          DIANA SUAREZ

13

14

15

16

17

18

19

20

21

22      Subscribed and sworn to before me

23   this _____ day of _____, 2015.

24   _____

25          NOTARY PUBLIC

# EXHIBIT 72

## REVISED DECLARATION OF SALIM ESTEFENN URIBE

I, Salim Estefenn Uribe, state as follows:

1.  I am at least twenty-one years of age and am competent to make this declaration.

2.  I am a citizen of Colombia currently residing in Bogota.

3.  I am the trustee for the Salesur II Trust and a beneficiary of the Esturicol Trust, which trusts were the beneficial owners of certificates of deposit ("CDs") in the Stanford International Bank, Ltd. ("SIBL"), including those CDs dated on or around:

    a.  REDACTED

    b.  REDACTED

    c.  REDACTED

    for the Esturicol Trust, and dated on or around:

    a.  REDACTED

    b.  REDACTED and

    c.  REDACTED

    for the Salesur II Trust.

4.  In relation to the aforementioned SIBL CDs, the Esturicol Trust and the Salesur II Trust have submitted claims to the United States Receiver, Ralph S. Janvey.

5.  The U.S. Receiver has recognized and allowed my claims, as detailed in claim numbers:

    a.  REDACTED

    b.  REDACTED

    c.  REDACTED

    d.  REDACTED



App. 1661

e.   **REDACTED** and

f.   **REDACTED**

for the Esturicol Trust, and claim numbers:

a.   **REDACTED**

b.   **REDACTED**

c.   **REDACTED**

d.   **REDACTED**

e.   **REDACTED** and

f.   **REDACTED**

for the Salesur II Trust.

6.    I am willing and able to take on the responsibilities demanded of me as a class representative in this matter, as I understand those responsibilities to include attending deposition and trial and protecting the rights of absent class members.

I state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 1st day of July, 2015.

_Salim Estefenn Uribe_
Salim Estefenn Uribe

839200v.1

App. 1662

# EXHIBIT 73

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3   PEGGY ROIF ROTSTAIN, et    §
     al.,                       §
 4                              §
              Plaintiffs,       §
 5                              §              Case No.
     VS.                        §          3:09-CV-2384-N-BG
 6                              §
     TRUSTMARK NATIONAL BANK,   §
 7   et al.,                    §
                                §
 8            Defendants.       §

 9

10

11

12

13              ORAL AND VIDEOTAPED DEPOSITION OF
                        SALIM ESTEFENN
                        Houston, Texas
14                  Thursday, July 2, 2015

15

16

17

18

19

20

21

22

23

24   Reported by: RENE WHITE MOAREFI, CSR, CRR, CLR, CCR, TCRR

25   JOB NO: 94837
```

Page 3

```
 1                    SALIM ESTEFENN

 2              A P P E A R A N C E S

 3
     BUTZEL LONG
 4   Attorney for the Official Stanford Investors
     Committee And the Class Plaintiffs
 5      230 Park Avenue
        New York, NY 10169
 6
     BY:   PETER MORGENSTERN, ESQ.
 7
     FISHMAN HAYGOOD PHELPS WALMSLEY WILLIS & SWANSON
 8   Attorney for the Class Plaintiffs
        201 St. Charles Avenue
 9      New Orleans, LA 70170

10   BY:  JAMES SWANSON, ESQ.
          BENJAMIN REICHARD, ESQ.
11

12
     GIBBS & BRUNS
13   Attorney for Defendant Trustmark National Bank
        1100 Louisiana
14      Houston, TX 77002

15   BY:   ASHLEY KLEBER, ESQ.

16
     SKADDEN ARPS SLATE MEAGHER & FLOM
17   Attorney for Defendant Societe Generale Private
     Banking (Suisse) S.A.
18      1000 Louisiana
        Houston, TX 77002
19
     BY:  NOELLE REED, ESQ.
20

21   SIMPSON THACHER & BARLETT
     Attorney for Defendant Toronto-Dominion Bank
22      425 Lexinton Avenue
        New York, NY 10017
23
     BY:  LYNN NEUNER, ESQ.
24

25
```

App. 1665

Page 4

1                    SALIM ESTEFENN

2

     NORTON ROSE FULBRIGHT
3    Attorney for Defendant Toronto-Dominion Bank
       2200 Ross Avenue
4      Dallas, TX 75201

5    BY:  RODNEY ACKER, ESQ.

6

     LOCKE LORD
7    Attorney for Defendant HSBC Bank
       2200 Ross Avenue
8      Dallas, TX 75201

9    BY:   TAYLOR BRINKMAN, ESQ.

10

     HAYNIE RAKE REPASS & KLIMKO
11   Attorney for Defendant Independent Bank,
     Successor-in-Interest to Bank of Houston
12     14643 Dallas Parkway
       Dallas, TX 75254
13

     BY:  BRAD REPASS, ESQ.
14

15   MORGAN LEWIS
     Attorney for Defendant Blaise Friedli
16     1001 Louisiana Street, Suite 4000
       Houston, Texas  77002
17

     BY:  RYAN WOOTEN, ESQ.
18

19    Also Present:
       MS. EMILY VONQUALEN
20     MR. ALFREDO VARGAS - INTERPRETER
       MR. ROBERT BIRDSALL - VIDEOGRAPHER
21

22

23

24

25

```
 1                      SALIM ESTEFENN

 2                       I N D E X

 3
                                              PAGE
 4
         SALIM ESTEFENN
 5
      EXAMINATION
 6         By Ms. Kleber...........................    10
           By Mr. Repass...........................   181
 7         By Ms. Neuner...........................   200
           By Mr. Brinkman.........................   247
 8         By Ms. Reed.............................   269

 9    FURTHER EXAMINATION
           By Mr. Repass...........................   307
10
      REPORTER'S CERTIFICATION....................   310
11
12                    E X H I B I T S

13                                       PAGE LINE
      Exhibit 115 ...........................   16    11
14         Resume of Salim Estefenn Uribe
      (URIBE_000046 - URIBE_000047)
15    Exhibit 116 ...........................   51     2
           Esturicol Trust Statement as of
16    3/31/2008
      (URIBE_000162 - URIBE_000177)
17    Exhibit 117 ...........................   59     6
           Stanford application
18    (URIBE_000188 - URIBE_000203)
      Exhibit 118 ...........................   61    15
19         Esturicol Trust Customer Account
      Balance
20    (no Bates - 1 page)
      Exhibit 119 ...........................   65    14
21         Notice of Determination
      (URIBE_000014 - URIBE_000016)
22    Exhibit 120 ...........................   67    13
           Proof of Debt regarding Esturicol
23    Trust
      (URIBE_000183 - URIBE_000187)
24

25
```

Page 6

```
 1                    SALIM ESTEFENN
 2    Exhibit 121 ...........................   72    8
          Correspondence from Grant Thornton
 3    to Esturicol Trust dated 4/26/2013
      (URIBE_000083 - URIBE_000089)
 4    Exhibit 122 ...........................   80    2
          Revocation of Trust dated
 5    10/20/2014 regarding Salesur II Trust
      (URIBE_000075 - URIBE_000075)
 6    Exhibit 123 ...........................   85   22
          Statement as of 2/29/2008
 7    regarding Salesur II Trust
      (URIBE_000115 - URIBE_000161)
 8    Exhibit 124 ...........................   91    3
          Proof of Debt regarding Salesur II
 9    Trust
      (URIBE_000093 - URIBE_000097)
10    Exhibit 125 ...........................   92   24
          Proof of Debt regarding Salesur II
11    Trust
      (URIBE_000093 - URIBE_000097)
12    Exhibit 126 ...........................   93   15
          Correspondence from Grant Thornton
13    to Salesur II Trust dated 5/2/2013
      (URIBE_000090 - URIBE_000092)
14    Exhibit 127 ...........................  102    2
          Declaration of Salim Estefenn
15    Uribe
      (URIBE_000001 - URIBE_000002)
16    Exhibit 128 ...........................  104   25
          Revised Declaration of Salim
17    Estefenn Uribe
      (no Bates - 2 pages)
18    Exhibit 129 ...........................  147   10
          Broker Check Report for Patricia
19    Maria Herr
      (URIBE_000048 - URIBE_000065)
20    Exhibit 130 ...........................  149    9
          Correspondence from Salim Estefenn
21    Uribe to Patricia Herr dated 9/2/2008
      (URIBE_000077 - URIBE_URIBE_000077)
22    Exhibit 131 ...........................  151    7
          Correspondence from Esturicol
23    Trust and Teresa Uribe de Estefenn to
      Patricia Herr dated 12/12/2006
24    (no Bates - 2 pages)
25
```

Page 7

1                    SALIM ESTEFENN

2    Exhibit 132 ........................... 170     5
         Representation Agreement
3    (URIBE_000003 - URIBE_000005)
     Exhibit 133 ........................... 219    13
4        Correspondence dated 1/30/2009
     from Salim Estefenn Uribe to Stanford
5    Trust Company Ref.: Salesur II
     Trust/104105
6    (URIBE_000071)
     Exhibit 134 ........................... 222    11
7        Correspondence dated 2/17/2009
     from Esturicol SA to Patricia Herr
8    (URIBE_000068 - URIBE_000068)
     Exhibit 135 ........................... 240     3
9        Contract of Professional Fees for
     the Colombian Depositors and other
10   Clients/Investors of the Stanford
     Financial Group
11   (URIBE_000006 - URIBE_000010)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

App. 1669

Page 9

```
 1              SALIM ESTEFENN

 2    Thacher & Bartlett representing the

 3    Toronto-Dominion Bank.

 4              MR. ACKER:  Rodney Acker, Norton

 5    Rose Fulbright, representing the Toronto-Dominion

 6    Bank.

 7              MR. BRINKMAN:  Taylor Brinkman,

 8    Locke Lord LLP, representing HSBC PLC.

 9              MR. WOOTEN:  Ryan Wooten, Morgan,

10    Lewis & Bockius, representing Blaise Friedli.

11              MR. MORGENSTERN:  Peter

12    Morgenstern for the Official Stanford Investors

13    Committee and the class plaintiffs.

14              MR. SWANSON:  Jim Swanson for the

15    class.

16              MR. REICHARD:  Ben Reichard for

17    the class plaintiffs.

18              THE VIDEOGRAPHER:  Court reporter,

19    would you please swear in the witness.

20              (Witness sworn.)

21              MS. KLEBER:  Before we get started

22    with the questioning this morning, I just want to

23    put on the record that we received an e-mail last

24    night from class counsel explaining that they had

25    identified some additional e-mails from Mr. Uribe
```

Page 10

 1                      SALIM ESTEFENN

 2      that have not yet been produced and offered to

 3      either postpone the deposition or give the bank

 4      defendants the option to reconvene the deposition

 5      at a later date after we've had a chance to

 6      review those additional documents.

 7                      And the bank defendants have

 8      elected to go forward with the deposition today,

 9      but we are reserving our rights to reconvene the

10      deposition.

11                      Does that accurately reflect the

12      state of play?

13                      MR. MORGENSTERN:  Yes, it does.

14                      MS. KLEBER:  Great.

15                      SALIM ESTEFENN,

16      having been duly sworn, testified as follows:

17                      EXAMINATION

18      BY MS. KLEBER:

19          Q.  Will you please state your name for the

20      record.

21          A.  Salim Estefenn.

22          Q.  And is it appropriate to call you

23      Mr. Uribe or Estefenn?

24          A.  Estefenn is my first last name.  If --

25          Q.  Okay.  And what do you prefer?

Page 37

1                    SALIM ESTEFENN

2    name?

3                THE WITNESS:  Laserna,

4    L-a-s-e-r-n-a.

5            Q.  (BY MS. KLEBER)  When were you married?

6            A.  2004, October the 2nd.

7            Q.  Is your spouse presently employed?

8            A.  Yes.

9            Q.  What is her job?

10           A.  She's lawyer.  She's an employee lawyer.

11           Q.  She specializes in employment law?

12           A.  Employment law.

13           Q.  Have you ever been involved in a lawsuit

14   personally before?

15           A.  No.

16           Q.  Have -- during your time at Thema and

17   Prolibros, were those companies ever involved in any

18   lawsuits other than the bankruptcy that we've --

19           A.  No.

20           Q.  -- referred to?

21           A.  Lawsuits, no.

22           Q.  When was the first time you heard of

23   Stanford International Bank?

24           A.  About two thou -- 1999.

25           Q.  And how did you first hear about Stanford

Page 38

1                  SALIM ESTEFENN

2    International Bank?

3          A.  I had an account -- saving account in

4    Banco de Miami, and my adviser was Patricia Herr, and

5    she started to work in Stanford in 1999.  She called

6    me and she showed me how was Stanford and she showed

7    me how was the portfoli -- the portfolio, and

8    that's -- that's the way I -- I knew Stanford,

9    really.

10         Q.  Did you purchase Stanford CDs through

11   Ms. Herr?

12         A.  Did I -- yeah, I bought it through her,

13   yeah.

14         Q.  When was your first purchase of a Stanford

15   CD?

16         A.  In 2002, maybe.  Yeah, I think 2002.  It

17   was -- I think it was 1999, but I changed the name of

18   the trust, so in the documents I do have, it was

19   2002.

20         Q.  Did you ever purchase any Stanford CDs in

21   your individual capacity or were all of your

22   purchases done through trusts?

23         A.  Everything was through trusts.  Salesur is

24   my trust name.

25              THE REPORTER:  What is it?

Page 39

1                    SALIM ESTEFENN

2           THE WITNESS:  Salesur.

3           Q.  (BY MS. KLEBER)  What is the purpose of

4    investing through a trust as opposed to investing

5    individually?

6           A.  Sorry?

7           Q.  Why would you make your investment through

8    a trust as opposed to investing directly?

9           A.  Just for privacy, I think.  I -- privacy,

10   would you say, it's not -- it's for not showing my

11   name -- not Salim Estefenn, just Salesur, which is

12   Sal, S -- S -- S-a-l is Salim, E is Estefenn, U-r is

13   Uribe.  So just for privacy, confidentiality.

14          Q.  Why were you concerned about keeping your

15   investment confidential?

16          A.  No, just because the process is not

17   working anymore.  I mean, with this process, the

18   whole -- the whole claims we have to do is through

19   our names.  I mean, the trust isn't work anymore.

20          Q.  I think I'm trying to ask you a different

21   question.  Back when you first made the investment in

22   1999, why were you concerned about keeping your

23   investment confidential such that you used a trust?

24          A.  No.  It was Patricia recommendation, I

25   think.

Page 40

1              SALIM ESTEFENN

2                THE REPORTER:   What

3    recommendation?

4                THE WITNESS:   Patricia Herr, who

5    was our adviser.   We open a trust, it was her

6    recommendation.

7         Q.  (BY MS. KLEBER)  Why did she recommend

8    that you use a trust instead of invest directly?

9         A.  Just create a trust.  I mean, it was how

10   our portfolio at the time, that's what she knew, so

11   that -- she gave us the recommendation, just that.

12        Q.  And did you ask her what her

13   recommendation was based upon?

14        A.  No, no.

15        Q.  So you just took that recommendation?

16        A.  Yes, we thought we -- we had had a good

17   experience with her through Bank Bogota, so we

18   believe her.

19        Q.  I want to come back to that.  But for now

20   I want to ask you about the -- a few different trusts

21   that I've seen referenced to in some of your

22   documents.  I've seen references to the Esturicol

23   Trust, right?

24        A.  (Moving head up and down.)

25        Q.  The Salesur II Trust and the Fadala Trust?

Page 45

```
 1                  SALIM ESTEFENN

 2          A.  Once we -- I mean, when the -- when

 3     Stanford process started, we knew it was going to --

 4     to keep working because it was the only thing that

 5     the Esturicol Trust had, so --

 6          Q.  Okay.

 7          A.  -- once the process has started.

 8          Q.  And your parents initially deposited the

 9     money into the Esturicol Trust when it was formed; is

10     that right?

11          A.  Yes.

12          Q.  Did you ever put any of your own money or

13     assets into the trust?

14          A.  Mine?  Mine directly?  Put in Esturicol

15     Trust, you mean?  No, mine, no.  My money's in my

16     trust.

17          Q.  Did Farid ever -- your brother, Farid,

18     ever put any money or assets into the Esturicol

19     Trust?

20          A.  No, he had his own, too.

21          Q.  Have you ever received any cash

22     distributions out of the Esturicol Trust?

23          A.  Yes.

24          Q.  What distributions have you received?

25          A.  Well, that was a long time ago.  I don't
```

Page 46

1                     SALIM ESTEFENN

2    remember exactly amounts and dates, but I did because

3    my father, when he was -- I mean, he's dead.  When he

4    was alive, too, he translated some money from his

5    account to mine one, just that.

6               THE REPORTER:  Just what?

7               THE WITNESS:  Just that.

8          A.  I mean, he translate some money from

9    Esturicol to Salesur.  That's how he did, a long time

10   ago.

11         Q.  (BY MS. KLEBER)  Do you know in

12   approximately what year that transfer took place?

13         A.  Maybe 2006, maybe.  I'm not sure, really.

14         Q.  What was the amount of that transfer?

15         A.  If I remember, it was  REDACTED

     ▮    ▮.  I don't remember exactly.

17         Q.  Do you recall any other distributions you

18   received from the trust?

19         A.  No.

20         Q.  Do you know if your brother, Farid, has

21   received any distributions from the Esturicol Trust?

22         A.  I have no idea.

23         Q.  And besides the investments in Stanford,

24   there are no other assets held at any time in the

25   Esturicol Trust --

Page 47

1                    SALIM ESTEFENN

2          A.   No.

3          Q.   -- right?

4          A.   Right.

5          Q.   Who made the decision to invest in

6    Stanford as it relates to the Esturicol Trust?

7          A.   It was my father.

8          Q.   Did you have any conversations with your

9    father back in 1999 when the Esturicol Trust invested

10   in Stanford for the first time?

11         A.   Yes.

12         Q.   What were those conversations?

13         A.   I was looking for a good investment.   I

14   was just think that Esturicol by that time has about

15   65 years of experience, so we thought it must be an

16   excellent bank.   That's why we made our investment in

17   Stanford.   In general, it was that, and Patricia who

18   was our adviser, we had had an excellent relationship

19   with her.   She also gave us an excellent reference of

20   Stanford.   So that's why.

21         Q.   Did your father ask your opinion as to

22   whether you should proceed with the investment in

23   Stanford for the Esturicol Trust?

24         A.   Yes, yes, we talk about that, and we

25   decided to open -- I mean, my father decided to open

Page 59

                         SALIM ESTEFENN

1

2      mother do that?

3              A.  I did.  She signed.

4              Q.  I'm going to hand you what I have marked

5      as Exhibit 117.

6                      (Exhibit 117 marked.)

7              Q.  (BY MS. KLEBER)  Do you recognize this

8      document?

9              A.  Yes.

10             Q.  And this is the packet of claim forms that

11     you submitted -- you and your mother submitted to the

12     receiver related to the Esturicol Trust, right?

13             A.  Yes.

14             Q.  And if you flip through this, you'll see

15     that there are actually only claims related to three

16     different accounts, because the second claim form in

17     the packet at URIBE_192 and the last claim form at

18     URIBE_200 relate to the same account, right?  And you

19     can see the account number on the first page of the

20     forms.

21             A.  This one?

22                  MR. MORGENSTERN:  Yes.

23             A.  Yes, I see.

24             Q.  (BY MS. KLEBER)  Okay.  And this packet

25     that I've handed you only has claim forms for three

Page 62

                        SALIM ESTEFENN

1
2       form for Account No. � REDACTED ▮, which is the third
3       account number on this Exhibit 118?
4               A.   (Moving head up and down.)
5               Q.   Do you see that anywhere in your claim
6       forms?
7               A.   In the -- no, here, no, I don't see.
8               Q.   Okay.  And I'm just trying to find out:
9       Did you submit a claim form for the ▮ REDACTED ▮?
10              A.   Yes.
11              Q.   And do you have a copy of that claim form?
12              A.   I might have in -- yes, I might have --
13      yeah, I do have a copy, because I fix it in Colombia.
14      I do have a copy.
15              Q.   Have you turned that over to your counsel?
16              A.   Yes, I did.
17              Q.   Okay.  Let's turn back to Exhibit 117,
18      your packet of claim forms.  And do you recall that
19      these forms ask you to list not only the amounts that
20      were deposited in Stanford, but amounts that were
21      wired out of Stanford CDs?
22              A.   Yes.
23              Q.   And did you try to list all of the
24      outgoing wires from the Esturicol accounts --
25              A.   Yes.

Page 63

1                    SALIM ESTEFENN

2          Q.   -- in these forms?

3          A.   Yes.

4          Q.   If you flip through these forms, it

5    appears that you have only listed outgoing wires that

6    took place in the year 2008; is that correct?

7          A.   Let me see.

8               Yes.

9          Q.   But as we've discussed, there were wires

10   that were outgoing from the Esturicol Trust before

11   2008 as well, right?

12         A.   Yes, maybe I missed put -- to put it in --

13              THE REPORTER:   I'm sorry?

14         A.   -- because I took as a reference the last

15   renew, maybe.  Maybe that's what I did.

16              THE REPORTER:   I'm sorry.  Can

17   you -- can you repeat?

18              THE WITNESS:   Maybe -- I think

19   I -- I -- I missed to put that one.

20         Q.   (BY MS. KLEBER)  So how did you miss the

21   pre-2008 outgoing wires as you were filling out these

22   forms?  Why did you fail to include that?

23         A.   As I told you at the beginning, I do have

24   just 2008 statements, so that's -- maybe that's why I

25   miss it the way that before.  I didn't have the whole

Page 64

                        SALIM ESTEFENN

1

2    information, because the documents, as I told you,

3    was kept by Patricia.

4         Q.  But did you have a memory that you had

5    received, for example, the approximately REDACTED

6    distribution from your father back in 2006?

7         A.  I tried to my best.

8         Q.  You -- you just didn't remember that --

9         A.  Yeah --

10        Q.  -- at that time?

11        A.  -- by that time, certainly.

12        Q.  Did the receiver approve your total

13   requested claim for the Esturicol Trust?

14        A.  No.

15             THE VIDEOGRAPHER:  Ashley, can we

16   take a break here?

17             MS. KLEBER:  Sure, let's pause for

18   a break.

19             MR. MORGENSTERN:  Okay.

20             THE VIDEOGRAPHER:  We're off the

21   record at 10:08 -- 10:09.

22             (Short recess.)

23             THE VIDEOGRAPHER:  We are on the

24   record at 10:28.

25             MR. MORGENSTERN:  Ashley, before

Page 84

1                    SALIM ESTEFENN

2                Back before Stanford collapsed --

3        A.   Okay.

4        Q.   -- had you ever received any distributions

5   from the Salesur II Trust Stanford accounts?

6        A.   Just one, yes.

7        Q.   And what was that?

8        A.   It was in December 2008 from Salesur II

9   Trust to my saving account in Banco de Miami.

10       Q.   Are you aware of any other distributions

11  out of the Salesur II Trust?

12       A.   No.

13       Q.   And beside -- who -- who made the decision

14  to open the Salesur II Trust?  Was that you alone?

15       A.   Yes.

16       Q.   Did you consult with your father about it?

17       A.   No.  I spoke with him and we open with the

18  Stanford, but it was my decision.

19       Q.   And why did you make the decision to

20  invest with Stanford?

21       A.   Because I saw Stanford Bank as a -- an

22  excellent bank.  It was 65 years old of experience,

23  so I thought was an excellent bank.  That's why.

24       Q.   And did you think that it was an excellent

25  bank based on Patricia Herr's recommendation?

Page 85

1                    SALIM ESTEFENN

2          A.  Correct.

3          Q.  Did you also think it was a good

4   investment based on your father's recommendation?

5          A.  Yes, it was for -- for us.

6          Q.  And 2002, approximately October 2002, is

7   the first time the Salesur Trust invested in

8   Stanford; is that right?

9          A.  Yes.

10         Q.  Did you receive statements, copies of

11  statements, from the Salesur II Trust starting in

12  2002?

13         A.  Not directly.

14         Q.  Indirectly?

15         A.  No.  I mean, no -- no, Patricia kept those

16  documents.

17         Q.  Okay.  Did you have an online account

18  where you could log on and see the status?

19         A.  The last year.

20         Q.  Only in --

21         A.  2008-2009.

22             (Exhibit 123 marked.)

23         Q.  (BY MS. KLEBER)  I'm going to hand you --

24  okay.  Fumbling around here.  But I'm now going to

25  hand you what I've marked as Exhibit 123.  I'll

Page 88

SALIM ESTEFENN

1

2        A.  Savings.

3        Q.  And before it was in your savings account,

4    where was it?  Is that funds that you would save from

5    your wages?

6        A.  Yeah, it was -- I mean, it was savings

7    that I did.  It was in my account.  I transferred to

8    Stanford.

9        Q.  Was any part of that REDACTED money that

10   you received from your parents?

11       A.  No.

12       Q.  So the entire REDACTED was money that you

13   had saved personally?

14       A.  Yes.

15       Q.  And then if you look at the same page,

16   URIBE_151, on Exhibit 123, below that, on

17   November 28th, 2008, there's an outgoing wire of

18   REDACTED.  Do you see that?

19       A.  Yes.

20       Q.  Why did you request that outgoing wire?

21       A.  I did it because I want to give my mom

22   some money.

23       Q.  Okay.  Earlier you testified that there's

24   only one outgoing wire in December of 2008 from the

25   Salesur Trust.  Do you --

Page 89

1                    SALIM ESTEFENN

2          A.  Yes.

3          Q.  -- recall that?

4          A.  Yeah.

5          Q.  Does this reflect -- refresh your

6    recollection of the --

7          A.  I don't remember this one, to be honest.

8    I don't remember this one.

9          Q.  You didn't remember it?

10         A.  This one, the --

11         Q.  Okay.

12         A.  REDACTED

13         Q.  But this refreshes your

14   recollection that --

15         A.  Yes.

16         Q.  -- that took place?

17         A.  Yes.

18         Q.  If we turn to URIBE_155.  Are you there?

19         A.  Yes.

20         Q.  There's an outgoing wire REDACTED.  Do

21   you see that?

22         A.  Yes.

23         Q.  What was the purpose of that outgoing

24   wire?

25         A.  Vacation.  That's what I said at the

Page 90

1                    SALIM ESTEFENN

2    beginning.

3              Q.  That was for a vacation?

4              A.  Yes.

5              Q.  So does that rec -- refresh your

6    recollection that there was -- there were multiple

7    outgoing wires from --

8              A.  No, no, just that one.  That's the only

9    one I did in November -- or December --

10   December 2008.

11             Q.  Oh, this is the -- this is the outgoing

12   wire that you talked about initially.  I --

13             A.  Yes.

14             Q.  Strike that.  Okay.  I see.

15             Do you believe that any funds were wired

16   out of your account before 2008, out of the

17   Salesur II Trust?

18             A.  No.

19             Q.  How -- are you confident of that?

20             A.  No, no, no, I'm sure I didn't do it.

21             Q.  You're positive?

22             A.  Yes, absolutely.

23             Q.  Okay.  I'm going to hand you -- actually,

24   did you submit a claim to the United States receiver

25   for the Salesur II Trust?

Page 112

SALIM ESTEFENN

1

2          A.  No, I mean --

3          Q.  -- family?

4          A.  Yeah, my father and me, but . . .

5          Q.  Who is Patricia Herr?

6          A.  Was my -- my adviser in -- in Stanford.

7          Q.  How did you meet Ms. Herr?

8          A.  She was my adviser in Banco Bogota Miami.

9   That's how I knew her.

10         Q.  When did she be -- first become your

11   adviser at Banco Bogota?

12         A.  When?

13         Q.  Uh-huh.

14         A.  When I opened my account.  Like, don't

15   remember exactly the date, but it was a long time

16   ago.  Maybe 1997, maybe.

17         Q.  At that time was Ms. Herr also the

18   financial adviser for any other members of your

19   family?

20         A.  My father.

21         Q.  Did your father introduce you to Ms. Herr?

22         A.  Yes.

23         Q.  And at some point Ms. Herr moved from --

24   from Banco Bogota to Stanford, right?

25         A.  Yes.

Page 113

1                    SALIM ESTEFENN

2          Q.  Do you remember when that happened?

3          A.  1999.

4          Q.  And where were her offices located?

5          A.  Miami, 701 Brickell Avenue; I remember.

6    They changed, but -- but at that time, it was that

7    address.

8          Q.  And did you first meet with Ms. Herr in

9    1999?

10         A.  I knew her before through my father.

11         Q.  Had you been to her offices before?

12         A.  In Banco do Miami, you mean?

13         Q.  Yes.

14         A.  Yes, I went.

15         Q.  On how many occasions?

16         A.  Many.

17         Q.  Can you give me a ballpark estimate?

18         A.  15, 20.  I don't know, really.

19         Q.  How often would you travel to Miami back

20   in the 1999 through --

21         A.  Twice per year, just that.

22         Q.  And would you go with your father during

23   those visits to meet with Ms. Herr?

24         A.  Yes.

25         Q.  Did you go to every visit or occasional --

Page 114

1                    SALIM ESTEFENN

2              A.  Occasional.

3              Q.  -- meetings?

4              A.  No.  Occasional --

5              Q.  Okay.

6              A.  -- yeah.

7              Q.  Was Ms. Herr the financial adviser for any

8    other members of your family?

9              A.  No.  Oh, my brother, my brother.

10             Q.  Farid.

11             A.  Yes.

12             Q.  Why is -- did you decide to hire Ms. Herr

13   as your financial adviser?

14                  (Question translated by the

15                   interpreter.)

16             A.  (In English)  Question.  When she was in

17   Banco de Miami or Stanford?  What do you mean?

18             Q.  (BY MS. KLEBER)  Did you hire Ms. Herr to

19   serve as your financial adviser while she was still

20   at Banco Bogota?

21             A.  Yes.

22             Q.  Okay.  And why did you make that

23   initial --

24             A.  She was --

25             Q.  -- decision to hire --

Page 115

1                    SALIM ESTEFENN

2            A.   -- the manager --

3            Q.   Why did you make that initial decision to

4       hire Ms. Herr?

5            A.   She was the manager of Banco de Miami, so

6       I -- I opened the account through her.   She was the

7       only adviser over there.

8            Q.   Did you choose to work with her because

9       your father had worked with her?

10           A.   Yes.   Yes, really.

11           Q.   Did you do anything to investigate

12      Ms. Herr's credentials before you hired her?

13           A.   No.

14           Q.   After Ms. Herr moved over from Banco

15      Bogota to Stanford, why did you decide to keep her as

16      your financial adviser?

17           A.   No, just she shows how was the portfolio

18      of Stanford, and she told us how was -- how was the

19      whole process if we were interested, and we decided

20      to go with her.

21           Q.   And did you understand whether or not

22      Ms. Kerr had -- Herr had any particular credentials

23      to serve as a financial adviser?

24               (Question translated by the

25               interpreter.)

Page 117

1                    SALIM ESTEFENN

2          Q.  But you did not actually invest personally

3    in a Stanford CD until 2002 --

4          A.  Yes.

5          Q.  -- right?

6          A.  It was through my father at the beginning.

7          Q.  And why didn't you invest right away in a

8    Stanford CD?

9          A.  I just had my saving in the Banco de Miami

10   for a while.

11         Q.  What did Ms. Herr tell you about the

12   Stanford CD?

13         A.  Well, it was CDs, was a company -- was a

14   bank that has about 65 years when we started.  And

15   she told the CDs was really safety, so that's why we

16   started to -- to invest through Patricia and

17   Stanford.

18         Q.  Did she tell you anything else about the

19   Stanford CD that you recall?

20         A.  No, they give you just the rates and

21   everything, but not in detail.

22         Q.  And did Ms. Herr's statements about the

23   safety of the CD influence your decision to purchase

24   the CD?

25         A.  I think it did, yeah.

Page 118

1                    SALIM ESTEFENN

2          Q.  Now, Ms. Herr, at this time, she was

3     employed by Stanford, right?

4          A.  By when?  By when?

5          Q.  By 2002 when you're --

6          A.  Yes --

7          Q.  -- making your first investment.

8          A.  -- she was in Stanford.

9          Q.  Did you discuss your decision to invest in

10    Stanford with any financial advisers that were not

11    employed by Stanford?

12          A.  No.

13          Q.  And did your parents' decision to invest

14    in Stanford through Ms. Herr also influence your

15    decision to invest personally?

16          A.  Yes, yes, because -- yes.

17          Q.  What other factors did you consider when

18    you were investing?  Anything else you can recall?

19          A.  No, not really.

20          Q.  What written materials were you provided

21    about Stanford?

22          A.  What?

23          Q.  Were you provided any written materials

24    about the Stanford CDs at the time you invested?

25          A.  No, I just have as a reference was she --

Page 119

1                    SALIM ESTEFENN

2    Patricia told me, so first the magazine from

3    Stanford, and we saw how was the whole process, how

4    was they growing up, but not -- not -- not in detail.

5            Q.  You recall flipping through one magazine

6    about Stanford --

7            A.  Yes --

8            Q.  -- correct?

9            A.  -- I remember I saw some magazines about

10   Stanford, how they were growing up.

11           Q.  Do you remember multiple magazines or one

12   magazine that you looked at?

13           A.  I don't remember exactly.

14           Q.  Okay.  Was the magazine that you're

15   referencing, was that in sping -- Spanish --

16           A.  In English.

17           Q.  -- or English?

18           A.  English.  Just English.

19           Q.  And did you review that magazine

20   carefully?

21           A.  Yes.

22           Q.  You read the whole thing?

23           A.  Well, in general, as you -- in general.

24           Q.  Okay.

25           A.  Not in detail, no.

Page 120

1                    SALIM ESTEFENN

2          Q.  What do you recall that the magazine said?

3          A.  How was the growing up, how -- how they

4     have in --

5                (Witness speaking in Spanish to

6                the interpreter.)

7          A.  (Through the interpreter)  Well, they had

8     as investments in CDs, how they were growing, in

9     general terms how Stanford was growing.

10         Q.  (BY MS. KLEBER)  Did those materials

11    influence your decision to invest in the Stanford CDs

12    or was it mostly the recommendation of your father

13    and Ms. Herr?

14         A.  (In English)  I -- I think it was more of

15    Patricia Herr and my father recommendation, yeah.

16         Q.  Can you -- as you sit here today, can you

17    think of any other written materials that you

18    reviewed?

19         A.  No, not really.

20         Q.  At the time you invested in the Stanford

21    CDs in 2002, did you have any understanding about

22    whether or not the Stanford CDs were insured?

23                (Question translated by the

24                interpreter.)

25         A.  (In English)  No, I didn't check it.

Page 121

1                    SALIM ESTEFENN

2          Q.  (BY MS. KLEBER)  You didn't know one way

3    or the other?

4                   (Question translated by the

5                   interpreter.)

6          A.  (In English)  No, I didn't know where

7    it --

8          A.  (Through the interpreter)  Well, I didn't

9    know that they were insured.  I knew they were CDs

10   with a certain rate that seemed safe and that

11   inspired safety, security.

12         Q.  (BY MS. KLEBER)  Back when you invested in

13   the Stanford CDs for the first time in 2002, did you

14   have an understanding about whether the Stanford CDs

15   provided a higher rate of return than other CDs that

16   were available in the market?

17         A.  (In English)  No, it was the --

18                 (Witness speaking in Spanish to

19                 interpreter.)

20         A.  (Through the interpreter)  It was the

21   same.  They were similar rates like the competitors

22   in Panama.

23         Q.  (BY MS. KLEBER)  So you believe that the

24   Stan -- the rate -- the interest rates on Stanford

25   CDs were comparable to other CDs in the market?

Page 131

1                    SALIM ESTEFENN

2   proposed class members purchased CDs through many

3   different financial advisers and brokers --

4          A.  Yes.

5          Q.  -- right?

6              And some of the 17,000 plus proposed

7   members speak different languages, right?

8          A.  Yes, because they're around the world.

9          Q.  And they invested in -- through different

10  currencies, right?

11         A.  Yeah.

12         Q.  And just to clarify, you didn't have any

13  investments with Stanford through brokerage accounts

14  that held equities or mutual funds, anything like

15  that, right?

16         A.  No.

17         Q.  Did any members of your family have those

18  types of brokerage account investments through

19  Stanford?

20         A.  No.

21         Q.  Do you know how many of the other 17,000

22  plus proposed class members had brokerage accounts

23  through Stanford in addition to CDs?

24         A.  No.

25         Q.  Do you know if Stanford provided any

Page 132

1                      SALIM ESTEFENN

2    different disclosures or information to people who

3    had brokerage accounts with Stanford in addition to

4    CDs?

5              A.  No, I don't know, really.

6              Q.  Do you know if Stanford provided any

7    different disclosures or information to people who

8    owned CDs through trusts like you versus people who

9    just owned CDs directly?

10                   (Question translated by the

11                   interpreter.)

12             A.  (In English)  No, not -- not really.  I

13   don't know.

14             Q.  (BY MS. KLEBER)  Do you know what

15   documents other Stanford CD purchasers received and

16   reviewed related to their CDs?

17             A.  No.

18             Q.  Do you know if -- so you don't know if

19   these materials were different than the materials

20   that you were given --

21             A.  No.

22             Q.  -- right?

23                 And those CD purchasers could be relying

24   on a different mix of materials than you relied on,

25   right?

Page 133

                          SALIM ESTEFENN

1

2               (Question translated by the

3               interpreter.)

4          A.   (In English)  Yeah, it was their -- their

5     decision, their materials.  They -- I mean, it was

6     the other investors' decision.

7          Q.   (BY MS. KLEBER)  It was -- are you saying

8     that it was the other investors' decision and you

9     don't know what materials they relied on?

10         A.   I -- I -- I think they -- they received

11    more or less the same material I did.

12         Q.   What is your basis for that statement?

13              (Question translated by the

14              interpreter.)

15         A.   (In English)  For the advisers.  I mean,

16    I -- I think they provide the -- the investors

17    material, like, say, annual report, annual report or

18    things like that to show how was Stanford growing up.

19    So . . .

20         Q.   (BY MS. KLEBER)  Do you know if any of the

21    financial advisers had materials that were different

22    depending on the region they worked in, the country,

23    et cetera?

24         A.   I don't know.

25         Q.   You don't know one way or the other,

```
                                              Page 134
  1                 SALIM ESTEFENN
  2    right?
  3           A.  No, I don't know if other had that
  4    information.
  5           Q.  Have you ever visited any Stanford offices
  6    besides the Miami office --
  7           A.  No.
  8           Q.  -- of Patricia Herr?
  9           A.  No.
 10           Q.  Have you ever attended any events hosted
 11    by Stanford?
 12           A.  No.
 13           Q.  Before Stanford entered receivership in
 14    2009, did you ever have any communications with
 15    anyone in the state of Texas about Stanford?
 16           A.  No.
 17           Q.  And your Stanford financial adviser,
 18    Ms. Herr, operated out of Miami, right?
 19           A.  Yes.
 20           Q.  Did she have any other offices?
 21           A.  No.
 22           Q.  When you purchased your CDs, you resided
 23    in Colombia, right?
 24           A.  I resided in Colombia.
 25           Q.  Did you ever travel to Texas in the course
```

Page 158

1                          SALIM ESTEFENN

2          A.  (In English) -- deposit.  Someone make

3     the deposit in bank and that's all.

4          Q.  (BY MS. KLEBER)  But you received

5     something in the mail, a letter from the receiver?

6          A.  Letter.

7          Q.  And -- but you did not keep that letter,

8     right?

9          A.  No.  Yes.

10          Q.  Have you received any distributions from

11     the joint liquidator in Antigua?

12          A.  No.

13          Q.  Have you ever received any correspondence

14     from the joint liquidator in Antigua claiming that

15     you received a preference payment from Stanford in

16     the last few months before Stanford collapsed?

17               (Question translated by the

18                interpreter.)

19          A.  (In English)  No.

20          Q.  (BY MS. KLEBER)  Do you know if any of the

21     other proposed class members received so-called

22     preference payments in the last six months before

23     Stanford closed?

24          A.  I know Esturicol, my mother -- my mother,

25     she got it.

Page 159

1          SALIM ESTEFENN

2          Q.  So your mother received a letter regarding

3   a preference payment from the joint liquidator in

4   Antigua?

5          A.  Yes.

6          Q.  And did that letter request that your

7   mother repay some amount to the liquidator?

8                (Question translated by the

9                interpreter.)

10         A.  We did not request.  I mean --

11               (Witness speaking to the

12               interpreter in Spanish.)

13         A.  (Through the interpreter)  My mother

14   didn't answer that letter.

15         Q.  (BY MS. KLEBER)  But did the letter ask

16   your mother to pay some funds back to the joint

17   receiver?

18         A.  (In English)  That's what the letter said.

19         Q.  And your mother did not answer that

20   letter?

21         A.  Did not, correct.

22         Q.  Does your mother, for the Esturicol Trust,

23   have any intention of repaying that amount of the

24   preference payment to the joint liquidator?

25         A.  To do it, you mean?

Page 160

SALIM ESTEFENN

1

2      Q.  Does she plan to do that?  Does she plan

3   to repay the money?

4      A.  To --

5              MR. MORGENSTERN:  Objection.

6      Q.  (BY MS. KLEBER)  Okay.

7      A.  No.  I mean --

8      Q.  Let's -- let's strike -- let me start over

9   and I'll ask the question so we have a cleaner

10  record.

11          (Ms. Emily Vonqualen joins the

12          proceedings.)

13      Q.  (BY MS. KLEBER)  Have you and your mother

14  discussed the request from the joint liquidator in

15  Antigua to repay some amount from the Esturicol

16  Trust?

17      A.  Yes, I have discussed with my mother.

18      Q.  And what did your mother say?

19      A.  That if she -- I mean, giving that money

20  back, it means you're going to get 1 percent of what

21  you're going to receive maybe, because you never

22  know.  So it means you got --  REDACTED

REDACTED

, so it doesn't sound logic.

25      Q.  And so --

Page 161

1                    SALIM ESTEFENN

2          A.   Does not sound logic.

3          Q.   And so she does not intend to repay any

4    funds to the joint liquidator, correct?

5          A.   Correct.

6          Q.   Do you file tax returns in Colombia?

7          A.   Sorry?

8          Q.   Do you file tax returns in Colombia?

9               (Question translated by the

10              interpreter.)

11         A.   (In English)  Yes, I do.

12         Q.   (BY MS. KLEBER)  And did you ever file any

13   tax returns for the trusts --

14         A.   No.

15         Q.   -- the Esturicol Trust or the Salesur II

16   Trust?

17         A.   No.

18         Q.   You've only filed tax returns individually

19   in Colombia --

20         A.   Yes.

21         Q.   -- correct?

22         A.   With my name, Salim Estefenn, yeah.

23         Q.   Under the tax laws of Colombia, are you

24   required to report interest that you earn on

25   investments?

Page 166

1                    SALIM ESTEFENN

2    They have the money.  I mean, that's what I mean.

3            Q.  Before getting involved in this lawsuit,

4    had you ever heard of Trustmark National Bank?

5            A.  No, I haven't.

6            Q.  Had you ever had any communications with

7    anyone employed by Trustmark National Bank?

8            A.  Never.

9            Q.  Have you ever had any accounts at

10   Trustmark?

11           A.  Never.

12           Q.  Do you know what the relationship between

13   Trustmark and -- and the Stanford entities was?

14           A.  No.  They have an account, but just that.

15           Q.  Before this lawsuit -- before getting

16   involved in this lawsuit, did you know that Trustmark

17   provided banking services for Stanford?

18           A.  I didn't know at the beginning.

19           Q.  When did you first learn that Trustmark

20   provided banking services for Stanford?

21           A.  With the process that started in 2009,

22   they had that account, they had an account over

23   there.

24           Q.  And back in 2009, how did you learn

25   that --

Page 167

1                    SALIM ESTEFENN

2           A.  I didn't know.

3           Q.  -- Trustmark had --

4           A.  Before 2009?

5           Q.  Let me finish my question.

6           A.  Sorry.

7           Q.  Back in -- in -- in 2009, how did you
8    learn that Trustmark provided banking services to
9    Stanford?

10          A.  No, before 2009, I didn't know, really.

11          Q.  Right.  After 2009, how did you learn --

12          A.  Just --

13          Q.  -- that Trustmark provided banking

14   services to Stanford?

15          A.  No, just I -- I -- that is the whole

16   process, that Stanford had an account.

17          Q.  Right now my question, I think, is a

18   little different.  I'm asking how -- how you learned

19   that Trustmark provided banking services to Stanford.

20          A.  Ah, it's in the investigation process, but

21   the investigation process has been done by our

22   lawyers --

23          Q.  Okay.

24          A.  -- really, not from me.

25          Q.  What specific banking services did

Page 171

SALIM ESTEFENN

1

2    there?

3         A.  Because when I -- this process started in

4    2009, and I've been talking with Peter since that

5    time.  This is when I just started in May this year.

6    So I keep in contact with him all time.

7         Q.  Now, had -- did you retain Fishman Haygood

8    to represent you individually or to represent the

9    Salesur II Trust or the Esturicol Trust?

10        A.  Yeah, I think it's Esturicol.  And even if

11   I said something that's different, I'm from Salesur

12   and Esturicol.

13        Q.  If we look at URIBE_003, the first page of

14   this document.

15        A.  It says my name.

16        Q.  It -- it says you; it does not reference

17   the two trusts, correct?

18        A.  Correct.

19        Q.  Since you became involved as a class

20   representative in the case, how much time have you

21   spent working on the case?

22        A.  Not too much.  It's their work, it's not

23   mine one.

24        Q.  And how many hours, would you say?

25        A.  Since -- maybe four or five hours.

```
 1                    SALIM ESTEFENN

 2           Q.  And since you became involved in the case,

 3      how often have you communicated with your attorneys?

 4           A.  As I said at beginning, once a month with

 5      Peter Morgenstern.

 6           Q.  Have you met any of the other named class

 7      representatives?

 8           A.  No.

 9           Q.  Have you ever reviewed the first amended

10      complaint that was filed in this action?

11           A.  In gen -- general, yeah -- no.  Within

12      detail, no.

13           Q.  When did you first look at that document?

14           A.  When they told me I would be a class

15      representative.

16                    THE REPORTER:  I'm sorry?  You

17      would be a class representative.

18           Q.  (BY MS. KLEBER)  Do you remember what

19      month that was?

20           A.  As I told you, May, about May.

21           Q.  And you said you did not review it in

22      detail.  Did you just sort of skim it or what -- what

23      did you do?

24           A.  No, I just check it in general, but just

25      in general.
```

Page 173

1                    SALIM ESTEFENN

2          Q.  Do you mean you only reviewed certain

3    pages or you just sort of looked through quickly or

4    what -- what do you mean?

5          A.  Quickly if you want, yeah.

6          Q.  Have you reviewed the complaint that was

7    filed by the Official Stanford Investment --

8    Investors Committee in this case?

9          A.  Yes.  But quickly, too, you know, only

10   tab.

11         Q.  What is the Official Stanford Investors

12   Committee?

13         A.  What is -- sorry?

14         Q.  The Official Stanford Investors Committee.

15         A.  It's a committee.  It's a commit --

16              (Witness speaking to the

17              interpreter in Spanish.)

18              THE INTERPRETER:  It's a

19   committee.

20         A.  (In English)  It's a committee in where

21   there are some people who are interested in the

22   process.  One of them is Peter Morgenstern.  He is

23   part of the committee.

24         Q.  (BY MS. KLEBER)  Do you know how many

25   complaints the committee has filed in this -- this

Page 174

                        SALIM ESTEFENN

1       case?

2              A.  Not really.

3              Q.  Well, how many have you reviewed?

4              A.  I think it's just one.

5              Q.  Just one.  Have you reviewed the motion to

6       substitute class representatives that was filed in

7       this case?

8              A.  Quickly, but yes.

9              Q.  Do you know if you reviewed that document

10      before it was filed?

11             A.  No.

12             Q.  You don't know one way or the other or

13      you -- you did not?

14             A.  No, I did not.

15             Q.  You reviewed it after it was filed?

16             A.  Yes.

17             Q.  Have you reviewed the class's second

18      amended complaint filed in this case?

19             A.  No.

20             Q.  Have you reviewed the motion to certify

21      the class that was filed in this case?

22             A.  Which one?

23             Q.  Motion to certify a class.

24             A.  No.

Page 175

```
                         SALIM ESTEFENN
 1
 2          Q.  And so you also haven't reviewed any of
 3    the materials in the appendix to that motion other
 4    than perhaps your declaration?
 5          A.  In general.  I mean, to see specifically,
 6    no.  Just in general I have known that some documents
 7    have -- have had --
 8                  (Witness speaking to the
 9                  interpreter in Spanish.)
10                  THE INTERPRETER:  Have been filed.
11          A.  (In English)  Have been filed, but not
12    check specifically each one.
13          Q.  (BY MS. KLEBER)  Have you ever been
14    instructed to save all of your documents related to
15    Stanford?
16                  (Question translated by the
17                  interpreter.)
18          A.  (In English)  No.
19          Q.  (BY MS. KLEBER)  Will you tell me what you
20    did to search for documents that might be relevant to
21    this case?
22                  (Question translated by the
23                  interpreter.)
24          A.  (In English)  Just as I said at beginning,
25    I start to get the documents, like statements, since
```

Page 195

1              SALIM ESTEFENN

2         A.  -- report.

3         Q.  Right.  And in terms of these banks right

4    here, what evidence do you have that we knew that

5    this money was being misguided?

6              (Question translated by the

7              interpreter.)

8         A.  (Through the interpreter)  I believe that

9    the banks knew the process, I mean, the money

10   movement where they were going to and from, and they

11   should have reported these operations.

12        Q.  (BY MR. REPASS)  Do you have any firsthand

13   knowledge of that?

14             (Question translated by the

15             interpreter.)

16        A.  (In English)  No.

17        Q.  (BY MR. REPASS)  I represent the Bank of

18   Houston.  Have you ever been to the Bank of Houston?

19        A.  No.

20        Q.  Now, Patricia and your dad recommended

21   that you get into the Stanford CDs.  Did anyone at

22   the Bank of Houston recommend that you get into the

23   Stanford CDs?

24        A.  No.

25        Q.  You bought your CDs through the Miami

Page 198

```
 1                       SALIM ESTEFENN

 2          Q.  -- true?

 3          A.  She told us, yes.

 4          Q.  Yes.

 5               Bank of Houston made no representations to

 6     you, did they?

 7          A.  No.

 8          Q.  None of these banks made any

 9     representations to you, did they?

10          A.  No.

11          Q.  You never even talked with anyone at the

12     Bank of Houston about these CDs?

13          A.  No.

14          Q.  And nothing that my client said to you or

15     did to you encouraged you to purchase those CDs,

16     right?

17          A.  Yeah.

18          Q.  Now, look at Exhibit 128, and then we're

19     about done.  Can you get that one in front of you,

20     sir.  Do you -- do you have it, sir?

21          A.  Yeah, I have it right here.

22          Q.  Now, you testified earlier that you made

23     some mistakes on Exhibit 128, true?

24          A.  I made a mistake in Exhibit 127.  No,

25     128 --
```

Page 203

                         SALIM ESTEFENN

1

2          A.   Yes.

3          Q.   As we currently sit here, Salesur II does

4    not exist?

5          A.   No.

6          Q.   Mr. Estefenn, who is Samia Estefenn Uribe?

7          A.   My sister.

8          Q.   Does your sister have accounts with

9    Stanford?

10         A.   No.

11         Q.   Are you sure of that?

12         A.   Yes.

13         Q.   Mr. Estefenn, who is -- what is Rex

14   Designs, SA?

15         A.   It was -- Rex was a trust or something

16   that we -- that my mother sold some dollars and we

17   transferred from StraightCo (phonetically spelled)

18   and they give them to my mom in Colombian pesos --

19   the same amount in Colombian pesos.

20              MS. NEUNER:  Can you read back

21   that answer, please, particularly the beginning.

22              (Requested material was read.)

23         Q.   (BY MS. NEUNER)  Mr. Salesur, that doesn't

24   make sense to the average person reading it, so we

25   need to redo it.

Page 204

1               SALIM ESTEFENN

2               MR. MORGENSTERN:  Mr. Estefenn.

3       Q.  (BY MS. NEUNER)  Sorry, Mr. Estefenn.

4           Let me try again.  What is Rex Designs,

5  SA?

6       A.  What is?  It's -- it's like a trust that

7  a -- a friend of my mom -- my mom and my -- a friend

8  of the family has, an account.

9       Q.  And does your family have any ownership

10 interest in this Rex Designs, SA, account?

11      A.  No.

12      Q.  So it is an account and a trust that

13 belongs to a family friend?

14      A.  Yes.

15      Q.  And where is it located?

16      A.  No idea.  I don't know.

17      Q.  And what are the relations between your

18 family and the family that owns the Rex Designs, SA?

19      A.  Friends, just that.

20      Q.  Is your family in the habit of giving tens

21 of thousands of dollars to Rex Designs, SA?

22      A.  No, it's just a small -- a small transfer.

23 Just one, I think.

24      Q.  What is -- describe that small transfer --

25      A.  It's --

Page 205

1               SALIM ESTEFENN

2        Q.  -- you just referred to.

3        A.  I do not remember exactly the value, the

4   amount, but we transferred in dollars some money to

5   them, and they give us in Colombian pesos, just was

6   that operation.

7        Q.  When did that take place?

8        A.  Don't remember.  I --

9        Q.  Roughly.

10       A.  No, I don't remember, really.  I had that

11   letter, but I do not remember exactly the date.

12            THE REPORTER:  I had what?

13            THE WITNESS:  I -- the letter is

14   there, but I do not remember the date exactly.

15       Q.  (BY MS. NEUNER)  When you say "a small

16   transfer," do you mean **REDACTED**?

17       A.  Maybe that amount, yeah.

18       Q.  Do you recall -- and we'll look at the

19   account statements -- **REDACTED** out of the

20   Salesur II Trust in November 2008?

21       A.  Yes, I remember that.

22       Q.  And what did you use that money for?

23       A.  Just to give to my mom some money that I

24   wanted to give her, just that.

25       Q.  So how did you physically take it out?

Page 206

1                    SALIM ESTEFENN

2       Did you have it transferred to yourself?

3            A.  I sent a letter to Stanford fiduciary, and

4    they -- who I gave that money to -- don't -- don't

5    remember, really.  But I just gave REDACTED, and they

6    give me that money in pesos.  It was the same one

7    as -- as Rex.  And I give that money to my mom.

8    That's what I wanted to do.

9            Q.  I need to go back over that answer.

10   There's US dollars sitting in your Salesur II trust

11   account with Stanford, correct?

12           A.  Yes.

13           Q.  You give an instruction for REDACTED to be

14   taken out of your Salesur II account, correct?

15           A.  Yes.

16           Q.  Where do you order that money to be

17   transferred to?

18           A.  Whom -- I don't remember exactly whom got

19   it from the Salesur II Trust.  There is a letter, the

20   instructions, but I do not remember who I sold those

21   dollars.

22           Q.  Do you recall ordering the transfer of the

23   REDACTED to be sent from your Salesur II trust account

24   to Rex Designs, SA?

25           A.  Rex Designs, yeah, maybe sold to them

Page 207

1                    SALIM ESTEFENN

2      to -- to -- to -- from Salesur II Trust.

3            Q.  And when you say "sold to them," why --

4      what do you mean you sold to them?

5            A.  I mean -- I'm going to give an example.

6      REDACTED

7                  (Witness speaking to the

8                  interpreter in Spanish.)

9            A.  (In English)  To REDACTED pesos per dollar,

10     they gave me 30 million pesos in Colombia.  That's

11     how he did -- I did.

12           A.  (Through the interpreter)  To give you an

13     example, REDACTED they deliver

14     me --

15           A.  (In English) REDACTED

16           A.  (Through the interpreter)  -- REDACTED

18           A.  (In English)  In Colombia.  It's the same

19     amount, but in different money.  Different --

20     different --

21                  (Witness speaking to the

22                  interpreter in Spanish.)

23                  THE INTERPRETER:  Currency.

24           A.  (In English)  Different currency.

25           Q.  (BY MS. NEUNER)  Mr. Estefenn, are you

Page 208

1                    SALIM ESTEFENN

2     testifying that you would remove US dollars from your

3     Salesur II Trust with Stanford and have it wired to

4     the Rex Designs, SA, entity and then Rex Designs, SA,

5     would translate the US dollars into Colombian pesos

6     and then send you the Colombian pesos equivalent?

7                    (Question translated by the

8                    interpreter.)

9          A.  (In English)  Yes, they give me in

10    Colombia that money, that amount.

11         Q.  (BY MS. NEUNER)  What is the family that

12    owns the Rex Designs, SA, that you're friends with?

13         A.  If I remember, it's **REDACTED** who was

14    a friend of my father.

15         Q.  Can you spell that, please, for Rene.

16         A.  **REDACTED** -- it's -- sorry.

17              THE WITNESS:  It's not Rene.

18    **REDACTED** -- shall I write it?

19              MR. MORGENSTERN:  If you want.

20              MS. NEUNER:  Madam Court Reporter,

21    do you have the correct spelling of that?

22              THE REPORTER:  Yes.  Well, I

23    assume it is.

24         Q.  (BY MS. NEUNER)  Did the Rex Designs

25    entity take a commission for exchanging the US

Page 209

1                    SALIM ESTEFENN

2    dollars into Colombian pesos?

3         A.  No.

4         Q.  Did your mother with the Esturicol Trust

5    also use Rex Designs, SA, as her exchange entity to

6    turn US dollars into Colombian pesos?

7              (Question translated by the

8              interpreter.)

9              MR. MORGENSTERN:  Objection to the

10   form.

11             You can answer.

12        A.  I think she did it once, but I don't

13   remember amount.  I think she did it once.

14        Q.  (BY MS. NEUNER)  Do you believe your

15   mother sent REDACTED in late September 2008 from the

16   Esturicol trust account with Stanford to Rex Designs?

17        A.  Yeah, I think she did, yeah.

18        Q.  And two months later, you sent REDACTED

19   from your Salesur II Trust to Rex Designs --

20        A.  Yes.

21        Q.  -- correct?

22             Why was your family collectively taking

23   REDACTED out of the Stanford accounts in September and

24   November of 2008?

25        A.  In -- in Salesur case, Salesur II case,

Page 210

1          SALIM ESTEFENN

2    was because I want to give my mother some money, just

3    that.  And in September, which was Esturicol, was

4    because my mother needed some money for her in

5    Bogota.

6          Q.  For her --

7                THE REPORTER:  Needed some what?

8          A.  For her in Bogota, Colombia.

9          Q.  (BY MS. NEUNER)  Now, the Salesur II Trust

10   was your personal trust account, correct?

11         A.  Yes.

12         Q.  And I believe you testified earlier that

13   the principal amounts you deposited were from the

14   wages that you earned when you worked at Prolibros

15   and Thema?

16         A.  Thema.

17         Q.  Is that correct?

18         A.  Yes, yes.

19         Q.  Now, Mr. Estefenn, isn't it true that in

20   November of 2008, you received an REDACTED wire into

21   your Salesur II account from your mother's Esturicol

22   account?

23         A.  It was my saving account.

24         Q.  Excuse me?

25         A.  That -- REDACTED -- were deposit

Page 211

1                    SALIM ESTEFENN

2    in my account, in Salesur II -- second trust, yeah.

3         Q.  Sir, I'm going to ask it again so we have

4    a clean record.  Mr. Estefenn, is it true that in

5    November 2008, your Salesur II account with Stanford

6    received an REDACTED in from your mother's

7    Esturicol trust account with Stanford?

8         A.  Yes, part of -- part of that was my

9    mother, part of that was my savings.

10        Q.  What do you mean by that?

11        A.  Yes, there was -- was money that I had in

12   Bogota that I gave to my mother.  Part of it was my

13   saving that I gave her, and she gave me that money in

14   the United States in my account.

15           So it means, like, I bought to her some

16   dollars and they put -- they translate from Esturicol

17   to my account, just that.  Part of that was my

18   saving, part of that she gave me.

19        Q.  How much of the REDACTED that your mother's

20   trust transferred to you was your own wage earnings?

21        A.  I think about 50 percent, 40.

22        Q.  REDACTED

23        A.  REDACTED

24        Q.  REDACTED was essentially a

25   gift from your mother to you?

Page 212

1                    SALIM ESTEFENN

2           A.   My mother gave me.

3           Q.   Okay.   Now, when you received that

4    transfer of REDACTED in November of 2008, you

5    proceeded to take out REDACTED and send it back to Rex

6    Designs in Colombia --

7           A.   Yes.

8           Q.   -- correct?

9                Why did you do that?

10          A.   Because I wanted to give my mother some

11   money.

12          Q.   So you gave your mother money, she gave

13   you back money, and then you took out the money to

14   give back to your mother?

15          A.   Yes.

16          Q.   That doesn't make sense to me.   Can you

17   help me understand it better?

18          A.   Yes, I just wanted to give my mother some

19   money as a -- as a present, if you want to say.   I

20   mean, I just wanted to give her some money.

21          Q.   She gave you REDACTED as a present and you

22   gave her back REDACTED as a present?

23          A.   She gave to my -- my brother, my sister,

24   and me.   I don't know what they -- my brother's -- my

25   brother and sister did.   I just wanted to give to my

Page 213

                              SALIM ESTEFENN

 1

 2      mother some present as a money.  I know she was

 3      needing, so that's what I did.  I think it's not a

 4      mistake.

 5              Q.  She was needing money, so she gave you

 6      REDACTED as a present?

 7              A.  Yes, she gave me and I give her back,

 8      because I wanted.  I mean, I -- I feel like I -- I'm

 9      a good son.  That's how I feel.  So I want to give

10      her some money back because she was needing.

11              Q.  You took out of the  REDACTED

12      to go on a vacation, correct?

13              A.  How many, REDACTED

14              Q.  Yes, sir.

15              A.  Yes, more or less, yes.

16              Q.  What was the vacation to?

17              A.  It was to New York and the -- yes, it was

18      to New York.

19              Q.  Do you have any children, Mr. Estefenn?

20              A.  Yes.

21              Q.  How -- how many children and what are

22      their ages?

23              A.  At that time?

24              Q.  Yes.

25              A.  In 2008, I just had one, the older,

Page 224

1                    SALIM ESTEFENN

2          Q.   -- correct?

3          A.   Yes.

4          Q.   And that is an account that you own,

5     correct?

6          A.   Yes.

7          Q.   And the re -- transfer request is in the

8     amount of REDACTED US dollars, right?

9          A.   Yes.

10         Q.   And this is what you believe to be the

11    entirety of the Esturicol Trust amounts with

12    Stanford --

13         A.   Yes.

14         Q.   -- at the time?

15         A.   Yes.

16         Q.   So is it fair to say your purpose in

17    drafting this letter was to obtain a transfer of the

18    entire Esturicol Trust proceeds out of Stanford into

19    your personal account in Miami?

20         A.   Yes.

21         Q.   What was the response on this letter?

22         A.   They never gave us a response.

23         Q.   Did you create a similar letter for the

24    Salesur II?

25         A.   Yes.

App. 1725

Page 245

1                    SALIM ESTEFENN

2      topics and some documents, but not really what I

3      have -- I knew what I have to do.

4              Q.   And in preparing for today's deposition,

5      you did, in fact, review your files on the Stanford

6      accounts?

7              A.   Sorry?

8                   (Question translated by the

9                    interpreter.)

10             A.   (In English)  Yes, I did and what I had,

11     what I have, I mean, documents I have.

12             Q.   (BY MS. NEUNER)  Did you have any other

13     meetings with Ben prior to today's deposition?

14             A.   Yesterday for a while just for dinner.

15             Q.   How long, roughly, did your dinner meeting

16     last?

17             A.   One hour, one hour and a half.

18             Q.   And during that dinner was when you signed

19     the new declaration, correct?

20             A.   After -- after dinner, after that.

21             Q.   Mr. Estefenn, what do you know about my

22     client, the Toronto-Dominion Bank?

23             A.   Why?

24             Q.   What do you know about my client, the

25     Toronto-Dominion Bank?

Page 246

1                    SALIM ESTEFENN

2          A.  Not too much.  They have made the

3    investigation.  I just . . .

4              Q.  Do you personally have any connection to

5    the Toronto-Dominion Bank?

6          A.  No.

7              Q.  Have you received any communications from

8    the Toronto-Dominion Bank?

9          A.  No.

10             Q.  Do you have any knowledge of how the

11   Toronto-Dominion Bank is connected to the Stanford

12   financial entities?

13         A.  No, not really.

14             Q.  There was nothing that the

15   Toronto-Dominion Bank did to induce you to make your

16   Stanford investments, right?

17         A.  No.

18         Q.  I'll have no more questions, then.  Thank

19   you.

20             MR. MORGENSTERN:  Okay.

21         Q.  (BY MS. NEUNER)  Thank you very much,

22   Mr. Estefenn.

23         A.  You're welcome.

24             MS. NEUNER:  Who else?

25             THE VIDEOGRAPHER:  We're coming up

Page 247

                         SALIM ESTEFENN

1

2    on an hour.  Should we just take a quick break?

3                    MR. BRINKMAN:  That's fine.

4                    THE VIDEOGRAPHER:  We're off the

5    record at 15:10.

6                    (Short recess.)

7                    THE VIDEOGRAPHER:  We're on the

8    record at 15:21.

9                         EXAMINATION

10   BY MR. BRINKMAN:

11        Q.  Good afternoon, Mr. Estefenn.  My name is

12   Taylor Brinkman.  I represent HSBC Bank PLC.

13        A.  Okay.

14        Q.  And you understand that HSBC is one of the

15   defendants in this case?

16        A.  Yes.

17        Q.  What do you know about HSBC's involvement

18   with Stanford?

19        A.  No, I don't know too much.  Yeah, I don't

20   know.  I mean, I know HSBC's a bank.  England bank, I

21   think.  But no -- in detail, no.  As I said, it's

22   their investigation, not my responsibility.

23        Q.  So you have no understanding of how HSBC

24   participated in the Alan Stanford fraud, correct?

25        A.  I know Stanford has an account there, but

App. 1728

Page 259

```
 1              SALIM ESTEFENN
 2              interpreter.)
 3              MR. MORGENSTERN:  Objection to
 4    form.
 5         A.  (In English)  Yes, in theory, yes.
 6         Q.  (BY MR. BRINKMAN)  So why aren't you
 7    seeking that amount in this lawsuit?
 8              (Question translated by the
 9              interpreter.)
10         A.  (In English)  No, I -- but the interest,
11    yes, I did, I did.  If you see the forms that I sent
12    to Gilardi, it includes the interest.  It does.  They
13    did not recognize that amount, but at least I did my
14    claim for the -- for the total.
15         Q.  (BY MR. BRINKMAN)  But I'm asking about
16    what you're trying to get in this lawsuit from my
17    client and the other banks.  Are you trying to
18    recover the interest that you earned on your Stanford
19    CDs?
20         A.  If I can get it, yes, if I can get it.  I
21    mean, I know they recognize me different amount, but
22    in my claim, I did -- we include the interest, yes.
23         Q.  (BY MR. BRINKMAN)  What about the other
24    class members?  Should they get the interest that
25    they earned on their Stanford investments?
```

Page 260

1                    SALIM ESTEFENN
2         A.  I have no idea.  It's their
3    responsibility.
4         Q.  Do you think it's a -- you say it's their
5    responsibility.  What do you mean by that?
6         A.  I give them some advice, some suggestions
7    what they have to do, but it's -- it's not my
8    savings.  It's they savings, so that's what they have
9    to do.  I represent here as a class member -- as a
10   class representative because our similar cases.
11                    (Witness speaking to the
12                    interpreter in Spanish.)
13        A.  (Through the interpreter)  Different
14   scenarios, but they are similar cases.
15        A.  (In English)  Similar cases.  So that's
16   why I'm representing, but it is their responsibility,
17   which is not the same.
18        Q.  (BY MR. BRINKMAN)  You're saying it's the
19   other class members' responsibility to do what?
20        A.  Their claims.
21        Q.  To do what with their claims?
22        A.  I mean, I -- when I fill out a claim, it's
23   my responsibility over my investment.  But it's not
24   my responsibility over their -- their investment.
25   I'm not investor of their money.  That's what I mean.

Page 270

1                    SALIM ESTEFENN

2    to -- with the Security Generale, too, so . . .

3              THE REPORTER:  The what?

4         A.  With --

5         Q.  (BY MS. REED)  Who?

6         A.  -- with the bank.

7         Q.  Which bank?

8         A.  Security Generale.

9         Q.  Security Generale?

10        A.  (Moving head up and down.)

11        Q.  Have you ever heard of the bank Société

12   Générale?

13        A.  The whole investigation about that bank

14   has -- has been done by lawyers.

15        Q.  So before you became involved in this

16   lawsuit, you had never heard of Société Générale?

17        A.  No.

18        Q.  Do you know the difference between Société

19   Générale and Société Générale Private Banking

20   (Suisse)?

21        A.  Not really.

22        Q.  Did you know that they're entirely

23   different?

24        A.  Sorry?

25        Q.  Did you know that they are entirely

Page 272

1                    SALIM ESTEFENN

2          Q.  -- is headquartered in Switzerland?

3          A.  It's in Switzerland.

4          Q.  So what's the difference between the two

5    entities?

6          A.  I don't know, really.  I don't know,

7    really.

8          Q.  And in saying that you believe some of

9    your money was somehow deposited at Société Générale

10   Private Banking (Suisse), your entire basis for that

11   statement is that your lawyers have told you that?

12         A.  Yes.

13         Q.  You have no independent basis for that

14   statement?

15                 (Question translated by the

16                 interpreter.)

17         A.  (In English)  No, not really.

18         Q.  (BY MS. REED)  Do you know what a

19   correspondent bank is?

20                 (Question translated by the

21                 interpreter.)

22         A.  (In English)  Yes.

23                 May I ask:  Could you speak a little bit

24   slowly --

25         Q.  (BY MS. REED)  I will --

Page 274

SALIM ESTEFENN

1

2          A.   No.

3          Q.   Did you ever have a bank account at

4     Société Générale Private Banking (Suisse)?

5          A.   Never.

6          Q.   Do you own any CDs currently?

7               (Question translated by the

8               interpreter.)

9          A.   (In English)  No, those . . .

10         Q.   (BY MS. REED)  I'd like you to take a look

11    at your declarations, the two versions, Exhibit 127

12    and 128.

13              Exhibit 127 indicates that it was signed

14    on the 29th of April 2015; is that right?

15         A.   Yes.

16         Q.   That's on the second page.

17              Is that correct?  Is that the date that it

18    was signed?

19         A.   Yes.

20         Q.   Okay.  And today is July 2nd, right?

21         A.   Yes.

22         Q.   So this was just a few months ago that you

23    signed this?

24         A.   Yes.

25         Q.   Is this -- is this document, Exhibit 127,

Page 275

1                    SALIM ESTEFENN

2    the first document you've been asked to sign in this

3    litigation?

4         A.  Yes, because -- yes.

5         Q.  Did you understand it to be an important

6    document?

7         A.  Yes.

8         Q.  Did you understand it to be important that

9    it be correct?

10        A.  Yes.

11        Q.  Did you read the last paragraph before

12   your signature stating that this was made under

13   penalty of perjury?

14        A.  Yes.

15        Q.  Do you know what perjury is?

16        A.  Yes, I would say like --

17             (Witness speaking to the

18             interpreter in Spanish.)

19             THE INTERPRETER:  Like a penalty.

20        A.  (In English)  Like a penalty, yeah.

21        Q.  (BY MR. BRINKMAN)  But what is perjury?

22             (Question translated by the

23             interpreter.)

24        A.  (In English)  It's like I have to say the

25   truth, yeah.  I have to say truth.  Perjury is that

Page 276

1                          SALIM ESTEFENN

2      meaning.

3                     (Witness speaking to the

4                     interpreter in Spanish.)

5           A.   (Through the interpreter)  I am unable to

6      tell lies.

7           Q.   (BY MS. REED)  Right.  And you said under

8      penalty of perjury that everything in this document,

9      which is only one page long, really, was true and

10     correct, correct?

11          A.   Yes.

12          Q.   Okay.  So the first -- there are only six

13     paragraphs in this document, right?

14          A.   (Moving head up and down.)

15          Q.   Right?

16          A.   Yes.

17          Q.   I need you to answer out loud just so the

18     court reporter can get that.

19               And the first one says that you are at

20     least 21 years old and competent to make the

21     declaration, right?

22          A.   Yes.

23          Q.   That statement was true and correct when

24     you made it, right?

25          A.   Yes.

Page 277

1                     SALIM ESTEFENN

2          Q.  And so you repeated it exactly in your

3     second declaration, Exhibit 128?

4          A.  Almost the same, yeah, I made a mistake,

5     just like I knew I had made a --

6          Q.  I need you -- I know you -- you'd like to

7     explain.  I need you to just answer the question I've

8     asked, and I'll -- if I need an explanation from you,

9     I'll ask you for an explanation --

10         A.  Okay.

11         Q.  -- okay?

12            So Paragraph 1 at least you were happy

13     with because you repeated it in your second

14     declaration, right?

15         A.  Yes.

16         Q.  So that was a correct statement?

17         A.  Yes.

18         Q.  Okay.  And it was true?

19         A.  Yes.

20         Q.  Paragraph 2, you corrected the spelling of

21     Colombia, right?

22         A.  Yes.

23         Q.  Did you catch that misspelling or did

24     someone else catch it?

25         A.  Someone else.  I didn't.

Page 278

1                    SALIM ESTEFENN

2          Q.   Someone else caught it?

3          A.   Yeah.

4          Q.   Okay.   When Exhibit 127 first came to you,

5     was it in this form or did you make changes to it

6     before you signed it in April?

7                    (Question translated by the

8                    interpreter.)

9          A.   (In English)   I -- I just put information

10    here in the Point 3.   That's the change I did,

11    basically.

12         Q.   (BY MS. REED)   So when Exhibit 127 came to

13    you, the items that are behind letters (a), (b), (c),

14    (D) in Paragraph 3 were blank and you filled in the

15    dates that we --

16         A.   I filled in --

17         Q.   -- see here.

18         A.   -- yes.

19         Q.   What did you use to fill in those dates?

20         A.   The statement that I had.

21         Q.   Which statement?

22         A.   It's -- Vantis send me, just on that --

23    one you had minutes ago, one statement.   This one

24    that Vantis sent us.

25         Q.   Is it an exhibit we've used today?

App. 1737

Page 279

1                    SALIM ESTEFENN

2                    MR. MORGENSTERN:  118.

3          Q.  (BY MS. REED)  Exhibit 118?

4          A.  118.  Just -- yes, 118.

5          Q.  Is this the only -- Exhibit 118, is this

6    the only document that you looked at to fill in the

7    blank spaces in Exhibit 127 --

8          A.  Yes.

9          Q.  -- when you were given --

10         A.  Yes.

11         Q.  I have to ask you to wait --

12                   MR. MORGENSTERN:  Let her finish

13   her question --

14         Q.  (BY MS. REED)  -- or we get --

15                   MR. MORGENSTERN:  -- before you

16   answer.

17         Q.  (BY MS. REED)  -- our court reporter gets

18   tangled up and your "yes" will be in the middle of my

19   question, okay?

20         A.  Okay.

21         Q.  Okay.  So is Exhibit 118 the only document

22   that you used to complete Exhibit 127?

23         A.  Point 3, yes.

24         Q.  You did not look at any of, for example,

25   the claims you'd actually made to the receiver in

Page 280

1                          SALIM ESTEFENN

2    completing Exhibit 127?

3          A.  Basically I used 118 because the claims

4    has at the same time the same information that 118 --

5    Exhibit 118 has.

6          Q.  Okay.  I'm -- I'm -- what I'm trying to

7    clarify is that in -- in completing and signing

8    Exhibit 127, is Exhibit 118 the only document you

9    looked at?

10         A.  Yes.

11         Q.  You did not look at your claim that you'd

12   submitted with the receiver?

13         A.  For this declaration, yes --

14         Q.  Yes.

15         A.  -- the only one.

16         Q.  That's the only one.

17             Okay.  So we've established that other

18   than the misspelling of Colombia, which someone else

19   caught, Paragraph 2 in Exhibit 127 was correct when

20   it was made and is repeated in Exhibit 128; is that

21   right?

22         A.  Yes.

23         Q.  Okay.  Paragraph 3, the first statement

24   is, "I am the trustee for Esturicol Trust," correct?

25         A.  Yes.

Page 281

1                   SALIM ESTEFENN

2         Q.  And this is Exhibit 127.  And we've

3  established that was a false statement when you made

4  it --

5         A.  Yes.

6         Q.  -- right?  Okay.

7              So that was false.  You are not and never

8  were the trustee of Esturicol Trust, correct?

9                   (Question translated by the

10                  interpreter.)

11        A.  (In English)  The -- the trustee -- it's a

12  trust -- trustee, no, I -- I was -- no, I was

13  beneficiary.

14        Q.  (BY MS. REED)  Right.  You were never the

15  trustee of Esturicol Trust?

16        A.  Yes.

17        Q.  So that first part of Paragraph 3 is

18  false?

19                  (Question translated by the

20                  interpreter.)

21        A.  (In English)  I made a mistake, yeah.

22        Q.  (BY MS. REED)  The next part of

23  Paragraph 3 says, "which is the beneficial owner of

24  certificates of deposit issued by the Stanford

25  International Bank on or around the following dates."

Page 282

1                    SALIM ESTEFENN

2              Do you see that?

3         A.   Which?  This one?

4         Q.   The portion of the sentence that follows

5    "I am the trustee" --

6         A.   Okay.  Yeah.

7         Q.   So you see the portion of Paragraph 3

8    which says that Esturicol Trust is the beneficial

9    owner of certificates of deposit issued by the

10   Stanford International Bank on -- on or around the

11   following dates, and then there are dates listed --

12        A.   Yes.

13        Q.   -- correct?

14        A.   Correct.

15        Q.   Now, looking at Exhibit 118, it's clear

16   that you took the dates in 3(a), (b), (c), and (d)

17   from Exhibit 118.  Do you see that they match?

18        A.   Yes.

19        Q.   So the first is your express account, 30

20   April 2002, right?

21        A.   (Moving head up and down)  Yes.

22        Q.   Okay.  Your express account was not a CD,

23   was it?

24        A.   No.

25        Q.   So that's another statement that is not

Page 283

1                        SALIM ESTEFENN

2    true in this declaration, Exhibit 127?

3          A.  No, it's true.  Yes, it is true.

4          Q.  You never had -- Esturicol Trust never had

5    a CD?

6          A.  No, no, no.  I mean, it's -- it's true

7    that this is the date that -- of the express account.

8          Q.  Right.

9          A.  Yeah, it's true.

10         Q.  But your -- but your declaration says

11   that's the date that the Esturicol Trust had a CD

12   issued by Stanford International Bank --

13         A.  Yes.

14         Q.  -- and that's not true?

15         A.  It's not a CD, it was an express account.

16         Q.  Right.  So that statement, 3(a), is false?

17         A.  It was another mistake, just that.

18         Q.  Well, it's false, it's not correct --

19         A.  Yes.

20         Q.  -- right?  So it's false.

21             Now, on 3(b), (c), and (d), it looks like

22   on Exhibit 128 you've added the issue date, the

23   original issue date, July 28, 1999, for example,

24   under (a), which transfers over from the original

25   3(b), then you added "last renewed on or around

Page 284

1                        SALIM ESTEFENN

2       August 18, 2008."  Why did you add that?

3              A.  Just to give information that we have

4       renewed that -- those -- those CDs.

5              Q.  So when you filled this out in 2015, you

6       weren't aware that CDs that you originally had issued

7       in 1999 had been renewed after 1999?

8              A.  I knew.

9              Q.  Why didn't you include that information in

10      the first declaration?

11             A.  Because I just put the information when it

12      was created, was opened the CD, not when it was

13      renewed, but I put the information of the date

14      when -- in --

15                    (Witness speaking to the

16                    interpreter in Spanish.)

17             A.  (In English)  On the day it was created.

18             A.  (Through the interpreter)  The date when

19      it was created.

20             Q.  (BY MS. REED)  Okay.  Was it your idea to

21      add to each of the subparagraphs of Paragraph 3 the

22      last renewed on --

23             A.  Was just to clarify.

24             Q.  -- phrase?

25                    I'm asking whether it was your idea --

Page 285

1                     SALIM ESTEFENN

2          A.   It was --

3          Q.   -- to add --

4          A.   -- no, it was my lawyer idea.

5          Q.   Okay.   You also changed the language in

6    the body -- the body of Paragraph 3.   Initially you'd

7    said, "The beneficial owner of certificates of

8    deposit issued by the Stanford International Bank on

9    or around the following dates."   You changed it to,

10   "Certificates of deposit in the Stanford

11   International Bank including those CDs dated on or

12   around."   You took out the "issued" language and

13   changed it to -- changed it to "CDs dated on or

14   around."   Why did you make that change?

15         A.   To clarify.

16         Q.   Why does that make it more clear?

17         A.   Because you see the date you open the

18   account, was opened the account, and the date it was

19   renewed, just to clarify.

20         Q.   Whose idea was it to make that change or

21   was it your idea to make that change?

22         A.   Yeah.

23         Q.   It was your idea?

24         A.   No, it was -- I mean, it was -- we spoke

25   about it and just you want -- we want to be -- to

Page 286

1                     SALIM ESTEFENN

2    clarify.

3           Q.  In Paragraph 4, you stated --

4           A.  Excuse me.  127 or 128?

5           Q.  Let's start with original --

6           A.  Okay.

7           Q.  -- 127.  You wrote, "In relation to the

8    aforementioned SIBL CDs, I have submitted claims to

9    the United States receiver, Ralph S. Janvey,"

10   correct?

11          A.  Yeah.

12          Q.  And then you changed it to, in

13   Exhibit 128, "In relation to the aforementioned SIBL

14   CDs, the Esturicol Trust and the Salesur Trust -- II

15   Trust have submitted claims to the United States

16   receiver, Ralph S. Janvey," correct?

17          A.  Yes.

18          Q.  And so is the Exhibit 128, the -- the

19   July 1st version --

20          A.  Yes.

21          Q.  -- is that correct?

22          A.  Yes.

23          Q.  And so the first version was not correct,

24   you didn't individually submit those claims?

25          A.  Yes, just to clarify, the same case, just

Page 287

1                    SALIM ESTEFENN

2    to clarify because I was not trustee of Esturicol.  I

3    was --

4          Q.  Well, to make it correct.

5          A.  Correct --

6          Q.  Right?

7          A.  -- yeah.

8          Q.  It's --

9          A.  Was solving --

10         Q.  -- not just to clarify --

11         A.  Was solving my mistake.

12         Q.  Right.  So it's to make it correct?

13         A.  Yes.

14         Q.  Okay.  So in Paragraph 4, you're

15   acknowledging that, in fact, you personally did not

16   submit the claims; the trust submitted the claims,

17   right?

18         A.  Yes, I am the trustee and beneficiary,

19   but, yes.

20         Q.  Right.  Well, you changed it to say the

21   trust submitted the claims --

22         A.  Yes.

23         Q.  -- correct?

24            But in Paragraph 5, you kept the language

25   saying, "the receiver has recognized and allowed my

Page 288

1                    SALIM ESTEFENN

2  claims."  So you didn't change that to be the trust?

3        A.  Yeah.  Yes.

4        Q.  Is that another mistake?

5             MR. MORGENSTERN:  Objection.

6        A.  When I say my name, I refer to Esturicol

7  and -- and Salesur II Trust.

8             THE REPORTER:  You refer to what?

9             THE WITNESS:  I refer to Esturicol

10  and Salesur, the second.

11        Q.  (BY MS. REED)  But you acknowledge in

12  Paragraph 4 they're not your claims, they're the

13  trust's claims?

14        A.  I know -- I know in this case, I referred

15  to -- when I said my claims, I referred to Esturicol;

16  and when I beneficiary and Salesur II when I am the

17  trustee.

18        Q.  Well, I mean, you originally said "I've

19  submitted claims" and you change it to "the trusts

20  have submitted claims," but you didn't change

21  Paragraph 5, right?

22        A.  Yes.

23        Q.  Okay.  And, in fact, on Paragraph 3, we've

24  established that, in fact, the Salesur II Trust has

25  been dissolved.  And so it is still incorrect to say

Page 289

1                         SALIM ESTEFENN

2      that you are the trustee for the Salesur II Trust,

3      correct?

4              A.  Could you -- could you repeat it?

5              Q.  I can.  We established in Exhibit 122 that

6      showed the dissolution --

7              A.  122?

8              Q.  122.  And you can pull that out, if you'd

9      like.

10             A.  Okay.

11             Q.  We established in Exhibit 122 that, in

12     fact, you revoked the -- the Salesur II Trust has

13     been revoked as of October 2014, correct?

14             A.  Yes.

15             Q.  And so even yesterday when you signed the

16     declaration swearing that you are the trustee for

17     this trust, it doesn't exist, does it?

18             A.  Salesur, you mean?

19             Q.  Salesur II.

20             A.  Yes.

21             Q.  Yes, it does exist or no, it doesn't

22     exist?

23             A.  It doesn't exist anymore.

24             Q.  Right.  So this statement is still not

25     true, because you are not the trustee; this trust

Page 290

1               SALIM ESTEFENN

2    doesn't exist?

3            A.  Of Salesur, you mean?

4            Q.  Salesur II.

5            A.  Yes, it doesn't exist, but if you want to,

6    I can give you an explanation about this.

7            Q.  First, I'd like you to just confirm for me

8    that statement --

9            A.  Yes.

10           Q.  -- is still not true.

11           A.  Yes.

12           Q.  So even when you corrected it yesterday,

13   this statement that you are the trustee for the

14   Salesur II Trust is still a false statement?

15           A.  Yes.

16           Q.  Okay.  Paragraph 6 states, "I am willing

17   and able to take on the responsibilities demanded of

18   me as a class representative in this matter, as I

19   understand those responsibilities to include

20   attending deposition and trial and protecting the

21   rights of absent class members."

22               Do you see that sentence?

23       A.  Yes.

24       Q.  What are the responsibilities of a class

25   representative as you understand them?

App. 1749