# EXHIBIT 82

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| PEGGY ROIF ROTSTAIN, et al. on behalf of themselves and all others similarly situated<br><br>v.<br><br><br>TRUSTMARK NATIONAL BANK, et al., Defendants. | Civil Action No. 3:09-CV-02384-N-BG<br><br>Judge: Hon. David C. Godbey<br><br>Mag.: Hon. Nancy M. Koenig |

## DECLARATION OF PROFESSOR KENNETH M. LEHN

REFERENCES INFORMATION DESIGNATED CONFIDENTIAL BY PLAINTIFFS

## I.     Qualifications

1.      I am the Samuel A. McCullough Professor of Finance in the Joseph M. Katz School of Business at the University of Pittsburgh.  I teach undergraduate and graduate level courses in finance, including courses on business valuation, corporate restructuring, and corporate governance.  I also am an affiliated professor of law at the University of Pittsburgh.  I have published more than 40 scholarly papers, primarily in the field of corporate finance.  I have served on the editorial boards of several scholarly journals and am a founding editor of the *Journal of Corporate Finance*.

2.      I was chief economist of the Securities and Exchange Commission ("SEC") from 1987 to 1991 and deputy chief economist from 1984 to 1985.  During my time at the SEC, my staff and I assisted the SEC's division of enforcement on dozens of matters involving alleged violations of U.S. securities laws.  Much of this work involved analysis of whether specific information was material to investors.  Since leaving the SEC, I have been retained by various parties in litigation, including both plaintiffs and defendants to opine on, among other issues, materiality, loss causation and damages.  On multiple occasions, I have submitted reports and provided testimony on issues related to class certification.  I also have been retained several times to serve as an independent distribution consultant as part of settlements between mutual fund advisers and the SEC.  In this role, I identified losses incurred by mutual fund investors because of alleged wrongdoing by the fund advisors and oversaw the distribution of more than $500 million to investors.

3.      I received a B.A. in economics from Waynesburg College in 1975, an M.A. in economics from Miami University in 1976, and a Ph.D. in economics from Washington University in 1981.  My *curriculum vitae*, which lists my publications and recent testimony, is attached hereto as Exhibit A.

## II.     Assignment

4.      Plaintiffs bring this action against The Toronto-Dominion Bank ("TD Bank"), Trustmark National Bank ("Trustmark"), HSBC Bank plc ("HSBC"), Société Générale Private Banking

(Suisse), S.A. ("SG Suisse"), Independent Bank f/k/a Bank of Houston ("BoH"), and Blaise
Friedli (collectively, "Defendant Banks").[1]

5.      I have been asked by counsel for TD Bank and Trustmark:

- to review Plaintiffs' allegations in this matter as presented in the Complaint and the Memorandum Supporting Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel, dated April 30, 2015 ("Plaintiffs' Class Certification Brief"); and

- to opine on whether Plaintiffs have presented a reliable damages methodology that (i) is tied to Defendant Banks' alleged misconduct; and (ii) can be applied on a class-wide basis.

6.      I have been assisted in this matter by staff at Cornerstone Research ("Cornerstone"), an
economics consulting firm.

7.      As part of this engagement, I have reviewed various materials, including, among others,
the Complaint, Plaintiffs' Class Certification Brief and exhibits, deposition testimony from
named Plaintiffs, court filings, reports from the U.S. Receiver for the Stanford Entities, Ralph S.
Janvey ("Receiver"), and reports issued by the SEC.  A list of materials I have considered in
forming my opinions is contained in Exhibit B attached hereto.

8.      My billing rate in this matter is $1,050 per hour.  In addition, I will receive a portion of
Cornerstone's non-officer staff billings collected in support of my work in this matter.  I
understand that any payments I receive are not contingent or based on the content of my opinions
or the outcome of this or any other matter.  My work in this matter is ongoing, and I reserve the
right to supplement my current analysis if additional information becomes available.

## III.    Summary of Opinions

9.      In my opinion, Plaintiffs fail to present a reliable damages methodology.  Specifically:

- Plaintiffs fail to present a damages methodology that is tied to the alleged misconduct of Defendant Banks.

---

[1] Plaintiffs' Second Amended Class Action Complaint, May 1, 2015 (Dkt. No. 279) ("Complaint"), at p. 1.

- The Receiver's Net Loss Approach (defined below) is not an appropriate methodology for calculating damages resulting from Defendant Banks' alleged misconduct on a class-wide basis for several reasons, including: (i) the Receiver's estimate of Net Losses (defined below) is a mathematical calculation intended to measure claims, not damages, in this or any other class action case, (ii) it is not tied to the alleged misconduct of Defendant Banks as it does not contemplate losses that investors would have incurred "but for" the Defendant Banks' alleged misconduct, and (iii) verification of the Receiver's calculations requires individualized inquiry.

- Plaintiffs fail to present a damages methodology that can be applied on a class-wide basis.

- Plaintiffs fail to address potential conflicts among members of the purported class that make a class-wide damages methodology inappropriate.

The bases for my opinion are set forth below.

## IV.    Background and Allegations

10.    Stanford International Bank ("SIB") was founded by Robert Allen Stanford ("R.A. Stanford") in 1985.[2]  SIB was an Antiguan-based private bank that marketed investment products to clients around the world through a network of brokers and financial advisors.[3]  SIB's core investment products were certificates of deposit ("CDs") with fixed or variable interest rates and maturities of one month to five years.[4]  SIB offered two main products that promised investors a fixed interest rate: "FixedCD" and "FlexCD."  The FixedCD product penalized withdrawals of interest for balances of less than $250,000 and early withdrawals of principal.  The FlexCD allowed periodic withdrawals of interest and early withdrawals of up to 25 percent of principal without penalty, but offered a lower interest rate than the FixedCD product.[5]  The FixedCD and FlexCD products had an "automatic rollover" feature that reinvested investors' money into new

---

[2] SIB Internal Training & Marketing Manual, March 2008, at p. 5.  The company was started in Montserrat under the name Guardian National Bank.  It was moved to Antigua in 1990 and renamed Stanford International Bank.  ("Allen Stanford Sentenced to 110 Years in Prison for Orchestrating $7 Billion Investment Fraud Scheme," Department of Justice Press Release, June 14th, 2012).

[3] SIB Internal Training & Marketing Manual, March 2008, at p. 5.

[4] SIB Internal Training & Marketing Manual, March 2008, at p. 11.

[5] SIB Internal Training & Marketing Manual, March 2008, at pp. 11–15.

CDs automatically at maturity.  In addition, SIB offered investors a variable interest rate through its "Index-Linked CD" product, which prohibited withdrawals for the first year and penalized withdrawals of principal thereafter until maturity.  Fixed rate CDs were denominated in major world currencies, while variable rate CDs were denominated in U.S. Dollars only.[6]  As of February 22, 2009, SIB had approximately $7.2 billion of CDs outstanding to over twenty thousand investors.[7]

11.     SIB was one of over 100 companies that were owned directly or indirectly by R.A. Stanford.[8]  The principal businesses of these companies involved financial services such as banking, broker dealer operations, capital management, trust services, coins and bullion, merchant banking, and private equity.[9]  In this report, I refer to all of these companies as "Stanford Entities."

12.     The SEC Staff was examining the Stanford Entities as early as 1997.[10]  The SEC began a formal investigation on October 26, 2006.[11]  On February 17, 2009, the SEC charged R.A. Stanford and three of his companies (SIB, broker-dealer and investment adviser Stanford Group Company, and investment adviser Stanford Capital Management) for orchestrating a fraudulent investment scheme.[12]  Pursuant to the SEC's request, a U.S. district court entered a temporary restraining order, froze the assets of R.A. Stanford and his companies, and appointed a receiver to marshal those assets.[13]

13.     Plaintiffs' allegations stem from the fact that Defendant Banks provided banking and other financial services for the Stanford Entities.  For example, Plaintiffs allege that:

- TD Bank "provided correspondent banking, investment and other financial services,"[14]

---

[6] SIB Internal Training & Marketing Manual, March 2008, at p. 11.

[7] Report of the Receiver, April 23, 2009 (*Securities and Exchange Commission v. Stanford International Bank, LTD., et al.*) ("Receiver's 2009 Report"), at p. 12.

[8] Receiver's 2009 Report, at p. 5.

[9] Receiver's 2009 Report, at p. 6.

[10] "Investigation of the SEC's Response to Concerns Regarding Robert Allen Stanford's Alleged Ponzi Scheme," U.S. SEC Office of Inspector General, Case No. OIG–526, March 31, 2010, at p. 16.

[11] "Investigation of the SEC's Response to Concerns Regarding Robert Allen Stanford's Alleged Ponzi Scheme," U.S. SEC Office of Inspector General, Case No. OIG–526, March 31, 2010, at p. 97.

[12] "SEC Obtains Temporary Restraining Order, Asset Freeze, and Other Relief Against Defendants," SEC Litigation Release, February 17, 2009; "SEC Charges R. Allen Stanford, Stanford International Bank for Multi-Billion Dollar Investment Scheme," SEC Press Release, February 17, 2009.

[13] "SEC Obtains Temporary Restraining Order, Asset Freeze, and Other Relief Against Defendants," SEC Press Release No. 20901, February 17, 2009.

[14] Plaintiffs' Class Certification Brief, at pp. 12–13.

Page 4

- Trustmark processed investors' checks that were sent from Antigua to the United States,[15]
- HSBC processed "investors' purchases of SIB[]'s CDs in Euros and Pounds Sterling,"[16]
- BoH transferred SIB's CD investor funds "to various other Stanford Entities' operational accounts,"[17] and
- SG Suisse serviced a personal account for R.A. Stanford and provided him with a personal loan.[18]

14.    Plaintiffs assert that these services performed by the Defendant Banks enabled R.A. Stanford's fraud.[19]  Plaintiffs also allege that the Defendant Banks had "the information required to expose the Stanford *Ponzi* scheme."[20]  With respect to TD Bank, for example, Plaintiffs allege that TD Bank should have inferred Stanford's fraud from "frequent withdrawals and deposits of huge round sums in the tens of millions of dollars" and "the transfer of investor funds to other Stanford Entities that SIB[] never disclosed to its investors,"[21] and that its banking relationship should have "provid[ed] TD Bank with knowledge and awareness of the Stanford [f]raud."[22] Similarly, Plaintiffs allege that (i) Trustmark "observed that SIB[] CD investor funds were routinely transferred in large, round sums to other Stanford Entities;"[23] (ii) HSBC saw "investor funds deposited into…[SIB's] HSBC accounts s[it] largely uninvested;"[24] (iii) BoH knew that its transactions were "inconsistent with how SIB[] described its operations and investments;"[25] and (iv) SG Suisse should have observed "that R.A. Stanford was using investor funds in a way that was not revealed to investors."[26]  With this alleged information, Plaintiffs claim that Defendant

---

[15] Plaintiffs' Class Certification Brief, at p. 12.
[16] Plaintiffs' Class Certification Brief, at p. 13.
[17] Plaintiffs' Class Certification Brief, at p. 14.
[18] Plaintiffs' Class Certification Brief, at p. 15.
[19] Plaintiffs' Class Certification Brief, at p. 5.
[20] Plaintiffs' Class Certification Brief, at p. 3.
[21] Complaint, at ¶ 6.
[22] Complaint, at ¶ 345.
[23] Plaintiffs' Class Certification Brief, at p. 12.
[24] Plaintiffs' Class Certification Brief, at p. 13.
[25] Plaintiffs' Class Certification Brief, at p. 14.
[26] Complaint, at ¶ 9.

Banks should have "severed their banking relationships with all Stanford Entities—as other banks before them had done."[27]

15.     Plaintiffs seek to certify a class of more than 17,000 investors in SIB's CD products.[28] As defined in Plaintiffs' Class Certification Brief, the purported class consists of "[a]ll persons who invested in SIB[] CD(s) from August 23, 2004 – February 16, 2009, inclusive, and whose claims for losses related to SIB[] CDs are recognized, authorized, and calculated by the United States Receiver for the Stanford Entities, Ralph S. Janvey."[29]

16.     Plaintiffs assert that damages for the purported class members can be quantified by calculations performed by the Receiver and his team as part of the Receivership claims process. Plaintiffs propose that "each [Plaintiff] should recover their losses based on the same simple calculation that can be readily made" from the data collected by the Receiver.[30]  The Receiver's calculations—which were intended to measure claims, not damages associated with alleged misconduct by specific Defendants—employ a "net loss" approach ("Receiver's Net Loss Approach").[31]  Under the Receiver's Net Loss Approach, each purported class member's loss (referred to as the "Net Loss" or "Allowed Claim Amount") "is calculated on a 'money in, money out' basis—*i.e.*, money paid into the scheme minus any money returned to the investor."[32]  The Receiver does not recognize "any fictitious, unpaid interest that has accrued on SIB CDs," given that such interest was the result of a *Ponzi* scheme.[33]  Plaintiffs assert that "questions of

---

[27] Plaintiffs' Class Certification Brief, at p. 4.  Plaintiffs also claim that Defendant Banks "should have frozen the accounts of the Stanford Entities."  Complaint, at ¶ 4.  It is not clear what Plaintiffs mean by "freezing" Stanford's accounts and whether or not Defendant Banks had any authority to do so.  For the purposes of this report, I consider that the action available to a Defendant Bank in the but for world was to sever its banking relationship with the Stanford Entities.

[28] Plaintiffs' Class Certification Brief, at p. 7.

[29] Plaintiffs' Class Certification Brief, at p. 17.  In their Complaint, Plaintiffs include a footnote that states:  "In addition, or in the alternative, the Court may also wish to certify a class comprised of all persons who invested in SIB[] CD(s) on or before February 16, 2009 and whose claims for losses related to SIB[] CDs are recognized and authorized by the United States Receiver for the Stanford Entities, Ralph S. Janvey, or any other classes or subclasses that the Court deems appropriate." (Complaint, at ¶ 420).

[30] Plaintiffs' Class Certification Brief, at p. 6.

[31] Receiver's Motion for Approval of Interim Distribution Plan, January 11, 2013 ("Receiver's Motion for Approval of Interim Distribution Plan"), at p. 1.  Note that while the Plaintiffs refer to a "simple calculation that can be readily made from the data collected by the Court-appointed Receiver," they never explicitly state what the simple calculation is.  In this report, I assume that the Plaintiffs are referring to the Receiver's Net Loss Approach, as described in Receiver's Motion of Approval of Interim Distribution Plan.

[32] Receiver's Motion for Approval of Interim Distribution Plan, at p. 9.

[33] Receiver's Motion for Approval of Interim Distribution Plan at pp. 9, 17.

damages can be proven on a class-wide basis by the Receiver's team, specifically the Receiver's retained forensic accounting firm, FTI."[34]

## V.      Plaintiffs Fail to Present a Reliable Damages Methodology

17.      An appropriate methodology to estimate damages associated with a defendant's (or a group of defendants') alleged misconduct should take into account a plaintiff's economic circumstances in two states of the world: (i) the actual world and (ii) a "but for" world.  In the actual world, a plaintiff's loss is the actual loss suffered.  In the but for world, a plaintiff's loss is the loss that would have resulted if the defendant had not engaged in the alleged misconduct. Damages are then calculated as the difference between the loss that materialized in the actual world and the loss, if any, that would have materialized in the but for world.

18.      An appropriate damages methodology in a class action case should be applicable on a class-wide basis.  It is my understanding that the damages methodology should align the purported class members' interests and should not require individualized inquiry.

### A.      Plaintiffs Fail to Present a Damages Methodology That Is Tied to the Alleged Misconduct of Defendant Banks

19.      I understand that, in this litigation to date, Plaintiffs have not put forth an expert report or declaration regarding damages.  Moreover, in the Complaint and Plaintiffs' Class Certification Brief, Plaintiffs do not articulate a but for world that would allow one to assess damages caused by Defendants' alleged misconduct.  While Plaintiffs claim that Defendant Banks "should have severed their banking relationships with all Stanford Entities,"[35] they do not present any analysis to address whether or not, and to what extent, purported class members' losses would have been affected if a Defendant Bank had severed its banking relationship with the Stanford Entities.  In order to address these questions, one has to define a but for world by identifying: (i) the specific actions Defendant Banks would have taken in the purported but for world, (ii) the timing of these actions, and (iii) the effect these actions would have had on numerous parties, including the Stanford Entities, other banks, regulators and investors.

_____

[34] Plaintiffs' Class Certification Brief, at p. 55.
[35] Plaintiffs' Class Certification Brief, at p. 4.

20.     Plaintiffs fail to define a but for world that considers these issues.  Without defining a but for world, it is not possible to develop a reliable damages methodology that ties to Defendant Banks' alleged misconduct.  Moreover, as I illustrate in Section V.C and Section VI below, the Plaintiffs' allegations could give rise to multiple but for worlds, which would require individualized inquiry and present potential conflicts among the purported class members.

**B.     Receiver's Net Loss Approach Is Not an Appropriate Methodology for Calculating Damages Resulting from Defendant Banks' Alleged Misconduct on a Class-Wide Basis**

21.     Instead of articulating a damages methodology that is tied to the alleged misconduct of Defendant Banks, Plaintiffs assert that damages for purported class members can be quantified according to the Receiver's Net Loss Approach.[36]  Plaintiffs state that the purported class "is limited to include only those investors whose claims have been allowed by the Receiver" and "that number exceeds 17,000 investors with over $4.4 billion in approved claims."[37]  As a basis for these numbers, the Plaintiffs refer to the Receiver's statement about the CD claims for which the Receiver sent "Notices of Determination,"[38] which contains Allowed Claim Amounts determined by the Receiver, using the Receiver's Net Loss Approach.[39]  Since the Receiver's Net Loss Approach presumably takes into account investments made prior to August 23, 2004, the beginning date of Plaintiffs' purported class period, the above cited figures may not be accurate.  To the extent that there are investors for whom the Receiver calculated an Allowed Claim Amount but only invested in Stanford CDs prior to August 23, 2004, those investors would not be members of the purported class, per Plaintiffs' class definition.  Plaintiffs have not explained whether and how such investors could be identified.

---

[36] Plaintiffs' Class Certification Brief, at p. 6.

[37] Plaintiffs' Class Certification Brief, at p. 19, citing Exhibit 11 to Plaintiffs' Class Certification Brief (Supplement to Receiver's 24th Report Regarding the Claims & Distribution Processes, April 28, 2015), at p. 1.

[38] The Receiver states that "Notices of Determination and Amended Notices of Determination had been disseminated with respect to 17,316 unique CD claims. The aggregate Allowed Claim Amount for those claims is $4,468,307,052.43." (Supplement to Receiver's 24th Report Regarding the Claims & Distribution Processes, April 28, 2015, at p. 9).  Notice of Determination is defined as follows: "The Receiver shall provide a written Notice of Determination to each Claimant that submits a Proof of Claim…If the Receiver has disallowed the Claim in whole or in part, the Notice of Determination shall so state and include a statement setting forth the reasons for disallowing the Claim and the date of the Receiver's determination."  (Order, May 4, 2012 (*Securities and Exchange Commission v. Stanford International Bank, LTD., et al.*), at p. 17).

[39] Receiver's Motion for Approval of Interim Distribution Plan, at pp. 9, 10.

22.     The Receiver's Net Loss Approach is a mathematical calculation intended to measure claims—it is not an appropriate methodology for estimating damages associated with Defendant Banks' alleged misconduct on a class-wide basis for a number of reasons, including the following:

- Receiver's Net Loss Approach is a mathematical calculation intended to measure claims, not damages, in this or any other class action case;
- Receiver's Net Loss Approach is not tied to the alleged misconduct of Defendant Banks as it does not contemplate the losses investors would have incurred but for the Defendant Banks' alleged misconduct; and
- Application of the Receiver's Net Loss Approach and verification of its results require individualized inquiry.

Below, I discuss each of these reasons in detail.

### 1.     The Receiver's Net Loss Approach is a mathematical calculation intended to measure claims, not damages, in this or any other class action case

23.     The Receiver presents the Net Loss Approach as a method to be used for *pro rata* distribution of funds from the Receivership Estate.[40]  The goal of identifying a suitable method to distribute funds to investors is distinct from the goal of calculating economic damages resulting from the alleged misconduct of the Defendant Banks.  As such, the Receiver's choice of a Net Loss Approach is governed by factors distinctly different from the calculation of damages.  For example, the Receiver states that using the Net Loss Approach is "equitable because it ensures that all investors who suffered an out-of-pocket loss [in the actual world] receive compensation from the Receivership."[41]  In other places, the Receiver states that the Net Loss Approach is preferable to a different method of distributing receivership assets, the so called "rising tide" method,[42] because it "leads to a more equitable outcome," has a "more even-handed treatment of losses," is "far more cost-effective" in light of the "the financial records of the Stanford

---

[40] Receiver's Motion for Approval of Interim Distribution Plan, at p. 1.
[41] Receiver's Motion for Approval of Interim Distribution Plan, at p. 17.
[42] The Receiver defines the rising tide method as follows: "Under the rising tide method, a claimant would receive nothing if the amount that had been returned to the claimant exceeded the amount of the claimant's pro rata share, even if the claimant suffered an out-of-pocket loss."  (Receiver's Motion for Approval of Interim Distribution Plan, at p. 19).

enterprise, as well as the nature of the information being submitted by claimants in the claims process," and saves the receivership money by "simplifying the distribution process."[43]  In sum, the Receiver's Net Loss Approach is not a damages model.

> **2.**     **The Receiver's Net Loss Approach is not tied to the alleged misconduct of Defendant Banks as it does not contemplate losses investors would have incurred but for the Defendant Banks' alleged misconduct**

24.     The Receiver's Net Loss Approach also is not an appropriate damages methodology because it is not tied to the alleged misconduct of the Defendant Banks.  The Receiver's Net Loss Approach is based *only* on the losses in the actual world and fails to consider an appropriate but for world.  As such, using the Receiver's Net Loss Approach to estimate damages violates the fundamental principle of establishing and calculating damages stemming from a defendant's alleged misconduct.  Because the Receiver's Net Loss Approach was designed for a very different purpose (*i.e.*, distributing funds among claimants), the approach does not address the impact of the Defendant Banks' alleged misconduct on the losses incurred by purported class members.

25.     By proposing the Receiver's Net Loss Approach to estimate class-wide damages, Plaintiffs, in effect, assume that each and every purported class member would have suffered no Net Loss in the but for world.  This assumption implies that purported class members who purchased Stanford CDs and suffered out-of-pocket losses because of R.A. Stanford's (and the Stanford Entities') actions would have avoided all such losses if Defendant Banks had severed their banking relationships with the Stanford Entities.  Plaintiffs fail to establish why this would be the case.  In particular, Plaintiffs do not address how each and every purported class member would have avoided such losses if the Defendant Banks had severed their banking relationship with the Stanford Entities.  In Section V.C below, I provide examples that illustrate why this is unlikely to be the case and why individualized inquiry of purported class members would be necessary in order to test this claim.

---

[43] Receiver's Motion for Approval of Interim Distribution Plan, at p. 20.

26.     The problem with ignoring the but for world in a damages calculation can be illustrated with a simple example. Exhibit C1 shows three hypothetical investors:[44]

- Investor A invests $10,000 in Stanford CDs in October 2008 and does not withdraw any money. Based on the Receiver's Net Loss Approach, his loss is calculated as $10,000.

- Investor B invests $10,000 in Stanford CDs in January 2006 and does not withdraw any money. Based on the Receiver's Net Loss Approach, his loss is calculated as $10,000.

- Investor C invests $10,000 in Stanford CDs in January 2008 and withdraws $5,000 in October 2008. Based on the Receiver's Net Loss Approach, his loss is calculated as $5,000.

27.     Under Plaintiffs' proposed methodology, all three investors would have positive damages by virtue of having out-of-pocket losses in the actual world. In contrast, a damages methodology that takes into account the alleged misconduct of a Defendant Bank would consider the losses that would have resulted in the but for world and whether, and to what extent, they would have differed from actual losses. If Plaintiffs had proposed such a methodology, they would have had to establish the date on which a Defendant Bank would or should have taken a different action. Even if one considers a but for world that specifies the date on which the Defendant Bank allegedly should have severed its relationship, and if one assumes that the severing of these relationships would have revealed the *Ponzi* scheme to all investors, Plaintiffs' proposed methodology still does not measure damages appropriately. To see this, consider the losses for three hypothetical investors in the but for world, as shown in Exhibit C2. For the purpose of illustration, assume in the but for world that a Defendant Bank severs its banking relationship with the Stanford Entities in August 2008, at which point all investors learn of the *Ponzi* scheme and cease dealing with all Stanford Entities. The Net Losses in the but for world would be as follows:

---

[44] I illustrate this point with a hypothetical example because I do not have access to full records detailing the investment history of purported class members.

- Investor A would not have invested $10,000 in Stanford CDs in October 2008, so his Net Loss in the but for world would be zero.  Compared to his Net Loss in the actual world (which is $10,000), his damages would be $10,000.

- Investor B still would invest $10,000 in Stanford CDs in January 2006, so his Net Loss in the but for world would be $10,000.  Compared to his Net Loss in the actual world (which is $10,000), his damages would be zero.

- Investor C still would invest $10,000 in Stanford CDs in January 2008, but Investor C would no longer be able to withdraw $5,000 in October 2008, so his Net Loss in the but for world would be $10,000.  Compared to his Net Loss in the actual world (which is $5,000), his damages would be negative $5,000, *i.e.*, Investor C benefitted from the *Ponzi* scheme going on longer than what Plaintiffs are alleging.

28.    These examples illustrate why Plaintiffs' purported methodology does not measure damages incurred by purported class members.  All three investors have positive Net Losses in the actual world, but based on the timing of the Defendant Bank's action and the investment pattern of individual investors, the impact of the Defendant Banks' alleged misconduct on their losses could be positive, negative or zero.  A methodology that ignores the but for world cannot assess the impact of a Defendant Bank's alleged misconduct on the losses incurred by purported class members.

29.    Moreover, the but for world would be different based on the date a Defendant Bank was supposed to have taken action.  For example, Plaintiffs allege that in August 2008 TD Bank personnel became aware of a Bloomberg article describing an SEC investigation into the Stanford Entities and Stanford CDs and queried Stanford personnel.[45]  Plaintiffs also allege that in November 2006, TD Bank personnel sought due diligence questionnaires completed by Stanford Entities.[46]  Depending on whether TD Bank is assumed to sever its banking relationship with the Stanford Entities in August 2008, November 2006, or some other date, the losses would be different for different purported class members.  Similar questions would apply to other Defendant Banks as well.  For example, Plaintiffs allege that Trustmark personnel sent questions

---

[45] Complaint, at ¶ 342.
[46] Complaint, at ¶ 341.

to Stanford Entities in August 2006, discussed "wire activity" in October 2006, and asked questions about transfers between affiliates in January 2009.[47]  Depending on whether Trustmark is assumed to sever its banking relationship with the Stanford Entities in August 2006, October 2006, January 2009, or some other date, the losses would be different for different purported class members.

30.     Even if Plaintiffs had specified a date on which a Defendant Bank allegedly should have severed its relationship with the Stanford Entities, the calculation of losses in the but for world requires assessment of the impact of that Defendant Bank's action on individual investors.  Such an assessment entails addressing various questions, such as whether or not the Defendant Bank's action would be public information, whether or not a particular investor would learn of the Defendant Bank's action, whether or not the investor would act on that information, whether or not the Stanford Entities would replace the Defendant Bank with some other bank, and so forth. I address these questions and similar issues in Section V.C below and explain why individualized inquiry is required to assess the effect of Defendant Banks' alleged misconduct on the losses incurred by purported class members.

### 3.     Application of Receiver's Net Loss Approach and verification of its results require individualized inquiry

31.     The Receiver's Net Loss Approach is based on calculations that are performed and adjusted based on the investment history and supporting documents provided by each investor, which differ across purported class members.  As such, application of the Receiver's Net Loss Approach and verification of its results require individualized inquiry.  Moreover, the Receiver's Net Loss Approach ignores individualized factors that likely would affect the losses of purported class members.

32.     As an initial matter, Plaintiffs have not demonstrated that the Receiver's Net Loss Approach can be calculated reliably.  Indeed, deposition testimony of the named Plaintiffs reveals that the Receiver's Net Loss calculations are contested by the named Plaintiffs themselves.  There is no way to ascertain whether similar issues affect the Net Loss calculations

_____

[47] Complaint, at ¶¶ 243, 245, 252.

Page 13

of other purported class members without going through their individual records and investigating each Plaintiff on an individual basis.[48]

33.     Testimony of the named Plaintiffs demonstrates that some did not understand how the Receiver arrived at the Net Loss amounts and why these amounts differ from their submitted claims.  For example, in his deposition testimony, purported class member and former named plaintiff Gabriel Suarez was asked: "[d]o you know why the receiver disallowed a portion of your claim?" Mr. Suarez responded "I do not."[49]  He objected to the Receiver's calculation due to ███████████████ REDACTED ███████████████[50]  In another example, named Plaintiff Sarah Elson-Rogers submitted a claim of REDACTED to both the Receiver and the Antiguan Joint Liquidators ("Joint Liquidators").[51]  However, her allowed claims were different: the Receiver recognized REDACTED of her claim, while the Joint Liquidators recognized REDACTED.[52]  Asked why she thought the Receiver had reduced her allowed claim, she responded that she did not know but there could be "some exchange rate issues."[53]  These discrepancies illustrate that due to Plaintiffs' varied circumstances, verification of the Receiver's Net Loss determination requires individual inquiry.

34.     It also appears that certain assumptions and exceptions in the Receiver's Net Loss Approach would likely influence Plaintiffs' Net Loss calculations disproportionately, depending on the unique circumstances of individual purported class members.  Under the Receiver's Net Loss Approach, for instance, Plaintiffs "will not be allowed to receive a disproportionate or double recovery" from other sources, such as distributions received from the Joint Liquidators or other lawsuits.[54]  To incorporate these adjustments, the Receiver attempts to deduct recoveries received from other sources from each claimant's distribution.[55]  Such adjustments require individualized inquiry for a number of reasons.

---

[48] I do not have access to the data and materials that would allow me to replicate the Receiver's Net Loss Methodology, such as Allowed Claim Amounts for purported class members, underlying documents used in calculating these, or any details about how the Receiver calculated these amounts.  As such, I am unable to fully verify the reliability of the Receiver's Net Loss calculation.
[49] Deposition of Gabriel Suarez, at p. 198.
[50] Deposition of Gabriel Suarez, at p. 200.
[51] Deposition of Sarah Elson–Rogers, at pp. 296–297.
[52] Deposition of Sarah Elson-Rogers, at pp. 296–297.
[53] Deposition of Sarah Elson-Rogers, at p. 297.
[54] Receiver's Motion for Approval of Interim Distribution Plan, at p. 11.
[55] Receiver's Motion for Approval of Interim Distribution Plan, at p. 12.

Page 14

35.     First, there is not one specific set of lawsuits that uniformly involves all purported class members.  Instead, different purported class members are involved in lawsuits involving different defendants.  For example, ,[56] and named Plaintiff Guthrie Abbott filed a lawsuit against his financial advisor John Mark Holliday.[57]

36.     Second, the filing dates of such lawsuits and the dates on which payments related to the lawsuits were received likely differ across purported class members.  Some purported class members have already received payments as a result of their lawsuits, REDACTED REDACTED [58]  In contrast, Mr. Abbott has not received any payments related to his lawsuit against his financial advisor, Mr. Holliday, as the case has been stayed for more than five years.[59]  Depending on the success or failure of such lawsuits against other third parties, Plaintiffs will likely be treated differently under the Receiver's Net Loss Approach.

37.     Third, the Receiver's ability to know about and account for such collateral payments differs across purported class members.  For example, purported class members could also be class members in other lawsuits, but the Receiver's claim process does not ask for disclosure of class action proceedings where the claimant is not a named plaintiff.  Similarly, claimants also are not required to disclose prospective lawsuits that are not yet filed that may result in future distributions.[60]

38.     Further, the Receiver's ability to calculate an accurate claim is limited by the representations made by purported class members.  To illustrate, consider the circumstances of two named Plaintiffs, Steven Queyrouze and Guthrie Abbott.  REDACTED REDACTED REDACTED [61]  However, during his deposition, Mr. Queyrouze testified that he received REDACTED and a REDACTED payment from the Joint

---

[56] Deposition of Steven Queyrouze, at p. 222.
[57] Deposition of Guthrie Abbott, at p. 85.
[58] Deposition of Steven Queyrouze, at p. 232.
[59] Deposition of Guthrie Abbott, at p. 97.
[60] Stanford Financial Claims Website Frequently Asked Questions, http://www.stanfordfinancialclaims.com/Home/FAQ.
[61] Deposition of Steven Queyrouze, Exhibit 44, at pp. 003072–003077.

Liquidators.[62]  In contrast, Mr. Abbott (together with his wife, Patricia Abbott) filed a lawsuit against their financial advisor in April 2009, but the court stayed the proceedings in 2010 pending the outcome of other litigation.  REDACTED
REDACTED [63]  These examples illustrate that individualized inquiry is required to identify the specific lawsuits in which purported class members are involved and to verify the amount of collateral payments received from such lawsuits (and other sources).

39.     The Receiver's Net Loss Approach also relies on general assumptions to address circumstances that would otherwise require case-by-case adjustments.  For example, the Receiver's Net Loss Approach ignores potential differences in the tax status of individual purported class members.  The "Frequently Asked Questions" section of the Receiver's website indicates that some Plaintiffs may have offset a portion of their losses by claiming a "Theft Loss Deduction" on their 2009 income taxes.[64]  The Receiver's Net Loss calculation ignores these benefits,[65]  which likely differ across purported class members depending on the jurisdictions in which they pay taxes, differences in tax regimes in those jurisdictions, whether the purported class member had any net income that the tax loss could be used to offset, the amount of net income, and whether or not the purported class member claimed the benefit.  For example, named Plaintiffs Sarah Elson-Rogers, Steven Queyrouze, and Guthrie Abbott stated that they claimed losses on their tax returns related to their investments in Stanford CDs, whereas named Plaintiffs Salim Estefenn Uribe and Diana Suarez stated that they did not.[66]

40.     The Receiver's Net Loss Approach also does not account for investors' repayment of so called "preference payments" pursued by the Joint Liquidators.[67]  REDACTED
REDACTED
REDACTED [68] REDACTED

---

[62] Deposition of Steven Queyrouze, at pp. 225, 232.
[63] Deposition of Guthrie Abbott, Exhibit 53, at pp. 000431–000433.
[64] Stanford Financial Claims Website Frequently Asked Questions, http://www.stanfordfinancialclaims.com/Home/FAQ.
[65] Stanford Financial Claims Website, Frequently Asked Questions, http://www.stanfordfinancialclaims.com/Home/FAQ.
[66] Deposition of Sarah Elson Rogers, at pp. 149–150; Deposition of Guthrie Abbott, at pp. 209–210; Deposition of Diana Suarez, at pp. 154–156; Deposition of Steven Queyrouze, at, pp. 186–187; Deposition of Salim Estefenn Uribe, at p. 148.
[67] Receiver's Motion for Approval of Interim Distribution Plan, at p. 9.
[68] Deposition of Guthrie Abbott, Exhibit 52, at pp. 000010–12.

Page 16



REDACTED [69] REDACTED

REDACTED

REDACTED [70] evidence suggests that not all purported class members returned these payments. REDACT

REDACTED

REDACTED [71]  Mr. Abbott

testified that "they wanted me to send them REDACTED on the off chance I might get back 1%…and

that didn't seem like a good exchange."[72]  When asked if he intended to comply with the

obligation, Mr. Abbott responded: "[o]nly if I were ordered by a court to do so."[73] REDACTED

REDACTED

REDACTED [74]  When asked

"[d]id you ever repay any of that money to the estate?" Mr. Suarez responded, "I did not."[75]

Similarly, named Plaintiff Diana Suarez stated that she did not repay this money to the Stanford

estate.[76]  Proposed class members who return preference payments are situated differently than

those who do not, and individualized inquiry would be required to determine whether a proposed

class member intends to return these payments.

41.      More generally, from an economics perspective, there is no reason why preference

payments should be treated differently from withdrawals made prior to August 22, 2008.  These

earlier withdrawals are considered "money out" in the Receiver's Net Loss Approach and are

not, I understand, subject to clawback.  As such, under the Receiver's Net Loss Approach,

purported class members who made withdrawals are treated differently than those who did not.

Moreover, depending on the timing of the withdrawals, purported class members would be

affected differently in alternative but for worlds.  I illustrate these differences in Section VI.

---

[69] Deposition of Guthrie Abbott, Exhibit 52, at pp. 000010–12.
[70] Deposition of Guthrie Abbott, Exhibit 52, at pp. 000010–12.
[71] Deposition of Guthrie Abbott, Exhibit 52, at pp. 000010–12.
[72] Deposition of Guthrie Abbott, at p. 82.
[73] Deposition of Guthrie Abbott, at p. 320.
[74] Deposition of Gabriel Suarez, Exhibit 20, at pp. 000167–70.
[75] Deposition of Gabriel Suarez, at pp. 225–226.
[76] Deposition of Diana Suarez, at pp. 156–157.

### C.  Plaintiffs Fail to Present a Damages Methodology That Can Be Applied on a Class-Wide Basis

42.     To be applied on a class-wide basis, a damages methodology should reflect how investors in different circumstances would learn of a Defendant Bank's severing of its relationship with the Stanford Entities and whether that knowledge would lead different purported class members to take different actions with respect to their SIB investments.  As I explain above, this inquiry would start with identification of a but for world.  In order to define a but for world, one has to identify: (i) the specific actions Defendant Banks would have taken in the purported but for world, (ii) the timing of these actions, and (iii) the effect these actions would have on numerous parties, including the Stanford Entities, other banks, regulators and investors.  Depending on how these issues are addressed, multiple but for worlds could arise.  Assessing the effect of Defendant Banks' alleged misconduct on the losses incurred by a particular purported class member depends on which but for world is proffered, as well as the characteristics and circumstances of each purported class member.  Below, I illustrate why individualized inquiry is necessary to establish how individual class members might have acted if a Defendant Bank had severed its relationship with the Stanford Entities.

43.     The first set of questions about a Defendant Bank's actions in the but for world relate to whether or not proposed class members would become aware of these actions and would ascribe any significance to them.  Specifically, if a Defendant Bank had severed its banking relationship with the Stanford Entities: (i) would this information become publicly available; (ii) would all purported class members have learned that the Defendant Bank took this action; and (iii) would that information register as a "red flag" for an individual class member?  The likelihood that an investor would learn of the Defendant Bank's action and how the investor would act on this knowledge is likely to differ across purported class members.

44.     First, Plaintiffs present no evidence to suggest that individual class members would even know if a Defendant Bank had severed its relationship with the Stanford Entities.  Second, even if a purported class member learns that the Stanford Entities no longer have a relationship with the Defendant Bank, it is not clear that said person would ascribe significance to this information.  This is particularly true for purported class members who had no knowledge of the banking relationship between the Defendant Bank and the Stanford Entities in the first place.

Deposition testimony suggests it would not be unusual if a purported class member had no knowledge of Defendant Banks' banking relationship with the Stanford Entities.  For example, purported class member and former named plaintiff Gabriel Suarez testified that, while he was investing in Stanford CDs, he was not familiar with TD Bank and was not aware that TD Bank played any role or had any involvement in the Stanford operations.[77]  Mr. Suarez testified that he first learned about TD Bank having accounts for Stanford in 2015.[78]  Mr. Suarez also testified that he had not heard of Trustmark before April 2015.[79]  Named Plaintiff Steven Queyrouze testified that at the time he was investing in Stanford CDs, he did not know that TD Bank "played any role in Stanford's bank accounts" and he first learned about it in February of 2009.[80]  Mr. Queyrouze also testified that he cannot recall ever hearing of Trustmark before the lawsuit.[81]  Similarly, named Plaintiff Sarah Elson-Rogers testified that at the time she made her investments, she was not aware that TD Bank "was involved with Stanford in any capacity;"[82] she was not aware of the existence of Bank of Houston;[83] she had not heard of Trustmark and did not know that Trustmark provided banking services for Stanford Entities.[84]

45.     While some purported class members could have been aware of a Defendant Bank's relationship with Stanford Entities, others, similar to the named Plaintiffs, would not have been. Even if the purported class members learned about a Defendant Bank's severing of its relationship, reactions of the first group of purported class members could likely differ from those in the second group.  For example, purported class members who were not aware of TD Bank's relationship with the Stanford Entities may be less likely to ascribe any significance to news that TD Bank had severed its relationship and, therefore, less likely to alter their investment behavior in a meaningful way.  Moreover, purported class members who reside in different countries are likely to be situated differently.  There is no reliable basis to expect that a severing of TD Bank's relationship with the Stanford Entities would affect a German investor to the same extent it would affect a Canadian investor.  Similarly, if Trustmark had severed its

---

[77] Deposition of Gabriel Suarez, at p. 252.
[78] Deposition of Gabriel Suarez, at pp. 252–253.
[79] Deposition of Gabriel Suarez, at p. 268.
[80] Deposition of Steven Queyrouze, at p. 240.
[81] Deposition of Steven Queyrouze, at p. 170.
[82] Deposition of Sarah Elson-Rogers, at p. 276.
[83] Deposition of Sarah Elson-Rogers, at p. 179–180.
[84] Deposition of Sarah Elson-Rogers, at p. 21–22.

banking relationship with the Stanford Entities, there is no reliable basis to expect the effect of this action to be the same for U.S. and U.K. investors.

46.     A second set of questions relate to the actions available to the Stanford Entities once a Defendant Bank severs its banking relationship and the effect of these actions on investor behavior.  For example, if a Defendant Bank (*e.g.*, TD Bank) had severed its banking relationship with the Stanford Entities: (i) could the Stanford Entities have received the same services from another bank; and (ii) if so, would purported class members have behaved differently than they did in the actual world?  The same questions apply to the other Defendant Banks.

47.     If a Defendant Bank had severed its relationship with the Stanford Entities, one potential but for world is one in which the Stanford Entities would be unable to receive the same services from another bank.  However, Plaintiffs provide no reliable basis to assume that this would be the case.  Furthermore, in the Complaint, Plaintiffs state that two banks previously had severed their relationships with Stanford Entities.  They claim that Bank of America provided correspondent banking services to SIB for "approximately one year in the mid-to-late 1990s," stopped these services around 1998 and also stopped providing correspondent banking services to all Caribbean banks.[85]  Plaintiffs also claim that Chase Manhattan Bank had a correspondent banking relationship with Guardian International Bank, Ltd. (the original name of SIB),[86] and ended the relationship, but do not specify the date or provide any source for these allegations.[87]

48.     If it is the case that Bank of America and Chase Manhattan Bank severed relationships with the Stanford Entities in the 1990s, well before R.A. Stanford's *Ponzi* scheme was revealed publicly, this suggests that the severing of a banking relationship with Stanford Entities, in and of itself, would not necessarily affect the operations of the Stanford Entities or reveal the *Ponzi* scheme.  Accordingly, it is not at all apparent that the losses incurred by the purported class members would have been reduced if a Defendant Bank had severed its relationship with the Stanford Entities.

---

[85] Complaint, at ¶¶ 213–215.  Plaintiffs do not provide any source for these allegations.  In particular, it is not clear whether Bank of America ending its relationship with the Stanford Entities was linked to the ending of its relationship with all Caribbean offshore banks.

[86] SIB was started in Montserrat under the name Guardian National Bank.  It was moved to Antigua in 1990 and renamed Stanford International Bank.  ("Allen Stanford Sentenced to 110 Years in Prison for Orchestrating $7 Billion Investment Fraud Scheme," Department of Justice Press Release, June 14th, 2012).

[87] Complaint, at ¶ 212.  Plaintiffs claim that the relationship was "ended due to concerns regarding double endorsed checks." *Id.*

49.     A next set of questions relates to whether or not the actions of regulators would have been affected if a Defendant Bank had severed its relationship with the Stanford Entities.  If it is unlikely that the actions of regulators would have been affected by the severing of a Defendant Bank's relationship with the Stanford Entities, then the likely effect on investors' actions would presumably be small.  Plaintiffs fail to demonstrate that Defendant Banks' banking relationship, or the severing of that relationship, would have any effect on regulators' behavior.

50.     The SEC first started examining Stanford Entities and SIB's sale of CDs in August 1997 and conducted additional examinations in 2002 and 2004.[88]  Plaintiffs provide no reliable basis to conclude that the severing of a Defendant Bank's relationship with the Stanford Entities would have affected the SEC's behavior.  This is further evidenced by the Bank of America example.  Plaintiffs allege that Bank of America stopped providing correspondent banking services to the Stanford Entities around 1998—at a time when the SEC already had started examining the Stanford Entities.  The SEC Report of Investigation, which reviewed the handling of the Stanford Entities' examination, makes no mention of the termination of the relationship between Bank of America and the Stanford Entities.  Furthermore, the SEC Report suggests that the SEC Enforcement Group's inquiry was closed in 1998 due to "lack of U.S. investors affected by the potential fraud and the difficulty of the investigation because it would have to obtain records from Antigua."[89]

51.     Even if one were to assume that a particular investor in the but for world: (i) learned about a Defendant Bank's severance of its banking relationship; and (ii) considered this a potential red flag, determining whether and in what way that investor would change his or her investing behavior requires individualized inquiry.  This is because each investor can be expected to react (or not) depending on his or her own circumstances and preferences, as illustrated by the differences in how purported class members actually reacted to news about the Stanford Entities.  For example, around 2007, named Plaintiff Ruth Alfille de Penhos became aware of a report in the newspaper El Universal suggesting that Stanford was involved with money laundering.[90]  Despite knowledge of and concern about this report, Ms. Alfille de Penhos

---

[88] SEC Report of Investigation, at pp. 18, 19, 22.
[89] SEC Report of Investigation, at p. 18.
[90] Deposition of Ruth Alfille de Penhos, at pp. 86–87.

chose to keep her investments with Stanford based on reassurances from her financial advisor, David Nanes.[91]  She also was reassured by her family that "'if you spoke to David, he's not going to trick you.'"[92]

52.     Numerous purported class members did not react to information that the SEC was collecting information on the Stanford Entities.  For example, in 2005, as part of its ongoing inquiry into the Stanford Entities, the SEC sent letters and questionnaires to Stanford's clients, asking about how the Stanford CDs were marketed to investors.[93]  The SEC Report of Investigation indicated that while this inquiry raised concerns among Stanford investors, many of them continued to invest because their financial advisors represented to them that there was not an issue.[94]  Other information was made public about the SEC investigation in a Bloomberg article released on July 3, 2008.[95]  It is unclear how many Stanford investors had access to this information, but it is clear that many of them continued to invest in Stanford CDs after this information became public knowledge.

53.     Other purported class members may have changed their investment behavior when news regarding suspicions about Stanford Entities was released.  REDACTED
REDACTED
REDACTED [96] REDACTED
REDACTED [97]
Named Plaintiff Steven Queyrouze similarly indicated that he did not have any indication that the CDs might have been part of a *Ponzi* scheme and that he did not hear any news about the SEC investigation.[98]  Mr. Queyrouze testified that he knew that SIB was based in Antigua, that the CDs were not insured by the FDIC, and that the interest rates on the CDs were high, but he did not consider any of these a cause for concern.[99]

---

[91] Deposition of Ruth Alfille de Penhos, at p. 87.
[92] Deposition of Ruth Alfille de Penhos, at p. 87.
[93] SEC Report of Investigation, at pp. 25, 85; Plaintiffs' Class Certification Brief, at p. 15.
[94] SEC Report of Investigation, at p. 25.
[95] "SEC Investigating Stanford Group Offshore-Bank CDs," Bloomberg, July 3, 2008.
[96] Deposition of Guthrie Abbott, Exhibit 55, at p. 000588.
[97] Deposition of Guthrie Abbott, Exhibit 55, at p. 000588.
[98] Deposition of Steven Queyrouze, at p. 163.
[99] Deposition of Steven Queyrouze, at p. 163.

54.     Investors' reactions to the news about the Stanford Entities also would depend on the extent to which investors relied on financial advisors, and the advice they would have received from their financial advisors.  As discussed above, named Plaintiff Alfille de Penhos testified that she discussed the news with her financial advisor and was advised not to act.[100]  Similarly, named Plaintiff Abbott brought his concern about the risk of the CD to his financial advisor, but was convinced to continue investing as he trusted his financial advisor "blindly" and "almost always" deferred to his decisions about investments.[101]  The SEC Report of Investigation also notes that when concerns were raised about the questionnaires sent to Stanford investors, investors who remained as investors in Stanford CDs did so on their financial advisors' advice.[102]

55.     Other factors also could affect how purported class members would have reacted to a severing of a Defendant Bank's relationship with the Stanford Entities.  For example, investors who had a long-standing relationship with SIB and believed they had been earning high returns on their Stanford investments may be less likely to change their investing behavior as compared with newer SIB investors.  Another potentially relevant factor is whether an investor's investments in Stanford CDs represent a material share of the investor's total investment portfolio.  Purported class members are likely to differ with respect to this factor.  For some, investments in Stanford CDs could constitute a major portion of their investments, whereas for others, their holdings of Stanford CDs may constitute a small percentage of the values of their portfolios.[103]  All else equal, purported class members who have most of their wealth invested in Stanford CDs are likely to be especially attentive to news related to SIB.  These examples illustrate that even if one were to assume that a particular investor in the but for world: (i) learned about a Defendant Bank's severing of its banking relationship; and (ii) considered this a potential red flag, determining whether and in what way that investor would change his investing behavior would require individualized inquiry.

---

[100] Deposition of Ruth Alfille De Penhos, at p. 87.

[101] Deposition of Guthrie Abbott, at pp. 31–32.

[102] SEC Report of Investigation, at p. 25.

[103] For example, named Plaintiff Steven Queyrouze testified that after receiving REDACTED from an investment, he invested about REDACTED with Stanford and the rest in different banks, REDACTED of his investments with Stanford was in CDs and the rest was in brokerage accounts that was returned to him.  (Deposition of Steven Queyrouze, at pp. 15–16, 31, 38–40, 68).

56.     The reaction of investors to news that a Defendant Bank had severed its relationship with the Stanford Entities also would likely depend on whether the severing occurred before or after the public disclosure of the Madoff *Ponzi* scheme on December 11, 2008.  It is likely that some purported class members would have reacted differently to information about SIB before and after this date.  Deposition testimony provided in this matter suggests that news of the Madoff *Ponzi* scheme heightened concerns of some investors that their investments in Stanford CDs may not be secure.  For example, named Plaintiff Steven Queyrouze was told by his financial advisor that he could not liquidate his CDs amid news reports on Madoff which "raised a concern about everything."[104]  Therefore, even if one were to assume that a Defendant Bank's severing of its banking relationship with the Stanford Entities would have an effect on the actions of purported class members, the effect would likely be different across purported class members and whether or not it occurred before or after the public disclosure of the Madoff *Ponzi* scheme.

## VI.     Potential Conflicts Among Purported Class Members

57.     As discussed above, Plaintiffs have failed to demonstrate a reliable methodology for calculating class-wide damages, largely because they have not set forth a but for world that can be used to estimate the losses that purported class members would have incurred but for the Defendant Banks' alleged misconduct.  Setting this issue aside, even if one hypothetically assumes a but for world that is highly favorable to Plaintiffs, potential conflicts exist among purported class members.

58.     To illustrate, hypothetically assume that but for a Defendant Banks' alleged misconduct, the *Ponzi* scheme would have been disclosed publicly, and the Stanford Entities would have ceased to operate.  Even under this extreme assumption, for which Plaintiffs have provided no evidence, there are multiple but for worlds depending on the date of the Defendant Bank's action (the "severance date") and the disclosure of the *Ponzi* scheme to the public (the "disclosure date").  The multiple but for worlds occur because damages may differ based on the specified severance and disclosure dates.  The example I present in Section V.B.2 illustrates the effect of the disclosure date on the estimate of damages.  Investors A and B, who both have Net Losses of

---

[104] Deposition of Steven Queyrouze, at p. 162.

$10,000 in the actual world end with different damages amounts, and Investor C who had a Net Loss of $5,000 in the actual world is worse off in the but for world when the disclosure date was August 2008. If a different disclosure date is specified, estimated damages may change. This is illustrated in Exhibit C3, which shows the same three hypothetical investors with a disclosure date in November 2006. As shown in this Exhibit, the change in the disclosure date does not affect losses of Investors A and B but results in a change in the but for Net Loss (and hence damages) amount for Investor C.

59.      Moreover, under the assumption that a Defendant Bank's severing of its relationship would result in disclosure of the *Ponzi* scheme, there is the potential for conflicts among purported class members due to the uncertainty surrounding the severance date and the disclosure date. Under this assumption, it is in the best interest of members of the purported class who invested *subsequent* to the but for discovery date ("subsequent purchasers") to claim they would not have invested in Stanford CDs in the but for world. If such a claim can be supported, then such subsequent purchasers could seek the full amount of their investments as damages. In contrast, members of the purported class who invested *prior* to the discovery date ("prior purchasers") cannot seek the full amount of their investments as damages, because their investment decisions had been made in the past—the Defendant Bank's alleged misconduct would not have an effect on the investment decision for prior purchasers, even under the Plaintiffs' theory. Instead, prior purchasers would be limited to claiming that they would have been able to recover funds based on the net assets that were held by the Stanford Entities as of the discovery date.[105] Thus, prior purchasers can only claim to be harmed to the extent that they would have received a higher recovery had the Receivership commenced around the time of an earlier discovery date. Since the severance date must be applied uniformly for all class members and its determination has disparate implications for individual Plaintiffs, conflicts are likely to arise among class members.

---

[105] According to Karyl Van Tassel, who oversees the forensic accounting and cash tracing activities for the Receiver, "[f]rom at least 1999 forward, the Stanford Enterprise was a Ponzi scheme and SIB was insolvent (*i.e.,* its liabilities exceeded the fair value of its assets)." (Declaration of Karyl Van Tassel, Exhibit 13 to Plaintiffs' Class Certification Brief, at p. 7). If true, this indicates that prior purchasers would recover less than 100 percent of their investments in every potential but for world given that the purported class period starts five years later.

60.     Conflicts concerning the severance date are confounded by uncertainty surrounding the potential recovery available to prior purchasers in any assumed but for world.  For example, prior purchasers might argue that the severance date occurred on a date when their recovery would have been as high as possible in the assumed but for world.  Some class members, however, may argue for an earlier severance date because it may allow them to claim damages as a subsequent purchaser instead of as a prior purchaser in the but for world.  Since potential recoveries available to prior purchasers may have fluctuated significantly over the class period, there is the potential for conflicts to arise between prior purchasers and subsequent purchasers in the purported class.

61.     To illustrate how these conflicts among class members may arise, consider how different severance date scenarios would affect the hypothetical investors discussed previously:

- Investor A invests $10,000 in Stanford CDs in October 2008 and does not withdraw any money.
- Investor B invests $10,000 in Stanford CDs in January 2006 and does not withdraw any money.
- Investor C invests $10,000 in Stanford CDs in January 2008 and withdraws $5,000 in October 2008.

62.     Each of these investors prefers a different but for severance date.  For example, if the value of net assets available to prior purchasers was highest in February 2008, Investor B has an economic incentive to support a but for world in which the severance date is February 2008. However, in contrast, Investor C has an economic incentive to support a but for world in which the severance date occurs prior to the date of his investment in January 2008.

63.     Potential conflicts also arise between members of the purported class because some investors were able to withdraw funds from the Stanford Entities before the *Ponzi* scheme was revealed.  Using the same three investors discussed above, Investor C is advantaged relative to Investor A and Investor B because Investor C succeeded in withdrawing $5,000 in October 2008, in the actual world.  Therefore, it is in Investor C's interest to support a but for world in which the discovery of the *Ponzi* scheme occurred before January 2008 or after October 2008, but not between those dates.  If the but for world assumes a discovery date between January 2008 and October 2008, Investor C's withdrawal of funds would not have been possible and those funds

Page 26

should have remained in the Stanford Entities for distribution to all prior purchasers. In contrast, it is in Investor A's interest to support a but for world in which the discovery of the *Ponzi* scheme occurred *before* October 2008, so that he or she could seek full recovery of the $10,000 investment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed in Pittsburgh, Pennsylvania.

Dated July 7, 2015

Kenneth M. Lehn

App. 2106

**June 2015**

**Kenneth Lehn**
**Curriculum Vitae**

Katz Graduate School of Business
University of Pittsburgh
278-B Mervis Hall
Pittsburgh, Pa. 15260
phone: (412) 648-2034
fax:    (412) 624-2875
e-mail: lehn@katz.pitt.edu

**Education**

Ph.D., Washington University, 1981 (Economics)
M.A., Miami University, 1976 (Economics).
B.A., Waynesburg College, 1975 (Economics).

**Employment**

Samuel A. McCullough Professor of Finance, March 1999-present; Professor of Business
Administration, September 1991-March 1999; Katz Graduate School of Business, University of
Pittsburgh.

Affiliated Professor of Law, School of Law, University of Pittsburgh, September 1997-present.

Director, Center for Research on Contracts and the Structure of Enterprise, University of
Pittsburgh, 1991-2001.

Chief Economist, U.S. Securities and Exchange Commission, June 1987-July 1991.

Adjunct Professor of Law, Georgetown University, 1990-1991.

Assistant Professor of Business and Public Policy, School of Business Administration,
Washington University, 1981-1987.

Research Associate, Center for the Study of American Business, Washington University, 1986-
1987.

Visiting Assistant Professor of Economics, University of California, Los Angeles, 1986.

Deputy Chief Economist, U.S. Securities and Exchange Commission, 1984-1985.

2

Instructor of Economics, Miami University, 1976-1977.

**Courses Taught**

Corporate Finance (MBA)
Applied Corporate Finance (MBA)
Valuation (MBA)
Creating Value through Restructuring (MBA)
Organization of Securities Markets (Undergraduate)
Business and Public Policy (Undergraduate, MBA, Executive)
Corporate Governance (Doctoral)
Finance for Lawyers (Law)

**Teaching Awards**

MBA Teacher of the Year (Pittsburgh), nine times.
MBA Teacher of the Year (Washington U.), 1987.
Undergraduate Teacher of the Year (Washington U.), 1981.

**Publications**

**Books**

*Modernizing U.S. securities regulation: economic and legal perspectives*, ed. with Robert W. Kamphuis, Jr., Homewood, Ill.: Business-One Irwin, 1993.

**Published Papers**

"Employee-management trust and M&A activity," with Leonce Bargeron and Jared Smith, *Journal of Corporate Finance*, forthcoming.

"Limited liability and share transferability: an analysis of California firms, 1920-1940," with Leonce Bargeron, *Journal of Corporate Finance*, forthcoming.

"Disagreement and the informativeness of stock returns: the case of acquisition announcements," with Leonce L. Bargeron, Sara B. Moeller, and Frederik P. Schlingemann, *Journal of Corporate Finance*, April 2014, 155-172.

"Financing the business firm," with Leonce Bargeron in *The Oxford Handbook in Managerial Economics*, edited by William Shughart and Christopher Thomas, Oxford University Press, 2013.

3

"Sarbanes-Oxley and corporate risk-taking," with Leonce Bargeron and Chad Zutter, *Journal of Accounting and Economics*, February 2010, 34-52.

"Determinants of the size and structure of corporate boards: 1935-2000," with Sukesh Patro and Mengxin Zhao, *Financial Management*, Winter 2009, 747-780.  Received Pearson/Prentice-Hall Award for second best paper published in *Financial Management* during 2008-2010.

"The subprime crisis and systemic risk: evidence from U.S. securities markets," with Leonce Bargeron and Mehmet Yalin, *Globalization and Systemic Risk*, edited by Douglas D. Evanoff, David S. Hoelscher, and George G. Kaufman, World Scientific Publishing, 2009, 299-312.

"The CISG: perspectives from an economist," *The CISG and the business lawyer*, edited by Ronald Brand, Harry Flechtner, and Mark Walter, Oxford University Press, 2007, 261-265.

"Governance indexes and valuation: which causes which?," with Sukesh Patro and Mengxin Zhao, *Journal of Corporate Finance* 13 (December 2007), 907-928.

 "The rise of the private equity market," with Thomas Boulton and Steven Segal, *New financial instruments and institutions: opportunities and policy challenges*, edited by Yasuyuki Fuchita and Robert Litan, Brookings Institution Press, 2007, 141-161.

"CEO turnover after acquisitions: are bad bidders fired?," with Mengxin Zhao, *Journal of Finance* (August 2006), 1759-1811. Reprinted in *Mergers and acquisitions*, ed. by J. Harold Mulherin, Edward Elgar Publishing, 2012.

"Corporate governance in the deregulated telecommunications industry," *Telecommunications Policy* (May-June 2002), 225-242.

"Growth opportunities and corporate debt policy: the case of the U.S. defense industry, 1980-1995," with Vidhan Goyal and Stanko Racic, *Journal of Financial Economics* (April 2002), 35-59.

"Decentralization, incentives, and value creation: the case of JLG Industries," with Heidi E. Treml, *Journal of Applied Corporate Finance* (Fall 2000), 60-70.  Reprinted in Donald H. Chew and Stuart L. Gillan, *Corporate governance at the crossroads*, McGraw-Hill Irwin, 2005.

"Workforce integration and the dissipation of value in mergers: the case of USAir's acquisition of Piedmont Aviation," with Stacey Kole, *Mergers and productivity*, edited by Steven Kaplan, National Bureau of Economic Research, University of Chicago Press, 2000, 239-279.

"Comment on 'Financial regulatory structure and the resolution of conflicting goals' by Larry D. wall and Robert A. Eisenbeis," *Journal of Financial Services Research,* (September/December 1999), 247-248.

4

"Some observations on Henry Manne's contributions to financial economics," *Case Western Law Review*, (Winter 1999), 263-268.

"Deregulation and the adaptation of governance structures: the case of the U.S. airline industry," with Stacey Kole, *Journal of Financial Economics* (April 1999), 79-118.  Won Second Jensen Prize for Corporate Finance and Organizations in 1999 *JFE* Best Paper Contest.  Reprinted in J. Harold Mulherin, *Mergers and corporate governance*, Edward Elgar Publishing, 2004.

"The causes and consequences of accounting fraud," with Mason Gerety, *Managerial and Decision Economics* (November-December 1997), 587-599.

"Antitrust franchise relocation in professional sports: an economic analysis of the *Raiders* case," with Michael Sykuta, *Antitrust Bulletin* (Fall 1997), 541-564.

"EVA, accounting profits, and CEO turnover," with Anil Makhija, *Journal of Applied Corporate Finance*, (Summer 1997), 90-97.

"Investor behavior in mass privatization: the case of the Czech voucher scheme," with Archana Hingorani and Anil Makhija, *Journal of Financial Economics* (1997), 349-396.  Reprinted in Diane Denis and John McConnell, *Governance: an international perspective*, Edward Elgar Publishing Ltd., forthcoming 2005.

"Deregulation, the evolution of governance structure, and survival," with Stacey Kole, *American Economic Review Papers and Proceedings* (May 1997), 421-425.

"EVA and MVA as performance measures and signals for strategic change," with Anil Makhija, *Strategy and Leadership* (May/June 1996), 34-38.

"The effect of entry in the local telephone market on the equity values of the Regional Bell Operating Companies," with Kevin Green, *Managerial and Decision Economics*, (July--August 1995), 469-477.

"The SEC's Market 2000 Report," with Corinne Bronfman and Robert A. Schwartz, 19 *Journal of Corporation Law*, 3 (Spring 1994), 523-551.  Modified versions are published in *Financial Review* (published by Ministry of Finance in Japan), Summer 1994, and "U.S. Securities Markets Regulation: Regulatory Structure," in Benn Steil, ed., *International financial market regulation*, (New York: John Wiley and Sons), 1994, 37-74.

"The market for marketplaces: reflections on the SEC's Market 2000 Report," in Robert A. Schwartz, editor, *Global equity markets: technological, competitive and regulatory challenges*, Irwin Professional, 1994.

EXHIBIT A

5

"Regulation of going private transactions," with Jeffry Davis in *Modernizing U.S. securities regulation: economic and legal perspectives*, Kenneth Lehn and Robert W. Kamphuis, Jr., eds., Homewood, Ill.: Business-One Irwin, 1993.

"Information asymmetries, Rule 13e-3, and premiums in going private transactions," with Jeffry Davis, 70 *Washington University Law Quarterly*, (l992), 587-6ll.

"Contractual resolution of bondholder-stockholder conflicts in leveraged buyouts," with Annette Poulsen, *Journal of Law and Economics*, (October l99l), 645-674.  Reprinted in Roberta Romano, *Foundations of corporate law*, Oxford University Press, 1993.

"Institutional ownership of equity: effects on stock market liquidity and corporate long-term investments," with Jonathan Jones and J. Harold Mulherin, in Arnold W. Sametz, ed., *Institutional investors: challenges and responsibilities*, (Homewood, Ill.: Dow-Jones Irwin), 1991, 115-127.

"The case for indexing," in *The effect of index investment policies on corporate governance*, 1991 Annual Colloquium on Corporate Law and Social Policy, University of Toledo Law School, 1991.

"Comment on 'Globalization of financial markets' by Clifford W. Smith, Jr.," in *Proceedings from Carnegie-Rochester Public Policy Conference*, 1991.

"Securities regulation during the Reagan Administration: corporate takeovers and the 1987 stock market crash," with Jeffry Davis, in Anandi P. Sahu and Ronald L. Tracy, eds., *The economic legacy of the Reagan years: euphoria or chaos?*, (New York: Praeger Publishers), 1991, 129-140.

"Comment on 'The record of LBO performance' by William Long and David Ravenscraft," in Arnold W. Sametz, ed., *The battle for corporate control*, (Homewood, Ill.: Dow-Jones Irwin), 1991, 547-553.

"The choice between dual class recapitalizations and going private transactions," with Jeffry Netter and Annette Poulsen, 27 *Journal of Financial Economics*, (October 1990), 557-580. Reprinted in J. Harold Mulherin, *Mergers and corporate governance*, Edward Elgar Publishing, 2004.

"Do bad bidders become good targets?," with Mark L. Mitchell, 98 *Journal of Political Economy* (April 1990), 372-398; reprinted, with some modifications, in 3 *Journal of Applied Corporate Finance* (Summer 1990), 60-69; Donald H. Chew, Jr., ed., *The new corporate finance: where theory meets practice*, New York: McGraw-Hill, 1993, 52-61; Michael J. Brennan, ed.,  *Empirical corporate finance*, Edward Elgar, 2000; and J. Harold Mulherin, *Mergers and corporate governance*, Edward Elgar Publishing, 2004.

6

"The economics of event risk: the case of bondholders in leveraged buyouts," with Annette Poulsen, 15 *Journal of Corporation Law* (Winter 1990), 199-217.

"The view from the SEC," in *Proceedings of the 1989 Annual Conference of the Garn Institute of Finance*, University of Utah, 1990, 167-170.

"Public policy towards corporate restructuring," 25 *Business Economics* (April 1990), 26-31.

"Commentary on 'An economic analysis of the Brady Report' by David Haddock," in Gerald P. Dwyer, Jr. and Rik W. Hafer, eds., *The stock market: bubbles, volatility, and chaos*, (Boston, Mass.: Kluwer Academic Publishers), 1990, 197-201.

"View from Washington on leveraged buyouts," in Edward I. Altman, ed., *The high yield debt market*, (Homewood, Ill.: Dow-Jones Irwin), 1990, 154-160.

"Free cash flow and stockholder gains in going private transactions," with Annette Poulsen, 44 *Journal of Finance* (July 1989), 771-787.

"Comment on 'The danger of regulatory overreaction to the October 1987 crash' by Lawrence Harris," 7 *Cornell Law Review* (July 1989), 948-952.

"Leveraged buyouts: wealth created or wealth redistributed?" with Annette Poulsen, in Murray L. Weidenbaum and Kenneth Chilton, eds., *Public policy towards corporate takeovers* (New Brunswick, N.J.: Transaction Publishers), 1988, 46-62.

"Majority-minority relationships -- an economic perspective," 13 *Canada-U.S. Law Journal* (1988), 135-141.

"The economics of leveraged takeovers," with David Blackwell and Wayne Marr, 65 *Washington University Law Quarterly* (1987), 163-191.

"The structure of corporate ownership: causes and consequences," with Harold Demsetz, 93 *Journal of Political Economy* (December 1985), 1155-1177.

"Information asymmetries in baseball's free agent market," *Economic Inquiry* (January 1984), 37-44; reprinted in Brian Goff and Robert D. Tollison, eds., *Sportometrics*, Texas A&M University Press, 1990, 253-261.

"Property rights, risk-sharing, and player disability in major league baseball," 25 *Journal of Law and Economics* (October 1982), 343-356; reprinted in Brian Goff and Robert D. Tollison, eds., *Sportometrics*, Texas A&M University Press, 1990, 35-58.

7

**Other Articles**

"Private insecurities," *The Wall Street Journal*, February 15, 2006.

"How to clean up after corporate scandals," *The Pittsburgh Post-Gazette*, October 6, 2002.

"Soaring labor costs may ground airline merger," *The Wall Street Journal*, May 25, 2000, A26.

"Some observations on the Shad-Johnson accord and SEC-CFTC jurisdiction disputes," in Charles W. Smithson, *Managing financial risk: a guide to derivative products, financial engineering, and value maximization*, McGraw-Hill, 1998.

"Hostile takeovers: some empirical observations," *Corporations, Securities and Antitrust News* (Fall 1996), 1, 10-11.

"The lessons of Marriott," *The Wall Street Journal*, March 11, 1993.

"A Coase for rejoicing," *The Wall Street Journal*, October 17, 1991.

"Agency evaluates bust-up takeovers," with Mark Mitchell, *National Law Journal* (November 6, 1989), S1, S3-S4; reprinted in the *New York Law Journal* (December 4, 1989).

"Market correction of bad acquisitions," with Mark Mitchell, 3 *Institutional Investor: Global Capital Markets Forum* (April 1989), 53.

"Are takeovers hostile to economic performance?," with John Pound and Gregg Jarrell, *Regulation* (September-October 1986).

"Takeovers don't crimp long-term planning," with Gregg Jarrell, *The Wall Street Journal*, May 1, 1985.

**Policy Reports**

"Institutional ownership, tender offers, and long-term investments," with Gregg Jarrell and Wayne Marr, Office of the Chief Economist, U.S. Securities and Exchange Commission, April 19, 1985.

"Noninvestment grade debt as a source of tender offer financing," Office of the Chief Economist, U.S. Securities and Exchange Commission, 1986.

"The post-offering price performance of closed-end funds," with Kathleen Weiss and David Malmquist, Office of Economic Analysis, U.S. Securities and Exchange Commission, 1989.

8

"Estimating the value of federal deposit insurance," with William C. Dale, Jeffry L. Davis, David Malmquist, and Hank McMillan, Office of Economic Analysis, U.S. Securities and Exchange Commission, 1991.

Letter to Jonathan Katz, Secretary, U.S. Securities and Exchange Commission, on Regulation of Credit Rating Agencies, December 5, 1994.

Testimony concerning disclosure of accounting policies for derivatives and disclosures of quantitative and qualitative information about market risk inherent in market risk sensitive instruments, Subcommittee on Securities, U.S. Senate Committee on Banking, Housing and Urban Affairs, 105th Congress, 1st Session, March 4, 1997.

**Consulting**

Retained by counsel for various firms and government agencies, including Akin Gump; Arnold & Porter; Arthur Cox; Australian Taxation Office; Baker Botts; Barber & Bartz; Bass, Berry & Sims; Bryan Cave; Buchanan Ingersoll; Cadwalader, Wickersham & Taft; Clifford Chance; Cornell & Gollub; Covington & Burling; Cravath, Swaine and Moore; Crowell & Moring; Davis Graham & Stubbs; Davis Polk & Wardwell; Dechert; DLA Piper; Dorsey & Whitney; Gibson, Dunn, & Crutcher; Fried, Frank, Harris, Shriver & Jacobson; Fulbright & Jaworski; Heller Ehrman; Hogan & Hartson;  Howrey, Hughes Hubbard & Reed; Irell & Manella; Jones Day; King & Spalding; Kirkland & Ellis; K&L Gates; Kramer Levin Naftalis & Frankel; Latham & Watkins; Lowenstein Sandler; Mayer Brown; McDermott, Will, & Emery; McGuireWoods; Milbank, Tweed, Hadley & McCoy; Morgan, Lewis, & Bockius; Morris, Nichols Arsht & Tunnel; Morrison & Foerster; Nossaman; O'Melveny & Myers; Orrick; Paul, Weiss, & Rifkind; Pepper Hamilton; Pillsbury Winthrop Shaw & Pitman; Proskauer & Rose; Quarles & Brady; Richards, Layton & Finger; Segal McCambridge Singer & Mahoney; Shearman & Sterling; Shook, Hardy & Bacon; Sidley; Simpson Thacher, & Bartlett; Skadden, Arps, Slate, Meagher, & Flom; Steptoe & Johnson; Sullivan & Cromwell; U.S. Securities and Exchange Commission; U.S. Department of Justice; Wachtell, Lipton, Rosen & Katz; Weil Gotshal; Williams & Connolly; Willkie Farr & Gallagher; WilmerHale; Wilson Sonsini; and Winston & Strawn.

Retained as Independent Distribution Consultant for Pilgrim Baxter & Associates, Federated Investors, Hartford Financial, Wachovia Corp. and GAMCO.

**Expert Witness Testimony**

In re: HP Securities Litigation, U.S. District Court, Northern District of California, San Francisco Division, Master File No. C-12-5980-CRB, deposition testimony, New York, N.Y., January 19, 2015.

Mary K. Jones, et al. v. Pfizer, Inc., et al., U.S. District Court, Southern District of New York, No. 10-cv-3864 (AKH), deposition testimony, New York, N.Y., October 24, 2014.

9

In re: Activision Blizzard, Inc. Stockholder Litigation, Court of Chancery of the State of Delaware, Consolidated C.A. No. 8885-VCL, deposition testimony, New York, N.Y., October 20, 2014.

Sue Ann Hamm, In Re the Marriage of, v. Harold Hamm, District Court Of Oklahoma County, State Of Oklahoma, FD-2012-2048, trial testimony, Oklahoma City, Okla., September 15, 2014.

In re: Adelphia Communications Corporation Securities and Derivative Litigation, relating to Island Partners, et al. v. Deloitte & Touche LLP, U.S. District Court, Southern District of New York,  05-CV-2770, deposition testimony, Philadelphia, Pa, September 5, 2014.

In re: Lehman Brothers Securities and ERISA Litigation, U.S. District Court, Southern District of New York, 09-MD-2017 (LAK), deposition testimony, New York, N.Y., June 11, 2014.

Sue Ann Hamm, In Re the Marriage of, v. Harold Hamm, District Court Of Oklahoma County, State Of Oklahoma, FD-2012-2048, deposition testimony, Oklahoma City, Okla., June 4, 2014.

Sandalwood Debt Fund A, Sandalwood Debt Fund B, and Hudson Investment Partners v. BDO USA LLP and BDO Seidman LLP, Superior Court of New Jersey, Law Division, Essex County, Docket No. L-9016-11, deposition testimony, Short Hills, N.J., April 9, 2014.

Bettina M. Whyte, as Trustee of the Semgroup Litigation Trust, vs. PriceWaterhouseCoopers, LLP, District Court In and For Tulsa County, State of Oklahoma, Case No. CJ-2010-04042, Daubert hearing, Tulsa, Okla., January 6, 2014.

Louis Pagnotti, Inc., et al. vs. Deloitte and Touche, LLP, Court of Common Pleas of Luzerne County, 104-CV-04967-JMF, deposition testimony, New York, N.Y., October 23, 2013.

Securities and Exchange Commission vs. Life Partners, Inc., et al., United States District Court for the Western District of Texas, Austin Division, 1-12-CV-00033-JRN, deposition testimony, New York, N.Y., August 23, 2013.

Bettina M. Whyte, as Trustee of the Semgroup Litigation Trust, vs. PriceWaterhouseCoopers, LLP, District Court In and For Tulsa County, State of Oklahoma, CJ-2010-04042, deposition testimony, Chicago, Ill., July 2013.

Raymond M. Pfeil, et al. v. State Street Bank & Trust Company, United States District Court Eastern District Of Michigan, Southern Division, 2:09-CV-12229-DPH-VMM, deposition testimony, New York, N.Y., March 27, 2013.

10

CMMF, LLC v. J. P. Morgan Investment Management, Inc. and Ted C. Ufferfilge, Supreme Court Of The State Of New York, County Of New York, 09-601924, trial testimony, New York, N.Y., January 29, 2013.

CMMF, LLC v. J. P. Morgan Investment Management, Inc. and Ted C. Ufferfilge, Supreme Court Of The State Of New York, County Of New York, 09-601924, deposition testimony, New York, N.Y., September 27, 2012.

In re: Refco, Inc. Securities Litigation, United States District Court Southern District of New York, 07-MD-1902 (GEL), deposition testimony, New York, N.Y., September 19, 2012.

Securities and Exchange Commission v. Michael W. Perry and A. Scott Keys, United States District Court, Central District Of California, 11-1309-R (JCX), deposition testimony, Washington, D.C., May 14, 2012.

Lissa Rohlik vs. I-Flow Corporation, United States District Court, Eastern District of North Carolina (Southern Division), 7:10-CV-00173-FL, deposition testimony, Pittsburgh, Pa., May 1, 2012.

City of Livonia Employees' Retirement System, et al. vs. Wyeth et al., United States District Court Southern District Of New York, 07-CV-10329-RJS, deposition testimony, New York, N.Y., February 2012.

In re: Delphi Financial Group Shareholder Litigation, Court of Chancery of the State of Delaware, C.A. No. 7144-VCG, deposition testimony, Wilmington, Del., February 18, 2012.

Alaska Electrical Pension Fund et al. v. Pharmacia Corporation et al., United States District Court, District of New Jersey, 03-1519 (AET), deposition testimony, New York, N.Y., October 2011.

Securities and Exchange Commission v. Rajnish Das and Stormy Dean, United States District Court For The District Of Nebraska, 8:10-CV-00102, deposition testimony, Denver, Col., July 12, 2011.

Securities and Exchange Commission v. Lisa Berry, United States District Court, Northern District of California, San Jose Division, C07-04431 RMW, deposition testimony, San Francisco, Ca., May 2011.

Joel Krieger, et al., v. Wesco Financial Corporation, et al, Court of Chancery of the State of Delaware, 6176-VCL, deposition testimony, New York, N.Y., April 28, 2011.

Eric Silverman, et al.,v. Motorola, Inc., et al., United States District Court for the

11

Northern District of Illinois, Eastern Division, 07-C-04507, deposition testimony, Washington, D.C., January 6, 2011.

NACCO Industries Inc., et al. v. Applica Inc., et al., United States District Court Northern District of Ohio, CA-2541-VCL, deposition testimony, New York, N.Y., December 17, 2010.

In re: Le-Nature's Inc. Commercial Litigation, United States Judicial Panel on Multidistrict Litigation, MDL 2021, arbitration testimony, Pittsburgh, Pa., December 2010.

Securities and Exchange Commission v. Raj Sabhlok and Michael Pattison, United States District Court, Northern District of California, San Francisco Division, C-08-4238 EMC, trial testimony, San Francisco, Ca, September 21, 2010.

Securities and Exchange Commission v. Angelo Mozilo, David Sambol and Eric Sieracki, United States District Court, Central District of California, CV09-03394 JFW (MANx), deposition testimony, Chicago, Ill., July 22, 2010.

In re: Le-Nature's Inc. Commercial Litigation, United States Judicial Panel on Multidistrict Litigation, MDL 2021deposition testimony, New York, N.Y., June 16, 2010.

In re: John Q. Hammons Hotels Inc. Shareholder Litigation, Court of Chancery of the State of Delaware, 758-CC, trial testimony, Georgetown, Del., June 2010.

In re: John Q. Hammons Hotels Inc. Shareholder Litigation, Court of Chancery of the State of Delaware, 758-CC, deposition testimony, New York, N.Y., April 2010.

Securities and Exchange Commission v. Raj Sabhlok and Michael Pattison, United States District Court, Northern District of California, San Francisco Division, C-08-4238 EMC, deposition testimony, San Francisco, Ca., December 21, 2009.

LDK Solar Securities Litigation, U.S. District Court, Northern District of California, C-07-05182-WHA, deposition testimony, San Francisco, Ca., December 15, 2009.

Makor Issues & Rights, Ltd. v. Tellabs, Inc., United States District Court, Northern District of Illinois, Eastern Division, Case No. 02 C 4356, deposition testimony, Chicago, Ill., October 2009.

David Rogers et al. v. Baxter International, Inc., et al., United States District Court, Northern District Of Illinois, Eastern Division, 06-3241, deposition testimony, Chicago, Ill., September 25, 2009.

12

Mainstay High Yield Corporate Bond Fund v. Heartland Partners et al., United States District Court Eastern District of Michigan, 07-10542, deposition testimony, New York, N.Y., September 2009.

In re: Metropolitan Securities Litigation, United States District Court, Eastern District of Washington, CV-04-25-FVS, deposition testimony, New York, N.Y., September 14, 2009.

27001 Partnership, et al. v. BT Securities Corporation, et al., Circuit Court Of The State Of Alabama,  In And For The County Of Jefferson, CV-04-7487-JLB, deposition testimony, New York, N.Y., August 10, 2009.

Securities and Exchange Commission v. Biovail Corporation et al., United States District Court, Southern District of New York, CIV-02979 (LAK), deposition testimony, New York, N.Y., July 30, 2009.

Eric Silverman, et al.,v. Motorola, Inc., et al., United States District Court for the Northern District of Illinois, Eastern Division, 07-C-04507, deposition testimony, Washington, D.C., June 2009.

Brieger, et al. v. Tellabs, Inc. et al., United States District Court, Northern District of Illinois, Eastern Division, 06-C-1882, trial testimony, Chicago, Ill., May 1, 2009.

In re: DVI, Inc. Securities Litigation, United States District Court, Eastern District of Pennsylvania, 03-CV-5336, deposition testimony, Philadelphia, Pa., February 26, 2009.

Brieger, et al. v. Tellabs, Inc. et al., United States District Court, Northern District of Illinois, Eastern Division, 06-C-1882, deposition testimony, Chicago, Ill., January 30, 2009.

Kingsway Financial Services, Inc., et al. v. PriceWaterhouseCoopers, et al., United States District Court, Southern District of New York, 03-C-5560 RMB (HBP), deposition testimony, New York, N.Y., January 28, 2009.

In re: Dollar General Corporation Securities Litigation, Sixth Circuit Court for Davidson County, Tennessee, Master Docket No. 07MD1 (Consolidated Action), deposition testimony, New York, N.Y., October 2008.

In re: Dollar General Corporation Securities Litigation, Sixth Circuit Court for Davidson County, Tennessee, Master Docket No. 07MD1 (Consolidated Action), deposition testimony, New York, N.Y., September 2008.

In re: Delphi Corporation Securities, Derivative & ERISA Litigation, United States District Court, Eastern District of Michigan, Southern Division, MDL No. 1725 05-CV-70882-DT, deposition testimony, Chicago, Ill., May 1, 2008.

13

In re: Xcelera.com, Inc. Securities Litigation, United States District Court, District of Massachusetts, Daubert hearing to exclude testimony of Scott Hakala, Boston, Mass., April 2008.

In re: Vivendi Universal, S.A. Securities Litigation, United States District Court, Southern District of New York, No. 02 Civ. 5571 (RJH/HBP), deposition testimony, New York, N.Y., April 18, 2008.

In re: HealthSouth Corporation Securities Litigation, United States District Court, Northern Alabama, Southern Division, Master File No. CV-03-BE-1500-S, In re: HealthSouth Corporation Stockholder Litigation, Consolidated Case No. CV-03-BE-1501-S, In re: HealthSouth Corporation Bondholder Litigation, deposition testimony, New York, N.Y., April 14, 2008.

In re: Apollo Group, Inc. Securities Litigation, United States District Court, District of Arizona, 2-04-cv-2147-JAT, trial testimony, Phoenix, Ariz., January 2008.

In re: Schering-Plough Corporation Securities Litigation, United States District Court, District of New Jersey, Master File No. 01-CV-0829 (KSH/MP), deposition testimony, Roseland, N.J., September 14, 2007.

In re: Xcelera.com, Inc. Securities Litigation, United States District Court, District of Massachusetts, Civil Action No. 00-CV-11649-RWZ, deposition testimony, Boston, Mass., August 2007.

In re: Omnicom Group, Inc. Securities Litigation, United States District Court, Southern District of New York, No. 02-CV-4483 (RCC), deposition testimony, New York, N.Y., May 4, 2007.

Janet Baker et al. v. Dexia S.A. and Dexia Bank Belgium, United States District Court, District of Massachusetts, deposition testimony, Pittsburgh, Pa., April 2007.

Ohio Public Employees' Retirement System, et al. vs. Richard D. Parsons, R.E. "Ted Turner," et al., Franklin County Common Pleas Court, Columbus, Ohio, Case No. 03CVH07-7932, United States District Court, Southern District of New York, In re AOL Time Warner, Inc. Securities and ERISA Litigation, MDL Docket No. 1500 (SWK), The Consolidated Opt-Out Action, Master File No. 06 Civ. 0695 (SWK), deposition testimony, New York, N.Y., March 30, 2007.

In re: Cardinal Health, Inc. Securities Litigation, United States District Court, Southern District of Ohio, Eastern Division, No. C2-04-00575 (ALM), mediation testimony, Dallas, Tex., March 2007.

14

In re: Apollo Group, Inc. Securities Litigation, United States District Court, District of Arizona, 2-04-cv-2147-JAT, deposition testimony, Pittsburgh, PA, February 7, 2007.

In re: Sprint Corporation Shareholders Litigation, District Court of Johnson County, Kansas Civil Court department, Case No. 04 CV 01714, deposition testimony, New York, N.Y., January 15, 2007.

In re: Curtis v. Northern Life Insurance Company, King County Superior Court, State of Washington, No. 01-2-18578-1 SEA, deposition testimony, Pittsburgh, Pa., July 2006.

Howard Yue vs. New Focus, Inc., et al. and New Focus, Inc. vs. Howard Yue, Superior Court of California, County of Santa Clara, Case No. CV808031, deposition testimony, Palo Alto, Ca., June 29, 2005.

Daniel McCabe, Russell E. McCabe, and David Motovidlak v. Ernst & Young, LLP, et al., United States District Court, District of New Jersey, No. Civ. 01-5747 (WHW), deposition testimony, New York, N.Y., April 2005.

Securities and Exchange Commission v. David C. Guenthner and Jay M. Samuelson, United States District Court, District of Nebraska, No. 8:02CV10, deposition testimony, Omaha, Neb., April 2005.

Fyffes PLC and DCC PLC, S&L Investments Limited, James Flavin, and Lotus Green Limited, The High Court, Dublin, Ireland, Case No. 1183P/2002, trial testimony, Dublin, Ireland, February 22, 2005.

Oracle Corporation and Pepper Acquisition Corp. v. Peoplesoft, et al., Delaware Chancery Court, New Castle County, Civil Action No. 20377, trial testimony, Wilmington, Del., October 7, 2004.

Oracle Corporation and Pepper Acquisition Corp. v. v. Peoplesoft, et al., Delaware Chancery Court, New Castle County, Civil Action No. 20377, deposition testimony, Wilmington, Del., September 24, 2004.

Sensormatic Electronics Corporation vs. First National Bank of Pennsylvania, Winner & Bagnara, Inc., and James E. Winner, Jr., United States District Court, Western District of Pennsylvania, Civil Action No. 99-756, deposition testimony, Sharon, Pa., June 2, 2004.

Securities and Exchange Commission v. Michael J. Rivers and Thomas E. Hall, United States District Court, District of Minnesota, 02-4213-JRT/FLN, trial testimony, Minneapolis, Minn., May 2004.

15

Corporacion Durango, S.A. de C.V., as assignee of Durango Paper Company v. HG Estate, LLC and St. Mary's Railroad Corporation, United States District Court, Southern District of New York, No. 02 CIV 10059 (CSH), arbitration testimony, New York, N.Y., April 2004.

In re: AT&T Corp. Securities Litigation, United States District Court, District of New Jersey, MDL No. 1399 Consolidated CA No. 01-1883, deposition testimony, Pittsburgh, Pa., March 10, 2004.

Austern Trust Dated 7/11/94, Barry Austern and Susan L. Austern Trustees, derivatively on behalf of DPL, Inc. vs. Peter H. Forster, Court of Common Pleas of Hamilton County, Ohio, deposition testimony, Cincinnati, Ohio, September 24, 2003.

MCI/Worldcom bankruptcy, deposition testimony, New York, N.Y., September 2003.

Securities and Exchange Commission v. Robert J. Prevett, et al., United States District Court, Northern District of California, Civil Action No. C-01-21069-PVT, trial testimony, San Jose, Ca., July 2003.

Internal Revenue Service v. Estate of Josephine Thompson, United States Tax Court, Docket No. 4939-02, trial testimony, New York, N.Y., June 2003.

In re: Telecorp PCS Incorporated Shareholders Litigation, Delaware Chancery Court, New Castle County, CA No. 19260-NC, deposition testimony, New York, N.Y., April 4, 2003.

Securities and Exchange Commission v. Jack Lau, et al., United States District Court, Northern District of California, Civil Action No. C-01-21067-PVT, trial testimony, San Jose, Ca., March 2003.

Sylvia Allen, as personal representative of the estate of James Allen vs. R.J. Reynolds Tobacco Company and Philip Morris Incorporated, United States District Court, Southern District of Florida, No. 01-4319-CIV-KING/O'Sullivan, deposition testimony, Miami, Fl., December 6, 2002.

Zoffanies Pty Limited v. Commissioner of Taxation (Australia), tribunal testimony, Sydney, Australia, August 2002.

United States v. Robert Prevett, United States District Court, Northern District of California, trial testimony, San Jose, Ca., November 2002.

United States v. Frank Dubone, et al., United States District Court, Western District of Pa., trial testimony, May 2002.

16

United States vs. Atul Bhagat, United States District Court, Northern District of California, trial testimony, San Jose, Ca., March 2002.

Consolidated Edison, Inc. against Northeast Utilities, Inc., Civil Action No.: 01-CIV1893 (JGK) (HP), deposition testimony, New York, N.Y., February 28, 2002.

Robert K. Bell, et al., v. Fore Systems, et al., United States District Court, Western District of Pennsylvania, Civil Action No. 97-1265, deposition testimony, Pittsburgh, Pa., June 2001.

Beder, et al. v. Cleveland Browns, Inc., et al., Court of Common Pleas of Ohio, Cuyahoga County, No. CV-297862, deposition testimony, Cleveland, Ohio, January 2001.

Kohler Company v. Sogen International Fund, Inc., Sheboygan County Circuit Court, Wisconsin, deposition testimony, Milwaukee, Wisc., October 1999.

The Common Fund for Nonprofit Organizations v. KPMG Peat Marwick LLP, et al., United States District Court, Southern District of New York, No. 96 CIV 0255 (MGC), deposition testimony, Washington, D.C., January 1999.

Securities and Exchange Commission v. Jacob Y. Terner, et al., United States District Court, Central District of California, Civil Action No. 97-4812 GHK (JGx), trial testimony, Los Angeles, Ca., July 1998.

Securities and Exchange Commission v. Jacob Y. Terner, et al., United States District Court, Central District of California, Civil Action No. 97-4812 GHK (JGx), deposition testimony, Los Angeles, Ca., June 1998.

Securities and Exchange Commission v. Harold Fitzgerald Lenfest and Marguerite Lenfest, United States District Court, Eastern District of Pennsylvania, Civil Action No. 95-CV-7597 JCH, deposition testimony, Philadelphia, Pa., February 1998.

United States v. Mark Aronds, United States District Court, Eastern District of Michigan, trial testimony, Detroit, Mich., December 1997.

Retirement System of Alabama, et al. , v. James River, et al., Circuit Court of the State of Alabama, deposition testimony, Richmond, Va., March 1997.

Securities and Exchange Commission v. Shahryar Soroosh, United States District Court, Northern District of California, No. C-96-3933-VRW, trial testimony, San Francisco, Ca., February 1997.

Securities and Exchange Commission v. Shahryar Soroosh, United States District Court, Northern District of California, No. C-96-3933-VRW, deposition testimony, January 1997.

17

Securities and Exchange Commission vs. Michael P. Angelos and G. Gregory Russell, United States District Court, District of Maryland, Civil Action No. B-96-834, deposition testimony, Baltimore, Md., November 22, 1996.

Securities and Exchange Commission vs. S. Jay Goldinger, Bert R. Cohen, Andrew E. Gerald, Harvey M. Rosen, and Ronald A. Weinstein, United States District Court, Central District of California, No. 91-3445-JWI (GHXx), deposition testimony, Los Angeles, Ca., February 22, 1995.

H Enterprises International v. General Electric Capital Corporation, et al., United States District Court, District of Minnesota, Fourth Division, CIV No. 4-91-679, deposition testimony, Minneapolis, Minn., 1994.

Exxon Valdez Oil Spill Litigation, deposition testimony, Anchorage, Alas., 1993.

The Procter & Gamble Company v. Mafco Holdings, Inc., et al., American Arbitration Association Commercial Tribunal, arbitration testimony, New York, N.Y., November 1992.

Carter Hawley Hale bankruptcy, deposition testimony, Los Angeles, Ca., 1991.


**Board and Committee Memberships**

NASD ATC Advisory Committee, 2006-2007.
Shadow Financial Regulatory Committee, 2003-2007.
Allegheny Institute, 2005-present.
Aristech Receivables, 1998-2001.
Weirton Receivables, 1993-2001.
Borden Receivables, 1994-1996.
Carbide/Graphite Group Receivables, 1993-1996.
Economic Advisory Board, The Nasdaq Stock Market, 1996-1998.
Academic Advisory Council, Turnaround Management Association, 2000–present.
Advisory Board, Mobot Inc., 2000.

**Journal and Other Refereeing**

*American Economic Review, Economic Inquiry, Economic Journal, Financial Management, Harvard Business School Press, Irwin Publishing, Journal of Accounting, Auditing and Finance, Journal of Business, Journal of Comparative Economics, Journal of Corporate Finance, Journal of Economics and Management Strategy, Journal of Finance, Journal of Financial Economics, Journal of Financial and Quantitative Analysis, Journal of Law and Economics, Journal of Law, Economics, and Organization, Journal of Managerial Accounting Research, Journal of Political*

18

*Economy*, *Management and Decision Economics*, *National Research Council Canada*, *National Science Foundation*, *Quarterly Journal of Economics*, *Rand Journal of Economics*, *The Accounting Review*, *The Financial Review*, *University of Chicago Press*.

**University Service**

Committee on Business School Centers (chair), 2011-2012.
Dean Search Committee for Katz School of Business, 2005-2006.
Promotion and Tenure Committee, Katz Graduate School of Business, 2004-2006., 2008-present.
Distinguished Faculty Committee, 2003-2005.
Executive Committee, Katz Graduate School of Business, 1994-1995 (co-chair); 1998-2001 (co-chair, 2000); 2008-2011; 2013-present.
Appeals Panel for Grievance over Denial of Tenure (chair), 1999.
Steering Committee for University's Reaccreditation with Middle States Association, 1999.
Promotion and Tenure Committee, Katz Graduate School of Business, 1999-2001.
Dean Search Committee for Katz Graduate School of Business, 1995.
Internal Review Committee for Economics Department (chair), 1994.
Faculty Appointment Committee, Katz Graduate School of Business, 1993-1994.
MBA Curriculum Committee, Katz Graduate School of Business, 1993.
Retirement Subcommittee, 1992-1993.
Doctoral Policy Committee, Katz Graduate School of Business, 1991-1993; 2003-2005.

**Other Professional Service**

Founding Editor, *Journal of Corporate Finance*, 1992-2001.
Associate Editor, Investment Management and Financial Innovations, 2004-2006.
Associate Editor, *Journal of Financial Research*, 1999-2005.
Associate Editor, *The Financial Review*, 1998-2003.
Associate Editor, *Asia-Pacific Journal of Accounting & Economics*, 2000-2003.
Associate Editor, *International Journal of the Economics of Business Economics*, 1994-present.
Associate Editor, *Pacific-Basin Finance Journal*, 1992-1996.
Editorial Board, *Investment Management and Financial Innovations*, 2004-2006.
Advisory Board, *Financial Economics Network*, 1994-present.
Advisory Board, *Journal of Financial Abstracts*, 1994-present.
Advisory Board, *Corporate, Securities, and Finance Law Abstracts*, 1996-present.
Advisory Board, *The Financier*, 1994-2003.
Advisory Board, *The Arbitrageur*, 1998-2003.
Program Committee, 1992, 1993 Pacific Basin Conferences.
Program Committee, 1992 Western Finance Association Meetings.
Program Committee, 1992, 1996, 2007 Financial Management Association Meetings.

**Seminar and Conference Presentations**

19

AEI-Brookings Joint Center for Regulatory Studies, Allegheny County Bankruptcy Symposium, American Appraisal Association, American Economic Association, American Enterprise Institute, American Finance Association, American Management Association, American Society of Appraisers, Arizona State University, Baruch College, Boston College, California Polytechnic University, Canadian Law and Economics Association, Clemson University, Columbia University, U.S. Department of Justice, DePaul University, Drexel University, Duquesne University, Federal Reserve Bank of Atlanta, Federal Reserve Bank of Chicago, Federal Reserve Bank of New York, Federal Reserve Bank of San Francisco, George Mason University, Georgetown University, Georgia Institute of Technology, Harvard University, Hofstra University, Indiana University, Massachusetts Institute of Technology, Michigan State University, National Bureau of Economic Research, Networks Financial Institute, North Carolina State University, Northeastern University, Northwestern University, Oberlin College, Ohio State University, Ohio University, Pennsylvania State University, Professional Liability and Underwriting Society, Purdue University, Queens University, Southern Methodist University, Texas A&M University, Tulane University, U.S. Chamber of Commerce, U.S. Department of Justice, U.S. Federal Trade Commission, U.S. Securities and Exchange Commission University of California (Los Angeles), University of California (Santa Barbara), University of Chicago, University of Delaware, University of Florida, University of Illinois, University of Kansas, University of Maryland, University of Michigan, University of Missouri, University of Missouri (St. Louis), University of North Carolina, University of Notre Dame, University of Oregon, University of Pennsylvania, University of Rhode Island, University of Rochester, University of South Carolina, University of Southern California, University of Texas, University of Texas (Dallas), University of Utah, University of Virginia, Washington University (St. Louis).

**EXHIBIT B**

# Materials Considered

**_Rotstain, et al. v. Trustmark National Bank, et al., Case No. 3:09-cv-02384-N-BG (N.D. Tex.)_**

Abbott 000025-000029

Abbott 000214

Elson-Rogers 000077-000108

Elson-Rogers 000146-000154

Elson-Rogers 000211-000212

Memorandum Supporting Plaintiffs' Motion for Class Certification, For Designation of Class Representatives and Class Counsel and Exhibits 1-18, served on April 30, 2015

Order, April 21, 2015

Penhos 000081-000124

Penhos 000220-000269

Penhos 000272-000276

Plaintiffs' Second Amended Class Action Complaint, May 1, 2015

Queyrouze 005769-005772

Revised Declaration of Salim Estefenn Uribe, July 1, 2015

Videotaped Deposition of Diana Suarez and Exhibits, July 1, 2015

Videotaped Deposition of Gabriel Suarez and Exhibits, May 19, 2015

Videotaped Deposition of Guthrie Abbott and Exhibits, May 28, 2015

Videotaped Interpreted Deposition of Ruth Alfille de Penhos and Exhibits, June 10, 2015

# Materials Considered

Videotaped Deposition of Salim Estefenn Uribe and Exhibits, July 2, 2015

Videotaped Deposition of Sarah Elson-Rogers and Exhibits, June 9, 2015

Videotaped Deposition of Steven Queyrouze and Exhibits, May 27, 2015

***Securities and Exchange Commission v. Stanford International Bank, Ltd., et al, Case No. 3:09-cv-00298-N (N.D. Tex.)***

Order Approving Receiver's Interim Distribution Plan, May 30, 2013

Order Approving Receiver's Second Interim Distribution Plan, July 2, 2014

Order, May 4, 2012

Receiver's 1st Schedule of Payments to be Made Pursuant to the 2nd Interim Plan and Exhibit 1, November 5, 2014

Receiver's Interim Report Regarding Claims Process, August 29, 2012

Receiver's Monthly Report Regarding Fees and Expenses Incurred as a Result of the Claims Process, 1-15, June 8, 2012 through August 23, 2013

Receiver's Monthly Report Regarding the Claims & Distribution Processes, 16-20, September 25, 2013 through January 13, 2014

Receiver's Motion for Approval of Interim Distribution Plan and Exhibits A and B, January 11, 2013

Receiver's Motion for Approval of Second Interim Distribution Plan and Proposed Order Approving Receiver's Second Interim Distribution Plan, June 4, 2014

Receiver's Report Regarding the Claims & Distribution Processes, 21-24, April 9, 2014 through April 2, 2015

Report of the Receiver, April 23, 2009

Supplement to Receiver's 24th Report Regarding the Claims & Distribution Processes, April 28, 2015

# Materials Considered

**Publicly Available Documents**

Alison Fitzgerald, "SEC Investigating Stanford Group Offshore-Bank CDs (Update 1)," *Bloomberg,* July 3, 2008

"Allen Stanford Sentenced to 110 Years in Prison for Orchestrating $7 Billion Investment Fraud Scheme," Department of Justice Press Release, June 14th, 2012

Frequently Asked Questions, Stanford Financial Claims Website, July 2, 2015

"Investigation of the SEC's Response to Concerns Regarding Robert Allen Stanford's Alleged Ponzi Scheme," U.S. Securities and Exchange Commission Office of Inspector General, Case No. OIG-526, March 31, 2010

"SEC Charges R. Allen Stanford, Stanford International Bank for Multi-Billion Dollar Investment Scheme," SEC Press Release, February 17, 2009

"SEC Obtains Temporary Restraining Order, Asset Freeze, and Other Relief Against Defendants," SEC Press Release, February 17, 2009

Stanford International Bank Limited – in Liquidation: Summary of claims by country and status, Troice v. Proskauer Rose, LLP, Case No. 3:09-cv-01600-N-BG (N.D. Tex.), Dkt. No. 198-8, at App. 926-927, filed on April 20, 2015

**EXHIBIT C1**

## Hypothetical Scenario: Net Losses in Actual World



EXHIBIT C2



**Hypothetical Scenario: Net Losses in But For World**

App. 2130

EXHIBIT C3

# Hypothetical Scenario: Net Losses in But For World



**EXHIBIT C4**

# Hypothetical Scenario: Difference Between Net Losses in Actual and But For Worlds

### Assumption: Stanford *Ponzi* Scheme Disclosed in August 2008

| Investor | Net Losses | | |
| --- | --- | --- | --- |
| | Actual | But For | Actual – But For |
| Investor A | $10,000 | $0 | $10,000 |
| Investor B | $10,000 | $10,000 | $0 |
| Investor C | $5,000 | $10,000 | -$5,000 |

### Assumption: Stanford *Ponzi* Scheme Disclosed in November 2006

| Investor | Net Losses | | |
| --- | --- | --- | --- |
| | Actual | But For | Actual – But For |
| Investor A | $10,000 | $0 | $10,000 |
| Investor B | $10,000 | $10,000 | $0 |
| Investor C | $5,000 | $0 | $5,000 |

# EXHIBIT 83

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| PEGGY ROIF ROTSTAIN, et al. on behalf of themselves and all others similarly situated<br><br>v.<br><br>TRUSTMARK NATIONAL BANK, et al., Defendants. | Civil Action No 3:09-CV-02384-N-BG<br><br>Judge: Hon. David C. Godbey<br><br>Mag.: Hon. Nancy M. Koenig |

## DECLARATION OF J. DOMINGO RIVAROLA REISZ

### I.        QUALIFICATIONS AND BACKGROUND

1.  I am a tenured professor at the Pontificia Universidad Católica del Perú. I have taught in the areas of civil procedure, international arbitration, remedies, and consumer protection. I have given courses, lectures, and conferences at the following institutions, among others:  Universidad Peruana de Ciencias Aplicadas (www.upc.edu.pe), Centenary Universidad Mayor de San Marcos (www.unms.edu.pe), Universidad del Pacífico (www.up.edu.pe), OSITRAN www.ositran.go.pe), and INDECOPI (www.indecopi.gob.pe).

2.  I am a litigation partner at the law firm of Payet, Rey, Cauvi, Pérez.  My practice expertise involves commercial dispute resolution, international and domestic arbitration, consumers protection and civil procedure.  I am also a current member of the roster of arbitrators of the following institutions: Arbitration Center of the Chamber of Commerce of Lima, Arbitration Centre of the College of Engineers of Perú, Arbitration Center of the American Chamber of Commerce.

3.  Prior to joining Payet, Rey, I was a partner from 2000 to 2006 at Bullard, Falla, Ezcurra & Rivarola Abogados, a leading law firm in arbitration. Before that, I had the appointment of legal counsel of the Instituto Nacional de Defensa de la Competencia y de la Protección de la Propiedad Intelectual ("INDECOPI," www.indecopi.gob.pe), a Peruvian public agency that mirrors the administrative powers of the U.S. Federal Trade Commission.  At INDECOPI, I took part in drafting Peruvian legislation concerning class action litigation for consumer protection issues.

4.  I have written several articles on consumer protection, civil procedure, and arbitration in collective works, specialized journals and collective books that can be reviewed in my resumé, attached as Exhibit A to this report.

5.  As outlined in my resumé, I achieved the Master of Law degree from the University of Virginia, with a focus on civil procedure and litigation.  I was granted a Fulbright Scholarship and also an award as John M. Olin Scholar.  My J.D. and L.L.B. degrees were given by the Pontificia Universidad Católica del Perú.

6.  I have not testified as an expert at a deposition or trial in the past four years.

7.  I am being compensated for my work in connection with this case at my customary consulting rate of $320 U.S. per hour.  My compensation is not contingent upon the nature of my opinions or the outcome of this litigation.

## II.   QUESTION POSED

8.  I have been asked to provide my independent opinion as an expert on Peruvian civil procedure as to whether a court in Perú would give preclusive effect to a U.S. class action judgment or court-approved settlement rendered in *Peggy Roif Rotstain, et al. v. Trustmark National Bank, et al.*, Civil Action No. 3:09-CV-02384-N-BG (the "*Rotstain* Action"), such that the Peruvian court would preclude a person domiciled in Perú who did not "opt out" of the plaintiff class (and was thus an "absent" class member) from bringing a subsequent action in Perú.

9. The conclusions outlined below are supported, in my experience as professor and practitioner of Peruvian civil procedure law, and take into account my relevant experience as legal counsel to INDECOPI and as drafter of legislation concerning class action litigation for consumer protection issues.

10. I reserve the right to supplement or modify my opinions expressed herein, particularly in light of any new arguments raised or materials presented by the plaintiffs in this case.

### III.   SUMMARY OF CONCLUSIONS

11. A court in Perú will not give preclusive effect to a U.S. class action judgment rendered in the *Rotstain* Action, or a court-approved settlement in the *Rotstain* Action, such that it would be binding on an absent plaintiff domiciled in Perú who did not affirmatively "opt out" of the plaintiff class.

### IV.   MATERIALS CONSIDERED

12. I have no first-hand knowledge of the specific facts underlying this dispute.  In forming my opinions expressed in this declaration, I have considered the following documents filed in the *Rotstain* Action: Plaintiffs' Second Amended Class Action Complaint (dated May 1, 2015); and a Memorandum Supporting Plaintiff's Motion for Class Certification, for designation of Class Representatives and Class Counsel (dated Apr. 30, 2015).

13. I have also considered the following rules, laws, and other precedents which are applicable in Perú:

   a.   Civil Code (CC).

   b.   Code of Civil Procedure (CCP).

   c.   Legislative Decree 1033 that regulates the organization and powers of INDECOPI (LD 1033).

   d.   Law 28237 that enacts Rules of Procedure for Constitutional Litigation (RPCL).

   e.   Constitutional Tribunal Judgments (CTJ).

      i.    Right to be judged under pre-existing procedural laws: 266-2002-AA/TC, 0041-2012-PA7TC.

      ii.    Due process and public order: 3283-2003-AA/TC, 0023-2005-PI/TC , 03891-2011-PA/TC.

      iii.    Class action and diffuse interests and the Constitution: 5270-2005-PA/TC.

   f.   Law 29571 that enacts the Consumers Protection Code (CPRC).

   g.   Supreme Decree 030-2011-PCM that approves Class action rules for consumer's protection (CAR).

   h.   Supreme Decree 093-2002-EF that compiles the laws on securities –Securities Act Compiled (SAC).

## V.    RULES GOVERNING THE RECOGNITION OF FOREIGN JUDGMENTS BY PERUVIAN COURTS

14. In order for a foreign judgment to be given preclusive effect in Perú (such that a defendant could raise a *res judicata* defense in Perú based on the foreign judgment), the foreign judgment must first be recognized by Peruvian courts.

15. The recognition of foreign judgments ("*exequatur*") in Perú is governed by the applicable provisions of the CC (Book X, Title IV of the CC) and the CCP (Section VI, Title II, Chapter 11).  Foreign judgments will be recognized in Perú by Peruvian courts if all of the following requirements are met:

   a.   The foreign judgment does not resolve matters under the exclusive jurisdiction of Peruvian courts (article 2104.1);

   b.   The court rendering the foreign judgment had jurisdiction under its own private international law rules and under international rules on jurisdiction (article 2104.2);

c.   The defendant was served with process in accordance with the laws of the foreign jurisdiction, was granted a reasonable opportunity to appear before such foreign court and was guaranteed due process rights (article 2104.3);

   i.   This requirement emphasises the situation of the defendant when addressing service of process. However, due process rights standards in Perú require more than service of process to the defendant, for claimants must obviously be given the same chance to exercise their rights. Due process rights are equally applicable to the claimant and defendant, *mutatis mutandis*. As a consequence, in the case at hand it is relevant to analyze if the prospective members of the class were given a reasonable chance to know about the class action proceedings and to *affirmatively and expressly* exercise their right to opt-out of the class. A reasonable chance to know is proved by evidence of proper and public notice. A litigant must then typically make a voluntary and wilful action: to consent to either appear or to expressly decide not to appear.  The reason is substantive due process: no person shall be forced to appear in court as a claimant without his or her consent.

d.   The foreign judgment must have the status of *res judicata* in the jurisdiction of the court rendering such judgment (article 2104.4);

   i.   Specifically, a certification of the judgment being *res judicata* is required by the Peruvian courts. In the context of federal civil procedure litigation, it must by certified that the non-prevailing party has exhausted appeals and petitions for certiorari or that the time limits for filing an appeal or a certiorari petition have elapsed.

e.   There shall be no pending litigation in Perú between the same parties for the same dispute, which was initiated before the commencement of the proceeding that concluded with the foreign judgment (article 2104.5);

i.    This requirement, in Peruvian law, means that no equivalent class action shall have been filed and commenced in Perú before the commencement of the foreign action at issue (*i.e.,* the *Rotstain* Action here).

f.   The foreign judgment is not incompatible with another enforceable judgment in Perú unless such foreign judgment was rendered first (article 2104.6);

i.    This requirement concerns a situation of  multiple pending class actions before multiple international jurisdictions for which enforcement may be requested in Perú. I have no information with respect to the pendency of other class actions in other jurisdictions (apart from the *Rotstain* Action pending in the U.S.).

g.   The procedure itself and the judgment rendered as a consequence of it shall not be contrary to the "public order" (and so-called "good morals") of Perú (article 2104.7);

i.    I address this requirement in depth below.

h.   If there is a treaty between Perú and the country in which such judgment has been rendered, the provisions of such treaty shall apply (*see* article 2102 of the CC).

i.    As of this date, there is no treaty between Perú and the United States of America on the enforcement of foreign judicial resolutions.

16. Finally, in considering whether to recognize a foreign judgment, a Peruvian court will also look at reciprocity (*see* article 2104.8 of the CC), which concerns whether a U.S. court would recognize a judgment in a similar litigation issued by a Peruvian court. Because there are no such similar Peruvian litigations, *see infra*, this inquiry is inapplicable.

**VI.    OPT-OUT CLASS ACTIONS FOR DAMAGES ARE FUNDAMENTALLY DIFFERENT THAN PROCEDURES AVAILABLE FOR COLLECTIVE REDRESS UNDER PERUVIAN LAW**

17. Peruvian law does not allow for actions akin to U.S. opt-out class actions.  The methods available for group redress under Peruvian law are fundamentally different.

18. First, Perú has a mechanism called *proceso para la protección de intereses difusos* ("*intereses difusos*" for short).  *Intereses difusos* are procedures to provide ***injunctive relief*** to stop a defendant from harming public goods, such as the environment or archeological and historical sites.  *See* Article 82 of CCP.   Accordingly, the remedy awarded from *intereses difusos* proceedings (generally, an injunction) accrues to benefit the common good.  Indeed, to the extent any damages are recovered, the amount recovered does not go to individual claimants but instead goes to the local government of the place where the harmful conduct took place.

19. Perú also has a mechanism called *proceso para la protección de intereses colectivos* ("*intereses colectivos*" for short), which is a procedural device to aggregate and join multiple individuals as claimants in single lawsuit against a defendant.  (*See* rationale 13 of STJ 5270-2005-PA/TC for the difference between *intereses colectivos* and *intereses difusos*).  The key feature of this collective action is that a group or class of individuals might be represented in litigation by public agencies (or through delegation of powers to non-governmental non-profit organizations) provided that the Court can identify a precisely identified category of affected prospective claimants.

20. Recent Peruvian legislation has instituted an opt-out form of an *intereses colectivos* action, exclusively for consumer protection subject matter.  This type of action was established by the CPRC (*see* article 131) and the CAR of 2011, which I refer to as "INDECOPI Actions."  INDECOPI Actions are not brought by individual consumers.  Instead, they must be brought by INDECOPI— a government agency with the purpose of protecting consumers (*see supra* ¶ 3)—or else by a non-profit organization (NPO) which has been assigned by INDECOPI.  INDECOPI or a NPO may file an action for a restitution or for damages for the benefit of consumers harmed by a supplier's violation of consumers' legal or contractual rights.

21. Notably, there has never been a filing of this type of *intereses colectivos* action in Perú to date.  In addition to being very recently implemented in Peruvian law, it is also confined in terms of subject matter (restricted to violations of consumer protection laws) and moreover is subject to stringent pre-filing requirements.  For example, before an

INDECOPI Action can be commenced, INDECOPI must find that consumers have exhausted their administrative law procedures against the supplier and that such administrative proceedings (which are held before INDECOPI and may result in fines, injunctions, and restitution) concluded in favor of the class of consumers.  It shall be noted that the administrative procedure against a supplier may also be commenced ex officio by INDECOPI itself.  But in both scenarios (*ex officio* or *ex parte*) the procedure must be concluded before an INDECOPI Action can be filed before the Courts.

22. In other words, according to Peruvian laws (CPRC), no judicial action seeking damages against a supplier and in favor of a class of consumers shall be commenced without prior exhaustion of the administrative procedure before INDECOPI. (*See* article 18.1 of LD 1033 and article 115.7 of CPRC.  According to article 3 of the CAR, consumers that form part of the class previously identified by INDECOPI during the administrative process may opt out of the class.  Of course, unless and until such an action takes place in Perú, all of these procedures exist in legislation but remain untested in the Peruvian courts.

## VII.    OPT-OUT CLASS ACTIONS FOR DAMAGES VIOLATE PERUVIAN PUBLIC ORDER AND DUE PROCESS

23. Under the Peruvian Constitution, "public order" includes the right to due process.  *See* CTJ 3283-2003-AA/TC, 0023-2005-PI/TC, 03891-2011-PA/TC.

24. One of the elements of due process is the right to be judged under pre-existing procedural laws.  This is a fundamental and constitutional right derived from Article 139 of the Constitution and construed by relevant case law.  *See* CTJ 266-2002-AA/TC, 0041-2012-PA/TC.

25. In the first case, CTJ 266-2002-AA/TC, the civil trial court transferred a pending case to a newly created trial court that had been given powers to hear cases where the subject matter was administrative law.  The claimant moved to strike the transfer and filed a motion to nullify the order to transfer the case.  The motion was grounded on the fact that the new trial court did not exist at the time of the filing of the complaint.  The claimant asserted its right not to be deviated from the preexisting procedural scheme in force when

the complaint was filed.  As the motion was denied, the claimant filed an action before the Constitutional Tribunal that found in his favor.  It stated as a rule of law that no one shall be deviated from the existing procedural laws in force at the time of the filing of the complaint.  In the second case, CTJ 0041-2012-PA/TC, the Constitutional Tribunal maintained its holding, citing the prior case.  The set of facts were similar.  In sum, it is a well settled constitutional principle that if a Peruvian judge would subject a defendant to a procedure that is contrary to the procedural schemes provided in advance by preexisting legislation, then such a procedure will be void and will be also deemed unconstitutional.

26. As discussed above, a limited protection for consumers through INDECOPI Actions exists in Peruvian law though it has never been tested in Peruvian courts.  The INDECOPI Action is unique among the types of actions permitted in Peruvian courts in that it provides for implied consent under the laws (CPRC, CAR) to ostensibly bind non-appearing class members in damages actions.  As explained above (*see supra*, ¶ 18), *intereses difusos* do bind everyone if the judgment is favorable to the "claimant – government" (*see* article 82 of CCP), but one must remember that no damages recovery is allowed for individual claimants or groups of claimants.  Any recovery goes in favour of the government.

27. No other form of Peruvian action besides the INDECOPI Action binds non-appearing class members, and notably, securities litigation legislation (SAC) does not provide for implied consent to sue of non-appearing claimants.  If the *Rotstain* Action would end in a court-approved settlement or a judgment unfavourable to the claimants, such court-approved settlement or judgment will not be recognized by the Peruvian courts; it will be considered a form of *intereses colectivos* judgment contrary to Peruvian public order and due process.  As stated before, the right to be judged under pre-existing procedural laws will prevent recognition of the possible *Rotstain* judgment.  Since Peruvian procedural law does not provide for a *procesos colectivos* scheme for damages where the cause of action is the breach of securities regulations duties, the Peruvian domiciliary against whom the recognition procedure is being asserted may file the affirmative defense of deviation of pre-existing procedural laws.

28. As a consequence, no defendant may be subject to a litigation mechanism that is contrary to the procedural protections and procedural schemes provided by the established Peruvian laws.  With relevance to the *Rotstain* Action, denial of the *exequatur* will occur because the *Rotstain* Action and any judgment or court-approved settlement that follows will be deemed contrary to the public order of Perú as defined above if taken for recognition.

## VIII.  RECIPROCITY

29. If there is a treaty between Perú and the country in which a judgment has been rendered, the provisions of such treaty shall apply to determine the bounds of reciprocal enforcement of judgments.  As of this date, there is no treaty between Perú and the United States on the enforcement of foreign judicial resolutions.  As a consequence, a general reciprocity rule is applicable under which Peruvian courts will deal with U.S. judgments in the same manner U.S. Courts deal with Peruvian judgments.

30. Article 2104 of the 1984 CC provides for a reciprocity test that must be met prior to entry of judgment in the recognition procedure.  Under this test, a judgment given by a U.S. District Court will be recognized and enforced by a Peruvian court only if according to the U.S. procedural or substantive law: (a) judgments issued by Peruvian courts are recognized and enforced (*i.e.*, given *res judicata* effect) and (b) judgments issued by Peruvian courts are not subject to re-examination on the merits of the case by U.S. District Courts (*i.e.*, they are given issue preclusion/collateral estoppel effect).

31. Years after the CC was enacted, the 1993 CCP established a rebuttable presumption favouring reciprocity to alleviate the burden of proof on the party seeking recognition.  In this manner, the opposing party in the *exequatur* procedure must show the absence of reciprocity, that is, show that a judgment issued by a Peruvian court would not be recognized and enforced in the foreign court at issue.

32. To this date, however, there is no published case in Perú regarding class actions. INDECOPI published a press release several years ago indicating that it was going to file an *intereses colectivos* before a Peruvian court, but it has not done so.  Thus, because no Peruvian court has had the chance to issue a judgment on the matter of a collective

action, the presumption of reciprocity does not work.  No such precedent or example of reciprocity exists because no collective action rulings have been yet issued in Perú; thus, no presumption applies.

33. If no presumption applies, the party seeking recognition will have to show that *intereses colectivos* judgments issued by Peruvian courts in similar litigations are recognized and enforced in the United States.  It is easy to conclude that this showing will be implausible because INDECOPI Actions (concerning which, to this date, there have been no judgments issued and which still remain untested in Peruvian courts. *see supra*, ¶ 21) are dissimilar.

34. Peruvian law does not recognize an *intereses colectivos* action that could permit individuals to recover damages for violations of the SAC (the Peruvian securities act, *see supra*, ¶ 27). In other words, no collective action judgment has been issued yet by any Peruvian court and such courts will not issue such judgments for SAC violations because the legal framework does not permit it.  Hence, there is and will not be a Peruvian judgment that could be taken for recognition and enforcement to any U.S. court.  The reciprocity test will therefore fail.

## IV.    CONCLUSIONS

35. A court in Perú would not recognize a judgment or court-approved settlement rendered in the *Rotstain* Action because said judgment or settlement will be deemed contrary to Peruvian public order and due process.

36. A court in Perú would neither recognize nor enforce a judgment or court-approved settlement rendered in the *Rotstain* Action because said judgment will be deemed contrary to due process. Under Peruvian due process standards no person shall be deemed a default or absent member of a non-consumer protection collective action.

37. A court in Perú would neither recognize nor enforce a judgment or court-approved settlement rendered in the *Rotstain* Action because said judgment will fail the reciprocity test since no collective action judgment has been issued yet by any Peruvian court.

Hence, no such judgment could have been taken for recognition and enforcement before any U.S. Court.

38. As a consequence of the above, a judgment or a court-approved settlement on the action referred to above will not be binding or have preclusive effect on an class member domiciled in Perú who did not "opt out" of the class.

39. Absent recognition of the aforementioned judgment, the Peruvian absent class member could file an individual action in Peruvian courts (provided that jurisdiction is properly established) and the defendant will not be allowed to oppose the prosecution of said action on the basis of *res judicata*.  The affirmative defense of *res judicata* will be surely dismissed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed in Lima, Peru.

Dated:  July 7, 2015



_____
J. Domingo Rivarola Reisz

# EXHIBIT A

**JOSÉ DOMINGO RIVAROLA REISZ**
Payet, Rey, Cauvi, Perez Abogados
www.prc.com.pe / drr@prc.com.pe
Victor Andrés Belaunde 147 - Torre Real 3 - Piso 12
Lima 27 – Republic of Peru
T. (511) 6123202
e-mail: domingo.rivarola@alumni.virginia.edu; drr@prc.com.pe

---

**Professional:**

Mr. Rivarola is Partner of Payet, Rey, Cauvi, Perez Attorneys, specializing in civil procedure, consumers' protection, commercial dispute resolution, international and domestic arbitration, tort and contract law.

Prior to joining Payet, Rey, Cauvi, Perez Attorneys, he was Partner at Bullard, Falla, Ezcurra & Rivarola Abogados and Legal Counsel at the *Instituto Nacional de Defensa de la Competencia y de la Protección de la Propiedad Intelectual -INDECOPI.*

**Teaching:**

- Professor of Contracts 1 and 2 (topics: constitutional bases of contracting, formation of the contract, massive contracting, interpretation, contractual remedies and defense against breach, execution and termination of the contractual relationship and the third parties of contracts), *Universidad Peruana de Ciencias Aplicadas*; 1999-2006.

- Professor of Legal Skills (topics: the course aims to train good litigants and lawyers with skills to interact effectively with their clients), *Pontificia Universidad Católica del Perú*; 2005.

- Professor of the First Course of Economic Analysis of Law, *Universidad Nacional Mayor de San Marcos*; 2005.

- Professor of the Course Political Aspects of the Judicial Proces", *Academia de la Magistratura*; 2005.

- Professor of Civil Law I (topics: the course proposes a systematic and comprehensive knowledge of the 10 Books of the Civil Code, with particular emphasis on the Book 1), *Pontificia Universidad Católica del Perú*; 2001 – 2005.

JOSÉ DOMINGO RIVAROLA REISZ
Payet, Rey, Cauvi, Perez Abogados
www.prc.com.pe / drr@prc.com.pe
Victor Andrés Belaunde 147 - Torre Real 3 - Piso 12
Lima 27 – Republic of Peru
T. (511) 6123202
e-mail:  domingo.rivarola@alumni.virginia.edu; drr@prc.com.pe

- Professor of Civil Liability, *Universidad Peruana de Ciencias Aplicadas*; 1999 – 2002.

- Professor of the Diploma in Criminal and Business Risk. Organized by *Universidad Peruana de Ciencias Aplicadas*; 2006 – 2007. Module: "Civil and Corporate aspects of penalties' ancillary measures."

- Professor of the V Course of University Extension in Regulation of Transport Infrastructure, *Organismo Supervisor de la Inversión en Infraestructura de Transporte Público - OSITRAN*; 2008 - 2010 (topics: sources, interpretation and application of the law).

- Professor of the Seminar on Civil Law and Civil Procedure Law, *Pontificia Universidad Católica del Perú*, 2008-2011 (topics: discussion of practical cases with civil and commercial content, based on the study of judicial and arbitration proceedings).

- Professor of Theory of Evidence, *Pontificia Universidad Católica del Perú*; 2013 – present.

- Professor of Theory of Conflict, *Pontificia Universidad Católica del Perú*; 2015 – present.

- Professor of the Seminar on Oral Arbitration and Oral Litigation. *Pontificia Universidad Católica del Perú;* to be taught this winter term.

**Publications[1]:**

- *Ius Novorum*. New evidence on the stage of appeal. In: "*Book of Papers from the Third International Congress of Process and Constitution. The guarantees of a Fair Process*", Palestra Editores, Lima, 2013.

- Peruvian Chapter. In: "*Confidentiality of Communications between Lawyers and Clients*". World Law Group, 2008.

- "The New Evidentiary Hearing" coauthor. In: *Journal of the Superior Court of Tumbes*

---

[1] The list of publications does not include several newspaper articles written in various media such as: (i) *Perú 21*, *Enfoque Themis* and Legal Express.

**JOSE DOMINGO RIVAROLA REISZ**
Payet, Rey, Cauvi, Perez Abogados
www.prc.com.pe / drr@prc.com.pe
Victor Andrés Belaunde 147 - Torre Real 3 - Piso 12
Lima 27 – Republic of Peru
T. (511) 6123202
e-mail:  domingo.rivarola@alumni.virginia.edu; drr@prc.com.pe

(in press), December 2007.

- The Constitutional Shield of Arbitration; In: *Peruvian Journal of Arbitration*, N° 2, Grijley, Lima, June 2006.

- "*¿Actori Incumbit Probatio*? A Rethought of Presumptions and Burdens of Proof: Common Law versus Civil Law. In: *Themis 51*. Lima, January 2006.

- "Consumer Protection Law", Comments, Judicial Precedents and Complementary Norms of Juan Espinoza and others, co-author. Editorial Rodhas, Lima, 2004.

- "¿Is the Economic Analysis of Law complete?" In: *Conexión Enfoque de la Revista Themis*, Lima, 2004.

- "Discrimination based on race: a dangerous legal precedent." In: *Diálogo con la Jurisprudencia*. Monthly Journal of analysis and case review. Gaceta Jurídica No. 11, Lima, 1999.

- "Looking beyond the Docket. The economic and social effects of Court decisions" co-author. In: *Revista Advocatus*, Lima, 1998.

- "Where you will not be happy to screw up. The conflict between fundamental rights in commercial advertising" In: *Revista Ius et Veritas* No. 15, Lima, 1998.

**Conferences & Seminars:**

- Exposition entitled: "The appeal in the Common Law: lessons and proposals". In: V International Seminar of Litigation "Process and Constitution". *Pontificia Universidad Católica del Perú*, 2015.

- Exposition entitled: "Precautionary Measures and Partial Awards ". In: II Congress of Judges and Arbitrators. Judicial Cooperation in Arbitration. *Instituto Peruano de Arbitraje et al,* Lima, 2015.

- Exposition entitled: "Enforcement of Partial Awards and Final Awards". In: I Congress of Judges and Arbitrators. Judicial Cooperation in Arbitration. *Instituto Peruano de Arbitraje et al,* Lima, 2014.

JOSÉ DOMINGO RIVAROLA REISZ
Payet, Rey, Cauvi, Perez Abogados
www.prc.com.pe / drr@prc.com.pe
Victor Andrés Belaunde 147 - Torre Real 3 - Piso 12
Lima 27 – Republic of Peru
T. (511) 6123202
e-mail:  domingo.rivarola@alumni.virginia.edu; drr@prc.com.pe

- Exposition entitled: "Extinctive Prescription in jurisprudence". Workshop for Judges and Members of the Court of Justice of Lima, November 2014.

- Exposition entitled: "The Effective Judicial Protection in the Enforcement of Arbitral Awards". In: IV International Seminar of Litigation "Process and Constitution". *Pontificia Universidad Católica del Perú*, 2014.

- Arbitration Law Seminar. "The evidence and Rules of the International Bar Association". *Pontificia Universidad Católica del Perú*, 2013.

- Exposition entitled: "The New Evidence and the Appeal". In: III International Seminar of Litigation "Process and Constitution". *Pontificia Universidad Católica del Perú*, 2013.

- Exposition entitled: "Precautionary Measures and Damage Weighting". In: II International Seminar of Litigation "Process and Constitution". *Pontificia Universidad Católica del Perú*, 2011.

- Exposition entitled: "Recognition and Enforcement of Foreign Arbitral Awards. The New York Convention". In: First International Training Course for Arbitrators. Organized by *Instituto Peruano de Arbitraje.* November 13, 2010.

- Exposition entitled: "Economic Analysis of the Precautionary Measures". Contrary Postures Seminar. Organized by *Themis Revista de Derecho.* April 14, 2010.

**Education:**

- Master of Laws, Fulbright Scholar and John M. Olin Scholar, University of Virginia, 2003.

- Licensed in Law, Pontificia Universidad Católica del Perú, 1999.

- LL.B, Pontificia Universidad Católica del Perú, 1998.

**JOSÉ DOMINGO RIVAROLA REISZ**
Payet, Rey, Cauvi, Perez Abogados
www.prc.com.pe / drr@prc.com.pe
Victor Andrés Belaunde 147 - Torre Real 3 - Piso 12
Lima 27 – Republic of Peru
T. (511) 6123202
e-mail:  domingo.rivarola@alumni.virginia.edu; drr@prc.com.pe

**Bar:**

- Lima, 1999

**Memberships:**

- Member of the List of Arbitrators of the Arbitration Center of the Chamber of Commerce of Lima.

- Member of the List of Arbitrators of the Arbitration Centre of the College of Engineers of Peru.

- Member of the List of Arbitrators of the Arbitration Center of the American Chamber of Commerce.

- Member of the International Association of Defense Councel (www.**iadc**law.org).

**Languages:**

- English (*proficient*), French (*basic*), German (Sprachdiplom Zwei 1990).

Lima, July 1, 2015

# EXHIBIT 84

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, et al. | § | Civil Action No 3:09-CV-02384-N-BG |
| on behalf of themselves and all others | § | |
| similarly situated, | § | |
| | § | Judge: Hon. David C. Godbey |
| | § | |
| Plaintiffs, | § | Mag.: Hon. Nancy M. Koenig |
| | § | |
| v. | § | |
| | § | |
| TRUSTMARK NATIONAL BANK, ET AL., | § | |
| | § | |
| Defendants. | § | |

**DECLARATION OF JANET WALKER**

I, Janet Walker, state as follows:

**I.   Introduction and Overview**

1.   Counsel for Defendant, THE TORONTO-DOMINION BANK, Inc ("TD Bank") have

asked me:

    a.  to describe the features of the action commenced by the Joint Liquidators ("JLs")

        of Stanford International Bank, Ltd. ("SIB") against TD Bank in Ontario (No. CV-

        12-9780-00CL) ("JLs' Canadian Action") to enable its comparison with the

        proposed class action in *Peggy Roif Rotstain, et. al. v. Trustmark National Bank,*

        *et. al.*, (Civil Action No 3:09-CV-02384-N-BG) ("proposed U.S. Class Action"),

        pending in the U.S. District Court for the Northern District of Texas; and

b. to provide my opinion on whether the courts in Canada would likely recognize a judgment or court-approved settlement rendered in the proposed U.S. Class Action as granting preclusive effect in Canada.

2. For the reasons explained in paragraphs 9–38, it is my opinion that (i) the beneficiaries in the JLs' Canadian Action include the beneficiaries in the proposed U.S. Class Action; (ii) the quantum of damages sought from TD Bank in the JLs' Canadian Action appears to be greater than that sought in the proposed U.S. Class Action; (iii) the request for equitable remedies in the JLs' Canadian Action has the potential to increase the recovery beyond the quantum of the damages specifically sought in that action; (iv) the differences between the ways in which attorneys' fees would be calculated and awarded in the JLs' Canadian Action and the proposed U.S. Class Action could make more of the award granted in the JLs' Canadian Action available to be distributed to the beneficiaries; (v) the allegations pursued in the JLs' Canadian Action appear to be broadly similar to those in the proposed U.S. Class Action; and (vi) both the JLs' Canadian Action and the U.S. Class Action assert that the conduct of TD Bank in dealing with the SIB investors would be governed by Canadian legal and regulatory standards.

3. For the reasons explained in paragraphs 39–74, in my opinion, it is unlikely that a Canadian court would recognize and grant preclusive effect to a judgment or court-approved settlement in the proposed U.S. Class Action because (i) the JLs have exclusive authority to initiate and pursue proceedings in Canada; (ii) the JLs' exclusive authority would need first to be varied for a foreign judgment or court-approved settlement to be recognized; (iii) a Canadian court is unlikely to be inclined to vary the order of the Québec Superior Court in favour of recognizing a judgment or court-approved settlement

in the proposed U.S. Class Action; and (iv) the beneficiaries of the JLs' Canadian Action

are unlikely to be regarded as having consented to jurisdiction in the proposed U.S. Class

Action.

4.   In forming this opinion I have considered the following:

     a.   Civil Action No 3:09-CV-02384-N-BG - Plaintiffs' Second Amended Class
        Action Complaint ("U.S. Class Action Complaint");

     b.   Civil Action No 3:09-CV-02384-N-BG - Memorandum Supporting Plaintiffs'
        Motion for Class Certification, for Designation of Class Representatives and Class
        Counsel ("Certification Memorandum");

     c.   First Amended Statement of Claim *Joint Liquidators of Stanford International
        Bank, Ltd. v. Toronto-Dominion Bank*, No. CV-12-9780-00CL (Can. Ont. Sup. Ct.
        J.) ("JLs' Canadian Action Statement of Claim"));

     d.   Declaration of Receiver Ralph S. Janvey, 30 October 2014 ("Janvey Declaration")
        with Exhibits A-C; and

     e.   Canadian and other authorities relevant to the issues considered in this declaration.

5.   I am being compensated for my work in connection with this case at my customary

consulting rate of U.S. $565 per hour.

6.   I reserve the right to supplement or modify my opinions expressed herein, particularly in

light of any new arguments raised or materials presented by Plaintiffs in this case.

**II. Background and Qualifications**

7.   I am a Professor of Law at Osgoode Hall Law School of York University in Toronto, and

past Associate Dean. I have been a full time member of the faculty since 1996, and I have

been a member of the Bar of Ontario since 1998. From 2006–2015, I was the common law

advisor to the Federal Courts (Canada) Rules Committee.

8.   My qualifications may be found in my curriculum vitae, which are set out in Exhibit 1,

including a list of all publications authored by me within the past ten years and a list of all

4

cases in which I have testified as an expert at trial or by deposition in the past four years.

Of particular relevance in my curriculum vitae are the following:

    a.  I am the author of the major Canadian treatise on the Conflict of Laws, entitled *Castel and Walker: Canadian Conflict of Laws* (6 ed looseleaf, 2005+) which is regularly cited by courts at all levels across Canada), and the monograph, entitled *Halsbury's Laws of Canada: Conflict of Laws;* I am General Editor of the only published casebook on Civil Procedure, entitled *The Civil Litigation Process,* and one of two co-authors of *Civil Procedure* (Irwin, 2009); and I am the General Editor of *Class Actions in Canada,* the only published casebook on this subject in Canada.

    b.  I have authored numerous publications in the field of international and domestic litigation, and on the recognition and enforcement of class action judgments, which are listed in my curriculum vitae;

    c.  I have taught courses on civil procedure and the conflict of laws at Osgoode Hall Law School since 1996, and at other universities, including: Monash University Faculty of Law in Melbourne; Haifa University Faculty of Law; University of Toronto Faculty of Law; New York University School of Law (Hauser Visiting Professor); Oxford University (Leverhulme Visiting Professor); National University of Singapore; and from 2001–2014 at the Faculté des sciences juridiques, politiques et sociales de Tunis.

    d.  I was an International Advisor to the American Law Institute in its project with Unidroit to propose Transnational Principles and Rules of Civil Procedure, and, from 2006-2015, and I am a member of the Presidium of the International Association of Procedural Law.

9.  I have been a member of various Task Forces and Working Groups on the subject of Crossborder Class Actions, in particular, the Uniform Law Commission of Canada: National Class Action Reform Project (2004–06); International Law Association, Committee on International Litigation and the Interests of the Public: International

Aspects of Group Actions (2006–08); ABA Litigation Section Working Group on U.S.-Canada Cross-border Class Action Protocols (2007–11); and the International Bar Association Task Force on International Procedures and Protocols for Collective Redress (2007–11).

### III. Analysis

### A.  Description of JLs' Canadian Action

10. In May 2011, the Joint Liquidators, Marcus A. Wide and High Dickson of Grant Thornton LLP ("JLs") were appointed by order of the Eastern Caribbean Supreme Court and vested with all the assets of SIB. The JLs were empowered to sue entities in relation to SIB in any jurisdiction where they believed assets or property of SIB may be located. The JLs replaced liquidators who had been appointed in 2009. ("JLs' Canadian Action Statement of Claim," paras 28–29)

11. In August 2011, the JLs were authorized by the Superior Court of Québec to replace the interim receiver who had been given exclusive authority to initiate and pursue proceedings in respect of SIB. The order authorizing the JLs to replace the interim receiver recognized the JLs to have "'the equivalent or substantially similar powers and capacities than those of a trustee in bankruptcy or other insolvency holder within Canada' and (it) authorized the JLs to exercise those powers and capacities for the purposes of the institution and litigation of the within action against TD Bank." Pursuant to this order, the JLs commenced an action in the Superior Court of Justice of Ontario in accordance with their exclusive authority to initiate and pursue proceedings in Canada in respect of SIB. (JLs' Canadian Action Statement of Claim, paras 30, 32)

12. I understand that a motion for summary judgment to dismiss the JLs' Canadian Action on the basis of a limitations defense is currently pending, and that, if this motion is granted, the JLs' Canadian Action would be dismissed in full. I note that the claims against TD Bank based on negligent acts committed in Ontario would be understood by an Ontario court to be governed by Ontario law, including its limitation period, wherever the matter was decided. (*Limitations Act, 2002,* S.O. 2002, c. 24, Sch B).

**B.  Description of Proposed U.S. Class Action**

13. In May 2015, six named plaintiffs, on behalf of themselves and all others allegedly similarly situated, filed a proposed Second Amended Class Action Complaint in the United States District Court for the Northern District of Texas.  Plaintiffs alleged that, *inter alia*, TD Bank and four other banks provided assistance to R.A. Stanford, in his misappropriation of SIB investor funds.  Specifically, plaintiffs allege: (i) common law aiding, abetting or participation in a fraudulent scheme; (ii) aiding, abetting or participation in violations of the Texas Securities Act; (iii) aiding, abetting or participation in breach of fiduciary duty; (iv) aiding, abetting or participation in conversion; and (v) civil conspiracy. (U.S. Class Action Complaint, pp. 1–3, 120–26)

14. The following analysis provides a comparison between the JLs' Canadian Action and the proposed U.S. Class Action in respect of (i) beneficiaries, (ii) quantum of damages, (iii) other remedies, (iv) attorneys' fees, (v) allegations pursued, and (vi) applicable regulatory standards.

*(i) Beneficiaries*

15. The JLs commenced the Canadian Action for damages against TD Bank in their capacity as representatives of SIB and of SIB's approximately 21,000 creditors. The Statement of

Claim states that "[a]ny damages awarded to SIB will form part of SIB's estate and be disbursed to SIB's creditors." (JLs' Canadian Action Statement of Claim, para 35)

16. The proposed U.S. Class Action has been brought on behalf of "[a]ll persons who invested in SIBL CD(s) from August 23, 2004 – February 16, 2009, inclusive, and whose claims for losses related to SIBL CDs are recognized, authorized, and calculated by the United States Receiver for the Stanford Entities, Ralph S. Janvey." (U.S. Class Action Complaint, para 420)

17. Accordingly, it would appear that the beneficiaries of the JL's Action in Canada include all the potential beneficiaries of the proposed U.S. Class Action in respect of the recovery sought from TD Bank.

### (ii) Quantum of Damages

18. The JLs' Canadian Action Statement of Claim states that the relief sought in the Canadian Action includes "damages in the Canadian dollar amount equivalent to U.S. $5.5 billion and further amounts to be determined prior to trial" for approximately 21,000 investors. (JLs' Canadian Action Statement of Claim, para 1)

19. The class in the proposed U.S. Class Action is limited to include investors whose claims have been allowed by the Receiver, with the number estimated as exceeding 17,000 investors with over U.S. $4.4 billion in approved claims. (Certification Memorandum, p. 19)

20. Thus, the total amount of damages and the per person dollar value of the damages sought in the JLs' Canadian Action appears to be slightly larger than in the proposed U.S. Class Action.

*(iii) Other remedies*

21. In addition to the damages claimed, the JLs' Canadian Action also seeks "an accounting and disgorgement of profits in amounts to be determined prior to trial." (JLs' Canadian Action Statement of Claim, para 1(b))

22. In Ontario, under the rule against double recovery (*Kosanovic v. Wawanesa Mutual Insurance Co.* (2005) 70 O.R. (3d) 161 (C.A.)), it would not ordinarily be possible to recover under both the claim for damages and the claim for equitable relief, but if the Ontario court decided that more than US $5.5 billion was recoverable through an accounting and disgorgement of profits (*i.e.*, the equitable relief), that higher amount could be awarded.

23. Accordingly, the request in the JLs' Canadian Action for equitable remedies has the potential to increase the quantum of recovery beyond the level of the damages specifically sought.

24. The JLs' Canadian Action Statement of Claim also seeks "prejudgment and post-judgment interest on the foregoing amounts pursuant to the Court of Justice Act." (JLs' Canadian Action Statement of Claim, para 1(c)) Although this is not specifically sought in the proposed U.S. Class Action Complaint, it is my understanding that a request for recoverable pre-judgment and post-judgment interest would be presumed and generally implied in the request for "further and other relief" in the proposed U.S. Class Action Complaint. (U.S. Class Action Complaint, p. 126) Accordingly, there does not appear to be a substantive difference between the two proceedings in this regard.

*(iv) Attorneys' fees*

25. Finally, in addition to the substantive remedies and interest, the JLs' Canadian Action seeks "costs of this action on a substantial indemnity basis plus H.S.T. [taxes]" (JLs' Canadian Action Statement of Claim, para 1(d)), whereas the proposed U.S. Class Action seeks an order "Awarding attorneys' fees, and costs, as permitted by law." (U.S. Class Action Complaint, p. 126)

26. In Canada, in cases in which there are no settlement offers outstanding at the time of trial, it is common for costs to be awarded in favour of the prevailing party. However, costs are awarded on a substantial indemnity basis only in exceptional cases, typically as a sanction for misconduct in the litigation of the matter. Ordinarily, approximately 55–60% of the prevailing party's counsel fees are awarded to the prevailing party. Accordingly, although the JLs' Canadian Action Statement of Claim states that "[a]ny damages awarded to SIB will form part of SIB's estate and be disbursed to SIB's creditors" (JLs' Canadian Action Statement of Claim, para 35), it would appear that the portion of the attorneys' fees that are not reimbursed through the costs award (*e.g.*, 40–45%) would be borne by the estate of SIB.

27. Nevertheless, it is my understanding that, despite the request for an order for attorneys' fees in the proposed U.S. Class Action (U.S. Class Action Complaint, p. 126), the prevailing rule in the United States is that each party bears its own attorneys' fees. Typically, attorneys' fees in a U.S. class action are taken from the award that is otherwise distributed to the class. Furthermore, it is my understanding that the quantum payable for attorneys' fees is ordinarily fixed as a percentage of the award, and that it often exceeds the amount that would be payable based on the attorneys' usual hourly rate.

28. Accordingly, in my view, the differences between the ways in which attorneys' fees are calculated and awarded could result in more of the award being available for distribution to the beneficiaries in the JLs' Canadian Action than would be available for distribution to the beneficiaries in the proposed U.S. Class Action.

### (v) Allegations pursued

29. The U.S. Class Action Complaint and the JLs' Canadian Action Statement of Claim both contain broadly similar descriptions of the events underlying the claims brought.

30. The claims asserted in the U.S. Class Action Complaint include: (i) common law aiding, abetting, or participation in a fraudulent scheme; (ii) aiding, abetting or participation in violations of the Texas Securities Act; (iii) aiding, abetting, or participation in breach of fiduciary duty; (iv) aiding, abetting, or participation in conversion; and (v) civil conspiracy. (U.S. Class Action Complaint, pp. 120–126)

31. The allegations in the JLs' Canadian Action include negligence and knowing assistance. (JLs' Canadian Action Statement of Claim, paras 316–331)

32. In Ontario, a plaintiff's pleadings must contain a concise statement of the material facts on which the party relies for the claim, but it is not necessary to raise points of law in a pleading. A party is not prohibited from doing so if it so wishes, provided that the supporting material facts are pleaded.

33. The allegations pursued in the JLs' Canadian Action appear to be broadly similar to those in the proposed U.S. Class Action.

### (vi) Applicable regulatory standards

34. The U.S. Class Action Complaint explains:

> In Canada, TD Bank and other banks are regulated by the Office of the Superintendent of Financial Institutions ("OSFI"). OSFI has developed a manual of best practices for banks with regard to deterring and detecting money laundering. In addition to that guide, banks in Canada are governed by the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act*, S.C. 2000, c. 17 (the "PCMLTFA").

> (U.S. Class Action Complaint, para 65)

35. The U.S. Class Action Complaint goes on to describe the applicable statutory and regulatory standards (U.S. Class Action Complaint, pp. 21–23) and it concludes that: "These rules and regulations governed the conduct of TD Bank and applied to its relationship with SIBL, R.A. Stanford, and the Stanford Entities." (U.S. Class Action Complaint, para 70)

36. The JLs' Canadian Action Statement of Claim similarly describes the applicable legal and regulatory standards as administered by, *inter alia*, the Office of the Superintendent of Financial Institutions, and the way in which these standards governed the conduct of TD Bank pursuant to the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act*, S.C. 2000, c. 17 and its Regulations, and the *Criminal Code of Canada*. (JLs' Canadian Action Statement of Claim, pp. 68–94)

37. Accordingly, the U.S. Class Action Complaint and the JLs' Canadian Action Statement of Claim are in agreement that the conduct of TD Bank in dealing with the SIB investors is governed by Canadian legal and regulatory standards.

**B.  It is unlikely that a judgment or court-approved settlement in the proposed US Class Action would be granted preclusive effect in Canada**

12

38. In my opinion, it is unlikely that a Canadian court would recognize and grant preclusive effect to a judgment or court-approved settlement in the proposed U.S. Class Action for the following reasons.

### *(i) The JLs have exclusive authority to initiate and pursue proceedings in Canada*

39. In August 2011, the Superior Court of Québec granted the JLs' exclusive authority to initiate and pursue proceedings in respect of SIB. The *Bankruptcy and Insolvency Act (Canada)* is a federal statute. Orders such as the August 2011 order of the Superior Court of Québec (*see supra* para 10) in this case operate throughout Canada. Accordingly, in acting pursuant to the order of the Superior Court of Québec with "'the equivalent or substantially similar powers and capacities (as) those of a trustee in bankruptcy or other insolvency holder within Canada" (JLs' Canadian Action Statement of Claim, para 32), the exclusive authority of the JLs to commence proceedings would be recognized throughout Canada.

40. Where a court in Canada has exclusive authority over a particular matter, a foreign judgment or court-approved settlement will not be granted preclusive effect by a Canadian court.

41. Article 3155(1) of the Civil Code of Québec provides that "A decision rendered outside Québec is recognized and, where applicable, declared enforceable by the Québec (court), except (where) … (1) the authority of the State where the decision was rendered had no jurisdiction under the provisions of this Title …". Article 3165(1) provides that "The jurisdiction of foreign (courts) is not recognized by Québec (courts) … (1) where, by reason of the subject matter or an agreement between the parties, Québec law grants

exclusive jurisdiction to its (courts) to hear the action which gave rise to the foreign decision …".

42. In the rest of Canada, the same principle applies, such that a decision rendered by a foreign court in a matter in which a Canadian court has exclusive jurisdiction is not capable of recognition and enforcement in Canada. (*Duke v Andler* [1932] S.C.R. 734 (S.C.C.))

***(ii) The JL's exclusive authority would need first to be varied for a foreign judgment or court-approved settlement to be recognized***

43. It is acknowledged that the order of the Superior Court of Québec was made in the context of a larger cross-border co-operative arrangement for the administration of the SIB insolvency, one in which the U.S District Court for the Northern District of Texas, as the court at the place designated as the "Centre of Main Interest," appointed a Receiver over all property, assets, and records of the Stanford Defendants, and all entities they own or control. (Janvey Declaration, para 2) Also in this cross-border co-operative arrangement for the administration of the SIB insolvency, the courts of the SIB's domicile approved a multilateral settlement agreement and cross border protocol between the various parties, including the JLs, the U.S. Receiver, the U.S. Securities and Exchange Commission, the Official Stanford Investor's Committee, the U.S. Department of Justice and the U.S. Court Appointed Examiner ("Antiguan Cross Border Protocol").

44. However, within Canada, the order of the Québec Superior Court is independently determinative unless and until it is varied. Accordingly, if there were to be a variation so as to permit a departure from the exclusive authority currently enjoyed by the JLs over proceedings against TD Bank, this would need to be decided by a Canadian court in light

of the potential preferability of other means of proceeding; and it would not be accepted by a Canadian court merely as a consequence of the certification of a U.S. Class Action.

***(iii) A Canadian court is unlikely to be inclined to vary the order of the Québec Superior Court in favour of recognizing a judgment or court-approved settlement in the proposed U.S. Class Action***

45. Within Canada there is no inevitable hierarchy of preferred methods of seeking collective redress in a situation such as that involving the investors of SIB. Whether a class action can be certified in a matter in which there is an ongoing regulatory action will depend upon whether the class action is the "preferable" method of proceeding. (Class Proceedings Act, S.O. 1992, c. 6, s. 5(1))

46. For example, in *AIC Limited v Fischer*, 2013 SCC 69, the Supreme Court of Canada held that a settlement in a regulatory proceeding brought by the Ontario Securities Commission did not preclude the certification of a class action both because (a) the settlement, which had been negotiated with limited participation on the part of the beneficiaries had been entered into on a without prejudice basis, and (b) the expert evidence estimated that investors had received only a small portion of the compensation that they might otherwise receive. In this situation, a class proceeding (in addition to the previously established settlement) was determined preferable.

47. In another example, in *Mondor v. Fisherman; CC&L Dedicated Enterprise Fund (Trustee of) v. Fisherman* [2002] O.J. No. 1855 (S.C.J.), the Ontario Superior Court approved a settlement that had been negotiated jointly by class counsel in Ontario, and the Receiver and the Independent Litigation Supervisor appointed in Alberta. The Court of Queen's Bench of Alberta had previously approved the recommendation of the Independent Litigation Supervisor to implement the proposed settlement. Accordingly, in this situation,

the concern for preferability was addressed by the cooperation between the receiver and class counsel, and by the coordination of the potential proceedings.

48. Even if the alternative to certifying a class action in Canada were not to give effect to a Receiver's action, but rather to recognize a class action judgment or court-approved settlement in the matter in the U.S., the certification of a U.S. class action would not automatically be granted preclusive effect.

49.  This was illustrated in *Silver v. IMAX Corp.*, 2013 ONSC 1667 (S.C.J.) ("*Imax*"), a class proceeding relating to the purchase of shares on both Canadian and U.S. exchanges. In that case, steps were taken to coordinate the Canadian and U.S. class actions so that the claims would be adjudicated in the courts of the country where the shares were traded. The certification order that was granted in the United States was made conditional on the exclusion by the Canadian court from the plaintiff class in the action before it of shareholders who had used the NASDAQ to purchase their shares. The grounds for this requirement were that those purchasers would have a reasonable expectation that their claims would be adjudicated in the United States.

50. The Canadian court excluded the shareholders who had used the NASDAQ because the U.S. Court has a strong jurisdictional connection with the matters at issue. The Canadian court noted that other courts had "referred to the 'reasonable expectations' of the class members as to where their claims might be litigated as relevant to the question of a court's jurisdiction. It would be consistent with the reasonable expectations of the overlapping class members, who acquired their shares on the NASDAQ, and in circumstances where IMAX was subject to both U.S. and Ontario securities laws, that their rights could be

determined by the U.S. Court in the context of applicable U.S. law. This is a factor that, while not determinative, weighs in favour of the order sought." (*Imax, supra,* para 183)

51. Accordingly, the *Imax* decision illustrates the perceived need for cross-border coordination of collective redress proceedings to secure court approval for certification and for settlement.

52. The *Imax* decision also demonstrates the principle that the importance of coordinating parallel proceedings across borders for court approval in Canada is not a function of a perceived parochialism on the part of Canadian courts such that they would be reluctant to defer to U.S. courts. This was demonstrated also in *Kaynes v. BP* 2014 ONCA 580 (C.A.) ("*Kaynes*"). In that case, there were certification motions in class actions both in the United States and in Canada in respect of purchasers resident in both countries. The defendant had conceded that the Ontario courts had jurisdiction to entertain the claims of those members of the proposed class who purchased their shares on the Toronto Stock Exchange, but it challenged the jurisdiction of the Ontario court over those who had purchased their shares on the New York Stock Exchange. The Court of Appeal for Ontario held that the Superior Court in Ontario had jurisdiction, but that it should decline to exercise that jurisdiction on grounds of *forum non conveniens* in favour of a determination by the U.S. court of the claims of those who had purchased their shares on the New York Stock Exchange.

53. The *Kaynes* and *Imax* decisions reflect the inclination of Canadian courts in cases involving investors in cross-border situations to favour the adjudication of the investors' claims in the jurisdiction in which the investors would reasonably expect them to be decided.

54. In the case at hand, in my opinion, a Canadian court would be unlikely to endorse the abandonment of the JLs' Canadian Action in favour of the proposed U.S. Class Action because the SIB investors would reasonably expect the claims at issue to be decided in accordance with Canadian law.

55. In part, this is because, notwithstanding that the U.S. Class Action Complaint concedes that Canadian law provides the applicable legal standards to adjudicate the actions of TD Bank (see paras. 65-70), the U.S. Certification Memorandum indicates that it is unlikely that class counsel will seek to have Canadian law applied in the claims against TD Bank, in view of the assertion that Texas Law would govern the U.S Class Action. (Certification Memorandum, pp 45–49)

56. It is also notable that the proposed U.S. Class Action fails to include a representative plaintiff from Canada. In the *Breast Implant* litigation, a proposed settlement that had been negotiated entirely by U.S. lawyers and which allocated only 3% of the fund for claimants from all other countries, the claimants from Ontario, Québec and Australia were presumptively excluded at the request of their representatives because the settlement fund inappropriately discounted the value of their claims for which class actions in their own courts provided a viable alternative. (*In re Silicone Gel Breast Implant Prods. Liab. Litig.*, Nos. CV 92-P-10000-S & CV 94-P-I 1558-5, 1994 WL 578353 (N.D. Ala. Sept. 1, 1994).

57. In view of the history of cases like the *Breast Implant* litigation, it is unlikely that a Canadian court would be persuaded that the interests of claimants who would otherwise expect to have their claims decided in Canada under Canadian law would be well served in a U.S. class action in which there was no Canadian representative plaintiff.

58. Also of note in the proposed U.S. Class Action is the assertion that "any other potential jurisdiction lacks a significant interest in this adjudication" (Certification Memorandum, p. 45). This assertion is patently contrary to the current arrangements for cross-border cooperation, which entail the litigation of the TD Bank claims in Ontario. (Janvey Declaration; JLs' Canadian Action Statement of Claim)

59. A final consideration is that the Certification Memorandum misrepresents the Canadian law on the recognition of foreign class action judgments. The passage cited from *Anwar II*, 289 F.R.D. at 117–18 in pages 51–52 of the Certification Memorandum is, with respect, incorrect.

60. In England, where there is currently no form of action comparable to an opt-out class action, such as exists in the United States and in Canada, there is no case law directly addressing the preclusive effect of a foreign class action judgment or court-approved settlement on the rights of absent class members who seek to sue independently in the courts of England and Wales. The English jurisprudence focuses on the circumstances of the named parties in litigation.

61. The courts in Canada have long recognized that different considerations apply to the recognition of preclusive effects of foreign class action judgments or court-approved settlements on absent class members (*e.g., Currie v. McDonald's Restaurants of Canada Ltd.* [2005] O.J. No. 506 (C.A.). It flies in the face of more than two decades of increasingly sophisticated jurisprudence on class actions law and practice in Canada to suggest that Canadian courts would look to the United Kingdom for guidance on the recognition and enforcement of foreign judgments or court-approved settlements in the context of class actions. Indeed, there is no relevant English jurisprudence for a Canadian

court to consult.

62. In sum, the Certification Memorandum alleges, inconsistently with the U.S. Class Action Complaint, that Texas law and not Canadian law will apply; that no jurisdiction other than Texas has a significant interest in the adjudication; and misrepresents the state of Canadian law on the recognition and enforcement of foreign class action judgments or court-approved settlements.   Moreover, the proposed U.S. Class Action includes no representative plaintiff from Canada. .

63.  Accordingly, in my view, a Canadian court would regard it as important for the claims by the SIB investors against TD Bank to be adjudicated in the forum that they would reasonably expect them to be decided—namely, Canada—and on the basis of Canadian law. The proposed U.S. Class Action promises to do neither and, consequently, a Canadian court would be unlikely to endorse the abandonment of the JLs' Canadian Action in favour of the proposed U.S. Class Action.

*(iv) The beneficiaries of the JLs' Canadian Action have not submitted to the proposed U.S. Class Action*

64. Assuming that the Québec Superior Court could, in principle, be persuaded by the beneficiaries of the JLs' Canadian Action expressing their interest in having their claims adjudicated in the proposed U.S. Class Action to vary its current order granting exclusive authority to the JLs to pursue an action against TD Bank, it would remain for the Court to be persuaded that the beneficiaries had expressed such an interest. The Memorandum Supporting Plaintiffs' Motion for Class Certification argues that by filing the Proof of Claim Form, the beneficiaries did so:

> The proposed class is defined to include only investors whose claims
> have been recognized and allowed by the Receiver in the SEC Action.
> Thus, class members are persons that have filed claims and submitted
> to the jurisdiction of this court. … (in) what effectively amounts to an
> "opt-in" class of investors from around the world.
>
> (Certification Memorandum, pp. 54-55)

65. It is, of course, for the U.S. District Court in the Northern District of Texas to determine whether the filing of the Proof of Claim Form in the Receiver action constitutes submission to its jurisdiction *for the proposed U.S. Class Action*, as the Certification Memorandum seems to contend. However, any decision by the U.S. District Court in Texas to exercise jurisdiction over absent class members in the proposed U.S. Class Action is not determinative of whether a Canadian court would recognize that jurisdiction (and thereafter grant preclusive effect to a judgment or court-approved settlement rendered by the U.S. District Court in such an action). A Canadian court would decide for itself, applying on its own law, whether the submission of claim forms to the Receiver and its Claims Agent by SIB investors would give the U.S. District Court jurisdiction over claims in the proposed U.S. Class Action.

66. For the reasons stated below, in my view, a Canadian court is unlikely to consider the claims submission described herein to confer jurisdiction for the purposes of the proposed U.S. Class Action.

67. Perhaps most significant is that the Proof of Claim Form appears to confer jurisdiction only for limited purposes. Page 4 of the form provides the "Consent to Jurisdiction" provision stating as follows:

> CONSENT TO JURISDICTION:  If you submit a Proof of Claim
> Form *in this case*, you consent to the jurisdiction of the District Court
> for all purposes *relating to this claim* and agree to be bound by its

decisions, including, without limitation, a determination as to the validity and amount of any *claims asserted against the Receivership Entities*.  In submitting a Proof of Claim Form, you agree to be bound by the actions of the District Court even if that means your claim is limited or denied.

(emphasis added)

68. Thus, the Proof of Claim Form refers to the claims asserted against the Receivership Entities in the Receivership action—an action separate and apart from the proposed U.S. Class Action.

69. In Canada, attornment to the jurisdiction of a court in respect of a proceeding is confined to that proceeding and does not constitute a submission to the court's jurisdiction in other proceedings. (*McCaffrey v. Dalla-Longa*  [2007] O.J. No. 4628 (S.C.J.) para 18) In the related context of waiver of immunity to the court's jurisdiction, "the test…is a strict one. The Court of Appeal has instructed that any contractual waiver of immunity must be "clear and unequivocal; it cannot be presumed." (*Bombardier Inc. v. AS Estonian Air* 2013 ONSC 3039 (S.C.J.) citing *United States v. Friedland* (1999), 46 O.R. (3d) 321, at para 15 (C.A.)

70. Accordingly, it would appear that the Proof of Claim Form sent to the U.S. Receiver would be interpreted by a Canadian court as submission to the jurisdiction of the U.S. District Court for the Northern District of Texas exclusively for the SEC Action and not as submission to that jurisdiction in respect of the proposed U.S. Class Action.

71. The reasonable interpretation of the Proof of Claim Form is important because, in considering the possibility of granting preclusive effect to foreign class action judgments or settlements, Canadian courts have demonstrated considerable concern to ensure that absent class members receive adequate notice and opportunity to opt out.

72. In *Canada Post Corporation v. Lépine,* 2009 SCC 16 (S.C.C.) the Supreme Court of Canada considered an application in Québec for preclusive effect to be given to a class action judgment from Ontario. The application was denied because it was held that the notice of the Ontario settlement would fail to inform residents of Québec (who also received notice of the Québec action) of the potential impact of the Ontario settlement on their rights in the Québec action. The confusion created by the conflicting notices gave rise to a breach of a fundamental principle of procedure,warranting the refusal to recognize the Ontario judgment.

73. Accordingly, for the foregoing reasons, it is unlikely that a judgment or court-approved settlement in the proposed U.S. Class Action would be granted preclusive effect in Canada.

Pursuant to 28 USC §1746(1), I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 7, 2015 in New York, New York.

_____

Professor Janet Walker

# EXHIBIT 1

# JANET WALKER

Osgoode Hall Law School, 4700 Keele Street, Toronto, Ontario, Canada M3J 1P3
Arbitration Place, 900-333 Bay Street, Toronto, Ontario, Canada M5T 2H4
Outer Temple Chambers, 222 Strand, London WC2R 1BA
janet@janet-walker.com - www.janet-walker.com

## Professional

### Positions Held

| | |
|---|---|
| 1996-present | Professor, Osgoode Hall Law School, York University (Associate Dean, 2003-05 Member, Academic and Administrative Program Review, 2014) |
| 2006-15 | Common Law Advisor, Federal Courts Rules Committee |
| 1994-96 | Researcher, Litigation Department, Tory Tory DesLauriers & Binnington |
| 1993-94 | Law Clerk to the Chief Justice of Ontario and Justices of the Court of Appeal |

### Visiting Positions

| | |
|---|---|
| 2014-present | Academic Advisor, Chartered Institute of Arbitrators |
| 2001-2014 | Foreign Research Professor in Private International Law, Faculté des sciences juridiques, sociales et politiques de Tunis, Masters Program in Common Law (Course on Private International Law) |
| 2014 | Chartered Institute of Arbitrators (Oxford Diploma Course in International Arbitration) |
| 2013, 2015 | Institute in International Commercial Law and Dispute Resolution, Pittsburgh, Touro and Zagreb in Zadar, Croatia (Course on Advocacy in International Arbitration) |
| 2013 | Monash University in Prato, Italy (Course on Transnational Litigation) |
| 2010 | Leverhulme Visiting Professor, University College, Oxford University (Project on Teaching Procedure) |
| 2008 | Visiting Professor, Hauser Global Law Faculty, NYU/NUS Joint Program (Singapore) (Course in Comparative Private International Law) |
| 2007 | Visiting Professor, Hauser Global Law Faculty, NYU School of Law (Seminar in International Litigation) |
| 2006 | Visiting Professor, Faculty of Law, University of Toronto (Course on Private International Law) |
| 2006 | Visiting Professor, Faculty of Law, Haifa University, Israel (Course on Comparative Private International Law) |
| 2002 | Visiting Professor, Faculty of Law, Monash University, Melbourne, Australia (Course on Conflict of Laws) |

### Professional Qualifications and Activities

| | |
|---|---|
| 1998-present | Member of the Bar of Ontario and the Law Society of Upper Canada |

| | |
|---|---|
| 2014-present | Associate Member, Outer Temple Chambers, London |
| 2012-present | Member Arbitrator, Arbitration Place, Toronto |
| 2003-present | International Association of Procedural Law (Secretary General, 2011-present; Editorial Board of the International Journal of Procedural Law, 2010-present) |
| 2001-present | Member of Canadian Panel of Arbitrators, International Chamber of Commerce (ICC); International Panel of Neutrals, International Center for Dispute Resolution (ICDR); Panel of Foreign Arbitrators, China International Economic and Trade Arbitration Commission (CIETAC); Panel of Foreign Arbitrators, Shanghai International Economic and Trade Arbitration Commission (SHIAC); Panel of Arbitrators, Kuala Lumpur Regional Centre for Arbitration KLRCA; appointments as sole arbitrator (ICC 11707, 14579, 16319; ICDR 622-09; 137-13), co-arbitrator (ICC 13333) and chair (ICC 12939); and participation in courses and symposia, including LCIA Users' Symposium (Toronto, 2013), (London, 2010), (Boston, 2013) (Tylney Hall, 2008, 2014), (Toronto, 2007), (Chicago, 2006), (Montreal, 2004); ICC Workshop (Montreal, 2010); ICDR International Symposia in Advanced Case Management Issues (Toronto, 2007), (Prague, 2005); Juris Leading Arbitrators' Symposium (New York, 2007), (Toronto, 2005); Canadian Bar Association Conferences (with UNCITRAL, Ottawa, 2004), (with ICC, Calgary 2003), (with ICC, Montreal 2002), (with LCIA, Toronto 2001); ICC/CCIB Panel of Arbitrators Symposium, 2005, 2004, 2003, 2002; Chartered Institute of Arbitrators, FCIArb; Member, ICC Commission (2013-) |
| 1998-present | Expert witness and counsel to members of the profession and governments in Canada and elsewhere in matters relating to crossborder and domestic procedure |
| 2006-2012 | Chair, Toronto Chapter, Chartered Institute of Arbitrators |
| 2009-2011 | President, International Law Association, Canadian Branch |
| 2007-2010 | Working Group on Protocols for Parallel Class Actions, ABA Litigation Section |
| 2010-present | International Lawyers for Africa, Tunisian National Committee Member |
| 2009 | Conference Co-Chair, "Common Law-Civil Law: The Future of Categories-Categories of the Future" IAPL Conference (Toronto, June 3-6, 2009) |
| 2008 | Law Commission of Ontario, Scholar-in-Residence |
| 2008 | Cours de langue et civilisation françaises de la Sorbonne |
| 2007-2008 | IBA Task Force on International Procedures and Protocols for Collective Redress |
| 2006-2008 | ILA Committee on International Litigation and the Interests of the Public: International Aspects of Group Actions |
| 2006 | Conference Co-Chair, 72nd Biennial Conference of the International Law Association (Toronto, June 2006) |
| 2004-06 | Uniform Law Commission of Canada: National Class Action Reform Project |
| 1998-04 | International Adviser to the American Law Institute/Unidroit Transnational Rules and Principles of Civil Procedure Project |
| 1996-98 | Counsel on int'l dispute resolution to Tory, Tory, DesLauriers & Binnington |
| 1996 | Asst to the Hon CL Dubin QC in "An Independent Review of the Canadian Medical Protective Association" |
| 1993 | Panelist Assistant, Canada-US Free Trade Bi-national Panel |

1991-93        Research Coordinator, Province of Ontario Enquiry on Non-therapeutic Medical
               Procedures on Behalf of Mentally Incapable Individuals

## *Associations*

American Arbitration Association—ICDR Panel of International Neutrals
American Law Institute
American Society of International Law (Steering Cmte, Private Int'l Law Interest Group 2001-03)
Arbitralwomen (Founding Member, Board Member 2008-2010)
Arbitration Roundtable of Toronto/Toronto Commercial Arbitration Society (Program
        Committee 2010-2014)
Arbitration Place
Athenaeum Club, London
Canadian Bar Association
Canadian Association of Law Teachers
Canadian Council on International Law (1996-2008, Board of Directors, 2004-08)
Chartered Institute of Arbitrators (FCIArb) (Chair, Toronto Chapter, 2006-12; Executive, 2012-)
China Int'l Economic and Trade Arbitration Commission (CIETAC) Panel of Arbitrators
Governor General's Horse Guards Association (Life Member)
International Academy of Commercial and Consumer Law
International Association of Procedural Law (Presidium Member, 2011-present)
International Bar Association
ICC Canada, (Program Committee 2012-14; Executive Committee 2014-15) (formerly ICC
        Canadian National Committee (CCC) (Canadian Panel of Arbitrators 2001-present)
ICC Commission (2014-present)
International Law Association—(Advisory Committee, Research, 2002-08) (Canadian Branch
        Vice-President, 2004-09; President 2009-11) (2006 Biennial Conference Co-Chair)
Kuala Lumpur Regional Centre for Arbitration (KLRCA) Panelist member
Law Society of Upper Canada (non-practising member)
London Court of International Arbitration
Massey College, Senior Fellow
Osgoode Society
Shanghai Int'l Economic and Trade Arbitration Commission (SHIAC) Panel of Arbitrators
The Advocates' Society
University Club of Toronto
Worshipful Company of Arbitrators
Young Canadian Arbitration Practitioners' (Steering Cmte 2004-06, Advisory Board 2006-12)

## *Community Service, Honours*

1977-2014      Canadian Forces Primary Reserve (411 Air Reserve Squadron, 1977-87; Governor
               General's Horse Guards, 1987-2014; Bandmaster 2010-11; retiring rank MWO)
2012           Queen's Diamond Jubilee Medal
2011           Governor General's Horse Guards Commanding Officer and Regimental
               Sergeant Major's Award of Excellence
2011           Land Force Central Area Commander's Award of Excellence
2002           Queen's Golden Jubilee Medal
1989           Canadian Forces Decoration (1st clasp 1999, 2nd clasp 2009)

## Education

### Degrees

| | |
|---|---|
| 2002 | DPhil, Oxford University (Law – Conflict of Laws) (MA, 2010) |
| 1993 | JD (formerly LLB) Osgoode Hall Law School |
| 1982 | MA, York University (Social Theory) |
| 1979 | BA (Hons), York University (Arts – Individualized Studies) |

### Academic Awards

| | |
|---|---|
| 2010 | Osgoode Professional Development Part-time LLM Teaching Award |
| 2009 | Walter Owen Book Prize (*Éléments de common law canadienne – comparaison avec le droit civil québécois*, A Grenon, L Belanger-Hardy eds) |
| 1995 | Viscount Bennett Fellowship |
| 1995-96 | SSHRC Doctoral Fellowship |
| 1994-96 | Overseas Research Students Award |
| 1994 | JSD Tory Research and Writing Award |
| 1993 | Osgoode Hall Law School Silver Medal |
| 1993 | JSD Tory Research and Writing Award |
| 1993 | Benjamin Laufer Prize in International Law |
| 1993 | Christopher Robinson Memorial Scholarship |
| 1993 | Matthew Wilson Memorial Scholarship |
| 1993 | Cassels, Brock & Blackwell Centennial Prize in Lawyering Skills |
| 1992 | McCarthy Tétrault Prize |
| 1992 | Carswell Company Prize |
| 1992 | Gurston Allen Prize |
| 1992 | Prize in Conflict of Laws |
| 1992 | The Honourable Newton W Rowell Scholarship |
| 1991 | Clifton H Lane Memorial Prize in Property II |
| 1991 | Bassel, Sullivan & Leake Prize in Civil Procedure I |
| 1980-82 | Ontario Graduate Scholarship |
| 1979 | SSHRC Special MA Scholarship |
| 1979 | York Scholarship |
| 1977, '78, '79 | York In-Course Scholarships |
| 1976 | York Entrance Scholarship |
| 1975 | Ontario Scholar |

## Publications and Presentations *(past 10 years)*

### Books and Journal Issues

*Canadian Conflict of Laws* 7th ed looseleaf (Markham: Butterworths, 2016+) (forthcoming)

*The Civil Litigation Process: Cases and Materials,* 8th ed (Toronto: Emond Montgomery, 2015) General Editor (forthcoming)

*Castel & Walker: Canadian Conflict of Laws* 6th ed looseleaf (Markham: Butterworths, 2005+)

*Special Issue on Teaching Procedure,* (2014) 51 Osgoode Hall Law Journal, Guest Editor

*Class Actions in Canada, Cases and Materials* (Toronto: Emond Montgomery, 2013) General Editor

App. 2180

*Halsbury's Laws of Canada: Conflict of Laws,* 2011 reissue (Markham: Lexis Nexis Canada, 2011)

*Common Law, Civil Law and the Future of Categories (*Markham: LexisNexis, 2010) Editor, with Oscar Chase (736 pages), also published as (2010) 49 S.C.L.R. (2d)

*Civil Litigation (*Toronto: Irwin Law, 2010) with Lorne Sossin (300 pages)

*The Civil Litigation Process: Cases and Materials,* 7th ed (Toronto: Emond Montgomery, 2010) General Editor (983 pages)

*The Vis Book: A Participant's Guide to the Vis International Commercial Arbitration Moot* (Huntington, NY: Juris, 2007) Editor (190 pages)

*Halsbury's Laws of Canada: Conflict of Laws* (Markham: Lexis Nexis Canada, 2006) (854 pages)

*The Civil Litigation Process,* 6th ed (Toronto: Emond Montgomery, 2005) General Editor

*E drejta ndërkombëtare private (Private International Law: A Course for Magistrates*), Magistrates' School, Tirana, Albania (World Bank, 2005) with Arta Mandro-Balili and Ardian Kalia

*Canadian Conflict of Laws* 5th ed, looseleaf (Markham, Butterworths: 2002) with J-G Castel

*Special Issue of the Osgoode Hall Law Journal in Honour of Jean-Gabriel Castel*, (2000) Guest Editor

*The Civil Litigation Process,* 5th ed (Toronto: Emond Montgomery, 1999) with GD Watson, W Bogart, A Hutchinson, J Mosher and T Pinos

*A Practical Guide to Mooting* (Toronto: Emond Montgomery, 1995) with S Williams

### Looseleaf Casebooks

*Canadian Conflict of Laws: Cases and Materials* (1996, 1997, 1998, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2010, 2012)

*Transnational Litigation* (1998, 2000, 2002, 2008, 2010, 2012)

*International Business Transactions: Cases and Materials* (1998, 1999)

*Civil Procedure I* (1997, 1998, 1999)

### Journal Articles and Book Chapters

"Class Actions in Canada" in *Class Actions in International Perspective,* eds Diego Corapi - Gianluca Scarchillo 2016 (forthcoming)

"Australian and Canadian Perspectives on Arbitration: A Joint Discussion" (2014) 4 Quaderni de Colloqui

"Prohibited Means of Obtaining and Presenting Evidence" in Burkhard Hess, ed *Reports of the XIVth World Congress, International Association of Procedural Law* (2013)

"XVIIIth Moot" in eds L Barrington, N Casado Filho, C Finkelstein, *The Danubia Files* (Parker, CO: Outskirts Press, 2013)

"Cultural Dimensions of Group Litigation" in *Civil Procedure in Cross-Cultural Dialogue* (Moscow: CTATYT, 2012) 413-458

"Class Actions: Settlement, Approval, Res Judicata, Claims Administration and Cy-pres Awards" in *Procesos Colectivos/Class Actions* (Buenos Aires, U de Buenos Aires, 2012) 535-542

"Who's Afraid of US-style Class Actions?" (2012) Southwestern International LJ 509-566

"Summary Judgment has its Day in Court" (2012) 37 Queen's LJ 697-728

"Same-sex Divorce Tourism Comes to Canada" (2012) LQR 344-346

"Ethical Lawyering in the Clientless World of Class Actions in Canada (2012) Jotwell

"Current Jurisdictional and Recognitional Issues in the Conflict of Laws" (2011) 50 Cdn Bus LJ 499-525 (with Vaughan Black and Joost Blom)

"Canada" in The Funding and Costs of Civil Litigation in Comparative Perspective (Oxford: Hart Publishing, 2011) 239-60 (with Erik Knutsen)

"Conflict of Laws by Stephen G.A. Pitel and Nicholas S. Rafferty" (2010) 49 Cdn Bus LJ 478-480

"Are National Class Actions Constitutional?—A Reply to Hogg and McKee (2010) 48 Osgoode Hall LJ 95-143

"Applying Foreign Law" in Private International Law in Common Law Canada (Toronto: Emond Montgomery, 2010) 553-590

"Immovables" in Private International Law in Common Law Canada (Toronto: Emond Montgomery, 2010) 785-818

"El Litigio en Materia Civil y las Nuevas Technologías" en Roberto Berizonce, XXV Congreso Nacional de Derecho Procesal: Hacia el Bicentenario – Por una jusiticia transparente en el sistema republicano (Buenos Aires: Universidad de Buenos Aires, 2010) 1110-1137

"Muscutt Misplaced: The Future of Forum of Necessity Jurisdiction in Canada" (2009) 48 Cdn Bus LJ  135-143

"Teck Cominco and the Wisdom of Deferring to the Court First Seised, All Things Being Equal" (2009) 47 Cdn Bus LJ  192-208

"Le droit international privé" in Éléments de common law canadienne – comparaison avec le droit civil québécois, A Grenon ed (2008) 439-524

"Recognizing Multijurisdiction Class Action Judgments within Canada: Key Questions — Suggested Answers" (2008) 46 Cdn Bus 450-69

"Getting the Best Seats in International Commercial Arbitration" (2008) ADRIC Journal 9-24

"Forum Selection Clauses and Unfair Jurisdictions" (2007) 1 Dispute Resolution International 187-198 with Stefan Rützel and Sylvia Wünsch

"New Trends in Procedural Law: New Technologies and the Civil Litigation Process" (2007) 31 Hastings Int'l & Comp LR 251-94 with Garry Watson

"Castillo v Castillo: Closing the Barn Door" (2006) 43 Cdn Bus LJ 487-500

"Agreeing to Disagree: Can We Just Have Words?" (2006) 25 J of Law and Commerce 153-166

"Preliminary or Summary Proceedings, Scope and Importance" in XII Congreso Mundial de Derecho Procesal, Volumen I, eds M Storme & C Gomez-Lara (México: Universidad Nacional Autónoma de México, 2006) at 193-238, with Garry Watson

"The Role of Domestic Courts in the International Legal Order" (2005) 11 ILSA J International & Comparative Law 365-370

"Coordinating Multijurisdiction Class Actions through Existing Certification Processes" (2005) 42 Cdn Bus LJ 112-121

"Twenty Questions (about Section 23 of the Ontario Limitations Act, 2002) in J Ziegel, et al eds,

*The New Ontario Limitations Regime: Exposition and Analysis* (Toronto, Ont Bar Assoc, 2005) 95-121

"Crossborder Class Actions: A View from across the Border" (2004) Mich State DCL LR 755-798

### Reports

"Class Proceedings in Canada" Report for Session II-C — Civil Procedure, 18th Int'l Congress on Comparative Law (International Academy of Comparative Law, Washington 2010) 30 pp

"Consultation Paper: Reforming the Law of Crossborder Litigation: Judicial Jurisdiction" (Toronto: Law Commission of Ontario, 2009) 63 pp

"A Comparative Survey of Conflict of Law Rules in Canada: Overview, Bibliography and Comparative Tables" for Civil Justice Section, Bijuralism Group, Department of Justice, 2005

### Public Lectures

The Hague Academy of international law, Special Lectures: "Federalism, Regionalism and the Evolution of Private International Law" (July 2005)

### Conference Papers and Other Presentations

"Security for Costs" (June 2015) Costs in International Arbitration, International Bar Association (Munich)

"Of Guerillas and Elves" Hot Topics in International Arbitration (May 2015) Arbitration and Wealth Management, (Tortola, BVI)

"International Arbitration and the Core Curriculum" (April 2015) The Evolution and Future of International Arbitration: The Next 30 Years, Queen Mary University of London (London)

"How are Seats Chosen: An Inside View" (March 2015) CIArb Centenary Conference (Hong Kong)

"Mock Case Management Conference" (February 2015) VI ICC Congreso (San Jose, Costa Rica)

"Common Principles in the Area of Procedure ("Brussels 0"): Jurisdiction" (November 2014) The Evolution of European Private International Law: Coherence, Common Values and Consolidation, British Institute of International and Comparative Law (London)

"Challenges to Arbitrators, Responses from Arbitrators, and Challenge-proof Awards: Is there such a Beast?" (November 2014) CIArb UEA Branch International Conference (Dubai)

"Education and Training in International Arbitration" (November 2014) 2nd Annual Sydney Arbitration Week (Sydney)

"Multijurisdictional Class Actions (October 2014) Windsor Law School Seminar on Class Actions (Windsor by video)

"Collective Redress Across Borders - How Consumers are Flexing their Multi-jurisdictional Muscle" (October 2014) IBA Annual Conference (Tokyo)

"Ideological Background of the Constitution, Constitutional Rules and Civil Procedure" (Moderator, September 2014) International Association of Procedural Law Conference (Seoul)

"Class Actions" (August 2014) Ontario Justice Education Network (Toronto)

"The Comparative Context" (June 2014) Collective Actions: Experience and Expectations:

Association of European Competition Law Judges (Bucharest)

"Building a Good Seat" (June 2014) The UNCITRAL Model Law and Beyond (Tel Aviv)

"Enforcement: The Latest Developments" (May 2014) IBA Arbitration Committee: First Principles, Current Practice, Latest Trends (Toronto)

"The Future of International Arbitration Education" (May 2014) Chartered Institute of Arbitrators Board of Trustees Meeting (London)

"The Post-Hearing Phase" (April 2014) 10th Annual Leading Arbitrators Symposium (Vienna)

"Australian and Canadian Perspectives on Arbitration: A Joint Discusssion" (March 2014) Milan Chamber of Arbitration Colloquium (Milan)

"Summary Judgment in the Supreme Court of Canada: *Hryniak v Maludin* and its Implications (March 2014) Osgoode Professional Development Webinar  (Toronto)

"Confidentiality in International Arbitration" (November 2013) CIArb Toronto Chapter AGM Symposium (Toronto)

"*Ex-parte* Communications in International Arbitration (November 2013) Toronto Commercial Arbitration Society AGM Symposium (Toronto)

"International Issues Arising Out of the Uniform Law Conference Reform Project" (October 2013) ICC Canada Annual Conference (Toronto)

"Demolishing Legal Borders: Cross-border judicial cooperation and promoting effective remedies for collective redress and class action litigants" (October 2013) International Bar Association Conference (Boston)

"The managerial (or mismanaging) arbitrator: what are the limits of her power and the requirements of her duty?" (August 2013) Mastering the Challenges in International Arbitration (Stockholm)

"Practice and Procedure in International Arbitration" (May 2013) LCIA North American Symposium (Toronto)

"ICC Case Management Conference" (February 2013) IV Congeso International del Arbitraje, San José

"Who Speaks for the Class?" (December 2012) Keynote Speech - 4th Annual Class Action Colloquium (Toronto)

"Advising the Court: The Role of Experts" (November 2012) in *From Bench to Bench: Pharmaceutical Patents from Lab Bench to the Courtroom,* Toronto

"Where are the Women?" (November 2012) Arbitralwomen Symposium (Toronto)

"Arbitration Practice and Procedure" (November 2012) TCAS Annual Conference (Toronto)

"Cultural Dimensions of Group Litigation" (September 2012) International Association of Procedural Law, Moscow

"Three Engines of Trade: The Model Law, the CISG and Education" (June 2012) Reopening the Silk Road in the Legal Dialogue between Turkey and China, Istanbul

"Collective Proceedings and the Cultural Issues they Raise" (June, 2012) Buenos Aires

"Is the Witness Credible? Five Lies About the Truth" (May 2012) Alberta Arbitration and Mediation Society, Edmonton

"Recent Developments in Judgments" (May 2012) National Judicial Institute Civil Justice Seminar, Moncton

"Early Career Workshop: Civil Procedure" (February 2012) ANU, Canberra

"Are National Class Actions Constitutional?—A Debate with Peter Hogg" (February 2012) Toronto

"Who's Afraid of US-style Class Actions?" (January 2012) Our Courts and the World: Transnational Litigation and Civil Procedure, Los Angeles

"Conflict of Laws in 90 minutes" Federal Courts Clerks Seminar (January 2012) Ottawa

"Women in Arbitration in Canada and Beyond" (December 2011) Arbitration Place, Toronto

"Harmonization under the CISG and the Model Law" (November 2011) The Model Law After 25 Years: Global Perspectives on International Commercial Arbitration Law, Montreal

"Judicial Jurisdiction in Crossborder Matters: Time for Real and Substantial Change?" (November 2011) The Advocate's Society Fall Convention, Costa Rica

"Prohibited Means of Obtaining and Presenting Evidence" (July 2011) XIVth World Congress, International Association of Procedural Law, Heidelberg

"The ABA Protocols for Crossborder Class Actions" in *Multi-Jurisdictional, Cross-Border, and International Class Actions: Where Are We Heading?* (August 2011) American Bar Association Annual Meeting, Toronto

Expert Meeting: European Mass Claims and Private International Law (May 2011) Rotterdam

"International Arbitration Canadian Style: A Distinctive Approach?" American Bar Association Section on International Law Teleseminar (December 2010) Toronto

"Crossborder Mass Claims and Collective Redress: Are we on the road to an International Multijurisdictional Litigation Panel?" International Bar Association Annual Conference (October 2010) Vancouver

"International Litigation Issues" International Bar Association Young Lawyers' Program (October 2010) Vancouver

"Family Law Now – Crossborder Issues" Law Society of Upper Canada (September 2010) Toronto

"Civil Procedure in Canada" International Congress Association of the Associado dos Magistrados Brasileiros (September 2010) Toronto

"Access to Justice for Consumers and Small Businesses in a Post-territorial Era" International Association of Commercial and Consumer Law (July 2010) Toronto

"Solving Disputes in Israel-North American/European Commerce" Israel Bar Association 10th Annual Conference (June 2010) Eilat

"Quo Vadis: The Teaching of Procedure and the Future of the Profession" Public and Private Justice: Landscape of the European Legal Profession – Has Unity been Lost? (May 2010) Inter-University Centre, Dubrovnik

Moderator, London Court of International Arbitration European Users Symposium (March 2010) London

"Coordinating the Chaos: A Global Update on Mass Claims – Can Litigation, Arbitration and Government Remedies Work Together?" International Bar Association Annual Conference (October 2009) Madrid

"Litigation Funding and Costs in Canada" (July 2009) International Conference on Litigation Costs and Funding, Centre for Socio-Legal Studies & Institute of European and Comparative Law, Oxford University, Oxford (with Erik Knutsen)

"Procedural Reform: A View from the Shop Floor" (June 2009) International Seminar on Procedure: Theory and Practice, Hebrew University of Jerusalem, Jerusalem

"Civil Litigation in Canada: An Intensive Course for Senior Judges from Liaoning Province" (February 2009) Rotman School of Management, University of Toronto, Toronto

"Foreign Judgments and Multijurisdictional Agreements: Two Presentations to McMillan" (February 2009) McMillan, Toronto

"Drafting Effective Arbitration Clauses: Countdown to Success" Arbitration Primer for Corporate Counsel and Business Lawyers (October 2008) Arbitration Roundtable of Toronto, Toronto

"Overlapping Multijurisdiction Class Actions in Canada" (November 2008) National Judicial Institute, Moose Jaw, Saskatchewan

"Discretion and Codification in Private International Law" (October 2008) Wuhan University, Wuhan, China

"Recent Developments in Canadian Conflict of Laws" (October 2008) Zhongnan University, Wuhan, China

"The Rise and Fall of Forum non Conveniens" (October 2008) Private International Law Workshop, International Bar Association Annual Conference, Buenos Aires

"*Teck Cominco* and the first seised principle" (October 2008) Consumer and Commercial Law Workshop, Winnipeg (15 pp)

"The UNCITRAL Model Law: Past, Present and Future" (August 2008) International Arbitration Conference Brunei and 2nd RAIF Conference, Brunei Darussalam, 12 pp

"The Flightless Cormorant and the Future of Collective Redress in Europe" (June 2008) Class Actions in Europe and North America, Florence

"Recognizing Multijurisdiction Class Action Judgments within Canada: Key Questions—Suggested Answers" (April 2008) National Judicial Institute, Class Actions Conference for Judges, Toronto 13 pp

"International Arbitration: Fresh Ideas for a Changing World" (October 2007) ABILA International Law Weekend, New York, Moderator

"…there are parts of the world where things are badly wrong…': Forum Selection Clauses and Unfair Jurisdictions" (October 2007) International Bar Association Conference, Singapore 8 pp

"Jurisdiction to Grant Global Class Action Judgments and Settlements – dream or reality?"

(October 2007) International Bar Association Conference, Singapore

"Hindsight: Pitfalls and Mistakes in Resource Disputes" (September 2007) International Centre for Dispute Resolution (ICDR) ADR after NAFTA, Toronto

"The Preclusive Effect of Judgments in Collective Actions: Implications for Jurisdiction and Appropriate Forum" (July 2007) ILA Committee Meeting, Paris

"Challenges to Jurisdiction and Non-Signatories in Arbitration" (June 2007) Arbitration Roundtable of Toronto, *Current Issues in Canada-US Arbitration Practice: A Canadian Perspective,* New York

"What's with Article III?—The nature of judicial authority and private international law" (May 2007) Faculty Workshop, NYU School of Law 30 pp

"Pathological Clauses: A Hallowe'en Primer" (Oct 2006) Young Canadian Arbitration Practitioners (YCAP) Symposium, Montreal

"Initial Considerations in Drafting Arbitration Clauses" (September 2006) Arbitration Roundtable of Toronto (ART) *Arbitration for the In-House Counsel: Essentials for an Effective Arbitration Clause,* Toronto

"Group Actions in Canada" (June 2006) Report for the 2006 Meeting of the International Law Association, Committee on International Civil Litigation and the Interests of the Public, Toronto 16 pp

"When Transnational Contracts Come Before Domestic Courts" (May 2006) National Judicial Institute, *Civil Law Seminar: Contract Law,* Halifax

"Cross-Border Dilemmas: Multi-jurisdictional Class Actions" (April 2006) Ontario Bar Association, *National Civil Litigation CLE Conference,* Toronto

"Questions, Questions, Questions: Recent Developments in the Conflict of Laws" (March 2006) Blake, Cassels & Graydon, Toronto

"The Conflict of Laws" and "The Constitution and Statutes of Repose" (November 2005) Ontario Bar Association, *The New Ontario Limitations Regime: Exposition and Analysis*, Toronto

"The Basic Elements "(October 2005) Arbitration Roundtable of Toronto (ART) *Essentials for an Effective Dispute Resolution Clause,* Toronto

"Fragmentation: Diversification and Expansion of International Law—Private International Law", Panel Coordinator and Moderator (October 2005) Canadian Council on International Law 34th Annual Conference, Ottawa

"Recent Class Actions Developments in Canada and the US: National Class Actions" (October 2005) 35th Annual Consumer and Commercial Law Workshop, Toronto

"Reciprocity and Bilateralism in the Enforcement of Foreign Judgments" (June 2005) Canadian-American Research Centre for Law and Policy (CARC) *Commercial and Corporate Law across the Canada-United States Border*, Windsor 8 pp

"Jurisdiction and Foreign Parties: Developments in *Muscutt*, the Rules and Forum Conveniens" Osgoode Professional Development Centre (May 2005) Civil Litigation: The New Realities, Toronto

"The Real and Substantial Truth about Jurisdiction in Canada (April 2005) Canadian Bar Association, *National Civil Litigation Conference,* Toronto

"The World's Longest Undefended Border" (April 2005) Hamilton Law Association, *First Annual Emerging Issues in Cross-Border Commercial Litigation Seminar*, Niagara-on-the-Lake 8 pp

App. 2187

"Agreeing to Disagree: Can we just have words?" (March 2005) Vienna International Arbitration Centre: *From the 1980 Vienna Conference to the Digest and Beyond: Cases, Analysis and Unresolved Issues in the CISG*, Vienna 12 pp

### Funded Research

2010    The Project on Teaching Procedure
2006    Law Foundation of Ontario: 72nd Biennial Conference of the International Law Association
2006    Department of Justice: 72nd Biennial Conference of the International Law Association
2002    Foundation for Legal Research: Improvements to *Canadian Conflict of Laws*

## Expert Evidence    *(past 4 years)*

2011        CNR v Software AG, Inc Quebec Superior Court No.: 500-17-059969-10

2012        Newfoundland and Labrador v Rothmans, 2011 01G No 0826

2013        Bieberstein v Kirchberger Superior Court of Justice (Ontario) CV-1-08534-00CL

## Teaching and Supervision    *(past 10 years)*

### Courses at Osgoode Hall Law School

JD Program    Administration of Civil Justice: Class Actions
              Civil Procedure I
              Conflict of Laws
              Ethical Lawyering in the Global Community
              International Business Transactions
              International Commercial Arbitration
              Litigation Dispute Resolution and the Administration of Justice Colloquium
              Vis International Commercial Arbitraiton Moot Seminar
              Vis Team Faculty Advisor

LLM Program   Transnational Litigation
              International Commercial Dispute Resolution

### Other Teaching

2014        Oxford Diploma Course, CIArb

2013        Assessor, CIArb Accelerated Route to Fellowship Course (Sao Paolo; Geneva)

2012        Tutor, CIArb Introduction to International Arbitration Course (Toronto)

2012        Arbitro, Competencia Internacional de Arbitraje Comercial, American College of Law, Washington

2002-2014   Organizer, Canadian Regional Round, Vis Int'l Commercial Arbitration Moot

2005, 08-10 Faculty Adviser, Osgoode/Hebrew University of Jerusalem Exchange Program
2001-2014   Arbitrator, Vis Int'l Commercial Arbitration Moot, and Advisor (Osgoode Team,

2001-2014) (Tunis Team, 2008-2014)

2008        ICC Int'l Commercial Arbitration Workshop, McGill U Faculty of Law (Montreal)

2004-06     Osgoode-Aix Exchange, Lecturer on Contracts in the Conflict of Laws

### *Supervisor*

2015        Sagi Peari, SSHRC Post-doctoral Fellowship in Private International Law

2012        Peter Mazzacano, *Excuses for Nonperformance in International Commercial Law and CISG Article 79: The Elusive Goal of Uniformity* PhD (Osgoode)

2011        Wafa Younes, "The Recognition of *Forum Necessitatis* in Private International Law" LLM (Tunis II)

2011        Reyihanguli Aisaiti, "Saving Face in Canadian Courtrooms: The niqab and fundamental freedoms" LLM (Osgoode)

2010        Christina Poretta, "Assessing Damages in the Conflict of Laws: A New Framework for an Old Set of Rules" (LLM (Osgoode)

2007        Natasha Macleod, *Judgments from Questionable Jurisdictions* LLM (Osgoode) (in progress)

2008        Beligh Balti "The Reciprocity Requirement in the Recognition and Enforcement of Foreign Judgments: A Study in Light of the American Law Institute's Proposed Federal Law" LLM (Tunis II)

2007        Raya Jebali, "Registration Procedures for the Recognition and Enforcement of Judgments: A Comparative Study" LLM (Tunis II)

2007        Karim Toumi "International Enforcement of Judgments and Reciprocity" (Tunis II)

2006        Nawel Zemni, "Review of Damages in Foreign Judgments in Common Law Courts" LLM (Tunis II)

2004        Ramla Allani, *Private International Law and the Protection of the Cyber Consumer* PhD (Tunis II) (in progress)

2004        Virtus Igbokwe, *The Applicable Law in International Commercial Arbitration of Investment Disputes,* DJur (Osgoode)

### *External Examiner*

2014        Benjamin Hayward "Arbitral discretion in resolving conflicts of laws - the case for a bright-line closest connection test in international commercial arbitration" DPhil Thesis (Monash University)

2008        Amina Ben Dowa "The Law on Embryos in the United States" (Tunis II)

2007        Thoraya Zidi Sassi, " Carriage of Goods by Sea"(Tunis II)

2006        Natasha McLeod, "Influences on the Canadian Recognition and Enforcement of Judgments Regime" LLM (Queen's)

2006        Atef Jebali, "Study of Swap Agreements' Characteristics" LLM (Tunis II)

2006        Lofti Meziou, "Liability of International Carriers of Goods under American Maritime Law" LLM (Tunis II)

2004        Kethiri Med Jihad, "Pre-incorporation Contracts: A Comparative Study between Tunisian and American Laws" LLM (Tunis II)

## Administrative Appointments *(past 10 years)*

| | |
|---|---|
| 2014-15 | York Academic and Administrative Program Review Task Force; Senate Academic Policy, Planning and Research Committee; Co-Director, Civil Litigation and Dispute Resolution Part-time LLM Program; Grades Review Committee |
| 2013-14 | Senate Academic Policy, Planning and Research Committee; Nominating Committee, Alumni Board, Co-Director, Civil Litigation and Dispute Resolution Part-time LLM Program |
| 2012-13 | Senate Academic Policy, Planning and Research Committee; Nominating Committee, Alumni Board, Co-Director, Civil Litigation and Dispute Resolution Part-time LLM Program |
| 2011-12 | Co-Director, Civil Litigation and Dispute Resolution Part-time LLM Program; Nominating Committee, Alumni Board |
| 2010-11 | Faculty Recruitment Committee |
| 2009-10 | Decanal Search Committee |
| 2008-09 | Faculty Recruitment Committee |
| 2007-08 | Faculty Recruitment Committee, Tenure and Promotions Committee, Merit Pay Advisory Committee, File Preparation Committees (three files) |
| 2006-07 | Grades Review Committee, Library Committee, Senate Executive Sub-Committee on Honorary Degrees and Ceremonials (one file) |
| 2005-06 | Fall: Associate Dean: *ex officio* – Academic Policy Committee, Admissions Committee, Clinical Education Committee, Curriculum Review Committee, Equality Committee, Faculty Recruitment Committee, Grades Review Committee (Chair) Library Committee, Management Committee, Nominating Committee, (Building) Project Committee, Strategic Planning Committee (Core Group), Tenure and Promotions Committee (Chair); Web Management Committee; First Year Curricular Reform Committee<br>Senate Executive Sub-Committee on Honorary Degrees and Ceremonials<br>Winter: Faculty Recruitment Committee, Tenure and Promotions Committee, Senate Executive Sub-Committee on Honorary Degrees and Ceremonials |
| 2004-05 | Associate Dean: *ex officio* – Academic Policy Committee, Admissions Committee, Clinical Education Committee, Curriculum Review Committee, Equality Committee, Faculty Recruitment Committee, Grades Review Committee (Chair), Library Committee, Management Committee, Nominating Committee, (Building) Project Committee, Strategic Planning Committee, Tenure and Promotions Committee (Chair)<br>Convener, Litigation, Dispute Resolution and the Administration of Justice Program |