# EXHIBIT 94

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, | ) | |
| Et al., on Behalf of | ) | |
| themselves and all others | ) | |
| similar situated, | ) | |
|    Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE OFFICIAL STANFORD | ) | |
| INVESTORS COMMITTEE, | ) | CASE NO. |
|    Plaintiff-Intervenor, | ) | 3:09-CV-02384-N |
| | ) | |
| -against- | ) | |
| | ) | |
| TRUSTMARK NATIONAL BANK, | ) | |
| HSBC BANK PLC, THE | ) | |
| TORONTO-DOMINION BANK, | ) | |
| INDEPENDENT BANK f/k/a | ) | |
| BANK OF HOUSTON, SG | ) | |
| PRIVATE BANKING (SUISSE) | ) | |
| S.A., and BLAISE FRIEDLI, | ) | |
|    Defendants. | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
DIANA SUAREZ
August 28, 2015
VOLUME 2

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

[Page 3]

```
 1                    A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS:
 4        James R. Swanson, Esq.
          Benjamin D. Reichard, Esq.
 5        FISHMAN HAYGOOD, LLP
          201 St. Charles Avenue, Suite 4600
 6        New Orleans, LA   70170
          504.586.5252
 7        jswanson@fishmanhaygood.com
          Breichard@fishmanhaygood.com
 8
 9    FOR THE DEFENDANT THE TORONTO-DOMINION BANK:
10        Kavitha Sivashanker, Esq.
          SIMPSON THACHER & BARTLETT, LLP
11        425 Lexington Avenue
          New York, NY   10017
12        212.455.2197
          kavitha.sivashanker@stblaw.com
13
      FOR THE DEFENDANT THE TORONTO-DOMINION BANK:
14
          Rodney Acker, Esq.
15        Ellen Sessions, Esq.
          NORTON ROSE FULBRIGHT US LLP
16        2200 Ross Avenue, Suite 3600
          Dallas, TX   75201
17        214.855.8000
          rodney.acker@nortonrosefulbright.com
18        ellen.sessions@nortonrosefulbright.com
19
      FOR THE DEFENDANT INDEPENDENT BANK SUCCESSOR
20    BY MERGER TO BANK OF HOUSTON:
21        Brad Repass, Esq.
          HAYNIE RAKE REPASS & KLIMKO, P.C.
22        Wellington Centre
          14643 Dallas Parkway, Suite 550
23        Dallas, TX   75254
          972.716.1855
24        brad@hrrpc.com
25
```

App. 2841

[Page 4]

```
 1    FOR THE DEFENDANT HSBC BANK PLC:
 2         Taylor F. Brinkman, Esq.
           LOCKE LORD, LLP
 3         2200 Ross Avenue, Suite 2200
           Dallas, TX  75201
 4         214.740.8000
           tbrinkman@lockelord.com
 5
 6    FOR THE DEFENDANT TRUSTMARK NATIONAL BANK:
 7         Ashley Kleber, Esq.
           GIBBS & BRUNS LLP
 8         1100 Louisiana, Suite 5300
           Houston, TX  77002
 9         713.650.8805
           akleber@gibbsbruns.com
10
11    FOR THE DEFENDANT BLAISE FRIEDLI:
12         Stephanie Gamiz, Esq.
           MORGAN LEWIS & BOCKIUS, LLP
13         101 Park Avenue
           New York, NY  10178-0060
14         212.309.6202
           sgamiz@morganlewis.com
15
      FOR THE DEFENDANT SOCIÉTÉ GÉNÉRALE PRIVATE
16    BANKING (SUISSE) S.A.:
17         Wallis Hampton, Esq.
           SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
18         1000 Louisiana Street, Suite 6800
           Houston, TX  77002
19         713.655.5122
           wallis.hampton@skadden.com
20
21    ALSO PRESENT:
22         Rebecca Carter, Videographer
           Marilyn Reitta, Interpreter
23
24
25
```

App. 2842

[Page 5]

1                                  INDEX

                                                           PAGE
2    Appearances                                           3-4
3    DIANA SUAREZ
4        EXAMINATION BY MS. SIVASHANKER                      9
         EXAMINATION BY MR. REPASS                         137
5        EXAMINATION BY MR. HAMPTON                        148
         EXAMINATION BY MR. BRINKMAN                       159
6        EXAMINATION BY MR. SWANSON                        160
         FURTHER EXAMINATION BY MR. BRINKMAN               166
7        FURTHER EXAMINATION BY MR. REPASS                 167
         FURTHER EXAMINATION BY MR. SWANSON                172
8        FURTHER EXAMINATION BY MR. REPASS                 173
9
     Corrections and Signature                            176
10   Reporter's Certificate                               178
11
                               EXHIBITS
12   NO.    DESCRIPTION                                    PAGE
13   136    Plaintiffs Response to Defendants' First        14
            Set of Interrogatories (no Bates - 40
14          pages)
15   137    E-mail string, in Spanish with attached         19
            letter, top e-mail, top e-mail from
16          Gabriel Suarez to Diana Suarez, dated
            6/21/2001 (SUAREZ_000575 to 589)
17
     138    E-mail string, in Spanish and English          30
18          translation and Certificate of Accuracy,
            top e-mail, top e-mail from Maria
19          Villanueva to Diana Suarez, dated 2/5/2007
            (SUAREZ_000535 to 536)
20
     139    E-mail string, in Spanish and English          39
21          translation and Certificate of Accuracy,
            top e-mail from dianasrp2002@yahoo.com to
22          Maria Villanueva, dated 3/12/2007
            (SUAREZ_000448 to 449)
23
     140    Condensed transcript of the Oral               45
24          Deposition of Diana Suarez, taken on July
            1, 2015 (no Bates)
25

[Page 6]

EXHIBITS (CONT'D)

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 141 | E-mail string, in Spanish and English translation and Certificate of Accuracy, top e-mail from Diana Suarez to Sylvia Haltenhof, dated 3/3/2008 (SUAREZ_000556 to 558) | 46 |
| 142 | E-mail string, in Spanish and English translation and Certificate of Accuracy, top e-mail from Diana Suarez to Maria Villanueva, dated 7/28/2008 (SUAREZ_000685 to 686) | 65 |
| 143 | E-mail string, in Spanish and English translation and Certificate of Accuracy, top e-mail from Diana Suarez to Maria Villanueva, dated 8/7/2008 (SUAREZ_000726 to 730) | 69 |
| 144 | E-mail string, in Spanish and English translation and Certificate of Accuracy, top e-mail from Maria Villanueva to Diana Suarez, dated 9/17/2008 (SUAREZ_000640 to 642) | 72 |
| 145 | E-mail string, in Spanish and English translation and Certificate of Accuracy, top e-mail from Diana Suarez to Maria Villanueva, dated 2/20/2009 (SUAREZ_000683 to 684) | 79 |
| 146 | E-mail string, in Spanish and English translation and Certificate of Accuracy, top e-mail from Gabriel Suarez to Maria Villanueva and Carlos Villanueva, dated 2/18/2008 (SUAREZ_000712 to 715) | 86 |
| 147 | E-mail string, in Spanish and English translation and Certificate of Accuracy, top e-mail from Carlos Villanueva to dianasrp2002@yahoo.com, dated 4/6/2009 (SUAREZ_000627 to 628) | 90 |

[Page 7]

EXHIBITS (CONT'D)

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 148 | E-mail in Spanish and English translation and Certificate of Accuracy, Stiffello to destinatarios-no-revelados, dated 4/21/2009 (SUAREZ_000596 to 626) | 97 |
| 149 | E-mail string, in Spanish and English translation and Certificate of Accuracy, top e-mail from eduardo2606@yahoo.com to Diana Suarez, dated 5/25/2009 (SUAREZ_000592 to 593) | 102 |
| 150 | E-mail string, top e-mail from Gabriel Suarez to stanford.claims.support@uk.gt.com dated 3/12/2013 (SUAREZ_001248 to 1250) | 108 |
| 151 | Letter dated March 26, 2013, to Diana Suarez from Marcus Wide and Hugh Dickson (SUAREZ_001170 to 1173) | 114 |
| 152 | Proof of Claim Form (STAN_TDBANK_000340 to 352) | 125 |
| 153 | E-mail string, top e-mail from Gabriel Suarez Rigsdijk to Mom, dated 4/30/2013 (SUAREZ_001174) | 128 |
| 154 | Certification Form (STAN_TDBANK_000366 to 367) | 130 |
| 155 | E-mail string, in Spanish and English translation and Certificate of Accuracy, top e-mail from Gabriel Suarez to Eduardo Suarez, Daniel Suarez and Diana Suarez, dated 3/22/2013 (SUAREZ_001176 to 1228) | 132 |
| 156 | E-mail string, top e-mail from Diana Suarez to Gabriel Suarez, dated 5/2/2013 (SUAREZ_001373) | 135 |
| 157 | E-mail string, top e-mail from Maria Villanueva to Diana Suarez, dated 2/10/2006 (SUAREZ_000553 to 554) | 156 |

App. 2845

1    Q.   And after your last deposition, did you search

2    for any additional documents relating to Stanford in

3    connection with this case?

4    A.   No.   After -- after the -- my Yahoo! account

5    was recovered, and I gave my lawyers, you know, the --

6    the e-mails, I haven't done anything.

7    Q.   And did you give those e-mails before or after

8    July 1st, when you were deposed?

9    A.   Just the day before.

10    Q.   Day before.

11         And did you look for any documents in

12    e-mail account labeled aaaa@bbbb.com at any point after

13    your deposition?

14    A.   Oh, no.

15    Q.   Did you look for e-mails in that account before

16    your deposition?

17    A.   You mean --

18    Q.   Before your July 1st deposition.

19    A.   No.

20    Q.   And does this e-mail account contain any

21    e-mails you think relevant to this action?

22    A.   No.

23    Q.   Do you recall testifying in your last

24    deposition that this e-mail account may have had

25    relevant e-mails?

[Page 25]

1    used it with my Yahoo! account always joint together.

2        Q.   And when you say they were joined together, do

3    you mean all of the e-mails in the bbbb.com account or

4    in your Yahoo! account?

5        A.   Yes.

6        Q.   And there would be -- or would there be any

7    documents or e-mails in your bbbb.com account that are

8    not in your Yahoo! account?

9        A.   No.

10            MR. SWANSON:  Actually, I think Van, who

11    is not here, but he probably will be later.  We looked

12    into that at some point.  I wish I could tell you what,

13    but I don't know.  He does know, so when he gets here,

14    maybe we can get you a little more information on what

15    we did to be sure that there was nothing that was

16    relevant that was in a different account.

17            MS. SIVASHANKER:  Great.  Thank you.

18            MR. SWANSON:  Yeah.

19        Q.   (By Ms. Sivashanker)  And going back to --

20    after your July 1st deposition, did you look for -- I

21    know you mentioned that you produced e-mails from your

22    Yahoo! account the night before the deposition.

23            Did you provide any other documents to

24    your counsel after the deposition?

25        A.   No.

[Page 60]

1    it have to be after -- after the -- the fraud, because I

2    was always willing to pay taxes and I wanted all my --

3    my -- my papers and my -- to be correct, to be -- so I

4    didn't know.

5        Q.    So you think you gained an understanding of

6    this term sometime after February 2009?

7        A.    Yeah.

8        Q.    But you didn't understand this term before that

9    date?

10       A.    No.

11       Q.    And Ms. Suarez, you mentioned the tax returns.

12               Did you file -- when you filed your tax

13    returns, did you report the interest that you earned on

14    your Stanford CD investments on your tax returns?

15       A.    Okay.  All the -- all the information that I

16    have for my accounts and the interest rates and what I

17    was gaining from the accounts, I gave everything to my

18    husband.  He was the one -- they were married the day he

19    died.  I -- he did all the -- the taxes, and I never

20    really knew what was going on or anything.

21       Q.    So you don't know if you reported the interest

22    earned on your Stanford CDs on those tax returns?

23       A.    When I was looking at the tax returns, yes, we

24    did two years, I think.  And then in the 2007 for -- I

25    don't know what reasons he didn't do it.

[Page 61]

1      Q.    Sorry.  Just to make sure I understand.

2            So you said for two years, he --

3      A.    I think.  I'm not sure.

4      Q.    And for two years, he did the tax returns or

5  you did the tax returns?

6      A.    No.  He did the tax returns all the time.

7      Q.    And what were those two years that he did the

8  tax returns?

9            MR. SWANSON:  Object to the form.  She

10  said he did the tax returns on all the years.  You just

11  said two years.

12     A.    Since we marry in 1972.

13     Q.    (By Ms. Sivashanker)  So just to make sure I

14  understand, you mentioned two years.  You don't know why

15  he didn't do it.

16            What were you referencing there for the

17  two years?

18     A.    Oh, two years?  Did I say that?  I'm sorry.

19  But I should use the translator.

20            (Through interpreter)  Wait.  My husband

21  did the taxes ever since we got married in 1972, 1971,

22  until the day he died in 2014.  Going back and reviewing

23  the tax documents over these last years regarding to --

24  regarding the interest accrued, I saw that in the year

25  2007, the interest was not declared.  I spoke about this

App. 2849

[Page 62]

1    with my son, Gabriel.  My husband had already died, and

2    we believe that it was the accounting firm were the ones

3    that did not declare those taxes.  We don't know why.

4    That's it.

5        Q.    To make sure I understand, so in 2007, the

6    interest was not declared on the tax returns, correct?

7        A.    Correct.

8        Q.    And were there any other years, other than

9    2007, where the interest from the Stanford investments

10   was not declared on the tax returns?

11       A.    I couldn't find any of that in the -- in the

12   tax returns, so I don't know.

13       Q.    And when you say you couldn't find any of that,

14   you didn't see the interest reported in any of the other

15   tax returns?

16       A.    The only tax returns that I didn't see the

17   interest report was in 2007.  We didn't pay anything for

18   the -- I don't know if that's the way -- this is the

19   first year that I'm doing my taxes here in the states by

20   myself now that I'm a widow, so I'm getting used to all

21   the -- the tax returns and everything.

22       Q.    When did you start doing the taxes on your own?

23       A.    Last -- this year, 2000 --

24       Q.    '15?

25       A.    No, '15.

[Page 63]

1      Q.   So in '14 --

2      A.   Yeah, I did.

3      Q.   So in 2014, you started doing your own tax

4   returns?

5      A.   Yeah.  When my -- my husband died.

6      Q.   And you had mentioned or previously testified

7   about an accounting firm preparing the tax returns

8   previously.

9              Which accounting firm was this?

10     A.   Oh, I don't remember the name right now.

11     Q.   Do you know where the accounting firm is

12   located?

13     A.   It's located in Miami, but I don't remember the

14   name.

15     Q.   And so this was the firm that worked with you

16   for the US tax returns or worked with your husband?

17     A.   With my husband for awhile.

18     Q.   Were any other accounting firms used?

19     A.   I don't really know.  Like I say before, he was

20   the one that took care of all the financial things in

21   our family.

22     Q.   Have you filed any amended tax returns for

23   2007?

24     A.   I don't know what you're talking about.

25     Q.   So you previously just testified that you

1  learned that the interest for your Stanford CD

2  investments were not declared on your 2007 tax returns,

3  correct?

4      A.   Correct.

5      Q.   Did you file an amendment once you learned

6  about information -- or I'm sorry.

7              Once you learned that information, did you

8  file an amended tax return for 2007?

9      A.   Okay.  What I did is, the past two years, I

10  went to H&R Block and I gave all the information they

11  wanted and they did my taxes, and I pay what I had to

12  pay.

13      Q.   And did H&R Block file an amended tax returns

14  for prior years?

15      A.   I don't know.  I have to go and see the files.

16      Q.   You're not aware if they filed?

17      A.   I don't know.

18      Q.   And did you ask them to file an amended return,

19  if anything?

20      A.   I gave all -- I told them about all these

21  problems and I gave them all the information they

22  needed.

23      Q.   And did you mention to them that you were aware

24  that the interest had not been declared on your 2007 tax

25  return for your Stanford investment?

[Page 65]

1      A.    Yes, I did.

2             (Exhibit 142 was marked.)

3      Q.    (By Ms. Sivashanker)  Ms. Suarez, I'm going to

4      give you what's been marked as Exhibit 142.  This is an

5      e-mail that, again, has a Spanish version in front with

6      the English translation behind it with a certificate of

7      accuracy behind that.

8                    If you look at the English translation, it

9      is Bates-numbered SUAREZ_685 to SUAREZ_686.  It is an

10     e-mail chain and the top e-mail is from Diana Suarez to

11     Maria Villanueva, dated July 28, 2008.

12                   Ms. Suarez, if you're looking at this

13     e-mail, again, the bottom Bates number is 685.

14                   Do you recognize this e-mail?

15     A.    Yes, I do.

16     Q.    And if you look at the very bottom e-mail,

17     again, on the right-hand side on the bottom page, it's

18     685, so it's the very bottom e-mail on that page.

19                   Do you see that there's an e-mail from

20     Diana Suarez to, again, AA.

21                   Do you see that?

22     A.    Yes.

23     Q.    And if you look at that e-mail, you write:  I

24     would like to get information about the procedure to be

25     followed to make a withdrawal from my REDACTED ,

App. 2853

[Page 66]

1    before its maturity in September 2008 without penalties.

2    That is what amount can be withdrawn and transferred

3    into my Bank of America account.

4              Do you see that language?

5        A.   Yes, I do.

6        Q.   Why were you asking about information about how

7    to make a withdrawal here?

8        A.   Because my husband had a nervous breakdown and

9    we needed the money for his -- his problem.

10       Q.   And you were trying to transfer this amount for

11   your husband, Juan, correct?

12       A.   Yes.

13       Q.   Into your Bank of America account, correct?

14       A.   Yes.

15       Q.   And then were you hoping to transfer that

16   amount from Bank of America -- your Bank of America to

17   Juan afterwards?

18       A.   Yes.

19       Q.   And in the next e-mail, you'll see, again, on

20   the bottom right-hand page, it's 685, if you stay on the

21   685 page.  In the very middle, there's an e-mail from

22   Maria Villanueva to [REDACTED].

23              Do you see that e-mail?

24       A.   The one in the middle, yeah.

25       Q.   And is this your Yahoo! e-mail address?

[Page 67]

1          A.    Yes.

2          Q.    And Maria writes:  You can withdraw 25 percent

3     of the amount in the flex during the term of your

4     certificate.  That means that if the term is one year,

5     you can withdraw up to 25 percent without penalty in

6     that year.

7               Do you see that language?

8          A.    Yes.

9          Q.    Was this the first time that you had asked

10    Maria about making a withdrawal from your Stanford flex

11    account?

12         A.    I think so.

13         Q.    And had you made -- and in terms of this

14    amount, this would be a withdrawal that you were asking

15    about -- a withdrawal of principal, correct, from your

16    Stanford account?

17         A.    Yes.

18         Q.    And do you recall previously testifying that

19    the only withdrawals that you made from your account

20    were monthly interest withdrawals and no other amounts?

21         A.    Yes, I testified that.

22         Q.    But you agree that this amount that you were

23    seeking to withdraw was a withdrawal of principal,

24    correct?

25         A.    Yes.

[Page 68]

1       Q.    And if I look again at the very top e-mail on

2   the bottom right-hand page of 685, you'll see it's an

3   e-mail from you, Diana Suarez to Maria Villanueva,

4   correct?

5                 It's the very top e-mail on this page.

6       A.    In the --

7       Q.    It's the page Bates-numbered on the right, 685.

8       A.    Okay.

9       Q.    And in this e-mail, she writes:    The amount to

10  be withdrawn from the ⬛REDACTED⬛ and

11  deposited into my Bank of America ⬛REDACTED⬛

⬛  ⬛ , correct?

13      A.    Correct.

14      Q.    And this is ⬛REDACTED⬛ , correct?

15      A.    Yes.   Correct.

16      Q.    And so this ⬛REDACTED⬛ withdrawal was being

17  made for Juan, your husband, correct?

18      A.    Yes.

19      Q.    And would you agree that since this was a

20  withdrawal of principal, that your prior testimony, that

21  the only withdrawals you had made from your Stanford

22  account was interest was inaccurate?

23      A.    Yes.   I -- I can say that, but I'm going to --

24  I didn't remember --

25      Q.    But you would agree that --

[Page 69]

1        A.    -- the withdrawal.

2        Q.    But you would agree the prior testimony was not

3    accurate?

4        A.    Yes.

5                    (Exhibit 143 was marked.)

6        Q.    (By Ms. Sivashanker)  Ms. Suarez, I'm going to

7    give you what's now been marked as Exhibit 143.  Again,

8    this is a set of -- this is an e-mail chain where there

9    is a Spanish language version in the front and the

10   English language behind it that's been translated with a

11   certificate of accuracy behind that.

12                   This e-mail chain, the top e-mail is from

13   Diana Suarez to Maria Villanueva.  It's dated August 7,

14   2008, and it's Bates-numbered SUAREZ_726 through

15   SUAREZ_730.

16                   Ms. Suarez, do you remember this e-mail?

17       A.    Yes, I do.

18       Q.    And what does it generally discuss?

19       A.    I'm asking Maria about the transfer because he

20   is really in -- he's having problems and he needed the

21   money and I wanted her to tell me what happened to the

22   transfer so I could answer Juan, and I said:  Appears to

23   me that it is very urgent.  And I was being polite in

24   saying that I -- thank you very much for -- for all your

25   job.  I mean, everything you're doing.

[Page 108]

1     Q.   And previously, you had testified that you did

2   not have a certificate -- original certificate for the

3   September 6th, 2006 CD.

4              Do you recall that?

5     A.   September 6th, 2000 --

6     Q.   -- 6.

7     A.   Uh-huh, yes.

8     Q.   Did you have that certificate at the time of

9   this e-mail in May 25th, 2009?

10     A.   I was missing one and I don't remember which

11   one was it.

12     Q.   So even on May 25th, 2009, you were missing one

13   certificate?

14     A.   Yes.

15           (Exhibit 150 was marked.)

16     Q.   (By Ms. Sivashanker)  Ms. Suarez, I'm going to

17   hand you what's been marked as Exhibit 150.  This is an

18   e-mail.  It is dated March 12th, 2013.  It is an e-mail

19   chain, the top e-mail is dated March 12, 2013.  It's

20   from Gabriel Suarez to stanfordclaims.support@uk.tt.com

21   and it copies Diana Suarez.  It is Bates-numbered

22   SUAREZ_001248 to SUAREZ_001250.

23              Ms. Suarez, do you recognize this

24   document?

25     A.   Yes.

[Page 109]

1      Q.   And can you tell us generally what this

2   document is?

3      A.   This document, exactly what it says here, proof

4   of debt to claim form.

5      Q.   So this is the proof of debt claim form that

6   was submitted to the joint liquidators, correct?

7      A.   Exactly.

8      Q.   And do you know why this document was not

9   produced to us prior to your last deposition?

10      A.   This -- this wasn't?  I didn't know.  No.

11   Maybe because it wasn't in -- in the Yahoo! account, I

12   have the -- the copy.

13      Q.   And were additional e-mails collected from your

14   Yahoo! account after your last deposition?

15      A.   No.  No.

16           MR. SWANSON:  I think if you'd been at the

17   last deposition, you'd know that we didn't produce all

18   the e-mails before the last deposition, so this is

19   probably one of the many that wasn't produced because we

20   got them the day before.

21           MS. SIVASHANKER:  Okay.

22      Q.   (By Ms. Sivashanker)  And, Ms. Suarez, if you

23   look at the bottom e-mail on Page 1248, you'll see it's

24   from Stanford claim support, and it's signed by the

25   joint liquidators, Marcus Wide and Hugh Dickson.  And it

1    writes:  Dear sir/madam, we acknowledge your proof of

2    debt claim form.  However, please note that all four

3    signatures presented does not match the specimen in our

4    records.

5              Do you see that language?

6         A.   Yes, I do.

7         Q.   And if you look at the e-mail right above it

8    from Gabriel Suarez copying you to Stanford claim

9    support, it writes:  Attached is the requested

10   signature page for the proof of debt.  The quality of

11   the documents is somewhat reduced because of the

12   scanning.

13             Do you see that language?

14        A.   Yes.

15        Q.   And on this e-mail, your son, Gabriel Suarez,

16   is listed as a sender, correct?

17        A.   Yes.

18        Q.   And if you turn to the next page of the

19   document, the attachment, which is Bates-numbered 1250,

20   the attachment is a signature page, correct?

21        A.   Yes.

22        Q.   And is this your signature on this document?

23        A.   Yes.

24        Q.   And did you print your name on this page?

25        A.   Yes.

1        Q.   And did you -- did you date this document

2     March 11, 2013?

3        A.   Yes.

4        Q.   And are these -- is this a signature of your

5     son, Eduardo Suarez?

6        A.   I think so.

7        Q.   And is this a signature of your son, Daniel

8     Suarez?

9        A.   I think so.

10       Q.   And is this your signature of your son, Gabriel

11    Suarez?

12       A.   Yes, I think so, uh-huh.

13       Q.   Do you recall in your prior deposition

14    testifying that you had signed the proof of debt form

15    submitted in February of 2013?

16       A.   Could you please --

17       Q.   In your prior deposition --

18       A.   You're speaking too fast.

19       Q.   I'll try to slow down for you.

20            In your prior deposition, do you recall

21    previously testifying that you had signed the proof of

22    debt form to the joint liquidators which was submitted

23    in February of 2013?

24       A.   Yes.

25       Q.   Now, seeing this e-mail from the joint

1    liquidators discussing how the signatures presented did

2    not match their records, do you agree now that you did

3    not sign the February 2013 form that was submitted to

4    the joint liquidators?

5        A.    Yes.

6        Q.    So you would agree that your prior testimony

7    that you had signed the February 2013 form to the joint

8    liquidators was not correct?

9        A.    Yes.

10       Q.    And do you know what signature the joint

11   liquidators had on file for you that did not match the

12   signatures provided?

13       A.    No, I don't know.

14       Q.    And in addition to the proof of debt claim

15   form, have you submitted any other documents to the

16   joint liquidators?

17       A.    I don't remember.

18       Q.    And were there any other communications that

19   you recall after this communication from the joint

20   liquidators regarding issues provided by signatures by

21   you?

22       A.    I don't remember.   And by this time, I gave all

23   the power to my son, Gabriel.   I gave him the power of

24   attorney and everything, so he could act in my behalf.

25       Q.    And you mentioned this power of attorney.

[Page 113]

1          When did you give the power of attorney to

2    your son, Gabriel Suarez?

3         A.   Oh, my God.  I have to remember when I did

4    that.  It was -- I don't remember exactly the date.  It

5    was one of my trips to Miami.

6         Q.   And do you recall if it was after March of

7    2013?

8         A.   I don't recall.

9         Q.   And what did the power of attorney provide

10   Gabriel with the power to do?

11        A.   To do everything that have to be done in my

12   behalf.

13        Q.   And you say everything that had to be done on

14   your behalf.  Did that include everything relating to

15   your Stanford investments?

16        A.   Everything.

17        Q.   And has that power of attorney, is it still in

18   operation right -- today?

19        A.   Yes.

20        Q.   But you don't recall when you first gave it to

21   Gabriel Suarez?

22        A.   No, not exactly the date.

23        Q.   And do you know if you provided a copy of that

24   power of attorney to your counsel?

25        A.   No, I didn't.

[Page 116]

1       A.   Yes.

2       Q.   And then below that, you see   REDACTED

        ████    ████  , correct?

4       A.   Yes, correct.

5       Q.   And you had previously testified that your --

6    that this was the account for your express account,

7    correct?

8       A.   Correct.

9       Q.   And if you look right below that after that,

10   you see another account number listed towards the bottom

11   of the page, which is 1171.  It's   ██████ REDACTED ██████  ,

12   correct?

13      A.   Correct.

14      Q.   And the   ████ REDACTED ████  , this was for the first

15   CD that was issued to you on March 6, 2006, correct?

16      A.   Correct.

17      Q.   And this was the flex CD account, correct?

18      A.   Right.

19      Q.   If you turn to the next page -- actually,

20   sorry.

21              If you stay on Page 1171, you will see

22   that underneath the   ████ REDACTED ████  , there's three

23   columns, correct?

24      A.   Yes.

25      Q.   And there's two columns that are listed

App. 2864

[Page 117]

1       Deposits and Payments, correct?

2            A.   Correct.

3            Q.   Okay.  Now, if you turn to the next page, which

4       is 1172, if you go all the way down to the July 6, 2007

5       transaction.

6            A.   July?

7            Q.   July 6, 2007 transaction.

8            A.   Okay.  Yes.

9            Q.   And if you look at the very last column on the

10      very right, you see an amount of REDACTED listed,

11      correct?

12           A.   Correct.

13           Q.   And this is listed in the payments column,

14      correct?

15           A.   Correct.

16           Q.   And payments are withdrawals from the account,

17      correct?

18           A.   Correct.

19           Q.   So you would agree that on July 6th, 2007, a

20      REDACTED withdrawal was made from your flex CD account,

21      correct?

22           A.   That's what it says here, but I don't remember.

23           Q.   But you would agree, the document shows a

24      transaction on REDACTED as a withdrawal on July 6, 2007,

25      correct?

[Page 118]

1       A.   Yes.

2       Q.   And if you go a little bit farther down to

3    August 7, 2008.

4       A.   Yes.

5       Q.   On the very right hand, again, the last column

6    on the right, it lists an amount of REDACTED, correct?

7       A.   Correct.

8       Q.   And this amount of REDACTED is listed in the

9    payments column, correct?

10      A.   Correct.

11      Q.   So this REDACTED was also another withdrawal

12   from a flex account, correct?

13      A.   Correct.

14      Q.   So going back to the REDACTED withdrawal, do you

15   know who this withdrawal was made for?

16      A.   I don't recall, but I think it was to go from

17   one account to the other account.

18      Q.   Do you recall which accounts it was going

19   between?

20      A.   No. No.

21      Q.   But you would agree, this would have been a

22   withdrawal from your Stanford account to another bank

23   account, correct?

24      A.   To another Stanford account, the REDACTED.

25      Q.   So you think it might be to another Stanford

App. 2866

[Page 119]

1    account?

2        A.    Yes.   Another CD.

3        Q.    Okay.   If you turn back to the prior page,

4    1171, you'll see this is for REDACTED,

5    correct?

6               This is the exchange account we were

7    talking about earlier?

8        A.    This one.

9        Q.    Right.

10       A.    Uh-huh.   Yes.

11       Q.    Do you see any amounts of REDACTED being

12   deposited into this account on the date of July 6, 2007?

13       A.    No.

14       Q.    And you don't see any amounts of REDACTED being

15   deposited into this account after July 6, 2007, correct?

16       A.    Correct.

17       Q.    And then if you go back to the Page 1172 and

18   you look at the very bottom, it lists    REDACTED

     , correct?

20       A.    Correct.

21       Q.    And you previously testified, this is your

22   account for your fixed CD, correct?

23       A.    Correct.

24       Q.    And if you look to the transaction detail

25   underneath this account, again, you don't see any

[Page 120]

1    deposits into this account for REDACTED on July 6th,

2    2007, correct?

3        A.   Correct.

4        Q.   And if you turn to the next page, you don't see

5    any deposits into this account for REDACTED, into this

6    account at any point, correct?

7        A.   Correct.

8        Q.   And so for the -- would you agree, then, that

9    these are the three accounts, correct, that you had with

10   Stanford?

11       A.   Yes.

12       Q.   And so none of these show a deposit of REDACTED

▮        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, correct?

14       A.   Correct.

15       Q.   So would you agree that the REDACTED was a

16   transfer from your Stanford account to another

17   non-Stanford account?

18       A.   If that says here, it have to be that way.

19       Q.   And then for the REDACTED withdrawal, do you

20   know what this withdrawal was for on August 7th, 2008?

21       A.   That amount was the one that we were talking

22   before.

23       Q.   And was this the amount we were discussing in

24   regards to sending money to Juan, your husband?

25       A.   Exactly.

1      Q.   (By Ms. Sivashanker)  Ms. Suarez, I'm going to

2    hand you what's been marked now as Exhibit 154, and this

3    is a document titled Certification Form.  The Bates

4    numbering is STANFORD_TDBANK000366 to

5    STANFORD_TDBANK000367.

6              Ms. Suarez, do you recognize this

7    document?

8       A.   I don't -- I don't -- I don't remember, but

9    like I said before many, many times, I don't remember a

10   lot of these documents.

11      Q.   And if you go to the last page of the document,

12   you will see that there are four signatures there.

13              Do you see your printed name, Diana

14   Suarez?

15      A.   Yes.

16      Q.   Did you sign this document?

17      A.   Yes.

18      Q.   And if you turn back to the first page, you

19   will see in the first line numbered 1, it says:  Please

20   fill in all the following bubbles that apply to you.  I

21   have not applied for, asserted a claim for or received

22   compensation for any part of my total claim amount from

23   any source other than the receivership.

24              Do you see that language?

25      A.   Yes.

[Page 132]

1          Q.    And you see that this language was selected on

2      the form as the option being selected, correct?

3          A.    Yes.

4          Q.    And you previously testified that you did

5      submit a claim to the joint liquidators, correct?

6          A.    Yes.

7          Q.    Do you know why you didn't indicate that on

8      this form?

9          A.    I don't know.  No.

10         Q.    And do you agree that that information should

11     have been listed on the form?

12         A.    Let me read them again.

13               (Witness perusing document.)

14               Well, I don't know what to say about it

15     because, like I said before many times, my son was the

16     one who was doing this and he just say, you know, sign

17     here and I did.

18         Q.    So you think that your son filled the form out

19     incorrectly?

20         A.    Maybe.

21               (Exhibit 155 was marked.)

22         Q.    (By Ms. Sivashanker)  Ms. Suarez, I'm going to

23     hand you what's been marked as Exhibit 155.  This is a

24     Spanish language e-mail with English attachments behind

25     it.  Behind that is an English translation of the

[Page 151]

1                  Do you recall that?

2      A.   Yes.

3      Q.   Okay.  And there were some questions about your

4  2007 tax return.

5      A.   Yes.

6      Q.   First of all, did you file tax returns in the

7  US in 2006, 2007 and 2008?

8      A.   Yes, I did.

9      Q.   Okay.

10     A.   Jointly with my husband.

11     Q.   And when you testified that the 2007 tax return

12  didn't -- didn't include the interest that you received

13  from your CDs, you're referring to a tax return in the

14  United States --

15     A.   Yes.

16     Q.   -- is that correct?

17           Now, you would agree with me that if you

18  didn't pay taxes that were due, that would be wrong?

19     A.   Exactly.

20     Q.   And you mentioned that there is an accounting

21  firm, you don't remember the name, that you believed

22  didn't declare the -- these interest payments in 2007.

23     A.   Yes.

24     Q.   You recall that?

25           Do you have information at your house that

[Page 159]

1    me and say:  Don't buy that stuff because it's too

2    expensive, things like that.  I didn't want that.

3                    MR. HAMPTON:  That's all the questions I

4    have.  I appreciate your time today.

5                    THE WITNESS:  Okay.  Thank you.

6                    MR. HAMPTON:  Are you not going to tell me

7    that you enjoyed meeting me?

8                    THE WITNESS:  You are a very nice guy.

9    Okay.

10                   MR. SWANSON:  Yeah.

11                        EXAMINATION

12   BY MR. BRINKMAN:

13       Q.   Good afternoon, Ms. Suarez.  My name is Taylor

14   Brinkman and I represent HSBC.  I'll be brief.

15                   You testified earlier that you have given

16   your son, Gabriel, a power of attorney to act on your

17   behalf in all matters relating to Stanford, correct?

18       A.   Yes.  Not only Stanford, everything.

19       Q.   Does that power of attorney also give Gabriel

20   the ability to act on your behalf in this litigation?

21       A.   I would say yes, in everything.

22       Q.   And so Gabriel can make decisions for you with

23   respect to this litigation, correct?

24       A.   Correct.

25       Q.   Do you have authority to make decisions with