# EXHIBIT 96

[Page 1]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

PEGGY ROIF ROTSTAIN, et al.,    )
on behalf of themselves and     )
all others similarly            )
situated,                       )
                                )
                Plaintiffs      )
                                )
and                             ) Case No. 3:09-CV-02384-N
                                )
THE OFFICIAL STANFORD           )
INVESTORS COMMITTEE,            )
                                )
                Plaintiff-      )
                Intervenor,     )
                                )
    -against-                   )
                                )
TRUSTMARK NATIONAL BANK,        )
HSBC BANK PLC, THE              )
TORONTO-DOMINION BANK,          )
INDEPENDENT BANK F/K/A BANK     )
OF HOUSTON, SG PRIVATE          )
BANKING (SUISSE) S.A., and      )
BLAISE FRIEDLI                  )
                                )
                Defendants.     )

************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

MARK RUSSELL, RULE 30(b)(6) DESIGNEE

September 9, 2015

Volume 1

************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF MARK RUSSELL,
RULE 30(b)(6) DESIGNEE, produced as a deponent at the
instance of DEFENDANT THE TORONTO-DOMINION BANK, and duly
sworn, was taken in the above-styled and -numbered cause

[Page 2]

1    on the 9th day of September, 2015, from 9:46 a.m. to

2    5:17 p.m., before Tonie Thompson, Certified Shorthand

3    Reporter in and for the State of Texas, Registered

4    Professional Reporter, Certified Realtime Reporter,

5    reported by machine shorthand, at the offices of

6    Baker Botts, LLP, located at 2001 Ross Avenue, Dallas,

7    Texas 75201, pursuant to the Federal Rules of Civil

8    Procedure and the provisions stated on the record or

9    attached hereto.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S
 2    FOR DEPONENT, MARK RUSSELL, RULE 30(b)(6) DESIGNEE:
         Mr. David T. Arlington
 3       BAKER BOTTS LLP
         1500 San Jacinto Center
 4       98 San Jacinto Boulevard
         Austin, Texas 78701
 5       Phone:  (512)322-2553
         Fax:  (512)322-8301
 6       E-mail:  david.arlington@bakerbotts.com
 7    FOR PLAINTIFFS:
         Mr. James R. Swanson
 8       Mr. Benjamin Reichard
         FISHMAN HAYGOOD LLP
 9       201 St. Charles Avenue, Suite 4600
         New Orleans, Louisiana 70170
10       Phone:  (504)586-5252
         Fax:  (504)586-5250
11       E-mail:  jswanson@fishmanhaygood.com
                  breichard@fishmanhaygood.com
12
      FOR PLAINTIFF-INTERVENOR, THE OFFICIAL STANFORD
13    INVESTORS COMMITTEE:
         Mr. Peter D. Morgenstern
14       BUTZEL LONG P.C.
         380 Madison Avenue, 22nd Floor
15       New York, New York 10017
         Phone:  (212)818-1110
16       Fax:  (212)818-0494
         E-mail:  morgenstern@butzel.com
17
      FOR DEFENDANT TRUSTMARK NATIONAL BANK:
18       Ms. Ashley McKeand Kleber
         GIBBS & BRUNS LLP
19       1100 Louisiana Street, Suite 5300
         Houston, Texas 77002
20       Phone:  (713)650-8805
         Fax:  (713)750-0903
21       E-mail:  akleber@gibbsbruns.com
22
                         * * *
23
                         * * *
24
25              (Continued on the next page.)
```

[Page 4]

```
 1    FOR DEFENDANT HSBC BANK PLC:
         Mr. Taylor F. Brinkman
 2       LOCKE LORD, LLP
         2200 Ross Avenue, Suite 2200
 3       Dallas, Texas 75201
         Phone:  (214)740-8000
 4       Fax:  (214)740-8800
         E-mail:  tbrinkman@lockelord.com
 5

      FOR DEFENDANT THE TORONTO-DOMINION BANK:
 6       Ms. Lynn K. Neuner
         SIMPSON THACHER & BARTLETT LLP
 7       425 Lexington Avenue
         New York, New York 10017
 8       Phone:  (212)455-2696
         Fax:  (212)455-2502
 9       E-mail:  lneuner@stblaw.com
10       -- and --
11       Mr. Rodney Acker
         NORTON ROSE FULBRIGHT US LLP
12       2200 Ross Avenue, Suite 3600
         Dallas, Texas 75201
13       Phone:  (214)855-8000
         Fax:  (214)855-8200
14       E-mail:  rodney.acker@nortonrosefulbright.com
15    FOR DEFENDANT INDEPENDENT BANK F/K/A BANK OF HOUSTON:
         Mr. Brad Repass
16       HAYNIE RAKE REPASS & KLIMKO, P.C.
         Wellington Centre
17       14643 Dallas Parkway, Suite 550
         Dallas, Texas 75254
18       Phone:  (972)716-1855
         Fax:  (972)716-1850
19       E-mail:  brad@hrrpc.com
20    FOR DEFENDANT SG PRIVATE BANKING (SUISSE) S.A.:
         Mr. Wallis M. Hampton
21       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
         1000 Louisiana Street, Suite 6800
22       Houston, Texas 77002
         Phone:  (713)655-5116
23       Fax:  (713)483-9116
         E-mail:  wallis.hampton@skadden.com
24
25                 (Continued on the next page.)
```

App. 2909

[Page 5]

1     FOR DEFENDANT BLAISE FRIEDLI:

          Ms. Stephanie Gamiz (Via Telephone)

2         MORGAN LEWIS & BOCKIUS LLP

          101 Park Avenue

3         New York, New York 10178

          Phone:  (212)309-6000

4         Fax:  (212)309-6001

          E-mail:  sgamiz@morganlewis.com

5

      ALSO PRESENT:

6         Ms. Alexis Anderson, Videographer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

[Page 38]

1    put them into a single group called a claim group.  So

2    that's what the first column is representing.

3              And then the third column is basically the

4    allowed claim amount that comes out from our calculation

5    and the rules of how we determine what an allowed claim

6    amount is.  So there's multiple claims -- one or multiple

7    claims per claim group, and a single allowed amount on

8    that claim group.

9         Q.   Thank you.

10              Can you explain for us how the claim groups

11    were defined and formed?

12         A.   So there's -- we have an automated query that

13    does this, so there's -- I don't know the exact number.

14    There's a few different ways that a claim -- that

15    multiple claims can come into the same claim group.  So

16    they -- if there's claims that are claiming the same

17    account number, so there's multiple claims claiming the

18    same CD account number or SIB account number, those

19    claims would get put into the same claim group.

20              There is -- within Temenos, which is the

21    underlying database system that exited at SIBL for the

22    CDs.  So within this Temenos database, there is a unique

23    client ID.  It's just a field that's associated with each

24    account, and you can have multiple accounts per client

25    ID.  So if -- any claims that are claiming accounts that

[Page 39]

1    share a client ID would be grouped together.

2              And then as part of our process, when we

3    were doing -- when we were trying to identify net

4    winners, there was an extensive process that FTI went

5    through to kind of group accounts together, looking for

6    people whose accounts are related.  So any claims that

7    are claiming accounts that we had previously put into

8    groups would automatically be grouped together.  And so

9    that's kind of how claims initially get grouped.

10             There's also an objection process where,

11   once we notice claimants, they can object.  They can

12   object to basically anything they want to.  One of the

13   objections that sometimes they'll object to is how we've

14   grouped claims together.  And so sometimes we'll evaluate

15   what they give us.  Maybe they'll provide us

16   documentation or they may give us evidence that suggests

17   that we should go ahead and split their accounts out

18   further into different groups to kind of meet whatever

19   requirement it is, that if we agree with their objection,

20   to kind of get to the grouping.

21             So, initially, we do the grouping

22   electronically, and then that grouping can change if we

23   agree with an objection that comes in through the

24   objection process.

25        Q.   Can you give an illustrative example of an

[Page 92]

1    than what the records the receivership has -- show

2    regarding their deposits and their withdrawals.

3        Q.   And as part of the net loss calculation, the

4    receiver would eliminate any accrued interest on the

5    accounts, right?

6        A.   Correct, yeah.  From our perspective, we would

7    not consider accrued interest in our calculation.

8        Q.   So for the receiver's calculation, it's

9    literally money deposited with SIB, subtracting out money

10   that was paid out, whether it was extraction of principal

11   or redemption of CDs or interest payments?

12       A.   Essentially, yes.

13       Q.   Okay.  And even if something was received

14   initially by the investor as "an interest payment," it

15   would essentially be redenominated as cash out of

16   principal, right?

17       A.   Well, we wouldn't really change what it's

18   called.  We would just -- from our perspective, it's

19   either money coming in or money going out, and we don't

20   really make a distinction on whether it's principal or

21   interest.  We're just concerned with whether you put more

22   in than you took out or if you put less in than you took

23   out.

24       Q.   Okay.  As I understand from the class

25   representatives' depositions, many individuals, as part

[Page 93]

1    of the receivership process, took their final account

2    statement from February 2009 from SIB and submitted that

3    with their claim submission.  Was that generally your

4    experience?

5        A.   I know that there was a large number that did.

6    In terms of how many of them did that, I don't know.  But

7    it was a common thing that we saw, where somebody would

8    just submit, "I'm claiming my final balance as my claim

9    amount."

10       Q.   Okay.  And then it was up to the receiver and

11   your team to do the hard analysis of that person's

12   historical transactions to determine how much money had

13   been deposited and how much money had been withdrawn?

14       A.   Correct.

15       Q.   And when you did those net loss calculations,

16   how far back in time would you go for an individual?

17       A.   So we would go back as far as we have

18   information.  So it kind of depends on the individual,

19   but we didn't put a cutoff on a time frame.  We just went

20   back as far as our data would allow us to go.

21       Q.   How far does the data allow you to go?

22       A.   So it's not wholesale, across the board, but the

23   vast majority of our data begins in August of 2003.

24       Q.   I see.  Why August of 2003?

25       A.   So from what we can tell, that's when

[Page 94]

1    DataPro that I discussed was the predecessor to Temenos,

2    that's when it went online.  And so for the live

3    connection that we had into the Antigua server, that's as

4    far back as the information went that we could make a

5    copy of from our connection in the U.S.

6        Q.    What about if someone had invested in the 1990s?

7    Would the receiver's calculations capture that money in?

8        A.    It depends on whether it still existed as of

9    August 2003.  So if it still existed as of August 2003,

10   we have a mechanism to attempt to capture that dollar

11   amount, where any amount -- so the database shows

12   principal and interest.  Like, it makes a delineation

13   between the two.  And so what we would consider is in

14   August, if you have an account that just exists and has a

15   balance, anything that's in that principal column, we

16   would give the customer the benefit of the doubt that

17   that's a deposit.  And so we would treat that as if it

18   was money into the bank.

19       Q.    I see.

20             So if -- let's just pose an example.

21   Someone purchases in 1998, but they roll their CD with

22   the accrued interest in 2003 when the DataPro database

23   begins, they might have a principal balance that reflects

24   both their actual money deposited in hard cash and their

25   accrued interest, and essentially the receiver is going

[Page 107]

1    kind of where it was on the 25th report.  I'm sure that

2    it's probably gone up a little bit since then, but I

3    don't have specific numbers as I sit here today.

4              But, you know, we issue a certificate, and

5    in order for them to get paid and be included on a

6    distribution, they have to provide it back.

7    Q.   Okay.  So why don't we extract the relevant

8    statistics from the report, and then we'll go to that

9    exhibit that you folks gave to us this morning.

10   A.   Okay.

11   Q.   So from the 25th report, page 10, we

12   state -- the receiver states, "It sent certification

13   notices to CD claimants regarding 17,041 unique CD claims

14   and has processed certification forms received in

15   response for 14,394 of those unique CD claims."

16             Do you see that?

17   A.   That's correct.

18   Q.   So that means those 14,394 are then eligible to

19   receive distributions, right?

20   A.   Yeah, they're eligible to go on a distribution

21   list, potentially, depending on what their response was

22   on that certification.  So if they reported that they had

23   collateral recovery, then they wouldn't go on that

24   distribution list.

25   Q.   I see.

[Page 108]

1          They would be kept on a sideboard for

2    future distribution, if appropriate?

3       A.   Right, if it ever became appropriate.

4       Q.   I see.

5            Do you have a sense of how many people are

6    on the sideboard?

7       A.   I know it's on the exhibit.

8       Q.   Okay.

9       A.   I don't remember the specific number off the top

10   of my head.

11      Q.   Okay.  No, that's fine.

12      A.   Okay.

13      Q.   We'll finish this paragraph, and then we'll go

14   right to there.

15           So the final statement here is,

16   essentially, of the allowed claims, there are 420 unique

17   CD claims for which the notice of determination has been

18   issued but the certification has not yet been sent.  So

19   you're in an evolving process of sending things out?

20      A.   Right.  It's kind of a rolling basis of

21   preparing the certifications and e-mailing them out.  And

22   so when the report was filed, it just happened to be that

23   420 of them hadn't yet received their certification form

24   yet.

25      Q.   Okay.  Got it.

[Page 112]

1    arbitrations by investors against their Personal

2    Financial Advisors have been allowed to go forward in

3    some cases but have been stayed in others?

4        A.   I don't know specifics on those kind of

5    independent lawsuits that have gone on.

6        Q.   Okay.  Insurance settlements, can you describe a

7    little more about the nature of the claim?  Is it like a

8    theft-loss claim under a personal residential policy?

9        A.   I don't know the specifics on what the claim

10   was.  I just know that we've had two claimants report

11   that they've gotten settlements that were insurance

12   related.

13       Q.   Okay.

14       A.   I don't specifically know exactly what type of

15   claim was asserted or why the recovery occurred.

16       Q.   Okay.  Tax losses, can you give us a little more

17   information about what fits within this bucket?

18       A.   It's individuals who have reported that they've

19   claimed losses on their, like, federal or state income

20   taxes; and then the, kind of, recovery is what the

21   reporting essentially is, the tax savings that they got

22   from reporting those losses.

23       Q.   Okay.  So if someone conveyed to the receiver

24   that he had taken a loss on his 2009 tax return for the

25   amount that he was out of pocket as a result of the

[Page 113]

1  Stanford situation and then saved taxes that he didn't

2  have to pay as a result, the receiver would take that

3  amount into account for that individual's status as an

4  allowed claim recipient?

5      A.   So right now the -- kind of the final decisions

6  on what's going to happen on each type of collateral

7  recovery I don't think has been made.

8      Q.   Okay.

9      A.   So for right now, because that individual has

10  checked the box that says I have a collateral recovery,

11  they kind of are on the back burner, or on that other

12  board that you mentioned.

13      Q.   Right, the sideboard?

14      A.   Right, the sideboard.  But the receiver is

15  looking at each of those case by case to determine on

16  whether or not the type of recovery they've reported

17  means that they should or shouldn't be included on the

18  distribution.  But their recovery doesn't change our

19  calculated allowed amount.  It may -- you know, depending

20  upon what the receiver decides, it may depend on when or

21  if they ever get paid --

22      Q.   Yes.

23      A.   -- from equitable payment perspective.  But I

24  don't think the final decisions have been made on which

25  ones would preclude you from payment and which wouldn't.

[Page 114]

1    Q.   I see.  It's not altering the notice of

2    determination, but it's putting them in an altered status

3    with respect to the distributions that the receiver is

4    making?

5    A.   Correct.

6    Q.   I get it.

7              Why don't we do this.  I have a proposal

8    that we let you walk through Russell Exhibit 9 and then

9    break at that point for lunch.

10              MS. NEUNER:  Does that work for you, David?

11              MR. ARLINGTON:  Sure.

12              MS. NEUNER:  Okay.

13    Q.   (BY MS. NEUNER) So Russell Exhibit 9 is titled

14    "Hold Mail/Alternative Addresses."

15    A.   Can I tell you what it is, and then you can

16    decide if you want to go through this first or if you

17    want to go through what it relates to?

18    Q.   Sure.

19    A.   Okay.  So this -- there is -- one of the topics

20    addressed discussing a chart that was in one of Karyl's

21    declarations that breaks down investor numbers by the

22    country that they're located in, with the total number of

23    clients and the dollar amount of their balances when we

24    took over.

25              There was a category on that chart that was

[Page 115]

1    described as hold mail and/or SIB or STC-related type

2    address.  What this is, is a further breakdown of the

3    hold mail that is in that category, kind of describing at

4    a high level, for those that have a hold-mail mailing

5    address, are we able to identify other address

6    information within our database that is not hold mail

7    related.

8        Q.   Okay.

9        A.   So in other words, can we go to another level

10   and actually identify an address for those hold-mail

11   recipients or not.

12       Q.   So let me --

13       A.   I can walk you through this if you want to, or

14   if you want to go through the chart first.

15       Q.   Exactly.  Let's do the Karyl Van Tassel

16   document, and then we'll piece this in right after it.

17       A.   Uh-huh.

18            (Deposition Exhibit No. 15 marked.)

19       Q.   (BY MS. NEUNER) Okay.  I am handing you what

20   we've marked as Russell Exhibit 15, which, for the

21   record, is a document that's titled, on the first page,

22   Exhibit 13, "Declaration of Karyl Van Tassel,

23   December 2011," and internally is referred to as direct

24   testimony of Karyl Van Tassel, and which is dated, at the

25   end, as December 5th, 2011.

[Page 116]

1          You have that document in front of you,

2  Mr. Russell?

3      A.   I do.

4      Q.   Okay.  And then I think the chart that you're

5  referring to is on page 34, in the internal numbering of

6  the document, and page 35 at the bottom right-hand

7  corner?

8      A.   Correct.

9      Q.   Okay.  Why don't you describe for us what this

10  chart is.

11      A.   Okay.  So this is a chart that we put together

12  that does a count based on clients, of identifying which

13  country they reside in based on the most recent mailing

14  address associated with that client in the Temenos CD

15  database.  So it just kind of breaks it down.  It

16  provides both a count of the number of clients, as well

17  as what the ending balance of their SIB accounts was as

18  of when the receivership took over in February of 2009.

19      Q.   Okay.  So then the tally numbers at the bottom

20  show 28,001 for number of clients and 7.19 billion for

21  amount in U.S. dollars, which I take it would be their

22  ending balance, right?

23      A.   That's correct.

24      Q.   Okay.  So then as I understand what you've just

25  said, the address location is a categorical breakdown of

1   the most recent mailing address from the Temenos

2   database?

3        A.   That's correct.

4        Q.   Okay.  So then do you want to go to the Russell

5   Exhibit 9 and put this together?

6        A.   So on the chart in Russell 15, second from the

7   bottom there is a category that's listed as SIB, STCL or

8   hold mail addresses with 10,771 clients.

9        Q.   Yes.

10        A.   What Russell 9 is, is it's a identification of

11   the portion of the 10,771 that are hold mail.  So on

12   Russell No. 9 where it says client ID with hold mail

13   addresses of 9,487, that is a subpopulation of the 10,771

14   in the chart in Karyl's declaration.

15        Q.   I follow you.

16        A.   So then, like, Russell 9 says it's based on

17   Temenos' database and its client IDs where hold mail is

18   shown as the most recent statement address.

19        Q.   Okay.  And just for the record, "hold mail"

20   would mean that an investor is having his or her mail

21   held at SIBL in Antigua?

22        A.   It may be SIBL in Antigua.  It may be, like,

23   STCL in Antigua.  But, generally, one of the Stanford

24   entities, whether the bank itself or one of the trust

25   companies, would be physically holding the statements

[Page 118]

1    rather than sending them to the customer.

2         Q.   Okay.  Got it.

3         A.   So back to Russell No. 9.  The second bullet

4    point, it says, "Client IDs with alternative addresses."

5    The first sub bullet point says there's 273 client IDs

6    that have a non-hold mail address with the same client ID

7    in Temenos.  So in other words, the client ID that we're

8    saying has hold mail also has another address in the

9    system that is not hold mail.

10        Q.   Okay.

11        A.   9,161 of the client IDs that are referred to as

12   hold mail in the original chart, the client IDs don't

13   have another address that's not hold mail, but there is a

14   related client within the database that does have a

15   non-hold mail address.  So, like, a beneficiary of a

16   trust or the owner of a corporation or some other client

17   that's associated with more, like, a trust or entity-type

18   name.  And then there's only three of the 9,437 for which

19   we are not able to identify any non-hold mail address for

20   them.

21        Q.   Okay.  And how does -- this group doesn't

22   necessarily all fit within the allowed claimant group?

23        A.   That's correct.

24        Q.   For the allowed claimant group, you would have

25   physical addresses for all of them because you're

[Page 119]

1    potentially sending them checks, right?

2        A.   It depends on how their claim was filed.   I'd

3    say generally that's true, but it's not true in

4    100 percent of the cases.

5        Q.   How would they get their distributions if they

6    don't have it -- if you don't have an address?

7        A.   So there's some investors whose claims were

8    submitted by law firms that represent them.   So we may

9    may not necessarily have the actual location, like an

10   address information from the claims process for the

11   individual investors.   We may just have the address

12   associated with the law firm who is asking that the

13   correspondence and checks and communication go through

14   them rather than directly to the client.

15       Q.   Got it.

16              MS. NEUNER:   Okay.   I think we have timed

17   this exquisitely because we are out of tape.

18              THE DEPONENT:   Okay.

19              MS. NEUNER:   Thank you very much for the

20   whole morning session, and we'll see you after lunch.

21              THE DEPONENT:   Okay.

22              THE VIDEOGRAPHER:   Off the record.   End of

23   Tape 2.   Time, 12:33.

24              (Lunch taken at 12:33 p.m.)

25              (Back on the record at 1:45 p.m.)

[Page 122]

1   have attached at the back, and it's called Exhibit 39,

2   and that is a two-page chart.

3          Do you have that in front of you?

4   A.   I do.

5   Q.   Okay.  Great.

6          So if we could, let's start with

7   Ms. Van Tassel's.  She has this categorization, what she

8   calls, up above the chart, "the country-by-country

9   statistics for all CD clients are as follows."  And I

10  think we had questioning about this beforehand, and it

11  shows the most recent address information for the

12  claimants as of their ending account statement, right?

13  A.   Yeah.  It's a clarification based on the most

14  recent mailing address, and then it provides the ending

15  balance of the accounts for each -- for the clients.

16  It's presented by countries.

17  Q.   Okay.  Now, the Russell Exhibit 16, which is the

18  plaintiffs' moving brief in the Proskauer case, that has

19  a chart.  And if you will, on page 45, the description

20  says as follows, "The following chart, based on

21  information provided by the Antigua Joint Liquidators,

22  evidences in part -- because there are investors from

23  over 100 countries -- the geographic dispersion of the

24  class members in terms of the countries with the largest

25  concentration of Stanford investor victims."

[Page 123]

1              Do you see that?

2      A.   I do.

3      Q.   Okay.  And that chart tallies, in terms of

4  dollar amount, to 4.9 billion?

5      A.   Correct.

6      Q.   And in terms of number of civil clients, 17,605,

7  right?

8      A.   Correct.

9      Q.   Okay.  And then to line this up, Russell

10  Exhibit 17 has this Exhibit 39 which is attached, and

11  this has -- states at the top, "Stanford International

12  Bank, Limited, in Liquidation, Summary of Claims by

13  Country and Status."

14              And do you see that covers essentially two

15  pages?

16      A.   I do.

17      Q.   And the number of claims tallies to 21,738,

18  right?

19      A.   Correct.

20      Q.   And the total value of claims tallies to roughly

21  7.25 billion.  Do you see that?

22      A.   That's correct.

23      Q.   Okay.  Had you seen before information from the

24  Joint Liquidators with respect to claimants' country of

25  residence?

[Page 125]

1   with the Joint Liquidators --

2                 (Reporter instructs deponent to speak

3                 loudly and clearly.)

4       A.   Sorry.   The outcome, my understanding, is the

5   settlement and joint cooperation agreement was the final

6   outcome, where the receivership and the Joint Liquidators

7   agreed to kind of work together and share information.

8       Q.   (BY MS. NEUNER)  Okay.  So as part of that

9   Chapter 15 litigation, you had seen some submissions by

10  the receiver with respect to the country breakdown for

11  the CD claimants?

12      A.   Yeah, both by the U.S. receivership, our work,

13  and similar but different kind of statistics, obviously,

14  being submitted by the -- I can't remember which Joint

15  Liquidator, but one of the Joint Liquidators in the

16  Antigua process.

17      Q.   Okay.  So here is a question for you:  With

18  respect to the first chart that we have in front of us,

19  the Karen [sic] Van Tassel one that tallies to roughly

20  7.19 billion, and the Joint Liquidators chart, which is

21  the third one, attached to Exhibit 17, which tallies to

22  7.25 billion, do you have an understanding of whether the

23  receiver and the Joint Liquidators are generally in

24  agreement with respect to the breakdown of countries?

25      A.   I know that the Joint Liquidators and the

[Page 126]

1    receiver break down the countries based on different

2    data.  So, like, I know that ours --

3        Q.   Can you explain that?

4        A.   So I know that ours is based on the most recent

5    mailing address.  We don't know specifically, exactly

6    how -- what field or what code the JLs are using to do

7    their breakdown, but we know that they're not using the

8    most recent mailing address.

9             Like, I know during the Chapter 15, we

10   attempted to re-create it, and we couldn't exactly

11   re-create their numbers, but we could get close

12   using -- there's a field within the database that

13   purports to provide the nationality on an account basis,

14   and it looks like they were using that nationality field

15   rather than the mailing address.

16       Q.   When you say there's a field in the database, do

17   you mean the Temenos database?

18       A.   Correct.  Yeah, the underlying tables in the

19   Temenos database, there's a field that purports to show

20   the nationality.

21       Q.   So do you have that field too and you're just

22   not utilizing it?

23       A.   We do have that information.  We were -- you

24   know, when we were doing our litigation and our

25   classification, we basically made the conclusion that for

1   purposes of what we were doing in Chapter 15, what was

2   important to us was where that person actually physically

3   was, which we felt was better represented by the mailing

4   address, than necessarily where that person happened to

5   have been born --

6       Q.   Yes.

7       A.   -- which the nationality would be potentially

8   more representative of.

9               So we didn't care if you were born Mexico.

10  We cared more if you actually were in the United States

11  when you were buying your CDs or if you were in Venezuela

12  when you were buying your CDs.  So more where you were

13  located, not necessarily where you were born.

14      Q.   Okay.  Getting back to the receiver's analysis

15  and Karen [sic] Van Tassel's declaration, she's giving a

16  breakdown of what I understand to be the full universe of

17  claimants or individuals who held accounts, right?

18      A.   It's a breakdown of all clients in the database

19  at that time.

20      Q.   Okay.

21      A.   It's possible that you could have a client that

22  no longer had a balance, so they would increase our

23  count, but they would be included in our total client

24  number.  So it's anybody who existed in the database,

25  essentially.

[Page 128]

1       Q.   I follow you.

2                  Now, to your knowledge, has the receiver

3    generated a similar set of data for the allowed

4    claimants, showing their address location?

5       A.   Not that I'm aware of.

6       Q.   Okay.  And I'm going to stick with Karyl Van

7    Tassel's declaration for a moment.  Because from our

8    perspective, when we're trying to figure out the country

9    breakdown for the claimants, we have the receiver's

10   numbers here for the 7.2 billion, but we're trying to

11   figure out the country breakdown for the allowed

12   claimants, which would be the roughly 4.5 billion number

13   at this point in time, right?

14      A.   I -- yeah.

15      Q.   All I'm asking you for right now is that

16   4.5 billion, right?

17      A.   Yeah, correct.

18      Q.   So putting all this together, as we sit here,

19   the receiver, I take it, has not generated a

20   country-by-country breakdown for the 4.5 billion in

21   allowed claims of CD investors, right?

22      A.   Correct, we have not generated that as of today.

23      Q.   Do you have an understanding of whether the

24   percentage breakdown, which you see in the second column

25   here as percentage of clients or the percentage breakdown

1   based on U.S. dollars, would be similar in the allowed

2   claimant category and essentially prorated down to the

3   4.5 billion, or do you have a sense that entire countries

4   were excluded, that sort of thing?

5        A.   I don't -- I don't know if it would be equal

6   without really running the analysis.  You know, we

7   could -- because of the way our data works, we

8   could -- we could generate a similar chart that excludes

9   anybody who is not in a claim group or has an allowed

10  amount.  So it's something we could do.  So I don't

11  really know if it would bear that way out.

12            I do know that there's not -- I don't know

13  of any instances where a country has been completely

14  excluded.  I also haven't looked to see if that's true.

15  But I do know there isn't, like, a process or step where

16  any particular country is being excluded because of that

17  country.

18            So if it has occurred, it's just -- it's

19  because they're being excluded for another reason, like

20  being a net winner or being a defendant or some other

21  reason.

22       Q.   Okay.  Let me show you -- direct your attention

23  to the line in the Karyl Van Tassel testimony to Antigua

24  and Barbuda.

25       A.   Uh-huh.

[Page 130]

1     Q.   Now, is it true that Antiguan residents were not

2   allowed to buy the SIBL CDs?

3     A.   Our understanding is that a resident of Antigua

4   or, like, a citizen of Antigua would not be allowed to

5   buy the CDs.

6     Q.   Okay.  Can you help us understand why there

7   would be a line item for Antigua and Barbuda?

8     A.   We haven't investigated it to, like,

9   specifically know the answer, but I do know that expats

10   live there, and I don't know whether or not they would be

11   excluded from buying CDs.  I just don't know the law on

12   that.  But the reason they would show up in this chart is

13   because there are some clients who have a physical

14   mailing address that is in Antigua or Barbuda that is

15   unassociated with a Stanford-related entity.

16     Q.   Okay.  And going back to your hold

17   mail/alternative addresses, of the 10,771 who show up in

18   the SIB, STCL or hold-mail addresses, you essentially can

19   find a proxy address, if you will, for the vast majority

20   of those individuals, right?

21     A.   So the only -- so that category had SIB, STCL or

22   hold mail.  The only piece we've done additional analysis

23   to date on is the hold mail.

24     Q.   Okay.

25     A.   And so the 9,437 is just that hold mail piece.

[Page 131]

1        Q.    Yeah.

2        A.    And we're able to identify additional addresses

3    for all but three of them.  We could do the analysis on

4    the other pieces; we just haven't done it to date.

5        Q.    Have you created a new chart that would reflect

6    the reallocation of the -- that 9,434 individuals to the

7    other countries?

8        A.    We haven't done that.

9        Q.    Do you know where proportionally those

10   individuals would be reallocated?

11       A.    We haven't actually looked at where they would

12   sit.  We've just looked to see if there is another

13   address.  So we'd need to take it to that next step of

14   saying and now break that further down by country, which

15   we haven't done yet.

16       Q.    Right.  So you can't say to me, Lynn, of those

17   9,400, the vast majority are in the United States?

18       A.    Right, today I couldn't say that.  We'd have to

19   do more analysis to figure out what that breakdown is.

20       Q.    Okay.  Do you have an understanding of the

21   following?  On the Karyl Van Tassel declaration, for the

22   United States of America, she has 2.6 billion, or

23   37 percent of the total of roughly 7.2 billion?

24       A.    Correct.

25       Q.    Okay.  Now looking at the third chart we have in

[Page 136]

1    2.4 billion that's in the hold mail address in the

2    Van Tassel chart was reallocated back among the other

3    countries?

4        A.   They potentially could be closer.  I don't know

5    that they would ever -- because we're classifying based

6    on address versus nationality, really for them to

7    harmonize, we'd either have to both clarify on address or

8    both clarify on nationality.

9        Q.   Okay.

10       A.   Because that's really what's driving the

11   differences between the two.

12       Q.   Uh-huh.  I follow.

13           So as we sit here today, if the receiver

14   had to, you could run a chart on the 4.5 billion in

15   allowed claims and categorize the claimants either by

16   their last known address or by their nationality?

17       A.   Correct.

18       Q.   Okay.  Let's talk about the United States

19   claimants.

20       A.   Okay.

21       Q.   To your knowledge, has the receiver undertaken

22   an analysis of the United States claimants on a

23   state-by-state basis?

24       A.   Not the claimants.  The only thing that we've

25   done for a state perspective is we've taken the same

[Page 137]

1    7,000 that's in the Karyl's chart, in this Exhibit 15,

2    and broken those down by state.

3        Q.   And what did you do that for?

4        A.   I believe there was a request that we received

5    from a member of the -- one of the

6    Stanford -- either -- I don't remember if it was the OSIC

7    committee or if it was the Stanford victims' coalition.

8    There was a request that came through asking if we could

9    do a state-by-state breakdown, so we provided it for

10   that.

11       Q.   Okay.

12            (Deposition Exhibit Nos. 19 and 20 marked.)

13       Q.   (BY MS. NEUNER) Let me show you a document which

14   I'll mark as Russell No. 19.  Here you go.  And then,

15   Mr. Russell, I'm going to give you a companion exhibit,

16   which I'm marking as Russell No. 20, and I'll explain

17   what that is in a moment too.

18            Okay.  For the record, Russell No. 19 is a

19   one-page document stamped Abbott 6, and at the top in

20   handwriting says, "CD losses by states."  And Russell

21   No. 20 is a one-page chart called "Class Composition,

22   47 States."

23            And, Mr. Russell, what I'll tell you is

24   that Exhibit No. 20 is again created by Simpson Thacher,

25   and it is simply a chart using the data from Exhibit 19

[Page 138]

1    in an easier-to-read format.

2         A.   Okay.

3         Q.   So we can use the two sort of interchangeably to

4    help read the numbers and so forth.

5              Let me start with Exhibit 19.

6         A.   Okay.

7         Q.   Can you tell us what this is?

8         A.   So this is a chart prepared by FTI that takes

9    the 7,072 United States address clients from Karyl's

10   original chart in Russell 15 and breaks those down by the

11   state that they're located in, using that same mailing

12   address information.

13        Q.   Okay.   Now, this is somewhat hard to read, but

14   with my magnifying glass, I was able to discern that the

15   first column says "State address."   The second column

16   says "number of clients," and the third says "most recent

17   statement information."   Underneath that, in all

18   capitals, "Total ending balance USD."

19             Does that make sense to you?

20        A.   That's correct.

21        Q.   Okay.   And then when do you recall creating this

22   chart?

23        A.   It was in February 2009.   This version is

24   actually February 22nd, 2009.

25        Q.   I see.

[Page 139]

1            And when you created it, do you remember

2     what you did with it, who did you give it to?

3          A.   I believe we provided it to counsel so they

4     could provide it to the original requester, which

5     was -- I don't remember her name, but she used to be in

6     charge of the Stanford investors coalition or the -- I

7     don't think she is anymore, but I know she used to lead

8     it.

9          Q.   Okay.  Do you remember the woman's name?

10         A.   That's --

11         Q.   Okay.  That's no problem.

12         A.   I'm thinking it's, like, Angie something, but I

13    don't remember her name specifically.

14         Q.   Okay.  And at the top this states, "Stanford

15    Financial Group Most Recent Mailing State Breakdown for

16    SIBL Claims with Most Recent Statement Mailing Address

17    Within the United States."  And then after that it says

18    as of February 22, 2009, right?

19         A.   That's correct.

20         Q.   Okay.  And the very bottom footnote says, "There

21    are an estimated 71 unique SIBL claimants with the most

22    recent statement mailing address within the United States

23    that has a blank value for the mailing state address"?

24         A.   That's correct.

25         Q.   Have you ever been able to ascertain the

[Page 140]

1    information for those?

2        A.   We have not.

3        Q.   Okay.  Now, I'm looking at Exhibit No. 20,

4    which, again, is just a more readable version of this

5    other chart, 19.  We've ranked these states by highest

6    dollar value to lowest dollar value.  Do you see that?

7        A.   Yes.

8        Q.   Now, as we've talked about, this tallies to

9    2.6 billion, which was the account statement and not the

10   allowed amount, right?

11       A.   That's correct.

12       Q.   In this chart, Florida is the highest-dollar

13   state at 857 million with 33.26 percent of this universe,

14   which adds to 2.6 billion, right?

15       A.   That's correct.

16       Q.   Do you have an understanding as you sit here

17   today whether Florida would still have the highest-dollar

18   percentage for the allowed claimants?

19       A.   I don't.  We'd have to -- we could rerun the

20   analysis to figure it out, but I don't know exactly how

21   it would break down from an allowed amount.

22       Q.   Okay.  Just to be clear, as we sit in our

23   chairs, the receiver could do a state-by-state breakdown

24   for the allowed claimants based on either the most recent

25   mailing address or the nationality, right?

[Page 141]

1    A.    We could -- we can do it by the most recent

2    mailing address.  For the nationality, we'd have to do it

3    as a combo.  So we'd have to identify who is the U.S.

4    based on nationality and then use the address to pull out

5    the state.

6    Q.    Oh, good point.  Right.  Because, for example,

7    one of our other claimants, Ms. Sarah Ellison-Rogers, is

8    a UK citizen, but she resides in North Carolina?

9    A.    Right.  And so if we classified them by

10   countries and nationality, in her instance you would have

11   her classified as UK, so she wouldn't have a state, so we

12   wouldn't be able to -- if we were classifying it that

13   way, she would be a UK national with a United States

14   state, which just wouldn't make sense.

15   Q.    Right, right.  I follow that.

16   A.    Uh-huh.

17   Q.    Is it your under -- or do you have any

18   understanding whether there are still 47 states

19   represented in the allowed claimant population?

20   A.    I don't.

21   Q.    Okay.  Do you have an understanding whether

22   there are still 106 countries included in the allowed

23   claimant population?

24   A.    I don't.  We'd have to rerun the analysis.

25   Q.    Would it surprise you to learn that there were

App. 2940

[Page 150]

1    one of the two?

2        A.    Could have been Mr. Powers, Mr. Arlington, or

3    Mr. Day, one of those three.

4        Q.    Then, if you will, go ahead and just

5    narratively, because it'll be faster, take us through

6    your three meetings with Mr. Alexander, whether by phone

7    or in person.

8        A.    So I believe -- I'm trying to see if I can

9    remember each one specifically.  I know the topics that

10   were covered in general on all three.  I can't say with

11   certainty which topic was in which phone conversation.

12   So at a high level what we discussed was the

13   transactional information and deposit and withdrawal

14   summaries that we provided them for the class

15   representatives.

16           We also had discussions with them regarding

17   what level of information we had regarding addresses; how

18   extensive was, like, the nationality field populated;

19   were there any other potential identification fields in

20   the database and how extensively were they populated.

21           We also had discussions about kind of that

22   cutoff period that we have at the beginning, where data

23   begins on August 2003.  We had a discussion about some

24   accounts for which they're on what we refer to as

25   quarterly statements.  So some of the last information we

App. 2941

1   have for them is actually December 2008.  It doesn't,

2   kind of, follow through that last month and a half.

3              And then we also discussed some, kind of,

4   parameters around, like, a gap that we have, like -- a

5   six-month gap of data that we have within the

6   transactional information.

7       Q.   When does that six-month gap take place?

8       A.   Goes from June 1st, 2006, through essentially

9   December 2006, but we do have the ending balance

10  information for December 2006.

11      Q.   Why do you suppose that gap exists?

12      A.   We haven't been able to figure it out.  We do

13  know from some of the reconciliation we've done with the

14  JLs, the gap appears to exist in their live data set as

15  well.  So it looks like for some reason the live version

16  of the database that we pulled our copy from, at some

17  point, either because that piece of the hard drive was

18  corrupted or because somebody had accidentally erased

19  some information or it just kind of went away, that that

20  live version of the database that we pulled our copy from

21  just didn't have that transaction activity in it.

22      Q.   Okay.

23      A.   And then kind of the last thing that we

24  discussed is there's -- similar to the 12/31/2008 issue,

25  there's a few accounts in there that will sporadically

[Page 152]

1    have a few transactions missing from one of their

2    accounts.  Like, if they're on a quarterly statement,

3    they may be missing some information from, like, the

4    January/February and they'll just have the

5    March transaction information.

6        Q.   So essentially, that last category is missing

7    gaps within the quarter?

8        A.   Correct.  Like, it's not -- it's not pervasive

9    and always there.  It's kind of sporadic in that it'll

10   happen every once in a while.

11             And then the last kind of topic that we

12   kind of covered is other data that the receivership kind

13   of has available; what type of bank information do we

14   have; you know, statements, wire information, check

15   copies; what potentially do we have from a hard copy

16   perspective in the U.S.; and potentially what may exist

17   that we could get access to from the JLs through the

18   cross-border agreement.

19       Q.   Okay.  On that last item where you referred to

20   what information the JLs have that we could get access to

21   through the cross-border agreement, is your sense that

22   the receiver has more comprehensive, richer data, or that

23   the JLs do?

24       A.   From what we've seen, it looks -- from the live

25   data set, it looks to be about the same.  We have

[Page 174]

1    A.    The documents, or what the agreement kind of

2    says?

3    Q.    No, no, we know the agreement, so we'll save you

4    there.

5    A.    Okay.

6    Q.    The information gathered and maintained by the

7    Joint Liquidators, we had talked about, essentially, what

8    they provided to you.

9    A.    Correct.

10   Q.    And the short form of your testimony was you

11   weren't exactly sure what the receiver had produced back

12   to the Joint Liquidators, if much, right?

13   A.    That's correct.

14   Q.    Okay.

15         MS. NEUNER:   Thank you.

16   Q.    (BY MS. NEUNER) Is there anything further with

17   respect to information exchanged with the Joint

18   Liquidators that we haven't covered?

19   A.    Not that we've kind of exchanged en masse.   I

20   think what this is referring to is just kind of what we

21   discussed and what I had discussed earlier here, was that

22   there are SIBL client records down there that we are

23   aware of and potentially backup tapes with SIBL data that

24   predates '03.

25   Q.    Okay.

[Page 175]

1      A.   But we haven't actually exchanged that

2    information with the liquidators to date.

3      Q.   I see.

4              MS. NEUNER:  Okay.  We're almost near the

5    end of our tape.  I'm going to propose that we stop now,

6    and I'm going to review my notes and talk to the folks on

7    the other side of the table about the most efficient way

8    to spend the rest of the afternoon.

9              THE DEPONENT:  Okay.

10             MS. NEUNER:  Okay.  Thank you very much.

11             THE DEPONENT:  No, no problem.

12             THE VIDEOGRAPHER:  Off the record, end of

13   Tape 3.  Time, 3:05.

14             (Break taken at 3:05 p.m.)

15             (Back on the record at 3:17 p.m.)

16             THE VIDEOGRAPHER:  Back on the record,

17   start of Tape 4.  Time, 3:17.

18                    EXAMINATION

19   BY MR. HAMPTON:

20     Q.   Mr. Russell, my name is Wallis Hampton.  I

21   represent Societe Generale Private Banking (Suisse).  I

22   just want to go over a few of the things we talked about

23   today.

24     A.   Okay.

25     Q.   Let's start by getting out Exhibit 8, which is

[Page 242]

```
1              (Back on the record at 4:50 p.m.)

2              THE VIDEOGRAPHER:  Back on record.  Start

3     of Tape 5.  The time is 4:50.

4              MS. NEUNER:  Thank you.

5        Q.   (BY MS. NEUNER) Mr. Russell, let's go to the

6     warehouse documents, if you would describe what that

7     means for us.

8        A.   So the receivership has, like, a warehouse space

9     where we keep all of the, kind of, hard copy records that

10    the receivership gathered and took control of when the

11    receivership took, like -- kind of got put in place in

12    February.

13             There were offices kind of spread

14    throughout the U.S., like Stanford group offices.

15    There's offices, I don't know everywhere, but I know

16    there's some offices in DC, Florida, Memphis, Houston,

17    kind of spread out throughout the United States.

18             And so all of that -- all of the hard copy

19    records were all brought into one space down in Houston,

20    and I believe it's still in Houston.  There's a warehouse

21    in Houston that has those hard copy records.

22       Q.   Could you quantify the volume in this warehouse

23    for us?

24       A.   I haven't ever walked through it.

25             MR. ACKER:  Could you speak up a little
```

[Page 243]

1  bit?

2              THE DEPONENT:  Sorry.

3      A.   I haven't walked through it.  It's a lot.  I

4  don't know the exact parameters on how big it is, but

5  there's hundreds of boxes of hard records -- of hard copy

6  records.  I don't know if it approaches thousands, but I

7  know it's over hundreds.

8              MR. ARLINGTON:  It's over 15,000 boxes.

9              MS. NEUNER:  15,000 boxes?

10             MR. ARLINGTON:  Right.

11     Q.   (BY MS. NEUNER) And maybe you know this, or

12  maybe you don't, but I'll ask.  Do you think those 15,000

13  boxes all come from Stanford, so they're Stanford-related

14  documents, or would they also include documents from

15  third parties?

16     A.   Like, documents that have been produced to the

17  receivership?

18     Q.   Yes.

19     A.   I don't know.  I know it has the

20  Stanford-related documents.  I don't know if that's also

21  where the receiver would store any hard copy production.

22  I just don't know.

23             MR. ARLINGTON:  Lynn, I'm happy to visit

24  with you about any or all of this off the record, to give

25  you an idea of what's there, what's not.

[Page 248]

1    everything for all of the entities, but for the ones that

2    were managed and kind of operated from Houston, it

3    contains a lot of the underlying accounting, general

4    ledger-type transactions.

5        Q.   Okay.  Okay.  Let me turn to a topic that we

6    noticed for today's deposition but we hadn't gotten to

7    yet.

8        A.   Okay.

9        Q.   We had asked about the receiver's ability to

10   calculate investors' losses for post-August 23, 2004, and

11   pre-August 23rd, 2004.  I understand that this may not be

12   possible, but let me just open it up to you to tell us

13   what is possible, what you could do.

14       A.   So we haven't undertaken to do that kind of

15   analysis.  First, there's several different assumptions

16   that you would kind of have to go through and kind of

17   establish, how are we going to deal with this specific

18   item.  Like, such as, how are you going to deal with

19   rollovers?  Do you consider that to be -- if it rolls

20   over after that date, is that new investment in, or do

21   you keep the date from when it came in before the date?

22            Similar to transfers, if there is money

23   that was invested in a CD before that date, that CD

24   matured and they transferred it a new CD, would you

25   consider that as post or pre?  So you'd kind of have to

1    establish some protocols around that.

2              You'd also need to establish some protocols

3    on how -- since essentially what you're trying to do is

4    you're trying to say the money that was in existence

5    prior to that date, how much of that is left in the

6    allowable amount, you're kind of talking about a tracing

7    analysis, like identifying specific dollars and seeing if

8    they're still in the bank at the end of the day.

9              So you'd also kind of have to establish how

10   you're going to treat how money moves.  So does it move

11   on a first-in/first-out basis?  Does it move on a

12   last-in/last-out basis?  And then you'd also have to do

13   one more kind of assumption.  Do you assume that interest

14   moves before principal, that principal moves before

15   interest, or that it moves kind of in relation to it on a

16   percentage basis?

17             Once you do that, you know, with the

18   transaction detail that we have, you can develop a query

19   where you could then trace the money according to your

20   parameters, to say, okay, well, how much of this does or

21   doesn't exist in the allowable amounts that are being

22   calculated?  Or how much of this does or doesn't exist in

23   the -- still exists in the bank at the end of the day

24   that's a part of the 7.2 billion?  Kind of depending upon

25   what the actual damage calculation is going to be, you

[Page 250]

1   could develop a query to kind of trace those funds once

2   you kind of establish those rules.

3       Q.   I follow that.

4            Would you also have to potentially break

5   apart your groups into individual claimants?

6       A.   Like -- that's kind of like another

7   establishment that you'd have to decide, is am I going to

8   treat this on an account-level basis, on a client ID

9   basis?  Like, how am I going to group it for that

10  perspective?  It wouldn't really affect whether the money

11  still existed; it would affect who you associate the

12  money with --

13      Q.   Right.

14      A.   -- potentially, if you're going to segregate it

15  that way.  There's a lot of -- there's a lot of question

16  marks that you would have to give answers to, kind of set

17  the parameters first, but you could that.

18      Q.   Okay.  So as we sit here today, we have

19  approximately 4.5 billion in allowed amounts, but that

20  really covers the claimants' submissions going back to

21  the earliest analyzed time frame, which is roughly 2003?

22      A.   Yeah, roughly August 2003.

23      Q.   Right.  But even that would still potentially

24  take into account preceding amounts, earlier than

25  August 2003, to the extent they were showing up or being

[Page 251]

1    counted as principal as of August 2003, right?

2        A.    Correct.

3        Q.    Okay.  So on a very rough basis, would you think

4    that cutting off money that was invested prior to

5    August 23rd, 2004, from the overall $4.5 billion

6    calculation would decrease it?

7        A.    I haven't -- it could or -- it may or it may

8    not, because it depends on whether or not -- if you're

9    talking about specifically did the money that existed

10   still exist, you'd kind of have to do that tracing to

11   find out.  It could, but it's not necessarily given that

12   it would.

13       Q.    Can you explain that a little bit more?

14       A.    Yeah.  So, like, let's take an instance -- so,

15   like, I'll give you kind of two examples, one where it

16   would and one where it wouldn't.

17       Q.    Okay.

18       A.    So one where it would is if you had an

19   individual that invested $100,000 prior to August 23rd,

20   2004.

21       Q.    Right.

22       A.    And then they invest $100,000, say, in

23   January 2007 and they never take out any withdrawals.

24   For that particular person right now, we'd have an

25   allowed claim amount of $200,000.  And if you removed any

1   money that came in prior to August 23rd, 2004, it would

2   reduce it to 100,000.

3        Q.   Okay.

4        A.   If you take -- and this is if you're talking

5   about is the money that's a part of the loss still in the

6   bucket, right.  So if you take kind of a similar

7   situation, somebody invests $100,000 before August 23rd,

8   2004, and in December 2005 they withdraw 125,000.  So

9   they take out all that original 120,000 -- 100,000 plus

10  25,000 interest.

11       Q.   Okay.

12       A.   And then, say, in -- again, like, say,

13  January 2007, they invest $225,000, for that person, they

14  have two -- they have 325,000 in, 125,000 out, and they

15  have a net loss of 200,000.

16       Q.   I need you to do that back one more time.

17       A.   Sorry.

18       Q.   Because here's where I -- I put in 100,000 in

19  August -- prior to August?

20       A.   100,000 prior to August.

21       Q.   Yeah.

22       A.   125 out in December '05.

23       Q.   Yes?

24       A.   And then in January '07, they put in 225.

25       Q.   Oh, that's where I missed it.  Okay.

[Page 253]

1          A.   So at an aggregate level, that person also is a

2     $200,000 net loser.  But if we remove the 100,000 from

3     their overall net loss, well, that 100,000 is not a part

4     of the 200 that they lost that came into the bank after

5     January.

6                    So it's not going to reduce the total

7     allowed amount for them by removing the earlier

8     withdrawal.  So it just depends on whether that money

9     would still exist at the end of the day in the bank or

10    not.  And until you do that, you don't really know

11    whether it would go down or not.

12         Q.   So they would be 325 invested, cash in?

13         A.   Correct.

14         Q.   They'd be -- they withdrew 125, so they're out

15    of pocket 200?

16         A.   Correct.

17         Q.   But if you remove the first 100,000, because

18    that's an investment prior to August 2004, right,

19    wouldn't it be they'd have $100,000 of loss?

20         A.   I guess it depends on how you're saying that

21    part of the calculation should be.  The way I was

22    interpreting your question is how much of the money that

23    was in there prior to '04 is still a part of the

24    allowable amount.

25         Q.   Yeah.

[Page 254]

1      A.   And so the money from pre-2004, the 100,000,

2   doesn't exist in the bank anymore.

3      Q.   Right.

4      A.   So there's nothing to remove from their allowed

5   amount of 200.  If you're just saying ignore all

6   transactions that happened before August 2004, that would

7   get a little wonky because people are taking money out

8   without ever putting it in.

9      Q.   Right.

10      A.   But if you went that way, then that calculation

11   would be what you said.  If you're saying just ignore the

12   transactions, versus I just want to know whether or not

13   that specific money still existed, that's kind of two

14   different analyses.

15      Q.   Yeah.  I think what you'd really have to do is

16   look only at purchases after August 23, 2004.  So

17   honestly, you would only look at the January 2007

18   purchase?

19      A.   The 225.

20      Q.   Of the 225?

21      A.   Right.  And then that's where you'd have to

22   define what you mean by "purchase."

23      Q.   Yes.

24      A.   Because would you consider a rollover a

25   purchase?  Would you consider one CD that was $300,000

[Page 255]

1    becoming three CDs that are 100,000 each, are those

2    purchases?  So that's where kind of that definition of

3    how do we treat those types of instances, how would you

4    do that.

5        Q.    I agree with you.

6        A.    So you would have to set your parameters.  But

7    once you set the parameters, you can build a query to say

8    treat these transactions in this way, and then you can

9    run it against the database to get the numbers.

10       Q.    Uh-huh.  Those two examples were very helpful.

11   That was good.  It makes you realize there are so many

12   facets to this because of the potential for the

13   withdrawals.

14                There's one other permutation I wanted to

15   ask you about.  If someone had invested prior to

16   August 23, 2004, and they bought a five-year CD and just

17   left it there, right?  So they're an account holder as of

18   February 2009, but they haven't made any purchase during

19   the August 23, 2004, to the February 2009 period.

20       A.    Uh-huh.

21       Q.    That person would be eliminated completely from

22   this calculation I'm asking you to perform, right?

23       A.    Yeah, under the assumption -- like, under

24   any -- under kind of any way that you would look at it,

25   if a person, say, deposited $100,000 in July 2004 on a

[Page 256]

1  five-year CD that would mature in July of 2009, so after

2  the receivership took over, and if they had no transfers

3  of any kind after, it just kind of sat there and nothing

4  happened, if you were going to say is that $100,000 still

5  in the -- quote/unquote, in their account and a part of

6  their allowed claim amount, then the answer would be yes.

7      Q.  Right.

8      A.  So if the decision was to eliminate those

9  amounts, then that 100,000 would be eliminated.

10     Q.  Right.  Okay.  Thank you.  It's a bit of a brain

11 teaser.

12     A.  No, that's okay.

13     Q.  One last subject matter for you.  It goes back

14 to this Collateral Source Recoveries.  We learned during

15 Mr. Abbott's deposition -- I alluded to this earlier --

16 that he's brought an individual suit against his personal

17 financial advisor, Mr. Halliday in Mississippi, but it's

18 been stayed --

19     A.  Okay.

20     Q.  -- as a result of the stay associated with the

21 receiver's actions.

22          Now, assuming that stay gets lifted at some

23 point in the future and Mr. Abbott is allowed to proceed

24 to try and collect money from his personal financial

25 advisor, would the receiver anticipate working that into

# EXHIBIT 97

[Page 313]

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, | ) | |
| et al., on behalf of | ) | |
| themselves | ) | Case No. 3:09-CV-02384-N |
| | ) | |
| and | ) | |
| | ) | |
| all others similarly | ) | |
| situated, Plaintiffs, | ) | |
| and THE OFFICIAL | ) | |
| STANFORD INVESTORS | ) | |
| COMMITTEE, | ) | |
| | ) | |
| Plaintiff-Intervenor. | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| TRUSTMARK NATIONAL | ) | |
| BANK, HSBC BANK PLC, | ) | |
| the TORONTO-DOMINION | ) | |
| BANK, INDEPENDENT BANK | ) | |
| F/K/A BANK OF HOUSTON, | ) | |
| SG PRIVATE BANKING, | ) | |
| (SUISSE) S.A. and | ) | |
| BLAISE FRIEDLI, | ) | |
| | ) | |
| Defendants. | ) | |

**************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

SALIM ESTEFENN URIBE

SEPTEMBER 10, 2015

VOLUME 2

**************************************************

[Page 315]

1            A P P E A R A N C E S
2

   FOR THE CLASS PLAINTIFFS:
3

        BUTZEL LONG
4       22nd Floor
        380 Madison Avenue
5       New York, New York  10017
        Mr. Peter D. Morgenstern
6       212.818.1110
        morgenstern@butzel.com
7
            -and-
8

        FISHMAN HAYGOOD LLP
9       201 St. Charles Avenue, Suite 4600
        New Orleans, Louisiana  70170
10      Mr. James R. Swanson
        504.236.6176
11      jswanson@fishmanhaygood.com
12

   FOR THE DEFENDANT SOCIÉTÉ GÉNÉRALE CREDIT BANKING
13 SUISSE:
14      SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
        1000 Louisiana, Suite  6800
15      Houston, Texas  77002
        Mr. Wallis M. Hampton
16      713.655.5154
        wallis.hampton@skadden.com
17

18 FOR THE DEFENDANT HSBC:
19      LOCKE LORD, LLP
        2200 Ross Avenue, Suite 2200
20      Dallas, Texas  75201
        Mr. Taylor F. Brinkman
21      214.740.8442
        tbrinkman@lockelord.com
22

23

24

25            -CONTINUED-

```
 1   FOR THE DEFENDANT TORONTO-DOMINION BANK:
 2        SIMPSON THACHER & BARTLETT LLP
          425 Lexington Avenue
 3        New York, New York  10017
          Mr. Joshua Polster
 4        212.455.2266
          joshua.polster@stblaw.com
 5
 6   FOR THE DEFENDANT TRUSTMARK NATIONAL BANK:
 7        GIBBS & BRUNS, LLP
          1100 Louisiana, Suite 5300
 8        Houston, Texas 77002
          Ms. Ashley McKeand Kleber
 9        713.751.5225
          akleber@gibbsbruns.com
10
11   FOR DEFENDANT INDEPENDENT BANK F/K/A BANK OF HOUSTON:
12        HAYNIE RAKE REPASS & KLIMKO, P.C.
          14643 Dallas Parkway, Suite 550
13        Wellington Centre
          Dallas, Texas  75254
14        Mr. Brad G. Repass
          972.716.1855
15        brad@hrrpc.com
16
     FOR DEFENDANT BLAISE FRIEDLI:
17
          MORGAN LEWIS & BOCKIUS, LLP
18        1717 Main Street, Suite 3200
          Dallas, Texas  75201
19        Ms. Stephanie Gamiz - via phone
          214.466.4000
20        sgamiz@morganlewis.com
21
     VIDEOGRAPHER:
22
          Jarek Barringer
23
     INTERPRETER:
24
          Lauren Ames
25
```

[Page 317]

1                                    INDEX

2                  ORAL AND VIDEOTAPED DEPOSITION OF

3              SALIM ESTEFENN URIBE, SEPTEMBER 10, 2015

4                                  VOLUME 2

5                                                           Page

6      APPEARANCES..............................  315

7      BY MR. POLSTER...........................  320

8      BY MR. HAMPTON...........................  406

9      BY MR. REPASS............................  430

10

11

12

13

14     WITNESS CORRECTIONS AND SIGNATURE........  452

15     REPORTER CERTIFICATION...................  454

16

17

18

19

20

21

22

23

24

25

App. 2961

[Page 318]

1                        EXHIBIT INDEX
2            ORAL AND VIDEOTAPED DEPOSITION OF
3        SALIM ESTEFENN URIBE, SEPTEMBER 10, 2015
4                          VOLUME 2
5                    Description                    Page
6
    Estefenn  158      3/7/13 email from Grupo PH ... 331
7                      to Stanford Claims,
                       URIBE_004567 to 4578
8
    Estefenn  159      Email string ending with ..... 333
9                      8/24/09 email from Grupo PH
                       to (name redacted),
10                     URIBE_009022 to 9024
11  Estefenn  160      Confidentiality and Cost ..... 342
                       Sharing Agreement,
12                     URIBE_009025
13  Estefenn  161      Sample Grupo PH Power of ..... 348
                       Attorney Form, URIBE_009026
14
    Estefenn  162      June 20, 2011, email chain ... 350
15                     between Grupo PH and
                       undisclosed recipients,
16                     URIBE_006378 to 6384
17  Estefenn  163      Email string ending with ..... 366
                       7/25/12 email from (name
18                     redacted) to Grupo PH,
                       URIBE_005467
19
    Estefenn  164      Email string ending in ....... 372
20                     10/23/13 email from Grupo PH
                       to Jose Contreras,
21                     URIBE_002767 to 2768
22  Estefenn  165      Email string ending with ..... 376
                       3/19/13 email from Alex
23                     Brook to Grupo PH,
                       URIBE_004377 to 4381
24
25

877-479-2484          U.S. LEGAL SUPPORT          www.uslegalsupport.com

App. 2962

[Page 319]

```
 1    Estefenn  166      Email string ending with ..... 383
                         7/3/14 email from Grupo PH
 2                       to Rachel Rochelle Sidney,
                         URIBE_001101 to 1102
 3
      Estefenn  167      7/6/12 email from (redacted .. 385
 4                       name) to Grupo PH,
                         URIBE_005393 to 5394
 5
      Estefenn  168      Email string ending in ....... 390
 6                       3/8/14 email from (redacted
                         name) to Salim Estefenn,
 7                       URIBE_002177 to 2178
 8    Estefenn  169      Email string ending with ..... 395
                         6/30/15 from Annette Escobar
 9                       to Grupo PH, et al.,
                         URIBE_000408 to 412
10
      Estefenn 170       Settlement Contract, ......... 402
11                       URIBE_000288 to 292
12    Estefenn 171       Credit Assignment Contract, .. 402
                         URIBE_000293 to 296
13
      Estefenn 172       Notice of Settlement with .... 433
14                       BDO USA, LLP, et al.,
                         URIBE_010959 to 10961
15
16              •_____•
17
18    REPORTER NOTE:  All answers given in English unless
19    noted.
20
21
22
23
24
25
```

[Page 329]

1          Q.   You're aware of the claims process involving

2     the receiver for the Stanford Bank; is that right?

3                    THE WITNESS:   "You're aware" means?

4                    THE INTERPRETER:   You are aware.

5     (Interpreting.)

6          A.   Yes.

7          Q.   (BY MR. POLSTER)   And you're aware of the

8     claims process involving the Joint Liquidators for

9     Stanford; is that correct?

10         A.   Yes.

11         Q.   Have you done anything to help the members of

12    Grupo PH submit claims in either the Joint Liquidator

13    or the receivers claims processes?

14         A.   Yes, I help them if they need it.

15         Q.   And what have you done to help members of

16    Grupo PH in the Joint Liquidators and receiver claims

17    processes?

18         A.   Just bringing them the forms for claim and

19    helping them with scanning the documents and sending

20    through email.   That's all I've done.

21         Q.   So which documents have you scanned for the

22    Grupo PH members?

23         A.   The -- for instance, the -- the form for the

24    claim and through the receivers, through the

25    liquidators, Grant Thornton, and passports,

App. 2964

[Page 330]

1      statements, that kind of information.  Information

2      from Stanford Bank.

3           Q.   And do you ever fill out the receiver's form

4      or the liquidator's form for another person?

5           A.   For my mom.  Just for her.

6           Q.   Do you ever -- I'll reask that question.

7                Have you ever sent a form to the Joint

8      Liquidator on behalf of a person other than your mom?

9           A.   Yes.

10          Q.   And what were the circumstances where you did

11     that?

12          A.   Why?

13          Q.   Yes.

14          A.   Because they do not have -- they're old

15     people.  They do not have an email.  They do not know

16     how to -- how it works, so I just helping them.

17          Q.   And the same, have you ever sent forms to the

18     receiver on behalf of investors other than your

19     mother?

20          A.   Yes.

21          Q.   Why have you decided to help the Grupo PH

22     members?

23          A.   Because I know how they feel.  I mean, it's

24     the same as I do.  They -- old people need some help

25     sometimes.  So that's what I am doing.  Helping them.

[Page 332]

1      Q.   Is that your handwriting?

2      A.   Yes.  It looks like it.

3      Q.   Is this a claim form for one of your

4  accounts, Mr. Estefenn?

5      A.   You mean my investment?

6      Q.   Right.  Is this a claim form for one of your

7  investment accounts with Stanford?

8      A.   You mean my -- my investment or investors,

9  you mean?

10     Q.   Your -- I'll reask the question.

11          Is this a claim form for the Esturicol Trust?

12     A.   I don't see Esturicol trust.  I think it's

13  not.

14     Q.   And is it a claim form for the Salesur Trust?

15     A.   No.

16     Q.   So is it a claim form for some other

17  investor?

18     A.   Maybe my brother.  Maybe.

19     Q.   Is it possible that it's a claim form for

20  someone who's not related to you?

21     A.   Yes.  I just -- I've sent from two or three

22  people more.  But, in fact, it's in the documents that

23  I sent.

24     Q.   So you have filled out claim forms for some

25  people who are not related to you?

[Page 333]

1      A.    Well, I just help people.   Yeah.   Maybe --

2    maybe a couple since then.

3      Q.    So who are the people -- you don't need to

4    say their names who you filled the claim forms out --

5    I'll reask the question.

6           Have you filled out claim forms to the

7    liquidators for members of Grupo PH who are not your

8    family?

9      A.    Maybe a couple more, yeah.

10     Q.    And how did you have the information to fill

11   out the claim forms of those people?

12     A.    Those people have gave me the information.

13     Q.    And why did you fill out the claim forms

14   on -- for those Grupo PH members?

15     A.    Because as I said in the beginning, they are

16   old people, and they need some help just for that.

17     Q.    Did you ever sign the names of Grupo PH

18   members to the claim forms who are not your family

19   members?

20     A.    If I have signed the forms?

21     Q.    Correct.

22     A.    No.

23          (Estefenn Exhibit 159

24   marked/introduced.)

25     Q.    (BY MR. POLSTER)  This is Exhibit 159.  It's

[Page 336]

1        A.   Well, it was -- we do not have a form --

2    procedure.  This person want to be part of the group

3    and I sent this information.  But there is no specific

4    process out.  We have no -- no specific process.

5        Q.   (BY MR. POLSTER)  But it was common for you to

6    ask the members of Grupo PH to provide you information

7    on the amount of their Stanford investments?

8        A.   No, it's their -- I mean, it's their

9    information.  It's their information.  It's not

10   necessary, I mean.  I just try to help people when

11   they need it.  Provide the information.

12       Q.   Sure.

13            Why did an investor providing you with the

14   amount of their Stanford investment help you to help

15   that investor?

16       A.   They do not have to provide me that

17   information.  It's their decision.

18       Q.   But some Grupo PH members did provide you

19   with information on the amount of their Stanford

20   investments?

21       A.   Maybe.  Yes.

22       Q.   Now, the second paragraph, still looking at

23   Exhibit 159, says:  "Also to cover some expenses that

24   may arise (so far there haven't been any), we are

25   contributing $50,000, money that is being controlled

[Page 337]

1    by" --

2         A.   Sorry.   Pesos.   Colombian pesos.   That

3    means --

4         Q.   Helpful.   Thank you.

5         A.   -- $20, more or less.

6         Q.   "We are contributing this amount of money

7    that is being controlled by...and two more people in

8    the group."   [As read]

9              Do you see that?

10        A.   Yeah.

11        Q.   And do members of Grupo PH have to contribute

12   50,000 pesos to join the group?

13        A.   It was voluntary.   Because this is not

14   business for me.   It's voluntary.

15        Q.   This paragraph refers to some expenses.

16             What sort of expenses would arise for Grupo

17   PH?

18        A.   For instance, at the beginning, we had

19   meetings in my office.   It's not my own office.   I

20   have friend --

21                  THE WITNESS:   (Speaking Spanish.)

22                  THE INTERPRETER:   I have rented it.

23        A.   I've rented it.   So I spent a long -- at the

24   beginning, a long time at the -- just at the beginning

25   of the process, and that's why.   But in general, it

1  was voluntary, first of all.  And second, there was

2  no -- I mean, expenses was my time.  Sometimes

3  printing things for giving them information.  Just

4  that.

5       Q.   (BY MR. POLSTER)  And about how many investors

6  paid you 50,000 pesos?

7       A.   Don't remember.

8       Q.   Do you remember about, not exactly?

9       A.   No, I do not remember, honestly.

10      Q.   The next paragraph, looking back at the

11  exhibit, provides your bank account information.

12          Do you see that?

13      A.   Which one?  Sorry.

14      Q.   The next paragraph, still looking at page

15  9022, provides your bank account information; is that

16  correct?

17      A.   Uh-huh.

18      Q.   And you suggested that this investor deposit

19  the 50,000 pesos into your bank account; is that

20  right?

21      A.   Yes.

22      Q.   So did you keep the Grupo PH money also in

23  your -- in your personal bank account?

24      A.   No.  I mean, people who give me that money

25  there, money was spent for those -- at the beginning

[Page 339]

1      expenses.  But there is -- that was just once and no

2      one gave me that money.

3          Q.   So some members of Grupo PH gave money into

4      your personal bank account?

5          A.   Certainly my mom, for example.  My brother,

6      Ricardo.  A friend of mine who was a Stanford

7      investor.

8          Q.   And some members -- some Stanford investors

9      who were not your family members gave money for Grupo

10     PH into your bank account?

11         A.   As I said, it's absolutely voluntary, it was.

12         Q.   Did you have a system to keep track of which

13     of the money was your personal money and which of the

14     money was from Grupo PH members?

15                    THE WITNESS:  (Speaking Spanish.)

16                    THE INTERPRETER:  (Interpreting.)

17         A.   No.

18         Q.   (BY MR. POLSTER)  Do you know if there is any

19     money currently in your bank account that was

20     contributed by Grupo PH members?

21                    THE INTERPRETER:  Counsel, would you --

22         Q.   (BY MR. POLSTER)  I'll reask the question.

23              Is there any money currently in your bank

24     account that was contributed by Grupo PH members?

25         A.   No.

[Page 350]

1    the process going.  So I usually have a meeting with

2    Peter Morgenstern, our lawyer, and I provide him

3    information through email.  That's all.  We do not --

4    we do not have meetings anymore.

5        Q.    So Grupo PH is a way that you provide

6    information from your lawyer, Mr. Morgenstern, to

7    members of Grupo PH?

8        A.    Yes.  Sometimes, yeah.

9        Q.    Are there any other ways that you use to

10    provide information from your counsel in this case to

11    other investors?

12                THE INTERPRETER:  Could you repeat the

13    question, Counsel?

14                MR. POLSTER:  Can you read it back,

15    please.

16                THE REPORTER:  "Are there any other ways

17    that you use to provide information from your counsel

18    in this case to other investors?"

19                THE INTERPRETER:  (Interpreting.)

20        A.    No.

21                (Estefenn Exhibit 162

22    marked/introduced.)

23        Q.    (BY MR. POLSTER)  Exhibit 162 is another

24    exhibit that we had translated from Spanish into

25    English.  I'd like first to look at the attachment on

[Page 351]

1    Grupo -- or, excuse me, Exhibit 162.  The -- let me

2    step back -- let me step back a second.

3              The -- looking -- let's look at the first page

4    of Exhibit 162.  It is an email from the Grupo PH

5    account, and it looks like the date and the "To"

6    fields have been redacted.

7              Do you see that?

8         A.   Uh-huh.  Yes.

9         Q.   And the subject is:  "Fwd: Información para

10   mirar cobertura."

11             How's my Spanish?

12        A.   Sorry, sir?

13        Q.   What is -- here.  The -- the subject line in

14   English is "Information to check coverage."

15        A.   Where are you?

16        Q.   I'm looking on the first page, which is 6378.

17   Are you there?

18        A.   (Nods head.)

19        Q.   And the subject line of the top email is

20   "Information to check coverage."

21             Do you see that?

22        A.   "Information to check coverage," yeah.

23        Q.   Now, turning -- there's an attachment to the

24   email which begins on page 6380, and it goes until

25   page 6384.

[Page 352]

1          Do you see that attachment?

2      A.   Uh-huh.

3      Q.   Now, I'd like to first talk about what

4  information is in -- in this attachment.

5      A.   What kind of information?

6      Q.   Yes.  What is the information in the

7  attachment?

8      A.    It's name and last name of the investor, a

9  number of trust that they represent, number of people

10  who go to the meetings.  There's a column that says

11  "Janet."  It's the person who kept that money.  "GXA,"

12  that's the person who has another money, that 50,000

13  pesos that they gave us.  And last one is

14  observations.

15      Q.   So just to go back over, the first column is

16  names of Grupo PH members?

17      A.   Yes.

18      Q.   And the second column is --

19      A.   Number of trusts they represent.

20      Q.   And that's the number of Stanford trust

21  accounts that the Grupo PH members represent?

22      A.   Sorry?  Sorry?

23      Q.   Those are trusts being used to purchase

24  Stanford investments?

25      A.    That's what they represent.

[Page 353]

1    Q.   And what does "...Trust present at Meeting,"

2    the third column, signify?

3        A.   It's a number -- a number of trust

4    assistants, people who go to -- who was going to -- to

5    meetings.

6        Q.   The meeting refers to a Grupo PH meeting?

7        A.   Was the meetings we had at -- just at the

8    beginning of the process.

9        Q.   So why is sometimes the "# of Trust present

10   at Meeting" column information different than "# of

11   Trust Represented" column information?

12       A.   Yeah.  For instance, number 19 --

13       Q.   Yes.

14       A.   -- was -- she represent -- she was just one

15   person who was going to the meetings, but she was

16   representing a trust, just as an example.

17       Q.   I see.

18            And Janet is the person who held the 50,000

19   pesos that some Grupo PH members contributed?

20       A.   Yeah.

21       Q.   Then what is the -- can you explain the GXA

22   column again?

23       A.   It's another person, but that is not her

24   name.

25       Q.   Those initials stand for a person?

[Page 358]

1      Q.   -- the last phrase says:  "...since I know

you can identify who your clients were."

2

3           Do you see that language on the top email?

4      A.   Sorry.

5           MR. POLSTER:  Let's change the tape and

6  we can reask.  We have to change the video.

7           Go off the record.

8           MR. MORGENSTERN:  We need to take a

9  break.

10          THE VIDEOGRAPHER:  We're off the record

11  at 10:40.

12          (Break.)

13          THE VIDEOGRAPHER:  We're back on the

14  record at 10:53.

15     Q.   (BY MR. POLSTER)  So, looking back at Exhibit

16  162, Mr. Estefenn.

17     A.   Okay.

18     Q.   We were looking at the top email on page

19  6378, which the last clause says in English:

20  "...since I know you can identify who your clients

21  were."

22          Do you see that language?

23     A.   Yes.  Yeah, I see.  Yes, I see.

24     Q.   And does that refresh your recollection that

25  you sent this email on page 6378?

[Page 359]

1      A.   Yes.  Reading that, I remember that.

2      Q.   And did you send the email to Ms. Herr?

3      A.   Yes.

4      Q.   And attached to the top email on page 6378 is

5  the group list information that we looked at in the

6  attachment; is that correct?

7      A.   It's a list of the group.

8      Q.   And why did you provide that information to

9  Ms. Herr?

10     A.   Because she knew who was her clients.

11     Q.   So some of the people listed on the

12  attachment were Ms. Herr's clients and some were not

13  Ms. Herr's clients?

14     A.   Maybe.

15     Q.   And you wanted Ms. Herr to identify which

16  were her clients?

17     A.   It was another information but not necessary,

18  really.

19     Q.   Why did you provide that information to

20  Ms. Herr?

21     A.   I have no reason.  I mean....  Yeah, there is

22  no reason, really.  Maybe just to identify who was her

23  clients.

24     Q.   But the members of Grupo PH knew who their

25  financial advisors were; right?

[Page 360]

1     A.   Certainly.

2     Q.   So why did you need Ms. Herr to identify her

3  clients?

4     A.   No, I didn't, really.   I just sent her the

5  information from the people who was part of the group.

6  Just that -- just -- just -- just to say her who was a

7  member of the group.  Just that.   There is no specific

8  reason.

9     Q.   So you just wanted to keep Ms. Herr informed

10  on the members of the Grupo PH?

11     A.   Maybe that's why.   Yeah.

12     Q.   And other than this email we're looking at on

13  page 6378, do you recall any other information you

14  provided to Ms. Herr regarding the Grupo PH members?

15          THE INTERPRETER:   (Interpreting.)

16     A.   I do not remember, really.

17     Q.   (BY MR. POLSTER)   Do you remember -- did you

18  provide -- I'll reask the question.

19          When is the last time you've had a

20  communication with Ms. Herr?

21     A.   April last year.

22     Q.   And that's April 2014?

23     A.   Yes.

24     Q.   And what was that communication in April 2014

25  about?

[Page 394]

 1     confidential.

 2               Do you see that?

 3     A.    Yes.  That's what it says.

 4     Q.    And do you have an understanding as to why

 5     the information was confidential?

 6     A.    No idea.

 7     Q.    In addition to this email, have you received

 8     other communications at your Grupo PH address that the

 9     sender tells you are confidential information?

10     A.    About this topic?

11     Q.    Sure.  About this topic.

12     A.    No, I -- this, I don't remember to have

13     specific -- more information about.

14     Q.    And how about other topics more generally?

15     A.    Maybe, yeah.  If it's general, maybe.

16     Q.    So some confidential information concerns

17     investors' trusts, which we discussed earlier; right?

18     A.    Yeah.

19     Q.    Is there any other types of confidential

20     information that you receive at your -- that you

21     received emails from, from investors?

22     A.    No.  Not really.

23     Q.    You can set that one aside.

24               Are you familiar with a group action pending

25     in Colombia court against Stanford Bank entity?

[Page 395]

1      A.   No.

2           (Estefenn Exhibit 169

3      marked/introduced.)

4      Q.   (BY MR. POLSTER)   This is Exhibit 169, which

5      is stamped from page 408 to 412.   Also has a Spanish

6      language document followed by an English translation.

7           Please take a minute to look over -- look over

8      this Exhibit 169.

9      A.   Uh-huh.   This is recently.

10     Q.   Yes.   The first email on page 408 is dated

11     June 30, 2015, and it's from Annette Escobar to some

12     redacted names and your email address; right?

13     A.   Yup.

14     Q.   And who is Annette Escobar?

15     A.   I've understood that she's a lawyer that

16     works with the liquidators, Grant Thornton.   She lives

17     in Miami, I think.

18     Q.   And what is the purpose of this communication

19     between you and Ms. Escobar in Exhibit 169?

20     A.   To solve some questions that we have for a

21     document they sent us in order to sign it.   Just

22     questions about it.   Just to solve that.

23     Q.   Please turn to page 410 of this same exhibit,

24     169.   And there's an email in the middle of the page

25     dated June 16, 2015, from redacted to Grupo PH.

[Page 396]

1                 Do you see that?

2         A.    Uh-huh.   Yeah.

3         Q.    And it begins:   "For your information and

4    review of these documents, which will be those that

5    will have to be signed and returned to an email

6    address that they will be sending" -- excuse me.

7                 MR. POLSTER:   There's something in my

8    eye.   Let's go off the record for a second.

9                 THE VIDEOGRAPHER:   We're off the record

10   at 12:33.

11                 (Off the record.)

12                 THE VIDEOGRAPHER:   We're back on the

13   record at 12:36.

14       Q.    (BY MR. POLSTER)   So looking back at

15   page 410 --

16       A.    Uh-huh.

17       Q.    -- have you had a chance to read this email

18   over that begins "Salim"?

19       A.    Yes.

20       Q.    And the email refers to a collective claim in

21   Colombia.   I'm looking at the last phrase in the first

22   paragraph.

23                 Do you see that phrase?

24       A.    Yes.

25       Q.    And do you know what the collective claim in

[Page 397]

1      Colombia is?

2           A.    Yes.   In Colombia?

3           Q.    In Colombia.

4           A.    No.   The liquidators approved to the first

5      payment, which is 1 percent.   But because in Colombia

6      we have a suit against Stanford, in theory, we cannot

7      get that money back.   So that -- that is

8      the -- (speaking Spanish.)

9                (Witness in English)   That is the money that

10     they should give us, that 1 percent.   That is the

11     topic.   Yeah.

12          Q.    And so the liquidators took the position that

13     they weren't going to make the payment to Colombian

14     investors because of a Colombian claim that's pending

15     against Stanford in Colombia?

16          A.    Correct.   There is a claim in Colombia, so in

17     theory, Colombian investor cannot receive that

18     payment.

19          Q.    And are you a party to the Colombian claim

20     against Stanford in Colombia?

21          A.    No.

22          Q.    Are you a member of the affected group for

23     the Colombian claim against Stanford?

24          A.    No.

25                MR. MORGENSTERN:   Objection.

[Page 398]

1          THE WITNESS:   Same question.

2                    MR. MORGENSTERN:   Calls for a legal

3     conclusion.   Come on.

4      Q.   (BY MR. POLSTER)   If the claimants in the

5     Colombian claim are successful, do you have an

6     understanding as to whether or not you would receive

7     payment in that lawsuit?

8      A.   In theory, even though I'm not part of the

9     group, in theory, that happens.   In theory.   But, I

10    mean, I'm not part of the group.

11     Q.   How did you first learn about the Colombian

12    lawsuit?

13     A.   How?   Sorry?

14     Q.   How did you first learn about the Colombian

15    lawsuit?

16     A.   Through Annette.   She send us the

17    information.

18     Q.   And did you have an opportunity -- did you

19    have an opportunity to join the group in the Colombian

20    action?

21     A.   No.

22     Q.   Did you have an opportunity to -- to -- let

23    me reask the question.

24          Did the Colombian action -- do you know how

25    the -- I'll reask.

[Page 399]

1          Do you know how the group of claimants in the

2    Colombian action is defined?

3          A.   No.

4          Q.   Do you believe that you have the potential to

5    get money from a Colombian action even -- even though

6    you purchased your certificates in Florida?

7          A.   I don't know, really, if we have the option.

8          Q.   Let's actually -- let's go back to that

9    exhibit for one second.   Back to Exhibit 169.

10         Would you look at page 409.   And there's an

11   email on that page from Grupo PH to Annette Escobar

12   dated June 25, 2015.

13         Do you see that?

14         A.   Yes.

15         Q.   And take a minute to look over the email, if

16   you haven't had a chance yet.   My question is going to

17   be first about Question Number 4 on the email.

18         Are you there?

19         A.   Uh-huh.

20         Q.   And it says:   "Did the victims who are part

21   of the class action group waive and/or assign their

22   rights in the liquidation of Antigua?"

23         Do you see that?

24         A.   Yes.

25         Q.   And that's a question that you asked to

1    Ms. Escobar; right?

2        A.   Yes.

3        Q.   And why did you ask that question to

4    Ms. Escobar?

5        A.   Because that is -- we have no idea if they

6    keep the rights to Antigua, because, in theory, that

7    process is for the litigation -- the final suits are

8    going to be part of the litigation process.  So we

9    have no idea if those present keep their rights to

10   Antigua.  We have no idea.

11       Q.   And when you wrote, "Did the victims who are

12   part of the class action group," do you consider

13   yourself one of the victims, part of the class action

14   group?

15       A.   The victims, being a part of the group, the

16   victims, yes.

17       Q.   Now, please look at Question 9, which says:

18   "Will the judge have the scenario of a group of

19   Colombian citizens (the class action) and Mr. Wide

20   representing another group of Colombians, who invested

21   in the U.S.A. and we assigned our rights, fighting for

22   the" asset -- "assets, who will guarantee us absolute

23   confidentiality?"

24            Do you see that question?

25            What is the confidentiality you were

# EXHIBIT 98

[Page 1]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

Case No. 3:09-CV-02384-N

---------------------------------------x

PEGGY ROIF ROTSTAIN, et al, on behalf

of themselves and all others similarly

situated,

                  Plaintiffs,

        and

THE OFFICIAL STANFORD INVESTORS

COMMITTEE,

                  Plaintiff-Intervenor.

      -against-

TRUSTMARK NATIONAL BANK, HSBC BANK PLC,

The TORONTO-DOMINION BANK, INDEPENDENT

BANK F/K/A BANK of HOUSTON, SG PRIVATE

BANKING, (SUISSE) S.A. and BLAISE

FRIEDLI,

                  Defendants.

---------------------------------------x

DEPOSITION UNDER ORAL EXAMINATION OF:

          VAUGHAN BLACK

        September 14, 2015

[Page 2]

1          TRANSCRIPT of the deposition of VAUGHAN

2     BLACK, called for Oral Examination in the

3     above-entitled matter, said deposition being

4     taken pursuant to Federal Court Rules, by and

5     before Roberta Caiola, a Certified Shorthand

6     Reporter and Notary Public of the State of New

7     York, at the office of Simpson Thacher &

8     Bartlett, LLP, 425 Lexington Avenue, New York,

9     New York 10017, on Monday, September 14, 2016,

10    at 9:46 a.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

[Page 3]

1    A P P E A R A N C E S:

2

3    FISHMAN HAYGOOD

4    201 St. Charles Avenue

5    Suite 4600

6    New Orleans, Louisiana 70170

7    BY:  JIM SWANSON, ESQ.

8    BY:  BENJAMIN D. REICHARD, ESQ.

9    Attorneys for Class Plaintiff

10

11   MORGAN LEWIS & BOCKIUS, LLP

12   101 Park Avenue

13   New York, New York 10178

14   BY:  STEPHANIE GAMIZ, ESQ.

15   Attorney for the Defendant, Blaise Friedli

16

17   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

18   4 Times Square

19   New York, New York 10036

20   BY:  JULIE COHEN, ESQ.

21   Attorneys for the Defendant

22

23

24

25

[Page 4]

1    A P P E A R A N C E S:   (Continued):

2

3    HAYNIE RAKE REPASS & KLIMKO, P.C.

4    14643 Dallas Parkway, Suite 550

5    Dallas, Texas 75254

6    BY:  BRAD REPASS, ESQ.

7    Attorneys for Independent Bank f/k/a

8    Bank of Houston

9    (Present Telephonically)

10

11   LOCKE LORD, LLP

12   2200 Ross Avenue, Suite 2200

13   Dallas, Texas 75201

14   (214) 740-8000

15   BY:  TAYLOR BRINKMAN, ESQ.

16   Attorneys for HSBC Bank

17   (Present Telephonically)

18

19

20

21

22

23

24

25

[Page 5]

1   A P P E A R A N C E S:   (Continued):

2

3   GIBBS & BRUNS, LLP

4   1100 Louisiana, Suite 77002

5   Houston, Texas 77002

6   (713) 650-8805

7   BY:  ASHLEY KLEBER, ESQ.

8   Attorneys for Trustmark National Bank

9   (Present telephonically)

10

11   SIMPSON THACHER & BARTLETT, LLP

12   425 Lexington Avenue

13   New York, New York 10017

14   BY:  LYNN NEUNER, ESQ.

15   Attorneys for Toronto-Dominion Bank

16

17   ALSO PRESENT:

18   JUNIOR SIRIVAR, ESQ.

19   McCarthy Tetrault LLP

20   (Canadian Counsel, TD Bank)

21   JAMES SOTO, Videographer

22

23

24

25

[Page 87]

1                        VAUGHAN BLACK

2    processing proofs of claim?

3          A.      I understand.

4          Q.      And do you understand there to be a

5    separate case, which is the case in which you

6    submitted this declaration, which is the Peggy

7    Rotstain versus Trustmark National Bank, et al.?

8          A.      Yes.

9          Q.      I'm going to ask you to put aside

10   the pertinence of the question and just answer

11   the actual question which is, would a Canadian

12   Court deem this Proof of Claim Form with its

13   consent to jurisdiction in the receivership case

14   as a consent to jurisdiction in the Peggy

15   Rotstain verse versus Trustmark National Bank

16   case, which we've been calling the Dallas class

17   action?

18         A.      I believe it would not.  I agree

19   with Janet Walker on that point.

20         Q.      Okay.  Going back to your

21   declaration, and we were in paragraph 14.  We

22   were discussing what a future notice in the

23   Dallas class action would have to say in order

24   for it to support enforcement of a Dallas class

25   action judgment in Canada.

1                    VAUGHAN BLACK

2     been decided in Canada there would be in effect

3     a res judicata matter, and it wouldn't be given

4     any greater effect than it decided.

5          Q.     Right.  And earlier we were talking

6     about the converse situation which was a

7     first-in-time U.S. case.  Here the scenario is a

8     first-in-time Canadian case?

9          A.     Right.

10          Q.     And your view is that if there is

11     in existence a Canadian money judgment, a

12     second-in-time U.S. judgment for money could

13     possibly be refused recognition in Canada,

14     right?

15          A.     Yes, and the reason for that being

16     that the plaintiffs, to the extent there is

17     overlap, that might be a factual matter to

18     determine on the fact of the development, the

19     plaintiffs might already have been fully

20     compensated in Canada; or at least in Canada the

21     creditors of SIB Bank might have fully recovered

22     and be made whole.

23                    All of this is against the

24     background of Canadian courts, as I hope U.S.

25     courts would, is going to be on guard against

[Page 153]

1                     **VAUGHAN BLACK**

2    **double recovery.**

3         Q.    So taking this principle and

4    playing it out in a potential fact scenario in

5    the future, suppose if you would that the

6    two cases, the joint liquidators one in Ontario

7    and the Texas class action in Dallas, are

8    proceeding along and both cases have come to a

9    trial.

10              You stated earlier that that is

11   quite conceivable under existing Canadian

12   precedent that there are simultaneous

13   proceedings going on in two different

14   jurisdictions, Canada and the U.S., right?

15        A.    Right.  If I can just add, it's

16   conceivable in Canada, even if there are

17   identities of parties between which there isn't

18   in this circumstance.

19        Q.    Now, in your view what would happen

20   if the joint liquidators' case is fully tried

21   and submitted to the Canadian jurist who is

22   taking let's say six months to make a decision,

23   and in the decision-making time period the Texas

24   jury comes to a verdict and awards $4 billion in

25   damages, okay?

# EXHIBIT 99

[Page 1]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS - DALLAS DIVISION

-----------------------------------x

PEGGY ROIF ROTSTAIN, et al., on
behalf of themselves and all others
similarly situated

                Plaintiffs,

      -and-

THE OFFICIAL STANFORD INVESTORS
COMMITTEE,

        Plaintiff-Intervenor,

     -against-

TRUSTMARK NATIONAL BANK, HSBC BANK
PLLC, THE TORONTO-DOMINION BANK,
INDEPENDENT BANK f/k/a BANK OF
HOUSTON, SG PRIVATE BANKING (SUISSE)
S.A., and BLAISE FRIEDLI,

           Defendants.

-----------------------------------x

          September 15, 2015
          9:50 a.m.

    Videotaped Deposition of ANGEL R. OQUENDO,
taken by Defendants, pursuant to notice, at the
offices of Simpson Thacher & Bartlett LLP, 425
Lexington Avenue, New York, New York, before
SUZANNE PASTOR, a Shorthand Reporter and Notary
Public within and for the State of New York.

1                    ANGEL R. OQUENDO

2     involved.

3          Q.     Are you referring to a Carol Van

4     Tassel declaration?

5          A.     Yes.

6          Q.     So you reviewed that declaration?

7          A.     I read it at some point, yes.

8          Q.     So do you recall the major Latin

9     American countries as represented by number of

10    claimants?

11         A.     Yes.  I mean, I didn't do hard

12    numbers on this, but I think that the countries

13    that I discussed with counsel were essentially

14    the countries that, if I'm remembering this

15    correctly, that Van Tassel refers to as the

16    countries most represented among the class.

17         Q.     Did you discuss El Salvador as a

18    country on which you would consider opining?

19         A.     Maybe at some point we talked about

20    El Salvador as a possible country to discuss.

21    And now I can't remember that well.  I believe

22    that one of the expert opinions for the

23    defendants, maybe Gidi's opinion talks about El

24    Salvador.  So at one point I asked whether I

25    should include El Salvador.  This was I think

[Page 66]

1              ANGEL R. OQUENDO

2      maybe after I submitted the report, or maybe

3      while I was drafting it.   Probably while I was

4      drafting it.   And I was told it was not

5      necessary.

6         Q.      So plaintiffs told you --

7      plaintiffs' counsel told you you didn't need to

8      include El Salvador in your opinion?

9         A.      Didn't need to include El Salvador,

10     yes, that's correct.

11        Q.      Were you aware from your

12     recollection that Ecuador and El Salvador has

13     close to the same number of claimants in this

14     case?

15        A.      No, I wasn't aware of that.   I'm

16     not aware of that, no.

17        Q.      What's your general understanding

18     of the geographic dispersion of claimants in

19     this case?

20        A.      My understanding is that when we're

21     talking about foreign absentees, the bulk of

22     them come from Mexico.   My understanding is that

23     there's a big number from Venezuela also.   And

24     then all of these other countries are

25     represented but in lesser numbers than Mexico

[Page 154]

1                    ANGEL R. OQUENDO

2      general civil actions in Latin America.

3           Q.     So to your knowledge, is common law

4      civil conspiracy a recognized claim in, say,

5      Mexico?

6           A.     As I said, not specifically.  But

7      the code says that any time that harm is caused

8      through the actions of the defendant, the

9      plaintiff can bring an action, general causes of

10     action.  That's the kind of case that could be

11     brought in Latin America.

12          Q.     What code are you referring to?

13          A.     I'm referring to, for instance, in

14     this case the code -- the civil code for the

15     District of Mexico for instance.  But I'm

16     talking generally.  So you could look at the

17     codes of any of the other countries, and they

18     have this general statement.

19          Q.     You're just saying codes of

20     countries generally provide for when harm is

21     caused, someone can bring an action?

22          A.     Yes.  I'm saying in Latin America

23     and in the civil law tradition, usually you have

24     a civil code and the civil code contains general

25     provisions on civil actions.  One of the

[Page 155]

1            ANGEL R. OQUENDO

2    provisions that you find in these codes is a

3    provision that says if there is an injury that

4    causes harm, then there is a cause of action.

5            Q.      Right.  It might be helpful to get

6    a little bit more specific than just codes that

7    permit actions based on harm.  To your

8    knowledge, do you know if conversion is a

9    recognized claim in any of these Latin American

10   countries?

11           A.      I don't know.  You mean the six

12   countries that we're talking about here, right?

13           Q.      Yes.

14           A.      I don't know.

15           Q.      Why don't we take a look at chapter

16   8 of your textbook.

17              (Oquendo Exhibit 13 for

18   identification, Book Excerpt, Chapter 8, Latin

19   American Law)

20           Q.      So we're marking this as Oquendo

21   13.  And this is chapter 8 of your textbook, is

22   that right?

23           A.      Yes.

24           Q.      And if you turn to page 536.

25           A.      I'm right there.

[Page 183]

```
 1                 ANGEL R. OQUENDO

 2    rather than under jurisdiction.  So that's why I

 3    refer then to the discussion later.

 4         Q.    So --

 5         A.    In the next section.

 6         Q.    So you just disagree with Justice

 7    Hoyos in this instance about what Panamanian

 8    court would do.

 9         A.    Yes.  Would most probably tend to

10    do.

11         Q.    Now, on page 40 of your report you

12    refer to the proof of claim form.

13         A.    Mm-hmm.

14         Q.    Do you recall this part of the

15    discussion?

16         A.    Yes, I do.

17         Q.    I just want to get a better sense

18    on the record of your views on this.  So at the

19    outset you say you agree with Professor Gidi,

20    Siqueiros and Justice Hoyos that return of the

21    proof of claim form by claimants does not amount

22    to submission to the jurisdiction of this

23    action.

24         A.    Yes.

25         Q.    Right?
```

App. 3001

[Page 188]

1                    ANGEL R. OQUENDO

2      insert additional language.

3            A.     Yes.

4            Q.     And on page 1 of the order, the

5      additional language the court has inserted is

6      after "for all purposes relating to this claim."

7            A.     Yes.

8            Q.     And you see that's in italics,

9      right?

10           A.     I see that's in italics, yes.

11           Q.     What do you understand "this claim"

12     to refer to in the context of this jurisdiction

13     paragraph?

14           A.      This is what is referred to in the

15     report.  And that is that the parties do not

16     acknowledge the authority of the tribunal

17     vis-à-vis this class action.

18           Q.     So you agree with the experts that

19     you cite that the proof of claim form is limited

20     to the SEC receivership action.

21           A.     Yes, as I say in the report.

22           Q.     You also say you think it's -- you

23     just think it's overdrawn I believe is your

24     word.

25           A.     Yes.

# EXHIBIT 100

## SIMPSON THACHER & BARTLETT LLP

425 LEXINGTON AVENUE
NEW YORK, NY 10017-3954
(212) 455-2000

———

FACSIMILE (212) 455-2502

DIRECT DIAL NUMBER
(212) 455-3525

E-MAIL ADDRESS
pkazanoff@stblaw.com

<u>BY E-MAIL</u>

September 16, 2015

Re:    *Rotstain, et al. v. Trustmark National Bank, et al.*
          <u>Discovery Requests</u>

James R. Swanson, Esq.
Benjamin D. Reichard, Esq.
Fishman Haygood, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, LA 70170-4600

Peter D. Morgenstern, Esq.
Butzel Long, P.C.
230 Park Avenue, Suite 850
New York, NY 10169

Scott M. Berman, Esq.
Friedman Kaplan Seiler & Adelman, L.L.P.
7 Times Square, 27th Floor
New York, NY 10036

Dear Counsel:

      We write to follow up on certain outstanding class certification discovery issues,
specifically (i) our August 21, 2015 letter requesting materials identified in the Declaration
of J. Lester Alexander, III ("August 21 Letter"), (ii) Plaintiffs' responses to Defendants'
First Requests For Production To Former Class Plaintiffs, dated July 2, 2015 (the "Requests
to Former Class Plaintiffs"), and (iii) discovery related to Diana Suarez, Ruth Alfille de
Penhos, and Salim Estefenn Uribe.

      First, in our August 21 Letter, we requested production of certain documents and
information identified in the Declaration of J. Lester Alexander, III, by August 26, 2015.  To
date, Plaintiffs have not provided any response to this Letter.  We again ask that Plaintiffs
produce the materials requested in the August 21 Letter on or before September 18, 2015, so
that Defendants will have a reasonable opportunity to review them in advance of Mr.
Alexander's deposition scheduled for September 22, 2015.

BEIJING   HONG KONG   HOUSTON   LONDON   LOS ANGELES   PALO ALTO   SÃO PAULO   SEOUL   TOKYO   WASHINGTON, D.C.

SIMPSON THACHER & BARTLETT LLP

James R. Swanson, Esq.
Peter D. Morgenstern, Esq.
Scott M. Berman, Esq.                    -2-                    September 16, 2015

     Second, as set forth in our September 4, 2015 correspondence, Defendants believe that Plaintiffs should provide formal responses and objections to the Requests to Former Class Plaintiffs, in light of the current status of meet and confer discussions on those Requests. Given the deadlines for class certification briefing, we ask that these responses be provided by September 23, 2015.

     Third, in connection with Diana Suarez, Ruth Alfille de Penhos, and Salim Estefenn Uribe, Defendants request that Plaintiffs produce the following documents by September 25, 2015.

## Diana Suarez

1. As requested in our letter of July 16, 2015 (the "July 16 Letter") (Item 5) and discussed during Ms. Suarez's July 1 deposition, please conduct a search for and produce any letters sent by Ms. Suarez to the Securities and Exchange Commission regarding its application to compel the liquidation of Stanford Group Company.[1]

2. As requested in our July 16 Letter (Item 7) and discussed during Ms. Suarez's July 1 and August 28 depositions, please produce the account statements for the Bank of America account to which Ms. Suarez maintains online access (account no. **REDACTED**) reflecting Stanford Financial Group interest payments to Ms. Suarez.[2]

3. Ms. Suarez testified during her August 28 deposition that she executed a power of attorney giving her son, Gabriel Suarez, authorization to act on her behalf, including with respect to her Stanford investments and this litigation.[3] She further testified that this power of attorney is still in effect.[4] Please produce a copy of that document.

4. Please produce information regarding the identity of the accountants who originally assisted Ms. Suarez with her tax returns for the year 2007, before Ms. Suarez retained H&R Block to assist her with her taxes, and who purportedly did not declare interest payments that Ms. Suarez received from Stanford on such returns.[5]

---

[1] *See* Suarez July 1, 2015 Dep. Tr. at 259:1-260:5. Per your request at Ms. Suarez's August 28 deposition, a copy of the July 16 Letter has been attached for your reference.

[2] *See id.* at 130:3-14; Suarez Aug. 28, 2015 Dep. Tr. at 26:1-27:25.

[3] Suarez Aug. 28, 2015 Dep. Tr. at 112:18-113:16, 159:13-24.

[4] *Id.* at 113:17-19, 159:13-24.

[5] *See id.* at 60:11-25, 61:13-62:7, 63:6-17, 151:20-152:15, 152:21-25.

SIMPSON THACHER & BARTLETT LLP

James R. Swanson, Esq.
Peter D. Morgenstern, Esq.
Scott M. Berman, Esq.                    -3-                    September 16, 2015

**Ruth Alfille de Penhos**

5. At her deposition on June 10, 2015, Ms. Penhos testified that her family only made claims to the U.S. Receiver and the Antiguan Joint Liquidators.[6]  In her August 5, 2015 responses to Defendants' First Set of Interrogatories to Current and Former Class Plaintiffs, however, Ms. Penhos identified a NAFTA Arbitration Claim that relates to her SIBL CDs.[7]  Please produce all documents relating to the NAFTA Arbitration Claim that Ms. Penhos filed in connection with her SIBL CDs.

**Salim Estefenn Uribe**

6. Mr. Estefenn testified during his deposition on September 10, 2015 that he has sent his former Stanford financial advisor, Patricia Herr, email communications over the last six years.[8] REDACTED .[9] There is no basis for these redactions.  Please produce all communications between Mr. Estefenn and Ms. Herr, with Ms. Herr's name and email address unredacted.

7. In the document BATES-stamped Uribe_006378 through Uribe_0006384 (Uribe Deposition Exhibit 162), REDACTED . Please produce these pages in unredacted form.

                    *          *          *

We reserve all rights in connection with class certification discovery, including in connection with the above-listed requests.  If you would like to discuss any of the requests, we are available to do so.

                    Sincerely,

                    Peter E. Kazanoff /KSS

                    Peter E. Kazanoff

---

[6] *See* Penhos Dep. Tr. at 181:20-182:17.

[7] *See* Plaintiff Penhos's Responses to Defendants' First Set of Interrogatories, served on August 5, 2015, at Answer to Interrogatory No. 7.

[8] *See* Estefenn Sept. 10, 2015 Dep. Tr. at 43:4-16 (rough).

[9] *See, e.g.*, Estefenn Dep. Exhibits 162-63; Estefenn Sept. 10, 2015 Dep. Tr. at 40:5-18, 47:21-48:10 (rough).

SIMPSON THACHER & BARTLETT LLP

James R. Swanson, Esq.
Peter D. Morgenstern, Esq.
Scott M. Berman, Esq.                    -4-                    September 16, 2015

Enclosure

cc:     Rodney Acker, Esq.
        Taylor F. Brinkman, Esq.
        Roger B. Cowie, Esq.
        Jeffrey G. Hamilton, Esq.
        Wallis M. Hampton, Esq.
        Brian A. Herman, Esq.
        Ashley McKeand Kleber, Esq.
        Jeffrey C. Kubin, Esq.
        James V. Leito IV, Esq.
        Noelle M. Reed, Esq.
        Brad G. Repass, Esq.
        Ellen Sessions, Esq.
        Ryan C. Wooten, Esq.

# EXHIBIT 101

[Page 1]

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| PEGGY ROIF ROTSTAIN, et al., on behalf of themselves | ) ) ) |
| and | ) ) |
| all others similarly situated, Plaintiffs, and THE OFFICIAL STANFORD INVESTORS COMMITTEE, | ) ) ) ) ) ) |
| Plaintiff-Intervenor. | ) C.A. 3:09-CV-02384-N ) |
| VS. | ) ) |
| TRUSTMARK NATIONAL BANK, HSBC BANK PLC, the TORONTO-DOMINION BANK, INDEPENDENT BANK F/K/A BANK OF HOUSTON, SG PRIVATE BANKING, (SUISSE) S.A. and BLAISE FRIEDLI, | ) ) ) ) ) ) ) ) |
| Defendants. | ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

J. LESTER ALEXANDER III, CPA

SEPTEMBER 22, 2015

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

```
 1                    A P P E A R A N C E S
 2

    FOR THE CLASS PLAINTIFFS:
 3

           FISHMAN HAYGOOD LLP
 4         201 St. Charles Avenue, Suite 4600
           New Orleans, Louisiana  70170
 5         Mr. James R. Swanson
           504.236.6176
 6         jswanson@fishmanhaygood.com
 7

    FOR THE DEFENDANT SOCIÉTÉ GÉNÉRALE CREDIT BANKING
 8  SUISSE:
 9         SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
           1000 Louisiana Street, Suite  6800
10         Houston, Texas  77002
           Mr. Wallis M. Hampton
11         713.655.5154
           wallis.hampton@skadden.com
12

13  FOR THE DEFENDANT HSBC:
14         LOCKE LORD, LLP
           2200 Ross Avenue, Suite 2200
15         Dallas, Texas  75201
           Mr. Roger B. Cowie
16         214.740.8442
           rcowie@lockelord.com
17

18

    FOR THE DEFENDANT TORONTO-DOMINION BANK:
19

           SIMPSON THACHER & BARTLETT LLP
20         425 Lexington Avenue
           New York, New York  10017
21         Mr. Peter Kazanoff
           212.455.2266
22         pkazanoff@stblaw.com
           Ms. Kavitha Sivashanker
23         kavitha.sivashanker@stblaw.com
24
25                    -CONTINUED-
```

[Page 4]

1   FOR THE DEFENDANT TRUSTMARK BANK:

2       GIBBS & BRUNS, LLP

        1100 Louisiana, Suite 5300

3       Houston, Texas 77002

        Mr. Jeffrey C. Kubin

4       713.751.5225

        jkubin@gibbsbruns.com

5

6

    FOR DEFENDANT BLAISE FRIEDLI:

7

        MORGAN, LEWIS & BOCKIUS LLP

8       1000 Louisiana, Suite 4000

        Houston, Texas  77002

9       Mr. Ryan C. Wooten - via phone

        713.890.5725

10      rwooten@morganlewis.com

11

12  VIDEOGRAPHER:

13      Jerry Garza

14

    ALSO PRESENT:

15

        Mr. Jason E. Beesinger - Skadden (Houston)

16

17

18

19

20

21

22

23

24

25

App. 3011

[Page 6]

1                          EXHIBIT INDEX

2                ORAL AND VIDEOTAPED DEPOSITION OF

3        J. LESTER ALEXANDER III, CPA, SEPTEMBER 22, 2015

4                          Description                    Page

5

     Alexander 1          8-6-2015 Declaration of J. ... 11
6                         Lester Alexander, III

7    Alexander 2          Plaintiffs' Second Amended ... 23
                          Class Action Complaint
8

     Alexander 3          10-15-2010 Report............. 28
9

     Alexander 4          12-29-2010 Cumberland School . 43
10                        of Law CLE registration form
                          and attachment
11

     Alexander 5          Stanford Financial Group ..... 58
12                        Receivership form

13

14                •_____•

15

16

17

18

19

20

21

22

23

24

25

[Page 28]

```
 1              THE VIDEOGRAPHER:  On the record at

 2     10:02 a.m.

 3                   (Alexander Exhibit 3 marked/introduced.)

 4        Q.   (BY MR. KAZANOFF)  Mr. Alexander, we've

 5     introduced as Alexander 3, a report issued by you and

 6     the Accounting, Economics & Appraisal Group in the

 7     matter I believe you previously referenced, the

 8     American Bank matter?

 9        A.   Sure.  Yes, that's what this is.

10        Q.   And the date of this report is October 15,

11     2010?

12        A.   Correct.

13        Q.   And is this a report that you issued in

14     connection with the Pearlman litigation that you had

15     previously testified about?

16        A.   Let me flip it first --

17        Q.   Sure.

18        A.   -- just to make sure it's complete.

19             It is, except it's got appended to it

20     deposition testimony.  So it is my report, but also

21     attached to it is something labeled "Exhibit B," which

22     appears to be excerpts of the deposition.

23        Q.   Understood.

24             Was that -- was that an appendix to your

25     report?
```

[Page 29]

1      A.   Not -- not as I filed it.  I don't know why

2  that is attached.

3      Q.   Okay.  And I'll note that this document, at

4  the top, there's a filing from the electronic filing

5  system for the court dated 10-24-2011.

6           Let me ask you, if you could, to turn to

7  paragraph 6, which is on page 4.  And do you see the

8  last sentence where it says:  "Internal controls,

9  internal audits, external audits, board member

10  oversight, audit committee oversight, banker

11  underwriting, bank monitoring, state

12  regulation...federal regulation do not generally

13  detect sophisticated frauds like Pearlman's fraud

14  schemes"?

15      A.   I do see that.

16      Q.   Do you continue to agree with that statement?

17      A.   In general, that's true.

18      Q.   Let me ask you to turn to -- look one further

19  down in the report, paragraph 7.

20           Do you see the last sentence of the

21  paragraph 7 before it gets to 7.1:  "These studies

22  found that the larger the fraud, the less likely they

23  are to be detected"; and then the follow-on sentence,

24  "Internal controls, internal audit and external audit

25  were all inadequate at addressing such frauds"?

[Page 30]

1    A.    I see that.

2         Q.    Do you continue to agree with that statement?

3         A.    I think historically, in that time frame,

4    that is true.   I think with changes that occurred more

5    recently that improvement has occurred.

6              But with respect to that time frame, I think

7    that's generally true.

8         Q.    In the --

9         A.    In general.   Not specifically.   Keeping in

10   mind that it's very fact-specific,

11   facts-and-circumstances specific.   But from a general

12   premise, that's true.

13        Q.    And the Stanford Ponzi scheme took place

14   during that period; correct?

15        A.    That is correct.

16        Q.    The Stanford Ponzi scheme was over before the

17   end of that period?

18        A.    Yes.

19        Q.    And have you done any work to determine

20   whether the Stanford Ponzi scheme would be part of the

21   general rule that you've just described?

22        A.    I haven't done any work, but just the facts

23   of this case and what I understand is being pled, it

24   wouldn't -- this internal control issue wouldn't seem

25   to apply.

App. 3015

[Page 31]

1       Q.    What do you mean it "wouldn't seem to apply"?

2    Why do you say that?

3       A.    Well, what I understand is being pled is the

4    failure to disclose to the buyers of the security that

5    they were purchasing securities in a Ponzi scheme; and

6    that the banks, with their banking activities, had

7    information sufficient to be found liable for aiding

8    and abetting.

9       Q.    And is the source of your understanding the

10   complaint in this action?

11      A.    Yeah, or an assumption.

12      Q.    It's an assumption.  You haven't done any

13   work?

14      A.    No.

15      Q.    You're not giving any opinions about that?

16      A.    I am not.

17      Q.    Okay.  Do you have any information about that

18   other than what you've received from plaintiffs'

19   counsel?

20      A.    I'm not sure I understand your question.

21      Q.    Let me rephrase, then.

22            The assumption that you just described, is

23   the source of the information for that assumption

24   plaintiffs' counsel?

25      A.    Well, I -- it -- it is plaintiffs' counsel,

[Page 32]

1  but it's an assumption that's also supplemented by

2  reading pleadings in the case and looking at

3  information and evidence in the case; but, yes, it is

4  an assumption.

5      Q.   What evidence in the case?

6      A.   The -- to the extent -- I'm trying to

7  remember what -- what I have and haven't seen.  Let

8  me -- let's work, first, primarily off of accepting

9  what's been either pled or said in motions about what

10 happened in both this case and other cases in the

11 Stanford Ponzi scheme.

12     Q.   Okay.  So let me try to ask one clear

13 question.

14          Other than pleadings, conversations with

15 counsel, any other sources of information about your

16 assumption?

17     A.   No.

18     Q.   Let me ask you to turn to paragraph 14.  "As

19 discussed above" -- I'm sorry.  I want to turn your

20 attention to the beginning of paragraph 14.

21          "As discussed above, risk-management

22 activities, including those performed by banks do not

23 generally detect frauds like Pearlman's schemes.  None

24 of the fraud schemes studied were uncovered by the

25 risk management activities performed by a bank.  This

[Page 33]

1  is because customary bank underwriting and monitoring

2  practices are not designed to detect activities as

3  sophisticated as the schemes employed by Pearlman,

4  Madoff, Ebbers, Lay, and the others discussed above."

5          Do you continue to agree with that statement?

6      A.   From the context of bank fraud, which is what

7  the issue was here, I agree with it.  I think, again,

8  it's very facts-and-circumstances specific.

9      Q.   Did you discuss the Stanford scheme at all in

10  this report, do you recall?

11      A.   I don't remember.

12      Q.   Why don't you turn to paragraph 11, if you

13  could.  Do you see the reference in the second-to-last

14  sentence to the SEC charging Allen Stanford?

15      A.   I do.

16      Q.   Thank you for your patience.  I assure you

17  this speeds me up rather than slows me down.  You can

18  put that to one side.

19          I think you've previously testified about a

20  team that's assisted you in connection with your work

21  in this matter.  Is the name of the firm Accounting,

22  Economics & Appraisal Group, LLC?

23      A.   That's my firm, yes.

24      Q.   And you founded that firm?

25      A.   I did.

[Page 64]

1    computer forensic experts.  I had a partner for a

2    number of years that did that for a living.  And it's

3    been my experience that that is a very fruitful way to

4    start, and likely might be the only thing you have to

5    do.

6        Q.   But FTI said to you that one place they would

7    look to plug this information is -- plug this gap is

8    information from the claimants themselves; correct?

9        A.   They said to me that they have looked at

10   their records.  They have not looked at the backup

11   tapes.  They said to me that they believed that the

12   backup tapes -- if they could be reloaded, they

13   were -- they did not have the experience to give me

14   any comfort there.  That it would be the first place

15   they would look, like me.  And then they talked about

16   their warehouse which they believed would likely have

17   the information that they needed.

18            They did comment that their experience, which

19   was on appeals, was more from the claimants' point of

20   view.

21       Q.   And the accuracy of that information would

22   depend on the accuracy of the information provided by

23   the individual claimants; correct?

24       A.   Well, the answer to that would depend on what

25   the claimants submitted.

[Page 69]

1    A.   Well -- and this may be part of your

2    question -- I was told that the receiver has been able

3    to remediate -- when needed, has been able to

4    remediate the gaps.

5         I was told that the Joint Liquidator, when it

6    was presented the need, has remediated the gaps.  And

7    I myself has -- have tested that with Suarez and found

8    that the Joint Liquidator did have sufficient

9    information in that case -- in that situation to

10   remediate the gaps.

11   Q.   Okay.  So just to make sure we've got this

12   clear on the record.  Your opinions on this are based

13   on what you've been told by the receiver about its

14   ability to remediate gaps, what you've been told by

15   the receiver about the JL, Joint Liquidator's ability

16   to remediate gaps?

17   A.   What their experience has been with the JL

18   remediated gaps.

19   Q.   And the work you did with respect to one

20   investor?

21   A.   And my experience coming into this, and my

22   knowledge of the nature of banking -- bank accounting

23   and the tracking of deposits and withdrawals.

24   Q.   Haven't --

25   A.   Also, you know, clearinghouse, et cetera.

[Page 72]

1    it's the page 1 where the number in the lower

2    right-hand corner is 681,286.

3        A.   Yes.

4        Q.   Do you see line 22 of this spreadsheet, and

5    it says:  "This deposit is an initial balance.  As

6    such, these funds were deposited either prior to

7    8/31/2003 or between 6/1/2006 and 12/31/2006.  For

8    purposes of this analysis, the principal balance is

9    treated as a deposit."

10           Do you understand what that means?

11       A.   I do.

12       Q.   Can you tell me what it means?

13       A.   It's indirectly referring to two gaps in the

14   data.

15       Q.   What are those gaps?

16       A.   There's a period of time between June 1 of

17   2006 through December 31, 2006, where the source of

18   the receiver's transactional database had a gap in the

19   data itself, according to the -- Mr. Russell, and

20   Mr. Sizemore; so that's one.

21           And then the second relates to when

22   information was transferred from a legacy system to, I

23   believe, DataPro, that occurred in the '03 time frame.

24   And that was not captured, that information was not

25   captured because it was not online at the time the

[Page 73]

1   receiver did its data transfer, and it -- to my --

2   based on my interviews, that information is on backup

3   tapes with the Joint Liquidator.

4        Q.   And does the receiver have access to that

5   information?

6        A.   It's my opinion he does through the

7   cooperation agreement.

8        Q.   Did the receiver tell you why they haven't

9   accessed it?

10       A.   It's my understanding they made a -- which is

11  done many times in the claims processing, they made a

12  cost benefit analysis and decided to default to the

13  most favorable treatment to the claimant, and that's

14  the assumption that they've documented here.

15       Q.   And can you explain what you mean, why the

16  assumption is most favorable to the claimant here?

17       A.   Because it treats rollover interest as if it

18  were a deposit.  And rollover interest is fictitious

19  and it needs to be identified and eliminated.

20       Q.   When you say it's "most favorable to the

21  claimant," does that mean that it states the alleged

22  losses in the maximum possible terms?

23       A.   It means it's not a damage number.

24       Q.   What do you mean by "it's not a damage

25  number"?

[Page 74]

1      A.   It's a claim number.   It's one of the reasons

2   this calculation is not a damage calculation.

3      Q.   And how were you going to do this calculation

4   differently at some point in the future?

5      A.   Well, with respect to the '06 time frame,

6   I've been told the data exists to reconstruct the

7   investment activity, which makes complete sense to me

8   because I believe it exists too.

9           With respect to the 2003 prior information,

10   I've been told that the data exists on backup tapes.

11   And the uncertainty of FTI was whether it could

12   be -- they used the word "harvested"; I would use the

13   word "forensically extracted" from the backup tapes.

14           I've had substantial experience in that,

15   doing that, and working with teams doing that.   And

16   it's my opinion that, you know, it likely can be --

17   you may not be able to reload the backup tapes, but

18   you can get the information off of it.

19           To the extent it's not usable form, there's

20   substantial records in both Houston and in the custody

21   of the Joint Liquidator that can be used to

22   reconstruct investment activity --

23      Q.   Have you had any --

24      A.   -- on a class-wide basis.

25      Q.   Have you had any conversations with the

[Page 75]

1   Joint Liquidator?

2       A.   I have not, but it's my understanding counsel

3   has an open dialogue with the Joint Liquidator.

4       Q.   Have you been informed that the

5   Joint Liquidator has agreed to provide this

6   information?

7       A.   I haven't asked that question, so I haven't

8   been informed that.

9       Q.   Did FTI say anything about the Joint

10  Liquidator's willingness to provide this information?

11      A.   I don't remember that.  I remember them

12  not -- not -- not expecting any -- they were expecting

13  cooperation, and I've also reviewed the Joint

14  Cooperation Agreement, and that seems to be the spirit

15  of the agreement.

16      Q.   But you're not expressing an opinion as to

17  what the cooperation agreement provides or doesn't

18  provide; correct?

19      A.   No.  I'm only -- well, to this extent:  To

20  the extent I need -- need to review the agreement to

21  issue a reliable opinion, I am relying on my review,

22  interpretation of that cooperation agreement; but I'm

23  not going to interpret the agreement for the court.

24      Q.   Right.  You're not going to give a legal

25  opinion on what the agreement --

App. 3024

[Page 76]

1       A.    No.

2          Q.    -- legally provides any of the parties to the

3    agreement; correct?

4       A.    Correct.

5          Q.    And if I understand correctly, these data

6    gaps that you've identified you expect to be addressed

7    through backup tapes initially?

8       A.    Initially.

9          Q.    That would be the first place I would go.

10      A.    Right.

11         Q.    So this is work you haven't done yet?

12      A.    Oh, no, no, nor would -- would a reasonable

13   person at this stage of the lawsuit.

14         Q.    And FTI hasn't done this work?

15      A.    Correct.  They, instead, made that

16   conservative assumption to save money.

17      Q.    In paragraph 6 of your declaration, you

18   referenced the -- that you were provided sections of

19   the Texas Securities Act relevant to damages case law.

20      A.    Which paragraph; 7 or 6?  I'm sorry.

21      Q.    Paragraph 6.

22      A.    6, yes.  I see where that is.

23      Q.    Do you see where that is towards the end?

24      A.    I do.

25      Q.    Did you review those sections?

[Page 85]

1      Q.   I'm going to change my hypothetical.  I'm

2    going to make it a little simpler.

3           Investor A and B are identical; they both

4    claim the theft tax loss.

5      A.   Correct.

6      Q.   Investor A has enough income to shield, thus

7    that the net benefit of the tax loss is $1 to him.  $1

8    less in taxes that get paid.

9           Person B makes the same election that you're

10   saying is available to all putative class members, has

11   no income to offset, thus the benefit of the tax loss

12   to Investor B is zero.

13           Now your methodology pays these two

14   individuals the same dollar in my hypothetical.

15   Haven't you left Investor A and Investor B in

16   different spots?

17     A.   Well, they have a tax loss, and they can

18   carry it back and they can carry it forward.  Should

19   I -- am I now to assume they had no prior income and

20   no future income?

21     Q.   Correct.

22     A.   So let me make sure I got it.

23           We've got one investor that I would describe

24   as a typical investor who invests in substantial sums

25   in CDs and has income; receives what they thought was

[Page 86]

1  taxable income; reports that income and pays tax on

2  it; then they learn they have a loss; they get their

3  recoveries; they offset it against their -- their

4  investment; and they then report a net tax loss; they

5  have income in that year, and they get a tax benefit.

6      The other investor invests, receives

7  income -- do I assume he reported that income for tax

8  purposes?

9  Q.   You assume the same reporting for -- by both

10  of those.

11  A.   Okay.  So when that loss is incurred, they

12  would be able to go back and recoup those taxes on the

13  income they paid.

14      So there's not a situation if they report the

15  taxes and follow the tax -- report the income and

16  follow the tax law where they wouldn't be recouping

17  taxes.

18      But this person, other than that income, had

19  no income and had no income in the future; their tax

20  benefit would be different under that situation, I

21  agree.

22  Q.   And with respect to class -- putative class

23  members that don't pay taxes in the United States,

24  you're not expressing an opinion about whether the

25  ability to claim a theft loss is the same in those

[Page 88]

1      Q.    (BY MR. KAZANOFF)   But your -- your view that

2   the -- the -- ability to claim the theft tax loss is

3   common among the U.S. -- is limited to the U.S. class

4   members, because you don't know the ability for -- for

5   the members of the putative class outside the U.S.,

6   whether they have that ability or not?

7      A.    Yeah, and I'm not -- I don't think I'm even

8   trying to issue an opinion about the commonality of

9   the ability to do something or not do something for

10  tax purposes.

11            I'm pointing out to you that this right to

12  receive a deduction and obligation to pay taxes, it

13  varies by jurisdiction, yes; but it's the same before

14  or after.

15            I mean, the variance before and the variance

16  after is the same.  And it's generally accepted,

17  therefore, that you do not take into account the

18  after-tax effects when computing damages on a

19  class-wide basis or on commercial damages or for net

20  investment losses.  There's only one instance that

21  it's generally accepted, and that's in the personal

22  injury area.

23                  THE VIDEOGRAPHER:  The tape is about to

24  end or has already ended, I'm not too sure.

25                  MR. KAZANOFF:  We'll take a break.

1    that extent, you could construe it as a legal opinion.

2           But, no, I don't intend to practice law or

3    tell the judge what to rule or how to rule.

4      Q.   So I'm going to have to ask it again because

5    I'm looking at the answers, I just don't think we've

6    gotten to the answer.

7           Does the word "economic" have any

8    significance in this sentence, or could I just X it

9    out and your opinion means the same thing?

10     A.   I don't know what else to add to all the

11   other answers.

12     Q.   No, then let me just --

13     A.   I think the answer is don't -- you know, take

14   all my other answers and then don't mark it out.

15     Q.   So it has some significance?

16     A.   It has the significance that I've testified

17   to, yes.

18     Q.   Okay.  Your next bullet point is:  "The

19   Defendant's expert, Lehn, misunderstands the claims

20   and applicable damages formulas" -- "applicable damage

21   formulas."

22           What does "misunderstand the claims" mean?

23     A.   He's trying to change what is being -- or

24   alter what the criteria is under a -- when there's a

25   claim for breach of -- or aiding and abetting.  And

[Page 98]

1    he's trying to add an extra factor to it, which

2    is -- doesn't make any sense and -- when you look at,

3    you know, how aiding and abetting works, when there is

4    joint and several liability --

5        Q.   And this is all based on what you've been

6    told is the law in these areas?

7        A.   I was provided the instruction that they

8    are -- that counsel is suing for aiding and abetting,

9    and I was provided the instruction that liability

10   would be joint and several.   And with those two

11   instructions, I look at what Lehn is proposing and say

12   this doesn't make any sense.

13       Q.   And those are the instructions you got from

14   plaintiffs' counsel?

15       A.   I did.

16       Q.   So would you agree that your opinion -- this

17   opinion hinges on the accuracy of those instructions?

18       A.   It hinges on a finding of aiding and

19   abetting, and the applicability of joint and several

20   liability, you are correct.

21       Q.   Right.   So the opinion hinges on what counsel

22   has told you about those two factors?

23       A.   Said another way:   If aiding and abetting or

24   joint and several liability don't apply, that would

25   change my opinion.

[Page 116]

1    recovery in the action.  Under those circumstances,

2    how are you going to mitigate the impact to that on

3    your class methodology for calculating damages?

4        A.   So the claimant is committing fraud?

5        Q.   I'm just looking for an answer to my last

6    question.

7        A.   But that's -- the premise of your question is

8    the claimant is committing fraud.  And I haven't

9    inquired about what the antifraud procedures are; but

10   I have inquired enough to know that there are

11   certifications signed that would prevent that.

12           So they are intentionally hiding the fact

13   that they got a recovery.  I don't know the answer.

14   But if despite all best intentions and all the

15   procedures, a claimant were to commit a fraud in such

16   a way that it would not be discovered, it would not be

17   discovered.

18       Q.   So let me read my question back to you and

19   see if we can get a -- get an answer, which may be

20   consistent with what you've just said, but it comes

21   with enough else that I'd like to get a clean question

22   and answer.

23           In the situation where the receiver does not

24   know about the other proceeding, the JLs don't know

25   about the other proceeding, you and your team do not

[Page 117]

1    know about the other proceeding, and the claimant does

2    not disclose the recovery in that proceeding, whether

3    intentionally or unintentionally as part of the claim

4    process, in that situation, how are you going to

5    impact -- mitigate that impact in your methodology

6    you've proposed for calculating damages?

7         A.   So if a claimant receives a recovery and for

8    whatever reason it is not discovered either through

9    the efforts of the Joint Liquidator with all of the

10   arrangements that are in place, with all the agencies

11   where claims are being pursued, nor discovered by the

12   receiver with all that's in place to help assure that

13   the receiver learns about these things, but if for

14   one -- some reason something ultimately slips through

15   the cracks and is not discovered, it would not be

16   discovered.

17        Q.   And there wouldn't be any way to mitigate it

18   in your methodology?

19        A.   If -- if -- just what your premise is,

20   despite everyone's best efforts, despite having a good

21   methodology, something goes undetected, is your

22   premise.

23             So, of course, if despite everything everyone

24   can do that's reasonable to be done, and it goes

25   undetected, then it would go undetected.

[Page 131]

1       A.   Yes.

2       Q.   Did you use data from a receiver?

3       A.   I don't know.

4       Q.   Was it a bankruptcy proceeding?

5       A.   No.  No.  It was an insurance proceeding, and

6    I don't know whether the company at the time of the

7    settlement was in receivership or not; it could have

8    been.

9       Q.   When was this?

10      A.   When I was with PricewaterhouseCoopers.  It

11   was a long time ago; or it may have been right after I

12   left.  It was a long time ago.  I cannot precisely

13   recall.

14      Q.   Any other examples?

15      A.   No, not in the connection with the

16   certification of a class for the plaintiffs.

17      Q.   You previously testified that you were

18   informed by the receiver that there were certain gaps

19   in the data available; correct?

20      A.   Correct.

21      Q.   Have you determined whether there's any other

22   gaps in the data that you have not been informed by

23   the receiver about?

24      A.   Have I determined whether there were gaps in

25   the data that the receiver did not tell me about?  I

[Page 132]

1    don't know.  I haven't made that -- I haven't gone

2    through my mind in my findings in that way.  I

3    don't -- I don't think so.  I mean, I think I'm aware

4    of all of the gaps in the data.

5         Q.   But you haven't reviewed the data yet?

6         A.   No.  I have not tested the reliability of

7    what I've been told by the receiver's experts; and so

8    to some degree, I am relying on my knowledge of FTI

9    and the quality of that firm.

10             Please tell Neal Hochberg I said that.

11        Q.   Turn to page 6, if you could --

12        A.   I'm there.

13        Q.   -- of Alexander 1.

14             In the second sentence you say:  "Lehn's

15   'but-for' world is not part of the TSA damages

16   methodology," and you cite --

17        A.   Which paragraph?  I'm sorry.

18        Q.   Oh, I'm sorry.  Paragraph 15.

19        A.   Okay.

20        Q.   Second sentence.

21        A.   Okay.  Got it.

22        Q.   And I'm referring specifically to footnote 3,

23   which has two case cites in it.

24             Are those two cases the support for

25   the -- your statement that Lehn's "but-for" world is

[Page 133]

1    not part of the TSA damages methodology?

2         A.   No, not exclusively.

3         Q.   What else?

4         A.   They're listed on the back, and I can't tell

5    you which ones also provide support, but there are

6    other cases.

7         Q.   So it's case law?

8         A.   It is case law, that is correct.

9         Q.   Right.   And this is -- this is information

10   that you received from plaintiffs' counsel; correct?

11        A.   Correct.

12        Q.   This isn't an opinion; this is an assumption?

13        A.   It is an opinion based on an assumption.

14             The assumption is that the TSA applies and

15   liability judgments can be enforced joint severally.

16             And based on those two assumptions, Lehn's

17   opinions don't make sense because the "but-for" world

18   is not part of that.

19             The bad actor commits a wrong act, causes the

20   damage.   Those who are found to have been aiding and

21   abetting in a joint/several liability can be held

22   accountable for the full amount of the damage.   So the

23   "but-for" doesn't make any sense.

24             Said another way:   If you drive me to the

25   bank and I rob the bank, it doesn't matter whether I

[Page 135]

1    and abetter trying to avoid that joint and several

2    liability because all they did was aid and abet.

3        Q.    Would you agree that joint and several

4    liability only applies when liability attaches?

5        A.    That's what I have been told.

6        Q.    And that's what you wrote here; right?

7        A.    I guess I did.

8        Q.    Paragraph 15.

9        A.    Yeah.

10        Q.    So in liability, you're not opining on when

11    liability attaches or it doesn't?

12        A.    No, I am not.

13        Q.    So you're not opining on if -- put aside

14    whether causation has -- can be described in economic

15    terms, you're not opining on whether causation is or

16    isn't an element that the plaintiffs have to prove of

17    their claim; in other words, you're not -- you're

18    opining on damages, not liability; correct?

19        A.    You know, I can't -- you're mixing things.

20        Q.    Let me ask a different question.  I don't

21    want to --

22        A.    I can't separate economics from causation of

23    damages.

24        Q.    Then let me -- let me make -- put the

25    question -- ask you a better question.

[Page 136]

1          The question as to whether a defendant is

2     liable or not under the statute is not a topic you're

3     opining on?

4          A.   You are correct.

5          Q.   You're opining on damages, assuming liability

6     has been proved?

7          A.   Or said from another space:  Assuming, in the

8     class certification context, that it will be proved.

9          You know, but I do think it's different, the

10    issue of causation.  When you're looking at class-wide

11    damages and the assumption of liability, joint and

12    several, for aiding and abetting, there is clearly a

13    disconnect at that point in time interjecting

14    "but-for" concepts into a damages analysis.  It just

15    doesn't make any sense.

16         Q.   Again, just so we have this clear.  Whether

17    liability is joint and several or not assumes that

18    liability has been proven; correct?

19         A.   Correct.

20         Q.   The fact that joint and several -- that a

21    recovering party can pursue that recovery on a

22    joint-and-several basis does not impact whether

23    liability has been proven; it's something that follows

24    the proving of liability?

25         A.   Or is associated with it.

1      Q.    It's a method of recovery?

2      A.    Correct.

3      Q.    Not a liability standard?

4      A.    I'm not sure I'm qualified to answer that

5  question because I don't see the distinction.

6      Q.    So moving away from the TSA for a moment.

7      A.    Okay.

8      Q.    You see the third sentence here:  "It is also

9  not part of the damages methodology for Plaintiffs'

10  other claims."

11         What claims are you referring to?

12      A.    The one I can recall is a common law aiding

13  and abetting claim.  And I don't want to botch my

14  characterization of the third count that I'm thinking

15  of.

16      Q.    And is the basis for this statement about the

17  other claims that you have been told to assume that

18  joint and several liability applies to those claims as

19  well?

20      A.    Yes.

21      Q.    And if that -- as we talked about before, if

22  that assumption turned out to be incorrect, you'd have

23  to revisit this opinion; correct?

24      A.    Yes.

25      Q.    At the end of paragraph 15, do you see where

# EXHIBIT 102

1

2              IN THE UNITED STATES DISTRICT COURT

3            FOR THE NORTHERN DISTRICT OF TEXAS

4                      DALLAS DIVISION

5

6     - - - - - - - - - - - - - - - x

7   PEGGY ROIF ROTSTAIN, et al.,    :

8                    Plaintiffs,    :     Case No.

9                       vs.         :   3:09-CV-2384-N-BG

10  TRUSTMARK NATIONAL BANK,        :

11  et al.,                         :

12                   Defendants.    :

13    - - - - - - - - - - - - - - - x

14

15              Toronto, Ontario, Canada

16              Friday, September 25, 2015

17  Videotaped Deposition of:

18                 PROFESSOR JANET WALKER

19  the witness, called for examination by counsel

20  for the Class Plaintiffs, pursuant to notice and

21  agreement, commencing at 9:37 a.m., at McCarthy

22  Tetrault, 66 Wellington Street West, Suite 5300,

23  Toronto, before Virlana Kardash, RPR, CSR,

24  Commissioner of Oaths.

25  Job No: 98092

Janet Walker

1
2   potentially far more significant than they were in

3   Lepine.  So I would think that -- and I did

4   actually -- I was asked to do a comparison based on

5   what you could see at the time between the two actions

6   with regard to quantum of damages, the kinds of relief

7   that are being sought, the calculation of attorneys

8   fees, and the nature of the claim, and to offer my

9   view as to the differences there.

10       And as I did in my declaration, my analysis

11  suggested that in many respects they would be regarded

12  as more favorable to the plaintiffs than the U.S.

13  class action.  So I think what concerns me about the

14  notice here is that the notice would have to alert the

15  claimants to that.

16       It would have to say, even if the same total

17  award was granted, the JLs in the Canadian action will

18  bill their hours but you, Mr. Swanson, will receive

19  25 percent of the award.

20       Q    Well, that would be great.  I wish I would,

21  but I'm not so sure the judge would allow that.  Do

22  you think he would?

23       A    I don't know.

24       Q    I think I would deserve it.

25       A    I'm sure you would.

1                     Janet Walker

2        Q    But I don't know if he would give that.

3        A    In other words, there is potentially less

4   net award available, that the per-person dollar amount

5   seems to be larger, that potentially the standard of

6   negligence might be easier to demonstrate.

7        Q    The what would be easier?  I didn't hear

8   you.

9        A    The negligence standard.

10       Q    Oh, negligence may be easier than the --

11       A    Than the allegations in the U.S. Complaint.

12   And I guess the challenges to work out under the

13   Lepine standard and as suggested in paragraph D, the

14   claimants would have to be alerted to all of those

15   differences.

16            And I can't see why, if they were fairly

17   appraised of those differences, why they would not opt

18   out.  But at the same time, the notice will say to

19   them, "And if you don't opt out, it would be

20   reasonable to assume that you did not wish to opt

21   out."

22            So they will lose all of their entitlements in

23   any event; so it's kind of a catch-22.  I don't see

24   how the notice could be fair and yet still result in

25   them not all opting out.  And if they didn't, I don't

1                          Janet Walker

2    know if a Canadian court would subsequently be

3    persuaded, quite apart from all the other issues we've

4    been speaking about of the need to have authority over

5    the property, how a Canadian court will be persuaded

6    that it is -- paragraph C, that they were accorded

7    procedural fairness, including adequate notice, if

8    they were held to be bound.

9         Q    So is what you're saying that I could write

10   anything down in the notice?  It doesn't matter what I

11   write, that there's a good chance that the notice will

12   be deemed to be not an effective notice?

13             MS. NEUNER:  Objection to form.  Go ahead.

14             THE WITNESS:  I was advised that I can't be

15   told to stop, which is different from Canada.

16   BY MR. SWANSON:

17        Q    Yes.  Canada must be pretty annoying then

18   because that would be really annoying if Lynn could

19   just tell you to stop.  She'd do it too.  She'd do it

20   every single time.

21        A    As I say, it's a catch-22.  Again, it's an

22   impossible scenario because, if you completely

23   appraise them, I cannot imagine anybody who would not

24   opt out.  Therefore, again, the people who didn't opt

25   out are, in theory, presumed to have consented and

1                          Janet Walker

2        therefore are bound by the class action.

3               And I can't see how a Canadian court would see

4        that that is reasonable.

5        Q     Are you offering the opinion in this case

6   that the Canadian case offers the investors a better

7   chance of recovery than the American case?

8        A     That was my impression from the pleadings,

9   yes.

10       Q     Okay.  And you think you could discern that

11  from looking at the pleadings because the joint

12  liquidator wrote down 5.5 million and we wrote down

13  4.5 million?

14             MS. NEUNER:  Correction for the record.

15  We're talking billions, not millions.

16             MR. SWANSON:  Yes.  I keep forgetting that.

17             MS. NEUNER:  Okay.

18             MR. SWANSON:  Thank you.

19             MS. NEUNER:  I'll let the question stand.

20             THE WITNESS:  That was only one aspect.

21  BY MR. SWANSON:

22       Q     I'm sorry.  My question was is that opinion

23  based on the fact that the joint liquidators wrote

24  down the figure 5.5 billion and we wrote down the

25  figure 4.5 billion?

**Errata Sheet**

Page 11, Line 6 "provided there is, A, a real"
Page 16, Line 21 "representative plaintiffs – but, in any event, the other
Page 19, Line 15  "this point -- that the proposal to have them"
Page 24, Line 18 ""B" and the"
Page 25, Line 7 "be -- there <u>was</u> some concern, and these"
Paeg 25, Line 18 "section 5(1)(e)"
Page 48, Line 2 "Justice Auclair"
Page 48, Line 17 "Justice Auclair"
Page 54, Line 8 "property -- and the property seems"
Page 75, Line 23 "it was not hostile"
Page 77, Line 5 "ABA"
Page 81, Line 11 "working group -- two class"
Page 90, Line 10 "hand gestures have been"
Page 94, Line 20 "time -- and there were a period of years -- when the"
Page 96, Line 23 "Maclean's"
Page 96, Line 24 "Maclean's"
Page 97, Line 20 "Maclean's"
Page 114, Line 8 "action -- receivership process -- just"
Page 120, Line 15-16 "three: identities, parties, issues…"
Page 120, Line 18 "…those are for"
Page 120, Line 19 "term -- more elastic -- in"
Page 121, Line 4 "is: "not necessarily"."
Page 121, Line 6 "pursued -- and"
Page 121, Line 13 ""transaction-based""
Page 121, Line 14 "action -- if "
Page 121, Line 16 "considered -- are"
Page 126, Line 20 "adapt"
Page 135, Line 18 "underway"
Page 141, Line 24 "Well, see, if"
Page 145, Line 23 "apprise"
Page 147, Line 9 "action -- are"
Page 148, Line 20 "Holmested"
Page 151, Line 8 "seen, for example, in"
Page 153, Line 11 "Holmested"
Page 153, Line 12 "Holmested"
Page 154, Line 3 "Walker: Canadian"
Page 155, Line 3 "Process""
Page 155, Line 12 "Garry"
Page 155, Line 13 "Holmested"
Page 158, Line 12 "equities"
Page 158, Line 23 "Wide"
Page 159 Line 10 "seised"
Page 164, Line 16 ""to be determined""

30 September 2015

# EXHIBIT 103





Liquidators    FAQs    Reports/Communication    Filings/Orders    Claims    SDC        News    Contact    Site Map    Español    Home

## Preference Payments

**Stanford International Bank – In Liquidation (the Bank)**
**Preference Payments to Creditors in the run up to insolvency**

The discussion below is to provide a non-binding broad overview of the background to this issue. It is not intended to be a full examination of the legal issues, rights and remedies of the Bank and its CD holders. The Joint Liquidators' ("JLs") final position will be set out in their Court filings and may differ from the points below.

In the 6 months prior to the appointment of receiver managers in February 2009 over $1.5BN of funds were withdrawn from the Bank.

Objective
The objective of clawbacks is to have them returned to the pool of funds available to all creditors, so these monies can be redistributed more fairly, to the advantage of those who were left behind in the race to get money out.

These clawbacks fall into two categories

Clawbacks from Net Winners
$700m of this amount is due from Net Winners. There may be other Net Winners who were paid with interest prior to the 6 month preference period. If we are successful in pursuing these claims this amount will be available for distribution to the investors in future dividend payments. On the basis of Net Winners identified in the preference period this equates to approximately an additional dividend of approximately 14 cents in the dollar, based on claims of $4.88billion.

Clawback of Preferences
$600m of the total cash out flow was paid to Investors who have a claim in the estate. We are still investigating persons who received Preference payments, but who for reasons of their own have not claimed their balance in the estate. If we recover these preference payments it will be available for distribution to all investors. This action will in effect be a redistribution from the investors who have withdrawn large amounts to investors who did not receive any funds or received relatively small amounts in the 6 month period. Investors claims will be increased by the preference once returned.

This will equate to an additional distribution of approximately 11 cents in the dollar based on claims of $5.23billion (once preference payments have been added back).

The two clawbacks cumulatively have the ability to increase distributions to those that did not benefit to an additional 25% of their claim. This assumes we are able to recover all these monies.

Those who did not receive a Preference will benefit by the full 11%. This is in addition to the Net Winner clawback which could yield an additional 14% making an improvement of 25% to creditors who did not benefit at the expense of other creditors. In the real world it is unlikely that we will be able to recover all the clawbacks, and actual distributions will likely fall short of the additional 25% that is theoretically possible.

We are running a test case to affirm that our position is correct and as a basis to pursue and collect preferences not returned voluntarily.

As a pragmatic option, we are presently open, within fairly tight parameters to ensure consistency and fairness, to negotiate settlements of preferences which reflect the specifics of your situation. Once we have obtained a Court ruling, we would expect to recover them in full.

*Click on the question to show the answer*

**1.** What is a Preference payment?

Preference Payments | sibliquidation.com                    Page 2 of 2
Case 3:09-cv-02384-N-BG    Document 351-22    Filed 11/02/15    Page 144 of 144    PageID
22218

2. How is this relevant in the Stanford International Bank matter?

3. Why have I received a Preference letter?

4. What shall I do if I have received a Preference letter?

5. Why has my claim increased?

6. What happens once I repay the Preference payment to the Estate?

7. What happens if I do not repay the Preference payment to the Estate?

8. What do I do if I disagree with this approach?

9. What is the Preference payment formula?

Home

Liquidators

Claims Administration

FAQs

News

SDC

News

Contact

Site Map

Latest News

NOTICE TO CREDITORS Re NET
WINS AND PREFERENCES
May 30, 2014

DISTRIBUTION PROCESS
UNDERWAY TO SIB CREDITORS
March 4, 2014

The Joint Liquidators Announce First
Distribution
January 20, 2014

Search this site                    Sub

© 2011-2012 SIB Liquidation. All rights Reserved. Designed and maintained by ECO Strats.

Top ↑