**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, *et al.*, on behalf of themselves and all others similarly situated, | § § § | |
| Plaintiffs, | § § | |
| v. | § | Case No.: 3:09-CV-02384-N |
| TRUSTMARK NATIONAL BANK, *et al.*, | § § § | |
| Defendants. | § § | |
| THE OFFICIAL STANFORD INVESTORS COMMITTEE, on its own behalf and as assignee of RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER, | § § § § § § | |
| Intervenor-Plaintiff, | § § | |
| v. | § § | |
| SG PRIVATE BANKING (SUISSE) S.A. and BLAISE FRIEDLI, | § § § | |
| Defendant. | § § § | |

---

**THE OFFICIAL STANFORD INVESTORS COMMITTEE'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND BRIEF IN SUPPORT**

---

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ..................................................................... 1

II.  BACKGROUND AND PROCEDURAL HISTORY ...................................... 2

III.  UNDISPUTED FACTS ................................................................................. 6

IV.  ARGUMENT & AUTHORITIES ................................................................. 9

   A.  Standard on Summary Judgment .................................................... 9

   B.  The Elements of a Fraudulent Transfer Under TUFTA ......................................... 9

      1.  Standard for Proving Fraudulent Intent ..................................... 10

      2.  The Reasonably Equivalent Value Defense ................................ 11

   C.  The Elements for a Fraudulent Transfer Under TUFTA Have Been Established ......................................... 12

      1.  The Transfer to SG Suisse Was Fraudulent as a Matter of Law ................. 12

      2.  SG Suisse Did Not Provide Any Value, much less Reasonably Equivalent Value, to SFGL ......................................... 13

V.  PRAYER ...................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adams v. Travelers Indem. Co. of Conn.,*
   465 F.3d 156 (5th Cir. 2006) ............................................................................ 9

*African Enter., Inc. v. Scholes,*
   516 U.S. 1028, 116 S. Ct. 673  (1995) ............................................................. 14

*Am. Cancer Society v. Cook,*
   675 F.3d 524 (5th Cir. 2012) .......................................................................... 12

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ......................................................................................... 9

*Cal. Pipe Recycling, Inc. v. Sw. Holdings, Inc.,*
   Civil Action No. H–09–2502, 2010 WL 56053 (S.D. Tex. Jan. 5, 2010) ............ 15

*Connell v. Connell,*
   889 S.W.2d 534 (Tex. App.—San Antonio 1994, writ denied) ......................... 15

*Douglass v. United Servs. Auto. Ass'n,*
   79 F.3d 1415 (5th Cir. 1996) ............................................................................ 9

*Eberhard v. Marcu,*
   530 F.3d 122 (2d Cir. 2008) ........................................................................... 14

*Floyd v. Dunson (In re Rodriguez),*
   209 B.R. 424 (Bankr. S.D. Tex. 1997) ............................................................ 12

*GE Capital Commercial, Inc. v. Worthington National Bank,*
   No. 3:09-cv-572-L, 2012 WL 2159185 (N.D. Tex. Jun. 13, 2012) .................... 15

*Hahn v. Love,*
   321 S.W.3d 517 (Tex. App. – Houston [1st Dist.] 2009, pet. denied) ................. 11

*In re Enron Corp.,*
   No. 03-3522, 2005 WL 6237551 (Bankr. S.D. Tex. Dec. 9, 2005) ..................... 12

*In re Erlewine,*
   349 F.3d 205 (5th Cir. 2000) .......................................................................... 12

*In re Gulf Fleet Holdings, Inc.,*
   491 B.R. 747 (Bankr. W.D. La. 2013) ............................................................... 2

*In re Hannover Corp.*,
   310 F.3d 796 (5th Cir. 2002) ........................................................................... 12

*In re KZK Livestock*,
   221 B.R. 471 (Bankr. C.D. Ill. 1998) ............................................................... 15

*In re Old CarCo LLC*,
   435 B.R. 169 (Bankr. S.D.N.Y. 2010) ................................................................ 2

*In re Stanford Int'l Bank, Ltd.*,
   No. 3:09-cv-721  (N.D. Tex. July 30, 2012) ...................................................... 4

*In re Tousa, Inc.*,
   680 F.3d 1298 (11th Cir. 2012) ....................................................................... 11

*Janvey v. Adams*,
   588 F.3d 831 (5th Cir. 2009) ........................................................................ 2, 3

*Janvey v. Alguire*,
   No. 3:09-cv-724-N, 2013 WL 2451738 (N.D. Tex. Jan. 22, 2013) .............. passim

*Janvey v. Alguire*,
   647 F.3d 585, 597 (5th Cir. 2011) ................................................................ passim

*Janvey v. Brown*,
   767 F. 3d 430 (5th Cir. 2014) ........................................................ 6, 10, 12, 14

*Janvey v. Dem. Sen. Camp. Comm.*,
   793 F. Supp. 2d 825 (N.D. Tex. 2011) .......................................................... passim

*Janvey v. Dem. Sen. Camp. Comm*,
   Case No. 3:10-cv-00346-N [Doc. 140] ............................................................ 15

*Northern Nat. Gas Co. v. Sheerin*,
   No. SA-09-cv-709-XR, 2010 WL 2542200 (W.D. Tex. Jun. 21, 2010) .............. 12

*Olabisiomotosho v. City of Houston*,
   185 F.3d 521 (5th Cir. 1999) ............................................................................ 9

*Orr v. Kinderhill Corporation*,
   991 F.2d 31 (2nd Cir. 1993) ............................................................................. 2

*Phillips v. B.R. Brick And Masonry, Inc.*,
   No. 01-09-00311-CV, 2010 WL 3564820, (Tex.App.—Houston [1st Dist.]
   (Sept. 10, 2010) .............................................................................................. 11

*Quilling v. 3D Marketing, LLC*,
   No. 3-06-CV-0293-L, 2007 WL 1058217 (N.D. Tex. Feb. 8, 2007) .................. 10

*Scholes v. Lehmann,*
   56 F.3d 750 (7th Cir. 1995) ........................................................................ 10, 14

*SEC v. Resource Development Int'l, LLC,*
   487 F.3d 295 (5th Cir. 2007) ............................................................................. 10

*SEC v. Stanford Int'l Bank, Ltd., et al.,*
   Case No. 3-09-CV-0298-N ................................................................................ 3

*Smith v. American Founders Financial Corp.,*
   365 B.R. 647 (S.D. Tex. 2007) .......................................................................... 11

*Stoebner v. Lingenfelter,*
   115 F.3d 576 (8th Cir. 1997) ............................................................................. 15

*Warfield v. Byron,*
   436 F.3d. 551 (5th Cir. 2006) ...................................................................... 10, 12

## Statutes

TEX. BUS. & COM. CODE § 24.002(12) ........................................................................ 10

TEX. BUS. & COM. CODE § 24.005(a) ............................................................................ 9

TEX. BUS. & COM. CODE § 24.009(a) .......................................................................... 11

## Rules

FED. R. CIV. P. 56(a); ................................................................................................ 9

Intervenor-Plaintiff, the Official Stanford Investors Committee ("OSIC") files this motion for partial summary judgment and brief in support against Defendant Société Générale Private Banking (Suisse) S.A. ("SG Suisse" or "Defendant"), and respectfully shows the Court as follows:

## I.    PRELIMINARY STATEMENT

For decades, SG Suisse and its senior executive Blaise Friedli ("Friedli") were willing, enthusiastic, and well-paid participants, partners, and facilitators of the fraudulent, multi-billion dollar Ponzi scheme perpetrated by R. Allen Stanford ("Allen Stanford") and certain of his associates.[1]  By this motion, however, OSIC seeks to focus the Court on just a single fraudulent transaction, pursuant to which SG Suisse enriched itself to the tune of almost $100 million at the expense of Stanford Financial Group Ltd. ("SFGL"), an entity separate and apart from Allen Stanford.

In the fall of 2004, Allen Stanford borrowed $95 million from SG Suisse.  Allen Stanford took great care to emphasize in his correspondence with SG Suisse, and in the applicable loan documents, that the loan in question was personal in nature.  SG Suisse then transferred the $95 million proceeds to a loan facility account set up in Allen Stanford's name.

Over three years later (and *after* the personal loan had matured), SFGL, an entity funded entirely by customer deposits from Stanford International Bank, Ltd. ("SIB"), pledged *its* assets to guarantee repayment of Allen Stanford's $95 million personal loan from SG Suisse (the

---

[1]        Among other things, SG Suisse and Friedli (i) vouched for Allen Stanford's honesty and integrity to investors and prospective investors; (ii) facilitated the design and operation of a system which enabled Allen Stanford to steal and divert billions of dollars of his innocent depositors' money for his own use; (iii) assisted in hiding the fraud from investors, prospective investors and the regulatory authorities which could have stopped the fraud and prevented billions of dollars in losses; and (iv) enabled Allen Stanford to bribe the very auditors and public officials who were purportedly protecting the investors' interests, through the design and operation of a secret "slush fund" overseen by Friedli and SG Suisse, all while Friedli served in various clearly conflicting capacities within the Stanford organization itself (while being compensated with investors' stolen funds).

"Pledge").  Significantly, none of the $95 million loan proceeds were ever transferred to SFGL.

On December 15, 2008 – just weeks before his massive Ponzi scheme was publicly revealed –

Allen Stanford directed SG Suisse to debit $95,350,000 from an SFGL account in full repayment

of *his* personal loan.  SG Suisse debited $95,350,000 from the SFGL account and almost

simultaneously repaid itself.  The Pledge, together with the $95 million debit, together constitute

and are referred to herein as the "Transfer." [2]  *See* [Doc. 130] ¶¶ 8, 80-83.

Since the Stanford Entities (as defined below, which included SFGL) were operated as a

Ponzi scheme, the Transfer by SFGL to SG Suisse was made with fraudulent intent as a matter of

law.  Moreover, SG Suisse failed to provide any value, let alone reasonably equivalent value to

SFGL in exchange for the Transfer.  Only Allen Stanford received value (the original loan

proceeds transferred in 2004).  Accordingly, OSIC is entitled to partial summary judgment

avoiding and recovering the Transfer.

## II.   BACKGROUND AND PROCEDURAL HISTORY

This action arises out of the multi-billion-dollar Ponzi scheme perpetrated by Allen

Stanford through a network of over 130 entities (the "Stanford Entities") in 14 countries over a

period of at least 15 years. *See Janvey v. Adams*, 588 F.3d 831, 833 (5th Cir. 2009); *Janvey v.*

*Dem. Sen. Camp. Comm.*, 793 F. Supp. 2d 825, 856-57 (N.D. Tex. 2011), *aff'd* 699 F.3d 848,

*op'n withdrawn and replaced*, 712 F.3d 185 (5th Cir. 2013).

---

[2]   Because the Pledge and SG Suisse's $95 million debit were part of a single integrated transaction, the two should be "collapsed" or combined for purposes of OSIC's fraudulent transfer claim.  *See, e.g., In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 771 (Bankr. W.D. La. 2013) ("[W]here there are multiple related transactions, courts will sometimes 'collapse' the transactions and consider the transactions as one integrated transaction for purposes of assessing whether the debtor received reasonably equivalent value."); *In re Old CarCo LLC*, 435 B.R. 169 (Bankr. S.D.N.Y. 2010) ("The collapsing concept is usually applied when a series of transactions actually comprise a single integrated transaction, notwithstanding the fact that the formal structure erected and labels attached make them appear distinct."); *Orr v. Kinderhill Corporation*, 991 F.2d 31, 35 (2nd Cir. 1993) (holding that an "allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications.").

As the Court has previously recognized, Allen Stanford defrauded investors by selling purported certificates of deposit ("CDs") issued by SIB. *Adams*, 588 F.3d at 833; *Dem. Sen. Camp. Comm.*, 793 F. Supp. 2d at 856-57. SIB maintained a high volume of CD sales by promising above-market returns and falsely assuring investors that the CDs were backed by safe, liquid investments. *Adams*, 588 F.3d at 833. In fact, SIB used the proceeds from sales of new CDs to make interest and redemption payments on pre-existing CDs because it did not have sufficient assets, reserves and investments to cover its liabilities. *Id.*; *Dem. Sen. Camp. Comm.*, 793 F. Supp. 2d at 856-57.

In February 2009, the Securities & Exchange Commission filed a civil action against Allen Stanford, SIB, and others associated with the Ponzi scheme. This Court appointed Ralph S. Janvey as the Receiver (the "Receiver") for the Stanford Entities, including SFGL. *Adams* at 828.

On June 18, 2009, a federal grand jury in Houston, Texas indicted Allen Stanford and other co-conspirators on 21 counts, including wire and mail fraud, obstruction of an SEC investigation, and money laundering.

On November 11, 2009, the Class Plaintiffs filed their First Amended Petition stating claims against SG Suisse and other bank defendants for fraudulent transfer, conspiracy to commit fraud, and aiding and abetting fraud. [Doc. 1-5.] The Class Plaintiffs filed their Second Amended Class Action Complaint on June 23, 2015 (the "Class Complaint"). [Doc. 279.]

On August 10, 2010, this Court authorized and approved the formation of OSIC, and designated OSIC to represent the interests of SIB investors and to bring and take legal actions for the benefit of SIB investors and on behalf of the Receiver and the Receivership Estate in certain instances. *See SEC v. Stanford Int'l Bank, Ltd., et al.*, Civil Action No. 3-09-CV-0298-N [Doc.

1149] (the "OSIC Order").   OSIC and the Receiver subsequently entered into an agreement regarding the prosecution of claims against certain third-parties (the "Agreement"), including claims under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), which Agreement was approved by Order of this Court dated February 15, 2011.   *See id.*, [Doc. No. 1267].

On July 30, 2012, this Court entered an order piercing the corporate veil as between the Stanford Entities and aggregating the Stanford Entities for the purpose of determining the Stanford Entities' principal place of business and center of main interest under Chapter 15 of the United States Bankruptcy Code.   *See In re Stanford Int'l Bank, Ltd.*, No. 3:09-cv-721, [Doc. 176], at *20, *26-36 (N.D. Tex. July 30, 2012) (the "Chapter 15 Order").   The Court did not pierce the corporate veil as between the Stanford Entities and Allen Stanford, and did not aggregate Allen Stanford and the Stanford Entities.

On December 14, 2012, OSIC filed an Intervenor Complaint against SG Suisse.   [Doc. 130].   OSIC brought this action pursuant to its authority under the OSIC Order and Agreement, and as attorney-in-fact and assignee of the Receiver's claims against SG Suisse.   The Intervenor Complaint states claims against SG Suisse for (i) avoidance and recovery of fraudulent transfers, including the $95 million Transfer from SFGL to SG Suisse; (ii) aiding and abetting fraudulent transfers; (iii) breach of fiduciary duty; (iv) aiding and abetting breaches of fiduciary duty; (v) aiding and abetting a fraudulent scheme; (vi) aiding and abetting conversion; (vii) aiding and abetting violations of the Texas Securities Act; and (viii) civil conspiracy.

Plaintiffs in the Class Complaint and the Intervenor Complaint allege, among other things:

- SG Suisse, a Swiss bank with offices located in the United States and throughout the world, enabled the fraud and knowingly and actively participated in Allen Stanford's theft of billions of dollars of CD-customer

funds.  (*See* Class Complaint ¶¶ 277-278; Intervenor Complaint ¶¶ 1-11, 21, 102-118.)

- SG Suisse played a major role in the management of the Stanford Entities' business and assets, maintaining various accounts in the name of SIB and Bank of Antigua, among others.  (*See* Class Complaint ¶¶ 277-279; Intervenor Complaint ¶¶ 46-47.)

- SG Suisse maintained and facilitated Allen Stanford's use of what Allen Stanford's primary co-conspirator James Davis ("Davis") described as a "secret" slush fund account in the name of SFGL, a Stanford Entity funded secretly and entirely by SIB CD proceeds.  (*See* Class Complaint ¶¶ 283-286; Intervenor Complaint ¶¶ 1-11, 52-58.)

- With the material assistance of SG Suisse's Executive Vice-President, Friedli, Allen Stanford and Davis used the "secret" SFGL account to dispense bribes to regulators and auditors who, like SG Suisse, kept the fraud hidden from SIB CD investors.  Friedli also knowingly and actively assisted Allen Stanford in transferring over $80 million in CD customer funds from the secret SFGL account to various of his personal bank accounts around the world.  The stolen funds were subsequently wasted and squandered on Allen Stanford's extravagant lifestyle.  (*See* Class Complaint ¶¶ 290-302; Intervenor Complaint ¶¶ 59-72.)

- SG Suisse engaged in significant personal loan activity with Allen Stanford. In late-2004, SG Suisse provided Allen Stanford with a $95 million loan.  In December 2008 – only weeks before the massive fraud was publicly uncovered – Allen Stanford directed that this personal loan be repaid with SIB CD customer funds from the "secret" SFGL account.  SG Suisse took repayment of the loan without providing any value whatsoever to SFGL in return.  (*See* Class Complaint ¶¶ 308-312; Intervenor Complaint ¶¶ 79-84.)

On March 6, 2012, after a six-week jury trial, Allen Stanford was convicted of thirteen counts of wire fraud, conspiracy to commit wire fraud, mail fraud, obstruction of an SEC proceeding, conspiracy to obstruct an SEC proceeding, and conspiracy to commit money laundering.  On June 14, 2012, Allen Stanford was sentenced to serve 110 years in prison. Former Chief Investment Officer, Laura Pendergest-Holt, who pleaded guilty in June 2012 to obstructing an SEC investigation into the Stanford Ponzi scheme, was sentenced in September 2012 to serve 36 months in prison, followed by three years supervised release.  Former Chief

Accounting Officer Gilberto T. Lopez and former Global Controller of Stanford Financial Group Global Management Mark J. Kuhrt, were convicted in November 2012 on 9 counts of wire fraud and one count of conspiracy to commit wire fraud. Lopez and Kuhrt were each sentenced on February 14, 2013 to serve 20 years in prison. On January 22, 2013, Davis, after entering into a plea agreement, was sentenced to serve five years in prison for his role in the Ponzi scheme.

## III.   UNDISPUTED FACTS

It is beyond dispute that the Stanford Entities were a massive Ponzi scheme. *See* Declaration of Karyl Van Tassel (the "KVT Declaration") ¶¶ 6-24, attached to the Appendix filed in support of this motion.[3] Further, both this Court and the Fifth Circuit Court of Appeals have held repeatedly that all the Stanford Entities subject to the Court's Receivership were operated as a Ponzi scheme. *See Janvey v. Alguire*, No. 3:09-cv-724-N, 2013 WL 2451738, at *7 (N.D. Tex. Jan. 22, 2013) ("Net Winner Order"); *Janvey v. Brown,* 767 F. 3d 430, 433 (5th Cir. 2014); *Janvey v. Dem. Sen. Camp. Comm.*, 712 F.3d 185, 198 (5th Cir. 2013) ("DSCC II"); *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011).

SFGL was a Stanford Entity that provided management support services to other Stanford Entities, including accounting, IT, legal, marketing, and other administrative services. *See* KVT Declaration ¶ 9.

SFGL maintained an account – number 108.731 – with defendant SG Suisse at its Lausanne, Switzerland office ("SocGen 108.731"). *See* KVT Declaration ¶ 26. Davis, the former Chief Financial Officer of SIB, admitted in his plea agreement that SocGen 108.731 was

---

[3]     OSIC also adopts and incorporates by reference the facts, analyses, opinions, and conclusions contained in prior declarations by Ms. Van Tassel, which have been previously submitted to and credited by the Court. *See Janvey v. Alguire*, No. 3:09-cv-724-N, 2013 WL 2451738, at *6-7 (N.D. Tex. Jan. 22, 2013); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 793 F. Supp. 2d 825, 834-35 (N.D. Tex. 2011).

used, in part, to bribe SIB's outside "auditor," CAS Hewlett & Co., and Antiguan officials.[4] *See id*. All the money deposited or transferred into SocGen 108.731 came from the sale of CDs to investors by SIB. *See* KVT Declaration ¶¶ 27-28. From June 2000 to September 2008, approximately $262 million was transferred from SIB to SocGen 108.731. *Id*.

On September 10, 2004, Allen Stanford sent a letter to SG Suisse asking to "personally borrow US$95,000,000" from SG Suisse, to be guaranteed "by a cash deposit/investment account of Stanford Financial Group in the amount of US$110,000,000 along with my personal guarantee." *See* KVT Declaration ¶ 29; KVT-SG-18. On September 29, 2004, the board of directors of SFGL adopted a unanimous resolution that, among other things, stated "that R. Allen Stanford be and is hereby authorized, directed and empowered to encumber and pledge such Company [defined as SFGL] assets, as may be necessary or convenient in connection with any indebtedness incurred by the Company or by R. Allen Stanford *personally*." *See* KVT Declaration ¶ 30; KVT-SG-19.

Just over a month later, on November 15, 2004, Allen Stanford sent Blaise Friedli of SG Suisse an executed Credit Facility Agreement, and asked that SG Suisse "credit my personal account for the full $95,000,000 on November 22, 2004." *See* KVT Declaration ¶ 31; KVT-SG-20. The Credit Facility Agreement provided that the loan would mature on November 22, 2007. *Id*. SG Suisse then transferred the money, as instructed, to a personal account maintained by Allen Stanford at SG Suisse. *See* KVT Declaration ¶ 32.

On December 19, 2007, SFGL pledged the assets in SocGen 108.731 to SG Suisse "as collateral for any present and future claims that [SG Suisse] may have against" the $95 million

---

[4]     The Fifth Circuit has noted that Davis is "singularly positioned to provide insight into the workings of Stanford." *See Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011).

loan facility.  *See* KVT Declaration ¶ 33; KVT-SG-21.  This pledge occurred three years after SG Suisse made the personal loan to Allen Stanford, and almost a month after this personal loan matured.  *Id.*

The account statements for SocGen 108.731 contain an entry for $96 million with the explanation "PLEDGE FAV. 3RD PARTY W/O MATURITY."  *See* KVT Declaration ¶ 34; KVT-SG-22.  This entry confirms that $96 million from SocGen 108.731 had been pledged to guarantee a no-maturity loan to a third party.  *Id.*

On December 15, 2008 – just weeks before the Ponzi scheme was publicly uncovered – Allen Stanford sent a letter to Friedli, to "confirm authorization to debt [sic] account 108.731 for US$95,350,000 to liquidate the balance due on my loan."  *See* KVT Declaration ¶ 35; KVT-SG-23.  The following day, SG Suisse debited SocGen 108.731 in the amount of $95,350,000.00.  *See* KVT Declaration ¶ 36; KVT-SG-24.

SG Suisse debited SocGen 108.731 despite the fact that, while the loan being repaid was made to Allen Stanford in his personal capacity, the loan was being repaid from an account held in the name of SFGL.  *Id.*  At the time SFGL transferred this money to SG Suisse, the Stanford Entities, including SFGL, were being operated as a Ponzi scheme.  *See* KVT Declaration ¶¶ 6-24.

In sum, SG Suisse can present no evidence to refute the conclusion that: (i) the Stanford Entities, including SFGL, were operated as a Ponzi scheme; (ii) SFGL was funded entirely by SIB CD proceeds stolen from innocent investors; (iii) in December 2007, SFGL pledged CD proceeds to guarantee a personal loan made years earlier by SG Suisse to Allen Stanford; (iv) SFGL transferred CD proceeds to SG Suisse totaling $95,350,000 on December 15, 2008; (v) the Transfer from SFGL to SG Suisse was made solely to guarantee and repay a personal

loan made by SG Suisse to Allen Stanford, and (vi) none of the personal loan proceeds were transferred by Allen Stanford to SFGL. OSIC is therefore entitled to judgment as a matter of law avoiding and recovering the Transfer.

## IV.   ARGUMENT & AUTHORITIES

### A.   Standard on Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." FED. R. CIV. P. 56(a)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). While the Court must view all evidence and draw all reasonable inferences in the light most favorable to the non-movant, it "need not sift through the record in search of triable issues." *Janvey v. Dem. Sen. Camp.*, 793 F. Supp. 2d at 829. (citing *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006)). "Indeed, factual controversies are resolved in favor of the nonmoving party only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Id.* (citing *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999)). "Conclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden to establish a genuine issue of material fact requiring a trial. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).

### B.   The Elements of a Fraudulent Transfer Under TUFTA

Under TUFTA, a transfer is fraudulent if it was made "with actual intent to hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COM. CODE § 24.005(a); *Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011). A "transfer" means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in

an asset, and includes <u>payment of money</u>, release, lease, and <u>creation of a lien or other</u> <u>encumbrance</u>." Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ § 24.002(12) (emphasis added).

### 1.       Standard for Proving Fraudulent Intent

"In this circuit, proving that a transferor operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made." *Janvey v. Brown*, 767 F.3d 430, 439 (5th Cir. 2014); *see also Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006); *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995)). Thus, a plaintiff is not required to independently establish that the transfers at issue were made with actual fraudulent intent; "the mere existence" of a Ponzi scheme establishes such intent as a matter of law. *Quilling v. 3D Marketing, LLC*, No. 3-06-CV-0293-L, 2007 WL 1058217, at *2 (N.D. Tex. Feb. 8, 2007) (citing *Warfield v. Byron*, 436 F.3d. 551, 558 (5th Cir. 2006)). Courts, including this one, have made this determination on summary judgment. *See* Net Winner Order at *7; *Dem. Sen. Camp.*, 793 F. Supp. 2d at 856-857. Since the statute requires only a finding of fraudulent intent on the part of the transferor "debtor," the transferee's knowing participation is irrelevant for purposes of establishing that a transfer was fraudulent under TUFTA. *Janvey v. Alguire* , 647 F.3d at 598-99 (citing *Warfield*, 436 F.3d at 559); *SEC v. Resource Development Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007).

Finally, fraudulent intent will be found for transfers made from each entity that participated in the Ponzi scheme. *See Dem. Sen. Camp.*, 793 F. Supp. 2d at 856-857 (applying Ponzi scheme presumption on summary judgment to the over 100 Stanford-related entities which derived all or most of their income from SIB CDs).

### 2.      The Reasonably Equivalent Value Defense

Once the transfer and fraudulent intent are established (as they are here), the burden shifts to the transferee (here, SG Suisse) to establish a defense under TUFTA.  *See Hahn v. Love*, 321 S.W.3d 517, 527 n.9 (Tex. App. – Houston [1st Dist.] 2009, pet. denied).

A transferee's only defense under TUFTA is to show that it received an otherwise fraudulent transfer "in good faith <u>and</u> for a reasonably equivalent value."  Net Winner Order at *6 (emphasis in original); TEX. BUS. & COM. CODE § 24.009(a).  Both elements of the defense must be established such that a defendant who claims to have received a transfer in good faith must still demonstrate that it gave reasonably equivalent value in return to establish a defense under TUFTA.  *Id.*

It is well-settled that a transfer made by a debtor solely for the benefit of a third party is not made for "reasonably equivalent value" under TUFTA.  *See, e.g., Smith v. American Founders Financial Corp.*, 365 B.R. 647, 666 (S.D. Tex. 2007) ("a transferor receives less than reasonably equivalent value when it transfers property in exchange for consideration that passes to a third party") (citation omitted); *Phillips v. B.R. Brick and Masonry, Inc.*, No. 01-09-00311-CV, 2010 WL 3564820, at *5 (Tex.App.—Houston [1st Dist.] Sept. 10, 2010) (upholding jury verdict that payments by debtor to corporation for benefit of third-party is not made for "reasonably equivalent value" under TUFTA); *see also In re Tousa, Inc.*, 680 F.3d 1298 (11th Cir. 2012) (grant of liens by corporate subsidiaries to secure debt owed by their parent was not made for receive reasonably equivalent value).[5]

---

[5]      The Court can rely on *In re Tousa* because the Fifth Circuit has held that cases interpreting Section 548 are instructive in analyzing fraudulent transfers under TUFTA.  *See Janvey v. Dem. Sen. Camp. Comm., Inc.*, 712 F.3d 185, 194 (5th Cir. 2013) ("UFTA is modeled on § 548(a)(1) of the Bankruptcy Code, and, therefore cases interpreting § 548(a)(1) may be used to interpret UFTA or its Texas equivalent.").

Where there is no genuine issue of material fact for trial, the issue of value may be decided on summary judgment. *See Northern Nat. Gas Co. v. Sheerin*, No. SA-09-cv-709-XR, 2010 WL 2542200, at *6 (W.D. Tex. Jun. 21, 2010); *In re Erlewine*, 349 F.3d 205, 209 (5th Cir. 2003); *In re Enron Corp.*, No. 03-3522, 2005 WL 6237551, at *43 (Bankr. S.D. Tex. Dec. 9, 2005); *In re Hannover Corp.*, 310 F.3d 796, 801 (5th Cir. 2002).

Here, as demonstrated below, there is no genuine issue of material fact for trial. OSIC has established each of the elements of a fraudulent transfer under TUFTA, and SG Suisse cannot establish a reasonably equivalent value defense.[6]

## C.      The Elements for a Fraudulent Transfer Under TUFTA Have Been Established

### 1.      The Transfer to SG Suisse Was Fraudulent as a Matter of Law

The Transfer to SG Suisse was fraudulent under TUFTA. It is well settled that the Stanford Entities (including SFGL) operated a Ponzi scheme. *See* KVT Declaration ¶¶ 6-24; *see also, Janvey v. Brown,* 767 F.3d at 433; *DSCC II,* 712 F.3d at 198*; Janvey v. Alguire,*, 647 F.3d at 597; Net Winner Order at *6-7. Consequently, all transfers by the Stanford Entities, including the Transfer by SFGL to SG Suisse, were made with fraudulent intent as a matter of law. *See Janvey v. Alguire,*, 647 F.3d at 598; *Am. Cancer Society v. Cook*, 675 F.3d 524, 527 (5th Cir. 2012); *Floyd v. Dunson (In re Rodriguez)*, 209 B.R. 424, 433 (Bankr. S.D. Tex. 1997).

OSIC is thus entitled to avoid and recover the amount of the Transfer unless SG Suisse can meet its burden of establishing a reasonable equivalent value defense. *Cook*, 675 F.3d at 527; *Warfield*, 436 F.3d at 558. SG Suisse cannot make such a showing.

---

[6]      Even if SG Suisse is able to demonstrate that it took the Transfer for reasonably equivalent value – and it cannot, as demonstrated below – SG Suisse must still prove at trial that it took the Transfer in good faith within the meaning of TUFTA.

**2.**     **SG Suisse Did Not Provide Any Value, much less Reasonably Equivalent Value, to SFGL**

SG Suisse cannot satisfy its burden of demonstrating that it provided reasonably equivalent value for the Transfer because SFGL was not the beneficiary of the personal loan made to Stanford.

The Transfer was made by SFGL to SG Suisse to secure and then repay a separate *personal* loan made years earlier to Allen Stanford.  *See* KVT Declaration ¶¶ 29-37.  Indeed, Allen Stanford disclosed to SG Suisse that the loan was personal in nature, and SFGL later pledged CD customer funds in SocGen 108.731 as security for the loan.  *Id.*

More specifically, on September 10, 2004, Allen Stanford asked to "personally borrow US$95,000,000" from SG Suisse, to be guaranteed "by a cash deposit/investment account of Stanford Financial Group in the amount of US$110,000,000 along with my personal guarantee."  *See* KVT Declaration ¶ 29; KVT-SG-18.  On November 15, 2004, Allen Stanford sent Friedli of SG Suisse an executed Credit Facility Agreement, and asked that SG Suisse "credit my personal account for the full $95,000,000 on November 22, 2004.  *See* KVT Declaration ¶ 31; KVT-SG-20.

Three years later, on December 19, 2007, Allen Stanford caused SFGL to pledge the assets in SocGen 108.731 to SG Suisse "as collateral for any present and future claims that [SG Suisse] may have against" the $95 million personal loan facility.  *See* KVT Declaration ¶ 33; KVT-SG-21.  SG Suisse's account statements for SocGen 108.731 state that SFGL's assets were pledged for a loan made to a "third party."  *See* KVT Declaration ¶ 34; KVT-SG-21.  This pledge was made three years after the personal loan was originally funded, and almost a month after the personal loan matured.  *See* KVT Declaration ¶ 33.

On December 15, 2008, Allen Stanford sent SG Suisse a letter to "confirm authorization to debt [sic] account 108.731 [i.e., the SFGL account] for US$95,350,000 to liquidate the balance due on ***my loan***." *See* KVT Declaration ¶ 35; KVT-SG-23 (emphasis added). SG Suisse, in turn, debited the SFGL account in the amount of $95,350,000.00 – all SIB CD customer funds – in repayment of the personal loan, providing no value whatsoever to SFGL in return. *See* KVT Declaration ¶¶ 36-37; KVT-SG-24.

Accordingly, the undisputed facts are that SFGL made the Transfer for the benefit of a third-party, Allen Stanford, to pledge and repay the personal loan made to Allen Stanford, and without receiving an exchange of reasonably equivalent value (or any value at all).

Relying on the Chapter 15 Order, SG Suisse has previously argued in its motion to dismiss that the Transfer somehow benefitted the Stanford Estate as a whole (although not specifically SFGL) because this Court, many years later in the context of determining the Stanford Entities' principal place of business, concluded that the Stanford Entities operated as a "single entity." *See* [Doc. 173]. But the Court, in the Chapter 15 Order, pierced the corporate veil <u>only</u> as between the various Stanford Entities. *See* Chapter 15 Order at 36 ("the Court pierces SIB's corporate veil and <u>aggregates the Stanford Entities.</u>") (emphasis added). The Court did not pierce the corporate veil as between <u>the Stanford Entities and Allen Stanford</u> and did not aggregate the Stanford Entities and Allen Stanford.[7]

---

[7]     Indeed, the Fifth Circuit and other courts have repeatedly recognized that there is a critical distinction between the perpetrator of a Ponzi scheme (here, Allen Stanford) and the corporate entities used by that perpetrator as a part of his scheme. *See e.g., DSCC II*, 712 F.3d at 190 (the "knowledge and effects of the fraud of the principal of a Ponzi scheme in making fraudulent conveyances of the funds of the corporations under his evil coercion are not imputed to his captive corporations"); *Janvey v. Brown*, 767 F.3d at 437; *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008) ("The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys that Douglas had made the corporations divert to unauthorized purposes.") (citing *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), cert denied sub nom. *African Enter., Inc. v. Scholes*, 516 U.S. 1028, 116 S. Ct. 673, 133 L.Ed.2d 522 (1995)).

Moreover, a legal result that would aggregate Allen Stanford and SFGL now for the sole and specific purpose of providing SG Suisse with a narrow defense to OSIC's otherwise established fraudulent transfer claim would directly contravene well-settled case law holding that courts should decline to pierce the corporate veil when the result would be to prevent innocent parties from recovering fraudulent transfers.  *See, e.g., Cal. Pipe Recycling, Inc. v. Sw. Holdings, Inc.*, Civil Action No. H–09–2502, 2010 WL 56053, at *7 (S.D. Tex. Jan. 5, 2010); *Stoebner v. Lingenfelter*, 115 F.3d 576, 579-80 (8th Cir. 1997); *In re KZK Livestock*, 221 B.R. 471, 479 (Bankr. C.D. Ill. 1998).[8]

In sum, the only person who received value in this transaction was Allen Stanford – not SFGL which repaid this personal loan with stolen CD customer funds at Allen Stanford's direction.  OSIC is therefore entitled to avoid and recover the amount of the Transfer under applicable law.[9]

## V.   <u>PRAYER</u>

For the reasons set forth above, the OSIC requests the entry of an order (i) avoiding the Transfer; (ii) recovering the Transfer and entering judgment against SG Suisse in the amount of $95,350,000; (iii) awarding OSIC prejudgment interest and attorneys' fees in an amount to be determined by the Court; and (iv) awarding OSIC any further relief the Court deems appropriate.

---

[8]     It would be unfair and inequitable to reward SG Suisse and penalize the innocent investors in the Stanford Ponzi scheme for SG Suisse's participation in a fraudulent transfer that itself enabled Allen Stanford and SG Suisse to ignore the corporate separateness of SFGL.  Indeed, "[t]he purpose of [TUFTA] is to prevent fraudulent transfers of property by a debtor who intends to defraud creditors by placing assets beyond their reach."  *Connell v. Connell*, 889 S.W.2d 534, 542 (Tex. App.—San Antonio 1994, writ denied).  This is precisely what Allen Stanford tried to accomplish in directing SFGL to engage in the Transfer.

[9]     OSIC is also entitled to prejudgment interest on the amount of the Transfer, as well as its attorneys' fees. *See GE Capital Commercial, Inc. v. Worthington National Bank*, No. 3:09-cv-572-L, 2012 WL 2159185, at *18-19 (N.D. Tex. Jun. 13, 2012) (ruling that prejudgment interest may be awarded in cases brought under TUFTA, citing significant authority); *Janvey v. DSCC, et al.*, Case No. 3:10-cv-00346-N [Doc. 140] (N.D. Tex. entered Mar. 6, 2012) (awarding attorneys' fees).

Dated:  December 22, 2015

Respectfully Submitted,

**ATTORNEYS FOR THE OFFICIAL STANFORD INVESTORS COMMITTEE**

**BUTZEL LONG, P.C.**

/s/ *Peter D. Morgenstern*
Peter D. Morgenstern (*admitted pro hac vice*)
morgenstern@butzel.com
Joshua E. Abraham (*admitted pro hac vice*)
abraham@butzel.com
230 Park Avenue, Suite 850
New York, New York  10169
(212) 818-1110
(212) 818-0494 (Facsimile)

**FRIEDMAN KAPLAN SEILER & ADELMAN LLP**
Scott M. Berman (*admitted pro hac vice*)
sberman@fklaw.com
7 Times Square
New York, New York  10036-6516
Telephone: (212) 833-1100
Facsimile: (212) 833-1250

*Of Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court, and that all counsel of record will be served via the Court's ECF system on December 22, 2015.

*/s/ Peter D. Morgenstern*
Peter D. Morgenstern
