IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, *et al.*, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| and | § | |
| | § | |
| THE OFFICIAL STANFORD INVESTORS COMMITTEE, | § | |
| | § | |
| | § | Civil Action No. 3:09-CV-2384-N |
| Intervenor-Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| TRUSTMARK NATIONAL BANK, *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

**SOCIÉTÉ GÉNÉRALE PRIVATE BANKING (SUISSE) S.A.'S
AMENDED SUPPLEMENTAL RESPONSE BRIEF IN SUPPORT OF ITS RESPONSE
TO INTERVENOR-PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
1000 Louisiana St., Suite 6800
Houston, Texas 77002
Tel: (713) 655-5122
Fax: (713) 483-9122

**ATTORNEYS FOR DEFENDANT
SOCIÉTÉ GÉNÉRALE PRIVATE
BANKING (SUISSE) S.A.**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

ABBREVIATIONS ................................................................................................... viii

INTRODUCTION ........................................................................................................1

RESPONSE AND COUNTER-STATEMENT OF UNDISPUTED FACTS ................................4

    I.      In 2004, at the request of SFGL, SG Suisse disbursed $95 million of its
          own funds in exchange for a perfected security interest in the 108731
          account ......................................................................................................5

          A.      The Committee cherry-picks documents to support a false claim
                 that the 108731 account was first pledged in 2007 .....................................5

          B.      Discovery documents contradict the Committee's purportedly
                 undisputed facts about the creation of the loan and the pledge ...................7

          C.      The purpose of the $95 million loan was the purchase and funding
                 of a Venezuelan Bank ...............................................................................11

          D.      The 2007 deed of pledge did not cancel or supersede the 2004
                 deeds of pledge ......................................................................................11

           E.      The Committee and its expert have made no attempt to trace the
                 loan proceeds or to value assets acquired for the Stanford Entities
                 with those assets ....................................................................................13

          F.      When SG Suisse carried out its customer's directive to execute on
                 the pledged account and repay the outstanding loan, SFGL's debt
                 of $95 million was extinguished ................................................................15

    II.     The assets of both the Stanford Entities and Stanford are part of the
          Receivership Estate ...................................................................................16

    III.    The Committee does not establish the source and use of the funds in the
          108731 account .......................................................................................18

STANDARD OF REVIEW ..........................................................................................21

ARGUMENT ...........................................................................................................21

    I.      Documents not included in the Committee's Appendix to its Motion are
          not part of the summary judgment record and must be disregarded ...................22

II.  The Committee's TUFTA claims fail as a matter of law ........................................25

    A.  The 108731 account funds used to repay the loan are not a recoverable "asset" under TUFTA ............................................................25

        (i)  SG Suisse held a valid lien on the assets in account 108731 as of 2004 ........................................................................26

        (ii)  The 2007 deed of pledge did not cancel or supersede the 2004 liens on account 108731 ........................................28

    B.  The Committee cannot amend its Motion – or its Complaint – by challenging the 2004 Pledge for the first time through its reply brief ..........................................................................................................30

    C.  Summary judgment must be denied because of the 2004 pledges .............31

        (i)  Any challenge to a 2004 pledge of the 108731 account is barred by the statute of repose ........................................31

        (ii)  The Committee has not proffered any evidence that a 2004 pledge was not a valid lien ............................................34

III.  SG Suisse took the liens and the repayment of the loan in good faith and for reasonably equivalent value ..........................................................34

    A.  SG Suisse received the transfer in good faith ...........................................35

    B.  SG Suisse took both the lien and the loan repayment for reasonably equivalent value .......................................................................................36

        (i)  The Committee and the Receiver treat Stanford and the Stanford Entities that he owned as a single unit ...........................40

        (ii)  Genuine issues of material fact remain regarding whether and to what extent SFGL or the Estate benefited from the loan and repayment .......................................................46

CONCLUSION .............................................................................................................50

# TABLE OF AUTHORITIES

## CASES

*In re 1701 Commerce, LLC,*
    511 B.R. 812 (Bankr. N.D. Tex. 2014)............................................26

*In re 4100 West Grand LLC,*
    481 B.R. 444 (Bankr. N.D. Ill. 2012) ....................................38, 40

*American Pipe & Construction Co. v. Utah,*
    414 U.S. 538 (1974)..............................................................33

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..............................................................21

*Andrews v. CompUSA, Inc.,*
    Nos. CIV.A.3:00-CV-1368-D, CIV A.3:00-CV-1490-D, 2002 WL 265089 (N.D.
    Tex. Feb. 21, 2002), *aff'd,* 54 F. App'x 413 (2002) ..........................23

*Centeq Realty, Inc. v. Siegler,*
    899 S.W.2d 195 (Tex. 1995)....................................................42

*Dethrow v. Parkland Health Hospital System,*
    204 F.R.D. 102 (N.D. Tex. 2001) ..............................................30

*Doyle v. Kontemporary Builders, Inc.,*
    370 S.W.3d 448 (Tex. App. 2012)..............................................26

*In re Duque Rodriguez (Murphy v. Avianca, Inc.),*
    77 B.R. 937 (Bankr. S.D. Fla. 1987)............................................48

*Encompass Office Solutions, Inc. v. Connecticut General Life Insurance Co.,*
    No. 3:11-CV-02487-L, 2017 WL 3268034 (N.D. Tex. July 31, 2017).......................22, 24

*Equity Industrial Ltd. Partnership IV v. South Worldwide Logistics, LLC,*
    No. 14-14-00750-CV, 2016 WL 1267848 (Tex. App. Mar. 31, 2016) ..........................25

*In re Fairchild Aircraft Corp.,*
    6 F.3d 1119 (5th Cir. 1993) ....................................................47, 49

*Federal Land Bank Ass'n of South Alabama, FLCA v. Cornelius & Salhab, R.P.,*
    Civil Action No. H-09-3115, 2010 WL 3545406 (S.D. Tex. Sept. 9, 2010)..............42, 45

*First National Bank of Seminole v. Hooper,*
    104 S.W.3d 83 (Tex. 2003)......................................................34, 38

*Fontenot v. Upjohn Co.*,
    780 F.2d 1190 (5th Cir. 1986) ................................................................21, 34

*GE Capital Commercial, Inc. v. Worthington Nat'l Bank*,
    754 F.3d 297 (5th Cir. 2014) ........................................................................35

*Gillie v. First State Bank of Morton, Tex. (In re Gillie)*,
    96 B.R. 689 (Bankr. N.D. Tex. 1989) ...........................................................28

*Goodman v. H.I.G. Capital, LLC (In re Gulf Fleet Holdings, Inc.)*,
    491 B.R. 747 (Bankr. W.D. La. 2013) ...........................................................32

*Harris v. Rowe*,
    593 S.W.2d 303 (Tex. 1979) ..........................................................................27

*Hickman v. Sloan Fluid Accessories, Inc.*,
    833 F. Supp. 2d 822 (E.D. Tenn. 2011) .........................................................30

*In re IFS Financial Corp.*,
    417 B.R. 419 (S.D. Tex. 2009), *aff'd*, 669 F.3d 255 (5th Cir. 2012) ....................39, 47, 48

*In re International Loan Network, Inc.*,
    160 B.R. 1 (Bankr. D.C. 1993) ......................................................................38

*Janvey v. Alguire*,
    Nos. 3:09-CV-0724-N et al., 2013 WL 2451738 (N.D. Tex. Jan. 22, 2013), *aff'd
    sub nom. Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014) .........................................17, 41

*Janvey v. Alguire*,
    847 F.3d 231 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 329 (2017) ....................................41

*Janvey v. Brown*,
    767 F.3d 430 (5th Cir. 2014) ........................................................2, 38, 39, 40, 46

*Janvey v. Democratic Senatorial Campaign Committee, Inc.*,
    712 F.3d 185 (5th Cir. 2013) ........................................................35, 36, 37, 43

*Janvey v. Golf Channel, Inc.*,
    487 S.W.3d 560 (Tex. 2016)..........................................................21, 36, 39, 43

*In re Jeffrey Bigelow Design Group, Inc.*,
    956 F.2d 479 (4th Cir. 1992) ........................................................................49

*Lewis v. Southwest Airlines Co.*,
    No. 3:16-cv-1538-M, 2017 WL 879225 (N.D. Tex. Mar. 6, 2017)..................................30

*Liquidation Tr. v. Daimler AG (In re Old CarCo LLC)*,
    435 B.R. 169 (Bankr. S.D.N.Y. 2010) ...........................................................................32

*Maradiaga v. Intermodal Bridge Transport, Inc.*,
    899 F. Supp. 2d 551 (N.D. Tex. 2012) ..........................................................................24

*Mayo v. Pioneer Bank & Trust Co.*,
    270 F.2d 823 (5th Cir. 1959) ...................................................................................42, 46

*Mellon Bank, N.A. v. Metro Communications, Inc.*,
    945 F.2d 635 (3d Cir. 1991)...........................................................................................47

*Mullins v. TestAmerica, Inc.*,
    564 F.3d 386 (5th Cir. 2009) .........................................................................................25

*Nathan v. Whittington*,
    408 S.W.3d 870 (Tex. 2013)..........................................................................................31

*Orr v. Kinderhill Corp.*,
    991 F.2d 31 (2d Cir. 1993).............................................................................................32

*In re Pace (Osherow v. Nelson Hensley & Consolidated Fund Management, LLC)*,
    456 B.R. 253 (W.D. Tex. 2011)......................................................................................48

*In re Pembroke Development Corp.*,
    124 B.R. 398 (Bankr. S.D. Fla. 1991)............................................................................47

*Radio Networks, LLC v. Baisden Enterprises, Inc.*,
    No. 3:14-cv-1860-L, 2017 WL 2722565 (N.D. Tex. June 20, 2017), *appeal filed*,
    No. 18-10130 (5th Cir. Jan. 31, 2018) ...........................................................................26

*Smith v. American Founders Financial Corp.*,
    365 B.R. 647 (S.D. Tex. 2007) ......................................................................................46

*Swicegood v. Medical Protective Co.*,
    No. Civ.A.3:95-CV-0335-D, 2003 WL 22234928 (N.D. Tex. Sept. 19, 2003) ...............23

*Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*,
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) ...........................................................................32

*Winterthur International American Insurance Co. v. Bridgestone/Firestone, Inc.*,
    No. Civ.A. 3:01-CV-0059-, 2003 WL 21281736 (N.D. Tex. May 27, 2003) ..................30

## STATUTES

Tex. Bus. & Com. Code Ann. § 9.104 ............................................................................28

Tex. Bus. & Com. Code Ann. § 9.203 ......................................................................28

Tex. Bus. & Com. Code Ann. § 9.304(a) .................................................................27

Tex. Bus. & Com. Code Ann. § 9.308(c) .................................................................28

Tex. Bus. & Com. Code Ann. § 9.312 ......................................................................28

Tex. Bus. & Com. Code Ann. § 9.313 ......................................................................28

Tex. Bus. & Com. Code Ann. § 9.314 ......................................................................28

Tex. Bus. & Com. Code Ann. § 24.002(2)(A)...........................................25, 26, 29, 33

Tex. Bus. & Com. Code Ann. § 24.002(8) ...............................................................26

Tex. Bus. & Com. Code Ann. § 24.002(12) .............................................................31

Tex. Bus. & Com. Code Ann. § 24.002(13) .............................................................26

Tex. Bus. & Com. Code Ann. § 24.009(a) ...............................................34, 35, 37

Tex. Bus. & Com. Code Ann. § 24.010(a)(2)...........................................................31

## RULES

Fed. R. Civ. P. 56(a) ...............................................................................................21

Fed. R. Evid. 1006 ..................................................................................................24

N.D. Tex. Local R. 56.5(c) ......................................................................................23

N.D. Tex. Local R. 56.6(a) ......................................................................................23

## OTHER AUTHORITIES

Joint Pretrial Order, *Janvey v. GMAG LLC*,
　　Case No. 3:15-CV-0401-N-BQ (N.D. Tex. filed Jan. 4, 2017), Dkt. 225 ........39

Magness Parties' Brief in Support of Motion for Summary Judgment, *Janvey v. GMAG LLC*,
　　Case No. 3:15-cv-00401-N-BQ (N.D. Tex. filed Oct. 7, 2016), Dkt. 124 ........39

Order, *In re Stanford Int'l Bank, Ltd.*,
　　No. 3:09-CV-0721-N (N.D. Tex. July 30, 2012), Dkt. 176.......................17, 41

Order, *SEC v. Stanford Int'l Bank, Ltd*,
  Civil Action No. 3:09-cv-0298-N (N.D. Tex. May 4, 2012), Dkt. 1584 ....................14, 15

Receiver's Motion for Entry of an Order (I) Establishing Bar Date for Claims; (II)
  Approving Form and Manner of Notice Thereof; and (III) Approving Proof of
  Claim Form and Procedures for Submitting Proofs of Claim, *SEC v. Stanford Int'l
  Bank, Ltd*.,
  Case No. 3:09-cv-0298-N (N.D. Tex. Nov. 16, 2011), Dkt. 1473....................................14

Second Amended Order Appointing Receiver, *SEC v. Stanford Int'l Bank, Ltd.*,
  Civil Action No. 3:09-CV-298-N (N.D. Tex. July 19, 2010), Dkt. 1130........................44

Amended Order Appointing Receiver, *SEC v. Stanford Int'l Bank, Ltd.*, Case No.
  3:09CV00298-N (N.D. Tex. Mar. 12, 2009), Dkt. 157 ....................................................44

Order Appointing Receiver, *SEC v. Stanford Int'l Bank, Ltd*,
  Case No. 3:09CV0298-L (N.D. Tex. Feb. 17, 2009), Dkt. 10...........................................17

# ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| D. App'x | Appendix to Société Générale Private Banking (Suisse) S.A.'s Amended Supplemental Response to Intervenor-Plaintiff's Motion for Partial Summary Judgment |
| Compl. | The Official Stanford Investors Committee's Intervenor Complaint [Dkt. 130] |
| KVT Dep. | Transcript from the January 23, 2018 deposition of Karyl Van Tassel |
| Motion | The Official Stanford Investors Committee's Motion for Partial Summary Judgment and Brief in Support [Dkt. 359] |
| P. App'x | Appendix to The Official Stanford Investors Committee's Motion for Partial Summary Judgment [Dkt. 360] |
| Reply | Reply Brief in Further Support of The Official Stanford Investors Committee's Motion for Partial Summary Judgment [Dkt. 371] |

Pursuant to the Court's November 9, 2017 and March 8, 2018 orders [Dkts. 429 and 455], defendant Société Générale Private Banking (Suisse) S.A. ("SG Suisse"), subject to and without waiving its objections to the Court's exercise of jurisdiction over it, respectfully submits this amended supplemental response to The Official Stanford Investors Committee's (the "Committee's") Motion for Partial Summary Judgment (the "Motion") [Dkt. 358].[1]  This brief and the attached appendix supersede SG Suisse's Supplemental Response Brief in Support of its Response to Intervenor-Plaintiff's Motion for Partial Summary Judgment and supporting appendix [Dkts. 447-48] and SG Suisse's original Brief in Support of its Response to Intervenor-Plaintiff's Motion for Partial Summary Judgment and supporting appendix [Dkts. 367-68].

## INTRODUCTION

The documents finally produced in this matter and the testimony of the Committee's own expert establish precisely what SG Suisse anticipated in its original opposition.  In 2004, SG Suisse loaned $95 million of its own money to Robert Allen Stanford ("Stanford"), and simultaneously secured that loan with an equivalent perfected security interest created by two deeds of pledge in SG Suisse's favor on a bank account – the 108731 account – held by Stanford Financial Group Ltd. ("SFGL").  The 2004 pledges represented a perfect exchange of value for equal value – $95 million of SG Suisse's funds exchanged for an equivalent pledge of SFGL assets.  When SG Suisse followed the direction of its customer in 2008 and took repayment of the outstanding loan balance from the pledged account, it was not "enriched . . . to the tune of almost $100 million."  Motion at 2.  It was simply made whole.

---

[1]   Pursuant to Federal Rule of Civil Procedure 44.1, SG Suisse intends to rely on Swiss law in this Response.  SG Suisse has included the Declaration of Romain Jordan ("Jordan Decl.") at pp. 294-297 of its Appendix and the Declaration of Dr. Jean-Luc Chenaux ("Chenaux Decl.") at pp. 400-31 of its Appendix.

SG Suisse's secured loan transaction is similar to the purchase of CDs by investors.  In each transaction, the purchaser/lender gave a Stanford entity its own funds in exchange for a contractual promise that the funds would be repaid at a fixed maturity date.  With SG Suisse the promise took the form of the loan and pledge documents, and with the CD investors, it was a certificate of deposit.  The Fifth Circuit has held that the unsecured CD creditors who recovered their principal before the Stanford fraud was revealed are entitled to keep the principal they recouped.[2]  The Committee, however, contends that unlike those CD creditors, fully secured creditor SG Suisse must disgorge its recovered principal.  Disregarding the Committee's wholly unsupported accusations that SG Suisse and its senior executive Blaise Friedli were knowing, even "enthusiastic," participants in the Stanford scheme (Motion at 1), there is no distinction between the $95 million loan transaction and the CD transactions with respect to the recovery of principal.

The Committee has not met its burden of proof on its TUFTA claims.  In its Motion, the Committee seeks to avoid and recover "the Transfer," which it defines as (1) a purported <u>2007</u> pledge of the 108731 account, and (2) the 2008 repayment of the original loan through a debit to the 108731 account.  Motion at 1-2.  The Committee supports its Motion almost exclusively through the opinion of its expert, Karyl Van Tassel.  But the Committee fails to attach or identify any of the evidence that Ms. Van Tassel purportedly relied on in forming her opinions, denying SG Suisse and the Court the ability to test her unsupported assertions.  And when confronted in her deposition, Ms. Van Tassel admitted that she did not review or address key documents

---

[2]  *See Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014).

**SOCIÉTÉ GÉNÉRALE PRIVATE BANKING (SUISSE) S.A.'S**                                    **PAGE 2**
**AMENDED SUPPLEMENTAL RESPONSE BRIEF IN SUPPORT OF ITS**
**RESPONSE TO INTERVENOR-PLAINTIFF'S MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

relating to the 2004 loan, that she could not support her opinions regarding the source of funds in account 108731, and that she could not testify as to the ultimate disposition of the loan proceeds.

Moreover, the Committee does not and cannot proffer any evidence that the 2007 pledge on account 108731, which it seeks to avoid, supplanted the earlier-established 2004 pledges. Indeed, in its original reply brief in support of its Motion, the Committee denied the existence of any 2004 pledge. *See* Reply at 4, 13. The 2004 deeds of pledge and other recently produced documents remove any doubt that SG Suisse held a valid lien on account 108731 when it accepted repayment of the $95 million loan. Under either Swiss or Texas law, SG Suisse held a perfected security interest in the account as of October 2004 that was not extinguished until the secured loan was repaid in 2008.

Because the 108731 account was pledged in 2004, it follows that the 2008 loan repayment debit from the 108731 account was not a transfer that can be avoided. To the extent that they were pledged for the benefit of SG Suisse, the funds in the account used to repay the loan were not an "asset" of any Stanford Entity under the meaning of TUFTA, and therefore are not subject to avoidance. The Committee cannot evade this result by seeking to avoid the 2004 pledges. The Committee has never asserted a claim for avoidance of the 2004 pledges, and it is barred by the statute of repose from doing so now. Further, because under Swiss law the 2004 pledges on account 108731 took priority over the later 2007 pledge, it is irrelevant whether the Committee can avoid the 2007 pledge. The 2004 pledges – which cannot be challenged – granted SG Suisse a security interest on the funds used to repay the $95 million loan regardless of the validity of the 2007 pledge.

In addition, Ms. Van Tassel's testimony gives rise to genuine issues of material fact that preclude summary judgment for the Committee on SG Suisse's affirmative defense that it took the repayment of the loan in good faith and for reasonably equivalent value. Aside from lobbing naked accusations that SG Suisse and Mr. Friedli knowingly participated in the Ponzi scheme – unsupported allegations that cannot be credited in these summary judgment proceedings – the Committee offers no evidence to challenge SG Suisse's good faith. And Ms. Van Tassel's testimony, even if credited, establishes that SG Suisse gave value in exchange for the security interest and loan repayment. Ms. Van Tassel testified that as much as $47 million of the loan funds were used to purchase a Venezuelan bank that became part of the Receivership Estate, and that nearly all of the remainder was transferred to other Stanford Entities or to bank accounts that were ultimately seized by the Receiver. Having received the benefit of assets purchased with the proceeds of the 2004 loan, the Receivership Estate cannot contend it is entitled to avoid the pledge that secured that loan. To require SG Suisse to transfer another $95 million to the Receivership would unjustly provide the estate with a double recovery.

## RESPONSE AND COUNTER-STATEMENT OF UNDISPUTED FACTS

The Committee seeks in its Motion to "avoid and recover the Transfer." The Transfer is defined as "the $95,350,000 debit" from an SFGL account and the Pledge. Motion at 2. The Pledge is defined as a 2007 pledge of SFGL's assets to guarantee a $95 million loan extended by SG Suisse in 2004 – over three years earlier. *Id.* at 1-2. The Committee does not challenge the 2004 pledges of the 108731 account. Indeed, until Ms. Van Tassel's deposition, the Committee denied that a 2004 pledge even existed. *See* Reply at 4 (referring to "SG Suisse's baseless argument that the pledge in connection with the $95 million loan was made in 2004"); *id.* at 13

(contending that SG Suisse's argument "that the pledge in connection with the $95 million loan occurred in 2004" "is baseless speculation contrary to the declaration of Ms. Van Tassel").

The Committee has failed to put forth actual evidence to support its motion for partial summary judgment.  Instead of meeting its burden, the Committee resorts to claiming that SG Suisse "can present no evidence" to refute the unsupported conclusions in the Motion.  These include that (1) "SFGL was funded entirely by SIB CD proceeds stolen from innocent investors;" (2) that "in December 2007, SFGL pledged CD proceeds to guarantee a personal loan made years earlier by SG Suisse to Allen Stanford;" (3) that "SFGL transferred CD proceeds to SG Suisse totaling $95,350,000 on December 15, 2008;" (4) that the "Transfer from SFGL to SG Suisse was made solely to guarantee and repay a personal loan made by SG Suisse to Allen Stanford;" and (5) that "none of the personal loan proceeds were transferred by Allen Stanford to SFGL."  Motion at 8-9.  Setting aside the Committee's invalid attempt to shift the burden of proof, the Committee is factually incorrect.  Not only can SG Suisse refute each one of these conclusions, but the Committee has not, and could not, prove them in the first place.  The Committee's statement of "undisputed facts" contains multiple unsupported statements and conclusions, many of which are <u>contradicted</u> by the documents that accompany the Motion and the testimony of the Committee's expert.

**I.      In 2004, at the request of SFGL, SG Suisse disbursed $95 million of its own funds in exchange for a perfected security interest in the 108731 account.**

**A.      The Committee cherry-picks documents to support a false claim that the 108731 account was first pledged in 2007.**

The Committee elected to file its Motion in December 2015, before merits discovery commenced and when discovery was stayed.  Knowing that SG Suisse could neither obtain documents from the Committee nor produce documents in its defense without facing sanctions in

Switzerland, the Committee strategically attached just three documents to its Motion concerning the establishment of the 2004 loan: a September 10, 2004 letter from Stanford to Rene Picciotto of SG Suisse stating that he wanted to borrow $95 million "secured/guaranteed by a cash deposit/investment account of Stanford Financial Group in the amount of" $110 million; a September 24, 2009 SFGL board resolution authorizing Stanford to encumber and pledge SFGL assets in connection with the indebtedness of SFGL or Stanford personally; and a November 10, 2004 credit facility agreement. P. App'x 369, 371, 373-79.

The Committee also relied on a lone document, dated December 19, 2007, to support its claim that "three years after" the 2004 loan was issued, "SFGL pledged the assets in [account] 108731" as collateral for the loan. Motion at 7-8; P. App'x 381-82. But the Committee did not provide any evidence showing that account 108731 was unencumbered prior to December 2007. This is because it was not. The 2004 loan documents and surrounding correspondence, many of which were in the Committee's possession when it filed its Motion, all establish that SG Suisse received a pledge on SFGL's assets in 2004.

As further support for the purported 2007 timing of the pledge, the Committee's expert points to a single 108731 account statement from 2008 with the notation "PLEDGE FAV 3rd PARTY W/O MATURITY," and contends that this demonstrates that the 2007 pledge document created the lien on the 108731 account. Declaration of Karyl Van Tassel ("KVT Decl.") ¶ 33-34, P. App'x 18; D. App'x 38-39 (KVT Dep. 129:21-131:6). Documents produced by the Committee, however, establish that this notation appears on 108731 account statements issued well <u>before</u> the December 2007 pledge document. *See, e.g.*, D. App'x 72 (Ex. D, Mar. 14, 2005), 114 (Ex. M, Feb. 26, 2005), 128 (Ex. N, Mar. 21, 2006).

**B.     Discovery documents contradict the Committee's purportedly undisputed facts about the creation of the loan and the pledge.**

In the prior briefing on its Motion, the Committee told this Court that SG Suisse's claim that the 108731 account was pledged in 2004 – and not in 2007 – was "baseless speculation contrary to the declaration of Ms. Van Tassel."  Reply at 13.  Discovery since produced by the Committee and SG Suisse confirms that SG Suisse was correct.  Several documents establish that two 2004 pledges were created contemporaneously with the $95 million loan:

- An October 11, 2004 Credit Facility Agreement between Stanford and SG Suisse, which contemplated a $95 million loan to be used primarily for the purchase of Banco Galicia and related investments in Venezuela.  D. App'x 350-55 (Ex. GG).

- A "credit authorisation" executed on October 11, 2004, in which SFGL authorized "an advance on current account or a lombard credit"[3] backed by a pledge on SFGL account 108731.  D. App'x 103 (Ex. L).  The "credit authorisation" states that the account holder or Client "acknowledges and accepts . . . that his/their assets are pledged to cover the credit in accordance with the duly signed General Deed of Pledge."  *Id.*

- A Deed of Pledge and Declaration of Assignment, executed on October 11, 2004, for account 108731.  D. App'x 95-96 (Ex. I).  Ms. Van Tassel testified that she had not seen either the October 11 "credit authorisation" or this October 11 deed of pledge at the time she drafted her declaration.  D. App'x 38, 43, 57 (KVT Dep. 128:20-129:10, 147:8-148:11, 204:17-24).

---

[3]     A "Lombard Credit" is by definition a line of credit guaranteed by a pledge of securities or other collateral placed in the possession of the creditor and thus easy to realize.  Jordan Decl. ¶ 1, D. App'x 295; *see also* Chenaux Decl. ¶ 28, D. App'x 408-09.  By definition, a Lombard Credit is thus secured at the time of inception. Ms. Van Tassel testified that she did not know what a Lombard Credit was.  D. App'x 43 (KVT Dep. 148:12-15).

- A second Deed of Pledge and Declaration of Assignment, executed on October 11, 2004, for account 108731. D. App'x 357-58 (Ex. HH). This document pledged account 108731 account in favor of SG Suisse for any claims against "214,8600 R. ALLEN STANFORD / FOR MAXIMUM AMOUNT OF USD 110,000,000 ONE HUNDRED TEN MILLION USD." *Id.* Per Ms. Van Tassel, account 2148600 was Stanford's personal account into which the $95 million loan proceeds were deposited. KVT Decl. ¶ 32, P. App'x 18.; *see also id*. ¶ 33 (describing account 2148600 as the $95 million "loan facility").

- An October 4, 2004 letter to Blaise Friedli at SG Suisse, in which Stanford states that he is enclosing the following documents that were "needed to finalize [his] personal credit line:" (1) a legal opinion; (2) a September 29, 2004 board resolution of the Stanford Financial Group;[4] (3) audited financials for SFGL as of December 31, 2003; (4) certificates of incorporation and good standing, articles of incorporation, bylaws, and a certificate of amalgamation for SFGL; and (5) a copy of Stanford's United States, Antigua, and Barbuda passports. D. App'x 101 (Ex. K). The October 4 letter also states that a statement of Stanford's personal assets and liabilities would be sent under separate cover[5] and that the line of credit would "be utilized primarily for the acquisition of Banco Galicia, and a further investment in the Bank's operations in . . . Venezuela." *Id.* Finally, the October 4 letter states that Stanford will complete the account opening forms "in person at SGPB Geneva on Monday, October 11, 2004." *Id.* Ms. Van Tassel admits she

---

[4]  Ms. Van Tassel testified that the referenced board resolution could be the same board resolution she cited in her declaration. D. App'x 42 (KVT Dep. 143:18-144:4), 101 (Ex. K).

[5]  By letter dated October 5, 2004, Harry Failing sent Friedli a statement of Stanford's assets and liabilities as of June 30, 2004, as anticipated in the October 4 letter. D. App'x 344-48 (Ex. FF). The statement revealed that Stanford held $705,740,000 in total assets, primarily investments in various Stanford companies, and $1,515,000 in liabilities. *Id.* at 347. Stanford's investment in SFGL was valued at $55,000,000. *Id.*

saw this document before she drafted her declaration, but decided not to disclose it. D. App'x 42 (KVT Dep. 142:5-143:3).

- An undated document titled "Opinion of Counsel to Stanford Financial Group Limited: Credit Facility Agreement," in which attorney Kenneth C. Allen opines that a deed of pledge executed in connection with a $95 million loan was duly executed and delivered in accordance with an SFGL board resolution dated September 29, 2004. D. App'x 98-99 (Ex. J). Mr. Allen further opines that "[a]ll actions of any kind . . . required for the validity or enforceability against [SFGL] of the Deed of Pledge and Declaration of Assignment have been obtained or performed and are valid and subsisting in full force and effect." D. App'x 98 (Ex. J). Ms. Van Tassel admits that she did not see this document before she drafted her declaration, but became aware of it afterwards. D. App'x 40-41 (KVT Dep. 134:24-135:12, 141:13-23).

- An October 14, 2004 letter from Stanford to Joseph Toson at SG Suisse, confirming that "the assets held in the name of Stanford Financial Group Limited are solely owned by the Company and are free of any liability or encumbrances to any third party whatsoever." D. App'x 360 (Ex. II). The letter continued: "A Board Resolution dated September 29, 2004, duly signed and delivered to SG Private Bank (Suisse) S.A., authorizes R. Allen Stanford to pledge these assets." *Id.*

- A Promissory Note executed on November 15, 2004, in which Stanford "unconditionally promise[d] to pay at sight against this promissory note the sum of ninety five million Dollars . . . to the order of [SG Suisse]." D. App'x 362 (Ex. JJ).

- Account statements for the 108731 account that predate the purported 2007 pledge document and state, under the heading "Warranties & Pledge," "PLEDGE FAV 3rd PARTY W/O MATURITY." D. App'x 39, 45, 46 (KVT Dep. 131:7-132:9, 156:14-25, 158:8-15), 72 (Ex. D), 114 (Ex. M), 128 (Ex. N). Ms. Van Tassel relies on this exact language on an account document dated after the 2007 purported pledge document as evidence of the existence of a pledge. KVT Decl. ¶ 34, P. App'x 18, 387. Despite her prior declaration, when she was confronted with these account statements, Ms. Van Tassel refused to say "one way or the other" that the reference to the pledge on the pre-2008 statements referred to the security interest established in 2004 at the time the $95 million loan issued. D. App'x 39-40, 45-46 (KVT Dep. at 131:22-134:5, 156:14-25, 158:8-15). She was, however, not aware of any other loan to which the pre-2008 pledge notation could refer. D. App'x 39-40 (KVT Dep at 132:20-134:5).

Ms. Van Tassel agreed – as she must – that the following are all related to one another: the October 11, 2004 "credit authorisation;" the October 11, 2004 deed of pledge; the October 11, 2004 credit facility agreement; the September 29, 2004 board resolution; and the October 4, 2004 letter from Stanford. D. App'x 43-44 (KVT Dep. 147:8-153:22). In fact, taken together with the second deed of pledge signed on October 11, 2004 and the subsequent November 10, 2004 credit facility agreement,[6] the documents establish that the loan and the associated pledges of the 108731 account were finalized no later than November 10, 2004.

---

[6] The November 10, 2004 credit facility agreement indicates that it supersedes a credit facility agreement and a promissory note also dated October 11, 2004. Notably, however, the November credit facility did not cancel or supersede the deed of pledge or "credit authorisation" also signed by Stanford on October 11, 2004. *See* P. App'x 379; D. App'x 44-45 (KVT Dep. 153:9-154:3).

**C.    The purpose of the $95 million loan was the purchase and funding of a Venezuelan Bank.**

Both the original October 11, 2004 Credit Facility Agreement and the November 10, 2004 Credit Facility Agreement state that the purpose of the loan was the "acquisition of 100% of the capital of Banco Galicia (a Venezuelan bank), increase of its capital and acquisition of a building for Banco Galicia's head office, and in a general way, investments in Banco Galicia's operations in its country of domicile, Venezuela and in other corporate investments." P. App'x 376; D. App'x 350 (Ex. GG). The October 4, 2004 letter from Stanford to SG Suisse likewise states that the line of credit was "to be utilized primarily for the acquisition of Banco Galicia, and a further investment in the Bank's operations in . . . Venezuela." D. App'x 101 (Ex. K).

**D.    The 2007 deed of pledge did not cancel or supersede the 2004 deeds of pledge.**

The 2007 deed of pledge on which the Committee erroneously bases its claim is nearly identical to the 2004 deed of pledge granting SG Suisse a lien on account 108731 to secure obligations of Stanford and account 2148600. Documents produced by SG Suisse show that the 2007 deed of pledge was executed contemporaneously with an amendment to the 2004 loan agreement that increased the amount of Stanford's credit line. However, nothing in the 2007 deed of pledge provides that it supplants or cancels the 2004 deeds of pledge.

On December 4, 2007, Stanford executed "Amendment no 1" to the November 10, 2004 Credit Facility Agreement. D. App'x 364 (Ex. KK). The amendment extended the final maturity of the loan to "[a]t least February 21st, 2008" and amended other terms relating to the utilization, interest rate, and interest payment dates. *Id.* All other terms and conditions of the agreement were expressly left unchanged. *Id.*

On December 19, 2007, Stanford executed "Amendment no 2" to the November 10, 2004 Credit Facility Agreement.  D. App'x 366 (Ex. LL).  This amendment increased the credit line by $10 million, to a total of $105 million, and extended the final maturity of the loan to November 21, 2008.  *Id*.  It also updated terms relating to the utilization, interest rate, and interest payment dates.  *Id.*  All other terms and conditions of the agreement were expressly left unchanged.  *Id.*

Also on December 19, 2007, Stanford executed (1) a Promissory Note and (2) a Deed of Pledge and Declaration of Assignment, both in favor of SG Suisse.  The Promissory Note states that Stanford "unconditionally promise[s] to pay at sight against this promissory note the sum of one hundred and five million Dollars . . . to the order of [SG Suisse]."  D. App'x 368 (Ex. MM).  The Deed of Pledge and Declaration of Assignment pledges SFGL account 108731 as collateral for any "present and future claims that the bank may have against Robert Allen Stanford – Account NR 2'148'600."  P. App'x 381.

Whereas one of the 2004 pledges secured the assets in the 108731 account for SG Suisse's benefit for any claims up to $110,000,000 against Stanford and account 2148600, the December 19, 2007 deed of pledge eliminates the $110,000,000 limit.  D. App'x 357 (Ex. HH); P. App'x 381-82.  This expansion of SG Suisse's lien on account 108731 was executed simultaneously with the $10,000,000 increase to Stanford's credit line under "Amendment no 2" to the November 10, 2004 Credit Facility Agreement.  P. App'x 381-82; D. App'x 366 (Ex. LL).  Nothing in the 2007 deed of pledge expressly or implicitly provides that it cancels or supersedes the 2004 pledge, and it did not have such effect as a matter of fact and law.

    **E.**    **The Committee and its expert have made no attempt to trace the loan proceeds or to value assets acquired for the Stanford Entities with those assets.**

Separately and apart from the Committee's attempt to misdirect the Court by obfuscating the 2004 pledge, the Committee also fails to inform the Court of evidence of how the loan proceeds were used.  In fact, no evidence regarding where the loan proceeds were deposited, transferred, or spent was attached to the Motion or Ms. Van Tassel's declaration.  D. App'x 48 (KVT Dep. at 167:17-168:12).  But Ms. Van Tassel's testimony itself establishes that, at a minimum, material questions of fact exist regarding the benefits received by SFGL and the Receivership Estate from the $95 million loan.[7]  Ms. Van Tassel testified that between $44 and $47 million of the loan funds were used to purchase Banco Galicia, the bank in Venezuela.  D. App'x 34, 49 (KVT Dep. 110:22-111:23, 170:1-171:17).

Like SIB and SFGL, both Banco Galicia and its holding company were Stanford Entities and became part of the Receivership Estate.  D. App'x 35-36 (KVT Dep. 117:17-118:2).  The bank, which was renamed Stanford Bank Venezuela, or Stanford Bank S.A., Banco Comercial,[8]

---

[7]    Bank statements for account 2148600, which demonstrate substantial movement of funds into and out of the account, compound the open fact issues regarding the tracing of the loan proceeds.  For example, in 2007 alone, bank statements show that Stanford transferred at least $5,477,481 into the account from sources that are not on their face attributable to the $95 million loan.  D. App'x 370-80 (Ex. NN).  Substantial interest payments from fiduciary deposits were also credited to the account.  A few examples of these interest payments, totaling over $360,000, are attached as Exhibit OO.  D. App'x 382-88.  In addition to Stanford's deposits and interest payments, the account also held securities.  D. App'x 390 (Ex. PP).

[8]    *See* Fabiola Sanchez, *Venezuelan authorities begin process to sell off Stanford Bank SA*, Associated Press, March 9, 2009, D. App'x 263 (Ex. W); *Stanford Bank sold in auction*, ABC13, May 8, 2009, D. App'x 267 (Ex. X); Bloomberg News, *Venezuela takes control of Stanford bank there*, Houston Chronicle, February 19, 2009, D. App'x 397 (Ex. RR); D. App'x 34 (KVT Dep. 111:20-112:5); Hartman Decl. ¶ 27 n. 53, D. App'x 283.

is listed in court documents as a Receivership Entity, and the Receiver was empowered to seize its assets for the benefit of creditors.[9]

Ms. Van Tassel made no attempt to determine the value of the bank, either as of the date it was purchased by a Stanford Entity[10] with the loan proceeds or as of the date the Receivership was established.  D. App'x 34 (KVT Dep. 112:23-113:15).  News stories from around the time the Receivership was established suggest that the bank was worth more than the $44 to $47 million that Stanford allegedly invested in it.  A February 2009 Reuters article stated that Stanford Bank Venezuela had $288 million in assets when it was seized by the Venezuelan government in 2009.  *See* Ana Isabel Martinez, *Venezuela seizes Stanford bank after online run*, Reuters, Feb. 19, 2009, D. App'x 259 (Ex. V).  The Venezuelan government reportedly seized the bank after creditors withdrew an estimated $93 million, over a third of the bank's customer deposits, in a run on the bank after Stanford's fraud was revealed.  *See* D. App'x 264 (Ex. W).  And the bank was reportedly later sold at auction for approximately $111.6 million.  *See* D. App'x 267 (Ex. X); *see also* Jeremy Morgan, *Venezuela Offshoot of Crashed Stanford Bank Sold to BNC*, Latin American Herald Tribune, D. App'x 270-71 (Ex. Y).

In addition to the funds invested in the Venezuelan bank, Ms. Van Tassel claims to have determined – again from a review of unspecified banking records that were not attached to her

---

[9]   *See, e.g.*, Order at 55, *SEC v. Stanford Int'l Bank, Ltd*, Civil Action No. 3:09-cv-0298-N (N.D. Tex. May 4, 2012), Dkt. 1584, D. App'x 254 (Ex. U); Receiver's Motion for Entry of an Order (I) Establishing Bar Date for Claims; (II) Approving Form and Manner of Notice Thereof; and (III) Approving Proof of Claim Form and Procedures for Submitting Proofs of Claim at 1-2, *SEC v. Stanford Int'l Bank, Ltd*, Case No. 3:09-cv-0298-N (N.D. Tex. Nov. 16, 2011), Dkt. 1473, D. App'x 182-83 (Ex. T).

[10]   Ms. Van Tassel defined "Stanford Entities" as "all entities owned or controlled by R. Allen Stanford, James M. Davis, Laura Pendergest-Holt, Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, and the other defendants in the case styled *Securities & Exchange Commission v. Stanford International Bank, Ltd., et al*., Case No. 3:09-CV-0298-N," over which the Court appointed Ralph S. Janvey as Receiver.  KVT Decl. ¶ 3, P. App'x 4-5.

---

declaration or the Motion – that a total of $23 million of the loan funds were sent to three accounts held in Stanford's name.  D. App'x 49-50 (KVT Dep. 173:23-174:25).   Another $12 million was purportedly transferred to an account held by Stanford Bank Panama, another Stanford Entity included in the Receivership Estate.  D. App'x 50 (KVT Dep. 176:12-177:16). An additional $10 million purportedly went to Stanford Group Holdings, and then to Stanford Group Company.  D. App'x 50-51 (KVT Dep. 177:19-178:8).  Ms. Van Tassel could not trace the remaining $3 million of the loan funds.  D. App'x 51 (KVT Dep. 178:11-13).

Crediting Ms. Van Tassel's testimony, all of the loan proceeds that she purportedly traced were transferred into accounts or entities that were included in the Receivership Estate, which the Receiver was empowered to recover against for the benefit of CD investors.  Declaration of Susan Hartman ("Hartman Decl.") ¶¶ 27-28, D. App'x 282-85.  Additionally, bank statements show that, in 2005, over $30 million was transferred out of the 2148600 account directly to Stanford Corporate Services in Venezuela, Stanford Corporate Services (BVI), and Stanford Financial Group Co.  D. App'x 392-95 (Ex. QQ).  All of these entities are included in the Receivership Estate.  Order, D. App'x 254 (Ex. U).  The Committee has not put forth any evidence that any of the loan funds left these entities before the Receiver was appointed.  Ms. Van Tassel herself could not say whether the original loan funds were actually already recovered by the Receiver.  D. App'x 50-51 (KVT Dep. 174:3-178:13).

**F.      When SG Suisse carried out its customer's directive to execute on the pledged account and repay the outstanding loan, SFGL's debt of $95 million was extinguished.**

On December 15, 2008, Stanford drafted a letter to Mr. Friedli requesting that SG Suisse debit account 108731 for USD $95,350,000 "to liquidate the balance due on my loan," an act authorized in 2004 by operation of the deeds of pledge.  P. App'x 389; Chenaux Decl. ¶¶ 107-

120, D. App'x 428-31. A "debit advice" for account 108731 dated December 16, 2008 shows a debit in that amount. P. App'x 391. The repayment of the loan extinguished the lien on account 108731. An SFGL statement for account 108731 shows a "credit" of $95,800,000[11] on the account as of December 16, 2008 for "repayment" of a "PLEDGE FAV. 3RD PARTY." D. App'x 145 (Ex. P). The "PLEDGE FAV. 3RD PARTY W/O MATURITY" notation no longer appears on a weekly account statement for account 108731 after Stanford's December 15 request to repay the loan. *Compare* D. App'x 151 (Ex. Q) (account statement for 108731 dated December 15, 2008 includes an entry for the pledge), *with* D. App'x 159-68 (Ex. R) (account statement for 108731 dated December 22, 2008 does not include an entry for the pledge).

## II. The assets of both the Stanford Entities and Stanford are part of the Receivership Estate.

As the Committee admits, Stanford "was sole owner, directly or indirectly, of more than 130 separate entities, including SIB and SFGL." KVT Decl. ¶ 7, P. App'x 7. Ms. Van Tassel testified that Stanford owned SIB, SFGL, and Stanford Bank Venezuela. *Id.* ¶ 9, P. App'x 8-9; D. App'x 35 (KVT Dep. 117:3-16). SFGL was a Stanford Entity that allegedly provided management support services to other Stanford Entities, including accounting, IT, legal, marketing, and other administrative services. KVT Decl. ¶ 9, P. App'x 9. Although she testified that solvency must be determined on an entity-by-entity basis when analyzing a specific transfer, Ms. Van Tassel did not analyze whether SFGL was solvent at any point, and the Committee has not provided any evidence of SFGL's insolvency. D. App'x 52 (KVT Dep. 184:21-185:8).

---

[11]  The Committee does not address the discrepancy between the loan repayment amount and the amount of the pledge.

Ms. Van Tassel further testified that the Stanford Entities "were collectively operated as a Ponzi scheme since at least 1999." KVT Decl. ¶ 6, P. App'x 7; *see also, e.g.*, *Janvey v. Alguire*, Civil Action Nos. 3:09-CV-0724-N et al., 2013 WL 2451738, at *7 (N.D. Tex. Jan. 22, 2013), *aff'd sub nom. Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014).   The Court has concluded that the "commingling of funds among the Stanford Entities was the norm," and that "Stanford and his associates transferred assets among the Stanford Entities in disregard of corporate formalities." Order at 34-35, *In re Stanford Int'l Bank, Ltd.*, No. 3:09-CV-0721-N (N.D. Tex. July 30, 2012), Dkt. 176.   Ms. Van Tassel likewise testified that funds were transferred throughout the Stanford enterprise, including from SIB to SFGL, "with no regard for corporate separateness." P. App'x 206; D. App'x 52 (KVT Dep. 182:10-23).

On February 17, 2009, the Court established the Stanford Receivership Estate and empowered the Receiver to take control of all assets owned or controlled by the Receivership Estate, and those traceable to such assets.   *See* Order Appointing Receiver ¶ 5, *SEC v. Stanford Int'l Bank, Ltd.*, Case No. 3:09CV0298-L (N.D. Tex. Feb. 17, 2009), Dkt. 10, D. App'x 172 (Ex. S).   The Receivership Estate is comprised in part of Receivership Assets, defined as "assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities), of the Defendants and all entities they own or control . . . ."   *Id.* ¶ 1, D. App'x 170.   The "Defendants" include, among others, Stanford, SIB, and Stanford Group Company.   *Id.* at 1, D. App'x 170.   The assets held in Stanford's personal name and the assets of over 130 entities he owned or controlled are included in the Receivership Estate.   *See id.*; D. App'x 22 (KVT Dep. 65:11-14).

III.    **The Committee does not establish the source and use of the funds in the 108731 account.**

The Committee asserts in its Motion that SG Suisse "can present no evidence to refute" that "SFGL was funded entirely by SIB CD proceeds." Motion at 8. But the Committee's own evidence refutes that claim. The Committee has produced documents showing that SFGL maintained account 108731 with SG Suisse. *See, e.g.*, P. App'x 367, 384-85, 391. The Committee's claim that <u>all</u> of the money transferred or deposited into account 108731 between 2000 and 2008 came from the sale of SIB CDs to investors is based solely on Ms. Van Tassel's declaration. She states that "[f]rom an analysis of SIB's and SFGL's cash flows, we have determined that" approximately $262 million in funds were transferred into the 108731 account. KVT Decl. ¶ 27, P. App'x 16. This $262 million is reflected in a chart purporting to show twenty-five transfers between 2000 and 2008 totaling $262 million. *Id*. But neither the Committee nor Ms. Van Tassel has identified any documents – account statements, emails, or any other evidence – supporting her conclusions about these transfers. In short, neither the Committee nor Ms. Van Tassel has provided evidentiary support, and nothing in the Motion papers allows SG Suisse or its expert to recreate Ms. Van Tassel's analysis or test her conclusions regarding the source and amount of funds purportedly transferred into account 108731. Hartman Decl. ¶¶ 13-17, D. App'x 278-80.

The reason for the absence of supporting evidence was evident at Ms. Van Tassel's deposition. She conceded that, contrary to her claim at paragraph 27 of her declaration, she did not actually trace all of the funds reflected in the chart in her declaration. Instead, for the period between June 2000 to May 2002 – encompassing 12 of the 25 transfers on her chart – Ms. Van Tassel simply copied information about those transfers from an unspecified

demonstrative exhibit used by the government at Stanford's criminal trial.  D. App'x 15-16 (KVT Dep. 34:2-36:4, 38:4-21).  That purported government exhibit was not identified in or attached to the Motion or Ms. Van Tassel's declaration, nor was it produced in discovery.  Furthermore, Ms. Van Tassel testified that she does not have and has not seen any of the documents that the government used to create the demonstrative exhibit.  D. App'x 14-15, 17 (KVT Dep. 30:6-19, 36:5-23, 42:4-14).

For the period July 2003 through September 2008, which encompasses the remaining 13 transfers on her chart, Ms. Van Tassel relied on the same government exhibit, purportedly corroborated by a "smattering" of unidentified bank statements from account 108731, some unidentified emails, and unidentified banking data obtained from Toronto-Dominion Bank. D. App'x 16-17 (KVT Dep. 39:20-45:11).  None of this evidence was attached to or identified in Ms. Van Tassel's declaration or the Motion.

Ms. Van Tassel also testified that, "to [her] knowledge," the transfers identified on her chart were the <u>only</u> transfers into account 108731 during the stated period.  D. App'x 15 (KVT Dep. 36:5-17).  But the Committee's own documents show that there were deposits into account 108731 that Ms. Van Tassel omitted.  For example, a 2005 statement reflects a deposit of $60 million that did not come from a SIB account and is not in Ms. Van Tassel's declaration. D. App'x 61 (Ex. C).  Ms. Van Tassel admits she did not consider this substantial deposit and she could not explain it.  D. App'x 23-24 (KVT Dep. 69:1-71:13).  The few bank statements that the Committee produced for account 108731 demonstrate that it was more than just a cash deposit account; it also held bonds, equities, and other profit-earning investments.  D. App'x 27, 45-46 (KVT Dep. 83:5-22, 155:15-156:8, 158:17-159:17), 105 (Ex. M), 132 (Ex. O), 338 (Ex. CC).

These account statements reflect that substantial profits from investments managed by SG Suisse were deposited into the account. Ms. Van Tassel included none of these deposits and interest payments in her chart. D. App'x 45-46 (KVT Dep. 155:2-156:8, 158:17-159:17), 105 (Ex. M), 132 (Ex. O), 338 (Ex. CC).

Ms. Van Tassel admitted that the $60 million deposit and investment return deposits were not comprised of CD proceeds. D. App'x 24 (KVT Dep. 70:4-10). She also acknowledged that she did not know how much interest was earned on the 108731 account from 2000 to 2008. D. App'x 26-27 (KVT Dep. 81:9-83:6). Ms. Van Tassel also could not rule out the possibility that funds transferred from the Toronto-Dominion Bank account – which she opined in her declaration consisted exclusively of CD investor funds – might include interest earned on deposits in that account. D. App'x 21 (KVT Dep. 58:17-25).

Ms. Van Tassel also made no effort to trace funds transferred <u>out</u> of the account. D. App'x 27-28 (KVT Dep. 84:2-85:17; 88:19-24). Banking records in the Committee's possession show that, in 2007 and 2008 alone, at least $69,000,000 was transferred out of account 108731 into other Stanford Entity accounts, including accounts held by SFGL and SIB. D. App'x 29-31, 46-47 (KVT Dep. 90:8-91:6, 93:20-94:3, 97:17-98:1; 160:13-165:18), 76 (Ex. E), 78 (Ex. F), 80 (Ex. G), 82-93 (Ex. H), 340 (Ex. DD). To the extent that 108731 received any of the purported CD investor funds reflected on Ms. Van Tassel's chart, she did not determine how much remained in the account as of December 2008. Finally, Ms. Van Tassel admitted that she does not know the balance in the 108731 account in June 2000 (before the first transfer on her chart) or at any other date. D. App'x 15-16 (KVT Dep. 37:21-38:21).

This evidence falls far short of the kind of reliable evidence needed for Ms. Van Tassel to have a reasonable basis for her conclusions about the source or use of funds in the 108731 account.   Hartman Decl. ¶¶ 12-18, D. App'x 278-80 (citing the AICPA Code of Professional Conduct).

## STANDARD OF REVIEW

As the party moving for summary judgment, the Committee bears the burden to show that "there is no genuine dispute as to any material fact and [that it is] entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Where the movant bears the burden of proof on an issue, "he must establish beyond peradventure *all* of the essential elements of the claim . . . to warrant judgment in his favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  If the movant seeks summary judgment on the non-movant's affirmative defense, which the Committee has here, the movant must "disprove[] the existence of any essential element of the . . . affirmative defense." *Id.*  The trial court must resolve all reasonable doubts and draw all reasonable inferences in favor of the party opposing the motion for summary judgment.  *See Anderson*, 477 U.S. at 255.  The Committee has not carried and cannot carry its burden.

## ARGUMENT

In its Motion, the Committee spends a scant two paragraphs on establishing the elements of its TUFTA claims, mistakenly assuming that the fact that the Stanford Entities were part of a Ponzi scheme is dispositive.  Motion at 12.  But as resolved by the Texas Supreme Court after the Committee filed its Motion, even a Ponzi scheme can engage in transfers not subject to avoidance under TUFTA.  *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 581 (Tex. 2016).

More important, invoking the label "Ponzi scheme" does not relieve the Committee of its burden of proof as to each element of its TUFTA claim and SG Suisse's affirmative defenses. The Committee does not approach, much less meet, its burden.

## I.    Documents not included in the Committee's Appendix to its Motion are not part of the summary judgment record and must be disregarded.

To support its purported "undisputed facts," the Committee relies almost exclusively on the declaration of Ms. Van Tassel. But neither the Committee nor Ms. Van Tassel identifies the vast majority of the documents that she reviewed and relied on in forming her opinions. Ms. Van Tassel, in turn, purports to base her conclusions on exhibits to her prior declarations in other Stanford cases, but does not attach any of those exhibits. Instead, she directs SG Suisse and the Court to hunt for them in the tens of thousands of pages of filings on PACER. KVT Decl. ¶ 5, P. App'x 6. Nor does Ms. Van Tassel identify which exhibits to which declarations she relies on for any particular conclusion or statement. Further, other than the handful of documents attached to her declaration, Ms. Van Tassel admitted that she did not include or identify the evidence that she relied on and reviewed. *See, e.g.*, D. App'x 13-14, 17 (KVT Dep. 29:18-30:24, 32:4-16, 43:5-13). Instead, she testified that "there were lots of documents" available to her and that she considered in connection with her declaration, but that she could not identify them. *Id.*; D. App'x 42 (KVT Dep. 142:25-143:3). This is inconsistent with professional standards, *see* Hartman Decl. ¶¶ 14-18, D. App'x 278-80, and legally improper. *Cf. Encompass Office Sols., Inc. v. Conn. Gen. Life Ins. Co.*, Civil Action No. 3:11-CV-02487-L, 2017 WL 3268034, at *9 n.4 (N.D. Tex. July 31, 2017). Perhaps more disconcerting, the Committee did not respond to SG Suisse's specific request for those documents after learning of the prejudicial impropriety. Reed Decl. ¶ 7, D. App'x 301. The refusal to identify the documents

prevented SG Suisse from reviewing or testing Ms. Van Tassel's unsupported opinions.   D. App'x 24 (KVT Dep. 72:23-73:3); Hartman Decl. ¶ 18, D. App'x 280.

The Committee also cannot use an expert to circumvent its obligation to support its Motion with record evidence.  A party that seeks to support a motion for summary judgment with materials "must include the materials in an appendix," N. D. Tex. Local Rule 56.6(a), and "must support each assertion by citing each relevant page of its own or the opposing party's appendix," *id.* 56.5(c).  The Court need only "take into account evidence that the party has cited in the manner required—that is, to each page of the appendix that supports each assertion that the party makes concerning the summary judgment evidence."  *Andrews v. CompUSA, Inc.*, Nos. CIV.A.3:00-CV-1368-D,  CIV  A.3:00-CV-1490-D,  2002  WL  265089,  at  *3  (N.D.  Tex. Feb. 21, 2002), *aff'd*, 54 F. App'x 413 (5th Cir. 2002); *see also Swicegood v. Med. Protective Co.*, No. Civ.A.3:95-CV-0335-D, 2003 WL 22234928, at *3 n.7 (N.D. Tex. Sept. 19, 2003) (noting that incorporating by reference previously filed evidence does not comport with local rules because it does not include "'citations to each page of the appendix that supports each assertion that the party makes'" (citation omitted)).  For this reason alone, the Motion should be denied as the Committee has not only failed to meet its burden but also failed to allow SG Suisse and the Court to meaningfully consider the evidence in purported support of the motion.

The refusal to identify the documents underlying Ms. Van Tassel's assertions unsuccessfully camouflages the infirmities of her analysis.  Ms. Van Tassel's testimony reveals that she draws conclusions based upon insufficient and unreliable evidence that an expert in her field would not rely on, and applies inconsistent methodologies.  Hartman Decl. ¶¶ 13-24, D. App'x 278-281.  For instance, in her "analysis" of the source of the funds in account 108731,

Ms. Van Tassel relies solely on information that she gleaned from a government demonstrative exhibit that was not produced, and which she had no role in preparing and could not authenticate. *Id*. ¶ 18; D. App'x 280. Nor does she know what documents were used by the government to prepare the demonstrative exhibit. *Id*. Ms. Van Tassel's summary chart and accompanying opinions at paragraphs 27 and 28 of her declaration should thus be excluded under Federal Rule of Evidence 1006.[12] Fed. R. Evid. 1006 ("The proponent must make the originals or duplicates available for examination or copying, or both . . . ."). Rule 1006 requires that "(1) [summary] charts [be] based on competent evidence . . . ; (2) the primary evidence used to construct the charts [be] available to the other side for comparison in order that the correctness of the summary may be tested; [and] (3) the person who prepared the charts [be] available for cross-examination . . . ." *Encompass Office Sols., Inc.*, 2017 WL 3268034, at *9 n.4 (third alteration in original) (citation omitted). If underlying documents purportedly used in the preparation of summary evidence are not made available to the opponent and the Court, the summary evidence is not competent and must be excluded. *Id.* (excluding summary evidence where the underlying documents used to create the summary were not produced, as "there is no indication that the [summary evidence] is based on competent evidence, and the court has no way of evaluating the correctness of the summary, as it is unclear what information was used to prepare the summary and whether such information was produced during discovery or made available to [the opponent]").

---

[12]   "While Rule 1006 generally applies to the submission of evidence at trial . . . , it has been applied in the summary judgment context." *Maradiaga v. Intermodal Bridge Transp., Inc.*, 899 F. Supp. 2d 551, 570 (N.D. Tex. 2012) (excluding summary judgment evidence where "the court was unable to confirm, based on the documents attached to [an] affidavit, whether [the defendant] paid . . . more than 72% for services performed as [the defendant] asserts, because neither [of the submitted] affidavits provide any explanation as to how they reached their conclusion in this regard or how the documents support the conclusion").

---

## II.     The Committee's TUFTA claims fail as a matter of law.

The Committee seeks to "avoid[] and recover[]" the Transfer, which it defines as including two separate transactions:  (1) a pledge by SFGL of assets in account 108731 that the Committee asserts occurred in 2007; and (2) a transfer of $95 million in 2008 from account 108731 to SG Suisse in repayment of the balance of a 2004 loan.  Motion at 1-2.  The Committee seeks to conflate these two distinct transactions into one "Transfer" because it recognizes that the 2008 repayment is not an avoidable transfer under TUFTA.  Property encumbered by a valid lien – here, the 108731 account subject to the 2004 pledge – is not a recoverable "asset" under TUFTA.  Tex. Bus. & Com. Code Ann. § 24.002(2)(A).  But the Committee cannot by fiat simply make two distinct transactions into one.  Indeed, the evidence now establishes that the 2007 pledge was preceded by two earlier pledges executed in 2004, at the same time as the loan.  The Committee does not challenge either of the 2004 pledges in its Motion or Complaint.  Accordingly, *on this basis alone*, the Committee's TUFTA claims must fail as a matter of law.

### A.     The 108731 account funds used to repay the loan are not a recoverable "asset" under TUFTA.

The Committee bears the burden to prove that there is no genuine issue of material fact that the $95 million that was used to repay the Stanford loan "was an 'asset' over which [SG Suisse] did *not* hold a security interest with priority over a later judicial lien."  *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 414 n.20 (5th Cir. 2009) (finding valid lien in absence of evidence that defendant failed to perfect its security interest); *accord Equity Indus. Ltd. P'Ship IV v. S. Worldwide Logistics, LLC*, NO. 14-14-00750-CV, 2016 WL 1267848, at *4 (Tex. App.— Houston [14th Dist.] Mar. 31, 2016, no pet.) ("As part of its burden of proving at trial a transfer of one or more of [defendant's] assets, [plaintiff] would have the obligation to prove the transfer

of [defendant's] property that was unencumbered by a valid lien . . . ."). The Committee cannot meet that burden because the evidence proves the opposite — that is, that SG Suisse held a perfected security interest in the 108731 account at least as far back as October 2004. Notably, the Committee has not only not challenged that 2004 lien in either its Motion or Complaint, it has affirmatively denied the existence of the 2004 lien even though a 2004 pledge document was in the Committee's possession when it did so.

To be a transfer under TUFTA, the debtor must dispose of or part with "an asset." *See In re 1701 Commerce, LLC*, 511 B.R. 812, 826 (Bankr. N.D. Tex. 2014); *Doyle v. Kontemporary Builders, Inc.*, 370 S.W.3d 448, 453-54 (Tex. App.—Dallas 2012, pet. denied). TUFTA's definition of "asset" expressly excludes "property to the extent it is encumbered by a valid lien." Tex. Bus. & Com. Code Ann. § 24.002(2)(A). A lien "includes a security interest created by agreement." *Id.* § 24.002(8). Thus, where property is encumbered by a valid lien, it is not an "asset" under TUFTA, and execution on that lien cannot support a fraudulent transfer. *See Radio Networks, LLC v. Baisden Enters., Inc.*, Civil Action No. 3:14-cv-1860-L, 2017 WL 2722565, at *14 (N.D. Tex. June 20, 2017) ("Thus, for a transfer to occur, it must include an 'asset.' TUFTA defines 'asset' as all property of the debtor but expressly excludes 'property to the extent it is encumbered by a valid lien.'" (citation omitted)), *appeal filed*, No. 18-10130 (5th Cir. Jan. 31, 2018). A "valid lien" is one "that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." Tex. Bus. & Com. Code Ann. § 24.002(13).

### (i)    SG Suisse held a valid lien on the assets in account 108731 as of 2004.

It is undisputed that in the fall of 2004, SFGL executed a series of documents that established the $95 million loan and the attendant security interest in the 108731 account that

secured that loan.  *See supra* at 7-11.   The September 29, 2004 SFGL board resolution authorized a lien on account 108731 as collateral for the 2004 Loan.  P. App'x 371.   SFGL's counsel, Kenneth Allen of Allen, Markham & Associates, opined that the deed of pledge relating to the $95 million loan was duly executed and delivered in accordance with that board resolution, and that "all actions of any kind . . . required for the validity or enforceability against [SFGL] of the Deed of Pledge and Declaration of Assignment have been obtained or performed and are valid and subsisting in full force and effect."  D. App'x 98 (Ex. J).  In October 2004, SFGL also delivered both a "credit authorisation" and two deeds of pledge and declarations of assignment pledging account 108731 in favor of SG Suisse.  D. App'x 95-96 (Ex. I), 103 (Ex. L), 357-58 (Ex. HH).  Notably, account statements from 2005 and 2006 for the 108731 account include the very same "PLEDGE" notation that the Committee's expert relies on as proof of the existence of a security interest in 2007.  KVT Decl. ¶ 34, P. App'x 18; D. App'x 72 (Ex. D), 114 (Ex. M), 128 (Ex. N).  Taken together,[13] the evidence in the summary judgment record thus establishes that in 2004, SG Suisse took a lien on SFGL's assets in account 108731 simultaneously with – and as security for – its $95 million loan to Stanford.

Under Texas law, "[t]he local law of a bank's jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in a deposit account maintained with that bank."  Tex. Bus. & Com. Code Ann. § 9.304(a).  Therefore, Swiss law governs the pledge agreements and SG Suisse's rights in the pledged assets.  Chenaux Decl. ¶¶ 45-53, D. App'x 413-14.  The two 2004 pledges were valid and binding on SFGL under Swiss law.  *Id.* ¶¶

---

[13]   "Separate instruments contemporaneously executed as a part of the same transaction and relating to the same subject matter may be construed together as a single instrument."  *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979) (citing *Rudes v. Field*, 204 S.W.2d 5 (Tex. 1947)).

55-90, D. App'x 415-24.  All the conditions required under Swiss law for the establishment of a pledge on assets deposited in account 108731 were met, and the pledges were therefore validly established.[14]  Chenaux Decl. ¶ 90, D. App'x 424.  SG Suisse was entitled to rely on Stanford's authority to bind SFGL as set forth in the September 29, 2004 SFGL board resolution, which empowered Stanford to pledge SFGL's assets "in connection with any indebtedness incurred by the Company or by R. Allen Stanford personally," and by the legal opinion of SFGL's counsel confirming the validity of SFGL's actions.  P. App'x 371; D. App'x 98-99 (Ex. J); Chenaux Decl. ¶ 67, D. App'x 418.  Moreover, to the extent that one of the 2004 deeds of pledge had granted a lien on SFGL's account to secure claims against Stanford personally, such a "cross-pledge" is permissible under Swiss law.  Chenaux Decl. ¶ 80, D. App'x 422.  Under Swiss law, the pledges remained in force until the extinction of the secured claim in connection with which the pledges were made.[15]  Chenaux Decl. ¶¶ 97-106, D. App'x 426-28.  Here, SG Suisse held a valid lien on account 108731 from October 11, 2004 until the lien was extinguished by the repayment of the $95 million loan on December 16, 2008.  Id. ¶ 106, D. App'x 428.

> **(ii)     The 2007 deed of pledge did not cancel or supersede the 2004 liens on account 108731.**

Nothing in the 2007 deed of pledge indicates that it cancels or supersedes either of the 2004 liens on account 108731.  Chenaux Decl. ¶¶ 97, 100-01, D. App'x 426-27.  Swiss law

---

[14]   Although Swiss law clearly applies, on this issue, even if Texas law applied, the result would have been the same.  A pledge against the 108731 account in 2004 would have been perfected because (1) Stanford was empowered to transfer rights in the account to SG Suisse; (2) SG Suisse's loan was consideration for its security interest; and (3) SG Suisse retained possession and control of the depository account funds until the security interest extinguished in 2008.  Tex. Bus. & Com. Code Ann. §§ 9.203, 9.313, 9.314.  The security interest perfects automatically and remains perfected because the secured party was the depository bank.  *See* Tex. Bus. & Com. Code Ann. §§ 9.104, 9.312, 9.314.

[15]   The same is true under Texas law.  *See* Tex. Bus. & Com. Code Ann. § 9.308(c); *Gillie v. First State Bank of Morton, Tex. (In re Gillie)*, 96 B.R. 689, 691 (Bankr. N.D. Tex. 1989).

---

permits multiple pledges on a particular asset.  *See Id.* ¶¶ 101, 104, D. App'x 426-27.  Unless the parties expressly intended the 2007 pledge to discharge the 2004 liens – and there is no evidence in the record to suggest they did – the earlier liens remained in force until extinguished.  *Id.* ¶¶ 97-106, D. App'x 426-28.  The 2007 deed of pledge is not superfluous either.  Rather, it secured the additional $10,000,000 line of credit available to Stanford under the second amendment to the November 10, 2004 Credit Facility Agreement (and any additional claims SG Suisse may have against Stanford or account 2148600), as well as accrued interest on the loan.  *Id.* ¶¶ 103-04, D. App'x 427.

The Committee's attempt to avoid the 2007 deed of pledge has no effect on SG Suisse's security interest on account 108731 in connection with the original $95 million loan.  Even assuming that the Committee could prevail on its claim to avoid and unwind the 2007 pledge, which it cannot, the funds in account 108731 remained encumbered by a valid lien by virtue of the 2004 pledges.  Under Swiss law, the priority of pledges on an asset is determined by the date the pledges were made.  *Id.* ¶ 104, D. App'x 427.  Accordingly, the 2007 pledge is junior to the two 2004 pledges on account 108731 in the order of priority with respect to the realization of the pledges.  *Id.*  The $95 million loan repayment from account 108731 in 2008 was within the $110,000,000 maximum guarantee granted to SG Suisse in the 2004 deed of pledge relating to claims against Stanford and account 2148600.  D. App'x 357-58 (Ex. HH).  The full amount of the loan repayment was therefore "encumbered by a valid lien" within the meaning of TUFTA, regardless of the validity of the 2007 pledge.  Tex. Bus. & Com. Code Ann. § 24.002(2)(A).

Because SG Suisse held a perfected interest in the funds in the 108731 account as of 2004, those funds were not an "asset" for purposes of TUFTA when Stanford directed SG Suisse

to execute on the pledge in 2008.  *Id.*  Accordingly, the 2008 repayment cannot be avoided or recovered.

> **B.**     **The Committee cannot amend its Motion – or its Complaint – by challenging the 2004 Pledge for the first time through its reply brief.**

The Committee did not assert any claim related to the 2004 pledges in its Complaint, nor did it address them in its Motion.  Indeed, the Committee denied the existence of any 2004 pledge.  *See* Reply at 4, 13.  "It is well settled that a [summary judgment] movant cannot raise new issues for the first time in a reply brief because consideration of such issues 'deprives the non-moving party of its opportunity to address the new arguments.'"  *Hickman v. Sloan Fluid Accessories, Inc.*, 833 F. Supp. 2d 822, 828 (E.D. Tenn. 2011) (citation omitted) (denying summary judgment as to a claim that was not addressed in the movant's opening brief); *cf. Wintherthur Int'l Am. Ins. Co. v. Bridgestone/Firestone, Inc.*, No. Civ.A. 3:01-CV-0059-, 2003 WL 21281736 (N.D. Tex. May 27, 2003) (Godbey, J.) (refusing to consider new arguments raised by movant for the first time in a reply brief in support of a motion to compel).  Moreover, "[i]t is generally improper for a party to introduce new evidence at the reply stage of a motion proceeding." *Lewis v. Sw. Airlines Co.*, Civil Action No. 3:16-cv-1538-M, 2017 WL 879225, at *3 (N.D. Tex. Mar. 6, 2017) (denying party's request to file new evidence with a reply in support of a motion for judgment on the pleadings, where party had withheld the evidence from the motion's opponent); *Dethrow v. Parkland Health Hosp. Sys.*, 204 F.R.D. 102, 104 (N.D. Tex. 2001) ("[T]he purpose of a reply brief is to rebut the nonmovant's response, not to introduce new evidence . . . ." (citation omitted)).

**C.   Summary judgment must be denied because of the 2004 pledges.**

**(i)   Any challenge to a 2004 pledge of the 108731 account is barred by the statute of repose.**

Any challenge to the 2004 pledges would be barred by the statute of repose.  Under TUFTA Section 24.010(a), a claim is extinguished four years after a transfer was made or an obligation incurred.  Tex. Bus. & Com. Code Ann. § 24.010(a)(2).  The Texas Supreme Court has held that TUFTA's statute of repose operates to substantively "extinguish" claims outside its time limits, rather than merely procedurally barring an untimely claim.  *See Nathan v. Whittington*, 408 S.W.3d 870, 874 (Tex. 2013).  Having an "absolute nature," the statute of repose "fix[es] an outer limit beyond which no action can be maintained" and "takes away the right altogether, creating a substantive right to be free of liability after a specified time."  *Id.* at 873, 875 (citations omitted) (holding that plaintiff had no TUFTA claim even though time would have been tolled under a statute of limitations).  Because the Committee has never challenged the 2004 pledges, any claim or liability based on those pledges is now barred by the statute of repose.

The Committee cannot avoid this outcome by attempting to "collapse" the formation of the 2004 liens into a single transaction with the 2008 repayment.  Motion at 2 n.2; Reply at 4.  The original creation of the liens and the repayment of the loan were two separate corporate actions that cannot be "collapsed" to form a single "transfer" within the repose period.  The "creation of a lien" is by itself a "transfer" under TUFTA.  Tex. Bus. & Com. Code Ann. § 24.002(12).  Indeed, the Committee itself has stated that the creation of the pledge was its own "transfer."  Reply at 5 ("SFGL's asset pledge *itself* was a fraudulent transfer.").

*Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013), and the other cases on which the Committee has relied are readily distinguishable.  In *Tronox*, the court did not combine separate transactions, but found that a transaction that was initiated in 2002 was not completed until 2005 when the last document needed to effect the transaction was executed.  *Id.* at 267.  That is not what occurred here.  The creation of a lien under Swiss law requires only a single pledge document.  Chenaux Decl. ¶¶ 83-86, D. App'x 422-23.  Thus, unlike in *Tronox*, once the 2004 pledges were executed, the transaction was effectuated.

The analysis in *Tronox* also turned on the "knowledge of the defendants of the structure of the entire transaction and . . . whether its components were part of a single scheme." *Tronox*, 503 B.R. at 269 (citation omitted); *see also Orr v. Kinderhill Corp.*, 991 F.2d 31, 35-36 (2d Cir. 1993) (holding that "the record [was] clear" that challenged conveyances "were elements of a single restructuring plan adopted by Kinderhill's board of directors"); *Liquidation Tr. v. Daimler AG (In re Old CarCo LLC)*, 435 B.R. 169, 185 (Bankr. S.D.N.Y. 2010) (collapsing component transactions in a corporate restructuring for a reasonably equivalent value analysis where "there was an overriding business plan that provided for the restructuring of the Chrysler Companies" and "the deal documents themselves make clear that the entire transaction is linked").  But there is no such comparable evidence in this case.  The Committee presents no evidence that the parties contemplated that the creation of the 2004 lien on account 108731 and the uncertain future loan repayment would constitute a single scheme.[16]  While the 2004 liens were created in

---

[16]   This case is similar to *Goodman v. H.I.G. Capital, LLC (In re Gulf Fleet Holdings, Inc.)*, 491 B.R. 747 (Bankr. W.D. La. 2013), on which the Committee relies.  *See* Motion at 2 n.2.  In *Gulf Fleet*, the court declined to consider two transactions as one for the purposes of its fraudulent transfer analysis.  491 B.R. at 770-71.  The

*(cont'd)*

connection with the execution of the $95 million loan, no evidence supports treating the creation of the liens and the <u>repayment</u> of the loan as a single transaction.  Collapsing the creation of a lien with the event that extinguishes that lien would erase the statutory TUFTA exemption from recovery of assets "encumbered by a valid lien."  Tex. Bus. & Com. Code Ann. § 24.002(2)(A).

The Committee also previously argued that its TUFTA claims were timely because they related back to the putative class plaintiffs' original complaint under the tolling doctrine discussed in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554-55 (1974).  Reply at 4-5 (citing Order at 10 [Dkt. 234]).  But neither class plaintiffs nor the Committee has ever asserted a claim to avoid the 2004 pledges on the 108731 account.  *See generally* Compl.  To the contrary, the Committee has affirmatively stated as recently as 2015 that the existence of a 2004 pledge is "baseless speculation contrary to the declaration of Ms. Van Tassel."  Reply at 13.  The Committee cannot now challenge a transfer it denied ever occurred.

As the Court has acknowledged, *American Pipe* also does not preserve claims different from those originally filed by the class.  *See* Order at 22 [Dkt. 234] (citing *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1015, 1020-21) (N.D. Cal. 2014) and *In re Commonwealth Oil/Tesoro Petroleum Corp. Sec. Litig.*, 467 F. Supp. 227, 258-60 (W.D. Tex. 1979) (holding *American Pipe* tolling preserved only later filings that asserted "exactly the same cause of action" as the original complaint (citation omitted))).  The avoidance of a lien on SFGL assets is an entirely separate claim from the recovery of banking fees, which was asserted by the

---

*(cont'd from previous page)*

Trustee had argued that the repayment of a loan should be combined with a separate secured loan because the proceeds of the secured loan were used to effect the repayment of the first loan.  But the court found that there were insufficient allegations that the parties intended to link the two transactions.  *Id.* at 771.  Here, there is no evidence that the parties intended from the outset to link the creation of the liens with the repayment of the loan as a single transaction.  Nothing in the 2004 loan documents required repayment of the loan by liquidating the pledged collateral, as opposed to repayment from another source.

class plaintiffs.[17]  And the Committee itself has made clear that it regards its claim for avoidance of the 2007 pledge as a separate and distinct transfer.  *See* Reply at 4 ("[T]he uncontroverted evidence shows that the asset pledge securing the $95 million loan was made in 2007 . . . ."), *id.* at 5 ("SFGL's asset pledge *itself* was a fraudulent transfer.").

**(ii)    The Committee has not proffered any evidence that a 2004 pledge was not a valid lien.**

The evidence before the Court shows that SG Suisse held a valid lien on account 108731 as of 2004.  As demonstrated above, SFGL's Board of Directors duly authorized a pledge on its assets in 2004, and the Committee itself produced documents evidencing the 2004 pledge.  That lien was perfected under Swiss law.  Jordan Decl. ¶ 2-9, D. App'x 295-97; Chenaux Decl. ¶¶ 55-90, D. App'x 415-24.  And the Committee has produced no evidence (much less undisputed evidence) that SG Suisse acted in bad faith when taking the lien on the account in 2004.

**III.    SG Suisse took the liens and the repayment of the loan in good faith and for reasonably equivalent value.**

In addition, judgment against SG Suisse is not warranted because the Committee has not refuted SG Suisse's affirmative defense.  If the movant seeks summary judgment on the non-movant's affirmative defense, the movant must "disprove[] the existence of any essential element of the . . . affirmative defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). TUFTA includes an affirmative defense to a fraudulent transfer claim for transferees "who received the transfer in good faith and for a 'reasonably equivalent value.'" *First Nat'l Bank of Seminole v. Hooper*, 104 S.W.3d 83, 85 (Tex. 2003) (citation omitted); *see also* Tex. Bus. & Com. Code Ann. § 24.009(a).  SG Suisse took both the liens on SFGL's assets in account 108731

---

[17]    *See* Plaintiff's Original Petition ¶¶ 120-27, Cause No. 2009-53845, Harris County District Court, 129th Judicial District (Aug. 23, 2009).

and the repayment of the $95 million loan in good faith and for reasonably equivalent value.  At the very least, genuine issues of material fact preclude summary judgment.

### A.       SG Suisse received the transfer in good faith.

The Committee does not challenge SG Suisse's good faith defense.  Motion at 12 n.6; Reply at 12.  The standard for determining "good faith" under section 24.009(a) of TUFTA is whether the defendant knew or had reason to know of the fraudulent scheme.  *GE Capital Commercial, Inc. v. Worthington Nat'l Bank*, 754 F.3d 297, 311-12 (5th Cir. 2014).  The Receiver has contended that "without an expert's examination of the corporations' books and records, *no outsider,* including the SEC, could have known or discovered probative evidence that Stanford had operated a Ponzi scheme."  *Janvey v. Democratic Senatorial Campaign Comm., Inc.* ("*DSCC*"), 712 F.3d 185, 197 (5th Cir. 2013) (emphasis added).  Surveying the history of Stanford's companies, the Fifth Circuit noted that until February 2009, "it was not readily evident to [the Receiver] or to anyone not privy to the inner workings of the Stanford corporations that these entities were part of a massive Ponzi scheme perpetrated by Stanford," and it was not until April 2009 that Davis "disclosed facts indicating the true nature and duration of Stanford's operation."  *Id.* at 196-97.  There is no evidence (and certainly no undisputed evidence) that SG Suisse had any access to the Stanford Entities' internal books and records, nor that it had any reason to know Stanford was operating a Ponzi scheme.  In fact, James Davis, Stanford's CFO and admitted co-conspirator, testified in Stanford's criminal trial that, to his knowledge, Mr. Friedli did not participate in Stanford's fraud.  D. App'x at 2-4.  Further, the Committee acknowledges in its Motion that Stanford's "massive fraud" did not become known until the SEC filed suit and the receiver was appointed in February 2009, months after the transfer satisfying SG Suisse's lien on account 108731.  Motion at 3, 5, 8.

The Committee has had access to the Receiver's documents for years.  If it had found any evidence suggesting that SG Suisse acted in bad faith, it undoubtedly would have presented it in its Motion.  Instead of doing so, the Committee conclusorily alleges that SG Suisse knew of or should have ferreted out Stanford's fraud and repeats its unsupported and inflammatory accusations that SG Suisse and Blaise Friedli were "willing, enthusiastic, and well-paid participants" in Stanford's Ponzi scheme.  Motion at 1, 5.  This baseless allegation asks the Court to resolve at the summary judgment stage an ultimate fact at issue in the case based on nothing more than a bald, conclusory assertion.

Without additional facts, knowledge of a fraudulent scheme cannot be established by the mere occurrence of normal banking transactions alleged here.  It is unexceptional that SG Suisse would: (i) make a loan to an individual, (ii) secure the loan with the depository account of an entity owned by the individual with express authorization from the entity's board, and (iii) accept repayment of the loan through satisfaction of the lien.  The Committee does nothing to address the "ultimate question:"  whether SG Suisse had knowledge of the "*fraudulent nature* of the [transactions], not just their existence."  *See DSCC*, 712 F.3d at 199.  There is no evidence to suggest that it did.  At a minimum, there are questions of fact that preclude summary judgment.

**B.     SG Suisse took both the lien and the loan repayment for reasonably equivalent value.**

The Texas Supreme Court held in *Golf Channel* that the "'reasonably equivalent value' requirement can be satisfied with evidence that the transferee (1) fully performed under a lawful arm's-length contract for fair market value, (2) provided consideration that had objective value at the time of the transaction, and (3) made the exchange in the ordinary course of the transferee's business."  *Golf Channel, Inc.*, 487 S.W.3d at 564.  Consideration in exchange for a transfer "had

objective value at the time of the transaction," *id.* at 570, if it "confer[red] some direct or indirect economic benefit to the debtor." *Id*. at 574.  The *Golf Channel* court made clear that "the value of services or goods provided to a debtor does not hinge on whether a debtor utilizes services or goods to further an illegal scheme or to pursue a legitimate business endeavor." *Id.* at 581.  It further noted that "the definition of value [in the statute] expressly includes a transfer made to satisfy an antecedent debt, even though satisfaction of the debt would deplete estate assets that might otherwise have been available for the benefit of [other] creditors."  *Id.* at 576; *see also* Tex. Bus. & Com. Code Ann. § 24.009(a).

The *Golf Channel* factors are easily satisfied in this case.  The loan documentation itself demonstrates that the loan was a lawful, arms-length transaction made in the ordinary course of business, and the Committee has put forth no evidence demonstrating otherwise.  *See, e.g.,* D. App'x 95-96 (Ex. I), 103 (Ex. L).  Though the Committee offers the conclusory assertion that SG Suisse and its executives were "willing participants" in the Ponzi scheme, it provides no evidence to support that claim.

Nor can it be disputed that SG Suisse provided actual economic consideration for the pledge and loan repayment.  In the 2004 transaction, SG Suisse released $95 million in exchange for an equivalent security interest in the 108731 account.  *See, e.g*., P. App'x 369.  With respect to the repayment of the loan, the value of what SG Suisse gave and what it took were the same: SG Suisse released the lien in exchange for the repayment.  Before the repayment, SG Suisse was the guarantor of a $95 million debt, which the Committee does not dispute was erased by the

repayment.  Without that release, SG Suisse would be a secured creditor as to those assets.[18]

Because the 2008 repayment fully discharged that antecedent debt, it constituted "reasonably

equivalent value."  *See In re 4100 W. Grand LLC*, 481 B.R. 444, 456 (Bankr. N.D. Ill. 2012)

("The court finds that the release of the Debtor's indebtedness (as well as the debt of its

guarantors) of over $2 million under the Loan Documents was value for purposes of section

548.").  Moreover, the repayment of the loan released any pledge on amounts over $95 million,

allowing the balance of the account to be distributed to CD investors or otherwise used by SFGL.

Here, there also was a dollar-for-dollar exchange because the lien on account 108731 had

a "defined value when it was created" that was equal to the loan.  Where a debt and lien are for

the same sum certain, transfers made in a dollar-for-dollar exchange constitute "reasonably

equivalent value" as a matter of law.[19]  *See First Nat'l Bank*, 104 S.W.3d at 86-87 (holding that

bank gave reasonably equivalent value as a matter of law where lien had a "defined value when it

was created" equal to the amount of the debt owed); *In re Int'l Loan Network, Inc.*, 160 B.R. 1,

12 (Bankr. D.C. 1993) (upholding transfer because the "value was certainly 'reasonably

equivalent'; it was the exact same value—dollar for dollar"); *Janvey v. Brown*, 767 F.3d 430,

442 (5th Cir. 2014) ("'[C]reditors are not . . . defrauded if all that happens is the exchange of an

existing asset of the debtor for a different asset of equal value.'" (second alteration in original)

(quoting *Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995))).  Thus, the $95 million

---

[18]   Indeed, once the loan matured, SG Suisse would have been within its rights as a secured creditor to debit the account for all amounts due at that time, without waiting for Stanford to direct the transfer.  Chenaux Decl. ¶¶ 107-120, D. App'x 428-31.

[19]   Ms. Van Tassel agrees with this principle, stating that "[o]f course, cash, by definition, is stated at fair value." KVT Decl. ¶ 19, P. App'x at 13.

satisfaction of the lien in repayment of the loan constitutes reasonably equivalent value as a matter of law.

The loan repayment transaction is similar to the transactions in which certain CD creditors recovered their principal payments before the Stanford Ponzi scheme was revealed. Those transfers of principal to CD investors have been held to constitute the satisfaction of an antecedent debt of the Stanford Ponzi scheme.[20]   *See Brown*, 767 F.3d at 443 (holding that investors' "principal payments were payments of an antecedent debt, namely fraud claims that the investor-defendants have as victims of the Stanford Ponzi scheme").  As the Texas Supreme Court explained in *Golf Channel*, "[i]n terms of exchanging 'value,' the circumstances under which Golf Channel entrusted an asset to Stanford and received reciprocal compensation are not materially distinguishable from the situation in which Ponzi-scheme investors obtained repayment of the investment funds they had entrusted to Stanford."  *Golf Channel, Inc.*, 487 S.W.3d at 580.  "[A]s services were fully provided, each payment also had value under TUFTA by extinguishing claims against the estate for the value of those services." *Id.* at 582.

The recovery of SG Suisse's loan principal did not diminish the net value of the estate. Rather, as a matter of law, there is reasonably equivalent value where the discharge of one person's debt reduces the liability of others by the same amount.  *See In re IFS Fin. Corp.*, 417 B.R. 419, 442 (S.D. Tex. 2009) (rejecting argument that entity received no value for discharging

---

[20]   SG Suisse is also similarly situated to the investors in *Janvey v. GMAG LLC*, who received $88 million in loans from SIB that were fully collateralized by the balances on the investors' SIB CDs.  *See* Magness Parties' Brief in Support of Motion for Summary Judgment at 4-5, *Janvey v. GMAG LLC*, Case No. 3:15-cv-00401-N-BQ (N.D. Tex. filed Oct. 7, 2016), Dkt. 124.  The loan balances were purportedly discharged through set-off against the accrued interest and the balances of the CDs.  *Id.*; Joint Pretrial Order at 12, *Janvey v. GMAG, LLC*, Case No. 3:15-CV-0401-N-BQ (N.D. Tex. filed Jan. 4, 2017), Dkt. 225.  The Receiver did not contest that SIB received reasonably equivalent value for the loan proceeds up the amount of the Magness parties' initial deposits into the SIB CDs.  Magness Parties' Brief in Support of Motion for Summary Judgment at 6; Joint Pretrial Order at 7 n.2.

debt of another entity in the same Ponzi scheme because the payments reduced the overall estate's liabilities in the same amount as the transfer), *aff'd*, 669 F.3d 255 (5th Cir. 2012); *In re 4100 W. Grand LLC*, 481 B.R. at 456 (finding that $2 million release of the liability of the debtor and the loan guarantor in exchange for payment was value for purposes of section 548 of the Bankruptcy Code pertaining to fraudulent transfers).  For the same reasons the Fifth Circuit rejected the Receiver's attempt to claw back CD investors' principal payments, the Court should reject the Committee's efforts to require SG Suisse to pay back into the Receivership SG Suisse's own funds that it recovered from the Stanford enterprise.

### (i)     The Committee and the Receiver treat Stanford and the Stanford Entities that he owned as a single unit.

The Committee's only retort to this undeniable exchange of value-for-value is to insist that SFGL specifically received no value for the loan repayment because SFGL discharged the debt of Stanford, who it characterizes as a third party.  But the Committee's contention that SFGL and Stanford were distinct legal entities with separate interests is nonsense in the context of the Stanford Ponzi scheme and diametrically opposed to the Receiver's position in virtually every other instance.  From the perspective of the Receivership Estate, for whose benefit the Committee pursues these claims, there is no difference between Stanford and the entities he controlled, and there is no legitimate basis to recognize a distinction solely for the purpose of seizing SG Suisse's money.

The Fifth Circuit held that Stanford and the Stanford Entities should be viewed as a single entity, noting that "the Stanford corporations were the robotic tools of Stanford's Ponzi scheme." *Brown*, 767 F.3d at 438 (citation omitted).  The Fifth Circuit also stated that the Stanford Entities were "hostage corporations" under Stanford's complete control, and are

separate actors only "now that they are under the control of the Receiver."  *Janvey v. Alguire*,

847 F.3d 231, 241-42 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 329 (2017); *see also id.* at 241-42

(noting that Stanford "blurr[ed] . . . corporate boundaries" and concluding "[n]ow that Stanford

no longer controls the Bank and the Company for the benefit of an integrated criminal scheme

[because of the appointment of a Receiver], the Bank and the Company are separate actors").

The Court has also concluded that "Stanford operated the entire network of Stanford

Entities as an integrated unit" and that they should be treated as "a single entity."  *Janvey v.*

*Alguire*, Civil Action Nos. 3:09-CV-0724-N et al., 2013 WL 2451738, at *2-3 (N.D. Tex. Jan.

22, 2013) (citation omitted), *aff'd sub nom. Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014).  It

has also observed that:

> The Receiver has shown that Stanford operated the entire network of Stanford
> Entities as an integrated unit in order to perpetrate a massive worldwide fraud.
> Each Stanford Entity either participated in the scheme, derived benefit from the
> scheme, or lent the appearance of legitimacy to the entirety of Stanford's
> fraudulent enterprise.  To ignore these findings would elevate form over substance
> - thereby legitimizing the corporate structure that Stanford utilized to perpetrate
> his fraud and running afoul of Fifth Circuit precedent cautioning courts to look
> beyond the surface . . . .  [A]ll the Stanford entities were "operated as one for
> purposes of perpetrating a fraud on investors . . . ."

Order at 36, *In re Stanford Int'l Bank, Ltd.*, No. 3:09-CV-0721-N (N.D. Tex. July 30,

2012), Dkt. 176 (citation omitted) (the "Chapter 15 Order").  In the Chapter 15 Order, the Court

conducted an alter ego analysis and pierced the veil between SIB and other Stanford Entities for

jurisdictional purposes.  Noting that "commingling of funds among the Stanford Entities was the

norm," and that "Stanford and his associates transferred assets among the Stanford Entities in

disregard of corporate formalities," the Court found no basis to distinguish between the Stanford

Entities and "recognized that Stanford and his affiliates operated as one[.]"  *Id.* at 27, 34-35.

Although  different  legal  standards  govern  veil  piercing  for  jurisdictional  and  substantive

purposes, the Court concluded that "*[r]egardless of the standard the Court employs*," the evidence of the absence of separation between and among Stanford Entities warranted piercing SIB's corporate veil. *Id.* at 25-26 (emphasis added). This same evidence warrants piercing any corporate veil between the Stanford Entities and Stanford, their sole owner and controller. In contrast, none of the cases that the Committee previously cited in its Reply in opposition to veil piercing involved a Ponzi scheme that operated as a single, integrated criminal enterprise for the purpose of defrauding investors.[21] *See* Reply at 7-8 (citing, *inter alia*, *Cal. Pipe Recycling, Inc. v. Sw. Holdings, Inc.*, Civil Action No. H-09-2502, 2010 WL 56053 (S.D. Tex. Jan. 5, 2010)).

SFGL did not discharge the debt of a "third party" because Stanford is SFGL's (and the Ponzi scheme's) alter ego. Under Texas law, "when a 'corporation is considered the alter ego of the individual . . . the two are treated as one.'" *Fed. Land Bank Ass'n of S. Ala., FLCA v. Cornelius & Salhab, R.P.*, Civil Action No. H-09-3115, 2010 WL 3545406, at *8 (S.D. Tex. Sept. 9, 2010) (alteration in original) (citation omitted). Courts "disregard the corporate fiction under the 'alter ego' theory when the corporation is 'organized and operated as a mere tool or business conduit of another corporation.'" *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 198 (Tex. 1995) (citation omitted).

---

[21]   The facts here are similar to those in *Federal Land Bank*, where the court refused to void a transfer by a corporate entity that paid its owner's personal legal expenses. 2010 WL 3545406, at *7-9. There, the court found reasonably equivalent value because the business was its owner's alter ego. *Id.* The individual and entity operated as "a single business enterprise" in a fraudulent scheme that included funneling loan proceeds from plaintiff bank through various corporate entities for use in the scheme and for various personal expenditures by the individual defendants. *Id.* at *2. The court concluded that, based on alter ego, there was no division between the entity making the payment and the individual who received the direct benefit, and both shared the same potential liability for the scheme at the time of the payment. *See id.* at *8; *see also Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 830 (5th Cir. 1959) (finding no voidable transfer where loan to individual owner was repaid by entity because "[t]here was such a degree of identity and commingling of affairs" that they "cannot be regarded as separate legal entities" with respect to the loan and because corporate resolutions authorized the owner's use of corporate funds to pay personal debts).

The Committee concedes that Stanford and the Stanford Entities together "orchestrated and operated a wide-ranging Ponzi scheme." Compl. ¶ 28.  Its expert concludes that "[t]he transfers to the entities comprising the Stanford Entities . . . were made with no regard for corporate separateness."  P. App'x at 206.  Yet while the Committee appears prepared to ignore the corporate separateness between and among SFGL and 130 unrelated Stanford Entities (*see* Motion at 4, 14), it insists that the Court draw an artificial line between SFGL and Stanford himself – SFGL's sole owner.  *Id.* at 4.  That position is both illogical and inequitable.

The entire premise of corporate disregard is that an owner can be equated with its company.  It would make no sense to exclude the ultimate owner from the alter ego finding when the owner's actions gave rise to that finding in the first place, particularly in a Ponzi scheme situation.  The holding in *DSCC* does not suggest a different outcome.  712 F.3d at 191-92.  There, the Fifth Circuit addressed whether the Receiver's standing to recover fraudulent transfers on behalf of the Stanford Entities was defeated based on *in pari delicto*.  *See id.* (citing *Scholes*, 56 F.3d at 754).  The court held that the knowledge of a Ponzi scheme's principals "may not be attributed to his robotic corporate tools . . . *once they have been freed from the principal's coercion*, thus permitting the receiver to recover corporate assets that the principal fraudulently transferred to third parties."  *Id.* at 192 (emphasis added).  *DSCC* says nothing about whether Stanford and his controlled entities should be treated as one at the time the transfers were made and before the Receivership was created.  *See Golf Channel, Inc.*, 487 S.W.3d at 569 & n.47 (holding that under TUFTA, whether a party received "value" the purposes of the reasonably equivalent value defense is determined at the date of the transaction).  A contrary rule would

effectively supplant the statutory affirmative defense with a strict liability regime if the transfer turns out in hindsight to involve a Ponzi scheme.

In any event, the Committee is judicially estopped from claiming that Stanford and SFGL are distinct for purposes of SG Suisse's affirmative defense.  At the request of the Securities and Exchange Commission, the Court created a Receivership Estate that included the assets, wherever located, of both Stanford individually and all of the entities that he owned and controlled.  Order Appointing Receiver, D. App'x 170-80 (Ex. S).[22]  The Court authorized the Receiver to "[c]ollect, marshal, and take custody, control, and possession of all the . . . assets of . . . the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated . . . ."  Order Appointing Receiver, D. App'x 172 (Ex. S). In creating the Receivership Estate and authorizing the Receiver, the Court did not distinguish between the assets in Stanford's name and the assets of the companies he owned and controlled. Accordingly, the Committee and the Receiver have equally pursued both.  *See* Compl. ¶¶ 3, 18-19.

Despite all this, the Committee now seeks to apply the alter ego doctrine selectively, using it to seize assets with one hand, while denying it to avoid repayment to SG Suisse with the other.[23]  It does so even though it has produced <u>no</u> evidence that the loan funds from SG Suisse were ever transferred beyond the entities and accounts that later comprised the Receivership

---

[22]   The Court's order appointing the Receiver was subsequently amended for reasons that are not relevant here.  *See* Amended Order Appointing Receiver, *SEC v. Stanford Int'l Bank, Ltd.*, Case No. 3:09CV00298-N (N.D. Tex. Mar. 12, 2009), Dkt. 157; Second Amended Order Appointing Receiver, *SEC v. Stanford Int'l Bank, Ltd.*, Civil Action No. 3:09-CV-298-N (N.D. Tex. July 19, 2010), Dkt. 1130.

[23]   The Committee also argued in its original reply brief that "R. Allen Stanford was insolvent on the date SFGL guaranteed his personal loan because he was operating a Ponzi scheme at that time," applying to Stanford personally the presumption that a Ponzi scheme is insolvent at its inception.  Reply at 12.  There, too, the Committee conflated Stanford personally with the Ponzi scheme.

Estate assets.   Courts have rejected similar attempts to selectively invoke an alter ego theory. *See Fed. Land Bank*, 2010 WL 3545406, at *8 (finding alter ego treatment in TUFTA analysis "especially appropriate [in] circumstances such as those present here, in which the creditor has already pierced the corporate veil to get to the individual's assets"); *id.* at *7 (agreeing that "the trustee could not pursue the assets of the alter ego entities on the theory that they were the same as the debtor while avoiding transfers that benefitted the entities on the theory that they were separate" (citing *In re Leneve*, 341 B.R. 53, 63 (Bankr. S.D. Fla. 2006))).

In authorizing the Receiver to seize Stanford's personal assets to pay back CD investors, the Court implicitly recognized that there is no distinction between the creditors of the Stanford Entities and creditors of Stanford personally.   Certainly, the Committee does not seek to recover the loan repayment for the benefit of SFGL or its creditors; rather, the Committee seeks recovery for the Receivership Estate.[24]   In essence, the "debtor" for the purposes of the Committee's TUFTA claim is the Stanford Ponzi scheme as a whole.   This is underscored by the fact that both the Committee and Ms. Van Tassel devote considerable attention to attempting to establish that the funds in account 108731 did not belong to SFGL, but were instead CD investor funds that Stanford transferred from SIB.   Motion at 6-7; KVT Decl. ¶¶ 27-28, P. App'x 16-17.[25]   Yet, at the same time, the Committee insists that SG Suisse must show reasonably equivalent value to SFGL, not to SIB.   Motion at 13-15.   This position is absurd.

---

[24]   *See, e.g.*, Compl. ¶ 19 ("[T]he Committee is . . . cooperating with the Receiver concerning the identification and prosecution of actions under fraudulent transfer and other legal theories for the benefit of the Receivership Estates and SIB[] investors."); *id.* ¶ 92 ("The Receivership Estates are entitled to disgorgement of the funds transferred from SIB[], SFGL, and other Stanford Entities subject to the Receivership . . . .").

[25]   *See also* Motion at 15 n.8 (arguing that it would be inequitable "to reward SG Suisse and penalize the innocent investors" in the Ponzi scheme); Reply at 8 ("SG Suisse was repaid by SFGL for the R. Allen Stanford personal loan with stolen CD customer funds. [ . . . ] SG Suisse should not be permitted to keep these funds at the direct expense of Stanford's investors-victims."); *id.* at 9 ("The Court should ignore SG Suisse's request for preferential treatment over other creditors of the Receivership Estate.").

---

Finally, it is no answer that SG Suisse treated SFGL and Stanford as separate entities at the time it made the loan in 2004.[26] SG Suisse took the lien on account 108731 years before the Ponzi scheme was revealed to the world.  It had no reason to disregard SFGL's separate corporate status, and its care to document SFGL's authority to pledge the account speaks to its good faith.  The Committee has put forth no evidence to support its accusations that SG Suisse had any idea that Stanford was running a Ponzi scheme at <u>any</u> point before the world knew.  The lien was duly authorized by SFGL's board, as confirmed by the legal opinion of SFGL's counsel.  And SG Suisse had no choice but to honor its customer's instruction and permit Stanford to access the loan funds as SFGL had directed.  *See Mayo*, 270 F.2d at 830 (finding no voidable transfer where, even if a loan was for the benefit of individual owner rather than entity that repaid it, "the bank had no alternative, under the language of the resolutions [authorizing owner's use of corporate funds], to honoring [owner's] signature and instructions").

>          (ii)     **Genuine issues of material fact remain regarding whether and to what extent SFGL or the Estate benefited from the loan and repayment.**

Even if the Court does not treat Stanford and the Stanford Entities as alter egos, fact questions remain as to the extent to which SFGL and the other entities in the Receivership Estate received value from the loan.  As discussed above, the Court has made clear that Stanford and the Stanford Entities he controlled were so "related or situated that they share an identity of interests." *See Brown*, 767 F.3d at 438; *Smith v. American Founders Financial Corp.*, 365 B.R. 647 (S.D. Tex. 2007).  As Judge Rosenthal noted in *Smith v. American Founders Financial Corp.*, a debtor's discharge of a third-party debt may be for reasonably equivalent value when:

---

[26]    The Committee raised this argument in its original Reply.  *See* Reply at 7.

a.   "the debtor's payment of a third party's debt results in a discharge of the debtor's own debt to the third party;"

b.   "the debtor and the third party are so 'related or situated that they share an identity of interests because what benefits one will . . . benefit the other to some degree;'"

c.   "[the] debtor 'enjoys the benefits of the goods or services it bought for its principal, the transfer of money for those goods or services may not be avoided.'"

365 B.R. at 667 (first alteration in original) (quoting *In re Newtowne, Inc.,* 157 B.R. 374, 379 (S.D. Ohio 1993)).   The court should "examine all aspects of the transaction and carefully measure the value of all benefits and burdens to the debtor, direct or indirect." *Id.* at 666 (citation omitted).

Courts have recognized a variety of indirect benefits resulting from third-party transactions that constitute "reasonably equivalent value." *See, e.g., In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1125-26 (5th Cir. 1993) (finding preservation of existing and new business opportunities constituted "reasonably equivalent value" such that the "risk" of paying third party's debt "generated cognizable value"), *abrogated on other grounds by In re Dunham*, 110 F.3d 286 (5th Cir. 1997); *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991) (finding that availability of credit and additional business opportunities hold "considerable value in the commercial world" and must be considered in determining reasonably equivalent value); *In re Pembroke Dev. Corp.*, 124 B.R. 398, 400-01 (Bankr. S.D. Fla. 1991) (finding reasonably equivalent value from indirect benefits including the bank's forbearance on foreclosure and extension of maturity date of loan on which debtor was guarantor).

For example, in a Texas case involving a Ponzi scheme with multiple entities, the court found reasonably equivalent value where one entity paid off loans whose proceeds flowed to other entities and individuals as part of the scheme. *See In re IFS Fin. Corp.*, 417 B.R. at 442.

The court in *IFS Financial* found that the individual owner "exercised unfettered control" of the transferor bank account, although it was held in the name of another entity.  *Id.* at 437. Ultimately, it did not matter which entity owed the underlying debt because the debt and the transfer effectively canceled each other out and the overall estate did not lose value.[27]  *Id.* at 437-38.

Bank records from the 2148600 account show that over $30 million was transferred out of the account directly to other Stanford Entities within the Receivership Estate.  D. App'x 392-95 (Ex. QQ).  And notably, although the Committee's motion and Ms. Van Tassel's declaration are silent as to how the loan funds were used, Ms. Van Tassel testified that she had traced nearly all of the loan funds to entities within the Receivership Estate.  D. App'x 49-51 (KVT Dep. 170:3-178:13).  At least $44 million of the loan proceeds were invested in Banco Galicia, whose holding company she conceded was one of the "130 or more" Stanford Entities and part of the Receivership Estate.  D. App'x 22, 35-36, 49 (KVT Dep. 65:13-20, 117:24-118:6, 170:1-15). Ms. Van Tassel did not conduct any analysis of the bank to determine its value at the time it was acquired with loan proceeds or at the time the Receivership was established.  D. App'x 49 (KVT Dep. 171:18-22).  Yet news articles suggest that the bank's value far exceeded $44 million in February 2009, with one article stating that the bank was sold for nearly $112 million.  Hartman Decl. ¶ 27, D. App'x 283.  Plainly, SG Suisse's loan, which was used to purchase a Stanford Entity that ultimately increased in value, provided "value" to the Stanford enterprise at the time it

---

[27]   This dynamic distinguishes this present case from cases like *In re Duque Rodriguez (Murphy v. Avianca, Inc.)*, 77 B.R. 937 (Bankr. S.D. Fla. 1987), and *In re Pace (Osherow v. Nelson Hensley & Consolidated Fund Management, LLC)*, 456 B.R. 253 (W.D. Tex. 2011), which the Committee previously cited in opposition to the "indirect benefit" theory.  Reply at 11-12.  These cases did not involve a Ponzi scheme in which money flowed across entities without regard for corporate separateness, such that the creditors of one entity in the scheme are in essence the same for all the entities.  In addition, the Committee relied on a presumption that Stanford was personally insolvent, but has put forth no evidence supporting this claim.

was made, regardless of what happened to the Bank after the Ponzi scheme was uncovered. *See, e.g., In re Fairchild Aircraft*, 6 F.3d at 1126 (holding that subsequent events are irrelevant to determining whether a transfer was made for reasonably equivalent value at the time it was made). The Committee has not produced any documents or evidence showing how assets or profits from the Bank were distributed before or after it was seized by the government. The Committee refused SG Suisse's request for documents on this subject, depriving SG Suisse of the opportunity to test its assertion that none of the Bank's assets directly or indirectly benefited SFGL. Reed Decl. ¶ 5, D. App'x 300.

Another $25 million in loan proceeds was allegedly deposited in Stanford Bank Panama, Stanford Group Holdings, and a holding company associated with Stanford Bank Venezuela, all of which are part of the Stanford Receivership. D. App'x 49-51 (KVT Dep. 173:16-178:8). Ms. Van Tassel did not trace the funds beyond the initial transfers to these entities, but she could not rule out the possibility that these funds were recovered by the Receiver. *Id*.; Hartman Decl. ¶¶ 25-28, D. App'x 282-85. An additional $23 million was purportedly traced to accounts held in Stanford's name, but again, Ms. Van Tassel did not know what those funds were used for or whether those funds were recovered by the Receivership when Stanford's personal assets were included in the Receivership Estate. *Id.* Ms. Van Tassel could not account for the remaining $3 million of the loan funds. D. App'x 51 (KVT Dep. 178:9-13).

Crediting Ms. Van Tassel's testimony, it is apparent that some or all of the loan funds were recovered by the Receivership. If so, recovery of those same amounts from SG Suisse would result in a double recovery for the Estate. *See In re Jeffrey Bigelow Design Grp., Inc.*, 956 F.2d 479, 485 (4th Cir. 1992) (holding no fraudulent transfer where repayment of a loan did

not result in depletion of the estate and "the estate, and hence the unsecured creditors, would be paid twice" if the transfer were avoided).   At a minimum, Ms. Van Tassel's testimony raises genuine issues of material fact on this point that preclude summary judgment.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Committee's Motion for Partial Summary Judgment.

Dated: March 27, 2018                         Respectfully submitted,


                                              */s/ Noelle M. Reed*
                                              Noelle M. Reed
                                              State Bar No. 24044211
                                              Noelle.Reed@skadden.com
                                              Sarah K. Grossnickle
                                              State Bar No. 24090137
                                              Sarah.Grossnickle@skadden.com
                                              SKADDEN, ARPS, SLATE,
                                                MEAGHER & FLOM LLP
                                              1000 Louisiana St., Suite 6800
                                              Houston, Texas 77002
                                              Tel: (713) 655-5122
                                              Fax: (713) 483-9122

                                              George A. Zimmerman
                                              (Admitted pro hac vice)
                                              George.Zimmerman@skadden.com
                                              Skadden, Arps, Slate,
                                                Meagher & Flom LLP
                                              4 Times Square
                                              New York, New York 10036
                                              Tel: (212) 735-3000
                                              Fax: (917) 777-2047

                                              Of Counsel:

                                              Michelle L. Davis
                                              State Bar No. 24038854
                                              Michelle.Davis@skadden.com
                                              SKADDEN, ARPS, SLATE,
                                                MEAGHER & FLOM LLP
                                              725 N. Avalon Court
                                              Granbury, Texas 76048
                                              Tel.: (942) 523-8718
                                              Fax: (713) 483-9197

                                              **ATTORNEYS FOR DEFENDANT
                                              SOCIÉTÉ GÉNÉRALE PRIVATE
                                              BANKING (SUISSE) S.A.**

---

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on March 27, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the counsel who have registered with this Court.


                            */s/ Noelle M. Reed*
                            Noelle M. Reed