IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:09-CV-2384-N |
| | § | |
| TRUSTMARK NATIONAL BANK, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This Order addresses the motions for summary judgment filed by all remaining Defendants to this action: HSBC Bank PLC ("HSBC") [854], Independent Bank [859], Trustmark National Bank ("Trustmark") [860], Toronto-Dominion Bank ("TD Bank") [858], Société Générale Private Banking S.A. ("SG Suisse") [874], and Blaise Friedli [876].[1]   The Court concludes that fact issues exist as to the majority of Plaintiffs' nonabandoned claims.  Defendants have, however, demonstrated entitlement to judgment as a matter of law on a subset of issues.  Accordingly, the Court grants in part and denies in part the motions for summary judgment.

---

[1] TD Bank has also moved for leave to supplement its appendix [1061].  The Court, however, grants the motion for leave to supplement and has taken notice of TD Bank's proposed filing in drafting this Order.  The Court has also taken notice of HSBC's supplemental authority and denies its motion for leave to file notice [1129] as moot.

## I. THE HISTORY OF THE PARTIES' DISPUTE

This case arises out of the Ponzi scheme perpetrated by R. Allen Stanford, his associates, and various entities under his control. The facts of the scheme are well-established, see, e.g., *Janvey v. Democratic Senatorial Campaign Comm., Inc. (DSCC)*, 712 F.3d 185, 188–89 (5th Cir. 2013), and will not be recounted in great detail here. Stanford and the entities under his control sold fraudulent certificates of deposit ("CDs") issued by the Antigua-based Stanford International Bank Limited ("SIBL"). The CDs paid relatively high rates of interest, but SIBL claimed it deployed the funds raised from CD sales only in low risk, high return funds. In reality, the CD proceeds were used to finance Stanford's own extravagant lifestyle, and to pay off previous investors. The facts supporting the claims in this action are complex. At root, the Plaintiffs allege that the Defendant financial institutions provided banking services that supported and furthered Stanford's scheme.

In August 2009, a group of Stanford investors seeking to represent a putative class ("Class Plaintiffs") filed their original petition in the 129th District Court for Harris County, Texas. Class Plaintiffs named as Defendants Trustmark, TD, HSBC, Bank of Houston (now Independent Bank), and SG Suisse. Class Plaintiffs asserted claims for fraudulent transfers under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), Tex. Bus. & Com. Code §§ 24.001–24.013, conspiracy to commit fraud, and aiding and abetting fraud. After the Defendants removed the action to federal court, the Judicial Panel for Multi-District Litigation transferred the case to this District as part of the ongoing Stanford Multi-District Litigation proceedings.

ORDER – PAGE 2

After Defendants filed motions to dismiss Class Plaintiffs' claims, the Official Stanford Investors Committee ("OSIC") moved to intervene in the case. The Court granted OSIC's motion to intervene and OSIC filed two intervenor complaints, see Intervenor Compl., Dec. 14, 2012 [130] (the "First Intervenor Complaint" or "FIC"); Intervenor Compl., Feb. 15, 2013 [133] (the "Second Intervenor Complaint" or "SIC").

In response to OSIC's intervention, Class Plaintiffs moved for leave to amend their petition to include allegations and claims asserted in OSIC's intervenor complaints. The Court granted leave and ordered that "Plaintiffs' Class Complaint shall be considered to incorporate by reference [OSIC's] claims against [SG Suisse and Friedli] . . . and OSIC's claims against [Trustmark, TD, and HSBC] . . . ." Order, Aug. 25, 2014 [212]. Defendants moved to dismiss OSIC's intervenor complaints and the class complaint. The Court partially granted these motions, applying the arguments raised in Defendants' motions to dismiss the intervenor complaints equally to Class Plaintiffs' claims based on the incorporation. *See* Order, Apr. 21, 2015 [234]. Among other claims addressed in that Order, the Court declined to dismiss OSIC's constructive fraudulent transfer claims. *Id.* at 19–20 (holding that OSIC properly pled the absence of reasonably equivalent value in TUFTA claim by alleging transfers from Ponzi scheme).

After partially granting Defendants' motions to dismiss, the Court granted Class Plaintiffs leave to amend their complaint. Order, June 23, 2015 [278]. The Second Amended Class Action Complaint asserts claims against the Bank Defendants and Friedli for (1) aiding, abetting, or participating in a fraudulent scheme; (2) aiding, abetting, or participating in violations of the Texas Securities Act ("TSA"); (3) aiding, abetting, or

ORDER – PAGE 3

participating in a breach of fiduciary duty; (4) aiding, abetting, or participating in conversion; and (5) civil conspiracy. *See generally* Second Am. Class Compl. [279].

Following the amendment, the Defendants again moved to dismiss claims that appeared in the amended complaint. The Court denied the motions. Order 1, July 27, 2016 [387]. Subsequently, the Court denied the Class Plaintiffs motion for certification, holding that the putative class could not satisfy the predominance requirement included in Federal Rule of Civil Procedure 23. Order 3, November 7, 2017 [428]. Nevertheless, several of the original putative class members remain parties to this suit to pursue their claims individually (the "Named Plaintiffs"). The Defendants have moved for summary judgment on claims not previously dismissed or abandoned.[2]

## II. THE SUMMARY JUDGMENT STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[2] Plaintiffs filed a notice of abandonment of certain claims [976] simultaneously with their briefs in opposition to the motions to dismiss addressed in this order. This order, therefore, addresses only those claims that Plaintiffs have not voluntarily surrendered.

When a party bears the burden of proof on an issue, she "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [her] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis omitted). When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment by either (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322–25.

Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact such that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). Indeed, factual controversies are resolved in favor of the nonmoving party "'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'" *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### III. PLAINTIFFS TIMELY RAISED THEIR CLAIMS

Over the course of this action, the Defendants have repeatedly raised timeliness objections, and they do so again in their motions for summary judgment. The Defendants

argue that (i) both the Named Plaintiffs' and OSIC's TSA claims fall outside the relevant limitations period, (ii) their fiduciary breach claims also fall outside the four-year limitations period, and (iii) that OSIC's TUFTA claims cannot apply to any fund transfers prior to December 5, 2007 under that statute's four-year statute of repose.  Finding the timeliness arguments deficient or subject to genuine factual disputes, the Court declines to grant summary judgment on this ground.

As a threshold matter, the Court notes that it has already ruled that the Named Plaintiffs timely brought their fiduciary breach and TSA claims by pleading facts sufficient to support them in the original complaint [1-4].  Order 9, 11, July 27, 2016 [387].  The Court declines to take up the Defendants' invitation to revisit that holding and turns to the timeliness of OSIC's claims.

Essentially, the Defendants argue that the court should grant judgment on the fiduciary breach and TSA claims because OSIC first specifically identified these legal theories in pleadings filed after the relevant limitations periods had run.  This position lacks merit.

### A.  Limitations Do Not Bar OSIC's TSA Claims

The sufficiency of the allegations in a pleading, and not the precise legal theories or causes of action identified or invoked in it, determine whether a party timely instituted an action.  The Federal Rules of Civil Procedure applicable to pleading sufficiency govern in federal court.  *FDIC v. Dawson*, 4 F.3d 1303, 1308 (5th Cir. 1993).  Rule 8 applies generally and requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  It also cautions that

no "technical form is required," and directs courts to construe pleadings "so as to do justice." *Id.* 8(d)(1), (e).  As the Supreme Court has recently observed, Rule 8 does not countenance dismissal "for imperfect statement of the legal theory," rather it suffices for the plaintiff to describe the events that, he alleges, entitle him to relief. *Johnson v. City of Shelby*, 574 U.S. 10, 11–12 (2014) (per curiam).  A complaint that adequately describes the occurrences entitling the plaintiff to relief such that it can survive a Rule 12(b)(6) motion also stops the clock for limitations purposes.  Thus, failure to identify a specific legal theory in an initial pleading will not prove fatal so long as the plaintiff included allegations sufficient to state the claim later identified.

OSIC's intervenor complaint alleges facts sufficient to support its TSA claims against the various Defendants.  As the Court has previously noted, a claim for aiding and abetting a TSA violation consists of (1) a principal violation, (2) scienter, and (3) substantial assistance.  Order 8 n.5, July 27, 2016.  And the Court has held that OSIC sufficiently alleged aiding and abetting fraud in its intervenor complaint.  Order 24–26, April 21, 2015 [234].  By separate order, the Court has observed that, given the nature of the scheme, that allegations stating a claim for aiding and abetting fraud also suffice to state an aiding-and-abetting claim under the TSA.  Order 7–8, July 27, 2016.  The Court will not disturb those holdings now.  Thus, the Court concludes that the OSIC sufficiently alleged its TSA claims in the intervenor complaint, defeating Defendants' timeliness objections.

### B. OSIC Timely Pled Its Fiduciary Breach Claims

OSIC also sufficiently alleged that the Defendants knowingly participated in breaches of fiduciary duty by Stanford and Davis. Once again, the Court's earlier orders in this case will guide its analysis. By prior order, the Court held that the Named Plaintiffs' original complaint sufficiently pled the fiduciary breach claims. Order 11, July 27, 2016. OSIC's intervenor complaint contains similar factual allegations, favoring the same conclusion here. OSIC alleged facts about the structure of SIBL's CD program, including the relationship between SIBL's salesforce and its customer base. Intervenor Compl. ¶ 3. The Defendants, according to OSIC, engaged in extensive, ongoing due diligence (or should have done so pursuant to regulatory requirements) of SIBL. *Id.* ¶¶ 46–55, 58, 59-61. The required due diligence should have made the Defendants aware of the existence of fiduciary relationships as well as the suspicious activity among the Stanford entity accounts. *Id.* As with the original complaint, the Court finds these allegations sufficient to support OSIC's fiduciary duty claim against them.

### C. The Court Accepts TD & HSBC's Objection
### Only as to the Constructive TUFTA Claims

OSIC has abandoned its TUFTA claims against some of the Defendants but continues to press these claims against TD, HSBC and SG Suisse. Therefore, the Court turns to the remaining defendants' argument that the TUFTA claims are time-barred.

The statute of repose affects two of OSIC's TUFTA claims. As the Court explained in a previous order:

> OSIC asserts fraudulent transfer claims under three different TUFTA provisions: section 24.005(a)(1), section 24.005(a)(2), and section

24.006(a).[3]  Section 24.005(a)(1) claims must be brought "within four years after the transfer was made . . . or, if later, within one year after the transfer or obligation was or could reasonably have been discovered . . . ."  TEX. BUS. & COM. CODE ANN. § 24.010(a)(1).

Order 9, April 21, 2015.  Claims under sections 24.005(a)(2) and 24.006(a) must be brought within four years after the transfer was made or the obligation was incurred.  TEX. BUS. & COM. CODE ANN. § 24.010(a)(2).  The Court declined to dismiss OSIC's TUFTA claims — to the extent OSIC brought them on behalf of investors — on the grounds that *American Pipe* tolling applied.[4]  Subsequently, the United States Supreme Court held that *American Pipe* tolling, as a fundamentally equitable doctrine, could not override a pure statute of repose.  *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2052 (2017).  The periods of repose for Constructive TUFTA claims articulate a strict period and do not contemplate extensions under any circumstances.  The Court finds that *ANZ Securities* controls, and *American Pipe* tolling does not apply to the Constructive TUFTA claims.  The Court turns to the question of relevant reference date in the absence of tolling.

The intervenor complaint does not relate back to the date of the Named Plaintiffs' original complaint for purposes of defeating TUFTA's statute of repose.  Some courts have applied relation back to an intervenor's complaint where doing so would not prejudice the defendant.  But even the cases in which the court allowed relation back acknowledge a divide on the issue, often attributed to the lack of express authorization for relation back in

---

[3] As in that earlier Order, The Court will continue to refer to section 24.005(a)(2) and section 24.006(a) claims as "Constructive TUFTA Claims."

[4] In its previous order, the Court dismissed the TUFTA claims to the extent that OSIC sought to pursue them on behalf of the Receiver.

Federal Rule of Civil Procedure 24. *See, e.g.*, *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 629 F. Supp. 2d 1091, 1102–03 (E.D. Cal. 2009) (allowing relation back but discussing several cases adopting the opposite conclusion), *rev'd on other grounds*, 618 F.3d 1066 (9th Cir. 2010). The Supreme Court reasoned in *ANZ Securities* that equitable tolling should typically not apply to defeat a statute of repose. *ANZ Securities*, 137 S. Ct. at 2050. At the same time, it concluded that *American Pipe* tolling is an equitable doctrine because the doctrine lacks direct support in the text of Rule 23. *Id.* at 2052. This logic applies equally in this case. Rule 24 does not explicitly provide for relation back of an intervenor's complaint. Thus, a court's authority to allow it flows from the court's general equitable powers. The Supreme Court drew a key distinction between statutes of limitation and of repose in *ANZ Securities*: Courts should exercise significantly more caution before employing equitable doctrines to overcome the latter than the former. The Court declines to allow OSIC's intervenor complaint to relate back for the purposes of defeating TUFTA's statute of repose and holds TUFTA limitations should be measured against the date of OSIC's motion to intervene, December 5, 2011. Accordingly, the Court grants partial summary judgment in favor of TD and HSBC as to the section 24.006(a) and section 24.005(a)(2) claims as to transfers before December 5, 2007.

The TUFTA repose provision, however, does not require the Court to enter judgment against OSIC on its section 24.005(a)(1) claims against TD, HSBC or SG Suisse. The statute of repose for section 24.005(a)(1) claims permits tolling under the discovery rule. And the Fifth Circuit's reasoning in a related Stanford case does not foreclose OSIC's argument that its TUFTA claim is timely under the discovery rule. As the Defendants have

ORDER – PAGE 10

noted, the Fifth Circuit has identified August 27, 2009 (the date of Davis's guilty plea) as the date all claimants had notice of the "nature and duration of the Ponzi scheme". *DSCC* 712 F.3d at 197.  It does not follow, however, that all claimants possessed the information necessary to sufficiently allege — subject to the strictures of Rule 9(b) — the fraudulent nature of specific bank transfers as of that day.  The discussion appears in the opinion to underscore the fact that, prior to Davis's plea, *even the Receiver* remained unaware of the scheme's duration and how fully it had infected the Stanford entities.  In fact, the Fifth Circuit noted that no evidence existed "that the Receiver had any feasible means to discover whether [other allegedly improper transfers] were fraudulent in nature other than to have an expert examine the books and records of Stanford, SIBL, and the Stanford corporations." *Id.*  This hardly amounts to a holding that, as a matter of law, all potential claimants possessed the knowledge necessary to state any and all claims against Stanford and the entities involved in the scheme as of August 2009.  Accordingly, the Court declines to grant judgment in favor of TD and HSBC on the ground that the TUFTA claim is untimely as a matter of law.

### IV.  TEXAS LAW RECOGNIZES LIABILITY FOR KNOWING PARTICIPATION IN A BREACH OF FIDUCIARY DUTY

OSIC's abandonment of its claims for aiding and abetting fraud and conversion obviates the need for the Court to assess the impact of subsequent cases in the Texas Supreme Court and Fifth Circuit on the viability of these claims.  As its sole remaining derivative liability claim, OSIC alleges that the Defendants knowingly participated in

breaches of fiduciary duty that harmed Stanford investors.  The Court turns to the legal sufficiency of such a claim.

Texas has long recognized a claim for knowing participation in a breach of fiduciary duty.  *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942).  Recent decisions in state and federal courts support its continuing vitality.  *See, e.g., Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007); *D'Onofrio Vacation Publ'ns., Inc.*, 888 F.3d 197, 216 (5th Cir. 2018); *Taylor v. Rothstein Kass & Co.*, 2020 WL 554583, at *6 n.4 (N.D. Tex. Feb. 4, 2020); *Hunter Bldgs. & Mfg., L.P. v. MBI Global LLC*, 436 S.W.3d 9, 15 (Tex. App. — Houston [14th Dist.] 2014, pet. denied).  At least one of these cases rejects the applicability of the authorities relied on by Defendants in the context of a knowing breach of fiduciary duty.  *Milligan, Tr. for Westech Capital Corp. v. Salamone*, 2019 WL 4003093, at *1–2 (W.D. Tex. Aug. 23, 2019).  Based on the foregoing, the Court concludes that Plaintiffs' fiduciary breach claims are cognizable under Texas law.

## V.  PLAINTIFFS HAVE PRESENTED A LEGALLY COGNIZABLE THEORY OF DAMAGES

The Defendants next argue that shortcomings in Plaintiffs' damages models entitle them to summary judgment.  First, they suggest that Plaintiffs' purported failure to provide "viable" damages models entitles the Defendants to summary judgment.  Next, the Defendants argue that the record does not support a key assumption underlying Plaintiffs' damages theories.  Finally, Defendants attack Plaintiffs' damages models on the grounds

that they fail to calculate damages directly attributable to Defendants' conduct.  The Court declines to grant summary judgment based on the reasons cited.

The purportedly nonviable damages model does not warrant summary judgment.  In support of their argument, Defendants rely on *El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 F. App'x 450 (5th Cir. 2005), for the general proposition that the failure to provide a viable damages model proves fatal to the plaintiff's case at the summary judgment stage. *Id.* at 453–54.  Defendants' reliance is misplaced.  That case involved an antitrust claim under the Clayton Act.  *Id.* at 452.  Unlike a claim for breach of fiduciary duties — which requires a showing of the mere *existence* of damages — the Clayton Act's private right of action requires the plaintiff to establish the fact of damages *and* "some indication of the amount of damages."  *Compare id.* (enumerating the elements of a claim under section 4 of the Clayton Act), *with First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (enumerating the elements of a breach of fiduciary duty claim).  In an action under the Clayton Act's private cause of action, therefore, the plaintiff must identify record evidence establishing a genuine dispute of fact as to the amount of damages to avoid summary judgment.  But this makes liability under the Clayton Act distinct from the causes of action in this case.  Likewise, SG Suisse raises a similar objection to the viability of Plaintiffs' damages models.  The Court notes that it has permitted plaintiffs in related cases to proceed past the motion to dismiss stage on an increased liability theory and will not reassess that holding in this case.  Accordingly, the Court finds the argument grounded in the viability of Plaintiffs' damages models unavailing.

ORDER – PAGE 13

The Defendants' final two arguments do not establish their entitlement to summary judgment. Both arguments elide the distinction between direct and derivative liability. Plaintiffs argue that the Defendants' processing of transfers or otherwise conducting business on behalf of the Stanford entities exposes them to derivative liability (for aiding and abetting in the case of the TSA claim and as knowing participants in the case of the fiduciary duty claim). First, Plaintiffs' damages calculations do not rely on evidence not in the record. Plaintiffs do not assume that the Banks had a duty to vet every transfer executed on behalf of the Stanford entities. Plaintiffs intend these allegations to serve as circumstantial evidence of the Defendants' mental states — a necessary showing to support Plaintiffs' derivative liability claims. Plaintiffs calculate damages attributable to the primary violations and merely argue (consistent with Texas law) that the Defendants should be held jointly and severably liable for those losses. For the same reason, Plaintiffs' failure to factor but-for causation into these calculations does not render them deficient as a matter of law. Accordingly, the Court denies the request for summary judgment.

## VI. The TSA Claims Do Not Fail as a Matter of Law

Defendants argue that the Court should grant summary judgment in their favor on Plaintiffs' TSA claims. They argue, in essence, that the claims fail as a matter of law based on several purported defects in the primary TSA violations as alleged by plaintiffs. Defendants advance two distinct bases to support this contention: First, they say that none of the relevant actors engaged in a primary violation of the TSA at all; second, they argue that Plaintiffs cannot demonstrate causation with respect to each CD investor.

ORDER – PAGE 14

### A.  SIBL and the Individual Schemers Violated the TSA

Robert Allen Stanford, acting in concert with other Stanford employees, conducted a massive Ponzi scheme that ran for over a decade.  Like all Ponzi schemes, Stanford needed a continuous influx of new capital to avoid detection.  The Stanford entities enticed new investors by selling CDs that advertised a high rate of return.  Defendants do not contest that the CDs constitute securities under the meaning of the TSA.  Nonetheless, they ask the Court to accept that — in perpetuating a Ponzi scheme via the sale of securities — neither the individuals who were subsequently convicted of criminal charges related to the fraud nor the entities that issued the securities committed a violation of the Texas statute prohibiting the sale of fraudulent securities.

The Court cannot accept such an unfathomable result.  First, the conduct of Stanford and Davis meets the meaning of "seller" under the statute.  Second, the Fifth Circuit's previous discussion of SIBL's knowledge of the fraudulent scheme — which arose in an entirely different context — does not mean that SIBL lacked the capacity, as a matter of law, to have committed a violation of the TSA.

*1. Stanford and Davis.* — Case law interpreting the TSA embraces a relatively expansive conception of the term "seller."  First, the TSA broadly defines "sell" as "any act by which a sale is made, including a solicitation to sell, an offer to sell, or an attempt to sell."  *In re Enron Corp. Sec., Derivative, & ERISA Litig.*, 258 F. Supp. 2d 576, 604 (S.D. Tex. 2003) (quoting *Lutheran Brotherhood v. Kidder Peabody & Co.*, 829 S.W.2d 300, 306–07 (Tex. App. — Texarkana 1992, writ granted w.r.m.)).  While the remedy included in the TSA implies a sale must actually occur, a TSA seller need not be the person

who actually passes title to the security to incur liability. *Id.* Looking to interpretation of federal securities laws as a guide, Texas courts have held that the TSA's definition of seller should include not only those who pass title to the security but those "who successfully solicit[] the purchase, motivated at least in part by a desire to serve [their] own financial interests.". *Highland Cap. Mgmt., L.P. v. Ryder Scott Co.*, 402 S.W.3d 719, 741 (Tex. App. — Houston [1st Dist.] 2012, no pet.) (quoting *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)). This definition includes brokers and "others who solicit offers to purchase securities" by controlling "the flow of information to the potential purchaser." *Pinter*, 486 U.S. at 646.

Evidence in the record suffices to create a genuine dispute as to whether Stanford and Davis meet the statutory definition of "seller." In his guilty plea, Davis attested to several relevant facts about his and Stanford's activities during the period of the Ponzi scheme. Between 2005 and 2009, Davis states that he and Stanford attempted numerous conferences with financial advisors, brokers, and potential investors during which they repeatedly made public false statements about SIBL's investment performance, which theoretically generated the income paid out to SIBL's CD investors. Plea Agreement ¶ 17(aa) [30], *in United States v. Davis*, Criminal Action No. 4:09-CR-00335-1 (S.D. Tex. filed Aug. 27, 2009). Given that by 2008, SIBL had sold CDs totaling over $7 billion in principal, it is plausible — if not likely — that these false statements led directly to sales of CDs. Defendants have brought forward no evidence to counter the evidence that Davis and Stanford solicited offers for the SIBL securities, on numerous occasions and in

ORDER – PAGE 16

circumstances likely to result in sales.  Thus, Defendants have failed to carry their burden and establish their entitlement to summary judgment on this issue.

     *2. **SIBL.*** — SIBL's knowledge (or lack thereof) of the fraudulent scheme does not figure into whether Plaintiffs can show a primary violation of the TSA.  Civil liability under that statute attaches when a person "offers or sells a security . . . by means of an untrue statement."  TEX. REV. CIV. STAT. art. 581-33A(2).  Reading the TSA's plain language, courts have concluded that a plaintiff need not show scienter to succeed on his claim. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 343–44 (5th Cir. 2008).  Thus, a plaintiff may establish that a primary violation of the TSA has occurred without reference to the defendant's state of mind.

     A defendant's lack of knowledge only bears on liability under the TSA as part of an affirmative defense.  A defendant may escape liability where he "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission."  TEX. REV. CIV. STAT. art. 581-33A(2)(b).  Importantly, however, the statute shifts the burden of establishing the lack of knowledge to the defendant, making the defense an affirmative one. *Id.* (making clear that the defendant bears the burden of proof).

     SBIL's purported lack of knowledge does not absolve it of a TSA violation.  Though not expressly framed this way, the Court construes Defendants' argument as an assertion that extending Fifth Circuit precedent to this case would allow SIBL to establish the affirmative defense to TSA liability as a matter of law.  The context in which the cited case arose figured strongly into the court's reasoning and militates against the extension advocated by the Defendants.

ORDER – PAGE 17

The Fifth Circuit has, for a narrow purpose, refused to impute knowledge of the Stanford Ponzi scheme to the SIBL with respect to actions taken while under Stanford's control. In *DSCC*, the court addressed fraudulent transfer claims advanced by the Receiver on behalf of SIBL. *DSCC*, 712 F.3d at 189. The recipients of those funds argued that SIBL's knowledge of the wrongdoing vitiated the claims. *Id.* at 192. Surveying opinions of other circuit courts to have passed on the question, the Fifth Circuit agreed that realizing a core purpose of receivership — maximizing victims' recovery —justified a refusal to impute knowledge of the scheme to SIBL in this setting. *Id.* at 190–91 (examining *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) and *Eberhard v. Marcu*, 530 F.3d 122 (2d Cir. 2008)). Hence, the court held that knowledge of the scheme should not be imputed to SIBL; as such, the recipients' *in pari delicto* defense failed. *Id.* at 192.

The justification for refusing to impute knowledge to SIBL in *DSCC* does not extend to this case. Defendants here argue the Court should adopt the Fifth Circuit's reasoning from *DSCC* so that they may avoid potential liability. To do so would cut off an avenue by which the Stanford Ponzi scheme's victims might increase their recoveries. Moreover, accepting this argument would lead to untenable outcomes in similar cases. No principle appears to limit the extension of the holding in *DSCC* to *any* Ponzi scheme involving a closely held entity that issued fraudulent securities to perpetuate the scheme. Thus, extending *DSCC* as the Defendants advocate would effectively immunize any entity under the control of a Ponzi schemer from liability for violations of the TSA. This result follows because the refusal to impute knowledge to an entity under a Ponzi schemer's control would allow the entity to establish the TSA's affirmative defense of lack of knowledge as

a matter of law. For these reasons, the Court declines to extend *DSCC*'s imputed-knowledge holding to the setting of a TSA violation.

### B. Plaintiffs Have Raised a Fact Issue Regarding Causation

Proof of a primary violation of the TSA requires a showing that the false or misleading statement induced the purchase of the security. *Crescendo Invs., Inc. v. Brice*, 61 S.W.3d 465, 475 (Tex. App. — San Antonio 2001, pet. denied); TEX. REV. CIV. STAT. art. 581-33A(2) (specifying liability for a "person who offers or sells a security . . . *by means of* an untrue statement"). Thus, to avoid summary judgment, the record must reflect that a genuine issue exists as to whether the misstatements supporting a primary violation of the TSA induced the purchases of the securities.

The Court has previously contended with this issue in a related Stanford case, concluding that causation at the individual level precluded class certification. Order 4, *in Turk v. Pershing LLC*, Civil Action No. 3:09-CV-2199-N (N.D. Tex. issued Mar. 21, 2019). In many cases, the Stanford entities sold CDs to retail investors through a network of financial advisors ("FAs") employed by an entity known as the Stanford Group Company ("SGC") to sell CDs issued by SIBL. Pershing LLC acted as a clearing broker for SGC for at least part of the time the Ponzi scheme was ongoing. Operatively, Pershing's involvement occurred at the retail level. When an FA sold a CD to an individual investor, Pershing would receive the instruction from SGC and would commence a wire transfer of the customer's funds from SGC to SIBL. Hence, each interaction between Pershing and the Stanford entities related to a specific retail transaction and required individualized proof on the part of each putative class plaintiff.

ORDER – PAGE 19

Plaintiffs in this case have advanced a subtly different theory that favors allowing the claim to proceed.  The Court starts by noting that the Defendants have conceded that this objection applies only to OSIC and not the Named Plaintiffs.  As to OSIC, however, the objection also fails.  In this case, Plaintiffs allege that the Banks materially aided primary TSA violations by Stanford, Davis, and SIBL by providing ongoing banking services to SIBL.  The Court has held that the TSA covers actors like Stanford or Davis when they offered or solicited sales of securities by means of false representations, and the Plaintiffs may prevail by establishing their theory of wholesale causation corresponding to the ongoing, systematic violations of the TSA that they allege.  This feature of the claims in this case distinguishes them from those in *Pershing* because those claims dealt exclusively with individual transactions induced by misrepresentations made by specific FAs.

Texas case law supports allowing Plaintiffs to proceed on their broad theory of causation.  The question of inducement necessarily dovetails with the assessment of a misstatement's materiality, and courts have frequently reiterated that the Act focuses squarely "on the conduct of the seller" and "not on the conduct of individual buyers." *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 649 (Tex. App. — Houston [14th Dist.] 1995, writ dismissed w.o.j.); *Tex. Cap. Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 776 (Tex. App. — Houston [1st Dist.] 2001, pet. denied); *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 480 (Tex. App. — Houston [1st Dist.] 2018, pet. denied).  Evidence properly before the court establishes a pattern of false statements in connection with what could reasonably be interpreted as solicitations or offers to sell CDs by the relevant actors.  SIBL

ORDER – PAGE 20

issued a significant number of these instruments totaling billions of dollars of outstanding notional balance. These misrepresentations spoke to the success of SIBL's investment strategy as a means to drive above-market rates on the CDs it issued with the intent that prospective investors choose that product over competing alternatives. The Court therefore declines to grant summary judgment on this basis.

## VII. PLAINTIFFS' FIDUCIARY DUTY CLAIMS DO NOT FAIL AS A MATTER OF LAW

The Defendants next argue that the fiduciary duty claims fail as a matter of law. OSIC can enforce the fiduciary duties owed to SIBL and can therefore bring a derivative action related to an alleged breach of those duties. Further, Stanford could not ratify the fraudulent conduct giving rise to the breaches of his fiduciary duties. Accordingly, the Court declines to grant summary judgment as to these claims.

No fiduciary duties were owed to the CD investors directly, but OSIC can sue on behalf of the Stanford entities. The Defendants do not deny that Stanford and Davis owed fiduciary duties to the Stanford entities (of which they served as officers, directors, or both). The Banks instead argue that none of these actors owed fiduciary duties to the Named Plaintiffs as creditors of SIBL. Plaintiffs do not address this argument in their responsive briefing, and the Court treats this argument as abandoned. Nevertheless, OSIC, as assignee of the Receiver, may enforce the fiduciary duties owed by Stanford and Davis to the Stanford entities, including by means of a knowing participation claim under Texas law.

And OSIC's claims do not fail as a matter of law. First, the Fifth Circuit's logic in *DSCC* — allowing the Receiver's fraudulent transfer claims to proceed — should apply in

this context as well.  Even if Stanford ratified the conduct that would otherwise constitute a breach of fiduciary duty, that ratification should not constrain OSIC's ability to seek relief on behalf of the Stanford victims.  Second, Stanford could not have ratified the conduct at issue.[5]  Generally, the unanimous approval of shareholders can ratify conduct of an officer or director which would otherwise have constituted a breach of fiduciary duty.  *See, e.g.*, *Michelson v. Duncan*, 407 A.2d 211, 219 (Del. 1979) (unanimous vote of shareholders necessary to ratify waste, fraud, or ultra vires acts).  Equally generally, however, shareholders cannot ratify conduct that violates statute or public policy.  *In re Safety Int'l., Inc.*, 775 F.2d 660, 662 (5th Cir. 1985); *see also Solomon v. Armstrong*, 747 A.2d 1098 (Del. Ch. 1999) ("No amount of shareholder ratification validates acts repugnant to public policy . . . which are therefore void *ab initio*.), *aff'd*, 746 A.2d 277 (Del. 2000).  Nor may the single shareholder of a close corporation ratify misconduct which constitutes a fraud on third-party creditors.  *See, e.g.*, *Steinberg v. Buczynski*, 40 F.3d 890, 892 (7th Cir. 1994). Because Stanford and Davis's conduct has given rise to criminal sanctions and civil penalties, the Court declines to hold, as a matter of law, that no breach of fiduciary duties occurred based on ratification of their conduct.

## VIII.  DEFENDANTS' SERVICES CAN CONSTITUTE SUBSTANTIAL ASSISTANCE

The Defendants argue that the financial services they provided cannot constitute substantial assistance.  The Court begins by noting that it has previously rejected this broad

---

[5] The parties cite largely to Texas law on this point. The Court reserves judgment on the choice of law applicable because Stanford and Davis's conduct implicates multiple of the Stanford entities incorporated in multiple jurisdictions.

argument at the motion to dismiss stage.  Order 26, April 21, 2015.  Noting the financial nature of the Stanford scheme, the Court concluded that "providing even routine banking services for the Stanford scheme . . . inherently facilitated the financial transactions and operations that formed the lifeblood" of the Ponzi scheme.  *Id.*

Defendants object that their "routine" banking services cannot amount to substantial assistance.  In support of this proposition, they rely on Fifth Circuit case law holding that "grist of the mill" transactions cannot rise to the level of substantial assistance.  *See, e.g.*, *Amacker v. Renaissance Asset Mgmt. LLC*, 657 F.3d 252, 257 (5th Cir. 2011); *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 621 n.24 (5th Cir. 1993).  *Amacker*, for instance, holds that merely executing commodities trades on behalf of a third party does not constitute substantial assistance in the context of an aiding-and-abetting claim under the Commodities Exchange Act.  657 F.3d at 252.  Thus, the inquiry becomes whether the Plaintiffs' evidence suggests the Defendants did more than facilitate "grist of the mill" financial transactions.

This Court has previously drawn a distinction distinction between common services — which may rise to the level of substantial assistance — and merely routine services — which do not.  Order 9 [21], *in Kneese v. Pershing L.L.C.*, Civil Action No. 3:10-CV-1908-N (N.D. Tex. issued Nov. 14, 2012).  And courts determining whether conduct constitutes substantial assistance look to whether the alleged aider exercised professional judgment or discretion in providing service to the primary violator.  *Id.* at 9–10.

Plaintiffs identify evidence that the Defendants engaged with Stanford in significant, nonroutine ways that involved the exercise of substantial professional

judgment and discretion.  One of the Defendants provided unusual "pouching" services for CD investors' checks.  Pl.'s App. Resp. Trustmark's Mot. Summ. J. 6129–30 [984].  Several of the Defendants arranged unusual loans or otherwise provided revolving credit for Stanford or his entities.  Pl.'s App. Resp. SG Suisse's Mot. Summ. J. 1766 [991]; Pl.'s App. Resp. TD Bank's Mot. Summ. J. 1437 [994].  And several of the Defendants lent their reputation to Stanford, allowing him to open new relationships or to avoid scrutiny from other financial institutions with which he became involved.  Pl.'s App. Resp. SG Suisse's Mot. Summ. J. 1159–78; Pl.'s App. Resp. Trustmark's Mot. Summ. J. 5581–5627; Pl.'s App. Resp. TD Bank's Mot. Summ. J. 1888–95; Pl.'s App. Resp. Independent Bank's Mot. Summ. J. 2441–45 [987].  While the latter two examples could fairly be characterized as common banking services, the Court concludes that — viewed holistically — the suite of services that each Defendant offered to Stanford suffices to permit a reasonable jury to find that the Defendants rendered substantial assistance in support of the malfeasance of Stanford or the Stanford entities.

### IX.  PLAINTIFFS HAVE PLACED DEFENDANTS' MENTAL STATES IN GENUINE DISPUTE

#### A.  TSA Claims

As discussed previously, Plaintiffs allege that Defendants violated the TSA by aiding and abetting primary violations committed by the principal actors in the Stanford Ponzi scheme.  To succeed on this theory, Plaintiffs must identify evidence in the record sufficient to raise a fact issue as to Defendants' mental state.  Specifically, the evidence must reasonably suggest that Defendants assisted in the perpetration of the primary TSA

violations "with intent to deceive or with reckless disregard for the truth or the law." TEX. REV. CIV. STAT. art. 581-33F(2). The Texas Supreme Court has read reckless disregard to encompass assistance rendered "in the face of a perceived risk" that the assistance "would facilitate untruthful or illegal activity." *Sterling Tr. Co. v. Adderley*, 168 S.W.3d 835, 842 (Tex. 2005). The evidence must suggest a subjective awareness of, in the case of the TSA claims, material misstatements being made in connection with the sales of CDs.

Victims of financial fraud frequently bring claims against banks that served the wrongdoer, often alleging that the banks acted recklessly with regard to the truth of the underlying fraud. In these cases, Plaintiffs typically must rely on circumstantial evidence of "suspicious" behavior or "red flags" that the defendants ignored to establish a genuine dispute as to the defendants' recklessness. While a plaintiff can successfully demonstrate scienter using only circumstantial evidence, Texas courts have firmly cautioned that the standard goes beyond merely showing that the defendant "should have known" that he was participating in an improper scheme. *See, e.g. In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 388 F. Supp. 2d 780, 787–88 (S.D. Tex. 2005). As the Texas Supreme Court has alternatively stated, the standard is one of "general awareness" of and indifference to a "perceived risk" of the principal's improper activity. *Sterling*, 168 S.W.3d at 841. Nevertheless, this Court has previously held that a plaintiff can still establish a defendant's scienter as an aider and abettor without showing knowledge of the Ponzi scheme itself. Order 8–9 [114], *in Off. Stanford Invs. Comm. v. Greenberg Traurig, LLP*, Civil Action No. 3:16-CV-4641 (N.D. Tex. Dec. 17, 2014). In an aiding-and-abetting

claim under the TSA, for example, the evidence must simply suggest a subjective awareness of material misstatements being made in connection with the sales of CDs.

*1. SG Suisse and Friedli.* — The record contains more than a mere scintilla of evidence that SG Suisse and Friedli acted with reckless disregard for the true nature of Stanford's businesses. Plaintiffs can identify numerous documents — authored both externally and internally to SG Suisse — raising serious and substantial questions about the propriety of Stanford's activity and the representations he made about SIBL's business. Pl.'s App. Resp. SG Suisse's Mot. Summ. J. at 1910–13, 1921–23. Questions, it turned out, that Stanford's conduct wholly warranted. The record also establishes the stringent procedures that these Defendants should have observed with respect to their client relationships and includes evidence of the Defendants' failures to live up to these obligations. *Id.* at 458–63, 491 (detailing the findings of severe deficiencies in the handling of the Stanford relationship by SG Suisse and Friedli by Swiss banking regulators). At some level repeated failures to scrutinize a customer's activity in the face of concerns emanating from within and without the bank can go beyond the level of "should have known" and verge into circumstantial evidence of a subjectively perceived risk of wrongdoing by the counterparty. The Court holds that the record at this stage could support a reasonable finding that the SG Suisse and Friedli continued to provide crucial financial services to the Stanford principals in the face of subjective awareness that Stanford and SIBL were engaged in continuous misrepresentations of SIBL's business in connection with the sales of CDs.

ORDER – PAGE 26

*2. Trustmark and Independent Bank.* — Plaintiffs' evidence creates a genuine fact issue as to whether Trustmark and Independent subjectively perceived the risk that their services were contributing to an overall improper scheme. Uncontroverted record evidence shows the longevity of the Stanford relationship as well as its overall importance to Dennis Watson personally as well as to Republic and Independent as institutions. Pl.'s App. Resp. Trustmark's Mot. Summ. J. at 2–3, 668–72, 6972, 6980; Pl.'s App. Resp. Independent Bank's Mot. Summ. J. at 280, 5920, 6261. Further, Watson possessed substantial familiarity with Stanford's business model while working at these banks. Pl.'s App. Resp. Trustmark's Mot. Summ. J. at 1117, 6855, 6857, 6889–91, 6921, 6953, 6975; Pl.'s App. Resp. Independent Bank's Mot. Summ. J. at 6261–64. Following Trustmark's acquisition of Republic, Watson decamped to Independent Bank, taking all of his knowledge of Stanford (and some of Stanford's business) with him. Pl.'s App. Resp. Independent Bank's Mot. Summ. J. at 340–41, 409–11. Taken together with unexplained, massive flows of funds between the Stanford entities that both banks witnessed, *see, e.g.*, Pl.'s App. Resp. Trustmark's Mot. Summ. J. at 599, 5911, 5931–32, 5975; Pl.'s App. Resp. Independent Bank's Mot. Summ. J. at 440, 1137, 5330–31, 5346, 5349, a jury could reasonably conclude that Trustmark possessed the requisite "general awareness" of Stanford's impropriety in the sale of the CDs. Accordingly, the Court declines to grant summary judgment on this ground.

*3. TD Bank.* — The record evidence also establishes a dispute of fact as to TD Bank's awareness of the securities violations. TD Bank had tremendous insight into the flow of investor funds at the beginning of their journey through the Stanford entities

ORDER – PAGE 27

because SIBL primarily deposited investor proceeds in its account with TD Bank from 1996 until 2009.  Pl.'s App. Resp. TD's Mot. Summ. J. at 477–78, 590–91, 601–02.  TD Bank also had clear insight into the destination of funds wired out of this account, which clearly indicated that SIBL directed the bulk of incoming funds to paying earlier investors, an obvious hallmark of a Ponzi scheme.  *Id.*  TD Bank also invested some of SIBL's funds, earning a much lower rate than the investment returns that SIBL claimed to generate.  *Id.* at 945.  Taken together, this evidence could support a reasonable finding that TD Bank transacted with Stanford in full awareness that improper behavior was ongoing within the Stanford entities.

*4. HSBC.* — Plaintiffs also raise a genuine issue of fact as to HSBC's general awareness of the underlying scheme.  Like the other banks, HSBC had insight into the source of funds coming into the accounts the Stanford entities maintained with it as well as a general sense of the destination of outgoing fund flows.  Pl.'s App. Resp. HSBC's Mot. Summ. J. 63–64 [982].  HSBC's change to the listed purpose of the main SIBL account for AML reporting purposes strongly suggests that HSBC had investigated these flows and concluded that they did not accord with the purpose SIBL provided.  Such an investigation would have shown that rather than routing money into bona fide investment accounts, most of the outgoing funds went to repaying SIBL CD holders.  *Id.*  Additionally, internal communications show that HSBC employees questioned Stanford's conduct and explicitly raised the possibility of fraud amongst themselves.  *Id.* at 589, 628.  Whether and to what extent financial professionals within HSBC subjectively perceived the inconsistencies between SIBL's representations regarding its activities and the fund flows

ORDER – PAGE 28

that HSBC was privy to is a question of credibility best determined at trial; the evidence identified by Plaintiffs at least permits a reasonable finding that HSBC continued to service the Stanford accounts in the face of a general awareness of the securities violations.  Hence, HSBC has failed to establish its entitlement to summary judgment.

### B.  Knowing Participation in a Breach of Fiduciary Duties

To succeed on a claim for knowing participation in a breach of fiduciary duties, a plaintiff must prove "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship."  *Meadows*, 492 F.3d at 639. Defendants do not contest that Stanford and Davis owed fiduciary duties to SIBL nor that the Defendants knew of that fiduciary relationship.  Defendants instead argue that the record fails to establish a genuine issue of fact as to their awareness of any conduct constituting participation in the breach of those relationships.

The cases addressing claims for knowing participation in a breach of fiduciary duties establish that the third-party defendant must have had actual knowledge of the breach.  *See, e.g.*, *CBIF Ltd. P'ship v. TGI Friday's Inc.*, 2017 WL 1455407, at *16 (Tex. App. — Dallas 2017); *Seven Seas Petroleum, Inc. v. CIBC World Mkts. Corp.*, 2013 WL 3803966, at *14 (S.D. Tex. 2013).   Courts have made clear that a less culpable mental state, such as constructive knowledge, will not suffice..  *See Franklin D. Azar & Assocs., P.C. v. Bryant*, 2019 WL 5390172, at *4 (E.D. Tex. 2019).  As with an aiding-and-abetting claim under the TSA, however, a plaintiff may prevail on a knowing participation claim with circumstantial evidence alone.  *See Franklin D. Azar*, 2019 WL 5390172 at *4

ORDER – PAGE 29

(denying summary judgment based on plaintiff's circumstantial evidence).   Hence, evidence that could support a reasonable finding either way on the issue of actual awareness will suffice to defeat summary judgment.

1. *SG Suisse and Friedli.* — The evidence supports a fact issue as to SG Suisse and Friedli's awareness that they were participating in breaches of fiduciary duties owed to SIBL.  For example, the record discloses numerous suspicious transactions that occurred while SG Suisse failed to fully observe bank regulatory requirements.  As noted previously, *see* Subpart IX.A.1, SG Suisse and Friedli possessed actual or constructive knowledge of questions about Stanford's practices raised by SG Suisse insiders and outside consultants. And Friedli even indicated in internal communications that he harbored doubts about the propriety of Stanford's conduct after reports of an investigation emerged.  Pl.'s App. Resp. SG's Mot. Summ. J. 11.   While none of this evidence conclusively establishes direct knowledge, it has substantial probative value.   Taken together the evidence presented suffices to create a credibility battle best resolved by a jury rather than a court at the summary judgment stage.   On this record, a fact finder could reasonably disregard SG Suisse and Friedli's self-serving claims that they merely failed to investigate all of these warning signs and instead knew that they were participating in and facilitating ongoing and extensive breaches of Stanford and Davis's duties to SIBL.

2. *Trustmark and Independent Bank.* — The evidence likewise supports a genuine issue of fact as to Trustmark and Independent Bank's knowledge of their participation in the breaches of fiduciary duties owed to SIBL.  As noted previously, *see* Subpart IX.A.2, these Houston banks are tied together by their association with Dennis Watson.  Over the

ORDER – PAGE 30

course of more than a decade, Watson nurtured a highly lucrative relationship with Stanford and the Stanford entities.  Furthermore, both of these regional banks paid substantial attention to the Stanford account, being one of the largest depositors at both institutions.  This context gives added weight to the circumstantial evidence identified by Plaintiffs that Trustmark and Independent Bank both saw numerous, ongoing signs of improper activity in the Stanford accounts they maintained and that both of these banks pushed forward with high-risk banking activity in support of Stanford even after due diligence reports raised questions about the manner in which the Stanford entities were being run.  All told, this evidence could support a reasonable finding that the banks were aware that Stanford and Davis consistently violated their fiduciary duties to SIBL by means of transactions routed through Trustmark and Independent.  Thus, these banks have failed to establish their entitlement to summary judgment.

  *3. TD Bank.* — The evidence also raises a genuine dispute regarding TD Bank's knowledge of its involvement in breaches of fiduciary duties owed to SIBL in genuine dispute.  As discussed previously, *see* Subpart IX.A.3, the record contains significant evidence of improper activity within the Stanford accounts.  While Plaintiffs cannot succeed merely by showing a negligent failure to investigate suspicious transactions, the circumstantial evidence of numerous "red flags" remains probative.  TD had a long-term, profitable relationship with the Stanford entities over the course of which TD lent Stanford the benefit of its reputation on several occasions.  The nature of the relationship between TD Bank and the Stanford entities differed from that which it would have with a typical onshore depositor in several important ways.  The correspondent services provided to SIBL

ORDER – PAGE 31

created a gateway to the dollar-denominated financial system. Meeting SIBL's needs required bespoke arrangements and significant contact between TD Bank and the Stanford entities. From the entire constellation of facts, a reasonable fact finder could determine that TD Bank possessed actual knowledge that it was facilitating transactions that amounted to breaches of the fiduciary duties SIBL's officers owed to it.

    *4. HSBC.* — Circumstantial evidence serves to support a fact issue as to HSBC's knowledge of Stanford and Davis's improper conduct involving HSBC-mediated activity. Much of the evidence relevant to the knowing participation in a breach of fiduciary duty claim has been discussed in the context of the TSA claims as well, *see* Subpart IX.A.4. As with the other Defendants, the determination of whether HSBC merely failed to investigate conduct that *should* have raised serious questions or whether HSBC's employees did indeed come to know of misconduct within the Stanford entities — specifically that certain transactions in which HSBC involved itself amounted to breaches of fiduciary duties — comes down to a battle of credibility. The Court agrees with Plaintiffs that the evidence in the record could reasonably support a finding of actual knowledge, and as such defers the determination to trial.

### *C. TUFTA Claims*

    A transfer that is otherwise fraudulent under Texas Business and Commerce Code Section 24.005(a)(1) is not voidable if the transferee acted in good faith. TEX. BUS. COMM. CODE ANN. § 24.009(a). To demonstrate good faith, the transferee must establish "that its conduct was honest in fact, reasonable in light of known facts, and free from willful ignorance of fraud." *Janvey v. GMAG, LLC*, 592 S.W.3d 125, 129 (Tex. 2019). "In

ORDER – PAGE 32

applying this standard, Texas courts have considered "whether a transferee received fraudulent transfers with actual knowledge or inquiry notice of fraud." *Id.*  A transferee who takes while in possession of facts that would have prompted a reasonable person to investigate further cannot invoke good faith unless the transferee actually undertook a reasonable investigation. *Id.* at 131.

Fact issues as to TD Bank's good faith preclude summary judgment.  Much of the evidence identified as applicable to TD's knowledge for related claims is relevant here. The bar for a defendant to obtain summary judgment by invoking the good faith defense under TUFTA is higher than that for avoiding other claims for which the Court has declined to grant summary judgment.  For the same reasons, the Court concludes that the record supports a fact issue as to whether (i) TD Bank knew of facts that should have prompted an investigation into Stanford's conduct and (ii) whether any regulatory activities TD Bank undertook satisfy the reasonable investigation prong of the test articulated by the Texas Supreme Court in *GMAG*.  Both questions present fact issues best left to the determination of a jury.  Accordingly, the Court declines to grant summary judgment on the section 24.005(a)(1) claim.

TD Bank has, however, established its entitlement to summary judgment as to the constructive TUFTA claims.  As TD Bank points out in its briefing, establishing the constructive TUFTA claims requires the plaintiff to establish that the transfer was not made for "reasonably equivalent value."  TEX. BUS. COMM. CODE ANN. § 24.005(a)(2), 24.006(a).  TD Bank identifies competent evidence in support of such a finding.  OSIC does not address the issue of reasonably equivalent value in its response, and therefore the

ORDER – PAGE 33

Court treats the issue as abandoned. Thus, the Court grants summary judgment in favor of TD Bank as to the section 24.005(a)(2) and 24.006(a) claims.

The Court also denies HSBC's request for summary judgment as to the TUFTA claims. HSBC's only argument in favor of summary judgment is that the claims "are not sufficiently material to warrant a trial". Def. HSBC's Br. Supp. Mot. Summ. J. 30. The Court finds this unavailing as a legal basis to grant final judgment on a claim in advance of trial, and accordingly the Court denies the request for summary judgment.

## X. THE TSA AND TUFTA CLAIMS MAY PROCEED AGAINST THE FOREIGN DEFENDANTS

### A. TSA Claims

Defendants have not established an entitlement to summary judgment based on the possible extraterritorial application of the TSA. HSBC, SG Suisse, and TD Bank argue that any sale of securities that they might have aided occurred outside of Texas, requiring extraterritorial application of the statute. This argument is largely subsumed into the issue of the nature and location the underlying primary TSA violations, *see* Subpart VI.A. The Court rejected Defendants' attempt to limit principal violations of the TSA only to SFG brokers and other front-line salespersons. As such, a fact issue exists as to the possible connection between HSBC, SG Suisse, and TD Bank's services to the Stanford entities and conduct that unambiguously falls within the TSA's reach, even if the statute cannot be given extraterritorial application. Accordingly, the Court declines to hold that these Defendants could not, as a matter of law, have aided unlawful conduct within the TSA's reach.

### B. TUFTA Claims

The Court will not revisit its prior holding allowing TUFTA claims against a foreign bank related to allegedly entirely foreign transfers to proceed.  Acknowledging that the Court has previously denied this legal argument as to a similarly situated defendant in an earlier order in this case, SG Suisse asks the court to revisit the holding in light of new persuasive authority.  SG Suisse points the Court to a case in the Northern District of Illinois construing the Illinois Uniform Transfer Act.  That case involved an action against alleged insiders of a bankrupt entity who engaged in several significant transactions involving the entity shortly before it filed for bankruptcy protection.  *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 244 F. Supp. 3d 750, 753 (N.D. Ill. 2017).  The court first held that IUFTA did not apply extraterritorially and then addressed whether applying the statute to the transactions at issue would require extraterritorial application.  *Id.* at 757.  Because several of the transactions involved shifting ownership of affiliated, foreign entities from the debtor to the defendants, and because these transactions relied on the assistance of or otherwise substantially involved foreign persons, the court concluded that application of IUFTA to the allegedly fraudulent transfers would be extraterritorial.  *Id.* at 757–58.

*Armada*, even if it bound this Court, does not change the Court's prior analysis.  Assuming without deciding that TUFTA cannot apply extraterritorially, it is not the case that the transfers at issue demand extraterritorial application.  The Court has previously described the Stanford Ponzi as Houston-based, and the record at least raises the specter that SG Suisse understood itself to be dealing with a Texas-based network of affiliated

entities.  Unlike in *Armada*, where the court's discussion strongly suggested that the debtor entity and its affiliated business organizations maintained a substantial offshore presence in Europe and south Asia,  the record in this case fails to suggest any physical presence in Panama for the Stanford entities. Further, while SIBL did maintain a physical presence in Antigua, counterparties widely understood the Stanford operation to be managed from Texas.   Thus, even if *Armada* were controlling authority, this case should come out differently based on the inquiry in the second step.  In the interest of consistency, the Court declines to grant summary judgment on this basis.

### XI.  SWITZERLAND IS NOT THE SOLE FORUM FOR THIS LITIGATION

The contractual forum selection clauses in SG Suisse's agreements with its Stanford clients do not require dismissal of this case.  First, SG Suisse may enforce the forum selection clauses only against a party to the agreement.  To the extent that OSIC pursues claims against SG Suisse on behalf of individual investors, the forum selection clauses have no applicability.  Second, this Court has previously denied efforts to compel the Stanford Receiver to pursue arbitration in accordance with arbitration clauses in agreements entered into by the Stanford entities.  Order 1 [1093], *in Janvey v. Alguire*, Civil Action No. 3:09-CV-724-N (N.D. Tex. issued July 30, 2014).  The Fifth Circuit affirmed that denial on appeal. *Janvey v. Alguire*, 847 F.3d 231, 236 (5th Cir. 2017) (per curiam).  The same policy considerations leading the Court to permit the Receiver to avoid enforcement of the arbitration clauses at issue in *Alguire* control here as well, but without the complication of sorting out the interplay between the Federal Arbitration Act and

federal equity receiverships.  *See* Order 16–25 [1093], *in Janvey v. Alguire*, Civil Action No. 3:09-CV-724-N (N.D. Tex. issued July 30, 2014).  Further, as the concurrence noted in *Alguire*, 300 years of common law precedent militates against the enforcement of contracts made in furtherance of a criminal scheme.  *See Janvey v. Alguire*, 847 F.3d 231, 246 (5th Cir. 2017) (Higginbotham, J., concurring).  For these reasons, the Court rejects SG Suisse's request that the Court dismiss OSIC's claims against it in order to enforce forum selection clauses entered into by the Stanford entities.

## CONCLUSION

For the foregoing reasons, the Court grants summary judgment in favor of TD Bank with respect to OSIC's constructive TUFTA claims and in favor of HSBC on any constructive TUFTA claim tied to conduct outside of the relevant limitations period.  The Court denies summary judgment on all grounds asserted by the parties.

Signed January 20, 2022.

David C. Godbey
United States District Judge

ORDER – PAGE 37